# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS; STATE OF
RHODE ISLAND; STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA;
STATE OF HAWAI'I; STATE OF MAINE; STATE
OF MARYLAND; STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF NEVADA; STATE
OF NORTH CAROLINA; STATE OF NEW
MEXICO; STATE OF OREGON; STATE OF
VERMONT; STATE OF WASHINGTON; STATE
OF WISCONSIN,

        Plaintiffs,

    v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES; U.S.
OFFICE OF MANAGEMENT AND BUDGET;
MATTHEW J. VAETH, IN HIS OFFICIAL
CAPACITY AS ACTING DIRECTOR OF THE
U.S. OFFICE OF MANAGEMENT AND
BUDGET; U.S. DEPARTMENT OF THE
TREASURY; SCOTT BESSENT, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY; PATRICIA COLLINS IN HER
OFFICIAL CAPACITY AS TREASURER OF THE
U.S.; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY A. FINK, M.D.,
IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; DENISE CARTER, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY
OF EDUCATION; U.S. FEDERAL EMERGENCY
MANAGEMENT AGENCY; CAMERON
HAMILTON, IN HIS OFFICIAL CAPACITY AS
ACTING ADMINISTRATOR OF THE U.S.
FEDERAL EMERGENCY MANAGEMENT

C.A. No. 1:25-cv-00039

**REQUEST FOR EMERGENCY
TEMPORARY RESTRAINING
ORDER UNDER FEDERAL RULE
OF CIVIL PROCEDURE 65(B)**

1

AGENCY; U.S. DEPARTMENT OF
TRANSPORTATION;
JUDITH KALETA, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF
TRANSPORTATION;
U.S. DEPARTMENT OF LABOR; VINCE
MICONE, IN HIS OFFICIAL CAPACITY AS
ACTING SECRETARY OF LABOR; U.S.
DEPARTMENT OF ENERGY; INGRID KOLB, IN
HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE U.S. DEPARTMENT OF
ENERGY; U.S. ENVIRONMENTAL
PROTECTION AGENCY; JAMES PAYNE, IN HIS
OFFICIAL CAPACITY AS ACTING
ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY;
U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, IN HER CAPACITY
AS SECRETARY OF THE U.S. DEPARTMENT
OF HOMELAND SECURITY; U.S.
DEPARTMENT OF JUSTICE; JAMES R.
McHENRY III, IN HIS OFFICIAL CAPACITY AS
ACTING ATTORNEY GENERAL OF THE U.S.
DEPARTMENT OF JUSTICE; THE NATIONAL
SCIENCE FOUNDATION and DR.
SETHURAMAN PANCHANATHAN, IN HIS
CAPACITY AS DIRECTOR OF THE NATIONAL
SCIENCE FOUNDATION,

                Defendants.

## MOTION FOR A TEMPORARY RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff States move for issuance of an order temporarily restraining Defendants from enforcing the directive given to all Federal agencies in the Office of Management and Budget's January 27, 2025 Directive to "**temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by [certain] executive orders" pending the Court's review of the merits. Matthew J. Vaeth, Acting Director of the Office of Management and

Budget, "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" (January 27, 2025) ("OMB Directive"), at 2.

The OMB Directive's directive to "pause . . . disbursement of Federal funds under all open awards," and to "pause" other Federal financial assistance-related activities is unlawful under the Administrative Procedure Act ("APA") because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional right or power, in excess of statutory jurisdiction, authority, or limitations, and is contrary to law. *See* 5 U.S.C. § 706. The OMB Directive also violates constitutional Separation of Powers principles and exceeds the constitutional limitations on any Spending Clause power that Congress might have delegated to the executive branch in any of the activity areas affected by the "pause." The OMB Directive's "pause" mandate is causing Plaintiff States immediate and irreparable harm—in the form of millions of dollars in obligated funds and mass regulatory chaos—every day that the policy set out in the OMB Directive is in effect.[1] The balance of the equities also weighs overwhelmingly in Plaintiffs' favor. Plaintiff States thus respectfully request that this Court schedule a hearing on this matter today, January 28, 2025, or as soon as is otherwise practicable, and that the Court restrain the Defendants from enforcing the OMB Directive's directive to "pause all activities related to obligation or disbursement of all Federal financial assistance." OMB Directive at 2.

---

[1] Indeed, Defendants essentially acknowledged in a separate filing that a TRO would be appropriate if payments under particular grant programs have been delayed and that such delay would cause harm meriting immediate relief—which this record, with declarations from dozens of state officials indicating just that—amply demonstrates. Def.'s Notice Regarding Pls' Mot. for TRO, *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239 Dkt. 11 at 2 (D.D.C. Jan. 28, 2025).

## BACKGROUND

Last night, Plaintiff States became aware through social media reporting, later confirmed by the Washington Post,[2] that the Acting Director of the Office of Management and Budget, Matthew Vaeth, had sent a sweeping Directive to heads of executive departments and agencies that will upend the regular workings of State government programs providing health care, safe roads, disaster assistance, and other essential services. The OMB Directive has already caused mass uncertainty and confusion for recipients of Federal funds who are not sure when or if they will receive funding already obligated. The OMB Directive addresses "Federal financial assistance," a broad designation under Federal law that encompasses most Federal grants and loans—the Directive itself claims that $3 trillion of FY 2024 Federal government spending is comprised of Federal financial assistance. OMB Directive, at 1.

Complicating matters further, instead of communicating through normal procedural channels to explain changes in the complex Federal grant and loan programs each Federal executive branch agency is charged with administering, Director Vaeth issued the OMB Directive as a non-publicized internal memorandum dictating that all agencies "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance . . . ." *Id.* at 2. The memorandum further cryptically explains that the financial activities subject to the pause include, but are not limited to, "financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* And, while the OMB Directive specifically mentions seven executive orders that by their own terms purport to limit

---

[2] Jeff Stein, Jacob Bogage, and Emily Davies, "White House pauses all federal grants, sparking confusion," Washington Post, Jan. 27, 2025, https://www.washingtonpost.com/business/2025/01/27/white-house-pauses-federal-grants/.

Federal financial assistance or at least appear to begin a process at interrupting Federal financial assistance,[3] it is unclear if these are the only policies to which the memo applies. *Id.* at 1-2.

The OMB Directive sketches out a process by which each executive branch agency "must complete a comprehensive analysis" of their programs, the purpose of which is to allow the Administration to "review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." *Id.* at 2. But, while that happens, the Directive asserts that "all activities related to obligation or disbursement of all Federal financial assistance" must be paused. *Id.* at 2. And while the order describes the pause as temporary, there is no set end date. Agencies must submit a detailed report by February 10, 2025, but there is no deadline for OMB to make a determination and resume funding. *Id.* While waiting for that determination to be made, "[e]ach agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law . . . ." *Id.*

State Plaintiffs rely on Federal financial assistance to provide basic services to their residents. In FY 2024, Federal grants to States surpassed $1 trillion.[4]

Billions of dollars flow to State health systems, infrastructure, law enforcement, education, and everything in between. Many States are faced with the possibility of immediate cash shortfalls

---

[3] The referenced executive orders are: *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). Id. at 1-2.
[4] Rebecca Thiess, Kate Watkins, and Justin Theal, "Record Federal Grants to States Keep Federal Share of State Budgets High," Pew, Sept. 10, 2024, https://www.pewtrusts.org/en/research-and-analysis/articles/2024/09/10/record-federal-grants-to-states-keep-federal-share-of-state-budgets-high.

to conduct their basic everyday programs like funding for healthcare and food for children, which are and have been conducted through cooperative federalism arrangements enacted by Congress and in place for decades, and to address their most pressing emergency needs. *See* Affirmation of Keith D. Hoffman dated January 28, 2025 ("Hoffmann Aff.") at ¶¶3-31 (citing exhibits A-DD in support); Compl. ¶ ¶ 77-97. This will result in immediate and devastating consequences for the people of Plaintiff States. California is in particularly dire straits given the uncertainty imposed by the Department of Justice Memorandum on continued disbursement of Federal Emergency Management Agency ("FEMA") funding that is essential to the response to wildfires. Compl. ¶80. Many of these grants are distributed according to statutory formulas such that Congress did not leave discretion to agencies to determine qualification to begin with.

In short, funding making up billions of dollars in each of Plaintiff States has been cast aside regardless of the chaos this will cause or the impact on essential functions Americans need in their daily lives.

## ARGUMENT

The legal standard for a temporary restraining order "mirrors that for a preliminary injunction." *Schnitzer Steel Industries, Inc. v. Dingman*, 639 F. Supp. 3d 222, 226 (D.R.I. 2022) (citing *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016)). Under that standard, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 18 (1st Cir. 2020)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

7, 20 (2008). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). However, a "district court is required only to make an estimation of likelihood of success and need not predict the eventual outcome on the merits with absolute assurance." *Schnitzer Steel Industries, Inc.*, 639 F. Supp. 3d at 226 (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)).

I.    **Plaintiff States Have Standing to Challenge the OMB Directive.**

Plaintiff States risk losing billions of dollars of funding obligated to them by the Federal government, and for this reason, they easily meet the standard for Article III standing.

"To ensure the proper adversarial presentation *Lujan* holds that a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992)). "Monetary costs are of course an injury." *United States v. Texas*, 599 U.S. 670, 676 (2023). Thus, "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

Because the OMB Directive threatens to pause large amounts of Federal funding to the Plaintiff States on less than 24 hours' notice, the Plaintiff States meet these requirements. The injury could hardly be more severe: Plaintiff California faces the prospect of losing disaster relief funds at a moment of great need, as the Los Angeles area is recovering from devastating wildfires; Plaintiff States risk losing funding that they receive from the Federal government to provide school lunches to children from low-income families, grants to help law enforcement combat violence

against children, elders, and other vulnerable populations, and funds for highways and other essential infrastructure. Compl. ¶¶ 14, 30, 82, 90. In short, each of the Plaintiff States faces immediate, direct pocketbook losses.

Moreover, because the OMB Directive was issued to agency heads on less than 24 hours' notice, the Plaintiff States have had no time to prepare for this drastic move by the Federal government. Had the proposal given several weeks' or months' notice, the Plaintiff States could have consulted with their budgetary personnel to devise a plan to address any potential pause in funding. Compl. ¶¶ 95-97. As it is, they had no notice and thus no ability to set aside funding for the anticipated shortfall, work with their legislatures to appropriate funds, or take other similar measures. *Id.*

The OMB Directive's Federal financial assistance "pause" mandate is also causing a present harm to Plaintiff States' ability to engage in budgeting and financial planning.

As for traceability and redressability, the Defendants are the sole cause of this mayhem— there is no other party that these injuries could be traced to. And the injunctive relief Plaintiff States seek will prevent the Federal government from following through on its unlawful directive.

## II.    Plaintiff States Are Likely to Succeed on the Merits

Plaintiff States are likely to succeed on the merits of their claims. *First*, Defendants' actions violate the APA because they are acting *ultra vires*: Congress has not delegated any unilateral authority to Defendants to indefinitely pause all Federal financial assistance under any circumstance, irrespective of the specific Federal statutes and contractual terms governing particular grants, and without even considering those statutory and contractual terms. The OMB Directive's categorical and sweeping command cannot be squared with the complex statutory regime governing Federal grants and, specifically, the many Federal statutes requiring the Executive to provide grant funding to recipients under particular statutory provisions and formulas.

*Second,* the OMB Directive is arbitrary and capricious in multiple respects, including that it "entirely fail[s] to consider . . . important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), namely the significant harms imposed on grant recipients (including Plaintiff States) by an abrupt termination of nearly all Federal funding. There is also a sweeping gulf between the purported basis for the OMB Directive (President Trump's recent executive orders directing agencies to consider terminating programs in a handful of discrete policy areas) and what it actually does, which is to imperil billions of dollars in Federal funding without regard to what the funding supports, the statutory scheme authorizing it, or whether it has any connection to the recent executive orders. The OMB Directive also does not consider any alternatives—for instance, conducting its "review" absent a pause in Federal funds, or pausing only grants and other Federal financial assistance where it has some power to act.

Moreover, by purporting to terminate Federal funds on 24 hours' notice, the OMB Directive effectively renders illusory (1) its direction that funding be halted only "to the extent permissible by law" and (2) its statement that "OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis."  The OMB Directive provides no time for Federal agencies either to make supported requests for case-by-case exceptions to the memo's directives or to assess adequately whether halting particular grants would or would not be permissible under law. Even with more time, it is unclear whether it would be possible to assess whether the law permits any funding to be halted in response the President's Executive Orders where the Executive Orders themselves may be contrary to law.

Indeed, the OMB Directive does not identify *any* reasoned explanation for the decision to halt all Federal funding to grant recipients, across the board and indefinitely, much less one that

could justify such an extreme and reckless policy. And Defendants are not even attempting to clearly limit the spending "pause" to only some subset of Federal financial assistance as to which they determine that they have lawful authority to order the pause, because the pause is mandated to take effect at 5:00 p.m. on the day after it was issued and actually began even sooner—this morning. Defendants are thus acting with full knowledge that, as to many of the funding disbursements it is pausing indefinitely, the Executive has no lawful authority to hold back the funding, because Congress has tied its hands or because the terms of the grants—which States reviewed and accepted—do not authorize any such pause.

*Third*, implementing the OMB Directive Federal funding freeze will violate separation of powers principles. "The United States Constitution exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018), with the executive branch possessing only such authority in relation to Federal funding that Congress has chosen to give it. Congress has not given the Executive limitless power to "pause" all Federal financial assistance—including funds that Congress has expressly directed to specific recipients and purposes—while the Executive tries to figure out where it might have some authority to renege on its funding commitments, let alone to pause all Federal financial assistance indefinitely.

*Fourth*, even if the Executive had some power to suspend disbursements in some areas affected by the OMB Directive's instruction, it still would not have power to retroactively impose a new term on already agreed upon Federal financial assistance to Plaintiff States—the new term being that the Executive retains a right to pause already-awarded funding midstream, indefinitely, while it decides whether or not it still wants to fund the grant-funded activities. Plaintiff States are entitled to know the terms of the funding agreement *before* they enter into it. Plaintiff States are

not currently aware of grant terms that would allow an indefinite, unsubstantiated, across-the-board freeze of all funds—let alone the type of clear terms that would be required to put the States on notice, before they accepted the many Federal grants implicated by the OMB Directive, that these Federal funds could be frozen based solely on the Executive's unilateral whims. And to the extent the OMB Directive is attaching new, retroactive conditions on Federal funding recipients' receipt of Federal funds—or pausing Federal funding so it can decide whether to try to impose such new conditions—it is plainly in violation of the limitations on any spending power it might have.

Plaintiff States are thus highly likely to succeed on their claims that the OMB Directive is arbitrary and capricious and contrary to law, that agencies halting all disbursement of Federal funds pursuant to the OMB Directive are acting *ultra vires*, and that the executive branch—and the President—are violating  separation of powers principles.

## A.    The OMB Directive Is Contrary to Law and *Ultra Vires* (Count I)

It is black-letter law that, in the appropriations context, "the President must follow statutory mandates so long as there is appropriated money available." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord, e.g.*, *City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he President is without authority to thwart congressional will by canceling appropriations passed by Congress.").[5] The Executive cannot simply "decline to follow a statutory mandate or prohibition simply because of policy objections." *Aiken Cnty.*, 725 F.3d at 259. But the OMB

---

[5] The OMB Directive constitutes final agency action subject to the APA. Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation and quotation marks omitted). The OMB Directive is a final agency action because it is a final order directing all agencies to immediately "pause all activities related to obligation or disbursement of all Federal financial assistance." OMB Directive, at 2.

Directive purports to do just that, instructing agencies to "pause" trillions of dollars in Federal funding that Congress has directed the executive branch to spend—and, in many cases, that the agencies have formally obligated to grant recipients under specific terms—simply because such funds are not, in its view, "align[ed] . . . with the will of the American people as expressed through Presidential priorities." OMB Directive, at 1.

The OMB Directive identifies no legal authority for such an action, and there is none: no Federal law authorizes the President to unilaterally halt all disbursements of all Federal funds to all funding recipients, no matter the authorizing or appropriating statute, the regulatory regime, or the terms and conditions of the grant itself. *See Aiken Cnty.*, 725 F.3d at 261 n.1 (explaining that the executive branch and its officers, including the President, do "not have unilateral authority to refuse to spend" funds that have been appropriated by Congress "for a particular project or program"). To the contrary, when the President wants "to spend less that the full amount appropriated by Congress" he must comport with the specific procedural requirements set forth in the Impoundment Control Act, 2 U.S.C. §§ 681 *et seq.*; *see also Aiken Cnty.*, 725 F.3d at 261 n.1, citing 2 U.S.C. § 683 (requiring budget authority proposed for rescission to be made available for obligation until "Congress has completed action on a rescission bill[.]"). Even a temporary "pause" of budget authority by the OMB requires compliance with the ICA. 2 U.S.C. § 684 (requiring proposed deferrals to be transmitted via a "special message" to Congress).

Indeed, Federal appropriations law is complex and nuanced, and it cannot be squared with the OMB Directive's reckless sweep. Many of the most significant funding streams to the States, for instance, take the form of categorical or "formula" grants, which Congress has instructed the Executive to provide to States on the basis of enumerated statutory factors, such as population or the expenditure of qualifying State funds. *See, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 934-

35 (9th Cir. 2019) (describing the statutory factors determining eligibility for specific formula grant); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 280 (3d Cir. 2019) (same). Congress, for instance, has instructed the Department of Education to fund elementary and secondary education in the States by reference to specific formulas that encompass total population and the population of disadvantaged children, among other factors. 20 U.S.C. § 6303; *see* Rebecca R. Skinner, Cong. Rsch. Serv., R47702, *ESEA Title I-A Formulas: A Primer* (2023), available at http://bit.ly/4ha5W52. But the funding statute does not confer authority on the Department (or anyone else) to indefinitely halt elementary and secondary education grants to the States simply because such grants are not "align[ed] . . . with the will of the American people," OMB Directive, at 1, as the OMB Directive instructs it to do.

The same is true of many other Federal funds that Congress has required the Executive to provide to the States (and other grantees), but which the OMB Directive purports to indefinitely suspend. Congress has required the Secretary of Health and Human Services to reimburse States for a fixed portion of their Medicaid expenditures, 42 U.S.C. § 1396b(a) (outlining that the HHS Secretary "shall pay to each State" amount set by statute), an amount totaling over $800 billion annually, U.S. Dep't of Health & Human Servs., Centers for Medicare & Medicaid Servs., *NHE Fact Sheet*, https://bit.ly/42xCy4i (last updated Dec. 18, 2024). But Congress did not authorize the Acting Secretary to indefinitely suspend such payments "simply because of policy objections," *Aiken Cnty.*, 725 F.3d at 259, as the OMB Directive instructs. Likewise, Congress has established a statutory formula by which the Secretary of Transportation is required to distribute Federal highway funds to States, 23 U.S.C. § 104(c), an amount totaling approximately $60 billion annually, U.S. Dep't of Transp., Fed. Highway Admin., *State-by-State Federal Aid Highway Program Apportionments*, available at https://bit.ly/3WBmpXC. But Congress did not authorize

the Acting Secretary to indefinitely halt the distribution of highway funds to States on the view that such funds do not "advanc[e] Administration priorities," as the OMB Directive so instructs. At bottom, the OMB Directive appears to suggest that the Executive can unilaterally suspend the payment of Federal funds to the States at any time simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms and conditions of the grant itself. That is not the law.

**B.      The OMB Directive Is Arbitrary and Capricious (Count II)**

Plaintiff States are also highly likely to succeed on their claim that the OMB Directive is arbitrary and capricious in multiple respects.

First, the OMB Directive is arbitrary and capricious on its face because it "entirely fail[s] to consider . . . important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, principally the profound harms worked on the States and their residents by the abrupt halt in Federal funding and the significant reliance interests that States have developed in connection with the Federal funds to which they are entitled by law. It is a basic rule of administrative law that an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015). But the OMB Directive reflects no consideration of the extraordinary harm that its policy will impose on the States and their residents. The OMB Directive threatens Plaintiff States' ability to perform these essential activities—and it does so without any evidence that it considered the enormous costs of its abrupt policy change. Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

Likewise, the OMB Directive does not reflect any consideration of the "serious reliance interests" that Plaintiff States and their residents have developed on the Federal funds to which they were legally entitled, and the consequences of withdrawing those funds with little or no notice.

14

*Id.* at 30 (internal quotation marks and citation omitted). Again, all Plaintiff States rely on Federal funds to provide essential services to their residents, ranging from primary and secondary education to healthcare to disaster relief. But the OMB Directive's abrupt about-face—purporting to terminate access to Federal funds on 24 hours' notice—not only deprives Plaintiff States of those funds and threatens their ability to provide those services, it also effectively prevents Plaintiff States from making effective plans for the termination or cessation of Federal funding and the replacement of Federally funded programs with their State equivalents. The OMB Directive does not even acknowledge these interests, much less explain why they might warrant (in Defendants' view) less importance than whatever factors motivated the policy set out in the OMB Directive. "Making that difficult decision was the agency's job, but the agency failed to do it." *Id.* at 32.

The OMB Directive also does not reflect any attempt at all to consider alternative approaches to the policy it sets out. *See California v. EPA*, 72 F.4th 308, 317 (D.C. Cir. 2023) (noting that an agency action may be "arbitrary or capricious" where it "ignore[s] an obvious alternative"). The OMB Directive asserts that an across-the-board "pause" in Federal disbursements is needed to permit the Executive to "review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." OMB Directive, at 2. But it does not explain why such a dramatic step—the effective rescission of billions of dollars in obligated funds—is necessary to permit the incoming administration to "review" Federal spending for compliance with Federal law and, to the extent permissible, the administration's policy priorities. And the OMB Directive does not reflect any effort to consider the obvious alternatives to its sweeping policy—for instance, conducting its "review" absent a pause in Federal funds, or pausing only grants and other Federal financial assistance where it has some power to act. The failure to consider those alternatives, too, is arbitrary and capricious.

Indeed, the OMB Directive fails to articulate *any* plausible rationale that would support Defendants' extreme decision. It is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal citation and quotation marks omitted). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.* (internal citation and quotation marks omitted); *see also Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (an agency must "articulate[] a satisfactory explanation for [its] decision" (internal citation and quotation marks omitted)). Here, the OMB Directive sets forth no reasoning sufficient to justify its extraordinary policy shift. It states that Federal funds "should be dedicated to advancing Administration priorities," OMB Directive, at 1, and identifies a range of projects that it deems contrary to the policy priorities of the new administration, *see id.* (describing "Marxist equity, transgenderism and green new deal social engineering policies"), but it does not explain why—even presuming Defendants had authority to terminate Federal funding that they determined did not comply with their policy priorities—an immediate, across-the-board funding freeze, one untethered to Federal statute, regulation, or contract term, was the appropriate means for pursuing that end. Although the OMB Directive explains that the "temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities," OMB Directive, at 2, it does not explain why a "pause" on funding is necessary to provide Defendants with time to review Federal funding—nor, for that matter, how a sweeping and categorical "pause" in Federal disbursements could be "consistent with the law," *id.*, in the first place. Plaintiff States are likely to show that the OMB Directive is arbitrary and capricious.

### C.    The OMB Directive is Unconstitutional (Count III and IV)

Finally, even if the Executive had some statutory basis for the power it seeks to assert, that power would violate bedrock separation of powers principles, the Spending Clause, and the Tenth Amendment.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231. By contrast, there is "no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President can influence the legislative process in some smaller ways—the President "shall from time to time give to the Congress Information on the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient . . . ." U.S. Const. art. II, § 3. Further, "after a bill has passed both Houses of Congress, but 'before it becomes a Law,' it must be presented to the President." *Clinton*, 524 U.S. at 438-39 (quoting U.S. Const. art. I, § 7, cl. 2). Ultimately, however, under "the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.*

Through the OMB Directive, the Executive is claiming a breathtaking power to suspend all Federal grant disbursements and obligations regardless of the specific statutes, regulations, and terms, which govern grants—especially formula grants. Congress is the branch of government that has the authority to modify the statutory authorization of specific streams of funding, not the Executive.

To the extent the OMB Directive purports to impose new funding conditions on the States, it likewise also violates the Tenth Amendment and the Spending Clause. If the Federal government

"desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). But the OMB Directive appears to announce—with less than 24 hours' notice—a sweeping policy freezing disbursement of all Federal funds "that may be implicated by" seven executive orders. OMB Directive, at 2. That policy shift fails to provide Plaintiff States with the "clear notice" that they are entitled to under *Pennhurst*. 451 U.S. at 25. And, because the purpose and effect of the policy is to place new conditions on funds already obligated to specific States for specific purposes, it violates the basic rule that the Federal government cannot "surprise[] [S]tates with 'post acceptance or "retroactive" conditions.'" *City of Los Angeles*, 929 F.3d at 1174-75 (quoting *Pennhurst*, 451 U.S. at 25); *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). The OMB Directive is thus not only contrary to statute, it also violates basic constitutional principles, including the separation of powers, the Spending Clause, and the Tenth Amendment.

### III.    Plaintiff States Will Be Irreparably Harmed Absent a Temporary Restraining Order.

Plaintiff States rely on Federal funds to provide essential services for their residents every day—services that Congress specifically contemplated and authorized such funds to support. State health systems, for instance, rely on Federal funding to support hospitals, community health centers, and facilities for children and the elderly. Compl. 78, 86-87, 90. States rely on disaster funds from FEMA to rebuild homes and bridges—including, most recently, to help California's residents recover from devastating fires estimated to have caused over $150 billion in economic losses. *Id*. ¶ 80. State education systems, too, rely on formula grants from Federal agencies to improve teaching and learning in high-poverty schools. *Id*. ¶¶ 84-85. Imperiling this funding even for a temporary period is unquestionable irreparable harm. The OMB Directive's breadth justifies

equally broad temporary relief—it purports to pause enormous swathes of Federal funding, sowing immediate confusion and chaos that necessitates temporary relief halting its implementation.

There has apparently been a third document circulated by OMB attempting to clarify that the pause is not "across-the-board," and does not impact funding like Medicaid. Regardless of this attempt at clarification, the portals for processing Medicaid Disbursement were inoperable across numerous of Plaintiff States for hours. The system for drawing down Head Start and the Child Care Development Block Grant Fund were also down for some states. Plaintiff States became aware of this document via X (formerly Twitter). This directive does not describe how particular grant programs are treated, and the pausing continues as to nearly all Federal funding. This directive suggests that in some circumstances, a pause "could be a day," but it does not provide an end date, and the process required by the OMB Directive, including analysis and reports by agencies demonstrates that delays is more likely to be weeks or months, with no way of determining the actual length of time.

## IV.    The Public Interest and the Balance of the Equities Strongly Favor Entry of a Temporary Restraining Order.

When the government is a party, as it is here, "the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Jones v. Wolf*, 467 F. Supp. 3d 74, 93-94 (W.D.N.Y. 2020) (citing *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)). Here, both factors strongly favor granting Plaintiff States' application for a temporary restraining order.

As an initial matter, Plaintiff States have established both an overwhelming likelihood of prevailing on the merits of their challenge to the OMB Directive and grave, irreparable harm to their residents in the absence of an immediate injunction. Plaintiff States' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve

the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

Moreover, "there is a substantial public interest 'in having governmental agencies abide by the Federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Conversely, courts routinely observe that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 343 (collecting cases) (internal quotation marks, citations, and alterations omitted). Here, as Plaintiff States have shown, the OMB Directive transgresses both the APA and several constitutional limitations. There is, therefore, a strong public interest in curtailing OMB's unlawful conduct and requiring the executive branch to comply with basic constitutional, statutory, and procedural requirements, as well as the terms of the agreements into which they entered. Put simply, the public has a strong interest in the Federal government playing by the rules. *See, e.g.*, *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) ("[I]t is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law.").

The public also has strong reliance interests in preserving the continuity of existing Federal grant funding. Plaintiff States have detailed the myriad harms they and their residents will confront if the OMB Directive goes into effect. *See* Hoffman Aff. at ¶¶ 3-31. To take one example, Plaintiff States' health departments receive billions of dollars in essential Federal grant funding that may be "paused" as soon as this evening. The absence of these funds will have immediate and

dangerous consequences. *See,* Hoffman Aff. at ¶¶ 3-31. Courts have little trouble concluding that the public "benefit[s] from ensuring public health and safety." *Jones,* 467 F. Supp. 3d at 94; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,* 485 F. Supp. 3d 1, 61 (D.D.C. 2020) ("There is clearly a robust public interest in safeguarding prompt access to health care.").

Likewise, Plaintiff States receive billions of dollars in Federal grants for critical public services that ensure access to education, promote clean air and water, protect public safety, fight forest fires, and support the health of infants—to name just a handful of additional examples. The interruptions in Federal funding that are likely to result from the OMB Directive will impair all of these substantial interests. *See, e.g., Oklahoma v. Castro-Huerta,* 597 U.S. 629, 651 (2022) ("[T]he State has a strong sovereign interest in ensuring public safety and criminal justice within its territory."); *Pac. Merch. Shipping Ass'n v. Goldstene,* 639 F.3d 1154, 1180-81 (9th Cir. 2011) (noting that state "clearly has an especially powerful interest in controlling the harmful effects of air pollution").

On the other end of the scale, the Federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013)). Since the OMB Directive is unlawful, Defendants have no cognizable interest in its enforcement.

The OMB Directive is a blunt effort to effectuate vague policy changes that the Executive does not have authority to unilaterally impose, and it does not reflect any particularly compelling public interest. To the extent that Defendants assert that existing Federal grants constitute a "waste of taxpayer dollars" attributable to "Marxist equity, transgenderism, and green new deal social

engineering policies," OMB Directive, at 1, "those harms are insufficiently grave to overcome the much more substantial countervailing harms" to Plaintiff States, *League of Women Voters*, 838 F.3d at 13. And to the extent the OMB Directive purports to "support hardworking American families," OMB Directive, at 2, Plaintiff States have demonstrated that implementing the OMB Directive will instead irreparably harm a wide swath of Americans who benefit from programs that receive Federal grant funding. In short, the public interest and the equities are unambiguous. The OMB Directive is unlawful and there is no public interest in its enforcement. *See Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 343. A temporary restraining order will protect a vital source of funding for core public programs.

## CONCLUSION

"[P]articularly when so much is at stake, [] 'the Government should turn square corners in dealing with the people.'" *Regents of the Univ. of Cal.*, 591 U.S. at 24 (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). Here, the executive branch of the Federal government has overstepped the bounds of its authority through an unlawful, undemocratic effort to withhold billions in Federal grant, loan, or other financial assistance program funds, to the great detriment of the Plaintiff States and their millions of residents. For these reasons, Plaintiff States respectfully request a temporary restraining order as this case proceeds.

Respectfully submitted,

**LETITIA JAMES**
Attorney General of the State of New York

By: /s Rabia Muqaddam
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Zoe Levine*
Colleen K. Faherty*
28 Liberty Street
New York, NY 10005
(212) 416-8883

**ROB BONTA**
Attorney General of the State of California

MICHAEL L. NEWMAN*
THOMAS PATTERSON*
Senior Assistant Attorneys General
CHRISTINE CHUANG*
LARA HADDAD*
Supervising Deputy Attorneys General

/s/ Laura L. Faer
LAURA L. Faer
Supervising Deputy Attorney General
NICHOLAS GREEN*
CARLY MUNSON*
KENNETH SUGARMAN*
CHRISTOPHER KISSEL*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
laura.faer@doj.ca.gov

**KWAME RAOUL**
ATTORNEY GENERAL STATE OF ILLINOIS

By: /s/ Alex Hemmer
Alex Hemmer*

Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*


**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (RI Bar No. 8486)
*Civil Division Chief*
*Special Assistant Attorney General*

/s/ Sarah W. Rice
Sarah W. Rice (R.I. Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov

*Counsel for the State of Rhode Island*


**Matthew J. Platkin**
Attorney General of New Jersey

*/s/ Angela Cai*
Angela Cai*
*Executive Assistant Attorney General*

Jeremy M. Feigenbaum*
*Solicitor General*

Shankar Duraiswamy*
*Deputy Solicitor General*

Office of the Attorney General
25 Market Street
Trenton, NJ 08625

24

609) 376-3377
Angela.Cai@njoag.gov

*Counsel for the State of New Jersey*

**Andrea Joy Campbell**
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks *
Deputy Chief, Government Bureau
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

**KRIS MAYES**
*Attorney General of Arizona*

*s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
ACL@azag.gov

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Shannon Stevenson**
Shannon Stevenson, CO Reg. No. 35542
Solicitor General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6749

25

Shannon.Stevenson@coag.gov
Attorney for State of Colorado

STATE OF CONNECTICUT
**WILLIAM TONG**
ATTORNEY GENERAL

By: */s/ Michael K. Skold*
        Michael K. Skold*
        Solicitor General
        165 Capitol Ave
        Hartford, CT 06106
        (860) 808-5020
        Michael.skold@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

/s/ Andrew C. Mendrala___
ANDREW C. MENDRALA*
Assistant Attorney General

Public Advocacy Division
Office of the Attorney General for the D.C.
Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov
Counsel for the District of Columbia

26

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

*/s/Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


**AARON M. FREY**
Attorney General for
the State of Maine

/s/ Jason Anton
       JASON ANTON*
       Assistant Attorney General
       Office of the Attorney General
        6 State House Station
       Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
       jason.anton@maine.gov


**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

/s/ Adam D. Kirschner
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
akirschner@oag.state.md.us
410-576-6424

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ Linus Banghart-Linn
Linus Banghart-Linn*
Chief Legal Counsel
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By /s/ **Liz Kramer***
Solicitor General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

Attorneys for State of Minnesota

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA
*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov
Counsel for the State of Nevada

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD*
Chief Deputy Attorney General

By /s/ Daniel P. Mosteller*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
    Raleigh, NC 27602
    919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*


STATE OF NEW MEXICO
**RAÚL TORREZ**
ATTORNEY GENERAL

/s/ Anjana Samant
    Anjana Samant*
    Deputy Counsel for Impact Litigation
    New Mexico Department of Justice
    P.O. Drawer 1508
    Santa Fe, NM 87504-1508
    (505) 490-4060
    asamant@nmdoj.gov


**DAN RAYFIELD**
Attorney General of Oregon

CHRISTINA L. BEATTY-WALTERS*
    Senior Assistant Attorney General
    Trial Attorney
    Tel (971) 673-1880
    Fax (971) 673-5000
    Tina.BeattyWalters@doj.oregon.gov
    Of Attorneys for Defendants

29

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
       Jonathan T. Rose*
       Solicitor General
       109 State Street
       Montpelier, VT 05609
       (802)828-3171
Jonathan.rose@vermont.gov

**NICHOLAS W. BROWN**
Attorney General of Washington

*s/ Andrew Hughes*
ANDREW HUGHES*
LEAH BROWN*
Assistant Attorneys General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov.

*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

/s/ Aaron J. Bibb

Aaron J. Bibb
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

Counsel for the State of Wisconsin