# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS; STATE OF
RHODE ISLAND; STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA;
STATE OF HAWAI'I; STATE OF MAINE; STATE
OF MARYLAND; STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF NEVADA; STATE
OF NORTH CAROLINA; STATE OF NEW
MEXICO; STATE OF OREGON; STATE OF
VERMONT; STATE OF WASHINGTON; STATE
OF WISCONSIN,

        Plaintiffs,

    v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES; U.S.
OFFICE OF MANAGEMENT AND BUDGET;
MATTHEW J. VAETH, IN HIS OFFICIAL
CAPACITY AS ACTING DIRECTOR OF THE
U.S. OFFICE OF MANAGEMENT AND
BUDGET; U.S. DEPARTMENT OF THE
TREASURY; SCOTT BESSENT, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY; PATRICIA COLLINS IN HER
OFFICIAL CAPACITY AS TREASURER OF THE
U.S.; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY A. FINK, M.D.,
IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; DENISE CARTER, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY
OF EDUCATION; U.S. FEDERAL EMERGENCY
MANAGEMENT AGENCY; CAMERON
HAMILTON, IN HIS OFFICIAL CAPACITY AS
ACTING ADMINISTRATOR OF THE U.S.
FEDERAL EMERGENCY MANAGEMENT

C.A. No. 25-cv-39


**REQUEST FOR EMERGENCY
TEMPORARY RESTRAINING
ORDER UNDER FEDERAL RULE
OF CIVIL PROCEDURE 65(B)**

AGENCY; U.S. DEPARTMENT OF
TRANSPORTATION;
JUDITH KALETA, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF
TRANSPORTATION;
U.S. DEPARTMENT OF LABOR; VINCE
MICONE, IN HIS OFFICIAL CAPACITY AS
ACTING SECRETARY OF LABOR; U.S.
DEPARTMENT OF ENERGY; INGRID KOLB, IN
HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE U.S. DEPARTMENT OF
ENERGY; U.S. ENVIRONMENTAL
PROTECTION AGENCY; JAMES PAYNE, IN HIS
OFFICIAL CAPACITY AS ACTING
ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY;
U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, IN HER CAPACITY
AS SECRETARY OF THE U.S. DEPARTMENT
OF HOMELAND SECURITY; U.S.
DEPARTMENT OF JUSTICE; JAMES R.
McHENRY III, IN HIS OFFICIAL CAPACITY AS
ACTING ATTORNEY GENERAL OF THE U.S.
DEPARTMENT OF JUSTICE; THE NATIONAL
SCIENCE FOUNDATION and DR.
SETHURAMAN PANCHANATHAN, IN HIS
CAPACITY AS DIRECTOR OF THE NATIONAL
SCIENCE FOUNDATION,

   Defendants.

## CORRECTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### INTRODUCTION

1.  This action seeks declaratory and injunctive relief and vacatur under the

Administrative Procedure Act ("APA") with respect to the Office of Management and Budget's

January 27, 2025, Directive for Heads of Executive Departments and Agencies (M-25-13), with

the subject, "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs"

("OMB Directive").[1] The OMB Directive, set to take effect at 5 pm today but actually being implemented even earlier, directs that the head of every executive branch department and agency "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by" recent executive orders, "including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." OMB Directive, at 2 (emphasis in original). It requires all federal agencies to conduct a review of all federal financial assistance programs and supporting activities for consistency with current presidential policy, including the slate of executive orders directing immigration activities; eradicating DEI initiatives from federal programs; eliminating protections for members of the LGBTQ community; and removing conservation-focused regulations intended to protect the environment. The OMB Directive violates the APA and is unconstitutional. The substantial confusion created by the OMB Directive and unlawfully withheld funding pursuant to the OMB Directive's directive will result in immediate and devastating harm to Plaintiff States.

2.      The OMB Directive would permit the federal government to rescind already allocated dollars that have been included in recipient budgets—monies that are otherwise necessary for the Plaintiffs to ensure that their residents have quality healthcare, the protections of law enforcement, the benefit of safe roads, and assistance in the aftermath of natural disasters, among many other key services. Without this funding, Plaintiff States will be unable to provide certain essential benefits for residents, pay public employees, satisfy obligations, and carry on the important business of government.

---

[1] A copy of the OMB Directive is appended to this Complaint as Exhibit A.

3.      There has apparently been a new document circulated by OMB today attempting to clarify that the pause is not "across-the-board," and does not impact funding like Medicaid. Regardless of this attempt at clarification, as of the filing of this Complaint, the portal for processing Medicaid Disbursement was inoperable across numerous of Plaintiff States for hours. The system for drawing down Head Start and the Child Care Development Block Grant Fund were also down for some states. Plaintiff States became aware of this document via X (formerly Twitter). This directive also does not describe how particular grant programs are treated, and the pause appears to continue as to nearly all federal funding. This directive suggests that in some circumstances, a pause "could be a day," but the directive does not provide an end date, and the process required by the OMB Directive, including analysis and reports by agencies, demonstrates that delays are more likely to be weeks or months, with no way of determining the actual length of time. For these reasons, this new document actually increases confusion.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Rhode Island.

## PARTIES

### A. Plaintiffs

6.      The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

7.      The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

8.      The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

9.      The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

10.      The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

11.      The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts.

12.      The State of Arizona is a sovereign state in the United States of America.  Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

13.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who is the chief law enforcement officer of Colorado.

14.     The State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

15.     The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

16.     The District of Columbia is the capitol of the Federal District of the United States. The District of Columbia is represented by Attorney General Brian Schwalb.

17.     The State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne Lopez who is the chief law enforcement officer of Hawai'i.

18.     The State of Maine is a sovereign state of the United States of America. Maine is represented by Attorney General Aaron Frey who is the chief law enforcement officer of Maine.

19.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief law enforcement officer of Maryland.

20.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessell who is the chief law enforcement officer of Michigan.

21.     The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison who is the chief law enforcement officer of Minnesota.

22.     The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison who is the chief law enforcement officer of Minnesota.

23.     The State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

24.     The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

25.     The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

26.     The State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield who is the chief law enforcement officer of Oregon.

27.     The State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark who is the chief law enforcement officer of Vermont.

28.     The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of

Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

29.    The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul who is the chief law enforcement officer of Wisconsin.

30.    Plaintiff States each receive billions of dollars annually from the federal government, for services that range from funding essential healthcare and free or low-cost school meals to low-income children, to providing grants to support law enforcement efforts to combat violence against children, elders and other vulnerable groups, to funding the maintenance of highways and roads. The OMB Directive jeopardizes all of this funding – funding that Congress designated and appropriated for the States.

**B. Defendants**

31.    Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

32.    Defendant the United States Office of Management and Budget (OMB) is a cabinet agency within the executive branch of the United States government. The Office of Management and Budget is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. § 501.

33.    Defendant Matthew J. Vaeth is the Acting Director of the Office of Management and Budget, and that agency's highest ranking official. He is responsible for overseeing OMB, providing direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, including being responsible for

authoring the OMB Directive and ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity. 31 U.S.C. §§ 502, 503; "President Trump Announces Acting Cabinet and Cabinet-Level Positions" (Jan. 20, 2025) ("Acting Designations EO").

34.    Defendant the United States Department of the Treasury is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. The Department of the Treasury is responsible for ensuring the financial security of the United States.

35.    Scott Bessent is the Secretary of the Department of the Treasury and responsible for the operations of the Department of the Treasury, and management the finances of the United States. He is sued in his official capacity. 31 U.S.C. § 301.

36.    Patricia Collins is the Treasurer of the United States and responsible for the management of the finances of the United States. She is sued in her official capacity. 31 U.S.C. § 301.

37.    Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. §§ 3501, 3501a.

38.    Defendant Dorothy A. Fink, M.D., is the Acting Secretary of the Department of Health and Human Services, and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official the capacity. 42 U.S.C. §§ 3501a, 3502; Acting Designations EO.

39.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government.  20 U.S.C. § 3411.

40.    Defendant Denise Carter is the Acting Secretary of the United States Department of Education, and that agency's highest ranking official.  She is charged with the supervision and

management of all decisions and actions of that agency. She is sued in her official capacity. 20 U.S.C. § 3412; Acting Designations EO.

41.     Defendant United States Federal Emergency Management Agency is part of the United States Department of Homeland Security, a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 313.

42.     Defendant Cameron Hamilton is the Acting Administrator of the United States Federal Emergency Management Agency, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 6 U.S.C. §§ 313, 314.

43.     Defendant United States Department of Transportation is a cabinet agency within the executive branch of the United States government. 49 U.S.C. § 102.

44.     Defendant Judith Kaleta is the Acting Secretary of the United States Department of Transportation, and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 49 U.S.C. § 102; Acting Designations EO.

45.     Defendant United States Department of Labor is a cabinet agency within the executive branch of the United States government. 29 U.S.C. § 551.

46.     Defendant Vincent Micone is the Acting Secretary of the United States Department of Labor, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 29 U.S.C. § 551; Acting Designations EO.

47.     Defendant United States Department of Energy is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 7131.

48.    Defendant Ingrid Kolb is the Acting Secretary of the United States Department of Energy, and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 42 U.S.C. § 7131; Acting Designations EO.

49.    Defendant United States Environmental Protection Agency is an independent agency within the executive branch of the United States government.

50.    Defendant James Payne is the Acting Administrator of the United States Environmental Protection Agency, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. Acting Designations EO.

51.    Defendant United States Department of Homeland Security is an independent agency within the executive branch of the United States government. 6 U.S.C. § 111.

52.    Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 6 U.S.C. § 112.

53.    Defendant United States Department of Justice is an independent agency within the executive branch of the United States government. 28 U.S.C. § 501.

54.    Defendant James R. McHenry III is the Acting Attorney General for the United States Department of Justice, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 28 U.S.C. § 503, https://www.whitehouse.gov/presidential-actions/2025/01/designation-of-acting-leaders/.

55.    Defendant the National Science Foundation is an independent agency within the executive branch of the United States government.

56.    Defendant Dr. Sethuraman Panchanathan is the Director of the National Science Foundation, and that agency's highest ranking official.  He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.

## ALLEGATIONS

### A. Background

#### i.    Executive Orders

57.    On January 20, 2025, and in the days following, President Trump issued a series of executive orders announcing widespread policy changes and indicating, in a non-specific and unclear manner, that a number of funding commitments to various federal funding recipients would be rescinded. The OMB Directive purports to implement these executive orders. None of these orders lawfully or reasonably provides authority for the OMB Directive's disruption of all federal financial assistance, nor could they.

58.    "Putting America First in International Environmental Agreements" (the "Environmental EO"), sets out a policy to "put the interests of the United States and the American people first in the development and negotiation of any international agreements with the potential to damage or stifle the American economy." Environmental EO § 2.

59.    To accomplish its stated policy, the Environmental EO directs the United States Ambassador to the United Nations to withdraw the United States as a signatory to the Paris Agreement under the United Nations Framework Convention on Climate Change. *Id.* § 3(a). It also mandates the revocation or rescission of U.S. financial commitments made under the United Nations Framework Convention on Climate Change, which is the governing body responsible for

implementing the Paris Agreement. *See id.* § 3(b)-(c). The order additionally rescinds the U.S. International Climate Finance Plan and directs federal agencies "to revoke or rescind policies that were implemented to advance the" Plan. *Id.* § 3(e)-(f). Finally, the Environmental EO mandates that the "Secretary of State, Secretary of Commerce, and the head of any department or agency that plans or coordinates international energy agreements shall henceforth prioritize economic efficiency, the promotion of American prosperity, consumer choice, and fiscal restraint in all foreign engagements that concern energy policy." *Id.* § 3(g).

60.    Also on January 20, 2025, the President issued an executive order entitled, "Protecting the American People Against Invasion" (the "Invasion EO"). This EO asserts that an "unprecedented flood of illegal immigration" over the last four years resulted in the entry of people who "present significant threats to national security and public safety," "are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," or have "abused the generosity of the American people."

61.    The Invasion EO further asserts that it is the "the policy of the United States to achieve the total and efficient enforcement" of its immigration laws and issues a wide-ranging series of instructions to various persons and agencies within the federal government.

62.    Among those directives contained in the Invasion EO is the following:

> Sec. 17.  Sanctuary Jurisdictions.  The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds.

63.    On January 20, 2025, the President also issued an executive order entitled, "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "DEI EO"). This EO asserts that the Biden administration "forced illegal and immoral discrimination programs, going

13

by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government," and announces the intent to eliminate any such programs. In addition to ordering the review and potential revision of "all existing Federal employment practices, union contracts, and training policies or programs to comply with this order" the DEI EO mandates the termination of various offices, positions, programs and practices within the federal government, including in relation to its grants or contracts.

64.    The EO also requires all agency, department, or commission heads to provide a wide range of information and analyses related to DEI, diversity, equity, inclusion, and accessibility, or environmental justice efforts, mandating evaluation of "positions, committees, programs, services, activities, budgets, and expenditures," as well as policies, programs and practices. The EO also requires agencies to provide the Director of OMB a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021."

65.    On January 20, 2025, the President also issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid" (the "Foreign Aid EO"). This EO asserts that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values," and announces that it is "the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." The EO orders a 90-day pause in all U.S. foreign development assistance "for assessment of programmatic efficiencies and consistency with United States foreign policy," further specifying that " [a]ll department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance

14

funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors," pending review of those programs. The Foreign Aid EO further instructs department and agency heads, the Secretary of State and the Director of OMB to participate in a review of the programs, to culminate in a decision as to whether each program should be continued, modified, or ended.

66.     On January 20, 2025, the President issued an executive order entitled "Unleashing American Energy" (the "Energy EO"), which purports to address "burdensome and ideologically motivated regulations" that allegedly "have impeded the development of [energy and natural] resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens." To that end, Section 2 of the Energy EO declares several policies, including encouraging energy exploration and production on Federal lands and waters, producing and processing non-fuel minerals, ensuring an abundant supply of reliable energy, and safeguarding the freedom to choose among appliances.

67.     The Energy EO also directs agencies to temporarily pause certain types of funding. Specifically, Section 7 provides that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program, and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." Section 7 further provides that within 90 days (*i.e.*, before April 20, 2025), all agency heads must submit a report detailing their review and

recommendations to "enhance their alignment with the policy set forth in section 2." According to this EO, no funds paused under this section can be disbursed until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements "are consistent with any review recommendations they have chosen to adopt." *Id.*

68.     On January 20, 2025, the President issued an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender EO"). This EO purports to redirect federal policy "by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." Gender EO § 1. The EO sets out definitions for, among other things, "male" and "female," and states that these definitions "shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.* § 2. The term "gender ideology" is defined as follows:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

In addition to mandating that all federal agencies require individuals' biological sex on government documents, the EO directs the separation of biological males from females in prisons and federally managed private spaces, begins the process of rescinding regulations that include gender identity in community planning and development, and rescinds a slew of federal guidance concerning gender identity, including the Attorney General's interpretation of the Supreme Court's opinion in *Bostock v. Clayton County*, 590 U.S. 644 (2020).

69.    Additionally, the Gender EO requires that (a) agencies "shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," (b) agencies "shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," (c) the Attorney General "shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," and (d) the Attorney General "shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964." *See* Gender EO §§ 3(e) & (g), 4(c), 5.

70.    On January 24, 2025, the President issued an executive order titled "Enforcing the Hyde Amendment" ("Hyde EO"). This EO states that while Congress has annually enacted the Hyde Amendment, which prevents the use of Federal funds for abortion care (with narrow exceptions), the Biden administration had disregarded this prohibition and instead "embedd[ed] forced taxpayer funding of elective abortions in a wide variety of Federal programs." The EO goes on to revoke two executive orders issued under the Biden Administration. The first, Executive Order 14076, Protecting Access to Reproductive Healthcare Services (July 8, 2022), directs the heads of various agencies and/or the Attorney General to, *inter alia*, "protect and expand access to abortion care," "consider actions . . . to ensure the safety of patients, providers . . . and to protect the security of clinics," and "provide technical assistance . . . to States seeking to afford legal protection to out-of-State patients and providers who offer legal reproductive healthcare." The second, Executive Order 14079, Securing Access to Reproductive and Other Healthcare Services (Aug. 3, 2022), directs the Secretary for Health and Human Services to advance access to reproductive healthcare "through Medicaid for patients traveling across State lines for medical care" and ensure, including through technical support, "understanding of and compliance with

17

Federal non-discrimination laws [including those related to pregnancy] by healthcare providers that receive Federal financial assistance."

### ii. The OMB Directive

71.     On the evening of January 27, State Plaintiffs were alerted through social media to a Directive sent by Matthew J. Vaeth, Acting Director of the Office of Management and Budget to heads of executive departments and agencies. The Directive, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," references the seven executive orders described above. OMB Directive, at 1-2. It further states that all federal agencies "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2. Moreover, while this analysis is ongoing, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* at 2 (emphasis in original). Pursuant to the OMB Directive, the temporary pause will take effect today, January 28, 2025 at 5:00 PM. *Id.*

72.     The OMB Directive appears to require the temporary suspension of disbursement and obligation of all Federal financial assistance with few exceptions, and not just funds that may be related to "foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.*; *see also* Jeff Stein, et al., *White House Pauses all Federal Grants, Sparking Confusion*, Washington Post (Jan. 27, 2025, updated Jan. 28, 2025) ("A person familiar with the order, speaking on the condition of anonymity to describe confidential decisions, confirmed the

accuracy of the document and said it applied to all grants."). Indeed, the OMB Directive states that the pause applies to "*all* activities related to obligation or disbursement of *all* Federal financial assistance," seemingly separate from its additional application to "other relevant agency activities that may be implicated by the executive orders." *Id.* at 2 (emphasis added). And the Directive expressly states that its list of "other relevant agency activities" that may be implicated by the executive orders is merely illustrative and not exhaustive. *Id.*

73.     The OMB Directive relies upon a potentially broad definition of affected Federal funds. *See id.* at 1 n.1 ("For the purposes of this Memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients *of any type* except for assistance received directly by individuals." (emphasis added)). Paragraphs one and two of 2 C.F.R. 200.1 list the following forms of Federal financial assistance: grants, cooperative agreements, non-cash contributions or donations of property, direct appropriations, food commodities, other financial assistance, loans, loan guarantees, interest subsidies, and insurance. This encompasses all grant programs.

74.     These broad, but not well-defined, categories of financial assistance that may be affected by the OMB Directive will be paused indefinitely. There is no time period by which the pause must end. Instead, the OMB Directive states that the pause must continue until agencies "submit to OMB detailed information on any programs, projects or activities subject to this pause[,]" which must happen by February 10, 2025 *and* OMB "review[s] and provide[s] guidance to your agency with respect to the information submitted." *Id.* at 2. The OMB Directive provides no time frame whatsoever for OMB to conduct review and provide guidance to federal agencies.

75.     In many instances, State agencies have accepted Federal funds after the Federal government set forth terms and conditions, which the State had to accept. The Plaintiff States know of no grants that had terms consistent with the prohibitions set forth in the OMB Directive (e.g., prohibiting use of funds to promote "woke gender ideology"). The Plaintiff States are also not aware of grants that include notice to the States or have any terms that would authorize the Federal government to impose a sudden, across-the-board, indefinite freeze of already allocated funds. The OMB Directive has now sown chaos and confusion around whether States can continue to receive disbursements of funding already obligated to them and whether any further funding will ever be obligated. And this uncertainty surrounds all grant programs, without regard to the specific statutes that authorize particular grant programs or what regulations or terms govern their award and use. For example, the OMB Directive references categories of funding with no clear reference to Federal law, including categories like "woke gender ideology," terms not appearing in any statute governing the grant of Federal financial assistance and the "green new deal," an apparent reference to proposed legislation that was never enacted.

76.     Following the transmittal of the OMB Directive to Federal agencies, OMB circulated a document labeled "Instructions for Federal Financial Assistance Program Analysis in Support of M-25-13."[2] This document contains a chart listing federal funding lines, with columns that ask whether the funding line "promote[s] gender ideology," "provide[s] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens," "relate[s] 'environmental justice' programs or 'equity-related' grants" among other inquiries. The chart appears to be a way of assessing whether the funding programs are related to any of the Executive Orders referenced in the OMB Directive.

---

[2] A copy of this document is appended to this Complaint as Exhibit B.

### iii.    Funding Affected

77.    A full account of all of the federal grant programs that benefit Plaintiff States is impossible here. Grants to the States in FY 2024 surpassed $1 trillion. Rebecca Thiess, Kate Watkins & Justin Theal, "Record Federal Grants to States Keep Federal Share of State Budgets High," Pew Charitable Trust (Sep. 10, 2024), https://www.pewtrusts.org/en/research-and-analysis/articles/2024/09/10/record-federal-grants-to-states-keep-federal-share-of-state-budgets-high. However, there are a number of key funding streams that are most essential and where the OMB Directive's impact is most alarming.

78.    State health systems rely on federal grant programs in order to provide essential services to millions of residents—these programs are necessary to keep health systems functioning. State Departments of Health alone receive billions in grant funding. Department of Health and Human Services grants support hospital facilities, community health centers, lab testing, addiction treatment centers, services for people living with disabilities, and facilities for aging people. In New York, the Department of Health alone has nearly $40 billion in Federal funding obligated for FY 2025. Hundreds of millions of dollars from these funds support the facilities that provide community healthcare, including in rural and other under-resourced areas.

79.    States likewise rely on federal funds to maintain vital programs for their residents, including Medicaid, the single largest federal funding stream to the States—over $600 billion in funding in Fiscal Year 2023 designated for reimbursing the States' cost of providing healthcare to their poorest residents. That year, for instance, Illinois received over $21 billion from the federal government in Medicaid reimbursements, or over 60% of the amount that it spent on critical health services for its eligible residents. Congress has specifically directed the Executive Branch to give

the States these funds, but as of this filing, Illinois and other States are prohibited from accessing the funds that Congress has allotted them.

80.     States rely on Federal FEMA funds for disaster relief and management.  In the last year alone, California has faced devasting fires. President Biden issued a Presidential declaration of a major disaster for the State of California on January 8, 2025, FEMA-4865-DR. The declaration authorized FEMA and its Administrator, Curtis Brown, to provide assistance to State and local governments as well as individuals pursuant to the Stafford Act and its implementing regulations. The financial impacts of the fires are staggering. Recent estimates place the total economic losses at upwards of $150 billion. The OMB Directive pushes pause on any FEMA grant money not yet disbursed, including key support for California as it responds to the fires.

81.     Similarly, in September 2024, Hurricane Helene inflicted catastrophic damage to public and private property across western North Carolina. The most recent estimates indicate the total cost of the damage is approximately $60 billion. The federal government has already pledged financial support to North Carolina to assist with Helene recovery. On September 26, 2024, President Biden issued an emergency declaration, FEMA-3617-EM, for the State of North Carolina. That declaration provided, in part, for Public Assistance-Category B, including direct federal assistance to the State. Two days later, the President approved an Expedited Major Disaster Declaration, FEMA-4827-DR, to ensure North Carolina receives federal disaster relief funds expeditiously.  And last week, President Trump issued an executive order directing the Secretary of Homeland Security, acting through the Administrator of FEMA, and the Administrator of the Small Business Administration to "immediately take all necessary and appropriate measures, including through direct assistance, loans, and other available means, to expedite roadway clearance or rebuilding, including the section of Interstate 40 in North Carolina that remains

closed, and the repair or rebuilding of roads and bridges on private property in areas of North Carolina affected by Hurricane Helene." Executive Order, Emergency Measures To Provide Water Resources in California and Improve Disaster Response in Certain Areas (Jan. 24, 2025). North Carolina needs this federal assistance to rebuild and revitalize the western region; it cannot cover the cost of Helene's damage alone. Yet the OMB Directive purports to freeze the federal funding that should be disbursed pursuant to these federal actions. The purported freeze will substantially disrupt recovery efforts in western North Carolina, delaying repairs to homes, businesses, roads, bridges, and other critical infrastructure.

82.     Federal infrastructure funding often provides emergency augmentation of state budgeted and planned funds when disaster strikes. To take one current example, Rhode Island experienced the unexpected failure of a bridge span carrying a major interstate highway, the Washington Bridge, that has a daily traffic volume of 90,000 vehicles and has been closed since December 2023. Rhode Island's Congressional Delegation wrote to Acting Director Vaeth on January 27, 2025, inquiring after the $220 million in competitive grant funding allocated for the bridge and the balance of the $600 million in competitive grant funding for other critical infrastructure, including bridges along I-95, currently awarded to Rhode Island. As of filing, there has been no response to clarify that this money would not be impacted.

83.     In FY 2024, the Federal Edward Byrne JAG grant program gave over $180 million in funding to the states to fund essential law enforcement and criminal justice programs, including programs that prevent and prosecute hate crimes, address the opioid crisis, and support mental health treatment services. Other grant programs administered by the U.S. Department of Justice fund initiatives to combat violence against women and internet crimes against children, support community policing, and provide services to victims of crimes. The High Intensity Drug

Trafficking Areas (HIDTA) program provides assistance to Federal, state, local, and Tribal law enforcement agencies operating in areas determined to be critical drug-trafficking regions of the United States. An email from Shannon Kelly, the Director of the National HIDTA program, on January 28, 2025, indicates that National HIDTA Assistance Center payments to state-based HIDTA programs have been paused at OMB's direction. Pausing these grants imperils state, local, and Tribal funding for critical public safety initiatives.

84.     State education systems also receive tremendous amounts of federal funding. In New York, the Department of Education has $2.1 billion obligated for FY 2025. Included in that funding are *formula* grants that local education agencies receive to improve teaching and learning in high-poverty schools in particular for children failing, or most at-risk of failing, to meet challenging State academic standards. Because this is a formula grant, the allocation is supposed to be automatic based on a statutory formula. These grants have served millions of children nationwide.

85.     State institutions of higher education also receive billions of dollars in grants, not including direct student aid, that fund essential research in every conceivable area of study.

86.     Plaintiff States also receive millions of dollars in grants through the Title IV-E Foster Care program to provide safe and stable out-of-home care for children in their care until plans can be made for permanency.

87.     For the most recent fiscal year—FY2024, running from July 1, 2023 to June 30, 2024—Washington received over $27 billion in federal funding. This comprised approximately 32% of Washington's total budget for FY2024.

88.     Approximately $13 billion of this funding comprised of Medicaid reimbursements, which is excluded from the definition of "federal financial assistance" under 2 CFR 200.1. The

memo purportedly does not apply to Medicaid reimbursements. However, Washington State is presently unable to draw funds for Medicaid reimbursements. Even just yesterday—before the OMB Directive was set to take effect—the Washington State Health Care Authority attempted to request approximately $160 million from the Department of Health and Human Services, which was denied.

89.    The remaining $14 billion-plus largely comprised the sort of "federal financial assistance" that are likely threatened by the OMB Directive.

90.    To give just a few examples, this includes such critically important programs as:

a.   Highway planning and construction funds, which amounted to over $952 million in FY2024 state expenditures. These funds include the Highway Infrastructure Program, which provides federal funds for road, bridge, ferry, transit capital, and Intelligent Transportation System capital projects for the elimination of hazards and the installation of protective devices at railway-highway crossing;

b.   Child Care and Development Block Grants, which amounted to over $393 million in FY2024 state expenditures. This is the primary federal grant program that allows states to provide childcare assistance to low-income working families with children under age 13;

c.   National School Lunch Program, which amounted to over $361 million in FY2024 state expenditures. This program provides nutritious meals to children. Public school districts, private schools, residential child care institutions, and Charter Schools may participate in school meal programs;

d.   Title I education grants, which amounted to over $310 million in FY2024 state expenditures. Title I funds instructional help to children whose academic performance is below average, based on a formula that targets funding to schools and districts with higher percentages of students in poverty;

e.   Special Education grants, which amounted to over $275 million in FY2024 state expenditures. This program serves to meet the excess costs of providing special education and related services to children with disabilities, including support and direct services, technical assistance and personnel preparation, assisting schools in providing positive behavioral interventions and supports, and improving the use of technology in the classroom;

f.   Child support enforcement, which amounted to over $134 million in FY2024 state expenditures;

g.  Allergy and infectious disease research, which amounted to over $121 million in FY2024 state expenditures;

h.  Low-income home energy assistance, which amounted to over $96 million in FY2024 state expenditures. This program helps keep families safe and healthy through initiatives that assist families with energy costs. LIHEAP provides federally funded assistance to reduce the costs associated with home energy bills, energy crises, weatherization, and minor energy-related home repairs;

i.  Substance abuse treatment block grants, which amounted to over $65 million in FY2024 state expenditures. This grant helps plan, carry out, and evaluate activities for the prevention, treatment, and recovery of substance abuse for individuals not covered by Medicaid;

j.  Veterans nursing care funding, which amounted to over $59 million in FY2024 state expenditures; and

k.  Hundreds or thousands of other programs, covering everything from immunizations to clean water to adoption assistance to transit to childcare to global AIDS prevention to National Guard operations to crime victim assistance to immigration and refugee assistance to wildlife restoration, and on and on.

91.    If these and similar federal funds are suddenly withheld, even temporarily, Washington simply does not have funds to cover all of these necessary programs that are currently funded through federal dollars. And it most certainly does not have the funds to backfill federal dollars while continuing to pay for the many state-funded programs on which its residents rely. Thus, pausing or terminating federal funds would necessarily entail cuts—likely drastic cuts—to key services provided by state agencies on which Washington residents depend.

92.    This threat to federal funding comes at a precarious time for Washington. Due to factors like inflation, higher projected caseloads in several safety net programs, and revenue declines, Washington is facing a forecasted budget deficit of over $12 billion over the next four years.

93.    Washington's Legislature is currently in session trying to address this budget shortfall and pass a budget for the FY2025-2027 biennium. Many Washington state agencies are facing budget cuts of between three and six percent to account for the lack of funding.

94.    OMB's direction to withhold additional billions of dollars in federal funding, even temporarily, would interfere with critical state programs, drastically worsen Washington's budget shortfall, and make it nearly impossible for state agencies and Washington's Legislature to intelligently prioritize budgeting needs.

95.    Because the OMB Directive provided effectively no notice to the States, it compounded these injuries. The States were unable to prepare for or mitigate the pause in federal funding, meaning that the OMB Directive will cause chaos and confusion. Given the less than 24 hours notice, the States were unable to set aside funding for the anticipated shortfall in response to the OMB Directive, work with their legislatures to appropriate funds, or take other similar measures to lessen the blow.

96.    Moreover, by purporting to terminate federal funds on 24 hours' notice, the OMB Directive effectively renders illusory (1) its direction that funding be halted only "to the extent permissible by law" and (2) its statement that "OMB may grant exceptions allowing federal agencies to issue new awards or take other actions on a case-by-case basis." The OMB Directive provides no time for federal agencies either to make supported requests for case-by-case exceptions to the Directive's directives or to assess adequately whether halting particular grants would or would not be permissible under law. Even with more time, it is unclear whether it would be possible to assess whether the law permits any funding to be halted in response the President's Executive Orders where the Executive Orders themselves may be contrary to law.

97.    State agencies administer numerous federal grants and direct grant programs of their own—some of which pass through federal funding. State agencies in Plaintiff States do not know when or if disbursements and obligations may resume, complicating the important work they do to ensure that state residents have access to healthcare services, education support, appropriate

27

law enforcement, reliable infrastructure, among many other missions. They are also now unable to evaluate whether they need to take action under their own sub-agreements or contracts to mitigate any downstream effects of the pause.

## CAUSES OF ACTION

### COUNT I

**(Substantive Violation of the Administrative Procedure Act – Contrary to Law, Ultra Vires)**

98.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

99.     Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

100.     No authority—constitutional or otherwise—authorizes the President or the Director of OMB to order federal agencies not to enforce duly promulgated regulations, to refrain from fulfilling their statutory duties, or to violate federal law.

101.     Defendants also include "agenc[ies]" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1), and the OMB Directive is agency action subject to the APA.

102.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(B) – (C).

103.     Defendants may only exercise authority conferred by statute.

104.     Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338

U.S. 632, 644 (1950)).  And in *Loper Bright*, the Supreme Court in 2024 clarified that historical principles of "respect" did not equate to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original).  Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

105.    Defendants have no authority to impose a government-wide pause on federal awards without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream. This breathtaking freeze of all federal assistance is unauthorized, unprecedented, and not entitled to respect or deference by this Court.

106.    Defendants also cannot refuse to disburse funds appropriated by Congress contrary to congressional intent and directive.

107.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Defendants lack legal authority to impose the conditions and has, in so doing, acted contrary to law and in violation of the APA.

108.    Plaintiffs are also entitled vacatur of the OMB Directive pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the OMB Directive.

## COUNT II
### (Substantive Violation of the Administrative Procedure Act – Arbitrary & Capricious – Against Agency Defendants)

109.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

110.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the OMB Directive is agency action subject to review under the APA.

111.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

112.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

113.    Because the OMB Directive provides no reasoned basis for pausing the disbursement and obligation of trillions of federal dollars and fails to consider the consequences of that action, it is arbitrary and capricious. Even if the OMB Directive is targeted at implementation of certain Executive Orders, that justification cannot support the breadth of its effect. Further, the OMB Directive contains no reasoning as to the impact and chaos it has caused, including as to the Plaintiff States and their residents, who rely on federal funding for key programs and services.

114.    The OMB Directive further provides no reasoned basis for refusing to disburse funds appropriated by Congress contrary to congressional intent and directive, and thus is arbitrary and capricious.

115.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the OMB Directive violates the APA because it is arbitrary and capricious.

116.    Plaintiffs are also entitled to vacatur of the OMB Directive pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the OMB Directive.

## COUNT III

### (Violation of the Separation of Powers—Usurping the Legislative Function)

117.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

118.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

119.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

120.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution, *see, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *West Virginia v. EPA*,

31

597 U.S. at 723-24, *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

121.    The OMB Directive violates the separation of powers because the executive branch has overridden the careful judgements of Congress by refusing to disburse funding for innumerable federal grant programs—some of which are even formula grants dictated by precise statutory formulas. Pausing funding under the affected programs and permanent refusal to disburse funds appropriated by Congress contrary to congressional intent and directive both violate the separation of powers.

122.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the OMB Directive violates the constitutional principles of separation of powers doctrine, and impermissibly arrogates to the executive power that is reserved to Congress.

123.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing the OMB Directive.

## COUNT IV

### (Violation of the Spending Clause)

124.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

125.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, clause 1.

126.    If funding conditions reach a certain level of coercion, they encroach on state sovereignty as guaranteed by the Tenth Amendment by "commandeering . . . reserved State power." *State of New York v. U.S. Dep't of Justice*, 951 F.3d 84, 114 (2d Cir. 2020). States must also have fair notice of conditions. "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). Conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citing *Mass. v. United States*, 435 U.S. 444 (1978)).

127.    Because the OMB Directive imposes new conditions on federal funding, altering the terms upon which grants were obligated and disbursed contrary to Congressional authority, the OMB Directive imposes funding conditions that are coercive, retroactive, ambiguous, and unrelated to the purpose of myriad grants affected.

128.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the OMB Directive violates the Spending Clause.

129.    Plaintiffs are also entitled to a preliminary and permanent injunction barring the Agency Defendants from enforcing the OMB Directive.

## COUNT V

**(Violation of the Presentment, Appropriations, and Take Care Clauses)**

33

130.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

131.    The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States."  U.S. Const. Art. I, Sec. 7, Clause 2; *INS v. Chadha*, 462 U.S. 919, 946 (1983). "Our Constitution gives Congress control over the public fisc." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024); *see also id.* at 431 ("By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement. It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch."). The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. Art. I, Sec. 7.  The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed. . . ."  U.S. Const. Art. II, Sec. 3, Clause 3.

132.    No provision of the United States Constitution authorizes the executive to enact, amend, or repeal statutes, including appropriations approved by Congress and signed into law by the President. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

133.    The executive cannot unilaterally amend or cancel appropriations that Congress has duly enacted.  *See Train v. City of New York*, 420 U.S. 35, 38, 44 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); 2 U.S.C. § 683 (requiring the President to transmit proposed

rescissions of budget authority to Congress for approval and requiring "any amount of budget authority proposed to be rescinded" to be made available for obligation unless and until Congress approves the rescission within 45 days).

134.    The OMB Directive constitutes a refusal to spend money appropriated by Congress, in violation of the executive's constitutional authority to administer the law.

135.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the OMB Directive violates the Presentment, Appropriations, and Take care Clauses of the U.S. Constitution.

136.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants from enforcing the OMB Directive.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Issue a judicial declaration that the OMB Directive is unconstitutional and/or unlawful because it violates the APA and the Constitution;

ii.    Vacate the OMB Directive and issue all necessary and appropriate process to postpone the effective date of the OMB Directive or to preserve status or rights pending conclusion of the review proceedings under 5 U.S.C. § 705;

iii.    Temporarily restrain and enjoin the Agency Defendants from implementing or enforcing the OMB Directive, pending further orders from this Court;

iv.    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended;

v.    Pursuant to 5 U.S.C. § 705, postpone the effective date of the OMB Directive, so as to preserve the status and rights of the Plaintiff States;

vi.   Pursuant to 5 U.S.C. § 706, vacate the OMB Directive;

vii.  Preliminarily and permanently enjoin the Agency Defendants from enforcing the

OMB Directive;

viii. Issue a writ of mandamus compelling Defendants to immediately cease implementing

the OMB Directive without further delay;

ix.   Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

x.    Grant other such relief as this Court may deem proper.



Respectfully submitted,

**LETITIA JAMES**
Attorney General of the State of New York

By:  /s Rabia Muqaddam
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Zoe Levine*
28 Liberty Street
New York, NY 10005
(212) 416-8883

**ROB BONTA**
Attorney General of the State of California

MICHAEL L. NEWMAN*
THOMAS PATTERSON*
Senior Assistant Attorneys General
CHRISTINE CHUANG*
LARA HADDAD*
Supervising Deputy Attorneys General

/s/ Laura L. Faer

LAURA L. Faer
Supervising Deputy Attorney General
NICHOLAS GREEN*
CARLY MUNSON*
KENNETH SUGARMAN*
CHRISTOPHER KISSEL*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
laura.faer@doj.ca.gov

**KWAME RAOUL**
ATTORNEY GENERAL STATE OF ILLINOIS

By: /s/ Alex Hemmer
Alex Hemmer*
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

*Counsel for the State of Illinois*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (RI Bar No. 8486)
*Civil Division Chief*
*Special Assistant Attorney General*

/s/ Sarah W. Rice
Sarah W. Rice (R.I. Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov

37

*Counsel for the State of Rhode Island*


**Matthew J. Platkin**
Attorney General of New Jersey

*/s/ Angela Cai*
Angela Cai*
*Executive Assistant Attorney General*

Jeremy M. Feigenbaum*
*Solicitor General*

Shankar Duraiswamy*
*Deputy Solicitor General*

Office of the Attorney General
25 Market Street
Trenton, NJ 08625
609) 376-3377
 Angela.Cai@njoag.gov

*Counsel for the State of New Jersey*


**Andrea Joy Campbell**
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks *
Deputy Chief, Government Bureau
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

**KRIS MAYES**
*Attorney General of Arizona*

*s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004

(602) 542-3333
Joshua.Bendor@azag.gov
ACL@azag.gov


**PHILIP J. WEISER**
Attorney General
State of Colorado

 /s/ Shannon Stevenson*
 Shannon Stevenson, CO Reg. No. 35542
 Solicitor General
 Colorado Department of Law
 Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
 Denver, CO 80203
 Phone: (720) 508-6749
  Shannon.Stevenson@coag.gov
Attorney for State of Colorado


STATE OF CONNECTICUT
**WILLIAM TONG**
ATTORNEY GENERAL

By: *_/s/ Michael K. Skold_*
       Michael K. Skold*
       Solicitor General
       165 Capitol Ave
       Hartford, CT 06106
       (860) 808-5020
       Michael.skold@ct.gov


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: *_/s/ Ian R. Liston_*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

39

(302) 683-8899
ian.liston@delaware.gov


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

/s/ Andrew C. Mendrala___
ANDREW C. MENDRALA*
Assistant Attorney General

Public Advocacy Division
Office of the Attorney General for the D.C.
Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov
Counsel for the District of Columbia

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

*/s/Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov


**AARON M. FREY**
Attorney General for
the State of Maine

/s/ Jason Anton
JASON ANTON*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800

40

Fax: 207-287-3145
jason.anton@maine.gov

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

/s/ Adam D. Kirschner
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
akirschner@oag.state.md.us
410-576-6424

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ Linus Banghart-Linn
Linus Banghart-Linn*
Chief Legal Counsel
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By /s/ **Liz Kramer***
Solicitor General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

Attorneys for State of Minnesota

41

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA
*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov
Counsel for the State of Nevada

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD*
Chief Deputy Attorney General

By /s/ Daniel P. Mosteller*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
        Raleigh, NC 27602
        919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*

STATE OF NEW MEXICO
**RAÚL TORREZ**
ATTORNEY GENERAL

/s/ Anjana Samant_____
        Anjana Samant*
        Deputy Counsel for Impact Litigation
        New Mexico Department of Justice
        P.O. Drawer 1508
        Santa Fe, NM 87504-1508
        (505) 490-4060
        asamant@nmdoj.gov

42

**DAN RAYFIELD**
Attorney General of Oregon

_____

CHRISTINA L. BEATTY-WALTERS*
    Senior Assistant Attorney General
    Trial Attorney
    Tel (971) 673-1880
    Fax (971) 673-5000
    Tina.BeattyWalters@doj.oregon.gov
    Of Attorneys for Defendants


**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
    Jonathan T. Rose*
    Solicitor General
    109 State Street
    Montpelier, VT 05609
    (802)828-3171
Jonathan.rose@vermont.gov


**NICHOLAS W. BROWN**
Attorney General of Washington

*s/ Andrew Hughes*
ANDREW HUGHES*
LEAH BROWN*
Assistant Attorneys General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov.

*Attorneys for Plaintiff State of Washington*

43

**JOSHUA L. KAUL**
Attorney General of Wisconsin

/s/ Aaron J. Bibb

Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

Counsel for the State of Wisconsin

*pro hac vice forthcoming

44