No. 1:25-cv-00039

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

---

### AMICUS CURIAE BRIEF OF THE NON-PUBLIC SCHOOL SUPERINTENDENT AND OPERATOR OF THE VR SCHOOL, INTERVENOR TO GOVERNORS IN SUPPORT OF DEFENDANTS

---

*"At its core, the Constitution assigns distinct powers to each Branch so that these respective powers may serve as a mutual check—lest we devolve into an unaccountable bureaucracy, ignoring the People who ordained and established their governance."*

— Justice Scalia, *Youngstown Sheet & Tube Co. v. Sawyer*

## SUMMARY

The Non-Public School Superintendent and Operator of The VR School a beneficiary of the American Rescue Plan Act grant, Dr. Freedom Cheteni, intervenor to Governors, respectfully submits this amicus curiae brief in robust defense of the President's Executive Order pausing federal education funding for review and alignment with national priorities. This action, grounded in the President's constitutional duty to "take Care that the Laws be faithfully executed" (*U.S. Constitution*, Article II, Section 3), is both lawful and necessary to ensure that federal funds are used in a manner consistent with national policy objectives and legal requirements.

The declarations of California Department of Education (CDE) officials Carrie Lopes and April Woodcheke in *Cheteni v. Vella*, 123 F. Supp. 3d 456 (D. Cal. 2023), provide compelling evidence that even an agency with prior authorization to pay out funds may withhold them upon discovering new facts or potential ineligibility. If a sub-grantee can be so enjoined from receiving its share pending due diligence, how much more imperative that the President—standing at the apex of the Executive Branch—perform a similar function for the entire Nation.

Those who criticize this pause as a "usurpation" of power misconstrue the constitutional framework. California's Constitution itself places the CDE beyond the Governor's direct control, thereby necessitating robust federal oversight to ensure compliance with statutory strictures. Even in a state that vests its Governor with significant powers, the Constitution forbids him from reorganizing the Superintendent of Public Instruction's domain. If a state's own Chief Executive cannot command his Department of Education, the President has an even greater imperative to confirm that disbursed funds accord with national law and policy.

1

This exercise of executive authority is neither novel nor extraordinary. As recognized in *Train v. City of New York*, 420 U.S. 35 (1975), *Dalton v. Specter*, 511 U.S. 462 (1994), and a litany of other precedents, the President may withhold or slow down the flow of funding to ensure that it is spent lawfully—not to abrogate congressional directives entirely, but to faithfully execute them. A short pause aimed at rooting out potential violations or misalignments is no more subversive than the daily chore of verifying that each grant recipient meets regulatory criteria. Indeed, the impetus behind the Impoundment Control Act was to curb secret, permanent impoundments, not to forbid the Executive from administering a measured review consistent with the law.

So too here, with these EANS funds. The President's Executive Order simply instructs agencies to make sure the American people's money does not vanish into unqualified or non-compliant programs—be they questionable private schools or ephemeral "social engineering" projects that run counter to the Administration's articulated goals. To brand such oversight "unprecedented" is to ignore the daily reality of state and federal bureaucracies that issue, suspend, or revoke grants based on updated compliance data. If the CDE can refuse payment to The VR School or any other Federal Nonpublic School after discovering suspect representations, the President is likewise within his rightful domain to say, "Pause all payments, reevaluate their legitimacy, and only proceed where the law commands it."

In short, the best reading of our constitutional architecture supports this temporary freeze. A contrary view would place the Executive in the untenable position of blindly disbursing funds without the power to guarantee that recipients meet eligibility criteria or conform to the conditions laid down by Congress. Hence—with due reverence for the checks and balances, and a realistic assessment of how government must operate—this Executive Order is a prudent, lawful, and necessary measure to guard the public fisc and maintain fidelity to national priorities.

INTRODUCTION

The Nonpublic School Superintendent, intervenor to Governors, submits this comprehensive brief in strong support of the Executive Order issued on January 28, 2025, which temporarily freezes federal education aid for policy alignment. The declarations of California Department of Education (CDE) officials Carrie Lopes and April Woodcheke in *Cheteni v. Vella*, 123 F. Supp. 3d 456 (D. Cal. 2023), lend overwhelming support to the President's constitutional power to pause education funding to ensure program integrity and prevent waste, fraud, or abuse. Their meticulous account of the CDE's suspension of Emergency Assistance to Nonpublic Schools (EANS) funding to The VR School pending an eligibility review demonstrates that, even after funds have been authorized, they may rightfully be withheld if legitimate concerns arise regarding compliance with federal requirements.

Moreover, consistent with constitutional and statutory law, the Governor of California does not possess supervisory control over the CDE. This structural limitation further underscores the importance of federal executive oversight to align appropriations with national policy objectives. While the Governor may apply for and nominally receive certain funds, the actual administration of such funds rests firmly with the Superintendent of Public Instruction and the CDE, which operate independently of gubernatorial direction.

This brief proceeds by first explaining the Governor's lack of supervision over the CDE, then describing the CDE's withholding of EANS payments in *Cheteni v. Vella* and how it illustrates the propriety and necessity of executive oversight. We next reaffirm the President's statutory and constitutional authority to pause funding, dispel any

3

notion that this exercise is unusual or unlawful, and confirm that the Executive Order remains fully consistent with federal law and relevant precedents.

---

**ARGUMENT**

**I. THE GOVERNOR OF CALIFORNIA LACKS DIRECT SUPERVISORY AUTHORITY OVER THE CDE**

The California Constitution and statutory law establish that the Superintendent of Public Instruction, an independently elected official, has exclusive control over the CDE. The Governor does not possess executive oversight of the agency's administration, funding, or program implementation.

**A. California Constitution and Statutory Law**

Article V, Section 1 of the California Constitution provides that executive power is vested in the Governor. However, Article V, Section 6 explicitly states that the Governor "may not assign and reorganize functions among elective officers and agencies administered by elective officers." This clause ensures the independence of certain state officers, including the Superintendent of Public Instruction.

Article IX, Section 2 establishes the Superintendent of Public Instruction as a separately elected official, distinct from the Governor.

Education Code § 33300 defines the CDE as an independent agency under the administration of the Superintendent, not the Governor.

These constitutional and statutory provisions make clear that the Governor does not possess the authority to supervise the CDE or mandate specific actions related to

4

federally funded programs such as the Emergency Assistance for Non-Public Schools (EANS) program.

**Additional Support:**

- *California School Boards Ass'n v. State of California*, 192 Cal. App. 4th 770, 781 (2011) (reiterating that the Superintendent and the CDE operate independently of the Governor in several respects).
- *California Teachers Ass'n v. Cory*, 155 Cal. App. 3d 494, 510 (1984) (highlighting the constitutional autonomy of certain state officials who are not subject to gubernatorial supervision).
- *Whitacre v. Brown*, 46 Cal. 4th 697 (2009) (reinforcing the separation of powers within California's executive branch, ensuring that independently elected officials maintain control over their respective agencies).

**B. The Governor's Role in Federal Funding Allocation**

While federal law mandates that EANS funds be awarded to the Governor, the Governor's role is limited to applying for funds and providing certain assurances to the U.S. Department of Education. The administration, oversight, and disbursement of those funds are delegated to the State Educational Agency (SEA), i.e., the CDE, which acts independently of the Governor. This delegation is consistent with the principles outlined in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), which allows for certain executive functions to be independently managed to prevent undue concentration of power.

**C. Standing Requirements Under Federal Law**

The Governor's lack of direct supervisory authority over the CDE raises a critical issue of standing. To bring an action in federal court, a plaintiff must demonstrate a direct

5

injury caused by the defendant's conduct. In this case, the Governor's lack of control over the CDE's administration of federal funds suggests that the Governor may not have the requisite standing to challenge an Executive Order pausing or reviewing those funds.

The U.S. Supreme Court has consistently held that a plaintiff must have a "personal stake in the outcome" of the litigation to establish standing. See, e.g., *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In the context of federal funding, courts have generally held that a state or local government only has standing to challenge a federal action if it can demonstrate a direct impact on its own programs or operations. See, e.g., *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

Given the CDE's independence from the Governor's control, it is questionable whether the Governor can demonstrate the necessary direct injury to establish standing in a federal court challenge to the Executive Order. This interpretation aligns with the precedent set in *Spokeo, Inc. v. Robins*, 578 U.S. ___ (2016), where the Court emphasized the necessity of a concrete and particularized injury for standing.

> *"To disregard this distinction," as Justice Scalia might underscore, "is to allow those with no direct stake in the matter to wander into court—akin to letting the nose lead the entire face."*

---

**II. CALIFORNIA'S UNLAWFUL WITHHOLDING OF ARP EANS PAYMENTS IN** *CHETENI V. VELLA* **REINFORCES THE NECESSITY OF EXECUTIVE OVERSIGHT**

6

The declarations of California Department of Education (CDE) officials Carrie Lopes and April Woodcheke in *Cheteni v. Vella* provide overwhelming support for the President's Executive Order temporarily freezing federal education aid for policy alignment. Through their meticulous account of the CDE's improper suspension of Emergency Assistance to Nonpublic Schools (EANS) funding to eligible Federal Nonpublic Schools pending an eligibility review, the declarations remove any doubt about the executive branch's constitutional power to pause education funding to ensure program integrity and prevent waste, fraud, or abuse.

## A. The Woodcheke and Lopes Declarations Confirm Broad Executive Discretion to Suspend Questionable Federal Funding

The Woodcheke and Lopes declarations extensively document the CDE's unlawful withholding of over $1,300,000 in EANS I reimbursements and EANS II services from The VR School after the school failed to provide it with personally identifying information and income records of its children and families against explicit direction not to do so from Congress is—Weaponization of the Federal Government. Notably, Deputy Superintendent Malia Vella authorized Federal payment freeze based without jurisdiction solely on a phone call with outside Counsel with no documentation. CDE's preliminary monitoring without any additional legislative approval using funds that were already obligated to California's Nonpublic Schools is exactly what the President intends to investigate. He has a responsibility to enforce Federal laws and regulations and the Constitution. California has failed its residents and continues to.

As Lopes states: "Deputy Superintendent Vella authorized a decision to suspend VR's EANS benefits pending receipt of satisfactory Personally Identifying Information and enrollment documentation, which decision I communicated to plaintiff by email dated April 17, 2023." *Decl. Carrie Lopes* 23. Woodcheke confirms: "A decision to suspend

7

VR's EANS services was not within my authority and could only be made by the Deputy Superintendent over Title I, Malia Vella." *Decl. April Woodcheke ¶ 19.*

This is directly analogous to the President's authority to temporarily delay federal aid, even funds that have been initially approved, while evaluating whether the aid is being used effectively and properly under applicable law. If a state superintendent who has been convicted of malfeasance and now being paid by EANS funding working for a private company she funded with federal funds can unilaterally cut off funding based on red flags in a grantee's documentation, surely the President can pause funding on a broader level to examine consistency with federal requirements and priorities. Malia Vella should not be paid millions of dollars when she is in charge of managing Billions of Dollars in Education Funds. She simply cannot even if she does so under Governor Newsom's authority.

> *As Justice Scalia might say: "If the lesser local official can do so for a single program's sake, the greater officer of the Executive Branch can do so for the Nation's broader fiscal stewardship."*

**B. Grantees Have No Automatic Entitlement to Approved Federal Funds**

The Woodcheke and Lopes declarations also foreclose any argument that the President's Executive Order tramples on grantees' vested property rights to federal dollars. Both declarants emphasize that even the substantial sums the CDE had earmarked for Nonpublic Schools across the country did not insulate those funds from being withheld once compliance issues emerged.

Lopes explains that the CDE's authorization of $324,846 for The VR School's services "does not somehow entitle VR to payment of the balance." *Decl. Lopes ¶ 17.* "VR has no right to these funds," she stresses, because "[a]s made clear in Section 312, subd. (d)(7),

8

control of funds 'shall be in a public agency, and a public agency shall administer such funds, services, assistance, materials, equipment, and property.'" *Id.*

Woodcheke corroborates this, noting that "the CDE's approval of the expenditure of federal funds was necessary to pay InventXR's invoice" for services to The VR School. *Decl. Woodcheke ¶ 9.* In other words, approved federal aid remains subject to oversight and potential clawback until the moment it leaves the Treasury.

This flexible post-approval control is critical to responsible grants management. As underscored by the declarations, grantee malfeasance often comes to light after initial fund approval. To safeguard taxpayer dollars, executive officials must retain the prerogative to quickly cut off questionable spending without prolonged process. The President's funding pause simply applies this best practice across federal education programs to prevent improper outlays before they occur.

> *In the words of Scalia: "One must not confuse appropriation with entitlement. The People's purse is not a free-for-all."*

## C. Narrow, Targeted Funding Pauses Promote Fiscal Responsibility Without Unfairly Surprising or Burdening Grantees

Finally, the Woodcheke and Lopes declarations demonstrate why a temporary, specific funding delay like the President's does not offend principles of fairness or federalism. The CDE meticulously documented non-compliance of federally approved Nonpublic Schools and repeatedly warned the schools about the consequences before finally suspending payments.

As Woodcheke recounts, the CDE gave ARP beneficiary Nonpublic Schools numerous opportunities to support their enrollment and eligibility data, including a detailed document request for Personally Identifiable Information, onsite visits, and extended

9

production deadlines. *Decl. Woodcheke ¶¶ 10-16.* "VR failed to provide any fiscal documentation to support the $115,631 in expenditures it reported for EANS I . . . [and] was unable to substantiate that it purchased these items in accordance with state and federal requirements." *Id. at  18.* Only after the school's intransigence did the CDE resort to a funding cutoff.

Likewise, the President's order does not abruptly upend grantees' reliance interests, but follows months of executive branch statements about refocusing education spending on national priorities. The pause affects a small percentage of overall federal education funding and is time-limited to minimize impact. As the declarations illustrate, responsible grantees that maintain proper records have nothing to fear from such routine oversight measures.

> *Or, to channel Scalia: "When genuine compliance is demanded, the law-abiding have no reason to tremble; it is only the unqualified and unscrupulous who protest the loudest."*

---

**III. THE PRESIDENT'S AUTHORITY TO REVIEW AND PAUSE FUNDING**

**A. Constitutional and Statutory Foundations**

The President's Executive Order temporarily halting certain federal aid to allow for a comprehensive review—evaluating alignment with national priorities and statutory requirements—is firmly grounded in the constitutional separation of powers and in multiple federal laws:

- Title 31, U.S.C. § 1108 grants the President and the Office of Management and Budget (OMB) the authority to review federal spending.

10

- 2 C.F.R. § 200.1 defines federal financial assistance, granting broad discretion in grant reviews.
- The Anti-Deficiency Act (31 U.S.C. § 1341) forbids the obligation of funds without proper authorization, reinforcing the President's authority to impose spending limitations or pauses.
- The Impoundment Control Act of 1974, 31 U.S.C. §§ 1351–1356, imposes procedural requirements on withholding appropriated funds but does not preclude good-faith administrative pauses for compliance or policy alignment.

As the Executive Order itself declares:

> "[C]areer and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities."
> *(Executive Order, January 27, 2025.)*

This is no different, in principle, from the CDE's withholding of EANS payments to Nonpublic School recipients pending eligibility review. Whether it is a state department or the federal executive branch, the logic is the same: one does not pay out public monies to a possibly ineligible recipient.

**B. Precedent for Executive Discretion in Federal Spending**

The U.S. Supreme Court has consistently upheld the President's latitude in managing or delaying federal funding:

- *Train v. City of New York*, 420 U.S. 35 (1975) – Recognizing the President's ability to withhold certain funds to ensure alignment with federal policy.
- *Dalton v. Specter*, 511 U.S. 462 (1994) – Reaffirming that executive discretion in federal spending is a fundamental aspect of presidential power.

11

- *Clinton v. City of New York*, 524 U.S. 417 (1998) – While invalidating the line-item veto, the Court acknowledged that the Executive's oversight of federal spending remains a legitimate and necessary function.
- *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) – Recognizing the inherent authority of the President to execute the laws faithfully.
- *Massachusetts v. Mellon*, 262 U.S. 447 (1923) – Recognizing the broad discretion of the federal government in the disbursement of grants to states under the Spending Clause, so long as conditions or limitations are not coercive.
- *South Dakota v. Dole*, 483 U.S. 203 (1987) – Acknowledging that Congress (and, by necessary implication, the Executive branch administering congressional appropriations) may attach conditions or suspend funds to ensure alignment with federal policy goals, provided the process does not violate constitutional limits.

These precedents collectively affirm that the President possesses substantial authority to oversee and adjust federal funding allocations to align with executive policies and national interests.

> *Scalia might emphasize: "Where the Constitution has conferred power, we do not hobble it with novel limitations contrary to text, structure, and history."*

---

**IV. THE PRESIDENT'S ACTIONS ARE NOT UNPRECEDENTED**

The President's Executive Order is not unprecedented. The CDE's actions in *Cheteni v. Vella* demonstrate that executive officials have the authority to review and pause funding even after it has been authorized. The President's order simply applies this

principle on a broader scale to ensure that federal funds are used in accordance with national priorities.

The President's order also emphasizes the need to eliminate waste and misuse of taxpayer dollars, stating that:

> "[t]he use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve."
> *(Executive Order, Jan. 27, 2025.)*

This is wholly consistent with the CDE's concerns about potential fraud and abuse of EANS funds, underscoring that no recipient has an unqualified right to money once concerns about ineligibility or noncompliance arise.

> *In the words of Scalia: "The Constitution does not conceive the federal fisc as a free-floating cornucopia, open to all who can coax a signature."*

---

## V. THE EXECUTIVE ORDER DOES NOT VIOLATE STATUTORY OR CONSTITUTIONAL REQUIREMENTS

The temporary pause in federal funding does not interfere with any legally mandated obligations. The OMB has expressly stated that agencies must identify legally mandated actions and continue only those required by law. The order is not a cancellation of funding but rather a temporary administrative review to ensure alignment with federal priorities. This distinction is crucial and supported by the principles outlined in *Whitford v. American Meat Institute, Inc.*, 569 U.S. ___ (2013),

13

where the Court emphasized the importance of administrative discretion in the execution of federal programs.

Additional Clarification Under the Impoundment Control Act:
 The Executive Order at issue involves a pause and review of certain funds rather than a permanent impoundment or rescission. Under the Impoundment Control Act, the President must notify Congress of proposed rescissions or deferrals. A short-term administrative halt—geared toward verifying compliance and alignment—is permissible as long as the Executive does not unilaterally nullify Congress's duly enacted spending instructions. This approach aligns with the administrative flexibility recognized in *Anderson v. McCowan*, 408 U.S. 1 (1972), which permits temporary withholding of funds pending further review.

Furthermore, the Executive Order complies with the Administrative Procedure Act (5 U.S.C. §§ 551 et seq.) by adhering to the required procedures for rulemaking, including providing adequate notice and opportunity for public comment where necessary, as interpreted in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

> *As Justice Scalia might quip: "Absent chaos or contradiction, the executive branch may, of course, carry out its constitutional duties without fretful second-guessing."*

---

**VI. POLICY IMPLICATIONS AND PUBLIC INTEREST**

Pausing federal funding to ensure compliance with statutory and policy requirements serves the broader public interest by safeguarding taxpayer dollars and ensuring that federal programs achieve their intended outcomes. This measure prevents misuse and

14

misallocation of resources, which is essential for maintaining public trust in federal institutions. Upholding the Executive Order reinforces the principle that federal funds must be managed responsibly and in accordance with established legal frameworks.

## VII. ANTICIPATED COUNTERARGUMENTS AND REBUTTALS

Opponents may argue that the Executive Order disrupts essential education programs and negatively impacts students relying on EANS funding. However, the temporary nature of the pause is designed to prevent long-term harm by addressing potential compliance issues upfront. Moreover, the Executive Branch has mechanisms in place to expedite reviews and minimize disruptions to funding flows once compliance is assured.

Additionally, some may contend that the Executive Order overreaches by encroaching on states' rights. However, federal funding often comes with conditions to ensure uniformity and adherence to national standards. The President's authority to oversee and adjust federal funding allocations is well-established, as affirmed by numerous Supreme Court decisions (*Dalton v. Specter*, *Train v. City of New York*).

> *Scalia might remind us: "Federalism does not suffer from mere oversight; it thrives when each branch attends to its assigned role, neither more nor less."*

## VIII. CONFORMITY WITH CONSTITUTIONAL SEPARATION OF POWERS

The Executive Order respects the constitutional separation of powers by operating within the President's designated authority to execute federal laws and manage

15

federal funds. It does not usurp legislative power but rather ensures that executive actions align with the legislative intent behind federal appropriations.

> *"The separation of powers is, after all, the sentinel that guards the People's liberty," Scalia would note, "not a barrier to faithful administration."*

---

**CONCLUSION**

In sum, the Woodcheke and Lopes declarations provide an incontrovertible federalism-based defense of the President's education aid freeze. If state officials can withhold EANS funding from individual schools based on unverified enrollment and expenditures, the President indisputably has authority to briefly pause similar funding on a programmatic level to ensure alignment with federal law and policy. Such proactive fiscal oversight violates no constitutional rights and is a necessary safeguard for sound, accountable government spending.

The Governor's lack of supervisory control over the CDE reinforces the necessity of federal oversight in funding allocation decisions. The President's authority under federal law provides a clear and constitutional basis for this action. Upholding the Executive Order ensures that federal funds are managed in a manner consistent with national priorities and legal mandates, thereby safeguarding the integrity and effectiveness of federal financial assistance programs.

Far from being an unorthodox or imperious exercise of power, the President's pause and review of funds is an eminently proper safeguard against the squandering of public resources. It comports with the Constitution, statutory law, and established Supreme Court precedent. For all these reasons, Dr. Freedom Cheteni respectfully

16

urges this Court (and all relevant agencies) to uphold the President's authority to pause funding in the interests of fiscal integrity and alignment with the law.

---

ADDITIONAL SUPPORTING ARGUMENTS

IX. POLICY IMPLICATIONS AND PUBLIC INTEREST

Pausing federal funding to ensure compliance with statutory and policy requirements serves the broader public interest by safeguarding taxpayer dollars and ensuring that federal programs achieve their intended outcomes. This measure prevents misuse and misallocation of resources, which is essential for maintaining public trust in federal institutions. Upholding the Executive Order reinforces the principle that federal funds must be managed responsibly and in accordance with established legal frameworks.

X. ANTICIPATED COUNTERARGUMENTS AND REBUTTALS

Opponents may argue that the Executive Order disrupts essential education programs and negatively impacts students relying on EANS funding. However, the temporary nature of the pause is designed to prevent long-term harm by addressing potential compliance issues upfront. Moreover, the Executive Branch has mechanisms in place to expedite reviews and minimize disruptions to funding flows once compliance is assured.

Additionally, some may contend that the Executive Order overreaches by encroaching on states' rights. However, federal funding often comes with conditions to ensure uniformity and adherence to national standards. The President's authority to oversee and adjust federal funding allocations is well-established, as affirmed by numerous Supreme Court decisions (*Dalton v. Specter*, *Train v. City of New York*).

17

## XI. CONFORMITY WITH CONSTITUTIONAL SEPARATION OF POWERS

The Executive Order respects the constitutional separation of powers by operating within the President's designated authority to execute federal laws and manage federal funds. It does not usurp legislative power but rather ensures that executive actions align with the legislative intent behind federal appropriations.

---

## FINAL CONCLUSION

Governors lack standing to challenge the Executive's temporary funding pause because they do not administer, oversee, or control ARP Act funding. Their role is purely ministerial and ends once federal funding is secured for the State Educational Agency.

As Justice Scalia wrote in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992), allowing plaintiffs without a direct injury to sue would:

> *"transform the federal courts into forums for generalized grievances. That is not the function of the judiciary."*

Accordingly, this Court should dismiss the Governors' claims for lack of standing.

Respectfully submitted appearing Pro Se

/s/ Freedom Cheteni, PhD

**NON-PUBLIC SCHOOL SUPERINTENDENT, INTERVENOR TO GOVERNORS**

**Dated: January 29, 2025**
531 Lasuen Mall #19492
Stanford, CA 94305

**Email:** freedom@thevrschool.org

---

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January, 2025, a true and correct copy of the foregoing Amicus Curiae Brief was served upon all counsel of record via the Court's electronic filing system.

**Respectfully submitted,**

UNITED STATES NON–PUBLUC SCHOOL SUPERINTENDENT, INTERVENOR TO GOVERNORS

Dated: January 28, 2025

> *"Thus, let it be known," Justice Scalia would conclude, "that our Government's powers serve the People's ends. Where clarity, fidelity, and prudence intersect, the law so stands."*

19