## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, et al.,<br><br>Defendants. | C.A. No. 1:25-cv-00039<br><br>**REQUEST FOR EMERGENCY RELIEF TO ENFORCE TEMPORARY RESTRAINING ORDER OF JANUARY 31, 2025, UPON EVIDENCE OF VIOLATION** |

**PLAINTIFF STATES' MOTION FOR ENFORCEMENT OF THE TEMPORARY RESTRAINING ORDER**

On January 31, 2025, this Court issued a Temporary Restraining Order enjoining Defendants, including the President of the United States, Donald J. Trump, the United States Office of Management and Budget, and the United States Treasury Department, from "reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant)" by any means, including through oblique means "such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025." TRO 12, ECF No. 50 ("Order"). Yet Plaintiff States and entities within the Plaintiff States continue to be denied access to federal funds. These denials continue to cause immediate irreparable harm as demonstrated in the temporary restraining order proceedings and will be further demonstrated in support of the Plaintiff States' request for preliminary injunction, filed simultaneously with this motion. Jobs, lives, and the social fabric of life in the Plaintiff States are

at risk from the disruptions and uncertainty that have continued now a full week after entry of the Order. As this Court noted, executive action that is "in name-only and may have" proceeded "simply to defeat the jurisdiction of the courts" weighs in favor of temporary but decisive action. Order, 10. Unfortunately, such action is once again necessary on an urgent basis.

The sands have only continued to shift since January 31. As explained below, there has been an ever-changing kaleidoscope of federal financial assistance that has been suspended, deleted, in transit, under review, and more since entry of the Order. These conditions persist today. In particular, Defendants have—for the first time this week—taken the position that certain federal funds, including federal financial assistance under the Inflation Reduction Act ("IRA") and the Infrastructure Improvement and Jobs Act ("IIJA"), is outside the scope of the Court's Order, a position contradicted by the plain text of the Order and the notice Defendants previously filed with the Court explaining their view of the scope of the Order. *See* Order 11-12.

And, while it is imaginable that a certain amount of machinery would need to be re-tooled in order to undo the breadth of the Federal Funding Freeze, there is no world in which these scattershot outages, which as of this writing impact billions of dollars in federal funding across the Plaintiff States, can constitute compliance with this Court's Order. Defendants contemplated an all-of-government "pause" on federal funding could be implemented in the less than 24 hours between when the OMB Directive issued and when it took effect. Yet, as to a number of funding sources that provide critical services in Plaintiffs' States, the situation has not changed at all nearly a week after the Court's Order, which noted that "[t]he evidence in the record at this point shows that . . . the Executive's decision to pause appropriated federal funds [for at least some federal programs] 'remains in full force and effect.'" Order 10.

Defendants also seek resort to unspecified administrative and operational delays—but these are the delays the Defendants are enjoined from imposing.  This Court should enforce the plain text of its temporary restraining order and order Defendants to immediately restore funds and desist from the federal funding pause until the preliminary injunction motion can be heard and decided, a process which is proceeding expeditiously in separate proceedings before this Court.

## I.    FACTUAL BACKGROUND

### A.    Court Order

This Court's Order restrained three types of conduct.  First, Defendants shall "not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms."  Order 11.  Second, the Defendants shall not accomplish any of the listed prohibited activities during "'identif[ication] and review' of federal financial assistance programs, as identified in the OMB Directive."  Order 12.  Third, the Federal Funding Freeze is not to be reinstituted under any name—Defendants are "restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant)."  *Id*.  Moreover, the Court required affirmative action of the Defendants—that is, if any grant needed to be stopped, delayed, or otherwise withheld in the regular order, Defendants are required to "comply with all notice and procedural requirements in the award, agreement, or other instrument" governing the federal financial assistance at issue.  *Id*.

In addition, in recognition that the scope of the Federal Funding Freeze was vast, the Court ordered Defendants' attorneys to "provide written notice of this Order to all Defendants and

agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m."
and file a copy with the Court at the same time.  *Id*.

### B.     Defendants' Subsequent Conduct

#### 1.     Notice of Court Order

Defendants filed the Notice of Court Order on Monday, February 3, 2025.  In it, Defendants
stated their understanding of the scope of the Court's Order, telling all of their "employees,
contractors, and grantees" that "Federal agencies cannot pause, freeze, impede, block, cancel, or
terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the
President's recently issued Executive Orders."  Notice of Ct. Order 1, ECF No. 51-1. Defendants
accompanied their filing of the Notice with a brief cover memorandum to the Court, which
elaborated on their views that:

- the Order did not restrain the "President or his advisors from communicating with federal agencies or the public about the President's priorities regarding federal spending."

- the Order did not enjoin "the President's Executive Orders, which are plainly lawful and unchallenged in this case."

- the Order did not "impos[e] compliance obligations on federal agencies that are not Defendants in this case."

#### 2.     Noncompliance with Court Order

Despite the Court's order, Defendants have failed to resume disbursing federal funds in
multiple respects.

*IRA/IIJA funds*. First, Defendants have failed to fully resume disbursing federal funds
appropriated by the IRA and IIJA. Plaintiff States' agencies that receive IRA/IIJA-appropriated
funds under final grant agreements have been regularly refreshing federal payment portals—in
particular, the Automated Standard Application for Payments ("ASAP")—to check whether their

grants have been restored. For some IRA/IIJA grants, grant accounts have reappeared over the course of the week in ASAP, and federal grantor agencies have communicated to the States that grant accounts are or will shortly be un-suspended. For other IRA/IIJA grants, as of the evening of Wednesday, February 5, grant accounts continue to be missing in ASAP and unavailable for drawing down disbursements; other grant accounts are still flagged as suspended or held "per executive order" or "for agency review." In these cases, federal grantor agencies have replied to state agency inquiries with receipt-acknowledging non-answers or not replied at all—and often meetings with agency grant offices remain cancelled. The following grants are illustrative, although not exhaustive—many states have had these and other important grants frozen or paused:

- The **Climate Pollution Reduction Grant** program, administered by EPA and funded by a $5 billion IRA appropriation, supports States, tribes, and local governments in planning and implementing greenhouse-gas reduction measures. For example, the regional air district covering Los Angeles, California received a $500 million award, subject to a final grant agreement, to clean up the highly polluting goods movement corridor between the Imperial Valley's logistics hubs and warehouses to the Port of Los Angeles. (Ex. 42 to Thomas-Jensen Aff. ¶ 8.)[1] As of February 5, this grant and other Climate Pollution Reduction Grants remained inaccessible in ASAP. (Ex. 42 to Thomas-Jensen Aff. ¶¶ 8, 25; Ex. 28 to Thomas-Jensen Aff. ¶¶ 8, 11, 18–19; Ex. 84 to Thomas-Jensen Aff. ¶¶ 10, 11, 15; Ex. 106 to Thomas-Jensen Aff. ¶¶ 41–44; Ex. 83 to Thomas-Jensen Aff. ¶¶ 2, 25; Ex. 56 to Thomas-Jensen Aff. ¶ 12; *see also* Ex. 20 to Thomas-Jensen Aff. ¶¶ 19, 23 (as of Feb. 4); Ex. 44 to Thomas-Jensen Aff. ¶¶ 35–36 (same); Ex. 49 to Thomas-Jensen Aff. ¶ 19 (same); Ex. 97 to Thomas-Jensen Aff. ¶¶ 4(B), 5, 14 (same); Ex. 61 to Thomas-Jensen Aff. ¶¶ 8, 10 (same)).

- For sixty years, EPA has administered a national **air monitoring** network and research program under Clean Air Act sections 103 to 105. The IRA appropriated $117.5 million to fund air monitoring grants under this program to increase States' abilities to detect dangerous pollution like particulate matter (soot) and air toxics, including in disadvantaged communities. These pollutants create a particular public health emergency in areas recovering from wildfires. As of February 5, air monitoring grants remained inaccessible in ASAP. (Ex. 28 to Thomas-Jensen Aff. ¶¶ 7, 18-19;  Ex. 97 to Thomas-Jensen Aff. ¶¶ 12,

---

[1] Simultaneous with this filing, Plaintiff States are filing a Motion for Preliminary Injunction to which the Affidavit of Molly Thomas-Jensen is an appended exhibit.  All of the exhibits and other contents of the motion for preliminary injunction are hereby incorporated by cross-reference. Exhibits to this motion will be denoted by letters.

15; Ex. 42 to Thomas-Jensen Aff. ¶¶ 12-13, 25; Ex. 84 to Thomas-Jensen Aff. ¶¶ 12-13, 15; Ex. 106 to Thomas-Jensen Aff. ¶¶ 58-71; Ex. 73 to Thomas-Jensen Aff. ¶ 8; *see also* Ex. 23 to Thomas-Jensen Aff. ¶ 12 (as of Feb. 4)).

- The IRA appropriates $4.5 billion to the Department of Energy for the **Home Electrification and Appliances Rebates Program**. The rebate program, administered by state energy offices under final federal grants, subsidizes low- and moderate-income households' purchase and installation of electric heat pump water heaters, electric heat pump space heating and cooling systems, and other home electrification projects. Thousands of homeowners across Plaintiff States have signed up for Plaintiff States' programs, received approvals, and even started installation in reliance on these rebates, and are stuck paying their contractors an extra $8,000 if state energy offices cannot draw down funds. As of February 5, that remained the case: the home rebate grants are held "for agency review" in ASAP. (Ex. 40 to Thomas-Jensen Aff. ¶¶ 8, 11, 37; Ex. 95 to Thomas-Jensen Aff. ¶¶ 23, 37-40, 55; Ex. 20 to Thomas-Jensen Aff. ¶¶ 6, 22 (as of Feb. 4); *see also* Ex. 108 to Thomas-Jensen Aff. ¶¶ 33, 35; Ex. 85 to Thomas-Jensen Aff., Ex. J).

- The **Solar for All** program, administered by the Environmental Protection Agency ("EPA") and funded by the IRA's Greenhouse Gas Reduction Fund, awarded $7 billion to 60 grantees to install rooftop and community solar energy projects in low-income and disadvantaged communities. These awards—all with final grant agreements in place—support the construction of cheap, resilient power in underserved neighborhoods, and provide particular protection to communities in which wildfire risk regularly causes utilities to de-energize transmission lines. As of February 5, numerous Plaintiff States were unable to access their Solar For All grant accounts in ASAP. (Ex. 108 to Thomas-Jensen Aff. ¶¶ 19–21 (Rhode Island); Ex. 44 to Thomas-Jensen Aff. ¶ 14 (Connecticut); Ex. 52 to Thomas-Jensen Aff. ¶ 12 (Hawaiʻi); Ex. 73 to Thomas-Jensen Aff. ¶ 8 (Michigan); Ex. 71 to Thomas-Jensen Aff. ¶¶ 2, 7 (Maine); Ex. 85 to Thomas-Jensen Aff. ¶¶ 5, 10 (New Jersey); Ex. 95 to Thomas-Jensen Aff. ¶¶ 6, 55 (New York)).  As of the time of filing, it appears that access in ASAP has at least begun to be restored in many of the Plaintiff States.

*Other funds.*  Defendants have failed to follow the Court's order with respect to other funds, too. On February 3, the National Institutes of Health abruptly cancelled an advisory committee review meeting with Brown University's School of Public Health for a $71 million grant on dementia care research, saying "all federal advisory committee meetings had been cancelled."[2] Ex.

---

[2] Defendants have asserted that the National Institutes for Health ("NIH") is not a Defendant.  Ex. C at 1.  But NIH is a component of the United Department of Health and Human Services.  *See* 42 U.S.C. § 281(a); 42 U.S.C. § 202.

107 to Thomas-Jensen Aff. ¶¶ 6, 10. Head Start programs in Michigan and Vermont were, as of February 5, still unable to access federal funds from the Department of Education. Ex. 111 to Thomas-Jensen Aff. ¶ 5; Ex. 76 to Thomas-Jensen Aff. ¶ 12. On February 5 and 6, the Centers for Disease Control and Prevention and the Health Resources and Services Administration renewed stop work orders to a University of Washington program doing global HIV prevention work. Decl. of Maya Beal (Feb. 7, 2025) ¶¶ 4, 10–11, 14–15, attached as Exhibit A. As Plaintiff States' preliminary injunction motion details, since the entry of the Court's Order, their agencies have received inconsistent guidance, cancelled and un-cancelled meetings, and inexplicably patchwork restorations of some grants but not others. Plaintiff's Motion for Preliminary Injunction 18, 20, 21, 24, 32.

### 3.    Attempts to Remedy

Plaintiff States attempted to remedy these issues on Wednesday, February 5, but were not successful. *See* Exhibits B and C. As part of that conferral process, Defendants have identified two grounds to excuse noncompliance.

***First***, in correspondence to Plaintiff State Oregon, Defendants explained that, in their view, certain IRA/IIJA funds lie outside the Order's scope. Specifically, Defendants explained that such funding "was paused pursuant to OMB Memorandum M-25-11, which is not challenged in *New York v. Trump* and preceded issuance of the challenged OMB Memorandum M-25-13." Exhibit B at 1.

As background, OMB Memorandum M-25-11 ("OMB *Unleashing* Guidance"), which predated the OMB Directive, instructed agencies that the "directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) [(IRA)] or

the Infrastructure Investment and Jobs Act (Public Law 117-58) [(IIJA)]," but that pause applied only to "funds supporting the Green New Deal"—a term the OMB *Unleashing* Guidance defines as "supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." Ex. 13 to Thomas-Jensen Aff. The Guidance provides no further explanation of how federal agencies are to make that determination.

Defendants thus appear to now take the position that the "freeze" set out in the *Unleashing* Guidance is distinct from the "freeze" set out days later in the OMB Directive, and that they remain free to freeze funds pursuant to the *Unleashing* Guidance. That position would appear to allow Defendants to continue to freeze any funds under either the IIJA or IRA that the federal grantor agency might characterize as "supporting the Green New Deal."[3]

**Second**, Defendants have taken the position that, as a categorical matter, "the mere fact of a pause in funding does not inherently violate the Court's Order," and that the payment delays and blockages the Plaintiff States have endured for the past week despite the Order are excusable because there "are operational and administrative reasons for payments taking longer than normal." As discussed below, certain federal funding streams have resumed, and others have not; consequently, key programs are at risk in the Plaintiff States because of Defendants' failure to timely comply with this Court's Order.

## LEGAL STANDARD

Courts may issue further orders to obtain "compliance with a court order." *United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S.

---

[3] Defendants subsequently took a third view of the applicability of the Order to such funds, stating in further correspondence with Plaintiff States that the EPA, the grantor agency for a large majority of the IRA and IIJA funding streams, was "still working through the administrative process of 'unsuspending' grants." Exhibit C at 1.

187, 191 (1949)).  In the First Circuit, to remedy violations of court orders, there are four factors

to satisfy: (1) notice of the court order; (2) clarity and unambiguity of the order; (3) ability to

comply; and (4) violation of the order.  *Letourneau v. Aul*, No. CV 14-421JJM, 2024 WL 1364340,

at *2 (D.R.I. Apr. 1, 2024) (citing *Hawkins v. Dep't of Health & Hum. Servs.*, 665 F.3d 25, 31 (1st

Cir. 2012)).

"[T]he 'clear and unambiguous' standard applies to the language of the relevant court order,

not to its effectiveness." *Cashman Dredging & Marine Contracting Co., LLC v. Belesimo*, No. CV

21-11398-DJC, 2022 WL 3227535, at *4 (D. Mass. May 17, 2022) (quoting *Goya Foods, Inc. v.

Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002)).  When evaluating whether a court order is

"clear and unambiguous," the question is "not whether the order is clearly worded as a general

matter." *Saccoccia*, 433 F.3d at 28.  Instead, the "clear and unambiguous" prong "requires that the

words of the court's order have clearly and unambiguously forbidden the precise conduct" giving

rise to the need for enforcement. *Id.* (emphasis omitted) (citing *Perez v. Danbury Hosp.*, 347 F.3d

419, 424 (2d Cir. 2003)).

## ARGUMENT

### I.  The Court Should Order Defendants to Immediately Restore Frozen Funding Pursuant to the Court's Temporary Restraining Order.

Clear and convincing evidence demonstrates that all four elements for further enforcement

of the Order are met.  Defendants had notice of the Order, the Order was clear and unambiguous,

Defendants had the ability to comply with the Order, and Defendants have violated and continue

to violate the Order. *See Letourneau v. Aul*, No. CV 14-421JJM, 2024 WL 1364340, at *2 (D.R.I.

Apr. 1, 2024) (citing *Hawkins v. Dep't of Health & Hum. Servs.*, 665 F.3d 25, 31 (1st Cir. 2012)).

There can be no dispute as to the first, third, and fourth elements.  First, Defendants had notice of

the Order, as they appeared at the hearing on the motion for a temporary restraining order, received

the subsequent Order, filed the required Notice of the Order they intended to distribute to "all Defendants and agencies and their employees, contractors, and grantees," Order 12, in fact distributed the Order, and have communicated with Plaintiffs about the Order.

Second, and as explained further below, the language applicable to Defendants' assertions is plain and unambiguous and compels the result opposite from Defendants' assertion. That is, the plain language of the Order sweeps in all incorporated articulations of the Federal Funding Freeze that are patent in the OMB Directive *and* the Order requires compliance without exception for administrative or operational difficulties, especially for any that extend a multiple of the length of time it took to implement the Federal Funding Freeze in the first instance.

Third, Defendants had the ability to comply with the Order. Simply put, because Defendants were able to cut off funding streams, they are equally able to turn those streams back on. Plaintiff States of course appreciate the need to allow Defendants a short period of time to operationalize the Order, but that time has long since passed. Defendants managed to implement widespread and disruptive funding freezes immediately after the OMB Directive was distributed, yet they have somehow now required a week or more to restore only some of the withheld funding. As described in Plaintiff States' Motion for Preliminary Injunction 24–34, many of the programs for which funds were still frozen days after entry of the Order conspicuously mirror the President's policy attacks on funding for environmental projects, foreign aid, university research, and services for low-income families. Defendants' partial compliance demonstrates that they have the ability to fully comply, and the Order does not allow for selective compliance.

Fourth, Defendants have violated the Order. The evidence is overwhelming, as described *supra* Section B.2 and in the Motion for Preliminary Injunction 24–34, that Plaintiff States continue to experience widespread disruption in funds without notice or other procedural

requirements of the relevant award, agreement, or other instrument.  Defendants appear to contend that their conduct is permissible under the Order. *Supra* Section B.3. But Defendants are wrong. Under the plain and unambiguous text of the Order, which bars Defendants from "implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants," Defendants' conduct violates the Order. Order 12.

### A. The Order Plainly Encompasses Categorical Funding Freezes Tied to Executive Orders (Including the *Unleashing American Energy* Executive Order)

Defendants apparently take the position that they can implement at least one of the funding freezes called for by the "series of Executive Orders" issued by the President "during the initial days of his Administration," including "Unleashing American Energy (Jan. 20, 2025)," Ex. 9 to Thomas-Jensen Aff.. But the plain text of the Order does not allow for such an interpretation; "the words of the court's order have clearly and unambiguously forbidden th[is] precise conduct." *United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005) (emphasis omitted) (citing *Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003)).

The Order requires Defendants to cease "implementing, or otherwise giving effect to the OMB Directive *under any other name or title* or through any other Defendants (or agency supervised, administered, or controlled by any Defendant)." Order 12 (emphasis added).  The text of the Court's Order must be read in conjunction with the substance of the OMB Directive, which required agencies to "implement" the Executive Orders issued by the President during the initial days of his administration by "temporarily paus[ing] all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." OMB Directive, Compl. Ex. A.  Any categorical pause of obligations or disbursements *to implement the*

*Executive Orders* is exactly "implementing, or otherwise giving effect to the OMB Directive." Order 12.

The OMB Directive acknowledges that it is the implementation of prior action.  In the *Unleashing American Energy* Executive Order, the President announced a categorical, immediate, and indefinite pause on federal funds under the IRA and IIJA. Ex. 1 to Thomas-Jensen Aff. at 8353 Specifically, Section 7(a) of the *Unleashing American Energy* Executive Order, entitled "Terminating the Green New Deal," ordered all federal agencies to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." *Id.* at 8357. The next day, OMB issued a memorandum clarifying that Section 7(a) of the *Unleashing American Energy* Executive Order only paused funding that the agencies identified as "Green New Deal" funding, i.e., "funds supporting programs, projects, or activities that may be implicated" by a set of Executive Branch priorities on energy and environmental regulation announced in Section 2 of that Executive Order.  Ex. 13 to Thomas-Jensen Aff..  The OMB Directive used equivalent language, express referencing the *Unleashing American Energy* Executive Order and announcing a categorical pause on disbursing "financial assistance for ... the green new deal." Compl. Ex. A.

Defendants' apparent argument that they are permitted to continue to freeze federal funds by reference to the *Unleashing* Guidance, as long as they do not formally do so pursuant to the OMB Directive, is unavailing. That an earlier directive *also* directed a categorical funding freeze does not alter or amend the text of this Court's Order, which restrains Defendants from categorically freezing duly appropriated and obligated funds. After that Order, the OMB Directive may not be given effect, "under any other name or title." Order 12.  That "title" includes the OMB *Unleashing* Guidance. Indeed, Defendants' own prior statements reflect that they previously understood the Court's Order to have that effect: The Notice that Defendants circulated to federal

12

employees and filed with this Court instructed employees not to "pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, *or on the basis of the President's recently issued Executive Orders*."  Notice of Ct. Order 1, ECF No. 51-1 (emphasis added).  Neither that Notice nor the document that accompanied it to this Court identified a carveout for other memoranda or guidance documents that implemented functionally the same policy and with functionally the same effect. Indeed, Defendants' prior, broader understanding of the Court's Order is, as discussed *supra* Section B.1, the only plausible one, given that the Court specifically enjoined Defendants from carrying out the same policy "under any other name or title."

Defendants' multiple actions to pause IRA/IIJA funds implement the OMB Directive, even if those actions also were also consistent with the OMB *Unleashing* Guidance.  For example, in Rhode Island, the first denial of the Solar for All grant fund drawdown request occurred on January 27, 2025, the same day OMB 25-13 was published.  Ex. 108 to Thomas-Jensen Aff. at 14.  And the account in the grants administration system was entirely suspended January 28, 2025, at 5:44pm.  *Id.* at 17.  Even if the initial draw was rejected as a result of the OMB *Unleashing* Guidance (and it is not clear that it was), the account suspension was clearly undertaken pursuant to the OMB Directive, going into effect right on time to meet the deadline articulated there.  That account suspension, or the act taken pursuant to the OMB Directive, persisted as of February 5.  Ex. 108 to Thomas-Jensen Aff. ¶ 19.  No explanation that the grant was out of compliance or authority for the suspension of the account was given. Similarly, EPA's suspension of a Southern California air district's $500 million award under the Climate Pollution Reduction Grant program went into effect on January 28th precisely—that is, the grant account was available for disbursement on the morning of the 28th, but it disappeared the same afternoon—the day after the

OMB Directive was published, but an entire week after OMB's *Unleashing* Guidance. Ex. 42 to Thomas-Jensen Aff. ¶¶ 18–19 & Exs. B, C.

In addition, the President continued to order new extensions of the Federal Funding Freeze simultaneous with the OMB Directive taking effect. These Executive Orders are also covered by the Order. In an Executive Order issued January 28, the President ordered federal agencies "that provide[] research or education grants to medical institutions" to "take appropriate steps to ensure" (or, in other words, cut off vital funding) that those institutions immediately discontinue ongoing gender affirming care to existing minor patients and cease to serve minor patients. Ex. 8 to Thomas-Jensen Aff. § 4. That edict issued without regard to the harm to minor patients that would be inflicted by such a cessation or delay of care, in violation of settled law. This continued effort to, in concert with OMB, pause vital funding first without establishing any basis in law is similarly conduct prohibited by the Order.

As these facts demonstrate, Defendants now seek to dress up their actions taken as a result of the OMB Directive and the blanket command contained therein in a new guise. But doing that is what the Court has prohibited: Defendants may not "implement or give effect to" the commands of "the OMB Directive" even if "under any other name or title." Ascribing action to an Executive Order or a prior Guidance when the action is squarely within scope of OMB 25-13 is giving effect to the OMB Directive under a different name.

### B. The Plain Text of the Order Made No Provision for Day After Day of Administrative Pauses and Delays

The Defendants have responded to Plaintiff States' alerts that some essential federal financial assistance is still inexplicably paused with empty assurances. When Plaintiff States raised examples of the continued freeze of federal financial assistance in the face of the Court's order, counsel for Defendants suggested "operational and administrative reasons for payments

taking longer than normal" as an explanation for days-long delays.  Ex. C, 1.  "Operational and administrative reasons" is a phrase so vague as to not be helpful at all in understanding whether the Defendants understand and intend to comply with the plain text of this Court's Order.  This is an essential quandary, because from the Plaintiff States' perspective, the only evidence available is evidence of nonpayment.  Defendants were instructed not to leave Plaintiff States in the dark, and in those limited exceptions where some sort of pause or freeze could be supported by applicable legal authority, Defendants must give the appropriate notice and procedural safeguards meant to prevent the disruption here. Order 12.

Without explanation or substantiation, "operational and administrative reasons" for lengthy delays in restoring funding is incredible, particularly given the speed and efficiency with which hundreds of funding streams were frozen in the immediate wake of the OMB Directive.  When OMB issued the Directive in the evening on January 27, 2025, it required the temporary pause to "become effective on January 28, 2025, at 5:00 PM." Compl. Ex. A. Contemporaneous reporting and Plaintiffs' evidence demonstrate that funding shutoffs began almost immediately after the OMB Directive issued.  It is inexplicable why the federal government, which apparently determined it feasible to pause almost all federal funding within 24 hours, has not universally restored access to funds after nearly a week.  As explained in the Plaintiff States' Motion for Preliminary Injunction 34, even a momentary delay in the intricate accounting dance that underpins our cooperative federal system can result in failures to make payroll and the potential shuttering of programs and nonprofit entities that provide vital health and human services to the residents of the Plaintiff States.

Defendants' assertion that "the mere fact of a pause in funding does not inherently violate the Court's Order," Ex. C, also cannot be squared with the plain text of the Order, which states that

Defendants "shall not pause" federal financial assistance to the Plaintiff States. Order 11. Of course, as set forth in the Order, there could be an instance where a specific applicable statute, regulation or term of the grant allowed a pause—but in that case, the Defendants must "comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs" before funding could be paused. Order 12. Across the Plaintiff States, there is no evidence that Defendants have made any attempt at this compliance as to the funding still paused.

## CONCLUSION

For the reasons provided above, the Court should enforce the clear and unambiguous text of its temporary restraining order and order Defendants to immediately restore funds until the preliminary injunction motion can be heard and decided. Plaintiff States do not request any sanction at this time. The Court should further Order that Defendants immediately take every step necessary to effectuate the Order, including clearing any administrative, operational, or technical hurdles to implementation. In addition, the Court should Order compliance with the plain text of the existing Order not to pause any funds on the basis of pronouncements pausing funding incorporated into the OMB Directive, like Section 7(a) of the Unleashing Executive Order and the OMB Unleashing Guidance.

Respectfully submitted,

February 7, 2025

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Kathryn M. Sabatini*
Kathryn M. Sabatini (RI Bar No. 8486)
Civil Division Chief
Special Assistant Attorney General
Sarah W. Rice (RI Bar No. 10465)
Deputy Chief, Public Protection Bureau
Assistant Attorney General
Leonard Giarrano IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Michael J. Myers*
Senior Counsel
Molly Thomas-Jensen*
Special Counsel
Colleen Faherty*
Special Trial Counsel
Zoe Levine*
Special Counsel for Immigrant Justice
28 Liberty St.
New York, NY 10005
(929) 638-0447
Rabia.Muqaddam@ag.ny.gov
Michael.Myers@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Zoe.Levine@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Laura L. Faer*
Laura L. Faer*
Supervising Deputy Attorney General
Christine Chuang*
Supervising Deputy Attorneys General
Nicholas Green*
Carly Munson*
Kenneth Sugarman*
Christopher J. Kissel*
Lara Haddad*
Theodore McCombs*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
Deputy Solicitor General
115 S. LaSalle St.
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

17

Laura.Faer@doj.ca.gov
Christine.Chuang@doj.ca.gov
Nicholas.Green@doj.ca.gov
Carly.Munson@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Lara.Haddad@doj.ca.gov
Theodore.McCombs@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
Deputy Chief, Government Bureau
Turner Smith*
Deputy Chief, Energy and Environment
Bureau
Anna Lumelsky*
Deputy State Solicitor
1 Ashburton Pl.
Boston, MA  02108
(617.963.2277)
katherine.dirks@mass.gov
turner.smith@mass.gov
anna.lumelsky@mass.gov

**KRISTEN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Nathan Arrowsmith*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Nathan.Arroswmith@azag.gov

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Angela Cai*
Angela Cai*
Executive Assistant Attorney General
Jeremy M. Feigenbaum*
Solicitor General
Shankar Duraiswamy*
Deputy Solicitor General
25 Market St.
Trenton, NJ 08625
(609) 376-3377
Angela.Cai@njoag.gov
Jeremy.Feigenbaum@njoag.gov
Shankar.Duraiswamy@njoag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
Jill Lacedonia
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.skold@ct.gov
Jill.Lacedonia@ct.gov

18

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
Solicitor General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
shannon.stevenson@coag.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726
Andrew.Mendrala@dc.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jason Anton*
Jason Anton*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6424
AKirschner@oag.state.md.us

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Linus Banghart-Linn*
Linus Banghart-Linn*
Chief Legal Counsel
Neil Giovanatti*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
GiovanattiN@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
Deputy Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov

**JEFF JACKSON**
Attorney General for the State of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
919-716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Christina Beatty-Walters*
Christina Beatty-Walters*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
Leah Brown*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Aaron J. Bibb*
Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
BibbAJ@doj.state.wi.us

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I filed the within via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to counsel of record on this 7th day of February, 2025.

*/s/ Sarah W. Rice*