# Thomas-Jensen Affirmation

# Exhibit # 34

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF NEW YORK; et al.,

        Plaintiffs,

    v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

        Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

1

## DECLARATION OF JENI KITCHELL

I, Jeni Kitchell, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated here, except those matters stated upon information and belief (which includes the verification of all exhibits); as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California State University as Assistant Vice Chancellor, Finance & Budget Administration and Controller.  The California State University is responsible for the provision of higher education services to students across the state of California.  Consisting of 23 university campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations, the CSU educates more than 450,000 undergraduate and graduate students each year and employs more than 63,000 employees.

3.      The CSU is the largest public university system in the United States and is the state's greatest producer of bachelor's degrees – awarding nearly 127,000 degrees each year – and drives the economy in agriculture, information technology, business, hospitality, life sciences, healthcare, public administration, education, media and entertainment.  In 2022-23, more than half of CSU students graduated with zero debt and about 78% of CSU's students received financial aid, including federal financial aid.

4.      As the Assistant Vice Chancellor, Finance & Budget Administration/Controller, I am responsible for oversight of financial operations at the CSU and financial reporting from all sources, including federal funding.

5.      The CSU receives federal research funding. A hallmark of CSU research is immersive student learning and discovery that addresses society's most urgent challenges,

including those in agriculture, water, fire prevention and cybersecurity. Undergraduate students who participate in faculty-mentored research are better prepared for future careers, graduate education and leadership roles that contribute to their respective communities.

6.      CSU and its auxiliary organizations receive nearly $600 million in federal funding for research projects each year from agencies such as the Department of Energy, the Environmental Protection Agency, the Health Resources & Services Administration, National Institutes of Health, the Department of Health & Human Services, the Centers for Disease Control, NASA, the National Forest Foundation (and U.S. Forest Service), the National Science Foundation, the Department of the Navy, the Department of Transportation, the U.S.G.S., and USAID.  These projects enrich teaching quality and prepare students for professional success through hands-on experiences. This amount also covers Maritime Administration (MARAD) funding for support of the maritime education provided at the California State University Maritime Academy, the only U.S. Merchant Marine Academy on the west coast.

7.      CSU's students receive over $2.2 billion each year in federal grants and loans for financial aid.  A freeze or pause in federal funds would reduce access to those critical student resources and could have an immediate impact of over $1 billion for this spring semester alone.

8.      Over 80% of students receive some type of financial aid with over 50% of CSU students eligible for Pell Grants.

9.      Even if Pell Grants and direct loans are not included, students who rely on Supplemental Education Opportunity Grants (SEOG) and federal work-study funds to support themselves in college would suffer from this pause. Those funds total approximately $48 million for the 2023-24 aid year.

10.     Throughout the CSU, a total of 207,118 students received an aggregate of over $1 billion in federal aid from July 1, 2023, to June 30, 2024. As a result of the extensive aid provided by the federal government, two-thirds of CSU students graduated with zero student loan debt, which allows them to move seamlessly into the workforce and pursue all types of careers without concern for carrying significant debt and helps to ensure a robust workforce and fill high and low-need employment positions.

11.     As described in more detail below, the freeze on federal funding caused by the OMB Memo did have and, if reinstated or reissued under any other name, would have significant and detrimental impacts on the CSU.

12.     I have reviewed the Memorandum for Heads of Executive Departments and Agencies, M-25-13, dated January 27, 2025, issued by the Executive Office of the President of the United States, Office of Management and Budget, Matthew J. Vaeth, Acting Director, regarding "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memo"). It is my understanding that the OMB Memo required all federal agencies to "pause" all activities related to disbursement of all federal financial assistance, which I understand would include disbursements to the California State University, including its 23 university campuses and auxiliary organizations, the research, financial aid, and student support programs, and the funds used to support the education of license track cadets at the California State University Maritime Academy, which we oversee under our current federal funding sources.

13.     The wording in the OMB Memo regarding the pause in federal funding was vague and unclear in its scope, reach and impact to the California State University. In the broadest scope, it could have an existential effect on higher education in California and across the country

as it could have immediately eliminated both student support and employee jobs. For example, although it varies by grant, commonly about half of contract or grant funding supports employment-related expenses (e.g., salaries and benefits). The pause could also stop us for an indefinite period from serving and meeting some of our critical missions, including research and development that supports critical government interests, such as health and safety and national security.

14.     Further, the OMB Memo created confusion and uncertainty for the California State University and its 23 university campuses and auxiliary organizations about whether and when we would receive federal grant disbursements, including how long those disbursements would be "paused." This confusion has remained since the distribution of the OMB Memo, through last week, and ongoing. Additionally, since the OMB Memo was issued, we have received dozens and dozens of notices from a variety of federal agencies containing conflicting and inconsistent information regarding whether there is a pause or freeze. Just a few examples are described below.

15.     Many grant awardees scheduled award drawdowns in anticipation of the impending "pause." Yet even timely award drawdowns were cancelled.

16.     For example, the National Science Foundation announced by email at 1:52 p.m. PT on Tuesday, January 28 that "[t]he Award Cash Management Service (ACM$) will be temporarily unavailable beginning Tuesday, January 28, 2025 at 5:00 p.m. EST, while NSF performs a comprehensive review of the award portfolio to ensure compliance with recent Executive Orders, pursuant to Office of Management and Budget (OMB) Memorandum M-25-13, issued on January 27, 2025. Therefore, all payments under active awards will be paused as the agency conducts the required reviews and analysis." (Ex. A, a true and correct copy of which

5

is attached.)  The email went on to announce that grant awardees would be "receiving cancellation notices for any pending payment transactions to enable resubmission, pending additional guidance, to ensure only eligible activities are included in future payment requests."

17.    The NSF then sent a follow-up email on Thursday, January 30 at 11:45 a.m. PT notifying its grant awardees that "all ACM$ transactions that were submitted on Tuesday 01/28/2025 have been cancelled."  (Ex. B, a true and correct copy of which is attached.)  This included all drawdowns submitted before the OMB Memo 5 p.m. ET deadline.  It was not until Monday, February 2 at noon EST that the ACM$ system was expected to be available again for drawdowns.  (Ex. C, a true and correct copy of which is attached.)

18.    Even after the access portals for the various agencies were re-opened this week, some agencies imposed barriers to access that were not in place before the OMB memo and TRO were issued.

19.    For example, the National Institutes of Health (NIH) had previously allowed constant (24-hour) access to the portal to drawdown awarded grant funds.  After the TRO was issued, several CSU campuses had difficulty finding a window when the portal was opened.  It turns out that the NIH payment management system had instituted reduced hours, but did not notify its grant recipients until February 4, when it notified them that "[e]ffective immediately, PMS is only available during the hours of 5:00AM to 4:00PM ET Monday through Friday and 9:00 AM to 9:00 PM ET Saturday and Sunday.  The limited hours are in effect until further notice." (Ex. D, a true and correct copy of which is attached.)

20.    This means that for grant awardees whose administrative staff are on the West Coast and do not work on weekends (such as the CSU), the portal is available for drawdowns only during morning work hours each weekday.   Both lack of notice and the reduced hours

resulted in late drawdowns of needed resources, thereby impacting cash flow and other business processes.

21.     Allowable costs to be covered by a grant are predetermined by the grant-awarding agency through a legally binding contract that by regulation (2 CFR § 200.300 *et seq.*) generally cannot be amended or terminated without notice to both the agency and its awardees.

22.     Drawdowns by an awardee are generally done monthly or more frequently on a cost-recovery basis to reimburse the awardee for allowable costs already incurred, such as equipment purchases and payroll for researchers (including faculty and student employees), and student stipends.  This means that the drawdowns that the CSU university campuses and auxiliaries attempted to make during the week of January 27 and after were costs that were incurred well before that date, and in most cases before the new administration came into office.

23.     When the pause was implemented, it meant that student and staff employees' jobs were at risk for lack of funding.

24.     As one example, one of the CSU campuses funds the director of the McNair Scholars fully through grant awards.  The McNair Scholars at CSUDH (https://www.csudh.edu/mcnair/) are students who are first-generation, low-income students interested in research-based education through the graduate level.  One of the key outcomes of the program is the number of students who graduate with a Ph.D. in ten years. These students go on to highly productive careers that support the engine of the economy. The McNair Scholars Program at CSUDH was established in 2004 and has achieved a 93% graduate school acceptance rate.  The university relies completely on grant funding to support this program.

25.     Losing this federal funding would have an immediate and detrimental effect on students; the uncertainty of funding due to the vagueness of federal directives has a highly

destabilizing effect on this program and many others similarly situated.  In fact, due to the disruptions caused by even a short interruption to the process, some grant awardees are now drawing down more frequently – up to weekly – to reduce the risk that the awardee will be denied access to awarded funds for any length of time, thereby suffering cash flow issues that could impact wage payments and organizational viability.  These business process changes were necessitated by the OMB Memo even if it is never reactivated.

26.    The general notices CSU received also create practical impediments to meet the required fiscal and programmatic compliance of each award. The CSU accepts each award with a commitment to comply diligently with the award's objectives, terms and conditions.  However, the vague and generalized notices have caused confusion and disruption to compliance because the grant-awarding agency does not identify which part of the award will be impacted, but then places on the university the entire risk of failure to comply now with the agency's unknown future action.

27.    For example, one federal agency (NSF) funded a project that requires the grantee to conduct surveys; however, because the approved theoretical framework guiding the survey metrics and proposed analysis of the results may fall afoul of upcoming requirement changes, as per the agency communication (discussing "frameworks," see https://new.nsf.gov/executive-orders), the grant awardee must either continue on course with the approved framework (to meet the project timeline) and risk the agency deciding not to pay after the work is done, or to defer the work (and miss timelines) in anticipation of a *possible* change in survey metrics and analytical framework.  Absent more specific and detailed information, the program administrators are left guessing whether the program is impacted or will be impacted by uncertain funding freezes.  This chills current research work, which then adversely impacts

research advancements and finding solutions to real world problems through research previously meritoriously reviewed and approved.

28.     The harm to the CSU will continue if further delays in funding and cost allowability are not resolved. As described above, commonly at least half of grant funding supports the personnel doing or supporting the research.  Uncertainty in funding sources, or instability in fund availability will have real-world consequences to jobs, procurement, and education.  This affects not only those directly funded by the grants, but indirect funding (administrative support) as well.  In addition, procurement agreements made based on committed grant funds, and subawards will require stop work notices. The avoidable instability caused by abrupt decommitment to previously-approved projects will also impede faculty from carrying out their educational program goals. Overall, research and scholarly activities will be negatively impacted resulting in lost science and value to the public. The impacts of this could reverberate through the system for some time, if the loss of trust in the government to honor its contractual commitments lingers.

29.     We continue to be concerned that the funding will again be delayed or denied, especially because we continue to be told that some of our reimbursement requests will not be paid. For example, on February 4, 2024, CSU Monterey Bay received a phone call from the U.S. Economic Development Administration that they will receive requests for reimbursements, but that they were directed not to process and pay reimbursements for a program that relates to the Monterey Bay Small Business Assistance and Resilience Program.

30.     Additionally, I reviewed the "Notice of Court Order" issued by the United States Department of Justice (DOJ) on February 3, 2025 (Notice) (Ex. E, a true and correct copy of which is attached), which referred to and attached the temporary restraining order issued in this

matter on January 31, 2025. While the Notice states that "Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards of obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders," it also states that "Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion – not as a result of the OMB Memo or the President's Executive Orders – and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such pause." The ambiguities in the language of this United States Department of Justice Notice give us further concern that the funding will be delayed or denied by federal awarding agencies.

31.     As discussed above, the CSU's budget relies heavily on student financial aid support, multi-year federal research and sponsored programs funding, as well as federal support for the California State University Maritime Academy.  Federal funding contributes to the operational budgets of all 23 CSU campuses, and a freeze could lead to tremendous budget shortfalls, forcing campuses to cut back on student services, employees, and resources.

32.     CSU formulated its plans and allocated funding for staffing and student support based on the anticipated receipt of promised federal funding. Federal financial assistance, such as Pell Grants, Work Study funds, and student loans, is crucial for many CSU students. It the Federal government reinstitutes or reissues a freeze it could jeopardize this support, making it harder for students to afford their education and achieve their degrees.

33.     A freeze could jeopardize ongoing research projects and research support and delay new projects. Additionally, various public service programs are supported by federal funds at the CSU, including those aimed at improving low-income students' readiness for college and

recruiting teachers for high-need schools. These programs could face significant disruptions, affecting both students and the communities the CSU serves.

34.    If the federal funding is again paused, blocked, denied or delayed suddenly, it would have an immediate and substantial detrimental effect on the CSU.   A loss of or pause in federal funding can severely disrupt research continuity and trajectories. While research *can* resume, lost time, momentum, and the potential dispersal of research teams (including undergraduate and graduate students) create setbacks from which it is difficult, and sometimes impossible, to fully recover. This has cascading effects on future breakthroughs and innovation. Specific situations facing disruption include clinical trials where an interruption in research means the loss of the entire research project due to loss of research subjects or degradation of the research plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 5, 2025, at Long Beach, California.

_____
Jeni Kitchell (Feb 5, 2025 10:49 PST)
_____
Jeni Kitchell

11

EXHIBIT A

**From:** ACMS Financial Points-of-Contact <ACMS_POC@LISTSERV.NSF.GOV> on behalf of Justin Poll <jpoll@NSF.GOV>
**Sent:** Tuesday, January 28, 2025 1:52 PM
**To:** ACMS_POC@LISTSERV.NSF.GOV <ACMS_POC@LISTSERV.NSF.GOV>
**Subject:** ACM$ Unavailable Starting Tuesday 1/28/2025

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate the sender and know the content is safe. Contact ITS if you have any concerns

The Award Cash Management Service (ACM$) will be temporarily unavailable beginning Tuesday January 28, 2025 at 5:00 p.m. EST, while NSF performs a comprehensive review of the award portfolio to ensure compliance with recent Executive Orders, pursuant to Office of Management and Budget (OMB) Memorandum M-25-13, issued on January 27, 2025. Therefore, all payments under active awards will be paused as the agency conducts the required reviews and analysis.

You will be receiving cancellation notices for any pending payment transactions to enable resubmission, pending additional guidance, to ensure only eligible activities are included in future payment requests.

NSF has created an Executive Order Implementation webpage to ensure the widest dissemination of information and updates. We will continue to communicate with you as we receive additional guidance.

#####################################################################

EXHIBIT B

**From:** ACMS Financial Points-of-Contact <ACMS_POC@LISTSERV.NSF.GOV> on behalf of Justin Poll <jpoll@NSF.GOV>
**Sent:** Thursday, January 30, 2025 11:45 AM
**To:** ACMS_POC@LISTSERV.NSF.GOV <ACMS_POC@LISTSERV.NSF.GOV>
**Subject:** ACM$ Transactions from 01/28/2025 have been canceled

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate the sender and know the content is safe. Contact ITS if you have any concerns

Our top priority is resuming our funding actions and services to the research community and our stakeholders. We are working expeditiously to conduct a comprehensive review of our projects, programs and activities to be compliant with the existing executive orders.

Please note that all ACM$ transactions that were submitted on Tuesday 01/28/2025 have been cancelled. Please remember that award recipients must comply with agency policies regarding the timing of payments and are encouraged to review PAPPG 24-1 Ch. 8.C.2.a for additional guidance before preparing any resubmissions once ACM$ is back online.

For certain programs, such as SBIR/STTR, there may also be program specific guidance you may need to refer to.  NSF has created an Executive Order Implementation webpage to ensure the widest dissemination of information and updates. We will continue to communicate through this site as we receive additional guidance.

#################################################################

EXHIBIT C

**From:** NSF eBusiness Outreach <EBUSINESS@LISTSERV.NSF.GOV> on behalf of NSF Business Applications <NSF_Business_Applications@NSF.GOV>
**Sent:** Sunday, February 2, 2025 10:58 AM
**To:** Sainz, Patricia <patricia.sainz@csuci.edu>
**Subject:** MESSAGE TO NSF PI COMMUNITY

You don't often get email from nsf_business_applications@nsf.gov. Learn why this is important

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate the sender and know the content is safe. Contact ITS if you have any concerns

MESSAGE to the NSF PI Community,

On Friday, January 31, 2025, a Federal Court issued a Temporary Restraining Order (TRO) directing Federal grant-making agencies, including the National Science Foundation (NSF), to "...not pause, freeze, impede, block, cancel, or terminate... awards and obligations to provide federal financial assistance to the States, and... not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." Although the language of the TRO is directed at State institutions, the Department of Justice has determined that it applies to all NSF award recipients. You can review the TRO here.

In order to comply with the TRO, the NSF Award Cash Management Service (ACM$) system is available for awardees to request payments as of 12:00pm EST, February 2, 2025.

This message is also available on the Executive Order Implementation webpage.  Please check back regularly as we add frequently asked questions (FAQs) based on community feedback.

Sethuraman Panchanathan
Director

EXHIBIT D

Websites that we are utilized are open for drawdowns:

- **PMS (NIH) has limited usage time**





- **NSF or Research.gov**



- **Department of Education**



G5 - Empowering the Grant Community United States Department of Education

Empowering the grant community.

Main Help

You are here: **Home**

**Email ID**

**Password**

(Case Sensitive)

Login to G5

Not registered? Sign Up
Forgot Email ID or Reset Password »

## Help Desk

Help is available via the e-mail and phone numbers below.

- Hours Of Operation: 8:00 AM to 6:00 PM EST, Monday - Friday, except on Federal holidays.
- Toll-Free:1-888-336-8930
- TTY:1-800-877-8339
- Local:202-401-6238
- Email:obssed@servicenowservices.com

## Welcome

**Please see the attached regarding the temporary r 31, 2025, in New York et al v. Trump, No. 25-cv-39**

## News and Events

**09/06/24 All users with internal roles must have** - Effective October 1, 2024, G5/G6 will no longer supp unless they have the following:

1. ed.gov email address
2. ED issued PIV card
3. ED issued GFE (government furnished laptop)

more »

**09/05/24 Refunds Guidance Updated** - Guidance of Education has been enhanced in the Frequently Ask search for the Refunds guidance on the FAQs page. m

**05/23/23 Login.gov Frequently Asked Questions** sign-on method operated by the US General Services to access government websites. You can use a single a agency that partners with Login.gov. more »

## G5 Web Site Hours of Operation

Below are the days and times that the G5 web site is av time.

| G5 Hours of Operation in Eastern Time | | | | | | |
|---|---|---|---|---|---|---|
| Sun. | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. |
| Unavailable from 03:00PM - 11:59PM | Unavailable from 12:00AM - 06:00AM | Available 24 hours | Unavailable from 09:00PM - 11:59PM | Unavailable from 12:00AM - 06:00AM | Available 24 hours | Available 24 hours |

G5 Version:6.21.01

- **ASAP served Department of Energy, Nuclear Regulatory Commission, Department of Interior, Department of Justice)**



**Broadcast Message**

- (Updated on 09.05.24) Attention Microsoft Internet Explorer Users: As of June 15, 2022, compatible with both Microsoft Edge and Chrome browsers. Visit the following webpage https://fiscal.treasury.gov/asap/software-browser-requirements.html

- (Posted 8.28.24) Department of Commerce (DoC) Recipients: The National Oceanic and open ASAP accounts from September 22, 2024 thru October 16, 2024 This will impact th 13200001 - EDA The last day for Recipients to submit payment requests for awards with recipients must withdraw the necessary funding for the period before 3:00 PM EDT Sept eduled to be paid from September 20, 2024 through October 16, 2024 as they will be rej contact either the Regional Grants Specialist or email EDAGrants@noaa.gov. Questions the Grants Management Specialist (GMS) responsible for administering the award(s).

- (Posted 5.3.23) Are you new to ASAP or need help requesting payments? Register for o

- Attention Department of Justice recipients: At the end of each month, DOJ will temporari financial statement reporting requirements of the Office of Management and Budget. (Th previous Grants Payment Request System (GPRS)). For each month except September September (fiscal year end), access will not be available for the last 5 business days. All prior to the cutoff day each month.

- Attention National Institute of Food and Agriculture (USDA-NIFA) recipients: USDA-NIFA business days of each month. All USDA-NIFA recipients (ALC 12402200 & 12402200/01 of each month. Accounts will re-open the 1st business day of each month. This effort will captured in USDA-NIFA's accounting systems and reconciled with Treasury's Central Ac

Thank you,
Chi

4

EXHIBIT E

| | |
|---|---|
| **From:** | The AAG for Administration |
| **To:** | The AAG for Administration |
| **Subject:** | Notice to DOJ Commercial Vendors Regarding Federal Funding Pause – Temporary Restraining Order |
| **Date:** | Monday, February 3, 2025 2:55:17 AM |
| **Attachments:** | RI Temporary Restraining Order Notice 01-31-2025.pdf |

**This Message Is From an External Sender**
This message came from outside your organization.

  Report Suspicious

# Notice to DOJ Commercial Vendors Regarding Federal Funding Pause – Temporary Restraining Order

Please see the attached written Notice of the Court's Order, and a copy of the Court's Order, regarding a freeze of certain Federal funds, potentially impacting contract awards and obligations. Effective immediately, this temporary restraining order prohibits certain actions.

A copy of this Notice will be filed on **Monday, February 3, 2025, by 9:00 a.m**.

Assistant Attorney General for Administration
U.S. Department of Justice

**This is a no reply email address. Please do not reply to this message.**

## NOTICE OF COURT ORDER

You are hereby advised that a temporary restraining order has been entered in the case of *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025). You are receiving this Notice pursuant to the Court's directive that notice of the order be provided "to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." A copy of the Court's Order is attached for reference.

This case challenges an alleged "pause" of certain Federal financial assistance, related to OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo"). Although that OMB Memo was rescinded on January 29, 2025, the plaintiffs in the above-referenced case allege that the funding pause directed by the OMB Memo is still in effect, including because of recently issued Executive Orders by the President.

In response, the Court has entered a temporary restraining order prohibiting certain actions by the Defendants in the case, which is effective immediately. All Defendants—including their employees, contractors, and grantees—must immediately comply with the Court's Order. For complete details and terms of the Court's Order, please refer to pages 11 and 12 of the enclosed Order.

To assist in your compliance, here is a summary of the key terms:

1. **Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders.**

2. **This prohibition applies to all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations).**

3. **Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders—and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such a pause.**

   a. On pages 11 and 12 of the Order, the Court prohibits agencies from pausing funding "except on the basis of the applicable authorizing statutes, regulations, and terms." Thus, agencies remain free to exercise their own discretion under their "authorizing statutes, regulations, and terms," including any exercise of discretion to pause certain funding. Additionally, agencies remain free to take action pursuant to the terms of the relevant award or obligation, such as in cases of grantee noncompliance.

   b. Any exercise of agency discretion, however, cannot be based on the OMB Memo or the President's Executive Orders, given that the Court has prohibited agencies from "implementing or giving effect to the OMB [Memo] under any other name

or title[.]" (Order, pg.12).  Additionally, any decision to pause, stop, delay, or otherwise withhold federal financial assistance programs must comply with all notice and procedural requirements in the award, agreement, or other instrument setting forth the terms of the award or obligation.

4. **Out of an abundance of caution, all federal agencies (even those not named as defendants in the case) should comply with the above-referenced terms.**

As the Court's Order reflects, the above terms are temporary as litigation in the case is ongoing. At present, however, the Court's Order is in effect and must be complied with.

If you have any questions about the scope or effect of the Court's Order, please contact your agency's Office of General Counsel or your grant officer, as appropriate.  Thank you for your attention to this matter.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) ) |
| v. | ) ) ) |
| DONALD TRUMP, *in his Official Capacity as President of the United States*; U.S. OFFICE OF MANAGEMENT AND BUDGET; MATTHEW J. VAETH, *in his Official Capacity as Acting Director of the U.S. Office of Management and Budget*; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his Official Capacity as Secretary of the Treasury*; PATRICIA COLLINS, *in her Official Capacity as Treasurer of the U.S.*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY A. FINK, M.D., *in her Official Capacity As Acting Secretary Of Health And Human Services*; U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, *in her Official Capacity as Acting Secretary of Education*; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, *in* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 25-cv-39-JJM-PAS

_his Official Capacity as Acting_ )
_Administrator of the U.S. Federal_ )
_Emergency Management Agency_; U.S. )
DEPARTMENT OF )
TRANSPORTATION; )
JUDITH KALETA, _in her Official_ )
_Capacity as Acting Secretary of_ )
_Transportation_; U.S. DEPARTMENT OF )
LABOR; VINCE MICONE, _in his Official_ )
_Capacity as Acting Secretary of Labor_; )
U.S. DEPARTMENT OF ENERGY; )
INGRID KOLB, _in her Official Capacity_ )
_as Acting Secretary of the U.S._ )
_Department of Energy_; U.S. )
ENVIRONMENTAL PROTECTION )
AGENCY; JAMES PAYNE, _in his Official_ )
_Capacity as Acting Administrator of the_ )
_U.S. Environmental Protection Agency_; )
U.S. DEPARTMENT OF HOMELAND )
SECURITY; KRISTI NOEM, i_n her_ )
_Capacity as Secretary of the U.S._ )
_Department of Homeland Security_; U.S. )
DEPARTMENT OF JUSTICE; JAMES R. )
McHENRY III, _in his Official Capacity as_ )
_Acting Attorney General of the U.S._ )
_Department of Justice_; THE NATIONAL )
SCIENCE FOUNDATION; and DR. )
SETHURAMAN PANCHANATHAN, _in_ )
_his Capacity as Director of the National_ )
_Science Foundation_, )
 )
     Defendants. )
 )

## **TEMPORARY RESTRAINING ORDER**

     The legal standard for a Temporary Restraining Order ("TRO") mirrors that of

a preliminary injunction.  The Plaintiff States must show that weighing these four

factors favors granting a TRO:

1. likelihood of success on the merits;
2. potential for irreparable injury;
3. balance of the relevant equities; and

4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

## Likelihood of Success on the Merits

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In **Count I**, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In **Count II**, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

3

In **Count III**, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In **Count IV**, the States allege a violation of the Spending Clause of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. law 1.

And in **Count V**, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover.  Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take?  The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not.  The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims.  The reasons are as follows:

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

> When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

> Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill. *See* 2 U.S.C. § 683; *see also Train v. City of New York,* 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary,* 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.,* 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

### Irreparable Harm

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

will cause severe disruption in their ability to administer such vital services–
even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause
  on funding that Congress has allocated will harm them and their citizens.
  These programs range from highway planning and construction, childcare,
  veteran nursing care funding, special education grants, and state health
  departments, who receive billions of dollars to run programs that maintain
  functional health systems.  *See, e.g.*, ECF No. 3-1 at 56 (highway construction
  programs in Delaware), at 73 (childcare programs in Michigan), at 113
  (veterans nursing care funding in Washington state), at 77 (special education
  programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts.  The
  States assert that the pause applies to federal actions directing federal
  financial assistance to North Carolina to address the damage inflicted by
  Hurricane Helene and to any Federal Emergency Management Agency grant
  money not yet disbursed, including key support for California's ongoing
  response to the fires.  ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National
  High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law
  enforcement in high drug-trafficking areas, shows that payments to state-
  based HIDTA programs have been paused, putting the public's safety at risk.
  *Id.* ¶ 83.

8

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens. Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here. As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

### Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.

- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.

- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest. Moreover, the

9

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect."  ECF No. 44.

### Mootness

The Defendants now claim that this matter is moot because it rescinded the OMB Directive.  But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts.  The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point.  At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum.  *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')."  ECF No. 43.  Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented."  ECF No. 44.  And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum."  ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

## Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025.  ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m.  Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court.  A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025