# Thomas-Jensen Affirmation

# Exhibit # 43

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

    Plaintiffs,

v.

DONALD TRUMP, in his official capacity as President of the United States; et al.,

    Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## DECLARATION OF TONY THURMOND

I, Tony Thurmond, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Superintendent of Public Instruction for the State of California. I have been California's Superintendent of Public Instruction since January 2019. In this role, I serve as the state official who oversees California's Department of Education, which provides leadership, assistance, oversight, and resources.

2. I hold dual master's degrees in Law and Social Policy and Social Work from Bryn Mawr College. Prior to becoming Superintendent of Public Instruction, I served in a number of roles, including as an educator, social worker, and elected official. From 2008-2012, I served on the West Contra Costa School Board, where, among other things, I helped build new schools, increase funding for counseling, after-school, music, and athletic programs, reduce school suspensions by 27%, and bring nutrition and wellness programs to our schools. In the State Assembly, I championed legislation to, among other things, expand free school lunch programs, improve access for families for early education and childcare, and shift millions of dollars directly from prisons to schools.

3. I understand that the Director of the United States Office of Management and Budget ("OMB") issued a memorandum to the heads of all federal executive departments and agencies on January 27, 2025 regarding the "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memorandum"), and have reviewed the OMB Memorandum. It is my understanding that the OMB Memorandum directed federal agencies to identify and review all federal financial assistance programs and supporting activities so OMB may determine whether they are "consistent with the President's policies and requirements,"

2

including a series of Executive Orders issued by President Donald J. Trump beginning on January 20, 2025. OMB Memorandum at 1.

4. It is my understanding that the OMB Memorandum further directed those federal agencies to "temporarily pause"—in other words, withhold—"disbursement of all [f]ederal financial assistance. . . including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." OMB Memorandum at 2.

5. I also understand that the OMB Memorandum instructed a pause on federal funding that includes the K-12 funding sources I discuss herein.

6. I am providing this declaration to explain more generally certain harms to the State of California that are or might be caused when the federal government pauses such activities.

**Background**

7. As the Superintendent of Public Instruction, I provide education policy direction and oversight to the largest common school system of public schools in the nation, which includes 1,019 school districts, 11,278 schools, and 5,837,690 students. Of these students, 2.6 million are in grades K-5; 1.3 million are in grades 6-8; and nearly two million are in grades 9-12. In 2018-2019, 48.6 percent of California students were female and 51.4 percent of those students were male.

8. All California public schools receive federal funds from the United States Department of Education. As a result, California public schools are subject to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., the Every Student Succeeds Act (ESSA), 23 U.S.C. § 6301, and other federal and state education-related laws.

9. The California Department of Education's mission is to innovate and collaborate with educators, schools, parents, districts, and community partners to ensure that all of California's 5.8 million public school students—across more than 9,000 schools—have access to a world-class education. Our aim is to prepare students to live, work, and thrive in a multicultural, multilingual, and highly connected world.

10. Consistent with federal and state laws, Local Education Agencies (LEAs) within the State serve all school-age children, regardless of their race, nationality, ethnic origin, sex, gender, religion, disability, or immigration status. An LEA—such as a school district—is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade twelve public educational institutions.

11. As described below, it is my understanding that withholding federal financial assistance in accordance with the OMB Memorandum would inflict significant harm upon California Department of Education's efforts to provide a free and appropriate public education to all children by restricting the federal funding made available to LEAs and public schools in California to serve our students, particularly low-income students and students with disabilities.

**Federal Financial Assistance for Public Education in California:**

**Special Education Funding and Programs**

12. The Individuals with Disabilities Education Act (IDEA) provides that schools are responsible for providing a free appropriate public education ("FAPE") to students with disabilities. 20 U.S.C. § 1412(a). This includes special education and related services. *Id.*

13. The California Department of Education's Special Education Division oversees special education programs and services for students with disabilities in California.

14.     Funding for special education is meant to cover the additional costs that are associated with educating students with disabilities due to their disability. In California, there are three main sources of special education funding: (1) the federal government, as part of the IDEA; (2) the State; and (3) school district and charter school LEAs. For the school year 2024-25, California received $1.5 billion in special education funding from the federal government. The State allocated $4.8 billion for special education, and LEAs, using unrestricted funds, covered the remaining approximately $8 billion in special education costs.

15.     Approximately $34 million of the 2024-25 IDEA, Part B, Section 619, Federal Preschool Grant funding is specifically allocated for special education and services to children with disabilities for preschool children ages three, four, and five.

16.     Medicaid responsibility precedes that of the LEA for a Medicaid (called Medi-Cal in California) covered service in the student's Individualized Education Plan (IEP). 20 U.S.C. § 1412(a)(12)(A)(i); 42 U.S.C. § 1396b(c). Section 1396b(c) states: "Nothing in this subchapter shall be construed as prohibiting or restricting, or authorizing the Secretary to prohibit or restrict, payment under subsection (a) for medical assistance for covered services furnished to a child with a disability because such services are included in the child's individualized education program established pursuant to part B of the IDEA [20 U.S.C. 1411 et seq.] or furnished to an infant or toddler with a disability because such services are included in the child's individualized family service plan adopted pursuant to part C of such Act [20 U.S.C. 1431 et seq.]." The IDEA provisions regarding LEA responsibilities for a FAPE do not alter the Medicaid responsibility for Medicaid-covered services in the IEP. 20 U.S.C. § 1412(e).

17.     The California Department of Education receives funding under three provisions of IDEA. Since 1988, Section 1903(c) of the Social Security Act has authorized the federal

5

Medicaid program to reimburse LEAs for covered services provided to Medicaid-eligible students with disabilities, pursuant to the IDEA, 20 U.S.C. § 1400 et seq., provided the services were delineated in the student's IEP (or similar plan) and covered in the state plan for Medicaid.

18. IDEA requires LEAs to develop an IEP for children found eligible for special education and related services. An IEP identifies certain special education and related services, and program modifications and supports, that the LEA will provide a child with a disability. If the IEP identifies Medicaid-covered services necessary to provide supports for the child with a disability, the IDEA requires LEAs to provide those Medicaid-covered services pursuant to the IEP.

19. Thus, LEAs and public schools in California may provide certain Medicaid-covered services to students with disabilities under an IEP, such as (but not limited to): audiological services, occupational therapy, physical therapy, psychological and mental health services, behavioral intervention services, as well as speech and language therapy.

20. In school year 2023-24, one of the largest school districts in the state (serving approximately 10,000 students with disabilities) received $5,000,000 in Medi-Cal reimbursements. Smaller districts sampled received approximately $1.5-$1.8 million in reimbursement for these services. On average, LEAs with between 4,000-6,000 students with disabilities receive more than $1,000,000 per LEA. In the State, there are 30 LEAs that serve more than 4,000 students with disabilities, thus receiving approximately $30,000,000 in Medi-Cal reimbursement.

## Other Education Funding and Programs

21.     In addition to IDEA funding and Medicaid reimbursement, the State receives federal funds under various parts of the Every Student Succeeds Act ("ESSA"), 23 U.S.C. § 6301, to support many other critical aspects of education programming.

22.     For example, ESSA requires state educational agencies, such as the California Department of Education, to determine school eligibility for Comprehensive Support and Improvement ("CSI"). LEAs with schools that are eligible for CSI must partner with stakeholders to develop and implement a school plan for the school to improve student outcomes. The federal government provides states with grant funding each year to support these activities. For the 2024-2025 Fiscal Year, the State has been allocated approximately $144 million in ESSA federal grants.

23.     Title I, Part A of the ESSA is a federal categorical program designed to ensure that all children have a fair and equal opportunity to obtain a high-quality education and reach, at a minimum, proficiency in the state content standards and assessments. This funding is intended to meet the educational needs of low-achieving students enrolled in the highest poverty schools. California has been apportioned more than $2 billion to meet the needs of some of its most vulnerable students under Title I, Part A for the 2024-2025 fiscal year.

24.     Under Title I, Part B of the ESSA, State Assessment Formula Grants, California has been apportioned almost $27 million for the 2024-2025 fiscal year.

25.     Under Title I, Part C of the ESSA, Education of Migratory Children, California has been apportioned over $120 million of the 2024-2025 fiscal year.

26.     Title I, Part D, Subpart 2 of the ESSA, also called "The Prevention and Intervention Programs for Children and Youth Who Are Neglected, Delinquent, or At-Risk" is a

7

federal categorical program that provides financial assistance to LEAs' programs that serve students who are neglected, delinquent, or at-risk. California has been apportioned almost $17 million under Title I, Part D, Subpart 2 for the 2024-2025 fiscal year.

27. Title II, Part A of the ESSA, referred to as "Supporting Effective Instruction," is a federal categorical program that provides supplemental activities that strengthen the quality and effectiveness of teachers, principals, and other school leaders to increase student achievement consistent with challenging state academic standards. California has been apportioned more than $232 million to support effective instruction under Title II, Part A, during the 2024-2025 fiscal year.

28. Under Title III, Part A of the ESSA, referred to as English Language Acquisition, Language Enhancement, and Academic Achievement, California has been apportioned more than $157 million for the 2024-2025 fiscal year.

29. Title IV, Part A of the ESSA, referred to as the "Student Support and Academic Enrichment Program" is a federal categorical program that provides funds to increase the capacity of LEAs to provide a well-rounded education, improve school conditions for student learning, and improve the use of technology in order to improve the academic achievement and digital literacy of all students. California has been apportioned more than $152 million to meet these goals under Title IV, Part A during the 2024-2025 fiscal year.

30. Title IV, Part A of the ESSA is referred to as the 21st Century Community Learning Centers. The purpose of the program as described in federal statute is to provide opportunities for communities to establish or expand activities that focus on improved academic achievement; enrichment services that reinforce and complement the academic program; and

8

family literacy and related educational development services. California has been apportioned more than $146 million under Title IV, Part B for the 2024-2025 fiscal year.

31. Title V, Part B, Subpart 2 of the ESSA is referred to as the Rural and Low-income School Program. California has been apportioned more than $5 million under this program for the 2024-2025 fiscal year.

32. Under Perkins V, the Carl D. Perkins Career and Technical Education Act of 2006, as amended by the Strengthening Career and Technical Education for the 21st Century Act. California has been apportioned approximately $77 million for vocational education for the 2024-2025 fiscal year.

33. Under the McKinney-Vento Education for Homeless Children and Youth program, California has been apportioned more than $15 million for the 2024-2025 school year.

34. California also draws approximately $40-$50 million in federal funds per week for Nutrition Services. For example, in the next 60 days, our Nutrition Services Division anticipates receiving: (1) $384 million ($192 million per month, on average) in federal meal reimbursements to LEAs; (2) $7 million from the federal State Administrative Expenses fund for operational needs (*e.g.*, payroll, contracts, leases, mandatory training and travel); (3) $300,000 to fund summer meal programming from the Summer Electronic Benefits Transfer program; and (4) approximately $5-$6 million from various other related grants and apportionments, such as the Fresh Fruit and Vegetable and Local Food for Schools programs.

35. The grants and programs described above are an illustrative, rather than exhaustive list, of the types of federal funds under the ESSA that currently support the education of children in grades K-12 in California.

## Substantial and Irreparable Harm:

## Administrative and Financial Burdens and Uncertainty

36.  Education is one of the most important functions of state and local governments.

37.  Given the broad language in the OMB Memorandum, it is my understanding that if the funding freezes or "pauses" described in the OMB Memorandum take effect, federal agencies including, but not limited to the U.S. Department of Education ("U.S. DOE") or Department of Finance, will temporarily stop providing the State with some or all of the critical funding described above, which is only a portion of the federal financial assistance provided to support public education.

38.  Any pause in our federal funding would cause irreparable harm and jeopardize critical educational opportunities for millions of preschool and school-age children.

39.  As outlined above, overall, the U.S. DOE provides about $7.9 billion annually in support of California's public education system. This includes funding for Title I to support low-income families, IDEA for students with disabilities, school lunch programs, services to families living on military bases, Indian reservations and post-secondary financial aid. Operationally, a federal funding freeze would have disruptive impacts and create uncertainty for LEAs—particularly for our most vulnerable students, families, and educators. Any freeze or delay in payments could cause layoffs, suspension of services to needy students and disruption of student learning supports. Furthermore, the California Department of Education would not be able to provide our oversight role in ensuring that the funds awarded are in compliance with the legislative intent of the awards or grants.

40.  Specifically, in the absence of IDEA funding and Medicaid reimbursements, LEAs would have to draw upon State funds to maintain those IEP-required services for the

10

affected special needs students, reducing the State's overall funds and diverting those funds from other critical educational services. This will impose substantial costs and burdens on our system and cause significant financial hardship for the California Department of Education and its LEAs.

41.    Freezing or "pausing" IDEA funding would also significantly impact the Special Education Division, which relies on these funds to support essential operations. Without these funds, there would be disruption to educational services provided to students with disabilities, loss of related services (such as physical therapy, speech therapy, occupational therapy, and services for deaf or blind students), and delayed or reduced payments to staff and potential layoffs. The California Department of Education would not be able to support its one hundred and fifty-four staff who are responsible for fulfilling federally mandated activities, including completing required monitoring and oversight responsibilities, maintaining the state's formal complaint resolution system, and gathering and reporting data. *See, e.g.* 20 U.S.C. §§ 1415, 1416, 1418. We would also not be able to process IDEA grant and contract payments to LEAs, resulting in our inability to meet financial obligations.

42.    Similarly, withholding ESSA funding would greatly disrupt and interfere with LEAs' ability to effectively support and educate their students and meet their obligations under the ESSA.

43.    For example, loss of Title I, Part A funding would interfere with LEAs' ability to provide effective, evidence-based strategies and resources to schools' high numbers or high percentages of children from low-income families to close the achievement gap and enable the students to meet the state's challenging academic standards for both Targeted Assistance and Schoolwide schools.

44.    Loss of Title I, Part B funding would create significant hardships for our division that provides required educational data, which is nearly 50 percent funded by federal monies.

45.    Loss of Title I, Part C funding would interrupt critical services that support high quality and comprehensive educational programs for migratory children designed to help reduce educational disruption and other issues resulting from repeated moves as families migrate for work in the agriculture, dairy, lumber, and fishing industries.

46.    Loss of Title I, Part D funding would interfere with support for programs run by County Offices of Education to prevent at-risk youth from dropping out of school, and to provide dropouts and children returning from correctional facilities or institutions for neglected youth with a support system, including transitional services to make successful transition from institutionalization to further schooling or employment.

47.    Loss of Title III, Part A funding would interfere in programs that support the English-language proficiency of U.S. born students and immigrant students, which would lead to delays in the acquisition of English, thereby impeding instruction and academic development for many students.

48.    Loss of Title IV, Part A funding would interrupt critical services that improve students' academic achievement by increasing LEAs', schools', and local communities' capacity to provide all students with access to a well-rounded education, improve school conditions for student learning, and increase the use of technology to improve the academic achievement and digital literacy of all students.

49.    Loss of Title IV, Part B funding would interrupt critical services that support high-quality, comprehensive expanded learning programs, which would significantly impact working families who rely on 21st Century Community Learning Centers. These Learning

Centers offer a safe environment for children until 6:00 PM, providing essential academic enrichment for students needing extra support. Additionally, they offer nutritious snacks and after-school meals, addressing food insecurity issues prevalent in many low-income neighborhoods.

50. Loss of Title V, Part B, Subpart 2 funding would interrupt existing critical services designed to address the unique needs of rural school districts that frequently: (1) lack the personnel and resources needed to compete effectively for federally competitive grants; and (2) receive formula grant allocations in amounts too small to be effective to meet their intended purposes.

51. Similarly, withholding Perkins V federal funding would disrupt career technical education (CTE) for California students, stopping statewide efforts to develop career skills in high-skill, high-wage, high-demand industries. California's links between high schools, community colleges, and local businesses could slow down, reducing the job training opportunities and course efficiency. Professional development and research supporting CTE school staff and students would halt, impacting workforce preparation across the state. This interruption would limit California students' ability to develop skills for emerging professional sectors, particularly in technology, agriculture, manufacturing, and healthcare industries.

52. In addition, without the McKinney-Vento Education for Homeless Children and Youth program, there would be an interruption in critical services to support high quality and comprehensive educational programs that ensure homeless students have access to the same public education as that provided to other children and youth.

53. We also would not be able to reimburse grantees of the Comprehensive Literacy State Development Grant and the 21st Century School Leadership Programs for already expended funds.

54. Further, if the California Department of Education did not receive federal state administrative expense (SAE) funding, or if it is reduced or delayed, we would not be able to cover the costs for our Nutrition Services Division payroll, state operations, and mandatory work. We would need to rely on state general funds, which would create a significant burden on state resources. If LEAs and schools do not receive their federal reimbursement for meals served, they could not pay their staff, purchase food, operate their programs, or provide schools meals to students.

55. Within the next few weeks, we are scheduled to draw federal funds from U.S. DOE's grants management system. For example, our next scheduled pay date from the U.S. DOE grants management system (G5/G6) is February 19, 2025. Similarly, we are scheduled to draw $53 million from U.S. DOE on February 12, 2025 for ESSA programs. Without these funds, the LEAs' daily cash flow would be impacted and some would be forced to borrow internally or seek funds from external sources.

56. As outlined above, California relies on federal funding to provide public education to millions of preschool and school-age children. If federal funding is again paused, blocked, denied, impeded, or delayed suddenly, as contemplated in the OMB Memorandum, it will do immeasurable harm to our schools and educators that count on a steady funding source to provide education to millions of children. Moreover, if federal funding is again paused, blocked, denied, impeded, or suddenly delayed without or with minimal notice, as intended through the

OMB Memorandum, this would also create significant harm because we are unable to prepare for or mitigate the pause in federal funding.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on February 5, 2025, at Richmond, California.

_____
Tony Thurmond