Thomas-Jensen
Affirmation

Exhibit # 44

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK; et al., <br><br>       Plaintiffs, <br><br>    v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; et al., <br><br>       Defendants. | C.A. No 1:25-cv-00039-JJM-PAS |

**DECLARATION OF COMMISSIONER KATIE DYKES
ON BEHALF OF THE CONNECTICUT DEPARTMENT OF ENERGY AND
ENVIRONMENTAL PROTECTION**

I, Katie Dykes, hereby depose and state as follows:

1.      I am the Commissioner of the Connecticut Department of Energy and Environmental Protection (hereinafter "DEEP").  I have held that position since February 20, 2019.  I make this declaration as a representative of DEEP, in part based on the business records of DEEP and in part based on my personal knowledge and experience.  In my official capacity and based on my personal knowledge and other sources of information that I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

2.      On Friday, January 31, 2025, this Court entered a Temporary Restraining Order ("TRO") [Doc. 50] prohibiting any funding freeze except as permitted by statute, regulation or the terms of the award.  This TRO applies to the United States Environmental Protection Agency ("EPA") and to our grants under the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA").  Notwithstanding the TRO, as of today, our most critical IIJA-

1

and IRA-related EPA-administered grants remain suspended in Automated Standard Application for Payments ("ASAP"), EPA's payment portal, so DEEP cannot access them. These illegally frozen grants total $534,464,753 as of February 4, 2025 at 10:27 AM. Some of the largest and most significant are detailed below, but this is not an exhaustive list.

3.      On Monday, February 3, some (but not all) of our grant contacts at DEEP received an email from EPA simply transmitting the TRO without further commentary. An example is attached as Exhibit A. The email from EPA transmitting the TRO contained neither a representation that funding access would be reinstated, nor any reason, justification, or legal basis for continuing to freeze funds.

4.      The TRO had directed Defendants to "provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m.," but to the best of my knowledge, no one at DEEP who was a point of contact for our major Solar for All award received this email.

5.      On Tuesday, February 4, DEEP reached out using a standardized email to its EPA contacts on various frozen grants to inquire why funding had not been unfrozen consistent with the TRO. A sample of one such email with a typical response is attached hereto as Exhibit B. None of the responses received contained any legal justification for the non-compliance, or any specific response about whether or when EPA would comply with the TRO and unfreeze the funds.

**<u>SOLAR FOR ALL GRANT</u>**

6.      On July 9, 2024, DEEP received confirmation from EPA that DEEP had been awarded the Solar for All grant for which DEEP had applied on October 12, 2023. True and

accurate copies of the grant award documents with the terms and conditions applicable thereto
are attached as Exhibit C.

7.      Funding for the Solar for All Program was made available as a fully awarded and
obligated award for which DEEP was authorized to draw down funds, on a reimbursement basis,
for activities consistent with the approved work plan.

8.      Pursuant to the Solar for All grant, DEEP initiated Project SunBridge. Project
SunBridge will reach thousands of households, with a priority focus on multi-family affordable
housing units. The project is designed to overcome current barriers for low-income and
disadvantaged communities to access solar and storage energy technologies through a
combination of financial and technical assistance. Through greater access to distributed solar and
storage installations, Project SunBridge aims to achieve a minimum household energy savings of
20% for all participants.  The project will assist Connecticut in reaching our statutory goal of a
zero-carbon electric sector by 2040, as established by Public Act 22-5.

9.      Specifically, the financial assistance includes loan and lease products for multi-
family and single-family residents to deploy distributed solar and storage, and upfront incentives
for distributed storage. The technical assistance includes workforce development trainings and
programs, support for communities to deploy distributed solar and storage, building audits for
properties looking to deploy solar and storage, and support for community outreach and
engagement. Since receiving this award, DEEP has made meaningful progress on implementing
the EPA-approved work plan and has incurred costs totaling $27,469.78 to date for staff salaries
and benefits.  DEEP anticipates continuing to use staff time in the near future to implement the
EPA-approved work plan.

10. On January 30, 2025, DEEP's federal grants unit observed that DEEP's Solar for All Account was suspended in ASAP, the federal portal for drawing down funds made available to the states. No notice of the suspension was provided, nor any grounds given, and no rationale for terminating or modifying the award funding was supplied.

11. By suspending the Solar for All program, EPA has impounded $62,050,000 of funding that had previously been awarded and obligated to DEEP.

12. On January 30, 2025, a member of DEEP's staff reached out to our contact on this grant at EPA to inquire about an email received by other Solar for All awardees in other states stating "[EPA] has paused all funding actions" related to Solar for All. DEEP did not receive this email. The contact did not know why DEEP did not receive this email.

13. On February 3, 2025, the staff member reached out to the contact again to inquire about an email received by Solar for All awardees in other states, which stated: "Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information." DEEP did not receive this email. Again, the contact did not know why DEEP was not getting these communications.

14. On February 4, 2025, the staff member reached out to our EPA contact on this grant a third time and asked her by email to explain why Solar for All funding is still suspended in ASAP despite the January 31, 2025 TRO that blocked the freeze on federal grants. The contact responded and noted that the EPA is "closely tracking the recent [TRO]." She did not share any information about why the funds are still inaccessible, and she told DEEP that specific guidance regarding ASAP funds is still forthcoming. See Exhibit B.

15.     This lack of communication and definitive answers, combined with suspended access to Solar for All funding in ASAP, has caused confusion and impaired DEEP's ability to continue implementing its EPA-approved work plan under this grant. DEEP has incurred administrative expenses through staff time to implement this federal funding and make sufficient progress in furtherance of the EPA-approved work plan. Absent this funding, Connecticut residents will not be able to access distributed solar and storage to diversify the fuel mix, site generation close to load, and reduce air pollution and greenhouse gas emissions.

16.     Furthermore, the lack of access to this funding creates budgetary uncertainty that will prevent DEEP from using these funds to continue to fund portions of existing staff salaries. The uncertainty of continued funding also means DEEP is unable to recruit and hire future staff to support this program. These impacts to current and future staffing impair DEEP's ability to adequately implement the Solar for All program and will eventually require DEEP to reallocate program resources.

**CLIMATE POLLUTION REDUCTION GRANT - HEAT PUMP COALITION GRANT**

17.     On October 3, 2024, DEEP received confirmation from EPA that DEEP had a grant agreement in place for the Climate Pollution Reduction Grant - Heat Pump Coalition grant for which DEEP had applied by the application deadline of April 1, 2024.  True and accurate copies of the grant award documents with the terms and conditions applicable thereto are attached as Exhibit D.

18.     Funding for the Heat Pump Coalition Grant was made available as a fully awarded and obligated award for which DEEP was authorized to draw down funds up to the full amount for activities consistent with the EPA-approved work plan.

19.     Pursuant to the terms of the Heat Pump Coalition Grant, DEEP initiated the grant workplan for a multi-state effort to accelerate the adoption of cold-climate air-source heat pumps, ground-source heat pumps, and heat pump water heaters across New England. On July 22, 2024, EPA announced the Heat Pump Coalition Grant was awarded a $450 million grant from the EPA Climate Pollution Reduction Grant Program (CPRG). Connecticut DEEP finalized the 5-year grant agreement with EPA in October 2024. The coalition is led by DEEP in partnership with the Massachusetts Department of Energy Resources, Rhode Island Office of Energy Resources, Maine Governor's Office for Policy Innovation and the Future, and New Hampshire Department of Environmental Services.  Since receiving this award, DEEP has made meaningful progress on implementing the EPA-approved work plan and has incurred costs totaling $69,339 to date for staff salaries and benefits.  DEEP anticipates continuing to use staff time in the near future to implement the EPA-approved work plan.

20.     On January 28, 2025, a DEEP manager received a notification from the EPA with the subject line "Pause EPA Grants," stating: "EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." A link to the Unleashing American Energy Executive Order was included in the email.  The email is attached as Exhibit E.

21.     On January 31, 2025, DEEP's federal grants unit observed that DEEP's Heat Pump Coalition Account was suspended in ASAP, the federal portal for drawing down funds made available to the states.

22.     By suspending the Heat Pump Coalition Grant program, the EPA has impounded $450,000,000 of funding that was awarded and obligated to the multi-state coalition, including the $80,000,000 of that funding that has been earmarked for DEEP.

23.     On February 3, 2025, a DEEP manager received a notification from the EPA stating the following: "Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information. If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official." A copy of the court's order was attached to the email.

24.     On February 4, 2025, the DEEP manager called the EPA Project Officer listed on the EPA grant agreement to inquire about why the Heat Pump Coalition Grant funds were still inaccessible in ASAP despite the fact that the EPA had notified the DEEP manager of the TRO issued by the federal District Court of Rhode Island blocking the freeze on federal grants. The DEEP manager was unable to reach the EPA contact and left a voicemail.

25.     On February 4, 2025, the DEEP manager emailed the EPA grant contact asking for an explanation why the Heat Pump Coalition Grant funding was still suspended in ASAP despite the active TRO. The EPA contact was not able to provide further clarity on when the accounts will be unfrozen.

26.     This lack of clear communication, combined with suspended access to the heat pump grant funding in ASAP, has caused confusion and impaired DEEP's ability to continue implementing its EPA-approved work plan. DEEP has incurred administrative expenses through staff time and a contract agreement to implement this federal funding and make sufficient progress in furtherance of the EPA-approved work plan. Absent this funding, Connecticut

residents will continue to experience market and affordability barriers to heat pump adoption. This will negatively impact Connecticut's ability to meet its decarbonization goals, as set forth above.

27.     Furthermore, the lack of access to this funding creates budgetary uncertainty that will prevent DEEP from using these funds to continue to fund portions of existing staff salaries. The uncertainty of continued funding also means DEEP is unable to recruit and hire future staff to support this program. These impacts to current and future staffing impair DEEP's ability to adequately implement the Heat Pump Coalition Grant and will eventually require DEEP to reallocate program resources.

28.     In addition, given the funding suspension, it is unclear whether DEEP will be able to proceed with issuing a Request for Proposals for a contractor to implement the Heat Pump Coalition Program. DEEP issued a Request for Information on January 7, 2025, seeking public comment and participation in a technical conference to inform the development of the Request for Proposals for the Heat Pump Coalition Grant program implementer contractors. The Request for Information stated DEEP's intention to release a Request for Proposals for contractors as soon as February 2025, in furtherance of the Heat Pump Coalition Grant work plan.

**CONNECTICUT CLIMATE POLLUTION REDUCTION PLANNING GRANT**

29.     In accordance with the *Program Guidance for States, Municipalities, and Air Pollution Control Agencies* for the *Climate Pollution Reduction Grants Program: Formula Grants for Planning* issued by EPA on March 1, 2023, DEEP submitted a Notice of Intent to Participate to EPA by the deadline of March 31, 2023 and then submitted an application with a workplan and budget for the planning grant by the deadline of April 28, 2023.  On July 24, 2023, DEEP received confirmation from EPA that DEEP had been awarded a Climate Pollution

Reduction Planning grant.  True and accurate copies of the grant award documents, as conveyed

on July 24, 2023, and subsequent amendments to the grant agreements received on September

18, 2024 and December 20, 2024, are attached as Exhibit F.

30.    Funding for the Connecticut Climate Pollution Reduction Planning Grant was

made available as a fully awarded and obligated award from which DEEP was authorized to

draw down funds up to the full amount for activities consistent with the approved work plan.

The funded grant activities are meant to build upon the plans and policy recommendations of the

Governor's Council on Climate Change and Connecticut's sector-specific climate plans in the

areas of transportation, energy, buildings, and natural and working lands.  Grantees under this

program have three required deliverables: a Priority Climate Action Plan, a Comprehensive

Climate Action Plan, and a Status Report.  DEEP published and submitted the Priority Climate

Action Plan to the EPA on March 1, 2024.

31.    DEEP has started work on the Comprehensive Climate Action Plan (CCAP) that

is due by July 1, 2026.  In accordance with the Programmatic Conditions of the Grant

Agreement, the CCAP will be "a narrative report that should touch on all significant greenhouse

gas ("GHG") sources/sinks and sectors present in a state or metropolitan area, establish near term

and long-term GHG emission reduction goals, and provide strategies and identify measures to

achieve those goals. Each CCAP must include: a GHG inventory; GHG emissions projections;

GHG reduction targets; quantified GHG reduction measures; a benefits analysis for the full

geographic scope and population covered by the plan; a low-income and disadvantaged

communities benefits analysis; a review of authority to implement; a plan to leverage other

federal funding; and, a workforce planning analysis."  The illegal funding freeze will

significantly impair DEEP's ability to continue work on the CCAP as required under the terms of this grant.

32.    On January 28, 2025, a DEEP manager received a notification from the EPA with the subject line "Pause EPA Grants" stating, "EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." A link to the Unleashing American Energy Executive Order was included in the email.

33.    On January 28, 2025, DEEP's Director of the Planning and Standards Division of the Bureau of Air Management with the DEEP manager of the grant copied, sent the 6th Quarterly Report for the Connecticut Climate Pollution Reduction Planning Grant due by January 30, 2025 via email to the EPA Project Officer for the Connecticut Climate Pollution Reduction Planning Grant. On January 29, 2025, the EPA grant contact replied via email thanking the DEEP Director for the submission and stating she would "follow-up as needed."

34.    Soon thereafter, DEEP's federal grants unit observed that DEEP's Connecticut Climate Pollution Reduction Planning Grant Account was suspended in ASAP, the federal portal for drawing down funds made available to the states.

35.    On February 4, 2025, a DEEP manager called the EPA grant contact to inquire about why the Connecticut Climate Pollution Reduction Planning Grant funds were still inaccessible in ASAP despite the fact that the EPA had notified the manager of the TRO. The DEEP manager was unable to reach the contact and left a voicemail.

36.     On February 4, 2025, a DEEP manager reached out to the contact by email asking for an explanation why the Connecticut Climate Pollution Reduction Planning Grant funding was still suspended in ASAP despite the active TRO.  The EPA contact was not able to provide further clarity on when the accounts will be unfrozen.

37.     By suspending the Climate Pollution Reduction Grant program, EPA has impounded the remaining funds not yet drawn down to date for DEEP personnel salary and fringe, indirect costs, travel, and contracts of the $3,000,000 that had previously been awarded and obligated to DEEP. The lack of access to this funding creates budgetary uncertainty that will prevent DEEP from using these funds to continue to fund portions of existing staff salaries and pay contractors for expenses incurred and for work on remaining tasks in those contractual agreements. The uncertainty of continued funding also means DEEP is unable to recruit and hire future staff to support this planning.  It also affects DEEP's ability to proceed with entering into additional pending contracts with contractors to assist DEEP with producing the deliverables required by the grant. These impacts to current and future staffing and contracting impair DEEP's ability to adequately complete the Comprehensive Climate Action Plan and the Status Report, and will eventually require DEEP to reallocate program resources.

38.     If it continues, the illegal funding freeze will significantly impact the deployment of electric vehicle charging infrastructure in seven municipalities across the state, and impact statewide efforts to promote clean, equitable and sustainable transportation.

## OTHER HARMS TO THE AGENCY

39.     In addition to the direct harms from not having access to appropriated funds, the chaotic and unpredictable communications from the federal government regarding DEEP's

legally contracted for and fully obligated funding has caused additional harms, including but not limited to the following:

40.     Agency staff have been pulled away from our primary mission by the need to start monitoring the status of all our funding on a daily basis, organizing cross-agency meetings, and preparing information and materials for litigation.

41.     DEEP values transparency with the public and the lack of information and conflicting directives impede our ability to be transparent concerning these funds and initiatives that already have been announced.

42.     DEEP is concerned about the chilling effect on the market from the stop and go communications on entities that were willing to partner with DEEP to fulfill many of the services related to these awards.

43.     Awards such as the supplemental funding (FY 2022-2025) for our critical statewide Clean Water Fund efforts were suspended for days, starting on or about January 28, 2025. Although it appears the award was unfrozen on or about February 4, 2025, we have not been able to confirm the ability to access funds, and it is not clear whether this award of approximately $75,000,000 will remain unfrozen. This funding suspension caused significant uncertainty in regard to the ongoing upgrade of the Norwich Public Utilities wastewater treatment facility, a $180,000,000 project that began construction in the fall of 2023.

44.     In addition to being illegal and in violation of the TRO, these funding suspensions are incredibly wasteful and disruptive.  Requiring DEEP to operate in this climate of uncertainty regarding the stability of fully-obligated funding is extremely resource intensive and is a barrier to our attainment of the energy and environmental protection and climate goals which are the express legislatively-approved purpose of the awarded funds.

45.     This Declaration is accurate as of 10:25 a.m. Eastern Standard time on February

5, 2025.


**SIGNED UNDER THE PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY, 2025.**

_Katie S. Dykes_

Katie S. Dykes
Commissioner of the Connecticut Department of
Energy and Environmental Protection

# EXHIBIT A

## French, Rebecca

| | |
|---|---|
| **From:** | EPA_Grants_Info <EPA_Grants_Info@epa.gov> |
| **Sent:** | Monday, February 3, 2025 8:38 AM |
| **Subject:** | Notice of Court's Order |
| **Attachments:** | Notice of Temporary Restraining Order 01-31-2025.pdf |

> **EXTERNAL EMAIL:** This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

Phillip Schindel
Acting Director
US EPA Grants Management & Business Operations Division
202-564-5293
Schindel.Phillip@epa.gov

# EXHIBIT B

| | |
|---|---|
| **From:** | Hopkinson, Melissa |
| **To:** | Sickinger, Claire |
| **Cc:** | Savidge, Lauren |
| **Subject:** | RE: Funding suspension |
| **Date:** | Tuesday, February 4, 2025 10:31:42 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Hi Claire,

Thanks for reaching out. EPA is closely tracking the recent Temporary Restraining Order (*New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025)). We have been told that specific guidance for the agency regarding ASAP funds is forthcoming, and we will share more information as soon as possible. Thank you in advance for your patience as we work through this transition period.

Melissa

**From:** Sickinger, Claire <Claire.Sickinger@ct.gov>
**Sent:** Tuesday, February 4, 2025 10:25 AM
**To:** Hopkinson, Melissa <Hopkinson.Melissa@epa.gov>
**Cc:** Lauren.Savidge@ct.gov
**Subject:** Funding suspension

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Dear Melissa,

Our fiscal office at the Connecticut Department of Energy and Environmental Protection is sharing that as of this morning, our EPA funding under IIJA and IRA is still showing as suspended in ASAP despite the temporary restraining order (TRO) that the federal district court of Rhode Island issued on 1/31/25 in *New York v. Trump*; not all formal points of contact at DEEP received yesterday's notice from the EPA containing the TRO but some points of contact did. Can you provide any updates on when we might expect to see the funding unfrozen? As you know, we need this funding to continue implementing our awards and so are looking for any updates you might have.

Thank you for helping to follow up on this question.

Sincerely,
Claire

**Claire Sickinger (she/her)**
Associate Research Analyst
Office of Supply and Infrastructure
Bureau of Energy and Technology Policy
Connecticut Department of Energy & Environmental Protection
10 Franklin Square, New Britain, CT 06051
860.827.2618  |  Claire.Sickinger@ct.gov



*Conserving, improving, and protecting our natural resources and environment;*
*Ensuring a clean, affordable, reliable, and sustainable energy supply.*



**portal.ct.gov/DEEP**

# EXHIBIT C

5H - 84090001 - 1    Page 1

| | | GRANT NUMBER (FAIN): 84090001 | |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | MODIFICATION NUMBER: 1 PROGRAM CODE: 5H | **DATE OF AWARD** 12/11/2024 |
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/11/2024 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** 10109 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 EIN: 86-1154163 | DEPT OF ENERGY & ENVIRONMENTAL PROTECTION 79 ELM STREET HARTFORD, CT 06106-5127 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Claire Sickinger 10 Franklin Square New Britain, CT 06051 **Email:** claire.sickinger@ct.gov **Phone:** 860-827-2618 | Cynthia Gonzales 1201 Constitution Ave NW, 1101R Washington, DC 20004 **Email:** Gonzales.Cynthia@EPA.GOV **Phone:** 720-429-4080 | Caitlyn Chandler OGD-GMBOD, 3903R 1200 Pennsylvania Ave NW Washington, DC 20460 **Email:** Chandler.Caitlyn@epa.gov **Phone:** 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Project SunBridge: Connecting Communities to a Solar Future

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 62,450,000.00 | **TOTAL PROJECT PERIOD COST** $ 62,450,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,450,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Barbara Proctor - Associate Award Official | **DATE** 12/11/2024 |

EXHIBIT 30

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 62,050,000 | $ 0 | $ 62,050,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,450,000 | $ 0 | $ 62,450,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

EXHIBIT 32

5H - 84090001 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 442,067 |
| 2. Fringe Benefits | $ 399,938 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 61,450,000 |
| 9. Total Direct Charges | $ 62,292,005 |
| 10. Indirect Costs: 35.74 % Base MTDC | $ 157,995 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,450,000 |
| 12. Total Approved Assistance Amount | $ 62,450,000 |
| 13. Program Income | $ 37,500,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,450,000 |

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa. gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

• Progress towards objectives on key performance metrics over the entire Period of Performance,
• Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
• Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
• Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
• Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply [EPA's Final Financial Assistance Conflict of Interest Policy](#) to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

<u>3. Indirect Cost Rate</u>

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

<u>4. Sufficient Progress</u>

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

<u>5. Termination</u>

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

    1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

    2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

    3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

    4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

    5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

### AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

### AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT D

5E - 00A01474 - 0    Page 1

| | | | GRANT NUMBER (FAIN): 00A01474<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5E | DATE OF AWARD<br>10/03/2024 |
|---|---|---|---|---|

**U.S. ENVIRONMENTAL PROTECTION AGENCY**

Grant Agreement

| GRANT NUMBER (FAIN): | 00A01474 | DATE OF AWARD |
|---|---|---|
| MODIFICATION NUMBER: | 0 | 10/03/2024 |
| PROGRAM CODE: | 5E | |
| TYPE OF ACTION<br>New | | MAILING DATE<br>10/08/2024 |
| PAYMENT METHOD:<br>ASAP | | ACH#<br>10109 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:<br>DEPT OF ENERGY & ENVIRONMENTAL PROTECTION<br>79 Elm Street<br>Hartford, CT 06106-5127<br>EIN:  86-1154163 | PAYEE:<br>DEPT OF ENERGY & ENVIRONMENTAL PROTECTION<br>79 Elm Street<br>Hartford, CT 06106-5127 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Henry Webster<br>10 Franklin Square<br>Hartford, CT 06106-1650<br>**Email:** Hank.Webster@ct.gov<br>**Phone:** 860-827-2890 | Meredith Seibold<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** Seibold.Meredith@epa.gov<br>**Phone:** 617-918-1117 | Robert Smith<br>Grants Management Branch<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912<br>**Email:** Smith.Robert.F@epa.gov<br>**Phone:** 617-918-1960 |

**PROJECT TITLE AND DESCRIPTION**

Climate Pollution Reduction Grants - Heat Pump Coalition Grant

See Attachment 1 for project description.

| BUDGET PERIOD<br>11/01/2024 - 10/31/2029 | PROJECT PERIOD<br>11/01/2024 - 10/31/2029 | TOTAL BUDGET PERIOD COST<br>$ 450,000,000.00 | TOTAL PROJECT PERIOD COST<br>$ 450,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/01/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 450,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 450,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 1, EPA New England<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 | U.S. EPA, Region 1, EPA New England<br>R1 - Region 1<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Arthur Johnson - Director, Mission Support Division | DATE<br>10/03/2024 |

5E - 00A01474 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 450,000,000 | $ 450,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 450,000,000 | $ 450,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| IRA-CPRG | 24010CG083 | 2226 | E4SF5 | 01V1 | 000ACGXJ2 | 4132 | - | - | $ 450,000,000 |
| | | | | | | | | | $ 450,000,000 |

5E - 00A01474 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,514,576 |
| 2. Fringe Benefits | $ 2,272,413 |
| 3. Travel | $ 22,500 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 444,261,880 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 449,071,369 |
| 10. Indirect Costs: 0.00 % Base - | $ 928,631 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 450,000,000 |
| 12. Total Approved Assistance Amount | $ 450,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 450,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 450,000,000 |

## Attachment 1 - Project Description

The purpose of this award is to provide funding under the Inflation Reduction Act (IRA) to Connecticut Department of Energy and Environmental Protection (CT DEEP). The recipient will implement greenhouse gas (GHG) reduction programs, policies, projects, and measures identified in a Priority Climate Action Plan (PCAP) developed under a Climate Pollution Reduction Grants (CPRG) planning grant. Activities conducted through this grant will benefit all residents of and visitors to Connecticut, Maine, Massachusetts, New Hampshire and Rhode Island through four main objectives: implementation of ambitious measures that will achieve significant cumulative GHG reductions by 2030 and beyond; pursuit of measures that will achieve substantial community benefits, particularly in low-income and disadvantaged communities; complementing other funding sources to maximize these GHG reductions and community benefits; and, pursuit of innovative policies and programs that are replicable and can be "scaled up" across multiple jurisdictions. The activities include various initiatives intended to rapidly accelerate adoption of cold-climate air-source heat pumps (ASHPs), heat pump water heaters (HPWHs), and ground source heat pumps (GSHPs) in single-family and multifamily residential buildings in Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island. These initiatives will be implemented through three program pillars or "hubs": the Market Hub, Innovation Hub, and Resource Hub.

Through the Market Hub, the recipient will work with contractors and partner organizations to provide per-unit midstream incentives for qualifying ASHPs, HPWHs, and GSHPs via distributors. The recipient will also conduct contractor training on regionally relevant topics, such as cold-climate heat pumps and whole-home installations, to drive consistent installation practices. Workforce development programs to grow the contractor base, with a focus on promoting job creation and entrepreneurship in low-income and disadvantaged communities (LIDACs), will be developed as well.

Activities to be performed through the Innovation Hub include 1 or 2 large-scale, multiyear state initiatives to address specific state priorities and develop scalable solutions to overcome barriers for LIDACs; annual "Quick Start Grants" for community-based pilot projects to expand access to heat pumps for LIDACs; and stakeholder engagement to ensure community involvement in the design of these programs.

Through the Resource Hub, the recipient and its partners will collect and share aggregate or anonymized data on heat pump markets and program participation; share resources for consumer and contractor education; and offer additional LIDAC-specific outreach and resources. Stipends will be distributed to groups representing LIDACs to encourage community participation. Key deliverables include semi-annual progress reports and a detailed final report to EPA; a Quality Assurance Progress Plan (QAPP), if deemed necessary by EPA; annual program evaluations by a third-party Program Evaluator (beginning in Month 23 of the project); and annual reports to stakeholders describing results for the Market Hub and Innovation Hub (also beginning in Month 23). Reports for the Innovation Hub will include information on heat pumps installed (including data on installations in low-income and disadvantaged communities), barriers overcome, incumbent systems replaced, and scalable solutions identified. Reports to EPA will describe actual GHG emissions reduced and report on the recipient's progress toward achieving other outputs and outcomes described in the workplan.

Additional deliverables for each of the three project pillars are listed below.

Market Hub:

- Equipment eligibility criteria and Qualified Product Lists (QPLs) for heat pump technologies (updated annually)

- Standardized tool for distributor reporting and incentive processing

- Training resources for contractors and workforce development programs

- Data on workforce development program participation; records and evaluation of outreach activities to workforce organizations in low-income and disadvantaged communities

Innovation Hub:

- 1 or 2 large-scale projects in each coalition state

- Annual grants for smaller-scale, community-based grants

- Selection criteria for Innovation Hub projects

Resource Hub:

- Central website hosting publicly accessible data

- Maps and tools for regional trend analysis, synthesizing publicly available information from each coalition state on building decarbonization policy and programs, housing stock and fuel sources, available incentives, and electricity and fuel costs

- Web-based, easily searchable repository of educational resources for distributors, contractors, program implementers, and other stakeholders

The expected outcomes include 2,209,712 metric tons (MT) of cumulative greenhouse gas (GHG) reductions by 2030 and 9,051,956 MT by 2050; reductions in criteria air pollutant emissions and associated health benefits; an increase in heat pump adoption such that heat pumps comprise 65% of heating, ventilation, and air conditioning (HVAC) and water heater sales by 2030 and 90% of sales by 2040; lower installation costs for heat pumps due to greater market scale and data transparency; an increase in New England homes fully electrified by 2030; significant job growth in the heat pump industry, including in low-income and disadvantaged communities (LIDACs); and full access to equitable and affordable heat pump solutions, resulting in lower energy burdens and improved health outcomes.

The intended beneficiaries include all residents of and visitors to Connecticut, Maine, Massachusetts, New Hampshire and Rhode Island. Specifically, residents of single-family and multifamily residential buildings in these five New England states will benefit from the project's focus on the rapid adoption of heat pump technology to permanently shift the market from fossil fuel equipment to heat pumps. Additional beneficiaries include heat pump distributors, contractors, and program implementors across the region who will receive training and other resources. LIDACs in particular will benefit from this project, as the program as a whole is designed to address the specific barriers that disadvantaged communities face in adopting heat pumps. At least 40% of Accelerator funding will be directed to LIDACs; 100% of the Innovation Hub funding will serve LIDACs and LIDAC-targeted programs are included in each pillar. No subawards are included in this assistance agreement.

5E - 00A01474 - 0    Page 6

# Administrative Conditions

## National Administrative Terms and Conditions

### General Terms and Conditions

The recipient agrees to comply with the current Environmental Protection Agency (EPA) general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

•Federal Financial Reports (SF-425):  rtpfc-grants@epa.gov and Project Officer on Page 1 of Award Document

•MBE/WBE reports (EPA Form 5700-52A): Grants Specialist on Page 1 of Award Document AND Larry Wells, Disadvantaged Business Utilization Program Manager: r1_mbewbereport@epa.gov

•All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: Grants Specialist and Project Officer on Page 1 of Award Document

•Payment requests (if applicable): Grants Specialist and Project Officer on Page 1 of Award Document

•Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Project Officer on Page 1 of Award Document AND R1QAPPs@epa.gov

## B. Use of Expired Rates (relates to Section 6.4 of the IDC Policy)

*Options for Applicants if the Negotiated Rate Has Expired*

The applicant should do (at least) one of the following:

-Request an IDC rate extension from the cognizant agency (this is not an option for provisional and fixed rates with carryforward), in order to budget and draw down IDCs;

5E - 00A01474 - 0    Page 7

-**Submit an IDC rate proposal to the cognizant agency in order to include IDCs in the budget. IDCs should not be drawn down until a rate is approved;**

-Seek a regulatory exception (only available for fixed rates with carry-forward) from the National Policy, Training and Compliance Division of EPA's Office of Grants and Debarment to continue to budget and draw down IDC's, using the previous/expired rate;

-Use the 10% *de minimis* rate; or Remove IDCs from the budget, and do not charge for IDCs. Funds may be transfered to the appropriate Direct budget categories, in this case. In some cases, it may be a good idea for an applicant to do a combination of options, such as request an extension from the cognizant agency and also submit a rate proposal to the cognizant agency.

*Drawing Down EPA Funds for IDCs with an Expired IDC Rate*

Only institutes of Higher Education may draw down for IDCs with an expired rate, as long as an approved rate was in place and funds were budgeted for IDCs when grant was awarded.

Other recipient types (tribe, Non-profit, governmental agency that receives $35,000,000 or more in federal funding annually) has an expired (or expiring) rate, the applicant must do one of the following, in order to continue using that rate after expiration:

-Obtain approval from the cognizant agency to extend the rate (not applicable to fixed rates with carry-forward or provisional rates).

-Obtain a regulatory exception from the National Policy, Training, and Compliance Division (NPTCD) of EPA's Office of Grants and Debarment (OGD), to continue to use a fixed rate with carry-forward (for EPA grants only).

## Programmatic Conditions

Climate Pollution Reduction Implementation Grants Programmatic Terms and Conditions

A. Deliverables

The first phase of the Climate Pollution Reduction Grants (CPRG) program provided funding for designing Priority Climate Action Plans (PCAPs) that incorporate a variety of measures (i.e., programs, policies, measures, and projects) that reduce greenhouse gas (GHG) emissions. The purpose of this CPRG Implementation assistance agreement is to implement proposed measures within a specified PCAP identified in the CPRG Implementation Grant General Competition application. All programs, policies, measures, and projects contained in the final, approved CPRG implementation assistance agreement workplan are required deliverables.

The recipient agrees to implement GHG reduction programs, policies, projects, and measures (collectively referred to as "GHG reduction measures," or "measures") identified in a PCAP developed under a CPRG planning grant and included in the CPRG implementation grant workplan. The recipient agrees to ensure that each is successfully implemented before the end of the grant project period. The recipient agrees to successful project implementation, which includes the process of putting a decision or plan into effect; executing the program, policies, projects and/or measures, not just planning or designing the programs, policies, projects and/or measures. The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, including actual GHG emissions reduced, not just the expected outputs and outcomes of the proposed measures. Clean Air Act (CAA) section 137 also requires that CPRG Implementation grant recipients address the degree to which a grant reduces GHG emissions in total and with respect to low-income and disadvantaged communities, where "greenhouse gas" refers to the air pollutants carbon dioxide ($CO_2$), hydrofluorocarbons (HFCs), methane ($CH_4$), nitrous oxide ($N_2O$), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

To the best of their ability, the recipient agrees to:

- implement GHG emission reduction programs, policies, measures, and projects that are expected to reduce GHG emissions (or enhance GHG removals) by the estimated cumulative total GHG emission reductions from the final approved workplan;

- only report emission reductions occurring as a result of CPRG funding; and

- only report emission reduction data in units of million metric tons of carbon dioxide equivalent (MMTCO2e) where appropriate, calculated using the global warming potentials (GWP) in the International Panel on Climate Change's (IPCC) Fifth Assessment Report.

Refer to the Notice of Funding Opportunity, EPA-R-OAR-CPRGI-23-07 (https:

//www.epa.gov/system/files/documents/2023-09/CPRG General Competition NOFO.pdf), Appendix B, Global Warming Potentials for GHGs, for details about how to apply GWP values for different gases.

For the measures included in the final, approved assistance agreement work plan, the recipient agrees to provide transparent GHG emission reduction estimates based on high-quality, thorough, reasonable, and

5E - 00A01474 - 0    Page 9

comprehensive methodologies, assumptions, and calculations. Examples of tools that could be used to assist in these GHG quantifications can be found at: https://www. epa.gov/inflation-reduction-act/climate-pollution-reduction-grants.

B. Final Approved Work Plan and Modifications

The recipient agrees to implement the measures in the EPA-approved work plan that will achieve significant cumulative GHG reductions by 2030 and beyond.

Recipient agrees to carry out the project in accordance with the final approved workplan. Recipients are required to report deviations from budget or project scope or objective, and must request prior written approval from the EPA:

- For any change in the scope or objective of the project or program (even if there is no associated budget revision requiring prior written approval);

- For change in key personnel (including employees and contractors) that are identified by name or position in the Federal award;

- For the disengagement from a project for more than three months, or a 25% reduction in time and effort devoted to the Federal award over the course of the period of performance, by the approved project director or principal investigator;

- For the inclusion of costs that require prior approval in accordance with 2 CFR Part 200 Subpart E—Cost Principles or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable;

- For the transfer of funds budgeted for participant support costs as defined in 2 CFR Section 200.1 Definitions to other budget categories;

- For the subawarding, transferring or contracting out of any work under the award;

- Changes in the total approved cost-sharing amount;

- When the need arises for additional Federal funds to complete the project.

Proposed modifications to the approved work plan or budget, including additions, deletions, or changes in the schedule, shall be submitted in a timely manner to the EPA Project Officer for approval. Depending on the type or scope of changes, a formal amendment to the award may be necessary.

Major project modifications may include but are not limited to: changes to the approved environmental results, outputs or outcomes, types and number of affected devices or equipment, the approved types of emission reduction technologies to be implemented, specific programs or policies to be adopted, or changes to the approved project location(s). Any change that would significantly alter the cumulative GHG reductions achieved by 2030 and beyond and affect the achievement of community benefits, especially in low- income and disadvantaged communities, may not be allowed. The recipient shall not

make changes to the proposed activities in the EPA-approved work plan without prior written approval from the EPA. The recipient shall contact the EPA Project Officer with the proposed changes; however, depending on the type of change, the Agency Award Official or Grant Management Officer may need to make the final determination. If issues regarding proposed measures arise that cannot be resolved, the EPA may elect to terminate the assistance agreement, and/or if applicable, recover ineligible expenditures from the recipient. Any significant changes to the approved work plan that would result in undermining the integrity of the award competition will not be approved.

For grants that are awarded to a recipient that is serving as the lead for a coalition under the CPRG program, the recipient agrees to abide by the terms set out in the Memorandum of Agreement (MOA), including the roles, responsibilities, and commitments that each partner will provide to ensure project success, the operating model for the coalition, and the resources that each partner will contribute to the project. As established in the CPRG coalition's MOA, the lead applicant is accountable to the EPA and accepts full responsibility for effectively carrying out the full scope of work and proper financial management of the grant. Coalition members who are grant subrecipients are accountable to the lead applicant for proposed use of EPA funding and successful project implementation. The recipient shall not make changes to the signed MOA without prior written approval from the EPA.

C. Performance Reporting and Final Performance Report

1. Performance Reports - Content

The recipient agrees to inform the EPA as soon as it is aware of problems, delays, or adverse conditions that will materially impair the recipient's ability to meet the outputs/outcomes specified in the final, approved assistance agreement work plan. The recipient agrees to inform the EPA immediately rather than waiting until the next performance report is due.

The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, not just the expected outputs and outcomes of the proposed measures. The recipient agrees to report out on each performance measures that will be the mechanism to track, measure, and report progress toward achieving the expected outputs and outcomes for each GHG reduction measure. The recipient agrees to track and report separately on the work conducted and GHG emissions reductions for each measure (program, policy, measure, or project) specified in the final, approved assistance agreement work plan. Recipients also agree to track and report separately on the budgets for each measure.

In accordance with 2 CFR 200.329, the recipient agrees to submit semi- annual, one-year, and final performance progress reports that include brief information on each of the areas specified below. To ensure the EPA can effectively monitor progress towards the achievement of measures, the recipient also agrees to report progress for each measure identified in the final, approved assistance agreement work plan as soon as work is completed and information is available.

a. Semi-Annual: The recipient agrees to submit semi-annual performance reports that include brief information on each of the following areas:

1. a comparison of actual technical progress and milestones achieved during the reporting period to the outputs/outcomes and performance measures established in the final, approved assistance agreement work plan, which may include technical changes made to the project, public events conducted, websites published, release of public-facing documents or tools, or other reportable activities described in the work plan;

2.  a consolidated budget update with separate tracking for each measure (that is, how much was spent on equipment, supplies, contractors, subgrants, etc., during the reporting period and cumulatively) and, when appropriate, additional pertinent information such as analysis and explanation of cost overruns, high-unit costs, cost-share expenditures, program income, infrastructure costs subject to Buy America, Build America (BABA) compliance, or requested budget modifications (for example, when the recipient is requesting to move funding from one budget category to another);

3.  if necessary, a description of the reasons why any implementation timeline milestones or outputs/outcomes were missed for each measure established in the final, approved assistance agreement work plan, including the recipient's strategy to address challenges faced and/or the recipient's approach to ensure that the approved outputs/outcomes for each measure will be achieved within the period of performance;

4.  documentation of community engagement activities conducted in low- income and disadvantaged communities for each measure, which describes how the activities were publicized, categorizes respondents/attendees (e.g., the number of people from Tribal governments, federal government, state government, local government, nonprofits, for profits, universities, and the public), explains how input from participants was considered in decisions for implementing the measure, and details how meaningful engagement with low- income and disadvantaged communities will be continuously included in the development and implementation of the measure;

5.  as applicable, strategies for mitigating environmental risks;

6.  a description of any climate resiliency planning, siting, design, and operation of the project.

7.  as applicable, updates to individuals, including those from coalition members, who serve as key contacts and/or any changes to the roles and responsibilities of key contacts involved in each measure and the reason(s) for the change(s);

8.  as applicable, updates regarding which organizations have the authority to implement each measure and the reason(s) for the change(s);

9.  as applicable, updates regarding changes to contracts, subgrants, and participant support costs;

10. as applicable, progress on generating high-quality jobs with a diverse, highly skilled workforce and support of strong labor standards; and

11. summary of anticipated activities for the next 6-month reporting period.

b. One-year report: As part of the second semi-annual progress report (*i.e.* the more detailed one-year report), the recipient agrees to report the additional data to the EPA using the reporting template from the

EPA's Information Collection Request 2806.01, Office of Management and Budget (OMB) Control Number 2060-0763. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request. This includes co-pollutant emissions reductions of each pollutant impacted by each measure, the sector impacted, and the county in which the emissions change. In addition, the recipient agrees to report the Climate and Economic Justice Screening Tool (CEJST) Census tract IDs or the EPA's EJScreen Census block group IDs for areas affected by GHG reduction measures, consistent with the EPA's definition of low-income and disadvantaged communities for the CPRG program.

c. Final Report: The recipient also agrees to submit a detailed final report and to report certain data associated with the final report to the EPA using the reporting template from the EPA's Information Collection Request 2806.01, OMB Control Number 2060-0763.

d. Coalition Performance

The grant recipient is accountable to the EPA and accepts responsibility for carrying out the full scope of work and proper financial management of the grant. In the event that a coalition member withdraws, the grant recipient continues to be subject to the EPA's terms and conditions for the grant, the subaward policy, and EPA grants policy. In circumstances where the EPA deems that the withdrawal of a coalition member fundamentally alters the project or jeopardizes the project's success, the EPA will consider appropriate remedies and reserves the right to terminate an awarded grant (see 2 CFR 200.339 through 343)

2. Performance Reports

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 days after the six-month reporting period ends. Semi-annual reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This semi-annual reporting schedule shall be repeated for the duration of the award agreement.

October 1 – March 31 Reporting Period: report due April 30

April 1 – September 30 Reporting Period: report due October 30

As part of the second semi-annual performance report that is submitted one year after the grant award, the recipient agrees to submit the one-year performance report that includes the additional details specified above in section C.1.b.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.

D. Allowable and Unallowable Activities

The recipient agrees to only use this CPRG Implementation grant award funding to implement measures in the EPA approved workplan for this CPRG Implementation grant and follow the grant Terms and Conditions.

All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for financial assistance as well as other activities that involve acquiring real property, including related equipment purchases, if not already in the EPA approved work plan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that are not in the EPA approved work plan; (b) activities that support measures, activities or projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use this CPRG award to replace existing program federal funding, but the recipient may use CPRG funds to supplement or expand existing programs. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

The recipient agrees to not use the award to aid regulated entities to comply with EPA regulatory requirements.

E. Davis-Bacon Related Act Term and Condition

1. Program Applicability

  1. Climate Pollution Reduction Implementation Grants.

  2. Section 314 of the Clean Air Act.

  3. Construction activities conducted under a Climate Pollution Reduction Implementation Grant.

  4. The recipient must work with the appropriate authorities to determine wage classifications for the specific project(s) or activities subject to Davis Bacon under this grant.

2. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) (https://www.dol. gov/agencies/whd/government-contracts/construction) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

  1. Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

  2. Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

  3. Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

3. Recipient Responsibilities When Entering Into and Managing Contracts

1.  Solicitation and Contract Requirements:
2.  Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
3.  Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

"By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants (https://www.epa. gov/grants/contract- provisions-davis-bacon-and-related-acts)."

1.  After Award of Contract:
2.  Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).
3.  Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

4. Recipient Responsibilities When Establishing and Managing Additional Subawards

1.  Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant:

"By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients (https://www.epa.gov/grants/contract-provisions-davis-bacon- and-related-acts)."

2.  Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. Consideration as Part of Every Prime Contract Covered by DBRA

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

F. Cybersecurity Condition

1. State Grant Cybersecurity

a. The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

b. (1) The EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or the EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by the EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or the EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and the EPA.

G. Climate Resilience:

To the extent practicable, the recipient agrees to incorporate current and future climate change risk in planning, siting, design, and operation of the project. Approaches for incorporating climate change risk may make use of climate change data and information (e.g., projections and emission scenarios) that are reflective of the project's anticipated lifespan. This includes consideration of the climate change risks posed to the individuals, communities, local governments, organizations, or other entities served by the project over its anticipated lifespan.

H. Equipment and Devices

1. Procurement of Systems, Equipment and Devices

When purchasing replacement systems, equipment and/or devices, the recipient agrees the replacement systems, equipment or device:

1. will continue to perform a similar function and operation as the system, equipment or device that is being permanently rendered inoperable;

2.  will achieve the estimated emission reductions included in the EPA-approved work plan; and

3.  is consistent in its intended use, operation and location as described in the EPA-approved work plan.

The procurement of systems, equipment or devices should follow the EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements (https://www.epa.gov/grants/best-practice- guide-procuring-services-supplies-and-equipment-under-epa-assistance).

## 2. Operation and Maintenance

The recipient will assure the continued proper operation and maintenance of systems, equipment and devices funded under this agreement. Such practices shall be operated and maintained for the expected lifespan of the specific measure and in accordance with commonly accepted design standards and specifications. The recipient shall include a provision in every applicable sub-agreement (subaward or contract) awarded under this grant requiring that the management practices for the project be properly operated and maintained. Likewise, the sub-agreement will assure that similar provisions are included in any sub-agreements that are awarded by the sub- recipient.

## 3. Equipment Use and Management

Equipment is defined as tangible personal property having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes (see Capital assets at 2 CFR 200.1 Definitions), or the amount specified in Equipment at 2 CFR 200.1. Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally- awarded funds, title to the equipment vests in the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

These conditions must be met by the grant recipient for equipment use and management during the grant period:

1.  Use the equipment for the authorized purposes of the project during the period of performance or until the property is no longer needed for the purposes of the project.

2.  Not encumber the property without approval of the Federal awarding agency or pass-through entity.

3.  Use and dispose of the property as described below. Equipment use and management instructions are applicable to assistance agreement recipients and subrecipients acquiring equipment under this award. Per 2 CFR 200.313 (b), state agencies may use and manage equipment acquired through a Federal award by the state in accordance with state laws and procedures. Per 2 CFR 200.313(b), Indian Tribes must use, manage, and dispose of equipment acquired under a Federal award in accordance with tribal laws and procedures.

Recipient agrees that at the end of the project period the recipient will continue to use the equipment

purchased under this assistance agreement in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by the Federal award. After the end of the grant period, equipment purchased under this award that is no longer needed, may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency.

Consistent with 2 CFR 200.313, unless instructed otherwise, a grant recipient may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds. When acquiring replacement equipment, the non-Federal entity may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

Subrecipients are subject to the same federal requirements as the grant recipient (also known as the "pass-through entity") and they must comply with applicable subaward provisions of 2 CFR Part 200, the EPA Subaward Policy, and the EPA's General Term and Condition for Subawards.

Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests with the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

In this case, equipment includes systems, equipment and devices.

I. Equipment Disposition for Recipients

State agencies may dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures.

J. QUALITY ASSURANCE

1. Quality Assurance Project Plan(s) (QAPP)

Prior to beginning environmental information operations, the recipient must:

1. Prepare a QAPP(s) for all applicable projects and tasks involving environmental information operations in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard;

2. Submit the document for EPA review and approval at least sixty (60) days before environmental information operations begin. QAPPs are submitted by e-mail to both the EPA Project Officer (PO) (see page 1 of the assistance agreement for contact information) and the Region 1 Quality Assurance Branch (QAB) at R1QAPPS@epa.gov;

3. Obtain EPA approval from both the EPA PO and Regional Quality Assurance Manager (RQAM) (or delegated QA Reviewer) prior to the start of environmental information operations.

4. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the RQAM at least annually and may also be

5E - 00A01474 - 0    Page 18

submitted when changes occur.

The recipient should discuss any potential new environmental information operations with the EPA PO prior to starting those operations. The EPA PO and the RQAM can assist in determining if a QAPP is required.

1. The recipient shall notify the PO and RQAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval. In consultation with the PO and the RQAM, if it is determined that no QAPP is required at the time of award, the recipient must review project activities at least annually and discuss any revisions to determine whether a QAPP is appropriate.
2. Quality Management Plan (QMP) (only applicable to organizations with existing, EPA-approved QMPs)
3. Submit the current EPA-approved QMP to the EPA Project Officer (PO) within sixty (60) days after grant award. The EPA PO will confirm that the QMP remains current (i.e., it was approved by EPA within the last five-years). The EPA PO shall confirm the status of the QMP with Region 1 Quality Assurance Manager (RQAM), if needed.

2. The recipient must review their EPA-approved QMP at least annually.These reviews shall be documented and made available to the EPA PO and/or RQAM, if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPAPO and RQAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and RQAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard

"Environmental information operations" is a collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation, or application of environmental technology. For EPA, environmental information includes direct measurements of environmental parameters or processes, analytical testing of environmental conditions, information provided by models, information compiled from other sources such as databases, software applications, or existing literature, the development of environmental software, tools, or models, or the design, construction, operation, or application of environmental technology.

To assist meeting these requirements, regional guidance documents and resources are available at Region 1 Quality Program Documents and national (Agency-wide) QA Directives are available at EPA Quality Program Directives.

K. Retention / Required Documentation

In accordance with 2 CFR 200.334, the recipient must retain all Federal award records, including but not limited to, financial records, supporting documents, and statistical records for at least three years from the date of submission of the final financial report. The records must be retained until all litigation, claims, or audit findings have been resolved and final action has been taken if any litigation, claim, or audit is started before the expiration of the three-year period. Examples of the required records include: (1) time

and attendance records and supporting documentation; and (2) documentation of compliance with statutes and regulations that apply to the project.

In accordance with 2 CFR 200.337, the EPA, the Inspector General, the Comptroller General, and the pass-through entity, or any of their authorized representatives, have the right of access to any documents, papers or records of the recipient which are pertinent to the grant award. The rights of access are not limited to the required retention period, but last as long as the records are retained.

If the demonstration projects or activities, device and/or the device components are to be sold, the recipient must comply with the program income requirements (see the Program Income section below).

L. Program Audit

The EPA will conduct random reviews of recipients to protect against waste, fraud, and abuse. As part of this process, the EPA, or its authorized representatives may request documentation from current recipients to verify statements made on the application and reporting documents. Recipients may be selected for advanced monitoring, including a potential site visit to confirm project details. The EPA, or its authorized representatives, may also conduct site visits to confirm documentation is on hand and that the project is completed as agreed upon, as well as confirm applicable infrastructure adheres to Build America, Buy America (BABA) requirements. Recipients are expected to comply with site visit requests and recordkeeping requirements and must supply the EPA with any requested documents for three years from the date of submission of the final expenditure report, or risk cancellation of an active grant application or other enforcement action.

M. Use of Submitted Information

Applications and reporting materials submitted under this competition may be released in part or in whole in response to a Freedom of Information Act (FOIA) request. The EPA recommends that applications and reporting materials not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information that, if disclosed, would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR 2.203. (Review EPA clause IV.a, Confidential Business Information, under EPA Solicitation Clauses (https://www.epa.gov/grants/epa-solicitation-clauses)).

The EPA may make publicly available on the EPA's website or another public website copies or portions of CPRG grant project information.

The EPA reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use, for federal purposes, submitted project photos, including use in program materials.

N. SIGNAGE REQUIREMENTS

1. Investing in America Emblem –

The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act" as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and

must be maintained in good condition throughout the construction period.

The recipient will ensure compliance with the guidelines and design specifications provided by the EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage

2. Procuring Signs

Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or the EPA logo or seal) into the appropriate non-English language (s). The costs of such translation are allowable, provided the costs are reasonable.

O. USE OF LOGOS

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that CT DEEP received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa. gov/stylebook/using-epa-seal-and-logo#policy

P. Public or Media Events

The EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

Q. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR

200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition

remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in

Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs: https://www.epa. gov/sites/default/files/2020-11/documents/epa-guidance-on-participant- support-costs.pdf.

R. Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

S. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

T. Health and Safety Plan

Before beginning field work, the recipient must have a health and safety plan in place providing for the protection of on-site personnel and area residents, unless specifically waived by the award official. This plan need not be submitted to the EPA but must be made available to the EPA upon request. The recipient's health and safety plan must comply with Occupational Safety and Health Administration (OSHA) 29 CFR 1910.120, entitled "Hazardous Waste Operations and Emergency Response."

U. Foreign Entity of Concern

The recipient agrees to not directly transfer EPA funds through a subaward, contract, or participant support costs to a foreign entity of concern (FEOC). The EPA considers FEOCs to include foreign entities that are owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation as defined by Congress in Section 40207 of the Infrastructure Investment and Jobs Act. The EPA uses the proposed interpretive rule from the U.S. Department of Energy (DOE) to provide additional guidance in determining FEOCs. See 88 Fed. Reg. 84,082 (Dec. 4, 2023). If DOE finalizes an interpretive rule that differs in material respects from the proposal, the EPA may amend the award agreement accordingly.

Additionally, the recipient agrees to develop and implement internal controls that ensure EPA funds are

not directly transferred to FEOCs, including through subawards, contractors, and participant support costs.

## V. Historic Preservation

National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## W. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition , the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• Endangered Species Act, as specified in 50 CFR Part 402: Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• Federal Funding Accountability and Transparency Act: Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation and in the General Term and Condition "Reporting Subawards and Executive Compensation."

• Farmland Protection Policy Act: This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• Coastal Zone Management Act: Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

X. Copyrighted Material and Data

In accordance with 2 CFR 200.315, EPA has the right to reproduce, publish, use and authorize others to reproduce, publish and use copyrighted works or other data developed under this assistance agreement for Federal purposes. Examples of a Federal purpose include but are not limited to: (1) Use by EPA and other Federal employees for official Government purposes; (2) Use by Federal contractors performing specific tasks for [i.e., authorized by] the Government; (3) Publication in EPA documents provided the document does not disclose trade secrets (e.g. software codes) and the work is properly attributed to the recipient through citation or otherwise; (4) Reproduction of documents for inclusion in Federal depositories; (5) Use by State, tribal and local governments that carry out delegated Federal environmental programs as "co-regulators" or act as official partners with EPA to carry out a national environmental program within their jurisdiction and; (6) Limited use by other grantees to carry out Federal grants provided the use is consistent with the terms of EPA's authorization to the other grantee to use the copyrighted works or other data. Under Item 6, the grantee acknowledges that EPA may authorize another grantee(s) to use the copyrighted works or other data developed under this grant as a result of:

• The selection of another grantee by EPA to perform a project that will involve the use of the copyrighted works or other data, or

• Termination or expiration of this agreement.

In addition, EPA may authorize another grantee to use copyrighted works or other data developed with Agency funds provided under this grant to perform another grant when such use promotes efficient and effective use of Federal grant funds.

# EXHIBIT E

| | |
|---|---|
| **From:** | EPA_Grants_Info |
| **Subject:** | Pause EPA Grants |
| **Date:** | Tuesday, January 28, 2025 4:41:38 PM |

---

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

# EXHIBIT F

5D - 00A01405 - 0    Page 1

| | | GRANT NUMBER (FAIN): 00A01405 | |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | MODIFICATION NUMBER: 0 PROGRAM CODE: 5D | **DATE OF AWARD** 07/24/2023 |
| | | TYPE OF ACTION New | MAILING DATE 07/27/2023 |
| | | PAYMENT METHOD: ASAP | ACH# 10109 |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| Energy & Environmental Protection Connecticut Department of 79 Elm Street Hartford, CT 06106-5127 EIN:  86-1154163 | CTDEEP 79 Elm Street Hartford, CT 06106-5127 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Rebecca French 79 Elm Street Hartford, CT 06106-5127 **Email:** Rebecca.French@ct.gov **Phone:** 860-966-6243 | Shutsu Wong 5 Post Office Square, Suite 100 Boston, MA 02109-3912 **Email:** Wong.Shutsu@epa.gov **Phone:** 617-918-1078 | Robert Smith Grants Management Branch 5 Post Office Sq, Suite 100 Boston, MA 02109-3912 **Email:** Smith.Robert.F@epa.gov **Phone:** 617-918-1960 |

**PROJECT TITLE AND DESCRIPTION**

Connecticut Climate Pollution Reduction Planning Grant

See Attachment 1 for project description.

| BUDGET PERIOD 07/01/2023 - 06/30/2027 | PROJECT PERIOD 07/01/2023 - 06/30/2027 | TOTAL BUDGET PERIOD COST $3,000,000.00 | TOTAL PROJECT PERIOD COST $3,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/28/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $3,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $3,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 1 , EPA New England 5 Post Office Square, Suite 100 Boston, MA 02109-3912 | U.S. EPA, Region 1, EPA New England R1 - Region 1 5 Post Office Square, Suite 100 Boston, MA 02109-3912 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official    Arthur Johnson - Director, Mission Support Division | DATE 07/24/2023 |

EXHIBIT 35
Page 94 of 352

5D - 00A01405 - 0    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $0 | $3,000,000 | $3,000,000 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $3,000,000 | $3,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Oganization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 230101G066 | 2231 | E4SFX | 01V1 | 000ACGXJ1 | 4132 | - | - | $3,000,000 |
| | | | | | | | | | $3,000,000 |

5D - 00A01405 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $794,369 |
| 2. Fringe Benefits | $772,125 |
| 3. Travel | $0 |
| 4. Equipment | $0 |
| 5. Supplies | $0 |
| 6. Contractual | $1,158,257 |
| 7. Construction | $0 |
| 8. Other | $0 |
| 9. Total Direct Charges | $2,724,751 |
| 10. Indirect Costs: 0.00 % Base - | $275,249 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $3,000,000 |
| 12. Total Approved Assistance Amount | $3,000,000 |
| 13. Program Income | $0 |
| 14. Total EPA Amount Awarded This Action | $3,000,000 |
| 15. Total EPA Amount Awarded To Date | $3,000,000 |

## *Attachment 1 - Project Description*

This agreement provides funding under the Inflation Reduction Act (IRA) to Connecticut Department of Energy & Environmental Protection (CT DEEP) to develop a comprehensive, economy-wide climate mitigation plan or update an existing plan in collaboration with air pollution control districts, and large and small municipalities statewide, and tribal governments that will support actions to reduce greenhouse gases (GHG) and harmful air pollutants and to conduct meaningful engagement with low- income and disadvantaged communities.

Specifically, the recipient will build upon CT's existing climate planning efforts and GHG reduction goals, summarize implementable policies, programs and actions to reduce emissions, and develop new analyses and planning where needed. The recipient will identify policies, programs, projects, and regulatory actions that in combination are likely to achieve the state climate targets. All analyses, modeling exercises, and policy research to inform deliverables will build upon and be shaped by robust stakeholder engagement across the state. In general, activities include the development, updating, and evaluation of plans to reduce climate pollution (i.e., to reduce GHG emissions and/or enhance carbon sinks). Specific activities include building upon existing strategic plans to re-affirm and refine, as needed, a priority list of mitigation actions that will also look to unlock cutting edge decarbonization strategies, capitalizing on the important planning and coordinating role Councils of Governments (COGs) play in Connecticut, and coordinating with the CT Department of Transportation as they develop a Carbon Reduction Strategy. CT DEEP will assess mitigation actions and sinks of GHGs and criteria air pollutant sources and may address a variety of sub-sectors not yet robustly studied within CT, such as, but not limited to, waste planning, natural and working lands; off-road and non-road engines; locomotives, marine, aircraft and airports to the extent not federally preempted; industrial processes; government-owned property and assets; and natural gas supply, distribution and service. CT DEEP will also provide quantitative and qualitative analyses to help all levels of CT government determine the benefits of GHG reductions for the state. Cost-benefit analyses will also quantify the impacts of GHG reductions in low-income and disadvantaged communities. A thorough review of federal, state, and local funding and financing opportunities will accompany policy recommendations, and a review of state and local authority to implement each policy or program will also be incorporated into each recommendation. All analyses, modeling exercises, and policy research will build upon and be shaped by robust stakeholder engagement across the state. At minimum, the CT DEEP expects to collaborate with sister state agencies, tribal nations, regional COGs, municipalities, and the broader public. Where possible, public meetings will likely be held in collaboration with existing climate, equity, and energy organizations. To support the participation of disadvantaged communities in these forums and public meetings, CT DEEP will leverage the expertise of their Environmental Justice Office. Three key deliverables will be produced and submitted over the course of the four-year program period, including: a Priority Climate Action Plan (PCAP), due March 1, 2024; a Comprehensive Climate Action Plan (CCAP), due two years from the date of the award; and a Status Report, due at the close of the grant period.

Other expected outputs include: GHG and criteria air pollution reduction targets to support compliance with state climate goals, changes to sector emissions trajectories, benefit analyses including cost savings, economic development, health, electric grid reliability, and/or resilience, assessment of workforce needs as needed, and analysis of health impacts to low-income and disadvantaged communities. Action recommendations will be produced, including recommendations for adoption at the municipal level.

The expected outcomes include a PCAP and CCAP that identifies: tons of pollution (GHGs and co-pollutants) reduced over the lifetime of the measures; tons of pollution (GHGs and co-pollutants) reduced annually; and tons of pollution (GHGs and co-pollutants) reduced with respect to low-income and disadvantaged communities. Other expected outcomes include:

improved staff capacity to understand and implement policies to address climate change; enhanced multi-scalar community engagement on climate pollution reduction; improved ambient air quality; health benefits achieved; increased awareness of climate-related health benefits; increased public awareness of project and results; and/or, creation of high-quality jobs with an emphasis on workers from underserved populations.

The intended beneficiaries include all residents of and visitors to CT. CT will coordinate with all nine COGs in CT, including specific engagement with municipalities that are not directly covered by Municipal Statistical Area CPRG Planning Grants. CT will also invite CT's Tribal Nations to participate in the development of deliverables. Low-income and disadvantaged communities will be given special attention in outreach and stakeholder engagement, and CT will employ best practices to support engagement of these communities. CT will also assess the impacts of proposed GHG reduction measures on low-income and disadvantaged communities, including direct and indirect benefits. No subawards are included in this assistance agreement.

5D - 00A01405 - 0    Page 6

## *Administrative Conditions*

**National Administrative Terms and Conditions**

**General Terms and Conditions**

The recipient agrees to comply with the current EPA general terms and conditions available at:
https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2022-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**A.  Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

• Federal Financial Reports (SF-425):  rtpfc-grants@epa.gov

• MBE/WBE reports (EPA Form 5700-52A): **Grants Specialist on Page 1 of Award Document and Larry Wells, Disadvantaged Business Utilization Program Manager: r1_mbewbereport@epa.gov**

• All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Grants Specialist and Project Officer on Page 1 of Award Document**

• Payment requests (if applicable): **Grants Specialist and Project Officer on Page 1 of Award Document**

• Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **Project Officer on Page 1 of Award Document AND R1QAPPs@epa.gov**

**B.  Pre-Award Costs**

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from 07/01/2023 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

## *Programmatic Conditions*

**Climate Pollution Reduction Grants Specific Programmatic Terms and Conditions**

**A**.  **PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT**

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on

each of the following areas:  1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

**Performance Reports - Frequency**

Quarterly performance reports are required to be submitted electronically to the EPA Project Officer within 30 calendar days after the reporting period (every three-month period). Quarterly reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This quarterly reporting schedule shall be repeated for the duration of the award agreement.

July 1 – September 30 Reporting Period: report due date October 30 (note, in year 1, this reporting period should begin at the project start date)

October 1 – December 31 Reporting Period: report due date January 30

January 1 – March 31 Reporting Period: report due date April 30

April 1 – June 30 Reporting Period: report due date July 30

**The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.**

**B.  DELIVERABLES AND REQUIREMENTS**

**States that accept an award are required to produce and electronically submit the following three deliverables by the date specified:**

1.) By March 1, 2024, a Priority Climate Action Plan (PCAP), which is a narrative report that includes a focused list of near-term, high-priority, implementation ready measures to reduce Greenhouse Gas (GHG) pollution and an analysis of GHG emissions reductions that would be achieved through implementation. These initial plans can focus on a specific sector or selected sectors, and do not need to comprehensively address all sources of GHG emissions and sinks in the jurisdiction. The PCAP must include: a GHG inventory; quantified GHG reduction measures; a low-income and disadvantaged communities benefits analysis; and a review of authority to implement.

2.) A Comprehensive Climate Action Plan (CCAP), due 2 years from the date of the award. The CCAP is a narrative report that should touch on all significant GHG sources/sinks and sectors present in a state or metropolitan area, establish near-term and long-term GHG emission reduction goals, and provide strategies and identify measures to achieve those goals. Each CCAP must include: a GHG inventory; GHG emissions projections; GHG reduction targets; quantified GHG reduction measures; a benefits analysis for the full geographic scope and population covered by the plan; a low-income and disadvantaged communities benefits analysis; a review of authority to implement; a plan to leverage other federal funding; and, a workforce planning analysis.

3.) A Status Report, due at the closeout of the 4-year grant period. This report should include the implementation status of the quantified GHG reduction measures included in the CCAP; any relevant updated analyses or projections supporting

CCAP implementation; and, next steps and future budget/staffing needs to continue CCAP implementation.

States must coordinate with municipalities and air pollution control agencies within their state to include priority measures that are implementable by those entities. States are further encouraged to similarly coordinate with tribes. In all cases, the lead organization for a state or metropolitan area PCAP funded through the CPRG program must make the PCAP available to other entities by March 1, 2024 for their use in developing an implementation grant application.

State lead organizations must involve stakeholder groups and the public in the process for developing the PCAP and CCAP. Potential stakeholders include urban, rural, and underserved or disadvantaged communities as well as the general public, governmental entities, federally recognized tribes, Port Authorities, labor organizations, community and faith-based organizations, and private sector and industry representatives.

## C. Cybersecurity Condition

**State Grant Cybersecurity**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## D. Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

5D - 00A01405 - 0    Page 9

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable. Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**E**.  **Public or Media Events**

The Recipient agrees to notify the EPA Project Officer listed in this award document of public or media events related to activities accomplished as a result of this agreement, and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**F**.  **Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**G.  Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient will develop Quality Assurance Project Plans (QAPP) for all applicable projects and tasks involving environmental information operations in accordance with the most current version of *EPA Requirements for Quality Assurance Project Plans*. Regional guidance documents and national guidance documents may be helpful in meeting the requirements.

"Environmental information operations" is a collective term for work performed to collect, produce, evaluate, or use environmental information or the design, construction, operation, or application of environmental technology. For EPA, environmental information includes direct measurements of environmental parameters or processes, analytical testing of environmental conditions, information provided by models, information compiled from other sources such as databases, software applications, or existing literature, the development of environmental software, tools, or models, or the design, construction, operation, or application of environmental technology.

The QAPP must be approved by EPA prior to environmental information operations, except under circumstances requiring immediate action to protect human health and the environment or operations conducted under police powers. Unless an alternate schedule has been agreed upon, QAPPs are to be submitted at least 60 days before project activities begin. QAPPs are submitted electronically to the following:

> ***EPA Project Officer (see page 1 of assistance agreement for contact information) and Regional Quality Assurance Branch via R1QAPPs@epa.gov***

> ***\*If electronic submission is unavailable, please contact the Project Officer Coordinator for submittal instructions.***

For organizations with an EPA-approved Quality Management Plan (QMP), the recipient will submit an annual update letter to EPA documenting progress over the year and any changes to the QMP. Annual update letters will be sent every year for

four years until the expiration of the QMP (five years from initial EPA approval). Annual QA update letters will be sent to the EPA Project Officer/Tribal Coordinator and the RQAM on the anniversary of the approval of the QMP by the RQAM; or on another mutually agreeable schedule. In addition, for multi-year projects, the grantee shall confirm that the QAPP is current and accurate.

**H.  Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Connecticut Department of Energy and Environmental Protection received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy