Thomas-Jensen
Affirmation
(redacted)


Exhibit # 71

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br>         Plaintiffs, <br>    v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, et al., <br><br>         Defendants. | C.A. No. 1:25-cv-00039 -JJM-PAS |

**DECLARATION OF DAN BURGESS**

I, Dan Burgess, hereby depose and state as follows:

1.  I am the Director of the Maine Governor's Energy Office. I have held that position since March of 2019. I make this declaration as a representative of the Maine Governor's Energy Office (Maine GEO), in part based on the business records of the State of Maine and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity with, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

**Solar for All Program**

2.  On October 12, 2023, the Maine GEO applied for the U.S. Environmental Protection Agency's (EPA) Solar for All Program. A true and accurate copy of the grant application materials is attached hereto as Exhibit A.

3.  On April 22, 2024, the Maine GEO received confirmation from the EPA that the Maine GEO had been awarded the grant. True and accurate copies of the grant award documents are attached hereto as Exhibit B. True and accurate copies of the terms and conditions applicable

1

to those grant award documents, as conveyed on December 19, 2024, are attached hereto as Exhibit C.

4.      Funding is disbursed on a reimbursement basis through the Automated Standard Application for Payments (ASAP) payment system.

5.      Maine's Solar for All Program (MESA) proposes three financial assistance program channels to comprehensively address the range of barriers faced by low-income households: single-family and multifamily on-site solar programs, and an efficient energy assistance community solar program. The original application proposed a fourth financial assistance channel, targeted support for cooperatively-owned community solar. This program channel is still included in this workplan, but has been re-categorized as technical assistance in conformance with EPA definitions. Energy storage is incorporated across all three channels to build resilience and maximize value. MESA also proposes a holistic range of technical assistance, supporting expanded workforce development opportunities, project-deployment technical assistance including siting and permitting supports, and additional support to overcome barriers including interconnection challenges.

6.      Following the program award, the Maine GEO has been able to draw down initial funding in the total amount of $26,000.

7.      On January 28, 2025, a notification was posted to the Maine GEO's ASAP account indicating a change to our Solar for All Program grant award and instructing Maine GEO to review the related account profile stating that the grant is suspended and no longer open for cash draws. See below screenshot and Exhibit D.  As of February 5, 2025, the Maine GEO

ASAP account no longer showed the grant as accessible to draw down funds from.



8.      Two full-time positions are filled and funded by this grant.  These positions are a Clean Energy Finance Program Manager and a Solar for All Coordinator.

9.      Without access to these funds, the Maine GEO is unable to move forward with the necessary program design and implementation of this Solar for All Program.  This impacts the goals of the program to benefit low-income Maine residents and therefore risks missing opportunities for energy savings for thousands of Maine ratepayers and also economic development and workforce development opportunities.  Further, this also risks the ability of the Maine GEO to employ the necessary staff to plan and implement the program.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2025 at Augusta, Maine.


*/s/ Dan Burgess*

_____
DAN BURGESS
Director, Governor's Energy Office
State of Maine

 **EPA KEY CONTACTS FORM**

OMB Number: 2030-0020
Expiration Date: 06/30/2024

**Authorized Representative:** *Original awards and amendments will be sent to this individual for review and acceptance, unless otherwise indicated.*

**Name:** Prefix: _____ First Name: Ethan     Middle Name: _____

Last Name: Tremblay     Suffix: _____

**Title:** Policy and Markets Program Manager

**Complete Address:**

Street1: 62 State House Station

Street2: _____

City: Augusta     State: ME: Maine

Zip / Postal Code: 04333-0062     Country: USA: UNITED STATES

**Phone Number:** 2075302603     **Fax Number:** _____

**E-mail Address:** ethan.tremblay@maine.gov

**Payee:** *Individual authorized to accept payments.*

**Name:** Prefix: _____ First Name: _____     Middle Name: _____

Last Name: _____     Suffix: _____

**Title:** _____

**Complete Address:**

Street1: _____

Street2: _____

City: _____     State: _____

Zip / Postal Code: _____     Country: _____

**Phone Number:** _____     **Fax Number:** _____

**E-mail Address:** _____

**Administrative Contact:** *Individual from Sponsored Programs Office to contact concerning administrative matters (i.e., indirect cost rate computation, rebudgeting requests etc).*

**Name:** Prefix: _____ First Name: _____     Middle Name: _____

Last Name: _____     Suffix: _____

**Title:** _____

**Complete Address:**

Street1: _____

Street2: _____

City: _____     State: _____

Zip / Postal Code: _____     Country: _____

**Phone Number:** _____     **Fax Number:** _____

**E-mail Address:** _____

EPA Form 5700-54 (Rev 4-02)

# EPA KEY CONTACTS FORM

**Project Manager:** *Individual responsible for the technical completion of the proposed work.*

**Name:**    **Prefix:** [          ]    **First Name:** [                    ]    **Middle Name:** [                    ]

**Last Name:** [                    ]    **Suffix:** [          ]

**Title:** [                    ]

**Complete Address:**

**Street1:** [                    ]

**Street2:** [                    ]

**City:** [                    ]    **State:** [                    ]

**Zip / Postal Code:** [                    ]    **Country:** [                    ]

**Phone Number:** [                    ]    **Fax Number:** [                    ]

**E-mail Address:** [                    ]

EPA Form 5700-54 (Rev 4-02)

 **EPA**

OMB Number: 2030-0020
Expiration Date: 06/30/2024

## Preaward Compliance Review Report for
## All Applicants and Recipients Requesting EPA Financial Assistance

Note: Read Instructions before completing form.

**I. A. Applicant/Recipient (Name, Address, City, State, Zip Code)**

Name: Governor's Energy Office

Address: 62 State House Station

City: Augusta

State: ME: Maine                     Zip Code: 04333-0062

**B. Unique Entity Identifier (UEI):** SMUBL99CK218

**C. Applicant/Recipient Point of Contact**

Name: Ethan Tremblay

Phone: 2075302603

Email: ethan.tremblay@maine.gov

Title: Policy and Markets Program Manager

**II. Is the applicant currently receiving EPA Assistance?** ☐ Yes  ☒ No

**III. List all pending civil rights lawsuits and administrative complaints filed under federal law against the applicant/recipient that allege discrimination based on race, color, national origin, sex, age, or disability. (Do not include employment complaints not covered by 40 C.F.R. Parts 5 and 7.)**

None

**IV. List all civil rights lawsuits and administrative complaints decided against the applicant/recipient within the last year that alleged discrimination based on race, color, national origin, sex, age, or disability and enclose a copy of all decisions. Please describe all corrective actions taken. (Do not include employment complaints not covered by 40 C.F.R. Parts 5 and 7.)**

None

**V. List all civil rights compliance reviews of the applicant/recipient conducted under federal nondiscrimination laws by any federal agency within the last two years and enclose a copy of the review and any decisions, orders, or agreements based on the review. Please describe any corrective action taken. (40 C.F.R. § 7.80(c)(3))**

None

**VI. Is the applicant requesting EPA assistance for new construction? If no, proceed to VII; if yes, answer (a) and/or (b) below.**
☒ Yes  ☐ No

**a. If the grant is for new construction, will all new facilities or alterations to existing facilities be designed and constructed to be readily accessible to and usable by persons with disabilities? If yes, proceed to VII; if no, proceed to VI(b).**
☒ Yes  ☐ No

**b. If the grant is for new construction and the new facilities or alterations to existing facilities will not be readily accessible to and usable by persons with disabilities, explain how a regulatory exception (40 C.F.R. 7.70) applies.**

**VII.** Does the applicant/recipient provide initial and continuing notice that it does not discriminate on the basis of race, color, national origin, sex, age, or disability in its program or activities?  (40 C.F.R 5.140 and 7.95)     ☒ Yes   ☐ No

  **a.** Do the methods of notice accommodate those with impaired vision or hearing?     ☒ Yes   ☐ No

  **b.** Is the notice posted in a prominent place in the applicant's/recipient's website, in the offices or facilities or, for education programs and activities, in appropriate periodicals and other written communications?     ☒ Yes   ☐ No

  **c.** Does the notice identify a designated civil rights coordinator?     ☒ Yes   ☐ No

**VIII.** Does the applicant/recipient maintain demographic data on the race, color, national origin, sex, age, or disability status of the population it serves?  (40 C.F.R. 7.85(a))     ☒ Yes   ☐ No

**IX.** Does the applicant/recipient have a policy/procedure for providing meaningful access to services for persons with limited English proficiency?  (Title VI, 40 C.F.R. Part 7, *Lau v Nichols* 414 U.S. (1974))     ☒ Yes   ☐ No

**X.** If the applicant is an education program or activity, or has 15 or more employees, has it designated an employee to coordinate its compliance with 40 C.F.R. Parts 5 and 7?  Provide the name, title, position, mailing address, e-mail address, fax number, and telephone number of the designated coordinator.

**XI.** If the applicant is an education program or activity, or has 15 or more employees, has it adopted grievance procedures that assure the prompt and fair resolution of complaints that allege a violation of 40 C.F.R. Parts 5 and 7?  Provide a legal citation or applicant's/recipient's website address for, or a copy of, the procedures.

---

### For the Applicant/Recipient

I certify that the statements I have made on this form and all attachments thereto are true, accurate and complete.  I acknowledge that any knowingly false or misleading statement may be punishable by fine or imprisonment or both under applicable law.  I assure that I will fully comply with all applicable civil rights statutes and EPA regulations.

| A. Signature of Authorized Official | B. Title of Authorized Official | C. Date |
|---|---|---|
| Lisa J Smith | Director | 10/12/2023 |

---

### For the U.S. Environmental Protection Agency

I have reviewed the information provided by the applicant/recipient and hereby certify that the applicant/recipient has submitted all preaward compliance information required by 40 C.F.R. Parts 5 and 7; that based on the information submitted, this application satisfies the preaward provisions of 40 C.F.R. Parts 5 and 7; and that the applicant has given assurance that it will fully comply with all applicable civil rights statures and EPA regulations.

| A. *Signature of Authorized EPA Official | B. Title of Authorized Official | C. Date |
|---|---|---|
| | | |

Instructions for EPA FORM 4700-4 (Rev. 04/2021)

General. Recipients of Federal financial assistance from the U.S. Environmental Protection Agency must comply with the following statutes and regulations.

Title VI of the Civil Rights Acts of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. The Act goes on to explain that the statute shall not be construed to authorize action with respect to any employment practice of any employer, employment agency, or labor organization (except where the primary objective of the Federal financial assistance is to provide employment). Section 13 of the 1972 Amendments to the Federal Water Pollution Control Act provides that no person in the United States shall on the ground of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under the Federal Water Pollution Control Act, as amended. Employment discrimination on the basis of sex is prohibited in all such programs or activities. Section 504 of the Rehabilitation Act of 1973 provides that no otherwise qualified individual with a disability in the United States shall solely by reason of disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. Employment discrimination on the basis of disability is prohibited in all such programs or activities. The Age Discrimination Act of 1975 provides that no person on the basis of age shall be excluded from participation under any program or activity receiving Federal financial assistance. Employment discrimination is not covered. Age discrimination in employment is prohibited by the Age Discrimination in Employment Act administered by the Equal Employment Opportunity Commission. Title IX of the Education Amendments of 1972 provides that no person in the United States on the basis of sex shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. Employment discrimination on the basis of sex is prohibited in all such education programs or activities. Note: an education program or activity is not limited to only those conducted by a formal institution. 40 C.F.R. Part 5 implements Title IX of the Education Amendments of 1972. 40 C.F.R. Part 7 implements Title VI of the Civil Rights Act of 1964, Section 13 of the 1972 Amendments to the Federal Water Pollution Control Act, and Section 504 of The Rehabilitation Act of 1973.

Items "Applicant" means any entity that files an application or unsolicited proposal or otherwise requests EPA assistance. 40 C.F.R. §§ 5.105, 7.25. "Recipient" means any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organizations, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance. 40 C.F.R. §§ 5.105, 7.25. "Civil rights lawsuits and administrative complaints" means any lawsuit or administrative complaint alleging discrimination on the basis of race, color, national origin, sex, age, or disability pending or decided against the applicant and/or entity which actually benefits from the grant, but excluding employment complaints not covered by 40 C.F.R. Parts 5 and 7. For example, if a city is the named applicant but the grant will actually benefit the Department of Sewage, civil rights lawsuits involving both the city and the Department of Sewage should be listed. "Civil rights compliance review" means: any federal agency-initiated investigation of a particular aspect of the applicant's and/or recipient's programs or activities to determine compliance with the federal non-discrimination laws. Submit this form with the original and required copies of applications, requests for extensions, requests for increase of funds, etc. Updates of information are all that are required after the initial application submission. If any item is not relevant to the project for which assistance is requested, write "NA" for "Not Applicable." In the event applicant is uncertain about how to answer any questions, EPA program officials should be contacted for clarification.

## CERTIFICATION REGARDING LOBBYING

Certification for Contracts, Grants, Loans, and Cooperative Agreements

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," in accordance with its instructions.

(3) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly. This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Statement for Loan Guarantees and Loan Insurance

The undersigned states, to the best of his or her knowledge and belief, that:

If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan, the undersigned shall complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," in accordance with its instructions. Submission of this statement is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required statement shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

---

\* APPLICANT'S ORGANIZATION

Governor's Energy Office

\* PRINTED NAME AND TITLE OF AUTHORIZED REPRESENTATIVE

Prefix: [ ]   \* First Name: Dan   Middle Name: [ ]

\* Last Name: Burgess   Suffix: [ ]

\* Title: Director

\* SIGNATURE: Lisa J Smith   \* DATE: 10/12/2023

---

## Other Attachment File(s)

* **Mandatory Other Attachment Filename:** 1238-Attachments I J K L.pdf

| Add Mandatory Other Attachment | Delete Mandatory Other Attachment | View Mandatory Other Attachment |

To add more "Other Attachment" attachments, please use the attachment buttons below.

| Add Optional Other Attachment | Delete Optional Other Attachment | View Optional Other Attachment |

## Project Narrative File(s)

* **Mandatory Project Narrative File Filename:**    1234-GEO Solar for All_Program Narrative.pdf

Add Mandatory Project Narrative File    Delete Mandatory Project Narrative File    View Mandatory Project Narrative File

To add more Project Narrative File attachments, please use the attachment buttons below.

Add Optional Project Narrative File    Delete Optional Project Narrative File    View Optional Project Narrative File

OMB Number: 4040-0004
Expiration Date: 11/30/2025

## Application for Federal Assistance SF-424

**\* 1. Type of Submission:**
- [ ] Preapplication
- [x] Application
- [ ] Changed/Corrected Application

**\* 2. Type of Application:**
- [x] New
- [ ] Continuation
- [ ] Revision

**\* If Revision, select appropriate letter(s):**

**\* Other (Specify):**

**\* 3. Date Received:** 10/12/2023

**4. Applicant Identifier:**

**5a. Federal Entity Identifier:**

**5b. Federal Award Identifier:**

**State Use Only:**

**6. Date Received by State:**

**7. State Application Identifier:**

**8. APPLICANT INFORMATION:**

**\* a. Legal Name:** Governor's Energy Office

**\* b. Employer/Taxpayer Identification Number (EIN/TIN):** 01-6000001

**\* c. UEI:** SMUBL99CK218

**d. Address:**

**\* Street1:** 62 State House Station

**Street2:**

**\* City:** Augusta

**County/Parish:**

**\* State:** ME: Maine

**Province:**

**\* Country:** USA: UNITED STATES

**\* Zip / Postal Code:** 04333-0062

**e. Organizational Unit:**

**Department Name:**

**Division Name:**

**f. Name and contact information of person to be contacted on matters involving this application:**

**Prefix:**

**\* First Name:** Ethan

**Middle Name:**

**\* Last Name:** Tremblay

**Suffix:**

**Title:** Policy and Markets Program Manager

**Organizational Affiliation:** Governor's Energy Office

**\* Telephone Number:** 2075302603

**Fax Number:**

**\* Email:** ethan.tremblay@maine.gov

**Application for Federal Assistance SF-424**

**\* 9. Type of Applicant 1: Select Applicant Type:**

A: State Government

**Type of Applicant 2: Select Applicant Type:**

**Type of Applicant 3: Select Applicant Type:**

**\* Other (specify):**

**\* 10. Name of Federal Agency:**

Environmental Protection Agency

**11. Catalog of Federal Domestic Assistance Number:**

66.959

**CFDA Title:**

Greenhouse Gas Reduction Fund: Section 134(a)(1) - Zero Emission Technologies Grant Program

**\* 12. Funding Opportunity Number:**

EPA-R-HQ-SFA-23-01

**\* Title:**

SOLAR FOR ALL

**13. Competition Identification Number:**

**Title:**

**14. Areas Affected by Project (Cities, Counties, States, etc.):**

| Add Attachment | Delete Attachment | View Attachment |

**\* 15. Descriptive Title of Applicant's Project:**

The Maine Governor's Energy Office prepared this application for funding to administer a Solar for All program under the Greenhouse Gas Reduction Fund Solar for All program administered by EPA.

Attach supporting documents as specified in agency instructions.

| Add Attachments | Delete Attachments | View Attachments |

**Application for Federal Assistance SF-424**

**16. Congressional Districts Of:**

* a. Applicant `ME-All`        * b. Program/Project `ME-All`

Attach an additional list of Program/Project Congressional Districts if needed.

[                    ]  [ Add Attachment ]  [ Delete Attachment ]  [ View Attachment ]

**17. Proposed Project:**

* a. Start Date: `07/01/2024`        * b. End Date: `06/30/2029`

**18. Estimated Funding ($):**

| | |
|---|---|
| * a. Federal | 99,479,251.00 |
| * b. Applicant | 0.00 |
| * c. State | 0.00 |
| * d. Local | 0.00 |
| * e. Other | 0.00 |
| * f. Program Income | 0.00 |
| * g. TOTAL | 99,479,251.00 |

**\* 19. Is Application Subject To Review By State Under Executive Order 12372 Process?**

☐ a. This application was made available to the State under the Executive Order 12372 Process for review on [          ].

☐ b. Program is subject to E.O. 12372 but has not been selected by the State for review.

☒ c. Program is not covered by E.O. 12372.

**\* 20. Is the Applicant Delinquent On Any Federal Debt?  (If "Yes," provide explanation in attachment.)**

☐ Yes    ☒ No

If "Yes", provide explanation and attach

[                    ]  [ Add Attachment ]  [ Delete Attachment ]  [ View Attachment ]

**21.** "By signing this application, I certify (1) to the statements contained in the list of certifications** and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances** and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)

☒ ** I AGREE

** The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**Authorized Representative:**

Prefix: [          ]        * First Name: `Dan`

Middle Name: [          ]

* Last Name: `Burgess`

Suffix: [          ]

* Title: `Director`

* Telephone Number: `2075926998`        Fax Number: [          ]

* Email: `dan.burgess@maine.gov`

* Signature of Authorized Representative: `Lisa J Smith`        * Date Signed: `10/12/2023`

## BUDGET INFORMATION - Non-Construction Programs

OMB Number: 4040-0006
Expiration Date: 02/28/2025

### SECTION A - BUDGET SUMMARY

| Grant Program Function or Activity (a) | Catalog of Federal Domestic Assistance Number (b) | Estimated Unobligated Funds | | New or Revised Budget | | |
|---|---|---|---|---|---|---|
| | | Federal (c) | Non-Federal (d) | Federal (e) | Non-Federal (f) | Total (g) |
| 1. Year 1 | | $ | $ | $ 27,406,585.00 | $ | $ 27,406,585.00 |
| 2. Year 2 | | | | 46,845,697.00 | | 46,845,697.00 |
| 3. Year 3 | | | | 8,249,486.00 | | 8,249,486.00 |
| 4. Year 4 + 5 | | | | 16,977,484.00 | | 16,977,484.00 |
| 5. Totals | | $ | $ | $ 99,479,252.00 | $ | $ 99,479,252.00 |

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102) Page 1

**SECTION B - BUDGET CATEGORIES**

| 6. Object Class Categories | GRANT PROGRAM, FUNCTION OR ACTIVITY | | | | Total |
|---|---|---|---|---|---|
| | (1) Year 1 | (2) Year 2 | (3) Year 3 | (4) Year 4 + 5 | (5) |
| a. Personnel | $ 227,115.00 | $ 237,889.00 | $ 248,705.00 | $ 527,614.00 | $ 1,241,323.00 |
| b. Fringe Benefits | 161,792.00 | 165,938.00 | 167,658.00 | 340,122.00 | 835,510.00 |
| c. Travel | 11,170.00 | 11,170.00 | 11,170.00 | 22,340.00 | 55,850.00 |
| d. Equipment | 75,000.00 | | | | 75,000.00 |
| e. Supplies | 15,000.00 | 2,000.00 | 2,000.00 | 4,000.00 | 23,000.00 |
| f. Contractual | 425,000.00 | 320,000.00 | 220,000.00 | 840,000.00 | 1,805,000.00 |
| g. Construction | | | | | |
| h. Other | 24,000,000.00 | 41,850,000.00 | 6,850,000.00 | 13,700,000.00 | 86,400,000.00 |
| i. Total Direct Charges (sum of 6a-6h) | 24,915,077.00 | 42,586,997.00 | 7,499,533.00 | 15,434,076.00 | $ 90,435,683.00 |
| j. Indirect Charges | 2,491,508.00 | 4,258,700.00 | 749,953.00 | 1,543,408.00 | $ 9,043,569.00 |
| k. TOTALS (sum of 6i and 6j) | $ 27,406,585.00 | $ 46,845,697.00 | $ 8,249,486.00 | $ 16,977,484.00 | $ 99,479,252.00 |
| 7. Program Income | $ | $ | $ | $ | $ |

**Authorized for Local Reproduction**

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102)  Page 1A

## SECTION C - NON-FEDERAL RESOURCES

| (a) Grant Program | (b) Applicant | (c) State | (d) Other Sources | (e)TOTALS |
|---|---|---|---|---|
| 8. Year 1 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 9. Year 2 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10. Year 3 | 0.00 | 0.00 | 0.00 | 0.00 |
| 11. Year 4 + 5 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12. TOTAL (sum of lines 8-11) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

## SECTION D - FORECASTED CASH NEEDS

| | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|
| 13. Federal | $ | $ | $ | $ | $ |
| 14. Non-Federal | $ | | | | |
| 15. TOTAL (sum of lines 13 and 14) | $ | $ | $ | $ | $ |

## SECTION E - BUDGET ESTIMATES OF FEDERAL FUNDS NEEDED FOR BALANCE OF THE PROJECT

| (a) Grant Program | FUTURE FUNDING PERIODS    (YEARS) | | | |
|---|---|---|---|---|
| | (b)First | (c) Second | (d) Third | (e) Fourth |
| 16. Year 1 | $ | $ | $ | $ |
| 17. Year 2 | | | | |
| 18. Year 3 | | | | |
| 19. Year 4 + 5 | | | | |
| 20. TOTAL (sum of lines 16 - 19) | $ | $ | $ | $ |

## SECTION F - OTHER BUDGET INFORMATION

| 21. Direct Charges: | 22. Indirect Charges: |
|---|---|
| | |

**23. Remarks:**

**Authorized for Local Reproduction**

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102)  Page 2

Attachment I



OFFICE OF THE GOVERNOR
1 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0001

Janet T. Mills
GOVERNOR

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Dear Administrator Regan:

The State of Maine, through the Governor's Energy Office, is proud to submit this application for the Environmental Protection Agency's *Solar for All* competition, an historic investment through the Inflation Reduction Act to ensure our most vulnerable populations benefit from the deployment of solar energy.

My administration has prioritized the fight against climate change in Maine through actions to reduce carbon emissions, transition to renewable energy, and ensure Maine communities are resilient to the increasingly volatile effects of climate change. As co-chair of the United States Climate Alliance, I have proudly stood alongside our bipartisan coalition of 25 governors securing America's net-zero future by advancing state-led, high-impact climate action. Maine's bold leadership in deploying clean energy technologies reduces harmful greenhouse gas emissions and also directly addresses our state and region's longstanding overreliance on fossil fuels, which drive the high costs that have burdened Maine households and businesses, and especially our most vulnerable, for too long.

Earlier this year, recognizing our significant progress to date – including leading the nation in deployment of efficient heat pumps and solar energy, I announced a new accelerated goal of 100% clean energy by 2040. Importantly, as we work to implement these critical objectives, funding through *Solar for All* will help ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most: low-income and disadvantaged homeowners and renters, who often face the most challenging energy burdens. Indeed, Maine households face the second highest average energy burden of any state in the country. As we continue our steadfast and urgent work to reduce fossil fuel dependence – including for the 58% of Maine households that use costly delivered fuel oil as their primary home heating source, compared to a national average of 4% – we must also facilitate the increased availability of affordable, reliable electricity.

*Solar for All* funds have the opportunity to transform solar and storage deployment in Maine by overcoming significant barriers to accessing clean energy technologies for low-income and disadvantaged communities. Tens of thousands of Maine households will benefit directly from cost savings and resilience improvements, and every Maine household and business will see the beneficial effects of new, cost-effective clean energy. Furthermore, these funds will help accelerate the pace of deployment by bringing new job training resources, especially for rural and underserved populations, who will benefit from new opportunities for good jobs in clean energy careers.



PRINTED ON RECYCLED PAPER

Maine has demonstrated that we won't wait to fight climate change and bring the benefits of clean energy to our entire state. By fully funding Maine's application for *Solar for All*, these historic investments of the Inflation Reduction Act are well spent. I am grateful for the leadership of the Environmental Protection Agency in administering these Greenhouse Gas Reduction Funds and appreciate the consideration of Maine's application.

Sincerely,

Janet T. Mills

Governor



**Office of the Chief and Council**
Kirk E. Francis
*Chief*
Mark Sockbeson
*Vice-Chief*
Maulian Dana
*Tribal Ambassador*

**Penobscot Nation**
12 Wabanaki Way
Indian Island, Maine 04468
Phone: (207) 817-7349
Fax: (207) 827-6042

October 11, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office *Solar for All* Application, in response to Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support for the application submitted by the Governor's Energy Office for the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition.

The Penobscot Nation submitted a Notice of Intent to apply for Award Option #2 of the *Solar for All* program. Unfortunately, the amount of time needed to complete the required documentation to form a Tribal Consortium has made it infeasible to submit a full application by the deadline. The Penobscot Nation was recently awarded federal grant funding through the United States Department of Energy to enable the deployment of approximately 1.3 megawatts of solar on tribal government buildings at Indian Island, the home of the Penobscot Nation. We have additional work underway to prepare to deploy up to 800 residential solar projects and energy storage on Indian Island. This, in essence, was the project we intended to propose within *Solar for All*.

Given this change of plan, the Governor's Energy Office has incorporated language into the State of Maine's application to consider working with one or more Tribes to deploy a portion of the State's award to support Tribal solar and storage projects. The State's application also emphasizes the opportunity to coordinate, where appropriate, with the Penobscot Nation on workforce development, technical assistance, and other programmatic activities. This is an important opportunity to work collaboratively to ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most – low-income, disadvantaged, and historically marginalized homeowners, renters, and communities who often face the highest energy burden.

I appreciate the EPA's leadership and encourage the EPA to fully fund the State of Maine's application.

Kind regards,

**Michael Burgess, J.D.**
*Economic and Community Development Director*
Penobscot Indian Nation
Cell: 207-881-3333
12 Wabanaki Way, Indian Island ME 04468
Web: www.penobscotnation.org
Email: mburgess@penobscotnation.org



STATE OF MAINE
GOVERNOR'S OFFICE OF POLICY INNOVATION AND THE FUTURE
181 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0181

October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

**Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01**

Administrator Regan,

Please accept this letter of support from the Maine Governor's Office of Policy Innovation and the Future (GOPIF) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. GOPIF encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Governor's Office of Policy Innovation and the Future fosters collaboration across state government to help solve Maine's most important long-term challenges utilizing data-driven, innovative policy solutions. Combating climate change and encouraging clean energy policy are among Governor Mills' top priorities. GOPIF coordinates the work of the Maine Climate Council and collaborates with other state agencies, including the Governor's Energy Office, and key stakeholders on policy issues related to climate and energy. Additionally, and relevant to this proposal, GOPIF administers the Community Resilience Partnership, a program that assists municipal and tribal communities to reduce carbon emissions, transition to clean energy, and become more resilient to climate change effects through grants and direct support.

In cooperation with the Governor's Energy Office, GOPIF anticipates that the Community Resilience Partnership can be a vehicle for delivering technical assistance and financial support to communities in support of Maine's *Solar for All* goals in the following ways:

1. Making grants to priority communities for activities related to solar permitting and siting, stretch building codes and ordinances, and professional development for code enforcement staff.
2. Hosting facilitating training opportunities for community officials, planners, permitters, code enforcement staff, and volunteer committee/commission members.
3. Encouraging the use of tools like model ordinances and DOE's Solar+App.

GOPIF appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Brian Ambrette
Senior Climate Resilience Coordinator



**MAINE MUNICIPAL**
**ASSOCIATION** SINCE 1936

60 Community Drive | Augusta, ME 04330-9486
1-800-452-8786 (in state) | (t) 207-623-8428
(f) 207-624-0129

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North, Washington, DC 20460

Re: Maine Municipal Association's the Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Thursday, October 5, 2023

Dear Administrator Regan,

Please accept this letter as the Maine Municipal Association's (MMA) support for the Solar for All funding application being submitted by the Governor's Energy Office.

Under Governor Janet Mills' leadership, Maine has been on the forefront of promoting and implementing the changes necessary to achieve climate resiliency. The protection of our heritage resources and tourist industries, which serve as the foundation of our economic vitality, is of utmost importance, as is ensuring that all Maine residents can afford to comfortably live in their homes. It is for this reason that municipal leaders believe the funds available under the Solar of All program will be well invested by the Mills Administration and used to support and implement federal level solar energy objectives.

As a membership organization that represents the interests of 484 Maine towns and cities, the provision of quality and affordable services to all Maine residents is a top priority for the Association. However, far too often the funding for needed services falls disproportionately on the property tax, in turn placing additional burdens on low-income households that are already dealing with increasing rental, grocery, and utility costs. As a result, the luxury of implementing efficient energy solutions is far out of reach for the 30,000 disadvantaged households expected to benefit under this program.

To put a finer point on the issue, the Solar for All program provides an opportunity for Maine towns and cities to partner with the GEO to deliver much needed energy savings programs to vulnerable Maine families. A program of this nature will help move many deserving households up the "hierarchy of needs" pyramid, while advancing federal and state policy initiatives and goals.

MMA appreciates EPA's leadership on this issue and looks forward to experiencing the positive impacts these funds will have on Maine communities.

Sincerely,

Catherine M. Conlow
Executive Director
Maine Municipal Association

**Mayor and Council Offices**

Kate Snyder
*Mayor*

October 4, 2023



---

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of Portland for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The City of Portland encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Our City has ambitious climate action goals, as well as a commitment to help low-income and marginalized communities fully participate in the transition to clean energy. For example, our successful Electrify Bikes! Program helps low- and moderate-income residents purchase e-bikes. In early 2024, we will launch DIY Electrify!, which will help LMI residents purchase energy-efficient electric appliances such as induction cooktops and home weatherization kits.

We continue to explore ways to help LMI residents install solar projects or participate in cost-effective community solar projects. Our staff has been engaged with community partners, housing providers, and agencies like the Governor's Energy Office to identify and overcome barriers to adoption. The addition of financial and technical assistance funded by Solar For All would help take our efforts to advance equitable access to solar energy to the next level.

The City of Portland appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Kate Snyder
Mayor



**SUSTAINABILITY OFFICE**

Julie A. Rosenbach
Sustainability Director

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The City of South Portland's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 3, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of South Portland for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The City of South Portland encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

In 2020, the City of South Portland adopted a joint climate action and adaptation plan with the City of Portland, called *One Climate Future*. The plan has 68 strategies designed to help us achieve our goal of reducing greenhouse gas emissions 80% by 2050. This is in line with the state's *Maine Won't Wait* plan.

The core approach of *One Climate Future* is beneficial electrification coupled with renewable electricity. One of our key milestones is to install 50MW of solar in the cities by 2030 and 245MW by 2050. This goal is based on an analysis GridSolar completed in 2020 of rooftops in the Greater Portland area to estimate the cities' maximum capacity for solar generation. The study found that Portland and South Portland could collectively accommodate 375MW of rooftop solar. In reality, it would be very difficult to meet this maximum build-out because not all building owners will install solar for a variety reasons. Nevertheless, the GridSolar study offers proof that a significant supply of rooftop solar can be locally sourced.

Our *One Climate Future* plan also emphasizes equity. We know that reducing greenhouse gas emissions in not enough. Our goal is reduce emissions in a way that helps everyone in our community thrive. The City of South Portland supports *Solar for All* because it will help us deliver meaningful benefits – energy savings, financing and program delivery, and high-quality jobs – to low-income and disadvantaged households. It will help us ensure equitable access and participation in solar programs by supporting partnerships with community-based organizations and outreach that is responsive to the needs of diverse communities.

The City of South Portland appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Julie Rosenbach
Sustainability Director



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for the Maine Governor's Energy Office *Solar for All* Application (EPA-R-HQ-SFA-23-01)

Dear Administrator Regan:

I am writing in support of the Maine Governor's Energy Office application in the *Solar for All* competition. This grant could make a long-term difference in energy affordability for an estimated 30,000 low income and disadvantaged Mainers.

Low income, disadvantaged, socially vulnerable – Maine has it all. In fact, nearly half of Maine people live in disadvantaged Census tracts. Here is Rockland, with a Census tract that meets the federal definition of disadvantaged -- *average energy cost is in the 95% percentile* -- underscoring the need for creative solutions like the one proposed by the in Maine's application.

When you consider Maine is the grayest state in the nation, and Rockland is in one of the grayest areas with low incomes, sharp decreases in home affordability and increases in energy costs – we have a very vulnerable community and economy. This includes seniors struggling financially to remain in their homes, and businesses struggling to find and retain workers who can afford to live here.

Maine has been proactive with solar, including legislative action that spurred a dramatic increase in solar development, with associated benefits of energy savings and high-quality jobs. There remain, however, serious market barriers to residential solar -- barriers that this grant could effectively address.

Rockland stands ready to assist the State with outreach to ensure equitable access and participation in *Solar for All*. Our *Recharge Rockland* outreach program is specifically focused on helping our local community learn about incentives and assistance related to energy efficiency and renewable energy, and to increase uptake of those opportunities. We welcome the opportunity to support the State in its efforts to provide more equitable access to residential solar opportunities.

Thank you for considering the Maine proposal.

Sincerely,

Julie Hashem
Community Development Director

Cc Ethan Tremblay, Governor's Energy Office

City of Rockland • 270 Pleasant Street • Rockland, ME 04841 • www.rocklandmaine.gov



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01
October 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Clean Energy Partnership program (CEP) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Clean Energy Partnership program encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The State of Maine Governor's Energy Office established the Clean Energy Partnership program to support the growth of the clean energy economy in Maine through workforce development and innovation. In December 2022, the Clean Energy Partnership awarded clean energy workforce development grant funding to nine entities, leading to the engagement of over 2,000 Mainers in the first year of program operations. These projects have demonstrated results included attracting new workers to the clean energy and energy efficiency workforce, providing career training and upskilling opportunities to existing workers, increasing diversity and representation in the clean energy workforce, and creating and expanding clean energy apprenticeship, pre-apprenticeship, and internship models to facilitate entry into rewarding and high-paying jobs.

The CEP is committed to delivering meaningful benefits to low-income, disadvantaged, and underrepresented Mainers and embedding Good Jobs Principles in Maine's clean energy workforce development approach. If awarded, Solar for All will provide needed resources to expand CEP's work and address barriers related to solar workforce development. The CEP appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tagwongo Obomsawin
Clean Energy Partnership Program Manager



**STATE OF MAINE
DEPARTMENT OF LABOR
BUREAU OF EMPLOYMENT SERVICES
55 STATE HOUSE STATION
AUGUSTA, MAINE 04333-0055**

JANET T. MILLS
GOVERNOR

LAURA A. FORTMAN
COMMISSIONER

October 12, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Maine Department of Labor's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Department of Labor (MDOL) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The Maine Department of Labor encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Department of Labor is committed to advancing high-quality job opportunities for Maine workers and businesses by helping employers recruit and train a talented workforce, providing workers with the skills they need to be competitive in the economy through models such as registered apprenticeship, and ensuring safe and fair workplaces for people on the job.

MDOL's Maine Apprenticeship Program connects union and non-union employers with training providers to design registered apprenticeship and certified pre-apprenticeship opportunities—including nearly 1,000 current apprentices in clean energy occupations. Through MDOL's Maine Apprenticeship Program, CareerCenters, community workforce partners, and Bureau of Labor Standards, we anticipate supporting *Solar for All* by:

1. Maximizing equitable access to solar deployment among diverse communities via partnerships with regional CareerCenters, workforce partners, and community-based organizations.
2. Creating and expanding registered apprenticeship and certified pre-apprenticeship opportunities that support workforce development in clean energy, especially within our priority communities of women, people of color, people with disabilities, and justice involved individuals.
3. Supporting employers through outreach and education to comply with and monitor labor standards to ensure this opportunity translates to high-quality job opportunities.
4. Continuing monthly meetings between the Maine Apprenticeship Program and Governor's Energy Office on combined efforts in registered apprenticeship and clean energy projects.

PHONE: (207) 623-7981          TTY users call Maine Relay 711          FAX: (207) 287-5933
The Maine Department of Labor provides equal opportunity in employment and programs.
Auxiliary aids and services are available upon request to individuals with disabilities.

The Maine Department of Labor appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Laura A. Fortman
Commissioner, Maine Department of Labor

# Maine Community College System

**OFFICE OF THE PRESIDENT**
323 State Street, Augusta, ME 04330-7131
(207) 629-4000 | Fax (207) 629-4048 | mccs.me.edu

**David Daigler**
President

October 1, 2022

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity
Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Community College System for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The Maine Community College System encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine's Community Colleges are dedicated to educating today's students for tomorrow's career opportunities in an environment that supports personal and professional growth, innovation, and lifelong learning. The Maine Community College System is a leader in the State's workforce development system and has made significant investments in clean energy and related workforce programming during the past 10-15 years, including in electric vehicle maintenance, heat pump installation and repair, and solar installation.

Maine Community Colleges supports this initiative by providing Mainers with access to highly skilled training leading to industry-recognized certifications in solar installation.  These training and certifications improve our residents' economic well-being by providing pathways to new careers, incumbent employee upskilling, or opportunities for career changes.  Meeting solar deployment goals requires a highly skilled workforce with the required training to install and service the solar arrays.  Additionally, Maine requires critical mass in terms of highly trained individuals.  Our efforts support increasing the number of certified solar installers/technicians across the state.

The Maine Community College System appreciates EPA's leadership in deploying the *Solar for All* program; I am looking forward to the transformative impact these funds will have on Maine's low-income and disadvantaged communities.

Sincerely,

Central Maine
Community College
Auburn
cmcc.edu

Eastern Maine
Community College
Bangor
emcc.edu

Kennebec Valley
Community College
Fairfield/Hinckley
kvcc.edu

Northern Maine
Community College
Presque Isle
nmcc.edu

Southern Maine
Community College
South Portland/
Brunswick
smccme.edu

Washington County
Community College
Calais
wccc.me.edu

York County
Community College
Wells
yccc.edu



Maine Labor Climate Council
Portland, ME
October 7th, 2023

Environmental Protection Agency
Washington, DC

RE: Solar for All Letter of Support for Maine Governor's Energy Office

To whom it may concern,

Maine Labor Climate Council is a coalition of labor unions united in our mission of tackling the climate crisis while reversing economic and racial inequality. MLCC shares in the Maine Governor's Energy Office's (GEO) vision for a greener, more equitable future. With this letter MLCC wishes to convey our support for GEO's commitment to ensuring equitable allocation to low income and disadvantaged communities of the opportunities and benefits of union partnership and leadership in the clean energy transition.

MLCC and our twenty affiliate labor organizations view the climate and inequality crises as interrelated crises that demand a comprehensive response. We seek to develop the labor movement's vision for how to tackle these crises in a way that creates good Maine union jobs, reduces carbon emissions and economic inequality, and provides a meaningful seat at the table for workers and unions in this process. MLCC is educating fellow workers, building alliances and advocating for policy solutions that demonstrate that we do not have to choose between a healthy planet and good jobs that sustain our families and communities. Through legislative action, organizing in clean energy sectors, and grassroots community-based campaigns, we are deeply committed to a holistic "climate jobs" approach that centers equitable workforce development leading to high-quality careers.

As a key part of providing meaningful benefits, we know that solar projects funded through GEO's Solar for All program will create quality jobs that adhere to the apprenticeship and Davis-Bacon standards as set forth in the Inflation Reduction Act. GEO's prioritization of contractors who commit to using local labor and equitable workforce development — operationalized through relationships with registered pre-apprenticeship programs and the negotiation of Project Labor Agreements — is core to our work and approach at MLCC and essential for fulfilling the Justice40 principles.

Union registered apprenticeship and pre-apprenticeship models are key to accomplishing the twin goals of job quality and equitable workforce development. Pre-apprenticeship programs, which prepare workers to enter into and succeed in apprenticeship programs in the trades, are a successful way to bring women and BIPOC into these higher-paying, good union jobs, because

they help address potential barriers for marginalized communities to enter into apprenticeship programs. Apprenticeship programs are a very effective way to uplift historically marginalized groups because they provide wages and benefits throughout the training, are significantly less expensive than a two- or four-year college degree, and prepare their graduates to work as journey people in highly skilled, highly paid trades — all while significantly narrowing the gender and racial pay gaps. GEO's commitment to use Solar for All money to support the growth of registered apprenticeship and pre-apprenticeship programs will meaningfully advance the twin goals of equity and job quality.

The U.S. Environmental Protection Agency's (EPA) Greenhouse Gas Reduction Fund (GGRF) is an unprecedented opportunity to serve working people in Maine. MLCC is very supportive of GEO's commitment to having a preference for projects that include a Project Labor Agreement that centers equity, and we will support union locals and building trades councils in entering into Project Labor Agreements that result in equitable workforce development.

We recognize the historic potential of the GGRF to empower American workers and build the economy "from the middle out and bottom up". We support GEO's goal to transform low income and disadvantaged communities through opportunities for affordable solar energy and union jobs, and we look forward supporting this grant's implementation.

Very truly yours,

Francis Eanes

Executive Director, Maine Labor Climate Council



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Associated General Contractors of Maine's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Associated General Contractors of Maine (AGC Maine) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. AGC Maine encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Since 1951, AGC Maine has been dedicated to ensuring a sound and healthy construction industry and providing the public with an assurance of safety, skill, responsibility and integrity of AGC member firms. We work for Maine's construction companies by providing necessary leadership on issues from site work development to environmental policy. We represent the industry across all sectors- from general contractors and subcontractors to suppliers and service providers. Our industry collectively employs over 30,000 skilled workers.

AGC has been a supporter of contractors in the renewable energy space for many years, and a leader in workforce development through our Maine Construction Academy. We are also a part of the Maine Governors Clean Energy Partnership. Our Construction Immersion program engages youth and under-represented adult populations in registered apprenticeship and pre-apprenticeships in construction. Our programs introduce participants to over 10 different career pathways in construction, including HVAC, plumbing and electrical work required for deployment of renewal energy initiatives.

We believe Maine Governors Energy Office is perfectly positioned to support the EPA's objectives to maximize solar deployment and ensure equitable access. We are poised to assist in the development of this workforce and to support the initiatives through our existing community partnerships.

AGC Maine appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Kelly Flagg
Executive Director
AGC Maine



October 5, 2023

The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

RE: MaineHousing's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01


Dear Administrator Regan:

Please accept this letter of support on behalf of MaineHousing for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. MaineHousing encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantages households across Maine.

MaineHousing is the State of Maine's Housing Finance Agency. MaineHousing has been helping Maine people own, rent, repair, and heat their homes since 1969. We are an independent state authority created to address the problems of unsafe, unsuitable, overcrowded, and unaffordable housing. We issue tax-exempt and taxable housing bonds, serve as the State of Maine's Low Income Housing Tax Credit allocating agency, and also provide additional state and federal resources as non-paying subsidy loans for the creation of affordable multifamily rental housing. With very few exceptions, the housing financed by MaineHousing serves individuals and families designated as extremely low income, very low income, and low income – ranging from those experiencing homelessness up to those making 60% of the Area Median Income.

MaineHousing has been working with the Maine Governor's Energy Office in designing a portion of the plan for *Solar for All* to benefit Maine's low income and disadvantaged residents by adding solar to as many of the planned rehabilitation of 750 units of public housing as possible. MaineHousing hopes to finance the conversion of this outdated, unhealthy, and inefficient public housing to rent restricted multifamily Low Income Housing Tax Credit properties that will reduce and avoid Greenhouse Gas Emissions; drive additional impacts of energy savings, wealth creation, health benefits, and broadened access to opportunity to low income residents; transform private credit markets so that they understand, adopt, and scale financial products that reduce the cost of clean technologies and drive broader market adoption; and inform national and state policy to more effectively target solutions to support the low-carbon transition in low income and disadvantaged communities. The addition of *Solar for All* funding will be matched by the projected $175 million investment in rehabilitation and energy efficiency improvements that will be made to these properties.

MaineHousing appreciates EPA's leadership in deploying *Solar for All* and looks forward to the transformative impact these funds will have for low income and disadvantaged communities in Maine.

Sincerely,

Daniel E. Brennan
Director



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

*Subject:* Support letter for Maine Governor's Energy Office Application to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

On behalf of the Maine Association of Public Housing Directors (MAPHD), please
accept this letter of support for the application submitted by the Maine Governor's
Energy Office for the Solar for All competition. Maine has an ambitious four-year
climate plan with strategies to emit less carbon, produce energy from renewable sources
and protect our natural resources, communities, and people from the effects of climate
change. Solar For All is another tool in this effort, with a crucial focus on lower-income
Mainers. When funded, Maine will support residential solar energy to benefit
approximately 30,000 low-income and disadvantaged households across Maine.

Maine Association of Public Housing Directors is a membership organization that
represents all twenty-two Public Housing Authorities in the state. Together, we own
over 7,500 affordable apartments in 176 properties across the state. As an association,
we will work with the Governor's Energy Office to maximize solar deployment and
ensure equitable access and participation in the state's existing affordable housing
stock. The average public housing property in Maine is 50 years old. While Maine has
led the way in green building and green technologies for new affordable housing
construction, resources have been scarce to retrofit older properties.

MAPHD looks forward to the impact these funds will have for low-income and
disadvantaged communities in Maine and we are pleased to support this application.

Sincerely,

Debora Keller, Chair
Maine Association of Public Housing Directors

# AVESTA
## HOUSING

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Avesta Housing's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan,

Please accept this letter of support on behalf of Avesta Housing for the application submitted by the Maine Governor's Energy Office (GEO) for the *Solar for All* competition. Avesta encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Avesta Housing's mission is to improve lives and strengthen communities by promoting and providing quality affordable homes for people in need. We provide rental housing, programs, and connections to services to aid low income and vulnerable populations in attaining self-sufficiency.

One of Avesta's areas of focus is investment in sustainability for our affordable housing developments to preserve housing long-term and reduce residents' cost burden. While there is a demonstrable reduction on the cost burden to residents when solar energy can be deployed in one of our affordable housing developments, funding is limited. Compliance and regulatory requirements can further limit the ability to fund these projects within traditional financial models.

The GEO *Solar for All* program will provide real benefit to low-income households by expanding deployment and ensuring equitable access to renewable resources for low-income and vulnerable Mainers across the state. This funding is critical to ensure that marginalized communities are not left behind as the effects of climate change continue to mount.

Avesta appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Rebecca Hatfield
President & CEO

 

# WISHCAMPER

### 43°N 70°W

We invest in affordable housing and renewable energy throughout the US

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The Wishcamper Companies Inc.'s Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 4, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of The Wishcamper Companies, Inc. ("TWC") for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. TWC encourages EPA to fully award Maine's application and anticipates Supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantage households across Maine.

TWC is a national developer and owner of affordable housing with interests in over 7,000 units across the country. TWC also develops and invests in renewable energy projects located in the Northeast that provide local communities with clean-renewable energy at discounted prices where the cost of electricity is among the nation's highest. Our investments focus on accessible housing and sustainable energy sources to enhance living standards and contribute positively to the environment. Our interest in the *Solar for All* program stems from the opportunity to benefit two meaningful causes in which we have built a business to support.

TWC aspires to leverage *Solar for All* proceeds to assist in delivering meaningful benefits to low-income and disadvantaged households throughout Maine. Between our deep-rooted partnerships with local housing agencies and solar installers, we would look to maximize deployment to create the greatest energy savings possible for residents.

TWC appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Very truly yours,

*Jim Hanley*

Jim Hanley
President | The Wishcamper Companies Inc.



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: A Climate to Thrive's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 4, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of A Climate to Thrive (ACTT) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. A Climate to Thrive encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

ACTT was founded as a small community organization on Mount Desert Island (MDI) with an ambitious goal: establishing energy-independent and transitioning our island  off of fossil fuels. As a community-founded and driven organization, ACTT's work has primarily focused on helping MDI's residents adopt clean energy generation and implement efficiency upgrades regardless of income. We've spearheaded this work by partnering with several local installers for bulk community discounts and running two SolarizeMDI campaigns, two WeatherizeMDI campaigns, and one ElectrifyMDI campaign. By lowering the cost of rooftop residential solar installations coupled with strong community outreach and education, our solarize campaigns alone have helped over 140 islanders transition to solar energy. Our Solarize model has been copied by other communities throughout the state, as we formally support community-driven climate solutions initiatives through a program called Local Leads the Way.

Through this work, we've witnessed firsthand the gap that currently exists between those who can and cannot afford the upfront costs of these systems. We have found that those who can least afford to install an array tend to have the highest energy burden and stand to benefit the most from owning solar.  If Maine were to obtain *Solar for All* funds, our organization could pursue a third solarize program emphasizing additional outreach to community members who received visits from solar contractors but could not afford to install an array, despite the SolarizeMDI discount. We believe that our low-income community members should have equal access to the financial and resilience benefits that solar and storage offer.

ACTT appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine. ACTT also honors the important steps the EPA has made to ensure environmental justice is pursued by our federal government. The impacts of these federal policies are felt at the grassroots level. It is our hope that the dispersal of these funds honors this precedent.

Sincerely,

Johannah Blackman,
Executive Director
A Climate to Thrive, johannah@aclimatetothrive.org



October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W., Room 3426
North Washington, D.C. 20460

Dear Administrator Regan:

Please accept this letter of support on behalf of Acadia Center for the application submitted by the Maine Governor's Energy Office (GEO) for the Solar for All competition. Acadia Center encourages EPA to fully award Maine's application in support of residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Acadia Center is a Maine based but New England wide organization whose mission is to advance effective energy solutions for a livable climate and a stronger, more equitable economy. Acadia Center has advocated and will continue to advocate for solar policies and programs in Maine that reduce carbon emissions, including working with the Maine Governor's Energy Office. Acadia Center is committed to environmental and energy equity for low-income and disadvantaged communities across Maine and in New England, and Solar for All will provide critical energy saving and environmental benefits.

Maine is a rural State, and people in small towns want to participate in a clean energy future, as they have demonstrated in making Maine a national leader in heat pump installation. If Solar for All grants the GEO's application, Mainers can do what they have shown their willingness to do with heat pumps, adopt solar technology to reduce their electricity bills while benefiting the environment.

Sincerely,

Peter LaFond
Senior Policy Advocate and Maine Program Director
plafond@acadiacenter.org
207-236-6470 ext.305

Cranberry Isles Community Solar Association

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Cranberry Isles Community Solar Association Support for Maine Governor's Energy Office Application in Response to Solar for All

Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 2, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Cranberry Isles Community Solar Association for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Cranberry Isles Community Solar Association encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Cranberry Isles Community Solar Association is a group of committed and concerned citizens of the Cranberry Isles seeking to solve the chronic problems associated with frequent power outages on the islands and provide access to low cost solar energy and energy savings to our low income households including over 10 CIRT homes.

We are seeking to support Solar for All in one or more of the following:

1. Delivering meaningful benefits to low-income and disadvantaged households, including power resiliency, energy savings, financing and program delivery, and high-quality jobs;

2. Overcoming market barriers to residential-serving distributed solar and/or providing project-deployment through technical assistance, including;
a) The high cost of solar deployment – We plan to use a competitive bid format plus incentives through the Inflation Reduction Act and any State grants to drive down the cost of solar by 75% or more;
b) Identifying suitable sites for solar – We plan to use building structures with south facing roofs for solar applications;
c) Utility reluctance to deploy solar – By adding batteries to the larger solar arrays we seek to provide voltage stability to the ends of the Versant distribution lines and save on the considerable cost of sending teams over to restore power.

3. Maximizing solar deployment and ensure equitable access and participation, including through partnerships, with the Town of Cranberry Isles Selectmen, the CIRT Homes Association, The Islesford Neighborhood House Association, Friends of Acadia, the Islesford Historical Society, and the Cranberry Isles Fishermen's Cooperative.

Cranberry Isles Community Solar Association appreciates EPA's leadership in deploying Solar for All, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

President
Cranberry Isles Community Solar Association



**Executive Director**
Scott Vlaun

**Ed. & Programming**
Seal Rossignol

**Communications**
Renee Igo

**Climate Resiliency**
Claire McGlinchey

**Municipal Resiliency**
Tony Giambro

**Board of Directors**
Thea Hart
Roberta Hill
Michael Newsom
Michael Dunn
Azalea Cormier
Willow Adler
Emlyn Crocker
Gem Haviland
Craig Reynolds

The Honorable Michael Regan

Administrator, U.S. Environmental Protection Agency

1200 Pennsylvania Avenue, N.W.

Room 3426 WJC North Washington, DC 20460

Re: The Center for an Ecology-Based Economy's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

I am writing today on behalf of the Center for an Ecology-Based Economy (CEBE) in support of the application submitted by the Maine Governor's Energy Office for the "Solar for All" competition. Given the tremendous need for affordable clean energy in Maine's under-resourced rural communities, CEBE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve the EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Center for an Ecology-Based Economy was founded in 2013 as a response to the climate crisis. Located in Norway, a town of around 5,000 residents in rural inland Maine, CEBE set out to raise awareness of climate change and help local communities build climate resilience while lowering GHG emissions. While our projects and educational outreach have spanned the interrelated areas of food, shelter, transportation, and energy, a strong focus on solar power as a tool for both adaptation and mitigation has always been part of our work.

Since our first small off-grid project to power an irrigation system at our local community garden, we have installed three more solar projects, the largest, a 6,400W dual axis tracker at our local high school, offsets the electricity consumption of three level 2 EV charging stations, also installed by CEBE. As a service provider for Maine's Community Resilience Partnership, we work with local communities on climate resilience and have facilitated three rooftop PV

projects for area municipalities to offset energy costs and reduce emissions.

In 2017, spurred on by The U.S. Department of Energy's Sunshot program, CEBE set its sights on developing a community solar cooperative to provide low cost solar power to residents of our rural communities, many of which experience low or moderate incomes. We received $20,000 in technical assistance funding from the DOE for that project, but given Maine's net metering policy at that time, allowing only nine offtakers per installation, and lack of funding opportunities, we were unable to make the economics work and we put the project on hold. With new, more favorable net metering policy in place, our organization now has a viable model for a consumer-owned, community solar co-operative which will utilize dual axis trackers on small sites to create a network of 150 kW solar "gardens." These projects will benefit local landowners, provide affordable renewable energy to local LMI households, support local jobs,  and keep energy dollars circulating within our communities. We recently received a "Energizing Rural Communities" Prize from the U.S. DOE for this project, and have been invited to apply for the second round of the DOE's "Energy Improvement in Rural Areas" Grant program.

CEBE is poised to launch an ambitious program to bring renewable energy to rural Mainers that continue to struggle with escalating energy costs. We will need the kind of assistance that the Governor's Energy Office will be able to provide through this funding to create robust educational and outreach campaigns, and to spearhead the grid of the future to help Maine meet its critical climate goals and build energy equity in the state.

Thank you for considering this letter of support.

Scott Vlaun, Executive Director
Center for an Ecology-Based Economy, Norway, Maine



JOHN T. GORMAN
F O U N D A T I O N

*Advancing ideas. Promoting opportunities.* **Improving lives in Maine.**

October 5, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection
Agency  1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460


Subject: The John T. Gorman's Support for Maine Governor's Energy Office Application in Response to *Solar for All*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01


Dear Administrator Regan:

Please accept this letter of support on behalf of the John T. Gorman Foundation for the application submitted by the Maine  Governor's Energy Office for the *Solar for All* competition. The John T. Gorman Foundation encourages EPA to fully award Maine's  application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling  residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The John T. Gorman Foundation is a private foundation based in Portland, Maine, with a mission to make Maine a more equitable place where all children and families can thrive. To achieve the greatest impact, the Foundation has a special interest in strengthening children and families with the least resources and helping communities provide them with the supports and opportunities they need to thrive.

We support the Maine Governor's Energy Office Solar for All application because it will deliver meaningful benefits to low-income and disadvantaged households, including  energy savings and high-quality jobs.

The John T. Gorman Foundation appreciates EPA's leadership in deploying the *Solar for All* program and we look forward to the  transformative impact these funds will have for low-income and disadvantaged communities in Maine.

 Sincerely,

Nicole Witherbee
President & CEO



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Island Institute's Support for Maine Governor's Energy Office Application in
Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 11, 2023

Dear Administrator Regan:
Please accept this letter of support on behalf of the Island Institute for the application
submitted by the Maine Governor's Energy Office for the Solar for All competition. Island
Institute encourages EPA to fully award Maine's application and anticipates supporting the
deployment of awarded funds to achieve EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Seventy-five percent of Maine's coastal communities have fewer than 3000 people. Twenty-
five percent of coastal communities have fewer than 800 people. These are rural, capacity
constrained communities facing significant economic challenges leading to the presence of
low income and disadvantaged households.

Island Institute is a 40 year old community development nonprofit located in Rockland,
Maine. We predominantly work with island and coastal communities to build community
sustainability and to further the climate resilience of both communities and the businesses
that support them.  These are predominantly small, rural, natural resource dependent
communities that rely heavily on fossil fuels, and a few of these communities have the
highest electricity costs outside of communities in Alaska where diesel fuel is flown in.

To help address the capacity and energy challenges in these communities and to help them
build towards climate resilience, Island Institute is the northeast regional technical
assistance provider for the National Renewable Energy Lab's Energy Transition Initiative
Partnership Program. Through this work, we support island and remote communities in
accessing technical assistance for planning energy transitions from various national labs.
Many of these projects are focused on microgrids, battery storage, and renewable
generation.

386 Main Street • Post Office Box 648 • Rockland, Maine 04841-0648
Tel: 207-594-9209 • Fax: 207-594-9314 • inquiry@islandinstitute.org
www.islandinstitute.org

Solutions that help increase the adaption of clean energy projects that benefit low income residents would be very interesting to communities working through the ETIPP process as well as to other communities who are also concerned about energy challenges.

Island Institute is committed to supporting the Solar for All application through our efforts to provide community scale energy planning technical assistance. We also work closely with natural resource based businesses, particularly fishermen, aquaculturists, and working waterfront businesses like boatyards. We believe that employees of some of these businesses may well qualify for this program.

Finally, Island Institute has long been concerned about the ability of rural communities to access clean energy programs and the availability of contractors to do the work in these communities. A few years back we published a paper "Bridging the Rural Efficiency Gap" in the peer reviewed journal Energy Efficiency. We are very aware of the needs and challenges facing these communities and work diligently to improve access and acceptance of programs that provide economic and climate benefits.

Island Institute appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Nick Battista
Chief Policy Officer
Island Institute

2

**Natural Resources Council of Maine**

3 Wade Street • Augusta, Maine 04330 • (207) 622-3101 • Fax: (207) 622-4343 • www.nrcm.org

**clf**
conservation law foundation

*For a thriving New England*

[**Union of Concerned Scientists**]

ucsusa.org Two Brattle Square, Cambridge, MA 02138-3780  t 617.547.5552  f 617.864.9405
1825 K Street NW, Suite 800, Washington, DC 20006-1232  t 202.223.6133  f 202.223.6162
500 12th Street, Suite 340, Oakland, CA 94607-4087  t 510.843.1872  f 510.843.3785
One North LaSalle Street, Suite 1904, Chicago, IL 60602-4064  t 312.578.1750  f 312.578.1751

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Joint Letter of Support for Maine Governor's Energy Office Application in Response to *Solar for All –*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

We write today on behalf of the Natural Resources Council of Maine (NRCM), the Union of Concerned Scientists
(UCS) and the Conservation Law Foundation (CLF) in strong support of the Solar for All application from the Maine
Governor's Energy Office (GEO). We urge EPA to fully award Maine's request and we anticipate leveraging our
organizational resources to support its successful implementation in pursuit of EPA's goal of bringing the benefits
of solar to some 30,000 disadvantaged and low-income Maine people.

NRCM is Maine's leading environmental advocacy organization with more than 25,000 members and supporters.
NRCM has been working for more than 60 years to protect, restore, and conserve Maine's environment, and is
deeply engaged in the state's climate and clean energy policy and planning, including Maine's programs to support
community solar projects.

UCS is the nation's leading science based non-profit organization with more than a half a million supporters
nationally and more than 2,500 in Maine. UCS advances equitable science-based solutions to some of the world's
most pressing problems, including working to ensure that Maine and the rest of the country meets its climate and
clean energy goals.

Founded in 1966, CLF is a non-profit advocacy organization with 5,000 members across New England, including
approximately 500 in Maine. CLF works to solve the environmental problems threatening the people, natural
resources, and communities of New England. CLF's advocates use law, economics and science to design and
implement strategies that conserve natural resources, protect public health, and promote vital communities in our
region.

NRCM and UCS jointly submitted comments on the GEO's draft Solar for All application. Additionally, all three
organizations have been active participants in matters related to environmental justice and distributed solar
generation in Maine for many years, including in matters before the Public Utilities Commission and the Legislature
and as participants in numerous stakeholder processes.

UCS has substantial experience providing technical expertise and conducting analysis on policies to advance equity
in the clean energy transition, both in Maine and around the country. As Maine's Solar for All program is
operationalized, UCS could support the deployment of technical assistance by leveraging data to assist low-income
and disadvantaged communities in maximizing the effectiveness of funding for projects that are a priority for
them.

*Protecting the Nature of Maine*

Printed on post-consumer recycled, processed chlorine-free paper

Respected as a technical expert on solar energy Maine, NRCM has strong relationships across state and municipal agencies, developers, advocates, and community-based organizations across the state. We have multiple channels of communication with our supporters across all 16 counties, including our blog, podcast, social media, print media, and participation at regional events and meetings. All of these channels could be valuable platforms for sharing educational and outreach information about the Solar for All program in Maine to advance equitable access and meaningful involvement.

In Maine, CLF is the NGO community's principal legal advocate for clean energy. In addition to providing legal advice to community groups, last year we led the effort to pass Maine's first environmental justice bill. Previously, we worked with UCS, NRCM, and other groups to prioritize funding for underrepresented groups to participate in Public Utility Commission proceedings. Not only will we be able to use those skills to help implement Maine's Solar for All program with other advocacy organizations, but also we will use them to ensure that the program is properly implemented to reach the targeted communities.

We believe Maine is very well positioned today to deploy awarded funds rapidly and effectively. Programmatic elements of GEO's application align closely with recommendations that emerged from a rigorous 18-month stakeholder process hosted by GEO. That effort concluded in January 2023, having identified a highly cost-effective program design for community solar. There was broad support among the diverse stakeholders for a program that allocated the benefits of community solar to low-and-moderate income households. Maine also established a Green Bank in 2021, which could be a powerful outlet for providing financial assistance to install solar in low-income and disadvantaged communities. The green bank is operated by Efficiency Maine Trust, a quasi-governmental entity that implements energy policies and statewide programs designed to overcome social and financial barriers, especially for low-income Maine people. Furthermore, Maine has a pipeline of solar projects in the late stages of interconnection review that would likely be eligible for GEO's Solar for All program, and as a result be capable of delivering benefits more quickly to vulnerable populations across the state.

We greatly appreciate EPA's leadership in this area. Ensuring disadvantaged and underserved communities have access to the benefits of clean energy must be central to our efforts to decarbonize the electric sector. NRCM, UCS and CLF would be honored to support the implementation of Maine's ambitious Solar for All program to help assure the transformative impact these funds would have here in Maine. Please feel free to contact us if you have any questions or need additional information.


Respectfully submitted,




Rebecca Schultz
Natural Resources Council of
Maine
3 Wade Street
Augusta, ME 04330
Tel: (207) 430-0175
Email: rschultz@nrcm.org

Steve Clemmer
Union of Concerned Scientists
2 Brattle Square, 6th Floor
Cambridge, MA 02138
Tel: (978)-844-4531
Email: sclemmer@ucsusa.org

Sean Mahoney
Vice-President & Senior Counsel
Conservation Law Foundation
53 Exchange Street
Portland ME 04101
Tel: (207) 210-6439
Email: smahoney@clf.org



**In Support for Maine Governor's Energy Office Application in Response to *Solar for All***
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Maine Conservation Voters for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. Maine Conservation Voters encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine Conservation Voters (MCV) is a nonpartisan, nonprofit organization that works to make conservation and climate action in Maine a political priority. Our organization represents more than 13,000 members and supporters dedicated to protecting the environment and our democracy. We serve on the Steering Committee of the Maine Climate Council and work closely with the Governor's Energy Office to achieve Maine's ambitious statutory emissions reduction and renewable energy requirements, to reduce energy cost volatility, and to advance equity through Maine's climate response.

In February of this year, Governor Janet Mills advanced Maine's goal of 100% clean energy from 2050 to 2040, a nod to the commendable progress we have made as a state and the speed at which we can achieve a just clean energy transition when we work together and create strong, responsible policy. Solar energy plays a key role in meeting Maine's accelerated clean energy targets, reducing emissions from fossil fuels, and serving new electricity demand associated with electrification of heating and transportation. Homegrown clean energy makes sense to Maine people and communities, which prize self-sufficiency and the quality jobs associated with the State's growing clean energy economy. We worry, though, about equitable access to renewable energy and the fair distribution of costs and benefits across diverse populations. Indeed, the Maine Legislature came close to dismantling the State's net energy billing program this summer due to concerns about its impact on low-income ratepayers. The

program was revamped instead, but the near miss highlighted the urgency of deploying residential solar energy and storage to benefit low-income and disadvantaged households across the state.

Maine is allocating significant state resources and funding to advance an equitable clean energy transition that delivers *Solar for All*, but we cannot do it alone. Federal support through programs authorized by the Inflation Reduction Act, which Maine people advocated for and continue to celebrate, is essential. We appreciate EPA's leadership in the *Solar for All* competition, which is an opportunity for Maine to build on a strong track record of solar deployment and realize the transformative impacts of additional investment. for low-income and disadvantaged communities in Maine.

MCV urges EPA to fully award Maine's $100 million *Solar for All* application and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you,

Kathleen Meil
Senior Director of Policy and Partnerships
Maine Conservation Voters



October 5, 2023

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

Re: Support for Maine's Solar for All Application: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

On behalf of The Northeast Clean Energy Council ("NECEC" or "The Council"), I am writing to express our support for Maine's Solar for All grant application, which is being submitted by the Governor's Energy Office. We are committed to supporting Maine in their efforts to ensure that low-income and disadvantaged communities equitably benefit from the state's ambitious Solar for All program, which would benefit approximately 30,000 low-income and disadvantaged households across the state.

NECEC leads the just, equitable, and rapid transition to a clean energy future and a diverse climate economy. NECEC is the only organization in the Northeast that covers all of the clean energy market segments, representing the business perspectives of investors and clean energy companies across every stage of development. NECEC members span the broad spectrum of the clean energy industry, including energy efficiency, clean transportation, wind, solar, energy storage, microgrids, fuel cells, and advanced and "smart" technologies.

The Council is dedicated to growing the clean energy economy in Maine and across the region, in pursuit of our mission to create a world-class and equitable clean energy hub in the Northeast. The Council's 250+ members include companies based in Maine and those from elsewhere who do business or hope to make future investments in the state.

NECEC actively follows and seeks to advance the maximum and equitable deployment of state and utility programs and policies related to energy efficiency and renewable energy development. Along with promoting the development of clean energy resources that help this sector thrive and contribute to economic development, NECEC works to ensure energy equity, public health and justice are fully considered in energy planning processes.

An element of Maine's proposed Solar for All program that NECEC is particularly proud to support is the Project Deployment Technical Assistance Plan, which would:

- Support solar developers, contractors, and affordable housing developers to develop pipelines of solar projects;
- Support overcoming barriers related to project deployment such as siting, permitting, interconnection;
- Invest in workforce and entrepreneurship opportunities in low-income and disadvantaged communities;
- Support property managers and building owners with direct technical and financial assistance to understand all of the financing options, grants, tax credits, and other incentives that may be available to them through Solar for All and other state, federal, local and utility programs.

**How NECEC would support the Project Deployment Technical Assistance Plan:**

Through our public policy work and the leadership of our diversity, equity and inclusion / workforce development team, NECEC will support the Maine Solar For All program by serving as a convener and a conduit of information. NECEC's network includes thousands of connections across the clean energy industry, utilities, other non-profits, community and institutional leaders and more. We will seek to be a partner to the State of Maine to understand the project goals and help find solutions that can advance our shared goals related to climate, clean energy and equity.

In addition, NECEC is currently the lead project applicant with U.S. EPA Region 1 in a collaborative with 26 other state and non profit organizations seeking to develop the New England Center for Environmental and Energy Justice (NEC-EJECA), intended to be the first of its kind technical assistance center that supports environmental and energy justice (EEJ) communities that are disproportionately plagued by environmental pollution and environmental justice challenges.

We are pleased that the University of Maine Senator George J. Mitchell Center for Sustainability Solutions is a project partner in this initiative. NEC-EJECA's goal is to empower and build EEJ communities' capacity to achieve their own individual visions of a thriving community by providing responsive technical assistance, training, and resources.

Maine has been a leader in our nation's transition to a clean energy future and NECEC would be proud to play a critical role in supporting the implementation of Maine's ambitious Solar For All program. We believe the Governor's Energy Office has demonstrated experience deploying technical assistance and incentive funding for solar technology and collectively will be able to successfully deliver meaningful benefits to underserved communities. Please feel free to contact me if you have any questions or need additional information.

Sincerely,

*Joseph A. Curtatone*

Joseph A. Curtatone, President
Northeast Clean Energy Council

# ☀ SOLAR ENERGY ASSOCIATION OF MAINE

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC
North Washington, DC  20460

Re:  The Solar Energy Association of Maine's Support for Maine Governor's Energy Office
Application to *Solar for All* Funding Opportunity Number: EPA R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Solar Energy
Association of Maine (SEAM) for the application submitted by the Maine
Governor's Office for the *Solar for All* competition.  SEAM encourages EPA to fully
award Maine's application and anticipates supporting the deployment of awarded
funds to achieve EPA's objectives by enabling residential solar energy to benefit
approximately 30,000 low-income and disadvantaged households throughout
Maine.

SEAM is a broad coalition of solar energy supporters, including
(1) municipalities; (2) colleges; (3) conservation organizations; (4) solar installers;
(5) community and economic development entities; (6) energy law, economics,
and engineering professionals; and (7) individual and cooperative electricity
customers (residential, commercial, and institutional).  We support the
development of solar electricity of all project sizes and ownership models, for the
benefit of all Maine people.  SEAM is a Maine not-for-profit corporation governed
by a diverse Board of Directors.  It is not a trade group.  We have been active over
the past eight years. We are especially concerned about bringing solar energy
directly to low-income and disadvantaged households, by encouraging and
facilitating ownership in distributed energy resources (DERs).

SEAM is an all-volunteer education and advocacy organization, with an
affiliation with Dirigo Community Solar Group, another Maine not-for-profit
providing services to small electric generating cooperatives and community solar

farms.  This affiliation endows us with considerable operating experience with small groups of residential owners of solar equipment.  We envision using this experience to help low-income and disadvantaged households understand the benefits of solar energy, educate them on how to go about participating in the clean energy sector themselves, and provide how-to guides and operating assistance at nominal cost.

SEAM also has a high degree of interest in assisting to start a potential low-interest loan program so low-income people and disadvantaged households can <u>acquire</u> rooftop solar or shares in small group projects if they are renters or their homes are not good for rooftop solar.  We believe this would be an especially effective way to assist such challenged populations, either individually or in small groups, by helping to finance ownership of solar equipment where the loans could be structured so that the loan repayments would be less than the avoided market electricity costs, thus both saving money for disadvantaged households and helping them build equity in their own solar equipment.  SEAM and Dirigo have experience in this and would love to bring this experience to a targeted population of low-income people and disadvantaged households.

Through its diverse Board, SEAM has relationships with many groups (e.g., municipalities, community action and development entities) with existing relationships with low-income people and disadvantaged households.  We think we can use these relationships to be particularly helpful in reaching the goals of the *Solar for All* program.

In the totality of things, SEAM and Dirigo are completely on board with this initiative of the Maine Governor's Energy Office (GEO) and the objectives of the *Solar for All* program.  We appreciate EPA's leadership in deploying this program, and look forward to the transformative impact these funds will have on "piercing the veil, " allowing the GEO to bring the advantages of solar equipment ownership and clean energy to low-income and disadvantaged communities in Maine.  We'll be enthusiastic, cooperating partners without seeking any of the funds for ourselves!

(Signature on following page)

2

Very truly yours

Steven L Weems
Executive Director
Solar Eneregy Association of Maine
and
President
Dirigo Community Solar Group

GEO Letter of Support for the *Solar for All Program* 10-6-23I

3

Senator George J. Mitchell
Center for Sustainability
Solutions



5710 Norman Smith Hall
Orono, Maine 04469-5710
Tel: 207.581.3195
Fax: 207.581.3320
umgmc@maine.edu
umaine.edu/mitchellcenter/

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Senator George J. Mitchell Center for Sustainability Solutions' Support for Maine
Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number:
EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Senator George J. Mitchell Center for
Sustainability Solutions (MCSS) for the application submitted by the Maine Governor's Energy
Office for the *Solar for All* competition. MCSS encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's
objectives by enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

For the last decade, the MCSS has been a leader in launching and supporting partnerships in
which interdisciplinary teams of students and faculty from universities and colleges throughout
the state collaborate with diverse stakeholders to tackle and help find solutions to a wide range
of urgent sustainability challenges that directly benefit Maine and other regions. These
challenges, which reside at the intersection of environmental, social, and economic issues,
include renewable energy, local agriculture, municipal planning, forest management, solid
waste, and coastal water quality. Our **Mission:** Serving as a leader and valued partner in
understanding and solving societal problems related to the growing challenge of improving
human well-being while protecting the environment. Our **Vision:** Connecting knowledge with
action to create a brighter environmental, social, and economic future in and beyond Maine.

The State's *Solar for All* application is in line with our Mission and Vision and an incredible
opportunity for low-income and disadvantaged populations across Maine to gain direct long-
term benefits from the sustainable energy transition. The MCSS is committed to and actively
engaged in supporting community-driven solutions to sustainability challenges, including
climate and energy. One MCSS Faculty Fellow in particular, Dr. Sharon Klein, has an active
research program focused on understanding and supporting community-driven renewable
energy and energy efficiency/conservation projects and programs in Maine's underserved

communities (indigenous Wabanaki, rural, remote, and low income). She is especially excited about leveraging synergies with *Solar for All* and her role as a Service Provider in Maine's Community Resilience Partnership and her recently funded 4-year projects (EPA-G2022-STAR-F1 (*Drivers and Environmental Impacts of Energy Transitions in Underserved Communities*) award titled *The Role of State Networks in Advancing Community-Initiated and -Engaged Sustainable Energy Action in Underserved Communities*; NSF 22-633 EPSCoR RII Track-2 FEC award titled *Collaborative Research: RII Track-2 FEC: STORM: Data-Driven Approaches for Secure Electric Grids in Communities Disproportionately Impacted by Climate Change*).

The MCSS anticipates supporting *Solar for All* by:

1. Connecting *Solar for All* program administrators with local and tribal government staff and citizens, as well as community-based organizations and businesses, interested in and already engaged in delivering meaningful solar benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.

2. Conducting community-engaged research to help overcome market barriers to residential-serving distributed solar and providing or connecting to existing project-deployment technical assistance as applicable based on the available time and expertise of our faculty, staff, and students and needs identified. Market barriers that could be addressed through our technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.

3. Helping to maximize solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

The MCSS greatly appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Yours sincerely,

David D. Hart, Ph.D.
Director and Professor

Sharon J.W. Klein, Ph.D.
Faculty Fellow and Associate Professor

2



September 29, 2023

Mr. Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

**Re: Support for the State of Maine's Solar for All Application**

Dear Administrator Regan:

ReVision Energy, an employee owned, certified B Corporation solar company in New England, would like to share our strong support for the State of Maine's Solar for All grant application, submitted by the Maine Governor's Energy Office. As a member of Maine's growing clean energy industry whose mission is quite literally to make life better by building our just and equitable electric future, we are strong supporters of the state submitting a thoughtful, competitive application to the Environmental Protection Agency's Solar for All Program within the Greenhouse Gas Reduction Fund given the immense opportunity to bring the benefits of clean energy to low-income Mainers.

To democratize the clean energy transition, ReVision Energy is proactively helping low- to moderate-income and environmental justice communities gain access to solar energy, heat pumps, battery storage, and electric vehicle charging stations. Our work includes proactively securing every possible funding and financing opportunity to reduce the barrier of up-front installation costs through both public and private entities. We have installed solar projects low-income multi-family housing, manufactured home communities, and other community solar installations for the purposes of serving marginalized populations. Additionally, we are an active member of Amicus Solar, a member-owned purchasing cooperative of nearly 80 high-quality, independent, values-driven solar energy companies. This network has actively advocated for policy mechanisms to serve low-income communities at the federal level and is currently working to develop a model for our companies to take full advantage of the Inflation Reduction Act's updates to the Investment Tax Credit to ultimately bring more and more low-income Americans the benefits of clean energy. We believe this experience, and our track record in building both residential and small-scale commercial distributed generation here in Maine, can help serve the state in its implementation of Solar for All funding and the multiple thoughtful avenues the application features, from the residential direct ownership channel to the multifamily housing programs to the cooperative ownership community solar.

Additionally, we support Maine's application given its focus on workforce development. In 2018, ReVision Energy launched the first ever in-house electrical apprenticeship program and full Training Center here in our home state of Maine to address the need for qualified workforce to implement clean energy solutions. Recently, we have added pre-apprenticeship programs to our offerings, including specific training modules for New Mainers. All programming is closely aligned with our justice and equity values, ensuring compensation throughout the work-and-learn program to provide on-the-job technical training to complement both the professional and personal lives of our apprentices. We appreciate and strongly support Maine's application's focus in investing in workforce and entrepreneurship opportunities and we hope our experience can assist in the meaningful deployment of funding.



Overall, we believe the Maine Governor's Energy Office has demonstrated experience in deploying technical and financial assistance for solar technology, and the state will successfully deliver meaningful benefits to underserved communities through Solar for All funding. We thank the Agency for the opportunity to offer this letter of support, and we respectfully request full support of Maine's application. Thank you.

Sincerely,

Lindsay L. Bourgoine
Director, Policy & Government Affairs
ReVision Energy

Sundog Solar LLC
P.O. Box 465
222 East Main St.
Searsport, ME 04974



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Sundog Solar's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

May 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Sundog Solar for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition.  Sundog Solar encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Sundog Solar and our dedicated company of 30 employees have been operating out of Midcoast Maine since 2009.  We offer photovoltaic, energy storage, heat pump and EV charging technologies, turnkey developments and installations to residential and commercial customers.  Our company is thrilled for this opportunity to present itself to the state of Maine and its residents. We've experienced from our inception, the political dispute against "net energy billing" mainly being for the financial burden it puts on low-income individuals and households.  This funding opportunity is a substantial bridge to that existing gap, providing the necessary funds needed to deploy solar energy for all.

Sundog Solar aligns to support *Solar for All* by delivering meaningful and valuable benefits to low income households as we do with each and every project we install, through clear energy savings, quality partnership in program delivery and financing opportunities.  We are excited to maximize solar deployment in Maine and ensure equitable access and participation through partnerships with community-based organizations.  We anticipate providing outreach support, responsive to the needs of diverse communities and overcoming market barriers through technical assistance, permitting, interconnection, and community education.

Sundog Solar appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities here in Maine!

Sincerely,

Danny Piper
Principal Owner
Sundog Solar



417 5th Avenue
Suite 803
New York, NY 10016

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: UGE's Support for Maine Governor's Energy Office Application in Response to *Solar for All*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6th, 2023

Dear Administrator Regain:

Please accept this letter of support on behalf of UGE for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. UGE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

UGE is working to make renewable affordable and accessible for all by developing, owning, and operating community solar projects. Strengthening renewable energy equity is one of UGE's guiding goals; our stated target is for more than 25% of the energy off-take from our operational portfolio to serve Low-to-Moderate Income households by 2026.

Among states with active community solar programs, Maine has the second lowest average annual income. This, coupled with the fact that Maine residents pay some of the highest electricity costs in the nation means that arguably, Low-to-Moderate income Mainers stand to benefit most from the energy cost savings brought by shared community solar. Already UGE has been partnering with Maine environmental organizations, schools, and municipalities including the Center for an Ecology-Based Economy, the Town of Norway, and Foxcroft Academy to ensure equitable access and participation in the economic benefits brought by our shared solar projects. The Solar for All program will help UGE and other energy equity-focused solar developers expand our work bringing cleaner, cheaper energy to those who need it most in the State of Maine.

UGE appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tyler Adkins
*Chief Revenue Officer*



www.ugei.com
+1 (917) 720 5685

Attachment J



STATE OF MAINE
OFFICE OF THE GOVERNOR
1 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0001

Janet T. Mills
GOVERNOR

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Dear Administrator Regan:

The State of Maine, through the Governor's Energy Office, is proud to submit this application for the Environmental Protection Agency's *Solar for All* competition, an historic investment through the Inflation Reduction Act to ensure our most vulnerable populations benefit from the deployment of solar energy.

My administration has prioritized the fight against climate change in Maine through actions to reduce carbon emissions, transition to renewable energy, and ensure Maine communities are resilient to the increasingly volatile effects of climate change. As co-chair of the United States Climate Alliance, I have proudly stood alongside our bipartisan coalition of 25 governors securing America's net-zero future by advancing state-led, high-impact climate action. Maine's bold leadership in deploying clean energy technologies reduces harmful greenhouse gas emissions and also directly addresses our state and region's longstanding overreliance on fossil fuels, which drive the high costs that have burdened Maine households and businesses, and especially our most vulnerable, for too long.

Earlier this year, recognizing our significant progress to date – including leading the nation in deployment of efficient heat pumps and solar energy, I announced a new accelerated goal of 100% clean energy by 2040. Importantly, as we work to implement these critical objectives, funding through *Solar for All* will help ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most: low-income and disadvantaged homeowners and renters, who often face the most challenging energy burdens. Indeed, Maine households face the second highest average energy burden of any state in the country. As we continue our steadfast and urgent work to reduce fossil fuel dependence – including for the 58% of Maine households that use costly delivered fuel oil as their primary home heating source, compared to a national average of 4% – we must also facilitate the increased availability of affordable, reliable electricity.

*Solar for All* funds have the opportunity to transform solar and storage deployment in Maine by overcoming significant barriers to accessing clean energy technologies for low-income and disadvantaged communities. Tens of thousands of Maine households will benefit directly from cost savings and resilience improvements, and every Maine household and business will see the beneficial effects of new, cost-effective clean energy. Furthermore, these funds will help accelerate the pace of deployment by bringing new job training resources, especially for rural and underserved populations, who will benefit from new opportunities for good jobs in clean energy careers.



PRINTED ON RECYCLED PAPER

Maine has demonstrated that we won't wait to fight climate change and bring the benefits of clean energy to our entire state. By fully funding Maine's application for *Solar for All*, these historic investments of the Inflation Reduction Act are well spent. I am grateful for the leadership of the Environmental Protection Agency in administering these Greenhouse Gas Reduction Funds and appreciate the consideration of Maine's application.

Sincerely,

Janet T. Mills

Governor

*131st Legislature*

# Senate of Maine

**Senate District 35**

*Senator Mark Lawrence*

*3 State House Station*

*Augusta, ME 04333-0003*

*Office (207) 287-1515*

October 5, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Legislature's Energy, Utilities and Technology Committee Chair Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

I serve as the Co-Chair of the Energy, Utilities and Technology Committee of the Maine Legislature. I was also the lead sponsor of recently enacted, bipartisan legislation directing the Maine Governor's Energy Office to apply for federal funds from the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition. I encourage EPA to fully award Maine's application, which aligns with the state's statutorily directed clean energy goals and demonstrates a clear path to achieve EPA's objectives by enabling deployment of residential solar energy that will directly benefit a wide range of low-income and disadvantaged households across Maine.

Maine has established statutory greenhouse gas reduction requirements and renewable energy requirements to reduce cost volatility and address the challenge of climate change. Solar energy plays a key role in these efforts by reducing emissions from fossil fuels, serving new electricity demand associated with heat pumps and other efficient and cost-effective technologies, and creating quality jobs and investment to grow Maine's clean energy economy. Each new solar project also contributes to a stronger, more reliable electric grid.

The *Solar for All* competition is an opportunity for Maine to build on its track record of solar deployment by ensuring that low-income and disadvantaged communities across the state have access to the benefits of solar and energy storage, including monthly bill savings,

1

pathways to ownership, and workforce development. The application submitted by the Maine Governor's Energy Office proposes new financing and program delivery models that will remove barriers to these benefits through access to clean energy technologies.

The funds deployed through *Solar for All* will have a truly transformative impact for low-income and disadvantaged communities in Maine. I appreciate EPA's leadership regarding this program.

Sincerely,

Mark Lawrence

State Senator, Maine Senate District 35



**Stanley Paige Zeigler Jr.**
60 Freedom Pond Road
Montville, ME 04941
Cell Phone: (207) 323-1414
StanleyPaige.Zeigler@legislature.maine.gov

# HOUSE OF REPRESENTATIVES
## 2 STATE HOUSE STATION
### AUGUSTA, MAINE 04333-0002
### (207) 287-1400
### TTY: (207) 287-4469

October 10, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Legislature's Energy, Utilities and Technology Committee Co-Chairs Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

As a Co-Chair of the Energy, Utilities and Technology Committee of the Maine Legislature. I am also the co-sponsor of recently enacted, bipartisan legislation directing the Maine Governor's Energy Office to apply for federal funds from the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition. I encourage EPA to fully award Maine's application, which aligns with the state's statutorily directed clean energy goals and demonstrates a clear path to achieve EPA's objectives by enabling deployment of residential solar energy that will directly benefit a wide range of low-income and disadvantaged households across Maine.

Maine has established statutory greenhouse gas reduction requirements and renewable energy requirements to reduce cost volatility and address the challenge of climate change. Solar energy plays a key role in these efforts by reducing emissions from fossil fuels, serving new electricity demand associated with heat pumps and other efficient and cost-effective technologies, and creating quality jobs and investment to grow Maine's clean energy economy. Each new solar project also contributes to a stronger, more reliable electric grid.

The *Solar for All* competition is an opportunity for Maine to build on its track record of solar deployment by ensuring that low-income and disadvantaged communities across the state have access to the benefits of solar and energy storage, including monthly bill savings, pathways to ownership, and workforce development. The application submitted by the Maine Governor's Energy Office proposes new financing and program delivery models that will remove barriers to these benefits through access to clean energy technologies.

The funds deployed through *Solar for All* will have a truly transformative impact for low-income and disadvantaged communities in Maine. We appreciate EPA's leadership regarding this program.

Sincerely,



**Office of the Chief and Council**
Kirk E. Francis
*Chief*
Mark Sockbeson
*Vice-Chief*
Maulian Dana
*Tribal Ambassador*

**Penobscot Nation**
12 Wabanaki Way
Indian Island, Maine 04468
Phone: (207) 817-7349
Fax: (207) 827-6042

October 11, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office *Solar for All* Application, in response to Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support for the application submitted by the Governor's Energy Office for the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition.

The Penobscot Nation submitted a Notice of Intent to apply for Award Option #2 of the *Solar for All* program. Unfortunately, the amount of time needed to complete the required documentation to form a Tribal Consortium has made it infeasible to submit a full application by the deadline. The Penobscot Nation was recently awarded federal grant funding through the United States Department of Energy to enable the deployment of approximately 1.3 megawatts of solar on tribal government buildings at Indian Island, the home of the Penobscot Nation. We have additional work underway to prepare to deploy up to 800 residential solar projects and energy storage on Indian Island. This, in essence, was the project we intended to propose within *Solar for All*.

Given this change of plan, the Governor's Energy Office has incorporated language into the State of Maine's application to consider working with one or more Tribes to deploy a portion of the State's award to support Tribal solar and storage projects. The State's application also emphasizes the opportunity to coordinate, where appropriate, with the Penobscot Nation on workforce development, technical assistance, and other programmatic activities. This is an important opportunity to work collaboratively to ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most – low-income, disadvantaged, and historically marginalized homeowners, renters, and communities who often face the highest energy burden.

I appreciate the EPA's leadership and encourage the EPA to fully fund the State of Maine's application.

Kind regards,

**Michael Burgess, J.D,**
*Economic and Community Development Director*
Penobscot Indian Nation
Cell: 207-881-3333
12 Wabanaki Way, Indian Island ME 04468
Web: www.penobscotnation.org
Email: mburgess@penobscotnation.org

STATE OF MAINE
PUBLIC UTILITIES COMMISSION

Philip L. Bartlett, II
CHAIRMAN

Harry Lanphear
ADMINISTRATIVE DIRECTOR

Patrick Scully
Carolyn C. Gilbert
COMMISSIONERS

October 5, 2023

The Honorable Michael Regan Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Public Utilities Commission's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Public Utilities Commission (Commission) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition.

The Commission strongly encourages the EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Commission anticipates supporting the Solar for All effort primarily through assisting solar projects with interconnecting to Maine's grid. Specifically, this past legislative session, Public Law 2023, chapter 307, provides for an Ombudsman position at the Commission to assist solar developers with interconnection challenges. This legislation allows for funding to be provided through grants as well as fees to the project developers. Funding the Ombudsman through the Solar for All program will deliver meaningful benefits to all Mainers by reducing barriers, thereby maximizing solar development equitably throughout Maine, particularly in low income and diverse communities.

The Commission appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Philip L. Bartlett II
Chair

Cc:  Harry Lanphear, Administrative Director



State of Maine
**Office of the Public Advocate**
112 State House Station, Augusta, Maine 04333-0112
(207) 624-3687 (voice) 711 (TTY)
www.Maine.gov/meopa

Janet T. Mills
GOVERNOR

William S. Harwood
PUBLIC ADVOCATE

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Office of the Public Advocate's Support for Maine Governor's Energy
Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-
SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Office of the Public Advocate
(MEOPA) for the application submitted by the Maine Governor's Energy Office for the
*Solar for All* competition. MEOPA encourages EPA to fully award Maine's application and
anticipates supporting the deployment of awarded funds to achieve EPA's objectives by
enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

MEOPA's primary responsibility is to represent the interests of Maine utility consumers. As
set forth in our authorizing statute, 35-A M.R.S. § 1702 our attorneys advocate in legislative,
regulatory and court proceedings for rates, services, and practices, that benefit utility
customers. Most of our regulatory work takes place in proceedings before the Maine Public
Utilities Commission.

MEOPA supports GEO's efforts to expand the benefits of solar energy to low-income and
disadvantaged households. For too long, low-income and disadvantaged communities have
not benefited equitably from certain clean energy investments. We look forward to
partnering in the Solar for All program to be sure that all citizens can equitably and fairly
enjoy the benefits of cost-effective solar development programs.

The Maine Office of the Public Advocate appreciates EPA's leadership in deploying the
*Solar for All* program and looks forward to the transformative impact these funds will have
for low-income and disadvantaged communities in Maine.

Sincerely,

*William S. Harwood*

William S. Harwood
Maine Public Advocate



October 5, 2023

The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

RE: MaineHousing's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of MaineHousing for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. MaineHousing encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantages households across Maine.

MaineHousing is the State of Maine's Housing Finance Agency. MaineHousing has been helping Maine people own, rent, repair, and heat their homes since 1969. We are an independent state authority created to address the problems of unsafe, unsuitable, overcrowded, and unaffordable housing. We issue tax-exempt and taxable housing bonds, serve as the State of Maine's Low Income Housing Tax Credit allocating agency, and also provide additional state and federal resources as non-paying subsidy loans for the creation of affordable multifamily rental housing. With very few exceptions, the housing financed by MaineHousing serves individuals and families designated as extremely low income, very low income, and low income – ranging from those experiencing homelessness up to those making 60% of the Area Median Income.

MaineHousing has been working with the Maine Governor's Energy Office in designing a portion of the plan for *Solar for All* to benefit Maine's low income and disadvantaged residents by adding solar to as many of the planned rehabilitation of 750 units of public housing as possible. MaineHousing hopes to finance the conversion of this outdated, unhealthy, and inefficient public housing to rent restricted multifamily Low Income Housing Tax Credit properties that will reduce and avoid Greenhouse Gas Emissions; drive additional impacts of energy savings, wealth creation, health benefits, and broadened access to opportunity to low income residents; transform private credit markets so that they understand, adopt, and scale financial products that reduce the cost of clean technologies and drive broader market adoption; and inform national and state policy to more effectively target solutions to support the low-carbon transition in low income and disadvantaged communities. The addition of *Solar for All* funding will be matched by the projected $175 million investment in rehabilitation and energy efficiency improvements that will be made to these properties.

MaineHousing appreciates EPA's leadership in deploying *Solar for All* and looks forward to the transformative impact these funds will have for low income and disadvantaged communities in Maine.

Sincerely,

Daniel E. Brennan
Director



**MAINE MUNICIPAL**
**ASSOCIATION** SINCE 1936

60 Community Drive | Augusta, ME 04330-9486
1-800-452-8786 (in state) | (t) 207-623-8428
(f) 207-624-0129

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North, Washington, DC 20460

Re: Maine Municipal Association's the Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Thursday, October 5, 2023

Dear Administrator Regan,

Please accept this letter as the Maine Municipal Association's (MMA) support for the Solar for All funding application being submitted by the Governor's Energy Office.

Under Governor Janet Mills' leadership, Maine has been on the forefront of promoting and implementing the changes necessary to achieve climate resiliency. The protection of our heritage resources and tourist industries, which serve as the foundation of our economic vitality, is of utmost importance, as is ensuring that all Maine residents can afford to comfortably live in their homes. It is for this reason that municipal leaders believe the funds available under the Solar of All program will be well invested by the Mills Administration and used to support and implement federal level solar energy objectives.

As a membership organization that represents the interests of 484 Maine towns and cities, the provision of quality and affordable services to all Maine residents is a top priority for the Association. However, far too often the funding for needed services falls disproportionately on the property tax, in turn placing additional burdens on low-income households that are already dealing with increasing rental, grocery, and utility costs. As a result, the luxury of implementing efficient energy solutions is far out of reach for the 30,000 disadvantaged households expected to benefit under this program.

To put a finer point on the issue, the Solar for All program provides an opportunity for Maine towns and cities to partner with the GEO to deliver much needed energy savings programs to vulnerable Maine families. A program of this nature will help move many deserving households up the "hierarchy of needs" pyramid, while advancing federal and state policy initiatives and goals.

MMA appreciates EPA's leadership on this issue and looks forward to experiencing the positive impacts these funds will have on Maine communities.

Sincerely,

Catherine M. Conlow
Executive Director
Maine Municipal Association

**Mayor and Council Offices**

Kate Snyder
*Mayor*

October 4, 2023



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of Portland for the application submitted by
the Maine Governor's Energy Office for the Solar for All competition. The City of Portland
encourages EPA to fully award Maine's application and anticipates supporting the deployment of
awarded funds to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Our City has ambitious climate action goals, as well as a commitment to help low-income and
marginalized communities fully participate in the transition to clean energy.  For example, our
successful Electrify Bikes! Program helps low- and moderate-income residents purchase e-bikes.
In early 2024, we will launch DIY Electrify!, which will help LMI residents purchase energy-efficient
electric appliances such as induction cooktops and home weatherization kits.

We continue to explore ways to help LMI residents install solar projects or participate in
cost-effective community solar projects.  Our staff has been engaged with community partners,
housing providers, and agencies like the Governor's Energy Office to identify and overcome barriers
to adoption. The addition of financial and technical assistance funded by Solar For All would help
take our efforts to advance equitable access to solar energy to the next level.

The City of Portland appreciates EPA's leadership in deploying the Solar for All program and looks
forward to the transformative impact these funds will have for low-income and disadvantaged
communities in Maine.

Sincerely,

Kate Snyder
Mayor



**SUSTAINABILITY
OFFICE**

JULIE A. ROSENBACH
Sustainability Director

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The City of South Portland's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 3, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of South Portland for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The City of South Portland encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

In 2020, the City of South Portland adopted a joint climate action and adaptation plan with the City of Portland, called *One Climate Future*. The plan has 68 strategies designed to help us achieve our goal of reducing greenhouse gas emissions 80% by 2050. This is in line with the state's *Maine Won't Wait* plan.

The core approach of *One Climate Future* is beneficial electrification coupled with renewable electricity. One of our key milestones is to install 50MW of solar in the cities by 2030 and 245MW by 2050. This goal is based on an analysis GridSolar completed in 2020 of rooftops in the Greater Portland area to estimate the cities' maximum capacity for solar generation. The study found that Portland and South Portland could collectively accommodate 375MW of rooftop solar. In reality, it would be very difficult to meet this maximum build-out because not all building owners will install solar for a variety reasons. Nevertheless, the GridSolar study offers proof that a significant supply of rooftop solar can be locally sourced.

Our *One Climate Future* plan also emphasizes equity. We know that reducing greenhouse gas emissions in not enough. Our goal is reduce emissions in a way that helps everyone in our community thrive. The City of South Portland supports *Solar for All* because it will help us deliver meaningful benefits – energy savings, financing and program delivery, and high-quality jobs – to low-income and disadvantaged households. It will help us ensure equitable access and participation in solar programs by supporting partnerships with community-based organizations and outreach that is responsive to the needs of diverse communities.

The City of South Portland appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Julie Rosenbach
Sustainability Director



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for the Maine Governor's Energy Office *Solar for All* Application (EPA-R-HQ-SFA-23-01)

Dear Administrator Regan:

I am writing in support of the Maine Governor's Energy Office application in the *Solar for All* competition. This grant could make a long-term difference in energy affordability for an estimated 30,000 low income and disadvantaged Mainers.

Low income, disadvantaged, socially vulnerable – Maine has it all. In fact, nearly half of Maine people live in disadvantaged Census tracts. Here is Rockland, with a Census tract that meets the federal definition of disadvantaged -- *average energy cost is in the 95% percentile* -- underscoring the need for creative solutions like the one proposed by the in Maine's application.

When you consider Maine is the grayest state in the nation, and Rockland is in one of the grayest areas with low incomes, sharp decreases in home affordability and increases in energy costs – we have a very vulnerable community and economy. This includes seniors struggling financially to remain in their homes, and businesses struggling to find and retain workers who can afford to live here.

Maine has been proactive with solar, including legislative action that spurred a dramatic increase in solar development, with associated benefits of energy savings and high-quality jobs. There remain, however, serious market barriers to residential solar -- barriers that this grant could effectively address.

Rockland stands ready to assist the State with outreach to ensure equitable access and participation in *Solar for All*. Our *Recharge Rockland* outreach program is specifically focused on helping our local community learn about incentives and assistance related to energy efficiency and renewable energy, and to increase uptake of those opportunities. We welcome the opportunity to support the State in its efforts to provide more equitable access to residential solar opportunities.

Thank you for considering the Maine proposal.

Sincerely,

Julie Hashem
Community Development Director

Cc Ethan Tremblay, Governor's Energy Office

City of Rockland • 270 Pleasant Street • Rockland, ME 04841 • www.rocklandmaine.gov



Senator George J. Mitchell
Center for Sustainability
Solutions

5710 Norman Smith Hall
Orono, Maine 04469-5710
Tel: 207.581.3195
Fax: 207.581.3320
umgmc@maine.edu
umaine.edu/mitchellcenter/

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Senator George J. Mitchell Center for Sustainability Solutions' Support for Maine
Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number:
EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Senator George J. Mitchell Center for
Sustainability Solutions (MCSS) for the application submitted by the Maine Governor's Energy
Office for the *Solar for All* competition. MCSS encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's
objectives by enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

For the last decade, the MCSS has been a leader in launching and supporting partnerships in
which interdisciplinary teams of students and faculty from universities and colleges throughout
the state collaborate with diverse stakeholders to tackle and help find solutions to a wide range
of urgent sustainability challenges that directly benefit Maine and other regions. These
challenges, which reside at the intersection of environmental, social, and economic issues,
include renewable energy, local agriculture, municipal planning, forest management, solid
waste, and coastal water quality. Our **Mission:** Serving as a leader and valued partner in
understanding and solving societal problems related to the growing challenge of improving
human well-being while protecting the environment. Our **Vision:** Connecting knowledge with
action to create a brighter environmental, social, and economic future in and beyond Maine.

The State's *Solar for All* application is in line with our Mission and Vision and an incredible
opportunity for low-income and disadvantaged populations across Maine to gain direct long-
term benefits from the sustainable energy transition. The MCSS is committed to and actively
engaged in supporting community-driven solutions to sustainability challenges, including
climate and energy. One MCSS Faculty Fellow in particular, Dr. Sharon Klein, has an active
research program focused on understanding and supporting community-driven renewable
energy and energy efficiency/conservation projects and programs in Maine's underserved

communities (indigenous Wabanaki, rural, remote, and low income). She is especially excited about leveraging synergies with *Solar for All* and her role as a Service Provider in Maine's Community Resilience Partnership and her recently funded 4-year projects (EPA-G2022-STAR-F1 (*Drivers and Environmental Impacts of Energy Transitions in Underserved Communities*) award titled *The Role of State Networks in Advancing Community-Initiated and -Engaged Sustainable Energy Action in Underserved Communities*; NSF 22-633 EPSCoR RII Track-2 FEC award titled *Collaborative Research: RII Track-2 FEC: STORM: Data-Driven Approaches for Secure Electric Grids in Communities Disproportionately Impacted by Climate Change*).

The MCSS anticipates supporting *Solar for All* by:

1. Connecting *Solar for All* program administrators with local and tribal government staff and citizens, as well as community-based organizations and businesses, interested in and already engaged in delivering meaningful solar benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.

2. Conducting community-engaged research to help overcome market barriers to residential-serving distributed solar and providing or connecting to existing project-deployment technical assistance as applicable based on the available time and expertise of our faculty, staff, and students and needs identified. Market barriers that could be addressed through our technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.

3. Helping to maximize solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

The MCSS greatly appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Yours sincerely,

David D. Hart, Ph.D.
Director and Professor

Sharon J.W. Klein, Ph.D.
Faculty Fellow and Associate Professor

2



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Coalition for Community Solar Access' Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Coalition for Community Solar Access (CCSA)
for the application submitted by the Maine Governor's Energy Office for the Solar for All
competition. CCSA encourages EPA to fully award Maine's application and anticipates supporting
the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to
benefit approximately 30,000 low-income and disadvantaged households across Maine.

CCSA is a national coalition of businesses and nonprofits working to expand customer choice and
access to solar for all American households and businesses through shared solar programs. CCSA's
mission is to empower every American energy consumer with the option to choose local, clean, and
affordable shared solar.

We have been championing the Greenhouse Gas Reduction Fund, and more specifically, the Solar
For All program, since we advocated for an equitable expansion of solar beginning with our
Roadmap to Expand Solar Access for All released in April 2021. One of the main pillars of that
roadmap was to empower 30 million households to go solar, including 15 million with low to
moderate incomes and encourage state development and expansion of robust distributed solar
programs.

CCSA intends to support Maine's Solar for All application by ensuring smooth and successful
implementation of the programs resulting from a funding award, particularly an Energy Assistance
model that leverages Maine's experience in community solar to deliver meaningful benefits to low
income customers.  We represent community solar developers and providers, and therefore are well
situated to facilitate information sharing and feedback on the development of the energy assistance
program in order to ensure maximum solar deployment under the program. CCSA is also willing and
able to advise on methods for identifying eligible customers to participate in energy assistance
through solar programs. Our membership includes entities with extensive experience in identifying
eligible customers for energy programs, conducting outreach to customers on ways to save on their
energy bill, and ensuring customers receive the full extent of possible benefits from participation.



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

CCSA will also continue our advocacy efforts to address market barriers to low-income serving solar in Maine. We plan to continue our work to improve interconnection practices and grid planning, as well as regulatory and legislative advocacy to address additional market barriers including siting, permitting, consumer protections, financing, and program design.

In closing, we support the approval of the Maine Solar For All application at the full requested amount as we believe it is the most efficient and equitable way to serve Maine's low income and disadvantaged customers. CCSA appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

*Kate Daniel*

Kate Daniel
Northeast Regional Director
Coalition for Community Solar Access
kate@communitysolaraccess.org



**In Support for Maine Governor's Energy Office Application in Response to *Solar for All***
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Maine Conservation Voters for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. Maine Conservation Voters encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine Conservation Voters (MCV) is a nonpartisan, nonprofit organization that works to make conservation and climate action in Maine a political priority. Our organization represents more than 13,000 members and supporters dedicated to protecting the environment and our democracy. We serve on the Steering Committee of the Maine Climate Council and work closely with the Governor's Energy Office to achieve Maine's ambitious statutory emissions reduction and renewable energy requirements, to reduce energy cost volatility, and to advance equity through Maine's climate response.

In February of this year, Governor Janet Mills advanced Maine's goal of 100% clean energy from 2050 to 2040, a nod to the commendable progress we have made as a state and the speed at which we can achieve a just clean energy transition when we work together and create strong, responsible policy. Solar energy plays a key role in meeting Maine's accelerated clean energy targets, reducing emissions from fossil fuels, and serving new electricity demand associated with electrification of heating and transportation. Homegrown clean energy makes sense to Maine people and communities, which prize self-sufficiency and the quality jobs associated with the State's growing clean energy economy. We worry, though, about equitable access to renewable energy and the fair distribution of costs and benefits across diverse populations. Indeed, the Maine Legislature came close to dismantling the State's net energy billing program this summer due to concerns about its impact on low-income ratepayers. The

program was revamped instead, but the near miss highlighted the urgency of deploying residential solar energy and storage to benefit low-income and disadvantaged households across the state.

Maine is allocating significant state resources and funding to advance an equitable clean energy transition that delivers *Solar for All*, but we cannot do it alone. Federal support through programs authorized by the Inflation Reduction Act, which Maine people advocated for and continue to celebrate, is essential. We appreciate EPA's leadership in the *Solar for All* competition, which is an opportunity for Maine to build on a strong track record of solar deployment and realize the transformative impacts of additional investment. for low-income and disadvantaged communities in Maine.

MCV urges EPA to fully award Maine's $100 million *Solar for All* application and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you,

Kathleen Meil
Senior Director of Policy and Partnerships
Maine Conservation Voters



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

RE: Maine Renewable Energy Associations's Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Renewable Energy Association
(MREA) for the application submitted by the Maine Governor's Energy Office for the *Solar for
All* competition. MREA encourages EPA to fully award Maine's application and anticipates
supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential
solar energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

MREA is a not-for-profit association of renewable energy producers, suppliers of goods and
services to those producers, and other supporters of this industry. MREA members sustainably
manufacture electricity from solar, wind, hydro, tidal, biomass, and energy storage projects in
Maine.

MREA is a strong supporter of Maine's ambitious renewable energy mandate to transition to
80% renewable energy by 2030 and 100% by 2050. Indeed, we also support the Mills
Administration's recent initiative to achieve 100% by 2040. Solar will play a key part in the
achievement of these targets. Solar deployment in Maine has a proven track record of lowering
energy bills. A *Solar for All* award would ensure that those benefits reach low-income and
disadvantaged households across the state.

MREA anticipates supporting *Solar for All* in a variety of ways. In particular, as an organization
with a strong presence in the policy space, MREA is committed to ensuring that municipal and
state permitting regulation and other regulations are conducive to meeting *Solar for All's* goals.
Also, because we are a network of solar companies, we are poised to communicate the

opportunities afforded by a *Solar for All* award and identify opportunities for cross-company collaboration.

MREA appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you for your consideration.

Eliza Donoghue, Esq.
Executive Director



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Central Maine Power's Support for Maine Governor's Energy Office Application in Response to *Solar for All*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Central Maine Power for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. Central Maine Power encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Central Maine Power is dedicated to offering clean, reliable, and affordable services to our customers in the State of Maine. With this evolving infrastructure and State climate goals, Central Maine Power looks for ways we can best support all our customers and assist the State of Maine to achieve these goals.

Central Maine Power aspires to support *Solar for All* through:

1. Delivering meaningful benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.
2. Overcoming market barriers to residential-serving distributed solar and/or providing project-deployment technical assistance. Market barriers that could be addressed through technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.
3. Maximizing solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

Central Maine Power appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Joe Purington
President & CEO

83 Edison Drive; Augusta, ME 04336
Telephone 207-629-2002
www.cmpco.com



An equal opportunity employer



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
October 11, 2023

RE: Versant Power's Support for Maine Governor's Energy Office Solar for All Application, Funding Opportunity EPA-R-HQ-SFA-23-01

Dear Administrator Regan,

Versant Power is pleased to submit a letter of support for the Maine Governor's Energy Office "Solar for All" submission to the U.S. Environmental Protection Agency, which we understand aims to ensure low- and moderate-income Maine households benefit from the deployment of residential solar energy projects.

Versant Power is strongly focused on the work it takes to provide safe, reliable service throughout northern and eastern Maine, and we're committed to helping meet our state's climate and energy objectives in an efficient, cost-effective way. With more than 500 dedicated employees across our 10,400-square-mile service territory, we aim to be a trusted partner in identifying and deploying solutions to benefit our customers.

We welcome partnerships that help us achieve shared goals and support policies that aim to help low and moderate-income Mainers benefit directly from the energy transitions. Versant Power is committed to working with the Governor's Energy Office, policymakers, regulators and stakeholders in Maine to implement this and other programs effectively and at the least possible cost to all Maine ratepayers

We appreciate the opportunity to provide these comments and urge you to select the Maine Governor's Energy Office's Solar for All application for the full award sought.

Sincerely,

President, Versant Power

Attachment K



STATE OF MAINE

OFFICE OF THE GOVERNOR
1 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0001

Janet T. Mills
GOVERNOR

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Dear Administrator Regan:

The State of Maine, through the Governor's Energy Office, is proud to submit this application for the Environmental Protection Agency's *Solar for All* competition, an historic investment through the Inflation Reduction Act to ensure our most vulnerable populations benefit from the deployment of solar energy.

My administration has prioritized the fight against climate change in Maine through actions to reduce carbon emissions, transition to renewable energy, and ensure Maine communities are resilient to the increasingly volatile effects of climate change. As co-chair of the United States Climate Alliance, I have proudly stood alongside our bipartisan coalition of 25 governors securing America's net-zero future by advancing state-led, high-impact climate action. Maine's bold leadership in deploying clean energy technologies reduces harmful greenhouse gas emissions and also directly addresses our state and region's longstanding overreliance on fossil fuels, which drive the high costs that have burdened Maine households and businesses, and especially our most vulnerable, for too long.

Earlier this year, recognizing our significant progress to date – including leading the nation in deployment of efficient heat pumps and solar energy, I announced a new accelerated goal of 100% clean energy by 2040. Importantly, as we work to implement these critical objectives, funding through *Solar for All* will help ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most: low-income and disadvantaged homeowners and renters, who often face the most challenging energy burdens. Indeed, Maine households face the second highest average energy burden of any state in the country. As we continue our steadfast and urgent work to reduce fossil fuel dependence – including for the 58% of Maine households that use costly delivered fuel oil as their primary home heating source, compared to a national average of 4% – we must also facilitate the increased availability of affordable, reliable electricity.

*Solar for All* funds have the opportunity to transform solar and storage deployment in Maine by overcoming significant barriers to accessing clean energy technologies for low-income and disadvantaged communities. Tens of thousands of Maine households will benefit directly from cost savings and resilience improvements, and every Maine household and business will see the beneficial effects of new, cost-effective clean energy. Furthermore, these funds will help accelerate the pace of deployment by bringing new job training resources, especially for rural and underserved populations, who will benefit from new opportunities for good jobs in clean energy careers.



PRINTED ON RECYCLED PAPER

Maine has demonstrated that we won't wait to fight climate change and bring the benefits of clean energy to our entire state. By fully funding Maine's application for *Solar for All*, these historic investments of the Inflation Reduction Act are well spent. I am grateful for the leadership of the Environmental Protection Agency in administering these Greenhouse Gas Reduction Funds and appreciate the consideration of Maine's application.

Sincerely,

Janet T. Mills

Governor



**Office of the Chief and Council**
Kirk E. Francis
*Chief*
Mark Sockbeson
*Vice-Chief*
Maulian Dana
*Tribal Ambassador*

**Penobscot Nation**
12 Wabanaki Way
Indian Island, Maine 04468
Phone: (207) 817-7349
Fax: (207) 827-6042

October 11, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office *Solar for All* Application, in response to Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support for the application submitted by the Governor's Energy Office for the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition.

The Penobscot Nation submitted a Notice of Intent to apply for Award Option #2 of the *Solar for All* program. Unfortunately, the amount of time needed to complete the required documentation to form a Tribal Consortium has made it infeasible to submit a full application by the deadline. The Penobscot Nation was recently awarded federal grant funding through the United States Department of Energy to enable the deployment of approximately 1.3 megawatts of solar on tribal government buildings at Indian Island, the home of the Penobscot Nation. We have additional work underway to prepare to deploy up to 800 residential solar projects and energy storage on Indian Island. This, in essence, was the project we intended to propose within *Solar for All*.

Given this change of plan, the Governor's Energy Office has incorporated language into the State of Maine's application to consider working with one or more Tribes to deploy a portion of the State's award to support Tribal solar and storage projects. The State's application also emphasizes the opportunity to coordinate, where appropriate, with the Penobscot Nation on workforce development, technical assistance, and other programmatic activities. This is an important opportunity to work collaboratively to ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most – low-income, disadvantaged, and historically marginalized homeowners, renters, and communities who often face the highest energy burden.

I appreciate the EPA's leadership and encourage the EPA to fully fund the State of Maine's application.

Kind regards,

**Michael Burgess, J.D,**
*Economic and Community Development Director*
Penobscot Indian Nation
Cell: 207-881-3333
12 Wabanaki Way, Indian Island ME 04468
Web: www.penobscotnation.org
Email: mburgess@penobscotnation.org



STATE OF MAINE

**GOVERNOR'S OFFICE OF POLICY INNOVATION AND THE FUTURE**

**181 STATE HOUSE STATION**

**AUGUSTA, MAINE**

**04333-0181**

October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

**Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01**

Administrator Regan,

Please accept this letter of support from the Maine Governor's Office of Policy Innovation and the Future (GOPIF) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. GOPIF encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Governor's Office of Policy Innovation and the Future fosters collaboration across state government to help solve Maine's most important long-term challenges utilizing data-driven, innovative policy solutions. Combating climate change and encouraging clean energy policy are among Governor Mills' top priorities. GOPIF coordinates the work of the Maine Climate Council and collaborates with other state agencies, including the Governor's Energy Office, and key stakeholders on policy issues related to climate and energy. Additionally, and relevant to this proposal, GOPIF administers the Community Resilience Partnership, a program that assists municipal and tribal communities to reduce carbon emissions, transition to clean energy, and become more resilient to climate change effects through grants and direct support.

In cooperation with the Governor's Energy Office, GOPIF anticipates that the Community Resilience Partnership can be a vehicle for delivering technical assistance and financial support to communities in support of Maine's *Solar for All* goals in the following ways:

1. Making grants to priority communities for activities related to solar permitting and siting, stretch building codes and ordinances, and professional development for code enforcement staff.
2. Hosting facilitating training opportunities for community officials, planners, permitters, code enforcement staff, and volunteer committee/commission members.
3. Encouraging the use of tools like model ordinances and DOE's Solar+App.

GOPIF appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Brian Ambrette
Senior Climate Resilience Coordinator

STATE OF MAINE
PUBLIC UTILITIES COMMISSION

Philip L. Bartlett, II
CHAIRMAN

Patrick Scully
Carolyn C. Gilbert
COMMISSIONERS

Harry Lanphear
ADMINISTRATIVE DIRECTOR

October 5, 2023

The Honorable Michael Regan Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Public Utilities Commission's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Public Utilities Commission (Commission) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition.

The Commission strongly encourages the EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Commission anticipates supporting the Solar for All effort primarily through assisting solar projects with interconnecting to Maine's grid. Specifically, this past legislative session, Public Law 2023, chapter 307, provides for an Ombudsman position at the Commission to assist solar developers with interconnection challenges. This legislation allows for funding to be provided through grants as well as fees to the project developers. Funding the Ombudsman through the Solar for All program will deliver meaningful benefits to all Mainers by reducing barriers, thereby maximizing solar development equitably throughout Maine, particularly in low income and diverse communities.

The Commission appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Philip L. Bartlett II
Chair

Cc: Harry Lanphear, Administrative Director



**MAINE MUNICIPAL**
**ASSOCIATION** SINCE 1936

60 Community Drive | Augusta, ME 04330-9486
1-800-452-8786 (in state) | (t) 207-623-8428
(f) 207-624-0129

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North, Washington, DC 20460

Re: Maine Municipal Association's the Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Thursday, October 5, 2023

Dear Administrator Regan,

Please accept this letter as the Maine Municipal Association's (MMA) support for the Solar for All funding application being submitted by the Governor's Energy Office.

Under Governor Janet Mills' leadership, Maine has been on the forefront of promoting and implementing the changes necessary to achieve climate resiliency. The protection of our heritage resources and tourist industries, which serve as the foundation of our economic vitality, is of utmost importance, as is ensuring that all Maine residents can afford to comfortably live in their homes. It is for this reason that municipal leaders believe the funds available under the Solar of All program will be well invested by the Mills Administration and used to support and implement federal level solar energy objectives.

As a membership organization that represents the interests of 484 Maine towns and cities, the provision of quality and affordable services to all Maine residents is a top priority for the Association. However, far too often the funding for needed services falls disproportionately on the property tax, in turn placing additional burdens on low-income households that are already dealing with increasing rental, grocery, and utility costs. As a result, the luxury of implementing efficient energy solutions is far out of reach for the 30,000 disadvantaged households expected to benefit under this program.

To put a finer point on the issue, the Solar for All program provides an opportunity for Maine towns and cities to partner with the GEO to deliver much needed energy savings programs to vulnerable Maine families. A program of this nature will help move many deserving households up the "hierarchy of needs" pyramid, while advancing federal and state policy initiatives and goals.

MMA appreciates EPA's leadership on this issue and looks forward to experiencing the positive impacts these funds will have on Maine communities.

Sincerely,

Catherine M. Conlow
Executive Director
Maine Municipal Association

**Mayor and Council Offices**

Kate Snyder

*Mayor*

October 4, 2023



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of Portland for the application submitted by
the Maine Governor's Energy Office for the Solar for All competition. The City of Portland
encourages EPA to fully award Maine's application and anticipates supporting the deployment of
awarded funds to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Our City has ambitious climate action goals, as well as a commitment to help low-income and
marginalized communities fully participate in the transition to clean energy.  For example, our
successful Electrify Bikes! Program helps low- and moderate-income residents purchase e-bikes.
In early 2024, we will launch DIY Electrify!, which will help LMI residents purchase energy-efficient
electric appliances such as induction cooktops and home weatherization kits.

We continue to explore ways to help LMI residents install solar projects or participate in
cost-effective community solar projects.  Our staff has been engaged with community partners,
housing providers, and agencies like the Governor's Energy Office to identify and overcome barriers
to adoption. The addition of financial and technical assistance funded by Solar For All would help
take our efforts to advance equitable access to solar energy to the next level.

The City of Portland appreciates EPA's leadership in deploying the Solar for All program and looks
forward to the transformative impact these funds will have for low-income and disadvantaged
communities in Maine.

Sincerely,

Kate Snyder
Mayor



**SUSTAINABILITY OFFICE**

Julie A. Rosenbach
Sustainability Director

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The City of South Portland's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 3, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of South Portland for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The City of South Portland encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

In 2020, the City of South Portland adopted a joint climate action and adaptation plan with the City of Portland, called *One Climate Future*. The plan has 68 strategies designed to help us achieve our goal of reducing greenhouse gas emissions 80% by 2050. This is in line with the state's *Maine Won't Wait* plan.

The core approach of *One Climate Future* is beneficial electrification coupled with renewable electricity. One of our key milestones is to install 50MW of solar in the cities by 2030 and 245MW by 2050. This goal is based on an analysis GridSolar completed in 2020 of rooftops in the Greater Portland area to estimate the cities' maximum capacity for solar generation. The study found that Portland and South Portland could collectively accommodate 375MW of rooftop solar. In reality, it would be very difficult to meet this maximum build-out because not all building owners will install solar for a variety reasons. Nevertheless, the GridSolar study offers proof that a significant supply of rooftop solar can be locally sourced.

Our *One Climate Future* plan also emphasizes equity. We know that reducing greenhouse gas emissions in not enough. Our goal is reduce emissions in a way that helps everyone in our community thrive. The City of South Portland supports *Solar for All* because it will help us deliver meaningful benefits – energy savings, financing and program delivery, and high-quality jobs – to low-income and disadvantaged households. It will help us ensure equitable access and participation in solar programs by supporting partnerships with community-based organizations and outreach that is responsive to the needs of diverse communities.

The City of South Portland appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Julie Rosenbach
Sustainability Director



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for the Maine Governor's Energy Office *Solar for All* Application (EPA-R-HQ-SFA-23-01)

Dear Administrator Regan:

I am writing in support of the Maine Governor's Energy Office application in the *Solar for All* competition. This grant could make a long-term difference in energy affordability for an estimated 30,000 low income and disadvantaged Mainers.

Low income, disadvantaged, socially vulnerable – Maine has it all. In fact, nearly half of Maine people live in disadvantaged Census tracts. Here is Rockland, with a Census tract that meets the federal definition of disadvantaged -- *average energy cost is in the 95% percentile* -- underscoring the need for creative solutions like the one proposed by the in Maine's application.

When you consider Maine is the grayest state in the nation, and Rockland is in one of the grayest areas with low incomes, sharp decreases in home affordability and increases in energy costs – we have a very vulnerable community and economy. This includes seniors struggling financially to remain in their homes, and businesses struggling to find and retain workers who can afford to live here.

Maine has been proactive with solar, including legislative action that spurred a dramatic increase in solar development, with associated benefits of energy savings and high-quality jobs. There remain, however, serious market barriers to residential solar -- barriers that this grant could effectively address.

Rockland stands ready to assist the State with outreach to ensure equitable access and participation in *Solar for All*. Our *Recharge Rockland* outreach program is specifically focused on helping our local community learn about incentives and assistance related to energy efficiency and renewable energy, and to increase uptake of those opportunities. We welcome the opportunity to support the State in its efforts to provide more equitable access to residential solar opportunities.

Thank you for considering the Maine proposal.

Sincerely,

Julie Hashem
Community Development Director

Cc Ethan Tremblay, Governor's Energy Office

City of Rockland • 270 Pleasant Street • Rockland, ME 04841 • www.rocklandmaine.gov



October 9, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

**Subject:** Efficiency Maine Trust Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Efficiency Maine Trust ("Efficiency Maine") for the application submitted by the Maine Governor's Energy Office (GEO) for the *Solar for All* competition. Efficiency Maine encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Efficiency Maine is the independent, quasi-state agency established in 2010 by the Maine Legislature to plan and implement energy efficiency and alternative energy programs in Maine. Through its suite of nationally recognized programs, Efficiency Maine administers initiatives to promote high-efficiency equipment and clean energy to help Maine's homes, businesses, and institutions reduce their energy costs and lower their greenhouse gas emissions. The Maine Legislature has established goals for Efficiency Maine pertaining to promoting the installation and use of heat pumps and electric vehicles (EVs), and has authorized Efficiency Maine to promote further use of energy storage, such as batteries, to help manage electricity demand and balance renewable energy generation. To advance these goals, the Maine Legislature has authorized Efficiency Maine to offer a variety of financing products, resulting in a growing role for the Efficiency Maine Green Bank.

A core element of all Efficiency Maine programs is delivering benefits from energy efficiency and clean energy to Maine's low-income and moderate-income households. Our programs offer consumer outreach, enhanced (and instantaneous) rebates, and lease-to-own offerings to help low-income consumers access the benefits of heat pumps, heat pump water heaters, EVs, and other clean energy products. In the past year, approximately 850 heat pumps and 900 heat pump water heaters were installed in low- and moderate-income homes through our programs. Partnering with the GEO initiative to help deploy the *Solar for All* funds in Maine offers the possibility of using synergies between the GEO

initiative and Efficiency Maine's incentive programs to help Maine's most vulnerable consumers and advance the State's climate action plan.

Efficiency Maine looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine and working with GEO to make that impact a reality.

Sincerely,

_____

Michael D. Stoddard
Executive Director

**CEI**

September 29, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Coastal Enterprises, Inc. (CEI)'s Support for Maine Governor's Energy Office Application in
Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of CEI for the application submitted by the Maine
Governor's Energy Office for the *Solar for All* competition. CEI encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by
enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged
households across Maine.

**Background and Focus on People and Communities with Low Incomes**
Coastal Enterprises, Inc. (CEI) is a nonprofit 501(c)(3) community development financial institution
(CDFI) founded in 1977. We work to build a just, vibrant and climate-resilient future for people and
communities in Maine and rural regions. We do this by integrating finance, business expertise and policy
solutions in ways that make the economy work more equitably.

CEI's goal is to help low-income people and communities build assets as we link development finance to
workforce, entrepreneurship, sustainable development, and policy development. We have a long history
of innovation, commitment to rural economic development, sector development strategies, an ability to
achieve impact for people and communities with low incomes, assistance to women business owners,
support for refugees, new immigrants and people of color, and creative public and private financing
mechanisms to meet our goals. Our Board of Directors consists of 20 community-based members and
our 65-member staff are experts in business advising and financing, workforce and financial
development, and industries including aquaculture, farming, child care, food, and renewable energy.

As a mission-driven investor, CEI supports the growth and expansion of the green businesses that we
finance and advise, including energy efficiency and renewable energy companies, sustainable farms and
food systems, and local fishing industries and aquaculturists. In addition, we strive to help all companies
in our portfolio identify ways to improve their environmental sustainability and implement green
business practices.

**Developing and Financing *Solar for All* Qualified Projects**
CEI has a decade-long record of providing flexible solar financing to small businesses, municipalities,
community facilities, and community solar projects and we anticipate deploying funds through each of
the Greenhouse Gas Reduction Fund pools, including: Solar for All, National Clean Investment Fund, and
Clean Communities Investment Accelerator. Over the past decade, we have financed 48 solar deals



across Maine and New England, resulting in 30MW of developed projects, with $25.6MM directly invested by CEI and $46.3MM additionally leveraged through bank and peer CDFI participations.

These projects benefit small businesses, municipalities, schools, and non-profits, including dairy farms, auto mechanic shops, art galleries and hockey rinks. We recognized early on that solar investments were an area where we could lend direct support to businesses and others looking to 'green' their operations. We developed a straightforward and flexible loan product, where solar equipment is typically the only required collateral – an unusual characteristic for a standard business loan. This reduced collateral requirement gives the borrower additional flexibility and allows us to be more flexible as well during underwriting.

As we have worked with new and existing borrowers to add solar to their operations, we remain committed to expanding access to solar in Maine. However, there are several challenges that small business owners face when considering installing solar on their companies.

The greatest challenge is the continued perception that solar is too expensive, particularly for the low-income and rural communities that we work in. We know from previous experience and borrower feedback that many are interested in solar power but have felt it was unattainable due to cost. While the installation and material cost of solar has decreased over the last decade, solar projects still represent a significant upfront investment for small businesses, especially those who cannot take advantage of the solar investment tax credit due to a low, or nonexistent, federal tax liability. As we underwrite these loans, we try to make the upfront savings from the solar installations equal to the monthly debt service payments on the loan. This can make the choice to go solar a cash flow neutral decision, which can lower this barrier for small business owners.

We also provide free technical assistance to borrowers who are interested in solar, where we walk through the installation process, provide references to reputable solar installers in the area, and overview the federal solar investment tax credit and the USDA Rural Energy for America (REAP) grant program, if applicable. We believe deepening this technical assistance and being more proactive in our outreach and education efforts around solar will provide a large benefit to our communities. We have already heard from multiple borrowers and prospective clients that they would welcome a structured webinar or information session about solar, as it can be difficult to know where to start.

Finally, it is important to acknowledge that the people and communities that are most impacted by climate change should not bear the financial burden of solving a climate crisis they did not cause. CEI uses equity as a driving lens of our work to ensure these communities benefit as the clean energy transition gains momentum. Over the past three years, we have financed 60% of our solar projects in federally designated economic development areas and 40% of our loans were to low-income borrowers or to projects that benefited low-and moderate-income users. Securing additional funding support to lower our interest rate will play a critical role in helping us deploy financing that will increase solar power in communities that stand to benefit the most.

**Type of Funding Projected**
CEI estimates that it could deploy up to $5 million in Solar for All funds in community solar projects in Maine, supporting 5MW of clean energy. We also anticipate requesting a maximum CCIA capitalization

award of $10 million and a technical assistance grant of $1 million. CEI anticipates borrowing additional capital through the National Clean Investment Fund (NCIF) to support its clean energy and greenhouse gas reduction financing. Low or no cost debt with terms of 10-15 years will be most useful. In addition to our current solar buydown loan product and community solar financing, we will develop a microenterprise heat pump loan product for small businesses. We are currently developing a product to maximize the benefits of the direct pay tax provision in the Inflation Reduction Act. CCIA funds could be a valuable capitalization source for that product.

**CEI's Clean Energy Financing Projections**
CEI's baseline 5-year projection is for the financing of 50-100 solar installations on <u>small businesses and for community solar projects</u> in rural Maine. This equates to roughly $7.5 million in total financing and 1.5-3MW of generation. In addition, we anticipate developing a specialized heat pump loan product for small businesses, modeled on our solar loan product. With the proper mix of capital and subsidy, including CCIA, NCIF, and Solar for All, this impact could be scaled up 3-5X and potentially regionally.

CEI appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Keith Bisson

President
Email: Keith.Bisson@ceimaine.org
Phone: 207-522-8764

# Genesis
## COMMUNITY LOAN FUND

The Honorable Michael Regan
Environmental Protection Agency 1200
Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: The Genesis Fund's Support for Maine Governor's Energy Office Application in
Response to *Solar For All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Genesis Fund for the application submitted
by the Maine Governor's Energy Office (Maine GEO) for the *Solar for All* competition. The
Genesis Fund encourages EPA to fully award Maine's application and anticipates supporting the
deployment of funds awarded to achieve the EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

The Genesis Fund is a nonprofit Community Development Financial Institution (CDFI) that
connects communities creating affordable housing and other essential community resources
with the capital and expertise they need to overcome barriers to opportunity and prosperity.
Genesis works throughout Maine and Northern New England to make flexible loans, deliver
expert project guidance, and promote policy solutions and systemic change. For over 31 years,
the Genesis Fund has delivered meaningful benefits to low-income and disadvantaged
households and we would be pleased to deepen our impact in partnership with Maine GEO
through the deployment of *Solar for All* resources.

A priority for the Genesis Fund has been to go where other sources of capital and technical
assistance won't. In our 31-year history, this strategic focus has resulted in lending more than
$96 million and supporting over 400 community development projects. Genesis lending and
technical assistance have helped bring families out of poverty, created safe affordable homes,
and brought health clinics, job training centers, recovery homes, and other community facilities
to rural towns not otherwise served by conventional financing.

Genesis aims to continue this track record with partners and communities across rural Maine in
helping to deploy *Solar for All* resources to effectively reduce carbon emissions and energy
costs for low-income and disadvantaged households.

clean energy adoption can lower costs for owners of multifamily properties and their low-income tenants. Second, by delivering technical assistance, Genesis will help owners and project developers of multi-family properties understand clean energy technology and access funding resources. Employing (and funding) models that use solar PV leasing and/or group purchase alike, the Genesis Fund will aim to prove the model in rural areas. In addition, we anticipate leveraging our 10+ year experience financing resident-owned communities (mobile home parks in which residents buy the land underneath their units) to assist in financing on-site community solar arrays for low- and moderate-income owners of mobile homes.

The Genesis Fund raises capital from a variety of partners, all of whom invest in Genesis because of our mission and our track record of improving lives. Working in EPA Region 1, our work to lower barriers for disadvantaged households results in secure, safe, healthy affordable homes that operate cost effectively. In Maine, energy costs combined with long winters and a preponderance of substandard housing stock create significant cost hurdles and real danger for lower income residents. Integrating investments from *Solar For All* coupled with technical assistance will significantly reduce this danger along with financial burden for low-income households.

Beginning three years ago, the Genesis Fund set a strategic goal to explore how best to increase focus on sustainability and movement away from fossil fuel dependence in our lending. Collaborating with other partners, we are increasingly employing resilience and sustainability lenses to our underwriting and seeking ways to directly connect low income households to clean energy resources. We have begun actively participating in clean energy policy efforts and local initiatives to convert the 80% dependence on home heating oil in northern New England. We are pleased to deepen our partnership with Maine GEO.

The Genesis Fund appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine. Please do not hesitate to contact me with any questions.

Sincerely,

*Liza Fleming-Ives*
*Executive Director*
*The Genesis Fund*
*207-844-2035*
*liza@genesisfund.org*



October 5, 2023

The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

RE: MaineHousing's Support for the Maine Governor's Energy Office Application in Response to
*Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of MaineHousing for the application submitted by the
Maine Governor's Energy Office for the *Solar for All* competition. MaineHousing encourages EPA
to fully award Maine's application and anticipates supporting the deployment of awarded funds to
achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-
income and disadvantages households across Maine.

MaineHousing is the State of Maine's Housing Finance Agency. MaineHousing has been helping
Maine people own, rent, repair, and heat their homes since 1969. We are an independent state authority
created to address the problems of unsafe, unsuitable, overcrowded, and unaffordable housing. We
issue tax-exempt and taxable housing bonds, serve as the State of Maine's Low Income Housing Tax
Credit allocating agency, and also provide additional state and federal resources as non-paying subsidy
loans for the creation of affordable multifamily rental housing. With very few exceptions, the housing
financed by MaineHousing serves individuals and families designated as extremely low income, very
low income, and low income – ranging from those experiencing homelessness up to those making
60% of the Area Median Income.

MaineHousing has been working with the Maine Governor's Energy Office in designing a portion of
the plan for *Solar for All* to benefit Maine's low income and disadvantaged residents by adding solar to
as many of the planned rehabilitation of 750 units of public housing as possible. MaineHousing hopes
to finance the conversion of this outdated, unhealthy, and inefficient public housing to rent restricted
multifamily Low Income Housing Tax Credit properties that will reduce and avoid Greenhouse Gas
Emissions; drive additional impacts of energy savings, wealth creation, health benefits, and broadened
access to opportunity to low income residents; transform private credit markets so that they
understand, adopt, and scale financial products that reduce the cost of clean technologies and drive
broader market adoption; and inform national and state policy to more effectively target solutions to
support the low-carbon transition in low income and disadvantaged communities. The addition of
*Solar for All* funding will be matched by the projected $175 million investment in rehabilitation and
energy efficiency improvements that will be made to these properties.

MaineHousing appreciates EPA's leadership in deploying *Solar for All* and looks forward to the transformative impact these funds will have for low income and disadvantaged communities in Maine.

Sincerely,

Daniel E. Brennan
Director



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01
October 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Clean Energy Partnership program (CEP) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Clean Energy Partnership program encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The State of Maine Governor's Energy Office established the Clean Energy Partnership program to support the growth of the clean energy economy in Maine through workforce development and innovation. In December 2022, the Clean Energy Partnership awarded clean energy workforce development grant funding to nine entities, leading to the engagement of over 2,000 Mainers in the first year of program operations. These projects have demonstrated results included attracting new workers to the clean energy and energy efficiency workforce, providing career training and upskilling opportunities to existing workers, increasing diversity and representation in the clean energy workforce, and creating and expanding clean energy apprenticeship, pre-apprenticeship, and internship models to facilitate entry into rewarding and high-paying jobs.

The CEP is committed to delivering meaningful benefits to low-income, disadvantaged, and underrepresented Mainers and embedding Good Jobs Principles in Maine's clean energy workforce development approach. If awarded, Solar for All will provide needed resources to expand CEP's work and address barriers related to solar workforce development. The CEP appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tagwongo Obomsawin
Clean Energy Partnership Program Manager



**JANET T. MILLS**
GOVERNOR

**STATE OF MAINE**
**DEPARTMENT OF LABOR**
**BUREAU OF EMPLOYMENT SERVICES**
**55 STATE HOUSE STATION**
**AUGUSTA, MAINE  04333-0055**

**LAURA A. FORTMAN**
COMMISSIONER

October 12, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Maine Department of Labor's Support for Maine Governor's Energy Office Application in
Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Department of Labor (MDOL) for the
application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The
Maine Department of Labor encourages EPA to fully award Maine's application and anticipates
supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Department of Labor is committed to advancing high-quality job opportunities for Maine
workers and businesses by helping employers recruit and train a talented workforce, providing workers
with the skills they need to be competitive in the economy through models such as registered
apprenticeship, and ensuring safe and fair workplaces for people on the job.

MDOL's Maine Apprenticeship Program connects union and non-union employers with training
providers to design registered apprenticeship and certified pre-apprenticeship opportunities—including
nearly 1,000 current apprentices in clean energy occupations.  Through MDOL's Maine Apprenticeship
Program, CareerCenters, community workforce partners, and Bureau of Labor Standards, we anticipate
supporting *Solar for All* by:

1. Maximizing equitable access to solar deployment among diverse communities via partnerships
   with regional CareerCenters, workforce partners, and community-based organizations.
2. Creating and expanding registered apprenticeship and certified pre-apprenticeship opportunities
   that support workforce development in clean energy, especially within our priority communities
   of women, people of color, people with disabilities, and justice involved individuals.
3. Supporting employers through outreach and education to comply with and monitor labor
   standards to ensure this opportunity translates to high-quality job opportunities.
4. Continuing monthly meetings between the Maine Apprenticeship Program and Governor's
   Energy Office on combined efforts in registered apprenticeship and clean energy projects.

PHONE: (207) 623-7981          TTY users call Maine Relay 711          FAX: (207) 287-5933
The Maine Department of Labor provides equal opportunity in employment and programs.
Auxiliary aids and services are available upon request to individuals with disabilities.

The Maine Department of Labor appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Laura A. Fortman
Commissioner, Maine Department of Labor

# Maine Community College System

**OFFICE OF THE PRESIDENT**
323 State Street, Augusta, ME 04330-7131
(207) 629-4000 | Fax (207) 629-4048 | mccs.me.edu

**David Daigler**
President

October 1, 2022

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity
Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Community College System for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The Maine Community College System encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine's Community Colleges are dedicated to educating today's students for tomorrow's career opportunities in an environment that supports personal and professional growth, innovation, and lifelong learning. The Maine Community College System is a leader in the State's workforce development system and has made significant investments in clean energy and related workforce programming during the past 10-15 years, including in electric vehicle maintenance, heat pump installation and repair, and solar installation.

Maine Community Colleges supports this initiative by providing Mainers with access to highly skilled training leading to industry-recognized certifications in solar installation.  These training and certifications improve our residents' economic well-being by providing pathways to new careers, incumbent employee upskilling, or opportunities for career changes.  Meeting solar deployment goals requires a highly skilled workforce with the required training to install and service the solar arrays.  Additionally, Maine requires critical mass in terms of highly trained individuals.  Our efforts support increasing the number of certified solar installers/technicians across the state.

The Maine Community College System appreciates EPA's leadership in deploying the *Solar for All* program; I am looking forward to the transformative impact these funds will have on Maine's low-income and disadvantaged communities.

Sincerely,

**Central Maine**
**Community College**
Auburn
cmcc.edu

**Eastern Maine**
**Community College**
Bangor
emcc.edu

**Kennebec Valley**
**Community College**
Fairfield/Hinckley
kvcc.me.edu

**Northern Maine**
**Community College**
Presque Isle
nmcc.edu

**Southern Maine**
**Community College**
South Portland/
Brunswick
smccme.edu

**Washington County**
**Community College**
Calais
wccc.me.edu

**York County**
**Community College**
Wells
yccc.edu



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Associated General Contractors of Maine's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Associated General Contractors of Maine (AGC Maine) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. AGC Maine encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Since 1951, AGC Maine has been dedicated to ensuring a sound and healthy construction industry and providing the public with an assurance of safety, skill, responsibility and integrity of AGC member firms. We work for Maine's construction companies by providing necessary leadership on issues from site work development to environmental policy. We represent the industry across all sectors- from general contractors and subcontractors to suppliers and service providers. Our industry collectively employs over 30,000 skilled workers.

AGC has been a supporter of contractors in the renewable energy space for many years, and a leader in workforce development through our Maine Construction Academy. We are also a part of the Maine Governors Clean Energy Partnership. Our Construction Immersion program engages youth and under-represented adult populations in registered apprenticeship and pre-apprenticeships in construction. Our programs introduce participants to over 10 different career pathways in construction, including HVAC, plumbing and electrical work required for deployment of renewal energy initiatives.

We believe Maine Governors Energy Office is perfectly positioned to support the EPA's objectives to maximize solar deployment and ensure equitable access. We are poised to assist in the development of this workforce and to support the initiatives through our existing community partnerships.

AGC Maine appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Kelly Flagg
Executive Director
AGC Maine



Maine Labor Climate Council
Portland, ME
October 7th, 2023

Environmental Protection Agency
Washington, DC

RE: Solar for All Letter of Support for Maine Governor's Energy Office

To whom it may concern,

Maine Labor Climate Council is a coalition of labor unions united in our mission of tackling the climate crisis while reversing economic and racial inequality. MLCC shares in the Maine Governor's Energy Office's  (GEO) vision for a greener, more equitable future. With this letter MLCC wishes to convey our support for GEO's commitment to ensuring equitable allocation to low income and disadvantaged communities of the opportunities and benefits of union partnership and leadership in the clean energy transition.

MLCC and our twenty affiliate labor organizations view the climate and inequality crises as interrelated crises that demand a comprehensive response. We seek to develop the labor movement's vision for how to tackle these crises in a way that creates good Maine union jobs, reduces carbon emissions and economic inequality, and provides a meaningful seat at the table for workers and unions in this process. MLCC is educating fellow workers, building alliances and advocating for policy solutions that demonstrate that we do not have to choose between a healthy planet and good jobs that sustain our families and communities. Through legislative action, organizing in clean energy sectors, and grassroots community-based campaigns, we are deeply committed to a holistic "climate jobs" approach that centers equitable workforce development leading to high-quality careers.

As a key part of providing meaningful benefits, we know that solar projects funded through GEO's Solar for All program will create quality jobs that adhere to the apprenticeship and Davis-Bacon standards as set forth in the Inflation Reduction Act. GEO's prioritization of contractors who commit to using local labor and equitable workforce development — operationalized through relationships with registered pre-apprenticeship programs and the negotiation of Project Labor Agreements — is core to our work and approach at MLCC and essential for fulfilling the Justice40 principles.

Union registered apprenticeship and pre-apprenticeship models are key to accomplishing the twin goals of job quality and equitable workforce development. Pre-apprenticeship programs, which prepare workers to enter into and succeed in apprenticeship programs in the trades, are a successful way to bring women and BIPOC into these higher-paying, good union jobs, because

they help address potential barriers for marginalized communities to enter into apprenticeship programs. Apprenticeship programs are a very effective way to uplift historically marginalized groups because they provide wages and benefits throughout the training, are significantly less expensive than a two- or four-year college degree, and prepare their graduates to work as journey people in highly skilled, highly paid trades — all while significantly narrowing the gender and racial pay gaps. GEO's commitment to use Solar for All money to support the growth of registered apprenticeship and pre-apprenticeship programs will meaningfully advance the twin goals of equity and job quality.

The U.S. Environmental Protection Agency's (EPA) Greenhouse Gas Reduction Fund (GGRF) is an unprecedented opportunity to serve working people in Maine. MLCC is very supportive of GEO's commitment to having a preference for projects that include a Project Labor Agreement that centers equity, and we will support union locals and building trades councils in entering into Project Labor Agreements that result in equitable workforce development.

We recognize the historic potential of the GGRF to empower American workers and build the economy "from the middle out and bottom up". We support GEO's goal to transform low income and disadvantaged communities through opportunities for affordable solar energy and union jobs, and we look forward supporting this grant's implementation.


Very truly yours,

Francis Eanes

Executive Director, Maine Labor Climate Council



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: A Climate to Thrive's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 4, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of A Climate to Thrive (ACTT) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. A Climate to Thrive encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

ACTT was founded as a small community organization on Mount Desert Island (MDI) with an ambitious goal: establishing energy-independent and transitioning our island  off of fossil fuels. As a community-founded and driven organization, ACTT's work has primarily focused on helping MDI's residents adopt clean energy generation and implement efficiency upgrades regardless of income. We've spearheaded this work by partnering with several local installers for bulk community discounts and running two SolarizeMDI campaigns, two WeatherizeMDI campaigns, and one ElectrifyMDI campaign. By lowering the cost of rooftop residential solar installations coupled with strong community outreach and education, our solarize campaigns alone have helped over 140 islanders transition to solar energy. Our Solarize model has been copied by other communities throughout the state, as we formally support community-driven climate solutions initiatives through a program called Local Leads the Way.

Through this work, we've witnessed firsthand the gap that currently exists between those who can and cannot afford the upfront costs of these systems. We have found that those who can least afford to install an array tend to have the highest energy burden and stand to benefit the most from owning solar.  If Maine were to obtain *Solar for All* funds, our organization could pursue a third solarize program emphasizing additional outreach to community members who received visits from solar contractors but could not afford to install an array, despite the SolarizeMDI discount. We believe that our low-income community members should have equal access to the financial and resilience benefits that solar and storage offer.

ACTT appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine. ACTT also honors the important steps the EPA has made to ensure environmental justice is pursued by our federal government. The impacts of these federal policies are felt at the grassroots level. It is our hope that the dispersal of these funds honors this precedent.

Sincerely,

Johannah Blackman,
Executive Director
A Climate to Thrive, johannah@aclimatetothrive.org



October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W., Room 3426
North Washington, D.C. 20460

Dear Administrator Regan:

Please accept this letter of support on behalf of Acadia Center for the application submitted by the Maine Governor's Energy Office (GEO) for the Solar for All competition. Acadia Center encourages EPA to fully award Maine's application in support of residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Acadia Center is a Maine based but New England wide organization whose mission is to advance effective energy solutions for a livable climate and a stronger, more equitable economy. Acadia Center has advocated and will continue to advocate for solar policies and programs in Maine that reduce carbon emissions, including working with the Maine Governor's Energy Office. Acadia Center is committed to environmental and energy equity for low-income and disadvantaged communities across Maine and in New England, and Solar for All will provide critical energy saving and environmental benefits.

Maine is a rural State, and people in small towns want to participate in a clean energy future, as they have demonstrated in making Maine a national leader in heat pump installation. If Solar for All grants the GEO's application, Mainers can do what they have shown their willingness to do with heat pumps, adopt solar technology to reduce their electricity bills while benefiting the environment.

Sincerely,

Peter LaFond
Senior Policy Advocate and Maine Program Director
plafond@acadiacenter.org
207-236-6470 ext.305



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Coalition for Community Solar Access' Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Coalition for Community Solar Access (CCSA)
for the application submitted by the Maine Governor's Energy Office for the Solar for All
competition. CCSA encourages EPA to fully award Maine's application and anticipates supporting
the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to
benefit approximately 30,000 low-income and disadvantaged households across Maine.

CCSA is a national coalition of businesses and nonprofits working to expand customer choice and
access to solar for all American households and businesses through shared solar programs. CCSA's
mission is to empower every American energy consumer with the option to choose local, clean, and
affordable shared solar.

We have been championing the Greenhouse Gas Reduction Fund, and more specifically, the Solar
For All program, since we advocated for an equitable expansion of solar beginning with our
Roadmap to Expand Solar Access for All released in April 2021. One of the main pillars of that
roadmap was to empower 30 million households to go solar, including 15 million with low to
moderate incomes and encourage state development and expansion of robust distributed solar
programs.

CCSA intends to support Maine's Solar for All application by ensuring smooth and successful
implementation of the programs resulting from a funding award, particularly an Energy Assistance
model that leverages Maine's experience in community solar to deliver meaningful benefits to low
income customers.  We represent community solar developers and providers, and therefore are well
situated to facilitate information sharing and feedback on the development of the energy assistance
program in order to ensure maximum solar deployment under the program. CCSA is also willing and
able to advise on methods for identifying eligible customers to participate in energy assistance
through solar programs. Our membership includes entities with extensive experience in identifying
eligible customers for energy programs, conducting outreach to customers on ways to save on their
energy bill, and ensuring customers receive the full extent of possible benefits from participation.



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

CCSA will also continue our advocacy efforts to address market barriers to low-income serving solar in Maine. We plan to continue our work to improve interconnection practices and grid planning, as well as regulatory and legislative advocacy to address additional market barriers including siting, permitting, consumer protections, financing, and program design.

In closing, we support the approval of the Maine Solar For All application at the full requested amount as we believe it is the most efficient and equitable way to serve Maine's low income and disadvantaged customers. CCSA appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

*Kate Daniel*

Kate Daniel
Northeast Regional Director
Coalition for Community Solar Access
kate@communitysolaraccess.org



**Executive Director**
Scott Vlaun

**Ed. & Programming**
Seal Rossignol

**Communications**
Renee Igo

**Climate Resiliency**
Claire McGlinchey

**Municipal Resiliency**
Tony Giambro

**Board of Directors**
Thea Hart
Roberta Hill
Michael Newsom
Michael Dunn
Azalea Cormier
Willow Adler
Emlyn Crocker
Gem Haviland
Craig Reynolds

The Honorable Michael Regan

Administrator, U.S. Environmental Protection Agency

1200 Pennsylvania Avenue, N.W.

Room 3426 WJC North Washington, DC 20460

Re: The Center for an Ecology-Based Economy's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

I am writing today on behalf of the Center for an Ecology-Based Economy (CEBE) in support of the application submitted by the Maine Governor's Energy Office for the "Solar for All" competition. Given the tremendous need for affordable clean energy in Maine's under-resourced rural communities, CEBE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve the EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Center for an Ecology-Based Economy was founded in 2013 as a response to the climate crisis. Located in Norway, a town of around 5,000 residents in rural inland Maine, CEBE set out to raise awareness of climate change and help local communities build climate resilience while lowering GHG emissions. While our projects and educational outreach have spanned the interrelated areas of food, shelter, transportation, and energy, a strong focus on solar power as a tool for both adaptation and mitigation has always been part of our work.

Since our first small off-grid project to power an irrigation system at our local community garden, we have installed three more solar projects, the largest, a 6,400W dual axis tracker at our local high school, offsets the electricity consumption of three level 2 EV charging stations, also installed by CEBE. As a service provider for Maine's Community Resilience Partnership, we work with local communities on climate resilience and have facilitated three rooftop PV

projects for area municipalities to offset energy costs and reduce emissions.

In 2017, spurred on by The U.S. Department of Energy's Sunshot program, CEBE set its sights on developing a community solar cooperative to provide low cost solar power to residents of our rural communities, many of which experience low or moderate incomes. We received $20,000 in technical assistance funding from the DOE for that project, but given Maine's net metering policy at that time, allowing only nine offtakers per installation, and lack of funding opportunities, we were unable to make the economics work and we put the project on hold. With new, more favorable net metering policy in place, our organization now has a viable model for a consumer-owned, community solar co-operative which will utilize dual axis trackers on small sites to create a network of 150 kW solar "gardens." These projects will benefit local landowners, provide affordable renewable energy to local LMI households, support local jobs,  and keep energy dollars circulating within our communities. We recently received a "Energizing Rural Communities" Prize from the U.S. DOE for this project, and have been invited to apply for the second round of the DOE's "Energy Improvement in Rural Areas" Grant program.

CEBE is poised to launch an ambitious program to bring renewable energy to rural Mainers that continue to struggle with escalating energy costs. We will need the kind of assistance that the Governor's Energy Office will be able to provide through this funding to create robust educational and outreach campaigns, and to spearhead the grid of the future to help Maine meet its critical climate goals and build energy equity in the state.

Thank you for considering this letter of support.

Scott Vlaun, Executive Director
Center for an Ecology-Based Economy, Norway, Maine

Cranberry Isles Community Solar Association

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Cranberry Isles Community Solar Association Support for Maine Governor's Energy Office Application in Response to Solar for All

Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 2, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Cranberry Isles Community Solar Association for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Cranberry Isles Community Solar Association encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Cranberry Isles Community Solar Association is a group of committed and concerned citizens of the Cranberry Isles seeking to solve the chronic problems associated with frequent power outages on the islands and provide access to low cost solar energy and energy savings to our low income households including over 10 CIRT homes.

We are seeking to support Solar for All in one or more of the following:

1. Delivering meaningful benefits to low-income and disadvantaged households, including power resiliency, energy savings, financing and program delivery, and high-quality jobs;

2. Overcoming market barriers to residential-serving distributed solar and/or providing project-deployment through technical assistance, including;
a) The high cost of solar deployment – We plan to use a competitive bid format plus incentives through the Inflation Reduction Act and any State grants to drive down the cost of solar by 75% or more;
b) Identifying suitable sites for solar – We plan to use building structures with south facing roofs for solar applications;
c) Utility reluctance to deploy solar – By adding batteries to the larger solar arrays we seek to provide voltage stability to the ends of the Versant distribution lines and save on the considerable cost of sending teams over to restore power.

3. Maximizing solar deployment and ensure equitable access and participation, including through partnerships, with the Town of Cranberry Isles Selectmen, the CIRT Homes Association, The Islesford Neighborhood House Association, Friends of Acadia, the Islesford Historical Society, and the Cranberry Isles Fishermen's Cooperative.

Cranberry Isles Community Solar Association appreciates EPA's leadership in deploying Solar for All, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

President
Cranberry Isles Community Solar Association



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Island Institute's Support for Maine Governor's Energy Office Application in
Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 11, 2023

Dear Administrator Regan:
Please accept this letter of support on behalf of the Island Institute for the application
submitted by the Maine Governor's Energy Office for the Solar for All competition. Island
Institute encourages EPA to fully award Maine's application and anticipates supporting the
deployment of awarded funds to achieve EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Seventy-five percent of Maine's coastal communities have fewer than 3000 people. Twenty-
five percent of coastal communities have fewer than 800 people. These are rural, capacity
constrained communities facing significant economic challenges leading to the presence of
low income and disadvantaged households.

Island Institute is a 40 year old community development nonprofit located in Rockland,
Maine. We predominantly work with island and coastal communities to build community
sustainability and to further the climate resilience of both communities and the businesses
that support them.  These are predominantly small, rural, natural resource dependent
communities that rely heavily on fossil fuels, and a few of these communities have the
highest electricity costs outside of communities in Alaska where diesel fuel is flown in.

To help address the capacity and energy challenges in these communities and to help them
build towards climate resilience, Island Institute is the northeast regional technical
assistance provider for the National Renewable Energy Lab's Energy Transition Initiative
Partnership Program. Through this work, we support island and remote communities in
accessing technical assistance for planning energy transitions from various national labs.
Many of these projects are focused on microgrids, battery storage, and renewable
generation.

386 Main Street • Post Office Box 648 • Rockland, Maine 04841-0648
Tel: 207-594-9209 • Fax: 207-594-9314 • inquiry@islandinstitute.org
www.islandinstitute.org

Solutions that help increase the adaption of clean energy projects that benefit low income residents would be very interesting to communities working through the ETIPP process as well as to other communities who are also concerned about energy challenges.

Island Institute is committed to supporting the Solar for All application through our efforts to provide community scale energy planning technical assistance. We also work closely with natural resource based businesses, particularly fishermen, aquaculturists, and working waterfront businesses like boatyards. We believe that employees of some of these businesses may well qualify for this program.

Finally, Island Institute has long been concerned about the ability of rural communities to access clean energy programs and the availability of contractors to do the work in these communities. A few years back we published a paper "Bridging the Rural Efficiency Gap" in the peer reviewed journal Energy Efficiency. We are very aware of the needs and challenges facing these communities and work diligently to improve access and acceptance of programs that provide economic and climate benefits.

Island Institute appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Nick Battista
Chief Policy Officer
Island Institute

2

**Natural Resources Council of Maine**

3 Wade Street • Augusta, Maine 04330 • (207) 622-3101 • Fax: (207) 622-4343 • www.nrcm.org

**clf**
conservation law foundation

*For a thriving New England*



ucsusa.org Two Brattle Square, Cambridge, MA 02138-3780  **t** 617.547.5552  **f** 617.864.9405
1825 K Street NW, Suite 800, Washington, DC 20006-1232  **t** 202.223.6133  **f** 202.223.6162
500 12th Street, Suite 340, Oakland, CA 94607-4087  **t** 510.843.1872  **f** 510.843.3785
One North LaSalle Street, Suite 1904, Chicago, IL 60602-4064  **t** 312.578.1750  **f** 312.578.1751

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Joint Letter of Support for Maine Governor's Energy Office Application in Response to *Solar for All* –
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

We write today on behalf of the Natural Resources Council of Maine (NRCM), the Union of Concerned Scientists
(UCS) and the Conservation Law Foundation (CLF) in strong support of the Solar for All application from the Maine
Governor's Energy Office (GEO). We urge EPA to fully award Maine's request and we anticipate leveraging our
organizational resources to support its successful implementation in pursuit of EPA's goal of bringing the benefits
of solar to some 30,000 disadvantaged and low-income Maine people.

NRCM is Maine's leading environmental advocacy organization with more than 25,000 members and supporters.
NRCM has been working for more than 60 years to protect, restore, and conserve Maine's environment, and is
deeply engaged in the state's climate and clean energy policy and planning, including Maine's programs to support
community solar projects.

UCS is the nation's leading science based non-profit organization with more than a half a million supporters
nationally and more than 2,500 in Maine. UCS advances equitable science-based solutions to some of the world's
most pressing problems, including working to ensure that Maine and the rest of the country meets its climate and
clean energy goals.

Founded in 1966, CLF is a non-profit advocacy organization with 5,000 members across New England, including
approximately 500 in Maine. CLF works to solve the environmental problems threatening the people, natural
resources, and communities of New England. CLF's advocates use law, economics and science to design and
implement strategies that conserve natural resources, protect public health, and promote vital communities in our
region.

NRCM and UCS jointly submitted comments on the GEO's draft Solar for All application. Additionally, all three
organizations have been active participants in matters related to environmental justice and distributed solar
generation in Maine for many years, including in matters before the Public Utilities Commission and the Legislature
and as participants in numerous stakeholder processes.

UCS has substantial experience providing technical expertise and conducting analysis on policies to advance equity
in the clean energy transition, both in Maine and around the country. As Maine's Solar for All program is
operationalized, UCS could support the deployment of technical assistance by leveraging data to assist low-income
and disadvantaged communities in maximizing the effectiveness of funding for projects that are a priority for
them.

*Protecting the Nature of Maine*

Printed on post-consumer recycled, processed chlorine-free paper

Respected as a technical expert on solar energy Maine, NRCM has strong relationships across state and municipal agencies, developers, advocates, and community-based organizations across the state. We have multiple channels of communication with our supporters across all 16 counties, including our blog, podcast, social media, print media, and participation at regional events and meetings. All of these channels could be valuable platforms for sharing educational and outreach information about the Solar for All program in Maine to advance equitable access and meaningful involvement.

In Maine, CLF is the NGO community's principal legal advocate for clean energy.  In addition to providing legal advice to community groups, last year we led the effort to pass Maine's first environmental justice bill.  Previously, we worked with UCS, NRCM, and other groups to prioritize funding for underrepresented groups to participate in Public Utility Commission proceedings. Not only will we be able to use those skills to help implement Maine's Solar for All program with other advocacy organizations, but also we will use them to ensure that the program is properly implemented to reach the targeted communities.

We believe Maine is very well positioned today to deploy awarded funds rapidly and effectively. Programmatic elements of GEO's application align closely with recommendations that emerged from a rigorous 18-month stakeholder process hosted by GEO. That effort concluded in January 2023, having identified a highly cost-effective program design for community solar. There was broad support among the diverse stakeholders for a program that allocated the benefits of community solar to low-and-moderate income households. Maine also established a Green Bank in 2021, which could be a powerful outlet for providing financial assistance to install solar in low-income and disadvantaged communities. The green bank is operated by Efficiency Maine Trust, a quasi-governmental entity that implements energy policies and statewide programs designed to overcome social and financial barriers, especially for low-income Maine people. Furthermore, Maine has a pipeline of solar projects in the late stages of interconnection review that would likely be eligible for GEO's Solar for All program, and as a result be capable of delivering benefits more quickly to vulnerable populations across the state.

We greatly appreciate EPA's leadership in this area. Ensuring disadvantaged and underserved communities have access to the benefits of clean energy must be central to our efforts to decarbonize the electric sector.  NRCM, UCS and CLF would be honored to support the implementation of Maine's ambitious Solar for All program to help assure the transformative impact these funds would have here in Maine. Please feel free to contact us if you have any questions or need additional information.

Respectfully submitted,

Rebecca Schultz
Natural Resources Council of Maine
3 Wade Street
Augusta, ME 04330
Tel: (207) 430-0175
Email: rschultz@nrcm.org

Steve Clemmer
Union of Concerned Scientists
2 Brattle Square, 6th Floor
Cambridge, MA 02138
Tel: (978)-844-4531
Email: sclemmer@ucsusa.org

Sean Mahoney
Vice-President & Senior Counsel
Conservation Law Foundation
53 Exchange Street
Portland ME 04101
Tel: (207) 210-6439
Email: smahoney@clf.org



**In Support for Maine Governor's Energy Office Application in Response to *Solar for All***
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Maine Conservation Voters for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. Maine Conservation Voters encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine Conservation Voters (MCV) is a nonpartisan, nonprofit organization that works to make conservation and climate action in Maine a political priority. Our organization represents more than 13,000 members and supporters dedicated to protecting the environment and our democracy. We serve on the Steering Committee of the Maine Climate Council and work closely with the Governor's Energy Office to achieve Maine's ambitious statutory emissions reduction and renewable energy requirements, to reduce energy cost volatility, and to advance equity through Maine's climate response.

In February of this year, Governor Janet Mills advanced Maine's goal of 100% clean energy from 2050 to 2040, a nod to the commendable progress we have made as a state and the speed at which we can achieve a just clean energy transition when we work together and create strong, responsible policy. Solar energy plays a key role in meeting Maine's accelerated clean energy targets, reducing emissions from fossil fuels, and serving new electricity demand associated with electrification of heating and transportation. Homegrown clean energy makes sense to Maine people and communities, which prize self-sufficiency and the quality jobs associated with the State's growing clean energy economy. We worry, though, about equitable access to renewable energy and the fair distribution of costs and benefits across diverse populations. Indeed, the Maine Legislature came close to dismantling the State's net energy billing program this summer due to concerns about its impact on low-income ratepayers. The

program was revamped instead, but the near miss highlighted the urgency of deploying residential solar energy and storage to benefit low-income and disadvantaged households across the state.

Maine is allocating significant state resources and funding to advance an equitable clean energy transition that delivers *Solar for All*, but we cannot do it alone. Federal support through programs authorized by the Inflation Reduction Act, which Maine people advocated for and continue to celebrate, is essential. We appreciate EPA's leadership in the *Solar for All* competition, which is an opportunity for Maine to build on a strong track record of solar deployment and realize the transformative impacts of additional investment. for low-income and disadvantaged communities in Maine.

MCV urges EPA to fully award Maine's $100 million *Solar for All* application and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you,

Kathleen Meil
Senior Director of Policy and Partnerships
Maine Conservation Voters



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

RE: Maine Renewable Energy Associations's Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Renewable Energy Association
(MREA) for the application submitted by the Maine Governor's Energy Office for the *Solar for
All* competition. MREA encourages EPA to fully award Maine's application and anticipates
supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential
solar energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

MREA is a not-for-profit association of renewable energy producers, suppliers of goods and
services to those producers, and other supporters of this industry. MREA members sustainably
manufacture electricity from solar, wind, hydro, tidal, biomass, and energy storage projects in
Maine.

MREA is a strong supporter of Maine's ambitious renewable energy mandate to transition to
80% renewable energy by 2030 and 100% by 2050. Indeed, we also support the Mills
Administration's recent initiative to achieve 100% by 2040. Solar will play a key part in the
achievement of these targets. Solar deployment in Maine has a proven track record of lowering
energy bills. A *Solar for All* award would ensure that those benefits reach low-income and
disadvantaged households across the state.

MREA anticipates supporting *Solar for All* in a variety of ways. In particular, as an organization
with a strong presence in the policy space, MREA is committed to ensuring that municipal and
state permitting regulation and other regulations are conducive to meeting *Solar for All's* goals.
Also, because we are a network of solar companies, we are poised to communicate the

opportunities afforded by a *Solar for All* award and identify opportunities for cross-company collaboration.

MREA appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you for your consideration.


Eliza Donoghue, Esq.
Executive Director

October 5, 2023

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

Re: Support for Maine's Solar for All Application: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

On behalf of The Northeast Clean Energy Council  ("NECEC" or "The Council"), I am writing to express our support for Maine's Solar for All grant application, which is being submitted by the Governor's Energy Office. We are committed to supporting Maine in their efforts to ensure that low-income and disadvantaged communities equitably benefit from the state's ambitious Solar for All program, which would benefit approximately 30,000 low-income and disadvantaged households across the state.

NECEC leads the just, equitable, and rapid transition to a clean energy future and a diverse climate economy. NECEC is the only organization in the Northeast that covers all of the clean energy market segments, representing the business perspectives of investors and clean energy companies across every stage of development. NECEC members span the broad spectrum of the clean energy industry, including energy efficiency, clean transportation, wind, solar, energy storage, microgrids, fuel cells, and advanced and "smart" technologies.

The Council is dedicated to growing the clean energy economy in Maine and across the region, in pursuit of our mission to create a world-class and equitable clean energy hub in the Northeast. The Council's 250+ members include companies based in Maine and those from elsewhere who do business or hope to make future investments in the state.

NECEC actively follows and seeks to advance the maximum and equitable deployment of state and utility programs and policies related to energy efficiency and renewable energy development. Along with promoting the development of clean energy resources that help this sector thrive and contribute to economic development, NECEC works to ensure energy equity, public health and justice are fully considered in energy planning processes.

An element of Maine's proposed Solar for All program that NECEC is particularly proud to support is the Project Deployment Technical Assistance Plan, which would:

- Support solar developers, contractors, and affordable housing developers to develop pipelines of solar projects;
- Support overcoming barriers related to project deployment such as siting, permitting, interconnection;
- Invest in workforce and entrepreneurship opportunities in low-income and disadvantaged communities;
- Support property managers and building owners with direct technical and financial assistance to understand all of the financing options, grants, tax credits, and other incentives that may be available to them through Solar for All and other state, federal, local and utility programs.

**How NECEC would support the Project Deployment Technical Assistance Plan:**

Through our public policy work and the leadership of our diversity, equity and inclusion / workforce development team, NECEC will support the Maine Solar For All program by serving as a convener and a conduit of information. NECEC's network includes thousands of connections across the clean energy industry, utilities, other non-profits, community and institutional leaders and more. We will seek to be a partner to the State of Maine to understand the project goals and help find solutions that can advance our shared goals related to climate, clean energy and equity.

In addition, NECEC is currently the lead project applicant with U.S. EPA Region 1 in a collaborative with 26 other state and non profit organizations seeking to develop the New England Center for Environmental and Energy Justice (NEC-EJECA), intended to be the first of its kind technical assistance center that supports environmental and energy justice (EEJ) communities that are disproportionately plagued by environmental pollution and environmental justice challenges.

We are pleased that the University of Maine Senator George J. Mitchell Center for Sustainability Solutions is a project partner in this initiative. NEC-EJECA's goal is to empower and build EEJ communities' capacity to achieve their own individual visions of a thriving community by providing responsive technical assistance, training, and resources.

Maine has been a leader in our nation's transition to a clean energy future and NECEC would be proud to play a critical role in supporting the implementation of Maine's ambitious Solar For All program. We believe the Governor's Energy Office has demonstrated experience deploying technical assistance and incentive funding for solar technology and collectively will be able to successfully deliver meaningful benefits to underserved communities. Please feel free to contact me if you have any questions or need additional information.

Sincerely,

*Joseph A. Curtatone*

Joseph A. Curtatone, President
Northeast Clean Energy Council

# ☀ SOLAR ENERGY ASSOCIATION OF MAINE

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC
North Washington, DC  20460

Re:  The Solar Energy Association of Maine's Support for Maine Governor's Energy Office
Application to *Solar for All* Funding Opportunity Number: EPA R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Solar Energy Association of Maine (SEAM) for the application submitted by the Maine Governor's Office for the *Solar for All* competition.  SEAM encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households throughout Maine.

SEAM is a broad coalition of solar energy supporters, including (1) municipalities; (2) colleges; (3) conservation organizations; (4) solar installers; (5) community and economic development entities; (6) energy law, economics, and engineering professionals; and (7) individual and cooperative electricity customers (residential, commercial, and institutional).  We support the development of solar electricity of all project sizes and ownership models, for the benefit of all Maine people.  SEAM is a Maine not-for-profit corporation governed by a diverse Board of Directors.  It is not a trade group.  We have been active over the past eight years. We are especially concerned about bringing solar energy directly to low-income and disadvantaged households, by encouraging and facilitating ownership in distributed energy resources (DERs).

SEAM is an all-volunteer education and advocacy organization, with an affiliation with Dirigo Community Solar Group, another Maine not-for-profit providing services to small electric generating cooperatives and community solar

farms.  This affiliation endows us with considerable operating experience with small groups of residential owners of solar equipment.  We envision using this experience to help low-income and disadvantaged households understand the benefits of solar energy, educate them on how to go about participating in the clean energy sector themselves, and provide how-to guides and operating assistance at nominal cost.

SEAM also has a high degree of interest in assisting to start a potential low-interest loan program so low-income people and disadvantaged households can <u>acquire</u> rooftop solar or shares in small group projects if they are renters or their homes are not good for rooftop solar.  We believe this would be an especially effective way to assist such challenged populations, either individually or in small groups, by helping to finance ownership of solar equipment where the loans could be structured so that the loan repayments would be less than the avoided market electricity costs, thus both saving money for disadvantaged households and helping them build equity in their own solar equipment.  SEAM and Dirigo have experience in this and would love to bring this experience to a targeted population of low-income people and disadvantaged households.

Through its diverse Board, SEAM has relationships with many groups (e.g., municipalities, community action and development entities) with existing relationships with low-income people and disadvantaged households.  We think we can use these relationships to be particularly helpful in reaching the goals of the *Solar for All* program.

In the totality of things, SEAM and Dirigo are completely on board with this initiative of the Maine Governor's Energy Office (GEO) and the objectives of the *Solar for All* program.  We appreciate EPA's leadership in deploying this program, and look forward to the transformative impact these funds will have on "piercing the veil, " allowing the GEO to bring the advantages of solar equipment ownership and clean energy to low-income and disadvantaged communities in Maine.  We'll be enthusiastic, cooperating partners without seeking any of the funds for ourselves!

(Signature on following page)

2

Very truly yours

Steven L Weems
Executive Director
Solar Eneregy Association of Maine
and
President
Dirigo Community Solar Group

GEO Letter of Support for the *Solar for All* Program 10-6-23l

Senator George J. Mitchell
Center for Sustainability
Solutions



THE UNIVERSITY OF
MAINE

5710 Norman Smith Hall
Orono, Maine 04469-5710
Tel: 207.581.3195
Fax: 207.581.3320
umgmc@maine.edu
umaine.edu/mitchellcenter/

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Senator George J. Mitchell Center for Sustainability Solutions' Support for Maine
Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number:
EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Senator George J. Mitchell Center for
Sustainability Solutions (MCSS) for the application submitted by the Maine Governor's Energy
Office for the *Solar for All* competition. MCSS encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's
objectives by enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

For the last decade, the MCSS has been a leader in launching and supporting partnerships in
which interdisciplinary teams of students and faculty from universities and colleges throughout
the state collaborate with diverse stakeholders to tackle and help find solutions to a wide range
of urgent sustainability challenges that directly benefit Maine and other regions. These
challenges, which reside at the intersection of environmental, social, and economic issues,
include renewable energy, local agriculture, municipal planning, forest management, solid
waste, and coastal water quality. Our **Mission:** Serving as a leader and valued partner in
understanding and solving societal problems related to the growing challenge of improving
human well-being while protecting the environment. Our **Vision:** Connecting knowledge with
action to create a brighter environmental, social, and economic future in and beyond Maine.

The State's *Solar for All* application is in line with our Mission and Vision and an incredible
opportunity for low-income and disadvantaged populations across Maine to gain direct long-
term benefits from the sustainable energy transition. The MCSS is committed to and actively
engaged in supporting community-driven solutions to sustainability challenges, including
climate and energy. One MCSS Faculty Fellow in particular, Dr. Sharon Klein, has an active
research program focused on understanding and supporting community-driven renewable
energy and energy efficiency/conservation projects and programs in Maine's underserved

communities (indigenous Wabanaki, rural, remote, and low income). She is especially excited about leveraging synergies with *Solar for All* and her role as a Service Provider in Maine's Community Resilience Partnership and her recently funded 4-year projects (EPA-G2022-STAR-F1 (*Drivers and Environmental Impacts of Energy Transitions in Underserved Communities*) award titled *The Role of State Networks in Advancing Community-Initiated and -Engaged Sustainable Energy Action in Underserved Communities*; NSF 22-633 EPSCoR RII Track-2 FEC award titled *Collaborative Research: RII Track-2 FEC: STORM: Data-Driven Approaches for Secure Electric Grids in Communities Disproportionately Impacted by Climate Change*).

The MCSS anticipates supporting *Solar for All* by:

1. Connecting *Solar for All* program administrators with local and tribal government staff and citizens, as well as community-based organizations and businesses, interested in and already engaged in delivering meaningful solar benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.

2. Conducting community-engaged research to help overcome market barriers to residential-serving distributed solar and providing or connecting to existing project-deployment technical assistance as applicable based on the available time and expertise of our faculty, staff, and students and needs identified. Market barriers that could be addressed through our technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.

3. Helping to maximize solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

The MCSS greatly appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Yours sincerely,

David D. Hart, Ph.D.
Director and Professor

Sharon J.W. Klein, Ph.D.
Faculty Fellow and Associate Professor

2



September 29, 2023

Mr. Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

**Re: Support for the State of Maine's Solar for All Application**

Dear Administrator Regan:

ReVision Energy, an employee owned, certified B Corporation solar company in New England, would like to share our strong support for the State of Maine's Solar for All grant application, submitted by the Maine Governor's Energy Office. As a member of Maine's growing clean energy industry whose mission is quite literally to make life better by building our just and equitable electric future, we are strong supporters of the state submitting a thoughtful, competitive application to the Environmental Protection Agency's Solar for All Program within the Greenhouse Gas Reduction Fund given the immense opportunity to bring the benefits of clean energy to low-income Mainers.

To democratize the clean energy transition, ReVision Energy is proactively helping low- to moderate-income and environmental justice communities gain access to solar energy, heat pumps, battery storage, and electric vehicle charging stations. Our work includes proactively securing every possible funding and financing opportunity to reduce the barrier of up-front installation costs through both public and private entities. We have installed solar projects low-income multi-family housing, manufactured home communities, and other community solar installations for the purposes of serving marginalized populations. Additionally, we are an active member of Amicus Solar, a member-owned purchasing cooperative of nearly 80 high-quality, independent, values-driven solar energy companies. This network has actively advocated for policy mechanisms to serve low-income communities at the federal level and is currently working to develop a model for our companies to take full advantage of the Inflation Reduction Act's updates to the Investment Tax Credit to ultimately bring more and more low-income Americans the benefits of clean energy. We believe this experience, and our track record in building both residential and small-scale commercial distributed generation here in Maine, can help serve the state in its implementation of Solar for All funding and the multiple thoughtful avenues the application features, from the residential direct ownership channel to the multifamily housing programs to the cooperative ownership community solar.

Additionally, we support Maine's application given its focus on workforce development. In 2018, ReVision Energy launched the first ever in-house electrical apprenticeship program and full Training Center here in our home state of Maine to address the need for qualified workforce to implement clean energy solutions. Recently, we have added pre-apprenticeship programs to our offerings, including specific training modules for New Mainers. All programming is closely aligned with our justice and equity values, ensuring compensation throughout the work-and-learn program to provide on-the-job technical training to complement both the professional and personal lives of our apprentices. We appreciate and strongly support Maine's application's focus in investing in workforce and entrepreneurship opportunities and we hope our experience can assist in the meaningful deployment of funding.



Overall, we believe the Maine Governor's Energy Office has demonstrated experience in deploying technical and financial assistance for solar technology, and the state will successfully deliver meaningful benefits to underserved communities through Solar for All funding. We thank the Agency for the opportunity to offer this letter of support, and we respectfully request full support of Maine's application. Thank you.

Sincerely,

Lindsay L. Bourgoine
Director, Policy & Government Affairs
ReVision Energy

Sundog Solar LLC
P.O. Box 465
222 East Main St.
Searsport, ME 04974

**SUNDOG SOLAR**™

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Sundog Solar's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

May 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Sundog Solar for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition.  Sundog Solar encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Sundog Solar and our dedicated company of 30 employees have been operating out of Midcoast Maine since 2009.  We offer photovoltaic, energy storage, heat pump and EV charging technologies, turnkey developments and installations to residential and commercial customers.  Our company is thrilled for this opportunity to present itself to the state of Maine and its residents. We've experienced from our inception, the political dispute against "net energy billing" mainly being for the financial burden it puts on low-income individuals and households.  This funding opportunity is a substantial bridge to that existing gap, providing the necessary funds needed to deploy solar energy for all.

Sundog Solar aligns to support *Solar for All* by delivering meaningful and valuable benefits to low income households as we do with each and every project we install, through clear energy savings, quality partnership in program delivery and financing opportunities.  We are excited to maximize solar deployment in Maine and ensure equitable access and participation through partnerships with community-based organizations.  We anticipate providing outreach support, responsive to the needs of diverse communities and overcoming market barriers through technical assistance, permitting, interconnection, and community education.

Sundog Solar appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities here in Maine!

Sincerely,

Danny Piper
Principal Owner
Sundog Solar



417 5th Avenue
Suite 803
New York, NY 10016

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: UGE's Support for Maine Governor's Energy Office Application in Response to *Solar for All*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6th, 2023

Dear Administrator Regain:

Please accept this letter of support on behalf of UGE for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. UGE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

UGE is working to make renewable affordable and accessible for all by developing, owning, and operating community solar projects. Strengthening renewable energy equity is one of UGE's guiding goals; our stated target is for more than 25% of the energy off-take from our operational portfolio to serve Low-to-Moderate Income households by 2026.

Among states with active community solar programs, Maine has the second lowest average annual income. This, coupled with the fact that Maine residents pay some of the highest electricity costs in the nation means that arguably, Low-to-Moderate income Mainers stand to benefit most from the energy cost savings brought by shared community solar. Already UGE has been partnering with Maine environmental organizations, schools, and municipalities including the Center for an Ecology-Based Economy, the Town of Norway, and Foxcroft Academy to ensure equitable access and participation in the economic benefits brought by our shared solar projects. The Solar for All program will help UGE and other energy equity-focused solar developers expand our work bringing cleaner, cheaper energy to those who need it most in the State of Maine.

UGE appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tyler Adkins
*Chief Revenue Officer*



Attachment L



STATE OF MAINE
OFFICE OF THE GOVERNOR
1 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0001

Janet T. Mills
GOVERNOR

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Dear Administrator Regan:

The State of Maine, through the Governor's Energy Office, is proud to submit this application for the Environmental Protection Agency's *Solar for All* competition, an historic investment through the Inflation Reduction Act to ensure our most vulnerable populations benefit from the deployment of solar energy.

My administration has prioritized the fight against climate change in Maine through actions to reduce carbon emissions, transition to renewable energy, and ensure Maine communities are resilient to the increasingly volatile effects of climate change. As co-chair of the United States Climate Alliance, I have proudly stood alongside our bipartisan coalition of 25 governors securing America's net-zero future by advancing state-led, high-impact climate action. Maine's bold leadership in deploying clean energy technologies reduces harmful greenhouse gas emissions and also directly addresses our state and region's longstanding overreliance on fossil fuels, which drive the high costs that have burdened Maine households and businesses, and especially our most vulnerable, for too long.

Earlier this year, recognizing our significant progress to date – including leading the nation in deployment of efficient heat pumps and solar energy, I announced a new accelerated goal of 100% clean energy by 2040. Importantly, as we work to implement these critical objectives, funding through *Solar for All* will help ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most: low-income and disadvantaged homeowners and renters, who often face the most challenging energy burdens. Indeed, Maine households face the second highest average energy burden of any state in the country. As we continue our steadfast and urgent work to reduce fossil fuel dependence – including for the 58% of Maine households that use costly delivered fuel oil as their primary home heating source, compared to a national average of 4% – we must also facilitate the increased availability of affordable, reliable electricity.

*Solar for All* funds have the opportunity to transform solar and storage deployment in Maine by overcoming significant barriers to accessing clean energy technologies for low-income and disadvantaged communities. Tens of thousands of Maine households will benefit directly from cost savings and resilience improvements, and every Maine household and business will see the beneficial effects of new, cost-effective clean energy. Furthermore, these funds will help accelerate the pace of deployment by bringing new job training resources, especially for rural and underserved populations, who will benefit from new opportunities for good jobs in clean energy careers.



PRINTED ON RECYCLED PAPER

Maine has demonstrated that we won't wait to fight climate change and bring the benefits of clean energy to our entire state. By fully funding Maine's application for *Solar for All*, these historic investments of the Inflation Reduction Act are well spent. I am grateful for the leadership of the Environmental Protection Agency in administering these Greenhouse Gas Reduction Funds and appreciate the consideration of Maine's application.

Sincerely,

Janet T. Mills

Governor



PRINTED ON RECYCLED PAPER



**Office of the Chief and Council**
Kirk E. Francis
*Chief*
Mark Sockbeson
*Vice-Chief*
Maulian Dana
*Tribal Ambassador*

**Penobscot Nation**
12 Wabanaki Way
Indian Island, Maine 04468
Phone: (207) 817-7349
Fax: (207) 827-6042

October 11, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office *Solar for All* Application, in response to Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support for the application submitted by the Governor's Energy Office for the U.S. Environmental Protection Agency's (EPA) *Solar for All* competition.

The Penobscot Nation submitted a Notice of Intent to apply for Award Option #2 of the *Solar for All* program. Unfortunately, the amount of time needed to complete the required documentation to form a Tribal Consortium has made it infeasible to submit a full application by the deadline. The Penobscot Nation was recently awarded federal grant funding through the United States Department of Energy to enable the deployment of approximately 1.3 megawatts of solar on tribal government buildings at Indian Island, the home of the Penobscot Nation. We have additional work underway to prepare to deploy up to 800 residential solar projects and energy storage on Indian Island. This, in essence, was the project we intended to propose within *Solar for All*.

Given this change of plan, the Governor's Energy Office has incorporated language into the State of Maine's application to consider working with one or more Tribes to deploy a portion of the State's award to support Tribal solar and storage projects. The State's application also emphasizes the opportunity to coordinate, where appropriate, with the Penobscot Nation on workforce development, technical assistance, and other programmatic activities. This is an important opportunity to work collaboratively to ensure the benefits of solar and energy storage are accessible to those who stand to benefit the most – low-income, disadvantaged, and historically marginalized homeowners, renters, and communities who often face the highest energy burden.

I appreciate the EPA's leadership and encourage the EPA to fully fund the State of Maine's application.

Kind regards,

**Michael Burgess, J.D.**
*Economic and Community Development Director*
Penobscot Indian Nation
Cell: 207-881-3333
12 Wabanaki Way, Indian Island ME 04468
Web: www.penobscotnation.org
Email: mburgess@penobscotnation.org



STATE OF MAINE
**GOVERNOR'S OFFICE OF POLICY INNOVATION AND THE FUTURE**
**181 STATE HOUSE STATION**
**AUGUSTA, MAINE**
**04333-0181**

October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

**Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01**

Administrator Regan,

Please accept this letter of support from the Maine Governor's Office of Policy Innovation and the Future (GOPIF) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. GOPIF encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Governor's Office of Policy Innovation and the Future fosters collaboration across state government to help solve Maine's most important long-term challenges utilizing data-driven, innovative policy solutions. Combating climate change and encouraging clean energy policy are among Governor Mills' top priorities. GOPIF coordinates the work of the Maine Climate Council and collaborates with other state agencies, including the Governor's Energy Office, and key stakeholders on policy issues related to climate and energy. Additionally, and relevant to this proposal, GOPIF administers the Community Resilience Partnership, a program that assists municipal and tribal communities to reduce carbon emissions, transition to clean energy, and become more resilient to climate change effects through grants and direct support.

In cooperation with the Governor's Energy Office, GOPIF anticipates that the Community Resilience Partnership can be a vehicle for delivering technical assistance and financial support to communities in support of Maine's *Solar for All* goals in the following ways:

1. Making grants to priority communities for activities related to solar permitting and siting, stretch building codes and ordinances, and professional development for code enforcement staff.
2. Hosting facilitating training opportunities for community officials, planners, permitters, code enforcement staff, and volunteer committee/commission members.
3. Encouraging the use of tools like model ordinances and DOE's Solar+App.

GOPIF appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Brian Ambrette
Senior Climate Resilience Coordinator

STATE OF MAINE
PUBLIC UTILITIES COMMISSION

Philip L. Bartlett, II
CHAIRMAN

Patrick Scully
Carolyn C. Gilbert
COMMISSIONERS

Harry Lanphear
ADMINISTRATIVE DIRECTOR

October 5, 2023

The Honorable Michael Regan Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Public Utilities Commission's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Public Utilities Commission (Commission) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition.

The Commission strongly encourages the EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Commission anticipates supporting the Solar for All effort primarily through assisting solar projects with interconnecting to Maine's grid. Specifically, this past legislative session, Public Law 2023, chapter 307, provides for an Ombudsman position at the Commission to assist solar developers with interconnection challenges. This legislation allows for funding to be provided through grants as well as fees to the project developers. Funding the Ombudsman through the Solar for All program will deliver meaningful benefits to all Mainers by reducing barriers, thereby maximizing solar development equitably throughout Maine, particularly in low income and diverse communities.

The Commission appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Philip L. Bartlett II
Chair

Cc:  Harry Lanphear, Administrative Director



State of Maine
**Office of the Public Advocate**
112 State House Station, Augusta, Maine 04333-0112
(207) 624-3687 (voice) 711 (TTY)
www.Maine.gov/meopa

Janet T. Mills
GOVERNOR

William S. Harwood
PUBLIC ADVOCATE

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Maine Office of the Public Advocate's Support for Maine Governor's Energy
Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-
SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Office of the Public Advocate
(MEOPA) for the application submitted by the Maine Governor's Energy Office for the
*Solar for All* competition. MEOPA encourages EPA to fully award Maine's application and
anticipates supporting the deployment of awarded funds to achieve EPA's objectives by
enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

MEOPA's primary responsibility is to represent the interests of Maine utility consumers. As
set forth in our authorizing statute, 35-A M.R.S. § 1702 our attorneys advocate in legislative,
regulatory and court proceedings for rates, services, and practices, that benefit utility
customers. Most of our regulatory work takes place in proceedings before the Maine Public
Utilities Commission.

MEOPA supports GEO's efforts to expand the benefits of solar energy to low-income and
disadvantaged households. For too long, low-income and disadvantaged communities have
not benefited equitably from certain clean energy investments. We look forward to
partnering in the Solar for All program to be sure that all citizens can equitably and fairly
enjoy the benefits of cost-effective solar development programs.

The Maine Office of the Public Advocate appreciates EPA's leadership in deploying the
*Solar for All* program and looks forward to the transformative impact these funds will have
for low-income and disadvantaged communities in Maine.

Sincerely,

*William S. Harwood*

William S. Harwood
Maine Public Advocate



**MAINE MUNICIPAL**
**ASSOCIATION SINCE 1936**

60 Community Drive | Augusta, ME 04330-9486
1-800-452-8786 (in state) | (t) 207-623-8428
(f) 207-624-0129

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North, Washington, DC 20460

Re: Maine Municipal Association's the Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Thursday, October 5, 2023

Dear Administrator Regan,

Please accept this letter as the Maine Municipal Association's (MMA) support for the Solar for All funding application being submitted by the Governor's Energy Office.

Under Governor Janet Mills' leadership, Maine has been on the forefront of promoting and implementing the changes necessary to achieve climate resiliency. The protection of our heritage resources and tourist industries, which serve as the foundation of our economic vitality, is of utmost importance, as is ensuring that all Maine residents can afford to comfortably live in their homes. It is for this reason that municipal leaders believe the funds available under the Solar of All program will be well invested by the Mills Administration and used to support and implement federal level solar energy objectives.

As a membership organization that represents the interests of 484 Maine towns and cities, the provision of quality and affordable services to all Maine residents is a top priority for the Association. However, far too often the funding for needed services falls disproportionately on the property tax, in turn placing additional burdens on low-income households that are already dealing with increasing rental, grocery, and utility costs. As a result, the luxury of implementing efficient energy solutions is far out of reach for the 30,000 disadvantaged households expected to benefit under this program.

To put a finer point on the issue, the Solar for All program provides an opportunity for Maine towns and cities to partner with the GEO to deliver much needed energy savings programs to vulnerable Maine families. A program of this nature will help move many deserving households up the "hierarchy of needs" pyramid, while advancing federal and state policy initiatives and goals.

MMA appreciates EPA's leadership on this issue and looks forward to experiencing the positive impacts these funds will have on Maine communities.

Sincerely,

Catherine M. Conlow
Executive Director
Maine Municipal Association

**Mayor and Council Offices**

Kate Snyder
*Mayor*

October 4, 2023



---

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of Portland for the application submitted by
the Maine Governor's Energy Office for the Solar for All competition. The City of Portland
encourages EPA to fully award Maine's application and anticipates supporting the deployment of
awarded funds to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Our City has ambitious climate action goals, as well as a commitment to help low-income and
marginalized communities fully participate in the transition to clean energy.  For example, our
successful Electrify Bikes! Program helps low- and moderate-income residents purchase e-bikes.
In early 2024, we will launch DIY Electrify!, which will help LMI residents purchase energy-efficient
electric appliances such as induction cooktops and home weatherization kits.

We continue to explore ways to help LMI residents install solar projects or participate in
cost-effective community solar projects.  Our staff has been engaged with community partners,
housing providers, and agencies like the Governor's Energy Office to identify and overcome barriers
to adoption. The addition of financial and technical assistance funded by Solar For All would help
take our efforts to advance equitable access to solar energy to the next level.

The City of Portland appreciates EPA's leadership in deploying the Solar for All program and looks
forward to the transformative impact these funds will have for low-income and disadvantaged
communities in Maine.

Sincerely,

Kate Snyder
Mayor



**SUSTAINABILITY OFFICE**

JULIE A. ROSENBACH
Sustainability Director

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The City of South Portland's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 3, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the City of South Portland for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The City of South Portland encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

In 2020, the City of South Portland adopted a joint climate action and adaptation plan with the City of Portland, called *One Climate Future*. The plan has 68 strategies designed to help us achieve our goal of reducing greenhouse gas emissions 80% by 2050. This is in line with the state's *Maine Won't Wait* plan.

The core approach of *One Climate Future* is beneficial electrification coupled with renewable electricity. One of our key milestones is to install 50MW of solar in the cities by 2030 and 245MW by 2050. This goal is based on an analysis GridSolar completed in 2020 of rooftops in the Greater Portland area to estimate the cities' maximum capacity for solar generation. The study found that Portland and South Portland could collectively accommodate 375MW of rooftop solar. In reality, it would be very difficult to meet this maximum build-out because not all building owners will install solar for a variety reasons. Nevertheless, the GridSolar study offers proof that a significant supply of rooftop solar can be locally sourced.

Our *One Climate Future* plan also emphasizes equity. We know that reducing greenhouse gas emissions in not enough. Our goal is reduce emissions in a way that helps everyone in our community thrive. The City of South Portland supports *Solar for All* because it will help us deliver meaningful benefits – energy savings, financing and program delivery, and high-quality jobs – to low-income and disadvantaged households. It will help us ensure equitable access and participation in solar programs by supporting partnerships with community-based organizations and outreach that is responsive to the needs of diverse communities.

The City of South Portland appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Julie Rosenbach
Sustainability Director



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Support for the Maine Governor's Energy Office *Solar for All* Application (EPA-R-HQ-SFA-23-01)

Dear Administrator Regan:

I am writing in support of the Maine Governor's Energy Office application in the *Solar for All* competition. This grant could make a long-term difference in energy affordability for an estimated 30,000 low income and disadvantaged Mainers.

Low income, disadvantaged, socially vulnerable – Maine has it all. In fact, nearly half of Maine people live in disadvantaged Census tracts. Here is Rockland, with a Census tract that meets the federal definition of disadvantaged -- *average energy cost is in the 95% percentile* -- underscoring the need for creative solutions like the one proposed by the in Maine's application.

When you consider Maine is the grayest state in the nation, and Rockland is in one of the grayest areas with low incomes, sharp decreases in home affordability and increases in energy costs – we have a very vulnerable community and economy. This includes seniors struggling financially to remain in their homes, and businesses struggling to find and retain workers who can afford to live here.

Maine has been proactive with solar, including legislative action that spurred a dramatic increase in solar development, with associated benefits of energy savings and high-quality jobs. There remain, however, serious market barriers to residential solar -- barriers that this grant could effectively address.

Rockland stands ready to assist the State with outreach to ensure equitable access and participation in *Solar for All*. Our *Recharge Rockland* outreach program is specifically focused on helping our local community learn about incentives and assistance related to energy efficiency and renewable energy, and to increase uptake of those opportunities. We welcome the opportunity to support the State in its efforts to provide more equitable access to residential solar opportunities.

Thank you for considering the Maine proposal.

Sincerely,

Julie Hashem
Community Development Director

Cc Ethan Tremblay, Governor's Energy Office

City of Rockland • 270 Pleasant Street • Rockland, ME 04841 • www.rocklandmaine.gov



September 29, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Coastal Enterprises, Inc. (CEI)'s Support for Maine Governor's Energy Office Application in
Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of CEI for the application submitted by the Maine
Governor's Energy Office for the *Solar for All* competition. CEI encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by
enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged
households across Maine.

**Background and Focus on People and Communities with Low Incomes**
Coastal Enterprises, Inc. (CEI) is a nonprofit 501(c)(3) community development financial institution
(CDFI) founded in 1977. We work to build a just, vibrant and climate-resilient future for people and
communities in Maine and rural regions. We do this by integrating finance, business expertise and policy
solutions in ways that make the economy work more equitably.

CEI's goal is to help low-income people and communities build assets as we link development finance to
workforce, entrepreneurship, sustainable development, and policy development. We have a long history
of innovation, commitment to rural economic development, sector development strategies, an ability to
achieve impact for people and communities with low incomes, assistance to women business owners,
support for refugees, new immigrants and people of color, and creative public and private financing
mechanisms to meet our goals. Our Board of Directors consists of 20 community-based members and
our 65-member staff are experts in business advising and financing, workforce and financial
development, and industries including aquaculture, farming, child care, food, and renewable energy.

As a mission-driven investor, CEI supports the growth and expansion of the green businesses that we
finance and advise, including energy efficiency and renewable energy companies, sustainable farms and
food systems, and local fishing industries and aquaculturists. In addition, we strive to help all companies
in our portfolio identify ways to improve their environmental sustainability and implement green
business practices.

**Developing and Financing *Solar for All* Qualified Projects**
CEI has a decade-long record of providing flexible solar financing to small businesses, municipalities,
community facilities, and community solar projects and we anticipate deploying funds through each of
the Greenhouse Gas Reduction Fund pools, including: Solar for All, National Clean Investment Fund, and
Clean Communities Investment Accelerator. Over the past decade, we have financed 48 solar deals



across Maine and New England, resulting in 30MW of developed projects, with $25.6MM directly invested by CEI and $46.3MM additionally leveraged through bank and peer CDFI participations.

These projects benefit small businesses, municipalities, schools, and non-profits, including dairy farms, auto mechanic shops, art galleries and hockey rinks. We recognized early on that solar investments were an area where we could lend direct support to businesses and others looking to 'green' their operations. We developed a straightforward and flexible loan product, where solar equipment is typically the only required collateral – an unusual characteristic for a standard business loan. This reduced collateral requirement gives the borrower additional flexibility and allows us to be more flexible as well during underwriting.

As we have worked with new and existing borrowers to add solar to their operations, we remain committed to expanding access to solar in Maine. However, there are several challenges that small business owners face when considering installing solar on their companies.

The greatest challenge is the continued perception that solar is too expensive, particularly for the low-income and rural communities that we work in. We know from previous experience and borrower feedback that many are interested in solar power but have felt it was unattainable due to cost. While the installation and material cost of solar has decreased over the last decade, solar projects still represent a significant upfront investment for small businesses, especially those who cannot take advantage of the solar investment tax credit due to a low, or nonexistent, federal tax liability. As we underwrite these loans, we try to make the upfront savings from the solar installations equal to the monthly debt service payments on the loan. This can make the choice to go solar a cash flow neutral decision, which can lower this barrier for small business owners.

We also provide free technical assistance to borrowers who are interested in solar, where we walk through the installation process, provide references to reputable solar installers in the area, and overview the federal solar investment tax credit and the USDA Rural Energy for America (REAP) grant program, if applicable. We believe deepening this technical assistance and being more proactive in our outreach and education efforts around solar will provide a large benefit to our communities. We have already heard from multiple borrowers and prospective clients that they would welcome a structured webinar or information session about solar, as it can be difficult to know where to start.

Finally, it is important to acknowledge that the people and communities that are most impacted by climate change should not bear the financial burden of solving a climate crisis they did not cause. CEI uses equity as a driving lens of our work to ensure these communities benefit as the clean energy transition gains momentum. Over the past three years, we have financed 60% of our solar projects in federally designated economic development areas and 40% of our loans were to low-income borrowers or to projects that benefited low-and moderate-income users. Securing additional funding support to lower our interest rate will play a critical role in helping us deploy financing that will increase solar power in communities that stand to benefit the most.

**Type of Funding Projected**
CEI estimates that it could deploy up to $5 million in Solar for All funds in community solar projects in Maine, supporting 5MW of clean energy. We also anticipate requesting a maximum CCIA capitalization

award of $10 million and a technical assistance grant of $1 million. CEI anticipates borrowing additional capital through the National Clean Investment Fund (NCIF) to support its clean energy and greenhouse gas reduction financing. Low or no cost debt with terms of 10-15 years will be most useful. In addition to our current solar buydown loan product and community solar financing, we will develop a microenterprise heat pump loan product for small businesses. We are currently developing a product to maximize the benefits of the direct pay tax provision in the Inflation Reduction Act. CCIA funds could be a valuable capitalization source for that product.

**CEI's Clean Energy Financing Projections**
CEI's baseline 5-year projection is for the financing of 50-100 solar installations on small businesses and for community solar projects in rural Maine. This equates to roughly $7.5 million in total financing and 1.5-3MW of generation. In addition, we anticipate developing a specialized heat pump loan product for small businesses, modeled on our solar loan product. With the proper mix of capital and subsidy, including CCIA, NCIF, and Solar for All, this impact could be scaled up 3-5X and potentially regionally.

CEI appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Keith Bisson

President
Email: Keith.Bisson@ceimaine.org
Phone: 207-522-8764



October 9, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

**Subject:** Efficiency Maine Trust Support for Maine Governor's Energy Office Application in Response to
*Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Efficiency Maine Trust ("Efficiency Maine") for the
application submitted by the Maine Governor's Energy Office (GEO) for the *Solar for All* competition.
Efficiency Maine encourages EPA to fully award Maine's application and anticipates supporting the
deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit
approximately 30,000 low-income and disadvantaged households across Maine.

Efficiency Maine is the independent, quasi-state agency established in 2010 by the Maine Legislature to
plan and implement energy efficiency and alternative energy programs in Maine. Through its suite of
nationally recognized programs, Efficiency Maine administers initiatives to promote high-efficiency
equipment and clean energy to help Maine's homes, businesses, and institutions reduce their energy
costs and lower their greenhouse gas emissions. The Maine Legislature has established goals for
Efficiency Maine pertaining to promoting the installation and use of heat pumps and electric vehicles
(EVs), and has authorized Efficiency Maine to promote further use of energy storage, such as batteries,
to help manage electricity demand and balance renewable energy generation. To advance these goals,
the Maine Legislature has authorized Efficiency Maine to offer a variety of financing products, resulting
in a growing role for the Efficiency Maine Green Bank.

A core element of all Efficiency Maine programs is delivering benefits from energy efficiency and clean
energy to Maine's low-income and moderate-income households. Our programs offer consumer
outreach, enhanced (and instantaneous) rebates, and lease-to-own offerings to help low-income
consumers access the benefits of heat pumps, heat pump water heaters, EVs, and other clean energy
products. In the past year, approximately 850 heat pumps and 900 heat pump water heaters were
installed in low- and moderate-income homes through our programs. Partnering with the GEO initiative
to help deploy the *Solar for All* funds in Maine offers the possibility of using synergies between the GEO

initiative and Efficiency Maine's incentive programs to help Maine's most vulnerable consumers and advance the State's climate action plan.

Efficiency Maine looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine and working with GEO to make that impact a reality.

Sincerely,

_____
Michael D. Stoddard
Executive Director

# Genesis
## COMMUNITY LOAN FUND

The Honorable Michael Regan
Environmental Protection Agency 1200
Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: The Genesis Fund's Support for Maine Governor's Energy Office Application in
Response to *Solar For All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Genesis Fund for the application submitted
by the Maine Governor's Energy Office (Maine GEO) for the *Solar for All* competition. The
Genesis Fund encourages EPA to fully award Maine's application and anticipates supporting the
deployment of funds awarded to achieve the EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

The Genesis Fund is a nonprofit Community Development Financial Institution (CDFI) that
connects communities creating affordable housing and other essential community resources
with the capital and expertise they need to overcome barriers to opportunity and prosperity.
Genesis works throughout Maine and Northern New England to make flexible loans, deliver
expert project guidance, and promote policy solutions and systemic change. For over 31 years,
the Genesis Fund has delivered meaningful benefits to low-income and disadvantaged
households and we would be pleased to deepen our impact in partnership with Maine GEO
through the deployment of *Solar for All* resources.

A priority for the Genesis Fund has been to go where other sources of capital and technical
assistance won't. In our 31-year history, this strategic focus has resulted in lending more than
$96 million and supporting over 400 community development projects. Genesis lending and
technical assistance have helped bring families out of poverty, created safe affordable homes,
and brought health clinics, job training centers, recovery homes, and other community facilities
to rural towns not otherwise served by conventional financing.

Genesis aims to continue this track record with partners and communities across rural Maine in
helping to deploy *Solar for All* resources to effectively reduce carbon emissions and energy
costs for low-income and disadvantaged households.

clean energy adoption can lower costs for owners of multifamily properties and their low-income tenants. Second, by delivering technical assistance, Genesis will help owners and project developers of multi-family properties understand clean energy technology and access funding resources. Employing (and funding) models that use solar PV leasing and/or group purchase alike, the Genesis Fund will aim to prove the model in rural areas. In addition, we anticipate leveraging our 10+ year experience financing resident-owned communities (mobile home parks in which residents buy the land underneath their units) to assist in financing on-site community solar arrays for low- and moderate-income owners of mobile homes.

The Genesis Fund raises capital from a variety of partners, all of whom invest in Genesis because of our mission and our track record of improving lives. Working in EPA Region 1, our work to lower barriers for disadvantaged households results in secure, safe, healthy affordable homes that operate cost effectively. In Maine, energy costs combined with long winters and a preponderance of substandard housing stock create significant cost hurdles and real danger for lower income residents. Integrating investments from *Solar For All* coupled with technical assistance will significantly reduce this danger along with financial burden for low-income households.

Beginning three years ago, the Genesis Fund set a strategic goal to explore how best to increase focus on sustainability and movement away from fossil fuel dependence in our lending. Collaborating with other partners, we are increasingly employing resilience and sustainability lenses to our underwriting and seeking ways to directly connect low income households to clean energy resources. We have begun actively participating in clean energy policy efforts and local initiatives to convert the 80% dependence on home heating oil in northern New England. We are pleased to deepen our partnership with Maine GEO.

The Genesis Fund appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine. Please do not hesitate to contact me with any questions.

Sincerely,

*Liza Fleming-Ives*
*Executive Director*
*The Genesis Fund*
*207-844-2035*
*liza@genesisfund.org*



October 5, 2023

The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

RE: MaineHousing's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of MaineHousing for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition.  MaineHousing encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantages households across Maine.

MaineHousing is the State of Maine's Housing Finance Agency. MaineHousing has been helping Maine people own, rent, repair, and heat their homes since 1969. We are an independent state authority created to address the problems of unsafe, unsuitable, overcrowded, and unaffordable housing.  We issue tax-exempt and taxable housing bonds, serve as the State of Maine's Low Income Housing Tax Credit allocating agency, and also provide additional state and federal resources as non-paying subsidy loans for the creation of affordable multifamily rental housing. With very few exceptions, the housing financed by MaineHousing serves individuals and families designated as extremely low income, very low income, and low income – ranging from those experiencing homelessness up to those making 60% of the Area Median Income.

MaineHousing has been working with the Maine Governor's Energy Office in designing a portion of the plan for *Solar for All* to benefit Maine's low income and disadvantaged residents by adding solar to as many of the planned rehabilitation of 750 units of public housing as possible.  MaineHousing hopes to finance the conversion of this outdated, unhealthy, and inefficient public housing to rent restricted multifamily Low Income Housing Tax Credit properties that will reduce and avoid Greenhouse Gas Emissions; drive additional impacts of energy savings, wealth creation, health benefits, and broadened access to opportunity to low income residents; transform private credit markets so that they understand, adopt, and scale financial products that reduce the cost of clean technologies and drive broader market adoption; and inform national and state policy to more effectively target solutions to support the low-carbon transition in low income and disadvantaged communities. The addition of *Solar for All* funding will be matched by the projected $175 million investment in rehabilitation and energy efficiency improvements that will be made to these properties.

MaineHousing appreciates EPA's leadership in deploying *Solar for All* and looks forward to the transformative impact these funds will have for low income and disadvantaged communities in Maine.

Sincerely,

Daniel E. Brennan
Director



Monday, October 02, 2023

5301 Central Ave.
St. Petersburg, FL 33710
**climatefirstbank.com**

Solar for All Grant Committee
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
1200 Pennsylvania Avenue, N. W.
Washington, DC 20460

**Re: Support for the Maine Governor's Energy Office Solar for All Application**

Dear Grant Review Committee:

I am writing to express our support for the Solar for All grant application submitted by the Maine Governor's Energy Office.  We endorse this application as a partner interested in providing private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects and assisting in the project deployment technical assistance plan.

Climate First Bancorp is the bank holding company for Climate First Bank, an FDIC-insured community bank with a mission to provide environmentally and socially impactful lending. Along with the Bank, Climate First Bancorp has a controlling interest in OneEthos, a minority-led, mission-driven technology company focused on providing digital, capacity and market-building solutions to financial institutions that are traditionally underserved by technology such as community banks, CDFIs, credit unions, and green banks. OneEthos is one of the few financial technology companies in the nation that is regulated by the Federal Reserve Bank. The Bancorp, Bank, and OneEthos are Certified B Corps and registered as state benefit corporations.

Climate First Bank's leadership team has extensive experience deploying affordable solar financing at scale, while demonstrating that financial excellence can occur without ethical compromise. Ken LaRoe, CEO and Founder pioneered solar lending in Florida at First Green Bank, the very first bank in the eastern United States with an environmental and social mission. Mr. LaRoe was the CEO and Founder of First Green Bank and Florida Choice Bank prior to starting Climate First Bank.

With the support of the fully digitized solar lending platform developed by OneEthos and a network of 200 solar installers, the Climate First Bank has generated and processed over $140 million in residential rooftop solar applications over the last 16 months. Our digital platform enables customer outreach, education, and financing at point-of-sale from a vetted network of solar contractors, including minority-owned, veteran-owned, woman-owned, and Business Enterprise Certified solar installers. Approximately 35% of the loans originated are currently located in CDFI investment areas. We believe we can do far more with the support of incentives from the Greenhouse Gas Reduction Fund.

Sincerely,

Marcio deOliveira
EVP, Chief Digital Banking Officer
marcio.deoliveira@climatefirstbank.com
(727) 335-0523

STATE OF MAINE
DEPARTMENT OF LABOR
BUREAU OF EMPLOYMENT SERVICES
55 STATE HOUSE STATION
AUGUSTA, MAINE  04333-0055

JANET T. MILLS
GOVERNOR

LAURA A. FORTMAN
COMMISSIONER

October 12, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Maine Department of Labor's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Department of Labor (MDOL) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The Maine Department of Labor encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Maine Department of Labor is committed to advancing high-quality job opportunities for Maine workers and businesses by helping employers recruit and train a talented workforce, providing workers with the skills they need to be competitive in the economy through models such as registered apprenticeship, and ensuring safe and fair workplaces for people on the job.

MDOL's Maine Apprenticeship Program connects union and non-union employers with training providers to design registered apprenticeship and certified pre-apprenticeship opportunities—including nearly 1,000 current apprentices in clean energy occupations.  Through MDOL's Maine Apprenticeship Program, CareerCenters, community workforce partners, and Bureau of Labor Standards, we anticipate supporting *Solar for All* by:

1. Maximizing equitable access to solar deployment among diverse communities via partnerships with regional CareerCenters, workforce partners, and community-based organizations.
2. Creating and expanding registered apprenticeship and certified pre-apprenticeship opportunities that support workforce development in clean energy, especially within our priority communities of women, people of color, people with disabilities, and justice involved individuals.
3. Supporting employers through outreach and education to comply with and monitor labor standards to ensure this opportunity translates to high-quality job opportunities.
4. Continuing monthly meetings between the Maine Apprenticeship Program and Governor's Energy Office on combined efforts in registered apprenticeship and clean energy projects.

PHONE: (207) 623-7981          TTY users call Maine Relay 711          FAX: (207) 287-5933
The Maine Department of Labor provides equal opportunity in employment and programs.
Auxiliary aids and services are available upon request to individuals with disabilities.

The Maine Department of Labor appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.


Sincerely,


Laura A. Fortman
Commissioner, Maine Department of Labor



STATE OF MAINE
GOVERNOR'S ENERGY OFFICE
62 STATE HOUSE STATION
AUGUSTA, MAINE

DAN BURGESS, DIRECTOR

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01
October 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Clean Energy Partnership program (CEP) for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Clean Energy Partnership program encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The State of Maine Governor's Energy Office established the Clean Energy Partnership program to support the growth of the clean energy economy in Maine through workforce development and innovation. In December 2022, the Clean Energy Partnership awarded clean energy workforce development grant funding to nine entities, leading to the engagement of over 2,000 Mainers in the first year of program operations. These projects have demonstrated results included attracting new workers to the clean energy and energy efficiency workforce, providing career training and upskilling opportunities to existing workers, increasing diversity and representation in the clean energy workforce, and creating and expanding clean energy apprenticeship, pre-apprenticeship, and internship models to facilitate entry into rewarding and high-paying jobs.

The CEP is committed to delivering meaningful benefits to low-income, disadvantaged, and underrepresented Mainers and embedding Good Jobs Principles in Maine's clean energy workforce development approach. If awarded, Solar for All will provide needed resources to expand CEP's work and address barriers related to solar workforce development. The CEP appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tagwongo Obomsawin
Clean Energy Partnership Program Manager



**Maine Community College System**

**OFFICE OF THE PRESIDENT**
323 State Street, Augusta, ME 04330-7131
(207) 629-4000 | Fax (207) 629-4048 | mccs.me.edu

**David Daigler**
President

October 1, 2022

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity
Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Community College System for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. The Maine Community College System encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine's Community Colleges are dedicated to educating today's students for tomorrow's career opportunities in an environment that supports personal and professional growth, innovation, and lifelong learning. The Maine Community College System is a leader in the State's workforce development system and has made significant investments in clean energy and related workforce programming during the past 10-15 years, including in electric vehicle maintenance, heat pump installation and repair, and solar installation.

Maine Community Colleges supports this initiative by providing Mainers with access to highly skilled training leading to industry-recognized certifications in solar installation.  These training and certifications improve our residents' economic well-being by providing pathways to new careers, incumbent employee upskilling, or opportunities for career changes.  Meeting solar deployment goals requires a highly skilled workforce with the required training to install and service the solar arrays.  Additionally, Maine requires critical mass in terms of highly trained individuals.  Our efforts support increasing the number of certified solar installers/technicians across the state.

The Maine Community College System appreciates EPA's leadership in deploying the *Solar for All* program; I am looking forward to the transformative impact these funds will have on Maine's low-income and disadvantaged communities.

Sincerely,

Central Maine
Community College
Auburn
cmcc.edu

Eastern Maine
Community College
Bangor
emcc.edu

Kennebec Valley
Community College
Fairfield/Hinckley
kvcc.edu

Northern Maine
Community College
Presque Isle
nmcc.edu

Southern Maine
Community College
South Portland/
Brunswick
smccme.edu

Washington County
Community College
Calais
wccc.me.edu

York County
Community College
Wells
yccc.edu



Maine Labor Climate Council
Portland, ME
October 7th, 2023

Environmental Protection Agency
Washington, DC

RE: Solar for All Letter of Support for Maine Governor's Energy Office

To whom it may concern,

Maine Labor Climate Council is a coalition of labor unions united in our mission of tackling the climate crisis while reversing economic and racial inequality. MLCC shares in the Maine Governor's Energy Office's (GEO) vision for a greener, more equitable future. With this letter MLCC wishes to convey our support for GEO's commitment to ensuring equitable allocation to low income and disadvantaged communities of the opportunities and benefits of union partnership and leadership in the clean energy transition.

MLCC and our twenty affiliate labor organizations view the climate and inequality crises as interrelated crises that demand a comprehensive response. We seek to develop the labor movement's vision for how to tackle these crises in a way that creates good Maine union jobs, reduces carbon emissions and economic inequality, and provides a meaningful seat at the table for workers and unions in this process. MLCC is educating fellow workers, building alliances and advocating for policy solutions that demonstrate that we do not have to choose between a healthy planet and good jobs that sustain our families and communities. Through legislative action, organizing in clean energy sectors, and grassroots community-based campaigns, we are deeply committed to a holistic "climate jobs" approach that centers equitable workforce development leading to high-quality careers.

As a key part of providing meaningful benefits, we know that solar projects funded through GEO's Solar for All program will create quality jobs that adhere to the apprenticeship and Davis-Bacon standards as set forth in the Inflation Reduction Act. GEO's prioritization of contractors who commit to using local labor and equitable workforce development — operationalized through relationships with registered pre-apprenticeship programs and the negotiation of Project Labor Agreements — is core to our work and approach at MLCC and essential for fulfilling the Justice40 principles.

Union registered apprenticeship and pre-apprenticeship models are key to accomplishing the twin goals of job quality and equitable workforce development. Pre-apprenticeship programs, which prepare workers to enter into and succeed in apprenticeship programs in the trades, are a successful way to bring women and BIPOC into these higher-paying, good union jobs, because

they help address potential barriers for marginalized communities to enter into apprenticeship programs. Apprenticeship programs are a very effective way to uplift historically marginalized groups because they provide wages and benefits throughout the training, are significantly less expensive than a two- or four-year college degree, and prepare their graduates to work as journey people in highly skilled, highly paid trades — all while significantly narrowing the gender and racial pay gaps. GEO's commitment to use Solar for All money to support the growth of registered apprenticeship and pre-apprenticeship programs will meaningfully advance the twin goals of equity and job quality.

The U.S. Environmental Protection Agency's (EPA) Greenhouse Gas Reduction Fund (GGRF) is an unprecedented opportunity to serve working people in Maine. MLCC is very supportive of GEO's commitment to having a preference for projects that include a Project Labor Agreement that centers equity, and we will support union locals and building trades councils in entering into Project Labor Agreements that result in equitable workforce development.

We recognize the historic potential of the GGRF to empower American workers and build the economy "from the middle out and bottom up". We support GEO's goal to transform low income and disadvantaged communities through opportunities for affordable solar energy and union jobs, and we look forward supporting this grant's implementation.


Very truly yours,

Francis Eanes

Executive Director, Maine Labor Climate Council



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Associated General Contractors of Maine's Support for Maine Governor's Energy Office
Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Associated General Contractors of Maine (AGC
Maine) for the application submitted by the Maine Governor's Energy Office for the *Solar for All*
competition. AGC Maine encourages EPA to fully award Maine's application and anticipates supporting
the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to
benefit approximately 30,000 low-income and disadvantaged households across Maine.

Since 1951, AGC Maine has been dedicated to ensuring a sound and healthy construction industry and
providing the public with an assurance of safety, skill, responsibility and integrity of AGC member firms.
We work for Maine's construction companies by providing necessary leadership on issues from site work
development to environmental policy. We represent the industry across all sectors- from general
contractors and subcontractors to suppliers and service providers. Our industry collectively employs
over 30,000 skilled workers.

AGC has been a supporter of contractors in the renewable energy space for many years, and a leader in
workforce development through our Maine Construction Academy. We are also a part of the Maine
Governors Clean Energy Partnership. Our Construction Immersion program engages youth and under-
represented adult populations in registered apprenticeship and pre-apprenticeships in construction. Our
programs introduce participants to over 10 different career pathways in construction, including HVAC,
plumbing and electrical work required for deployment of renewal energy initiatives.

We believe Maine Governors Energy Office is perfectly positioned to support the EPA's objectives to
maximize solar deployment and ensure equitable access. We are poised to assist in the development of
this workforce and to support the initiatives through our existing community partnerships.

AGC Maine appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the
transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Kelly Flagg
Executive Director
AGC Maine



October 2, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

*Subject:* Support letter for Maine Governor's Energy Office Application to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

On behalf of the Maine Association of Public Housing Directors (MAPHD), please accept this letter of support for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. Maine has an ambitious four-year climate plan with strategies to emit less carbon, produce energy from renewable sources and protect our natural resources, communities, and people from the effects of climate change. Solar For All is another tool in this effort, with a crucial focus on lower-income Mainers. When funded, Maine will support residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine Association of Public Housing Directors is a membership organization that represents all twenty-two Public Housing Authorities in the state. Together, we own over 7,500 affordable apartments in 176 properties across the state. As an association, we will work with the Governor's Energy Office to maximize solar deployment and ensure equitable access and participation in the state's existing affordable housing stock. The average public housing property in Maine is 50 years old. While Maine has led the way in green building and green technologies for new affordable housing construction, resources have been scarce to retrofit older properties.

MAPHD looks forward to the impact these funds will have for low-income and disadvantaged communities in Maine and we are pleased to support this application.

Sincerely,

Debora Keller, Chair
Maine Association of Public Housing Directors

**AVESTA**

H O U S I N G

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Avesta Housing's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan,

Please accept this letter of support on behalf of Avesta Housing for the application submitted by the Maine Governor's Energy Office (GEO) for the *Solar for All* competition. Avesta encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Avesta Housing's mission is to improve lives and strengthen communities by promoting and providing quality affordable homes for people in need. We provide rental housing, programs, and connections to services to aid low income and vulnerable populations in attaining self-sufficiency.

One of Avesta's areas of focus is investment in sustainability for our affordable housing developments to preserve housing long-term and reduce residents' cost burden. While there is a demonstrable reduction on the cost burden to residents when solar energy can be deployed in one of our affordable housing developments, funding is limited. Compliance and regulatory requirements can further limit the ability to fund these projects within traditional financial models.

The GEO *Solar for All* program will provide real benefit to low-income households by expanding deployment and ensuring equitable access to renewable resources for low-income and vulnerable Mainers across the state. This funding is critical to ensure that marginalized communities are not left behind as the effects of climate change continue to mount.

Avesta appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Rebecca Hatfield
President & CEO

307 Cumberland Avenue • Portland, Maine 04101
207-553-7777 • 1-800-339-6516 Voice/TTY
207-553-7778 Fax • www.avestahousing.org





# WISHCAMPER

### 43°N 70°W

We invest in affordable housing and renewable energy throughout the US

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: The Wishcamper Companies Inc.'s Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 4, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of The Wishcamper Companies, Inc. ("TWC") for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. TWC encourages EPA to fully award Maine's application and anticipates Supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantage households across Maine.

TWC is a national developer and owner of affordable housing with interests in over 7,000 units across the country. TWC also develops and invests in renewable energy projects located in the Northeast that provide local communities with clean-renewable energy at discounted prices where the cost of electricity is among the nation's highest. Our investments focus on accessible housing and sustainable energy sources to enhance living standards and contribute positively to the environment. Our interest in the *Solar for All* program stems from the opportunity to benefit two meaningful causes in which we have built a business to support.

TWC aspires to leverage *Solar for All* proceeds to assist in delivering meaningful benefits to low-income and disadvantaged households throughout Maine. Between our deep-rooted partnerships with local housing agencies and solar installers, we would look to maximize deployment to create the greatest energy savings possible for residents.

TWC appreciates EPA's leadership in deploying the Solar for All program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Very truly yours,

*Jim Hanley*

Jim Hanley
President | The Wishcamper Companies Inc.



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: A Climate to Thrive's Support for the Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 4, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of A Climate to Thrive (ACTT) for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. A Climate to Thrive encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

ACTT was founded as a small community organization on Mount Desert Island (MDI) with an ambitious goal: establishing energy-independent and transitioning our island  off of fossil fuels. As a community-founded and driven organization, ACTT's work has primarily focused on helping MDI's residents adopt clean energy generation and implement efficiency upgrades regardless of income. We've spearheaded this work by partnering with several local installers for bulk community discounts and running two SolarizeMDI campaigns, two WeatherizeMDI campaigns, and one ElectrifyMDI campaign. By lowering the cost of rooftop residential solar installations coupled with strong community outreach and education, our solarize campaigns alone have helped over 140 islanders transition to solar energy. Our Solarize model has been copied by other communities throughout the state, as we formally support community-driven climate solutions initiatives through a program called Local Leads the Way.

Through this work, we've witnessed firsthand the gap that currently exists between those who can and cannot afford the upfront costs of these systems. We have found that those who can least afford to install an array tend to have the highest energy burden and stand to benefit the most from owning solar.  If Maine were to obtain *Solar for All* funds, our organization could pursue a third solarize program emphasizing additional outreach to community members who received visits from solar contractors but could not afford to install an array, despite the SolarizeMDI discount. We believe that our low-income community members should have equal access to the financial and resilience benefits that solar and storage offer.

ACTT appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine. ACTT also honors the important steps the EPA has made to ensure environmental justice is pursued by our federal government. The impacts of these federal policies are felt at the grassroots level. It is our hope that the dispersal of these funds honors this precedent.

Sincerely,

Johannah Blackman,
Executive Director
A Climate to Thrive, johannah@aclimatetothrive.org



October 4, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W., Room 3426
North Washington, D.C. 20460

Dear Administrator Regan:

Please accept this letter of support on behalf of Acadia Center for the application submitted by the Maine Governor's Energy Office (GEO) for the Solar for All competition. Acadia Center encourages EPA to fully award Maine's application in support of residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Acadia Center is a Maine based but New England wide organization whose mission is to advance effective energy solutions for a livable climate and a stronger, more equitable economy. Acadia Center has advocated and will continue to advocate for solar policies and programs in Maine that reduce carbon emissions, including working with the Maine Governor's Energy Office. Acadia Center is committed to environmental and energy equity for low-income and disadvantaged communities across Maine and in New England, and Solar for All will provide critical energy saving and environmental benefits.

Maine is a rural State, and people in small towns want to participate in a clean energy future, as they have demonstrated in making Maine a national leader in heat pump installation. If Solar for All grants the GEO's application, Mainers can do what they have shown their willingness to do with heat pumps, adopt solar technology to reduce their electricity bills while benefiting the environment.

Sincerely,

Peter LaFond
Senior Policy Advocate and Maine Program Director
plafond@acadiacenter.org
207-236-6470 ext.305



**Executive Director**
Scott Vlaun

**Ed. & Programming**
Seal Rossignol

**Communications**
Renee Igo

**Climate Resiliency**
Claire McGlinchey

**Municipal Resiliency**
Tony Giambro

**Board of Directors**
Thea Hart
Roberta Hill
Michael Newsom
Michael Dunn
Azalea Cormier
Willow Adler
Emlyn Crocker
Gem Haviland
Craig Reynolds

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Re: The Center for an Ecology-Based Economy's Support for Maine Governor's Energy Office Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

I am writing today on behalf of the Center for an Ecology-Based Economy (CEBE) in support of the application submitted by the Maine Governor's Energy Office for the "Solar for All" competition. Given the tremendous need for affordable clean energy in Maine's under-resourced rural communities, CEBE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve the EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Center for an Ecology-Based Economy was founded in 2013 as a response to the climate crisis. Located in Norway, a town of around 5,000 residents in rural inland Maine, CEBE set out to raise awareness of climate change and help local communities build climate resilience while lowering GHG emissions. While our projects and educational outreach have spanned the interrelated areas of food, shelter, transportation, and energy, a strong focus on solar power as a tool for both adaptation and mitigation has always been part of our work.

Since our first small off-grid project to power an irrigation system at our local community garden, we have installed three more solar projects, the largest, a 6,400W dual axis tracker at our local high school, offsets the electricity consumption of three level 2 EV charging stations, also installed by CEBE. As a service provider for Maine's Community Resilience Partnership, we work with local communities on climate resilience and have facilitated three rooftop PV

projects for area municipalities to offset energy costs and reduce emissions.

In 2017, spurred on by The U.S. Department of Energy's Sunshot program, CEBE set its sights on developing a community solar cooperative to provide low cost solar power to residents of our rural communities, many of which experience low or moderate incomes. We received $20,000 in technical assistance funding from the DOE for that project, but given Maine's net metering policy at that time, allowing only nine offtakers per installation, and lack of funding opportunities, we were unable to make the economics work and we put the project on hold. With new, more favorable net metering policy in place, our organization now has a viable model for a consumer-owned, community solar co-operative which will utilize dual axis trackers on small sites to create a network of 150 kW solar "gardens." These projects will benefit local landowners, provide affordable renewable energy to local LMI households, support local jobs, and keep energy dollars circulating within our communities. We recently received a "Energizing Rural Communities" Prize from the U.S. DOE for this project, and have been invited to apply for the second round of the DOE's "Energy Improvement in Rural Areas" Grant program.

CEBE is poised to launch an ambitious program to bring renewable energy to rural Mainers that continue to struggle with escalating energy costs. We will need the kind of assistance that the Governor's Energy Office will be able to provide through this funding to create robust educational and outreach campaigns, and to spearhead the grid of the future to help Maine meet its critical climate goals and build energy equity in the state.

Thank you for considering this letter of support.

Scott Vlaun, Executive Director
Center for an Ecology-Based Economy, Norway, Maine



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North
Washington, DC 20460

Subject: Coalition for Community Solar Access' Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Coalition for Community Solar Access (CCSA)
for the application submitted by the Maine Governor's Energy Office for the Solar for All
competition. CCSA encourages EPA to fully award Maine's application and anticipates supporting
the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to
benefit approximately 30,000 low-income and disadvantaged households across Maine.

CCSA is a national coalition of businesses and nonprofits working to expand customer choice and
access to solar for all American households and businesses through shared solar programs. CCSA's
mission is to empower every American energy consumer with the option to choose local, clean, and
affordable shared solar.

We have been championing the Greenhouse Gas Reduction Fund, and more specifically, the Solar
For All program, since we advocated for an equitable expansion of solar beginning with our
Roadmap to Expand Solar Access for All released in April 2021. One of the main pillars of that
roadmap was to empower 30 million households to go solar, including 15 million with low to
moderate incomes and encourage state development and expansion of robust distributed solar
programs.

CCSA intends to support Maine's Solar for All application by ensuring smooth and successful
implementation of the programs resulting from a funding award, particularly an Energy Assistance
model that leverages Maine's experience in community solar to deliver meaningful benefits to low
income customers.  We represent community solar developers and providers, and therefore are well
situated to facilitate information sharing and feedback on the development of the energy assistance
program in order to ensure maximum solar deployment under the program. CCSA is also willing and
able to advise on methods for identifying eligible customers to participate in energy assistance
through solar programs. Our membership includes entities with extensive experience in identifying
eligible customers for energy programs, conducting outreach to customers on ways to save on their
energy bill, and ensuring customers receive the full extent of possible benefits from participation.



1380 Monroe Street NW, #721
Washington, DC 20010
720.334.8045
info@communitysolaraccess.org
www.communitysolaraccess.org

CCSA will also continue our advocacy efforts to address market barriers to low-income serving solar in Maine. We plan to continue our work to improve interconnection practices and grid planning, as well as regulatory and legislative advocacy to address additional market barriers including siting, permitting, consumer protections, financing, and program design.

In closing, we support the approval of the Maine Solar For All application at the full requested amount as we believe it is the most efficient and equitable way to serve Maine's low income and disadvantaged customers. CCSA appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

*Kate Daniel*

Kate Daniel
Northeast Regional Director
Coalition for Community Solar Access
kate@communitysolaraccess.org

Cranberry Isles Community Solar Association

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Cranberry Isles Community Solar Association Support for Maine Governor's Energy Office Application in Response to Solar for All

Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 2, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Cranberry Isles Community Solar Association for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. The Cranberry Isles Community Solar Association encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The Cranberry Isles Community Solar Association is a group of committed and concerned citizens of the Cranberry Isles seeking to solve the chronic problems associated with frequent power outages on the islands and provide access to low cost solar energy and energy savings to our low income households including over 10 CIRT homes.

We are seeking to support Solar for All in one or more of the following:

1. Delivering meaningful benefits to low-income and disadvantaged households, including power resiliency, energy savings, financing and program delivery, and high-quality jobs;

2. Overcoming market barriers to residential-serving distributed solar and/or providing project-deployment through technical assistance, including;
a)  The high cost of solar deployment – We plan to use a competitive bid format plus incentives through the Inflation Reduction Act and any State grants to drive down the cost of solar by 75% or more;
b)  Identifying suitable sites for solar – We plan to use building structures with south facing roofs for solar applications;
c)  Utility reluctance to deploy solar – By adding batteries to the larger solar arrays we seek to provide voltage stability to the ends of the Versant distribution lines and save on the considerable cost of sending teams over to restore power.

3. Maximizing solar deployment and ensure equitable access and participation, including through partnerships, with the Town of Cranberry Isles Selectmen, the CIRT Homes Association, The Islesford Neighborhood House Association, Friends of Acadia, the Islesford Historical Society, and the Cranberry Isles Fishermen's Cooperative.

Cranberry Isles Community Solar Association appreciates EPA's leadership in deploying Solar for All, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

President
Cranberry Isles Community Solar Association



JOHN T. GORMAN
F O U N D A T I O N

*Advancing ideas. Promoting opportunities. **Improving lives in Maine.***

October 5, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection
Agency  1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460


Subject: The John T. Gorman's Support for Maine Governor's Energy Office Application in Response to *Solar for All*
Funding Opportunity Number: EPA-R-HQ-SFA-23-01


Dear Administrator Regan:

Please accept this letter of support on behalf of the John T. Gorman Foundation for the application submitted by the Maine  Governor's Energy Office for the *Solar for All* competition. The John T. Gorman Foundation encourages EPA to fully award Maine's  application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling  residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

The John T. Gorman Foundation is a private foundation based in Portland, Maine, with a mission to make Maine a more equitable place where all children and families can thrive. To achieve the greatest impact, the Foundation has a special interest in strengthening children and families with the least resources and helping communities provide them with the supports and opportunities they need to thrive.

We support the Maine Governor's Energy Office Solar for All application because it will deliver meaningful benefits to low-income and disadvantaged households, including  energy savings and high-quality jobs.

The John T. Gorman Foundation appreciates EPA's leadership in deploying the *Solar for All* program and we look forward to the  transformative impact these funds will have for low-income and disadvantaged communities in Maine.

 Sincerely,

Nicole Witherbee
President & CEO



ISLAND
INSTITUTE

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
Subject: Island Institute's Support for Maine Governor's Energy Office Application in
Response to Solar for All
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 11, 2023

Dear Administrator Regan:
Please accept this letter of support on behalf of the Island Institute for the application
submitted by the Maine Governor's Energy Office for the Solar for All competition. Island
Institute encourages EPA to fully award Maine's application and anticipates supporting the
deployment of awarded funds to achieve EPA's objectives by enabling residential solar
energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

Seventy-five percent of Maine's coastal communities have fewer than 3000 people. Twenty-
five percent of coastal communities have fewer than 800 people. These are rural, capacity
constrained communities facing significant economic challenges leading to the presence of
low income and disadvantaged households.

Island Institute is a 40 year old community development nonprofit located in Rockland,
Maine. We predominantly work with island and coastal communities to build community
sustainability and to further the climate resilience of both communities and the businesses
that support them.  These are predominantly small, rural, natural resource dependent
communities that rely heavily on fossil fuels, and a few of these communities have the
highest electricity costs outside of communities in Alaska where diesel fuel is flown in.

To help address the capacity and energy challenges in these communities and to help them
build towards climate resilience, Island Institute is the northeast regional technical
assistance provider for the National Renewable Energy Lab's Energy Transition Initiative
Partnership Program. Through this work, we support island and remote communities in
accessing technical assistance for planning energy transitions from various national labs.
Many of these projects are focused on microgrids, battery storage, and renewable
generation.

386 Main Street • Post Office Box 648 • Rockland, Maine 04841-0648
Tel: 207-594-9209 • Fax: 207-594-9314 • inquiry@islandinstitute.org
www.islandinstitute.org

Solutions that help increase the adaption of clean energy projects that benefit low income residents would be very interesting to communities working through the ETIPP process as well as to other communities who are also concerned about energy challenges.

Island Institute is committed to supporting the Solar for All application through our efforts to provide community scale energy planning technical assistance. We also work closely with natural resource based businesses, particularly fishermen, aquaculturists, and working waterfront businesses like boatyards. We believe that employees of some of these businesses may well qualify for this program.

Finally, Island Institute has long been concerned about the ability of rural communities to access clean energy programs and the availability of contractors to do the work in these communities. A few years back we published a paper "Bridging the Rural Efficiency Gap" in the peer reviewed journal Energy Efficiency. We are very aware of the needs and challenges facing these communities and work diligently to improve access and acceptance of programs that provide economic and climate benefits.

Island Institute appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Nick Battista
Chief Policy Officer
Island Institute

**Natural Resources Council of Maine**

3 Wade Street • Augusta, Maine 04330 • (207) 622-3101 • Fax: (207) 622-4343 • www.nrcm.org

**clf**
conservation law foundation

For a thriving New England

**Union of Concerned Scientists**

ucsusa.org Two Brattle Square, Cambridge, MA 02138-3780  t 617.547.5552  f 617.864.9405
1825 K Street NW, Suite 800, Washington, DC 20006-1232  t 202.223.6133  f 202.223.6162
500 12th Street, Suite 340, Oakland, CA 94607-4087  t 510.843.1872  f 510.843.3785
One North LaSalle Street, Suite 1904, Chicago, IL 60602-4064  t 312.578.1750  f 312.578.1751

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Joint Letter of Support for Maine Governor's Energy Office Application in Response to *Solar for All –* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

We write today on behalf of the Natural Resources Council of Maine (NRCM), the Union of Concerned Scientists (UCS) and the Conservation Law Foundation (CLF) in strong support of the Solar for All application from the Maine Governor's Energy Office (GEO). We urge EPA to fully award Maine's request and we anticipate leveraging our organizational resources to support its successful implementation in pursuit of EPA's goal of bringing the benefits of solar to some 30,000 disadvantaged and low-income Maine people.

NRCM is Maine's leading environmental advocacy organization with more than 25,000 members and supporters. NRCM has been working for more than 60 years to protect, restore, and conserve Maine's environment, and is deeply engaged in the state's climate and clean energy policy and planning, including Maine's programs to support community solar projects.

UCS is the nation's leading science based non-profit organization with more than a half a million supporters nationally and more than 2,500 in Maine. UCS advances equitable science-based solutions to some of the world's most pressing problems, including working to ensure that Maine and the rest of the country meets its climate and clean energy goals.

Founded in 1966, CLF is a non-profit advocacy organization with 5,000 members across New England, including approximately 500 in Maine. CLF works to solve the environmental problems threatening the people, natural resources, and communities of New England. CLF's advocates use law, economics and science to design and implement strategies that conserve natural resources, protect public health, and promote vital communities in our region.

NRCM and UCS jointly submitted comments on the GEO's draft Solar for All application. Additionally, all three organizations have been active participants in matters related to environmental justice and distributed solar generation in Maine for many years, including in matters before the Public Utilities Commission and the Legislature and as participants in numerous stakeholder processes.

UCS has substantial experience providing technical expertise and conducting analysis on policies to advance equity in the clean energy transition, both in Maine and around the country. As Maine's Solar for All program is operationalized, UCS could support the deployment of technical assistance by leveraging data to assist low-income and disadvantaged communities in maximizing the effectiveness of funding for projects that are a priority for them.

Respected as a technical expert on solar energy Maine, NRCM has strong relationships across state and municipal agencies, developers, advocates, and community-based organizations across the state. We have multiple channels of communication with our supporters across all 16 counties, including our blog, podcast, social media, print media, and participation at regional events and meetings. All of these channels could be valuable platforms for sharing educational and outreach information about the Solar for All program in Maine to advance equitable access and meaningful involvement.

In Maine, CLF is the NGO community's principal legal advocate for clean energy.  In addition to providing legal advice to community groups, last year we led the effort to pass Maine's first environmental justice bill.  Previously, we worked with UCS, NRCM, and other groups to prioritize funding for underrepresented groups to participate in Public Utility Commission proceedings. Not only will we be able to use those skills to help implement Maine's Solar for All program with other advocacy organizations, but also we will use them to ensure that the program is properly implemented to reach the targeted communities.

We believe Maine is very well positioned today to deploy awarded funds rapidly and effectively. Programmatic elements of GEO's application align closely with recommendations that emerged from a rigorous 18-month stakeholder process hosted by GEO. That effort concluded in January 2023, having identified a highly cost-effective program design for community solar. There was broad support among the diverse stakeholders for a program that allocated the benefits of community solar to low-and-moderate income households. Maine also established a Green Bank in 2021, which could be a powerful outlet for providing financial assistance to install solar in low-income and disadvantaged communities. The green bank is operated by Efficiency Maine Trust, a quasi-governmental entity that implements energy policies and statewide programs designed to overcome social and financial barriers, especially for low-income Maine people. Furthermore, Maine has a pipeline of solar projects in the late stages of interconnection review that would likely be eligible for GEO's Solar for All program, and as a result be capable of delivering benefits more quickly to vulnerable populations across the state.

We greatly appreciate EPA's leadership in this area. Ensuring disadvantaged and underserved communities have access to the benefits of clean energy must be central to our efforts to decarbonize the electric sector.  NRCM, UCS and CLF would be honored to support the implementation of Maine's ambitious Solar for All program to help assure the transformative impact these funds would have here in Maine. Please feel free to contact us if you have any questions or need additional information.


Respectfully submitted,


Rebecca Schultz
Natural Resources Council of Maine
3 Wade Street
Augusta, ME 04330
Tel: (207) 430-0175
Email: rschultz@nrcm.org

Steve Clemmer
Union of Concerned Scientists
2 Brattle Square, 6th Floor
Cambridge, MA 02138
Tel: (978)-844-4531
Email: sclemmer@ucsusa.org

Sean Mahoney
Vice-President & Senior Counsel
Conservation Law Foundation
53 Exchange Street
Portland ME 04101
Tel: (207) 210-6439
Email: smahoney@clf.org



**In Support for Maine Governor's Energy Office Application in Response to *Solar for All***
Funding Opportunity Number: EPA-R-HQ-SFA-23-01

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Maine Conservation Voters for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. Maine Conservation Voters encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Maine Conservation Voters (MCV) is a nonpartisan, nonprofit organization that works to make conservation and climate action in Maine a political priority. Our organization represents more than 13,000 members and supporters dedicated to protecting the environment and our democracy. We serve on the Steering Committee of the Maine Climate Council and work closely with the Governor's Energy Office to achieve Maine's ambitious statutory emissions reduction and renewable energy requirements, to reduce energy cost volatility, and to advance equity through Maine's climate response.

In February of this year, Governor Janet Mills advanced Maine's goal of 100% clean energy from 2050 to 2040, a nod to the commendable progress we have made as a state and the speed at which we can achieve a just clean energy transition when we work together and create strong, responsible policy. Solar energy plays a key role in meeting Maine's accelerated clean energy targets, reducing emissions from fossil fuels, and serving new electricity demand associated with electrification of heating and transportation. Homegrown clean energy makes sense to Maine people and communities, which prize self-sufficiency and the quality jobs associated with the State's growing clean energy economy. We worry, though, about equitable access to renewable energy and the fair distribution of costs and benefits across diverse populations. Indeed, the Maine Legislature came close to dismantling the State's net energy billing program this summer due to concerns about its impact on low-income ratepayers. The

program was revamped instead, but the near miss highlighted the urgency of deploying residential solar energy and storage to benefit low-income and disadvantaged households across the state.

Maine is allocating significant state resources and funding to advance an equitable clean energy transition that delivers *Solar for All*, but we cannot do it alone. Federal support through programs authorized by the Inflation Reduction Act, which Maine people advocated for and continue to celebrate, is essential. We appreciate EPA's leadership in the *Solar for All* competition, which is an opportunity for Maine to build on a strong track record of solar deployment and realize the transformative impacts of additional investment. for low-income and disadvantaged communities in Maine.

MCV urges EPA to fully award Maine's $100 million *Solar for All* application and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you,

Kathleen Meil
Senior Director of Policy and Partnerships
Maine Conservation Voters



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

RE: Maine Renewable Energy Associations's Support for Maine Governor's Energy Office
Application in Response to Solar for All Funding Opportunity Number: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Maine Renewable Energy Association
(MREA) for the application submitted by the Maine Governor's Energy Office for the *Solar for
All* competition. MREA encourages EPA to fully award Maine's application and anticipates
supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential
solar energy to benefit approximately 30,000 low-income and disadvantaged households across
Maine.

MREA is a not-for-profit association of renewable energy producers, suppliers of goods and
services to those producers, and other supporters of this industry. MREA members sustainably
manufacture electricity from solar, wind, hydro, tidal, biomass, and energy storage projects in
Maine.

MREA is a strong supporter of Maine's ambitious renewable energy mandate to transition to
80% renewable energy by 2030 and 100% by 2050. Indeed, we also support the Mills
Administration's recent initiative to achieve 100% by 2040. Solar will play a key part in the
achievement of these targets. Solar deployment in Maine has a proven track record of lowering
energy bills. A *Solar for All* award would ensure that those benefits reach low-income and
disadvantaged households across the state.

MREA anticipates supporting *Solar for All* in a variety of ways. In particular, as an organization
with a strong presence in the policy space, MREA is committed to ensuring that municipal and
state permitting regulation and other regulations are conducive to meeting *Solar for All's* goals.
Also, because we are a network of solar companies, we are poised to communicate the

opportunities afforded by a *Solar for All* award and identify opportunities for cross-company collaboration.

MREA appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Thank you for your consideration.


Eliza Donoghue, Esq.
Executive Director

October 5, 2023

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

Re: Support for Maine's Solar for All Application: EPA-R-HQ-SFA-23-01

Dear Administrator Regan:

On behalf of The Northeast Clean Energy Council  ("NECEC" or "The Council"), I am writing to express our support for Maine's Solar for All grant application, which is being submitted by the Governor's Energy Office. We are committed to supporting Maine in their efforts to ensure that low-income and disadvantaged communities equitably benefit from the state's ambitious Solar for All program, which would benefit approximately 30,000 low-income and disadvantaged households across the state.

NECEC leads the just, equitable, and rapid transition to a clean energy future and a diverse climate economy. NECEC is the only organization in the Northeast that covers all of the clean energy market segments, representing the business perspectives of investors and clean energy companies across every stage of development. NECEC members span the broad spectrum of the clean energy industry, including energy efficiency, clean transportation, wind, solar, energy storage, microgrids, fuel cells, and advanced and "smart" technologies.

The Council is dedicated to growing the clean energy economy in Maine and across the region, in pursuit of our mission to create a world-class and equitable clean energy hub in the Northeast. The Council's 250+ members include companies based in Maine and those from elsewhere who do business or hope to make future investments in the state.

NECEC actively follows and seeks to advance the maximum and equitable deployment of state and utility programs and policies related to energy efficiency and renewable energy development. Along with promoting the development of clean energy resources that help this sector thrive and contribute to economic development, NECEC works to ensure energy equity, public health and justice are fully considered in energy planning processes.

An element of Maine's proposed Solar for All program that NECEC is particularly proud to support is the Project Deployment Technical Assistance Plan, which would:

- Support solar developers, contractors, and affordable housing developers to develop pipelines of solar projects;
- Support overcoming barriers related to project deployment such as siting, permitting, interconnection;
- Invest in workforce and entrepreneurship opportunities in low-income and disadvantaged communities;
- Support property managers and building owners with direct technical and financial assistance to understand all of the financing options, grants, tax credits, and other incentives that may be available to them through Solar for All and other state, federal, local and utility programs.

**How NECEC would support the Project Deployment Technical Assistance Plan:**

Through our public policy work and the leadership of our diversity, equity and inclusion / workforce development team, NECEC will support the Maine Solar For All program by serving as a convener and a conduit of information. NECEC's network includes thousands of connections across the clean energy industry, utilities, other non-profits, community and institutional leaders and more. We will seek to be a partner to the State of Maine to understand the project goals and help find solutions that can advance our shared goals related to climate, clean energy and equity.

In addition, NECEC is currently the lead project applicant with U.S. EPA Region 1 in a collaborative with 26 other state and non profit organizations seeking to develop the New England Center for Environmental and Energy Justice (NEC-EJECA), intended to be the first of its kind technical assistance center that supports environmental and energy justice (EEJ) communities that are disproportionately plagued by environmental pollution and environmental justice challenges.

We are pleased that the University of Maine Senator George J. Mitchell Center for Sustainability Solutions is a project partner in this initiative. NEC-EJECA's goal is to empower and build EEJ communities' capacity to achieve their own individual visions of a thriving community by providing responsive technical assistance, training, and resources.

Maine has been a leader in our nation's transition to a clean energy future and NECEC would be proud to play a critical role in supporting the implementation of Maine's ambitious Solar For All program. We believe the Governor's Energy Office has demonstrated experience deploying technical assistance and incentive funding for solar technology and collectively will be able to successfully deliver meaningful benefits to underserved communities. Please feel free to contact me if you have any questions or need additional information.

Sincerely,

*Joseph A. Curtatone*

Joseph A. Curtatone, President
Northeast Clean Energy Council

# ☀ SOLAR ENERGY ASSOCIATION OF MAINE

October 6, 2023

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC
North Washington, DC  20460

Re:  The Solar Energy Association of Maine's Support for Maine Governor's Energy Office
Application to *Solar for All* Funding Opportunity Number: EPA R-HQ-SFA-23-01

Dear Administrator Regan:

Please accept this letter of support on behalf of the Solar Energy
Association of Maine (SEAM) for the application submitted by the Maine
Governor's Office for the *Solar for All* competition.  SEAM encourages EPA to fully
award Maine's application and anticipates supporting the deployment of awarded
funds to achieve EPA's objectives by enabling residential solar energy to benefit
approximately 30,000 low-income and disadvantaged households throughout
Maine.

SEAM is a broad coalition of solar energy supporters, including
(1) municipalities; (2) colleges; (3) conservation organizations; (4) solar installers;
(5) community and economic development entities; (6) energy law, economics,
and engineering professionals; and (7) individual and cooperative electricity
customers (residential, commercial, and institutional).  We support the
development of solar electricity of all project sizes and ownership models, for the
benefit of all Maine people.  SEAM is a Maine not-for-profit corporation governed
by a diverse Board of Directors.  It is not a trade group.  We have been active over
the past eight years. We are especially concerned about bringing solar energy
directly to low-income and disadvantaged households, by encouraging and
facilitating ownership in distributed energy resources (DERs).

SEAM is an all-volunteer education and advocacy organization, with an
affiliation with Dirigo Community Solar Group, another Maine not-for-profit
providing services to small electric generating cooperatives and community solar

farms.  This affiliation endows us with considerable operating experience with small groups of residential owners of solar equipment.  We envision using this experience to help low-income and disadvantaged households understand the benefits of solar energy, educate them on how to go about participating in the clean energy sector themselves, and provide how-to guides and operating assistance at nominal cost.

SEAM also has a high degree of interest in assisting to start a potential low-interest loan program so low-income people and disadvantaged households can acquire rooftop solar or shares in small group projects if they are renters or their homes are not good for rooftop solar.  We believe this would be an especially effective way to assist such challenged populations, either individually or in small groups, by helping to finance ownership of solar equipment where the loans could be structured so that the loan repayments would be less than the avoided market electricity costs, thus both saving money for disadvantaged households and helping them build equity in their own solar equipment.  SEAM and Dirigo have experience in this and would love to bring this experience to a targeted population of low-income people and disadvantaged households.

Through its diverse Board, SEAM has relationships with many groups (e.g., municipalities, community action and development entities) with existing relationships with low-income people and disadvantaged households.  We think we can use these relationships to be particularly helpful in reaching the goals of the *Solar for All* program.

In the totality of things, SEAM and Dirigo are completely on board with this initiative of the Maine Governor's Energy Office (GEO) and the objectives of the *Solar for All* program.  We appreciate EPA's leadership in deploying this program, and look forward to the transformative impact these funds will have on "piercing the veil, " allowing the GEO to bring the advantages of solar equipment ownership and clean energy to low-income and disadvantaged communities in Maine.  We'll be enthusiastic, cooperating partners without seeking any of the funds for ourselves!

(Signature on following page)

2

Very truly yours

Steven L Weems
Executive Director
Solar Eneregy Association of Maine
and
President
Dirigo Community Solar Group

GEO Letter of Support for the *Solar for All* Program 10-6-23I



Senator George J. Mitchell
Center for Sustainability
Solutions

5710 Norman Smith Hall
Orono, Maine 04469-5710
Tel: 207.581.3195
Fax: 207.581.3320
umgmc@maine.edu
umaine.edu/mitchellcenter/

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Senator George J. Mitchell Center for Sustainability Solutions' Support for Maine
Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number:
EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of the Senator George J. Mitchell Center for
Sustainability Solutions (MCSS) for the application submitted by the Maine Governor's Energy
Office for the *Solar for All* competition. MCSS encourages EPA to fully award Maine's
application and anticipates supporting the deployment of awarded funds to achieve EPA's
objectives by enabling residential solar energy to benefit approximately 30,000 low-income and
disadvantaged households across Maine.

For the last decade, the MCSS has been a leader in launching and supporting partnerships in
which interdisciplinary teams of students and faculty from universities and colleges throughout
the state collaborate with diverse stakeholders to tackle and help find solutions to a wide range
of urgent sustainability challenges that directly benefit Maine and other regions. These
challenges, which reside at the intersection of environmental, social, and economic issues,
include renewable energy, local agriculture, municipal planning, forest management, solid
waste, and coastal water quality. Our **Mission:** Serving as a leader and valued partner in
understanding and solving societal problems related to the growing challenge of improving
human well-being while protecting the environment. Our **Vision:** Connecting knowledge with
action to create a brighter environmental, social, and economic future in and beyond Maine.

The State's *Solar for All* application is in line with our Mission and Vision and an incredible
opportunity for low-income and disadvantaged populations across Maine to gain direct long-
term benefits from the sustainable energy transition. The MCSS is committed to and actively
engaged in supporting community-driven solutions to sustainability challenges, including
climate and energy. One MCSS Faculty Fellow in particular, Dr. Sharon Klein, has an active
research program focused on understanding and supporting community-driven renewable
energy and energy efficiency/conservation projects and programs in Maine's underserved

communities (indigenous Wabanaki, rural, remote, and low income). She is especially excited about leveraging synergies with *Solar for All* and her role as a Service Provider in Maine's Community Resilience Partnership and her recently funded 4-year projects (EPA-G2022-STAR-F1 (*Drivers and Environmental Impacts of Energy Transitions in Underserved Communities*) award titled *The Role of State Networks in Advancing Community-Initiated and -Engaged Sustainable Energy Action in Underserved Communities*; NSF 22-633 EPSCoR RII Track-2 FEC award titled *Collaborative Research: RII Track-2 FEC: STORM: Data-Driven Approaches for Secure Electric Grids in Communities Disproportionately Impacted by Climate Change*).

The MCSS anticipates supporting *Solar for All* by:

1. Connecting *Solar for All* program administrators with local and tribal government staff and citizens, as well as community-based organizations and businesses, interested in and already engaged in delivering meaningful solar benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.

2. Conducting community-engaged research to help overcome market barriers to residential-serving distributed solar and providing or connecting to existing project-deployment technical assistance as applicable based on the available time and expertise of our faculty, staff, and students and needs identified. Market barriers that could be addressed through our technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.

3. Helping to maximize solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

The MCSS greatly appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Yours sincerely,

David D. Hart, Ph.D.
Director and Professor

Sharon J.W. Klein, Ph.D.
Faculty Fellow and Associate Professor

2



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Central Maine Power's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Central Maine Power for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition. Central Maine Power encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Central Maine Power is dedicated to offering clean, reliable, and affordable services to our customers in the State of Maine. With this evolving infrastructure and State climate goals, Central Maine Power looks for ways we can best support all our customers and assist the State of Maine to achieve these goals.

Central Maine Power aspires to support *Solar for All* through:

1. Delivering meaningful benefits to low-income and disadvantaged households. Meaningful benefits include energy savings, financing and program delivery, and high-quality jobs.
2. Overcoming market barriers to residential-serving distributed solar and/or providing project-deployment technical assistance. Market barriers that could be addressed through technical assistance include, but are not limited to, workforce development, permitting, interconnection, outreach, education, and community capacity-building.
3. Maximizing solar deployment and ensure equitable access and participation, including through partnerships with community-based organizations and support for outreach responsive to the needs of diverse communities.

Central Maine Power appreciates EPA's leadership in deploying the *Solar for All* program and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Joe Purington
President & CEO

83 Edison Drive; Augusta, ME 04336
Telephone 207-629-2002
www.cmpco.com

An equal opportunity employer

AVANGRID



The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460
October 11, 2023


RE: Versant Power's Support for Maine Governor's Energy Office Solar for All
Application, Funding Opportunity EPA-R-HQ-SFA-23-01


Dear Administrator Regan,

Versant Power is pleased to submit a letter of support for the Maine Governor's Energy
Office "Solar for All" submission to the U.S. Environmental Protection Agency, which
we understand aims to ensure low- and moderate-income Maine households benefit
from the deployment of residential solar energy projects.

Versant Power is strongly focused on the work it takes to provide safe, reliable service
throughout northern and eastern Maine, and we're committed to helping meet our
state's climate and energy objectives in an efficient, cost-effective way. With more than
500 dedicated employees across our 10,400-square-mile service territory, we aim to be
a trusted partner in identifying and deploying solutions to benefit our customers.

We welcome partnerships that help us achieve shared goals and support policies that
aim to help low and moderate-income Mainers benefit directly from the energy
transitions. Versant Power is committed to working with the Governor's Energy Office,
policymakers, regulators and stakeholders in Maine to implement this and other
programs effectively and at the least possible cost to all Maine ratepayers

We appreciate the opportunity to provide these comments and urge you to select the
Maine Governor's Energy Office's Solar for All application for the full award sought.


Sincerely,

President, Versant Power


PO Box 932, Bangor, ME 04402-0932



September 29, 2023

Mr. Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Avenue N.W.
Washington, DC 20004

**Re: Support for the State of Maine's Solar for All Application**

Dear Administrator Regan:

ReVision Energy, an employee owned, certified B Corporation solar company in New England, would like to share our strong support for the State of Maine's Solar for All grant application, submitted by the Maine Governor's Energy Office. As a member of Maine's growing clean energy industry whose mission is quite literally to make life better by building our just and equitable electric future, we are strong supporters of the state submitting a thoughtful, competitive application to the Environmental Protection Agency's Solar for All Program within the Greenhouse Gas Reduction Fund given the immense opportunity to bring the benefits of clean energy to low-income Mainers.

To democratize the clean energy transition, ReVision Energy is proactively helping low- to moderate-income and environmental justice communities gain access to solar energy, heat pumps, battery storage, and electric vehicle charging stations. Our work includes proactively securing every possible funding and financing opportunity to reduce the barrier of up-front installation costs through both public and private entities. We have installed solar projects low-income multi-family housing, manufactured home communities, and other community solar installations for the purposes of serving marginalized populations. Additionally, we are an active member of Amicus Solar, a member-owned purchasing cooperative of nearly 80 high-quality, independent, values-driven solar energy companies. This network has actively advocated for policy mechanisms to serve low-income communities at the federal level and is currently working to develop a model for our companies to take full advantage of the Inflation Reduction Act's updates to the Investment Tax Credit to ultimately bring more and more low-income Americans the benefits of clean energy. We believe this experience, and our track record in building both residential and small-scale commercial distributed generation here in Maine, can help serve the state in its implementation of Solar for All funding and the multiple thoughtful avenues the application features, from the residential direct ownership channel to the multifamily housing programs to the cooperative ownership community solar.

Additionally, we support Maine's application given its focus on workforce development. In 2018, ReVision Energy launched the first ever in-house electrical apprenticeship program and full Training Center here in our home state of Maine to address the need for qualified workforce to implement clean energy solutions. Recently, we have added pre-apprenticeship programs to our offerings, including specific training modules for New Mainers. All programming is closely aligned with our justice and equity values, ensuring compensation throughout the work-and-learn program to provide on-the-job technical training to complement both the professional and personal lives of our apprentices. We appreciate and strongly support Maine's application's focus in investing in workforce and entrepreneurship opportunities and we hope our experience can assist in the meaningful deployment of funding.



Overall, we believe the Maine Governor's Energy Office has demonstrated experience in deploying technical and financial assistance for solar technology, and the state will successfully deliver meaningful benefits to underserved communities through Solar for All funding. We thank the Agency for the opportunity to offer this letter of support, and we respectfully request full support of Maine's application. Thank you.

Sincerely,

Lindsay L. Bourgoine
Director, Policy & Government Affairs
ReVision Energy

Sundog Solar LLC
P.O. Box 465
222 East Main St.
Searsport, ME 04974

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: Sundog Solar's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

May 10, 2023

Dear Administrator Regan:

Please accept this letter of support on behalf of Sundog Solar for the application submitted by the Maine Governor's Energy Office for the *Solar for All* competition.  Sundog Solar encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

Sundog Solar and our dedicated company of 30 employees have been operating out of Midcoast Maine since 2009.  We offer photovoltaic, energy storage, heat pump and EV charging technologies, turnkey developments and installations to residential and commercial customers.  Our company is thrilled for this opportunity to present itself to the state of Maine and its residents. We've experienced from our inception, the political dispute against "net energy billing" mainly being for the financial burden it puts on low-income individuals and households.  This funding opportunity is a substantial bridge to that existing gap, providing the necessary funds needed to deploy solar energy for all.

Sundog Solar aligns to support *Solar for All* by delivering meaningful and valuable benefits to low income households as we do with each and every project we install, through clear energy savings, quality partnership in program delivery and financing opportunities.  We are excited to maximize solar deployment in Maine and ensure equitable access and participation through partnerships with community-based organizations.  We anticipate providing outreach support, responsive to the needs of diverse communities and overcoming market barriers through technical assistance, permitting, interconnection, and community education.

Sundog Solar appreciates EPA's leadership in deploying the *Solar for All* program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities here in Maine!

Sincerely,

Danny Piper
Principal Owner
Sundog Solar



417 5th Avenue
Suite 803
New York, NY 10016

The Honorable Michael Regan
Administrator, U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Room 3426 WJC North Washington, DC 20460

Subject: UGE's Support for Maine Governor's Energy Office Application in Response to *Solar for All* Funding Opportunity Number: EPA-R-HQ-SFA-23-01

October 6th, 2023

Dear Administrator Regain:

Please accept this letter of support on behalf of UGE for the application submitted by the Maine Governor's Energy Office for the Solar for All competition. UGE encourages EPA to fully award Maine's application and anticipates supporting the deployment of awarded funds to achieve EPA's objectives by enabling residential solar energy to benefit approximately 30,000 low-income and disadvantaged households across Maine.

UGE is working to make renewable affordable and accessible for all by developing, owning, and operating community solar projects. Strengthening renewable energy equity is one of UGE's guiding goals; our stated target is for more than 25% of the energy off-take from our operational portfolio to serve Low-to-Moderate Income households by 2026.

Among states with active community solar programs, Maine has the second lowest average annual income. This, coupled with the fact that Maine residents pay some of the highest electricity costs in the nation means that arguably, Low-to-Moderate income Mainers stand to benefit most from the energy cost savings brought by shared community solar. Already UGE has been partnering with Maine environmental organizations, schools, and municipalities including the Center for an Ecology-Based Economy, the Town of Norway, and Foxcroft Academy to ensure equitable access and participation in the economic benefits brought by our shared solar projects. The Solar for All program will help UGE and other energy equity-focused solar developers expand our work bringing cleaner, cheaper energy to those who need it most in the State of Maine.

UGE appreciates EPA's leadership in deploying the Solar for All program, and looks forward to the transformative impact these funds will have for low-income and disadvantaged communities in Maine.

Sincerely,

Tyler Adkins
*Chief Revenue Officer*



www.ugei.com
+1 (917) 720 5685

Program Narrative

# 1. Program Strategy Narrative
## 1.1 Impact Assessment

Recognizing the critical threat of climate change, Governor Janet Mills has committed Maine to an ambitious set of policies designed to reduce Maine's greenhouse gas emissions, transition to renewable energy, and grow Maine's clean energy economy. With bipartisan support from the Maine legislature, the state has established statutory greenhouse gas reduction requirements of 45% below 1990 levels by 2030 and 80% by 2050, as well as a requirement for statewide carbon neutrality by 2045. Maine has also established one of the most ambitious statutory Renewable Portfolio Standards (RPS) in the country, requiring 80% of electricity used in the state to be generated by renewable sources by 2030. To ensure achievement of Maine's climate and clean energy requirements complements Maine's economic growth, including the state's 10-year Economic Development Strategy,[i] in 2020 Governor Mills set a goal of doubling Maine's clean energy workforce to 30,000 jobs by 2030. Earlier this year, recognizing the progress made to date and the key role of clean energy in controlling costs for consumers and reducing fossil fuel dependence, Governor Mills announced a new accelerated goal of 100% clean energy by 2040.[ii] The state has also established nation-leading targets of deploying an additional 175,000 heat pumps – building on the recent success of deploying 100,000 new heat pumps in 2023, two years ahead of the initial target[iii] – and weatherizing more than 17,500 existing homes, including 1,000 low-income homes by 2025.

Attaining these critical requirements necessitates coordinated action and support across all sectors of Maine's economy and participation from communities across the state. To that end, the Maine Climate Council, co-chaired by the Commissioner of the Maine Department of Environmental Protection and the Director of the Governor's Office of Policy

*Figure 1: Maine has seen significant solar deployment in recent years, supported by ambitious state policies and favorable market conditions*



*Source: Governor's Energy Office. Data from ISO-New England, Central Maine Power, Versant Power, and other sources. Updated September 2023.*

Program Narrative

Innovation and the Future, brought together an assembly of scientists, industry leaders, bipartisan local and state officials, and engaged citizens, in 2019 and developed the state's first four-year Climate Action Plan to put Maine on a trajectory to decrease greenhouse gas emissions and achieve carbon neutrality. *Maine Won't Wait: A Four-Year Plan for Climate Action* represents the consensus result of extensive study, dialogue, and public deliberation undertaken by six working groups and two subcommittees, with engagement and input from thousands of people from across the state.[iv] *Maine Won't Wait* establishes four goals for Maine's climate response: (1) Reduce Maine's greenhouse gas emissions; (2) Make Maine more resilient to the impacts of climate change; (3) Foster economic opportunity and prosperity; and (4) Advance equity through Maine's response. To achieve these goals, *Maine Won't* Wait further describes eight Climate Action Strategies, which include Modernizing Maine's buildings; Reducing carbon emissions in the energy and industrial sectors through clean energy innovation; Growing Maine's clean energy economy and good jobs; Investing in climate-ready infrastructure; and Engaging people and communities in climate impacts and program opportunities.

Solar energy plays a crucial role in achieving each of these strategies and Maine has not waited to pursue deployment of this important renewable energy resource. Since 2019, more than 796 megawatts of solar photovoltaic resources have been installed in the state – a more than tenfold increase – with 67% of new capacity achieved through distributed solar projects less than 5 megawatts (see *Figure Figure* ). The growing solar sector in Maine includes utility-scale projects, community solar, and residential solar projects. Residential and community solar have achieved significant growth since 2019 due to the establishment of two net energy billing (i.e. net metering) programs. These programs have enabled both residential-serving and commercial and industrial-serving virtual net metering projects up to five megawatts in size, which could subscribe any number of offtakers within the same utility service territory. Following enactment of these programs, distributed solar deployment has accelerated considerably, with approximately 40,000 residential customers currently subscribed to operational projects (see *Figure 2*). This pace of deployment has placed Maine sixth in the nation in total community solar capacity as of mid-2022.[v] Residential rooftop solar has also reached 50% year-over-year growth in 2022 (see *Figure 3*). Solar has not only brought new sources of renewable electricity to advance Maine's emissions reduction requirements, but also contributed to the creation of new jobs and attracted significant new investment to Maine communities, with clean electricity jobs – including solar jobs – achieving the highest growth rate in the clean energy sector.[vi]

*Figure 2: Maine has experienced rapid distributed solar deployment in recent years, with favorable net metering and other supportive policies*



2

Program Narrative

While Maine's residential solar market has significantly expanded, limited available data suggest more work is needed to increase participation among low-income households, a key priority for the state's *Solar for All* application. In 2022, the Governor's Energy Office (GEO) facilitated the provision of residential rooftop solar customer data for the first time from Central Maine Power (CMP) and Versant Power,[1] the two investor-owned utilities required under Maine law to enable net metering options for residential customers, to researchers at Lawrence Berkeley National Laboratory (LBNL) for inclusion in the annual national-level *Tracking the Sun* database and solar demographics tool.[vii] Results from this analysis, based on data through calendar year 2021, demonstrate the estimated share of residential solar adopters in Maine at or below 100% of Area Median Income is 30%, slightly less than an estimated 33% of solar households nationally (see *Figure 4*). The GEO has also facilitated similar data sharing for residential customers participating in community solar through virtual net metering, beginning in calendar year 2022. Results of LBNL's analysis of community solar subscribers are not yet available, and thus no data regarding the income level or other demographic characteristics of the more than 32,000 residential customers already participating in community solar are available for this application.

*Figure 3: Residential rooftop solar growth has accelerated, reaching 50% year-over-year in 2022. Community solar growth was 300% in 2022 but is not shown due to the limited time series.*



*Figure 4: The Lawrence Berkeley National Laboratory Solar Demographics Tool indicates an estimated 30% of on-site residential solar adopters in Maine are at or below 100% of area median income, compared to approximately 30% nationally.*



---

[1] CMP and Versant serve 78.4% and 17.6% of residential customers in the state, respectively, totaling 96.0% of Maine residential customers. The remaining 4.0% of customers are served by nine municipal or cooperative utilities.

3

Program Narrative

Maine is the second-most rural state in the nation, with more than 60% of households meeting the definition established by the U.S. Census Bureau. The state's housing stock is the eighth-oldest in the nation, with 24% of units built before 1939.[viii] Maine is also the most heating-oil reliant state, with 58% of households utilizing heating oil or kerosene as their primary heating source and an additional 12% relying on propane.[ix] The state has recently completed a *Housing Production Needs Study*,[x] which identifies Maine's housing stock as having a high share of owner-occupied homes (73% in Maine compared to 65% nationally), high representation of single-family homes in the rental stock (61% in Maine compared to 33% nationally), and a high proportional representation of owner-occupied mobile and manufactured homes (9%) (see *Figure 3*). In Maine, there are about 100,000 affordable housing units – 25,000 subsidized units that are reserved for households with under 80 percent Area Median Income (AMI), and about 75,000 naturally occurring affordable housing units for households making less than 80% of AMI. Sixty-one percent of renter-occupied units are single-family homes, 18% in 2-9 unit buildings, and 10% in 10-49 unit buildings. The range of affordable housing types in Maine emphasizes the need to ensure the Solar for All program is accessible to a variety of building types to maximize the diversity of households that can participate and has informed the range of program channels proposed by this application.

*Figure 3: Occupied Units by Typology and Tenure in Maine, 2021 (State of Maine Housing Production Needs Study).*



Source: American Community Survey 5-Year 2021

### Program Overview

*Solar for All* presents an historic opportunity for Maine to accelerate the provision of benefits of residential solar and storage to low income and disadvantaged households, leveraging the strong market fundamentals already established by ambitious programs in recent years as well as additional federal incentives through the Inflation Reduction Act, including new and expanded tax credits and complementary funding streams. Maine is well prepared to put *Solar for All* funds to work expeditiously, ensuring the benefits of this historic federal investment are realized across the state, including rural areas, growing urban centers, islands, and in Tribal communities. Since the release of the *Solar for All* Notice of Funding Opportunity (NOFO) by EPA on June 28,

4

Program Narrative

2023, the Maine Legislature enacted an enabling framework for a new community solar program, building on the work of a diverse stakeholder group convened by the GEO for more than a year of program design and analysis.[2] The GEO has led a broad public engagement process to inform development of this application, incorporating direct outreach to key stakeholders and communities as well as a Draft Program Framework issued for a formal period of written comment.[xi] The result is a comprehensive proposal to ensure delivery of each eligible technology to a diverse range of low income and disadvantaged households across the entire state of Maine, maximizing the breadth and depth of meaningful benefits while holistically addressing a range of financial and non-financial barriers to deployment. Maine has also conducted a robust examination of the various eligible participants for EPA's *Solar for All* program in order to maximize geographic and community diversity as well as broad public outreach and engagement. This application is supported by more than forty letters of support and commitment from a broad range of affected stakeholders, demonstrating that Maine is ready – indeed, Maine won't wait – to deliver on the opportunity of *Solar for All*.

Consistent with our comprehensive approach, Maine's application for *Solar for All* proposes the **Maine Solar for All (MESA) program**, comprising four program channels through which *Solar for All* financial assistance will be deployed. These four channels address the full range of eligible households as defined by the NOFO, accounting for important additional characteristics including homeownership or renter status and single- or multi-family building occupancy, as well as addressing future housing production. Across these four channels, MESA ensures the achievement of EPA's three program objectives: reducing emissions of greenhouse gases and other air pollutants by maximizing the deployment of residential-serving solar, storage, and enabling upgrades; maximizing the breadth and diversity of households served; and mobilizing financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects. The four program channels of MESA are outlined below.

### *MESA-Single Family Residential Program Channel*

More than 106,000[xii] income-eligible households live in single-family units statewide, representing the intended population to be served by the MESA-Single Family Home Program Channel. Low-income households residing in single-family or owner-occupied small multifamily[3] housing units can benefit significantly from deployment of on-site (e.g. rooftop) solar energy, and often, energy storage. Furthermore, enabling upgrades including repairs or improvements to structural components, building envelope, and electrical systems reasonably associated with the installation of on-site solar and energy storage are anticipated to be frequently necessary and incorporated into this program channel.

The Single Family Residential Program Channel will utilize public-private partnerships between the GEO as the MESA program administrator and one or more residential on-site solar

---

[2] See Section 1.4: Distributed Solar Market Strategy.
[3] In general, GEO contemplates 'single-family' homes as residential buildings with not more than four dwelling units. As discussed in Section 1.7: Program Planning Timeline and Workplan Narrative, the GEO intends to further refine the definitions and categories for which MESA financial assistance will be deployed, including potential refinement of the definition of 'single-family' homes eligible for participation in the program channel.

5

Program Narrative

developers, which will apply to partner with the GEO through a competitive RFP process.[4] The program structure is broadly modeled on the Connecticut Green Bank program.[xiii] One or more qualified program vendors would propose to serve eligible low-income single-family homeowners by installing on-site solar, associated storage, and enabling upgrades financed through a lease-to-own offering. Further details are enumerated in Section 1.4. Qualified program vendors would be required to provide on-site solar products that:

- Are available only to Solar for All-eligible low-income households occupying single-family homes anywhere in the state of Maine.
- Maximize wrap-around services, including eligible enabling upgrades, through program delivery coordinated with related household energy programs including but not limited to existing energy efficiency and electrification incentives available through Maine's efficiency program administrator the Efficiency Maine Trust, funding from the Weatherization Assistance Program and applicable federal incentives through the Inflation Reduction Act.

The GEO proposes to allocate $16,250,000 in Solar for All funding to direct financial assistance through this program channel and estimates this funding amount will initially reach approximately 2,000 participating households. Resulting program key performance indicators are summarized in *Table 1*. These proposed metrics are ambitious yet reasonable when considered in the context of the comprehensive MESA program and given the already rapid expansion of Maine's residential on-site solar market described above.

### MESA Multifamily Residential Solar Channel

More than 31,000[xiv] income-eligible households live in multifamily units statewide, representing the intended population to be served by the Multifamily Residential Program Channel. Low-income households residing in multifamily housing units can benefit significantly from deployment of on-site (e.g. rooftop) solar energy, and often, energy storage. Furthermore, enabling upgrades including repairs or improvements to structural components, building envelope, and electrical systems reasonably associated with the installation of on-site solar and energy storage are anticipated to be often necessary and incorporated into this program channel.

The GEO proposes to allocate $20,000,000 in Solar for All funding to direct financial assistance through this program channel, and estimates, in part based on the performance of the New York and California programs,[xv] this funding amount will reach at least 2,000 participating households. Section 1.4 summarizes the Financial Assistance Strategy for this program channel. Resulting program key performance indicators are summarized in *Table 1*. This proposed program channel is ambitious but reasonable when considered in the context of the holistic suite

---

[4] At this time the GEO has not reached a final determination whether to sub-award *Solar for All* funds to one or more program administration partners, who would then qualify approved solar vendors, administration of program funds, etc.; or whether to sub-contract directly with solar vendors, administering vendor qualification directly through the sub-contracting process. The GEO continues to review relevant EPA program requirements, including guidance released in the Solar for All Frequently Asked Questions on October 6, 2023. These considerations are discussed in more detail in Section 1.7: Program Planning Timeline and Workplan Narrative.

6

of program channels and comprehensive technical assistance described in Section 1.5 and given the already rapid expansion of Maine's residential on-site solar market described above.

### MESA Energy Assistance Channel

In 2021, pursuant to legislation, the GEO convened the Distributed Generation Stakeholder Group (DGSG) to consider various distributed generation project programs to be implemented between 2024 and 2028. The DGSG represented a range of key perspectives, including but not limited to state entities including the Public Utilities Commission and Office of the Public Advocate, low-income and consumer advocates, environmental advocates, electric utilities, solar industry representatives, and researchers. Consistent with the legislative direction, the DGSG oversaw the development of robust technical analysis to evaluate multiple frameworks for a new community solar program, and obtained significant public input through its eighteen public meetings and multiple issue-focused work sessions including on the topics of equity and access.[xvi] The Final Report of the DGSG, submitted by the GEO to the Legislature in January 2023, provides the program framework proposed here as the Energy Assistance Program Channel – a low-income customer-serving community solar model that reduces barriers to participation, delivers meaningful benefits consistent with EPA's program requirements, and leverages Maine's significant prior investments in building a thriving distributed solar industry.[xvii]

*Figure 4: Energy Assistance program community solar projects ("Hybrid + Storage" in figures) are projected to be highly cost-effective from a jurisdiction-specific benefit-cost perspective, and put downward pressure on electric rates for all ratepayers.*



MESA Energy Assistance projects will primarily be community-scale paired solar and energy storage projects, consistent with EPA's definitions of eligible technologies and Maine law. Eligible participants in the MESA Energy Assistance Program Channel would be income-qualified households identified through existing assistance program enrollment. This population is likely to begin with the population of Low Income Heating Assistance Program (LIHEAP) beneficiaries in Maine, which included 30,106 households in 2021.

- Because the anticipated portfolio of MESA Energy Assistance solar projects are not likely to reach commercial operation and begin delivering financial benefits simultaneously, the GEO anticipates devising a mechanism by which the population of households benefitting from the program expands over time, ensuring that every benefiting household receives the required 20% equivalent bill reduction.

Program Narrative

- o One mechanism the GEO may consider is to work with LIHEAP program administrators to enroll LIHEAP beneficiaries in order of geographic proximity to the applicable solar project, maximizing the local community benefit. However, further refinement of the mechanism is needed and is discussed in Section 1.7.
- Direct enrollment of eligible participants results in a substantial financial savings to the program that would otherwise be required for traditional customer acquisition and subscriber management. This approach maximizes the program resources available to provide a direct financial benefit to eligible households, consistent with EPA's program objectives.
- Incorporation of energy storage for MESA Energy Assistance projects contributes to several important benefits, including substantially increasing the wholesale market value of the energy and, where applicable, capacity produced by the resource, and can also contribute to distribution grid reliability and resilience.
  - o The GEO intends to explore implementation of one or more pilot programs within the context of the MESA Energy Assistance Program Channel, under which projects sited on or in close proximity to critical facilities, such as municipal or school buildings which provide critical services to disadvantaged communities during emergencies and power outages, might be configured to provide backup power through islanding capabilities.
  - o Such projects are envisioned as primarily participating in the MESA Energy Assistance Program Channel, utilizing more than 50% of their energy output to generate direct benefits to qualified households. However, in the event of an outage, the projects would be configured to provide emergency backup power for one or more critical facilities.

More than 1,300 megawatts of potentially qualified community-scale solar projects are currently in development in the state, with a significant share likely to be ineligible to participate in the previous net energy billing incentive programs, which conclude for new entrants at the end of 2024, and therefore likely candidates to compete for a position in the MESA Energy Assistance Program Channel. The significant engagement and analysis already undertaken by the DGSG provide a foundation for program design and established a common understanding of the program approach among likely key program partners. Competitive bidding for PPAs is a well-established mechanism for stakeholders including the Public Utilities Commission and electric utilities in the state, with nearly two gigawatts of renewable energy previously contracted under equivalent mechanisms.[xviii]

The GEO estimates $35,000,000 in funding allocated to the MESA Energy Assistance Program Channel would result in approximately 45 megawatts of new community solar and 36 megawatt-hours of associated storage. It is assumed that 80% of these projects deploy energy storage. Enabling upgrades are not anticipated to be a significant portion of financial assistance deployed through this program channel due to the community-scale nature of the projects. In addition, given the significant pipeline of potentially eligible projects already in development, the GEO believes this program channel is ripe to scale even further with minimal additional program administration costs.

Program Narrative

### Cooperatively-owned Community Solar Channel

As EPA recognizes in the NOFO, many homeowners face physical and logistical barriers to deploying on-site solar. Maine has enabling statutes in place permitting cooperatively-owned community solar projects up to one megawatt in size. A small number of such projects already exist in the state, a testament to the determination and ingenuity of certain community leaders and organizers.[xix] *Solar for All* provides a key opportunity to leverage and scale these pioneering models through focused financial assistance paired with robust technical assistance focused on cooperative formation and governance, as described in Section 1.5.

Eligible participants would be any *Solar for All*-qualified household, with further consideration given to minimum share of income-qualified households to ensure incentives are directed primarily to the most disadvantaged populations.

The GEO expects to allocate $5,000,000 to the Cooperatively-owned Community Solar Channel. This is a feasible program model which leverages existing pioneering project models in the state to specifically deliver the NOFO-specified meaningful benefit of solar ownership to eligible households who may be unable to participate in other program channels.

The anticipated outcomes are guided by detailed modeling and grounded in the context of Maine and the experience of Maine-based organizations with decades of providing services to low income and disadvantaged communities and building the rapidly growing residential-serving solar and storage market.

*Table 1: Summary of Maine Solar for All program channel estimated key performance indicators[5]*

| Metric | Single Family Onsite | Multi Family Onsite | Community Solar Channels | Total |
|---|---|---|---|---|
| Total Funding Requested | | | | **$99.5M** |
| Financial Assistance Requested | $16.3M | $20M | $40M | **$76.3M** |
| Households benefitting | 2,000 | 2,000 | 34,000 | **38,000** |
| *Total Funding per household* | | | | **$2,618** |
| *Financial Assistance per household* | $8,125 | $10,000 | $1,030 | **$2,007** |
| Megawatts of solar | 12.1 | 12.1 | 44.7 | **68.9 MW** |

---

[5] Note that, consistent with the NOFO, all "Total Funding per…" and "Financial Assistance per…" metrics are calculated as the Total Funding requested or the Financial Assistance requested divided by the applicable metric. Therefore, these metrics do not reflect that actual financial assistance specifically required to achieve each outcome. Totals may differ due to rounding.

Program Narrative

| Metric | Single Family Onsite | Multi Family Onsite | Community Solar Channels | Total |
|---|---|---|---|---|
| *Total Funding per megawatt* | | | | **$1.4M** |
| *Financial Assistance per megawatt* | $1.34M | $1.65M | $782,998 | **$1.1M** |
| Megawatt-hours of storage | 1.2 | 1.2 | 35.8 | **38.2 MWh** |
| *Total Funding per megawatt-hour* | | | | **$2.6M** |
| *Financial Assistance per megawatt-hour* | $13.54M | $16.67M | $977,654 | **$2M** |
| Annual short tons of CO2 avoided[6] | 1,210 | 1,300 | 5,180 | **7,690** |
| *Total Funding per avoided CO2 short ton* | | | | **$12,936** |
| *Financial Assistance per avoided CO2 short ton* | $13,430 | $16,529 | $6,757 | **$9,915** |
| Total household savings over time | $69.9M | $69.9M | $259.4M | **$399.1M** |
| *Total Funding per dollar of household savings* | | | | **$0.25** |
| *Financial Assistance per dollar of household savings* | $9,302 | $11,448 | $91,863 | **$0.19** |

## 1.2 Meaningful Benefits Plan

Several characteristics specific to Maine make distributed solar plus storage particularly beneficial to low-income and disadvantaged populations and MESA ensures a comprehensive range of meaningful benefits will be delivered to these households.

---

[6] Avoided carbon dioxide is calculated using AVERT. The value accounts only for carbon dioxide reductions from solar production, but does not account for any time-sensitive variations as a result of battery storage.

Program Narrative

*Figure 5: Geographically-identified disadvantaged communities in Maine as defined by the NOFO*



Twenty-nine percent of Maine's population, about 383,000 people living in 168,000 housing units, are location with CEJST-identified disadvantaged community (see *Figure 5*). About 367,000 Maine households have incomes under 200 percent of the Federal Poverty Level (FPL). There are about 1,300 households on Tribal lands in Maine, with about 658 below 200% FPL. Maine also has about 5,000 year-round residents living on unbridged islands, as well as about 42,000 electricity customers connected to the rest of New England's grid only through New Brunswick, Canada.[7] Each of these characteristics makes delivering financial and resiliency benefits particularly important in Maine.

Due largely to compounding factors of rural character, high reliance on fossil fuels for home heating, generally older and less energy efficient building stock, and lower incomes, including a large percentage of adults over 65 with fixed incomes Maine is among those states with high energy burdens. The average statewide energy burden is 3 percent, while the average statewide energy burden for households below 200 percent of the Federal Poverty Level is 10 percent (see *Figure 6*).[xx] MESA will help alleviate this burden for an estimated 38,000 low-income and disadvantaged participants.

*Household Savings*

Where possible for households that pay an electricity bill, household savings will accrue to MESA participants through electric utility bill reductions. For households that do not pay an electricity bill, such as residents of a master-metered multifamily building, or in some instances households for whom an electricity bill reflects only a portion of their energy costs, such as residents of multifamily buildings where only unit plug load is billed to the resident directly, the appropriate program channel will require MESA-eligible projects to provide an equivalent financial or non-financial benefit of greater than or equal to the average household's annual

---

[7] While most of the state is part of New England's Independent System Operator (ISO-NE) regional transmission grid, the northernmost portion of the state is served by the Northern Maine Independent System Administrator (NMISA), which is not directly interconnected electrically with the rest of the U.S. electric grid.  NMISA's connection to the ISO-NE grid is via the New Brunswick Power Corporation. Northern Maine is the only region electrically isolated in this way in the lower 48 U.S. States. The NMISA region is home to approximately 90,000 residents and approximately 42,000 electricity consumers. (NMISA 2022 Seven Year Outlook. https://www.nmisa.com/wp-content/uploads/2022/04/2022-Seven-Year-Outlook-final-1.pdf.)

Program Narrative

*Figure 6: Average energy burden for all households by census tract in Maine (left) and average energy burden for low-income households by census tract in Maine (right)*



electricity expenditure, consistent with EPA's program requirements. All household savings values provided in this section are estimates and will be refined following award.

The MESA Single-Family Residential Solar Program Channel will deploy on-site solar and in some cases energy storage for eligible households. Participating households are assumed to deploy solar projects of sufficient capacity to offset approximately 90% of the household's annual electricity costs through net metering credits for customers of Central Maine Power and Versant Power, which serve 96% of electric customers statewide and are required by law to provide net metering arrangements.[8]

The Single-Family Residential Solar Program Channel will fund approximately 2,000 solar installations for eligible low-income single-family households, providing these households with an estimated 90% annual bill savings, an average of $1,400 per household. At least 10% of these installations will be paired with battery energy storage to provide additional resiliency benefits. Electricity bill savings of 90% are assumed based on participation by a typical electric utility customer in net energy billing,[xxi] which provides retail rate credits to customers. The $16.25 million of EPA funds reserved for this program are expected to offset the majority of the upfront solar and solar plus storage installation costs through low-interest leasing. A typical household is estimated to achieve overall annual bill savings of more than 70% after solar lease payments are factored in.[9] Rooftop solar systems are exempt from local property tax assessments in Maine.

The Multifamily On-site Solar Program Channel will fund rooftop solar installations to benefit approximately 2,000 customers and will require all participating projects to deliver eligible building occupants 20% bill savings. At least 10% of these installations will be paired with battery energy storage. Participating net metering customers living in a multifamily home with shared rooftop solar are estimated to save approximately $1,400/year. The multifamily program channel is projected to directly enable the deployment of approximately 12 megawatts of

---

[8] See Sections 1.3 and 1.5 for further discussion of opportunities to expand access to eligible households among the 4% of customers served by cooperative or municipal utilities through MESA technical assistance.

[9] The impact of tax incentives and EPA funds on the purchase price of a solar and solar plus storage installation were calculated, and then calculated lease payments based on a 20-year lease term and assumed 5.5 percent interest rate. This payment was subtracted from annual participant benefits and divided by total average bills for CMP's service territory, equating to 74% expected savings. Calculations are initial and based on assumptions. Participants in service territories with higher rates will experience higher savings.

Program Narrative

multifamily rooftop or on-site solar. Estimated bill savings for participants in net metering could exceed 70%. Participants without the ability to participate in net metering will be delivered an equivalent financial benefit benchmarked to at least 20% of the average residential utility customer bill, consistent with the NOFO requirements. The GEO intends to work with key stakeholders, as described in Section 1.7, to operationalize definitions and standards for equivalent financial benefits, leveraging resources including guidance from the U.S. Department of Housing and Urban Development.

Finally, the Energy Assistance Program Channel will utilize funds from the EPA to reduce the cost of power-purchase agreements for community-scale solar deployment. These investments will enable an estimated 34,000 low-income households in Maine to receive an equivalent financial benefit, delivered as energy bill assistance, corresponding to a minimum of 20% of the applicable average residential electric bill, consistent with the NOFO requirements. On average, the GEO estimates households participating in this program will save approximately $380 annually.

Integrating MESA programming with wraparound services, such as robust existing energy efficiency, weatherization, and electrification incentives, could further maximize benefits for participating households by improving administrative efficiency, easing outreach, and reducing not just electricity but total energy bills, as well as increasing indoor-air quality, comfort and dwelling-unit durability.

Total annual and per participant savings estimates for all MESA program channels are provided in *Table 2* and *Table 3*. Note the MESA Energy Assistance and MESA Cooperative community-owned projects are combined as "Community" in these tables.

*Table 2: Estimated annual electricity bill or equivalent savings per participant, by utility and MESA program channel*

| Utility | Community | Single Family | Multifamily | Community | Single Family | Multifamily |
|---|---|---|---|---|---|---|
| Central Maine Power | $394 | $1,806 | $1,806 | 20% | 90% | 90% |
| Versant Power-BHD | $374 | $1,716 | $1,716 | 20% | 90% | 90% |
| Versant Power-MPD | $348 | $1,598 | $1,598 | 20% | 90% | 90% |

*Table 3: Estimated total annual program savings by utility and MESA program channel*

| Utility | Community | Single Family | Multifamily |
|---|---|---|---|
| Central Maine Power | $10,504,334 | $2,833,800 | $2,833,800 |
| Versant Power- BHD | $1,715,074 | $462,588 | $462,588 |
| Versant Power- MPD | $486,531 | $131,266 | $131,266 |

Program Narrative

### Equitable Access

Ensuring that the benefits of the energy transition are delivered equitably is a central tenet of Maine's climate action plan, *Maine Won't Wait*. The MESA program will advance that goal through alignment with existing energy assistance programs, ownership and participatory governance pathways, targeted financial and technical assistance to low-income and disadvantaged communities, and programmatic design that ensures the spectrum of building and tenure types as well as geographic locations are eligible to participate. Refer to Section 1.6 for additional details.

Maine has conducted a robust examination of the various eligible participants for EPA's Solar for All program in order to ensure equitable access, and maximize geographic and community diversity, as described in Section 1.1. The range of housing types where low income and disadvantaged households reside in Maine emphasizes the need to ensure the MESA program is accessible to a variety of building types. The GEO has, accordingly, developed a suite of program channels that, if fully funded, would reach every segment of eligible populations across building and tenure types as well as geographic locations.

Program design has incorporated national best practices[xxii,xxiii] and lessons from Maine's participation in the National Community Solar Partnership[xxiv] to overcome barriers to accessing affordable solar, including low credit scores, insufficient tax burden, lack of familiarity with solar, language barriers, lack of broadband access, pre-construction upgrades needed, and lack of opportunities for renters to participate. For instance, the Energy Assistance Program Channel will enable access for households participating in existing assistance programs, regardless of credit score. For the single family and multifamily program channels, financial assistance will be allocated for enabling upgrades, addressing structural and electrical barriers to solar deployment. Throughout the program, broad outreach and technical assistance using existing, trusted relationships will facilitate trust around solar and storage installations. The program will also benefit from ongoing work by the Maine Connectivity Authority,[xxv] a quasi-governmental agency established in 2021 to ensure universal access to affordable high-speed broadband statewide by 2024.

### Resilience Benefits

The specific characteristics of Maine's low-income and disadvantaged households makes delivering resiliency benefits – in addition to financial benefits – particularly important. Due in large part to the rural nature and the climate of Maine – including major storm events and outages caused by dense vegetation – the electric grid in Maine faces one of the highest outage percentages in the country. In 2019, the state ranked among the highest in the country for average total annual power interruption duration per customer, and in 2020 experienced the highest average number of power interruptions.[xxvi] Accordingly, MESA prioritizes the prudent deployment of energy storage.

The single-family and multifamily program channels assume approximately 10% of supported projects will be paired with energy storage. This equates to approximately 400 households that will have enhanced resiliency from storage deployment. In the Energy Assistance program channel, 80% of projects are assumed to include deployment of storage, recognizing the substantial incremental value that the DGSG analysis found is captured when storage is utilized to capture clipped solar output and optimize the timing of energy delivery. Incorporating energy

14

Program Narrative

storage also has the potential to help address potential interconnection barriers, as discussed in Section 1.4. Solar plus storage could also offer additional opportunities for broader grid and program participant benefits, including from providing grid services or participating in demand response programs or virtual power plant opportunities. The GEO intends to actively explore such opportunities during the program design period.

Additionally, the GEO intends to explore implementation of one or more pilot programs within the context of the MESA Energy Assistance Program Channel, under which projects sited on or in close proximity to critical facilities, such as municipal or school buildings which provide critical services to disadvantaged communities during emergencies and power outages, might be configured to provide backup power through islanding capabilities. This would deepen benefits provided through MESA to low income and disadvantaged communities, by providing a critical source of resilience in the face of a changing climate and increasing extreme weather events.

### Community Ownership

As EPA recognizes in the NOFO, many homeowners face physical and logistical barriers to deploying on-site solar. MESA dedicates one of its four program channels to deploying cooperative owned solar specifically to deliver the meaningful benefit of solar ownership to eligible households who may face insurmountable barriers to participation in the other program channels. Direct financial assistance deployed through this MESA program channel would be directed to specific projects or portfolios of projects and would be complemented by broader technical assistance to foster a pipeline of viable projects as described in Section 1.4. For example, MESA could provide funding for purchase of a basic operations and maintenance package to overcome a substantial barrier to existing low-income solar efforts of managing long term service.

### Workforce Development and Entrepreneurship

The deployment of solar and storage technologies in Maine has the potential to create new, good quality job opportunities for workers in electrical and other trades, while also creating opportunities for the skilled incumbent workforce. These opportunities align with Maine's clean energy, climate, economic development, and workforce goals, including Governor Janet Mills' goal of doubling Maine's clean energy and energy efficiency jobs to 30,000 by 2030.

In 2021, the Maine GEO established the Clean Energy Partnership (CEP) program to support the growth of the clean energy economy in Maine through workforce development and innovation. The strength of the CEP lies in the coordinated engagement of industry, support organizations, training and educational institutions, and state government. Accordingly, the CEP convenes an Advisory Group of public and private entities in the industry, including representatives from the Governor's Office of Policy Innovation and the Future, the Maine Department of Labor (MDOL) and Department of Economic and Community Development, the Maine Community College System, the University of Maine system, the private sector, labor unions, researchers, and other subject-matter experts.

Clean energy workforce development is a priority in Maine, and the State has already conducted extensive gap analyses and roadmaps[xxvii] and developed, implemented, and expanded new and existing programs. Some of the ongoing clean energy workforce development initiatives within Maine include:

15

Program Narrative

- The GEO awarded $2.5 million in clean energy workforce development grants via the CEP program in December 2022, which has created new and expanded existing clean energy apprenticeship, pre-apprenticeship, and internship models across Maine. The GEO has also secured an additional $2.75 million to support clean energy workforce development including training, stipends, and curriculum.

- The Maine DOL awarded $12.3 million to the Maine Apprenticeship Program (MAP) to support the development of pre-apprenticeship and apprenticeship programs across multiple industries. Their grantees are increasing exposure to clean energy careers by creating pre-apprenticeship programs, developing multi-craft core curriculum and training for construction and trades, and creating new apprenticeship programs for solar careers.

- Maine is home to the first employer-sponsored electrical apprenticeship program in the nation to provide the training required for renewable energy professionals to earn electrician licensure (the ReVision Energy Electrical Apprenticeship Program, or REAP). With funds from the CEP and MDOL-MAP, ReVision Energy is developing nation-leading registered apprenticeship programs for solar careers not related to installation including for Customer Service Representatives, Technical Sales Specialists, Operations Managers, and PV Design Specialists.

- Coastal Counties Workforce, Inc, one of Maine's three regional workforce development boards, was selected for a $2 million award from the Building Pathways to Infrastructure Jobs grant program administered by the U.S. Department of Labor's Employment and Training Administration. The grant will fund the Green Jobs for ME program to prepare unemployed and underemployed individuals for high-wage, high-skills careers.

As described in Section 1.4, MESA will provide additional resources to Maine's existing, successful public-private partnerships to grow solar and storage focused apprenticeship programs and provide accessible career training to aspiring clean energy workers and the skilled incumbent workforce. This may include matching candidates with employers interested in hosting interns/apprenticeships related to solar/storage installations, providing training and certification reimbursement for employees, and facilitating information sharing. Additionally, the GEO will implement a combination of administrative and programmatic approaches to support the objectives of the program and embed Good Jobs Principles as required by the NOFO, which may include requiring third-party leasing companies and/or lending institutions and/or program administrator to have a transparent process that qualifies approved contractors, prioritize lenders who include requirements for consumer protection, electrical board compliance, and fair compensation in their process for approving contractors. The table below summarizes some of the solar workforce development barriers identified in Maine and strategies that MESA will deploy to address them.

*Table 4: Example Solar Workforce Development Barriers and Actions Taken to Address Barriers*

| Barrier | Current Action | Action with MESA |
|---------|---------------|------------------|
| Lack of access to solar energy in rural or disadvantaged communities can limit business | CEP-funded NABCEP training and credentialing opportunities for low income | Increase affordability and accessibility of solar for low income and disadvantaged communities, leading to local |

16

Program Narrative

| Barrier | Current Action | Action with MESA |
|---|---|---|
| opportunities for local contractors and local job creation. | and disadvantaged communities. | construction activity and job opportunities for trained workforce. |
| Lack of electricians, laborers, and access to training programs can limit solar workforce development. | CEP and MDOL-MAP funding supporting apprenticeship and pre-apprenticeship expansion, including programs related to solar installation, design, and sales. | Leverage existing pathways and provide additional resources to enable training and strengthen pathways into the solar workforce, while allowing most program funds to go directly to the deployment of solar and storage. |
| Low awareness of career opportunities in solar energy. | The CEP is designing and implementing an interactive clearinghouse website database for clean energy career information including internship and apprenticeship opportunities, training and educational programs, available career openings, and an outline of clean energy sector career pathways. | Solar for All will provide resources to expand CEP's work to continue outreach to build the clean energy talent pipeline and diversify recruitment strategies, including through partnerships with the Maine Community College System. |
| Embedding Good Jobs Principles in solar workforce development. | Maine's laws governing energy facility construction and public works and state-assisted projects provide standards and frameworks that may support high quality, middle-class jobs in the growing clean energy industry that pay family-sustaining wages and include benefits, and safe working conditions. | MESA will provide resources to expand CEP's work with Maine DOL to provide resources and information to employers to help them embed Good Jobs Principles in their workforce development approach, monitor progress, and promote opportunities for expanded apprenticeship programs. |

### 1.3 Distributed Solar Market Strategy

The MESA program is an opportunity for Maine to build on a strong track record of solar deployment and address barriers to low-income and disadvantaged community residential distributed solar deployment. As described in Section 1.1, the MESA program will be deployed in the context of Maine's ambitious climate and clean energy programs and activity, supported by the policy and market mechanisms detailed in this section. Specifically, the state has a renewable portfolio standard, an established target for energy storage,[xxviii] and a goal for distributed generation development.[xxix] The state has also established a stakeholder process to

Program Narrative

identify priorities for grid planning to ensure a modern, clean, reliable, and affordable grid,[xxx] and is in the process of updating rate designs to promote grid services and electrification[xxxi]. The Public Utilities Commission is also in the process of updating interconnection rules, with robust stakeholder comment and feedback.[xxxii] For more on interconnection, see Project Deployment Technical Assistance Plan.

### Renewable Portfolio Standard

Maine's renewable portfolio standard (RPS) requires that 80% of electricity sold in the state must be supplied by renewable energy resources by 2030.[xxxiii] Achieving the 80% by 2030 RPS requirement has also been incorporated by the Maine Climate Council as one of Maine's emissions reduction strategies put forward in the statutorily-required four year climate action plan..[xxxiv] The GEO's 2021 Renewable Energy Goals Market Assessment found that Maine is on track but will require new renewable energy generation through the end of 2030 to meet the RPS requirement.[xxxv] This requirement is expected to ensure a continued robust market for Renewable Energy Certificates (RECs), the compliance mechanism for the RPS. Projects supported through MESA are anticipated to leverage the value of these RECs, further extending the impact of MESA funding and supporting achievement of the established RPS.

### Net Metering

Maine law permits new solar projects up to one megawatt to qualify for retail net metering, including virtual offtakers and no mandated program cap. This policy will be an asset to deployment of MESA funds and enable the delivery of financial benefits for participants.

In July 2023, the Maine Legislature enacted Public Law 2023, chapter 411.[xxxvi] This bill charges the GEO with responsibility for developing the Distributed Solar and Energy Storage Program "to provide funding to foster the continued growth of cost-effective distributed solar facilities and energy storage systems in this State." The GEO is required to develop this program by July 2024, and to utilize the program as one vehicle for the deployment of federal funds obtained through *Solar for All*.

### Third Party Ownership and Community Solar

Maine law enables third-party ownership of solar systems through both the established retail net metering program as well as broadly through the ability for commercial entities to become licensed competitive electricity suppliers and/or to transact in wholesale energy markets. These enabling policies are reflected in the design of the program channels proposed in Section 1.1. Consolidated billing is enabled for certain net metering participants, and is anticipated to be applicable to the majority, if not all, MESA participants that may utilize net metering.

### Interconnection

As described in previous sections, Maine has seen robust distributed solar deployment in recent years. This pace of deployment has resulted in substantive experience with distributed generation interconnection among stakeholders, particularly solar installers and electric utilities. Distributed solar interconnection procedures are required by law. The implementing regulation, Maine Public Utilities Commission Rules Chapter 324, has been updated multiple times in recent years, and further modifications are anticipated to be adopted by the end of 2023. Earlier this year, an examination of interconnection procedures and grading was done for all fifty states and Maine's

Program Narrative

interconnection procedures received a grade of "C" from this review.[10] However, a majority of the criteria that were determined by this project to be deficient appear likely to be addressed at least in part by the ongoing interconnection rule update, including specific interconnection procedures supporting energy storage deployment, additional streamlined review, clarity of certain terms utilized for expedited screens, incorporation of supplemental screens, and timelines. Nevertheless, interconnection barriers including but not limited to timelines and costs assigned to interconnecting projects, are anticipated to be important barriers that MESA technical assistance funds will be essential to addressing, as described in Section 1.4.

### *Jurisdictional Consistency*

MESA is designed to maximize deployment breadth and diversity across Maine, including across different utility service areas. Major jurisdictional inconsistencies are not identified between the service territories of CMP and Versant Power, the two investor-owned utilities which serve 96% of residential customers in the state, given both are subject to the regulatory authority of the Maine Public Utilities Commission and the rules it promulgates. However, 4% of Maine residential customers are served by small cooperative or municipal utilities, including several which serve island communities or especially rural areas of the state. These utilities are not required by law to provide retail net metering but may choose to participate in MESA.

## 1.4 Financial Assistance Strategy

Consistent with the requirements established in the NOFO, MESA allocates financial assistance to enable deployment of residential and community solar, associated storage, and enabling upgrades to benefit an estimated 38,000 low-income and disadvantaged households, as described in Section 1. Attachment J includes letters of support from more than a dozen Maine leaders and entities expressing support for the MESA program pertaining to this financial assistance strategy.

### *Single-Family Residential Program Channel*

The Single Family Residential Program Channel will utilize public-private partnerships between the GEO as the MESA program administrator and one or more residential on-site solar developers, which will apply to partner with the GEO through a competitive RFP process.[11] The program structure is broadly modeled on the Connecticut Green Bank program.[xxxvii] One or more qualified program vendors would propose to serve eligible low-income single-family homeowners by installing on-site solar, associated storage, and enabling upgrades financed through a lease-to-own offering. Qualified program vendors would be required to provide on-site solar products that:

---

[10] Only one state, New Mexico, received an "A" grade; six states received a "B"; and fifteen states, including Maine and four other New England states, received a "C." See https://freeingthegrid.org/introduction-to-interconnection-grades/ for details.

[11] At this time the GEO has not made a determination whether to sub-award *Solar for All* funds to one or more program administration partners, who would then qualify approved solar vendors, administration of program funds, etc.; or whether to sub-contract directly with solar vendors, administering vendor qualification directly through the sub-contracting process. The GEO continues to review relevant EPA program requirements, including guidance released in the Solar for All Frequently Asked Questions on October 6, 2023. These considerations are discussed in more detail in Section 1.7: Program Planning Timeline and Workplan Narrative.

Program Narrative

- Are available only to Solar for All-eligible low-income households occupying single-family homes anywhere in the state of Maine.
- Provide a residential on-site solar product lease with no down payment and savings from day one (i.e. "cash flow positive" for the household).
- Maximize the program's leverage of available federal investment tax credits by the lessor. Utilizing a competitive RFP to select qualified program vendor(s) will enable the GEO to ensure vendors maximize the provision of tax benefits to program participants, maximizing depth of savings, and/or utilize tax benefits for reinvestment into the program, maximizing breadth of participation.

### *Multifamily Residential Program Channel*

This program channel intends to utilize a flexible, bespoke approach to deploying MESA capital to meet the needs of eligible multifamily housing owners and developers, ultimately delivering meaningful benefits to *Solar for All*-eligible tenants. Program models considered for replication or best practice adoption include the New York State Energy Research and Development Authority (NYSERDA) Multifamily Affordable Housing Incentives program[xxxviii] and the California Solar on Multifamily Affordable Housing Program.[xxxix] The Multifamily Residential Program Channel will utilize one or more public-private partnerships between the GEO as the MESA program administrator and one or more eligible partners that will act as capital providers, to be determined following award. The GEO anticipates refining and advancing these initial partnerships as described in Section 1.7. The Multifamily Residential Program Channel will:

- Provide low-cost capital that addresses the financing gap that has historically prevented adoption of on-site solar for many multifamily developments during new construction, in spite of supportive state policies including net metering.
  - During consultation with housing lenders and developers across the housing ecosystem, the primary barrier to adopting on-site solar during construction of new multifamily housing was cost overruns in other budget areas, which leads developers to "cut solar first."
  - Providing dedicated low-cost capital through established housing lenders will ensure this barrier is addressed in a suitably bespoke fashion, while adhering to all applicable federal and state guidance.
- Provide low-cost capital that encourages adoption of on-site multifamily solar in recently developed buildings, many of which are solar-ready.
  - The Maine State Housing Authority has required all new subsidized housing to be "solar-ready" in recent years, including appropriate structural documentation, electrical conduit and raceways, and consideration during rooftop layout for other equipment such as HVAC systems.
  - Most recently or soon to be constructed publicly-supported affordable housing developments are well-positioned to rapidly deploy on-site solar with the support of the Multifamily Residential Program Channel.
- Provide low-cost capital and supportive technical assistance to deploy on-site solar where practicable as legacy multifamily units are rehabilitated and retrofitted.
  - The Maine State Housing Authority has indicated approximately 750 units of affordable multifamily housing units are targeted for rehabilitation during the program period and may be primed for additional investment through on-site solar

20

Program Narrative

and storage deployment supported through the Multifamily Residential Program Channel.

o One affordable housing-focused community development financial institution has indicated there are 319 U.S. Department of Agriculture-financed properties in Maine totaling 4,955 units, nearly all built between 1974 and 1998, and all relatively homogeneous in layout, construction quality, and building envelope. A significant portion of these units are expected to transition ownership in part due to the age of the developments and could represent a population of building stock primed for rehabilitation and reinvestment including with solar and storage supported by MESA.

- The MESA Multifamily Residential Program Channel will pair capital deployment with robust technical assistance from pre-development through the solar deployment cycle as described in Section 1.4.

### *Energy Assistance Program Channel*

MESA Energy Assistance projects will primarily be community-scale paired solar and energy storage projects, consistent with EPA's definitions of eligible technologies and Maine law. Projects will be selected for the program through a competitive bidding process and awarded power purchase agreements (PPAs) with an applicable investor-owned utility under existing authority granted to the GEO and Maine Public Utilities Commission.[xl] Under typical Maine PUC directives, the utilities would monetize the value of energy and any purchased attributes from the PPA, and, after covering costs incurred, return any net revenue to ratepayers through a rate adjustment.[xli] For any projects procured through the MESA Energy Assistance Program Channel, such revenues would be placed in a fund to be allocated through utility bill credits to eligible low-income customers.

- The MESA Energy Assistance program channel will deploy funds to lower the cost of eligible projects bidding into the program, likely through a pre-qualified financing model that would allow prospective bidders to identify – and subsequently be evaluated during bid selection – necessary funding amounts to ensure delivery of the required minimum financial benefit.

### *Co-operative Community Ownership Program Channel*

- Direct financial incentives would be distributed as grants to support the formation and operations of customer-owned shared solar projects, which would leverage existing incentives through net energy billing to provide bill credits. Support from MESA funds would ensure projects could comply with the minimum 20% bill savings equivalent requirement.
- Financial assistance deployed through this MESA program channel would be directed to specific projects or portfolios of projects and would be complemented by broader technical assistance to foster a pipeline of viable projects as described in Section 1.4.

21

Program Narrative

### *Program Design Partners*
Where appropriate, utilizing existing relationships, administrative processes, and financial pathways will maximize the number of participants, ensure expeditious deployment, and encourage longevity.

Maine's program design seeks to prudently leverage additional funds to the extent possible, including through the following categories of funding. Note that some categories of leveraged funds overlap, so Expected Amount values are not intended to be additive.

The GEO also anticipates that further financial support for related activities will be available through the two additional competitions administered by EPA through the Greenhouse Gas Reduction Fund. The successful implementation of MESA does not rely upon those sources of funding; however, this application seeks to ensure flexibility in program design, to avoid duplication of efforts and be consistent with the EPA's intent to maximize solar deployment. To that purpose, while not included in *Table 5* below, MESA will strive to enable leveraging of additional support, including bonus tax credits.

*Table 5. Leveraged Funding Overview*

| Leveraged Funding Category | Description | Estimated Amount ($) |
|---|---|---|
| Investment tax credit | The Inflation Reduction Act provides a 30% tax credit for solar and storage investment and bonus tax credits of 10% for low-income communities or on Indian land. An up to 20% credit increase is available to eligible solar and wind facilities that are part of a qualified low-income residential building or provide at least 50% of a facility's total output to qualifying low-income households. | $61 million from the standard ITC with an additional $8 million of bonus credits |
| Matching funds from developers | The MESA proposal is based on estimated of what is needed for market actors to install projects based on current and future projections of financing and technology costs, incorporating complementary revenue streams including net metering or PPAs where applicable. | Not quantified |
| PPA revenue | Cost-effective PPAs are anticipated to provide complementary revenue for Energy Assistance program projects. | $14 million |
| Participant benefits of net metering | Single family and multi-family solar and solar plus storage installations will generate participant benefits from the existing net metering program. | Not quantified |

Program Narrative

| Renewable Energy Credits (RECs) | Where applicable, RECs will be monetized or retired to enable cost-effective project deployment and support achievement of renewable energy requirements. | $44 million |
|---|---|---|
| Value of resiliency | Storage deployment will enhance the reliability of low-income and medically vulnerable customers, which will provide substantial benefits to customers, as well as value to overall transmission and distribution grids. | Not quantified |

## 1.5 Project-Deployment Technical Assistance Strategy

MESA proposes a range of technical assistance opportunities, intended to address a suite of non-financial barriers to the deployment of residential solar, community solar, energy storage and enabling upgrades to benefit low-income and disadvantaged communities. These intended activities are based on a wide range of best practices and models from Maine and other jurisdictions, as well as previously identified priorities and challenges identified by Maine stakeholders. More than thirty organizations have provided letters of support in Attachment K related to the activities proposed for MESA technical assistance in this section.

### *Workforce training and participation plan*

The GEO has developed a robust Workforce Training and Participation Plan to benefit workers in low-income and disadvantaged communities. The aforementioned CEP initiative partners with community colleges, who have a track record of engaging and supporting underserved and underrepresented learners, and the Maine Department of Labor's Maine Apprenticeship Program, which seeks to support participation of under-represented populations by including supportive services such as academic, career exploration, and wraparound supports in its programming, and involve people who have been shut out from apprenticeship opportunities in program leadership and design, with a focus on individuals with disabilities, veterans, people of color, and the recovery community.

By increasing the awareness of prospective job-seekers, providing accessible trainings to develop necessary skills, and increasing resources for employers to hire workers from low-income and disadvantaged communities, the program will increase representation and access for the solar and storage workforce. Cross-sector partnerships with existing training and apprenticeship providers will enable the MESA program to better engage with communities, invest in high quality jobs, advance diversity, equity, inclusion, and accessibility, and help achieve Justice40-compliant benefits to disadvantaged communities and individuals. Program participants and worker representatives will also be able to provide feedback to the CEP Advisory Group on curricula, training opportunities, and ongoing needs, challenges, and opportunities to facilitate MESA solar deployments. The CEP Advisory Group meets regularly to inform the ongoing work of the initiative.

The Workforce Training and Participation Plan will also ensure a variety of types of organizations are eligible for to receive technical assistance funding, to maximize the diversity and depth of community-serving organizations that can participate and help the eligible

23

Program Narrative

populations they serve. Maine's Workforce Training and Participation Plan is comprised of the following strategies and activities:

1. *Invest in a well-qualified, skilled, and trained clean energy workforce.*
   Provide resources to apprenticeship sponsors, community colleges, adult education programs, and career and technical education programs serving low-income and disadvantaged communities. These investments may include professional development for teachers serving rural, disadvantaged, and underrepresented communities, and investments in pre-apprenticeship programs and/or other pre-employment training programs.

2. *Support the development of a resilient, skilled, and stable workforce for the project.*
   Work with the Maine Apprenticeship Program, the community college system, unions, employers, industry associations, employers, CTE programs at area high schools, and the public to identify workforce needs and candidates for training.

3. *Benchmark wages, benefits, and other worker supports*
   Work with Maine DOL to provide resources and information to employers to help them comply with labor standards, monitor enforcement, and highlight opportunities for apprenticeship and other workforce programming among non-participating clean energy employers and contractors.

4. *Partner with training and placement programs for underrepresented workers.*
   Through public outreach and engagement, identify and partner with workforce organizations serving underrepresented communities and those facing systemic barriers to quality employment, such as those with disabilities, women, returning citizens, opportunity youth, and veterans to understand opportunities to recruit and involve these populations in training opportunities. Work with community organizations and advertise training programs through Maine's secondary and tertiary school systems to attract trainees from diverse populations.

5. *Provide referrals for support services, such as childcare and transportation, to increase representation and access.*
   Work with local Adult Education partners and Community-Based Organizations to provide students with appropriate readiness skills, or to support trainees with programs such as English as a Second Language. For example, CEP's outreach and recruitment will work to connect eligible populations to the HOPE program, which covers costs related to education and training— e.g., tuition, fees, books, supplies, childcare, transportation, car insurance, technology, etc.— for Maine parents who qualify for TANF.

### *Interconnection*

The DGWG found that it takes about 3 years, on average, to interconnect a project between 2 and 5 megawatts.[xlii] and stakeholders across the State are actively and collaboratively working to address already-identified interconnection issues through legislation, Public Utilities Commission rulemaking to amend interconnection procedures, and several regular interconnection working groups. Solar for All will benefit from these changes to facilitate streamlined, safe, affordable, and equitable interconnection of distributed generation resources including storage, and will dedicate $900,000 for additional technical support.

24

Program Narrative

In 2021, the Interstate Renewable Energy Council (IREC) was engaged by the Public Utilities Commission to conduct a systematic review of Maine's interconnection procedures.[xliii] IREC's study obtained input from stakeholders, and provided clear recommendations based on national best practices. Based in part on IREC's recommendations, the Commission is currently conducted a rulemaking proceeding and proposes changes to cost responsibility, queue positioning, screening tests, and dispute resolution processes, as well as the inclusion of energy storage systems for the first time in chapter 324 rules. The updated rule may include implementing a flat fee approach for interconnection facilities for small projects, so as to streamline and make predictable the interconnection of smaller projects and projects intended to offset on-site load.

Central Maine Power and Versant Power have each developed hosting and load capacity maps that provide transparency into the likely interconnection capacity available for new solar projects. Technical assistance funds for interconnection are anticipated to support capacity and analysis for interconnection working groups, entities involved in interconnection processes, improved technical tools to increase transparency and reduce risk, and other methods based on existing stakeholder-identified priorities to address interconnection challenges. Specific examples may include technical assistance for small cooperative or municipal utilities to increase interconnection capabilities, tools to enhance transparency or facilitate data-sharing, and staffing capacity to support timely interconnection application review, processing, communications, and dispute resolution. Technical assistance may also support identification or analysis to enable prioritization of interconnection locations that provide grid benefits, such as avoiding more costly investments (i.e. non-wires alternatives), coordinate with load growth due to electrification, or enhance reliability or resilience.

*Siting*
MESA will provide technical assistance to developers and municipalities to ensure that projects are efficiently sited and permitted.  MESA program design incorporates the recommendations of several stakeholder groups as well as national best practices and tools. Initial analysis by The Nature Conservancy in Maine has indicated that a considerable number of brownfields and capped landfills in Maine may be suitable to support deployment of distributed generation.[xliv]

The Agricultural Solar Stakeholder Group, convened by The Department of Agriculture, Conservation and Forestry (DACF) and the GEO, issued a report to help ensure responsible siting of solar energy on agricultural lands.[xlv] This report recommended the development of additional technical assistance capacity and financial support for municipalities, councils of governments, or other networks to help municipalities consider responsible solar siting. DACF has compiled guides to determining prime farmland soil and soils of statewide importance, as well as guidance on utility scale solar installations. MESA will seek to align with the recommendations of the Agricultural Solar Stakeholder Group and the DGWG with regard to promoting development on already disturbed lands including brownfields, and to provide additional technical assistance including to communities and municipalities where appropriate. Encouraging brownfield development could also help leverage all possible financial resources, including additional federal tax incentives. MESA technical assistance for siting-related issues may include funding for further site analyses, development of local and state siting processes.

Program Narrative

Many municipal ordinances require solar development plans to be reviewed and approved by the local fire chief, planning board, municipal engineer, and/or code enforcement officials, among others. These requirements may be based on the type of installation, if the energy produced will be consumed on-site or sold onto the grid, and the nameplate capacity or the footprint of the system. MESA will include funds to provide technical assistance to municipalities to efficiently review and permit solar and storage. Such assistance may include support for municipalities to adopt a renewable energy ordinance that allows, enables, or encourages community-appropriate renewable energy and energy storage installation, as well as grants for adoption of a streamlined permitting process for small-scale renewable energy installations, including the Department of Energy's SolarAPP+. SolarAPP+ integrates with existing government software to automate and standardize plan review, permit approval, and project tracking, which can streamline project permitting and development. MESA will also build awareness of complementary tools and opportunities, including the SolSmart program and technical assistance available to communities through national laboratories and other potential service providers.

### Building Codes

Most building construction in Maine is governed by the Maine Uniform Building Code Energy Code (MUBEC), which is adopted by the Technical Building Codes and Standards Board. The Maine Climate Council Equity Subcommittee recommended strengthening building code adoption education in small and rural communities, by providing additional resources and training for code education, particularly for components of the code related to energy efficiency and among code enforcement officers and building professionals in smaller and rural communities. MESA will work to facilitate adoption of practices in municipalities to overcome potential barriers to solar and storage adoption. This may entail dedicated funding to support municipalities to adopt stretch building codes and DOE's model permitting, supporting regular professional development for code enforcement officers, and other related efforts.

### Summary of technical assistance

Throughout this application, the MESA program design has emphasized coordination with existing successful partnerships and programs to overcome identified barriers to residential-serving solar and storage deployment in low income and disadvantaged communities. The deployment of technical assistance will be further refined during the program planning period, including with input from the MESA Advisory Committee and other stakeholders.

The GEO anticipates allocating more than $10 million through MESA to technical support, including $5.5 million for workforce development, $900,000 for addressing interconnection challenges, and $3.75 million for program delivery technical assistance related to siting, permitting, codes, and related efforts.

## 1.6 Equitable Access and Meaningful Involvement Plan

MESA maximizes the breadth and diversity of communities served while prioritizing the most disadvantaged and lowest-income households. The GEO has proposed a comprehensive set of program channels that ensure a pathway to solar participation is available to any eligible household – renters and homeowners, rural and urban households, and any household that may face insurmountable barriers to on-site solar adoption. Attachment L includes letters of support

26

Program Narrative

from more than 40 organizations that seek to support or contribute to the achievement of these important objectives.

The GEO works closely in support of the Maine Climate Council, which emphasizes the need to advance equity through the state's climate response, including by establishing the Equity Subcommittee (ESC). MESA will provide direct support to, and center the experience of, households living in communities that the ESC has identified as "priority populations" for climate action, specifically: Households with low-income individuals, older adults, low-income residents of rental housing (especially multifamily), mobile home residents, low-income homeowners, rural communities, small towns with limited staff capacity, disadvantaged communities, and Tribal and Indigenous communities.

As discussed in Section 1.2, Maine has conducted a robust examination of the various eligible participants for MESA in order to maximize geographic and community diversity. 29 percent of Maine's population, about 383,000 people living in 168,000 housing units, are location with CEJST-identified disadvantaged community and about 400,000 are within a EJ Screen – identified community.[xlvi] About 367,000 Maine households have incomes under 200 percent of the Federal Poverty Level (FPL). Of those under 200% FPL, about 158,000 people also reside in communities identified as disadvantaged by the CEJST. There are about 1,300 households on Tribal lands in Maine, with about 658 below 200% FPL. These households and communities are routinely underserved and face disproportionate cumulative burdens and barriers to accessing clean energy technologies.

The program design is intended to maximize equitable access and meaningful involvement, through a focus on community solar, alignment with existing energy assistance programs, host ownership models, and dedicated technical assistance. Economies of scale associated with community solar supported through the Energy Assistance and Cooperative Community-owned Program Channels will broaden the delivery of benefits and overall participation. These channels also provide access for renters, as well as those in buildings that may not be suitable to host onsite solar. However, the majority of low-income households reside in single-family homes in Maine, and thus there is still a need for a dedicated program channel to ensure access to all MESA-eligible populations.

As discussed in Section 1.2, Maine's robust assessment of eligible populations and housing stock identifies that low-income and disadvantaged households in rural and suburban areas most predominantly live in single family buildings and mobile homes. The dedicated program channel for residential onsite solar and storage deployment, including enabling upgrades and technical assistance, will be crucial to ensuring access in these geographies. Some of the most rural counties have the highest average energy burdens, including Hancock, Piscataquis, Somerset, and Washington counties. While Maine is the second most rural state in the nation, a substantial share of households do live in urban or suburban settings, particularly in the coastal and southern counties. Urban areas are more likely to have multifamily building types, which are eligible for dedicated onsite program channel that includes enabling upgrades and technical assistance, as well as offsite community solar. Residents of more populous areas may also be more likely to have access to more than one residential solar installer, which may support faster project deployment.

Program Narrative

Project funds for enabling upgrades – up to 20% of financial assistance, as allowed by the NOFO – are included in the Single Family Residential and Multifamily Residential Program Channels. These are necessary to overcome barriers to deployment for low-income and disadvantaged communities and ensure equitable access.

There are about 1,300 households on Tribal lands in Maine, all of which will be eligible for applicable MESA program channels. MESA will be available to support Tribal solar and storage projects and will seek input from and coordination, where appropriate, with  Tribal nations on workforce development, technical assistance, and other programmatic activities. The Penobscot Nation submitted a Notice of Intent to apply for Award Option #2 of the *Solar for All* program as a consortium with the other Tribal nations in Maine. Following discussions with the Penobscot Nation's Director of Economic and Community Development, the GEO intended to support that application. Potential programs that would have been proposed included funds to deploy up to 800 residential solar projects and energy storage on Indian Island, the home of the Penobscot Nation. On October 10, 2023, the GEO learned that application would not be submitted due to logistical challenges. Therefore, as an alternative, the GEO is committed to collaborating with Tribal nations during the MESA program design period to more fully incorporate support for Tribal solar and storage projects into the MESA program, as well as deployment of technical assistance and meaningful involvement in program development. The Penobscot Nation has provided a letter of support for this application.

There is also a growing community of New Americans in Maine, who may face additional obstacles to accessing clean energy, including limited English proficiency, a lack of familiarity with solar, or alternative homeownership or financing requirements. MESA may seek to establish partnerships with community-based organizations and housing assistance providers to ensure appropriate avenues for engagement.

*Participatory governance plan*
MESA will establish and support a dedicated program Advisory Board that will convene regularly to:

- Provide strategic input and advice regarding program design and deployment;

- Review and advise on program evaluation, measurement, and verification;

- Provide a public forum through which interested stakeholders and members of the public, especially members of disadvantaged communities, may provide feedback and meaningful input into the MESA program.

The Advisory Board will have formal representation from affected stakeholders and regular public meetings with opportunities for public input and direct outreach to priority communities. Advisory Board membership and procedures will be established consistent with principles of procedural equity, ensuring that the Advisory Board serves as an effective and responsive venue for meaningful community input and influence on program decision-making. The Advisory Board will be supported by a neutral facilitator and comprise diverse representation from community-based organizations, representatives of low-income and disadvantaged communities, key program delivery stakeholders, and other voices.

28

Program Narrative

Program participants will also be informed of other opportunities for participatory governance outside of resources provided by the Solar for All program. For instance, a new law passed in 2022 directs the Maine Public Utilities Commission to provide additional and advanced access to intervenor funding to organizations and communities to participate in PUC adjudicatory processes, including those related to renewable procurement, interconnection, rate design, and several other processes that are intricately related to the success of the Solar for All program. Ensuring financial support so that low-income and disadvantaged communities can participate is another avenue to increase participatory governance.[xlvii]

### *Education, outreach, and community engagement plan*
Throughout this application, the Solar for All program design has emphasized coordination with existing successful partnerships and programs to overcome identified barriers to residential-serving solar and storage deployment in low income and disadvantaged communities and provide efficiencies in administration and outreach. The GEO will work with partners who have existing relationships with these populations to develop messaging and materials that can be shared within existing information channels used by the populations they serve. This collaboration will also ensure outreach is culturally appropriate. Partnering with trusted community organizations will improve the likelihood that participants feel comfortable sharing their feedback to help improve the program.

MESA's outreach strategy will incorporate recommendations of the Maine Climate Council Equity Subcommittee, including to:
- Ensure end-to-end language accessibility for written and online materials, assistance, and advisory services and meetings;
- Offer a variety of meeting times, agendas, and avenues to participation to align with work and childcare schedules; and
- Work with communities and community-based organizations to align outreach with people's existing and trusted social and community networks and channels.

### *Customer acquisition and management strategy*
MESA program design couples dedicated technical assistance with existing service provision channels. The GEO believes that customer acquisition, market transformation, and program longevity will be best achieved if an ecosystem of participating financing institutions, solar installers, and building owners routinely provide high quality services to low income and disadvantaged households as a course of their normal business. Customer acquisition and management resources and requirements will be established in consultation with the Advisory Committee and based on established best practices. Electrification and energy efficiency programs already deployed in Maine have utilized robust qualified vendor networks to ensure high standards for contractors interfacing directly with residential customers. Comparable requirements will be established for MESA program delivery, including establishment of a dedicated verification channel (e.g. web-based and 24/7 hotline resources) to ensure households can verify the status of a contractor.

The Energy Assistance Program Channel is specifically designed to reduce customer acquisition barriers, and associated program costs, by providing benefits directly to qualified households by leveraging established channels for delivery of assistance. The GEO will work with key partners during the program design period to refine the delivery method, potentially by utilizing the U.S.

29

Program Narrative

DOE and U.S. Department of Health and Human Services Low-Income Clean Energy Connector digital tool, which is currently being piloted through the National Community Solar Partnership.

### 1.7 Program Planning Timeline and Workplan Narrative

Maine's application for *Solar for All* is a comprehensive, ambitious plan to maximize the benefits of this historic federal investment for a diverse range of low income and disadvantaged households across the state. As described in sections 1 through 6, Maine has conducted substantive outreach and engagement to prepare for this opportunity, both preceding and subsequent to the release of EPA's Notice of Funding Opportunity in June 2023. A hallmark of the GEO's approach to policy and program development is substantive, effective stakeholder engagement; this approach will continue through development and implementation of the MESA program channels proposed in this application. This planning timeline and narrative describes the initial approach GEO will utilize to develop and commence delivery of the transformational suite of program channels and robust technical assistance described in this application. Activities described here correspond to those illustrated in Attachment D.

In order to refine and launch the proposed program channels, GEO will leverage existing and previously developed resources as described throughout this application, including:

- Continued membership and participation in associated working groups, conferences, and technical assistance available through:
    - The National Association of State Energy Officials (NASEO), the national association representing state energy offices. The Director of the GEO serves as a member of the NASEO Board of Directors;
    - The Clean Energy States Alliance (CESA), a national nonprofit coalition of state agencies and entities working together to advance clean energy. The GEO is a state agency member of CESA;
    - The U.S. Department of Energy National Community Solar Partnership (NCSP) States Collaborative, a coalition of community solar stakeholders working to expand access to affordable community solar to every American household and enable communities to realize other benefits, such as increased resilience and workforce development. The GEO is a formal state member of the NCSP States Collaborative.
- Continued participation and engagement with existing state-level resources, including but not limited to:
    - The Maine Climate Council, including the Energy Working Group, which is co-chaired by the Director of the GEO; the Buildings Working Group; and the Equity Subcommittee;
    - The Clean Energy Partnership, a program of the GEO described in Section 1.2;
    - The Community Resilience Partnership, a program of the Governor's Office of Policy Innovation and the Future, which the GEO supports;
    - The Efficiency Maine Trust Board of Directors, of which the Director of the GEO is an *ex officio* member;
    - The interconnection stakeholder working group, which is currently in formation by the Public Utilities Commission and the GEO anticipates participating formally;

Program Narrative

      o   The Electric Ratepayer Advisory Council, a statutorily-directed advisory body to the Office of the Public Advocate of which the GEO is a participant.

### *Overall Maine Solar for All Program Planning*

If awarded, the GEO will move expeditiously to complete program planning and deploy *Solar for All* funds. Initial steps will include:

- Hiring the MESA Program Manager and Program Coordinators, full time staff members competent at delivering equitable residential solar programs.
  - o Recognizing that developing, advertising, interviewing, hiring, and onboarding new staff can require several months, the GEO will dedicate sufficient existing staff capacity to commence program planning activities prior to filling these roles.
- Formation of the MESA Advisory Board as described in Section 1.6.
  - o The GEO will formalize the Advisory Board, including recruiting members and developing draft organizational materials, within four months of award.
  - o Organizational materials will likely include a charter, governance plan, communications plan, and other materials to enable the effective, efficient, and transparent fulfillment of the Advisory Board function.
  - o The GEO will seek to formally convene the Advisory Board for an initial meeting within four months of award and will subsequently convene the Advisory Board frequently, at least quarterly, throughout the remainder of the program design period.

### *Single Family Residential Program Channel*

The GEO will refine the proposed program design through development of a request for proposals to identify a program administration partner. The program administration partner may be a qualified solar installer with sufficient capacity to deploy the program to households across the state; however, the GEO is not aware of any such residential solar installer currently operating in the state. The program administration partner may also be a capable partner that does not directly install residential solar systems, but that can support the GEO in:

- Developing and implementing standards for Solar for All-qualified solar financing products;
- Developing and implementing a statewide brand for Solar for All-qualified lease products;
- Operationalizing and administering requirements for qualified residential solar installers, operationalizing consumer protection, marketing, data collection and reporting, and other program delivery standards developed as described previously.

The GEO will seek to establish a formal partnership with one or more program administration partners within nine months of award. The subsequent period necessary for the program administration partner to launch the single-family residential initiative is anticipated to take between three and nine months, resulting in financial assistance through this MESA program channel beginning to be deployed approximately twelve to eighteen months from award.

Program Narrative

*Multifamily Program Channel*

The GEO will identify one or more program administration partners to deploy Multifamily Program Channel financial assistance. Depending on the most suitable likely partner, the GEO will proceed with either a competitive solicitation to select one or more partners, or with an appropriate programmatic mechanism to designate the formal partner consistent with applicable EPA, other federal, and State of Maine requirements (e.g. subaward with memorandum of understanding).

The GEO anticipates this process taking no longer than six months, and further anticipates any subsequent program administration and development activities to require no more than six months, resulting in financial assistance through this MESA program channel beginning to be deployed within twelve months from award.

*Energy Assistance Program Channel*

The GEO will identify an efficacious mechanism to deploy MESA Energy Assistance funds in parallel to development of the associated competitive procurement process. Such a mechanism could include a complementary process under which project developers bid simultaneously for MESA funding and PPAs, with bids submitted in a format that enables project selection to incorporate the anticipated inclusion of MESA funding. The GEO anticipates discussing options and refining the concept with key stakeholders in advance of and subsequent to award.

Administration of comparable competitive procurement processes has occurred with regularity in recent years, and therefore the MESA Energy Assistance channel will largely build on a well-established and tested regulatory framework. At the same time, further program refinement with respect to the regulatory mechanism for implementation, definition of the eligible population and the manner and methods by which benefits are delivered will require continued consultation particularly with assistance program administrators, such as the Maine State Housing Authority which administers the LIHEAP program, and electric utilities. These collaborative discussions have already commenced and will continue prior to and subsequent to award. The GEO anticipates these efforts, which are described throughout this application, will continue through most of the initial program planning period, and anticipates the first funding opportunity through the MESA Energy Assistance program to be released during or around the fourth quarter of the program planning period.

*Cooperatively-owned Community Solar Channel*

The GEO anticipates soliciting one or more program delivery partners to support the Cooperatively-owned Community Solar Program Channel within the program development period. Program design will commence in collaboration with the program partner or partners once identified, and is anticipated to require approximately six months. This Program Channel is expected to launch during the fourth quarter of the program design period.

*Project-Deployment Technical Assistance*

The GEO will work collaboratively to refine the technical assistance delivery mechanisms with input from the Advisory Committee. The various technical assistance opportunities described in Section 1.5 will each require further refinement with regard to scope and timeline in order to maximize the program impact. Development and execution of these plans will be a key priority

Program Narrative

for the MESA Program Manager and Program Coordinators, and is anticipated to occur primarily following onboarding of those staff. An exception may be the workforce development technical assistance, which may leverage the GEO's existing staffing capacity to launch sooner, during the program design period.

### *MESA Program Administration*

Following the program planning period, the GEO will continue to administer the MESA program as described in Section 1.1 through 1.6, ensuring compliance with all applicable requirements and to successfully meet the established program objectives. The MESA program and associated budget are designed to enable the GEO to successfully deploy all program funds within he five year period of performance.

## 2. Program Administration Narrative

## 2.1 Budget Narrative

*Overview*

The proposed budget set forth in Attachment E reflects a prudent proposal informed by previous experience and analysis led by the GEO to plan and evaluate existing solar programs. Budget allocations and program design parameters have also been informed by a thorough review of reports, program evaluations, and datasets from national and other state sources. The allocations proposed have been refined through dialogue with industry, national and state entities, and individuals active in solar and clean energy programs within Maine and the region. This Budget Narrative complements the overall MESA program proposal laid out in the Program Strategy Narrative.

The GEO, as the award recipient, will administer the MESA award to efficiently and cost-effectively deploy approximately $99.5 million in EPA Solar for All award funds through financial and technical assistance, as well as program administration. As the state energy office, the GEO is well-positioned to utilize the administrative capabilities and procedures of the State of Maine to ensure the MESA program is administered in compliance with all applicable standards and requirements as established by EPA, as well as federal and state law and regulations.

The following sections describe the budget allocations contained in Attachment E.

*Personnel*

The GEO proposes three full-time personnel funded through MESA to lead the development of the MESA program, deployment of funds, and overall program administration and coordination throughout the program period of performance. Salaries supported in this budget allocation include one full-time Program Manager, who will assume MESA program administration and management duties and report to senior leadership within the GEO. Salaries for two full-time Program Coordinators are included to enable a program coordination and delivery team. Program Coordinators will report to the Program Manager or to senior leadership within the GEO. Qualifications and position specifications will be developed through the State of Maine Bureau

Program Narrative

of Human Resources hiring process and are anticipated to include prior experience and expertise in solar or related clean energy programs, program management experience, financial assistance deployment, and stakeholder engagement.

Estimated funding amount: $1,241,323

*Fringe*

Fringe benefits for all three salaried personnel described above are calculated utilizing the State of Maine base rate promulgated by the Bureau of Human Resources.

Estimated funding amount: $835,510

*Travel*

Travel expenses are included for two staff to attend one week-long conference per year. Such conferences could include national or regional convenings relevant to MESA administration. This funding could also support a larger number of shorter duration convenings in the event such conferences are available. Attending national or regional conferences will provide an opportunity for MESA staff to learn about and share program best practices, lessons learned, and improve the efficiency and impact of MESA program delivery.

Travel is also included for 250 miles of travel, including two overnights per quarter. With more than 35,000 square miles and the second-most rural population in the United States, effectively administering MESA in a manner that involves meaningful engagement and involvement for a diverse population of disadvantaged communities will necessitate in-person attendance at meetings, community events, and related travel.

Estimated funding amount: $55,850

*Equipment*

Funds are included for a data server or related information technology expense to ensure adherence with necessary confidentiality requirements or specifications necessary for program administration.

Estimated funding amount: $75,000

*Supplies*

Funds are included for supplies to support office functions, printing and communications materials associated with program development and delivery, and other administrative supplies. Additional supplies funding is included in Year 1 recognizing that the program planning period may involve more such supplies for initial startup activity than subsequent years of program activity.

Estimated funding amount: $23,000

Program Narrative

*Contractual*

Funds are included for MESA program planning and administration support, which is anticipated to involve one or more contractors supporting the GEO with program planning and development activities through technical analysis, legal and regulatory support, and outreach and stakeholder engagement. The proposed duration for most contracts will be one year for the program planning period, with an option for renewal if determined necessary through the program period.

Funds are included for program evaluation, measurement, verification and reporting (EM&V) which is anticipated to include one or more independent contractors that will develop EM&V plans during the program planning period, and implement the EM&V plans for each program channel during appropriate phases of the program period as described in Section 3 below. The proposed duration for the contract or contracts will be the full program period.

Funds are included for Advisory Board facilitation and administrative support, which is anticipated to include one or more GEO contractors to support the formation, neutral third-party facilitation, and administrative activities of the Advisory Board, and to provide for other administrative needs as identified by the advisory committee in collaboration with GEO. The proposed duration for the contract or contracts will be one to two years, with an option for renewal through the program period.

All contracts will be competitively procured consistent with standards established for the State of Maine by the Division of Procurement Services, and in compliance with EPA's Subaward Policy and all applicable requirements.

Estimated funding amount: $1,805,000

*Other*

Funds are included for subawards to entities to deliver financial assistance (budget lines 40-43) through the MESA program channels proposed in the Program Strategy Narrative: The Single Family Solar Lease Program Channel, the Multifamily Program Channel, the Energy Assistance Program Channel, and the Cooperative Community Owned Solar Program Channel. The GEO has not named subrecipients or contractors in this application, and therefore intends to determine the most appropriate mechanism to disburse these funds consistent with EPA requirements and all applicable federal and state law and regulations.

Funds are included for subawards to entities to provide technical assistance (budget lines 44-46) consistent with the project-deployment technical assistance plan described in the Program Strategy Narrative. Specifically, funds are included for one or more subgrants, contracts, or other appropriate mechanisms to implement workforce development technical assistance; one or more subgrants, contracts, or other appropriate mechanisms to implement interconnection challenge plan; and one or more additional subgrants, contracts, or other appropriate mechanisms to deliver additional project-deployment technical assistance as described in the Program Strategy Narrative.

Estimated funding amount: $86,400,000

Program Narrative

*Indirect*

As described in Appendix B of the Notice of Funding Opportunity, indirect costs are costs incurred by the grantee for a common or joint purpose that benefit one or more cost objective or program and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs on financial assistance (line 52) and on all other direct costs (line 53) are calculated using the 10% de minimis rate authorized by 2 CFR §200.414(f).

Estimated funding amount: $9,043,568

## 2.2 Fiscal Stewardship Plan

The MESA program will ensure full compliance with all applicable EPA requirements established in the NOFO, all other applicable federal and state requirements, including but not limited to:

- 2 CFR § 200.303
- 2 CFR § 200.322(b) and (d)
- 2 CFR 1500.1(b)

Comprehensive policies and procedures to administer these and other applicable requirements are contained in the State Administrative and Accounting Manual (SAAM)[12] and will be further operationalized in applicable sub agreements utilizing standard form contract riders and addenda. As an agency of state government, the GEO is well-positioned to ensure compliance through the robust resources and procedures, and capacity to develop new or adapt existing specifications and compliance mechanisms, available through state government.

As described in the Program Strategy Narrative, the GEO anticipates deploying funds in a comprehensive manner through multiple program channels. It is likely that one or more channels will involve agreements with entities that will interact directly with, or will oversee other entities that interact directly with, consumers through sales, leasing, or other transactions. To the extent such activities occur or are supported through MESA funds, the GEO will ensure compliance with all applicable federal and state consumer protection laws, including but not limited to those specified in the NOFO, through contract specifications. Through development of a qualified vendor network, the GEO will ensure entities are screened and qualified, with third-party verification available for consumers to ensure any marketing or contractor qualification claims can be independently verified (e.g. through a dedicated MESA telephone number and online contractor database). Such methods are already utilized for qualified energy efficiency and other clean energy vendor networks in the state.

## 2.3 Reporting Plan

The proposed Evaluation, Measurement, and Verification (EM&V) approach is designed to maximize transparency and reporting accuracy while reducing administrative burden. EM&V must be timely to allow the programs to adapt and evolve such that benefits can be maximized

---

[12] Available online at https://www.maine.gov/osc/administration/saam

Program Narrative

for participants and program resources are utilized efficiently and cost-effectively. EM&V assessments will be conducted by an impartial party or parties, such as an external consultant, to support unbiased and constructive reporting.

The EM&V plan will prioritize evaluating the most impactful factors within the proposed offering, and later include some of the more detailed elements. The likely initial high-level EM&V priorities, separated between process evaluation and impact evaluation, are as follows:

- Process evaluation
  - Program enrollment
  - Participant satisfaction
  - Barriers to participation
  - Review of data collection
- Impact evaluation
  - Actual annual energy production per kW of installed solar (kWh);
  - Actual average cost per kW of installed solar ($);
  - Actual bill savings per program participant ($);
  - Actual coincidence factor with ISO-NE peak day (%);

An approach used by other states recommends planning for a process evaluation in implementation in year one then progress to an impact evaluation in year two or year three. The GEO assumes that the process evaluation will be driven by customer surveys while the impact evaluation will be driven by field-level assessments (such as metering equipment) and customer billing data. The specific evaluation techniques will ultimately be at the discretion of the external consultant with input from the GEO and the MESA Advisory Board. As described in the Program Strategy Narrative, the GEO will solicit and contract with one or more independent EM&V contractors during the program development period.

### 3. Programmatic Capability and Environmental Results Past Performance

The Maine GEO provides three examples of federal awards demonstrating programmatic capability and environmental results past performance in Attachment F: Programmatic Capability and Environmental Results Past Performance, as well as a statement responding to the third prompt with respect to the proposed Maine Solar for All (MESA) program below.

The GEO is the designated state energy office for the State of Maine, charged with carrying out responsibilities of the state relating to energy resources, planning and development. The GEO also serves as the advisor to the Chief Executive on energy policy matters. The GEO is led by its Director, appointed by the Chief Executive as established in 2 M.R.S. §9.

The Director, Dan Burgess, has a decade of experience in senior executive leadership for state energy agencies, serving from 2012 to 2019 in various roles in the Massachusetts Executive Office of Energy and Environmental Affairs as Acting Commissioner, Deputy Commissioner, and Chief of Staff. Since 2019, Director Burgess has served as Director of the GEO.

The Deputy Director of the GEO, Celina Cunningham, has served in this capacity for nearly four years. She served for more than a decade in senior leadership positions within the U.S. Department of the Interior and as Legislative Director for U.S. Representative Jay Inslee. Deputy

Program Narrative

Director Cunningham has also held leadership roles within the largest solar energy industry association in the United States.

The GEO has grown in staffing capacity and expertise commensurate with the establishment and priority of Maine's climate and clean energy policy objectives. More than a dozen staff currently serve in a variety of capacities, including development and administration of a pipeline of more than $220 million in federal funding. GEO staff have substantial experience in administration of federal awards, administration of grants and other expenditures, contracts, and program lifecycle through development, administration, and evaluation. The MESA proposal includes funding for additional staff positions within the GEO to deliver the proposed program, and the GEO has a successful track record of attracting and retaining qualified personnel for a variety of energy policy and programming capacities.

As the state energy office and a unit of state government, the GEO is also supported administratively by the Maine Department of Administrative and Financial Services (DAFS), including the Office of the State Controller, Division of Procurement Services, Bureau of the Budget, and General Government Service Center. Therefore, the GEO is uniquely well-positioned to timely and successfully fulfill the goals and obligations of the proposed MESA project.

## End Notes

[i] Department of Economic and Community Development, *A Focus on Talent and Innovation: Maine Economic Development Strategy, 2020-2029.* *https://www.maine.gov/decd/sites/maine.gov.decd/files/inline-files/DECD_120919_sm.pdf*

[ii] Maine Energy Plan: Pathway to 2040. More information available at: https://www.maine.gov/energy/studies-reports-working-groups/current-studies-working-groups/energyplan2040#:~:text=The%20%E2%80%9CMaine%20Energy%20Plan%3A%20Pathway,supporting%20jobs%20and%20economic%20investment.

[iii] *After Maine Surpasses 100,000 Heat Pump Goal Two Years Ahead of Schedule, Governor Mills Sets New, Ambitious Target*. July 2023. https://www.maine.gov/governor/mills/news/after-maine-surpasses-100000-heat-pump-goal-two-years-ahead-schedule-governor-mills-sets-new

[iv] Maine Climate Council, *Maine Won't Wait: A Four-Year Plan for Climate Action.* *https://www.maine.gov/future/sites/maine.gov.future/files/inline-files/MaineWontWait_December2020.pdf*

[v] Xu, Kaifeng, Jenny Sumner, Emily Dalecki, and Robin Burton. 2023. Expanding Solar Access: State Community Solar Landscape (2022). Golden, CO: National Renewable Energy Laboratory. NREL/TP-6A20-84247. https://www.nrel.gov/docs/fy23osti/84247.pdf.

[vi] Maine Governor's Energy Office. *2022 Maine Clean Energy Workforce Report*. 2022. https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/2022%20Maine%20Clean%20Energy%20Workforce%20Report.pdf

[vii] Forrester, S., Barbose, G. L., O'Shaughnessy, E., Darghouth, N. R., & Crespo Montañés, C. (2022). Residential Solar-Adopter Income and Demographic Trends: November 2022 Update. Lawrence Berkeley National Lab.(LBNL), Berkeley, CA (United States). https://eta-publications.lbl.gov/sites/default/files/solar-adopter_income_trends_nov_2022.pdf and https://emp.lbl.gov/solar-demographics-tool

Program Narrative

---

viii Brennan, Daniel. (2022). Housing in Maine: An Overview. Commission to Increase Housing Opportunities by Studying Land Use Restrictions and Short-term Rentals. https://legislature.maine.gov/doc/8866 https://legislature.maine.gov/doc/8866

ix Maine Governor's Energy Office. 2022 Maine Energy Summary and Assessment. https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/GEO_EnergyAssessment_2022_FINAL.pdf

x State of Maine Housing Production Needs Study, October 2023. Available at: https://mainehousing.org/docs/default-source/default-document-library/state-of-maine-housing-production-needs-study_full_final-v2.pdf

xi See Maine's Application for Solar for All at https://www.maine.gov/energy/initiatives/infrastructure/solar-for-all and "Maine's Application to the U.S. EPA *Solar for All* Competition – Draft Program Framework for Public Comment" released September 8, 2023

xii Calculated from the Department of Energy's Low-income Energy Affordability Data (LEAD) Tool. See https://www.energy.gov/scep/slsc/lead-tool

xiii See https://www.ctgreenbank.com/strategy-impact/societal-impact/successful-legacy-programs/solar-for-all/ and Deason, J., Leventis, G., and Murphy, S. (2021). Performance of solar leasing for low- and middle-income customers in Connecticut. Lawrence Berkeley National Laboratory. https://www.cesa.org/wp-content/uploads/Performance-of-solar-leasing-for-low-and-middle-income-customers-in-Connecticut.pdf

xiv Calculated from the Department of Energy's Low-income Energy Affordability Data (LEAD) Tool. See https://www.energy.gov/scep/slsc/lead-tool

xv See https://www.nyserda.ny.gov/All-Programs/NY-Sun/Solar-for-Your-Business/Solar-for-Multifamily-Buildings and https://calsomah.org/incentives-finance

xvi See https://www.maine.gov/energy/studies-reports-working-groups/current-studies-working-groups/dg-stakeholder-group

xvii Governor's Energy Office. January 2023. *Final Report of the Distributed Generation Stakeholder Group. https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-files/Final%20Report%20of%20the%20DG%20Stakeholder%20Group_with%20appendix.pdf*

xviii See https://www.maine.gov/mpuc/regulated-utilities/electricity/rfp-awarded-contracts

xix See generally Center for an Ecology-based Economy at https://www.ecologybasedeconomy.org/solar and ReVision Energy at https://www.revisionenergy.com/solar-products/home/community-solar-power

xx calculated using the Department of Energy's Low-income Energy Affordability Data (LEAD) Tool

xxi Maine Public Utilities Commission, *Net Energy Billing,* https://www.maine.gov/mpuc/regulated-utilities/electricity/neb. Maine Public Utilities Commission, *Net Energy Billing,* https://www.maine.gov/mpuc/regulated-utilities/electricity/neb.

xxii https://www.nrel.gov/docs/fy21osti/80532.pdf

xxiii https://www.energy.gov/eere/solar/equitable-access-solar-energy

xxiv https://www.energy.gov/communitysolar/about-national-community-solar-partnership

xxv https://www.maineconnectivity.org/

xxvi EIA, Annual Electric Power Industry Report.

Program Narrative

xxvii Maine Governor's Energy Office. *2022 Maine Clean Energy Workforce Report*. 2022.
https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/2022%20Maine%20Clean%20Energy%20Workforce%20Report.pdf

xxviii 300 megawatts by the end of 2025 and 400 megawatts by the close of 2030. 35-A MRS section 3145:
https://www.mainelegislature.org/legis/statutes/35-A/title35-Asec3145.html

xxix 35-A MRS section 3209-A (7)

xxx Public Law 2021, section 702

xxxi Maine Public Utilities Commission Docket 2021-00325, and active rate design proceedings
for both CMP (Docket 2022-00152) and Versant (Advanced Rate Design Working Group).

xxxii Maine Public Utilities Commission Docket 2023-00103, "Commission initiated rulemaking
for small generator interconnection rule Chapter 324"

xxxiii 35-A M.R.S. §3210.

xxxiv See Endnote iv.

xxxv Renewable Energy Goals Market Assessment at p. 2. Available at:
https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/GEO_State%20of%20Maine%20Renewable%20Energy%20Goals%20Market%20Assessm
ent_Final_March%202021_1.pdf

xxxvi P.L. 2023 ch. 411

xxxvii See https://www.ctgreenbank.com/strategy-impact/societal-impact/successful-legacy-
programs/solar-for-all/ and Deason, J., Leventis, G., and Murphy, S. (2021). Performance of
solar leasing for low- and middle-income customers in Connecticut. Lawrence Berkeley National
Laboratory. https://www.cesa.org/wp-content/uploads/Performance-of-solar-leasing-for-low-
and-middle-income-customers-in-Connecticut.pdf

xxxviii See https://www.nyserda.ny.gov/All-Programs/NY-Sun/Solar-for-Your-Business/Solar-for-
Multifamily-Buildings

xxxix See https://calsomah.org/

xl See generally, 2 M.R.S. §9; 35-A M.R.S. §104; 35-A M.R.S. §3210 (A-I); 35-A M.R.S. §3803.

xli For instance, in 2022 renewable energy PPAs resulted in more than $68 million in bill
reductions for Maine electricity customers. See generally
https://www.maine.gov/tools/whatsnew/index.php?topic=puc-
pressreleases&id=8025065&v=article088

xlii Governor's Energy Office. January 2023. *Final Report of the Distributed Generation
Stakeholder Group. https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/Final%20Report%20of%20the%20DG%20Stakeholder%20Group_with%20appendix.pdf*

xliii "The IREC report" is Interconnection Standards, Practices, and Procedures to Support Access
to Solar Energy and Battery Storage for Maine Homes and Businesses. Report Prepared for the
Maine Public Utilities Commission. Interstate Renewable Energy Council. February 2022.

xliv Final Report of the Distributed Generation Stakeholder Group, January 6, 2023. Page 11.
Available at: https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/Final%20Report%20of%20the%20DG%20Stakeholder%20Group_with%20appendix.pdf

xlv https://www.maine.gov/energy/sites/maine.gov.energy/files/inline-
files/FINAL%20Report%20of%20the%20Agricultural%20Solar%20Stakeholder%20Group_Jan
%202022%20with%20Appendices.pdf

xlvi EJScreen-identified communities are defined as census block groups that are at or above the
90th percentile for any of EJScreen's supplemental indexes when compared to the nation or
state, and Tribal lands.

xlvii http://www.mainelegislature.org/legis/bills/getPDF.asp?paper=HP1500&item=6&snum=130

**Summary Program Cover Page**

1. **Program Title:** MESA: Maine Solar for All

2. **Brief Program Summary:**

MESA, Maine's application for *Solar for All*, is a comprehensive suite of programs designed to equitably accelerate the deployment of renewable solar energy and storage to benefit Maine's most vulnerable households, delivering meaningful energy savings, a cleaner environment, and high-quality jobs in the growing clean energy economy. As proposed, MESA will enable an estimated 38,000 low-income households to access solar, supporting rooftop projects on owner-occupied and rental residences across the state, as well as cost-effective community solar to enable energy savings benefits for households that may not be well-suited for on-site solar. The ambitious programs, supported by a significant number of Maine organizations, will also address non-financial barriers, helping to ensure job opportunities in the growing solar energy field, supporting modernization of Maine's electric grid, and providing resources to engage communities in supporting responsible solar deployment.

3. **Applicant Name:** Maine Governor's Energy Office

4. **Award Option Type:** Award Option 1.

5. **Applicant Eligibility:** The Maine Governor's Energy Office is applying on behalf of the State of Maine as a state applicant and meets the criteria of Section III.A.1 of the NOFO.

6. **Program Location:** The program location is the state of Maine.

7. **Program Scope of Work:** MESA proposes four financial assistance program channels to comprehensively address the range of barriers faced by low-income and disadvantaged households: single-family and multifamily on-site solar programs, an efficient energy assistance community solar program, and targeted support for cooperatively-owned community solar. Energy storage is incorporated across all four channels to build resilience and maximize value. MESA also proposes a holistic range of technical assistance, supporting expanded workforce development opportunities, siting and permitting supports, and additional support to overcome barriers including interconnection challenges.

8. **EPA Funding Requested:** $99,479,251. The Notice of Intent submitted for this application indicated approximately $100,000,000.00 would be sought. However, $99,479,251 reflects the final amount determined necessary to implement MESA as proposed, based on the rigorous analysis conducted in preparing this application.

9. **Population of census tracts identified by CEJST as disadvantaged:** 381,529

10. **Impact Targets:**
1. The number of households expected to benefit from MESA is: 38,000

    a. The funding requested per household is: $2,618

2. The number of megawatts of solar capacity expected to be deployed through the program is: 68.9 megawatts

    a. The funding requested per megawatt of solar is: $1,443,821

3. The number of megawatt-hours of storage expected to be deployed through the program is: 38.2 megawatt-hours

    a. The funding requested per megawatt-hour of storage is: $2,604,169

4. The expected number of short tons of annual carbon dioxide emissions avoided over time as a result of the program is: 7,690 short tons annually

    a. The funding requested per short ton of carbon dioxide reduced is: $12,936

5. The expected absolute amount of household savings realized over time through the program is: $399,133,652

    a. The funding requested per dollar of expected household savings is: $0.25

11. **Program Period:** Assuming EPA's intended date of July 2024 for disbursement of funds to grantee, the expected program period of performance beginning date is July 2024 and the expected program period of performance ending date is July 2029.

12. **Contact Information:**

| Primary Point of Contact | Administrative Point of Contact |
|---|---|
| Ethan Tremblay | Pamela Grimshaw |
| Policy and Markets Program Manager | Operations and Special Projects Administrator |
| 62 State House Station | 62 State House Station |
| Augusta, ME 04333 | Augusta, ME 04333 |
| ethan.tremblay@maine.gov | pamela.grimshaw@maine.gov |
| (207) 530-2603 | (207) 629-8505 |

13. **Coalition Partners:** None named.

14. **Named Contractors:** None named.

15. **Additional Named Subrecipients:** None named.



By electronic mail to: GGRF@epa.gov                                    July 28, 2023

RE: Notice of Intent to Apply for U.S. Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund, Solar for All, EPA-R-HQ-SFA-23-01

To Whom it May Concern:

The Maine Governor's Energy Office (GEO), established within the Executive Department and directly responsible to the Governor, is the lead energy office for the state. The GEO is responsible for activities such as developing the State Energy Security Plan, reporting on heating fuel and energy prices, and providing policy leadership and technical assistance. The GEO works in partnership with state agencies, federal and local officials, industry, nonprofits, and academia. The GEO has extensive experience leading initiatives that advance Maine's energy policies, including the Maine Offshore Wind Roadmap, Distributed Generation Stakeholder Group, and the Clean Energy Partnership.

The GEO intends to apply on behalf of the state for the Greenhouse Gas Reduction Fund Solar for All competition. The following information is provided and numbered responsive to the requirements of Section I.F of the Notice of Funding Opportunity EPA-R-HQ-SFA-23-01 (the NOFO).

1. Applicant Name: Maine Governor's Energy Office
2. Applicant Eligibility: The Maine Governor's Energy Office intends to apply on behalf of the State of Maine as a state applicant and meets the criteria of Section III.A.1 of the NOFO.
3. One application is anticipated.
   a. The award option anticipated pursuant to Section II.A of the NOFO is Award Option #1.
   b. The program location will be the state of Maine.
   c. The estimated funding requested is approximately $100 million.

The GEO appreciates the work of the Office of the Greenhouse Gas Reduction Fund to deploy this historic investment to combat the climate crisis designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans – including tens of thousands of Maine people – and catalyze transformation in markets serving low-income and disadvantaged communities. Our office looks forward to advancing a competitive application for this opportunity.

Sincerely,

Dan Burgess
Director, Governor's Energy Office

Attachment F - Programmatic Capability and Environmental Results Past Performance

**Programmatic Capability and Environmental Results Past Performance**

The Maine Governor's Energy Office provides three examples below of federal awards demonstrating programmatic capability and environmental results past performance, as well as a statement responding to the third prompt with respect to the proposed Maine Solar for All (MESA) program.

1. **U.S. EDA – Offshore Wind Roadmap**
   o *Whether, and how, you were able to successfully complete and manage those agreements*

The Maine Governor's Energy Office (GEO) successfully completed the two-year scope of work for the development of the Maine Offshore Wind Roadmap, a $2.16 million award through the U.S. Economic Development Administration. Management of this award included hiring and managing multiple contractors, implementing a robust stakeholder process, communications, reporting and meeting all deliverables.

   o *Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements*

The GEO met all reporting requirements under the grant agreement with the EDA in a timely manner. The GEO also submitted all final technical reports on time, which EDA approved.

   o *Your organizational experience and plan for timely and successfully achieving the objectives of the proposed project, and your staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project*

The GEO applied significant organizational and project management experience to achieving the objectives of the Maine Offshore Wind Roadmap project, one of multiple renewable energy initiatives in GEO. The GEO team included overall leadership from the Director, Dan Burgess, and Deputy Director, Celina Cunningham, program management experience from the Offshore Wind Program Manager, Stephanie Watson, subject matter expertise from multiple renewable energy policy analysts, and financial reporting support from GEO's Operations Manager. The Maine Department of Administrative and Financial Services also provided support with procurement and financial reporting.

2. **U.S. EIA SHOPP award**
   o *Whether, and how, you were able to successfully complete and manage those agreements*

The Governor's Energy Office (GEO) has administered the State Heating Oil and Propane Program (SHOPP) since the office was established in 2010. This award is a cooperative agreement between the EIA and the GEO. Management of this award involves collecting, collating, and reporting heating fuel price data from 120 retail outlets, weekly, during the heating season (October through March). The GEO has successfully performed this weekly survey each

Attachment F - Programmatic Capability and Environmental Results Past Performance

week, every year, without interruption. Under GEO direction, a subcontractor collects the raw data. The GEO then reports the data to the EIA and analyzes trends for internal staff and other interested parties. The GEO participates in monthly conference calls with EIA and has completes the annual reporting for the award. These are the terms for the award.

> o *Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements*

The GEO completed all reporting to the satisfaction of the EIA through 13 years of continuous performance.

> o *Your organizational experience and plan for timely and successfully achieving the objectives of the proposed project, and your staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project*

The GEO has performed this survey for 13 years, eleven under the same grant manager. The manager possesses the experience to achieve the tasks in the award agreement and participate fully in national discussions regarding award administration and price trends.

### 3. U.S. Department of Energy State Energy Program
> o *Whether, and how, you were able to successfully complete and manage those agreements*

The GEO has successfully managed this agreement since the office was established in 2010. The same grant program manager has successfully administered this award for the past eleven years, according to DOE's terms and conditions.

> o *Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements*

The GEO has completed the required quarterly and annual reporting, to the satisfaction of the DOE. According to Maine's DOE project officer, the GEO program reporting has consistently been among the best for content and completeness.

In addition, the grant manager has been the lead to develop and maintain the SEP-required state energy security plan. Two iterations of this comprehensive statewide plan were submitted on time, and according to BIL requirements.

> o *Your organizational experience and plan for timely and successfully achieving the objectives of the proposed project, and your staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project*

Attachment F - Programmatic Capability and Environmental Results Past Performance

For the SEP award, the same grant administrator has managed the award for the past eleven years. This includes applying for the award annually and completing all quarterly and end of year reporting; arranging for and conducting DOE's on-site visits every three years; participating in biennial SEP training forums; and performing the necessary close-out procedures when the three-year award cycle is complete. This requires a thorough knowledge of DOE's award expectations, state energy programs and policies, and knowledge of the state's energy policy priorities and programs supported by the award.

- *GEO's organizational experience and plan for timely and successfully achieving the objectives of the proposed Maine Solar for All (MESA) project, and staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project*

The GEO is the designated state energy office for the State of Maine, charged with carrying out responsibilities of the state relating to energy resources, planning and development. The GEO also serves as the advisor to the Chief Executive on energy policy matters. The GEO is led by its Director, appointed by the Chief Executive as established in 2 M.R.S. §9. By law, the Director serves as an ex officio board member of the Efficiency Maine Trust, overseeing an annual program budget of more than $165 million.

The Director, Dan Burgess, has a decade of experience in senior executive leadership for state energy agencies, serving from 2012 to 2019 in various roles in the Massachusetts Executive Office of Energy and Environmental Affairs as Acting Commissioner, Deputy Commissioner, and Chief of Staff. Since 2019, Director Burgess has served as Director of the Maine Governor's Energy Office.

The Deputy Director of the Governor's Energy Office, Celina Cunningham, has served in this capacity for nearly four years. She served for more than a decade in senior leadership positions within the U.S. Department of the Interior and as Legislative Director for U.S. Representative Jay Inslee. Deputy Director Cunningham has also held leadership roles within the largest solar energy industry association in the United States.

The GEO has grown in staffing capacity and expertise commensurate with the establishment and priority of Maine's climate and clean energy policy objectives. More than a dozen staff currently serve in a variety of capacities, including development and administration of a pipeline of more than $220 million in federal funding. GEO staff have substantial experience in administration of federal awards, administration of grants and other expenditures, contracts, and program lifecycle through development, administration, and evaluation. The MESA proposal includes funding for additional staff positions within the GEO to deliver the proposed program, and the GEO has a successful track record of attracting and retaining qualified personnel for a variety of energy policy and programming capacities.

As the state energy office and a unit of state government, the GEO is also supported administratively by the Maine Department of Administrative and Financial Services (DAFS), including the Office of the State Controller, Division of Procurement Services, Bureau of the Budget, and General Government Service Center. Therefore, the GEO is uniquely well-positioned to timely and successfully fulfill the goals and obligations of the proposed MESA project.

5H - 84088301 - 1    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Assistance Amendment | GRANT NUMBER (FAIN): 84088301<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5H | DATE OF AWARD<br>12/19/2024 |
|---|---|---|---|
| | | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>12/19/2024 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: | PAYEE: |
| GOVERNORS ENERGY OFFICE<br>62 STATE HOUSE STATION<br>AUGUSTA, ME 04333-0062<br>EIN: 01-6000001 | GOVERNORS ENERGY OFFICE<br>62 STATE HOUSE STATION<br>AUGUSTA, ME 04333-0062 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Ethan Tremblay<br>62 State House Station<br>Augusta , ME 04333-0062<br>Email: ethan.tremblay@maine.gov<br>Phone: 207-530-2603 | Lydia Kidane<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460<br>Email: Kidane.Lydia@epa.gov<br>Phone: 202-564-0506 | Shana Etheridge<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>Email: Etheridge.Shana@epa.gov<br>Phone: 202-564-9777 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Maine Governor's Energy Office.

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| BUDGET PERIOD<br>05/01/2024 - 04/30/2029 | PROJECT PERIOD<br>05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST<br>$ 62,120,000.00 | TOTAL PROJECT PERIOD COST<br>$ 62,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 62,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Phillip Schindel - Chief, Business Operations Branch | DATE<br>12/19/2024 |

5H - 84088301 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 61,720,000 | $ 0 | $ 61,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 62,120,000 | $ 0 | $ 62,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) Clean Air Act: Sec. 134(a)(1) National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84088301 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 902,076 |
| 2. Fringe Benefits | $ 585,277 |
| 3. Travel | $ 55,850 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 12,047 |
| 6. Contractual | $ 885,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 59,450,000 |
| 9. Total Direct Charges | $ 61,890,250 |
| 10. Indirect Costs: 9.42 % Base Total Direct Cost | $ 229,750 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 62,120,000 |
| 12. Total Approved Assistance Amount | $ 62,120,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 62,120,000 |

5H - 84088301 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

### I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

5H - 84088301 - 1    Page 14

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

### Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

5H - 84088301 - 1    Page 25

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

#### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

### D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

### E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

> 1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

> 2. Privately-owned commercial buildings when they meet the "public function" test;

> 3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

1. Single family homes;

2. Privately-owned, non-mixed-use, multi-family housing properties;

3. Privately-owned residential portions of mixed-use properties;

4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

5H - 84088301 - 1    Page 40

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

5H - 84088301 - 1    Page 42

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

    1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

    2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

    3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

    4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

    5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

5H - 84088301 - 1    Page 44

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

<u>B. Board Independence</u>

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

<u>C. Board Policies and Procedures</u>

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

<u>3. Legal Counsel</u>

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

<u>AB. Amendments to Award Agreement</u>

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

<u>AC. Preservation of Guidance and Data</u>

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## Solar For All (SFA) Terms and Conditions (December 3, 2024)

**I. Definitions** ........................................................................................................................... 3

    Air Pollutant ...................................................................................................... 3

    Award Agreement ............................................................................................. 3

    Apprentice ........................................................................................................ 3

    Contracts for Delivery of Financial Assistance ................................................. 3

    Eligible Recipient .............................................................................................. 3

    Eligible Zero-Emissions Technology ................................................................. 4

    Environmental Information ............................................................................... 5

    Environmental Information Operations ............................................................ 5

    EPA Project Officer ........................................................................................... 5

    EPA Award Official ............................................................................................ 5

    Financial Assistance ......................................................................................... 5

    Freely Associated States .................................................................................. 5

    Greenhouse Gas ............................................................................................... 6

    Low-Income and Disadvantaged Communities ................................................ 6

    Materially Impaired .......................................................................................... 7

    Participant Support Costs ................................................................................. 7

    Period of Closeout ............................................................................................ 7

    Period of Performance ..................................................................................... 7

    Post-Closeout Program Income ........................................................................ 8

    Program Administration Activities .................................................................... 8

    Program Beneficiary ......................................................................................... 8

    Program Income ............................................................................................... 8

    Project-Deployment Technical Assistance ........................................................ 9

    Subaward .......................................................................................................... 9

    Subrecipient ..................................................................................................... 9

    Waste, Fraud, or Abuse .................................................................................... 9

**II. National Programmatic Terms and Conditions** ............................................................. 10

    A. Performance Reporting .............................................................................. 10

    B. Cybersecurity Condition ............................................................................. 12

    C. Competency Policy ..................................................................................... 14

    D. Public or Media Events ............................................................................... 15

    E. In-Kind Assistance ...................................................................................... 15

    F. Geospatial Data Standards .......................................................................... 15

    G. Leveraging and Fundraising ........................................................................ 15

    H. Quality Assurance ...................................................................................... 16

    I. Real Property ............................................................................................... 17

    J. Program Income .......................................................................................... 18

    K. Use of Logos ............................................................................................... 18

**III. Additional Programmatic Terms and Conditions** ........................................................ 19

    A. Solar for All Workplan ................................................................................ 19

    B. Allowable and Unallowable Activities ......................................................... 19

    C. Foreign Entity of Concern ........................................................................... 20

    D. Low-Income and Disadvantaged Communities Expenditure Requirement ...... 20

    E. Revolving Loan Fund Characterization ......................................................... 20

F. Subawards to For-Profit Entities ........................................................................... 20
G. Subawards as Part of Revolving Loan Funds ......................................................... 21
H. Participant Support Costs ...................................................................................... 22
I. Contracts for Delivery of Financial Assistance ....................................................... 22
J. Labor and Equitable Workforce Development Requirements ................................ 23
K. Build America, Buy America Act............................................................................. 26
L. Consumer Protection Requirements ..................................................................... 27
M. Financial Risk Management Requirements ........................................................... 28
N. Historic Preservation ............................................................................................. 29
O. Uniform Relocation Assistance and Real Property Acquisition Policies Act ......... 30
P. Remedies for Non-Compliance .............................................................................. 30
Q. Clarifications to EPA General Terms and Conditions ............................................ 31
R. Period of Performance ........................................................................................... 33
S. Closeout Agreement .............................................................................................. 33
T. Accounting Principles ............................................................................................. 37
U. Internal Controls .................................................................................................... 37
V. Audits ..................................................................................................................... 37
W. EPA Project Officer Oversight and Monitoring..................................................... 38
X. Compliant URL Links .............................................................................................. 39
Y. Flow-Down Requirements...................................................................................... 39
Z. Financial Assistance in the Form of Credit Enhancements ................................... 39
AA. Additional Requirements for Eligible Nonprofit Recipients ............................... 40
AB. Amendments to Award Agreement ..................................................................... 41
AC. Preservation of Guidance and Data...................................................................... 41

**IV. Administrative Terms and Conditions**..................................................................... 42

A. General Terms and Conditions .............................................................................. 42
B. Correspondence Condition .................................................................................... 42
C. Intergovernmental Review Period ......................................................................... 42
D. Pre-Award Costs .................................................................................................... 43
E. New Recipient Training Requirement .................................................................... 43

## I. Definitions

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

3

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
    d. Being funded by public or charitable contributions; and
    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing

Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the

date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided

under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. National Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

**1. Progress Reports**

*Semi-Annual Report*
The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

*Final Report*
The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to

contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

**C. Competency Policy**
In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

14

**D. Public or Media Events**

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

**E. In-Kind Assistance**

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

**F. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**G. Leveraging and Fundraising**

**1. Leveraging**

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**2. Fundraising**

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

**H. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

**1. Quality Management Plan (QMP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

16

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

**I. Real Property**
In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

**Disposition**
If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

17

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

**Recordation**

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

**K. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. Additional Programmatic Terms and Conditions

**A. Solar for All Workplan**
**1. EPA-approved Solar for All Workplan**
The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**
The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**B. Allowable and Unallowable Activities**
The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

19

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;
2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

**G. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**H. Participant Support Costs**

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

> A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

> B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

**I. Contracts for Delivery of Financial Assistance**
**2 CFR 200 Procurement Standards**

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;

- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](.).

**J. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.   Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:
  i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
  ii. **Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
### b. After Award of Contract:

      i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. **Solicitation and Contract Requirements:**

      i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

      ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. **After Award of Contract**:

      i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

      ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F.  DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**1. Compliance with Federal Statutes and Regulations**
The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

**2. Free and Fair Choice to Join a Union**
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**K. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;
2. Privately-owned commercial buildings when they meet the "public function" test;
3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Single family homes;
2. Privately-owned, non-mixed-use, multi-family housing properties;
3. Privately-owned residential portions of mixed-use properties;
4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);
2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;
3. Federal Housing Administration Insured Multifamily Mortgages;
4. HUD Section 8 Funding;
5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**L. Consumer Protection Requirements**

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

**M. Financial Risk Management Requirements**

**1. Cash Management Requirements**

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

**Archeological and Historic Preservation Act (AHPA)**
This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

**O. Uniform Relocation Assistance and Real Property Acquisition Policies Act**
The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**P. Remedies for Non-Compliance**
The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

**Q. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

**1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**2. Establishing and Managing Subawards**
2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e.,

governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

### 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

**R. Period of Performance**
The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

**S. Closeout Agreement**
As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

### 1. Allowable Activities
The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements
After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements
The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and

benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

**4. Cash Management Requirements**

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

**5. Remedies for Non-Compliance**

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

**6. Suspension and Debarment**

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

**7. Non-Discrimination**

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

**8. Record-Keeping**

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

**9. Other Federal Requirements**

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

**10. Amendments to the Closeout Agreement**

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

**11. Audit Requirements**

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify

the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

### U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

### V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

**W. EPA Project Officer Oversight and Monitoring**
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.
2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;
4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;
7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;
8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial

Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

### X. Compliant URL Links
The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

### Y. Flow-Down Requirements
As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### Z. Financial Assistance in the Form of Credit Enhancements
If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves**.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity

providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

**AA. Additional Requirements for Eligible Nonprofit Recipients**

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

**1. Incorporation and Control**
The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

**2. Governance Requirements**

**A. Board Size and Composition**
The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

**B. Board Independence**
The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the [EPA's Final Financial Assistance Conflict of Interest Policy](EPA's Final Financial Assistance Conflict of Interest Policy).

### 3. Legal Counsel
The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

### AB. Amendments to Award Agreement
The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

### AC. Preservation of Guidance and Data
Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. Administrative Terms and Conditions

**A. General Terms and Conditions**

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**B. Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

**C. Intergovernmental Review Period**

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order

12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

**E. New Recipient Training Requirement**

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.



**Account Profile Inquiry**

Date: 01/31/2025
Time: 3:58 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
███████

**Recipient ID:**
█████

**Recipient Short Name:**
OEIS

**Inquiry Results:**

### ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | ████████ |
| Account ID : | ██████████ |
| Account Description : | SOLAR FOR ALL |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | 1011 |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $61,654,080.69 |
| Create Date : | 01/16/2025 |
| Begin Date : | 05/01/2024 |
| Performance Period End Date : | 04/30/2029 |
| End Date : | 08/30/2029 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $61,720,000.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

### GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | 5H84088301 |
| CFDA Number : | 66959.000 |
| Total Estimated Grant Amount : | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

### DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | $1,234,400.00 |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

**1  of  1**