Thomas-Jensen
Affirmation
(redacted)


Exhibit # 72

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF NEW YORK, et al., |
| Plaintiffs, |
| v. |
| DONALD TRUMP, in his official capacity as President of the United States, et al., |
| Defendants. |

C.A. No. 1:25-cv-00039-JJM-PAS

**DECLARATION OF SARAH CURRAN**

I, Sarah Curran, hereby depose and state as follows:

1.    I am the Deputy Director, Climate Planning and Community Partnerships in the Maine Governor's Office of Policy Innovation and the Future. I have held that position since April 22, 2019. I make this declaration as a representative of the Maine Governor's Office of Policy Innovation and the Future, in part based on the business records of the Maine Governor's Office of Policy Innovation and the Future and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

**<u>Climate Pollution Reduction Grant</u>**

2.    On April 27, 2023, the Maine Governor's Office for Policy Innovation and the Future applied for a grant from the Climate Pollution Reduction Grants program. A true and accurate copy of the grant application materials is attached hereto as Exhibit A.

1

3.     On August 10, 2023, I received confirmation from United States Environmental Protection Agency (EPA) that the Maine Governor's Office of Policy Innovation and the Future had been awarded the grant.  True and accurate copies of the grant award documents are attached hereto as Exhibit B**.**  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on August 10, 2023 are attached hereto as Exhibit C.

4.     The funding mechanism is reimbursement.

5.     The Maine Governor's Office of Policy Innovation and the Future is advancing project activity as described in the approved Workplan Narrative, including hiring additional staff and contracting with consultants to support outreach efforts and analysis of specific emission reduction pathways in support of the state's climate action plan.  The State submitted the required Priority Climate Action Plan (PCAP) on March 1, 2024, and work continues on the State's Comprehensive Climate Action Plan (CCAP) and other required elements for the grant according to its terms, due summer-fall 2025.

6.     On January 28, 2025, I received notice via email from the EPA that the EPA "is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget.  The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time."  The notice is attached hereto as Exhibit D.  On Monday February 3, 2025, I received notice from the EPA that, "Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information."  The notice is attached hereto as Exhibit E.  As of February 6, the grant funds are not available through the ASAP portal.

7.     As of December 31, 2024, the Maine Governor's Office of Policy Innovation and the Future has spent and drawn down $1,837,976.91 in funding under the award. The anticipated magnitude of impoundment is the remaining $1,162,013.09.

8.     The consequence of delayed/cancelled funding will be the inability to pay the salary and benefits of the staff hired with grant funds to support climate planning and implementation; and the inability to pay consultants for work both completed and pending, including facilitation and outreach and engagement consultants, and required analyses including economic costs and benefits of emissions reduction measures and workforce planning.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2025 at Augusta, Maine.

_____ */s/ Sarah Curran* _____

SARAH CURRAN
Deputy Director, Climate Planning and Community
    Partnerships
Governor's Office of Policy Innovation and the
    Future
State of Maine

OMB Number: 4040-0004
Expiration Date: 11/30/2025

## Application for Federal Assistance SF-424

**\* 1. Type of Submission:**
- [ ] Preapplication
- [x] Application
- [ ] Changed/Corrected Application

**\* 2. Type of Application:**
- [x] New
- [ ] Continuation
- [ ] Revision

**\* If Revision, select appropriate letter(s):**

**\* Other (Specify):**

**\* 3. Date Received:**
Completed by Grants.gov upon submission.

**4. Applicant Identifier:**

**5a. Federal Entity Identifier:**

**5b. Federal Award Identifier:**

**State Use Only:**

**6. Date Received by State:**

**7. State Application Identifier:**

**8. APPLICANT INFORMATION:**

**\* a. Legal Name:** Governor's Office of Policy Innovation and the Future

**\* b. Employer/Taxpayer Identification Number (EIN/TIN):** ▮▮▮▮▮▮▮▮

**\* c. UEI:** ▮▮▮▮▮▮▮▮

**d. Address:**

**\* Street1:** 181 State House Station

**Street2:**

**\* City:** Augusta

**County/Parish:**

**\* State:** ME: Maine

**Province:**

**\* Country:** USA: UNITED STATES

**\* Zip / Postal Code:** 04333-0181

**e. Organizational Unit:**

**Department Name:**

**Division Name:**

**f. Name and contact information of person to be contacted on matters involving this application:**

**Prefix:**

**\* First Name:** Hannah

**Middle Name:**

**\* Last Name:** Pingree

**Suffix:**

**Title:** Director

**Organizational Affiliation:**

**\* Telephone Number:** 207-624-7458

**Fax Number:**

**\* Email:** hannah.pingree@maine.gov

## Application for Federal Assistance SF-424

**\* 9. Type of Applicant 1: Select Applicant Type:**

A: State Government

Type of Applicant 2: Select Applicant Type:

Type of Applicant 3: Select Applicant Type:

**\* Other (specify):**

**\* 10. Name of Federal Agency:**

Environmental Protection Agency

**11. Assistance Listing Number:**

66.046

Assistance Listing Title:

Climate Pollution Reduction Grants

**\* 12. Funding Opportunity Number:**

EPA-R-OAR-CPRGP-23-01

**\* Title:**

Climate Pollution Reduction Planning Grant - Region 1

**13. Competition Identification Number:**

Title:

**14. Areas Affected by Project (Cities, Counties, States, etc.):**

| | Add Attachment | Delete Attachment | View Attachment |

**\* 15. Descriptive Title of Applicant's Project:**

State of Maine, Climate Pollution Reduction Planning Grant

Attach supporting documents as specified in agency instructions.

| Add Attachments | Delete Attachments | View Attachments |

**Application for Federal Assistance SF-424**

**16. Congressional Districts Of:**

* a. Applicant `1`                                    * b. Program/Project `All`

Attach an additional list of Program/Project Congressional Districts if needed.

`                    ` [ Add Attachment ] [ Delete Attachment ] [ View Attachment ]

**17. Proposed Project:**

* a. Start Date: `08/01/2023`                    * b. End Date: `07/31/2027`

**18. Estimated Funding ($):**

| | |
|---|---|
| * a. Federal | `2,999,990.00` |
| * b. Applicant | `0.00` |
| * c. State | `0.00` |
| * d. Local | `0.00` |
| * e. Other | `0.00` |
| * f. Program Income | `0.00` |
| * g. TOTAL | `2,999,990.00` |

**\* 19. Is Application Subject to Review By State Under Executive Order 12372 Process?**

☐ a. This application was made available to the State under the Executive Order 12372 Process for review on `          ` .

☐ b. Program is subject to E.O. 12372 but has not been selected by the State for review.

☒ c. Program is not covered by E.O. 12372.

**\* 20. Is the Applicant Delinquent On Any Federal Debt? (If "Yes," provide explanation in attachment.)**

☐ Yes   ☒ No

If "Yes", provide explanation and attach

`                    ` [ Add Attachment ] [ Delete Attachment ] [ View Attachment ]

**21. \*By signing this application, I certify (1) to the statements contained in the list of certifications\*\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances\*\* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)**

☒ \*\* I AGREE

\*\* The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**Authorized Representative:**

Prefix: `          `                    * First Name: `Hannah`

Middle Name: `          `

* Last Name: `Pingree`

Suffix: `          `

* Title: `Director`

* Telephone Number: `207-624-7458`          Fax Number: `          `

* Email: `hannah.pingree@maine.gov`

* Signature of Authorized Representative: `Completed by Grants.gov upon submission.`    * Date Signed: `Completed by Grants.gov upon submission.`

# BUDGET INFORMATION - Non-Construction Programs

OMB Number: 4040-0006
Expiration Date: 02/28/2025

### SECTION A - BUDGET SUMMARY

| Grant Program Function or Activity (a) | Assistance Listing Number (b) | Estimated Unobligated Funds Federal (c) | Estimated Unobligated Funds Non-Federal (d) | New or Revised Budget Federal (e) | New or Revised Budget Non-Federal (f) | New or Revised Budget Total (g) |
|---|---|---|---|---|---|---|
| 1. Climate Pollution Reduction Grants | 66.046 | $ 0.00 | $ 0.00 | $ 2,999,990.00 | $ 0.00 | $ 2,999,990.00 |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. Totals | | $ 0.00 | $ 0.00 | $ 2,999,990.00 | $ 0.00 | $ 2,999,990.00 |

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102) Page 1

**SECTION B - BUDGET CATEGORIES**

| 6. Object Class Categories | GRANT PROGRAM, FUNCTION OR ACTIVITY | | | | Total (5) |
|---|---|---|---|---|---|
| | (1) Climate Pollution Reduction Grants | (2) N/A | (3) N/A | (4) N/A | |
| a. Personnel | $ 760,417.00 | $ | $ | $ | $ 760,417.00 |
| b. Fringe Benefits | 380,209.00 | | | | 380,209.00 |
| c. Travel | 25,950.00 | | | | 25,950.00 |
| d. Equipment | 0.00 | | | | 0.00 |
| e. Supplies | 14,688.00 | | | | 14,688.00 |
| f. Contractual | 1,530,000.00 | | | | 1,530,000.00 |
| g. Construction | 0.00 | | | | 0.00 |
| h. Other | 16,000.00 | | | | 16,000.00 |
| i. Total Direct Charges (sum of 6a-6h) | 2,727,264.00 | | | $ | 2,727,264.00 |
| j. Indirect Charges | 272,726.00 | | | $ | 272,726.00 |
| k. TOTALS (sum of 6i and 6j) | $ 2,999,990.00 | $ | $ | $ | 2,999,990.00 |
| | | | | | |
| 7. Program Income | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

**Authorized for Local Reproduction**

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102) Page 1A

## SECTION C - NON-FEDERAL RESOURCES

| (a) Grant Program | (b) Applicant | (c) State | (d) Other Sources | (e)TOTALS |
|---|---|---|---|---|
| 8. Climate Pollution Reduction Grants | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. TOTAL (sum of lines 8-11) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

## SECTION D - FORECASTED CASH NEEDS

| | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|
| 13. Federal | $ 1,943,669.00 | $ 388,734.00 | $ 485,916.00 | $ 485,916.00 | $ 583,103.00 |
| 14. Non-Federal | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 15. TOTAL (sum of lines 13 and 14) | $ 1,943,669.00 | $ 388,734.00 | $ 485,916.00 | $ 485,916.00 | $ 583,103.00 |

## SECTION E - BUDGET ESTIMATES OF FEDERAL FUNDS NEEDED FOR BALANCE OF THE PROJECT

| (a) Grant Program | FUTURE FUNDING PERIODS    (YEARS) | | | |
|---|---|---|---|---|
| | (b)First | (c) Second | (d) Third | (e) Fourth |
| 16. Climate Pollution Reduction Grants | $ 1,943,669.00 | $ 898,669.00 | $ 21,626.00 | $ 136,026.00 |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20. TOTAL (sum of lines 16 - 19) | $ 1,943,669.00 | $ 898,669.00 | $ 21,626.00 | $ 136,026.00 |

## SECTION F - OTHER BUDGET INFORMATION

| 21. Direct Charges: 2,727,264.00 | 22. Indirect Charges: 272,726.00 |
|---|---|

23. Remarks: The application is requesting $2,999,990 over four years: Year 1 - $1,943,669.00; Year 2 - $868,669.00; Year 3 - $21,626.00; Year 4 - $136,026.00.

**Authorized for Local Reproduction**

Standard Form 424A (Rev. 7- 97)
Prescribed by OMB (Circular A -102) Page 2



OMB Number: 2030-0020 Expiration
Date: 06/30/2024

## Preaward Compliance Review Report for
## All Applicants and Recipients Requesting EPA Financial Assistance

Note: Read Instructions before completing form.

**I. A.  Applicant/Recipient (Name, Address, City, State, Zip Code)**

Name:  Governor's Office of Policy, Innovation and the Future

Address:  181 State House Station

City:  Augusta

State:  ME: Maine                    Zip Code:  04333-0181

**B.  Unique Entity Identifier (UEI):**  RAE6J9MCNKH5

**C.  Applicant/Recipient Point of Contact**

Name:  Sarah Curran

Phone:  207-530-3065

Email:  sarah.curran@maine.gov

Title:  Deputy Director, Climate Planning

**II.    Is the applicant currently receiving EPA Assistance?**  ☐ Yes   ☒ No

**III.   List all pending civil rights lawsuits and administrative complaints filed under federal law against the applicant/recipient that allege discrimination based on race, color, national origin, sex, age, or disability. (Do not include employment complaints not covered by 40 C.F.R. Parts 5 and 7.)**

None

**IV.   List all civil rights lawsuits and administrative complaints decided against the applicant/recipient within the last year that alleged discrimination based on race, color, national origin, sex, age, or disability and enclose a copy of all decisions.  Please describe all corrective actions taken.  (Do not include employment complaints not covered by 40 C.F.R. Parts 5 and 7.)**

None

**V.    List all civil rights compliance reviews of the applicant/recipient conducted under federal nondiscrimination laws by any federal agency within the last two years and enclose a copy of the review and any decisions, orders, or agreements based on the review. Please describe any corrective action taken. (40 C.F.R. § 7.80(c)(3))**

None

**VI.   Is the applicant requesting EPA assistance for new construction?  If no, proceed to VII; if yes, answer (a) and/or (b) below.**

☐ Yes   ☒ No

**a.  If the grant is for new construction, will all new facilities or alterations to existing facilities be designed and constructed to be readily accessible to and usable by persons with disabilities? If yes, proceed to VII; if no, proceed to VI(b).**

☐ Yes   ☒ No

**b.  If the grant is for new construction and the new facilities or alterations to existing facilities will not be readily accessible to and usable by persons with disabilities, explain how a regulatory exception (40 C.F.R. 7.70) applies.**

Not Applicable

**VII.** Does the applicant/recipient provide initial and continuing notice that it does not discriminate on the basis of race, color, national origin, sex, age, or disability in its program or activities? **(40 C.F.R 5.140 and 7.95)**    ☒ Yes   ☐ No

   **a.** Do the methods of notice accommodate those with impaired vision or hearing?    ☐ Yes   ☒ No

   **b.** Is the notice posted in a prominent place in the applicant's/recipient's website, in the offices or facilities or, for education programs and activities, in appropriate periodicals and other written communications?    ☒ Yes   ☐ No

   **c.** Does the notice identify a designated civil rights coordinator?    ☒ Yes   ☐ No

**VIII.** Does the applicant/recipient maintain demographic data on the race, color, national origin, sex, age, or disability status of the population it serves? **(40 C.F.R. 7.85(a))**    ☒ Yes   ☐ No

**IX.** Does the applicant/recipient have a policy/procedure for providing meaningful access to services for persons with limited English proficiency? (Title VI, 40 C.F.R. Part 7, *Lau v Nichols* 414 U.S. (1974))    ☒ Yes   ☐ No

**X.** If the applicant is an education program or activity, or has 15 or more employees, has it designated an employee to coordinate its compliance with 40 C.F.R. Parts 5 and 7? Provide the name, title, position, mailing address, e-mail address, fax number, and telephone number of the designated coordinator.

```
Michael Dunn; State EEO Coordinator; 79 State House Station, Augusta, Maine 04333-0079;(e) michael.dunn@maine.
gov; (f) 207-287-4452; (p) 207-287-4447
```

**XI.** If the applicant is an education program or activity, or has 15 or more employees, has it adopted grievance procedures that assure the prompt and fair resolution of complaints that allege a violation of 40 C.F.R Parts 5 and 7? Provide a legal citation or applicant's/recipient's website address for, or a copy of, the procedures.

```
The applicant has adopted a grievance procedure that assures prompt and fair resolution of complaints that
allege a violation of 40 C.F.R. Parts 5 and 7. The policy may be found in the "Policy Against Harrassment"
located at https://www.maine.gov/bhr/sites/maine.gov.bhr/files/inline-files/Harassment%20Policy%20January%
202021%20Final_3.pdf and in the Civil Service Bulletin 13.3A located at https://www.maine.gov/bhr/sites/maine.
gov.bhr/files/inline-files/csbull13-3A.pdf
```

---

### For the Applicant/Recipient

I certify that the statements I have made on this form and all attachments thereto are true, accurate and complete. I acknowledge that any knowingly false or misleading statement may be punishable by fine or imprisonment or both under applicable law. I assure that I will fully comply with all applicable civil rights statutes and EPA regulations.

**A. Signature of Authorized Official**

Completed by Grants.gov upon submission.

**B. Title of Authorized Official**

Director

**C. Date**

Completed by Grants.gov upon submission.

---

### For the U.S. Environmental Protection Agency

I have reviewed the information provided by the applicant/recipient and hereby certify that the applicant/recipient has submitted all preaward compliance information required by 40 C.F.R. Parts 5 and 7; that based on the information submitted, this application satisfies the preaward provisions of 40 C.F.R. Parts 5 and 7; and that the applicant has given assurance that it will fully comply with all applicable civil rights statures and EPA regulations.

**A. *Signature of Authorized EPA Official**

_____

**B. Title of Authorized Official**

_____

**C. Date**

_____

Instructions for EPA FORM 4700-4 (Rev. 04/2021)

General. Recipients of Federal financial assistance from the U.S. Environmental Protection Agency must comply with the following statutes and regulations. Title VI of the Civil Rights Acts of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. The Act goes on to explain that the statute shall not be construed to authorize action with respect to any employment practice of any employer, employment agency, or labor organization (except where the primary objective of the Federal financial assistance is to provide employment). Section 13 of the 1972 Amendments to the Federal Water Pollution Control Act provides that no person in the United States shall on the ground of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under the Federal Water Pollution Control Act, as amended. Employment discrimination on the basis of sex is prohibited in all such programs or activities. Section 504 of the Rehabilitation Act of 1973 provides that no otherwise qualified individual with a disability in the United States shall solely by reason of disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. Employment discrimination on the basis of disability is prohibited in all such programs or activities. The Age Discrimination Act of 1975 provides that no person on the basis of age shall be excluded from participation under any program or activity receiving Federal financial assistance. Employment discrimination is not covered. Age discrimination in employment is prohibited by the Age Discrimination in Employment Act administered by the Equal Employment Opportunity Commission. Title IX of the Education Amendments of 1972 provides that no person in the United States on the basis of sex shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. Employment discrimination on the basis of sex is prohibited in all such education programs or activities. Note: an education program or activity is not limited to only those conducted by a formal institution. 40 C.F.R. Part 5 implements Title IX of the Education Amendments of 1972. 40 C.F.R. Part 7 implements Title VI of the Civil Rights Act of 1964, Section 13 of the 1972 Amendments to the Federal Water Pollution Control Act, and Section 504 of The Rehabilitation Act of 1973.

Items "Applicant" means any entity that files an application or unsolicited proposal or otherwise requests EPA assistance. 40 C.F.R. §§ 5.105, 7.25. "Recipient" means any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organizations, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance. 40 C.F.R. §§ 5.105, 7.25. "Civil rights lawsuits and administrative complaints" means any lawsuit or administrative complaint alleging discrimination on the basis of race, color, national origin, sex, age, or disability pending or decided against the applicant and/or entity which actually benefits from the grant, but excluding employment complaints not covered by 40 C.F.R. Parts 5 and 7. For example, if a city is the named applicant but the grant will actually benefit the Department of Sewage, civil rights lawsuits involving both the city and the Department of Sewage should be listed. "Civil rights compliance review" means: any federal agency-initiated investigation of a particular aspect of the applicant's and/or recipient's programs or activities to determine compliance with the federal non-discrimination laws. Submit this form with the original and required copies of applications, requests for extensions, requests for increase of funds, etc. Updates of information are all that are required after the initial application submission. If any item is not relevant to the project for which assistance is requested, write "NA" for "Not Applicable." In the event applicant is uncertain about how to answer any questions, EPA program officials should be contacted for clarification.



# EPA KEY CONTACTS FORM

OMB Number: 2030-0020
Expiration Date: 06/30/2024

**Authorized Representative:** *Original awards and amendments will be sent to this individual for review and acceptance, unless otherwise indicated.*

<u>Name:</u>  Prefix: Ms.   First Name: Hannah   Middle Name:
Last Name: Pingree   Suffix:
<u>Title:</u>  Director
<u>Complete Address:</u>
Street1: 181 State House Station
Street2:
City: Augusta   State: NE: Nebraska
Zip / Postal Code: 04333-0181   Country: USA: UNITED STATES
<u>Phone Number:</u> 1-207-624-7458   <u>Fax Number:</u>
<u>E-mail Address:</u> hannah.pingree@maine.gov

**Payee:** *Individual authorized to accept payments.*

<u>Name:</u>  Prefix: Ms.   First Name: Hannah   Middle Name:
Last Name: Pingree   Suffix:
<u>Title:</u>  Director
<u>Complete Address:</u>
Street1: 181 State House Station
Street2:
City: Augusta   State: ME: Maine
Zip / Postal Code: 04333-0181   Country: USA: UNITED STATES
<u>Phone Number:</u> 1-207-624-7458   <u>Fax Number:</u>
<u>E-mail Address:</u> hannah.pingree@maine.gov

**Administrative Contact:** *Individual from Sponsored Programs Office to contact concerning administrative matters (i.e., indirect cost rate computation, rebudgeting requests etc).*

<u>Name:</u>  Prefix: Ms.   First Name: Cheryl   Middle Name:
Last Name: Miller   Suffix:
<u>Title:</u>  Secretary Specialist
<u>Complete Address:</u>
Street1: 181 State House Station
Street2:
City: Augusta   State: ME: Maine
Zip / Postal Code: 04333-0181   Country: USA: UNITED STATES
<u>Phone Number:</u> 1-207-624-7458   <u>Fax Number:</u>
<u>E-mail Address:</u> cheryl.miller@maine.gov

EPA Form 5700-54 (Rev 4-02)

# EPA KEY CONTACTS FORM

**Project Manager:** *Individual responsible for the technical completion of the proposed work.*

**Name:**  Prefix: Ms.    First Name: Sarah    Middle Name:

Last Name: Curran    Suffix:

**Title:**  Deputy Director, Climate Planning

**Complete Address:**

Street1: 181 State House Station

Street2:

City: Augusta    State: ME: Maine

Zip / Postal Code: 04333-0181    Country: USA: UNITED STATES

**Phone Number:** 1-207-530-3065    **Fax Number:**

**E-mail Address:** sarah.curran@maine.gov

## Project Narrative File(s)

**\* Mandatory Project Narrative File Filename:**    `Maine CPRG Workplan Narrative.pdf`

| Add Mandatory Project Narrative File | Delete Mandatory Project Narrative File | View Mandatory Project Narrative File |

To add more Project Narrative File attachments, please use the attachment buttons below.

| Add Optional Project Narrative File | Delete Optional Project Narrative File | View Optional Project Narrative File |

## Climate Pollution Reduction Grants – Planning Grants
## Workplan Narrative

### WORKPLAN SUMMARY

Maine Governor Janet Mills has prioritized tackling climate change, advancing clean energy, and improving the climate resiliency of Maine's communities. She believes that by encouraging efficiency, clean energy, sustainable construction, and low and no emissions solutions in Maine, Maine can grow good paying jobs, especially in our rural communities, save money for consumers, and improve the environment and health for all Maine people.

The Governor's Office of Policy Innovation and the Future (GOPIF) coordinates the work of the Maine Climate Council, established in law in 2019, and works with the Maine Department of Environmental Protection (Maine DEP), the Governor's Energy Office, Maine Department of Transportation (Maine DOT), other state agencies, regional and municipal governments, and key stakeholders on policy issues to advance climate and energy policy. GOPIF will serve as the lead agency for the EPA CPRG planning grant and will coordinate the creation of the three key deliverables covering the entire geography of Maine through the established structure and processes of the Maine Climate Council, the Community Resilience Partnership, and Biennial Greenhouse Gas Inventory produced by the Maine DEP.

Maine has statutory greenhouse emissions reduction targets requiring a 45% reduction in carbon emissions below 1990 levels by 2030, at least 80% reductions by 2050, and achieving carbon neutrality by 2045.

To create the Priority Climate Action Plan, Comprehensive Climate Action Plan and Status Report, Maine will build on the award-winning, *Maine Won't Wait (PDF),* (2020) the first four-year Climate Action Plan from the Maine Climate Council. On December 1, 2022, the Maine Climate Council released a progress report as well as a new online dashboard, highlighting progress being made to implement *Maine Won't Wait's* climate and energy recommendations. The progress report informs additional planning efforts and analyses included in the proposed CPRG budget and establishes a framework for tracking metrics for Maine's climate goals. Such metrics are critical for informing the public about whether policies are having the intended outcomes and for making evidence-based adjustments, enhancements, or replacements to policies in pursuit of our 2030, 2045, and 2050 targets.

The PCAP will focus on key sectors: transportation, buildings, energy, and natural and working lands and waters, identified in *Maine Won't Wait*, and will leverage the 2022 Climate Action Plan Progress Report highlighting achievements and areas where more analysis and strategy development are needed.

In September 2023, the Maine Climate Council will begin the planning process for the required update to the state climate action plan due December 1, 2024, which will also meet the requirements of the Comprehensive Climate Action Plan (CCAP), due summer-fall 2025, and is expected to include the same sectors.

1

Coordination with municipalities and tribal governments for the PCAP and CCAP will use the network, communication channels and cohort model in the Community Resilience Partnership, a new program launched by GOPIF to help Maine communities reduce emissions and prepare for the effects of climate change.

Stakeholder engagement for the PCAP and the CCAP will build on the Maine Climate Council's ongoing communication efforts and will be further informed by the recommendations of the Climate Council's Equity Subcommittee, which was established to support ongoing planning, and implementation of the state's climate strategies to ensure shared benefits across diverse populations in Maine, and targeted support for the state's disadvantaged communities.

In addition to quarterly reporting and Status Report, Maine DEP will continue to update its Biennial Report on Progress Toward Greenhouse Gas Reduction Goals every two years, providing a comprehensive analysis of Maine's greenhouse gas (GHG) emissions by fuel source and economic sector. GOPIF will continue with an annual Climate Action Plan Progress Report and update the online dashboard, highlighting progress on implementing recommendations, and tracking co-benefits and impacts on low-income and disadvantaged communities.

## RESPONSIBLE ENTITIES

**Lead Organization:**

|  |  |
|---|---|
|  | **Primary Contact** |
| **Name:** | Hannah Pingree |
| **Title:** | Director |
| **Department/Office:** | Governor's Office of Policy Innovation and the Future |
| **Email:** | Hannah.pingree@maine.gov |
| **Phone:** | 207-624-7458 |
|  | **Additional Contact(s) (optional – may be more than one)** |
| **Name:** | Sarah Curran |
| **Title:** | Deputy Director, Climate Planning and Community Partnerships |
| **Department/Office:** | Governor's Office of Policy Innovation and the Future |
| **Email:** | Sarah.curran@maine.gov |
| **Phone:** | 207-530-3065 |

**Coordinating Entities:**

| Coordinating Entity | Role |
|---|---|
| **Governor's Office of Policy Innovation and the Future** | **Co-Chair of Maine Climate Council, CPRG Planning Grant program designated Lead Organization** |
| **Department of Environmental Protection (Air Pollution Control Agency)** | **Co-Chair of Maine Climate Council, State Green House Gas Inventory, Advisory role on GHG Reduction Strategy/ RFPs, Co-Chair of Transportation Working Group and Industrial Task Force** |
| **Governor's Energy Office** | **Co-Chair of the Energy Working Group of Maine Climate Council, Advisory role on Energy Sector GHG Reduction Strategy/RFPs** |
| **Department of Transportation** | **Co-Chair of the Transportation Working Group of Maine Climate Council. Advisory role on Transportation Sector GHG Reduction** |

2

| | Strategy/RFPs |
|---|---|
| Efficiency Maine Trust | Co-Chair of the Buildings Working Group of Maine Climate Council. Advisory role on Buildings Sector GHG Reduction Strategy/RFPs |
| Department of Agriculture, Conservation and Forestry | Co-Chair of the Natural Working Lands Working Group of Maine Climate Council. Advisory role on Natural and Working Lands Sector GHG Reduction Strategy/RFPs |
| Department of Marine Resources | Co-Chair of the Coastal and Marine Working Group of Maine Climate Council. Advisory role on Coastal and Marine Sector GHG Reduction Strategy/RFPs |
| Maine Climate Council | Includes: State Agencies, Universities, Businesses, Representative of Farmers, Foresters and Fishermen, Municipalities and Regional Governments, Youth, Foundations & NGOs. Members of the Maine Climate Council |
| Consultants (TBD) | Responses to RFPs for analysis |

## DELIVERABLES DEVELOPMENT PROCESS
### Approach to Three Key Deliverables – PCAP, CCAP and Status Report

On December 1, 2020 Governor Mills welcomed the release of *Maine Won't Wait (PDF),* the first four-year Climate Action Plan from the Maine Climate Council and announced actions her Administration will take to protect Maine people and communities and spur economic growth in the fight against climate change. *Maine Won't Wait* puts Maine on a trajectory to decrease greenhouse gas emissions by 45% by 2030 and 80% by 2050. The plan calls for decisive steps including bolstering the electric vehicle market in Maine, expanding the number of heat pumps installed in Maine homes, doubling home weatherization rates, and transitioning to clean power to curb harmful greenhouse gas emissions. It also highlights the powerful role Maine's natural and working lands and waters play in sequestering carbon emissions to help meet Maine's ambitious 2045 carbon neutrality goal.

The plan details climate action steps to create economic opportunities for Maine, such as encouraging the growth of the clean energy economy; creating incentives for consumers, businesses and industries to invest in energy efficiency; and supporting innovative construction materials and agricultural systems that will encourage Maine's farmers, fishermen, and foresters to help build and feed the state into the future. Lastly, *Maine Won't Wait* focuses on preparing our communities and people to better withstand the likely accelerating impacts from climate change, especially our state's most vulnerable citizens and communities. The plan highlights the need for an ongoing approach to equity as we consider new programs and allocation of resources, and considers Maine's unique challenges as a highly rural state, with thousands of miles of coastline, and the oldest population in the country.

GOPIF will coordinate efforts to develop the PCAP and subsequent CCAP and Status Report through the existing structure and processes of the Maine Climate Council. The work will be iterative, responsive and adaptive, and will build on the existing *Maine Won't Wait* climate action plan, collaborative structure, and timeline, as well as the experience and expertise at the Maine DEP in creating the Biennial Greenhouse Gas Inventories.

3

The PCAP will include a focused list of near-term, high-priority, implementation-ready measures to reduce GHG pollution and an analysis of GHG emissions reductions that would be achieved through implementation. The plan will evaluate progress on the current goals and actions and will recommend steps to go deeper and accelerate progress in key areas.

In September 2023, the Maine Climate Council will begin the planning process for the required update to the state climate action plan due December 1, 2024 which will also meet the requirements of the CCCAP. The CCAP will be informed by *Maine Won't Wait* and its progress, as well as the priorities and analyses of the PCAP.

The PCAP and CCAP will focus on key sectors: transportation, buildings, energy, and natural and working lands and waters, identified in *Maine Won't Wait*, and will leverage the 2022 Climate Action Plan Progress Report highlighting progress as well as areas where more needs to be done to implement *Maine Won't Wait's* climate and energy recommendations. The PCAP will define implementation strategies to enhance Maine's progress, and will focus on equity considerations, ensuring the state's transition to more efficient technologies benefits Maine's low-income and disadvantaged communities. The CCAP will further define these strategies with enhanced approaches, benefit and co-benefit tracking, and deeper understanding of how these actions are impacting Maine's low-income and disadvantaged communities.

*Maine Won't Wait* includes the following specific strategies to reduce emissions in targeted sectors and quantifies the GHG reductions they are expected to achieve.

> *Strategy A: Embrace the Future of Transportation in Maine:* Transportation is the largest contributor of greenhouse gas emissions from fossil fuel combustion. This strategy includes accelerating Maine's transition to electric vehicles (EVs) with a target to put 219,000 light-duty EVs on the road in Maine by 2030, as well as reducing vehicle miles traveled with increased access to high-speed internet, improved access to public and shared transportation and bicycle and pedestrian infrastructure, and development strategies that locate schools, work and shopping near where people live.

> *Strategy B: Modernize Maine's Buildings: Energy Efficient, Smart and Cost-Effective Homes and Businesses:* Nearly 60% of Maine households rely on heating oil or kerosene as their primary home heating source, the highest percentage in the country. Recent high fossil energy prices hit Maine consumers hard, causing disproportionate harm to low-income and aging Mainers. Maine's buildings strategy is about transitioning Maine homes and businesses off oil to cleaner heating and cooling systems, with a goal to have at least 130,000 whole-home pump systems installed in Maine by 2030 (building on Maine's current goal of installing 100,000 single heat pumps between 2019 and 2025 which the state is on track to exceed), and more energy efficient appliances. Additional strategies include: doubling the pace of home weatherization; advancing the design and construction of new buildings with phase-in modern, energy efficient building codes to reach net zero carbon emissions for new construction in Maine by 2035; and promoting climate-friendly building products – especially those coming from forest products from Maine. It highlights the opportunity for the state to "Lead-by-Example" in publicly

4

funded buildings like schools and government buildings to demonstrate opportunities and save taxpayer dollars.

*Strategy C:  Reduce Carbon Emissions in Maine's Energy and Industrial Sectors through Clean Energy Innovation:* Maine's renewable portfolio standard (RPS) establishes the requirement that 80% of our energy be renewable by 2030, and the Governor has recently laid out an ambitious plan to get to 100% clean energy by 2040. Transitioning to cleaner energy generation and greater energy efficiency offers exciting new economic opportunity, especially in-state power production and storage. The Governor has set a goal to double the number of clean energy jobs in Maine to 30,000 by 2030, ensuring the state has quality jobs and pathways to accomplish our ambitious goals.

*Maine Won't Wait* also highlights the significant opportunity to sequester carbon in the state's natural and working lands and waters.

*Strategy E: Protect Maine's Environment and Working Lands and Waters, Promote Natural Climate Solutions and Increase Carbon Sequestration:* This strategy includes 30x30, a goal that 30% of Maine's lands are in conservation easements or protected by 2030 – including protection of working farmland and forestland. Strategy E is also about supporting the ability of Maine natural resource economies to adapt to climate change impacts and take advantage of new market opportunities. Maine's climate plan includes goals to increase locally consumed food from Maine's farms and fishermen, and to increase our production and consumption of forest productions that provide long-term sequestration benefits.

In addition to the *Maine Won't Wait* climate and energy recommendations, the PCAP and CCAP will be informed by several additional sector specific analyses, including:

**Transportation:**

- **Development of a Clean Transportation Roadmap for the Medium and Heavy Duty Vehicle (MHDV) sector in Maine.** As indicated in *Maine Won't Wait*, medium and heavy duty vehicles make up 27% of transportation emissions in Maine. In 2020, Maine joined 16 other states and the District of Columbia in signing the NESCAUM MHDV MOU, adopting goals and committing to the development of an action plan to make at least 30 percent of new MHDV vehicle sales zero emissions by 2030, and 100 percent of sales zero emissions by no later than 2050. The development of a Clean Transportation Roadmap for the Medium and Heavy Duty Vehicle (MHDV) sector in Maine will analyze those factors relevant to Maine from the NESCAUM MHDV action plan, and would include consideration of financial and non-financial vehicle and infrastructure incentives; actions to encourage public transit and public fleet zero emission MHDV deployment; effective infrastructure deployment strategies, regulations and policies; outreach and education; potential costs and benefits of zero emissions MHDVs; and utility actions to promote zero emission MHDVs. The plan would be developed in partnership with key community and industry stakeholders and would include exploration of key rural industry sectors, including forestry and farming.

5

- Development of a **Fleet Electrification Plan** that includes decarbonization pathways and program recommendations for state agencies as well as municipal and school fleets. The State of Maine Lead by Example (LBE) initiative sets ambitious targets for electrification of the state fleet. For the 2,300 light duty vehicles owned centrally by the state, our LBE targets include 50% of all new vehicle purchases being electric by 2025, and 100% by 2030. Due to the periodic and unpredictable availability of these vehicles on the market – especially when attempting to align vehicle availability with state procurement cycles – and the commensurate infrastructure investment required to serve electric vehicles – the state needs a proactive plan to follow to transition its fleet to cleaner more efficient vehicles. The plan will explore partnerships with other regional states and state/municipal partnerships to ensure competitive procurement and services.

- **A transportation policy research, communications, and engagement planning process** to inform the state climate plan on transportation strategies that can better support low and moderate income citizens, disadvantaged communities, aging Mainers and rural drivers as they consider new electrified transportation options and rebate programs, new public transportation opportunities, and other strategies that will support the state's emission reduction goals.

- Conduct an analysis of **Emission Reduction Opportunities Achievable through various Land Use Polices** that reduce vehicle miles traveled and encourage greater efficiency in construction. After decades of declining population, Maine is experiencing an influx of new residents, and has the 7th highest in-migration rate in the country. This analysis will inform policy decisions about how to accommodate population and economic growth while reducing associated greenhouse gas emissions.

**Buildings:** Heating, cooling, and lighting buildings accounts for nearly a third of Maine's GHG emissions; Maine can reduce greenhouse gases by modernizing our buildings to use cleaner energy, increase energy efficiency, and utilize lower-carbon building materials. The goal of this body of work would be to identify interventions in those segments of the residential, commercial, and public sector markets which serve low income and disadvantaged individuals and communities; and which strengthen heritage industries of importance to Maine while developing decarbonization workforce opportunities.  In the Buildings sector, additional analyses to inform the PCAP will include:

- Develop a detailed plan to accelerate the state's **Buildings Decarbonization Plans** including:
  - Analysis for significantly **scaling low and moderate incoming heating system replacements and weatherization actions**, especially for Maine homes relying on heating oil and kerosene;
  - **Analysis of replacing and/or upgrading the state's oldest/poorest quality residences** (with a focus on manufactured and affordable housing) and expanding the affordable housing stock with a cost benefit analysis of deep retrofits and/or replacement with high efficiency and net-zero homes, including opportunities to utilize Maine's sustainably harvested wood and insulation projects in the process;

6

- o **Creation of building decarbonization pathways for Maine's schools, municipal buildings, and state owned** and leased building spaces, including technology options, funding and borrowing mechanisms, and opportunities to leverage other state and federal funding programs;
- o **Cost-benefit analysis of other non-residential buildings decarbonization opportunities** in Maine's largest non-residential building sectors including health care institutions, higher education, small businesses, and industrial facilities. Evaluation will include barriers to emission reductions, policy options to support increased actions, as well as an evaluation of federal funding opportunities. Benefit analysis will also include public health benefits related to co-pollutant reductions, cost savings opportunities for consumers, and economic impacts.

**Energy:**

- Engagement, communications, and planning support for **Maine's 100% Clean Energy by 2040 Planning Process,** soon to be launched by Maine's Governor's Energy Office. Consulting support has already been identified for modeling pathways and policy options, but additional stakeholder engagement, communications, and plan implementation support will be needed.
- An analysis of **Maine's waste sector emissions impacts, opportunities and policy options** that will include options for both reducing waste and associated emissions and the most cost-effective options for generating clean energy by waste sector. Deeper analysis in the waste sector will include a Food Loss and Waste assessment, including waste generated in the commercial, residential, and institutional sectors, and an assessment of the current Food Waste Infrastructure and Future Policy Options to improve the recovery of surplus food generation.

**Carbon Sequestration Planning and Support for Marine, Natural and Working Lands Sectors:**

Maine is nearly 90% forested, has thousands of miles of coastline, and vast prime farmlands, creating significant opportunity for ongoing and increased carbon sequestration and climate friendly job-creation and preservation in Maine's forest products sector, agricultural sector, and in the marine/ocean "blue carbon" sector. Additional staff capacity will provide policy leadership on land protection efforts, natural resource sequestration opportunities, and emissions-reduction policies in Maine's heritage industry sectors to help the state meet both our emission reduction and carbon-neutrality goals.

These analyses will be further refined or advanced to inform the CCAP as needed.

## Required Elements for Three Key Deliverables - PCAP, CCAP, and Status Report

**GHG Inventory:** For the required GHG inventory, the state will utilize the Maine DEP's Ninth Biennial Report on Progress Toward Greenhouse Gas Reduction Goals, released in July 2022, which provides a comprehensive analysis of Maine's GHG emissions by fuel source and economic sector for the PCAP. By 2025, the CCAP will include the 10th Biennial Report, which is expected in early 2024. The Status Report will include metrics from the 11th Biennial Report, anticipated in early 2026.

7

The Ninth Biennial Report found that as of 2019, gross GHG emissions in Maine were 25 percent lower than 1990 levels, surpassing the state's medium-term goal of reducing gross GHG emissions to 10 percent less than 1990 levels by January 1, 2020. The report also identified fossil fuel combustion as the largest source of GHG emissions in the state and of that, transportation remains the largest contributor (49%), followed by residential buildings (21%), commercial buildings (12%), the industrial sector (12%) and electric power (5%).

The Ninth Biennial Report is the first to quantify the carbon sequestration benefits of Maine's forests, fields and wetlands. It is essential for the creation and evaluation of emission reduction programs to take into account this more comprehensive view of carbon released and sequestered within Maine's borders.

**GHG Emissions Projections**: For the PCAP, the state will utilize the GHG Emissions Projections conducted as part of the *Maine Won't Wait* planning process; the projections will be updated for the CCAP in 2024 by the Maine Climate Council Scientific and Technical Subcommittee comprised of interdisciplinary experts. The STS produced Scientific Assessment of Climate Change and Its Effects in Maine to inform *Maine Won't Wait.* The Status Report will include GHG Emission Projections developed for the third iteration of *Maine Won't Wait*, due late 2028.

**GHG Reduction Targets**: The state's GHG reduction targets are set in law and require 45% carbon emissions reductions from 1990 levels by 2030 and 80% by 2050. The state is also required to achieve carbon neutrality by 2045. The state has requirements to phase-down the use of HFCs.

**Quantified GHG Reduction Measures:** For the required Quantified GHG Reduction Measures in the three key deliverables, the state will competitively select a consultant to update the emissions modeling conducted as part of the *Maine Won't Wait* planning process.

Previous work on emissions modeling and the impacts of reductions targets and reductions measures included an analysis of the costs and benefits of the strategies recommended by the working groups (Assessing the Impacts Climate Change May Have on the State's Economy, Revenues, and Investment Decisions, an analysis by Eastern Research Group and Synapse Energy Economics). The report includes four volumes and a Summary report:

Volume 1, Vulnerability Mapping: A mapping analysis that identifies vulnerable communities, geographies, and economic sectors.

Volume 2, Cost of Doing Nothing Analysis: Estimates of losses that the State of Maine and its citizens could incur if the State does not take action to prevent or prepare for climate change.

Volume 3, Maine Emissions Analysis: An energy-use and emissions baseline based on current state and regional policies, as well as an assessment of options for meeting Maine's energy needs (and allowing economic growth) while reducing greenhouse gas emissions.

8

Volume 4, Economic Analyses of Adaptation and Mitigation Strategies: Economic analyses to provide context for the majority of the adaptation and mitigation strategies developed by the Maine Climate Council.

**Benefits Analysis:** For the Benefits Analysis encouraged in the PCAP and required in the CCAP and Status Report, the state will competitively select a consultant in addition to utilizing existing staff capacity at the Maine DEP.

**Low Income/Disadvantaged Communities Benefits Analysis**: For the required Low Income/Disadvantaged Communities Benefits Analysis in the three key deliverables, the state will competitively select a consultant in addition to supplementing existing staff capacity to conduct additional analysis using the Climate and Economic Justice Screening Tool (CEJST) released by the White House Council on Environmental Quality. The analysis will build on work of the Maine Climate Council's Equity Subcommittee and the existing work of the Maine Climate Council An Equity Assessment of Working Group Recommendations conducted by the University of Maine's Senator George J. Mitchell Center for Sustainability Solutions.

**Review of Authority to Implement:** The required Review of Authority for the three key deliverables will be conducted using existing staff capacity within GOPIF and the Maine DEP.

**Intersection with Other Funding Availability:** The Intersection with Other Funding Availability will be conducted for the three key deliverables iteratively using existing staff capacity within GOPIF and will include opportunities for the state as well as communities in Maine. This analysis will build on existing cross-agency coordination to develop strong proposals to respond to competitive federal funding opportunities to support state and local efforts. GOPIF coordinates key state agencies in pursuing opportunities through the Infrastructure Implementation Committee which was established by Governor Mills to mobilize a cross-agency effort to support implementation of the historic Infrastructure Investment and Jobs Act (IIJA) which has subsequently been referred to as the Bipartisan Infrastructure Law (BIL). GOPIF also coordinates the implementation of the Maine Jobs & Recovery Plan, Governor Mills' plan approved by the Legislature to invest nearly $1 billion in federal American Rescue Plan funds to improve the lives of Maine people and families, help businesses, create good-paying jobs, and build an economy poised for future prosperity. GOPIF works with key state agencies to coordinate other federal funding opportunities such as the Inflation Reduction Act (IRA) and the CHIPS and Science Act.

**Workforce Planning Analysis:** For the required Workforce Planning Analysis, the state will competitively select a consultant to conduct the analysis of workforce needs and opportunities. The analysis will build on specific strategies to leverage Maine's renewable energy resources and energy efficiency services to recover and grow Maine's economy and meet the state's bold climate goals provided in the report, Strengthening Maine's Clean Energy Economy, and bring together other state analyses such as those commissioned by the Governor's Energy Office to evaluate the clean energy workforce and identify strategies and opportunities for growth for the clean energy economy such as the 2021 Maine Clean Energy Industry Report, the 2022 Maine Offshore Wind Talent Analysis, and 2022 Maine Clean Energy Workforce Analysis Report,

9

as well as similar recent or upcoming analyses for the broadband, housing, and transportation sectors.

## Interagency and Intergovernmental Coordination for Three Key Deliverables - PCAP, CCAP and Status Report

GOPIF will work with the Maine Climate Council and its working groups and subcommittees as the primary coordinating entity for interagency coordination to develop the PCAP and subsequent CCAP and Status Report.

The Maine Climate Council members are re-appointed every 3 years, and Governor Mills has recently appointed 39 new members of Maine's Climate Council. The Climate Council will meet next in May 2023, to receive recommendations from the Equity Subcommittee for ensuring that all Mainers can benefit from climate action. The recommendations include specific actions and metrics to ensure that the programs and policies proposed in *Maine Won't Wait* reach disadvantaged populations as well as recommendations for procedural equity to increase participation by disadvantaged communities in state climate and energy planning and decision-making.

The Maine Climate Council is co-chaired by Hannah Pingree, Director of GOPIF, and Melanie Loyzim, Commissioner of the Maine DEP. State agency members include the Commissioner of the Department of Agriculture Conservation and Forestry, Director of the Governor's Energy Office, Commissioner of the Department of Inland Fisheries and Wildlife, Commissioner of the Department of Defense, Veterans and Emergency Management, Commissioner of the Department Administrative and Financial Services, Commissioner of the Department of Labor, Commissioner of the Department of Economic and Community Development, Commissioner of the Department of Marine Resources, Commissioner of the Department of Education, Commissioner of the Department of Transportation, and the Commissioner of Department of Health and Human Services. The Council also includes the Directors of Maine's Housing Authority and Efficiency Maine Trust, the state administrator for state efficiency programs.

The Maine Climate Council meets quarterly and is responsible for updating the state's climate action plan every four years and monitoring its progress.

10

The Council includes six working groups and two subcommittees: the scientific and technical subcommittee and the equity subcommittee. The working groups helped to develop the strategies in the state's climate action plan, and include the: Transportation Working Group; Buildings, Infrastructure and Housing Working Group; Energy Working Group; Coastal and Marine Working Group; Community Resilience, Public Health and Emergency Management Working Group; and Natural and Working Lands Working Group.



The Scientific and Technical Subcommittee of the Maine Climate Council is responsible for delivering a report that summarizes the impacts of climate change in Maine and how it might impact our state in the future.

The Equity Subcommittee was established to support planning and implementation of climate strategies to ensure benefits across diverse populations of Maine people. The effects of climate change will create significant hardships for disadvantaged people and communities, such as low-income residents, older adults, indigenous people, people of color, and others, who are less able to respond.

Together, the Climate Council and its working groups and subcommittee include more than 200 Maine people with a diverse set of experiences and backgrounds to develop the climate action plan. During the Council process, the Council also receives public comment and engages stakeholders in recommended strategies in a variety of settings and formats.

In addition to the Maine Climate Council, interagency coordination for the PCAP will leverage existing cross-agency coordination efforts that seek to develop strong proposals to respond to competitive federal funding opportunities to support state and local efforts.

Many federal funding opportunities are subject to the new conditions of the federal Justice40 Initiative, requiring federal agencies to deliver at least 40% of benefits to disadvantaged communities, and GOPIF is supporting a Justice 40 staff working group, to ensure state agencies and localities are ready and competitive for grant applications, and Maine gets its fair share of federal dollars; to ensure state agencies have the tools and information they need to comply; and to ensure state agencies are consistent, where feasible, in their considerations of disadvantaged communities and definitions.

11

Coordination with municipalities and tribal governments for the PCAP will also utilize the Community Resilience Partnership, a program launched by GOPIF to help Maine communities reduce emissions and prepare for the effects of climate change. Through grants and direct support to municipal and tribal governments and unorganized territories, the Community Resilience Partnership assists communities to reduce carbon emissions, transition to clean energy, and become more resilient to climate change effects.

GOPIF has also provided technical assistance to communities in Maine to support them to access federal funds directly, for example through the new statewide Maine Clean School Bus Program to help Maine school districts purchase electric school buses. The Maine Clean School Bus Program works with school districts and school bus contractors to provide free technical assistance to plan for, procure, and deploy electric school buses, and provides information on the EPA Clean School Bus Grant Program and assists schools in preparing funding applications. On October 26, 2022 the EPA announced that Maine led the country with the 4th most EV bus awards, per-capita, of all 50 states; and the most per capita in New England.

**Stakeholder Engagement for Three Key Deliverables - PCAP, CCAP, and Status Report**
The process to develop the PCAP and CCAP will include a robust element of community engagement – which will include disadvantaged communities and people, but also towns, youth, impacted industries, and stakeholders engaged in specific parts of our analysis. This engagement process will be replicated for the Status Report, and be linked with transparent communication in the Progress Reports associated with tracking implementation progress and outputs from *Maine Won't Wait*, which will be inclusive of the PCAP and CCAP as they are developed.

*Maine Won't Wait* highlights the importance of outreach and engagement in Strategy H: Engage with Maine People and Communities about Climate Impacts and Program Opportunities. Effective communication about Maine's climate strategies is critical to the success of the Maine Climate Action Plan. This strategy includes helping people understand the challenges and the opportunities, and helping Maine students to understand the science of Maine's changing climate and be prepared with the necessary skills to meet future workforce opportunities. Maine has launched a new website for climate action, maine.gov/climateplan/ with stories and ideas to help Maine people, businesses and communities take action on climate. *Maine Won't Wait* has become a blueprint for climate action for communities and organizations. In 2022, *Maine Won't Wait* earned the 2022 Resilience & Sustainability Award from the American Planning Association (APA) as the premier state climate plan in the country. The reason this plan is a working is because it is not sitting on a shelf, but it is being implemented by communities and businesses and people all over the state.

Stakeholder engagement for the PCAP, CCAP and Status Report will build on the Maine Climate Council's ongoing communication efforts and will be further informed by the recommendations of the Climate Council's Equity Subcommittee. Recommendations for equitable climate action in Maine included several strategies for procedural equity, intended to allow for meaningful participation in climate-related policy development, planning, and implementation, and to help ensure that disadvantaged communities are aware of, and can access, state programs and

12

funding opportunities for climate action. GOPIF will incorporate specific actions recommended by the Equity Subcommittee in the development of the PCAP and the CCAP, including identifying opportunities to hear from priority populations and providing stipends to compensate for costs incurred to participate.

### ENVIRONMENTAL RESULTS, OUTPUTS, AND OUTCOMES

Clear metrics for Maine's climate goals were established in the state's 4-year climate action plan, *Maine Wont' Wait*, which acknowledges that such metrics are critical for informing the public about whether policies are having the intended outcomes and for making evidence-based adjustments, enhancements, or replacements to policies in pursuit of our 2030, 2045, and 2050 targets.

December 1, 2022 was the two-year anniversary of the plan, and the Maine Climate Council released a progress report as well as a new online dashboard, highlighting the progress being made to implement *Maine Won't Wait's* climate and energy recommendations. Since the release of *Maine Won't Wait,* Maine has seen encouraging growth of electric vehicles purchases and public electric vehicle charging stations, and record installations of high efficiency heat pumps -- all of which directly address our state's leading causes of greenhouse gas emissions and start us on a path to achieve the ambitious of the plan. Maine is on track to meet its goal of using 80 percent renewable sources for our electricity by 2030, among the most ambitious goals in the country. Maine people, communities, businesses, and organizations across the state are taking real actions to reduce greenhouse gas emissions, transition to clean energy, and better prepare for the impacts of climate change.

*Maine Won't Wait*, 2022 Progress Report  (PDF)

2022 Progress Map and Dashboard | Maine Climate Plan

### Outputs
The outputs for CPRG planning grant will include:

1)  The PCAP, a narrative report due on March 1, 2024, that includes a focused list of near-term, high-priority, implementation-ready measures to reduce GHG pollution and an analysis of GHG emissions reductions that would be achieved through implementation.

    The PCAP will be based on the state's existing climate action plan, *Maine Won't Wait,* and will include a GHG Inventory; GHG Emissions Projections; GHG Reduction Targets; Quantified GHG Reduction Measures; a Benefits Analysis for the full geographic scope and population covered by the plan; a Low-income and Disadvantaged Communities Benefits Analysis; a Review of Authority to Implement; a Plan to Leverage Other Federal Funding; and a Workforce Planning Analysis.

2)  The CCAP, due summer-fall 2025, will touch on all significant GHG sources/sinks and sectors present in Maine, establish near-term and long-term GHG emission reduction goals, and provide strategies and identify measures to achieve those goals.

13

The CCAP will include a GHG inventory; GHG emissions projections; GHG reduction targets; Quantified GHG reduction measures; a Benefits Analysis for the full geographic scope and population covered by the plan; a Low-income and Disadvantaged Communities Benefits Analysis; a Review of Authority to Implement; a Plan to Leverage Other Federal Funding; and a workforce planning analysis.

3) The Status Report due summer-fall 2027 will include a GHG Inventory update; GHG Emissions Projections update; GHG Reduction Targets; Quantified GHG Reduction Measures status and update; a Benefits Analysis for the full geographic scope and population covered by the plan; a Low-income and Disadvantaged Communities Benefits Analysis; a Review of Authority to Implement update; a Plan to Leverage Other Federal Funding; a Workforce Planning Analysis; and a plan for Next Steps/Future Budget and Staffing Needs.

Additional outputs will include the number of Maine Climate Council quarterly meetings for interagency coordination and the number of community members, including from low-income and disadvantage communities who participate in the climate action planning processes.

In addition to quarterly reporting, GOPIF will continue to release an annual climate action plan progress report as well as update the online dashboard, highlighting the progress being made to implement the state's progress on climate and energy recommendations.

## Outcomes
The outcomes for CPRG planning grant will include tons of pollution (GHGs and co-pollutants) reduced over the lifetime of the measures identified in the PCAP and the CCAP; tons of pollution (GHGs and co-pollutants) reduced annually; and tons of pollution (GHGs and co-pollutants) reduced with respect to low-income and disadvantaged communities.

Additional outcomes will also include cost- savings for low-income households; public health benefits of improved air quality, protection from extreme heat and cold; and the economic benefits and good job creation, as well as improved staff capacity to implement policies to address climate change; and enhanced community engagement.

In addition to required quarterly reporting as well as the Status Report, Maine DEP will continue to update its Biennial Report on Progress Toward Greenhouse Gas Reduction Goals every 2 years, providing a comprehensive analysis of Maine's greenhouse gas emissions (GHG) by fuel source and economic sector. GOPIF will continue to release an annual climate action plan progress report as well as update the online dashboard, highlighting the progress being made to implement the state's progress on climate and energy recommendations.

## SCHEDULE
See Schedule provided in the "Additional Attachments" form uploaded through Grants.gov.

## REPORTING

14

Governor Mills has designated GOPIF with oversight and responsibility for managing grant funds and coordinating activities and deliverables pertaining to the CPRG Planning Grant program. In this role, GOPIF will be responsible to deliver the required quarterly reports including work status, work progress, difficulties encountered, financial expenditures, preliminary data results if applicable, anticipated future activities, and any changes of key personnel.

## BUDGET

See Budget provided as form SF424A uploaded through Grants.gov, and the "Budget Narrative" file uploaded in the "Additional Attachments" form uploaded through Grants.gov.

**Total Budget Summary**

|  | Total Requested from EPA |
|---|---|
| Personnel | $760,417 |
| Fringe Benefits | $380,209 |
| Travel | $25,950 |
| Equipment | $0 |
| Supplies | $14,688 |
| Contractual | $1,530,000 |
| Other | $16,000 |
| Total Direct | $2,727,264 |
| Indirect | $272,726 |
| TOTAL | $2,999,990 |

## CLIMATE INNOVATION TEAMS (OPTIONAL)

Maine is open to participating in Climate Innovation Teams, particularly in the areas of Estimating emission reductions and program benefits in disadvantaged communities, Sector-based strategies, and Workforce development. Costs associated with participation in the Climate Innovation Teams, such as travel to a potential annual meeting of the teams, are included in the workplan budget.

15

## Other Attachment File(s)

**\* Mandatory Other Attachment Filename:**    `Maine CPRG Schedule .pdf`

| Add Mandatory Other Attachment | Delete Mandatory Other Attachment | View Mandatory Other Attachment |

To add more "Other Attachment" attachments, please use the attachment buttons below.

| Add Optional Other Attachment | Delete Optional Other Attachment | View Optional Other Attachment |

**Maine Climate Planning Timeline and Milestones**

| ACTIVITY | Months | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 |
| year | 23 | | | | | 24 | | | | | | | | | | | | 25 | | | | | | | | 26 | | | | | | | | | | | | | | | 27 | | | | | | | |
| month | | Sept | | Nov | | Jan | | March | | May | | July | | Sept | | Nov | | Jan | | March | | May | | July | | Sept | | Nov | | Jan | | March | | May | | July | | Sept | | Nov | | Jan | | March | | May | | July |
| **Ongoing Processes and Meetings** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Develop Quality Assurance Project Plan, if required | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interagency Meetings (Maine Climate Council) - quarterly | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Stakeholder Meetings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Meetings with Municipal and Tribal Government Partners | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quarterly Reports | | | • | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • | | | • |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Priority Climate Action Plan** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Inventory/Emissions Projections/Reduction Targets (existing) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sector Specific Analyses | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Low Income/ Disadvantaged Communities Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quantified GHG Reduction Measures | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Review of Authority to Implement | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Intersection with Other Funding Availability | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workforce Planning Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Publish PCAP | | | | | | | | • | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Comprehensive Climate Action Plan** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Inventory | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Emission Projections | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Reduction Targets (existing) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quantified GHG Reduction Measures | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Low Income/ Disadvantaged Communities Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Review of Authority to Implement | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Intersection with Other Funding Availability | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workforce Planning Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| State Climate Action Plan due | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Publish CCAP | | | | | | | | | | | | | | | | | | | | | | | | • | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Status Report and Ongoing Activities** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Inventory Update | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Emissions Projections Update | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GHG Reduction Targets (existing) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quantified GHG Reduction Measures | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Low Income/ Disadvantaged Communities Benefits Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Review of Authority to Implement | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Intersection with Other Funding Availability | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workforce Planning Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Next Steps/Future Budget and Staffing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Publish Status Report | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | • |

**Budget Narrative File(s)**

---

**\* Mandatory Budget Narrative Filename:**    `Maine CPRG Budget Narrative.pdf`

| Add Mandatory Budget Narrative | Delete Mandatory Budget Narrative | View Mandatory Budget Narrative |

---

To add more Budget Narrative attachments, please use the attachment buttons below.

| Add Optional Budget Narrative | Delete Optional Budget Narrative | View Optional Budget Narrative |

## Budget Narrative

**Personnel**

| Salaries and Wages | Total Requested from EPA |
|---|---|
| 1 FTE Federal Grants Project Manager @ $89, 460.80 annually for 2-year limited period position. Public Service Coordinator II, CU 30. 4160 hours at $43.01/hr. | **$178,922** |
| 1 FTE Natural Resource Climate Policy Advisor @ $89,460.80 annually for 2-year limited period position. Public Service Coordinator II, CU 30. 4160 hours at $43.01/hr. | **$178,922** |
| 1 FTE Department of Environmental Protection Waste Coordinator @ $89, 460.80 annually for 2-year limited position. Public Service Coordinator II, CU 30. 4160 hours at $43.01/hr. | **$178,922** |
| 1 FTE Community Outreach Coordinator @ $89, 460.80 annually for 2-year limited period position. Public Service Coordinator II, CU 30. 4160 hours at $43.01/hr. | **$178,922** |
| 0.25 FTE Policy and Data Analyst @ $89, 460.80 annually for 2-year limited period position. Public Service Coordinator II, CU 30. 1040 hours at $43.01/hr. | **$44,730** |
| **TOTAL** | **$760,417** |

**Fringe Benefits**

| Rate/Base/Composition | Total Requested from EPA |
|---|---|
| 50% of Personnel Costs to cover FICA, retirement, health insurance, sick, personal, vacation days | **$380, 209** |

**Travel**

| | Total Requested from EPA |
|---|---|
| *See Narrative Note 1.* | |
| Airfare: Four trips (two trips for 2 staff) estimated at $500/round trip | **$7,200** |
| Per Diem: Estimated $79/day, 8 days (4 days per trip), 2 staff traveling | **$5,056** |
| Hotel: Estimated $258/night, 6 nights total (3 nights per trip for 2 staff) | **$12,384** |
| Mileage for Community Outreach Coordinator. Estimated at 1,200 miles/yr for two years to meet with communities during PCAP and CCAP development. Federal rate of $0.655/mile applied. | **$1,310** |
| **TOTAL** | **$25,950** |

**Equipment**

None.

**Supplies**

| | Total Requested from EPA |
|---|---|
| Computers for 4 FTE @ $153/month for 24 months | $14,688 |

**Contractual**

| *See Narrative Note 2.* | Total Requested from EPA |
|---|---|
| Facilitator for Maine Won't Wait Stakeholder Meetings and Work Group Meetings, Interagency Coordination | $100,000 |
| Translation Services for Stakeholder Meetings | $10,000 |
| Coordinator for Disadvantaged Communities Engagement | $50,000 |
| Reimbursement for participation expenses for Disadvantaged Communities Engagement | $70,000 |
| RFP for emissions and co-benefits analysis | $150,000 |
| RFP for Low Income/Disadvantaged Communities Benefits Analysis | $75,000 |
| RFP for workforce planning analysis | $75,000 |
| RFP Medium and Heavy-Duty Vehicle Roadmap | $200,000 |
| RFP Fleet Electrification Plan | $150,000 |
| RFP Land use and Vehicle Miles Traveled Analysis | $100,000 |
| RFPs Building Decarbonization Roadmaps | $250,000 |
| RFP Waste Emission Strategy | $250,000 |
| **TOTAL** | **$1,680,000** |

**Other**

| | Total Requested from EPA |
|---|---|
| Space rental for in-person community workshops, outreach, and/or Maine Climate Council meetings estimated at $1,000 each. | $12,000 |
| Printing and Publication Fees | $4,000 |
| **TOTAL** | **$16,000** |

**Indirect**

| | Total Requested from EPA |
|---|---|
| Indirect Cost Rate of 10% *de minimis* applied to all direct costs. | $272,726 |

**Total Budget Summary**

| | Total Requested from EPA |
|---|---|
| **Personnel** | $760,417 |
| **Fringe Benefits** | $380,209 |
| **Travel** | $25,950 |
| **Equipment** | $0 |
| **Supplies** | $14,688 |
| **Contractual** | $1,530,000 |
| **Other** | $16,000 |
| **Total Direct** | $2,727,264 |
| **Indirect** | $272,726 |
| **TOTAL** | $2,999,990 |

*Narrative Note 1.* There will be no international travel associated with this project or these funds. Travel budgets for 2 staff to attend the Climate Innovation Team Workshops estimated @ 2 per year, and internal state mileage for community outreach and engagement.

*Narrative Note 2.* Contractual agreements will be competitively procured when required. Contractual services have been identified to increase procedural equity and engagement with disadvantaged communities, meet required elements of the deliverables: Priority Climate Action Plan, Comprehensive Climate Action Plan, and Status Report, and further define strategies to reduce emissions in key sectors in Maine based on progress towards Maine's goals identified in Maine Won't Wait.

**Maine Budget for CPRG Planning Grant**

| | Year 1 | Year 2 | Year 3 | Year 4 | Total |
|---|---|---|---|---|---|
| **Personnel** | | | | | |
| 1 FTE Federal Grants Project Manager @ $89,460.80/Annually (Public Service Coordinator II,CU 30) | $ 89,461 | $ 89,461 | $ - | $ - | $ 178,922 |
| 1 FTE Natural Resource Climate Policy Advisor @ $89,460.80/Annually (Public Service Coordinator II,CU 30) | $ 89,461 | $ 89,461 | $ - | $ - | $ 178,922 |
| 1 FTE Community Outreach Coordinator @ $89,460.80/Annually (Public Service Coordinator II, CU 30) | $ 89,461 | $ 89,461 | $ - | $ - | $ 178,922 |
| .25 FTE Policy and Data Analyst @ $89,460.80/Annually (Public Service Coordinator II,CU 30) | $ 22,365 | $ 22,365 | $ - | $ - | $ 44,730 |
| 1 FTE DEP Waste Coordinator @ $89,460.80/Annually (Public Service Coordinator II,CU 30) | $ 89,461 | $ 89,461 | $ - | $ - | $ 178,922 |
| TOTAL PERSONNEL | $ 380,209 | $ 380,209 | $ - | $ - | $ 760,417 |
| **Fringe Benefits** | | | | | |
| Federal Grants Project Manager | $ 44,730 | $ 44,730 | $ - | $ - | $ 89,461 |
| Natural Resource Climate Policy Advisor | $ 44,730 | $ 44,730 | $ - | $ - | $ 89,461 |
| Community Outreach Coordinator | $ 44,731 | $ 44,731 | $ - | $ - | $ 89,461 |
| Policy and Data Analyst | $ 11,183 | $ 11,183 | $ - | $ - | $ 22,365 |
| DEP Waste Coordinator | $ 44,730 | $ 44,730 | $ - | $ - | $ 89,461 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TOTAL FRINGE BENEFITS** | $ 190,104 | $ 190,104 | $ - | $ - | | $ 380,209 |
| **Travel** | | | | | | |
| Airfare:Four trips (two trips for two individuals) estimated at $450/round trip | $ 1,800 | $ 1,800 | $ 1,800 | $ 1,800 | | $ 7,200 |
| Per Diem: Estimated $79/day, 8 days (4 days per trip), 2 staff travelling | $ 1,264 | $ 1,264 | $ 1,264 | $ 1,264 | | $ 5,056 |
| Hotel:  Estimated $258/night, 6 nights total (3 nights per trip), 2 staff travelling per trip | $ 3,096 | $ 3,096 | $ 3,096 | $ 3,096 | | $ 12,384 |
| Mileage: Community Outreach Coordinator 1,000 miles/yr @ $0.655/mile (2023 federal rate) | $ 655 | $ 655 | $ - | $ - | | $ 1,310 |
| **TOTAL TRAVEL** | $ 6,815 | $ 6,815 | $ 6,160 | $ 6,160 | | $ 25,950 |
| **Equipment** | | | | | | |
| **TOTAL EQUIPMENT** | $ - | $ - | $ - | $ - | | $ - |
| **Supplies** | | | | | | |
| computers x 4 FTE, $153/mo for 24 months | $ 7,344 | $ 7,344 | | | | $ 14,688 |
| **TOTAL SUPPLIES** | $ 7,344 | $ 7,344 | $ - | $ - | | $ 14,688 |
| **Contractual** | | | | | | |
| Facilitator for Maine Won't Wait Stakeholder Meetings and Work Group Meetings, Interagency Coordination | $ 50,000 | $ 50,000 | $ - | $ - | | $ 100,000 |
| Translation Services for Stakeholder Meetings | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | | $ 10,000 |

| | | | | | |
|---|---|---|---|---|---|
| Communications and Engagement | $ 25,000 | $ 25,000 | $ - | $ - | $ 50,000 |
| Coordinator for Disadvantaged Communities Engagement | $ 25,000 | $ 25,000 | $ - | $ - | $ 50,000 |
| Reimbursement for participation expenses for Disadvantaged Communities Engagement | $ 25,000 | $ 25,000 | $ 10,000 | $ 10,000 | $ 70,000 |
| RFP for emissions and co-benefits analysis | $ 50,000 | $ 50,000 | | $ 50,000 | $ 150,000 |
| RFP for Low Income/Disadvantaged Communities Benefits Analysis | $ 25,000 | $ 25,000 | | $ 25,000 | $ 75,000 |
| RFP for workforce planning analysis | $ 25,000 | $ 25,000 | | $ 25,000 | $ 75,000 |
| RFP Medium and Heavy Duty Vehicle Roadmap | $ 200,000 | | | | $ 200,000 |
| RFP Fleet Electrification Plan | $ 150,000 | | | | $ 150,000 |
| RFP Land use and VMT | $ 100,000 | | | | $ 100,000 |
| RFPs Building Decarbonization Roadmaps | $ 250,000 | | | | $ 250,000 |
| RFP Waste Emission Strategy | $ 250,000 | | | | $ 250,000 |
| TOTAL CONTRACTUAL | $ 1,177,500 | $ 227,500 | $ 12,500 | $ 112,500 | $ 1,530,000 |
| **Other** | | | | | |
| Space rental for in-person community workshops,  @ $1000 each | $ 4,000 | $ 4,000 | | $ 4,000 | $ 12,000 |
| Printing and Publication Fees | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 4,000 |
| TOTAL OTHER | $ 5,000 | $ 5,000 | $ 1,000 | $ 5,000 | $ 16,000 |
| **Indirect Charges** | | | | | |
| Federal Negotiated Indirect Cost Rate = 10% de minimis | $ 176,697 | $ 81,697 | $ 1,966 | $ 12,366 | $ 272,726 |

| (Indirect Rate x Personnel = Indirect Costs) | | | | | | $           - |
|---|---|---|---|---|---|---|
| TOTAL INDIRECT | $   176,697 | $  81,697 | $   1,966 | $   12,366 | | $   272,726 |
| TOTAL FUNDING | $  1,943,669 | $ 898,669 | $  21,626 | $  136,026 | | $   2,999,990 |

|  | Year 1 | Year 2 | Year 3 | Year 4 |  | Total |
|---|---|---|---|---|---|---|
| Direct Charges | $   1,766,972 | $  816,972 | $   19,660 | $  123,660 | | $   2,727,264 |
| Indirect Charges | $   176,697 | $  81,697 | $   1,966 | $   12,366 | | $   272,726 |
| Total | $   1,943,669 | $ 898,669 | $  21,626 | $  136,026 | | |

| | |
|---|---|
| **From:** | Parker, Katonya |
| **To:** | Curran, Sarah |
| **Cc:** | Burke, Dan (he/him/his) |
| **Subject:** | ▬▬▬▬▬ |
| **Date:** | Thursday, August 10, 2023 11:51:34 AM |
| **Attachments:** | Coverletter2.pdf |
| | OMB Form 00A01355-0.pdf |

**EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good morning,

Please find attached award documents. If you have questions, please contact me.

Thank you

Katonya Parker, Grants Specialist
U.S. Environmental Protection Agency
Grants Management Branch
Mission Support Division (MSD)
5 Post Office, Suite 100 (05-5)
Boston, MA  02109
Phone: 617-918-1967
Fax: 617-918-0967



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION I**
5 Post Office Square – Suite 100
Boston, Massachusetts 02109-3912

ATTENTION**:** Authorized Representative

Dear EPA Assistance Agreement Recipient,

Congratulations on your award. You have been identified as the Authorized Representative to receive award documents on behalf of your organization.

Attached is an electronically signed award for your ***Assistance Agreement***. Regarding acceptance of this award, please read your "**NOTICE OF AWARD**" statement, which is located on the front page of your attached award. EPA no longer requires your counter signature on award documents. Please take a moment to review all of your award as well as the Administrative and Programmatic Terms and Conditions of the award.

If your work plan and budget includes subawards of financial assistance (2 CFR 200.1 and 200.331), please pay particular attention to EPA's National Term and Condition for Subawards which is found in the Terms and Conditions for this award. By accepting this Assistance Agreement, your organization is certifying that it either has systems in place to comply with the regulatory or EPA policy requirements specified in the National Term and Condition for Subawards or that it will refrain from making subawards with funding EPA provides under this agreement until the systems are designed and implemented. Also note that should your organization decide to make a subaward(s) that was not described in the work plan and budgeted for under this agreement you must obtain prior written approval from EPA's Award Official for the subaward as provided at 2 CFR 200.308(c)(6).

I wish you success with the completion of your program. If you have any questions regarding your award, please contact your EPA Project Officer or EPA Grants Specialist. Our contact information is located in the attached award.

Best,

*Katonya Parker-Best*

Grants Management Specialist

Enclosure

cc:  EPA Grant File

5D - 00A01355 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY | | GRANT NUMBER (FAIN): 00A01355 MODIFICATION NUMBER: 0 PROGRAM CODE: 5D | DATE OF AWARD 08/02/2023 |
|---|---|---|---|---|
| | | | TYPE OF ACTION New | MAILING DATE 08/07/2023 |
| | Grant Agreement | | PAYMENT METHOD: ASAP | ACH# PEND |

| RECIPIENT TYPE: State | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT: | PAYEE: |
| STATE OF MAINE, GOVERNOR'S OFFICE OF POLICY INNOVATION AND 111 Sewall Street Augusta, ME 04330 EIN: 01-6000001 | Governor's Office of Policy Innovation and the Future 181 State House Station Augusta, ME 04333 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Sarah Curran | Dan Burke | Katonya Parker |
| 181 State House Station | 5 Post Office Square, Suite 100 | 5 Post Office Square, Suite 100 |
| Augusta, ME 04333-0181 | Boston, MA 02109-3912 | Boston, MA 02109-3912 |
| Email: sarah.curran@maine.gov | Email: Burke.Dan@epa.gov | Email: Parker.Katonya@epa.gov |
| Phone: 207-530-3065 | Phone: 617-918-1285 | Phone: 617-918-1235 |

**PROJECT TITLE AND DESCRIPTION**

Maine Climate Pollution Reduction Planning Grant

See Attachment 1 for project description.

| BUDGET PERIOD 08/01/2023 - 07/31/2027 | PROJECT PERIOD 08/01/2023 - 07/31/2027 | TOTAL BUDGET PERIOD COST $2,999,990.00 | TOTAL PROJECT PERIOD COST $2,999,990.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/27/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $2,999,990.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $2,999,990.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 1 , EPA New England 5 Post Office Square, Suite 100 Boston, MA 02109-3912 | U.S. EPA, Region 1, EPA New England R1 - Region 1 5 Post Office Square, Suite 100 Boston, MA 02109-3912 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | | |
|---|---|---|
| Digital signature applied by EPA Award Official    Arthur Johnson - Director of MSD | | DATE 08/02/2023 |

5D - 00A01355 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $0 | $2,999,990 | $2,999,990 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $2,999,990 | $2,999,990 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Oganization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| CPRG MAINE | 23010CG005 | 2231 | E4SFX | 01V2 | 000ACGXJ1 | 4132 | - | - | $2,999,990 |
| | | | | | | | | | $2,999,990 |

5D - 00A01355 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $760,417 |
| 2. Fringe Benefits | $380,209 |
| 3. Travel | $25,950 |
| 4. Equipment | $0 |
| 5. Supplies | $14,688 |
| 6. Contractual | $1,530,000 |
| 7. Construction | $0 |
| 8. Other | $16,000 |
| 9. Total Direct Charges | $2,727,264 |
| 10. Indirect Costs: 0.00 % Base | $272,726 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $2,999,990 |
| 12. Total Approved Assistance Amount | $2,999,990 |
| 13. Program Income | $0 |
| 14. Total EPA Amount Awarded This Action | $2,999,990 |
| 15. Total EPA Amount Awarded To Date | $2,999,990 |

## *Attachment 1 - Project Description*

This agreement provides funding under the Inflation Reduction Act (IRA) to State of Maine, Governor's Office of Policy Innovation and the Future to develop a comprehensive, economy-wide climate mitigation plan or update an existing plan in collaboration with air pollution control districts, and large and small municipalities statewide, and tribal governments that will support actions to reduce greenhouse gases (GHG) and harmful air pollutants and to conduct meaningful engagement with low- income and disadvantaged communities.

In general, activities include the development, updating, and evaluation of plans to reduce climate pollution (i.e., to reduce GHG emissions and/or enhance carbon sinks). Specific activities include 1) a GHG inventory; 2) GHG emissions projections; 3) GHG reduction targets; 4) Quantified GHG reduction measures; 5) A benefits analysis for the full geographic scope and population covered by the plan; 6) A low-income and disadvantaged communities benefits analysis; 7) A review of authority to implement; 8) A plan to leverage other federal funding; and, 9) A workforce planning analysis.

Three key deliverables will be produced and submitted over the course of the four-year program period, including: a Priority Climate Action Plan (PCAP), due March 1, 2024; a Comprehensive Climate Action Plan (CCAP), due two years from the date of the award; and a Status Report, due at the close of the grant period.

The expected outcomes include a PCAP and CCAP that identifies: tons of pollution (GHGs and co-pollutants) reduced over the lifetime of the measures; tons of pollution (GHGs and co-pollutants) reduced annually; and tons of pollution (GHGs and co-pollutants) reduced with respect to low-income and disadvantaged communities. Other expected outcomes include: improved staff capacity to implement policies to address climate change; enhanced community engagement; improved ambient air quality; health benefits achieved; increased public awareness of project and results; and, creation of high-quality jobs with an emphasis on workers from underserved populations.

The intended beneficiaries include all residents and visitors to the state of Maine through three main objectives: tackling damaging climate pollution; accelerating work to address environmental injustice and empower community-driven solutions in overburdened neighborhoods; and delivering cleaner air by reducing harmful air pollution in places where people live, work, play, and go to school.

No subawards are included in this assistance agreement.

## *Administrative Conditions*

**National Administrative Terms and Conditions**

**General Terms and Conditions**

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2022-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**A. Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov
MBE/WBE reports (EPA Form 5700-52A): **Grants Specialist on Page 1 of Award Document AND Larry Wells, Disadvantaged Business Utilization Program Manager:** r1_mbewbereport@epa.gov
All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Grants Specialist and Project Officer on Page 1 of Award Document**
Workplan revisions, equipment lists, programmatic reports and deliverables: **Project Officer on Page 1 of Award Document**
Quality Assurance documents, **Project Officer on Page 1 of Award Document AND** R1QAPPs@epa.gov

**B. Pre-Award Costs**

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from 08/01/2023 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

## *Programmatic Conditions*

**Climate Pollution Reduction Grants Specific Programmatic Terms and Conditions**

**A**.  PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas:  1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

**Performance Reports - Frequency**

Quarterly performance reports are required to be submitted electronically to the EPA Project Officer within 30 calendar days after the reporting period (every three-month period). Quarterly reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This quarterly reporting schedule shall be repeated for the duration of the award agreement.

July 1 – September 30 Reporting Period: report due date October 30 (note, in year 1, this reporting period should begin at the project start date)

October 1 – December 31 Reporting Period: report due date January 30

January 1 – March 31 Reporting Period: report due date April 30

April 1 – June 30 Reporting Period: report due date July 30

**The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.**

**B.  DELIVERABLES AND REQUIREMENTS**

**States that accept an award are required to produce and electronically submit the following three deliverables by the date specified:**

1.) By March 1, 2024, a Priority Climate Action Plan (PCAP), which is a narrative report that includes a focused list of near-term, high-priority, implementation ready measures to reduce Greenhouse Gas (GHG) pollution and an analysis of GHG emissions reductions that would be achieved through implementation. These initial plans can focus on a specific sector or selected sectors, and do not need to comprehensively address all sources of GHG emissions and sinks in the jurisdiction. The PCAP must include: a GHG inventory; quantified GHG reduction measures; a low-income and disadvantaged communities benefits analysis; and a review of authority to implement.

2.) A Comprehensive Climate Action Plan (CCAP), due 2 years from the date of the award. The CCAP is a narrative report that should touch on all significant GHG sources/sinks and sectors present in a state or metropolitan area, establish near-term and long-term GHG emission reduction goals, and provide strategies and identify measures to achieve those goals. Each CCAP must include: a GHG inventory; GHG emissions projections; GHG reduction targets; quantified GHG reduction

measures; a benefits analysis for the full geographic scope and population covered by the plan; a low-income and disadvantaged communities benefits analysis; a review of authority to implement; a plan to leverage other federal funding; and, a workforce planning analysis.

3.) A Status Report, due at the closeout of the 4-year grant period. This report should include the implementation status of the quantified GHG reduction measures included in the CCAP; any relevant updated analyses or projections supporting CCAP implementation; and, next steps and future budget/staffing needs to continue CCAP implementation.

States must coordinate with municipalities and air pollution control agencies within their state to include priority measures that are implementable by those entities. States are further encouraged to similarly coordinate with tribes. In all cases, the lead organization for a state or metropolitan area PCAP funded through the CPRG program must make the PCAP available to other entities by March 1, 2024 for their use in developing an implementation grant application.

State lead organizations must involve stakeholder groups and the public in the process for developing the PCAP and CCAP. Potential stakeholders include urban, rural, and underserved or disadvantaged communities as well as the general public, governmental entities, federally recognized tribes, Port Authorities, labor organizations, community and faith-based organizations, and private sector and industry representatives.

## C.  Cybersecurity Condition

**State Grant Cybersecurity**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## D.  Competency Policy

5D - 00A01355 - 0    Page 8

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable. Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**E**.  **Public or Media Events**

The Recipient agrees to notify the EPA Project Officer listed in this award document of public or media events related to activities accomplished as a result of this agreement, and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**F**.  **Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**G.  Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient will develop Quality Assurance Project Plans (QAPP) for all applicable projects and tasks involving environmental information operations in accordance with the most current version of EPA Requirements for Quality Assurance Project Plans. Regional guidance documents and national guidance documents may be helpful in meeting the requirements.

"Environmental information operations" is a collective term for work performed to collect, produce, evaluate, or use environmental information or the design, construction, operation, or application of environmental technology. For EPA, environmental information includes direct measurements of environmental parameters or processes, analytical testing of environmental conditions, information provided by models, information compiled from other sources such as databases, software applications, or existing literature, the development of environmental software, tools, or models, or the design, construction, operation, or application of environmental technology.

The QAPP must be approved by EPA prior to environmental information operations, except under circumstances requiring immediate action to protect human health and the environment or operations conducted under police powers. Unless an alternate schedule has been agreed upon, QAPPs are to be submitted at least 60 days before project activities begin. QAPPs are submitted electronically to the following:

**EPA Project Officer/Tribal Coordinator (see page 1 of assistance agreement for contact information) and**

**Regional Quality Assurance Branch via**                    **R1QAPPs@epa.gov**

        **\*If electronic submission is unavailable, please contact the Project Officer/Tribal Coordinator for submittal instructions.**

For organizations with an EPA-approved Quality Management Plan (QMP), the recipient will submit an annual update letter to EPA documenting progress over the year and any changes to the QMP. Annual update letters will be sent every year for four years until the expiration of the QMP (five years from initial EPA approval). Annual QA update letters will be sent to the EPA Project Officer/Tribal Coordinator and the RQAM on the anniversary of the approval of the QMP by the RQAM; or on another mutually agreeable schedule. In addition, for multi-year projects, the grantee shall confirm that the QAPP is current and accurate.

**H.  Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the State of Maine, Governor's Office of Policy Innovation and the Future received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**I.  Pre- Award Costs**

In accordance with 2 CFR 1500.8, the grantee may charge pre-award costs incurred from **08/01/2023** to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

**From:**     EPA_Grants_Info
**Subject:**  Pause EPA Grants
**Date:**     Tuesday, January 28, 2025 4:49:41 PM

**EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

| | |
|---|---|
| **From:** | EPA_Grants_Info |
| **Subject:** | Notice of Court"s Order |
| **Date:** | Monday, February 3, 2025 8:38:00 AM |
| **Attachments:** | Notice of Temporary Restraining Order 01-31-2025.pdf |

**EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

Phillip Schindel
Acting Director
US EPA Grants Management & Business Operations Division
202-564-5293
Schindel.Phillip@epa.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN,<br><br>       Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *in his Official Capacity as President of the United States*; U.S. OFFICE OF MANAGEMENT AND BUDGET; MATTHEW J. VAETH, *in his Official Capacity as Acting Director of the U.S. Office of Management and Budget*; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his Official Capacity as Secretary of the Treasury*; PATRICIA COLLINS, *in her Official Capacity as Treasurer of the U.S*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY A. FINK, M.D., *in her Official Capacity As Acting Secretary Of Health And Human Services*; U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, *in her Official Capacity as Acting Secretary of Education*; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, *in* | C.A. No. 25-cv-39-JJM-PAS |

|  |  |
|---|---|
| *his Official Capacity as Acting* | ) |
| *Administrator of the U.S. Federal* | ) |
| *Emergency Management Agency;* U.S. | ) |
| DEPARTMENT OF | ) |
| TRANSPORTATION; | ) |
| JUDITH KALETA, *in her Official* | ) |
| *Capacity as Acting Secretary of* | ) |
| *Transportation;* U.S. DEPARTMENT OF | ) |
| LABOR; VINCE MICONE, *in his Official* | ) |
| *Capacity as Acting Secretary of Labor;* | ) |
| U.S. DEPARTMENT OF ENERGY; | ) |
| INGRID KOLB*, in her Official Capacity* | ) |
| *as Acting Secretary of the U.S.* | ) |
| *Department of Energy;* U.S. | ) |
| ENVIRONMENTAL PROTECTION | ) |
| AGENCY; JAMES PAYNE, *in his Official* | ) |
| *Capacity as Acting Administrator of the* | ) |
| *U.S. Environmental Protection Agency;* | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY; KRISTI NOEM, i*n her* | ) |
| *Capacity as Secretary of the U.S.* | ) |
| *Department of Homeland Security;* U.S. | ) |
| DEPARTMENT OF JUSTICE; JAMES R. | ) |
| McHENRY III, *in his Official Capacity as* | ) |
| *Acting Attorney General of the U.S.* | ) |
| *Department of Justice;* THE NATIONAL | ) |
| SCIENCE FOUNDATION; and DR. | ) |
| SETHURAMAN PANCHANATHAN, *in* | ) |
| *his Capacity as Director of the National* | ) |
| *Science Foundation,* | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## TEMPORARY RESTRAINING ORDER

The legal standard for a Temporary Restraining Order ("TRO") mirrors that of

a preliminary injunction.  The Plaintiff States must show that weighing these four

factors favors granting a TRO:

1. likelihood of success on the merits;
2. potential for irreparable injury;
3. balance of the relevant equities; and

2

        4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

<u>Likelihood of Success on the Merits</u>

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In <u>**Count I**</u>, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In <u>**Count II**</u>, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

In **Count III**, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In **Count IV**, the States allege a violation of the Spending Clause of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. law 1.

And in **Count V**, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover.  Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take? The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not.  The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims.  The reasons are as follows:

4

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

> When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

> Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.  *See* 2 U.S.C. § 683; *see also Train v. City of New York,* 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary,* 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.,* 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

### Irreparable Harm

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

7

will cause severe disruption in their ability to administer such vital services–
even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause on funding that Congress has allocated will harm them and their citizens. These programs range from highway planning and construction, childcare, veteran nursing care funding, special education grants, and state health departments, who receive billions of dollars to run programs that maintain functional health systems. *See, e.g.*, ECF No. 3-1 at 56 (highway construction programs in Delaware), at 73 (childcare programs in Michigan), at 113 (veterans nursing care funding in Washington state), at 77 (special education programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts. The States assert that the pause applies to federal actions directing federal financial assistance to North Carolina to address the damage inflicted by Hurricane Helene and to any Federal Emergency Management Agency grant money not yet disbursed, including key support for California's ongoing response to the fires. ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law enforcement in high drug-trafficking areas, shows that payments to state-based HIDTA programs have been paused, putting the public's safety at risk. *Id.* ¶ 83.

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens.  Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here.  As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."  *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

### Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.

- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.

- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest.  Moreover, the

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect." ECF No. 44.

<u>Mootness</u>

The Defendants now claim that this matter is moot because it rescinded the OMB Directive. But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts. The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point. At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')." ECF No. 43. Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented." ECF No. 44. And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

10

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum."  ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

## Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

11

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025.  ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m.  Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court.  A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*
_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025