Thomas-Jensen Affirmation (redacted)

Exhibit # 83

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, *et al.,*

        Plaintiffs,

      v.

DONALD TRUMP, *et al.,*

        Defendants.

No. 1:25-cv-00039

## DECLARATION OF JOSHUA DAVIS

I, Joshua Davis, hereby depose and state as follows:

1.      I am the Chief Financial Officer for the North Carolina Department of Natural and Cultural Resources ("NCDNCR"). I have held that position since February of 2019. I make this declaration as a representative of NCDNCR in part based on the business records of the NCDNCR and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

2.      On March 28, 2024, the NCDNCR submitted a grant application on behalf of the Atlantic Conservation Coalition ("ACC")—a bipartisan coalition consisting of the States of South Carolina, Virginia, and Maryland, along with the Nature Conservancy ("TNC")—pursuant to the Inflation Reduction Act's Climate Pollution Reduction Grant program. A true and accurate copy of the confirmation of receipt and validation of the grant application as well as relevant grant application materials is attached hereto as **Exhibit A.**

3.      On July 22, 2024, the United States Environmental Protection Agency ("EPA") announced that the ACC had been awarded the requested $421,238,074.00 Climate Pollution Reduction Grant ("ACC Grant").[1]

4.      The following day, NCDNCR and its state partners entered into a Memorandum of Agreement outlining the states' respective roles, responsibilities, and commitments with respect to the ACC. A true and accurate copy of the Memorandum of Agreement is attached hereto as **Exhibit B.**

5.      NCDNCR received a formal notice of award and grant agreement on October 17, 2024. The grant agreement was subsequently updated on November 19, 2024 and January 16, 2025. A true and accurate copy of the amended grant agreement is attached hereto as **Exhibit C.**

6.      Under the terms of the grant agreement, EPA agreed "to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding the total federal funding of $421,238,074.00." EPA also agreed to provide reimbursement for "pre-award costs" incurred within a ninety-day window ending on October 1, 2024.

7.      NCDNCR is the primary recipient of the ACC Grant. The other ACC members are sub-recipients. As primary recipient, NCDNCR on behalf of ACC agreed "to implement [greenhouse gas] reduction programs, policies, projects and measures (collectively referred to as "GHG reduction measures," or "measures") identified in . . . the CPRG implementation grant workplan." A copy of this workplan is included in the attached grant application materials. *See* Ex. A.

---

[1] EPA, "North Carolina and three other Atlantic states to benefit from $421,238,074 Biden-Harris Administration investment for community-driven solutions to cut climate pollution," https://www.epa.gov/newsreleases/biden-harris-administration-announces-43-billion-grants-community-driven-solutions-cut (July 22, 2024); *see also* EPA, "North Carolina and three other Atlantic states to benefit from $421,238,074 Biden-Harris Administration investment for community-driven solutions to cut climate pollution," https://www.epa.gov/newsreleases/north-carolina-and-three-other-atlantic-states-benefit-421238074-biden-harris (July 23, 2024).

8.      As described in the workplan, each state within the ACC will direct approximately $50 million towards carbon reduction projects. $200 million of the awarded funds will be distributed to TNC for implementation of additional projects within the member states. NCDNCR estimates that approximately $67 million of these funds will go towards projects in North Carolina. In addition, NCDNCR will receive approximately $21 million for costs associated with the administration of the ACC.

9.      The funds awarded through the ACC Grant are distributed from EPA to NCDNCR via a reimbursement model: ACC members make expenditures to implement the ACC Grant workplan; ACC members send invoices to NCDNCR for those expenditures; and NCDNCR draws down qualifying funds through the U.S. Treasury, Bureau of Fiscal Service, Automated Standard Application for Payment ("ASAP") System.

10.     Under this model, NCDNCR and its partners rely upon the federal government's commitment to reimburse qualifying expenditures to avoid budget shortfalls and other financial harm.

11.     The ACC Grant serves multiple vital purposes for North Carolina and its partners. Southeastern peatlands, coastal habitats, and forests are key natural carbon sinks. They also reduce the impacts of catastrophic flood events, make our communities less vulnerable to wildfires, and stabilize local economies by attracting tourists and residents for recreational opportunities including boating, fishing, and birdwatching. Due to rapid population growth, growing developmental pressure, and reduced federal protections for wetlands, these lands are under immediate threat.[2]

---

[2] Status and Trends of Wetlands in the Conterminous United States 2009 to 2029, U.S. Fish and Wildlife Service (2024) *available at* https://www.fws.gov/sites/default/files/documents/2024-03/wetlands-status-and-trends-2009-2019-signed.pdf.

3

12.    To address the vital need for protection of these resources, the ACC has committed to implementing 21 shovel-ready projects that will reduce greenhouse gas emissions by 3,369,962.0 MT $CO_2$e by 2030 and 27,707,228.3 MT $CO_2$e by 2050. These projects will protect and restore coastal, peatland, and forest lands across the 4 member states.  As indicated above, in addition to reducing greenhouse gas emissions, these projects will bolster the economies of our coastal communities, improve wildfire resilience, and provide protection from catastrophic flooding, a growing crisis throughout our region.

13.    Since the award was announced by EPA, NCDNCR and its ACC partners have devoted significant resources towards implementation of the ACC's program commitments. At NCDNCR alone, I estimate that 25 NCDNCR employees have spent over 880 hours of staff time on project implementation.

14.    Additionally, NCDNCR has hired a new Natural Working Lands Coordinator and completed the interview process and extended an offer for a new Climate Change Grants Director. NCDNCR is relying upon funding from the ACC Grant to provide salaries for these positions.

15.    On January 27, 2025, NCDNCR staff accessed the ASAP system and observed that the ACC Grant account, Account ID No. ███████, had an account status of "Open" meaning that NCDNCR staff had the ability to draw down funds from the account.  However, other grant accounts, including those associated with grants from the National Park Service had been removed from ASAP, and NCDNCR was unable to draw down funds from those accounts.

16.    On January 28, 2025 at 4:41:10 PM, Deans Eatman, Assistant Secretary for Government Affairs at NCDNCR, received an email from EPA_Grants_Info@epa.gov stating:

4

Dear Grant Recipient,

EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

Please do not reply to this message. This mailbox is not monitored.

17.    On January 29, 2025, NCDNCR staff accessed the ASAP system and observed that none of NCDNCR's grant accounts were accessible, including the ACC Grant account. Specifically, the ASAP system included the following message "ERROR 839: No accounts found matching criteria."

18.    On February 3, 2025 at 8:33:29 AM, Mr. Eatman received another email from EPA_Grants_Info@epa.gov, stating:

Dear Grant Recipient,

Pursuant to the Court's directive in New York et al. v. Trump, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information. A copy of the Court's Order is also attached for reference. If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

Please do not reply to this message. This mailbox is not monitored.

19.    On February 3, 2025 at 1:58 PM, Mr. Eatman sent an email to Kristine Johnson, Manager, Grants Management and Strategic Planning Office in the Air and Radiation Division for EPA Region 4, requesting that she "confirm whether we can draw down funds while this TRO is in effect."  The email further stated, "This question is specific to the ACC CPRG award."

20.    On February 3, 2025 at 2:10:48 PM, Ms Johnso responded wi h n ema l that w s identic l o t e ema l sent from EPA_Grants_Info@epa.g v on Ja uar 28, 2025.

1.    On Feb ua y 3, 20 5 at 2: 3:38 P , Ms. J hnson res onded fu ther, s at ng "I am s eking f rther gu danc fr m o r GMO o f ce. wi l l t yo kno nce I get a definitive answer."

22.    On F br ary 4, 2025 NCDNCR staff acc ssed the AS P s stem and obs rved that NCDNCR's accounts a soci ted wi h gr nts from th National P rk ervice and the Nat ona Oceanic and Atmospheric Admin stra ion had ee rest ed to AS P. How ver, the ACC Gra t ac ount had not been restor d, nd CDNC w s no abl to d aw d wn funds from tha account.

3.    n Febr ary 5, 025 at 9:03:20 AM, Ms. J hnson re ponded urther s ati g "If you o no curre tl hav acc ss to dra dow fun s ou ill oon as t e ASAP a counts a e b ing unlocked in atc es."

24.    T ue and a curate c pies of th abov referenced email communications are attached h ret as **Exhi it D.** ru and accurate copi s o scree shots sh wing he statu o NCD CR g ant ac oun s on the ASAP s stem are attached hereto a **Exhibit E.**

5.    As of 4:09 PM on Februar 5 202 , NCDNCR was s ill not able to dr w d wn funds sing the ASAP sy tem fro the ACC ran accoun .

26.    Si ce EPA has annou ced its funding reeze nd he A C Grant ccount on he AS P syst m as been removed NCDNCR as been forced to pa se cti ities re at ng to i s implementation he A C G an out of concern that expenditures will not be reimbursed.

27.     If the funding freeze is not lifted, North Carolina will lose the benefits of over $117 million in conservation projects. As a result, North Carolina communities will be more vulnerable to flooding and wildfires and experience harm to their economies.

28.     In addition, NCDNCR will be saddled with costs associated with the personnel it has hired in reliance on the ACC Grant and staff time already spent administering and implementing the ACC Grant workplan.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY, 2025.**

Joshua Davis
Chief Financial Officer
NC Department of Natural and Cultural Resources

# Davis Declaration

# Exhibit A

| | |
|---|---|
| **From:** | do_not_reply@grants.gov |
| **Sent:** | Thursday, March 28, 2024 2:21 PM |
| **To:** | Kandros, Kimberly G |
| **Subject:** | [External] GRANT14106456 Grants.gov Submission Validation Receipt for Application |

CAUTION: External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Your application has been received and validated by Grants.gov and is being prepared for Grantor agency retrieval.

UEI: MFEHMF7KVJF5

AOR name: Kimberly G Kandros

Application Name: Climate Pollution Reduction Grants Program: Implementation Grants General Competition - DNCR

Opportunity Number: EPA-R-OAR-CPRGI-23-07

Opportunity Name: Climate Pollution Reduction Grants Program: Implementation Grants (General Competition)

https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fapply07.grants.gov%2Fapply%2Flogin.faces%3FcleanSession%3D1&data=05%7C02%7Ckimberly.kandros%40dncr.nc.gov%7C2eaef2bcb6254efa057c08dc4f53c671%7C7a7681dcb9d0449a85c3ecc26cd7ed19%7C0%7C0%7C638472468440285566%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C0%7C%7C%7C&sdata=FroFfLgTl4EDErFWH2kl8ZLla5H%2FGIy2Vqb0WcaENk0%3D&reserved=0

You will be notified via email when your application has been retrieved by Grantor agency.

Thank you.
Grants.gov
If you have questions please contact the Grants.gov Contact Center:
support@grants.gov
1-800-518-4726
24 hours a day, 7 days a week. Closed on federal holidays.

PLEASE NOTE: This email is for notification purposes only. Please do not reply to this email for any purpose.

# GRANTS.GOV™

# WORKSPACE FORM

This Workspace form is one of the forms you need to complete prior to submitting your Application Package. This form can be completed in its entirety offline using Adobe Reader. You can save your form by clicking the "Save" button and see any errors by clicking the "Check For Errors" button. In-progress and completed forms can be uploaded at any time to Grants.gov using the Workspace feature.

When you open a form, required fields are highlighted in yellow with a red border. Optional fields and completed fields are displayed in white. If you enter invalid or incomplete information in a field, you will receive an error message. Additional instructions and FAQs about the Application Package can be found in the Grants.gov Applicants tab.

## OPPORTUNITY & PACKAGE DETAILS:

| | |
|---|---|
| Opportunity Number: | EPA-R-OAR-CPRGI-23-07 |
| Opportunity Title: | Climate Pollution Reduction Grants Program: Implementation Grants (General Competition) |
| Opportunity Package ID: | PKG00283194 |
| CFDA Number: | 66.046 |
| CFDA Description: | Climate Pollution Reduction Grants |
| Competition ID: | |
| Competition Title: | |
| Opening Date: | 09/20/2023 |
| Closing Date: | 04/01/2024 |
| Agency: | Environmental Protection Agency |
| Contact Information: | CPRG@epa.gov |

## APPLICANT & WORKSPACE DETAILS:

| | |
|---|---|
| Workspace ID: | WS01268977 |
| Application Filing Name: | Climate Pollution Reduction Grants Program: Implementation Grants General Competition - DNCR |
| UEI: | MFEHMF7KVJF5 |
| Organization: | North Carolina Department of Natural and Cultural Resources |
| Form Name: | Application for Federal Assistance (SF-424) |
| Form Version: | 4.0 |
| Requirement: | Mandatory |
| Download Date/Time: | Sep 03, 2024 06:16:00 PM EDT |
| Form State: | No Errors |

## FORM ACTIONS:

OMB Number: 4040-0004
Expiration Date: 11/30/2025

## Application for Federal Assistance SF-424

| * 1. Type of Submission: | * 2. Type of Application: | * If Revision, select appropriate letter(s): |
|---|---|---|
| ☐ Preapplication | ☒ New | |
| ☒ Application | ☐ Continuation | * Other (Specify): |
| ☐ Changed/Corrected Application | ☐ Revision | |

| * 3. Date Received: | 4. Applicant Identifier: |
|---|---|
| Completed by Grants.gov upon submission. | |

| 5a. Federal Entity Identifier: | 5b. Federal Award Identifier: |
|---|---|
| | |

**State Use Only:**

| 6. Date Received by State: | 7. State Application Identifier: |
|---|---|
| | |

**8. APPLICANT INFORMATION:**

* a. Legal Name: North Carolina Department of Natural and Cultural Resources

| * b. Employer/Taxpayer Identification Number (EIN/TIN): | * c. UEI: |
|---|---|
| 566062189 | MFEHMF7KVJF5 |

**d. Address:**

* Street1: 109 East Jones Street
Street2:
* City: Raleigh
County/Parish: Wake
* State: NC: North Carolina
Province:
* Country: USA: UNITED STATES
* Zip / Postal Code: 27601-0000

**e. Organizational Unit:**

| Department Name: | Division Name: |
|---|---|
| | |

**f. Name and contact information of person to be contacted on matters involving this application:**

| Prefix: Ms. | * First Name: Kimberly |
|---|---|
| Middle Name: | |
| * Last Name: Kandros | |
| Suffix: | |

Title: Manager, Development and Special Projects

Organizational Affiliation:
NC Department of Natural and Cultural Resources

| * Telephone Number: 919-610-8218 | Fax Number: |
|---|---|

* Email: kimberly.kandros@dncr.nc.gov

**Application for Federal Assistance SF-424**

**\* 9. Type of Applicant 1: Select Applicant Type:**

A: State Government

Type of Applicant 2: Select Applicant Type:

Type of Applicant 3: Select Applicant Type:

**\* Other (specify):**

**\* 10. Name of Federal Agency:**

Environmental Protection Agency

**11. Catalog of Federal Domestic Assistance Number:**

66.046

CFDA Title:

Climate Pollution Reduction Grants

**\* 12. Funding Opportunity Number:**

EPA-R-OAR-CPRGI-23-07

**\* Title:**

Climate Pollution Reduction Grants Program: Implementation Grants (General Competition)

**13. Competition Identification Number:**

Title:

**14. Areas Affected by Project (Cities, Counties, States, etc.):**

Areas Affected.pdf    | Add Attachment | | Delete Attachment | | View Attachment |

**\* 15. Descriptive Title of Applicant's Project:**

Atlantic Conservation Coalition

Attach supporting documents as specified in agency instructions.

| Add Attachments | | Delete Attachments | | View Attachments |

**Application for Federal Assistance SF-424**

**16. Congressional Districts Of:**

* a. Applicant `NC-013`                              * b. Program/Project `NC-013`

Attach an additional list of Program/Project Congressional Districts if needed.

`Congressional Districts.pdf`    | Add Attachment | | Delete Attachment | | View Attachment |

**17. Proposed Project:**

* a. Start Date: `10/01/2024`                        * b. End Date: `09/30/2029`

**18. Estimated Funding ($):**

| | |
|---|---|
| * a. Federal | `421,238,074.00` |
| * b. Applicant | `0.00` |
| * c. State | `0.00` |
| * d. Local | `0.00` |
| * e. Other | `0.00` |
| * f. Program Income | `0.00` |
| * g. TOTAL | `421,238,074.00` |

**\* 19. Is Application Subject To Review By State Under Executive Order 12372 Process?**

☐ a. This application was made available to the State under the Executive Order 12372 Process for review on `                ` .

☐ b. Program is subject to E.O. 12372 but has not been selected by the State for review.

☒ c. Program is not covered by E.O. 12372.

**\* 20. Is the Applicant Delinquent On Any Federal Debt? (If "Yes," provide explanation in attachment.)**

☐ Yes    ☒ No

If "Yes", provide explanation and attach

`                ` | Add Attachment | | Delete Attachment | | View Attachment |

**21. \*By signing this application, I certify (1) to the statements contained in the list of certifications\*\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances\*\* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)**

☒ ** I AGREE

\*\* The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**Authorized Representative:**

| | | | |
|---|---|---|---|
| Prefix: | `Ms.` | * First Name: | `Kimberly` |
| Middle Name: | | | |
| * Last Name: | `Kandros` | | |
| Suffix: | | | |

* Title: `Manager, Development and Special Projects`

* Telephone Number: `919-814-6657`          Fax Number:

* Email: `kimberly.kandros@dncr.nc.gov`

* Signature of Authorized Representative: `Completed by Grants.gov upon submission.`    * Date Signed: `Completed by Grants.gov upon submission.`

*NOTE: USE OF THIS EXAMPLE COVER PAGE IS <u>OPTIONAL</u>. IF THIS INFORMATION IS PROVIDED IN A DIFFERENT FORMAT, EPA WILL NOT REVIEW AN APPLICATION UNFAVORABLY.*

## CPRG IMPLEMENTATION GRANTS COMPETITION
## COVER PAGE FOR APPLICATION

**<u>APPLICANT INFORMATION</u>**

| | |
|---|---|
| **Organization** | North Carolina Department of Natural and Cultural Resources |
| **Primary Contact Name** | Kimberly Kandros |
| **Phone Number** | 919-610-8218 |
| **Email Address** | kimberly.kandros@dncr.nc.gov |

**TYPE OF APPLICATION**   ☐ Individual Applicant      ☑ Lead Applicant for a Coalition

*If lead applicant for a coalition, provide a list of the coalition members below.*

Atlantic Conservation Coalition (North Carolina Department of Natural and Cultural Resources, South Carolina Office of Resilience, Maryland Department of the Environment, Virginia Department of Wildlife Resources,)

**FUNDING REQUESTED:** *Provide total EPA CPRG Implementation Grant funding requested.*

$ 421,238,074

**APPLICATION TITLE:** *Provide the title of your proposed project.*

The Atlantic Conservation Coalition

**BRIEF DESCRIPTION OF GHG MEASURES:** *Describe each GHG reduction measure contained in the application (1-2 sentences each).*

Measure 1 focuses on protecting and restoring high-carbon coastal habitats and peatlands to maximize carbon sequestration and coastal resilience benefits.

Measure 2 addresses the protection, use, restoration, and development forest land, promoting sustainable forestry management practices to increase carbon sequestration.

**SECTORS:** *Identify the sector(s) associated with the GHG reduction measures included in the application.*

- [ ] Industry
- [ ] Electricity Generation
- [ ] Transportation
- [ ] Other (please describe)
- [ ] Commercial and Residential Buildings
- [x] Agriculture/Natural and Working Lands
- [ ] Waste and Materials Management

## EXPECTED TOTAL CUMULATIVE GHG EMISSION REDUCTIONS

*For all proposed measures combined, provide the estimated cumulative GHG reductions:*

**Estimated cumulative GHG reductions for 2025-2030 (in metric tons)**

3,362,249

**Estimated cumulative GHG reductions from 2025-2050 (in metric tons)**

28,027,178

**LOCATIONS:** *List the primary location(s) where the proposed measures will be implemented*

**City**

**State; Territory; Federally recognized Tribe** | NC, SC, MD, VA

## APPLICABLE PRIORITY CLIMATE ACTION PLAN(S) (PCAP) ON WHICH MEASURES ARE BASED

**PCAP Lead Organization(s):** North Carolina Department of Environmental Quality,

**PCAP Title(s):** North Carolina Priority Climate Action Plan, Commonwealth of Virginia

**PCAP Website link(s) (if applicable):** https://www.deq.nc.gov/north-carolina-priority-clima

**List of GHG reduction measures and PCAP page reference for each measure:**

Measure 1:
North Carolina PCAP - Measure 14: Protect and restore high-carbon coastal habitats and peatlands, page 82

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

## Section 1. Overall Project Summary and Approach
### a. Description of Greenhouse Gas (GHG) Reduction Measures

The Atlantic Conservation Coalition (ACC) Climate Pollution Reduction Grant (CPRG) implementation proposal is a regional approach by North Carolina (NC), South Carolina (SC), Maryland (MD), Virginia (VA), and The Nature Conservancy (TNC), led by the North Carolina Department of Natural and Cultural Resources (NCDNCR), to reduce GHG emissions by leveraging the carbon sequestration (CS) power of natural and working lands (NWLs). In line with Environmental Protection Agency (EPA) requirements for non-competitive subaward to a non-profit entity, the ACC recruited and will sub-award $200 million of this proposal to TNC for the identification and implementation of natural climate solution projects with the greatest GHG emission reduction/CS benefits across the coalition states, regardless of state boundaries. In addition, each coalition member will direct approximately $50 million to carbon reduction projects that address the specific nature-based needs in their respective state. As a coalition, our collective efforts and resultant projects are designed to spur innovation and facilitate information sharing and synergies not possible through individual application. We believe the ACC is the strongest CPRG coalition demonstrating the critical role conservation and natural climate solutions play in providing climate mitigation, adaptation, and resilience benefits that prioritize low-income and disadvantaged communities (LIDACs). This coalition showcases the broad, bipartisan appeal of these strategies. Granting this application would build long-term support for continued carbon reduction and climate action in the mid-Atlantic and Southeast region of the United States.

The ACC proposes 21 shovel-ready projects, totaling $421,238,074.40, that will reduce GHG emissions by 3,369,962.0 MT $CO_2e$ by 2030 and 27,707,228.3 MT $CO_2e$ by 2050. **Measure 1** of this proposal focuses on protecting and restoring high-carbon coastal habitats and peatlands to maximize CS and coastal resilience benefits. **Measure 2** addresses the protection, use, and restoration of forested land, promoting sustainable forestry management practices to increase CS.

Southeastern peatlands, coastal habitats, and forests are key natural carbon sinks that also provide critical co-benefits necessary in making communities more climate resilient. However, due to rapid population growth, growing developmental pressure, and the U.S. Supreme Court rollback of federal wetland jurisdiction, NWLs are under immediate threat. A 2024 report on wetlands to Congress by the U.S. Fish and Wildlife Service found that wetland loss has rapidly increased by 50% since 2009.[1] According the report, the substantial loss of wetlands "…reduces the prosperity, health, and safety of communities through increased susceptibility of people and infrastructure to natural disasters like flood, drought, and wildfire; decreased food security and reduction in clean water; increased harmful algal blooms and related increases in toxins and oxygen depleted 'dead zones'; greater vulnerability to sea level rise and storms; and reduced recreational opportunities."

For NC, this proposal will support the directives of Governor Cooper's Executive Order (EO) 305[2], which sets bold goals to conserve one million acres of forests and wetlands, restore one million acres of forests and wetlands, and plant one million urban trees by 2040 and supports the NC NWL Action Plan.[2] For SC, this proposal will support the activities outlined in the state-mandated (S.C. Code §48-62-10) Strategic Statewide Resilience and Risk Reduction Plan[3], emphasizing the significance of natural features like floodplains, marshes, forests, and living shorelines in reducing flood risk and providing other ecosystem

---

[1] Status and Trends of Wetlands in the Conterminous United States 2009 to 2029, U.S. Fish and Wildlife Service, 2024. https://www.fws.gov/sites/default/files/documents/2024-03/wetlands-status-and-trends-2009-2019-signed.pdf [2] Governor Roy Cooper. Executive Order 305, 2024. https://governor.nc.gov/executive-order-no-305/open

[2] North Carolina Natural and Working Lands Action Plan. https://www.ncnhp.org/nwl/natural-and-working-lands

[3] Strategic Statewide Resilience and Risk Reduction Plan. https://scor.sc.gov/resilience

1

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

services, as well as build upon SCOR's current resilience planning initiatives to identify priority conservation areas and coordinate with local communities. MD's Climate Pollution Plan [4] sets the nation's most aggressive carbon mitigation targets, a 60% reduction in emissions by 2031 and net-zero emissions by 2045. MD also has a goal to plant and maintain five million native trees by 2031, with 500,000 required in urban, underserved areas. In VA, this proposal supports commitments to decarbonize all Port operations by 2040 and supports various Chesapeake Bay commitments including the 2014 CB Agreement that MD also participates in.[5] All projects in this proposal support the coalition states respective Priority Climate Action Plans (PCAPs). Common tasks, milestones and assumptions by all coalition members are listed in Table 1. The measures, supporting projects, and project-specific tasks, milestones and assumptions are outlined in Tables 2 and 3. Project risks, potential effects, and mitigation strategies are listed in Table 4.

NCDNCR will submit a memorandum of agreement signed by all coalition member states by August 1, 2024.

*Linkage to EPA Strategic Plan*

The Measures and Projects funded through this proposal support EPA's Fiscal Year (FY) 2022-2026 Strategic Plan. The proposal supports Goal 1, "Tackle the Climate Crisis"; Objective 1.1, "Reduce Emissions that Cause Climate Change." Through the FY 2022-2026 EPA Strategic Plan, EPA will "aggressively reduce the emissions of greenhouse gases from all sectors while increasing energy and resource efficiency and the use of renewable energy. This proposal and all Measures and Projects within this proposal support this goal and objective. For more information see EPA's FY 2022 – 2026 EPA Strategic Plan.

*Table 1: Coalition-wide Tasks, Milestones, and Assumptions*

| Collective Tasks, Milestones and Assumptions |
| --- |
| 1. Coalition members submit Memorandum of Agreement (MOA) to EPA. (July 1, 2024) |
| 2. NCDNCR award agreement with EPA. (Fall 2024) |
| 3. Subaward agreements and distribution of funds based on MOA framework. (Y1Q1) |
| 4."Steering Committee" quarterly meetings & regular reporting check-ins. (Y1Q1 – Y5Q4) |
| 5. Dashboard created to share information with the public. (Y1Q2) |
| 6. Biannual reporting from grant subawardees to NCDNCR. (Y1Q2 – Y5Q4) |
| 7. NCDNCR reporting consolidation and biannual reports back to EPA. (end Y1Q2 – Y5Q4) |

*Table 2: Description of GHG Reduction Measure 1 Projects and Project-Specific Tasks, Milestones and Assumptions[6]*

---

[4] Maryland Climate Pollution Plan. https://mde.maryland.gov/programs/air/ClimateChange/Pages/Maryland's-Climatehttps://mde.maryland.gov/programs/air/ClimateChange/Pages/Maryland's-Climate-Pollution-Reduction-Plan.aspxPollution-Reduction-Plan.aspx

[5] Virginia Chesapeake Bay Watershed Agreement, 2014. https://d18lev1ok5leia.cloudfront.net/chesapeakebay/Chesapeakehttps://d18lev1ok5leia.cloudfront.net/chesapeakebay/Chesapeake-Bay-Watershed-Agreement-Amended.pdfBay-Watershed-Agreement-Amended.pdf.

[6] Any activities listed beyond Year 5 indicate voluntary actions funded outside any awarded CPRG grant.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**NC Project 1: Coastal Habitat Enhancement Initiative (Measure 14 in NC PCAP):** These vital habitats face threats from persistent erosion, adverse land usage, and increased sea levels. By implementing nature-based solutions to avoid carbon emissions and sequester additional carbon, the initiative will bolster flood resilience, enhance water quality, and support the traditional economies of local communities. This project supports Measure 1, as the project involves the protection and restoration of coastal ecosystems.

The project aims to preserve and restore 595 acres of coastal habitats in NC. At least six coastal marsh resilience projects are identified for preliminary review, including living shoreline cost-share projects for fringing shoreline marshes, marshes associated with dredge spoil islands in Bogue Sound along the Intracoastal Waterway, sound-side marshes at Cape Lookout and Cape Hatteras National Seashores, marshes on the south side of Roanoke Island in Dare County, and marsh protection and enhancement in the vicinity of Outfall Canal in Hyde County. The shoreline changes and carbon assessment analysis conducted by NATRX will further evaluate these sites to ensure they meet carbon sequestration benchmarks and identify the most cost-effective locations, and this analysis may identify better alternative project sites that will achieve greater returns on investment in terms of project goals. Coastal habitat projects are not likely to require any new land acquisition as they will be sited on publicly owned marshes, National Seashores, or private marshes with donated protective easements. Some additional land acquisition may be required to obtain adjoining lands to achieve the peatland restoration goals will occur on a 787-acre property that is currently being purchased by NCCF with funding from the N.C. Land and Water Fund, the Mountain to Sea Trail grant, and the U.S. Navy. This property that is currently being purchased will be protected in perpetuity through conservation easements held by the Navy and the State of North Carolina. If additional land acquisition is necessary, it will be purchase from a willing seller at fair market values as established following the acquisition and due diligence procedures set out by the N.C. Land and Water Fund and the U.S. Navy. If this adjacent land is purchased, we anticipate a significant financial contribution from the U.S. Navy that has already shown its support for acquiring this land with REPI funds.

The coastal North Carolina elements of the project are led by the North Carolina Coastal Federation, with 42 years of experience in protecting and restoring coastal habitats. The Federation has continuously engaged public and private sector partners including academic and government researchers, engineers, federal and state environmental agency staff, local government officials, fishers, and other stakeholders in its ongoing work to acquire, protect, and restore coastal habitats, freshwater wetlands, coastal forests, and water quality. The Federation has a successful track record for acquiring and implemented hundreds of millions of dollars of projects funded with federal, state, and local government funding as well as private contributions.

The coastal habitat enhancement elements of the project are led by the North Carolina Coastal Federation, which has overseen hundreds of coastal habitat enhancement projects over the past four decades. The Federation will utilize its experienced staff to manage and implement these projects, ensuring compliance with federal and state procurement and environmental regulations. It will retain through competitive procurement processes professional private sector licensed engineers and contractors to implement projects.

The major outcomes for this project as listed on pages 18-19 of the proposal work plan include preserving and restoring a minimum of (1) 15 acres of peatlands and (2) 595 acres of coastal habitats. These projects will also help to protect two National Seashores from erosion and sea level rise.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

Secondary goals set by NCCF are to exceed these outcomes listed in the proposal by protecting and restoring 100 acres of peatlands, and by creating a 131.25 acres of marsh migration corridors.

Additional metrics that will be reported include linear feet of living shoreline installed, volume of sediment added to vulnerable marshes, total acreage of wetlands protected and restored.

Working with its consultants and Duke University's Nicholas Institute for Energy, Environment, and Sustainability, NCCF will also report estimated GHG reductions due to the project. The project is currently anticipated to reduce GHG emissions by 16.3k cumulative mtCO2e between 2025–2030, and 342.9k cumulative mtCO2e between 2025–2050, at a cost of $68.5/mtCO2e.

**The NATRX Shoreline Change and Restoration study** ($350,000) will use advanced tools to analyze potential project sites for erosion rates, sediment sources, and carbon sequestration opportunities. This analysis will leverage high-resolution satellite imagery and artificial intelligence (AI) to site, plan, evaluate, and implement appropriate living shoreline techniques for coastal habitat-based carbon projects.  This will assure that the most cost-effective project sites and designs are used by the project that will achieve anticipated reductions in GHG emissions.

**The Carbon Flux study** ($1.5 million) led by Kevin D. Kroeger, PhD, from the Biogeochemical Processes group at Woods Hole Coastal and Marine Science Center, USGS. He and his research team will measure and model the export rate of bicarbonate alkalinity from wetlands, supporting the inclusion of ocean sequestration of wetland inorganic carbon in the North Carolina GHG inventory and carbon sequestration benefits that can be attributed to the work funded by this element of the project. This research will utilize high-frequency, extended time-series methods and integrate with national projects funded by NASA to improve carbon sequestration representation in the NC inventory.  A preliminary evaluation of the importance of this inorganic carbon sequestration indicates that the results of this research may support a ~three-fold larger estimate of GHG emissions from these coastal habitat projects than relying on soil carbon sequestration estimates alone. Proper consideration of this form of carbon sequestration within GHG inventories and carbon market methodologies is therefore a critical priority for GHG reduction emission reporting that will result from this project.

**Duke University's Nicholas Institute for Energy, Environment, and Sustainability** will provide help with tracking and reporting project deliverables, and withy reporting carbon sequestration benefits as verified by currently approved scientific methods for estimating such benefits as well as new data on benefits that results from the USGS research project conducted by Biogeochemical Processes group at Woods Hole Coastal and Marine Science Center, USGS.

4

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions**
1. Project statement of work written, and subcontract executed with NC outlining planned project activities, milestones, deliverables, budget and reporting requirements. (Y1Q1) (Assumes funds received by the NCDNCR, contracts executed between parties that allocate funds based upon scopes of work.)
2. Project team organized and meets. (Y1Q1)
3. Project teams meet monthly (Y1-Y5) (Assumes team/partners will coordinate activities.)
4. Location identification, project prioritization, and feasibility studies for habitat projects. (Y1-Y2) (Assumes coordination with partners to scope out, plan, and design projects.)
5. Permitting of habitat projects. (Y1Q1-Q3) (Assumes authorizations when project designs developed.)
6. Develop subcontracts for research (US Geological Survey and Site Analysis (Natrx). (Y1Q1-Q3)
7. Project construction. (Y1Q4-Y5) (Assumes projects phased into construction phases, some are ready.)
8. Baseline and post-project monitoring. (Y1Q3-Y5) (Assumes research team begins work in Y1Q3.)
9. Community engagement. (Y1Q4-Y4) (Assumes community outreach centered on project sites.)
10. Communications (Coastal Review online series on carbon, TV news stories on projects produced by the NC Coastal Federation (NCCF) in partnership with various TV stations). (Y1-Y5, quarterly)
11. Project reporting as required by contracts. (Y1-Y5)

---

**NC Project 2: High-Carbon Acquisitions for NC State Park System (Measure 14 in NC PCAP):** If the State cannot purchase these high-carbon areas, this land will likely no longer sequester carbon in the future. Acquiring this land into the NC State Park System will protect it from conversion for perpetuity and provide resilience for droughts and stormwater impacts. This project supports Measure 1, as it involves identifying purchasing privately-owned land with the highest carbon value and threat of land use conversion to add to the state park system; many of these lands are peatlands or other coastal plain wetlands. The NC State Parks System Planning/Land Acquisition team identified about 20+ sites totaling over 45,000 acres that are adjacent to state parks, are priority tracts for acquisition, and meet the criteria for carbon sequestration.  The prioritization of which tracts to pursue first will be determined by a further analysis of the original list in terms of carbon sequestration value and the willingness of landowners to sell.

This project will *potentially* lead to restoration of degraded peatlands within purchased land tracts. Steps of restoration could include:

1. Design, establish and maintain a hydrologic monitoring network
2. Field data collection and analysis
3. Develop engineered restoration design
4. Installation of restoration interventions
5. Post-restoration hydrologic evaluation and refinement
6. Ensure adequate management staff capacity and financial resources to sustain long term restoration integrity and realization of project GHG benefits

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions:**

1. Duke University, in partnership with NCDNCR, will identify tracts for potential acquisition by NC State Parks with high expected carbon benefits. "Future needs" tracts that have been previously identified by NC State Parks as ecologically desirable and spatially contiguous to existing state parks will provide a starting point for this analysis. The expected carbon value of acquiring tracts around existing state parks will be assessed based on each tract's vulnerability to land conversion and its carbon stock relative to nearby land with similar likelihood of conversion. This relative carbon stock approach accounts for the potential for land conversion to "leak" from acquired land to nearby land; focusing on tracts with high carbon stocks relative to the local landscape ensures that the acquisition will have a carbon benefit even if some leakage occurs. A subset of tracts also has potential for additional carbon benefits through peatland restoration or eliminating timber harvest after they are acquired by NC State Parks. These carbon benefits will be quantified for each tract based on the methods described in the CPRG technical appendix for peatland restoration and IFM projects, respectively. Tracts will be classified into priority categories based on their total expected carbon benefits, so that NCDNCR can begin acquisition conversations with landowners of tracts in the highest priority category. (Y1Q1-Q2) (Assumes grant is awarded, and funds are in hand by this time.)
2. NCDNCR begins conversations with landowners in the highest ranked tracts for acquisition. (Y1Q3)
3. NCDNCR begins acquisition process, integrating high-priority tract(s) into state park system. (Y2-Y5) (Assumes landowners are willing to sell land. If not, NCDNCR will shift to pre-ranked alternatives.)

**MD Project 1: Coastal Wetland (Measure 21 in MD PCAP):** Through implementing initiatives that nourish living shorelines, scale wetland restoration, and facilitate tidal reconnection, this project seeks to leverage existing Coastal Resilience Easements to restore and protect critical habitats, thus mitigating carbon emissions resulting from land conversion and sea level rise. This project supports Measure 1, as it incorporates the upkeep of coastal areas, wetlands, and tidal flow. Tasks, Milestones, and Assumptions listed below assume consistency with state hiring and procurement processes.

MD Project 1 will support coastal wetland restoration and management in the Lower Eastern Shore of Maryland (Dorchester, Wicomico, Worcester, and Somerset counties). The program will feature implementation of living shorelines, wetland restoration, passive wetland species recruitment, and tidal reconnection of wetlands. The program will leverage the existing easement programs (with a focus on coastal resilience) in Maryland to identify private landowners willing to either plan to transition their land to wetlands or actively restore wetlands on their property, avoiding carbon emissions resulting from land conversion, projected sea level rise, and soil emissions from unhealthy habitats. A desktop analysis has been done identifying properties that have significant area that is projected to transition to wetlands and score these properties based on the existing and projected future ecological benefits along with the proximity to flood vulnerable populations. The program will also target shorelines on state lands on the Lower Eastern Shore that have high rates of erosion but are protecting extensive wetland complexes, for establishment of living shorelines, along with opportunities to restore wetland complexes themselves to improve habitat function and prolong the projected lifespan of the marsh. Opportunities to reestablish tidal connection on state or private lands will also be sought to restore and preserve habitat function.

MD Project 1 will be led by the Maryland Department of Natural Resources (DNR) and complements Maryland's Program Open Space Stateside and Rural Legacy Program, initiatives to protect high quality natural spaces, in part for the enhancement of quality of life for Maryland's communities. Funding through these programs will be leveraged to work with private landowners to implement Coastal

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

Resilience Easements on their properties. Funding for these programs is provided through the Maryland State Budget.

Maryland facilitates conservation of privately-owned lands via easements through Maryland's Program Open Space (POS) Stateside and Rural Legacy Program (RLP). Funding for these programs is provided through the Maryland State Budget. State-led living shoreline and wetland restoration projects are funded via Maryland's Grant Gateway, which is supported by Maryland state dollars. Funds from the CPRG ACC grant will align with funding sources such as these to increase wetland restoration and preservation and to establish a new protection initiative: Coastal Resilience Easements (CRE). CREs require additional funding beyond what is covered through POS and RLP to support the development and implementation of Coastal Resilience Management Plans (CRMP) that outline strategies for maintaining and enhancing natural habitat under changing climate conditions.

CREs are a novel and climate-adaptive protection strategy. Climate impacts, such as sea level rise, are altering landscapes and the ecological and cultural resources that traditional conservation easements are intended to preserve. Maryland DNR has developed a spatial approach to target lands that are projected to convert to wetlands in the future and score individual land parcels based on their climate resilience and predicted ability to support wildlife habitat. The conventional approach of imposing fixed land use restrictions on a property could limit a future landowner's flexibility to adapt to those climate impacts if the original easement inadvertently prohibits adaptive activities. CREs, similar to traditional conservation easements, reduce land development and enhance environmental benefits, such as carbon sequestration, improved habitat, and clean water; CREs also support adaptive land management by supporting the transition of marsh habitat and requiring the development of a Coastal Resilience Management Plan (CRMP).

Restoration associated with the Coastal Resilience Easements and Coastal Resilience Management Plans will be coordinated by DNR's Chesapeake and Coastal Service in collaboration with local land trusts, including the Lower Shore Land Trust and Eastern Shore Land Conservancy. These agencies will work together to hire qualified contractors to design, permit, and implement restoration.

Marsh restoration will be coordinated by DNR's Chesapeake and Coastal Service and Wildlife and Heritage Service, in collaboration with the Marshes for Tomorrow initiative being spearheaded by Audubon Mid-Atlantic and USFWS. These agencies will work together to hire qualified contractors to design, permit, and implement restoration. Living shoreline restoration will be coordinated by DNR's Living Shoreline Restoration team and Wildlife and Heritage Service; they will hire qualified contractors to design, permit, and implement restoration. The above agencies all have extensive experience overseeing marsh and living shoreline restoration projects. The state of Maryland was the first state to pass legislation requiring living shorelines to be considered first – before bulkheads and rip rap – for shoreline restoration.

Maryland DNR will lead MD Project 1 with oversight and strategic guidance on project implementation through MDNR's upper management (*Resilient Systems Officer, Chesapeake and Coastal Service Unit Director, Wildlife and Heritage Associate Director, and Land Acquisition and Planning Director*). MDNR's *Environmental Justice Officer* will oversee community engagement and the community liaison program; *Land Protection staff* will facilitate protection of private lands using Coastal Resilience Easements; *Land*

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

*Management staff* will facilitate restoration activities on state-owned lands. *Chesapeake and Coastal Service staff* will coordinate across protection and restoration initiatives, serving as a communication funnel between partners, contractors, and DNR staff.

DNR will also partner with the Marshes for Tomorrow Initiative – spearheaded by *Audubon Mid-Atlantic* and *USFWS* – to preserve and restore marsh habitats on Maryland's Lower Eastern Shore. DNR will also partner with the *Lower Shore Land Trust* and *Eastern Shore Land Conservancy* to develop and implement Coastal Resilience Management Plans.

Tasks, Milestones, and Assumptions:
1. Hire program staff to manage activities (Y1Q1-Y1Q2)
2. Establish a community liaison program to facilitate community engagement (Y1Q3-Y1Q4)
3. Assess tidal reconnection opportunities (Y1Q4)
4. Initiate community engagement (Y2Q3-Y2Q4) (Assumes establishment of the community liaison program by Y1Q4)
5. Identify marsh restoration and living shoreline opportunities with State land managers and community members (Y2Q4-Y3Q4) (Assumes restoration is completed by Dec 2029)
6. Engage landowners to implement Coastal Resilience Easements (Y2Q4-Y3Q1) (Assumes landowner interest)
7. Develop Coastal Resilience Management Plans and provide project sponsor technical assistance (Y2Q4)
8. Implement Coastal Resilience Management Plans, living shorelines, and restoration of tidal connectivity (Y3Q2-Y3Q3) (Assumes restoration is completed by Dec 2029)
9. Continue community engagement during and following project implementation.
10. Repeat steps 4-9 as needed consistent with funding allocations.

VA Project 1: Hog Island Wildlife Management Area (Measure 10 in VA PCAP):
The Virginia Department of Wildlife Resources (DWR) will implement this project to restore coastal marsh habitat and install 11 breakwaters along 3,425 feet of shoreline on Hog Island Wildlife Management Area (WMA) in Surry County to enhance the resiliency of the area to sea level rise, protect 406 acres of naturally occurring marsh, and reduce nutrient and sediment loading into the Chesapeake Bay. As the shoreline is restored through this project, the marsh is projected to expand and re-vegetate beyond the breakwater. The project is fully permitted, designed, and ready for bidding and construction. With the installation of living shorelines and breakwaters, this proposal will finish the actions needed to restore and protect Hog Island WMA for the next 50-plus years. This project supports Measure 1, as it is aimed at restoring coastal marsh habitats.

Tasks, Milestones, and Assumptions: Assumption:
1. Community engagement. (Y1Q4-Y2Q2) (Assumes funding is awarded by 12/2024. Project is already permitted, designed, and ready for bidding and construction.)
2. Planning and construction. (Y1Q4-Y3Q2)
3. Restoration of coastal marsh habitats (Y1Q4-Y3Q2) (Assumes project implemented at a constant rate over implementation period. Carbon benefits accrue as the project begins and continue indefinitely.)
4. Evaluation and future planning. (Y3Q2-Q3)
5. Closeout. (Y3Q2-Q3) (Assumes restoration is completed by 7/2029.)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**VA Project 2: Ragged Island Wildlife Management Area (Measure 10 in VA PCAP):**
This project will protect 860 feet of shoreline, create 8000 square feet of wetlands, and protect 330 acres of wetlands in the Ragged Island Wildlife Management Area (WMA). This will fund the remaining 13.3 breakwaters and living shoreline that were not funded by a NOAA grant on July 18th, 2024. The NOAA grant will fund 48.7 breakwaters, protect the rest of the 1,207 acres of wetlands, 5,440 feet of shoreline, and create the additional 2.76 acres of wetlands. This project supports Measure 1, as it is focused on shoreline restoration.

**Tasks, Milestones, and Assumptions:**
1. Community engagement around projects, design input, and community benefits. (Y1Q4-Y4Q3) (Assumes funding is awarded by 12/2024 and project is already in permitting phase.)
2. Planning and construction. (Y1Q4-Y2Q3)
3. Living shoreline and marsh protection. (Y2Q4-Y3Q3)
4. Creation of new marsh. (Y2Q4-Y3Q3)
5. Evaluation and future planning. (Y3Q4-Y4Q3)
6. Closeout. (Y4Q2-Q3) (Assumes restoration is completed by 7/2029.)

**VA Project 3: Comprehensive Tidal Marsh Restoration in the Guinea Marshes (Measure 10 in VA PCAP):**
This comprehensive initiative focuses on preserving and enhancing the expansive tidal marsh ecosystems within the Guinea Marsh Wildlife Management Area (WMA) and other publicly owned Mobjack Bay Marsh Islands. By designing strategically positioned gray-green erosion control structures along the marsh edge, the project will safeguard 400 acres of tidal wetlands and beaches and restore up to 3 acres of tidal wetlands, dunes, and beaches. Without action, a continued increase in storm surge intensity and frequency will erode the Guinea marshes, further exposing and releasing the stored $CO_2$ into the atmosphere and ocean. This project supports Measure 1, focusing on the safeguard of coastal habitats.

**Tasks, Milestones, and Assumptions:**
1. Community engagement. (Y1Q4-Y6Q3) (Assumes funding awarded by 12/2024; engagement is throughout design and implementation.)
2. Assess and plan. (Y1Q4-Y2Q3).
3. Erosion control and protection activities. (Y3Q4-Y5Q3).
4. Restoration of coastline. (Y3Q4-Y5Q3) (Assumes this involves establishing a monitoring process.)
5. Evaluation and future planning. (Y5Q4-Y5).
6. Closeout. (Y6Q2-Q3) (Assumes restoration is completed by 7/2029.)

**VA Project 4: Saltmarsh Acquisition and Protection at Frog Stool Preserve (Measure 10 in VA PCAP):**
The Virginia Department of Wildlife Resources (DWR) is working with a willing seller to acquire 621 acres on the Eastern Shore to secure and conserve a high priority saltmarsh. Once purchased, this property will be added to the Coastal Forest Wildlife Management Area (WMA), which is currently 5,574 acres. For this project, DWR will hold title to the real property being secured through this fee-simple acquisition and will incorporate the area into Virginia's WMA system, which will secure existing and future carbon sequestration capabilities. Although an appraisal and review appraisal are already underway with the property, if the acquisition does not work out, DWR has received several other offers from private landowners on the Eastern Shore regarding selling their properties, the majority of which are wetland areas and would expand the Eastern Shore WMA areas. This project supports Measure 1, by conserving a high priority saltmarsh to bolster carbon sequestration capabilities.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions:**
1. Community engagement. (Y1Q4-Y3Q3). (Assumes funding awarded by 12/2024; engagement throughout design and implementation.)
2. Acquisition of land and assessment. (Y1Q4-Y2Q2).
3. Conservation and restoration planning. (Y2Q2-Y3Q3).
4. Evaluation and future planning. (Y3Q3).
5. Closeout. (Y3Q2-Q3) (Assumes restoration is completed by 7/2029.)

**VA Project 5: New Wetland Restoration and Enhancement Project (Measure 10 in VA PCAP):**
This project will identify and implement 3,000 acres of wetland projects (with known opportunities on the Coastal Forests WMA on the Eastern Shore), nearly doubling previous efforts. Restoring drained wetlands has proven to reverse the loss of Carbon in mineral and organic soils. This project will begin with an outreach process to agencies and organizations with staff who frequently work with private landowners and other public landholding entities (e.g., DWR, NRCS, USFWS, USFS, DOF, DCR, SWCD, VIMS, local governments, and non-governmental organizations). This process will result in an identification and matching program between landowners with wetland project interests and available funding programs and service providers. Technical assistance will also be provided to these private and public landowners to implement the wetlands programs. This project supports Measure 1, as it is aimed at implementing wetland projects on private and public lands.

**Tasks, Milestones, and Assumptions:**
1. Hire wetland restoration specialists. (Y1Q4-Y2Q3) (Assumes funding awarded by 12/2024 and 6-10 month buffer for hiring.)
2. Community engagement. (Y1Q4-Y6Q3) (Assumes engagement is through design and implementation.)
3. Planning. (Y1Q4-Y4Q3)
4. Wetland and hydrologic restoration. (Y2Q4-Y5Q3)
5. Establish hydrophytic vegetation and GHG management. (Y2Q4-Y5Q3)
6. Evaluation and future planning. (Y5Q4-Y6Q3)
7. Closeout. (Y6Q2-Q3) (Assumes restoration is completed by 7/2029.)

**TNC Project 1: Peatland Restoration on Public Land and Acquisition & Restoration on Private Land (Measure 14 in NC PCAP, Measure 10 in VA PCAP, Section 6 in SC PCAP):** Eastern NC/southeastern VA is home to the greatest concentration of peat-based "pocosin" wetland landscapes in the U.S. Hydrologic restoration to rewet the peat soil has proven effective at reducing emissions and increasing sequestration. This project advances protection and restoration of pocosin wetlands across additional public lands and private ownerships, supporting Measure 1 by protection of peat wetland areas and restoring drained peatlands.

TNC will lead acquisition, restoration/management for each project to increase GHG benefits with TNC CPRG-funded staff and may contract restoration/management activities under our leadership. Land will be selected following the step wise approach detailed in the CPRG Technical Appendix (supplied with original proposal package), with a more focused prioritization following a Spatial Assessment TNC is conducting (to be completed September 30* note Assessment was completed), and then ensuring a more rigorous site- based review of parcels with a carbon pre-feasibility to account for GHG benefits of protection, restoration and management.  All potential tracts identified will be entered into a CPRG database; with a continuous feedback loop and re-assessment to identify landowners ready to sell land/carbon rights. See Attachment "Description of TNC CPRG Project Selection and Process".

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

TNC has developed many scenarios that may come to fruition, but until we begin landowner outreach, we cannot confirm exact acreages.

Acquisition and restoration/management  scenarios envisioned to date include –

2 publicly owned, large tracts with management rights secured  via peat carbon restoration and management term lease agreement and 8 mixed, 1k-5k acre tracts – 10 total transactions

1 publicly owned large tract with management rights acquired via peat carbon restoration and management agreement and 7 mixed, 1k-5k acre tracts, and 6 - 500-1k acre tracts acquired by fee or easement – 14 total transactions

Properties prioritized for Projects 1 will not likely have an easement. If the easement exists, the terms of the easement will be included in the carbon pre-feasibility to ensure it will not negatively impact the potential GHG benefits.

TNC Restoration Process:
1. Design, establish and maintain a hydrologic monitoring network
2. field data collection and analysis
3. develop engineered restoration design
4. installation of restoration interventions
5. post-restoration hydrologic evaluation and refinement
6. ensure adequate management staff capacity and financial resources to sustain long term restoration integrity and realization of project GHG benefits

TNC will work with carbon consultants., Hydrologic restoration consultants, contractors who will place water control structures.

For more detail on the quantitative outcomes and outputs associated with the project, please reference Measure 1 Coastal Habitats Tab, Line 4 and 5 in the Original Proposal Submission Attachment "GHGcalcs_NCDNCR".

**Project 1 Tasks, Milestones, and Assumptions:**
1. GIS analysis, utilizing carbon assessment outputs, conducted to prioritize private landowners for acquisition outreach. (Y1Q1-Y1Q2) (Utilizing TNC carbon assessment outputs. See Technical Appendix).
2. Hydrologic assessment and modeling of benefits for restorable pocosins on public lands. (Y1Q2) (Assumes this builds on current TNC work with agency partners and institutional landowners.)
3. Hiring of project staff including project manager, acquisition, and restoration specialists. (Y1Q3)
4. Assemble Year 1 cohort of priority properties, conduct landowner outreach. (Y1Q3-Q4)
5. Assessments of properties including appraisals, titles, ecological conditions, etc. (Y2Q1-Y5Q1) (Assumes outreach yields landowners interested in conservation and restoration.)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

6.  Acquire interest in properties by fee easement or long-term agreement sufficient to ensure restoration implementation, management, and carbon permanence. (Y2Q4-Y5Q2) (Assumes valuations and details compel ownerships to conservation management.)
7.  Contract for design/permitting/implementation of hydrologic restoration to rewet peat. (Y2Q1-Y5Q3)
8.  Monitor implementation results and assess  carbon outcomes via peer-reviewed carbon sequestration accounting methods. (Y3Q2-Y5Q4)


**TNC Project 2: Tidal Marsh Acquisition and Restoration on Private Land or Restoration on Public Land (Measure 10 in VA PCAP and Measure 21 in MD PCAP):** Eastern Virginia and Maryland hold opportunities to improve the resilience of existing vulnerable tidal marshes through shoreline management practices and restoration activities including living shorelines, sediment management, and practices to increase surface elevations such as thin layer sediment applications, vegetation management, and hydrologic management as some examples. TNC will lead tidal marsh acquisition and restoration opportunities that will be coordinated with coalition partners to ensure added benefit to efforts underway and build upon TNC's established footprint in the Chesapeake Bay, Chowan River, and Eastern Shore regions of VA and MD.

TNC land protection will be conducted by TNC.  TNC will lead restoration/management needed for each project to increase GHG benefits with CPRG staff and may contract restoration/management activities under our leadership. Land will be selected following the step wise approach detailed in the CPRG Technical Appendix (supplied with original proposal package), with a more focused prioritization following a Spatial Assessment TNC is conducting (to be completed September 30* note Assessment was completed), and then ensuring a more rigorous site- based review of parcels with a carbon pre-feasibility assessment to account for GHG benefits of protection, restoration and management.  All potential tracts identified will be entered into a CPRG database and tracked with a continuous feedback loop and re-assessment process to identify landowners ready to sell land. See Attachment "Description of TNC CPRG Project Selection and Process".

Acquisition for restoration scenarios include –

Several ~75-acre tracts with tidal restoration opportunities or with current intact flow in which keeping connectivity with adjacent intact flow will increase resiliency to potential climate impacts.

TNC Restoration Process:
1. Design, establish and maintain a hydrologic monitoring network
2. field data collection and analysis
3. develop engineered restoration design
4. installation of restoration interventions
5. post-restoration hydrologic eval and refinement
6. ensure adequate management staff capacity and financial resources to sustain long term restoration integrity and realization of project GHG benefits

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Project 2 Tasks, Milestones, and Assumptions:**

1. GIS analysis, utilizing carbon assessment and other spatial analysis outputs, conducted to prioritize private landowners for acquisition outreach. (Y1Q1-Y2Q1) (Using TNC carbon assessment outputs. See Technical Appendix).
2. Hydrologic assessment and modeling of benefits for restorable tidal wetlands on private and public lands. (Y2Q2) (Assumes this builds on current TNC work with agency partners and institutional landowners.)
3. Assemble Year 1 cohort of priority properties, conduct landowner outreach. (Y1Q3-Q4)
4. Outreach to landowners with high potential tidal carbon projects.
5. Conduct appraisals on identified properties (Y1Q1-Y5Q1)
6. Acquire fee interest in properties from willing sellers to ensure restoration implementation, management, and carbon permanence. (Y2Q4-Y5Q2) (Assumes valuations and details compel ownerships to conservation management.)
7. Contract for design/permitting/implementation of tidal restoration (not needed for acquisition of intact with no need for restoration). (Y2Q1-Y5Q3)
8. Monitor implementation results and assess carbon outcomes via peer-reviewed carbon sequestration accounting methods. (Y3Q2-Y5Q4)

*Table 3: Description of GHG Reduction Measure 2 Projects and Project-Specific Tasks, Milestones and Assumptions*[7]

**NC Project 3: Climate Smart Forestry in Low-income and Disadvantaged Communities (LIDACs) (Measure 15 in NC PCAP):** By implementing climate smart practices along with reforestation and conservation easements, this new program will support small forest landowners, resulting in net decreases in GHG emissions and complimentary co-benefits. This project supports Measure 2, as it features reforestation, conservation easements, and technical assistance for small forest landowners.

Roanoke's SFLRP service area is thirteen counties in northeastern NC (Bertie, Chowan, Edgecombe, Gates, Granville, Halifax, Hertford, Martin, Nash, Northampton, Perquimans, Vance, and Warren. SFLRP is currently exploring what counties to expand into based on a range of criteria that will focus on reaching LIADC forest landowners and communities. Our geographical, expansion will focus on these listed counties in central and southeast central North Carolina where LIDAC forest landowners, tribal lands, indigenous landowners have forestland holdings (Bladen, Columbus, Duplin, Franklin, Greene, Harnett, Hoke, Jones, Onslow, New Hanover, Pender, Pitt, Robeson, Sampson, Washington, Wayne, Wilson). In addition, Black Family Land Trust service area includes all of North Carolina where their focus will be LIDAC communities and forest landowner outreach and education, conservation easements and climate-smart practices addressing soil health.

---

[7] Any activities listed beyond Year 5 indicate voluntary actions funded outside any awarded CPRG grant.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

Both organizations have strong and long-lasting partnerships with the NC Forest Service, USDA, county soil and water districts, conservation organizations, and non-profit organizations. Additionally, they collaborate with community-based organizations and those that assist them. These partnerships position SFLRP and BFLT well to carry out grassroots outreach and landowner education.

Outreach strategies will include, but are not limited to, webinars, community workshops, annual forest landowner conferences, one-on-one sessions with individual family farm and forest owners. Recognizing that not everyone in LIDAC communities has broadband access, outreach will be conducted through all social media and digital platforms, radio, fact sheets and other publications as well as local newspapers to inform the public about SFLRP, BFLT, and the resources available through our partners, both technical and financial to assist LIDAC communities.

A vital component of the services provided by SFLRP and BFLT is guiding landowners through the process of increasing awareness of and implementing climate-smart forestry, improving soil health, addressing heirs' property strategies, and navigating the complex process of conservation easements.

**Roanoke Cooperative Sustainable Forestry and Land Retention Project (SFLRP) and Black Family Land Trust Outreach Strategy**

Roanoke's SFLRP service area is thirteen counties in northeastern NC (Bertie, Chowan, Edgecombe, Gates, Granville, Halifax, Hertford, Martin, Nash, Northampton, Perquimans, Vance, and Warren. SFLRP is currently exploring what counties to expand into based on a range of criteria that will focus on reaching LIADC forest landowners and communities. Our geographical, expansion will focus on these listed counties in central and southeast central North Carolina where LIDAC forest landowners, tribal lands, indigenous landowners have forestland holdings (Bladen, Columbus, Duplin, Franklin, Greene, Harnett, Hoke, Jones, Onslow, New Hanover, Pender, Pitt, Robeson, Sampson, Washington, Wayne, Wilson). In addition, **Black Family Land Trust** service area includes all of North Carolina where their focus will be LIDAC communities and forest landowner outreach and education, conservation easements and climate-smart practices addressing soil health.

Both organizations have strong and long-lasting partnerships with the NC Forest Service, USDA, county soil and water districts, conservation organizations, and non-profit organizations. Additionally, they collaborate with community-based organizations and those that assist them. These partnerships position SFLRP and BFLT well to carry out grassroots outreach and landowner education.
Outreach strategies will include, but are not limited to, webinars, community workshops, annual forest landowner conferences, one-on-one sessions with individual family farm and forest owners. Recognizing that not everyone in LIDAC communities has broadband access, outreach will be conducted through all social media and digital platforms, radio, fact sheets and other publications as well as local newspapers to inform the public about SFLRP, BFLT, and the resources available through our partners, both technical and financial to assist LIDAC communities.

A vital component of the services provided by SFLRP and BFLT is guiding landowners through the process of increasing awareness of and implementing climate-smart forestry, improving soil health, addressing heirs' property strategies, and navigating the complex process of conservation easements.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Quantitative Outcomes**
- Outreach on climate-smart forestry, soil health, and conservation easements
  - 1 annual conference per year
  - 4-6 workshops per year
  - Data collection
    - Landowner Surveys to determine awareness of natural resource agency technical and financial assistance, behavioral changes
    - Pre and post surveys to determine knowledge increase
  - Outreach to ~2,500 LIDAC landowners per year
  - 10,000 acres of climate-smart forestry and soil health practices implemented over five years
  - $500,000 cost share program developed to implement climate-smart practices
  - Publications
    - 4 news releases per year(print/digital)
    - Develop fact sheets on climate-forestry, conservation easements, soil health, carbon sequestration
    - Heirs' property guidelines for estate planning and steps to heirs' property resolutions

**Tasks, Milestones, and Assumptions:**
1. The Sustainable Forestry and Land Retention Project (SFLRP) and Black Family Land Trust (BFLT) will develop strategies to address climate smart forestry practices in LIDACs. (Y1Q1) (Assumes SFLRP and BFLT will be awarded funding by this time.)
2. Develop cost-share program framework. (Y1Q2)
3. Landowner outreach and implementation of cost-share program. (Y1-Y5) (Assumes landowners are willing to participate. Robust community outreach will take place.)


**NC Project 4: Rapid Tree Growth High-Carbon Forestry Cost Share (Measure 15 in NC PCAP):** This cost share program would incentivize the planting of tree seedlings with improved genetics and to implement silvicultural practices that increase the rate of CS. This project supports Measure 2, as it involves incentivizing the planting of genetically improved seedlings.

Cost-share will be available statewide, although with the program's focus on funding the planting of genetically improved seedlings, most funded projects are expected to occur within NC's coastal plain and piedmont regions.  Among NC's census tracts, most of the coastal plain and much of the piedmont are identified as disadvantaged according to criteria in the Climate and Economic Justice Screening Tool.

The forestry cost-share program will be modeled after the existing NC Forest Development Program; however, the new program will be unique and will be administered independently.  Program development will involve:
- Creating and filling a new forestry cost-share administrator position
- Developing a cost-share application form and procedures to accept applications
- Develop forestry practice written plan criteria
- Develop a database to administer the program, such as tracking applications, practice data, financial data, and reporting/accomplishment data
- Determining which practices and sub-practices will be eligible

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

- Establishing criteria and standards for each eligible forestry practice
- Develop a program handbook to provide guidelines on administering the program at both the NCFS field level and agency headquarters level
- Establishing cost-share percentage rates and prevailing ($) rates for each practice and sub-practice per geographic region of the state
- Establish applicant ownership criteria and acreage limits (minimum & maximum)
- Establish performance maintenance period and penalties
- Establish funding allocation procedures and timelines, example random draw vs first come/first served
- Establish landowner payment procedures and required documents
- Develop annual program budgets

Quantitative Outcomes and Outputs:
- Acres of forestry practices completed by practice, county, and forest type/species
- Number of landowners receiving financial assistance
- Cost-share amounts paid and total practice cost per landowner contract, practice, county, and forest type/species
- Number of tree seedlings planted by county, and forest type/species
- Qualitative and quantitative program impacts benefitting historically underserved landowners and economically depressed locales

Tasks, Milestones, and Assumptions:
1. Program development. (Y1) (Assumes grant is awarded and funding is allocated.)
2. Community outreach and promotion. (Y1-Y5)
3. Cost-share database modifications to allow for new program. (Y1-Y2)
4. Program begins accepting applications. (Y1) (Assumes program will quickly be stood up because of existing forestry development program model and experienced staff.)
5. Program applications accepted and awarded. (Y1-Y5)
6. Project implementation. (Y1-Y5)
7. Annual reporting. (Y1-Y5)
8. Program close-out and final review and reporting. (Y5)

**NC Project 5: Urban Tree Planting Program (Measure 15 in NC PCAP):** Municipalities and nonprofits in small to medium cities that lack local capacity will be eligible to apply to a grant program for urban tree planting. Managed by the NC Forest Service. The funding will result in approx. 1200 new trees planted. The project will reduce emissions through energy savings in addition to carbon sequestration. Co-benefits include improved shade and green space, reduction in hazardous air pollutants, and improved stormwater management. This project supports Measure 2, as it involves the planting trees.

Program Components and Procedures:
The urban tree planting cost share program will offer funding assistance to complete urban tree planting projects that include developing a tree planting plan, tree supply and planting, and two years of maintenance. Approximately 1,200 2 ½ inch caliper trees will be planted and maintained.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

The program will fund governmental tree planting projects that will deliver the highest ecosystem services and human health benefits. To accomplish this, request for applications will be solicited for projects to plant 50-100 trees in open space areas that will accommodate large tree species and the use of evergreens on properties such as K-12 public schools, neighborhood parks, residential streets, and community main streets.

Criteria:

Priority will also be given to small and medium-sized communities that have the highest U&CF need based on the community's NCFS management classification (See our Financial Assistance Program webpage), a blend of the USDA Forest Service Urban & Community Forestry Community Accomplishment Reporting measures and Abor Day Foundation Tree City USA measures.

Quantitative Outcomes/Outputs:
- Number of trees planted
- Number of projects awarded
- Number of municipalities
- Number of disadvantaged communities served

Tasks, Milestones, and Assumptions:
1. Program development. (Y1Q1-Q2) (Assumes grant is awarded and funding is allocated.)
2. Program outreach and promotion. (Y1-Y5)
3. Request for applications. (Y1Q3, Y2Q2-Y5Q2)
4. Project awards announced. (Y1Q3, Y2Q2-Y5Q2)
5. Project implementation and close-out. (Y1Q4-Y5)

**NC Project 6: EO 305 Implementation (Measure 15 in NC PCAP):** Funding is to be used to hire an EO 305 Implementation Coordinator and to fund research projects and other directives outlined in the EO that will help achieve the statewide goals of conserving and restoring one million acres and planting one million trees by 2040. This project supports Measure 2, as it is aimed at increasing the number of trees. This project will result in clear progress tracking of the conservation goals in EO 305, an updated Natural and Working Lands Action Plan, and provide reports and tools for public consumption.

The EO 305 Coordinator will help coordinate development of methodology to update existing wetland mapping data; feasibility study for a land cover map to support planning for community resilience to climate change; establish a benchmark to measure progress on EO 305 goals stated above; development and publishing of an ecosystem vulnerability analysis; reports estimating social, economic, and environmental value of conservation efforts in NC; adoption of no-net loss policies by NC Cabinet agencies; and incorporation of ecological and social benefits along with climate impact considerations into existing Biannual Protection Plan and NC Conservation Planning Tool. The NC Conservation Planning Tool will add ecosystems, climate resilience, carbon sequestration potential, ecosystem services, impact on marginalized and underserved populations, risk of conversion, proximity to other conserved lands, and pollinator habitat as the dataset become publicly available.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions:**
1. Hire EO 305 Implementation Coordinator. (Y1Q1)
2. Coordinator plans quarterly progress meetings with state government and stakeholders. (Y1-Y5)
3. Coordinator establishes method, begins tracking progress on EO 305's conservation goals. (Y1-Y5)
4. NCDNCR identifies research needs, allocates remaining funds to research needs. (Y1Q3)
5. NCDNCR, Coordinator create NWL Action Plan detailing status, barriers, and knowledge gaps. (Y3Q4)
6. Reports and tools funded by remaining funds are published for public consumption. (Y2-Y5)

**SC Project 1: Land Conservation and Restoration (Measure 10 in SC PCAP):** SC intends to acquire NWLs throughout the state to ensure their GHG emission reduction and co-benefits until 2050 and beyond. This project supports Measure 2, as it revolves around the protection and use of NWLs. Upon transfer of ownership to the state a land management plan will be developed for conserved property to ensure carbon capture potential is preserved and/or enhanced over until 2050 and beyond.  Funds will be used for acquisition of properties. Cost and funding for management, restoration and long term preservation will be identified in the land management plan.

Land will be identified from known acquisition opportunities. iTree Canopy tool along with SCORs conservation priority mapping will be used to identify parcels that have high carbon sequestration potential and offers the co benefit of climate adaptation by using ecosystem services to mitigate risk associated with climate driven increases in extreme precipitation.

i-Tree Canopy is a tool that allows users to assess and classify land cover, such as tree canopy, grass, and buildings, by analyzing random points on aerial imagery within a defined area. This tool estimates the benefits of tree cover, including carbon dioxide absorption, air pollution reduction, and stormwater management.

By accurately estimating tree cover, i-Tree Canopy provides essential data that quantifies the environmental benefits of trees, making it a powerful resource for land conservation planning, urban forestry, and environmental impact assessments. This information supports efforts to protect and enhance green spaces, guiding decisions that promote sustainability and resilience in communities.

The South Carolina Office of Resilience has used a combination of public and private datasets to better understand the landscape's role in flood mitigation across South Carolina. The methodology used to identify priority flood mitigation areas focuses on areas where flood hazards are expected, wetlands that absorb excess water, as well as those areas where water is most likely to infiltrate, reducing runoff. Protecting these areas will reduce community flood risk and allow for the natural storage and conveyance functions.

Quantitative Outcomes/Outputs
- Number of Acres Conserved
- Tons of Carbon Sequestration Potential Preserved
- Number of Acres indentified a Resilience Priority for Flood Protection Preserved

**Tasks, Milestones, and Assumptions:**
1. Hire SC Office of Resilience (SCOR) Land Acquisition Manager. (Y1Q4) (Assuming suitable applicants.)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

2. Finalize pre-identified conservation opportunities located in priority CS areas, including working forests, forested wetlands, and upland forests. (Y1Q4-Y3Q4) (Assumes current owners are willing to sell.)
3. Follow state procurement processes. (Y1Q4-Y4Q4) (Assumes identified projects have successful negotiations, long-term planning, pass environmental assessments, appropriate committee reviews.)
4. Protect lands and begin state management. (Y2Q4-Y5Q4) (Assumes each property will have different timelines for needed facilities, long-term planning, and management strategy.)
5. SCOR Land Acquisition Manager and long-term holder monitor CS benefits. (Y2Q4-Y6Q4) (Assumes lands will be managed in a way to ensure CS potentials are maximized.)

**MD Project 2: Agricultural Resource Conservation and Management (Agroforestry) (Measure 19 in MD PCAP):** Implement practices such as windbreaks, alley cropping, and silvopasture on 1,000 acres, leveraging the benefits of tree and shrub integration to improve soil health, water conservation, and CS. MD seeks to promote sustainable land management practices for long-term benefits. This project supports Measure 2, as it involves planting and protecting of additional trees.

Agroforestry practices present an opportunity to diversify, mitigate risk, and enhance environmental stewardship of lands. "Working trees" provide social and environmental benefits, particularly in communities and landscapes that may be designated as critical and LIDACs. Out of Maryland's 1400 census tracts, 366 are identified as disadvantaged communities. Many of these same communities within Maryland rely on nature-based drivers and traditional industries. Installation of these systems will create diverse and productive economies by creating jobs and multiple sources of production, resulting in stable communities and operations.

Maryland has existing programs which support tree planting across the state. However, historically funding and technical support has focused on the re-treeing of stream buffers and marginal agricultural land for land retirement. Programs supporting the unique technical and financial needs of the intentional planting of trees and other woody perennial for Agroforestry systems have been lacking. As a result, adoption of agroforestry practices in the state remains low. Data from the 2017 USDA Census of Agriculture indicated that only 3.8% of Maryland farms reported implementing an agroforestry practice.

The awarded funds will be used with MDA's Healthy Soils Competitive Fund (HSCF) to develop a standalone Advancing Agroforestry fund source (AAF) to support adoption of designated agroforestry practices within the state. Applications for the AAF will occur with the HSCF period in the winter (generally January- March) to be awarded in the spring annually. All farms across the state are eligible to apply, but applications would be ranked consistent with HSCF criteria described here. See page 8 for scoring rubric. Please note, consistent with HSCF procedures, additional consideration will be given to projects where environmental justice impacts on "overburdened" and "underserved" communities, as defined in §1–701 of the Maryland Environment article, are absent or minimized. For purposes of the AAF, we will use the EPA LIDAC tools in lieu of state tools.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions:**

1. Fill contractual position to support program deliverables. (Y1Q4)
2. Prepare application, promotional materials, and community engagement strategy around these materials. Leverage key partners for engagement. (Y1Q4-Y2Q4)
3. Educate partners and producers about initiative and solicit applications for projects. (Y2Q1) (Assumes application period will run consistent with Healthy Soils Competitive Fund.)
4. Review applications, select projects, and enter into agreements with producers. (Q1-Q2 annually)
5. (Assumes One month to evaluate/select successful applications, one month to enter into agreements)
6. Provide technical assistance to producers and disburse funds for implementation. (Q3-Q2 annually)
7. (Assumed this is based on agreed upon terms and conditions with producers.)
8. Partner engagement to identify/install agroforestry demonstration sites on public lands. (Q4 annually)
9. Complete in-field evaluation using MD Soil Health Card from participating "treated" areas and adjacent "control" areas to assess changes in soil health measures over project duration. (Q4 annually) (Assumes all sampling is consistent with soil health program protocols.)
10. Organize producer education opportunities for in-field demonstrations, workshops, etc. among participants and key stakeholders (year-round, depending on event). (Assumes leverage of existing meeting/field day venues to expand network. Events will educate producers of all commodities/sizes.)
11. Bi-monthly conference calls with key partners to discuss producer participation. (Y2Q1+)

**MD Project 3: Afforestation and Urban Trees (Measure 20 in MD PCAP):** Restore 500 acres of critical habitat, enhance forest management practices on 1,000 acres, and expand the state nursery to market locally sourced trees. The initiative seeks to achieve significant cumulative GHG reductions while promoting community health benefits. This project supports Measure 2, as it involves the protection of forestland for the purpose of achieving significant cumulative GHG reductions.

MD Project 3 will support afforestation and improved forest management in the Mid and Lower Eastern Shore of Maryland (Caroline, Talbot, Dorchester, Wicomico, Worcester, and Somerset counties) and in Baltimore City and Baltimore County within 5 miles of the Maryland Port Administration (MPA) port-related properties. MD Project 3 in the Mid and Lower Eastern Shore will be achieved by expanding capacity and building best practices for Atlantic white-cedar, bald-cypress, shortleaf pine, and other trees on public and private lands, targeting a fisheries restoration priority of the black-banded sunfish. The condition of natural stands will be evaluated using drone technology and interpretation of remotely sensed imagery. Partners will select and restore 500 new acres of this scarce, valuable habitat, and develop forest management and planting plans for the restoration sites. Where applicable, partners will work with private landowners to protect and restore their properties to contribute to the 500 acres. The MD State Nursery will be expanded to market locally sourced Atlantic white-cedar, bald-cypress, shortleaf pine, and other trees. Lessons learned will be shared with forest landowners through workshops and webinars, building on the recently established Delmarva Woodland Stewards.

Outreach will be to all CEJST areas from Caroline County south. Project locations will likely occur in the CEJST areas along Marshyhope Creek, the greater Princess Anne area, and from Pocomoke City to Crisfield. There are currently 281 active stewardship plans on private lands in these areas, covering approximately 27,000 acres. Lower lying areas will be targeted for the Atlantic white-cedar and baldcypress and upland areas for the shortleaf pine. Shortleaf pine grows on sandier sites and inland sand dunes need restoration in these areas. LIDAR has made mapping and finding these locations easier. See

20

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

below pictures of an inland sand dune in Caroline County in a CEJST area. It is estimated that there are 3,350 of these sites, totaling 14,270 acres on the Delmarva Peninsula.

The MPA will conduct tree plantings in Baltimore City and Baltimore County to increase the urban tree canopy and street tree plantings. Planting plans will focus primarily on increasing tree canopy and education opportunities. Target locations will be proximal (within 5 miles) of Port-related properties, at a minimum. Planting plans will be developed with input from affected communities.

**Tasks, Milestones, and Assumptions:**
1. Hire staff to manage proposed activities. (Y1Q4-Y2Q1) (Assumed parallel to state hiring processes.)
2. Preparation of a program guide, application, and promotional materials and community engagement around these materials. (Y2Q3) (Assumes within two months of establishing administrator contract.)
3. Educate stakeholders and communities about program guide; solicit applications for projects. (Y2Q4) (Assumes three months following publication of the program guide and promotional materials.)
4. Review applications, select projects, and enter into agreements with project sponsors. (Y3Q1) (Assumes one month to evaluate/select applications, and two months to enter into agreements.)
5. Provide technical assistance to project sponsors. (Assumed to be agreed upon project duration.)
6. Continued community engagement during and following project implementation.
7. Disburse funds to project sponsors. (Assumed process established in the agreements with sponsors.)
8. Revise program guide, materials, and application as needed in response to participant and community feedback. (Assumes this could be annually or left off depending on number of funding rounds.)
9. Repeat steps 4-9 as needed for as many funding rounds as the coalition anticipates offering. Assumption: This would be based on how many funding rounds anticipated.

**VA Project 6: Acquisition and Afforestation of Land in the City of Chesapeake (Measure 10 in VA PCAP):** For this project, the Virginia Department of Wildlife Resources (DWR) will acquire and reforest a 1,313-acre tract of land, building a permanent corridor of conservation lands between U.S. Fish and Wildlife Service's (USFWS) Great Dismal Swamp National Wildlife Refuge and the DWR's Cavalier WMA. Ducks Unlimited, DWR's partner in this project, has already purchased the property to effect initial security of this acreage, which will then be acquired by DWR. Following acquisition, Ducks Unlimited and DWR will protect the existing forests and return the prior-converted agricultural land back to historic wetland baselines by rehydrating peatlands and planting about 878,000 trees to restore the forested wetland areas. This project supports Measure 2, as it involves afforestation for greenhouse gas reductions.

**Tasks, Milestones, and Assumptions:**
1. Community engagement. (Y1Q4-Y6Q3) (Assumes funding awarded by 12/2024, engagement throughout design and implementation.)
2. Acquisition of lands and assessment. (Y1Q4-Y2Q3)
3. Reforestation and wetland restoration. (Y3Q4-Y5Q3)
4. Water storage and saltwater intrusion buffering. (Y3Q4-Y5Q3)
5. Peat soil rehydration and carbon emission reduction. (Y3Q4-Y5Q3)
6. Closeout. (Y6Q2-Q3) (Assumes restoration is completed by 7/2029.)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**VA Project 7: Eastern Shore Wildlife Management Areas Forest Restoration (Measure 10 in VA PCAP):**
For this project, the Virginia Department of Wildlife Resources (DWR) will restore and/or enhance 1,500 acres of upland habitat on recently acquired and existing lands on Virginia's Eastern Shore. This land is part of the 7,800 acres of industrial forests that DWR acquired in 2021 and 2022 from the New Forest Fund. While the property has been conserved for over 20 years, the forest has not been managed to maximize its vegetative growth and wildlife habitat restoration. The restoration will be completed by 5 additional DWR staff positions that include a regional forester, 3 habitat specialists, and an infrastructure specialist, in combination with existing staff and local contractors, as needed. The restoration will consist of sustainable forestry practices and best management practices, such as select cutting, shelterwood cuts, regeneration cuts, mowing, prescribed fire, and vegetative plantings. Carbon sequestration will be maximized through strategic management activities and smart selection of longer-lived tree and shrub species. This project supports Measure 2, as it involves the restoration of forest land through sustainable forestry practices.

**Tasks, Milestones, and Assumptions:**
1. Community engagement. (Y1Q4-Y2Q3) (Assumes funding awarded by 12/2024.)
2. Hire five additional staff. (Forester, Infrastructure Specialist, 3 Habitat Specialists) (Y1Q4-Y2Q3) (Assumes funding is awarded by 12/2024; 6–10-month buffer for hiring.)
3. Planning and assessment. (Y1Q4-Y2Q3)
4. Initial restoration and CS. (Y2Q4-Y5Q3)
5. Habitat improvement. (Y2Q4-Y5Q3)
6. Evaluation and future planning. (Y5Q4-Y6Q3)
7. Closeout. (Y6Q2-Q3)
Assumption: Restoration is completed by 7/2029. (Assumes plantings will not begin until 2027. The planted trees will all be Atlantic White Cedar, planted as rooted cuttings or seedlings.)

**VA Project 8: Quail Roost Farm Afforestation (Measure 10 in VA PCAP):** For this project, an afforestation and carbon sequestration (CS) project will be implemented at Quail Roost Farm to enhance carbon stocks via the stocking of high carbon trees, conservation of tidal marsh, and best soil management practices. The VA Port Authority (VPA) will fund the procurement of a conservation easement of the property and manage most of the property for CS while supporting the development of an urban agricultural park with water access on the rest of the site. There will be about 50 acres of carbon sequestration from the tidal marsh, soil, and trees, including from the planting of over 6,000 trees, with an emphasis on planting high-sequestering Water Oak trees. This project will involve signing an MOU with property owner, Nina Randolph to formally lay out the terms of the agreement, the finalized determination of the area to be used for sequestration, management of the site, and the particulars of the easement. The easement will be pursued and held by the Coastal Virginia Conservancy (CVC), who has been involved since the beginning and originally brought this project to the Port. CVC has acquired and held several land easements and was previously referred to as Living River Trust. On the Port's side, this project will be run and managed by Scott Whitehurst – Director of Environmental Policy and Compliance. This project supports Measure 2, as it involves afforestation for greenhouse gas reductions.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Tasks, Milestones, and Assumptions:**

1. Community engagement. (Y1Q4-Y6Q3) (Assumes funding awarded by 12/2024; engagement throughout design and implementation.)
2. Acquisition of conservation easement planning and procurement. (Y1Q4-Y2Q3)
3. Implementing and tree stocking. (Y3Q4-Y4Q3)
4. Design tidal marsh conservation and soil management. (Y3Q4-Y4Q3)
5. Park planning and development. (Y4Q4-Y5Q4)
6. Project evaluation. (Y5Q4-Y6Q3)
7. Closeout. (Y6Q2-Q3)

**VA Project 9: Tribal Restoration and Conservation Program Set-Aside (Measure 10 in VA PCAP):** The Virginia Department of Environmental Quality (DEQ) will oversee disbursement of funds via subawards to any of the following federally and state recognized tribes for restoration and conservation activities across the state: Cheroenhaka (Nottoway), Chickahominy, Chickahominy: Eastern Division, Mattaponi, Monacan, Nansemond Nation, Nottoway, Pamunkey, Patawomeck, Rappahannock, and Upper Mattaponi. The subawards, which will consist of carbon sequestration projects through acquisition, conservation, and/or restoration of forest lands or coastal wetland areas, will be selected on a competitive basis with consideration of the greenhouse gas reductions, costs, co-benefits, and LIDAC benefits of each project. Outcomes will be quantified using acreage, cost, vegetation types, and restoration practices These projects will also have an unquantifiable cultural value of returning lands to its ancestral owners and its original natural and cultural purposes. This program supports Measure 2, as it involves afforestation for greenhouse gas reductions.

**Tasks, Milestones, and Assumptions:**

1. Community engagement. (Y1Q4-Y6Q3) (Assumes funding awarded by 12/2024; engagement throughout design and implementation.)
2. Planning and capacity building. (Y1Q4-Y2Q3)
3. Implementing CS and biodiversity conservation program design. (Y2Q3-Y5Q3)
4. Evaluation and future planning. (Y5Q3-Y6Q4) 5. Closeout. (Y6Q3)

**VA Project 10: Coastal Protection in Ware Creek Wildlife Management Area (Measure 10 in VA PCAP)** For this project, the Department of Wildlife Resources (DWR) will protect 6,350 feet of shoreline in Ware Creek Wildlife Management Area through the installation of breakwaters for shoreline protection, wetland planting, and wetland renourishment. The protected areas include at least 312 acres of emergent wetlands and 122 acres of coastal forest/forested wetland area, primarily oak-pine and loblolly-shortleaf pine stands. The installation of the breakwaters will be contracted to Ducks Unlimited, who have already completed the program design for the breakwaters, plantings, and renourishment. This program supports Measure 1, as it is focused on protecting and restoring coastal wetland areas.

**Tasks, Milestones, and Assumptions:**

1. Community engagement around the project, design input and community benefits (Y1Q1-Y1Q2)- Assumes funding is awarded by 12/24.
2. Project Survey, Design, Permitting and Planning (Y1Q2-Y2Q1)
3. Living shoreline and marsh protection construction and planting. (Y2Q2-Y2Q3)
4. Evaluation and future planning. (Y2Q4-Y3Q3)
5. Closeout. (Y3Q2-Y3Q3)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**TNC Project 3: Appalachian Improved Forest Management (Measure 10 in VA PCAP, Measure 20 in MD PCAP, Measure 14 NC PCAP, and Section 7 in SC PCAP):**
Repeated high-grading harvests and short rotations have left privately owned forests in poor condition and limiting their carbon sequestration potential. By collaborating with state and federal agencies, other entities, and Native American Tribes, TNC plans to implement a climate smart approach to forest management, resulting in more GHGs sequestered. These projects support Measure 2, as they involve the protection of forest land across the Southeast.

Climate-smart forestry practices are designed to improve forest health, maximize the potential for carbon sequestration and help fight climate change. These practices can include ecological thinning, or selectively cutting trees for the betterment of whole forest. For example, removing smaller diameter trees gives larger trees more room to grow and spacing out harvests across longer intervals of time allows older and larger trees to store more carbon. The management may also include letting the forest grow.

TNC land protection will be conducted by TNC or through sub-awards to our land trust partners (likely in SC). TNC will lead restoration/management needed for each project to increase GHG benefits with CPRG staff and may contract restoration/management activities under our leadership. Land will be selected following the step wise approach detailed in the CPRG Technical Appendix (supplied with original proposal package), with a more focused prioritization following a Spatial Assessment TNC is conducting (to be completed September 30, *note Assessment was completed), and then ensuring a more rigorous site- based review of parcels with a carbon pre-feasibility to account for GHG benefits of protection, restoration and management.  All potential tracts identified will be entered into a CPRG database; with a continuous feedback loop and re-assessment to identify landowners ready to sell land/carbon rights. See Attachment "Description of TNC CPRG Project Selection and Process".

For more details on project locations and project location selection, please see CPRG Proposal Technical Appendix and Attachment "Description of TNC CPRG Project Selection and Process."

For more detail on land acquisition and an alternative plans/location if easements/private sells are not interested in participating, please see CPRG Proposal Technical Appendix and Attachment "Description of TNC CPRG Project Selection and Process."

For more detail on the quantitative outcomes and outputs associated with the project, please reference Measure 2 Forests, Lines 4, 5, 6, and 7 in Original Proposal Submission Attachment "GHGcalcs_NCDNCR."

**Project 3 Tasks, Milestones, and Assumptions:**
1.  GIS analysis, utilizing carbon assessment outputs, conducted to prioritize private landowners for acquisition outreach. (Y1Q4-Y2Q1) (UtilizingTNC carbon assessment outputs. See Technical Appendix.)
2.  Preparation of a program description and promotional materials and partner and community engagement about the program. (Y2Q1-Q2)
3.  Develop list of potential landowners with high carbon value forests. (Y2Q1-Q3)
4.  Outreach to landowners with high potential forest carbon projects. (Y2-Y3)
5.  Conduct carbon prefeasibility studies for identified properties. (Y2-Y3)
6.  Negotiate landowner agreements and acquire property interests. (Y2-Y3)

7.  Execute contracts with consultants for carbon project design and development documents. Utilize TNC CPRG funded staff when feasible. (Y2-Y5)
8.  Execute contracts with consultants to conduct forest inventory. Utilize TNC CPRG funded staff when feasible. (Y2-Y5)
9.  Conduct forest restoration and management practices where applicable. (Y2-Y5)
10.  Monitor implementation results and assess carbon outcomes via peer-reviewed carbon sequestration accounting methods. (Y3Q2-Y5Q4)

**TNC Project 4: Bottomland Hardwood Forests Protection and Restoration (Measure 10 in VA PCAP, Measure 20 in MD PCAP, Measure 14 in NC PCAP, and Section 7 in SC PCAP):** Repeated high-grading harvests and short rotations have left privately owned forests in poor condition and limiting their carbon sequestration potential. By collaborating with state and federal agencies, other entities, and Native American Tribes, TNC plans to implement a climate smart approach to forest management, resulting in more GHGs sequestered. These projects support Measure 2, as they involve the protection of forest land across the Southeast.

Climate-smart forestry practices are designed to improve forest health, maximize the potential for carbon sequestration and help fight climate change. These practices can include ecological thinning, or selectively cutting trees for the betterment of whole forest. For example, removing smaller diameter trees gives larger trees more room to grow and spacing out harvests across longer intervals of time allows older and larger trees to store more carbon. The management may also include letting the forest grow.

TNC land protection will be conducted by TNC or through sub-awards to our land trust partners (likely in SC). TNC will lead restoration/management needed for each project to increase GHG benefits with CPRG staff and may contract restoration/management activities under our leadership. Land will be selected following the step wise approach detailed in the CPRG Technical Appendix (supplied with original proposal package), with a more focused prioritization following a Spatial Assessment TNC is conducting (to be completed September 30, *note Assessment was completed), and then ensuring a more rigorous site- based review of parcels with a carbon pre-feasibility to account for GHG benefits of protection, restoration and management.  All potential tracts identified will be entered into a CPRG database; with a continuous feedback loop and re-assessment to identify landowners ready to sell land/carbon rights. See Attachment "Description of TNC CPRG Project Selection and Process".

For more details on project locations and project location selection, please see CPRG Proposal Technical Appendix and Attachment "Description of TNC CPRG Project Selection and Process."

For more detail on land acquisition and an alternative plans/location if easements/private sells are not interested in participating, please see CPRG Proposal Technical Appendix and Attachment "Description of TNC CPRG Project Selection and Process."
For more detail on the quantitative outcomes and outputs associated with the project, please reference Measure 2 Forests, Lines 4, 5, 6, and 7 in Original Proposal Submission Attachment "GHGcalcs_NCDNCR."

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

---

**Project 4 Tasks, Milestones, and Assumptions:**

1. GIS analysis, utilizing carbon assessment outputs, conducted to prioritize private landowners for acquisition outreach. (Y1Q4-Y2Q1) (Utilizing TNC carbon assessment outputs. See Technical Appendix.)
2. Preparation of a program description and promotional materials and partner and community engagement about the program. (Y2Q1-Q2)
3. Develop list of potential landowners with high carbon value forests. (Y2Q1-Q3)
4. Outreach to landowners with high potential forest carbon projects. (Y2-Y3)
5. Conduct carbon prefeasibility studies for identified properties. (Y2-Y3)
6. Negotiate landowner agreements and acquire property interests. (Y2-Y3)
7. Execute contracts with consultants for carbon project design and development documents. Utilize TNC staff when feasible. (Y2-Y5)
8. Execute contracts with consultants to conduct forest inventory. Utilize TNC staff when feasible. (Y2-Y5)
9. Conduct forest restoration and management practices where applicable. (Y2-Y5)
9. Monitor implementation results and assess carbon outcomes via peer-reviewed carbon sequestration accounting methods. (Y3Q2-Y5Q4)

---

*Table 4: Risks, Potential Effects, and Mitigation Strategies*

| Risks & Mitigation Strategies |
|---|
| **Risk 1**: Uncertainty in GHG benefit estimates for specific project activities. <br> <u>Effect</u>: Actual reductions may be less than or greater than estimated. <br> <u>Strategy</u>: Extensive consultation with academic experts was conducted to ensure scientific rigor of GHG estimates. Conservative adjustments were made for any conservation focused projects to account for potential emissions leakage despite strong efforts to avoid (see Risk 4). Additional data will be collected from field-based carbon inventories on subsets of projects over the five years of project implementation to improve future estimates. |
| **Risk 2**: Private landowners with highest carbon sequestering locations are not interested in projects, limiting opportunity for project procurement across project types. <br> <u>Effect:</u> Lower than anticipated GHG benefits if fewer peatland projects fulfilled than planned. |
| <u>Strategy</u>: Identify opportunities on state and federal lands as well as private lands. Proactively build on existing community engagement outreach efforts to connect with interested landowners. Leverage coalition partner and subawardee existing networks to ensure adequate project locations and cooperation with landowners. Project priority list will be ranked by carbon potential so that if one purchase doesn't work out, NCDNCR and other sub awarded state agencies and TNC can quickly move to the next best tract. |
| **Risk 3**: Delays in construction due to permitting delays. <br> <u>Effect:</u> The amount of time that projects deliver GHG reductions is reduced. <br> <u>Strategy</u>: Early coordination with regulatory agencies, track record of selected subawardees, such as NCCF, which has received hundreds of restorations permits over the past two decades. |

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Risk 4**: Selected tracts of land for conservation focused projects not under threat of conversion due to development, therefore, would remain as carbon storage even without projects. <u>Effect:</u> There would be no real additional carbon benefit through avoided conversion.

<u>Strategy:</u> Information such as known commercial or residential developer interest in purchasing land and the carbon potential ranking will ensure tracts purchased are both at-risk of conversion and of high-carbon value.

---

**Risk 5:** Delays in program administrator procurement process.
<u>Effect:</u> Delays may reduce cumulative GHG emission reductions in the near-term.
<u>Strategy:</u> Develop request for proposals (RFP) documentation between announcements of awardees and receipt of assistance agreement to build in more time.

---

**Risk 6:** Programs undersubscribed in certain areas, limiting reach.
<u>Effect:</u> GHG emission reductions may not occur over the same geographic scope as predicted. <u>Strategy</u>: Tracking of applicant locations and targeted outreach to areas where the program is not receiving applications/in undersubscribed areas, building on community engagement work conducted during creation of coalition member Priority Climate Action Plans and other active engagement work.

---

**Risk 7:** Higher than anticipated rates of sea level rise, coastal erosion, climate disturbance. <u>Effect:</u> Projects are less likely to be successful long term if models have underestimated climate impacts.
<u>Strategy:</u> Design projects to be resilient to SLR beyond the 1.5 ft by 2050 estimate; consider SLR when selecting sites for tree planting.

---

**Risk 8:** Site condition changes and/or delays caused by habitat degradation or extreme weather events.
<u>Effect:</u> Unexpected changes to existing land and/or damages may delay the project implementation.
<u>Strategy:</u> Identify ways to monitor shoreline erosion and invest in stabilization techniques; prioritize project implementation timelines that account for known periods of active high intensity coastal weather events, such as the Atlantic Hurricane Season. Ensure close coordination with implementing partners/contractors to allow for early warning and risk-averse approach to potential storms. Identify ways to harness existing capacity of wetlands and prevent further habitat degradation.

---

**Risk 9:** Local jurisdiction reluctance due to potential economic risk.
<u>Effect:</u> Jurisdictions may be hesitant to support efforts for acquisition of private properties due to the possible tax revenue losses, which may result in a delay in the timeline.
<u>Strategy:</u> Proactively coordinate with local jurisdiction about the proposed project, identify ways the project supports a more robust or new economic opportunities, emphasize resilience benefits.

---

**Risk 10:** Contractor delays in performing essential restoration design and engineering.
<u>Effect:</u> Delays in developing and quantifying CS amounts for projects.
<u>Strategy:</u> Enter into agreements up-front with contractors to secure availability and services

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

---

**Risk 11**: Landowners within LIDACs have in many cases been excluded from access to information, and thus may not want to participate in conservation programs.

Effect: Less acreage under sustainable forest management, less climate smart forestry reforestation, and management practices being implemented.

Strategy: Landowner outreach in LIDACs is vital to engage and inform landowners. Organizations like project partners, Roanoke SFLRP and Black Family Land Trust, and its coalition of the U.S. Department of Agriculture (USDA), State, NGO, forest industry, and other partners will conduct outreach meetings, workshops, and provide access to information via all media platforms to engage, and inform LIDAC landowners of resources available to address conservation and restoration solutions – like sustainable forest management – to add in their lands being a part of nature-based solutions to climate change.

---

**Risk 12:** Not enough demand from landowners not currently participating in similar programs.

Effect: Less uptake would decrease overall emissions reductions.

Strategy: Existing funds do not currently cover the year over year demand for forest development programs so we believe there will be enough demand. Additionally, NC Forest Service (NCFS) will work on targeted outreach to those who have previously not engaged with this program. Particularly in LIDACs to increase program demand.

---

**Risk 13:** Long term health and durability concerns for new trees and/or restored ecosystems.

Effect: Overestimate of GHG reduction through 2050.

Strategy: Trees prioritized for planting will be large and hardy trees with over 100-year life spans and will be planted in communal, government-managed areas like around schools or parks with enhanced oversight. Listed project partners have extensive experience planning and executing these types of successful projects. Grant agreements can include protections for project sites through 2050. This grant would allow for increased state capacity to ensure long-term monitoring. Additionally, plans will be made that identify optimal season and weather conditions for planting and other restoration practice and ensure careful monitoring.

---

**Risk 14:** NC EO 305 Goals and tracking goes until 2040, but funding would only be secured through 2029. Similar risk for long term durability following grant timeframe for other projects.

Effect: If not funded long-term, it may be less likely that the goals of EO 305 and additional listed projects for restoration and conservation can be reached.

Strategy: NCDNCR will work to establish a permanent position funded through other sources for the duration of the EO 305 period following the conclusion of the grant period as will other project partners. State capacity built throughout the grant period will be highlighted, along with the value of these projects to incentivize additional future investment and avoidance of potential backsliding.

---

**Risk 15:** Biodiversity loss in tree planting/reforestation projects.

Effect: Planting too many trees of the same species limits habitat heterogeneity, resilience, and biodiversity.

Strategy: Identify and plant sets of native species that support a healthy ecosystem to increase biodiversity and coordinate across new and existing efforts for awareness and best practices.

---

The above projects are collectively focused on advancing the following four goals:

1.     Implement ambitious measures that will achieve significant reductions by 2030 and beyond. Coastal habitats and peatlands throughout the ACC's coastal plain act as critical regional carbon sinks,

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

accumulating and storing tons of carbon annually.[8] Peatlands, wetlands with deep layers of rich organic soils, are particularly good at storing carbon due their deep organic soils.[9] Many of these wetlands are highly vulnerable to degradation, facing increasing threats from conversion, sea level rise, and more frequent, intense extreme weather events. Drained peatlands release $CO_2$ from their soils and are more vulnerable to severe peat fires that rapidly emit tons of $CO_2$. From 2008-2011, wildfires in Northern NC and southeastern VA peatlands released an estimated 20 million MT $CO_2$e.[10] Recent research has shown that hydrologic restoration of drained peatlands dramatically reduces their GHG emissions and can return them to net carbon sinks (Richardson et al. 2022). Restoration and conservation of peatlands and coastal habitats in the ACC region will support long-term storage of existing carbon stocks and will grow CS for generations.

Conservation and restoration of forests represents one of the largest opportunities to sequester carbon and support a suite of co-benefits such as protection of drinking water sources and biodiversity, and workforce and recreational opportunities. Forests are at risk for development or have been managed utilizing unsustainable forestry practices such as high-grading or short rotations reducing potential for CS. The projects supporting this measure will offer rapid CS benefits through protection of existing carbon storage, restoring and managing forests to enable natural increased CS rates, and increasing urban forest CS through targeted tree plantings. Actively managed forests will continue to sequester carbon into long-lived wood products, such as furniture and building materials. Urban tree planting projects will result in increased CS and support reduction of heat islands, resulting in reduced emissions through energy savings. One study estimates shade from North Carolina's tree canopy reduces energy bills by $150 million per year.[12]

2.      Pursue measures that will achieve substantial community benefits (such as reduction of criteria air pollutants (CAPs) and hazardous air pollutants (HAPs)), particularly in LIDACs. Fires in drained peatlands expose nearby communities to unhealthy smoke. In 2008, a large peat fire in NC and VA produced pollution far exceeding National Ambient Air Quality Standards which led to a significant increase in observed emergency department visits for lung and cardiopulmonary disease.[11] Restoring peatlands through rewetting reduces smoke-related hazardous air pollutants, along with disruptions and economic losses from active fires.[12] Additionally, healthy coastal habitats and peatlands filter water pollution and provide climate resilience co-benefits. Coastal habitats buffer coastal communities from waves and storm surge, provide nursery habitat for commercially and recreationally harvested fish species, and attract tourists and residents for recreational opportunities including boating, fishing, and birdwatching - all stabilizing local

---

[8] Richardson, C., & Flanagan, N.E. (2022). Annual carbon sequestration and loss rates under altered hydrology and fire regimes in southeastern USA pocosin peatlands. Global Change Biology, 0(0), 1-15

[9] Richardson, C., & Flanagan, N.E. (2022). Annual carbon sequestration and loss rates under altered hydrology and fire regimes in southeastern USA pocosin peatlands. *Global Change Biology, 0*(0), 1-15

[10] Pindilli, E., Sleeter, R., & Hogan, D. (2018). Estimating the societal benefits of carbon dioxide sequestration through peatland restoration. Ecological Economics, 154, 145-155.

 Nowak, David J.; Greenfield, Eric J. 2018. Declining urban and community tree cover in the United States. Urban Forestry & Urban Greening. 32: 32-55. https://doi.org/10.1016/j.ufug.2018.03.006.

[11] Rappold, A. G., et al. (2011). Peat Bog Wildfire Smoke Exposure in Rural North Carolina Is Associated with Cardiopulmonary Emergency Department Visits Assessed through Syndromic Surveillance. Environmental Health Perspectives, Vol. 119, No. 10. https://doi.org/10.1289/ehp.1003206

[12] Richardson, C., & Flanagan, N.E. (2022). Annual carbon sequestration and loss rates under altered hydrology and fire regimes in southeastern USA pocosin peatlands. Global Change Biology, 0(0), 1-15.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

economic drivers that are under threat from encroaching seas. The projects supporting this measure will benefit many coastal LIDACs and tribal communities.

Forest restoration and management can dramatically increase the value of ecosystem services. Well managed forests can minimize the start and spread of wildfires. Trees act as nature's filter for criteria air pollutants including ozone, sulfur dioxide (SO2), nitrogen dioxide (NO2), carbon monoxide (CO), and fine particulate matter less than 2.5 microns (PM2.5). Urban trees can also lower ambient air temperatures, decreasing the impacts of urban heat islands that can exacerbate heat-related illnesses.[13] Developed and managed urban forests increase community resilience for stormwater impacts, and provide shade, aesthetics, and recreational opportunities. These forestry projects will benefit LIDACs experiencing heat stress in urban areas and will benefit rural LIDACs through forestry cost-share programs and providing new and enhanced public green space. All proposed projects will support nature-based resiliency to flooding, which is a growing crisis throughout the region being made worse by climate change.[14]

3.    Complement other funding sources to maximize these GHG reductions and community benefits. The coalition members and partners will leverage existing funding sources and pursue new sources of funding through state and federal opportunities to maximize the benefits of this proposal. See Section 1b for more information.

4.    Pursue innovative policies and programs that are replicable and can be "scaled up" across multiple jurisdictions. The ACC proposes shovel-ready projects and programs that will build on existing initiatives and partnerships that can be scaled and replicated. Because of the abundance of protection and restoration opportunities across the region, and well-established local-state-federal and private partnerships, projects that support these measures can be readily adapted for jurisdictions. These programs build off proven concepts and existing programs. Although there is an existing backbone, the coalition is truly innovative because carbon benefits will be centered in natural and working land program design across this region for the first time. Several examples demonstrate existing regional coordination that can be leveraged to replicate and scale this work: The Sentinel Landscape Partnership led by the USDA, DOD, and DOI work on defense readiness through natural and working land projects across all four ACC states; cross-jurisdictional NWL work in the Albemarle-Pamlico, and CB estuarine systems; and robust partnerships on water quantity and quality across NC and SC's shared waterways.

### b. Demonstration of Funding Need

The Southeast is seeing unprecedented levels of in-migration and economic development. According to population estimates from the U.S. Census Bureau, collectively, the residential populations of NC, SC, MD, and VA ("the region") have grown by 738,490 people since 2020. Population growth intertwined with a growing regional economy is creating unprecedented pressures to further develop some of the country's most effective carbon sequestering NWLs.[17] Forests and wetlands are particularly vulnerable to these development pressures. Peer-reviewed research conducted by Climate Central and published in the Journal of Environmental Research Communications highlights the alarming potential impact of this

---

[13] Nowak, David J.; Hirabayashi, Satoshi; Bodine, Allison; Greenfield, Eric. 2014. Tree and forest effects on air quality and human health in the United States. Environmental Pollution. 193: 119-129.

[14] Climate Impacts in the Southeast. https://climatechange.chicago.gov/climate-impacts/climate-impactshttps://climatechange.chicago.gov/climate-impacts/climate-impacts-southeastsoutheast#:~:text=Low%2Dlying%20coastal%20areas%20are,seawater%20inundation%20and%20slow%20draining   [17] Buchanan, Maya K, et al. "Resilience of U.S. Coastal Wetlands to Accelerating Sea Level Rise." Environmental Research Communications, vol. 4, no. 6, (2022, June 1). https://iopscience.iop.org/article/10.1088/2515-7620/ac6eef.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

development (Buchanan et al. 2022). Holding constant moderate assumptions of emission reductions, sea level rise, and wetland growth rates, under the "full development" scenario, the region is predicted to lose a substantial amount of its coastal wetlands by 2050, led by NC at -46%, VA at -18%, MD at -11%, and SC at -5%. Restoring and increasing resilience of existing coastal wetlands can help to reduce wetland loss; however, land conservation to enable wetland migration is needed to fully offset expected losses. Under the "full conservation" scenario, the region can potentially gain significant coastal wetlands, led by MD at 35%, VA at 23%, NC at 16%, and SC at 10%. This disparity is supported by the underlying study's findings that wetland changes are highly dependent on the conservation of refugia– currently non-wetland areas bordering current wetlands. While coalition members have applied for related grants, these alone are not sufficient to implement the proposed measures, as many have application caps that preclude securing sufficient funding for the project in a meaningful timeframe. For example, VA has considered applying for grants under the National Coastal Wetlands Conservation grant program (USFWS) or North American Wetlands Conservation Act grant program (USFWS), but they have application and award cycles out of alignment with this proposal and require a minimum 50% nonfederal match to be competitive.

There is significant need for reforestation and better forest management that cannot currently occur in NC. Even with other federal programs, an estimated $113 million is needed to reforest one million acres (NC NWL Action Plan). With 8.1 million acres of land that could support forests throughout NC and SC, current forest development funding opportunities are not sufficient to be transformational. North Carolina's Forest Development program annually receives triple the funding requests than awards available. Each state receives funding for acquisition from their respective state budget and from partners with conservation trusts and funds, though state governments are often unable to purchase many high valued land tracts because residential and commercial developers are approaching landowners with higher bids.

Table 5 lists all federal and non-federal funding sources related to the proposed measures that have been explored. Funds for acquisition and restoration will continue to be leveraged from local, state, federal, and private sources.

*Table 5: Funding Sources Explored for Proposed Measures*

| State, Other Funding Sources |
| --- |
| **NC:** NOAA Climate Regional Resilience Challenge Grant (Pending), NOAA Coastal Habitat Awards (Awarded), NOAA Marine Debris Awards (Awarded), National Fish and Wildlife Foundation (NFWF) Coastal Resilience Awards (Awarded), Department of Defense (Awarded), Natural Resources Conservation Service (Awarded), USFWS (Awarded), NOAA Coastal Habitat (Pending), NC Land and Water Fund (Awarded), NC General Assembly (Awarded), NC DEQ 319 Program (Awarded), USDA Climate Smart Commodities Grant (Not Awarded), Natural Resources Conservation Service (NRCS) (Awarded), US Forest Service (Awarded), Laughing Gull Foundation (Awarded), Southern Bank (Awarded), CoBank (Awarded), NC Electric Membership Corporation (Awarded), US Endowment for Forestry and Communities (Awarded), USDA 2501 (Not Awarded), Frontline Power (Not Awarded), Tauke Family Foundation (Not Awarded), NFWF America the Beautiful (ATB) (Not Awarded), Camber Foundation (Pending), The Conservation Fund (Pending) |

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

| |
|---|
| **SC:** U.S. Department of Transportation/Federal Highway Administration – PROTECT (Promoting Resilient Operations for Transformative, Efficient and Cost-saving Transportation) (Pending), SCOR Reserve Fund (Disaster Relief and Resilience Reserve Fund) (Awarded), NOAA Climate Regional Resilience Challenge Grant (Not Awarded), NOAA Transformational Habitat Restoration and Coastal Resilience (FY 22, awarded, partnered with TNC) |
| **MD**: Agricultural Water Quality Cost-Share Program (Not Yet Applied), Forest Legacy Administration and Acquisition for Private Easements on Forested Land (Awarded), USDA Forest Service Landscape Scale Restoration Grants (Awarded), NRCS RCPP for Tree Planting on Agricultural Lands (Awarded), 5 million Trees (HB991) (Appropriated annually), NFWF ATB (Not Awarded), NOAA Transformational Habitat Restoration and Coastal Resilience Projects (Not Awarded), U.S. Army Corps of Engineers Wicomico River Maintenance Dredging/Deal Island Marsh Restoration (Awarded) |
| **VA:** NOAA Coastal Resources Management (Not Awarded), NOAA's Transformational Habitat and Coastal Resilience Grant (Pending), NFWF ATB (Not Yet Applied), NRCS Farm Bill Grant (Not Awarded), VA Land Conservation Foundation Grant (Not Yet Applied), Coastal Zone Management Program (Awarded), USFWS Wildlife Restoration Grant Program (Not Awarded), Chesapeake Watershed Investments for Landscape Defense (Not Awarded), EPA Small Watershed Grants (Not Awarded), VA Sea Grant (Pending), North American Wetlands Conservation Act (Not Awarded) |
| **TNC:** NFWF Emergency Coastal Resilience Fund (NC- 2 Awarded), NOAA Transformational Habitat Restoration and Coastal Resilience Projects (Not Awarded), NC Land and Water Fund Restoration Program: (NC: 2 Awarded, 1 Not Awarded), USFS, Community Forest Program (MD- Pending), US DOI Coastal SC Focus Areas Protection (SC: Not Awarded), US DOI Coastal SC Focus Areas Protection (SC: Not Awarded), US DOI Santee Delta-Winyah Bay Wetlands III (Not Awarded), US DOI Albemarle/Chowan Wetlands Conservation Initiative – Phase 3 (NC: Not Awarded), Healthy Trees Healthy Cities Healthy Baltimore (MD: Not Awarded), Expanding Agroforestry Production & Markets for Producer Profitability and Climate Stabilization (Not Awarded) |

### c. Transformative Impact

The ACC natural climate solutions projects hold transformative potential because its transboundary nature addresses climate change at scale. By restoring and managing forests, wetlands, and coastal habitats for GHG reductions, existing carbon stocks can continue to sequester carbon while increasing community resiliency. The application's design creates a novel and transformative opportunity to both restore and conserve the region's most crucial carbon sequestering NWLs through a holistic region-wide approach, while bolstering each state's institutional capacity to carry out local projects. For the first time, this bipartisan coalition of four states will work together to assess connected ecosystems with GHG reduction benefits front and center. TNC will take a novel, regional approach to identifying and mitigating GHG emissions through NWL projects across all states and regardless of state boundaries. More information on TNC's innovative approach to project identification and implementation can be found in the technical appendix. TNC will also continuously measure, monitor, and adapt management to further contribute to the science that will be shared beyond this 4-state coalition, fostering transformative impacts nation-wide.

For **Measure 1: Coastal Habitat and Peatland**, blue carbon and peatland CS is still an emerging field with exciting but limited research. This grant will fund innovative blue carbon and peatland projects in the ground, allowing for long term monitoring of real GHG impacts that can be quantified, tracked, and validated, which will further international understanding of the blue carbon field. In MD, VA, and NC, restoration of marshes and shorelines will ensure ongoing flood protection along the coastline and for

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

coastal communities, while providing habitat for wildlife and mitigating nutrient and sediment flow into the Chesapeake Bay, Pamlico Sound, and other valuable estuarine systems. NC and VA's extensive peatlands hold significant carbon storage promise; their acquisition and restoration will protect them from conversion for perpetuity, reduce GHG emissions, and provide resilience to wildfires, droughts, and stormwater impacts. Conservation easements and the addition of lands to state park systems ensures continued CS for generations.

The projects outlined in **Measure 2: Forestlands** are largely built on existing and proven programs the coalition partners will clone and scale with climate smart and CS potential. These new programs that will bring historically underserved communities to the table largely for the first time can fundamentally shift the approach to forestry across the coalition. In NC most forestlands are owned by private family farms which are passed down through generations. In SC, 87% of forests are privately-owned, with 63% being family-owned. These families will be empowered to be a part of the solution to the climate crisis. These land conservation and restoration activities will model successful climate smart NWL & forestry practices for families and communities to incorporate into their own properties.

As new agroforestry approaches are established and become more widespread, evidence has shown that they may prevent further environmental degradation, sequester carbon, increase the health of soils/water, improve production output, stabilize NWLs, and provide social and health benefits.

Recent rollbacks in federal wetland protections, the current lack of state-level capacity to institute, monitor, and enforce expanded protections, plus accelerating regional development pressures from population and economic growth, means that immediate action is needed to protect the GHG reduction benefits of these lands.

## Section 2: Impact of GHG Reduction Measures
### a/b. Magnitude of GHG Reductions from 2025 through 2030 & 2025 through 2050

Implementation of the proposal will result in durable GHG emission reductions, and afforestation will create near-term and lasting CS benefits. **The estimated cumulative GHG emission reductions from the ACC proposal are 3,369,962.0 MT $CO_2$e from 2025-2030 and 27,707,228.3 MT $CO_2$e from 2025-2050.**

Measure 1 will create GHG benefits by preserving existing carbon stocks and future carbon sequestration in coastal marshes and peatlands. Without implementation of this measure, literature shows that the salt marshes in the project areas would be lost (to sea level rise, erosion, etc.) by 2035.[15] [16]Marsh loss would cause emission of the carbon currently stored in the top meter of marsh soils and loss of soil CS and storable dissolved inorganic carbon export in future years. Peatland restoration will convert degraded peatlands back into carbon sinks and drastically reduce the risk of severe fires that emit enormous amounts of carbon. Measure 2 will create near term GHG benefits by preserving existing carbon in at-risk forests and enhancing carbon sequestration through improved forest management and reforestation. This funding presents an opportunity to avoid the development and conversion of these carbon sinks to impervious land, incapable of sequestering future carbon. Further, this alternative serves to create new sources of carbon emissions, decrease flood resiliency, and diminish water quality, Trees grown for harvest will provide long-term GHG benefits as they continue to store carbon in durable wood products once

---

[15] Warnell, Katie, Lydia Olander, and Carolyn Currin. "Sea level rise drives carbon and habitat loss in the US mid-Atlantic coastal zone." *PLoS Climate* 1, no. 6 (2022): e0000044.
[16] The Nature Conservancy & Maryland Department of Natural Resources," TNC Maryland Blue Carbon Resilience Credit Feasibility Study," December 2023. https://dnr.maryland.gov/ccs/Documents/Maryland-Blue-Carbon-Resilience-Credithttps://dnr.maryland.gov/ccs/Documents/Maryland-Blue-Carbon-Resilience-Credit-Feasibility-Study-2023-12-22.pdfFeasibility-Study-2023-12-22.pdf

33

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

harvested. Trees planted in urban areas will largely consist of oak and holly varieties that can have life spans of hundreds of years. These plantings will support GHG sequestration for generations. Further details on quantification methods, relevant assumptions, annual emission reduction estimates, and uncertainties associated with the estimates are provided in the Technical Appendix to this application.

### c. Cost Effectiveness of GHG Reductions

Implementation of this proposal is highly cost-effective. The cost-effectiveness of the proposal, inclusive of all measures in this application, is $125.28 per ton of $CO_2e$ reduced during 2025-2030, and $15.03 per ton of $CO_2e$ reduced from 2025-2050. The cost effectiveness of GHG reductions was determined with the following formula: *(Requested CPRG funding) / (Sum of Quantified GHG reductions from CPRG funding from 2025-2030 or 2025-2050).* There also will likely be cost savings due to economies of scale when doing large scale projects, which was not factored into our costs. The natural climate solutions proposed deliver CS at a fraction of the cost of technological or engineered solutions. Cost savings are derived from low upfront costs relative to other technologies, a proven history of implementation, and the myriads of environmental and community co-benefits. Costs associated with each measure are detailed in the Budget Table spreadsheet.

The natural climate solutions proposed will achieve many beneficial outcomes for each state, in addition to GHG mitigation. Ultimately achieving these co-benefits is a cost savings to the federal and state governments because fewer dollars will need to be invested in water quality, wildlife habitat, or enhancing coastal resilience. These benefits also convey real economic benefits by enhancing fisheries, improving hunting and outdoor recreation, and lowering the risk of climate threats to people and infrastructure.

### d. Documentation of GHG Reduction Assumptions

See Technical Appendix (separate document).

### Section 3: Environmental Results – Outputs, Outcomes, and Performance Measures

### a. Expected Outputs and Outcomes

Implementing this program to protect and manage NWLs will help to mitigate the ACC's gross emissions that contribute to climate change. These projects will empower natural systems to mitigate human impacts to the climate in a way that is at risk if these areas are developed or mismanaged. Continuous passive CS can efficiently promote annual reductions with few maintenance costs. Simultaneously, well planned conservation can have co-benefits for flooding, economic development, and air and water quality tied to climate change impacts. These restoration and conservation opportunities can bolster the ACC's communities, economies, and ecosystems that have been negatively impacted from floods and other natural hazards in the last decade.

One significant co-benefit relates to air quality; a study by Nowak et al. (2014) estimated that the ACC states remove 1,477,200 tons of CAPs annually through trees and forests. On average, the coalition states remove more tons of CAPs (369,300 tons) than the average state across the U.S. (348,000 tons). The ACC proposal will support existing and new removal of air pollutants through planting and protecting existing forests across the region. Additional co-benefits include clean water, flood resilience, improved biodiversity and wildlife habitat, recreational opportunities, ecosystem resilience, and enhanced soil health.

**Outputs:**

Measure 1

- 33,000 acres of peatlands newly preserved and/or restored in NC and VA (TNC)
- 150 acres of tidal wetlands restored in VA (TNC)

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

- 15 acres of peatlands and 595 acres of coastal habitats newly preserved and restored (NC)
- 3,300 acres permanently added to State Park System (NC)
- 10,000 of acres of forests, current or future coastal habitats, or agricultural lands restored (MD)
- 1,540 acres of coastal habitats restored (MD)
- 2,040 acres of created or improved wildlife habitat (MD)
- 217,700 trees and 4,800,000 native wetland species planted (MD)
- 100 properties protected from flooding after storms (conservative estimate) (MD)
- 14,000 lbs of nitrogen, 140 lbs of phosphorus, 1,600 tons of sediment avoided from entering the CB
- Annual sediment loading reduced by about 9,000 metric tons; nitrogen and phosphorus loading reduced by 10 and 5 metric tons respectively (VA)
- 10,000 acres of shorelines and habitats restored (VA)
- Coastal Resilience Plan created for 100 properties, implemented at 5 properties (MD)
- Two National Seashores protected from erosion and sea level rise (NC)

Measure 2
- 67,647 acres of forests under improved management in the Appalachians in MD and VA (TNC)
- 25,447 acres of bottomland hardwood forest under improved management in SC and VA (TNC)
- 1,200 urban trees planted (NC) o At least 55,000 acres of land reforested (NC)
- Approximately 12,240 acres placed into conservation, with additional benefits for agroforestry, recreation, and flood mitigation (SC)
- 1,000 new acres of agroforestry practices installed (MD)
- 250 producers and landowners engaged on the benefits of agroforestry (MD)
- 500 new acres of forest and 13 acres of urban trees planted (MD)
- 22,968 pounds of nitrogen and 591 pounds of phosphorus annually reduced from the CB
- Minimum of 10 additional soil health evaluation data points for the Healthy Soils Program (MD)
- Over 1,000,000 new native trees planted (VA)

**Outcomes (applicable to all coalition members):**
1) Reduction in cumulative metric tons of GHG emissions ($mtCO_2e$): 2025-2030: 3,362,249; 2025-2050: 28,027,178.0
2) Increased staff capacity to implement proposed measures
3) Enhanced level of community engagement as measured by an increased number of actions to engage with LIDACs
4) Improved access to parks and recreational green space for LIDACs
5) Reduced HAPs and CAPs in areas near tree plantings ($CO_2$, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride)
6) Increased tree canopy cover
7) Increased resiliency to flooding events as measured by avoided property loss near projects
8) Water quality improvements
9) Improved biodiversity and wildlife habitat
10) Decrease in local oceanic acidification
11) Increased recreational opportunities
12) Healthier communities and ecosystems

**b. Performance Measures and Plan**

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

Because many of the ACC projects build on existing programs, performance measures and metrics are already integrated into reporting requirements. For example, contracts with landowners will be required to include reporting requirements and metrics for forestry cost-share programs. As lead applicant, NCDNCR will gather and report on the progress of all projects funded across the coalition. A bi-annual reporting structure will be implemented to ensure coordinated and consistent reporting across all projects and Coalition partners will meet at least quarterly to discuss updates and address potential obstacles to implementation. Monitoring and administrative funds will also be used to measure onsite GHG emission reductions and air quality data. Performance measures will at minimum include the following but may be developed to include additional information once the grant period begins.

**Measure 1:** Project funds spent (NC), Linear feet of living shoreline constructed (NC, VA), Acres of land restored (NC, MD, VA), Acres of new public lands (NC), Acres of increased marshland/forested wetland (VA), Structural integrity of breakwaters (VA), Reduction in wave energy at marsh due to breakwaters (VA), Wetland flood protection (water storage capacity) (VA), Changes to wildlife populations (VA), GHG emissions sequestered year over year (all projects) Percentage of funding benefiting Climate & Economic Justice Screening Tool census tracts (all projects).

**Measure 2:** Acres of forestry practices completed by practice, county, and type/species (NC, SC, MD, TNC), Number of landowners receiving financial assistance (NC), Cost-shares paid and total practice cost per landowner contract, practice, county, and forest type/species (NC, SC), Number of tree seedlings planted by county, and forest type/species (NC), Number of trees planted (NC, VA), Number of municipalities served (NC), Total applications compared to awards for forestry grant programs (NC), Number of outreach events concerning the grant in each jurisdiction (MD, VA), Number of soil health evaluations collected (MD), Increase in vegetation growth (VA),GHG emissions sequestered year over year (All). Percentage of funding benefiting Climate & Economic Justice Screening Tool census tracts (all projects).

Duke University will assist in collecting performance measures and designing the reporting plan and will utilize the data that is collected to demonstrate implementation progress by developing a public, user-friendly map and data visualization dashboard. This dashboard will allow the EPA, coalition members, and members of the public to see how grant dollars are effectively and efficiently being used throughout the award period and beyond. Duke University will publish easily accessible information on dollars spent, acres of land conserved/restored, trees planted, GHG monitoring and benefits, CAP and HAP reduction estimates, and other key outputs and performance measures. Project benefits to LIDACs will be highlighted within the dashboard. The dashboard will also track project initiation, progress, and completion. The ACC will continuously explore how the dashboard can be used in the implementation evaluation.

Coalition members will track progress for each performance measure within their jurisdiction with databases, spreadsheets, and timekeeping records and report such progress to NC. Coalition members will meet quarterly throughout the period of performance to collaborate, share ideas, and update coalition members on progress. NC will then provide a status update with respect to each performance measure to EPA in semi-annual reports and the final report.

**c. Authorities, Implementation Timeline, and Milestones**

Table 6 identifies the parties, roles, and responsibilities for implementing each GHG reduction measure with their respective legal authority to carry out the measure (or plan for obtaining authority). A detailed implementation timeline for each measure, including tasks, key milestones, and key actions needed to meet measure goals and objectives by the end of the grant period, is provided in Section 1a.

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

*Table 6: Measure 1 Roles and Responsibilities by Entity*

| Implementing Entity | Roles and Responsibilities | Legal Authority |
|---|---|---|
| NCCF | Implement coastal habitat and peatland protection, restore projects, conduct monitoring and scientific analysis, report results. | Incorporated NGOs will obtain regulatory authority for projects through permit authorizations. |
| NCDNCR | Purchase and acquire land to be added to the NC State Park System. | NC General Statute Article 2 § 143B135.12 Gives NCDNCR the power to acquire lands of State Parks with Council of State approval. |
| MD Department of Natural Resources (DNR) | Project management, landowner outreach, project selection, subcontracting, verification, and tracking reporting metrics. | Either MD DNR is the land manager, or authority will be granted through easement. |
| VA DEQ | Lead agency to administer and disburse funds as subawards to partners and manage all projects reporting to NC DNR. | Code of VA, under § 10.1-11831. |
| VA Department of Wildlife Resources (DWR) | Subgrantee will implement Projects 1-7 with partners, handle coastal shoreline, marshland, peatland protection and restoration projects, land acquisition, monitoring and analysis, hiring, reporting. | Title 29.1 of the Code of VA. |
| VPA | Subgrantee responsible for implementing Project 8. This entails working with partners to purchase a conservation easement and perform reforestation activities. | VA Law Authorities under § 62.1-1281 |
| TNC | Acquiring interests in property, restoring ecological function, and increasing carbon retention/ sequestration rates. | TNC is a 501(c)(3) conservation nonprofit and owns, restores, and manages conservation lands. |

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

*Table 7: Measure 2 Roles and Responsibilities by Entity*

| Implementing Entities | Measure-Specific Roles and Responsibilities | Legal Authority |
|---|---|---|
| NC Forest Service | Create a rapid growth forest development cost share program and an urban tree planting grant program for municipalities and non-profits to apply. | General Statute Chapter 106 Article 83 "Forest Development Act" gives the NC Department of Agriculture and Consumer Services, which houses the NCFS, legal authority to administer forest development and cost-share programs. |
| Sustainable Forestry and Land Retention Project - NC | Expand current geographical area to reach additional LIDACs & provide access to technical and financial resources. | The SFLRP has authority to implement this program that aligns with Roanoke Cooperatives Mission. |
| Black Family Land Trust (BFLT) - NC | Acquire conservation easements on land in LIDACs; in partnership with Roanoke SFLRP implement a cost share program to implement climate smart reforestation/ forestry practices. | BFLT has been established for 21 years and has authority as a 501(c)(3) to execute Programs. |
| NCDNCR | Oversee implementation of EO 305. | EO 305 directs NCDNCR to lead the benchmarking and reporting of progress toward its implementation. |
| SCOR | Identify and acquire land for conservation, measure and monitor carbon benefits and co-benefits. It is SCOR's responsibility to develop, implement, and maintain the Statewide Resilience Plan. | S.C. Code Ann. §§ 48-62-30(1)(b) and (d)(iii) SCOR developed land conservation priorities and prioritized the role of nature-based solutions in land conservation and restoration efforts which co-benefits for GHG reduction efforts, including enhanced carbon sink capabilities. |
| MD Dept. of Natural Resources | Project management, landowner outreach, project selection, subcontracting for implementation, verification and tracking project success, reporting metrics. | Landowner agreement and/or memorandum of understanding with soil conservation districts. |

| MD Dept. Of Agriculture | Project management, landowner outreach, project selection, subcontracting for implementation, verification and tracking project success, reporting metrics. | Landowner agreement and/or MOU with Soil Conservation Districts |
|---|---|---|
| MD Department of the Environment (MDE) | Project management, inter-agency coordination, inter-agency project tracking implementation. | ND Code, Environment Article, § 2-1205 permits MDE to develop plans, adopt regulations, and implement programs to achieve the State's GHG reduction requirements. |
| VA DEQ | Lead agency to administer and disburse funds as subawards to partners and manage all projects reporting to NC DNR. | Code of VA, under § 10.1-11831. |
| VA Department of Wildlife Resources (DWR) | Subgrantee implementing Projects 1-7 with partners. Responsibilities include shoreline, marshland, peatland restoration, land acquisition, monitoring, analysis, hiring, and reporting. | Title 29.1 of the Code of VA. |
| VA Port Authority (VPA) | Subgrantee implementing Project 8. working with partners to purchase a conservation easement, perform reforestation activities. | VA Law Authorities under § 62.1-1281 |
| TNC | Acquiring interests in property, restoring ecological function, and increasing carbon retention/CS rates. | TNC is a 501(c)(3) nonprofit and owns and manages conservation lands. |

**Section 4: Low-Income and Disadvantaged Communities**
**a. Community Benefits**

39

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

**Figure 1: FEMA National Risk Assessment Map of Coalition States**



Everyone deserves clean water, clean air and a healthy environment. However, many LIDACs located next to industry or in climate vulnerable areas have been disproportionately burdened with pollution and climate hazards, adversely impacting quality of life. As demonstrated by the Federal Emergency Management Agency's (FEMA) National Risk Index, the ACC is particularly susceptible to be impacted long-term by natural hazards (Figure 1).[17] The National Risk Index evaluates risk by census tract by measuring expected annual loss, multiplied by social vulnerability, and then divided by community resilience.

The projects in this proposal can help mitigate these risks. Forests and wetlands make communities more resilient to flooding and major storms because root systems and vegetation slow velocity of moving water and reduce flooding volume. Restored peatlands are much less vulnerable to wildfires that contribute to poor health outcomes in inland LIDACs. Coastal habitats such as salt marshes provide economic benefits for commercial and recreational fisheries, prevent shoreline erosion, and significantly reduce flooding, especially caused by storm surges from tropical storms. Urban trees offer cooling shade during hot months, absorb stormwater, improve air quality, and provide public green spaces for communities to enjoy. Restoring and protecting forests and wetlands will help mitigate the consequences that human alterations to the environment are having on southeastern communities, economies, and ecosystems.

The implementation of the measures included in this proposal are anticipated to provide significant benefits to these communities; 594 distinct LIDAC census tract or block groups could foreseeably benefit from the projects in this proposal. Often, LIDACs are the most vulnerable populations to climate hazards, such as flooding, and are disproportionately slow to recover from the impacts of natural disasters due to lack of resources. By implementing projects near these communities, we not only reduce pollutant levels, but increase community resilience to hazards like flooding and heat. The coalition partners will track project deployment in and near identified LIDAC census tracts or block groups to quantify reduction in GHG emissions, co-pollutant emissions including CAPs and HAPs, and other community benefits. The ACC partners will include results of these assessments in semi-annual reports to EPA and make the information publicly available on the online dashboard. Duke University will include LIDAC data layers on the dashboard to help evaluate which on-the-ground projects are benefiting LIDACs and to publicly hold the ACC accountable for LIDAC commitments. More details on this dashboard can be found in Section 3b.

Communities in each state will experience real, on the ground benefits from ACC projects. Much of the forestland in ACC states is privately owned/managed so cost-share programs for reforestation on small family farms will support LIDACs. Landowners across the ACC will be able to apply for cost-share programs that will improve climate smart forestry, like NC's High-Carbon Rapid Growth Cost Share Program, MD's Healthy Soils Competitive Fund, and VA's Agricultural Cost-Share Program. BFLT has led the implementation of the African American Land Ethic and Wealth Retention and Asset Protection programs, which have led to retained family ownership/control of more than $12.5 million acres of their land assets in VA and NC. Urban forest programs will focus on small and medium-sized municipalities that currently lack capacity to administer and manage their own tree-planting projects.

---

[17] National Risk Index for Natural Hazard. https://www.fema.gov/flood-maps/products-tools/national-risk-index

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

The ACC does not expect LIDACs to experience major disbenefits from this proposal to enhance, protect and restore NWLs. Some potential disbenefits include potential loss of tax revenue from rural lands and minor construction detours. However, the coalition will have measures in place to ensure that at least 40% of total project benefits go to LIDACs. We mitigate this through intentional program design of this proposal by identifying the geography of several projects across the region that will be in LIDACs. There are also several proposed projects where the exact location is unknown until the grant is awarded and assessments begin. Throughout the grant period, the coalition will use the dashboard and qualitative metrics to assess progress toward Justice40 goals, with the ability to adapt if targets are falling short.

## b. Community Engagement

All coalition members performed extensive community outreach, including to LIDACs, during development of the measures contained in this proposal as part of their PCAP development process. As the lead applicant, NCDNCR engaged with and built on NCDEQ's community engagement during the PCAP process while leveraging NCDNCR's existing community engagement programming. SCOR provided a range of opportunities for community members to provide input during the PCAP development process, including forming action teams to involve experts and engaged stakeholders in PCAP development, conducting in-person meetings and webinars, and soliciting public input through an online survey. MD developed partnerships with community groups throughout the state to understand air quality concerns and build an air monitoring network. VA utilized several outreach channels to engage with LIDACs and raise awareness of public engagement sessions including social media, emails, newsletters, and government webpages; tribal engagement was prioritized as VADEQ consistently communicated with the Monacan Indian Nation and other tribal entities throughout PCAP development.

The coalition will seek input from LIDACs during development of promotional materials, guidance, and other materials, as well as continue meaningful engagement with LIDACs throughout and following implementation. Project leads will conduct targeted outreach with landowners, foresters, local and federal government, tribal communities, partner agencies, and community organizations for each project. Leads will also leverage news media, social media, and websites to notify the public about projects and how to get involved. These efforts will be ongoing prior to and during annual enrollment periods to make eligible participants aware of grants and cost-share programs. The coalition partners will particularly engage with the coalition's federal and state-recognized tribal communities. There are 29 state or federally recognized tribes within the four coalition states. Virginia will have a project specifically directed toward conservation and restoration within tribal communities. Coalition partners will engage with nearby tribes throughout project partnerships to ensure tribal communities have access and opportunity to benefit from the coalition projects.

Project partners may also establish programs to create opportunities for student and community involvement in monitoring the success and effectiveness of the restoration work. For example, in Virginia, DWR will work in partnership with Christopher Newport University and its programs to provide climate-resilience experiences to VA's local school children. The North Carolina Coastal Federation will also facilitate volunteer and educational opportunities with their living shoreline projects by leveraging their existing environmental education programming.

Duke University's public, user-friendly maps and the interactive data visualization dashboard will be used to make the coalition projects and programs accessible and easy to understand for the public and will allow individuals to see how projects are benefiting their communities. More details on this dashboard can be found in Section 3b.

## Section 5: Job Quality

41

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

The ACC will bolster local economies across the Southeast and support good quality jobs. This grant funding will directly create 56 new jobs, but the total impact through contracting and indirect job creation will be much greater. The environmental restoration industry supports approximately 33 jobs for every $1 million invested.[18] The study found that there is an employment multiplier between 1.48 and 3.8 (the number of jobs supported by every restoration project) and an output multiplier between 1.6 and 2.59 (multiplier for total economic output from investments). Coastal restoration requires a diverse set of skills that directly and indirectly employ a wide variety of people, including construction workers, engineers, ecologists, project managers, and heavy equipment operators. NOAA found that on average, 15 jobs were supported per $1 million invested, with up to 30 jobs created for some labor-intensive projects.[19] Based on this NOAA research, coastal habitat projects in this proposal will support approximately 2,500 jobs across the coastal region within the Coalition states. Continued protection of coastal habitats also creates long term indirect jobs through seafood and shellfish industries, tourism, and recreation. In the forestry sector, there will be an increase in demand for skilled workers to conduct site preparations and to plant trees. These jobs will range in required skill level and the projects will offer opportunity for the development of a specialized workforce throughout the states to support expanded agroforestry-based production systems. According to the Bureau of Labor Statistics, the conservation scientist and forester occupation pays on average $64,420 per year and the occupation is expected to grow by 4% by 2032.[20]

Jobs in environmental conservation and restoration fields do not all require four-year degrees. BenDor et al 2015 found that restoration projects create localized employment benefits while creating well-paying jobs compared to average wages, in a way that mirrors the construction industry at large. The projects in this proposal will take place largely in rural areas and will be especially beneficial for local, rural economies.

Each coalition states' commerce agency will be involved in supporting the growth of good paying environmental conservation and restoration jobs for this project. The member states have drawn in major job announcements in recent years in the climate and clean energy sector. Commerce agencies assist states in recruiting and keeping high-paying jobs across diverse skillsets and backgrounds. For example, NC's Department of Commerce's First in Talent Plan[21] sets goals for (i) increasing access to high-quality early education and decreasing childcare expenses; (ii) improving regional access to quality, affordable housing and transportation to grow and retain a vibrant workforce; and (iii) supporting initiatives seeking healthier communities. Virginia has an Inclusive Excellence Strategic Plan[22] to increase hiring and promotion of those from underrepresented backgrounds. The direct and indirect jobs created through this proposal will be supported by coalition members' robust workforce strategies. Additionally, in North Carolina , the Climate Corps office will engage with project partners to identify opportunities to place Climate Corps or other AmeriCorps Program service members with these projects.

---

[18] BenDor T, Lester TW, Livengood A, Davis A, Yonavjak L (2015) Estimating the Size and Impact of the Ecological Restoration Economy. PLoS ONE 10(6): e0128339. https://doi.org/10.1371/journal.pone.0128339

[19] NOAA. Habitat Restoration Supports Jobs, 2020. https://www.fisheries.noaa.gov/feature-story/habitat-restoration-supporthttps://www.fisheries.noaa.gov/feature-story/habitat-restoration-supports-jobs-stewardshipjobs-stewardship

[20] Bureau of Labor Statistics (2023) https://www.bls.gov/ooh/life-physical-and-social-science/conservation-scientists.htm#:~:text=Conservation%20scientists%20and%20foresters%20evaluate,suppressing%20fires%20and%20planting%20seedlings

[21] North Carolina Department of Commerce First in Talent Plan. https://www.commerce.nc.gov/guidelines-north-carolinahttps://www.commerce.nc.gov/guidelines-north-carolina-strategic-plan-economic-development/openstrategic-plan-economic-development/open

[22] Virginia DWR Inclusive Excellence Strategic Plan. https://dwr.virginia.gov/wp-content/uploads/media/DWR-Inclusivehttps://dwr.virginia.gov/wp-content/uploads/media/DWR-Inclusive-Excellence-Strategic-Plan-2022-2026.pdfExcellence-Strategic-Plan-2022-2026.pdf

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

Section 6: Programmatic Capability and Past Performance
a. Past Performance

NCDNCR's goal as a state agency is to be the leader in using the state's natural and cultural resources to build the social, cultural, educational and economic future of North Carolina. As a state agency, NCDNCR has a long and successful track record of receiving and administering federal awards and administering state awards for North Carolina's natural and cultural resources. NCDNCR was appropriated $99 million of State Fiscal Recovery Funds to administer in Session Law 2020-180. Table 8 provides a diverse list of both active and closed federal awards issued over the past four years:

*Table 8: Programmatic Capability and Past Performance*

| State/Project Title | Project-Specific Information |
|---|---|
| NC – Restoration at Charlotte Hawkins Brown House Historic Site | **Agreement Number:** P23AP01135<br>**Funding Agency/CFDA:** National Parks Service (NPS), Civil Rights Program **Brief Description:** $555,334 received to complete renovations to a historic structure, Work is in progress.<br>**Contact:** James Alvey, 202-354-2070, James_Alvey@nps.gov |
| NC - Rehabilitation of the House in the Horseshoe State Historic Site | **Agreement Number:** P23AP01505<br>**Funding Agency/CFDA:** NPS, Semi Quincentennial Program<br>**Brief Description:** $444,926 received to preserve a Revolutionary War era home. Work is in progress.<br>**Contact:** Dara Green. 202-354-2202, Dara_Green@nps.gov |
| NC - Shuttered Venue Operators | **Agreement Number:** SBAHQ21SV006204.3<br>**Funding Agency/CFDA:** Small Business Administration, Shuttered Venue Operators – 59.075<br>**Brief Description:** $9,816,332.85 received to offset the loss in ticket sales at the NC Zoo, Roanoke Island Festival Park, Tryon Palace and the NC Aquariums during the pandemic. Grant was closed out in July 2022 and all funds were spent in compliance with the terms of the grant. **Contact:** svogrant@sba.gov |
| NC – Artifact Exploration | **Agreement Number:** MA-251382-OMS-22<br>**Funding Agency/CFDA:** Institute of Museum and Library Services – 45.301<br>**Brief Description:** $148,839 received to develop and build an interactive exhibit on American Indian culture. Scheduled to conclude 8/2024. **Contact:** Jessica Ottley, jottley@imls.gov |
| NC – 2020 Programming at Tryon Palace | **Agreement Number:** GA-274245-20<br>**Funding Agency/CFDA:** National Endowment for the Humanities<br>**Brief Description:** $150,000 received to create new jobs at Tryon Palace during the pandemic. This grant was closed out in April 2022 and all funds were spent in compliance with the terms of the grant.<br>**Contact**: Marc Ruppel, 202-606-8269, MRuppel@neh.gov |

NCDNCR employs several staff to ensure grant administration success and will hire more positions to achieve project goals as described in the Budget Narrative. Once a grant is awarded, the appointed project team meets on a regular basis to track progress on schedule and goals. Performance measurements are

North Carolina Department of Natural and Cultural Resources
Atlantic Conservation Coalition

specific to each grant project. If progress is stalled, or an unforeseen event creates obstacles, NCDNCR's Manager of Development and Special Projects will contact the granting agency to explain the challenges and if necessary, request an extension. The Manager also reviews the grant RFP and contract, identifies the reporting requirements/schedule, allowable costs, and publicity obligations, and then shares the information with the project team to ensure compliance. Once costs are incurred, transactions are processed through NCDNCR's Office of Budget and Finance. Its Internal Audit unit ensures that activities are following State and federal regulations. NCDNCR follows the State Budget Act, Article 143C of the NC General Statutes, and the State Budget Manual. Internal controls are in place to control access to systems and records. Regular internal audits are conducted to assess the effectiveness of anti-fraud controls and identify potential vulnerabilities.

**b. Reporting Requirements**

NCDNCR's Manager of Development and Special Projects works closely with the project team assigned to implement a grant-funded project. Monthly, quarterly, or as-needed meetings are scheduled to discuss deliverables, identify obstacles, and facilitate communication. Staff tasks and deadlines are assigned using a project management matrix, which is reviewed during meetings. Notifications are sent to staff a month prior to reporting deadlines to provide enough time to compile required information for progress and financial reports. Once information is compiled, the Manager submits reports to the granting agency before the deadline. If the granting agency requires additional information or needs an item corrected, the Manager provides this information within 48 hours. For all projects in Table 8 above, NCDNCR submitted required interim and final reports in a timely manner and complied with all issued terms. In many cases, goals were not only fulfilled but exceeded.

**c. Staff Expertise**

As demonstrated in the Team Biographies attachment, the lead applicant, coalition members, and project partners are qualified with decades of applicable experience to successfully implement the proposed projects and achieve GHG reduction targets set out with these measures. The past performance section demonstrates NCDNCR has the technical expertise to be the lead applicant of this proposal for both grant management and understanding of subject matter.  In addition to federal awards, NCDNCR manages NC's Land and Water Fund Program which awards millions of dollars annually to nonprofits trusts, and government agencies to protect and restore NWLs across the state. NCDNCR also manages the North Carolina State Park System and the state's Natural Heritage Program. The agency is charged with leading the work of the NC NWL Action Plan and implementation of EO 305 and has the staff expertise to lead the implementation of this proposal.

**Section 7: Budget and Timely Expenditure of Grant Funds**

See the Budget Narrative and Budget Spreadsheet attachments for more information (separate documents).

# Davis Declaration

# Exhibit B

5E - 03D25824 - 0    Page 1

| | | | | |
|---|---|---|---|---|
| ![EPA logo] | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Grant Agreement** | | **GRANT NUMBER (FAIN):** 03D25824<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5E | **DATE OF AWARD**<br>10/17/2024 |

**GRANT NUMBER (FAIN):** 03D25824
**MODIFICATION NUMBER:** 0
**PROGRAM CODE:** 5E
**DATE OF AWARD** 10/17/2024

**TYPE OF ACTION**
New
**MAILING DATE** 10/22/2024

**PAYMENT METHOD:**
ASAP
**ACH#**

| | |
|---|---|
| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| North Carolina Department of Natural and Cultural Resources<br>NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF<br>4601 MAIL SERVICE CENTER<br>RALEIGH, NC 27699<br>EIN: 56-6062189 | North Carolina Department of Natural and Cultural Resources<br>NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF<br>4601 MAIL SERVICE CENTER<br>RALEIGH, NC 27699 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Emma Hughes<br>109 East Jones Street<br>Raleigh, NC 27601<br>Email: emma.hughes@dncr.nc.gov<br>Phone: 859-640-7863 | Erin Frew<br>61 Forsyth St SW<br>Atlanta, GA 30303-8960<br>Email: Frew.Erin@epa.gov<br>Phone: 404-562-9370 | Jasmine Williams<br>Grants Management Section<br>61 Forsyth St SW<br>Atlanta, GA 30303-8960<br>Email: williams.jasmine@epa.gov<br>Phone: 404-562-9334 |

**PROJECT TITLE AND DESCRIPTION**

Climate Pollution Reduction Grants

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>10/01/2024 - 09/30/2029 | **PROJECT PERIOD**<br>10/01/2024 - 09/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 421,238,074.00 | **TOTAL PROJECT PERIOD COST**<br>$ 421,238,074.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 03/28/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 421,238,074.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 421,238,074.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 4<br>61 Forsyth Street<br>Atlanta, GA 30303-8960 | U.S. EPA, Region 4, Air and Radiation Division<br>R4 - Region 4<br>61 Forsyth St SW<br>Atlanta, GA 30303-8960 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Shantel Shelmon - Grants Management Officer | **DATE**<br>10/17/2024 |

5E - 03D25824 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 421,238,074 | $ 421,238,074 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 421,238,074 | $ 421,238,074 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2404VW4138 | 2226 | E4SF5 | 04V6 | 000ACGXJ2 | 4132 | - | - | $ 421,238,074 |
| | | | | | | | | | $ 421,238,074 |

5E - 03D25824 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 10,178,563 |
| 2. Fringe Benefits | $ 4,125,448 |
| 3. Travel | $ 205,250 |
| 4. Equipment | $ 95,000 |
| 5. Supplies | $ 299,250 |
| 6. Contractual | $ 1,900,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 399,434,563 |
| 9. Total Direct Charges | $ 416,238,074 |
| 10. Indirect Costs: 10.00 % Base DE MINIMUS | $ 5,000,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 421,238,074 |
| 12. Total Approved Assistance Amount | $ 421,238,074 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 421,238,074 |
| 15. Total EPA Amount Awarded To Date | $ 421,238,074 |

5E - 03D25824 - 0     Page 4

# Attachment 1 - Project Description

This action approves an award in the amount of $421,238,074 to provide funding under the Inflation Reduction Act (IRA) to the North Carolina Department of Natural and Cultural Resources. The recipient will implement greenhouse gas (GHG) reduction programs, policies, projects, and measures identified in a Priority Climate Action Plan (PCAP) developed under a Climate Pollution Reduction Grants (CPRG) planning grant.The activities to be completed during the project period are described in 21 projects under two measures. Measure 1 of this proposal focuses on protecting and restoring high-carbon coastal habitats and peatlands to maximize carbon sequestration and coastal resilience benefits. Nine activities will fall under this measure. Measure 2 of this proposal addresses the protection, use, and restoration of forested land, promoting sustainable forestry management practices to increase carbon sequestration. Twelve activities will fall under this measure. The anticipated deliverables for Measure 1 and 2 include the following: 33,000 acres of peatlands newly preserved and/or restored in NC and VA (TNC), 150 acres of tidal wetlands restored in VA (TNC), 15 acres of peatlands and 595 acres of coastal habitats newly preserved and restored (NC), 3,300 acres permanently added to State Park System (NC),10,000 of acres of forests, current or future coastal habitats, or agricultural lands restored (MD), 1,540 acres of coastal habitats restored (MD). 67,647 acres of forests under improved management in the Appalachians in MD and VA (TNC), 25,447 acres of bottomland hardwood forest under improved management in SC and VA (TNC), At least 55,000 acres of land reforested (NC), Approximately 12,240 acres placed into conservation, with additional benefits for agroforestry, recreation, and flood mitigation (SC). The expected outcomes from Measures 1 and 2 include the following: Reduction in cumulative metric tons of GHG emissions (mtCOe): 2025-2030: 3,362,249; 2025-2050: 28,027,178.0. NCCF - Implement coastal habitat and peatland protection, restore projects, conduct monitoring and scientific analysis, report results; Maryland Department of Natural Resources (MDNR) - Project management, landowner outreach, project selection, subcontracting, verification, and tracking reporting metrics.;VA DEQ - Lead agency to administer and disburse funds as subawards to partners and manage all projects reporting to NC DNR.; VA Department of Wildlife Resources (DWR) - will implement Projects 1-7 with partners, handle coastal shoreline, marshland, peatland protection and restoration projects, land acquisition, monitoring and analysis, hiring, reporting.;VPA - responsible for implementing Project 8. This entails working with partners to purchase a conservation easement and perform reforestation activities.;TNC - Acquiring interests in property, restoring ecological function, and increasing carbon retention/ sequestration rates.; NC Forest Service - Create a rapid growth forest development cost share program and an urban tree planting grant program for municipalities and non-profits to apply.;Sustainable Forestry and Land Retention Project - Expand current geographical area to reach additional LIDACs & provide access to technical and financial resources; Black Family Land Trust (BFLT) - Acquire conservation easements on land in LIDACs; in partnership with Roanoke SFLRP implement a cost share program to implement climate smart reforestation/forestry practices;SCOR - Identify and acquire land for conservation, measure and monitor carbon benefits and co-benefits. It is SCOR's responsibility to develop, implement, and maintain the Statewide Resilience Plan;MD Dept. of Natural Resources - Project management, landowner outreach, project selection, subcontracting for implementation, verification and tracking project success, reporting metrics; MD Dept. Of Agriculture - Project management, landowner outreach, project selection, subcontracting for implementation, verification and tracking project success, reporting metrics; and MD Department of the Environment (MDE) - Project management, inter-agency coordination, inter-agency project tracking implementation.

5E - 03D25824 - 0    Page 5

# Administrative Conditions

## General Terms and Conditions

The recipient agrees to comply with the current Environmental Protection Agency (EPA) general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and Jasmine Williams, williams.jasmine@epa.gov, or 404-562-9334.

- MBE/WBE reports (EPA Form 5700-52A): Jasmine Williams, williams.jasmine@epa.gov, or 404-562-9334.

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: Erin Frew, frew.erin@epa.gov or 404-562-9370 and Jasmine Williams, williams.jasmine@epa.gov, or 404-562-9334.

- Payment requests (if applicable): Erin Frew, frew.erin@epa.gov or 404-562-9370 and Jasmine Williams, williams.jasmine@epa.gov, or 404-562-9334.

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Erin Frew, frew.erin@epa.gov or 404-562-9370.

## B. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

**C.  Pre-Award Costs**

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal cost sharing) incurred from 10/01/2024 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

5E - 03D25824 - 0    Page 7

# Programmatic Conditions

**Climate Pollution Reduction Implementation Grants Programmatic Terms and Conditions**

## A. Deliverables

The first phase of the Climate Pollution Reduction Grants (CPRG) program provided funding for designing Priority Climate Action Plans (PCAPs) that incorporate a variety of measures (i.e., programs, policies, measures, and projects) that reduce greenhouse gas (GHG) emissions. The purpose of this CPRG Implementation assistance agreement is to implement proposed measures within a specified PCAP identified in the CPRG Implementation Grant General Competition application. All programs, policies, measures, and projects contained in the final, approved CPRG implementation assistance agreement workplan are required deliverables.

The recipient agrees to implement GHG reduction programs, policies, projects, and measures (collectively referred to as "GHG reduction measures," or "measures") identified in a PCAP developed under a CPRG planning grant and included in the CPRG implementation grant workplan. The recipient agrees to ensure that each is successfully implemented before the end of the grant project period. The recipient agrees to successful project implementation, which includes the process of putting a decision or plan into effect; executing the program, policies, projects and/or measures, not just planning or designing the programs, policies, projects and/or measures. The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, including actual GHG emissions reduced, not just the expected outputs and outcomes of the proposed measures. Clean Air Act (CAA) section 137 also requires that CPRG Implementation grant recipients address the degree to which a grant reduces GHG emissions in total and with respect to low-income and disadvantaged communities, where "greenhouse gas" refers to the air pollutants carbon dioxide ($CO_2$), hydrofluorocarbons (HFCs), methane ($CH_4$), nitrous oxide ($N_2O$), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

To the best of their ability, the recipient agrees to:

- implement GHG emission reduction programs, policies, measures, and projects that are expected to reduce GHG emissions (or enhance GHG removals) by the estimated cumulative total GHG emission reductions from the final approved workplan;
- only report emission reductions occurring as a result of CPRG funding; and
- only report emission reduction data in units of million metric tons of carbon dioxide equivalent (MMTCO2e) where appropriate, calculated using the global warming potentials (GWP) in the International Panel on Climate Change's (IPCC) Fifth Assessment Report.

Refer to the Notice of Funding Opportunity, EPA-R-OAR-CPRGI-23-07 (https://www.epa.gov/system/files/documents/2023-09/CPRG General Competition NOFO.pdf), Appendix B, Global Warming Potentials for GHGs, for details about how to apply GWP values for different gases.

For the measures included in the final, approved assistance agreement work plan, the recipient agrees to provide transparent GHG emission reduction estimates based on high-quality, thorough, reasonable, and comprehensive methodologies, assumptions, and calculations. Examples of tools that could be used to assist in these GHG quantifications can be found at: https://www.epa.gov/inflation-reduction-act/climate-pollution-reduction-grants

## B. Final Approved Work Plan and Modifications

The recipient agrees to implement the measures in the EPA-approved work plan that will achieve significant cumulative GHG reductions by 2030 and beyond.

Recipient agrees to carry out the project in accordance with the final approved workplan. Recipients are required to report deviations from budget or project scope or objective, and must request prior written approval from the EPA:

• For any change in the scope or objective of the project or program (even if there is no associated budget revision requiring prior written approval);

• For change in key personnel (including employees and contractors) that are identified by name or position in the Federal award;

• For the disengagement from a project for more than three months, or a 25% reduction in time and effort devoted to the Federal award over the course of the period of performance, by the approved project director or principal investigator;

• For the inclusion of costs that require prior approval in accordance with 2 CFR Part 200 Subpart E—Cost Principles or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable;

• For the transfer of funds budgeted for participant support costs as defined in 2 CFR Section 200.1 Definitions to other budget categories;

• For the subawarding, transferring or contracting out of any work under the award;

– Changes in the total approved cost-sharing amount

– When the need arises for additional Federal funds to complete the project.

Proposed modifications to the approved work plan or budget, including additions, deletions, or changes in the schedule, shall be submitted in a timely manner to the EPA Project Officer for approval. Depending on the type or scope of changes, a formal amendment to the award may be necessary. Major project modifications may include but are not limited to: changes to the approved environmental results, outputs or outcomes, types and number of affected devices or equipment, the approved types of emission reduction technologies to be implemented, specific programs or policies to be adopted, or changes to the approved project location(s). Any change that would significantly alter the cumulative GHG reductions achieved by 2030 and beyond and affect the achievement of community benefits, especially in low-income and disadvantaged communities, may not be allowed. The recipient shall not make changes to the proposed activities in the EPA-approved work plan without prior written approval from the EPA. The recipient shall contact the EPA Project Officer with the proposed changes; however, depending on the type of change, the Agency Award Official or Grant Management Officer may need to make the final determination. If issues regarding proposed measures arise that cannot be resolved, the EPA may elect to terminate the assistance agreement, and/or if applicable, recover ineligible expenditures from the recipient. Any significant changes to the approved work plan that would result in undermining the integrity of the award competition will not be approved.

For grants that are awarded to a recipient that is serving as the lead for a coalition under the CPRG program, the recipient agrees to abide by the terms set out in the Memorandum of Agreement (MOA), including the roles, responsibilities, and commitments that each partner will provide to ensure project success, the operating model for the coalition, and the resources that each partner will contribute to the project. As established in the CPRG coalition's MOA, the lead applicant is accountable to the EPA and accepts full responsibility for effectively carrying out the full scope of work and proper financial management of the grant. Coalition members who are grant subrecipients are accountable to the lead applicant for proposed use of EPA funding and successful project implementation. The recipient shall not make changes to the signed MOA without prior written approval from the EPA.

## C. Performance Reporting and Final Performance Report

### 1. Performance Reports - Content

The recipient agrees to inform the EPA as soon as it is aware of problems, delays, or adverse conditions that will materially impair the recipient's ability to meet the outputs/outcomes specified in the final, approved assistance agreement work plan. The recipient agrees to inform the EPA immediately rather than waiting until the next performance report is due.

The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, not just the expected outputs and outcomes of the proposed measures. The recipient agrees to report out on each performance measures that will be the mechanism to track, measure, and report progress toward achieving the expected outputs and outcomes for each GHG reduction measure. The recipient agrees to track and report separately on the work conducted and GHG emissions reductions for each measure (program, policy, measure, or project) specified in the final, approved assistance agreement work plan. Recipients also agree to track and report separately on the budgets for each measure.

In accordance with 2 CFR 200.329, the recipient agrees to submit semi-annual, one-year, and final performance progress reports that include brief information on each of the areas specified below. To ensure the EPA can effectively monitor progress towards the achievement

of measures, the recipient also agrees to report progress for each measure identified in the final, approved assistance agreement work plan as soon as work is completed and information is available.

**a. Semi-Annual:** The recipient agrees to submit semi-annual performance reports that include brief information on each of the following areas:

(1) a comparison of actual technical progress and milestones achieved during the reporting period to the outputs/outcomes and performance measures established in the final, approved assistance agreement work plan, which may include technical changes made to the project, public events conducted, websites published, release of public-facing documents or tools, or other reportable activities described in the work plan;

(2) a consolidated budget update with separate tracking for each measure (that is, how much was spent on equipment, supplies, contractors, subgrants, etc., during the reporting period and cumulatively) and, when appropriate, additional pertinent information such as analysis and explanation of cost overruns, high-unit costs, cost-share expenditures, program income, infrastructure costs subject to Buy America, Build America (BABA) compliance, or requested budget modifications (for example, when the recipient is requesting to move funding from one budget category to another);

(3) if necessary, a description of the reasons why any implementation timeline milestones or outputs/outcomes were missed for each measure established in the final, approved assistance agreement work plan, including the recipient's strategy to address challenges faced and/or the recipient's approach to ensure that the approved outputs/outcomes for each measure will be achieved within the period of performance;

(4) documentation of community engagement activities conducted in low-income and disadvantaged communities for each measure, which describes how the activities were publicized, categorizes respondents/attendees (e.g., the number of people from Tribal governments, federal government, state government, local government, nonprofits, for profits, universities, and the public), explains how input from participants was considered in decisions for implementing the measure, and details how meaningful engagement with low-income and disadvantaged communities will be continuously included in the development and implementation of the measure;

(5) as applicable, strategies for mitigating environmental risks;

(6) a description of any climate resiliency planning, siting, design, and operation of the project.

(7) as applicable, updates to individuals, including those from coalition members, who serve as key contacts and/or any changes to the roles and responsibilities of key contacts involved in each measure and the reason(s) for the change(s);

(8) as applicable, updates regarding which organizations have the authority to implement each measure and the reason(s) for the change(s);

(9) as applicable, updates regarding changes to contracts, subgrants, and participant support costs;

(10) as applicable, progress on generating high-quality jobs with a diverse, highly skilled workforce and support of strong labor standards; and

(11) summary of anticipated activities for the next 6-month reporting period.

**b. One-year report:** As part of the second semi-annual progress report (i.e. the more detailed one-year report), the recipient agrees to report the additional data to the EPA. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request. This includes co-pollutant emissions reductions of each pollutant impacted by each measure, the sector impacted, and the county in which the emissions change. In addition, the recipient agrees to report the Climate and Economic Justice Screening Tool (CEJST) Census tract IDs or the EPA's EJScreen Census block group IDs for areas affected by GHG reduction measures, consistent with the EPA's definition of low-income and disadvantaged communities for the CPRG program.

**c. Final Report:** The recipient also agrees to submit a detailed final report and to report certain data associated with the final report to the EPA. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request.

**d. Subaward Performance Reporting**

Subawards establish a financial assistance relationship under which the subrecipient's employees and contractors implement programs and

projects to accomplish the goals and objectives of the grant. Subrecipients (which includes Coalition members) are subject to the same federal requirements as the pass-through entity. (For more details, see General Terms and Conditions 8. Establishing and Managing Subawards, applicable provisions of 2 CFR Part 200, the EPA's Subaward Policy). The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

(1) Summaries of results of reviews of financial and programmatic reports.

(2) Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

(3) Environmental results the subrecipient achieved.

(4) Summaries of audit findings and related pass-through entity management decisions.

(5) Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

As with any EPA grant with a grant recipient subawarding to subrecipients, the grant recipient is accountable to the EPA and accepts responsibility for carrying out the full scope of work and proper financial management of the grant. In the event that a coalition member withdraws, the grant recipient continues to be subject to the EPA's terms and conditions for the grant, the subaward policy, and EPA grants policy. In circumstances where the EPA deems that the withdrawal of a coalition member fundamentally alters the project or jeopardizes the project's success, the EPA will consider appropriate remedies and reserves the right to terminate an awarded grant (see 2 CFR 200.339 through 343)

## 2. Performance Reports - Frequency

The recipient agrees to submit **semi-annual** performance reports electronically to the EPA Project Officer within 30 days after the six-month reporting period ends. Semi-annual reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This semi-annual reporting schedule shall be repeated for the duration of the award agreement.

October 1 – March 31 Reporting Period: report due April 30

April 1 – September 30 Reporting Period: report due October 30

As part of the second semi-annual performance report that is submitted one year after the grant award, the recipient agrees to submit the **one-year** performance report that includes the additional details specified above in section C.1.b.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.

## D. Allowable and Unallowable Activities

The recipient agrees to only use this CPRG Implementation grant award funding to implement measures in the EPA approved workplan for this CPRG Implementation grant and follow the grant Terms and Conditions.

All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for financial assistance as well as other activities that involve acquiring real property, including related equipment purchases, if not already in the EPA approved work plan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that are not in the EPA approved work plan; (b) activities that support measures, activities or projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use this CPRG award to replace existing program federal funding, but the recipient may use CPRG funds to supplement or expand existing programs. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

5E - 03D25824 - 0    Page 11

The recipient agrees to not use the award to aid regulated entities to comply with EPA regulatory requirements.

**E. Davis-Bacon Related Act Term and Condition**

**1. Program Applicability**

a. Climate Pollution Reduction Implementation Grants.

b. Section 314 of the Clean Air Act.

c. Construction activities conducted under a Climate Pollution Reduction Implementation Grant.

d. The recipient must work with the appropriate authorities to determine wage classifications for the specific project(s) or activities subject to Davis Bacon under this grant.

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) (https://www.dol.gov/agencies/whd/government-contracts/construction) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

a. Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

b. Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

c. Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts**

a. Solicitation and Contract Requirements:

(1) Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

(2) Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

"By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants (https://www.epa.gov/grants/contract-provisions-davis-bacon-and-related-acts)."

b. After Award of Contract:

(1) Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

(2) Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards**

a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant:

"By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients (https://www.epa.gov/grants/contract-provisions-davis-bacon-and-related-acts)."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must

5E - 03D25824 - 0    Page 12

ensure subrecipients comply with the requirements in 29 CFR 5.6.

**5. Consideration as Part of Every Prime Contract Covered by DBRA**

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F.Cybersecurity Condition**

**1. State Grant Cybersecurity**

a. The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

b. (1) The EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or the EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by the EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or the EPA's Central Data Exchange. The recipient willbe in compliance withthis condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and the EPA.

**G. Climate Resilience:**

To the extent practicable, the recipient agrees to incorporate current and future climate change risk in planning, siting, design, and operation of the project. Approaches for incorporating climate change risk may make use of climate change data and information (e.g., projections and emission scenarios) that are reflective of the project's anticipated lifespan. This includes consideration of the climate change risks posed to the individuals, communities, local governments, organizations, or other entities served by the project over its anticipated lifespan.

**H. Subawards**

Refer to the General Terms and Condition, 8. "Establishing and Managing Subawards" and EPA Subaward Policy webpage (https://www.epa.gov/grants/grants-policy-issuance-gpi-16-01-epa-subaward-policy-epa-assistance-agreement-recipients) for access to additional information, including a subaward agreement template found in Appendix D.

The recipient must include the Build America, Buy America terms in any subawards, request for proposals, or solicitations for bids, and in all contracts.

**I. Subawards for For-profit Entities**

In addition to the EPA General Term and Condition "Establishing and Managing Subawards", the recipient (i.e. "pass-through entity") agrees to require that for-profit subrecipients comply with Subparts A through F of the Uniform Grant Guidance (2 CFR Part 200) and the Federal cost principles applicable to for-profit entities located at 48 CFR Part 31, with the exception of the method of payment to for-profit subrecipients must be "reimbursement" rather than "advance". Pass-through entities must obtain documentation that the for-profit

subrecipient has incurred eligible and allowable costs prior to releasing EPA funds to the subrecipient.

### J. Equipment and Devices

### 1. Procurement of Systems, Equipment and Devices

When purchasing replacement systems, equipment and/or devices, the recipient agrees the replacement systems, equipment or device:

a. will continue to perform a similar function and operation as the system, equipment or device that is being permanently rendered inoperable;

b. will achieve the estimated emission reductions included in the EPA-approved work plan; and

c. is consistent in its intended use, operation and location as described in the EPA-approved work plan.

The procurement of systems, equipment or devices should follow the EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements (https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance).

### 2. Operation and Maintenance

The recipient will assure the continued proper operation and maintenance of systems, equipment and devices funded under this agreement. Such practices shall be operated and maintained for the expected lifespan of the specific measure and in accordance with commonly accepted design standards and specifications. The recipient shall include a provision in every applicable sub-agreement (subaward or contract) awarded under this grant requiring that the management practices for the project be properly operated and maintained. Likewise, the sub-agreement will assure that similar provisions are included in any sub-agreements that are awarded by the sub-recipient.

### 3. Equipment Use and Management

Equipment is defined as tangible personal property having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes (see Capital assets at 2 CFR 200.1 Definitions), or the amount specified in Equipment at 2 CFR 200.1. Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests in the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

These conditions must be met by the grant recipient for equipment use and management during the grant period:

a. Use the equipment for the authorized purposes of the project during the period of performance or until the property is no longer needed for the purposes of the project. If equipment and/or equipment components are to be sold during the period of performance, the recipient must comply with the program income requirements (see the Program Income section below).

b. Not encumber the property without approval of the Federal awarding agency or pass-through entity.

c. Use and dispose of the property as described below. Equipment use and management instructions are applicable to assistance agreement recipients and subrecipients acquiring equipment under this award. Per 2 CFR 200.313(b), state agencies may use and manage equipment acquired through a Federal award by the state in accordance with state laws and procedures. Per 2 CFR 200.313(b), Indian Tribes must use, manage, and dispose of equipment acquired under a Federal award in accordance with tribal laws and procedures.

Recipient agrees that at the end of the project period the recipient will continue to use the equipment purchased under this assistance agreement in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by the Federal award. After the end of the grant period, equipment purchased under this award that is no longer needed, may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency.

Consistent with 2 CFR 200.313, unless instructed otherwise, a grant recipient may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds. When acquiring replacement equipment, the non-Federal entity may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

Subrecipients are subject to the same federal requirements as the grant recipient (also known as the "pass-through entity") and they must comply with applicable subaward provisions of 2 CFR Part 200, the EPA Subaward Policy, and the EPA's General Term and Condition for

Subawards.

Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests with the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

## K. Equipment Disposition for Recipients

State agencies may dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures.

## L. Quality Assurance Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the] Quality Assurance (QA) planning document[s] in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

## 2. Quality Assurance Project Plan (QAPP) a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QAPP 90 days after grant award, and/or no more than  180
c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur e. The recipient must submit a QAPP crosswalk  with the QAPP. **For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: Guidance for Quality Assurance Project Plans.

•EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## M. Retention / Required Documentation

In accordance with 2 CFR 200.334, the recipient must retain all Federal award records, including but not limited to, financial records, supporting documents, and statistical records for at least three years from the date of submission of the final financial report. The records must be retained until all litigation, claims, or audit findings have been resolved and final action has been taken if any litigation, claim, or audit is started before the expiration of the three-year period. Examples of the required records include: (1) time and attendance records and supporting documentation; and (2) documentation of compliance with statutes and regulations that apply to the project.

In accordance with 2 CFR 200.337, the EPA, the Inspector General, the Comptroller General, and the pass-through entity, or any of their authorized representatives, have the right of access to any documents, papers or records of the recipient which are pertinent to the grant award. The rights of access are not limited to the required retention period, but last as long as the records are retained.

## N. Program Audit

The EPA will conduct random reviews of recipients to protect against waste, fraud, and abuse. As part of this process, the EPA, or its authorized representatives may request documentation from current recipients to verify statements made on the application and reporting documents. Recipients may be selected for advanced monitoring, including a potential site visit to confirm project details. The EPA, or its authorized representatives, may also conduct site visits to confirm documentation is on hand and that the project is completed as agreed upon, as well as confirm applicable infrastructure adheres to Build America, Buy America (BABA) requirements. Recipients are expected to comply with site visit requests and recordkeeping requirements and must supply the EPA with any requested documents for three years from the date of submission of the final expenditure report, or risk cancellation of an active grant application or other enforcement action.

## O. Use of Submitted Information

Applications and reporting materials submitted under this competition may be released in part or in whole in response to a Freedom of Information Act (FOIA) request. The EPA recommends that applications and reporting materials not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information that, if disclosed, would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR 2.203. (Review EPA clause IV.a, Confidential Business Information, under EPA Solicitation Clauses (https://www.epa.gov/grants/epa-solicitation-clauses)).

The EPA may make publicly available on the EPA's website or another public website copies or portions of CPRG grant project information.

The EPA reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use, for federal purposes, submitted project photos, including use in program materials.

## P. Program Income

In accordance with 2 CFR Part 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

The program income shall be used in the following way:

1. Added to funds committed to the project by the EPA and used for the purposes and under the conditions of the assistance agreement.

The recipient must provide a description of how program income is being used in each of its performance reports. Further, a report on the amount of program income earned during the award period must be submitted with the Federal Financial Report, Standard Form 425.

Participant support costs include rebates, subsidies, stipends, or other payments to program beneficiaries. Participant support costs are not subawards as defined by 2 CFR §200.1 and should not be treated as such. Program beneficiaries may be individual owner/operators or private or public fleet owners, however program beneficiaries cannot be employees, contractors or subrecipients of the grant recipient. The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs:

1. Participant support costs must be reasonable, incurred within the project period and otherwise allocable to the EPA assistance agreement. Participant support costs for rebates must be supported by guidelines issued by the recipient and approved by the EPA's Award Official or Grants Management Officer, defining the rules, restrictions, timelines, programmatic requirements, reporting and transaction documentation requirements, eligibility, and funding levels that rebate beneficiaries must follow.

2. Recipient must abide by EPA Participant Support Cost regulation(s) and guidelines including but not limited to "Interim EPA Guidance on Participant Support Costs" (https://www.epa.gov/grants/rain-2018-g05-r1). "The EPA Guidance on Participant Support Costs" specifies requirements for rebate program approval by Authorized EPA Officials.

3. Recipient must enter into a written agreement with the program beneficiary that receives participant support costs. Such agreement should not be structured as a subaward agreement, and the administrative grant regulations under 2 CFR Part 200 and 2 CFR Part 1500, as well as the EPA's general terms and conditions do not flow down to program beneficiaries receiving participant support costs. Such written agreement is also required if a subrecipient or contractor intends to issue participant support costs to a program beneficiary. The written agreement must:

a. describe the activities that will be supported by rebates, stipends, subsidies or other payments;

b. specify the amount of the rebate, subsidy, stipend, or other payment;

c. identify which party will have title to equipment (if any) purchased with a rebate or subsidy or other payment;

d. specify any reporting required by the program beneficiary and the length of time for such reporting;

e. establish source documentation requirements (e.g., invoices) for accounting records; and

f. describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

4. Recipient must obtain prior written approval from the EPA's Award Official if recipient wants to transfer funds budgeted for participant support costs to other budget categories. If the recipient's request would result in undermining the integrity of the competition this grant or cooperative agreement was awarded under, the EPA will not approve the request.

Rebates, subsidies, and similar one-time, lump-sum payments to program beneficiaries for the purchase of eligible emissions control technologies and vehicle replacements are eligible participant support costs under this award when the program participant rather than the recipient owns the equipment, per 2 CFR 1500.1(a)(1). Engine replacements, marine and locomotive shorepower projects, and most electrified parking space technology projects are not eligible as participant support costs. Rebates can only fund a participating fleet owner's equipment purchase and installation costs (i.e. parts and labor, including costs incurred to scrap the existing vehicle); if a participating fleet owner requires funding for project administration, travel, extensive design/engineering, construction, etc., in order to carry out the project a subaward is the more appropriate option. Questions regarding the use of rebates under this award should be directed to the EPA Project Officer. Rebates are not considered subawards/subgrants as defined in 2 CFR Part 200 and should not be treated as such under this award.

## R. REAL PROPERTY

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### 1. Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from the EPA. The instructions will provide for one of the following alternatives:

a. Retain title after compensating the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA's contribution towards the original purchase (and costs of any improvements) by the current fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

b. Sell the property and compensate the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA's contribution towards the original purchase (and cost of any improvements) by the proceeds of the sale after deducting any actual and reasonable expenses paid to sell or fix up the property for sale. When the Federal award has not been closed out, the net proceeds from the sale may be offset against the original cost of the property. When directed to sell the property, the recipient must sell the property utilizing procedures that provide for competition to the extent practicable and that result in the highest possible return.

c. Transfer title to the EPA or a third party designated/approved by the EPA. The recipient is entitled to be paid an amount calculated by multiplying the percentage of the recipient's contribution towards the original purchase of the real property (and cost of any improvements) by the current fair market value of the property.

### 2. Recordation

As authorized by 2 CFR 200.316, the EPA requires that recipients who use EPA funding to purchase real property or to improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located which indicates that the real property has been acquired or improved with federal funding and that use and disposition conditions apply to the real property.

## S. SIGNAGE REQUIREMENTS

5E - 03D25824 - 0      Page 17

## 1. Investing in America Emblem

The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act" as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period.

The recipient will ensure compliance with the guidelines and design specifications provided by the EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage

## 2. Procuring Signs

Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or the EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## T. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it mustnotbe prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that theNorth Carolina Department of Natural and Cultural Resources (NCDNCR) received financial support from the EPA under an Assistance Agreement. More information is available at:https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

## U. Public or Media Events

The EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

## V. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1or2 CFR 200.456and scholarships and other forms of student aid such as tuition remission under2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered coveredNonprocurementtransactions for the purposes of2 CFR 180.300and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in FederalNonprocurementprograms under2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs: https://www.epa.gov/sites/default/files/2020-11/documents/epa-guidance-on-participant-support-costs.pdf.

## W. Conditional Award

The EPA has conditionally approved the work plan to allow the recipient to proceed to work on approved work plan components. The recipient may incur costs on eligible activities associated with the approved work plan components up to$168,495,230 until a final revised work plan has been approved by the EPA:

1. The recipient should not request payments and the EPA will not make payments for unapproved work; and

2. Any costs incurred for unapproved work by the recipient are at its own risk.

## X. Workplan Negotiations

The recipient will submit a revised workplan for EPA project officer review and approval. The Recipient agrees to continue workplan negotiations with the EPA project officer until the workplan is fully approved within 90 days after the date of award.

## Y. Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02,Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available athttps://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdfor a copy may also be requested by contacting the EPA Project Officer for this award.

## Z. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found athttps://www.fgdc.gov/.

## AA. Health and Safety Plan

Before beginning field work, the recipient must have a health and safety plan in place providing for the protection of on-site personnel and area residents, unless specifically waived by the award official. This plan need not be submitted to the EPA but must be made available to the EPA upon request. The recipient's health and safety plan must comply with Occupational Safety and Health Administration (OSHA) 29 CFR 1910.120, entitled "Hazardous Waste Operations and Emergency Response."

## AB. Foreign Entity of Concern

The recipient agrees to not directly transfer EPA funds through a subaward, contract, or participant support costs to a foreign entity of concern (FEOC). The EPA considers FEOCs to include foreign entities that are owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation as defined by Congress in Section 40207 of the Infrastructure Investment and Jobs Act. The EPA uses the proposed interpretive rule from the U.S. Department of Energy (DOE) to provide additional guidance in determining FEOCs. See 88 Fed. Reg. 84,082 (Dec. 4, 2023). If DOE finalizes an interpretive rule that differs in material respects from the proposal, the EPA may amend the award agreement accordingly.

Additionally, the recipient agrees to develop and implement internal controls that ensure EPA funds are not directly transferred to FEOCs, including through subawards, contractors, and participant support costs.

## AC. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### AD. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation and in the General Term and Condition "Reporting Subawards and Executive Compensation."

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management programmfor the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

5E - 03D25824 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY — Assistance Amendment | | |
|---|---|---|
| **GRANT NUMBER (FAIN):** 03D25824 **MODIFICATION NUMBER:** 1 **PROGRAM CODE:** 5E | **DATE OF AWARD** 11/19/2024 | |
| **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 11/19/2024 | |
| **PAYMENT METHOD:** ASAP | **ACH#** | |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| North Carolina Department of Natural and Cultural Resources NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF 4601 MAIL SERVICE CENTER RALEIGH, NC 27699 EIN: 56-6062189 | North Carolina Department of Natural and Cultural Resources NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF 4601 MAIL SERVICE CENTER RALEIGH, NC 27699 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Emma Hughes 109 East Jones Street Raleigh, NC 27601 **Email:** emma.hughes@dncr.nc.gov **Phone:** 859-640-7863 | Erin Frew 61 Forsyth St SW Atlanta, GA 30303-8960 **Email:** Frew.Erin@epa.gov **Phone:** 404-562-9370 | Jasmine Williams Grants Management Section 61 Forsyth St SW Atlanta, GA 30303-8960 **Email:** williams.jasmine@epa.gov **Phone:** 404-562-9334 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Climate Pollution Reduction Grants

This action approves an update to the Programmatic Terms and Conditions for the North Carolina Department of Natural and Cultural Resources. The recipient will continue to implement the greenhouse gas (GHG) reduction programs, policies, projects, and measures identified in a Priority Climate Action Plan (PCAP) developed under a Climate Pollution Reduction Grants (CPRG) planning grant.

| **BUDGET PERIOD** 10/01/2024 - 09/30/2029 | **PROJECT PERIOD** 10/01/2024 - 09/30/2029 | **TOTAL BUDGET PERIOD COST** $ 421,238,074.00 | **TOTAL PROJECT PERIOD COST** $ 421,238,074.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 03/28/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 421,238,074.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 4 61 Forsyth Street Atlanta, GA 30303-8960 | U.S. EPA, Region 4, Air and Radiation Division R4 - Region 4 61 Forsyth St SW Atlanta, GA 30303-8960 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Jasmine Williams - Grants Specialist | **DATE** 11/19/2024 |

5E - 03D25824 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 421,238,074 | $ 0 | $ 421,238,074 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 421,238,074 | $ 0 | $ 421,238,074 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5E - 03D25824 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 10,178,563 |
| 2. Fringe Benefits | $ 4,125,448 |
| 3. Travel | $ 205,250 |
| 4. Equipment | $ 95,000 |
| 5. Supplies | $ 299,250 |
| 6. Contractual | $ 1,900,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 399,434,563 |
| 9. Total Direct Charges | $ 416,238,074 |
| 10. Indirect Costs: 10.00 % Base DE MINIMUS | $ 5,000,000 |
| 11. Total (Share: Recipient ___0.00_ % Federal __100.00_ %) | $ 421,238,074 |
| 12. Total Approved Assistance Amount | $ 421,238,074 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 421,238,074 |

5E - 03D25824 - 1    Page 4

# Administrative Conditions

All of the Administrative terms and conditions remain the same.

# Programmatic Conditions

**The following Programmic Terms and Conditions have been updated:**

### A. Deliverables

The first phase of the Climate Pollution Reduction Grants (CPRG) program provided funding for designing Priority Climate Action Plans (PCAPs) that incorporate a variety of measures (i.e., programs, policies, measures, and projects) that reduce greenhouse gas (GHG) emissions. The purpose of this CPRG Implementation assistance agreement is to implement proposed measures within a specified PCAP identified in the CPRG Implementation Grant General Competition application. All programs, policies, measures, and projects contained in the final, approved CPRG implementation assistance agreement workplan are required deliverables.

The recipient agrees to implement GHG reduction programs, policies, projects, and measures (collectively referred to as "GHG reduction measures," or "measures") identified in a PCAP developed under a CPRG planning grant and included in the CPRG implementation grant workplan. The recipient agrees to ensure that each is successfully implemented before the end of the grant project period. The recipient agrees to successful project implementation, which includes the process of putting a decision or plan into effect; executing the program, policies, projects and/or measures, not just planning or designing the programs, policies, projects and/or measures. The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, including actual GHG emissions reduced, not just the expected outputs and outcomes of the proposed measures. Clean Air Act (CAA) section 137 also requires that CPRG Implementation grant recipients address the degree to which a grant reduces GHG emissions in total and with respect to low-income and disadvantaged communities, where "greenhouse gas" refers to the air pollutants carbon dioxide ($CO_2$), hydrofluorocarbons (HFCs), methane ($CH_4$), nitrous oxide ($N_2O$), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

To the best of their ability, the recipient agrees to:

- implement GHG emission reduction programs, policies, measures, and projects that are expected to reduce GHG emissions (or enhance GHG removals) by the estimated cumulative total GHG emission reductions from the final approved workplan;

- only report emission reductions occurring as a result of CPRG funding; and

- only report emission reduction data in units of million metric tons of carbon dioxide equivalent (MMTCO2e) where appropriate, calculated using the global warming potentials (GWP) in the International Panel on Climate Change&apos;s (IPCC) Fifth Assessment Report.

Refer to the Notice of Funding Opportunity, EPA-R-OAR-CPRGI-23-07 (https://www.epa.gov/system/files/documents/2023-09/CPRG General Competition NOFO.pdf), Appendix B, Global Warming Potentials for GHGs, for details about how to apply GWP values for different gases.

For the measures included in the final, approved assistance agreement work plan, the recipient agrees to provide transparent GHG emission reduction estimates based on high-quality, thorough, reasonable, and comprehensive methodologies, assumptions, and calculations. Examples of tools that could be used to assist in these GHG quantifications can be found at: https://www.epa.gov/inflation-reduction-act/climate-pollution-reduction-grants.

### B. Final Approved Work Plan and Modifications

The recipient agrees to implement the measures in the EPA-approved work plan that will achieve significant cumulative GHG reductions by 2030 and beyond.

Recipient agrees to carry out the project in accordance with the final approved workplan. Recipients are required to report deviations from budget or project scope or objective, and must request prior written approval from the EPA:

- For any change in the scope or objective of the project or program (even if there is no associated budget revision requiring prior written approval);

- For change in key personnel (including employees and contractors) that are identified by name or position in the Federal award;

- For the disengagement from a project for more than three months, or a 25% reduction in time and effort devoted to the Federal award over the course of the period of performance, by the approved project director or principal investigator;

- For the inclusion of costs that require prior approval in accordance with 2 CFR Part 200 Subpart E—Cost Principles or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable;

- For the transfer of funds budgeted for participant support costs as defined in 2 CFR Section 200.1 Definitions to other budget categories;

- For the subawarding, transferring or contracting out of any work under the award;

  - Changes in the total approved cost-sharing amount

  - When the need arises for additional Federal funds to complete the project.

Proposed modifications to the approved work plan or budget, including additions, deletions, or changes in the schedule, shall be submitted in a timely manner to the EPA Project Officer for approval. Depending on the type or scope of changes, a formal amendment to the award may be necessary. Major project modifications may include but are not limited to: changes to the approved environmental results, outputs or outcomes, types and number of affected devices or equipment, the approved types of emission reduction technologies to be implemented, specific programs or policies to be adopted, or changes to the approved project location(s). Any change that would significantly alter the cumulative GHG reductions achieved by 2030 and beyond and affect the achievement of community benefits, especially in low-income and disadvantaged communities, may not be allowed. The recipient shall not make changes to the proposed activities in the EPA-approved work plan without prior written approval from the EPA. The recipient shall contact the EPA Project Officer with the proposed changes; however, depending on the type of change, the Agency Award Official or Grant Management Officer may need to make the final determination. If issues regarding proposed measures arise that cannot be resolved, the EPA may elect to terminate the assistance agreement, and/or if applicable, recover ineligible expenditures from the recipient. Any significant changes to the approved work plan that would result in undermining the integrity of the award competition will not be approved.

For grants that are awarded to a recipient that is serving as the lead for a coalition under the CPRG program, the recipient agrees to abide by the terms set out in the Memorandum of Agreement (MOA), including the roles, responsibilities, and commitments that each partner will provide to ensure project success, the operating model for the coalition, and the resources that each partner will contribute to the project. As established in the CPRG coalition&apos;s MOA, the lead applicant is accountable to the EPA and accepts full responsibility for effectively carrying out the full scope of work and proper financial management of the grant. Coalition members who are grant subrecipients are accountable to the lead applicant for proposed use of EPA funding and successful project implementation. The recipient shall not make changes to the signed MOA without prior written approval from the EPA.

## C. Performance Reporting and Final Performance Report

### 1. Performance Reports - Content

The recipient agrees to inform the EPA as soon as it is aware of problems, delays, or adverse conditions that will materially impair the recipient&apos;s ability to meet the outputs/outcomes specified in the final, approved assistance agreement work plan. The recipient agrees to inform the EPA immediately rather than waiting until the next performance report is due.

The recipient agrees to adequately describe the actual environmental outputs and outcomes achieved, not just the expected outputs and outcomes of the proposed measures. The recipient agrees to report out on each performance measures that will be the mechanism to track, measure, and report progress toward achieving the expected outputs and outcomes for each GHG reduction measure. The recipient agrees to track and report separately on the work conducted and GHG emissions reductions for each measure (program, policy, measure, or project) specified in the final, approved assistance agreement work plan. Recipients also agree to track and report separately on the budgets for each measure.

In accordance with 2 CFR 200.329, the recipient agrees to submit semi-annual, one-year, and final performance progress reports that include brief information on each of the areas specified below. To ensure the EPA can effectively monitor progress towards the achievement of measures, the recipient also agrees to report progress for each measure identified in the final, approved assistance agreement work plan as soon as work is completed and information is available.

**a. Semi-Annual:** The recipient agrees to submit semi-annual performance reports that include brief information on each of the following areas:

(1) a comparison of actual technical progress and milestones achieved during the reporting period to the outputs/outcomes and performance measures established in the final, approved assistance agreement work plan, which may include technical changes made to the project, public events conducted, websites published, release of public-facing documents or tools, or other reportable activities described in the work plan;

(2) a consolidated budget update with separate tracking for each measure (that is, how much was spent on equipment, supplies, contractors, subgrants, etc., during the reporting period and cumulatively) and, when appropriate, additional pertinent information such as analysis and explanation of cost overruns, high-unit costs, cost-share expenditures, program income, infrastructure costs subject to Buy America, Build America (BABA) compliance, or requested budget modifications (for example, when the recipient is requesting to move funding from one budget category to another);

(3) if necessary, a description of the reasons why any implementation timeline milestones or outputs/outcomes were missed for each measure established in the final, approved assistance agreement work plan, including the recipient&apos;s strategy to address challenges faced and/or the recipient&apos;s approach to ensure that the approved outputs/outcomes for each measure will be achieved within the period of performance;

(4) documentation of community engagement activities conducted in low-income and disadvantaged communities for each measure, which describes how the activities were publicized, categorizes respondents/attendees (e.g., the number of people from Tribal governments, federal government, state government, local government, nonprofits, for profits, universities, and the public), explains how input from participants was considered in decisions for implementing the measure, and details how meaningful engagement with low-income and disadvantaged communities will be continuously included in the development and implementation of the measure;

(5) as applicable, strategies for mitigating environmental risks;

(6) a description of any climate resiliency planning, siting, design, and operation of the project.

(7) as applicable, updates to individuals, including those from coalition members, who serve as key contacts and/or any changes to the roles and responsibilities of key contacts involved in each measure and the reason(s) for the change(s);

(8) as applicable, updates regarding which organizations have the authority to implement each measure and the reason(s) for the change(s);

(9) as applicable, updates regarding changes to contracts, subgrants, and participant support costs;

(10) as applicable, progress on generating high-quality jobs with a diverse, highly skilled workforce and support of strong labor standards; and

(11) summary of anticipated activities for the next 6-month reporting period.

**b. One-year report:** As part of the second semi-annual progress report (i.e. the more detailed one-year report), the recipient agrees to report the additional data to the EPA. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request. This includes co-pollutant emissions reductions of each pollutant impacted by each measure, the sector impacted, and the county in which the emissions change. In addition, the recipient agrees to report the Climate and Economic Justice Screening Tool (CEJST) Census tract IDs or the EPA's EJScreen Census block group IDs for areas affected by GHG reduction measures, consistent with the EPA's definition of low-income and disadvantaged communities for the CPRG program.

**c. Final Report:** The recipient also agrees to submit a detailed final report and to report certain data associated with the final report to the EPA. The reporting template will be made available to grant recipients through an electronic data interface to be specified by EPA upon approval of the Information Collection Request.

**d. Subaward Performance Reporting**

Subawards establish a financial assistance relationship under which the subrecipient&apos;s employees and contractors implement programs and projects to accomplish the goals and objectives of the grant. Subrecipients (which includes Coalition members) are subject to the same federal requirements as the pass-through entity. (For more details, see

General Terms and Conditions 8. Establishing and Managing Subawards, applicable provisions of 2 CFR Part 200, the EPA&apos;s Subaward Policy). The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

(1) Summaries of results of reviews of financial and programmatic reports.

(2) Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

(3) Environmental results the subrecipient achieved.

(4) Summaries of audit findings and related pass-through entity management decisions.

(5) Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

As with any EPA grant with a grant recipient subawarding to subrecipients, the grant recipient is accountable to the EPA and accepts respongbility for carrying out the full scope of work and proper financial management of the grant. In the event that a coalition member withdraws, the grant recipient continues to be subject to the EPA's terms and conditions for the grant, the subaward policy, and EPA grants policy. In circumstances where the EPA deems that the withdrawal of a coalition member fundamentally alters the project or jeopardizes the project's success, the EPA will consider appropriate remedies and reserves the right to terminate an awarded grant (see 2 CFR 200.339 throughgn 343)

## 2. Performance Reports - Frequency

The recipient agrees to submit **semi-annual** performance reports electronically to the EPA Project Officer within 30 days after the six-month reporting period ends. Semi-annual reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This semi-annual reporting schedule shall be repeated for the duration of the award agreement.

October 1 – March 31 Reporting Period: report due April 30

April 1 – September 30 Reporting Period: report due October 30

As part of the second semi-annual performance report that is submitted one year after the grant award, the recipient agrees to submit the **one-year** performance report that includes the additional details specified above in section C.1.b.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.

## D. Allowable and Unallowable Activities

The recipient agrees to only use this CPRG Implementation grant award funding to implement measures in the EPA approved workplan for this CPRG Implementation grant and follow the grant Terms and Conditions.

All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for financial assistance as well as other activities that involve acquiring real property, including related equipment purchases, if not already in the EPA approved work plan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that are not in the EPA approved work plan; (b) costs of acquiring "intangible property," as defined in 2 CFR 200.1; (c) activities that support measures, activities or projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use this CPRG award to replace existing program federal funding, but the recipient may use CPRG funds to supplement or expand existing programs. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient&apos;s compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

The recipient agrees to not use the award to aid regulated entities to comply with EPA regulatory requirements.

**E. Davis-Bacon Related Act Term and Condition**

**1. Program Applicability**

a. Climate Pollution Reduction Implementation Grants.

b. Section 314 of the Clean Air Act.

c. Construction activities conducted under a Climate Pollution Reduction Implementation Grant.

d. The recipient must work with the appropriate authorities to determine wage classifications for the specific project(s) or activities subject to Davis Bacon under this grant.

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) (https://www.dol.gov/agencies/whd/government-contracts/construction) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

a. Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

b. Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

c. Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts**

a. Solicitation and Contract Requirements:

    (1) Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

    (2) Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

    "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants (https://www.epa.gov/grants/contract-provisions-davis-bacon-and-related-acts)."

b. After Award of Contract:

    (1) Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

    (2) Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards**

a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant:

> "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients (https://www.epa.gov/grants/contract-provisions-davis-bacon-and-related-acts)."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**5. Consideration as Part of Every Prime Contract Covered by DBRA**

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. Cybersecurity Condition**

**1. State Grant Cybersecurity**

a. The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

b. (1) The EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or the EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by the EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or the EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and the EPA.

**G. Climate Resilience:**

To the extent practicable, the recipient agrees to incorporate current and future climate change risk in planning, siting, design, and operation of the project. Approaches for incorporating climate change risk may make use of climate change data and information (e.g., projections and emission scenarios) that are reflective of the project&apos;s anticipated lifespan. This includes consideration of the climate change risks posed to the individuals, communities, local governments, organizations, or other entities served by the project over its anticipated lifespan.

### H. Subawards

Refer to the General Terms and Condition, 8. "Establishing and Managing Subawards" and EPA Subaward Policy webpage (https://www.epa.gov/grants/grants-policy-issuance-gpi-16-01-epa-subaward-policy-epa-assistance-agreement-recipients) for access to additional information, including a subaward agreement template found in Appendix D.

The recipient must include the Build America, Buy America terms in any subawards, request for proposals, or solicitations for bids, and in all contracts.

### I. Subawards for For-profit Entities

In addition to the EPA General Term and Condition "Establishing and Managing Subawards", the recipient (i.e. "pass-through entity") agrees to require that for-profit subrecipients comply with Subparts A through F of the Uniform Grant Guidance (2 CFR Part 200) and the Federal cost principles applicable to for-profit entities located at 48 CFR Part 31, with the exception of the method of payment to for-profit subrecipients must be "reimbursement" rather than "advance".  Pass-through entities must obtain documentation that the for-profit subrecipient has incurred eligible and allowable costs prior to releasing EPA funds to the subrecipient.

### J. Equipment and Devices

### 1. Procurement of Systems, Equipment and Devices

When purchasing replacement systems, equipment and/or devices, the recipient agrees the replacement systems, equipment or device:

a. will continue to perform a similar function and operation as the system, equipment or device that is being permanently rendered inoperable;

b. will achieve the estimated emission reductions included in the EPA-approved work plan; and

c. is consistent in its intended use, operation and location as described in the EPA-approved work plan.

The procurement of systems, equipment or devices should follow the EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements (https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance).

### 2. Operation and Maintenance

The recipient will assure the continued proper operation and maintenance of systems, equipment and devices funded under this agreement. Such practices shall be operated and maintained for the expected lifespan of the specific measure and in accordance with commonly accepted design standards and specifications. The recipient shall include a provision in every applicable sub-agreement (subaward or contract) awarded under this grant requiring that the management practices for the project be properly operated and maintained. Likewise, the sub-agreement will assure that similar provisions are included in any sub-agreements that are awarded by the sub-recipient.

### 3. Equipment Use and Management

Equipment is defined as tangible personal property having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes (see Capital assets at 2 CFR 200.1 Definitions), or the amount specified in Equipment at 2 CFR 200.1.

Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests in the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

These conditions must be met by the grant recipient for equipment use and management during the grant period:

a. Use the equipment for the authorized purposes of the project during the period of performance or until the property is no longer needed for the purposes of the project. If the equipment and/or equipment components are to be sold during the period of performance, the recipient must comply with the program income requirements (see the Program Income section below).

b. Not encumber the property without approval of the Federal awarding agency or pass-through entity.

c. Use and dispose of the property as described below. Equipment use and management instructions are applicable to assistance agreement recipients and subrecipients acquiring equipment under this award. Per 2 CFR 200.313(b), state agencies may use and manage equipment acquired through a Federal award by the state in accordance with state laws and procedures. Per 2 CFR 200.313(b), Indian Tribes must use, manage, and dispose of equipment acquired under a Federal award in accordance with tribal laws and procedures.

Recipient agrees that at the end of the project period the recipient will continue to use the equipment purchased under this assistance agreement in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by the Federal award. After the end of the grant period, equipment purchased under this award that is no longer needed, may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency.

Consistent with 2 CFR 200.313, unless instructed otherwise, a grant recipient may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds. When acquiring replacement equipment, the non-Federal entity may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

Subrecipients are subject to the same federal requirements as the grant recipient (also known as the “pass-through entity”) and they must comply with applicable subaward provisions of 2 CFR Part 200, the EPA Subaward Policy, and the EPA's General Term and Condition for Subawards.

Under 2 CFR 200.313, if the CPRG grant recipient purchases equipment with CPRG federally-awarded funds, title to the equipment vests with the grant recipient and there will be no ongoing requirements for the grant recipient for the purchased equipment after the end of the grant period.

**K. Equipment Disposition for Recipients**

State agencies may dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures.

**L. QUALITY ASSURANCE** Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA&apos;s Quality Management Plan (QMP) Standard. Submit the document for EPA review, and

iii. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP no more than 180 days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA&apos;s Quality Management Plan (QMP) Standard.

d. The recipient must submit a QMP crosswalk with the QMP.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop QAPP.

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the documents for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. For each type of project to be undertaken by the grantee over the course of this grant, the recipient must submit a project-specific QAPP 90 days after 10/17/2024.

c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur e. The recipient must submit a QAPP crosswalk  with the QAPP. **For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## M. Retention / Required Documentation

In accordance with 2 CFR 200.334, the recipient must retain all Federal award records, including but not limited to, financial records, supporting documents, and statistical records for at least three years from the date of submission of the final financial report. The records must be retained until all litigation, claims, or audit findings have been resolved and final action has been taken if any litigation, claim, or audit is started before the expiration of the three-year period. Examples of the required records include: (1) time and attendance records and supporting documentation; and (2) documentation of compliance with statutes and regulations that apply to the project.

In accordance with 2 CFR 200.337, the EPA, the Inspector General, the Comptroller General, and the pass-through entity, or any of their authorized representatives, have the right of access to any documents, papers or records of the recipient which are pertinent to the grant award. The rights of access are not limited to the required retention period, but last as long as the records are retained.

## N. Program Audit

The EPA will conduct random reviews of recipients to protect against waste, fraud, and abuse. As part of this process, the EPA, or its authorized representatives may request documentation from current recipients to verify statements made on the application and reporting documents. Recipients may be selected for advanced monitoring, including a potential site visit to confirm project details. The EPA, or its authorized representatives, may also conduct site visits to confirm documentation is on hand and that the project is completed as agreed upon, as well as confirm applicable infrastructure adheres to Build America, Buy America (BABA) requirements. Recipients are expected to comply with site visit requests and recordkeeping requirements and must supply the EPA with any requested documents for three years from the date of submission of the final expenditure report, or risk cancellation of an active grant application or other enforcement action.

## O. Use of Submitted Information

Applications and reporting materials submitted under this competition may be released in part or in whole in response to a Freedom of Information Act (FOIA) request. The EPA recommends that applications and reporting materials not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information that, if disclosed, would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR 2.203. (Review EPA clause IV.a, Confidential Business Information, under EPA Solicitation Clauses (https://www.epa.gov/grants/epa-solicitation-clauses)).

The EPA may make publicly available on the EPA&apos;s website or another public website copies or portions of CPRG grant project information.

The EPA reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use, for federal purposes, submitted project photos, including use in program materials.

## P. Program Income

In accordance with 2 CFR Part 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

The program income shall be used in the following way:

1. Added to funds committed to the project by the EPA and used for the purposes and under the conditions of the assistance agreement.

The recipient must provide a description of how program income is being used in each of its performance reports. Further, a report on the amount of program income earned during the award period must be submitted with the Federal Financial Report, Standard Form 425.

In accordance with 2 CFR 200.307(b) costs incidental to the generation of program income may be deducted from gross

income to determine program income, provided these costs have not been charged to the EPA award. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## Q. Participant Support Costs

Participant support costs include rebates, subsidies, stipends, or other payments to program beneficiaries. Participant support costs are not subawards as defined by 2 CFR §200.1 and should not be treated as such. Program beneficiaries may be individual owner/operators or private or public fleet owners, however program beneficiaries cannot be employees, contractors or subrecipients of the grant recipient. The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs:

1. Participant support costs must be reasonable, incurred within the project period and otherwise allocable to the EPA assistance agreement. Participant support costs for rebates must be supported by guidelines issued by the recipient and approved by the EPA&apos;s Award Official or Grants Management Officer, defining the rules, restrictions, timelines, programmatic requirements, reporting and transaction documentation requirements, eligibility, and funding levels that rebate beneficiaries must follow.

2. Recipient must abide by EPA Participant Support Cost regulation(s) and guidelines including but not limited to "Interim EPA Guidance on Participant Support Costs" (https://www.epa.gov/grants/rain-2018-g05-r1). "The EPA Guidance on Participant Support Costs" specifies requirements for rebate program approval by Authorized EPA Officials.

3. Recipient must enter into a written agreement with the program beneficiary that receives participant support costs. Such agreement should not be structured as a subaward agreement, and the administrative grant regulations under 2 CFR Part 200 and 2 CFR Part 1500, as well as the EPA&apos;s general terms and conditions do not flow down to program beneficiaries receiving participant support costs. Such written agreement is also required if a subrecipient or contractor intends to issue participant support costs to a program beneficiary. The written agreement must:

   a. describe the activities that will be supported by rebates, stipends, subsidies or other payments;

   b. specify the amount of the rebate, subsidy, stipend, or other payment;

   c. identify which party will have title to equipment (if any) purchased with a rebate or subsidy or other payment;

   d. specify any reporting required by the program beneficiary and the length of time for such reporting;

   e. establish source documentation requirements (e.g., invoices) for accounting records; and

   f. describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

4. Recipient must obtain prior written approval from the EPA&apos;s Award Official if recipient wants to transfer funds budgeted for participant support costs to other budget categories. If the recipient&apos;s request would result in undermining the integrity of the competition this grant or cooperative agreement was awarded under, the EPA will not approve the request.

Rebates, subsidies, and similar one-time, lump-sum payments to program beneficiaries for the purchase of eligible emissions control technologies and vehicle replacements are eligible participant support costs under this award when the program participant rather than the recipient owns the equipment, per 2 CFR 1500.1(a)(1). Engine replacements, marine and locomotive shorepower projects, and most electrified parking space technology projects are not eligible as participant support costs. Rebates can only fund a participating fleet owner&apos;s equipment purchase and installation costs (i.e. parts and labor, including costs incurred to scrap the existing vehicle); if a participating fleet owner requires funding for project administration, travel, extensive design/engineering, construction, etc., in order to carry out the project a subaward is the more appropriate option. Questions regarding the use of rebates under this award should be directed to the EPA Project Officer. Rebates are not considered subawards/subgrants as defined in 2 CFR Part 200 and should not be treated as such under this award.

## R. REAL PROPERTY

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### 1. Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from the EPA. The instructions will provide for one of the following alternatives:

a. Retain title after compensating the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA&apos;s contribution towards the original purchase (and costs of any improvements) by the current fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

b. Sell the property and compensate the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA&apos;s contribution towards the original purchase (and cost of any improvements) by the proceeds of the sale after deducting any actual and reasonable expenses paid to sell or fix up the property for sale. When the Federal award has not been closed out, the net proceeds from the sale may be offset against the original cost of the property. When directed to sell the property, the recipient must sell the property utilizing procedures that provide for competition to the extent practicable and that result in the highest possible return.

c. Transfer title to the EPA or a third party designated/approved by the EPA. The recipient is entitled to be paid an amount calculated by multiplying the percentage of the recipient&apos;s contribution towards the original purchase of the real property (and cost of any improvements) by the current fair market value of the property.

### 2. Recordation

As authorized by 2 CFR 200.316, the EPA requires that recipients who use EPA funding to purchase real property or to improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located which indicates that the real property has been acquired or improved with federal funding and that use and disposition conditions apply to the real property.

## S. SIGNAGE REQUIREMENTS

### 1. Investing in America Emblem

The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden&apos;s Inflation Reduction Act" as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period.

The recipient will ensure compliance with the guidelines and design specifications provided by the EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage

### 2. Procuring Signs

Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or the EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## T. USE OF LOGOS

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by

the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the North Carolina Department of Natural and Cultural Resources (NCDNCR) received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**U. Public or Media Events**

The EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days&apos; notice.

**V. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs: https://www.epa.gov/sites/default/files/2020-11/documents/epa-guidance-on-participant-support-costs.pdf.

**W. Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**X. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

**Y. Health and Safety Plan**

Before beginning field work, the recipient must have a health and safety plan in place providing for the protection of on-site personnel and area residents, unless specifically waived by the award official. This plan need not be submitted to the EPA but must be made available to the EPA upon request. The recipient&apos;s health and safety plan must comply with Occupational Safety and Health Administration (OSHA) 29 CFR 1910.120, entitled "Hazardous Waste Operations and Emergency Response."

**Z. EPASS Security**

In accordance with Homeland Security Presidential Directive-12 (HSPD-12), "Policy for a Common Identification Standard of Federal Employees and Contractors;" Executive Order 13467, &quot;Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information;&quot; and Executive Order 13488, &quot;Granting Reciprocity on Excepted Service and Federal Contractor Employee Fitness and Reinvestigating Individuals in Positions of Public Trust,&quot; the recipient agrees to follow instructions from the EPA project officer to ensure compliance with the EPA Personnel Access and Security System (EPASS).

Prior to beginning work at an EPA facility, the recipient, or its employees or program participants, must complete either:

1. A favorable fingerprint check for recipients (and their employees or program participants) who require six (6) months or less of unescorted physical access to EPA facilities; or

2. A favorable background investigation and fingerprint check for recipients (and their employees or program participants) who require more than six (6) months of unescorted physical access to EPA facilities.

Recipients, their employees, or program participants may not be permitted access to EPA facilities until meeting these requirements.

Recipients may initiate the appropriate check through the following link: https://cdx.epa.gov.

Failure of a recipient, their employees, or program participants to receive a favorable fingerprint or background check, whichever is applicable, shall result in the termination of the recipient, the employees, or program participants from continued enrollment in the program.

**AA. Foreign Entity of Concern**

The recipient agrees to not directly transfer EPA funds through a subaward, contract, or participant support costs to a foreign entity of concern (FEOC). The EPA considers FEOCs to include foreign entities that are owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation as defined by Congress in Section 40207 of the Infrastructure Investment and Jobs Act. The EPA uses the proposed interpretive rule from the U.S. Department of Energy (DOE) to provide additional guidance in determining FEOCs. See 88 Fed. Reg. 84,082 (Dec. 4, 2023). If DOE finalizes an interpretive rule that differs in material respects from the proposal, the EPA may amend the award agreement accordingly.

Additionally, the recipient agrees to develop and implement internal controls that ensure EPA funds are not directly transferred to FEOCs, including through subawards, contractors, and participant support costs.

**AB. Historic Preservation**

**National Historic Preservation Act (NHPA)**

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## AC. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation and in the General Term and Condition "Reporting Subawards and Executive Compensation."

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program

for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-

requirements.

**AD. Review and Oversight**

1. Products - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Quarterly Calls - The recipient shall consult with the EPA Project Officer on a quarterly basis in order to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. Conference call minutes/notes will be prepared after each call. It is at the EPA Project Officer&apos;s discretion to determine any change to the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer for approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

5E - 03D25824 - 2    Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Assistance Amendment** | **GRANT NUMBER (FAIN):** 03D25824 **MODIFICATION NUMBER:** 2 **PROGRAM CODE:** 5E | | **DATE OF AWARD** 01/16/2025 |
| | **TYPE OF ACTION** No Cost Amendment | | **MAILING DATE** 01/16/2025 |
| | **PAYMENT METHOD:** ASAP | | **ACH#** |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| North Carolina Department of Natural and Cultural Resources NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF 4601 MAIL SERVICE CENTER RALEIGH, NC 27699 EIN: 56-6062189 | North Carolina Department of Natural and Cultural Resources NORTH CAROLINA DEPARTMENT OF CULTURAL RESOURCES OFF 4601 MAIL SERVICE CENTER RALEIGH, NC 27699 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Deans Eatman 109 East Jones Street Raleigh, NC 27601 **Email:** deans.eatman@dncr.nc.gov **Phone:** 252-578-9892 | Erin Frew 61 Forsyth St SW Atlanta, GA 30303-8960 **Email:** Frew.Erin@epa.gov **Phone:** 404-562-9370 | Jasmine Williams Grants Management Section 61 Forsyth St SW Atlanta, GA 30303-8960 **Email:** williams.jasmine@epa.gov **Phone:** 404-562-9334 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Climate Pollution Reduction Grants

This action approves an update to programmatic terms and conditions in sections R, AA, and AE for the North Carolina Department of Natural and Cultural Resources.

| **BUDGET PERIOD** 10/01/2024 - 09/30/2029 | **PROJECT PERIOD** 10/01/2024 - 09/30/2029 | **TOTAL BUDGET PERIOD COST** $ 421,238,074.00 | **TOTAL PROJECT PERIOD COST** $ 421,238,074.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 03/28/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 421,238,074.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 4 61 Forsyth Street Atlanta, GA 30303-8960 | U.S. EPA, Region 4, Air and Radiation Division R4 - Region 4 61 Forsyth St SW Atlanta, GA 30303-8960 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Laura K Fowler - Sr. Grant Specialist | **DATE** 01/16/2025 |

5E - 03D25824 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 421,238,074 | $ 0 | $ 421,238,074 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 421,238,074 | $ 0 | $ 421,238,074 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5E - 03D25824 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 10,178,563 |
| 2. Fringe Benefits | $ 4,125,448 |
| 3. Travel | $ 205,250 |
| 4. Equipment | $ 95,000 |
| 5. Supplies | $ 299,250 |
| 6. Contractual | $ 1,900,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 399,434,563 |
| 9. Total Direct Charges | $ 416,238,074 |
| 10. Indirect Costs: 10.00 % Base DE MINIMUS | $ 5,000,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 421,238,074 |
| 12. Total Approved Assistance Amount | $ 421,238,074 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 421,238,074 |

## Administrative Conditions

All of the Administrative terms and conditions remain the same.

# Programmatic Conditions

The following Programmic Terms and Conditions have been updated:

## R. REAL PROPERTY

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient or subrecipient, as appropriate. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient or subrecipient may transfer its title as long as the title holder uses the land as originally intended as a carbon sink or holds the lands in a conservation easement that ensures that the land will continue to serve as a carbon sink. Before any such transfer, the recipient, subrecipient, and/or current title holder must provide advance notification to EPA, Region 4 of any intent to transfer said lands. Deeds must contain a notice of the grant restrictions set forth in this section. Additionally, once the transfer and any subsequent transfers are completed the title holder must send a copy of the deed to EPA, Region 4. The title holder must observe the original intent of the grant to restore, maintain, and conserve the land and shall not develop the land.

## 1. Disposition

When real property is no longer needed for the originally authorized purpose, the recipient, subrecipient, and/or title holder must obtain disposition instructions from EPA, Region 4, in accordance with the Term and Condition in Section R of the Award Document. The instructions will provide for one of the following alternatives:

a. Retain title after compensating the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA's contribution towards the original purchase (and costs of any improvements) by the current fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

b. Sell the property and compensate the EPA. The amount paid to the EPA will be calculated by multiplying the percentage of EPA's contribution towards the original purchase (and cost of any improvements) by the proceeds of the sale after deducting any actual and reasonable expenses paid to sell or fix up the property for sale. When the Federal award has not been closed out, the net proceeds from the sale may be offset against the original cost of the property. When directed to sell the property, the recipient must sell the property utilizing procedures that provide for competition to the extent practicable and that result in the highest possible return.

c. Transfer title to the EPA or a third party designated/approved by the EPA. The recipient is entitled to be paid an amount calculated by multiplying the percentage of the recipient's contribution towards the original purchase of the real property (and cost of any improvements) by the current fair market value of the property.

5E - 03D25824 - 2    Page 6

## 2. Recordation

As authorized by 2 CFR 200.316, the EPA requires that recipients who use EPA funding to purchase real property or to improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located which indicates that the real property has been acquired or improved with federal funding and that use and disposition conditions apply to the real property.

## AA. Foreign Entity of Concern

As part of carrying out this award, Recipient agrees that they are not:

1. an entity owned by, controlled by, or subject to the direction of a government of a "covered nation" as defined at 10U.S.C. §4872(d);

2. an entity headquartered in a "covered nation" as defined at 10U.S.C. §4872(d); or

3. a subsidiary of an entity described above in (1) or (2).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran. For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements. .

### AE. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 137(c) of the Clean Air Act, 42 USC § 7437(c) within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

**All other Programmatic Terms and Conditions remain the same.**

# Davis Declaration

# Exhibit C

EPA CPRG ATLANTIC CONSERVATION COALITION MOA

# DRAFT
# Memorandum of Agreement
# Atlantic Conservation Coalition
# EPA Climate Pollution Reduction Grant

This MEMORANDUM OF AGREEMENT ("MOA") is made between the North Carolina Department of Natural and Cultural Resources ("NCDNCR"), a principal department of the State of North Carolina; the Maryland Department of the Environment ("MDE"), a principal department of the State of Maryland; the South Carolina Office of Resilience ("SCOR"), an office of the State of South Carolina; and the Virginia Department of Environmental Quality ("Virginia DEQ"), a department of the Commonwealth of Virginia; referred to collectively as the "Parties;" for the purpose of outlining the Parties' roles and responsibilities as members of the Atlantic Conservation Coalition ("Coalition") and their commitment to implementing their project as applied for under the Environmental Protection Agency ("EPA") Climate Pollution Reduction Grants Program ("CPRG"), should funding be awarded.

WHEREAS, the 2022 Inflation Reduction Act ("IRA") established the CPRG program with the goal of reducing greenhouse gases; and

WHEREAS, the Parties have developed a regional approach to this goal by leveraging the carbon sequestration potential of natural and working lands; and

WHEREAS, the Parties have formed the Coalition, as encouraged by the CPRG competition, to apply for funding to implement their regional proposal, with NCDNCR serving as the lead applicant; and

WHEREAS, the EPA CPRG Notice of Funding Opportunity ("NOFO") EPA-R-OAR-CPRGI-23-07 requires the submission of an MOA signed by August 1, 2024; and

WHEREAS, the Parties included letters of intent to enter into this MOA as part of their application submitted to EPA on March 28, 2024; now

THEREFORE, IT IS AGREED:

## ARTICLE I.  COALITION MEMBER RESPONSIBILITIES

A.  Scope of the Project.  The Coalition's regional, four-state initiative consists of projects that will reduce greenhouse gases via natural and working lands through two measures: (1) protecting and restoring high-carbon coastal habitats and peatlands to maximize carbon sequestration and coastal resilience benefits; and/or (2) supporting the protection, use, and restoration of forested land that promotes sustainable forestry management practices to

### EPA CPRG ATLANTIC CONSERVATION COALITION MOA

increase carbon sequestration. The collaborative approach to identifying and executing projects will lead to outcomes with the highest carbon storage potential and community resilience co-benefits across the four-state region. The grant application submitted by the Coalition and showing the full scope of the project is attached to this MOA as Exhibit 1. The application is attached for reference and will be superseded by grant and subaward agreements.

B. General Responsibilities of the Parties.  To the extent allowed by law:

1. The Parties acknowledge that in addition to this MOA, if the Coalition is awarded a grant, the Parties may be required to enter into an EPA grant agreement or other separate instrument evidencing the award by EPA, or associated subaward agreements, with additional binding terms.
2. As lead applicant, NCDNCR will be accountable to EPA regarding financial management of the grant and confirming the scope of work implemented. The Parties acknowledge that the lead applicant will serve as an administrative pass-through for any awarded EPA funding and will distribute awarded funds following the allocations and requirements agreed upon in the grant application and/or any additional instruments evidencing the grant.
3. All other Parties will be accountable to the lead applicant in following EPA funding requirements and implementation of the project. This includes compiling necessary information in line with EPA reporting requirements for projects managed by Parties and their subrecipients. Parties are expected to submit this information to NCDNCR to be reported to EPA in line with grant requirements.
4. The Parties agree to use grant award funds solely for the general purposes as described in the grant application; in accordance with an EPA grant agreement, other instrument evidencing an award by EPA, or associated subaward agreements; and in accordance with any applicable laws, regulations, and guidelines.

C. Specific Responsibilities of the Parties.

1. NCDNCR intends to:
   a. Enter into an EPA grant agreement and comply with any EPA requirements described therein.
   b. Serve as Coalition lead, manage the overall award, issue subawards to other Parties, and direct operations as described in Article II, below.
   c. Direct specific projects as detailed in the grant application, Exhibit 1, including through subaward agreements with other entities.

2. MDE intends to:
   a. Enter into either an EPA agreement or a subaward agreement with NCDNCR and comply with any EPA or Coalition requirements described therein.
   b. Direct specific projects as detailed in the grant application, Exhibit 1, including through subaward agreements with other entities.

3. SCOR intends to:

EPA CPRG ATLANTIC CONSERVATION COALITION MOA

       a.  Enter into either an EPA grant agreement or a subaward agreement with NCDNCR and comply with any EPA or Coalition requirements described therein.

       b.  Direct specific projects as detailed in the grant application, Exhibit 1, including through subaward agreements with other entities.

4. Virginia DEQ intends to:

       a.  Enter into either an EPA grant agreement or a subaward agreement with NCDNCR and comply with any EPA or Coalition requirements described therein.

       b.  Direct specific projects as detailed in the grant application, Exhibit 1, including through subaward agreements with other entities.

## ARTICLE II.  COALITION OPERATING MODEL

A. NCDNCR will be the Coalition lead and will disseminate funds directly to Parties to apply to projects and initiatives detailed in the CPRG grant application.  Each Party will be allocated $50M to use as detailed in the grant application. The Nature Conservancy ("TNC") will be the subrecipient of $200M disseminated by NCDNCR.  NCDNCR will be allocated additional funds for administration and management of the CPRG grant across the Coalition, as described in Exhibit 1.

B. NCDNCR will coordinate with Parties and other subrecipients, contractors, and vendors to ensure timely application of funding for proposed projects detailed in the application, Exhibit 1.

C. Parties intend to track progress for each performance measure within their jurisdiction with databases, spreadsheets, and timekeeping records and report such progress to NCDNCR in a timely manner to meet the EPA reporting requirements described in the CPRG NOFO, an EPA grant agreement, or any applicable law or regulation. NCDNCR and all Parties intend to coordinate with applicable subrecipients of each Party to develop public-facing tools and materials showcasing the coalition's region-wide approach to projects.

D. NCDNCR will collect and compile tracking and reports on project progress, expenditures and purchases made with CPRG funding, tracking and reports on project accomplishments, and proposed timelines and milestones from the Parties.  NCDNCR intends to compile and submit required progress reports on grant implementation and planned activities to the EPA and submit a detailed final written report to EPA with the participation and collaboration from the Parties.

E. Parties intend to meet quarterly to share best practices and learning and identify any obstacles to award compliance so that NCDNCR can notify EPA throughout the period of performance.

**EPA CPRG ATLANTIC CONSERVATION COALITION MOA**

F.  Liaisons.  The Parties assign as their liaisons to the Coalition for purposes of this MOA, which may be changed by sending notice in accordance with Article III.D. herein:

    1.  NCDNCR:
        Deans Eatman
        NC Department of Natural and Cultural Resources
        109 E Jones Street
        Raleigh, NC 27699
        deans.eatman@dncr.nc.gov
        (252) 578-9892

    2.  MDE
        Allison Tjaden
        MD Department of the Environment
        1800 Washington Boulevard
        Baltimore, MD 21230
        Allison.tjaden@maryland.gov
        410-537-3228

    3.  SCOR:
        Alexander Butler
        South Carolina Office of Resilience
        632 Rosewood Drive
        Columbia, SC 29201
        Alex.butler@scor.sc.gov
        803-542-0463

    4.  Virginia DEQ
        Angela L. Conroy
        Air & Renewable Energy Division
        VA Department of Environmental Quality
        1111 E Main Street, Ste. 1400
        Richmond, VA 23219
        angela.conroy@deq.virginia.gov
        804-659-1982

**ARTICLE III.  GENERAL TERMS**

A.  Effective Date.  This MOA shall become effective only upon the award of funding by EPA through the CPRG program to the Coalition and shall remain in effect until the earliest of the end of the term of the grant, the date it is superseded by an EPA grant agreement and associated subaward agreements, or the date it is terminated in accordance with Article III.B., below.

EPA CPRG ATLANTIC CONSERVATION COALITION MOA

B. Termination. The Parties may terminate this MOA at any time by mutual written agreement signed by the Coalition. A Party may withdraw from this MOA upon service on the other Parties of written notice giving at least 30 days written notice of such intention to withdraw. This Agreement will automatically terminate if the EPA grant is not awarded or allocated to the Coalition.

C. Amendment. This MOA may only be amended by mutual written agreement of the Coalition.

D. Notice. All notices shall be deemed to have been fully given when made in writing and either personally delivered or deposited in the United States mail, certified and postage prepaid and addressed to the Parties' liaisons as identified in Article II. Section H. with copy by email to addresses listed above.

E. Entire Agreement. This MOA and the exhibits attached hereto represent the entire agreement between the Parties and supersedes all prior oral or written statements or agreements as to the subject matter discussed herein. There are no promises, terms, conditions, or obligations other than those contained in this MOA, and this MOA shall supersede all previous communications, representations, or agreements between the Parties as to the subject matter discussed herein.

F. No Assignment. This MOA shall not be assignable. No Party shall assign its rights, privileges, and obligations under this MOA to any other third party, whatsoever.

G. Availability of Funds. The Parties' obligations under this MOA are subject to the receipt of funds from EPA and appropriations under applicable state law. A failure by any Party to make any payment required by this MOA or to observe and perform any condition on its part to be performed under this MOA as a result of the failure of the EPA to disburse funds as agreed to in an EPA grant agreement or a separate instrument evidencing the award by EPA, or associated subaward agreements, shall not in any manner constitute a breach or default by the Party and the Party shall not be held liable in any manner whatsoever because of the absence of available funding.

H. Signature Authority. The Parties confirm the signatories below are fully authorized and empowered to enter into and bind their organization to the terms of this MOA. The signatories have read and understand the terms and conditions of this MOA.

I. Counterparts. This MOA may be executed in multiple counterparts, any of which shall be an original copy, and all of which constitute the MOA.

J. Sovereign Immunity. The Coalition acknowledges and agrees that nothing in this MOA shall be construed as a modification, compromise, or waiver by the Parties of its sovereign immunity or any applicable defenses, which are hereby expressly reserved to the respective Parties.

**EPA CPRG ATLANTIC CONSERVATION COALITION MOA**

K.  Access to records.  To the extent allowed under the laws of the State where the persons or records are located, the State Auditor, NCDNCR Internal Auditors, the joint Legislative Commission on Governmental Operations (as well as applicable legislative employees), and any other authorized State entity shall have access to persons and records as such access is required under North Carolina law (including but not limited to N.C.G.S. §§ 143-49 & 147-64.7).

L.  Scope of access to records. Access to records, as defined in Section III(K) above, is limited to records produced by or for NCDNCR pursuant to official CPRG duties. Disclosure of those same records of other parties will be available based on each state's disclosure requirements.

**AGREEMENT APPROVED AND EXECUTED BY:**

**NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES**

*[signature]*                                                                                     7/24/2024

Signature of Authorizing Official                                                          Date
D. Reid Wilson, Secretary

**MARYLAND DEPARTMENT OF THE ENVIRONMENT**

*[signature]*                                                                                     7/24/2024

Signature of Authorizing Official                                                          Date
Serena McIlwain, Secretary

Approved as to form and legal sufficiency for MDE this ____ July 24 day of 2024.

*[signature]*                                                                                     7/24/2024

Rebecca Reske                                                      , Assistant Attorney General        Date

**SOUTH CAROLINA OFFICE OF RESILIENCE**

*Benjamin I. Duncan, II, Chief Resilience Officer*                           7/24/2024

Signature of Authorizing Official                                                          Date
Benjamin I. Duncan, II, Chief Resilience Officer

**VIRGINIA DEPARTMENT OF THE ENVIRONMENTAL QUALITY**

*Michael S. Rolband, PE, PWD, PWS Emeritus, Director*                     7/24/2024

Signature of Authorizing Official                                                          Date
Michael S. Rolband, PE, PWD, PWS Emeritus, Director

# Davis Declaration

# Exhibit E

| | |
|---|---|
| **From:** | EPA_Grants_Info |
| **Subject:** | [External] Pause EPA Grants |
| **Date:** | Tuesday, January 28, 2025 4:41:10 PM |

You don't often get email from epa_grants_info@epa.gov. Learn why this is important

**CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

| **From:** | EPA_Grants_Info |
|---|---|
| **Subject:** | [External] Notice of Court's Order |
| **Date:** | Monday, February 3, 2025 8:33:29 AM |
| **Attachments:** | Notice of Temporary Restraining Order 01-31-2025.pdf |

You don't often get email from epa_grants_info@epa.gov. Learn why this is important

**CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) <u>all EPA assistance agreement recipients</u> are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

| From: | Johnson, Kristine |
|---|---|
| To: | Eatman, Deans |
| Cc: | Toney, Anthony; Frew, Erin; Kern, Kayla; Dolan, Margaret |
| Subject: | RE: [External] Notice of Court's Order |
| Date: | Monday, February 3, 2025 2:10:48 PM |

**CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Good afternoon,

EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thanks

**From:** Eatman, Deans <Deans.Eatman@dncr.nc.gov>
**Sent:** Monday, February 3, 2025 1:58 PM
**To:** Johnson, Kristine <Johnson.Kristine@epa.gov>
**Cc:** Toney, Anthony <Toney.Anthony@epa.gov>; Frew, Erin <Frew.Erin@epa.gov>; Kern, Kayla <Kern.Kayla@epa.gov>; Dolan, Margaret <Dolan.Margaret@epa.gov>
**Subject:** RE: [External] Notice of Court's Order

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Kristine,

I hope you're doing well. Checking in re the email communication below to confirm whether we can draw down funds while this TRO is in effect. This question is specific to the ACC CPRG award.

Thank you,

**Deans Eatman**
Assistant Secretary for Government Affairs
North Carolina Department of Natural and Cultural Resources

(252) 578-9892 cell
deans.eatman@dncr.nc.gov



**From:** EPA_Grants_Info <EPA_Grants_Info@epa.gov>
**Sent:** Monday, February 3, 2025 8:33 AM
**Subject:** [External] Notice of Court's Order

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) <u>all EPA assistance agreement recipients</u> are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

---

Email correspondence to and from this address may be subject to the North Carolina Public Records Law and may be disclosed to third parties by an authorized state official.

**From:** Johnson, Kristine
**To:** Eatman, Deans
**Cc:** Toney, Anthony
**Subject:** RE: [External] Notice of Court's Order
**Date:** Monday, February 3, 2025 2:23:38 PM

> **CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Hi,

Deans I am seeking further guidance from our GMO office. I will let you know once I get a definitive answer. I hope all is well.

Thanks

**From:** Eatman, Deans <Deans.Eatman@dncr.nc.gov>
**Sent:** Monday, February 3, 2025 1:58 PM
**To:** Johnson, Kristine <Johnson.Kristine@epa.gov>
**Cc:** Toney, Anthony <Toney.Anthony@epa.gov>; Frew, Erin <Frew.Erin@epa.gov>; Kern, Kayla <Kern.Kayla@epa.gov>; Dolan, Margaret <Dolan.Margaret@epa.gov>
**Subject:** RE: [External] Notice of Court's Order

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Kristine,

I hope you're doing well. Checking in re the email communication below to confirm whether we can draw down funds while this TRO is in effect. This question is specific to the ACC CPRG award.

Thank you,

**Deans Eatman**
Assistant Secretary for Government Affairs
North Carolina Department of Natural and Cultural Resources

(252) 578-9892 cell
deans.eatman@dncr.nc.gov



**From:** EPA_Grants_Info <EPA_Grants_Info@epa.gov>
**Sent:** Monday, February 3, 2025 8:33 AM
**Subject:** [External] Notice of Court's Order

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) <u>all EPA assistance agreement recipients</u> are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

---

Email correspondence to and from this address may be subject to the North Carolina Public Records Law and may be disclosed to third parties by an authorized state official.

| | |
|---|---|
| **From:** | Johnson, Kristine |
| **To:** | Eatman, Deans |
| **Cc:** | Toney, Anthony |
| **Subject:** | RE: [External] Notice of Court's Order |
| **Date:** | Wednesday, February 5, 2025 9:03:20 AM |

> **CAUTION:** External email. Do not click links or open attachments unless verified. Report suspicious emails with the Report Message button located on your Outlook menu bar on the Home tab.

Good morning,

I want to give you an update on the status of drawing down funds. If you do not currently have access to draw down funds you will soon as the ASAP accounts are being unlocked in batches. Let me know if you require additional information.

Thanks

---

**From:** Johnson, Kristine
**Sent:** Monday, February 3, 2025 2:24 PM
**To:** Eatman, Deans <Deans.Eatman@dncr.nc.gov>
**Cc:** Toney, Anthony <Toney.Anthony@epa.gov>
**Subject:** RE: [External] Notice of Court's Order

Hi,

Deans I am seeking further guidance from our GMO office. I will let you know once I get a definitive answer. I hope all is well.

Thanks

---

**From:** Eatman, Deans <Deans.Eatman@dncr.nc.gov>
**Sent:** Monday, February 3, 2025 1:58 PM
**To:** Johnson, Kristine <Johnson.Kristine@epa.gov>
**Cc:** Toney, Anthony <Toney.Anthony@epa.gov>; Frew, Erin <Frew.Erin@epa.gov>; Kern, Kayla <Kern.Kayla@epa.gov>; Dolan, Margaret <Dolan.Margaret@epa.gov>
**Subject:** RE: [External] Notice of Court's Order

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Kristine,

I hope you're doing well. Checking in re the email communication below to confirm whether we can draw down funds while this TRO is in effect. This question is specific to the ACC CPRG award.

Thank you,

**Deans Eatman**
Assistant Secretary for Government Affairs
North Carolina Department of Natural and Cultural Resources

(252) 578-9892 cell
[deans.eatman@dncr.nc.gov](mailto:deans.eatman@dncr.nc.gov)



---

**From:** EPA_Grants_Info <[EPA_Grants_Info@epa.gov](mailto:EPA_Grants_Info@epa.gov)>
**Sent:** Monday, February 3, 2025 8:33 AM
**Subject:** [External] Notice of Court's Order

Dear Grant Recipient,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) all EPA assistance agreement recipients are receiving the attached Notice of the Court's Order for awareness and information.  A copy of the Court's Order is also attached for reference.  If you have any questions about the scope or effect of the Court's Order, please contact your Grants Award Official.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

---

Email correspondence to and from this address may be subject to the North Carolina Public Records Law and may be disclosed to third parties by an authorized state official.

# Davis Declaration

# Exhibit D

# ASAP Screenshot

# 1/27/2025



Page ID #: 4713 (4.4.139.0.5) | CLONE: (ASAPGov_Cluster_Clone3) | Current Cycle Date: 01/27/2025

**Norma Stokes**

| Home | Enrollments | Payment Requests | Agency Functions | Reports | Inquiries | Help | Log Off |
|------|-------------|------------------|------------------|---------|-----------|------|---------|

Initiate Payment Requests (PR)

<div align="center">

**Step 2 of 4**

**Enter Payment Transactions**

**Display Selection Criteria**

</div>

| | |
|---|---|
| Payment Request Type : | Individual |
| Payment Method : | ACH |
| Bank Relationship : | ████████ |
| Requested Settlement Date : | 01/28/2025 |

Your criteria matched 143 account(s)
140 accounts not shown because they are unavailable for payment or already selected

| Recipient : NORTH CAROLINA DEPT OF CULTURA ████████ |
|---|
| Federal Agency : NATIONAL OCEANIC AND ATMOSPHER (13140001) |

| Cash on Hand : $ | | Total : $ | |
|---|---|---|---|

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|------------|----------------|----------------------------|-------------------|------------------|-----------------|
| ████████ | Open | | $62,200.55 | | |
| | Open | | | $ | + |
| | Open | | $99,961.00 | | |
| | Open | | | $ | + |

| Recipient : **NORTH CAROLINA DEPT OF CULTURA**  ▬▬ | | | | | |
|---|---|---|---|---|---|
| Federal Agency : **RTPFC-Grants (68128933)** | | | | | |
| Cash on Hand : $ | | | Total : $ | | |

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ▬▬ | Open | | $421,238,073.00 $ | | ➕ |

**Continue**   **Sort**   **Cancel**   **Help for this Step**

# ASAP Screenshot

# 1/29/2025

 •gov

(Version 3.4.0.5) | CLONE: (ASAPGov_Cluster_Clone2) | Current Cycle Date: 01/29/2025

Norma Stokes

| Home | Enrollments | Payment Requests | Agency Functions | Reports | Inquiries | Help | Log Off |

Initiate Payment Requests (PR)

### Step 1 of 4 (Continued)
### Retrieve Accounts

*ERROR 839: No accounts found matching criteria.*

Enter one or more of the following

Recipient ID : --ALL-- ∨

ALC / Region : --ALL-- ∨

Account ID (<u>or partial</u>) :

**Continue**　　　**Help for this Step**

# ASAP Screenshot

## 2/4/2025

 •gov

(ASAP 9.0.5) | CLONE: (ASAPGov_Cluster_Clone4) | Current Cycle Date: **02/04/2025**

**Norma Stokes**

| Home | Enrollments | Payment Requests | Agency Functions | Reports | Inquiries | Help | Log Off |

Initiate Payment Requests (PR)

## Step 2 of 4
## Enter Payment Transactions
### Display Selection Criteria

| | |
|---|---|
| Payment Request Type : **Individual** | |
| Payment Method : **ACH** | |
| Bank Relationship : | █████████ |
| Requested Settlement Date : **02/05/2025** | |

Your criteria matched 143 account(s)
94 accounts not shown because they are unavailable for payment or already selected

| Recipient : <u>NORTH CAROLINA DEPARTMENT OF C</u> ████ |
|---|
| Federal Agency : <u>DEPARTMENT OF THE INTERIOR (14100099)</u> |

| Cash on Hand : $ | Total : $ |
|---|---|

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ████ | Open | | $7,568,844.77 $ | | + |
| | Open | | $72,500.00 $ | | + |
| | Open | | $2,188.30 $ | | + |
| | Open | | $237.68 $ | | + |

| | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ███ | Open | | $10,000.00 $ | | + |
| | Open | | $333,392.23 $ | | + |
| | Open | | $5,105.51 $ | | + |
| | Open | | $475,301.87 $ | | + |

**Recipient : <u>NORTH CAROLINA DEPT OF CULTURA</u> ███**

**Federal Agency : <u>DEPARTMENT OF THE INTERIOR (14100099)</u>**

**Cash on Hand : $** | **Total : $**

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ███ | Open | | $201,532.94 $ | | + |
| | Open | | $498,960.00 $ | | + |
| | Open | | $500,000.00 $ | | + |
| | Open | | $150,000.00 $ | | + |
| | Open | | $300,231.50 $ | | + |
| | Open | | $160,276.00 $ | | + |
| | Open | | $100,000.00 $ | | + |
| | Open | | $500,000.00 $ | | + |
| | Open | | $470,071.28 $ | | + |
| | Open | | $0.00 $ | | + |
| | Open | | $109,680.98 $ | | + |
| | Open | | $0.00 $ | | + |

Pages: **1** 2 3

[Continue] [Sort] [Cancel] [Help for this Step]



ASAP .gov

Build: 2024.10.2 (39.0.5) | CLONE: (ASAPGov_Cluster_Clone4) | Current Cycle Date: 02/04/2025

**Norma Stokes**

| Home | Enrollments | Payment Requests | Agency Functions | Reports | Inquiries | Help | Log Off |

Initiate Payment Requests (PR)

## Step 2 of 4
## Enter Payment Transactions
### Display Selection Criteria

| | |
|---|---|
| Payment Request Type : Individual | |
| Payment Method : ACH | |
| Bank Relationship : ███████████ | |
| Requested Settlement Date : 02/05/2025 | |

Your criteria matched 143 account(s)
94 accounts not shown because they are unavailable for payment or already selected

| Recipient : NORTH CAROLINA DEPT OF CULTURA ████████ |
|---|
| Federal Agency : DEPARTMENT OF THE INTERIOR (14100099) |

| Cash on Hand : $ | Total : $ |

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ██████ | Open | | $201.00 $ | | + |
| | Open | | $500,000.00 $ | | + |
| | Open | | $500,000.00 $ | | + |
| | Open | | $500,000.00 $ | | + |



| | | | | |
|---|---|---|---|---|
| Open | | $555,334.00 | $ | + |
| Open | | $377,562.50 | $ | + |
| Open | | $500,000.00 | $ | + |
| Open | | $142,340.00 | $ | + |
| Open | | $457,336.00 | $ | + |
| Open | | $42,664.00 | $ | + |
| Open | | $250,000.00 | $ | + |
| Open | | $4,384,285.83 | $ | + |
| Open | | $195,805.00 | $ | + |
| Open | | $27,500.00 | $ | + |
| Open | | $845,248.70 | $ | + |
| Open | | $2,003,792.00 | $ | + |
| Open | | $4,701,464.00 | $ | + |
| Open | | $1,826,519.00 | $ | + |
| Open | | $19,439.00 | $ | + |
| Open | | $2,104.00 | $ | + |

Pages: 1 **2** 3





**Norma Stokes**

| Home | Enrollments | Payment Requests | Agency Functions | Reports | Inquiries | Help | Log Off |

Initiate Payment Requests (PR)

## Step 2 of 4
## Enter Payment Transactions
### Display Selection Criteria

| | |
|---|---|
| Payment Request Type : Individual | |
| Payment Method : ACH | |
| Bank Relationship : ▮▮▮▮▮▮▮ | |
| Requested Settlement Date : 02/05/2025 | |

Your criteria matched 143 account(s)
94 accounts not shown because they are unavailable for payment or already selected

| Recipient : NORTH CAROLINA DEPT OF CULTURA (▮▮▮▮▮ |
|---|
| Federal Agency : DEPARTMENT OF THE INTERIOR (14100099) |

| Cash on Hand : $ | Total : $ |
|---|---|

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| ▮▮▮▮▮▮ | Open | | $25,727.50 $ | | + |
| ▮▮▮▮▮▮ | Open | | $312,729.50 $ | | + |
| ▮▮▮▮▮▮ | Open | | $298,720.00 $ | | + |
| ▮▮▮▮▮▮ | Open | | $7,571.00 $ | | + |



| | Account Status | | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| | Open | | $492,429.00 $ | | + |
| | Open | | $750,000.00 $ | | + |
| | Open | | $100,000.00 $ | | + |



**Recipient :** <u>NORTH CAROLINA DEPT OF CULTURA</u>

**Federal Agency :** <u>NATIONAL OCEANIC AND ATMOSPHER (13140001)</u>

**Cash on Hand :** $     **Total :** $

| Account ID | Account Status | Requestor Reference Number | Available Balance | Amount Requested | Remittance Data |
|---|---|---|---|---|---|
| | Open | | $57,951.80 | | |
| | Open | | | $ | + |
| | Open | | $99,961.00 | | |
| | Open | | | $ | + |

Pages: 1 2 **3**

Continue    Sort    Cancel    Help for this Step