# Thomas-Jensen Affirmation

# Exhibit # 105

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; et al.,<br><br>Defendants. | C.A. No. 1:25-cv-00039-JJM-PAS |

**SUPPLEMENTAL DECLARATION OF DIRECTOR JONATHAN WOMER**

I, Jonathan Womer, declare as follows:

1. I am a resident of the State of Rhode Island. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I currently serve as the Director of the Rhode Island Department of Administration.

3. As described in my declaration dated January 28, 2025, I have a broad responsibility for most aspects of administration throughout Rhode Island state government, including generally overseeing and supporting the administration of federal financial assistance awarded to all Rhode Island state agencies.

4. Since my declaration dated January 28, 2025, and even since this Court's Temporary Restraining Order of January 31, 2025, disruption to the normal processing of federal financial assistance across Rhode Island State government has persisted.

1

5.     On Thursday, January 30, 2025, the Rhode Island Department of Labor and Training ("DLT") attempted to draw down federal financial assistance through the Payment Management System ("PMS"). The system displayed a banner titled "Payment Delays" and that stated, "Due to Executive Orders regarding potentially unallowable grant payments, PMS is taking additional measures to process payments. Reviews of applicable programs and payments will result in delays and/or rejections of payments." Ex. A, at 1 (showing two alert banners).

6.     A second banner titled "SYSTEM ALERTS!" and "PMS Hours of Operation" stated "Effective Immediately, PMS is only available during the hours of 9:00 AM to 4:00 PM EST Monday through Friday. The limited hours are in effect until a further notice." Ex. A at 1 (showing two alert banners).

7.     On the morning of Friday, January 31, 2025, at 10:39AM (EST), DLT was still seeing "Pending Review" for its payment requests. Ex. A, at 2 (screenshot emailed by DLT on Friday, January 31, 2025, at 10:39 AM showing four payment requests pending review); *id.* at 3 (screenshot emailed by DLT on Friday, January 31, 2025, at 2:23 PM showing full details of the same four payment requests); *id.* at 4 (screenshot emailed by DLT on Friday, January 31, 2025, at 10:39 AM showing a fifth payment request pending review). Even when the payment requests had ostensibly received approval in the "status change comments" section of the PMS dashboard, the main PMS dashboard still marked those payment requests as "pending review." Ex. A, at 5 (screenshot emailed by DLT on Friday, January 31, 2025, at 2:54 PM showing four payment requests still pending review); *id.* at 6 (a contemporaneous screenshot showing approval for Transaction #2052052264 with Request Amount $184,724.92); *id.* at 7 (a contemporaneous screenshot showing approval for Transaction #2052050879 with Request Amount $91,853.04); *id.*

2

at 8 (a contemporaneous screenshot showing approval for Transaction #2052052252 with Request Amount $201,016.34).

8.  On February 3 and 4, 2025, DLT reported that it had yet to receive funding, even though its requests had been marked as "okay to pay". DLT's Cash Management Unit manager had reached out to her PMS contact for more information about the hold up on February 3, 2025, but had not heard back.

9.  On February 5, 2025, DLT reported seeing that some of its payment requests had begun to show changes, with one drawdown having been processed and three showing as being "in transit". While DLT has not actually received the funds, it appears that the funds may be in the process of transferring after several days of waiting in what appeared to be an indefinite pending status.

10. The following paragraphs outline examples of harm to the State of Rhode Island if federal funding is again paused, blocked, denied, or delayed suddenly.

11. In Rhode Island, many of our nonprofit providers operate without large fiscal reserves. These providers operate with considerable dependency on federal aid. When there is a disruption in that flow, nonprofit providers experience operational disruptions and payroll issues. As a result, Rhode Islanders would experience essential service disruptions.

12. Due to its size, Rhode Island has a limited number of nonprofit service providers and when a provider is unable to perform its services due to lack of funding, there is often not a replacement service provider. This leads to a gap in essential services for Rhode Islanders. Despite the size of our State, we have the programmatic variety of any state, but because of our size, we lack a large market of multiple providers that can absorb these shocks. Losing one provider with a specific skillset and service ability can be very disruptive.

13. In the case of Medicaid providers, the stakes of biweekly funding payments are that homecare and community-based support providers rely on those payments to make payroll. They rely on regular, timely payments to make payroll, and any disruptions thereto would cause operational concerns and service disruption for Rhode Island's most vulnerable citizens. Large providers, such as hospital networks, nursing homes or physician networks, might be able to make a week of payroll because of their size, but even for them, such measures can raise operational concerns and an access to care crisis.

14. The nature of financial transactions of significant magnitude is that they are often complicated distributions of cash that cannot turn on a dime if the federal funding is again paused, blocked, denied, or delayed suddenly. Using Medicaid as an example, the State uses payment processing vendors to process distributions to service providers and vendors. Providers and vendors receive remittance advice days in advance of payment. Transferring banks are provided files days in advance of payment. And so, when the funds being transacted with are in the tens or hundreds of millions of dollars, it is not the kind of financial transaction that can easily be turned on or off with a moment's notice. When the receipt of federal funds is delayed by 24 or even 48 hours, it is unclear what would happen if a funding delay sent the State past a payment deadline, like the deadline for Medicaid providers. Many wheels would have already been set in motion to make that payment and conditioned on that payment. Changes to such transactions at a moment's notice are highly impracticable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2025, at Providence, Rhode Island.

_____
Jonathan Womer
Director
Rhode Island Department of Administration

# Exhibit A







3



4



5



6



7



8