Thomas-Jensen
Affirmation

Exhibit # 108

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

        Plaintiffs,

    v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

        Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## DECLARATION OF CHRISTOPHER KEARNS

I, Christopher Kearns, hereby depose and state as follows:

1.     I am the Acting Energy Commissioner at the Rhode Island Office of Energy Resources ("OER"). I have worked at OER for over 12 years and have held my current position since July 2022. I make this declaration as a representative of OER, in part based on the business records of OER and in part based on my personal knowledge, experience, and other sources of information I have obtained and reviewed in my official capacity. Based on these sources of information, I am familiar with and, if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

2.     It is my understanding that starting on January 20, 2025, President Donald Trump issued a series of executive orders and Defendants undertook certain actions in accordance with those executive orders. Together, these actions caused various disruptions to federal financial assistance to Rhode Island. Below I describe the specific disruptions that OER has experienced thus far and the impact of these disruptions. While the federal funding we receive through the

1

Solar for All program has experienced some of the most significant disruptions, as explained below, other programs have been affected as well.

**I.    Solar for All**

**A.  History of Award**

3.      On October 11, 2023, OER applied for federal financial assistance through the Solar for All program. A true and accurate copy of the application is attached hereto as Exhibit A. A true and accurate copy of the confirmation of receipt from Grants.gov is attached hereto as Exhibit B.

4.      Via an award dated July 9, 2024, OER received its grant under the Solar for All program from the U.S. Environmental Protection Agency ("EPA"). A true and accurate copy of the original grant award document is attached hereto as Exhibit C. A true and accurate copy of the Solar for All Terms and Conditions is attached hereto as Exhibit D.

5.      This grant included $48,930,000 and an additional $400,000 of in-kind contributions from the EPA. *See* Exhibit C at 2. The project period is to last through April 30, 2029. *See id.* at 1.

6.      OER was initially restricted to 2% of the awarded funds under the Solar for All grant until completion of an EPA-approved Solar for All Workplan. *See* Exhibit D at 17. As explained further below, this restriction has since been lifted.

7.      To access the money available through this grant, OER requests funds from the Rhode Island Solar for All ASAP.gov account. "ASAP" stands for "Automated Standard Application for Payments" and is run by the Bureau of the Fiscal Service.

8.      On August 30, 2024, OER submitted a draft amendment to its Solar for All application to EPA. A true and accurate copy of the amendment application form is attached hereto as Exhibit E.

9.      Via an amended award dated December 16, 2024, OER received its amended Solar for All grant from the EPA. A true and accurate copy of the amended grant award document is attached hereto as Exhibit F.

10.     This amended grant award removed the 2% funding restriction from the program and incorporated the necessary budget and Work Plan documentation. *See* Exhibit F at 1. In other words, OER had moved beyond the planning stage and could access the full $48,930,000 available per the grant through ASAP.gov. *See id.* at 2.

11.     On January 14, 2025, OER submitted an updated Work Plan for its Solar for All program. On January 16, 2025, the EPA Project Officer assigned to Rhode Island's Solar for All grant confirmed via email that OER had "met the Planning Period Term[s] and Conditions" and that the 2% restriction was removed "without further action from [OER] required" except for a handful of minor edits to the Work Plan. A true and accurate copy of this email exchange is attached hereto as Exhibit G.

12.     On January 17, OER submitted the updated Work Plan with the requested final changes. A true and accurate copy of this email is attached hereto as Exhibit H. A true and accurate copy of the Work Plan is attached hereto as Exhibit I.

### B. Recent Developments

13.     On Thursday, January 23, 2025, the Assistant Director of Financial & Contract Management for OER ("Assistant Director"), attempted to draw down $26,510.21 from the $48,930,000 available in the Rhode Island Solar for All ASAP.gov account. This was the first attempted draw from the Solar for All program and was intended to be used for the Rhode Island Solar for All Program coordinator's salary for the work the coordinator did from September through December 31, 2024.

14.     On Monday, January 27, 2025, the Assistant Director received a notification that the drawdown of $26,510.21 had been rejected. A true and accurate copy of this notification is attached hereto as Exhibit J.

15.     On Tuesday, January 28, 2025, OER received an email addressed to "Grant Recipient" that explained that EPA was "working diligently" to implement President Trump's Executive Order titled "Unleashing American Energy." *See* Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) (the "Energy EO"), https://www.federalregister.gov/d/2025-01956. The agency therefore had "paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time" and was "continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." A true and accurate copy of this notification is attached hereto as Exhibit K.

16.     On Wednesday, January 29, 2025, the Assistant Director checked the ASAP.gov account and saw that the Rhode Island Solar for All account had been suspended. The Assistant Director had sought to attempt the drawdown of $26,510.21 from the ASAP.gov account again but was unable to because the account was suspended. A true and accurate screenshot of the

Rhode Island Solar for All ASAP.gov account on January 29, 2025, at 11:09 AM EST is attached hereto as Exhibit L.

17.    Notifications from ASAP.gov showed that the suspension occurred on Tuesday, January 28, 2025, at 5:44 PM EST. A true and accurate copy showing OER's ASAP.gov notifications is attached hereto as Exhibit M. There was no communication at any time to OER either before or since regarding the reason for the suspension.

18.    Later that day, a financial specialist with the EPA informed the Assistant Director via email that OER had "recently submitted a refund payment to the EPA" for $26,510.21. The financial specialist asked for a "reason for the returned funds." The next day, the Assistant Director responded that she "did not request a refund" but rather "received a notification from ASAP that the payment request had been returned" and an attempt to request the funds the prior day had been unsuccessful because the Rhode Island Solar for All program ASAP.gov account had been suspended. There has been no response to the Assistant Director's email as of February 5, 2025. A true and correct copy of this email exchange is attached hereto as Exhibit N.

19.    As of February 5, 2025, OER's Solar for All ASAP.gov account is still suspended. Due to the suspension, OER is unable to request any additional drawdowns. A true and accurate screenshot of the Rhode Island Solar for All ASAP.gov account on February 5, 2025, at 9:00 AM EST is attached hereto as Exhibit O.

20.    As of February 5, 2025, OER has never received any communication from EPA indicating that the Rhode Island Solar for All grant was out of compliance with the terms of the grant or that the $26,510.21 attempted drawdown for the Rhode Island Solar for All Program Coordinator salary was improper in any way.

21.    As of February 5, 2025, OER has not received any further communication from the EPA regarding the status of its rejected drawdown or the suspension of its Solar for All program ASAP.gov account.

### C. Impact

22.    As noted above, EPA had approved OER's updated Work Plan (with minor edits) on January 16, 2025. Though substantial work beyond planning has not yet started on the Solar for All project, OER was going to hold kick off meetings this month with coalition partners and begin planning community engagement for the Solar for All program. But these plans are on hold, given the uncertainty regarding funding.

23.    During the planning phase, OER invested significant resources in developing a Solar for All plan that would comply with all grant program requirements, help low-income Rhode Islanders, and address climate issues.

24.    Specifically, Rhode Island's Solar for All program will involve the launch and expansion of a comprehensive suite of six financial assistance programs and twelve project deployment technical assistance initiatives designed to equitably address barriers to solar adoption in Rhode Island's low-income and disadvantaged communities. *See* Exhibit I at 1-2.

25.    The financial assistance programs proposed will deliver meaningful benefits of reliable solar power directly to Rhode Island's most historically underserved communities as determined by low-income and disadvantaged community-specific eligibility requirements. *See* Exhibit I at 1-2. Through new solar generation, the program hopes to serve 5,225 such Rhode Island households and provide over $48 million in household savings. *See* Exhibit I at 3.

26.     The program also expects to deploy 27.49 MW and 2.69 MWh of new solar generation, contributing to Rhode Island's overall energy availability and reliability. *See* Exhibit I at 3.

27.     Additionally, the Rhode Island Solar for All program's new solar generation will reduce carbon emissions by an estimated 506,527 metric tons. *See* Exhibit I at 3.

28.     If the funds for the Solar for All program are canceled or substantially further delayed, this program will not go forward, and these benefits will be unrealized. All of the planning work and investments that OER has done to date will be indefinitely on hold. These investments include hiring a Solar for All coordinator in September 2024 to manage Rhode Island's program through the planning stage and beyond.

29.     At the moment, Rhode Island has the ability to cover payments to the Solar for All coordinator with energy-related state funds in the short term while the fate of the Solar for All program remains unclear. However, soon the state will no longer be able to pay for the position or other contract positions related to Solar for All with its own funds and will have to end the program entirely. Even if we were to later be granted federal financial assistance for this program, getting it off the ground again, restarting the planning and implementation process, and rehiring for the coordinator and other positions will take significant time, effort, and additional investment.

30.     Any further planning regarding the Solar for All program is on hold, not only because of the funding freeze, but also because the program may be implicated in the U.S. Department of Energy ("DOE") directive to cease any activities relating to diversity, equity, and inclusion ("DEI"), Community Benefits Plans, or Justice40 requirements.

31.    On Tuesday, January 28, 2025, OER received a memorandum from DOE instructing that recipients of DOE grants must cease any activities and stop incurring costs related to any DEI programs and activities involving or relating to DEI objectives and principles, Community Benefits Plans, and Justice40 requirements, conditions, or principles. A true and correct copy of this memorandum is attached hereto as Exhibit P.

32.    The DOE DEI Memo can have a large negative impact, particularly on the most vulnerable populations in Rhode Island. Through the Justice40 requirements, for instance, many federal funds received by OER flow to disadvantaged communities that are marginalized, underserved, and overburdened by pollution, while DEI initiatives support equal access to wealth building opportunities for all, particularly those facing systemic barriers. Community Benefits Plans additionally involve the engagement of communities and labor and investment in America's workforce.

**II.    Other Affected Programs and Impact**

33.    OER receives numerous significant and essential grants from the federal government, including several others through the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA"). These include State Energy Program BIL funding, an Energy Efficiency Revolving Loan Fund, an Energy Efficiency Contractor Training Grant, the Home Electrification and Appliances Rebate Program, the Home Efficiency Rebate Program, the Energy Efficiency Conservation Block Grant Program, Preventing Outages and Enhancing the Resilience of the Electric Grid, and the Grid Resilience Formula Grant Program.

34.    As noted above, on January 28, 2025, OER received an email from EPA explaining that they were implementing President Trump's Energy EO by "paus[ing] all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at

8

this time" and "continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." *See* Exhibit K.

35.     Also on Tuesday, January 28, 2025, OER's ASAP.gov accounts were changed for all programs listed above and others. They were all changed to be set for "agency review." *See* Exhibit M. This means that any money drawn down through the account must first be reviewed and approved by the agency.

36.     This new development means that, at minimum, it will take longer for OER to get the funds needed to reimburse its expenses incurred under these federally funded programs. My understanding is that it typically takes around 30 days for agencies to review and approve funds. Prior to being set for "agency review," OER was able to obtain funding around 24 hours after requesting such funds. To my knowledge, this is the first time that this delay due to agency review has been applied to these funds. Even more concerning, the unexplained change in status raises general uncertainty about whether each attempted drawdown will be paid at all.

37.     By way of example, Rhode Island receives State Energy Program funding. This includes approximately $465,120 in annual funds and a one-time grant of $3,285,260 through the IIJA. The State Energy Program provides funding to states to support planning activities and programs that help reduce carbon emissions in all sectors of the economy. OER has received annual State Energy Program funding for decades. The IIJA allocation mandates that a portion of the funding be used to update a state's energy security plan.

38.     Though the State Energy Program's annual funds and IIJA funds are kept in separate ASAP.gov accounts, both of those accounts were set to agency review on Tuesday, January 28, 2025.

9

39.    To my knowledge, before Tuesday, January 28, 2025, OER's drawdowns from these funds have never been required to go through agency review before being received. This agency review requirement has since been removed for the annual State Energy Program funding and we were able to draw down funds on February 3, 2025. The agency review requirement remains in place, however, for the IIJA State Energy Program funding as of February 5, 2025.

40.    The delays inherent in having to go through agency review are already being felt in the state. On January 15, 2025, OER was awarded a grant of nearly $32 million related to our Home Efficiency Rebates ("HER") Program. A true and correct copy of the email from DOE communicating the award is attached hereto as Exhibit Q at 7.

41.    We were scheduled to have a kickoff call with a DOE Project Officer related to this program on January 30, 2025, but that call was suddenly canceled without explanation. *See* Exhibit Q at 1, 3. We are now unsure whether we will be able to draw down this grant money when needed and whether we should go ahead with planning for the program.

42.    On January 27, 2025, OER was forced to pause the $31.8 million Home Electrification and Appliance Rebate ("HEAR") Program. OER launched that program in September 2024 after receiving a $31.8 million award. Due to the uncertainty created by the withholding of funding from the DOE, OER sent an email to its implementation partners, the Rhode Island Community Action Agencies ("CAPs"), informing the CAPs to pause any new applications associated with the HEAR program. A true and correct copy of the email from OER pausing the program is attached hereto as Exhibit R.

43.    If we do not receive the funding for the HER or HEAR programs, it will simply not be possible to implement them in Rhode Island and the benefits to low- and moderate-income households will go unrealized. There is no plan B.

44.     As another example of how the executive orders and related agency decisions are having an immediate effect in the state: we are currently accepting applications related to a $10 million pool of funding for a program we are implementing regarding electric vehicle charging stations. These funds were made available through the National Electric Vehicle Infrastructure ("NEVI") Formula Program under the IIJA. OER is implementing this funding through a Memorandum of Understanding with the Rhode Island Department of Transportation (the recipient of NEVI funds). A true and correct copy of this Memorandum of Understanding is attached hereto as Exhibit S.

45.     While we were planning to accept applications for these NEVI funds throughout the month of February, we are now thinking of immediately stopping the application process and pausing the program because we are concerned these funds will never be released. This is because the recent Energy EO specifically targets relevant funding. *See* Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ("All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program.").

46.     This NEVI-funded program includes and facilitates partnerships among state agencies, municipalities, businesses, and nonprofit organizations. Pausing this program could significantly disrupt the timeline for implementation and hinder efforts to ensure a robust, accessible, and equitable deployment of electric vehicle charging infrastructure across the state.

47.    Losing millions of dollars in electric vehicle charging infrastructure and other energy-related federal funds would have a domino effect, including lost Rhode Island sales tax dollars, thus having impacts on state general revenue collections.

48.    Moreover, the Energy EO calls into question the status of state funding that has been set aside for some of the programs that may be immediately paused under the EO. Rhode Island sets aside state funding as required to match the federal funds obtained under certain federal funding grants. These state funds are used to administer the programs after federal funding is obtained. If federal funding is suddenly paused, this state funding is kept in limbo.

*    *    *

49.    The federal funding mentioned above is critical to OER's operations in Rhode Island. Should receipt of funding be delayed or denied altogether, the numerous programs that OER operates for the citizens of Rhode Island will suffer and perhaps have to cease altogether. Disadvantaged communities in the state are most likely to feel the most significant and immediate impact of a delay or suspension of many of the affected programs. However, given the scope of federal financial assistance at issue here, all residents in the state are likely to be affected.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY, 2025.**

Christopher Kearns
Acting Energy Commissioner
Rhode Island Office of Energy Resources

12

# EXHIBIT A

# I. Program Strategy Narrative

## 1. Impact Assessment

According to energy & environmental justice data obtained through the National Renewable Energy Laboratory's State and Local Planning for Energy (SLOPE) tool, 18.8% of Rhode Island's populace resides in DOE-defined Disadvantaged Communities.[1] Rhode Island's Disadvantaged Community Score is 19.64 out of 36.[2] Of the 244 census tracts in Rhode Island, 61 are identified by CEJST as disadvantaged. To increase the transparency of data available for CEJST-identified DACs across the state, the Office of Energy Resources has been working directly with the Department of Energy to help refine the Low-Income Energy and Affordability Data (LEAD) tool with a DAC-friendly data list view.[3] Updates to LEAD that were facilitated by OER can now tabulate these statistics specifically for CEJST-identified census tracts. RI's disadvantaged census tracts are home to **97,892 households**. Of the 97,892 DAC households, **66,421 (67.85%) are renters** and **32.15%** are homeowners. 62,607 (63.96%) DAC households earn 80% or below AMI and 44,450 of DAC households (45.41%) live in homes built before 1940.

## 1.1 Solar Market

As of June 2023, there are 541 MW of solar interconnected to Rhode Island distribution system, excluding long-term contract PPAs. Of the 541MW located in RI, 369MW are net-metered, and 136MW is enrolled in RI Energy's feed-in tariff program, the Renewable Energy Growth (REG) Program. The remaining capacity represents the CRNM pilot program, which was statutorily capped at 30MW in 2016 and will be expanded by another 40MW for a total of 70MW of total capacity. Additional context about the 30MW pilot and OER's commitment to low-income-inclusion and program access is provided in section 3, Distributed Solar Marketing Strategy.

Of the 3,635 total CRNM subscribers currently participating in the 30MW CRNM pilot program, only 164 of those customers receive a Low-Income billing rate named "A-60." Low-income participation represents a mere 4.5% of CRNM off-takers. With respect to low-income participation for behind-the-meter (BTM) solar, the total number of A-60 low-income customers who receive BTM solar credits from residential rooftop solar is only 857 out of over 20,941 households with solar accounts, representing 4.1% of BTM low-income solar participation. Given this, low-income populations are currently underserved with respect to the solar market, representing a large potential of customers to benefit from the upcoming increase of capacity to the CRNM program.

---

[1] https://maps.nrel.gov/slope/data-viewer?filters=%5B%5D&layer=sfa.low-income-households&geoId=G44&year=2020&res=state

[2] Disadvantaged Community scores are calculated at the census-tract level and sourced from the Department of Energy's Energy Justice Mapping Tool, which defines disadvantage based on a cumulative burden from 36 burden indicators that reflect fossil fuel dependence, energy burden, environmental and climate hazards, and socio-economic vulnerabilities. https://energyjustice.egs.anl.gov/

[3] LEADs mapping interface aggregates data at the census tract level to help inform policy and program design through statistics such as energy burden, number of households, Area Median Income (AMI), building age, and heating fuel type.

Beyond the base of potential program participants, Rhode Island hosts ample sites to locate community solar projects that are responsibly sited. Rhode Island recently enacted legislation banning solar development on core forests, ensuring that energy goals are not met at the expense of the natural environment. Based on the analysis of a recent Solar Siting Opportunities for Rhode Island report, there is between 3.3 and 7.3 GW solar technical potential in Rhode Island on already-disturbed sites.[4] Given this, developers participating in the expanded CRNM program are expected to have ample development opportunities.

## 1.2 Storage Market

The small handful of A-60 customers who have access to grid resilience benefits from on-site energy storage is a mere 7 customers, representing only 1% of the residential market. Rhode Island's energy storage market is dominated by residential-scale batteries, which total just over 7MW of rate continuous power output distributed across the state. 89% of installed energy storage capacity is paired with solar PV.

During the 2022 legislative session, the Senate passed Resolution 3064 requiring the RI Public Utilities Commission to open an energy storage docket and conduct a study to "identify issues related to compensation mechanisms for electric storage resources, ownership of storage services, and capacity connected to the electric distribution or transmission system, including the incorporation of electric energy storage into existing programs and tariffs."[5] It also directed the PUC to explore a "framework for electric rate tariffs to apply to energy storage" and a possible statewide target for energy storage. The PUC created a stakeholder working group in spring 2023 and facilitated three meetings. The resulting draft report was made available for public comment in late summer 2023.[6] The final report will likely be published this fall and may inform possible energy storage legislation in the 2024 session.

Given the current limited market participation of commercial scale battery storage projects, the upcoming final report from the PUC, and likely legislation in 2024 it is challenging for OER and the REF to develop a commercial scale energy storage adder for affordable housing, resiliency hubs, and public critical facility locations. However, there are several commercial storage program in similar jurisdictions in the Northeast upon which a framework for a Rhode Island-specific commercial storage program could be based. These include Energy Storage Solutions in Connecticut, and the Solar Massachusetts Renewable Target storage adder. OER and REF have the benefit of drawing on lessons learned, both positive and negative, from these existing programs in other states. OER and REF will draw on neighboring state experience as well as assistance from a future procurement for a technical expert to determine the appropriate commercial scale adder funding.

## 1.3 Impact Targets

---

[4] https://www.synapse-energy.com/sites/default/files/Solar_Siting_Opportunities_for_Rhode_Island_19-076.pdf
[5] http://webserver.rilin.state.ri.us/BillText22/SenateText22/S3064.htm
[6] https://ripuc.ri.gov/sites/g/files/xkgbur841/files/2023-07/RIPUC_Storage_Report-Draft_for_Public_Comment_0.pdf

*CRNM Impact Targets and Assumptions:* Given that CRNM will have the greatest impact on total households served, OER hired a consultant to conduct an in-depth analysis on CRNM output and outcome targets. This robust analytical framework also included the development of several assumptions that can be carried through the calculations for each remaining program's impact targets. The following justification analyzes the rationale used to calculate each of the requested impact targets. The initial phase of the CRNM program enabled by the funding being requested would seek to deploy 40 MW of community solar projects serving a majority low-income off takers. Based on the modeling provided by OER's consultant, over the program life, the following benefits are expected to be realized:

| | Estimated Impact | Dollar of SFA funding per unit of impact |
|---|---|---|
| Number of Households Benefited Annually | 4,502 | $10,218 |
| MW of Solar Capacity | 40 | $1,150,000 |
| MWh Solar Production Over Program-life | 1,009,419,529 | $0.05 |
| Annual Short Tons of $CO_2$ Avoided | 37,250 | $1,235 |
| Annual Household Savings | $1,037,206 | $44.35 |

To estimate the number of households benefiting from the CRNM program annually, OER's consultant calculated the expected annual generation from the 40 MW of program-wide deployment assuming a typical DC capacity factor for a ground mounted project in the region (15.1%). Next, *at least* 51% of total programmatic production is assumed to flow to low-income customers on an annual basis (we note that this is the minimum amount required by law under the revised CRNM program, and thus the results provided here illustrate a conservative case in which no projects elect to subscribe more low-income subscribers than is required). To translate the MWh allocated to low-income subscribers to the number of households benefited, the EIA's 2020 Residential Energy Consumption Survey (RECS) dataset was utilized to calculate monthly household electric usage for RI households that meet the 80% Area Median Income (AMI) criterion as 555 kWh per month. Assuming subscribers are allocated CRNM bill credits up to 90% of their load (as is standard practice to prevent over-allocation resulting in unused bill credits), **4,502** low-income households will benefit from the policy annually, with an average annual savings of $329 dollars per household (assuming subscribers receive meaningful benefit electric savings equal to 20% of the bill credit amount).

To forecast the bill credit amount, OER's consultant computed an expected net metering rate at the time of program launch (based on an analysis of natural gas futures, regional transmission costs, and Rhode Island distribution grid investment) and applied a 2.25% inflator for the duration of the program term (20 years).

3

To calculate MWh of solar production over the life of the 20-year program, OER's consultant utilized the capacity factor described above and assumed 0.7% annual production degradation (consistent with the National Renewable Energy Laboratory's Q1 2022 solar cost benchmark report).[7] The estimated 37,250 annual short tons of $CO_2$ avoided was calculated using the Environmental Protection Agency's AVoided Emissions and geneRation Tool (AVERT) tool, assuming a 25-year useful life of the solar projects participating in the program.

As also discussed in the Distributed Solar Market Strategy Section below, the initial 30 MW pilot program cap was reached quickly, and nearly 20 MWs were placed on a waiting list, for a total of 50 MW of demonstrated interest from developers. There is reason the believe that with the application of both the Financial Assistance and Technical Assistance funds from the SFA program, there may be greater interest in the upcoming CRNM program expansion than in the past pilot program. Nonetheless, the 40 MW target is currently set by statute, and OER wishes to ensure that program funds can be deployed within the program period without waiting for demand by developers to accrue.

*ASAP Impact Assumptions:* The ASAP program will support at least 630 households with an estimated 3.53 MW of rooftop solar, providing estimated absolute household savings of over $11 million for the 25-year useful life of the systems. These figures were calculated using an estimated system size of 5.6 kW-DC and an average per project incentive amount of $4,760. The average per project incentive amount is assumed to be $.85/W, though due to the structure of the ASAP program the incentive amount will vary between $.50/W-$1.10/W based on what level of federal ITC the project is receiving. The savings estimate assumes a 50/50 split between participants on the A-16 standard residential rate and the A-60 low-income customer rate schedule. The savings analysis used a first-year average utility rate of $.294/kWh for A-16 customers and $.204/kWh for A-60 customers, with an assumed 3.09% utility rate escalation based on historical data for Rhode Island between 2001-2021. It also includes an expected .7% annual degradation factor for the solar production and excludes additional savings from energy efficiency, which is provided as part of the ASAP program. The blended average 25-year savings per household is estimated to be $18,136, which multiplied by the 630 households results in the $11 million in absolute household savings.

*AHSSP Impact assumptions*: Given the unpredictability surrounding the size of multifamily housing units applying to ASSHP, RI Housing provided OER with an average multifamily system size of 182kW, based on existing multifamily solar PV system sizes. The average size of those installations was 74 units. Total capacity was therefore calculated by multiplying the average PV capacity per household of approximately 2.45kW/unit by 640 households served, totaling 1.57MW. Non-financial meaningful benefits are discussed in the Meaningful Benefits Plan and will be delivered to tenants but are not included in the conservative estimate below. The estimated emissions avoided is largely underestimated because low-income tenants who reside in Zero-Energy Buildings see energy savings far greater than their counterparts who live in older or unkept housing units, especially renters. RI Housing provided OER with an estimated of 33% bill savings. OER then took the current energy C-06 energy rate forecast, multiplied by a 2.25%

---

[7] https://www.nrel.gov/docs/fy22osti/83586.pdf

annual escalator (an escalation rate consistent with OER's consultant's rate forecast) and multiplied that by the 555kWh average usage profile as mentioned above for 80% AMI customers assumed above. The product of these figures can be used to estimate the per participant and program-wide lifetime savings rate.

Table 1 summarizes the remaining output and outcome targets requested in the NOFO for capacity of residential-serving solar and storage, including: capacity deployed, households served, funding per household, and projected annual $CO_2$ emissions avoided. To streamline assumptions used to calculate remaining values, please reference each footnote included in the table to reference how each value was calculated. The assumptions utilized in the above analyses for CRNM and ASAP (such as annual escalators, production degradation, energy consumption for 80%AMI, and A-60 utility rates) are carried through for the assumptions listed in Table 1 below. All emissions avoided were calculated using the AVERT tool. The average energy consumption data calculated above (555kWh for 80% AMI customers) is carried through each of the household savings calculations using A-60 and C-06 rate forecasts.

**The current number of households served totals 8,555**, which exceeds the ratio listed in the NOFO for population less than 1 million, therefore maximizing the impact of the program relative to the amount of funding requested. Given EPA Guidance indicating $100M is intended to serve up to 10,000 households, Rhode Island's $79M request to serve 8,555 households exceeds the "ratio" targeted by EPA's "small program". If $100M can serve 10,000 households, $79M should serve up to 7,900 households. Therefore, the "ratio" proposed by EPA's "small program" carveout has been exceeded in terms of households served.

| Table 1: Rhode Island's Output and Outcome Targets for Financial Assistance Programs | | | | | |
|---|---|---|---|---|---|
| **Program name** | **Capacity Deployed** | **Households Served** | **Absolute Household Savings** | **Federal Funding per household** | **$CO_2$ Emissions avoided** |
| ASAP | 3.53 MW | 630[8] | $11,425,995 | $4,760 | 76,500 |
| Low-Income Direct Ownership Adder | 3.08 MW[9] | 400[10] | $26,788,943[11] | Up to $5,000 | 66,750 |

[8] This does not include OER's in-kind cost share. RGGI Proceeds allocated towards ASAP was originally intended to serve 200-300 homes. Additional funding from Solar For All would serve an additional 630 homes, for up to 930 homes total.

[9] assumes a system size of 7.69kW, as this is the threshold capacity for which solar projects receive the flat incentive rate of $5,000 per project. REF's PV incentive is calculated at .65 cents/watt with a cap of $5,000. Systems with capacity larger than 7.69kW (up to 25kW for residential systems) receive the full grant amount. This is a conservative estimate.

[10] This is a conservative estimate calculated using the REF incentive max of $5,000. If any homes install systems smaller than 7.69 kW (see REF sample system size ranges on page 19) the funding allocation can reach more homes.

[11] calculated by utilizing a 25-year rate forecast for A-60 customers, with an assumed 2.25% utility rate escalation. It also includes an expected .7% annual degradation factor for the solar production. This value is a conservative estimate, as projects utilizing REF that receive the max grant amount of $5,000 may have system sizes larger than 7.69kW.

| Roof and Electrical System Adder | N/A[12] | 1,633[13] | N/A | $2,500-$15,000[14] | N/A |
| Low-income Energy Storage Adder | 16.11 MWh[15] | 750 | $8,836,875[16] | $2,000 | 26,800[17] |
| AHSSP (Multifamily) | 1.57MW | 640 | $9,228,731 | ~$7,500 | 34,000 |
| CRNM[18] | 40MW | 4,502[19] | $29,634,457[20] | $10,217 | 931,250 |
| **TOTAL** | 48.18 MW, 16.11 MWh | 8,555 | $85,915,001 | | 1,135,300 |

## 2. Meaningful Benefits Plan

The following Meaningful Benefits Plan explains the mechanisms through which all programs ensure a minimum of 20% household savings to beneficiaries. The comprehensive suite of seven programs offers a wide variety of deployment options designed to meet the needs of low-income and disadvantaged tenants, homeowners, and financing products that increase program appetite for community centers and critical facilities. Rhode Island's approach recognizes equitable access to enabling upgrades is crucial to wealth building and increased resiliency in our most underserved communities. Through a combination of affordable and accessible solar leases, community solar subscription models that ensure 20% minimum savings, or enable paths to ownership and low-income /DAC equity and wealth building through solar projects that can deliver near 100% household savings if adequately sized to historic household usage.

---

[12] The Roof and Electrical System Adder does not have a MW deployment target because its funds are dedicated to enabling upgrades. This adder enables solar and storage deployment because it can be paired with programs 2 and 4. Therefore, any savings or emissions avoided would be indirect in nature.

[13] Since the Program 3 adder for enabling upgrades can be spent in a variety of ways (electrical panel, wiring, roof, structural upgrades, Households served was derived by taking the average 466 (lower bound) - 2,800 (upper bound).

[14] Up to $2,500 for electrical panels, up to $15,000 per unit for wiring, up to $20,000 for roofing and structural.

[15] To calculate MWh deployed, the average residential battery system size (kW) was calculated using data from the past two years of REF energy storage adder funding rounds. Average battery size was 5.37kW. A 4-hour storage duration is assumed across all households served for a total of 16.11MWh.

[16] Assumes 10-year battery life. Absolute household savings was calculated using Connected Solutions Revenue (year 1 assumed savings of 1,500) adjusted by a 4% degradation rate, treating income from demand response as the driver for customer savings.

[17] a 10-year battery life is assumed. Given that the energy storage adder must be paired with solar, it is also assumed that the low-income direct purchase adder and low-income storage adder would be paired for any low-income projects applying to REF. The 3.08MW target was incorporated into AVERT along with estimated MWh avoided. It is important to note that this number should increase over the lifetime of the system as more renewables penetrate the grid. AVERT's values may not necessarily be valued for the duration of the lifetime value of storage assets.

[18] Since CRNM program expansion is statutorily capped at 40 additional MW, impact targets for CRNM include both programs 6 and 7. Program 6 is milestone grant-based, Program 7 finances community solar, but both programs contribute to the total 40MW allocation.

[19] Please see Program 6 Impact Assessment below for assumptions used in calculating this figure.

[20] Absolute Household Savings calculations are based on an analysis of expected production from participating projects in relation to forecasted retail rate in Rhode Island, assuming 20% bill credit savings are provided to participating households. The analysis assumes a 20-year program period to derive absolute savings program-wide.

**2.1 Affordable Solar Access Pathways:** The ASAP program will provide meaningful benefits to participants and communities through no-money-down third party ownership models in multiple ways. First, it will provide Rhode Island's disadvantaged and low-income households' utility bill savings through solar and energy efficiency services that are priced to achieve or exceed the 20% minimum savings threshold. Prospective solar system designs are screened prior to signing a solar contract to ensure that they meet the required savings threshold. Additionally, the program requires a first-year savings guarantee and a production guarantee over the term of the lease to ensure expected savings are actually delivered. Second, the ASAP program expands access to solar through accessible financing that requires no FICO score and no income requirement. Third, it will provide the meaningful benefit of increased resilience for low-income households through the inclusion of energy storage as an option for participants. Fourth, the lease structure provides a path to ownership at the end of the federal investment tax credit recapture period, allowing participants the option to build equity in the project. And fifth, the ASAP program is supporting quality, middle-class jobs by increasing solar deployment in disadvantaged communities.

**2.2 Low–Income Direct Purchase Adder:** The low-income Direct Purchase Adder will provide savings, access, and ownership through upfront grant payments in the following ways. The Purchase Adder will dramatically improve the access, feasibility and REF program appetite for direct-ownership residential-serving solar in households who have historically been left behind in the residential clean energy transition. This adder provides valuable assistance to enable the adoption of on-site solar for households who wish to procure their own power and offset as much of their electric load as possible. Once installed, behind-the-meter solar adequately sized to historic usage will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target. Given the inevitable lack of tax liability for low-income households, a "stackable" upfront grant available only to households that would not otherwise be capable of benefitting from federal incentives dramatically increases the feasibility for low-income customers to finance the remaining cost of a residential PV system.

**2.3 Roof and Electrical Systems Adder:** The Roof and Electrical Systems Adder will expand access to solar through upfront grant payments by enabling the adoption of on-site solar for households that cannot afford the upfront costs of roof or electrical panel replacements. This is a particularly acute barrier for low-income households, who tend to live in older housing stock with less robust electrical systems and ageing roofs, and often lack access to low-cost capital or personal savings to cover the high upfront costs of structural or electrical upgrades. By increasing the accessibility of enabling upgrades through a program managed by the same entity which offers upfront grants as described above, the installation of a PV system is substantially more feasible to households who have been outcasted by the clean energy transition solely because of the age of their home. Again, adequately sized to historic usage, low-income direct ownership of PV will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target. This adder can be paired with the low-income direct purchase adder, or the low-income specific expansion of the REF Energy Storage Adder as described below. Along with the other stackable adders in this proposal, this adder will

7

allow households to access meaningful savings, facilitate ownership, and broaden access to RI's solar programs.

**2.4 Low-Income/DAC Energy Storage Adder Expansion:** The Energy Storage adder will enable the adoption of energy storage paired with on-site solar. The addition of storage will offer meaningful benefits to households, but in ways distinct from that of a solar facility. By offering energy storage paired with solar to communities with frequent history of outages, the grid resilience benefits delivered directly to disadvantaged households can directly improve the reliability of electric service during major storm events. It can directly improve the quality of life for citizens who might otherwise have to relocate during storm events due to unsafe conditions such as extreme temperatures. Energy storage resources can also participate in Rhode Island's Connected Solutions program, which provides performance-based compensation for storage resources' abilities to respond to discharge events issued by the utility. Depending on the storage system and operational profile, a participant is expected to receive around $1,500 annually for participation.[21] Income from demand response can now serve as a driver for customer savings. This would result in a net reduction in the cost of being an electric customer far greater than a 20% reduction in per-kWh energy expenses (which is expected to equal roughly $300/yr for a typical low-income household). Furthermore, Connected Solutions, through reducing non-coincident system peaks, also serves to reduce capacity market costs for all New England customers, including Rhode Islanders.

**2.5 Affordable Housing Supplemental Solar Program (AHSSP):** Under this program, at least 50% of the net value of the net metered credits achieved with the addition of solar will be required to benefit low-income tenants of the affordable developments. These approaches could include direct reduction or rebates of tenant rents; establishment of increased operating or replacement reserves of the property; provision of free or reduced-cost high-speed internet access for the residents; provision of social service programs, such as job training or financial literacy programs, to the tenants; installation of additional energy-savings programs for the property, and other similar initiatives. Developers will be required to identify the benefits they intend to utilize to meet these requirements.

**2.6 Community Remote Net Metering:** The redesigned, low-income-focused CRNM program would meet the 20% household savings threshold by requiring and guaranteeing that community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill. These subscription models will include no sign-up fees, no cancellation fees, no credit checks, and equitable verification and sign-up processes. In 2023, the General Assembly expanded the CRNM program to allow for up to 50% commercial and industrial anchor tenants. By providing commercial anchor tenants, community solar projects can more easily overcome financing barriers commonly found in serving low-income customers. This guaranteed subscription model can help offset risks associated with subscriber turnover or unsubscribed capacity. Addressing

---

[21] https://www.rienergy.com/RI-Home/ConnectedSolutions/

8

these risks may encourage lenders to offer lower interest rates on project financing. The savings generated from the lower cost of capital can then be passed on to subscribers.

**2.7 RIIB Financing on Preferred Sites:** Projects funded through RIIB's DAC-focused Financing program for Community Solar on Preferred Sites would be a part of the total 40MW expansion of the low-income -focused CRNM program as described above. Via subscription models, meaningful benefits deliver a minimum of 20% household savings threshold by requiring that participating community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill prior to accounting for CRNM bill credits. Additionally, the technical assistance discussed in Section 5.12 of Project Deployment TA Strategy elaborates upon the resiliency focus that RIIBs proposals to public entities will include. All critical facilities who apply for technical assistance will include energy storage proposals as a part of project planning.

**2.8 Investing in Quality Jobs and Businesses (meaningful benefits criteria 5)**

Critical to ensuring that low-income households have access to residential rooftop and residential-serving community solar energy is a skilled workforce ready to perform installation and maintenance, engage in the supply chain, and support innovation. Equally critical to this mission is leveraging the need for an expanded and upskilled workforce to direct these opportunities to members of the same communities that will benefit from Rhode Island's Solar for All proposal. This is especially important as the solar industry is still recovering from job loses during the pandemic. While improvements have been made, RI lost over 2,500 clean energy jobs, 15.5%, from 2019 to 2021.[22] In RI, solar must be installed by licensed electricians, and there is a 1:1 apprentice to journeyman/master electrician ratio requirement. Creating a pipeline of electricians is critical to the success of the state's ambitious renewable energy goals.

The Rhode Island AFL-CIO maintains strong relationships and partnerships with its own member unions, community-based organizations across the state, and leaders in state and local government. AFL-CIO will leverage their members' expertise and existing partnerships with the Rhode Island Department of Labor and Training (DLT) to identify and establish equitable pathways to the kinds of family-sustaining clean energy careers illustrated in this application for disadvantaged communities. The Rhode Island AFL-CIO will dedicate staff time and resources to provide technical assistance towards workforce development best practices through apprenticeship utilization, community benefits agreements, project labor agreements, career readiness curriculum, and intake. If the application is awarded, the Rhode Island AFL-CIO will work with the OER to create a work plan and hold regular check-in meetings with staff and stakeholders.

*Real Jobs Rhode Island:* Real Jobs RI is a business-led workforce development initiative managed by RI DLT. It serves as Rhode Island's national-leader workforce development platform. Since its launch in 2016, Real Jobs RI has responsibly managed over $150 million in State and federal funding, consistently meeting or exceeding performance benchmarks, and

---

[22] https://energy.ri.gov/climate-change/clean-energy-jobs

establishing a firm commitment to providing services to communities that have historically experienced barriers to employment and career growth. From January 2016 through June 2023, the Real Jobs RI platform has served over 43,000 individuals, including jobseekers, incumbent workers, business owners, and entrepreneurs. Relative to the size of the labor force, this would be the equivalent of serving over 1.4 million individuals in a state the size of California. The individuals placed into employment by these partnerships are over-representative of persons of color, and individuals with a high school degree or less, relative to the general state population.

Industry-led and demand-driven, RJRI's model allows it to nimbly respond in real time to emerging workforce needs, and its extensive footprint across the state means that we can rapidly target recruitment efforts to areas of specific need. Participation in Solar for All workforce development programming through RJRI will be available to individuals via multiple entry points to ensure inclusive recruitment and access so there is "no wrong door" to enrollment. The State will intentionally recruit participants through RIDLT outreach channels, targeted marketing to unemployment insurance claimants, direct placement through Real Jobs RI, and most importantly, in close partnership with an established advisory group of community-based organizations (CBOs) that serve historically marginalized communities. These community-based partners will help advertise the program and recruit participants. In addition, they will directly inform program design to ensure that participants have the necessary resources and support to successfully complete the identified training tracks and access jobs.

Specifically, the RJRI team will coordinate with the OER to determine which communities will be the primary focus of programming through this proposal and will then assess which of the members of the CBO advisory committee provide services withing those areas. In addition, the Department will leverage its longstanding partnership with Building Futures to recruit low-income members of affected communities to participate in training.

*Building Futures:* Building Futures is a partnership between RI AFL-CIO and RI DLT that launched in 2007 as a construction industry partnership focused on leveraging the Registered Apprenticeship model of workforce development. Building Futures creates opportunities for individuals with barriers to employment to access the benefits offered by the Registered Apprenticeship model by operating a comprehensive pre-apprenticeship program to prepare diverse, low-income men and women for success in employment as registered apprentices in the building trades. Building Futures has a proven track record of successfully training individuals for placement in apprenticeships and demonstrating commitment to their goal of serving low-income Rhode Islanders. One hundred percent of individuals served by Building Futures qualify as low-income earners, seventy five percent are people of color, and fifty percent are justice-involved. In addition, eighty percent of Building Futures graduates remain in their chosen trade for more than ten years.

RJRI has partnered with Building Futures for years and continues to fund this crucially important work. With funding provided in this proposal, RJRI and Building Futures will create a pathway to apprenticeship as an electrician for between 150-200 individuals from DACs,  This will create a local, community-based workforce that can be day-one ready to work on the installation of rooftop and community solar projects, enabling meaningful community participation and access

10

to economic opportunity directly through this proposal, and providing a long-term, high-quality career track for these individuals long after this project has concluded.

The confluence of RJRI's lengthy track record of responding to emerging workforce needs, emphasis on equity, capacity for targeted recruitment—particularly among low-income communities—and proven efficacy in upskilling and placing workers into sustainable careers positions the state perfectly to respond to the workforce needs that will arise from this historic investment in expanding access to solar energy for low-income Rhode Islanders. The long-standing success of Building Future's model offers an immediate, existing pathway to high-quality employment for affected community members that can be utilized to ensure the success of this proposal. By leveraging these two programs, we will ensure that the economic opportunity created by this investment flows directly to those communities who have been harmed by their lack of access to solar powered energy and will address historic and systemic barriers to employment within these communities.

## 3. Distributed Solar Market Strategy

### 3.1 Market Barriers

There are a multitude of barriers to low-income customer participation in the RI solar markets. These include monetary barriers such as limited access to capital to purchase solar equipment upfront, perceived credit risk (justified or not) of low-income customers, generally higher customer acquisition costs, and overlap with other customer assistance programs that may reduce the direct benefits of solar adoption. Non-monetary barriers include lower home ownership rates, reducing the likelihood that a low-income customer can make the decision to install BTM solar, split incentives between landlords who own rented property, and low-income customers who pay their own electric bills, potential language barriers in low-income and EJ communities, and community distrust of direct marketing.

Rhode Island's low-income and DACs have historically been underserved by Rhode Island's distributed solar and storage market. While this can be partially attributed to conventional barriers such as lack of upfront financial capital and barriers to financing, a lack of enabling programmatic frameworks to allow low-income citizens to easily enter the market has persisted due to several market and regulatory barriers. The availability of this federal funding opportunity has transformative potential for low-income residents and DACs to act as participants in the market, allowing for multiple paths to participation such as low-commitment subscription models, third party ownership, and incentive adders that enable paths to ownership and wealth building through the expansion of existing ratepayer funded programs.

### 3.2 Net Metering Policies: Community Remote Net Metering

The CRNM program will address the market barriers listed above through a community solar model that does not necessitate a participating customer to own their own roof, bypasses the split incentive issue. In fact, it can enable a customer to take their subscription with them if they move within RIE's territory within the state. Credits can be provided at no upfront cost through a PPA in which low-income customers can both realize bill reductions and finance the solar projects

simultaneously, or as discussed in the Program 7 section and/or the "Facilitating ownership models and equity building" section below, could access low-cost financing options. Additionally, the inclusion of a potential C&I anchor tenant can allay some creditworthiness perceived risk to lower overall financing costs from third parties.

CNRM, a virtual net metered community solar program, was passed by the General Assembly as a 30MW pilot in 2016[23].  Eligible net metering credit recipients under the pilot program were:

   a.  Residential Credit Recipient, a residential account in good standing.
   b.  Low or Moderate-Income Housing Eligible Credit Recipients, an electric service account or accounts in good standing associated with any housing development or developments owner and operated by a public agency, nonprofit organization, limited equity housing cooperative, or private developer…

The program proved popular with community solar developers focused on projects serving residential subscribers and the 30 MWs was quickly filled with a waiting list for projects that ultimately never moved forward because the program cap was reached.  Due to program complexity, only one project associated with an affordable housing development moved forward. Although enabling community solar legislation was signed into law this year, the following narrative aims to explain the numerous efforts already undertaken by OER in previous years to ensure low-income inclusion in any future community solar program expansion.

After the CRNM program was signed into law, RIE filed tariff revisions to the Public Utilities Commission establishing the statutory program.[24] During the fall of 2016, RI Energy commenced a stakeholder review process with RI Housing and OER to develop their approach to implementation of the pilot. Representatives from RIE, OER, and RI Housing met with approximately twenty-five additional stakeholders to review draft documents, discuss feedback and make additional modifications to the pilot.[25] This stakeholder group ultimately determined that RIE would implement and manage the pilot and enrollment, and RI Housing would develop and manage the criteria and processes that govern whether residential housing developments satisfy the statutory requirements and definition of a LMI housing eligible credit recipient per the tariff. The PUC conducted a technical session and an open meeting in 2017, with the written order for CRNM to take effect in January of 2018.  There was a significant regulatory lag between the time the law was passed and when projects could apply to the program through the updated net metering tariff.

 In 2017, OER was awarded funding from the U.S. Department of Energy through a partnership with the Clean Energy States Alliance (CESA) for State Energy Strategies to Bring Solar to LMI Communities (SES) with four other states and the District of Columbia.[26]  Rhode Island's portion of the grant activities were focused on community solar and increasing participation in the projects by low-income customers.  With this funding, OER hired a contractor who helped

---

[23] Rhode Island Energy Net Metering Tariff
[24] https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4631-NGrid-Ord23005_1-16-18.pdf
[25] https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4631-NGrid-NetMeteringTariff%2811-30-16%29.pdf
[26] https://www.cesa.org/projects/state-energy-strategies-project/

lead low-income community solar efforts. This work included working directly with and building relationships with community based organizations as well creating education and outreach materials about community solar.  To understand the scope of what was needed, OER and RIE completed a survey of customers on the RIE low-income rate (A-60) which are considered low-income ratepayers.[27]  This survey was designed to assess:

- The degree of awareness regarding community solar to better design web content and outreach materials.
- low-income interest in participating in community solar and overall interest in clean energy and energy efficiency opportunities.
- Best ways to connect with low-income customers (i.e. – best time of day, how close to home, language needs, etc.).
- Information regarding a need for a low-income carve out.

Prior to circulation, the survey was vetted by key stakeholders who provided feedback before it was deployed.  It was sent out to 11,055 customers and yielded a 3.5% response rate. One of the surprising findings from this survey indicated that low-income customers highly prioritize reducing greenhouse gas emissions almost equally with prioritizing bill savings.  This was helpful information when designing outreach materials and attending public meetings because emphasis could be made on all the benefits of community solar without focusing only on electricity savings.



*Figure 2: Energy Bill Savings are almost equally as important to low-income customers as reducing greenhouse gas emissions*

---

[27] https://risolarmarketplace.com/assets/LOW-INCOME-Community-Solar-Memo.pdf

13

Other portions of the SES grant funded the RI Community Solar Marketplace website.[28]  This was a critically important tool in OER's strategy for increasing education regarding community solar.  The website also offered ways to showcase community solar projects, metrics and tell community stories.  It was also helpful in spreading the word about community solar related events.

In the original law creating the CRNM program, the state legislature had included language authorizing the PUC "to expand or modify the aggregate amount after a public hearing upon petition by the office of energy resources." Further, "(t)he commission shall determine within six (6) months of such petition being docketed by the commission whether the benefits of the proposed expansion exceed the cost."[29] OER planned on moving forward with a petition filing to the PUC requesting an expansion of the CRNM program in late 2020 rather than wait until year for legislative action, since efforts in the prior two years had been unsuccessful.  It was critically important to OER that low-income customers have access to and benefit from any proposed expansion of CRNM.

To prepare for the petition filing or another legislative effort, OER created a community solar working group of interested stakeholders, community solar developers, representatives from subscriber management companies, and other state agencies.  The group met regularly starting in the early summer of 2020 to discuss the potential expansion of the CRNM program. Concurrently, in May 2020, OER applied for technical assistance from the National Community Solar Partnership (NCSP) and was awarded first round assistance through Jill Clyburn and Associates to participate in the working group and lead public stakeholder meetings. The working group ultimately agreed on a draft "low-income Customer Inclusion in the CRNM Program Proposal" which was published in September 2020.[30] The proposal outlined a legislative or petition plan which required, "any new community solar project that applies to an expanded CRNM program would need to ensure that no less than 20% of the electricity output of the system is designated to low-income customer electricity accounts. Each project must also maintain a minimum 20% low-income throughout its life. CRNM projects must ensure that 20% of the capacity of the project is allocated to low-income customers always maintained". This plan also included sections on customer qualification, program oversight, and penalties for non-compliance.  OER, with assistance from Jill Clyburn and Associates, put the proposal out for public comment and held three public meetings during lunchtime and in the evening to maximize community attendance.  Technical assistance from NCSP also provided OER with public meeting coordination as holding these events as virtual stakeholder meetings was new during the height of the pandemic.  Meeting minutes and summaries as well as a final report on the stakeholder efforts were also provided to OER.

Concurrently with OER's 2020 work, the Division of Public Utilities and Carriers (DPUC) conducted a benefit-cost analysis evaluating the cost effectiveness of the CRNM program.[31]

---

[28] https://risolarmarketplace.com/
[29] http://webserver.rilin.state.ri.us/Statutes/TITLE39/39-26.4/39-26.4-3.HTM
[30] https://risolarmarketplace.com/community-stories/low-and-moderate-income-customer-inclusion-in-the-crnm-program-plan/
[31] https://ripuc.ri.gov/sites/g/files/xkgbur841/files/generalinfo/Synapse-CRNM-BCA-2021-Redacted.pd

There were few opportunities for stakeholder input into the benefits used to conduct the analysis. Only after the analysis was complete was it distributed to stakeholders. It concluded that an expansion of the CRNM program was not cost effective. As a result, OERs decided to not move forward with a petition because it would not been successful.  Additional legislative efforts to expand the CRNM program failed in 2021 and 2022 but succeeded in 2023.  The opportunity to revisit the topic of low-income community solar would not otherwise be possible without the availability of this funding opportunity.

Despite these challenges OER remains committed to ensuring low-income inclusion and program access as well as the expansion of CRNM.  In fact, OER has committed to provide metrics to the NCSP dashboard and will continue to collect project and off taker data from RIE, update the Community Solar Marketplace website, and tell community stories about the real-world impacts that community solar has on low-income customers.

### 3.3 Third-Party Ownership Policies

*Rhode Island Energy*

RIE's net metering and feed-in tariff programs are robust and explicitly allow for third party ownership. Under Rhode Island General Laws § 39-26.4-2, the definition of an "Eligible net-metering system" states "The eligible net-metering system may be owned by the same entity that is the customer of record on the net-metered accounts or may be owned by a third party that is not the customer of record..." Third-party ownership has been a critical financing structure that has increased access to solar, specifically for low- income households that lack the federal tax liability needed to utilize the Section 25D residential energy credit. Third-party ownership also provides the following benefits which are beneficial for low-income households:

- Immediate utility bill savings
- Ability to utilize Section 48 Investment Tax Credit adders (low-income Communities, Energy Communities, and Domestic Content)
- More accessible financing requirements
- System monitoring, maintenance, repairs, and warranty support
- Production, equipment performance, or savings guarantees
- System removal and recycling

Under the ASAP program, solar leases also provide a path to ownership at the end of the ITC recapture period for interested customers. Between the ITC and the ASAP incentive, this path to ownership will be more viable for low-income households to utilize.

Rhode Island Energy does not collect data as to what percentage of systems in RI are owned by a third party, or how many third-party owned systems are purchased by A-60 low-income utility customers. However, the Net Metering Tariff is supportive of third-party owned systems and will not serve as a barrier to deployment in low-income and disadvantaged households.[32]

---

[32] https://gridforce.my.site.com/servlet/servlet.FileDownload?file=0150W00000FLOW-INCOMEw

*Pascoag and Block Island Utility Districts*

There are two small utility districts in Rhode Island, Pascoag Utility District (PUD) and Block Island Utility District (BIUD) serving 4,700 and 1,650 customers respectively. Third party ownership is not a barrier to low-income or DAC access in these communities' utility territories do not contain DACs as identified by CEJST. However, both have limited net metering policies that do explicitly address third party ownership.

## 3.4 Battery Storage

Recently there has been an increase in battery storage projects in Rhode Island. This is in part due to both the REF small scale incentive and RIE's Connected Solutions Demand Response program. The REF Small Scale energy storage adders works in conjunction with RIE's Connected Solutions program run through the utility's energy efficiency program.[33] A similar innovative program is administered by utilities in Massachusetts' demand response programs. This program uses energy load curtailment and battery storage to reduce peak energy use, reduce air pollution, and lower electricity costs. During peak summer events between June and September, RIE will signal the customer's battery to discharge onto the grid for no more than three hours per event. For residential energy storage, the incentive rate is $400/kW performed per summer and that rate is locked in place for the first five summers the customer is enrolled. To maximize grid benefits, customers who install a battery and solar project and utilize the REF energy storage adder are required to enroll in the Connected Solutions program. An opt-out option is available upon customer request. RIE also offers 0% financing for the cost of an energy storage battery enrolled in Connected Solutions through the HEAT Loan program.[34] Qualified customers may receive an authorization form which can be brought to participating lenders to apply for the loan.[35] While the Connected Solutions program allows for standalone battery systems to participate, the REF adder does not. Projects incentivized through the REF must be paired with a PV system. According to data provided by RI Energy, as of end of June 2023, there were 890 energy storage projects interconnected and only 6 were commercial scale. These 6 projects make up only 5% of the total installed capacity of energy storage systems in the state.

## 3.5 Interconnection

RIE has transparent interconnection processes that are easily accessible online via an interconnection portal and available resource webpages. Their Interconnection Documents webpage is updated at least weekly and contains all documents necessary for developers to install small and large-scale projects, including all associated tariffs and process documents.[36] RIE's interconnection tariff is clear and recently updated as of September 1, 2022. It includes statutory time frames for review and fee schedules.[37] The online transparency of RIE's

---

[33] https://www.rienergy.com/RI-Home/ConnectedSolutions/BatteryProgram
[34] https://www.rienergy.com/media/ri-energy/pdfs/energy-efficiency/ri-steps-to-apply-0-financing.pdf
[35] https://www.rienergy.com/media/ri-energy/pdfs/ways-to-save/connectedsolutions/connectedsolutions_battery_fill.pdf
[36] https://gridforce.my.site.com/s/article/RI-Interconnection-Documents
[37] https://gridforce.my.site.com/servlet/servlet.FileDownload?file=0150W00000DPLF6

16

application process,[38] interconnection process,[39] interconnection documents, tariffs and other resources allow for easy sharing with developers should any market participants reach out to OER or the utility with questions about process. RIE's Customer Application Portal allows their staff and solar installers to communicate directly via chat or email throughout the application and interconnection process. OER also provides direct support to constituents who contact the office if they experience any interconnection delays, enabling the utility to prioritize cases that may have strayed from anticipated timelines. RIE's Rhode Island System Data Portal also enables transparent and public access to hosting capacity maps, heat maps and distribution assets.[40]

One gap that the current interconnection tariff has relates to the interconnection of commercial scale battery systems.  While OER and RIE staff have done work through the Solar Energy Innovation Network (SEIN) with both NREL and LBNL on the *Use of Operating Agreements and Energy Storage to Reduce Photovoltaic Interconnection Costs*, the core concept behind this work, an Operating Envelope Agreement (OEA), has not yet been incorporated into RIE's interconnection tariff.[41]  An OEA is a contractual agreement between the storage developer and the utility to describe the rules and parameters describing how the storage system will operate and discharge energy to the distribution system.  The report goes on to provide example language that can be incorporated into an interconnection tariff.  This concept and language may be included in a future update to the interconnection tariff, either through legislative or regulatory action.

### 3.6 Other Enabling Regulatory Frameworks

In 2021, Rhode Island passed the Act on Climate mandate, which sets enforceable climate emissions reductions to of 45% below 1990 emissions levels by 2030, 80% below 1990 emissions levels by 2040, and net-zero emissions by 2050.[42]  The law built upon the previous 2014 Resilient Rhode Island Act, which created the Executive Climate Change Coordinating Council and resulting 2016 Greenhouse Gas Emissions Reduction Plan.[43]

Rhode Island also has one of the nation's most ambitious Renewable Energy Standards of 100% renewable electricity by 2033[44]. Helping the state's most disadvantaged populace to reduce energy burdens through all programs proposed in this application will help to reduce residential reliance on delivered fuels while supporting and encourage distributed solar deployment.  As a small state with a relatively small solar market, it can be difficult to attract and retain installers to the state.  The state's strong RPS and successful suite of programs continues to send signals that the RI solar market continues to grow and welcomes new installers to the state.

---

[38] https://gridforce.my.site.com/s/article/RI-Application-Process
[39] https://gridforce.my.site.com/s/article/Interconnection-Process-RI
[40] https://systemdataportal.nationalgrid.com/RI/
[41] https://www.nrel.gov/docs/fy22osti/81960.pdf
[42] http://webserver.rilin.state.ri.us/Statutes/TITLE42/42-6.2/42-6.2-9.htm
[43] https://climatechange.ri.gov/sites/g/files/xkgbur481/files/documents/ec4-ghg-emissions-reduction-plan-final-draft-2016-12-29-clean.pdf
[44] http://webserver.rilin.state.ri.us/Statutes/TITLE39/39-26/39-26-4.htm

Community Solar also offers retail rate net-metering and already allows for consolidated billing credited directly to a customer's electricity bills, streamlining the delivery of meaningful benefits of community solar directly to low-income and DAC households. Additionally, Rhode Island exempts residential solar systems from taxation, which ensures customers would not be assessed a higher property tax rate after installing solar.[45]

## 4. Financial Assistance Strategy

Each of the seven programs described below will provide eligible financial assistance to enable the delivery of meaningful benefits to low-income and disadvantaged communities to deploy and benefit from each of the following programs. With less than 100,000 households located in DACs, Rhode Island is requesting an award in the "Small Programs" range. By requesting a total of $79M, RI's suite of programs is capable of serving at least 8,555 households, exceeding the ratio of households served proposed by EPA.

| Table 2: Rhode Island Financial Assistance Programs | | eligibility |
|---|---|---|
| Program 1 | Affordable Solar Access Pathways (ASAP) | Both |
| Program 2 | Low-Income Residential Solar Direct Ownership Adder | Income |
| Program 3 | Low-Income & DAC Roof and Electrical System Adder | Both |
| Program 4 | Low-Income/DAC Residential Energy Storage Adder | Either |
| Program 5 | Affordable Housing Solar Supplemental Program (AHSSP) | Either |
| Program 6 | Community Remote Net Metering (CRNM) | Either |
| Program 7 | Financing Community Solar on Preferred Sites | Either |

**Note:** Eligibility for each of the following programs is determined using EPA's definition of eligible low-income and disadvantaged communities as defined in SECTION I.D: Competition Terminology. The eligibility column identifies each program's eligibility requirements as either: (1) income-eligible, (2) DAC-eligible, (3) "either" income-eligible or DAC eligible, and (4) "both" income-eligibility and DAC eligibility required for participation. The eligibility designation for Program 5 (ASSHP) specifies "either" unsubsidized or subsidized housing, per EPA's definition.

## 4.1 Program 1: Affordable Solar Access Pathways (ASAP)

In this program, SFA funds will be used to triple the number of households the ASAP program can support through this newly created third party ownership grant program for low-income customers located in disadvantaged communities. In March of 2021, OER signed a letter joining the Clean Energy States Alliance's (CESA) Working Group for Scaling up Solar for LI Homeowners.  Through this initiative, CESA, along with other partners, committed to learn about, explore, and potentially adapt Connecticut's solar program for low-income homeowners. The initiative was funded through an award from the US Department of Energy Solar Energy Technologies Office. Throughout 2021 and 2022, OER met with the CESA team and representatives from the Connecticut Green Bank to learn more about their Solar for All

---

[45] http://webserver.rilin.state.ri.us/Statutes/TITLE44/44-3/44-3-3.HTM

program, lessons learned and best practices.  In the spring of 2022, OER, in association with the REF, decided to move forward with replicating Connecticut's program.  Through the Scaling up Solar project, OER received technical assistance through CESA and the North Carolina Clean Energy Technology Center (NCCETC) at North Carolina State University. In October 2022, NCCETC completed a Rhode Island specific solar market report along with analysis comparing the two residential solar programs, net metering and the feed-in-tariff program, Renewable Energy Growth.[46] In November 2022, OER committed $1.6 million of Regional Greenhouse Gas Initiative (RGGI) funding towards the implementation of ASAP.[47]  This allocation was the first commitment that OER has made to designing and implementing a program, outside of community solar, specifically for low-income customers. The initial RGGI funding allocation was intended to reach approximately 200-300 households. With additional funding through SFA, ASAP has the potential to triple its reach to nearly 1,000 low-income homeowners in DACs.

Notable components that aide in expanding low-income access to solar adoption include (1) no credit scores to be required, (2) no cancellation penalties, (3) a 14-cent electricity PPA price with a low annual escalator, (4) a representative dedicated to community partnerships and (5) community partner benefits of $400 per customer. Robust energy efficiency measures were also included, and customer cost savings can be realized by installing those measures first, which helps to reduce the customer's electricity usage.  Additionally, ASAP offers energy storage options for customers who would be interested in adding a resiliency component to their system. The ASAP-specific marketing plan as discussed in the Distributed Solar Marketing Strategy recognizes the need for energy storage deployment in communities with history of frequent outages, enhancing the resiliency of communities which have historically been underserved by grid resilience investments. The ASAP program launch is tentatively scheduled for December of 2023, pending the implementation of the new application portal and finalization of program design.

**Expansion of Renewable Energy Fund Programs**

The REF has two long standing programs which support the installation of net-metered solar on residential and commercial buildings.  Over time, the program has expanded to include adders for energy storage systems as well as carports for commercial applicants. Recognizing impacts to ratepayers, the expansion of all three REF programs as described below **would not be possible without the availability of federal funds**. The current funding source for REF is system benefit charges and alternative compliance payments supplemented with proceeds from the Regional Greenhouse Gas Initiative (RGGI). Funds are awarded to the solar installer, and the installer is required to subtract the exact grant amount from total project cost.

---

[46] Technical assistance provided to OER from CESA and NCCETC is based upon work supported by the US Department of Energy's Office of Energy Efficiency and Renewable Energy (EERE) under the Solar Energy Technologies Office Award Number DE-EE0008758
[47] https://energy.ri.gov/sites/g/files/xkgbur741/files/2022-11/2022-C%20Proposed%20RGGI%20Allocation%20Plan%20_FINAL.pdf

19

Currently, the REF incentive for small scale applicants is $.65/watt with a maximum incentive of $5,000 per project.[48] Any system size of 7.69kW would receive the maximum incentive. According to Rhode Island Energy, the average small scale net metered systems in 2022 and 2023 were 6.23kW and 6.52kW, respectively. The majority of small scale projects that have applied to the small scale REF program have had a system size at or above 7.69kW and received the maximum incentive.[49] The current small scale incentive can help offset approximately 15-20% of the upfront total project cost for a net metered, residential PV system. According to the 2021 Lawrence Berkley National Lab Tracking the Sun Report, the average cost/watt for a RI residential solar system is $4.80, which is significantly higher than both that national average of $3.80/watt and our neighboring states of Massachusetts, $3.50/watt and Connecticut, $3.90/watt.[50]

The REF proposes to expand their existing adder offerings to include three new adders which will be awarded concurrently with grant applications:

- Adder to the small scale program for direct ownership for low-income homeowners, providing additional funding to support the upfront cost of a customer owned PV system
- Adder to the small and commercial scale programs for roof and electrical system upgrades for low-income homeowners and multifamily housing projects
- Expansion of the small scale energy storage adder for low-income solar customers and the commercial scale energy storage adder for multifamily housing

## 4.2 Program 2: Residential Solar Low Income Direct Ownership Adder

OER recognizes that some LI customers will want an option to own the solar PV system and may be willing to finance the system. There are significant wealth building opportunities for customers who chose to own their solar system, including increasing the value of their property[51] and opportunities to increase and/or improve credit scores for a financed system.

The REF will double the small scale incentive for qualifying LI customers by creating an adder of .65/watt for eligible small scale direct purchase customers. Funding for the adder will come through SFA funding. LI customers will be able to receive a maximum grant amount of $10,000 for system sizes 7.69kW and higher. This adder proposal will help reduce the upfront cost of the solar system, reducing the remaining cost that may be financed.

| Table 3: Sample System Size Ranges | | | |
|---|---|---|---|
| System Size | Base Incentive | LI Adder | Total |
| 4kW | $    2,600.00 | $    2,600.00 | $    5,200.00 |
| 6kW | $    3,900.00 | $    3,900.00 | $    7,800.00 |
| 7.5kW | $    4,875.00 | $    4,875.00 | $    9,750.00 |
| 8kW | $    5,000.00 | $    5,000.00 | $  10,000.00 |

---

[48] https://commerceri.com/wp-content/uploads/2023/03/REF-Small-Scale-Flyer-1.18.22.pdf
[49] https://commerceri.com/wp-content/uploads/2023/03/REF_Financial-and-Performance-Report-CY22-FINAL_signed.pdf
[50] https://emp.lbl.gov/tracking-sun-tool
[51] LBNL, *Selling to the Sun*:, https://emp.lbl.gov/publications/selling-sun-price-premium-analysis

To ensure that the additional adder amount will be used to reduce the overall total project cost and not to inflate the financing fees, the REF will cap financing fees for projects utilizing the adder at a fixed percentage that will be determined based on stakeholder input. However, it is anticipated that this percentage will be no more than 15%. All small scale applications received by the REF must disclose the total project cost and the percentage of financing fees must be disclosed on the REF consumer protection disclosure form. The REF will work to streamline the reporting of this data and will not allow a project to utilize this adder if the fee percentage is greater than the final determined financing percentage of the total project cost.

## 4.3 Program 3: Roof and Electrical System Adder

There are several additional costs a low-income homeowner may face when going solar, especially in Rhode Island's communities with the highest energy burden. These costs can include roof replacement or electrical panel upgrades to cover the increased amperage of electrical service to accommodate the solar. Homeowners may also require the replacement of knob-and-tube wiring, a cost unique to older homes in New England. A solar system cannot be installed on a home with this type of wiring. Both single family homes and multifamily housing built prior to 1940 with four and fewer units (also known as triple deckers) may still have knob-and-tube wiring. The adder to remediate knob-and-tube wiring will result in additional energy efficiency savings and safety benefits, including the ability to weatherize the home with additional insulation while allowing for the installation of other future electrification technologies such as heat pumps and/or electric vehicles.

Both OER and REF worked with RIE and the RI Department of Human Services (DHS) to estimate the number of homes in DACs that may need these types of upgrades. According to the Department of Energy's Low Income Energy Affordability Data Tool (LEAD), there are 56,601 households in Rhode Island with AMI of 80% or less residing in homes built before 1940.[52] While some of those homes may have been previously remediated, DHS estimates that approximately 60,000 homes may still need to be address older wiring, including both single family and smaller multifamily housing.

Electrical panel upgrades are a known barrier to PV installation, presenting a modest cost and often a price threshold for the average residential homeowner. However, these costs have historically disbarred low-income homeowners from the solar market. In almost all cases, an additional electrical permit must be pulled by the electrician performing the work. While this additional permit cost may be nominal, it does add additional time to the project's installation timeline. The typical electrical panel upgrade is moving from a 30 amp service to a 60 amp service. This work must be completed by a licensed RI electrician and can usually be completed by the solar installation company.

Finally, roof replacements and the associated structural upgrades are a well-known barrier to solar installations, especially in older homes. The best time to install solar is immediately after the roof is replaced is ensure a long-life span for both the solar and roof.

---

[52] https://www.energy.gov/scep/slsc/lead-tool?ltShareCode=64f7d433a89c7

To address all of these barriers, the REF is proposing adders, funded through SFA, to the small scale and commercial scale programs with the following amounts:

| Table 4: Roof and Electrical Upgrade Adder, Type vs. Amount | |
| --- | --- |
| Enabling Upgrade Adder | Maximum Amount |
| Knob and tube wiring replacement, single family | $     15,000.00 |
| Knob and tube wiring replacement, triple decker | $     45,000.00 |
| Electrical Panel upgrade | $       2,500.00 |
| Structural upgrades and roof replacement | $     20,000.00 |

The adders may be bundled in any combination if a home needs to address multiple issues.   To qualify for any of these adders, a quote from a licensed electrician and/or roofing company must be submitted with the REF solar application.  These adders will be capped if the cost for any of the upgrades is less than the max adder amount.  For example, if the roofing quote is for $18,000, the REF will only provide funding of up to $18,000.  The REF will require several application and completion components to ensure the adder funds are appropriately dispersed and to prevent fraud.  For electrical adders these include:

- An electrical line diagram at application and completion indicating the amperage of the electrical panel and/or the type of wiring in the home before and after the PV installation.
- A quote from a licensed electrician that must be submitted with the REF solar application.  It must include the electrician's license number, which the REF team will verify, and if it is from the solar installation company's staff electrician or subcontracted electrician, that information must be included in the application.  The quote must be included at the time of application to receive a notice of award from the REF for the project.  Excluding the one exception below, at no other time in the project's construction period will the quote be accepted (i.e. prior to interconnection or at submission of completion documents).
- The cost of the upgrade must be included as a separate line item in the customer's solar contract with the installer that is clear and easy to understand.
- The solar installer must sign a self-attestation that the electrical panel and/or wiring upgrade is a necessity for the solar installation and is not just a "nice to have" by the homeowner.

Exception - in some cases, the Authority having Jurisdiction (AHJ) may require a solar installer to increase the amperage of the electrical panel after the system is installed but prior to interconnection.[53]  In these instances, the REF would be willing to accept documentation from the AHJ that this requirement must be met before they will sign the Certificate of Completion.  Then, the REF will provide the electrical panel adder upon completion.

For the roofing replacement and structural upgrade adder, these include:

- Information in the application about the current age of the roof.

---

[53] This exception was added based on feedback from solar stakeholders.

- The cost of the upgrade must be included as a separate line item in the customer's solar contract with the solar installer, indicating the name of the roofing company, that is clear and easy to understand.
- The timeline of the roof replacement.
- A quote from a roofing company that will be conducting the work. The quote must be included at the time of application to receive a notice of award from the REF for the project. At no other time in the project's construction period will the quote be accepted (i.e. prior to interconnection or at submission of completion documents). If the roofing contractor changes, the REF team must be notified prior to paying out the adder.
- An attestation from the solar installation company that they will pass along the total cost of the roof replacement to the roofing company who performed the work.
- Before and after aerial photos of the roof that must correspond with the layout drawing and shading reports for the installation.

## 4.4 Program 4: Expansion of Energy Storage Adder

In this program, SFA funds will be used to fund a consultant to develop a new commercial scale adder and provide funding to continue the small scale energy storage adder for systems paired with solar. The REF plans to reallocate the remaining RGGI funding currently used for both small and commercials adders to specifically for a newly developed commercial adder and use SFA funds to continue funding the small scale adder. As of June 2023, only a small percentage of customers on Rhode Island Energy's low-income rate (A-60) have installed an energy storage project in their home.

Currently, the REF offers at $2,000 flat rate adder for residential customers who installer an energy storage system concurrently with a solar PV system.[54] This adder has resulted in 209 customers installing energy storage systems concurrently with solar since the adder was created in 2020. The storage adder has been ineffective for incentivizing low-income households to install solar and storage to date.

Additionally, there is an energy storage adder for commercial scale PV systems which is $0.50/watt based on the maximum continuous power rating the energy storage component of the project can deliver over three hours, up to a $40,000 cap per project. For the purposes of this program, the maximum continuous power rating for the energy storage component of the project can deliver over three hours is calculated using the following equation:

$$\text{Maximum Continuous Power Rating} = \min\left(\frac{\text{total battery capacity in Wh}}{3 \text{ hours}}, \text{maximum continuous power rating of inverter in W}\right)$$

Generation from the renewable energy component does not count toward the maximum continuous power rating of the energy storage component.

---

[54] https://commerceri.com/wp-content/uploads/2020/09/REF-Storage-Adder-RFP-FINAL-.pdf

The REF will offer an additional $2,000 flat rate adder to qualifying low-income customers who wish to pair an energy storage system with either a leased or direct purchase PV system. This will bring the total energy storage incentive for a residential low-income customer to $4,000. The average cost of a battery system that went through the REF in 2023 was $22,036 and it is expected that the additional incentive will reduce the cost of an average RI battery storage system by 18.15%.

Additionally, customers utilizing the low-income energy storage adder will be encouraged to apply through Connected Solutions and utilize the 0% Heat Loan to receive no interest financing, allowing customers to pay back the cost of the battery on their monthly electricity bill. Annual Connected Solutions revenues vary based on system size and weather but are estimated at $2,000/year or $10,000 over the lifetime of the 5-year incentive program. This anticipated revenue was calculated based on Connected Solutions' incentive rate of $400/kW "summer" (June-September), with 2-3 hour discharge events and 30-60 events per season. If Connected Solutions revenue is included in the net cost of installing a residential battery, the low-income energy storage adder will defray net storage costs by 33.2%.

### 4.5 Program 5: Affordable Housing Solar Supplemental Program (AHSSP)

In this program, SFA funding will be used to provide grant funding through RI Housing to eligible affordable housing developments to offset the cost of net metered solar as well as battery storage systems.

RI Housing manages several programs related to funding for multifamily housing, including the Zero Energy for the Ocean State (ZEOS) Program.[55] Established in 2019, the ZEOS Program has supported the development of 185 net zero housing units in the state. These projects have been either single family or multifamily affordable housing developments that have added solar, air source heat pumps, and other energy efficiency technologies to reach net zero. Vital components to the program include project replicability, developer education and making specification sheets and construction plans available for future development which is required.

Several partners work with RI Housing (including OER, RIE, and their vendor for energy efficiency zero energy programs) which provides funding for the design and construction of net zero housing affordable to low-income tenants and homeowners. Projects can include new construction as well as deep retrofitted housing. Qualified teams made up of affordable housing developers, solar installers and HVAC contractors submit proposals for these zero energy housing developments. The proposals are then scored by the review committee and funding is awarded to the best and most impactful projects. In Fall of 2023, the ZEOS team received another seven applications from a wide variety of municipalities.

Funding for this program has historically come through multiple funding sources and in-kind services for building energy verification. RI Housing has provided program administration and $1,125,000 for the program. OER has also provided $750,000 of RGGI funding over the past

---

[55] https://energy.ri.gov/renewable-energy/solar/zero-energy-ocean-state

three program rounds specifically for the energy efficiency upgrades to get above baseline energy code, electric heating systems including heat pumps, solar and battery storage.

One challenge many developers have faced with utilizing the ZEOS program and more traditional affordable housing financing programs administered by RI Housing, which also incentivize the utilization of renewable energy, is finding the gap financing to support the installation of solar panels and associated costs. To expand the opportunity for more affordable housing to get closer to net zero RI Housing will create a new supplemental solar grant program, the AHSSP, which will be specifically designed to close those financing gaps for installing solar systems on affordable developments.  Eligible projects must meet the following criteria:

- The proposed development will serve renters earning no more than 80% of Area Median Income (AMI) or homeowners earning no more than 120% AMI
    - The development includes financing through the Zero Energy for the Ocean State (ZEOS) program, and/or;
    - The developer is applying for development financing through RI Housing, the development involves all electric new construction or gut rehabilitation, and the development will result in buildings that meet at least the RIE Residential New Construction Tier II rating[56]
- Eligible uses include onsite, net metered solar, installation costs, and associated energy storage.
- The form of financing will be grants to either the affordable housing developer or the solar developer.
- Developers will be able to access program resources as part of regularly scheduled RFPs for ZEOS and other RI Housing development financing programs.

The RIE Residential new construction program Tier II is an energy efficiency incentive for net zero new construction and net zero projects that meet 26-39% energy savings levels.

### 4.6 Program 6: Community Remote Net Metering

In this program, SFA funding will be used for OER to create a milestone based grant program to community solar projects to reduce ratepayer costs for the implementation of CRNM.

On June 24, 2023 Chapter 301 was signed into law by Governor McKee.[57] This new law, among other provisions, requires the OER to redesign the Community Remote Net Metering (CRNM) program, and mandates that at least 50% of the output from a CRNM project must be allocated to low-income residents or residents living in a disadvantaged or environmental justice community. The remaining output, which may be up to but not exceeding 50% of the project output, will be allocated to a commercial or industrial anchor tenant. The CRNM program would be structured as a 40 MW, two-year program. The focus on low-income offtakers is a novel development in the CRNM program and demonstrates a commitment from the whole of RI government to delivering benefits to customers who have historically been underserved by solar markets.

---

[56] https://www.rienergy.com/media/ri-energy/pdfs/energy-efficiency/ri-energy-rn_zero-energy-ready-program-description.pdf
[57] http://webserver.rilegislature.gov/BillText/BillText23/SenateText23/S0684A.pdf

Chapter 301 explicitly states that the OER shall design the net metering credit rate and factor in federal energy funding and tax credits "to develop the most cost-effective rate for community solar projects."

Under the Rhode Island least-cost procurement statute, procurement of distributed generation renewable energy resources must be "cost-effective, with measurable, net system benefits."[58] The PUC has determined in Docket 4600 that such cost effectiveness must be evaluated through the "Rhode Island test" which specifies the methodology for any benefit-cost analysis for a DG program.[59] OER must file a program proposal with the Rhode Island Public Utilities Commission (PUC), which would then issue a ruling either approving, approving with modifications, or denying the program proposal based in part on the findings of such benefit-cost analysis.

Because of these overlapping statutory and regulatory requirements, OER and its affiliates have endeavored to design a revised CRNM program that will not only maximize the impact of any federal grant funding but provides net benefits to both the participating offtakers and Rhode Island as a whole on a societal basis.

The specific funding request allocated to the CRNM program is based upon a benefit-cost analysis performed on behalf of OER's consultant and is tailored to meet both the 20% bill savings target for participants in the Solar For All program, and pass the Rhode Island Test benefit-cost standard. Any federal funding provided would improve both project economics to allow a greater direct benefit to the mostly low-income offtakers and improve the benefit-cost ratio in the Rhode Island Test without further burdening Rhode Island ratepayers.

It was made clear to legislators during the 2023 session that adding language expanding the CRNM program would be contingent upon receiving federal funding. While that might not be an apparent legislative intent, OER will not move forward with a filing to the PUC for a CRNM program expansion unless SFA funding is awarded because without it the likelihood of regulatory success is nominal. Additionally, more stakeholder input, especially from low-income constituents, is needed prior to this docket being filed. OER outlines additional work and associated costs needed for stakeholder engagement in the Project Deployment Technical Assistance Strategy below.

The redesigned, low-income-focused CRNM program would operate similarly to other subscription-based community solar programs, including a carve-out for low-income-off-takers. The community solar facility, either ground or roof mounted, would generate electric power, and the power exported to the distribution grid would, as metered, create bill credits, which would then be applied to the offtakers electric bills, reducing their energy burden. The CRNM program would function under a subscription-based community solar model, with a third party owning the solar facilities, and recruiting the relevant subscribers. This structure allows for direct bill credit savings that meet or exceed the 20% Solar For All threshold, as well as DOE's Community Solar

---

[58] http://webserver.rilin.state.ri.us/Statutes/TITLE39/39-1/39-1-27.7.HTM
[59] https://ripuc.ri.gov/eventsactions/docket/4600page.html

goals, based upon the delta between what customers would pay in subscription fees to the CRNM project owner and the retail cost of electric service without a CRNM subscription.

While the details of the program design would be formed through a robust stakeholder process in the coming months, the low-income focused CRNM program would fundamentally create a new, incremental market for low-income community solar in Rhode Island and enable access to the clean energy economy for communities which have historically seen underinvestment.

The funding amount requested was informed by a robust benefit-cost analysis which assumes that federal funding will be used to provide milestone grant assistance to eligible projects under the CRNM program. Grant assistance was chosen as the optimal assistance strategy as it maximizes the value of federal funds to program participants on a net present value basis, thereby allowing for the most efficient use of federal funds. Through the benefit-cost analysis, OER's consultant derived the amount of grant funding necessary to ensure that the program exceeds the minimum benefit-cost criteria of the "Rhode Island test."

### 4.7 Program 7: Financing Publicly Owned Community Solar Projects on Preferred Sites

Through this program, SFA funding will be used to create bond financing via a revolving loan fund managed by the Rhode Island Infrastructure Bank for public entities to install host-owned residential-serving community solar projects on preferred sites.

It is important to note that Programs 6 and 7 both support the deployment of community solar, but program 6 is a grant program to support the statutory expansion and rapid deployment of CRNM, whereas program 7 is a financing program for public entities supplemented by technical assistance. The technical assistance component to program 7 is discussed in the Project Deployment Technical Assistance Strategy below. Recognizing public entities frequently require financing and/or technical assistance to carry out solar projects, especially those that are oriented around community benefit rather than on-site benefit, due to limited staff bandwidth or but offers technical assistance to supplement any projects financed through the Rhode Island Infrastructure Bank (RIIB).

The sites for these projects may be owned by municipalities and quasi-public agencies and must be located on a preferred site.  The law defines preferred sites as,

> a location for a renewable energy system that has had prior development, including, but not limited to, landfills, gravel pits and quarries, highway and major road median strips, brownfields, superfund sites, parking lots or sites that are designated appropriate for carports, and all rooftops including, but not limited to, residential, commercial, industrial and municipal buildings.[60]

Rhode Island has a significant number of municipal properties which may be ideally suited for solar PV development. While many brownfields have already been developed, there remains a vast untapped opportunity to develop roof-mounted PV at public facilities, especially those with

---

[60] http://webserver.rilegislature.gov/BillText/BillText23/SenateText23/S0684A.pdf

low onsite electricity consumption. However, the ability to maximize the development of solar on those locations is limited due to restrictions in the State's net metering program which caps eligibility of solar PV to 125% of onsite usage. Many of these facilities, such as town halls, libraries, senior centers, recreation centers, currently serve or have the potential to be resilience hubs or disaster refuge centers, and could benefit from the installation of solar plus storage. Therefore, it is ripe for offering a more cost-effective solution in which municipalities host and own community solar projects, reducing the required returns for the community solar provider, and delivering more benefits: utility bill savings, clean energy, reduced pollution, and nearby resilience to the citizens of Rhode Island especially those within the DAC communities.

RIIB acknowledges that siting community solar projects in underserved urban landscapes may be difficult and will need to incorporate community buy-in during the siting process. However, locally sited community solar projects can foster a sense of community ownership amongst the subscribers to the system. To promote this community component wherever possible, RIIB will prioritize community solar projects sited in DACs.

Since projects financed through this program are publicly owned, RIIB will require system owners to offer tours to the community members and subscribers. This is further elaborated upon in the Equitable Access and Meaningful Involvement Plan below.

With limited funding available in the to-be-formed revolving loan program, RIIB proposes a competitive scoring process via applications held bi-annually based on the following criteria with weighting subject to change:

| Table 5: Additional Competitive DAC Scoring Criteria | |
|---|---|
| 0 | % of DAC/ low-income Off-take |
| 25 | % of discount offered to DAC/low-income subscribers |
| 25 | Establishment of energy storage in conjunction with a resilience hub open to public, capable of supporting 24 hours of backup power |
| 10 | If resilience hub is located within DAC |
| 10 | If resilience hub is located within 15-minute walking distance of 1,000 citizens |

## 5. Project Deployment Technical Assistance Strategy

**5.1 Energy Storage Incentive Analysis:** The REF will procure a consultant to perform an evaluation of the commercial scale energy storage market to determine an appropriate incentive for a battery system paired with solar located on multifamily housing, community resiliency hubs, or public critical facility locations. Please see the Distributed Solar Market Strategy above for commercial energy storage market work in Rhode Island. Since the incentive amount is unknown currently, REF proposes to fund the commercial scale energy storage incentive with in-kind Regional Greenhouse Gas Initiative Funding when the analysis is completed. SFA funds will be used to continue funding the small scale energy storage incentive program outlined in the Program 4 description above.

**5.2 Updates to the RI Community Solar Marketplace**: OER maintains the RI Community Solar Marketplace website which serves as a critical forum for community solar education and stakeholder engagement.  There are several updates that must be completed to prepare for the upcoming docket filing, additional stakeholder engagement, development of new FAQs, and updated metrics. Backend site design work will be needed as well as training for staff members to make edits such as code changes, layout and formatting as well as content updates.

**5.3 REF portal upgrades for new programs**: The REF is currently designing its new software platform funded, in part, through DOE's Scaling up Solar Initiative.  This new software platform will significantly improve the efficiency of program management efficiencies, communication between solar installers and REF.  It is not expected to be available for beta testing until early 2024.  However, including new adders in the REF's current suite of programs will require portal design and functionality that is not included in the current portal design.

**5.4 REF Income Verification Consultant (5 years)**: The REF will procure a vendor to provide income verification services as well as develop an auditing methodology for the ASAP program to ensure customers are meeting 20% household savings, meet the AMI requirements for eligibility and the geographical parameters for program participation.  The REF does not, nor would they prefer to, receive confidential customer information including but not limited to social security numbers, employment records or medical program enrollment information.  A third party vendor, with comprehensive cybersecurity policies and procedures in place, would be better equipped to handle this type of documentation.

**5.5 Workforce Development:** In 2021 RI AFL-CIO established a new project called Climate Jobs Rhode Island (CJRI). CJRI is a coalition of more than 30 environmental organizations, labor unions, pre-apprenticeship and career readiness organizations, and community organizations working together to make Rhode Island a national leader in the development of a 21st century net zero economy that leaves nobody behind. As the state sets forth to meet the goals outlined in the 2021 Act on Climate, CJRI is working to ensure that goals are met through a Just Transition by expanding access to family-sustaining clean energy jobs for impacted and frontline communities. The central principle in CJRI's mission is to ensure that working people's experiences and expertise are centered in climate policymaking. One of CJRI's priorities is to assist and support the state and municipalities in reaching the Act on Climate mandates. An example of this work includes active collaboration with state agencies in reaching these mandates, while leveraging the opportunity to strengthen economic resilience.
Many of CJRI's member organizations run registered apprenticeship programs for specific trades, while one member organization, Building Futures Rhode Island, is the sole intermediary of the state's apprenticeship council: Apprenticeship RI. While leveraging the expertise of its coalition partners, CJRI has been working with the DLT to forecast the needs of the clean energy workforce of the future and establishing pathways for people from frontline, disadvantaged communities to access family sustaining careers with good wages and benefits in the clean energy workforce. CJRI's collaboration with the DLT and other state agencies includes connecting the policy mechanisms with the right pathways to ensure that decarbonization projects enable the appropriate career pathways for people from disadvantaged communities.

29

CJRI currently has two staff members whose experience and knowledge include an ability to shape climate and workforce policy and programs in ways that ensure program implementation benefits working class people and people from disadvantaged communities. CJRI's coalition members provide expertise that enhance these skills and the organization will soon add two additional staff members in the beginning of 2024.

**5.6 Support for Community Engagement:** OER and its partners recognize how critical it is for the community to hear from the state regarding the design of programs designed to serve them. Their participation is critical to the success of the programs outlined in this application. The state needs to make it as easy as possible for community members and CBOs to participate in stakeholder meetings, either virtual or in person. To ensure maximum participation, OER plans to develop and deploy a robust plan which includes holding public meetings during evening hours with childcare, transportation assistance (gas reimbursement, bus fare, parking costs, etc.) and translation services for attendees who do not speak English as a first language. The outreach and educational strategy deployed by program partners will be culturally competent and linguistically appropriate to the needs of each community targeted through engagement efforts. This will include the creation of new outreach materials, online resources, videos, and emails. Additionally, underserved communities and its residents have difficult time engaging in the regulatory process, some of which directly impact their electricity bills. OER has included the RI Center for Justice as a program partner to address this problem with the upcoming CRNM docket. The Center will represent low-income customers in the docket filing. Details on each of these initiatives are further elaborated upon in the Equitable Access and Meaningful Involvement Plan.

**5.7 Translation Services (written and in-person):** OER will procure a vendor to assist with translation services for both written materials and for in-person meetings.  This vendor will need to provide staff to provide verbal translation services for languages identified by the community for in-person meetings, which may include stakeholder meetings related to community solar, solar 101s and other educational meetings, public meetings and docket proceedings.  The vendor will also need to be able to provide translation of written materials which may include content from the Community Solar Marketplace website, marketing material, sample contracts and disclosures, and other material as needed.

**5.8 REF Administrative Support**:
SFA funds will be used to provide costs associated with two staff people for the REF.  These include:

- Full Time Employee, Program Coordinator (for 5 years): The REF currently has a staff of two full time employees.  The volume of administrative work is expected to increase significantly should funds be awarded.
- 20% Accountant (for 5 years):  The REF currently relies heavily on Commerce RI's accounting team to provide financial assistance with paying out grants and adders. Should the

SFA funded be awarded, the number of financial transactions the REF will conduct is expected to double in volume from its current amount of approximately 700 in 2022.[61]

**5.9 OER Administrative Support**:

- Full Time Employee, Programming Services Officer (for 5 years): OER currently has a staff of nineteen, two of which focus exclusively on renewable energy program design and management.

**5.10 RI Housing Administrative Support:**

- 10% of three staff members (for five years): The positions include the Associate Director of Design and Construction, Manager of Design and Construction, and a Design and Construction Specialist to assist with program management, project underwriting, reporting and project selection. RI Housing currently has a staff of 229.

**5.11 Renewable Ready Technical Assistance**: OER is committed to the responsible siting and development of renewable energy projects. In 2023, the Rhode Island General Assembly introduced legislation creating a Renewable Ready program which is designed to promote responsible siting and development of renewable energy in locations where it would be an ancillary beneficial use to the redevelopment of previously contaminated property. While the legislation was not enacted into law during the 2023 legislative session, we expect the bill will be reintroduced during the 2024 legislative session. To prepare for the passage of the bill and subsequent enactment of the law, OER, RIIB and RIDEM will collaborate on an initiative for municipalities and developers which may include, but is not limited to, the identification of locations subject to determined set of criteria, property owner information, estimates of renewable energy production capacity at the locations, and an estimate and impact study of any utility interconnection costs which may be required to connect the project. Additionally, RIIB will manage a fund to provide financial assistance to reduce the site preparation and interconnection costs for renewable energy development projects on these locations. SFA funding will only be used if a successful Renewable Ready program passes in 2024.

**5.12 Community Solar Technical Assistance:** RIIB will design a technical assistance program for municipalities and quasi-public agencies to develop community solar projects. This program will increase the technical assistance offerings the Bank currently offers to public entities. Technical assistance that RIIB will offer to municipalities may include but is not limited to siting development, layout drawings, electrical line diagrams, energy forecast estimates, site assessments and visits, and economic analysis. Additionally, RIIB and their contractor will aid with development of RFPs and provide proposal evaluation assistance. Economic analysis will also be included through tools such as the National Renewable Energy Laboratory's System Advisor Model (SAM) to ensure that municipalities understand the overall project economics and risk profile, including capital costs, principal and interest payments, incentives such as the newly introduced direct pay provision and available state incentives. RIIB has experience with using SAM in developing cost benefit analyses for applicants to the Efficient Building Fund

---

[61] https://commerceri.com/wp-content/uploads/2023/03/REF_Financial-and-Performance-Report-CY22-FINAL_signed.pdf

RIIB also has extensive experience with competitively procuring vendors to provide interconnection technical assistance to public entities. Part of a vendors work may include utilizing RIE's System Data Portal and Heat Maps to determine interconnection feasibility, submit feasibility studies to RIE on behalf of municipalities and assist with study results interpretation for municipalities to make decisions about a particular site's interconnection feasibility.

By providing technical assistance to municipalities, key decision makers in communities will be able to better understand the market and make informed decisions. Additionally, technical assistance will specifically enable municipalities to evaluate the various solar ownership options thoroughly. Deciding on the community solar project ownership structure is a critically important early decision for municipalities to make and they should carefully weigh pros and cons before committing to either own the system or use a third party ownership structure before going out to bid for a community solar developer. To promote resilient project plans to DAC-serving critical facilities or resilience hubs, RIIBs technical assistance to these facilities will include energy storage proposals to bolster the importance of system reliability during weather events, enabling projects that receive technical assistance to reach a greater volume of RI's disadvantaged populace by seeking refuge at these facilities.

To qualify for technical assistance, municipalities must reach directly out to RIIB via email with a specific request to review one or more preferred sites within the municipality for community solar potential. The requesting municipality must have assembled relative site information, including one year's worth of electricity usage and age of roof (if applicable). RIIB will evaluate the requests for completeness and approve requests for technical assistance until funding is exhausted. Upon approval, RIIB will serve as the nexus between municipalities and available technical assistance opportunities.

**5.13 Travel, Auditing and Supplies:** OER has included costs associated with travel, for 2 OER and 2 REF staff to attend two conferences or workshops on topics relevant to SFA. A small amount has also been set aside for supplies. Finally, OER must comply with RI rules related to auditing fees.

## 6. Equitable Access and Meaningful Involvement Plan

It is critical to the RI coalition that equitable access to residential-serving rooftop and community solar is supported via a robust customer education and acquisition strategy. The following section describes RI's strategy for maximizing solar deployment across RI's underserved populace, while ensuring outreach is culturally and linguistically appropriate to the needs of the communities served. With community solar comprising of nearly half of the total households served through Rhode Island's Solar For All programs, the cultural awareness of RI's education and outreach is crucial to ensuring low-income and DAC interest and participation. OER remains committed to dismantling the distrust that underserved residents may experience due to the practices of untrustworthy solar canvassers and suspicious sales tactics. The RI coalition will set itself apart from marketing gimmicks through multilingual outreach campaigns that are as

educational about the benefits of solar as they are informative about bill savings. The following paragraphs detail RI's plan for engaging with CBOs, providing consumer education, multilingual outreach (online and in-person), in addition to transparent online resources backed by websites that can be traced back to the state agency or entity offering the solar program.

6.1 CBOs: OER is well-connected with over a dozen CBOs involved in the energy equity space. To successfully conduct educational outreach about RI's new and existing solar programs, program partners will inform CBOs early and often about community engagement and educational events.  OER plans to hold quarterly calls with CBOs to educate and provide opportunities for feedback. The low-commitment savings guarantee offered through community solar subscription models will be promoted via Rhode Island's community focused email listservs, including but not limited to: OER, the Executive Climate Change Coordinating Council (EC4), Climate Action Rhode Island, Racial Environmental Justice Council, the People's Port Authority, Rhode Island Environmental Education Association, and other newsletters distributed by CBOs that reach Rhode Island's most underserved constituents. When sending emails, it is critical that emails are translated to the appropriate language for each underserved census tract. RI Program partners will take responsibility for these translation services by providing CBOs with appropriate translations for their listservs, including the subject line. Translating subject lines is especially critical because it serves as a threshold for folks with limited English proficiency who may choose not to open or read the email, even if the body of the email is translated. Program partners can also distribute hard-copy outreach materials by mail to CEJST identified census tracts with a return address that can be verified by residents. The inclusion of return addresses from state agencies will help to establish trust that the distributor of hard-copy materials is not a scam and can be verified by similar online material.

6.2 Multilingual Education and Workshops: It is important that OER provide educational opportunities to DACs about the various benefits that energy management, energy efficiency and solar can provide to RI renters and homeowners. OER is committed to providing "Solar 101" educational resources and workshops such as one-pagers, tri-fold flyers, educational videos about solar energy (that can be QR coded on one-pagers and distributed), and in-person workshops held after work hours that residents can attend and learn about the benefits of solar energy and how to get involved. Part of this outreach work will also advertise the benefits of energy and climate resiliency, and information about local resilience hubs and/or critical facilities, and heating and cooling centers available to disadvantaged communities in the case of a power outage. In-person workshops provide regular opportunities for community members to participate in formal input and feedback structures. Translation services to be offered at in-person workshops, which is critical for community participation. Wrap-around services will be provided, recognizing childcare and compensation for constituent's time is equally as important. As part of the one-year program planning period, program partners will work with CBOs and other RI agencies currently offering wrap-around services to determine adequate offerings for the communities we are targeting through these initiatives.

OER aims to educate communities about meaningful solar benefits in tandem with engagement about project siting and meaningful involvement of community members with project planning

and operations.  Outreach materials that are distributed to DACs must be translated to the primary language of that community. As per the U.S. Census Bureau's 2010 American Community Survey, the total number of limited English proficient individuals in the city of Providence is **35,277**, out of a total population of 178,042. Rhode Island's most energy burdened DACs are centered around the City of Providence.[62] Most common non-English languages in RI are Spanish, Portuguese, Chinese and Cambodian. The Department of Housing and Urban Development (HUD) has established guidance with respect to determining when a language group reaches safe-harbor status, requiring provisions for written language assistance.[63]

Program partners will focus outreach and educational efforts in RI's most energy burdened census tracts. DAC-focused educational initiative is oriented around how solar can provide meaningful benefits while changing the energy landscape for underserved residents, from both a health and financial perspective. These materials will be made available in multiple languages using the translation services discussed in the Project Deployment Technical Assistance Strategy.

6.3 Community-Serving Solar Tours: To meaningfully involve and educate community members about where their solar is sited and how it delivers meaningful benefits to the community, awareness on a project-by-project basis can be bolstered by the offering of tours for residential-serving community solar projects. The Program Partners will hold solar siting conversations in tandem with education about the meaningful benefits of solar. Part of this outreach can include drawing attention to the availability of solar tours offered in the surrounding area. The RI Solar Marketplace website will also be updated to include information about where and when tours are available, with the potential to send email invites to subscribers to that specific project. As stated in the Program 7 description, community solar tours will be a requirement for any projects funded through SFA. While Program Partners will educate residents about the benefits of solar, it is important to be mindful that conversations such as system size, capacity allocations and ownership models may be outside the purview of the average low-income resident.  It is more important to engage with community members about aspects of the solar project that could more closely impact their day-to-day lives, in addition to electricity bill savings, such as what bushes, trees, or shrubbery may be used for screening, what methods might be most effective for spreading the word about the RI Solar Marketplace, and any other feedback community members may wish to provide.

6.4 Tribal engagement: Rhode Island is home to the Narragansett Tribe. This is the only tribal reservation in the state. Over the past few years, OER has made several attempts to contact and engage with the Narragansett Tribe, but attempts have been unsuccessful. OER recognizes barriers in distrust between tribal, state and federal government, and vows to continue attempting to respectfully and mindfully establish meaningful connections with the Narragansett Tribe and ensure inclusivity on our educational and outreach plan if they show such interest. This strategy will be integrated into the outreach strategy during the one-year program planning period.

---

[62] https://www.energy.gov/scep/slsc/lead-tool?ltShareCode=65172977a2e04
[63] City of Providence Language Access Toolkit, July 2020.

6.5 September 6th public hearing turnout and public comment: OER hosted a public stakeholder meeting on Wednesday, September 6, 2023, to brief stakeholders about the financial and technical assistance programs proposed in this application.[64] The meeting began after work hours at 6:00PM to help enable participation from community members. Turnout resulted with 22 attendees. OER elicited public comments over a two-week period closing on Friday, September 15th and published the slide deck to OER's SFA page.[65] OER sought responses to a total of 12 questions and incorporated feedback received into program design.  If awarded, OER is committed to hosting similar public meetings and opportunities for public comment to inform detailed program design and incorporate feedback on draft program plans.

6.6 Participatory Governance in Regulatory Proceedings: The R.I. Center for Justice (RICJ) has been the only legal aid organization providing direct representation and policy support to grassroots organizations and low-income utility consumers since its founding in 2015.  RICJ has intervened in multiple rate cases and PUC proceedings related to the economic interests and social justice needs of low-income utility consumers and communities most adversely impacted by the environmental and health impacts of reliance on fossil fuels.  Through working with existing grassroots organizations as a trusted partner, RICJ will continue to advance the goals of the Solar for All coalition by representing low-income consumers directly in PUC proceedings and any directly relevant court proceedings. RICJ is a non-profit public interest law center that partners with community groups to strengthen existing advocacy and service provision with legal representation and strategy. RICJ's legal priorities include protecting the rights and economic interests of low-income utility consumers and working to ensure access to safe, healthy and affordable housing.  These priorities reflect the most pressing needs of low-income Rhode Islanders. Providing legal representation through partnerships with community organizations ensures that the legal representation of individuals and groups supports efforts to advance social and economic justice through collective action and empowerment.

6.7 Community Solar Marketplace website: The RI Solar Marketplace website is Rhode Island's principal platform for community solar education and outreach and will also be used for communications on all initiatives undertaken by RI on community solar and customer inclusion. This website already includes a "Low- and Moderate-Income Customer Inclusion in the CRNM Program Plan" page (OER's LMI-inclusion efforts referenced in the Distributed Solar Marketing Strategy), which will be significantly expanded upon throughout the one-year program planning period. More information will be made available and the regulatory proceeding for CRNM is opened.[66]  The website will also be the primary way community solar project details are available to the public, including low-income customers, to learn where projects are located, who the installers is, and if the project is actively seeking new subscribers.  Customers can link directly to projects that may be looking to subscribe customers to learn more and sign up. Lastly, the website is home to the state's community solar metrics.  RI has committed to providing metrics to the National Community Solar Partnership (NCSP) which may be of

---

[64] OER Solar for All Public Meeting Presentation Slides
[65] OER Solar for All website
[66]  LMI Customer Inclusion in the CRNM Program Plan, September 28, 2020.

interest to other stakeholders, especially after the CRNM docket filing. The metrics provided to NSCP will be updated on the website as well.

6.8 LIHEAP and CAP engagement: OER and DHS were pleased to see the recent DHHS memo confirming that LIHEAP funds can for community solar subscriptions.[67] This is important information to share with many stakeholders and will be included on the Community Solar Marketplace website, incorporated into the CRNM PUC docket filing, and shared with RI's CAP agencies to discuss with low-income ratepayers along with other utility assistance programs. DHS and OER will work directly with CAP agencies to provide education about community solar. OER is committed to exploring NCSP's Low Income Clean Energy Connector which is expected to launch as a pilot for additional states in 2024.

6.9 ASAP Engagement Strategy: The ASAP program is unique in that it is limited to income-qualified households located in specific environmental justice areas, which requires a unique approach to customer education and outreach. The Program Partners recognize that there is no one-size-fits-all approach to real community-based engagement and that multiple pathways will be necessary to reach hard-to-reach households. Critically, various methods of engaging communities and customers work together to create a base level of knowledge and information among eligible communities. These pathways can include:

*Trusted Educational Resources:* Having consumer-friendly resources available from trusted sources is the foundation of any successful community engagement strategy. Consistency in program messaging coupled with culturally-sensitive approaches will be critical for the success of the ASAP program.

*Community Organization & Municipal Engagement:* Engagement with community-based organizations, nonprofits, and municipalities can be critical in reaching a wider range of eligible households that are missed through traditional marketing approaches. In addition to helping overcome distrust and providing legitimacy to the program, they also provide more outlets for providing information. Partnerships with cities and towns can provide an opportunity for press events to reach a broader audience. Partners such as utility assistance providers, neighborhood associations, church and school networks, and local governments all regularly interact with households throughout disadvantaged communities. The ability to co-market and co-brand materials can be powerful tools in overcoming hesitance or distrust in a new program.

*Community Events:* This includes participation in local events such as festivals, farmers markets, trade shows, or business associations. It can also include ongoing education events or webinars, particularly when done in coordination with municipalities or other community organizations. These events should also be provided in languages other than English.

*Geo-targeted Social Media:* With geographic-limited programs, targeted advertising can help inform and direct residents to the official program website and the benefits of the program. This targeted media approach can also help build broader awareness of the program which supports other potential participation pathways.

*Traditional Marketing:* The ASAP program will also include traditional advertising approaches including print, billboards, radio, or television ads. A statewide program with consistent

---

[67] https://www.acf.hhs.gov/ocs/policy-guidance/liheap-im-2023-04-community-solar-and-liheap-considerations

marketing and messaging, engaging educational materials for eligible households, and multifaceted delivery channels can reach a broader range of households.

*Canvassing:* Direct canvassing of eligible census tracts can be an effective method of reaching families and notifying them of their eligibility to participate in the ASAP program. Ideally the other marketing and outreach approaches will make it more likely that eligible families are aware of the program, making direct outreach more effective. Canvassing should be a complementary activity and not the only method for reaching eligible households.

*Referrals:* The most effective marketing approach is happy program participants who are receiving the meaningful benefits expected from the program. Positive experiences are shared throughout a community and can provide a legitimacy that is unmatched by any other approach. This positive "contagion" effect has been found to be a driver of solar adoption in neighborhoods of all incomes.[68]

6.10 Consumer Protection:  OER and the REF have several consumer protection requirements in place including the REF's Minimum Technical Requirements (MTR) which identifies specific codes projects must be built to, safety parameters, and site requirements that projects must met to qualify for incentives.[69]  Projects that do not meet the MTR are not eligible to receive funding. The REF requires that projects must be designed so that the estimates annual energy output is at least 80% of the default optimal output for a fixed PV project of the same capacity, as estimated by PVWATTS or a similar tool.  Additionally, the project must have a measured total solar resource fraction (TSRF) of 0.8 or greater and is subject to verification during a required onsite inspection.

The REF currently requires a 100% inspection for all projects that receive funding.  Most of these inspections are self-inspections and/or self-verification of compliance.  New installers participating with the REF's programs for the first time, delinquent installers, or those not performing well are subject to field inspections.  The inspection requirement will continue to be enforced for all REF programs included in this application.  Additionally, many of the projects that go through the EBF program managed by RIIB and the ZEOS program managed by RI Housing go through the REF program as well.  This demonstrates how effectively projects can be leveraged with multiple sources of funds.  The REF will provide inspection services for projects that leverage the REF funding.

In 2022, RI passed the Residential Solar Energy Disclosure and Homeowner's Bill of Rights Act.[70]  The law requires OER to develop and implement a standard, statewide consumer protection disclosure form for all residential solar systems sold across all three utility territories. The forms are in the process of being developed utilizing the template of the existing consumer protection disclosure forms already in use by the REF.  The law also requires the development of a third party ownership disclosure form.  It is anticipated that the ASAP program may launch in December before the TPO disclosure form is finalized, as such, the Program Partners have

---

[68] Dennehy, Kevin, Why Solar Adoption Can be Contagious, Yale School of the Environment, Dec. 2014.
[69] Renewable Energy Fund Rules and Regulations, RI Secretary of State website.
[70] http://webserver.rilin.state.ri.us/Statutes/TITLE39/39-26.8/INDEX.htm

developed a TPO form for ASAP, which includes the components outlined in the law. The law also allows for the enforcement of an administrative find of if residential solar installers do not meet the requirements outlined in the law. There is a gap in the current law that may be amended in the future statutory language. The law does not have any provisions for community solar customers. However, the Program Partners plan to address this in the CRNM filing. OER, through stakeholder feedback, will develop a community solar disclosure form to be included by developers and/or subscriber management companies for any low-income customers subscribing to any of the community solar projects developed under the new CRNM program.

Earlier in 2023, the RI Attorney General became more involved in solar consumer protection by fighting against deceptive marketing tactics from bad actors within the solar market. There is a current lawsuit against one installer for mispresenting total project costs and the value of the ITC. OER helped the AG's office develop a new website specific to solar customers and provides a link for customer complaints.[71] The Program Partners commit to complying with all applicable consumer protection laws from both the federal consumer protection and consumer financial laws as well as all RI state laws related to deceptive and abusive practices. OER commits to working with the AG's office and all Program Partners to track all customer complaints related to projects that may be funded through SFA. This will include developing a new procedure for tracking customer complaints, include a shared drive accounting system of all customer complaints by program. It will be important that each agency update the spreadsheet with details about the complaint, steps taken to resolve it, other entities, including the utility or subscriber management company that may need to be contacted, and any follow up needed.

### 7. Program Planning Timeline and Workplan Narrative

Attachment D outlines the activities that the Program Partners will perform during the planning year (July 1, 2024-June 30, 2025). Other plans and milestones for the remainder of the grant period will be developed during the planning year. When appropriate, activities related to development of reporting plans, metrics development and program refinement are included. OER plans on applying for technical assistance opportunities, when timely and relevant, for activities related to this application.

OER commits to adopting residential rooftop and residential-serving community solar best practices by planning to leverage existing technical assistance tools and resources for program planning. As discussed in the Equitable Access and Meaningful involvement plan, OER will coordinate with relevant stakeholders and partners, including local and/or state governments, utilities, CBOs, state-level assistance programs, labor organizations, and other stakeholders referenced in Sections 1.2 through 1.6, as evidenced by including coordination milestones and steps in the planning phase of the workplan.

## II. Program Administration Narrative

### II.2.1 Budget Narrative

---

[71] RI Attorney General's Solar Panel Initiative Website

The Program Partners have developed a detailed budget plan that reflect anticipated costs and expenses at the time of the application submission. All the budgeted items have been carefully reviewed and are prudent to deploy federal funds thoughtfully, with robust stakeholder input, and in mind with past federal funding deployment experience and associated reporting requirements, including but not limited to Buy America provisions. Financial Assistance for projects totals 87% of the total request.

As discussed in the 4.6 of the Financial Assistance Strategy, the RI Test, and associated benefit cost analysis the PUC requires for docket filings emphasize cost effective program design. Additionally, all other programs will include a robust plan for program evaluation to ensure program cost effectiveness and adjust adders. OER has also endeavored to keep administration and personal costs as low as possible while recognizing that adding seven new programs will result in additional staff and resource deployment.

## II.2.2 Fiscal Stewardship Plan

All Program Partners commits to reducing waste, fraud, and abuse both internally among our agencies by creating plans for audits. This includes including audit fees in the budget which are charged to each federal grant by the RI Office of Auditor General for the allocable costs of performing the State's single audit.[72] It also includes plans for the REF to go out to bid for an income verification vendor who will also provide audit services as outlines in Section 5.4 of the Project Deployment Technical Assistance Strategy.

The Infrastructure Bank continues to receive capitalization grants from the Environmental Protection Agency for both the Clean Water State Revolving Fund and Drinking Water State Revolving Fund programs. RIIB also receives contributions from the State of Rhode Island for the Municipal Road and Bridge SRF and EBF. The continued capitalization of the bank, combined with the Bank's access to the bond market, allows the bank to provide funding to qualified borrowers. Funds awarded under the Solar For All competition to RIIB will be used to capitalize revolving loan programs, specifically RIIB's Efficient Buildings Fund (EBF) and Clean Energy Fund (CEF). Income realized under the EBF and CEF will be returned to the respective revolving fund.

## II.2.3 Reporting Plan

As the lead applicant, RI OER is dedicated to tracking and measuring progress towards achieving outputs and outcomes. All Program Partners are aware of reporting requirements and are committed to ensuring timely and accurate reporting. Most are familiar with RGGI reporting which is already provided on an annual basis. OER is committed to executing on the anticipating reporting requirements as described in Section VI.C: Program Performance Reporting Requirements and making these metrics public. OER has experience with creating dashboards[73] and infographics that intuitively and visually display program data.

---

[72] http://www.oag.ri.gov/reports/SA_RI_2022.pdf
[73] https://drive.ri.gov/program-statistics

Many net metered projects in Rhode Island leverage the REF. These programs include EBF, ZEOS, and others not mentioned in this application. The REF will ensure to report on all funding sources for all projects leveraging SFA and ensure that projects do not dip into multiple programs erroneously. The REF provides an annual report to the Governor's Office and General Assembly providing details related to income, expenditures, and staff. OER and RIIB issue annual reports as well. OER has also published a Clean Energy Industry Report annually since 2015, which is accompanied by an infographic displaying high-level statistics on the Industry Report's website.[74] The Program Partners have ample experience in analyzing and publicizing program success, data, and evidence.

OER already provide metrics to the National Community Solar Partnership and will continue to update the number and capacity of community solar projects in the state, community solar off takers, including breakout by rate code to track the low-income participants, and will endeavor to include household savings in the future.

## II.2.4 Programmatic Capability and Environmental Results Past Performance

Attachment F details a list of the 5 most recent federally funded assistance agreements RI Office of Energy Resources has performed within the last 3 years.

As the lead applicant, OER's mission is to lead the state toward a clean, affordable, reliable, and equitable energy future. OER develops policies and programs that respond to the state's evolving energy needs, while advancing environmental sustainability, energy security, and a vibrant clean energy economy. OER is committed to working with public and private-sector stakeholders to ensure that all Rhode Islanders have access to cost-effective, resilient, and sustainable energy solutions. OER implements and manages energy programs that increase the reliability and security of our energy supply, reduce energy costs and mitigate price volatility, and improve environmental quality. The plan for timely and successfully achieving the objectives of all 7 programs is discussed in great detail in the Program Planning Timeline and Workplan Narrative, in addition to all information provided in attachment F.

Staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them to successfully achieve the goals of the proposed program is also included in attachment F.

---

[74] https://energy.ri.gov/climate-change/clean-energy-
jobs#:~:text=Clean%20energy%20employment%20in%20Rhode,wind%2C%20and%201%2C445%20in%20solar.

# EXHIBIT B



**Confirmation**

Thank you for submitting your grant application package via Grants.gov. Your application is currently being processed by the Grants.gov system. Once your submission has been processed, Grants.gov will send email messages to advise you of the progress of your application through the system. Over the next 24 to 48 hours, you should receive two emails. The first will confirm receipt of your application by the Grants.gov system, and the second will indicate that the application has either been successfully validated by the system prior to transmission to the grantor agency or has been rejected due to errors.

Please do not hit the back button on your browser.

If your application is successfully validated and subsequently retrieved by the grantor agency from the Grants.gov system, you will receive an additional email. This email may be delivered several days or weeks from the date of submission, depending on when the grantor agency retrieves it.

You may also monitor the processing status of your submission within the Grants.gov system by clicking on the "Track My Application" link listed at the end of this form.

Note: Once the grantor agency has retrieved your application from Grants.gov, you will need to contact them directly for any subsequent status updates. Grants.gov does not participate in making any award decisions.

IMPORTANT NOTICE: If you do not receive a receipt confirmation and either a validation confirmation or a rejection email message within 48 hours, please contact us. The Grants.gov Contact Center can be reached by email at support@grants.gov, or by telephone at 1-800-518-4726. Always include your Grants.gov tracking number in all correspondence. The tracking numbers issued by Grants.gov look like GRANTXXXXXXXX.

If you have questions please contact the Grants.gov Contact Center: support@grants.gov
1-800-518-4726  24 hours a day, 7 days a week. Closed on federal holidays.


The following application tracking information was generated by the system:


**Grants.gov Tracking Number:**    GRANT13996651

**UEI:**    FNVNBKCJMS47

**Submitter's Name:**    ████████████

**CFDA Number:**    66.959

**CFDA Description:**    Greenhouse Gas Reduction Fund: Section 134(a)(1) - Zero Emission Technologies Grant Program

**Funding Opportunity Number:**    EPA-R-HQ-SFA-23-01

**Funding Opportunity Description:**    SOLAR FOR ALL

**Agency Name:**    Environmental Protection Agency

**Application Name of this Submission:**    Rhode Island Equitable Access for Solar Energy (EASE) Programs

**Date/Time of Receipt:**    Oct 11, 2023 10:31:26 PM EDT


TRACK MY APPLICATION – To check the status of this application, please click the link below:

https://apply07.grants.gov/apply/spoExit.jsp?p=web/grants/applicants/track-my-application.html&tracking_num=GRANT13996651


It is suggested you Save and/or Print this response for your records.

# EXHIBIT C

5H - 84091001 - 0    Page 1

| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Grant Agreement** | **GRANT NUMBER (FAIN):** 84091001<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/09/2024 |
|---|---|---|
| | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/12/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>PEND |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS<br>1 CAPITOL HILL 4th Floor<br>Providence, RI 02908-5850<br>EIN: 05-6000522 | STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS<br>1 CAPITOL HILL 4th Floor<br>Providence, RI 02908-5850 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| One Capitol Hill<br>Providence, RI 02908-5850<br>Email:<br>Phone: | 290 Broadway, WD/DWMIB<br>New York, NY 10007<br>Email:<br>Phone: | OGD-GMB, 3903R<br>1200 Pennsylvania Ave NW<br>Washington, VA 20460-0001<br>Email:<br>Phone: |

**PROJECT TITLE AND DESCRIPTION**

Rhode Island Solar for All- "Note: A Special payment condition applies to this award."

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar. The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.
No subawards are included in this assistance agreement.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 49,330,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 49,330,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1300 Pennsylvania Avenue NW<br>Washington, DC 20004 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY ||
|---|---|
| Digital signature applied by EPA Award Official     - Associate Award Official | **DATE**<br>07/09/2024 |

5H - 84091001 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 48,930,000 | $ 48,930,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 49,330,000 | $ 49,330,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41020 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 48,930,000 |
| | | | | | | | | | $ 48,930,000 |

5H - 84091001 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00__ % Federal ___0.00__ %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 49,330,000 |
| 15. Total EPA Amount Awarded To Date | $ 49,330,000 |

5H - 84091001 - 0    Page 4

## Administrative Conditions

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed *prior* to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

5H - 84091001 - 0    Page 8

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient

to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

5H - 84091001 - 0    Page 10

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

G. Leveraging and Fund Raising

1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1)

must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

### H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

### 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

**K. Program Income**

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

**L. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

      Revised SF-424A, Budget Information for Non-Construction Programs

      Indirect Rate Proposal or Agreement, if applicable

      Revised Budget Narrative

      Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

### D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate

program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

### H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to

a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

### 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](EPA Guidance on Participant Support Costs)

### K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant

construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for

Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

## b. After Award of Contract:

5H - 84091001 - 0    Page 23

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

### 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

**The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.**

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

## O. Historic Preservation
### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

### P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the

performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims**

5H - 84091001 - 0    Page 28

Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient

agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

### 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

### 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

### 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

### 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

### 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

### 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the

5H - 84091001 - 0    Page 32

Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

   Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

   Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

   National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

   Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

   Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

   Endangered Species Act, as specified in 50 CFR Part 402;

   Federal Funding Accountability and Transparency Act;

   Farmland Protection Policy Act; and

Coastal Zone Management Act.

### 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

### 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

### V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at

any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that

the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

### AA. Compliant URL Links

**The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.**

### AB. Flow-Down Requirements

**As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.**

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form

of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient

agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT D

**SFA Terms and Conditions**

I. Definitions ................................................................................................................................. 3

    Air Pollutant ........................................................................................................................ 3

    Apprentice ........................................................................................................................... 3

    Eligible Recipient ................................................................................................................ 3

    Eligible Zero-Emissions Technology ................................................................................... 4

    EPA Award Official ............................................................................................................. 4

    EPA Project Officer ............................................................................................................. 4

    Financial Assistance ........................................................................................................... 5

    Greenhouse Gas ................................................................................................................. 5

    Low-Income and Disadvantaged Communities ................................................................. 5

    Participant Support Costs ................................................................................................... 6

    Program Administration Activities ..................................................................................... 6

    Program Beneficiary ........................................................................................................... 6

    Program Income ................................................................................................................. 6

    Project-Deployment Technical Assistance .......................................................................... 7

    Subaward ............................................................................................................................ 7

    Subrecipient ....................................................................................................................... 7

II. National Programmatic Terms and Conditions ....................................................................... 8

    A. Performance Reporting ................................................................................................. 8

    B. Cybersecurity Condition .............................................................................................. 10

    C. Competency Policy ..................................................................................................... 12

    D. Signage Required ....................................................................................................... 12

    E. In-Kind Assistance ...................................................................................................... 13

    F. Geospatial Data Standards ......................................................................................... 13

    G. Leveraging and Fund Raising ..................................................................................... 13

    H. Quality Assurance ...................................................................................................... 14

    I. Equipment Disposition ................................................................................................. 15

    J. Real Property ............................................................................................................... 15

    K. Program Income .......................................................................................................... 16

    L. Use of Logos ............................................................................................................... 16

III. Additional Programmatic Terms and Conditions ................................................................. 17

    A. Conflicts Among Authorities ....................................................................................... 17

    B. Specific Condition on Completion of EPA-approved Solar for All Workplan ................. 17

    C. Solar for All Workplan ................................................................................................. 18

    D. Allowable and Unallowable Activities ......................................................................... 18

    E. Foreign Entity of Concern ............................................................................................ 19

    F. Low-Income and Disadvantaged Communities Expenditure Requirement ................. 19

    G. Revolving Loan Fund Characterization ........................................................................ 19

    H. Subawards to For-Profit Entities ................................................................................. 20

    I. Subawards as Part of Revolving Loan Funds ................................................................ 20

    J. Participant Support Costs ............................................................................................. 21

    K. Labor and Equitable Workforce Development Requirements ....................................... 22

    L. Build America, Buy America Act .................................................................................. 25

    M. Consumer Protection Requirements ........................................................................... 26

    N. Financial Risk Management Requirements .................................................................. 26

1

O. Historic Preservation ........................................................................................................ 27

P. Uniform Relocation Assistance and Real Property Acquisition Policies Act .................... 28

Q. Other Federal Requirements ............................................................................................ 28

R. Remedies for Non-Compliance ......................................................................................... 29

S. Clarifications to EPA General Terms and Conditions ....................................................... 29

T. Period of Performance ..................................................................................................... 31

U. Closeout Agreement ........................................................................................................ 31

V. Accounting Principles ....................................................................................................... 34

W. Internal Controls ............................................................................................................. 34

X. Audits ............................................................................................................................... 34

Y. Annual Workshop ............................................................................................................. 35

Z. EPA Project Officer Oversight and Monitoring ............................................................... 35

AA. Compliant URL Links ...................................................................................................... 36

AB. Flow-Down Requirements ............................................................................................. 36

AC. Financial Assistance in the Form of Credit Enhancements ........................................... 36

AD. Additional Requirements for Eligible Nonprofit Recipients ......................................... 37

**IV. Administrative Terms and Conditions** ........................................................................... 38

A. General Terms and Conditions ......................................................................................... 38

B. Correspondence Condition .............................................................................................. 39

C. Intergovernmental Review Period ................................................................................... 39

D. Pre-Award Costs .............................................................................................................. 39

E. Pre-Award Administrative Capability ............................................................................... 40

F. New Recipient Training Requirement ............................................................................... 40

## I. Definitions

**Air Pollutant:** "Air pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** "Apprentice" means an individual working on a project receiving financial assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Eligible Recipient:** Eligible recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible recipients that are states are identified on the Notice of Award as a "state" recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit recipient under the Solar for All program:

   a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
   b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
   c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
   d. Being funded by public or charitable contributions; and

e.   Having the legal authority to invest in or finance projects.

Eligible recipients that are eligible nonprofit recipients are identified on the Notice of Award as a not for profit recipient type, excluding recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: "EPA Project Officer" means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, financial assistance means assistance that non-Federal entities receive or administer in the form of debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Financial assistance that generates program income such as debt and credit enhancements are considered financial products.

**Greenhouse Gas:** "Greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.
- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.
- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.
- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and

Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

**Participant Support Costs**: 2 CFR 200.1 defines participant support costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of participant support costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, participant support costs are primarily a form of financial assistance to projects which enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries. Program administration costs include procuring services and tools that support the recipient in program design (e.g., technical assistance from the United States Department of Energy (DOE) National Laboratories to support the recipient directly for program design). Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** "Program beneficiary" means an entity (either an individual or an organization) that receives financial assistance or technical assistance from the recipient or a subrecipient as an end-user. Expenditures for financial assistance or technical assistance to program beneficiaries are in the form of participant support costs, as defined in 2 CFR 1500.1. A program beneficiary is distinct from a subrecipient, as defined in 2 CFR 200.1.

**Program Income:** Consistent with 2 CFR 200.1, "program income" means gross income earned by the recipient that is directly generated by a supported activity or earned as a result of the award. Under this assistance agreement, program income includes but is not limited to loan and other origination fees, interest payments, principal repayments, interest on cash deposits, revenue from asset sales and other sources of program income. Additionally, under this assistance agreement, refunds from cash reserves, release of loan loss reserves, and similar transactions are treated as program income under 2 CFR 1500.8(b), and terms and conditions applicable to program income apply to such transactions. Costs incidental to the generation of program income may be deducted from gross income to determine

program income as authorized by 2 CFR 1500.8(b). EPA-specific rules on program income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients).

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "project-deployment technical assistance" and is services and tools provided by recipients to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, working capital lines of credit to small businesses, and other services and tools that enable low-income and disadvantaged communities to deploy or benefit from rooftop residential solar, and residential-serving community solar. Please note: financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as "project-deployment technical assistance" for the purposes of this program.

**Subaward:** 2 CFR 200.1 defines a subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity." Since subawards may come in other forms (i.e., loans), the term "subgrant" denotes a subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, "subrecipient" means an entity that receives a subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a program beneficiary of such an award. A subrecipient is distinct from a program beneficiary, which is referenced in 2 CFR 1500.1.

## II. National Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*
The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

9

**2. Transaction-Level and Project-Level Data**

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

**B. Cybersecurity Condition**

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**C. Competency Policy**
In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**D. Signage Required**

**1. Signage Requirements**
a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be

placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events
The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

### E. In-Kind Assistance
This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

### F. Geospatial Data Standards
All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

### G. Leveraging and Fund Raising

## 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising
2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

13

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

**H. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.
• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**I. Equipment Disposition**

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

**J. Real Property**
In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

**Disposition**
When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

**Recordation**

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

**K. Program Income**

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

**L. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

16

### III. Additional Programmatic Terms and Conditions

**A. Conflicts Among Authorities**

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

**B. Specific Condition on Completion of EPA-approved Solar for All Workplan**

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

- Revised SF-424A, Budget Information for Non-Construction Programs
- Indirect Rate Proposal or Agreement, if applicable
- Revised Budget Narrative
- Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**
**1. EPA-approved Solar for All Workplan**
The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**
The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**D. Allowable and Unallowable Activities**
The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to

18

support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

**E. Foreign Entity of Concern**
As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

**F. Low-Income and Disadvantaged Communities Expenditure Requirement**
The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

**G. Revolving Loan Fund Characterization**
EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

**H. Subawards to For-Profit Entities**

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

**I. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**
**1. Participant Support Cost Requirements**
The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.
B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

**2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs**
When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

21

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

**K. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.   Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and

Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B.  Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C.  Recipient Responsibilities When Entering Into and Managing Contracts:**

   **a.  Solicitation and Contract Requirements:**
      **i.  Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
      **ii.  Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
   **b.  After Award of Contract:**
      **i.  Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
      **ii.  Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D.  Recipient Responsibilities When Establishing and Managing Additional Subawards:**

   a.  **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
   b.  **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

   c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E.  Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

   a. **Solicitation and Contract Requirements:**
      i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
      ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
   b. **After Award of Contract**:
      i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
      ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F.  DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**2. Mega Construction Project Program**

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

**3. Compliance with Federal Statutes and Regulations**
The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Safety and Health Administration.

**4. Free and Fair Choice to Join a Union**
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**5. Disadvantaged Business Enterprises**
The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

**L. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**M. Consumer Protection Requirements**

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

**N. Financial Risk Management Requirements**

**1. Cash Management Requirements**

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**2. Climate-Related Financial Risks**

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-

sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

**P. Uniform Relocation Assistance and Real Property Acquisition Policies Act**

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**Q. Other Federal Requirements**

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

•       **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

•       **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

•       **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

•       **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

**R. Remedies for Non-Compliance**
The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

**S. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

**1. Access to Records**
In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

**2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**3. Establishing and Managing Subawards**

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate
The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress
The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination
In the process of being finalized.

**T. Period of Performance**

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

**U. Closeout Agreement**
As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

**1. Allowable Activities**

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

**2. Reporting Requirements**

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

**3. Low-Income and Disadvantaged Communities Expenditure Requirements**

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

**4. Cash Management Requirements**

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

**5. Remedies for Non-Compliance**

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

**6. Suspension and Debarment**

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

**7. Non-Discrimination**

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in

the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping
In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements
The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:
- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;
- Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

- Executive Order 11988 (Floodplain Management) and Executive Order 14030 (Climate-Related Financial Risk), as specified in the Financial Risk Management Programmatic Term and Condition;
- Endangered Species Act, as specified in 50 CFR Part 402;
- Federal Funding Accountability and Transparency Act;
- Farmland Protection Policy Act; and
- Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

### Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;
3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;
6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;
7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the

escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

**AD. Additional Requirements for Eligible Nonprofit Recipients**

***The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

**1. Incorporation and Control**
The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

**2. Governance Requirements**

**A. Board Size and Composition**
The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

**B. Board Independence**

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

**3. Legal Counsel**

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

**IV. Administrative Terms and Conditions**

**A. General Terms and Conditions**

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**B. Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and *[Insert GS or local email box (if local copy desired)]*
- MBE/WBE reports (EPA Form 5700-52A): *[Insert name and contact information of the appropriate DBE coordinator and Grants Specialist (optional)/or local email box.]*
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: *[Insert name and contact information of regional point of contact (the GS, PO, and/or local email box]*
- Payment requests (if applicable): *[Insert name and contact information of the GS and PO/or local email box]*
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: *[Insert name and contact information of the PO]*

**C. Intergovernmental Review Period**

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award

consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

### E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

### F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# EXHIBIT E

OMB Number: 4040-0004
Expiration Date: 11/30/2025

## Application for Federal Assistance SF-424

| * 1. Type of Submission: | * 2. Type of Application: | * If Revision, select appropriate letter(s): |
|---|---|---|
| ☐ Preapplication | ☐ New | E: Other (specify) |
| ☐ Application | ☐ Continuation | * Other (Specify): |
| ☒ Changed/Corrected Application | ☒ Revision | Program Income/Interg |

| * 3. Date Received: | 4. Applicant Identifier: |
|---|---|
| 08/30/2024 | |

| 5a. Federal Entity Identifier: | 5b. Federal Award Identifier: |
|---|---|
| | 84091001 |

**State Use Only:**

| 6. Date Received by State: | | 7. State Application Identifier: | |
|---|---|---|---|

**8. APPLICANT INFORMATION:**

* a. Legal Name: RI Department of Administration, Office of Energy Resources

| * b. Employer/Taxpayer Identification Number (EIN/TIN): | * c. UEI: |
|---|---|
| 056000522 | FNVNBKCJMS47 |

**d. Address:**

| * Street1: | One Capitol Hill |
|---|---|
| Street2: | |
| * City: | Providence |
| County/Parish: | |
| * State: | RI: Rhode Island |
| Province: | |
| * Country: | USA: UNITED STATES |
| * Zip / Postal Code: | 02908-5850 |

**e. Organizational Unit:**

| Department Name: | Division Name: |
|---|---|
| | Office of Energy Resources |

**f. Name and contact information of person to be contacted on matters involving this application:**

| Prefix: | | * First Name: | ██████ |
|---|---|---|---|
| Middle Name: | | | |
| * Last Name: | ████ | | |
| Suffix: | | | |

Title: Implementation Director of Policy and Program

Organizational Affiliation:

| * Telephone Number: | ████████ | Fax Number: | |
|---|---|---|---|
| * Email: | ████████████ | | |

## Application for Federal Assistance SF-424

**\* 9. Type of Applicant 1: Select Applicant Type:**

A: State Government

Type of Applicant 2: Select Applicant Type:

Type of Applicant 3: Select Applicant Type:

\* Other (specify):

**\* 10. Name of Federal Agency:**

Environmental Protection Agency

**11. Catalog of Federal Domestic Assistance Number:**

66.959

CFDA Title:

Greenhouse Gas Reduction Fund:  Section 134(a) - Zero Emmission Technologies Grant Program

**\* 12. Funding Opportunity Number:**

EPA-R-HQ-SFA-23-01

\* Title:

Solar for All

**13. Competition Identification Number:**

Title:

**14. Areas Affected by Project (Cities, Counties, States, etc.):**

[ Add Attachment ]  [ Delete Attachment ]  [ View Attachment ]

**\* 15. Descriptive Title of Applicant's Project:**

Solar for All

Attach supporting documents as specified in agency instructions.

[ Add Attachments ]  [ Delete Attachments ]  [ View Attachments ]

## Application for Federal Assistance SF-424

**16. Congressional Districts Of:**

* a. Applicant    RI-001                                    * b. Program/Project   RI-ALL

Attach an additional list of Program/Project Congressional Districts if needed.

| | Add Attachment | Delete Attachment | View Attachment |

**17. Proposed Project:**

* a. Start Date:  05/01/2024                               * b. End Date:  04/30/2029

**18. Estimated Funding ($):**

| | |
|---|---|
| * a. Federal | 49,330,000.00 |
| * b. Applicant | 0.00 |
| * c. State | 0.00 |
| * d. Local | 0.00 |
| * e. Other | 0.00 |
| * f. Program Income | 0.00 |
| * g. TOTAL | 49,330,000.00 |

**\* 19. Is Application Subject to Review By State Under Executive Order 12372 Process?**

☐ a. This application was made available to the State under the Executive Order 12372 Process for review on

☒ b. Program is subject to E.O. 12372 but has not been selected by the State for review.

☐ c. Program is not covered by E.O. 12372.

**\* 20. Is the Applicant Delinquent On Any Federal Debt? (If "Yes," provide explanation in attachment.)**

☐ Yes        ☒ No

If "Yes", provide explanation and attach

| | Add Attachment | Delete Attachment | View Attachment |

21. **\*By signing this application, I certify (1) to the statements contained in the list of certifications\*\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances\*\* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)**

☒ \*\* I AGREE

\*\* The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**Authorized Representative:**

| Prefix: | | * First Name: | ▮ |
| Middle Name: | | | |
| * Last Name: | ▮ | | |
| Suffix: | | | |

* Title:   Asst. Director, Financial & Contract Mgt

* Telephone Number: ▮                    Fax Number:

* Email: ▮

* Signature of Authorized Representative: ▮        * Date Signed:  08/30/2024

# EXHIBIT F

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Assistance Amendment** | **GRANT NUMBER (FAIN):** 84091001<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5H | | **DATE OF AWARD**<br>12/16/2024 |
| | **TYPE OF ACTION**<br>No Cost Amendment | | **MAILING DATE**<br>12/16/2024 |
| | **PAYMENT METHOD:**<br>ASAP | | **ACH#**<br>PEND |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS<br>1 CAPITOL HILL 4th Floor<br>Providence, RI 02908-5850<br>EIN:  05-6000522 | STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS<br>1 CAPITOL HILL 4th Floor<br>Providence, RI 02908-5850 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| One Capitol Hill<br>Providence, RI 02908-5850<br>**Email:**<br>**Phone:** | 290 Broadway, WD/DWMIB<br>New York, NY 10007<br>**Email:**<br>**Phone:** | OGD-GMB, 3903R<br>1200 Pennsylvania Ave NW, 3903R<br>Washington, DC 20460-0001<br>**Email:**<br>**Phone:** |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Rhode Island Solar for All

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 49,330,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 49,330,000.00 |
|---|---|---|---|

# NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 49,330,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1300 Pennsylvania Avenue NW<br>Washington, DC 20004 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official           - Associate Award Official | **DATE**<br>12/16/2024 |

5H - 84091001 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 48,930,000 | $ 0 | $ 48,930,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 49,330,000 | $ 0 | $ 49,330,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84091001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 389,931 |
| 2. Fringe Benefits | $ 228,982 |
| 3. Travel | $ 9,130 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 3,000 |
| 6. Contractual | $ 31,076,416 |
| 7. Construction | $ 0 |
| 8. Other | $ 17,622,541 |
| 9. Total Direct Charges | $ 49,330,000 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00__ % Federal __100.00_ %) | $ 49,330,000 |
| 12. Total Approved Assistance Amount | $ 49,330,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 49,330,000 |

5H - 84091001 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ██████████████████████████), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

5H - 84091001 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

     a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

     b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

     c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

     d. Being funded by public or charitable contributions; and

     e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

5H - 84091001 - 1    Page 8

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.


**Environmental Information:** Environmental Information is defined in EPA's [Environmental Information Quality Policy](). Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's [Environmental Information Quality Policy](). Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well [SFA@epa.gov]() such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

5H - 84091001 - 1    Page 20

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

### C. Recipient Responsibilities When Entering Into and Managing Contracts:

#### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

#### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

### D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

### E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

5H - 84091001 - 1    Page 30

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

  1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

  2. Privately-owned commercial buildings when they meet the "public function" test;

  3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

5H - 84091001 - 1    Page 33

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT G

**Friday, January 31, 2025 at 15:41:39 Central Standard Time**

| | |
|---|---|
| **Subject:** | RE: Rhode Island Revised Workplan and Timeline for Removal from Program Planning Period |
| **Date:** | Thursday, January 16, 2025 at 3:21:02 PM Central Standard Time |
| **From:** | ■■■■■■■ |
| **To:** | ■■■■■■■ (OER - Contractor) |
| **CC:** | ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ |
| **Attachments:** | image001.png, image002.png, image003.png, image004.png, image005.png |

---

**This Message Is From an External Sender**
This message came from outside your organization.

[ Report Suspicious ]

---

Good afternoon,

We have completed our review of the revised Rhode Island Office of Energy Resources Solar for All workplan and timeline. The Rhode Island Office of Energy Resources has met the Planning Period Term and Condition, with the specific condition III.A.2 removed without further action from the Recipient required upon receipt of this email in accordance with 2 CFR 200.208€ for all parts of the workplan except those specifically called out in the list below.

- Take out planning period note at the start of the 20% savings section.
- Please add tasks in the implementation period of your timeline to reflect the following statements:
  - OER will work to develop warranty requirements for the CRNM and AHSSP programs in accordance with EPA's General Terms and Conditions.
- Financial Assistance (Program 5) :
  - Please add a task for building out the incentive structure (or add more details about the final incentive structure) under this program. Currently it is just stated that you will adopt the design of the current program but do not discuss the design.
- The EPA division director reviewed the household savings plan and asked for the following additions be considered for the 20% Savings for Affordable Housing Program 5:
  - In reference to the text below, please indicate if the savings will be tied to historical usage/utility bills of the building and how it equates to 20% savings.
  - "At least 50% of the net value of the net metered credits achieved with the addition of solar to affordable housing will be required to benefit low-income tenants. These approaches will include direct reduction or rebates of tenant rents; establishment of increased operating or replacement reserves of the property; provision of free or reduced-cost high-speed internet access for the residents; provision of social service programs, such as job training or financial literacy programs, to the tenants; installation of additional energy-savings programs for the property, and other similar initiatives."
- Please correct the typos in the following sentences: 1) on p. 35 - "All ground mounted projects using SFA funds must adhere to the solar decommissioning law. ==in the law== took effect January 1, 2025.", and 2) on p. 23 - "OER, RIIB, and RIDEM ==will on a collaborative==

Technical Assistance initiative for municipalities and solar developers which includes, but is not limited to:"

Please make the updates as you are able to send back to ██████ (cc'd), the new EPA Project Officer. She will review the updates and provide written confirmation when changes are reviewed and get back to the RI team with any additional changes that may be needed. ██████ is out until Tuesday the 21st. In the meantime, please reach out to ██████ with any questions.

Thank you!

██████

██████████

Environmental Protection Specialist - Solar for All Team
Office of the Greenhouse Gas Reduction Fund
US Environmental Protection Agency
██████████

---

**From:** ██████████ OER - Contractor) ██████████████
**Sent:** Tuesday, January 14, 2025 8:37 PM
**To:** ██████████████████████
**Cc:** ██████████████████████████████████
██████████████████████████
**Subject:** Rhode Island Revised Workplan and Timeline for Removal from Program Planning Period

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Good evening.
The Rhode Island Office of Energy Resources has revised our workplan and timeline to remove the program planning period.
Attached are our red lined and clean versions (showing the final product of those changes) for both documents.
Please advise if there is any additional information needed to proceed with removing the program planning period.
Thank you.

██████



██████████
*Renewable Energy Program Coordinator – Solar for All*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
██████████████████████ | www.energy.ri.gov

2 of 3

[facebook.com]  [youtube.com]  [linkedin.com]

[twitter.com]

# EXHIBIT H

**Tuesday, February 4, 2025 at 20:33:24 Central Standard Time**

**Subject:** RE: Rhode Island Revised Workplan and Timeline for Removal from Program Planning Period
**Date:** Friday, January 17, 2025 at 11:24:22 AM Central Standard Time
**From:** ███████████████
**To:** ███████████████████
**CC:** ██████████████████████████████
**Attachments:** image001.png, image002.png, image003.png, image004.png, image005.png, RI SFA Work Plan - RED
LINE 01-17-25.docx, RI SFA Work Plan - CLEAN VERSION 01-17-25.docx, RI SFA Program Timeline - RED
LINE 01-17-25.xlsx, RI SFA Program Timeline - CLEAN VERSION 01-17-25.xlsx

████,

Thank you for the information and all the assistance you have provided to us to this point in the process.
I hope you enjoy your new assignment.

████ (and ██),
The attachments provided show both the redline and clean versions for both the workplan and timeline.
There was one additional correction to a typo on the timeline (line 60) and I have noted in red below
how the questions were addressed.
Please let us know if any additional information is needed.
Thank you very much.

████

████████
*Renewable Energy Program Coordinator – Solar for All*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
████████████████ | www.energy.ri.gov

**From:** ██████████████████
**Sent:** Thursday, January 16, 2025 4:21 PM
**To:** ████████████████████
**Cc:** █████████████████████████
████████████████████████████████
██████████████████████

**Subject:** RE: Rhode Island Revised Workplan and Timeline for Removal from Program Planning Period

| **This Message Is From an External Sender** | Report Suspicious |
|---|---|
| This message came from outside your organization. | |

Good afternoon,

We have completed our review of the revised Rhode Island Office of Energy Resources Solar for
All workplan and timeline. The Rhode Island Office of Energy Resources has met the Planning

Period Term and Condition, with the specific condition III.A.2 removed without further action from the Recipient required upon receipt of this email in accordance with 2 CFR 200.208€ for all parts of the workplan except those specifically called out in the list below.

- Take out planning period note at the start of the 20% savings section. Done (page 3 of the redline)
- Please add tasks in the implementation period of your timeline to reflect the following statements:
  - OER will work to develop warranty requirements for the CRNM and AHSSP programs in accordance with EPA's General Terms and Conditions. Added (new line 196 in timeline and modified language in workplan for clarity on starting on page 35)
- Financial Assistance (Program 5) :
  - Please add a task for building out the incentive structure (or add more details about the final incentive structure) under this program. Currently it is just stated that you will adopt the design of the current program but do not discuss the design. Added information in workplan (page 15)
- The EPA division director reviewed the household savings plan and asked for the following additions be considered for the 20% Savings for Affordable Housing Program 5:
  - In reference to the text below, please indicate if the savings will be tied to historical usage/utility bills of the building and how it equates to 20% savings.
  - "At least 50% of the net value of the net metered credits achieved with the addition of solar to affordable housing will be required to benefit low-income tenants. These approaches will include direct reduction or rebates of tenant rents; establishment of increased operating or replacement reserves of the property; provision of free or reduced-cost high-speed internet access for the residents; provision of social service programs, such as job training or financial literacy programs, to the tenants; installation of additional energy-savings programs for the property, and other similar initiatives." Additional information has been added to this section (page 8)
- Please correct the typos in the following sentences: 1) on p. 35 - "All ground mounted projects using SFA funds must adhere to the solar decommissioning law. in the law took effect January 1, 2025.", and 2) on p. 23 - "OER, RIIB, and RIDEM will on a collaborative Technical Assistance initiative for municipalities and solar developers which includes, but is not limited to:" Done (page 36 and page 23 of redline)

Please make the updates as you are able to send back to ▮▮ (cc'd), the new EPA Project Officer. She will review the updates and provide written confirmation when changes are reviewed and get back to the RI team with any additional changes that may be needed. ▮▮ is out until Tuesday the 21st. In the meantime, please reach out to ▮▮ with any questions.

Thank you!

▮▮▮

▮▮▮▮▮

Environmental Protection Specialist - Solar for All Team

Office of the Greenhouse Gas Reduction Fund
US Environmental Protection Agency

████████████

**From:** ████████████████████████████
**Sent:** Tuesday, January 14, 2025 8:37 PM
**To:** ██████████████████████████████
**Cc:** ██████████████████████████████

**Subject:** Rhode Island Revised Workplan and Timeline for Removal from Program Planning Period

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Good evening.
The Rhode Island Office of Energy Resources has revised our workplan and timeline to remove the program planning period.
Attached are our red lined and clean versions (showing the final product of those changes) for both documents.
Please advise if there is any additional information needed to proceed with removing the program planning period.
Thank you.

████




*Renewable Energy Program Coordinator – Solar for All*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
██████████████████████ | www.energy.ri.gov
[facebook.com]  [youtube.com]  [linkedin.com]
[twitter.com]

# EXHIBIT I

**Greenhouse Gas Reduction Fund**
**Solar for All**
**Rhode Island Equitable Access to Solar Energy (EASE) Programs Work Plan**
**Project Period: 5/1/24 – 4/30/29**
**Date of Submittal: January 14, 2025**

**Project Title: Rhode Island Equitable Access to Solar Energy (EASE) Programs**
**Grant Number:** 84091001
**Organization Name:** Rhode Island Office of Energy Resources (Lead for Coalition)
**Geography:** State of Rhode Island
**Definition of LIDAC:** The RI Coalition will use the Climate and Economic Justice Screening Tool (CEJST) to identify disadvantaged communities (DACs). The State of Rhode Island used GGRF's definition of "geographically dispersed low-income households" from the competition terminology. For metropolitan areas, this includes individuals and households with incomes at or below 80% of the Area Median Income (AMI), or 200% of the Federal Poverty Level, whichever is greater. For non-metropolitan areas, it includes those with incomes at or below 80% of the AMI, 80% of the Statewide Non-Metropolitan Area AMI, or 200% of the Federal Poverty Level.

Programs in Rhode Island that meet these criteria include:

1. Low Income Home Energy Assistance Program (LIHEAP)
  - Eligibility: Households with income at or below 60% of the state median income.

2. Supplemental Nutrition Assistance Program (SNAP)
  - Eligibility: Households with an older adult or someone with a disability may qualify if their income is less than 200% of the Federal Poverty Level (FPL).

Therefore, both LIHEAP and SNAP are capable of verifying and qualifying income eligibility of individuals seeking assistance from SFA programs.

The Rhode Island Coalition will continue to explore additional programs that can verify categorical eligibility as avenues for income verification and will update this section as needed.

**Introduction**

**Section 1: Project Description**

**1.1 Overview**

The Rhode Island coalition of applicants is proposing the launch and expansion of a comprehensive suite of six financial assistance programs and twelve project deployment technical assistance initiatives designed to equitably address barriers to solar adoption in Rhode Island's low-income and disadvantaged communities. All financial assistance programs are tailored to defray specific and longstanding financial barriers to solar adoption while addressing the needs of low-income

1

renters and homeowners. Financial assistance programs proposed specifically deliver meaningful benefits of reliable solar power directly to RI's most historically underserved communities through low-income and DAC-specific eligibility requirements. The following programs are numbered in the below summary table.

NOTE: Program 1 received approval from EPA to be removed from the application. Programs 2 through 7 were NOT renumbered to account for this change. There is no longer a "program 1" in this workplan.

| Rhode Island Financial Assistance Programs | | Residential Solar Program Type |
|---|---|---|
| Program 2 | Low-Income Residential Solar Direct Ownership Adder | Rooftop single family |
| Program 3 | Low-Income & DAC Roof and Electrical System Adder | Enabling upgrades |
| Program 4 | Low-Income/DAC Residential Energy Storage Adder | Associated Storage |
| Program 5 | Affordable Housing Solar Supplemental Program (AHSSP) | Multifamily |
| Program 6 | Community Remote Net Metering (CRNM) | Community Solar |
| Program 7 | Community Solar on Preferred Sites | Community Solar |

***REF "Adder" Expansions (Programs 2, 3, and 4)***: Programs 2, 3 and 4 are "adder" programs, which is an additional incentive for LIDAC residents on-top of the base incentives that exist for residential solar in Rhode Island. REF Adder programs deliver upfront grants, which are applied to by the installer and directly subtracted from a LIDAC homeowner's total project cost for residential-serving rooftop solar direct ownership, enabling upgrades, and associated solar paired with storage. Programs 2 and 4 double existing adders for LIDAC residents, while Program 3 is an entirely new adder supporting rooftop and electrical, or "enabling upgrades", by mitigating longstanding barriers to solar adoption in RI's oldest homes. These adders can all be paired or "stacked" with each other and applied directly to total project costs, reducing the burden of upfront investment. Upfront grants that directly reduce total project costs mitigate longstanding LIDAC-ownership barriers, enabling households to own their own systems and build wealth in communities that have historically been underserved by RI's ratepayer funded grant programs.

***Affordable Housing Solar Supplemental Program (Program 5)***: AHSSP is a milestone-based grant program for multifamily housing that builds upon the existing Zero Energy for the Ocean State's program design to deliver meaningful solar benefits to energy efficient LIDAC multifamily housing. Projects can include new construction and deep retrofitted housing.

***Community Remote Net Metering (Program 6):*** CRNM, Rhode Island's existing community solar Program established statutorily in 2017, will restructure the existing Renewable Energy Fund's Community Renewables Program to relaunch a milestone-based grant program incentivizing the ~20MW statutory expansion of RI's community solar program to a total of 50MW, reducing ratepayer costs for the implementation of CRNM. Meaningful benefits will be delivered to over 2,658 additional customers through low-commitment subscription models.

***Community Solar on Preferred Sites (Program 7)***: The Rhode Island Infrastructure Bank (RIIB) will launch a milestone-based grant program which will further enable funding options for community solar on public "preferred sites", while emphasizing the importance of energy resilience for DAC-serving critical facilities.

**1.2 Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals**

**Environmental Results - Outputs and Outcomes:**

**The following outputs/outcomes are based ONLY on new solar generation.**

| Table 1: Rhode Island's Output and Outcome Targets for Financial Assistance Programs | | | | | |
|---|---|---|---|---|---|
| **Program name** | **Capacity Deployed** | **Households Served** | **Absolute Household Savings** | **Federal Funding per household** | **CO$_2$ Emissions avoided** |
| Low-Income Direct Ownership Adder | 1.54 MW | 271 | $13,223,851 | $3,688 | 32,000 |
| Roof and Electrical System Adder | N/A | 1,478 | N/A | $2,500-$20,000 | N/A |
| Low-income Energy Storage Adder | 2.69 MWh | 125 | $1,292,156 | $2,000 | 4,200 |
| AHSSP (Multifamily) | 1.7 MW | 693 | $9,993,047 | $5,339 | 35,250 |
| CRNM | 24.25 MW | 2,658 | $23,968,299 | $11,286 | 435,077 |
| **TOTAL** | 27.49 MW, 2.69 MWh | 5,225 | $48,477,353 | | 506,527 |

**Outcomes related to workforce development are detailed on page 10.**

**Linkage to U.S. EPA's Strategic Goals:**
This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
  - Objective 1.1: Reduce Emissions that Cause Climate Change

**Section 2: Project Design Plan**

**2.1 Activities to be Conducted.**

NOTE: To request removal of Rhode Island's program planning period term and condition, this workplan has been revised in accordance with the "Specific Condition on the Solar for All Planning Period" guidance released by EPA on December 20, 2024. The guidance categorizes Household

3

Savings Plans as tasks – rather than core program decisions. Upon release of the December 20th guidance, the following edits remove frequent usage of program planning terminology to recategorize activities to be completed in year 1 of implementation as "TASKS," rather than "CORE PROGRAM DECISIONS." Additional detail related to the household savings plan can be found in section 5: Reporting Requirements.

**Meaningful Benefit Plan**

NOTE: AGREEMENTS/STRUCTURES THAT ENSURE 20% SAVINGS ACROSS ALL PROPOSED PROGRAMS:
For ALL PROGRAMS PROPOSED IN THIS APPLICATION as they pertain to system sizing and Total Solar Resource Fraction (TSRF): Per the Net-Metering Tariff[1], residential-serving rooftop solar in Rhode Island must be sized to the 3-year historic average of electricity usage, and exceptions can be made for homeowners looking to increase usage due to clean heating/cooling or homeowners purchasing electric cars. In addition, REF's Minimum Technical Requirements mandate that solar systems receiving a grant from REF must pass a shading analysis with a TSRF of at least 80% or higher. These structures lend themselves to the credibility of RI's household savings methodology by guaranteeing savings well over 20%, as solar sized to historic usage will save LIDAC homeowners far beyond 20% savings, striving towards 100% savings. Additional details on household savings plans are discussed in section 5: Reporting Requirements

Low–Income Direct Purchase Adder (Program 2):
Program 2 will provide energy savings, access, and ownership through upfront grant payments as outlined on page 2 above (see REF "Adders" Program description). Program 2 will enable the adoption of on-site solar for households who wish to procure their own power and offset as much of their electric load as possible. Once installed, behind-the-meter solar adequately sized to historic usage will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.

Program 2 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings:
   a. Details pertaining to the Household Savings Plan are detailed in section 5: Reporting requirements. Once the program is launched, behind-the-meter solar adequately sized to historic usage will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.
2. Activities to increase LIDAC Access:
   a. Activities to increase LIDAC access to program 2 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25.
3. Activities that increase household or grid resilience:
   a. Creation of outreach materials that encourage the braiding of REF adders: namely, promoting program 4 for energy storage in tandem with program 2, as Program 4 can only be utilized with solar plus energy storage installations.

---

[1] https://portalconnect.rienergy.com/RI/servlet/servlet.FileDownload?file=015Nu0000032vDc

4

b. Additional activities that increase household resilience are outlined in the educational and outreach strategies detailed in the Equitable Access and Meaningful Involvement Plan section of this document on page 25.

c. Launch Program 2 (also listed in FA section): program implementation improves household resilience as BTM solar protects from energy price volatility via net metering direct ownership models.

4. Facilitate ownership models that support wealth building / community ownership.

a. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.

b. Launch program 2 (also listed in FA section): Directly facilitate wealth building ownership models via program launch.

Roof and Electrical Systems Adder (Program 3):

Program 3 will expand access to solar through upfront grant payments by enabling the adoption of on-site solar for households that cannot afford the upfront costs of roof or electrical panel replacements. When adequately sized to historic usage, low-income direct ownership of PV will offset close to 100% of electric demand, resulting in significant bill reductions far beyond the 20% household savings target.

Program 3 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings: -- N/A

a. As a program geared specifically towards enabling upgrades, this criterion is not applicable because this program is an "adder" which MUST be paired with the REF direct ownership adder and can be paired with all adders simultaneously. This adder MUST be paired with the direct purchase of a solar system, where the 20% savings are experienced. There is a trade-off between Enabling upgrades serving as a necessary component to achieve 20% bill savings. This program enables those savings to be achieved via all other REF programs (1-4).

2. Activities to increase LIDAC Access:

a. Activities to increase LIDAC access to program 3 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25 as community engagement work accomplishes this deliverable.

3. Activities that increase household or grid resilience:

a. Activities necessary to increase household and grid resilience are outlined in the financial assistance strategy section on page 11.

b. Quality Assurance Activities: Please cross reference activities pertaining to quality assurance inspections in the Equitable Access and Meaningful Involvement Plan section on page 34 as quality assurance (QA) can play a crucial role in building household resilience by ensuring that products, services, and systems are reliable, safe, and effective.

       c.  Launch Program 3 (also listed in FA strategy): Electrical component improves household safety and resilience.

4. Facilitate ownership models that support wealth building.
   a. Launch Program 3 (also listed in FA strategy): Program implementation directly facilitates wealth building.
      i. See additional activities pertaining to program launch in the financial assistance strategy on page 11.
   b. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.

Low-Income/DAC Energy Storage Adder Expansion (Program 4):

Program 4 will enable the adoption of energy storage paired with on-site solar. By offering energy storage paired with solar to communities with frequent history of outages, the grid resilience benefits delivered directly to disadvantaged households can directly improve the reliability of electric service during major storm events.

Per the REF rules and regulations, the energy storage adder funded through this program MUST be deployed in conjunction with and connected to an eligible residential-serving solar project receiving financial assistance from the program. This is because it is an "adder" program. The storage must be sited on residential LIDAC property in conjunction with the solar system. The specific siting of these resources will be determined as applications are submitted to the REF for PV-paired projects.

Program 4 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings:
   a. Complete tasks in timeline associated with interagency collaboration for reporting plan to calculate household savings for PV paired storage and methodology to quantify resiliency benefits.
   b. Details pertaining to the Household Savings Plan are detailed in section 5: Reporting Requirements.
2. Activities to increase LIDAC Access:
   a. Activities to increase LIDAC access for program 4 are detailed in the Equitable Access and Meaningful Involvement Plan section on page 25. Community engagement work accomplishes this deliverable.
3. Activities that increase household or grid resilience:
   a. Meet with Energy Hub (administrators of RI Energy's Demand Response Program, Connected Solutions) to discuss energy storage incentives.
   b. Conduct educational Energy Storage and Resilience 101 listening sessions in census tracts in RI facing most frequent history of outages.
4. Facilitate ownership models that support wealth building / community ownership.
   a. Launch Program 4 (also in FA section): Program implementation directly facilitates wealth building.

6

        i. See additional activities pertaining to program launch in the financial assistance strategy on page 11.

    b. REF's Minimum Technical Requirements already include robust quality assurance measures through mandatory inspections for systems that receive a grant. Quality assurance inspections help build wealth in communities by raising property values and reducing opportunity for costly maintenance or repairs.

How the program intends to limit risk to communities when ownership pathways are offered:

All 3 REF programs directly support ownership pathways for LIDAC community members. These grant programs limit risk to communities in the following ways:

- Grants and Subsidies: Providing upfront grants, rebates, or subsidies can reduce the financial burden for low-income households, limiting their financial exposure and making it easier to afford solar installations by limiting the risk associated with taking the financial leap for a direct purchase system.
- Financial Literacy and Energy Education: The education and outreach strategy articulated in the Equitable Access and Meaningful Involvement Plan can include education on financial planning, energy savings, and the long-term benefits and responsibilities of solar ownership, helping participants make informed decisions.
- Consumer Protections: Enforcing clear, fair, and transparent contracts, along with dispute resolution mechanisms, can protect low-income consumers from predatory practices.
- Option to Purchase: Participants can be given the option to purchase the system at a reduced cost after a certain period. All of the adder programs with the REF are designed to be for customers who own the solar system.

REF PROGRAM HOUSEHOLD SAVINGS APPROACH (PROGRAMS 2, 3, AND 4): STEPS TO DEVELOPING SAVINGS APPROACH:

    HOW GRANTEES WILL TRACK SAVINGS:
- OER and REF have the ability to survey program participants as a means of verifying bill savings.

    AGREEMENTS OR STRUCTURES THAT WILL ENSURE SAVINGS:
- See above explanation on page 2 regarding historic PV system average sizing and TSRF requirements.

    HOW TO ENSURE VERIFICATION:
- Explore NDA options between OER and utilities for verification of customer bills, pending best practices on this to be released in EPA guidance.

Additional information pertaining to the Household Savings Plan is detailed in section 5: Reporting Requirements.

Affordable Housing Supplemental Solar Program (AHSSP):

At least 50% of the net value of the net metered credits achieved with the addition of solar to affordable housing will be required to benefit low-income tenants. These approaches will include direct reduction or rebates of tenant rents; establishment of increased operating or replacement reserves of the property; provision of free or reduced-cost high-speed internet access for the residents; provision of social service programs, such as job training or financial literacy programs,

7

to the tenants; installation of additional energy-savings programs for the property, and other similar initiatives. Will require developers to identify the benefits they intend to utilize to meet these requirements. Additional activities related to program design are included in the Financial Assistance Strategy. These additional activities will also include recognition of unintended consequences such as increased costs to tenants and ensuring that tenants benefit from electricity savings that the building might realize through solar adoption. It will also include ways to provide landlord encouragement to undertake energy efficiency measures before installing solar on the property.

Program 5 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings:
    a. Details pertaining to the Household Savings Plan are detailed in section 5: Reporting Requirements.
    b. Additional detail on utilizing recommendations in HUD's tenant benefit guidance and "Advancing Renewable Energy in Rhode Island Affordable Housing" for "non-financial benefit" tenants can be found in the Financial Assistance strategy section and Technical Assistance Strategy section.
2. Activities to increase LIDAC Access:
    a. Activities to increase LIDAC access for Program 5 are detailed in the equitable Access and Meaningful Involvement Plan section on page 25.
    b. Additional activities related to program design and implementation can be found in the financial assistance strategy section on page 13.
3. Activities that increase household or grid resilience:
    a. Protection from energy price volatility via net metering direct ownership models
    b. Explore the inclusion of CRNM subscriptions for tenants that pay their own electricity bills.
    c. Explore leveraging energy storage programs into AHSSP program design.
    d. OER will continue to explore additional activities necessary to increase household and grid resilience in AHSSP program design.

Community Remote Net Metering (CRNM – Program 6):
Program 6 will require and guarantee that community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill. These subscription models will include no sign-up fees, no cancellation fees, no credit checks, and equitable verification and sign-up processes. Program design for CRNM will be subject to regulatory approval during the proceedings with the RI Public Utilities Commission that must take place during year 1 of SFA program implementation and additional activities related to program design are included in the Financial Assistance Strategy.

Additional information on Rhode Island's participation in the Clean Energy Connector as a pilot state can be found on page 18 in the Financial Assistance Strategy section. The Clean Energy Connector ensures delivery of meaningful benefits by ensuring strong consumer protections and guaranteed bill savings.

Program 6 Activities to be Completed for the Meaningful Benefits Plan:

1. Activities needed to guarantee 20% savings:
   a. Incorporate household savings plan (see section 5) into CRNM program.
   b. Meet with Rhode Island Energy about CRNM program design.
   c. Regularly engage with DOE Connector staff on inclusion of LIHEAP used for community solar in CRNM.
2. Activities to increase LIDAC Access:
   a. File CRNM docket with public utilities commission and participate in regulatory process.
   b. Facilitate public meetings about community solar education and CRNM Program Design
   c. facilitate educational workshops for low-income customers about regulatory process.
   d. Develop stakeholder plan with Center for Justice for CRNM regulatory proceedings.
   e. Meeting with community solar developers and subscriber management companies about CRNM regulatory filing, current subscription offerings and contract terms
   f. Meeting with DOE Clean Energy Connector team to assess viability of participating as pilot state.
   g. Sign Clean Energy Connector Partnership agreement and submit to DOE.
   h. Formally join DOE on connector project as a pilot state
   i. Facilitate regular meetings with LIHEAP to coordinate RI Participation in connector.
3. Activities that increase household or grid resilience: N/A: since the residential-serving community solar project is not owned or located the property of a LIDAC electric customer, this criterion is non-applicable.

Rhode Island Infrastructure Bank (RIIB) Funding Preferred Sites (Program 7):
Projects funded through RIIB's DAC-focused grant program for Community Solar on Preferred Sites would be a part of the total 20MW expansion of the low-income-focused CRNM program as described above. As a result, program design will be finalized in tandem with CRNM program launch and technical assistance tasks will be completed during year 1 of implementation. Via subscription models, meaningful benefits deliver a minimum of 20% household savings threshold by requiring that participating community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription is equal to or greater than 20% of the household's electric bill prior to accounting for CRNM bill credits. Funding will be sub awarded to RIIB, who will manage the program and provide technical assistance as discussed in the Project Deployment TA section below) necessary to implement the community solar project. To design the program, the Bank is engaging its financial advisory and underwriting firms to establish program terms and consulting its technical advisors to establish program parameters for energy cost savings. The Bank's activities to establish a grant program will span four months and the Bank estimates the timespan to review applications and make project awards will span eight weeks.

Program 7 Activities to be Completed for the Meaningful Benefits Plan:
1. Activities needed to guarantee 20% savings:
   a. Determine baseline energy cost burden averages with OER and the utility.

9

      b. Development of Project Summary Form: which will allow applicants to conduct a cost savings analysis with the Bank's technical partner. The Bank's technical partner, in partnership with the utility, will review two years' worth of utility bills to establish baseline energy data from which the savings analysis will be performed.

2. Activities to increase LIDAC Access:
   a. Utilize RIIB's existing affordability index as a prioritization framework for applicants located 100% within or that serve 100% of Low Income and Disadvantaged Communities
   b. Facilitate two community information sessions per project with program participants.
   c. RIIB will collect information from program participants tallying community outreach and LIDAC enrollment.
   d. Utilize RIIB's process for income surveys to finalize reporting framework, including cost savings, number of households located within LIDACs impacted, and annual emissions avoided.

3. Activities that increase household or grid resilience:
   a. RIIB will require participating communities to participate in resilience-focused workshops provided by the Bank at no cost to develop and implement grid and infrastructure resiliency plans.

4. Other activities:
   a. OER will meet with RIIB and their legal team to determine whether RIIB rules and regulations need to be updated to include new technical assistance/grant program.

Investing in Quality Jobs and Businesses (meaningful benefits criteria 5):
The Rhode Island AFL-CIO will leverage their members' expertise and existing partnerships with the Rhode Island Department of Labor and Training (DLT) to identify and establish equitable pathways to the kinds of family-sustaining good-paying clean energy careers illustrated in this application for disadvantaged communities. The Rhode Island AFL-CIO will dedicate staff time and resources to provide technical assistance towards workforce development best practices through registered pre-apprenticeship and apprenticeship utilization, community benefits agreements, project labor agreements, career readiness curriculum, and intake. OER will work with the Rhode Island AFL-CIO to create a work plan and hold regular check-in meetings with staff and stakeholders.

OER will coordinate with RI DLT's Real Jobs Rhode Island (RJRI) platform team to determine which communities will be the primary focus of programming and will then assess which of the members of the CBO advisory committee provide services within those areas.

OER will leverage the longstanding partnership with Building Futures Rhode Island to recruit low-income members of affected communities to participate in training. RJRI and Building Futures will create a pathway to a registered apprenticeship as an electrician for between 150-200 individuals from LIDACs. It is expected that the specific budget identified, and work proposed by RI DLT through Solar for All will result in 75-100 new electricians.

OER commits to adhering to the US Department of Labor and Commerce Good Job Principles. During year 1 of SFA implementation, OER will work with workforce stakeholders on program details and reporting criteria to ensure that the Building Futures RI program, funded through SFA, will interact with the projects funded by SFA. Additionally, OER will work with the REF, RI Housing and RIIB to ensure the Good Job Principles are foundational to SFA implementation. Adherence to the principles will ensure that Building Futures graduates are able to pursue high-quality jobs in SFA programs.

Workforce Development Milestones to be Completed for the Meaningful Benefits Plan:

    a. Milestone 1: DLT to create workforce participation plan through Real Jobs RI. The design will include how DLT plans to ensure that the RJRI program will align with SFA funded programs and how RJRI program participants will receive high quality jobs at the conclusion of their participation.

    b. Milestone 2: OER to develop cadence of meetings with DLT, the RJRI platform team, RIIB, REF, and RI Housing to discuss inclusion of the US Department of Labor and Commerce Good Jobs Principles, develop a plan for tracking workforce participation in SFA funded programs, and design reporting criteria.

    c. Milestone 3: OER will coordinate with the RJRI team to determine which communities will be the primary focus of programming, ensure that all identified areas are in the SFA specified locations, and will then assess which of the members of the CBO advisory committee provide services within those areas specific to SFA.

    d. Milestone 4: OER/AFL-CIO development of workplan for workforce development for SFA Program Period

    e. Milestone 5: OER to complete 2024 Clean Energy Jobs Report

    f. Milestone 6: Meet with workforce development partners to discuss timeline and action items for implementation.

**Financial Assistance Strategy**

**The percent of award used for financial assistance is 88% as indicated in the budget. Accounting for the $400,000 of EPA Technical Assistance, the percentage of award goes down to 87%.**

**Expansion of Renewable Energy Fund (REF) Residential Programs to include LIDAC "Adders" for Solar Direct Purchase, Energy Storage, and Enabling Upgrades:**

Commerce RI's Renewable Energy Fund (REF) exists to help expand the role of renewable energy throughout Rhode Island. REF has two long standing grant programs (small and commercial-scale grant programs) which support the installation of net-metered solar on residential and commercial buildings. The REF also has existing adders for energy storage-paired systems and carport solar projects. The addition of new adders to REF's Residential Programs will be administered by REF, via subawards.

REF is funded using ratepayer dollars, alternative compliance payments, and RGGI, meaning that grant payments are not given directly to the end user. Installers apply to REF on behalf of a customer, the grant is awarded to the installer, and the installer will then leverage the grant

11

awards to directly reduce the cost of a solar project. The REF requires copies of all contracts between the customer and installer, ensuring that the grant amount is passed through to the customer. The consumer protections for this process are incorporated into the Minimum Technical Requirements that applicants must follow in order to receive a grant.

Once sub awarded, REF will expand their existing adder offerings to include three new LIDAC-specific adders, specifically designed to be added onto the existing market-rate base incentive of .65 cents/watt, up to 7.69kW or $5,000 max incentive amount for non-LIDAC customers. While the base incentive amount may change over the course of the five-year SFA program, the existing REF programs are expected to continue until 2028. Historically, funding for REF programs has been extended through legislative action. OER expects to work on a legislative proposal during the SFA implementation period to extend funding for REF programs through December 31, 2033. The addition of the three adders below will improve opportunities for wealth building by reducing upfront project cost in the following ways:

- Program 2: Adder to the small-scale program for direct ownership for low-income homeowners, providing additional funding to support the upfront cost of a customer owned PV system. While a market rate customer can receive up to $5,000 for a residential project, a LIDAC customer could receive up to $10,000 in reduced project cost for the same solar project.
- Program 3: Adder to the small-scale programs for roof and electrical system upgrades for low-income homeowners and multifamily housing projects
- Program 4: Expansion of the small-scale energy storage adder for low-income solar customers and the commercial scale energy storage adder for multifamily housing. While a market rate customer can receive $2,000 for a residential project, a LIDAC customer could receive an additional $2,000 in funding, totaling $4,000 in reduced project cost for a solar project paired with storage.

**Residential Solar Low Income Direct Ownership Adder (program 2):**
The adder will double the small-scale incentive for qualifying LIDAC customers by creating an adder of .65/watt for eligible small scale direct purchase customers. Customers will be able to receive a maximum grant amount of $10,000 for system sizes 7.69kW and higher. This adder will help reduce the upfront cost of the solar system, reducing the remaining cost that may be financed. Will cap financing fees for projects utilizing the adder at a fixed percentage that will be determined based on stakeholder input. Will work to streamline the reporting of this data and will not allow a project to utilize this adder if the fee percentage is greater than the final determined financing percentage of the total project cost. Examples of tiered incentive structure provided in the original application are provided in Table 3:

| Table 3: Sample System Size Ranges | | | |
|---|---|---|---|
| System Size | Base Incentive | LI Adder | Total |
| 4kW | $  2,600.00 | $  2,600.00 | $  5,200.00 |
| 6kW | $  3,900.00 | $  3,900.00 | $  7,800.00 |
| 7.5kW | $  4,875.00 | $  4,875.00 | $  9,750.00 |
| 8kW | $  5,000.00 | $  5,000.00 | $ 10,000.00 |

12

**Roof and Electrical System Adder (program 3):**

REF will provide adders to the Residential and LIDAC multifamily housing program (specifically, programs 2, 4, and 5 in the application) for knob and tube wiring replacement, electrical panel upgrades, structural upgrades and roof replacement. The current share of financial assistance for enabling upgrades is 13.5%, which is well within the 20% threshold for the lifetime of the program. OER has done due diligence to explore other sources of funding but enabling upgrades and pre-weatherization barriers have been a longstanding challenge for locating sources of funding to address non-generational assets that are not tied directly to energy savings calculations. OER staff have spoken with program directors, OER's CFO, and other state agencies to explore financial avenues for this funding, and OER believes the opportunity to fund enabling upgrades would not exist without this federal funding. OER remains committed to exploring opportunities to braid funding for enabling upgrades with the funding received from the Inflation Reduction Act's Home Energy Rebate Programs, when awarded. The adders may be bundled in any combination if a home needs to address multiple issues. To qualify for any of these adders, a quote from a licensed electrician and/or roofing company must be submitted with the REF solar application. These adders will be a capped if the cost for any of the upgrades is less than the max adder amount. REF will require several application and completion components to ensure the adder funds are appropriately dispersed and to prevent fraud.

Examples of incentive structure provided in the original application are provided below:

| Table 4: Roof and Electrical Upgrade Adder, Type vs. Amount | |
|---|---|
| Enabling Upgrade Adder | Maximum Amount |
| Knob and tube wiring replacement, single family | $          15,000.00 |
| Knob and tube wiring replacement, triple decker | $          45,000.00 |
| Electrical Panel upgrade | $            2,500.00 |
| Structural upgrades and roof replacement | $          20,000.00 |

**Expansion of Energy Storage Adder (program 4):**

Program 4 will provide funding to continue the small-scale energy storage adder for systems paired with solar. REF will offer an additional $2,000 flat rate adder to qualifying low-income customers who wish to pair an energy storage system with either a leased or direct purchase PV system. This will bring the total energy storage incentive for a residential low-income customer to $4,000. The average cost of a battery system that went through the REF in 2023 was $22,036 and it is expected that the additional incentive will reduce the cost of an average RI battery storage system by 18.15%.

REF Small Scale energy storage adders work in conjunction with the Rhode Island Energy (RIE) Connected Solutions program, run through the utility's energy efficiency program. Income-eligible Customers utilizing the low-income energy storage adder will be encouraged to apply through Connected Solutions and utilize the 0% Heat Loan to receive no interest financing, allowing customers to pay back the cost of the battery on their monthly electricity bill. Please reference page 17 under the Energy Storage Incentive Analysis section for additional information on recent changes to the Connected Solutions program.

REF "ADDER" PROGRAM FA ACTIVITIES TO BE COMPLETED FOR PROGRAMS 2, 3 AND:

1. Facilitating launch of REF application portal prior to adding programmatic funding
   a. Finalize beta testing for existing REF program "test users."
   b. Meet with REF vendor to discuss changes to portal for the SFA programs.
   c. REF Vendor to make changes to the portal for Programs 2, 3, and 4
   d. REF Vendor to beta test new programs in the portal with "test users"
   e. Finalize portal for new REF programs.
2. Develop and release survey to solar and battery storage RI market participants to gain feedback on rightsizing incentives.
3. Develop REF Adder application forms and integrating application forms into portal design.
4. Determine list of required attachments to be submitted with program applications for programs 2, 3 and 4.
5. Develop REF Adder completion documents and integrate application forms into portal design.
6. Release REF Adder application documents and completion documents for public comment for stakeholder feedback.
7. Present program design to solar stakeholders for review and comment.
8. Update REF application portal to include capabilities for new SFA "adder" programs.
9. Subaward to REF to launch program 2: LIDAC Direct Ownership Adder.
10. Subaward to REF to launch program 3: Roof and Electrical Systems Upgrade Adder.
11. Subaward to REF to launch program 4: LIDAC Energy Storage Adder.
12. Subaward to REF to update their website with existing program materials and links for new "adder" programs' launch.
13. Incorporate Solar for All funding into REF Annual Report
14. Coordinate with REF to implement program design of Roof and Electrical System Adder Program (program 3).
15. Coordinate with REF to hire a full-time employee responsible for SFA program management.
16. Create internal REF program process for adder intake and completion processing.
17. Develop OER/REF reporting framework to monitor adder funds awarded and expended.
18. Update the REF completion documents and review process for Commerce Accounting and Legal teams.
19. Update REF small scale program guidance document.
20. Create new flyers that encourage the braiding of REF Adder programs for best return on investment.
21. Update REF website with new, final program documents and process guide.
22. Statutorily extend the expiration date of the REF beyond 2028.
23. Update the REF Rules and Regulations.

**Affordable Housing Solar Supplemental Program (AHSSP – program 5):**
OER will leverage the existing Zero Energy for the Ocean State's (ZEOS) program design to provide milestone-based grant funding through RI Housing to eligible affordable housing developments to offset the cost of net metered solar as well as battery storage systems. Several partners work with RI Housing (including OER, RIE, and their vendor for energy efficiency zero energy programs) which provides funding for the design and construction of net zero housing affordable to low-income tenants and homeowners. Projects can include new construction as well as deep retrofitted

14

housing. To expand the opportunity for more affordable housing to get closer to net zero RI Housing will create this new supplemental solar grant program (the AHSSP), which will be specifically designed to close those financing gaps for installing solar systems on affordable developments. Eligible projects must meet required criteria. RI Housing and the ZEOS program have adopted HUD's guidance on benefits to tenants to ensure that building occupants, who may not receive a direct reduction on their electricity bill, receive some kind of non-financial benefit.

RI Housing worked with the National Housing Trust to develop a report on "Advancing Renewable Energy in Rhode Island Affordable Housing", which was published in March 2024. The report details several policy and programmatic activities RI Housing should consider adopting over the next few years. It also identifies barriers to the utilization of renewable energy in affordable housing, best practices to advance solar adoption, and a robust recommendations section. OER and RI Housing have met multiple times in the last few months to discuss the recommendations in the report and more technical assistance is needed to address the barriers outlined in the report. One of the notable findings from the report was that most stakeholders indicated that a lack of technical assistance and access to information created barriers to deploying renewable energy at affordable housing sites. Specifically, developers identified three technical assistance and education needs:

1. Finding easily accessible information about Rhode Island's renewable energy incentives, including help understanding net metering options.
2. Access to information about Inflation Reduction Act (IRA) resources and support in understanding how resources, especially clean energy tax credits, can be incorporated into project financing.
3. Assistance in designing and deploying solar facilities, including identifying reputable contractors (with experience in the affordable and multifamily sectors).

It will be important for OER and RI Housing to identify a path forward to address these needs and other barriers addressed in the report for development of the AHSSP program.

AHSSP ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY:
1. Coordinate with RI Housing to implement program design of AHSSP (program 5)
2. Explore possibility to incorporate technical assistance offerings in AHSSP for solar installations on affordable housing.
3. Explore technical assistance recommendations in HUD Tenant guidance.
4. Braid RI Housing funds with RGGI and SFA funding necessary to implement full scope of AHSSP within ZEOS program redesign.
5. Plan to refine any subsidies with input from industry:
   a. OER and RI Housing to issue Request for Information (RFI) to gain input from industry on tiered incentive structure.
   b. Explore options beyond ZEOS offerings for new construction AND existing building modifications/rehab.
   c. Establish file management system with RI Housing to ensure seamless communication for program design, implementation and reporting.

Community Remote Net Metering (CRNM):

OER will implement the statutory expansion of CRNM program design by establishing a milestone-based grant for community solar projects that reduce ratepayer. SFA funds will be provided directly to community solar installers or subscriber management companies as a pass-through cost. On June 24, 2023, SB-684A[2] was signed into law by Governor McKee. This new law, among other provisions, requires the OER to relaunch the Community Remote Net Metering program, and mandates that at least 50% of the output from a CRNM project must be allocated to low-income residents or residents living in a disadvantaged or environmental justice community. The redesigned CRNM program would be structured as a ~20 MW expansion of the program and would cap any new CRNM project to 5MWs or less. CRNM projects, per the law, may only be developed in Rhode Island Energy's distribution network, which covers approximately 98% of Rhode Island electricity customers.

Per the new law, OER must file a program proposal and associated benefit cost analysis with the Rhode Island Public Utilities Commission (PUC), which would then issue a ruling either approving, approving with modifications, or denying the program proposal based in part on the findings of such benefit-cost analysis. More stakeholder input, especially from low-income constituents, will be sought prior to this docket being filed. Low-income participation through participatory governance is an activity to be funded under this grant and was included in the original amount budgeted for community engagement. Please reference the participatory governance section of the Project Deployment Technical Assistance Strategy on page 29 for additional detail about our coalition partner, Center for Justice, and their involvement in LIDAC regulatory inclusion.

OER has experience with low income and CBO stakeholder engagement specific to community solar from prior attempts to expand the CRNM program. Notably, OER was a recipient of technical assistance from the first round of the National Community Solar Partnership. However, that was several years ago and there are likely new stakeholders and CBOs OER will need to engage. Many stakeholders do not have experience with the regulatory process, and it will be critical to ensure that they have a voice, both before and during the docket proceeding.

One other important stakeholder group that OER will need to engage are community solar developers and subscriber management companies. Since the existing CRNM program reached capacity four years ago, most, if not all, have left the RI market and are not engaged. A serious effort will be needed to ensure that once additional community solar capacity is available, that developers will be interested in building projects.

Lastly, it is expected that more CRNM projects will be built on existing infrastructure, such as roofs and parking lots rather than greenfield spaces. Municipalities may also be interested in hosting a community solar project on behalf of their residents. OER and other program partners will need to engage buildings owners and municipalities to help identify suitable locations for projects.

It is expected that the CRNM program would function under a subscription-based and milestone-based community solar model, with a third party owning the solar facilities, and recruiting the relevant subscribers. This structure allows for direct bill credit savings that meet or exceed the

---

[2] S0684A.pdf (rilegislature.gov)

20% SFA threshold target based upon the delta between what customers would pay in subscription fees to the CRNM project owner and the retail cost of electric service without a CRNM subscription. When municipalities express interest in hosting a CRNM project on municipal owned property, OER and RIIB will provide technical assistance to help them navigate the complexities of the program as well as assistance exploring how to take advantage of Direct Pay opportunities.

CRNM and DOE's Clean Energy Connector: Rhode Island is close to finalizing a partnership with the US Department of Energy (DOE) and National Renewable Energy Laboratories (NREL) as a pilot state for the Clean Energy Connector tool, which allows LIHEAP customers to be connected directly with community solar subscription fees. DOE and NREL are able to take on no more than 5 pilot states in 2025 and OER has been ambitious to sign on as a pilot state. This tool ensures strong consumer protections for community solar from enrollment through the life of the program, safeguarding consumer data, and providing customers with comprehensive and clear communication and disclosures about community solar. The Clean Energy Connector mandates a minimum 20% savings requirement for subscribed households and reduces the burden of income verification through LIHEAP. RI's involvement with the connector will help strengthen the case for LIDAC inclusion and engagement with community solar during the CRNM docket filing and will play an important role in the design of LIDAC inclusion in the CRNM program design. Currently, LIDAC community solar subscribers in RI make up only 5% of the total subscribers in the state utilizing community solar. The enabling legislation that expanded community solar mandates a minimum of 50% LIDAC uptake. The connector serves as a valuable nexus in closing the gap between community solar protections, education, and 20% bill savings.

Rhode Island has only one investor-owned utility that the CRNM law applies to. As a result, any new or existing community solar customers participating in the CRNM program will be able to move almost anywhere in the state, in Rhode Island Energy's territory, and be able to move their subscription with them. As OER continues to work with DOE on the Clean Energy Connector, the process with Rhode Island Energy for moving a CRNM subscription to a different electricity account will be created and published on the Community Solar Marketplace Website. The process for moving will also take into account any LIHEAP or other income eligible discounts the customer may receive at the time they move.

CRNM ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY:
1. Review program design parameters from neighboring states with enabling legislation to learn best practices.
2. Work with OER's consultant to model economic benefits of a milestone-based incentive structure for CRNM.
3. Go out for public comment on first draft of CRNM program.
4. Explore avenues to gain input from developer industry on attracting community solar installers back to RI.
5. Engage developers on benefits of DOE Clean Energy Connector.
6. File CRNM docket with the PUC and participate in the regulatory process.
   a. Activity 1: Meet with RIE about CRNM program design.

17

   b. Activity 2: Develop stakeholder plan with Center for Justice for CRNM Regulatory Proceedings.
   c. Activity 3: Hold 3 meetings with community solar developers and subscriber management companies about CRNM regulatory filing.

Funding Publicly Owned Community Solar Projects on Preferred Sites (Program 7):
Program 7 will establish a milestone-based grant program managed by the Rhode Island Infrastructure Bank (RIIB) for public entities to install host-owned residential-serving community solar projects on preferred sites. The law defines "preferred sites" as a location for a renewable energy system that has had prior development, including, but not limited to, landfills, gravel pits and quarries, highway and major road median strips, brownfields, superfund sites, parking lots or sites that are designated appropriate for carports, and all rooftops including, but not limited to, residential, commercial, industrial, and municipal buildings. This is a grant program for public entities supplemented by technical assistance. The sites for these projects may be owned by municipalities and quasi-public agencies.

RIIB will incorporate community buy-in during the siting process since siting community solar projects in underserved urban landscapes may be difficult. To promote this community component wherever possible, RIIB will prioritize community solar projects sited in DACs.

RIIB ACTIVITIES TO BE COMPLETED FOR THE FINANCIAL ASSISTANCE STRATEGY:
   1. RIIB will refine planned grant subsidies with a project and solicitation scope, inclusion of technical assistance, and projected disbursement schedules. Additionally, the bank will dedicate staff resources for federal reporting requirements. To compensate for a smaller allocation to the program, the Bank will examine internal unallocated revenues to provide additional financial relief.

**Project-Deployment Technical Assistance Strategy**

**Energy Storage Incentive Analysis:**
On June 26th Governor McKee signed the 2024 Energy Storage Act (S-2499A)[3] into law, which created an energy storage target in the state for the first time. The goals are 90 MWs by 2026, 195 MWs by 2028 and 600 MWs by 2033. The law requires OER to work with one of our SFA program partners, RIIB, to develop programs to facilitate energy storage adoption, in addition to the current programs already offered. It also requires the PUC to engage stakeholders to adopt frameworks for both an energy storage tariff and an interconnection tariff for distribution system interconnection battery storage projects.

 In 2024, Rhode Island Energy has made progress on educating stakeholders about battery storage interconnection processes including stand-alone batteries and solar with energy storage. In April 2024, OER invited Rhode Island Energy to present at a solar stakeholder meeting to provide education and information about the interconnection process to the RI solar industry. In July 2024, OER began public reporting on the number and location of energy storage projects in RIE's

---

[3] S2499A.pdf (rilegislature.gov)

territory.[4] More work will be needed on energy storage reporting in the next six months, including: adding progress towards the goals, adding in additional data from other utilities, and the creation of a more refined definition for small, commercial, and utility scale battery projects.

Earlier this year, RIE removed the Connected Solutions program from the energy efficiency program and included it is its own separate PUC filing under a System Reliability Procurement (SRP) for electric demand response.[5] The Connected Solutions Program offered a generous demand response incentive for customers who installed energy storage batteries and participated in peak load reduction events during the summer months. The proposal reduced the incentive from $400/kW for five years to $225kW for at least three years and $200/kW after five years. Since this was approved by the PUC in June 2024, it will be important for OER and its partners to be responsive to stakeholders about the impacts these changes will do to the current residential battery storage market.

To get a sense of the market's response to these changes, OER and the REF released a survey to residential battery storage installers to determine whether changes needed to be made to the REF's energy storage incentive currently offered to customers installing energy storage and solar projects. Currently the program does not provide incentives for stand-alone energy storage systems not tied with solar PV. There were eleven responses to the survey and all eleven indicated that because the SRP Connected Solutions changes were approved, the REF market rate energy storage incentive would need to increase. The survey also indicated strong support for a stand-alone battery incentive. While SFA funds will not be used to fund a stand-alone battery storage program, it will be important to work on addressing this industry identified need.

Program 4 focuses on the expansion of the existing REF energy storage adder and increasing the incentive amount to LIDAC residential customers. In order to rightsize incentives relative to neighboring markets and program appetite, OER and the REF need to undertake an analysis of the current battery storage market in Rhode Island. The analysis will provide three outcomes. The first will help inform OER on changes needed to the current REF energy storage adder incentive and right sizing the SFA energy storage adder. The second outcome will be to help inform an energy storage incentive for affordable housing. Lastly, the third outcome is to determine what programmatic and policy changes OER and the REF should make to enhance or add to the existing energy storage program to help achieve the new energy storage goals.

Program 4 will also help with meeting the new energy storage goal included in the recently passed energy storage law. OER met with RIE utility planners at the end of September to discuss the plan for engaging with the PUC on the new energy storage tariff which was opened by the PUC on August 30, 2024.[6] OER also has a consultant (not funded through SFA) for assistance with the new energy storage docket. OER, our consultant, and RIE will work closely together over the next year while this docket is underway to ensure there is a clear path forward for energy storage projects to move forward in the state. The result of the docket process should be a clear and easy to

---

[4] https://energy.ri.gov/renewable-energy/ris-clean-energy-portfolio
[5] https://ripuc.ri.gov/Docket-24-06-EE

[6] https://ripuc.ri.gov/Docket%20No.%2024-34-EL

understand process for interconnecting small scale, large scale, and utility scale batteries to the RIE distribution system.

OER will procure a consultant to perform an evaluation of the residential scale energy storage market to determine an appropriate incentive for a battery system paired with solar located on multifamily housing, community resiliency hubs, or public critical facility locations.

ACTIVITIES TO BE CONDUCTED TO SUPPORT ENERGY STORGE INCENTIVE ANALYSIS:
1. Work with RIIB and the REF teams to develop a scope of work for the energy storage analysis.
2. OER will procure the energy storage analysis vendor through a competitive solicitation.
3. Complete procurement process and execute contract with the selected vendor.
4. Hold kickoff meeting with energy storage analysis vendor.
5. Refine subsidies with input from industry by completing scope of work with vendor to rightsize the existing REF battery storage adder and the SFA battery storage adder.
6. Conduct stakeholder review and comment opportunity on proposed on draft of final report.
7. Publish final report.
8. Meet with Rhode Island Energy to discuss streamlining the battery storage interconnection process.
9. Attend meetings and participate in the PUC-led stakeholder process to create the interconnection tariff for battery storage projects.
10. Attend meetings and participate in the PUC-led stakeholder process to create an energy storage incentive tariff.
11. Attend energy-storage focused conferences to learn from other states with more advanced energy storage policies.
12. Continue to update the energy storage tracker towards the state goal.

**Updates to the RI Community Solar Marketplace:**
OER maintains the RI Community Solar Marketplace website which serves as a critical forum for community solar education and stakeholder engagement. There are several updates that must be completed to prepare for the upcoming docket filing: additional stakeholder engagement, development of new FAQs, and updated metrics. The SFA funding will be used to provide the backend site design work and changes to the layout and metrics sections to ensure ease of public accessibility. Funds will also be used to translate sections of the website into other languages as well as training for staff members to make edits such as code changes, layout and formatting as well as content updates.

ACTIVITIES TO BE CONDUCTED TO SUPPORT MARKETPLACE UPDATES:
1. Renewal of contract with website vendor
2. Training full-time staff on back end of website
3. Regular meetings with renewable team staff to formulate website updates.
4. Coordination with developers doing business in the state to update current listings, using list of developers.
5. Update Low- and Moderate-Income (LMI) Customer Inclusion in the CRNM Program Plan section of the marketplace website,

6. Add a new section to the website focused on upcoming docket filing and additional stakeholder engagement.
7. Add section to the website to include community serving solar tour information.

**REF portal upgrades for new programs:**

REF is currently designing its new software platform funded, in part, through DOE's Scaling up Solar Initiative. This new software platform will significantly improve the efficiency of program management efficiencies, communication between solar installers and REF. Including new adders in the REF's current suite of programs will require portal design and functionality that is not included in the current portal design. SFA funds will be used specifically for the support required to launch all the new REF-related programs proposed in this application.

TASKS TO BE CONDUCTED TO SUPPORT REF PORTAL:
1. Conduct beta testing portal for functionality and quality control.
2. REF to update application portal for new programs.
3. Additional activities related to supporting the launch of the REF portal upgrades is discussed in the financial assistance strategy section on page 11.

**REF Income Verification Consultant (5 years):**

OER will subaward funding to REF to procure a vendor to provide income verification services. Income verification is necessary to meet the geographic and income threshold requirements for SFA program participation. All vendors that contract with the REF must receive Commerce Rhode Island Board approval. OER will leverage state assistance programs such as LIHEAP and SNAP wherever possible to ensure the reasonableness of costs associated with income verification.

ACTIVITIES TO BE CONDUCTED TO SUPPORT INCOME VERIFICATION CONSULTANT:
1. OER and REF teams to read Income Verification Strategies for Income-Based Solar Programs report published by LBNL (July 2024)
2. Create a list of vendors that do similar work.
3. Draft RFP for income verification consultant
4. Publish the RFP for income verification consultant.
5. Present selected vendor to Commerce Rhode Island Board
6. Contract with vendor and hold kick off meeting.
7. Develop and publish process and procedure for income verification for stakeholder awareness.

**Workforce Development:**

Climate Jobs Rhode Island (CJRI) is a coalition of more than 30 environmental organizations, labor unions, registered pre-apprenticeship and apprenticeship organizations, career readiness organizations, and community organizations that was established in 2021. While leveraging the expertise of its coalition partners, CJRI has been working with the DLT to forecast the needs of the clean energy workforce of the future and establishing pathways for people from frontline, disadvantaged communities to access family sustaining careers with good wages and benefits in the clean energy workforce. CJRI's collaboration with the DLT and other state agencies includes connecting the policy mechanisms with the right pathways to ensure that decarbonization projects enable the appropriate career pathways for people from disadvantaged communities. CJRI

21

currently has two staff members whose experience and knowledge include an ability to shape climate and workforce policy and programs in ways that ensure program implementation benefits working class people and people from disadvantaged communities. CJRI's coalition members provide expertise that enhance these skills, and the organization will soon add two additional staff members in the beginning of 2024. SFA funds will NOT be used to support CJRI's administrative costs, including these two additional staff members. One staff person has been hired and the other will be hired in early 2025.

In 2024, RIDLT and the Governor's Workforce Board created a new Green Energy Workforce Advisory Committee (GEWAC). OER has a seat on the Committee as well as several subcommittees. GEWAC will serve as a convener and supporting body to help state agencies and stakeholders meet Rhode Island's Act on Climate. As the State considers how to restructure its economy, GEWAC will be charged with potentiating the meaningful involvement of frontline communities, identifying and making recommendations for federal funding opportunities, recommending energy and economic transition policy and supporting climate policy coordination. The following activities will be funded by and conducted under this grant, with the exception of Activity 3 below:

ACTIVITIES TO BE CONDUCTED TO SUPPORT WORKFORCE DEVELOPMENT:
  a. Activity 1: RIDLT to create workforce participation plan through Real Jobs RI and GEWAC.
  b. Activity 2: OER/AFL-CIO development of workplan for workforce development for SFA Program Period.
  c. Activity 3: OER to complete 2024 Clean Energy Jobs Report, which will not be funded through SFA.
  d. Activity 4: Meet with workforce development partners, including those on the GEWAC, to determine tasks to be completed during the implementation period.
  e. Engage apprentices and journey workers from environmental justice communities, construction industry stakeholders, and representatives of community organizations.

**Translation Services (written and in-person):**
OER will procure a vendor to assist with translation services for both written materials and for in-person meetings. This vendor will need to provide staff to provide verbal translation services for languages identified by the community for in-person meetings, which may include stakeholder meetings related to community solar, solar 101s and other educational meetings, public meetings and docket proceedings. The vendor will also need to be able to provide translation of written materials which may include content from the Community Solar Marketplace website, marketing material, sample contracts and disclosures, and other material as needed.

ACTIVITIES TO BE CONDUCTED TO SUPPORT TRANSLATION SERVICES:
  1. Post Language Translation RFP to state purchasing website.
  2. Complete procurement process with vendor and enter into contract.
  3. Kick-off meeting with translation services vendor to identify which events, print publication and digital marketing material will require real-time translation services.
  4. Identify contract manager on OER team.
  5. Hold check in meetings with vendor on a regular cadence.

6. Develop contract management plan to cover entire scope of translation services across federal and non-federal funding sources.
7. Determine how technical assistance offerings are incorporated into activities associated with chosen vendor.

**Renewable Ready Technical Assistance:**

OER, RIIB, and RIDEM will on a collaborative Technical Assistance initiative for municipalities and solar developers which includes, but is not limited to:

- the identification of locations for residential-serving solar installations subject to a determined set of criteria,
- identification of property owners to provide contact information
- estimates of renewable energy production capacity at the locations, and
- an estimate and impact study of any utility interconnection costs which may be required to connect the project.

RIIB will manage a fund to provide financial assistance to reduce the site preparation and interconnection costs for renewable energy development projects on these locations. In June 2024, the Rhode Island General Assembly passed SB-2293Aaa[7] which established the Renewable Ready Fund. The Fund, co-managed by OER and RIIB, will provide financial assistance to cover the costs of connecting a renewable energy generation project to the electric distribution system on eligible sites within LIDACs. The activities covered by this Fund include but are not limited to (1) installation of transformers and substations; (2) transmission facilitation; and (3) grid flexibility.

Partnership with Rhode Island Energy

The Renewable Ready law requires close coordination between OER, OER's consultant (not funded through SFA), and Rhode Island Energy on two projects related to siting:

1. The first is the identification of eligible sites. OER has been tasked with the creation of a list of locations in the state that:
   a. Is a current or former contaminated site as determined by the Department of Environmental Protection Management
   b. Is a property or a facility owned and/or managed by the State
   c. Is a rooftop of a public, municipal, or state-owned building
   d. Is a state property adjacent to a highway or major road
   e. Is owned by the electric distribution company and subject to the environmental response fund.

In addition to the list of locations, OER must also include:
   a. A reasonable estimate of the renewable energy production capacity of the location
   b. Identify the current owner of the property and provide their contact information
   c. Include a reasonable estimate of any utility interconnection costs that would be required to interconnect the project to the existing electricity transmission and distribution system.

The Renewable Ready fund shall be used to cover the costs of connecting a renewable energy generation project to the electric distribution systems on sites identified by OER and DEM and published on the list of eligible sites, and shall include but not limited to, the following activities:

---

[7] S2293Aaa.pdf (rilegislature.gov)

a. Installation of transformers and substations;
b. Transmission facilitation;
c. Grid flexibility; and
d. Electrification planning for sites and facilities

Funds shall not be used to conduct any interconnection study or other preliminary work as may be required by the electric distribution company or the public utilities commission.

RIE (and, if necessary, ISO-NE) will determine, for any projects over a MW, what upgrades to the distribution system are needed for the project to be interconnected as part of an interconnection feasibility study or an interconnection study. The Renewable Ready Fund will be designed to assist with the costs, identified by RIE through the interconnection study process, of equipment needed to facilitate the project. In the case of SFA projects, the Renewable Ready Fund (funded with SFA funds), will support the necessary upgrades needed to construct the project. Examples may include a transformer upgrade in a LIDAC neighborhood that is already saturated with rooftop solar or undergrounding of lines in a LIDAC in order to comply with a municipal solar ordinance requirement for a community solar project.

At this time, the types of technical assistance to be delivered are clearly defined by the statute but identification of eligible sites has not begun. The TA Program launch and eligible site identification will take place in year 1 of SFA Program implementation. As a result, proposed costs for grid updates are not known at this time. The $450,000 in SFA funding will comprise only a portion of the Renewable Ready Fund. Other sources of funding may be added to the fund to support non-SFA projects.

2. The second project is to provide financial assistance to eligible entities to reduce the site preparation and interconnection costs for the renewable energy development project on current or formerly contaminated sites.

Both of these projects will require close coordination with Rhode Island Energy for project site identification, costs related to interconnection and site work associated with project development and permitting with municipalities.

One other project that will require close coordination with Rhode Island Energy includes a recent technical assistance award from DOE to support OER's work related to integrated grid planning (IGP). On August 26, 2024, OER was notified of our deep dive application award to US DOE's State Technical Assistance Program. We are in the project scoping phase with the Regulatory Assistance Project (RAP). This work will continue OER's existing work on integrated grid planning with RAP and Lawrence Berkley National Laboratory (LBNL) on a pilot project with the town of Johnston and Rhode Island Energy. OER notified the distribution planning team at RIE of the award at the end of August and they are interested in continuing our collaboration on IGP work. OER also plans on engaging Rhode Island Statewide Planning in the next phase of IGP as well. IGP is a key component of Rhode Island's SEP IRA funding from DOE, and members of the renewables team at OER will be working on this initiative during the SFA timeframe. The scope of work for the technical assistance is still being developed, however, it is expected that a LIDAC will be included in the next round of

IGP and the SFA team will be working closely with the selected Town Planner and RIE's utility distribution planning team on implementation.

Finally, two more projects OER is working with RIE on relate to energy storage. OER is working with the utility on the revised Connected Solutions program design, which is mentioned above in the Meaningful Benefits plan related to battery storage. The other is the recently opened energy storage docket which is mentioned above in the Project Deployment Technical Assistance Strategy under the Energy Storage Analysis vendor section.

ACTIVITIES TO BE CONDUCTED TO SUPPORT RENEWABLE READY TA:
1. Track solar for all's impact on the state's Renewable Portfolio Standard
2. Work with RAP and LBNL to identify a LIDAC that will participate in the next round of IGP.
3. RI general assembly passes renewable energy legislation.
4. Engage with RIIB on Renewable Ready program design.
5. Identification of sites qualifying for the Renewable Ready program in LIDACs. Only the sites and projects identified will qualify for SFA funding in the Renewable Ready program.
6. Identify and engage with stakeholders via public meetings to be conducted for program design and feedback.
7. Upon program launch, conduct series of outreach events geared towards Renewable Ready Stakeholder feedback and education.
8. Explore sources of TA from 400k allocation versus external sources (e.g., DOE, SEIN, NCSP, etc.)
9. Establish file management system with RIIB to ensure seamless communication for program design, implementation and reporting.

**Community Solar Technical Assistance:**
RIIB, working with OER, will manage a technical assistance program for municipalities and quasi-public agencies to develop community solar projects on municipally owned property. RIIB will utilize SFA funding to provide municipalities technical assistance by paying for a competitively procured vendor to offer siting development, layout drawings, electrical line diagrams, energy forecast estimates, site assessments and visits, economic analysis and other activities as requested.

As part of the technical assistance program design, OER and RIIB will factor in the recently passed solar siting law which limits greenfield solar development and encourages solar adoption on previously disturbed surfaces (rooftops, parking lots, brownfields, etc.). All new ground mounted projects in the state must comply with DEM's new siting guidelines.[8] All new ground mounted CRNM projects will have to comply with the DEM Core Forest Guidance. Additionally, RIIB and OER will encourage CRNM projects to include best practices related to designing topological pathways for well drained sites, avoidance of projects in wetlands, encouragement of including plantings for pollinators, raising fencing for small animals, and utilizing native species plantings and trees whenever possible.

---

[8] https://dem.ri.gov/natural-resources-bureau/agriculture-and-forest-environment/forest-environment/core-forest

RIIB and their contractor will aid with development of RFPs and provide proposal evaluation assistance. Economic analysis will also be included through tools such as the National Renewable Energy Laboratory's System Advisor Model (SAM) to ensure that municipalities understand the overall project economics and risk profile, including capital costs, principal and interest payments, incentives such as the newly introduced direct pay provision and available state incentives. Part of a vendor's work may include utilizing RIE's System Data Portal and Heat Maps to determine interconnection feasibility, submit feasibility studies to RIE on behalf of municipalities and assist with study results interpretation for municipalities to make decisions about a particular site's interconnection feasibility.

To promote resilient project plans to DAC-serving critical facilities or resilience hubs, RIIB's technical assistance will include solar plus energy storage proposals to bolster the importance of system reliability during weather events, enabling projects that receive technical assistance to reach a greater volume of RI's disadvantaged populace by seeking refuge at these facilities. Only solar paired storage projects will be funded with SFA funding, as stand-alone storage is not an allowable use of SFA funds.

To qualify for TA, municipalities must reach directly out to RIIB via email with a specific request to review one or more preferred sites within the municipality for community solar potential. RIIB will evaluate the requests for completeness and approve requests for TA until funding is exhausted. Upon approval, RIIB will serve as the nexus between municipalities and available technical assistance opportunities.

ACTIVITIES TO BE CONDUCTED TO SUPPORT RIIB TECHNICAL ASSISTANCE:
1. Develop Technical Assistance Application for municipalities.
2. Develop outreach strategy for establishing connections with eligible DACs.
3. Develop strategy for Direct Pay technical assistance.
4. Explore Clean Energy Tax Navigator tools by L4GG as a tool to enhance Direct Pay TA offerings.
5. Work with consultant to develop Economic analysis framework, including tools such as the National Renewable Energy Laboratory's System Advisor Model (SAM)
6. Develop strategy for identifying and engaging with communities experiencing frequent history of outages.
7. Review feedback from TA providers and municipal participants to further refine scope of assistance to meet and address specific community needs.
8. Create summary of findings from TA workshops that lead to project financing and implementation.

**Project Deployment Regulatory Assistance (Center for Justice PDTA):**
OER will need to work closely with stakeholders as well as the Public Utilities Commission in order for the CRNM program to move forward. One of the most important stakeholders include LIDAC community members who were not provided an opportunity to voice their opinion in the first CRNM program. These important stakeholders often do not have the funds or ability to participate in the regulatory process as a lawyer is required to intervene. The Center for Justice will provide

26

LIDAC representation at the PUC for the CRNM regulatory process. CIFJ was not identified as a sub awardee in the original application but were factored into the community engagement costs. Additional detail regarding participatory governance is included on page 29 of the Equitable Access and Meaningful Involvement Plan.

ACTIVITIES TO BE CONDUCTED TO SUPPORT REGULATORY ASSISTANCE:
1. Facilitate meeting between OER/Center for Justice to allocate community engagement funding needed for Center for Justice. This activity will take place early in implementation year 1.
2. See Participatory Governance Activities for additional items.

**Equitable Access and Meaningful Involvement Plan**

In-kind Technical Assistance Awards

In 2024, OER applied for several technical assistance opportunities through various agencies and groups. Two of our applications, with specific activities related to the SFA workplan, were recently awarded.

Solar Energy Innovation Network (SEIN) Solar Community Assistance for Local Equity (SCALE) Project.[9] Innovation at SCALE is funded by the U.S. Department of Energy and led by the National Renewable Energy Laboratory (NREL) is designed to help communities and institutions find their path to solar in a just and equitable way. Through SCALE, DOE and NREL offers targeted technical and analytical assistance to help communities overcome barriers to solar adoption. NREL requested project applications that could take between three to six months to implement. OER applied in order to be better prepared for the solar public engagement work. OER was notified of their selection on July 1, 2024.

OER's proposal was specific to community engagement challenges. Two barriers were identified. The first is getting the attention of the public and community-based organizations. Often their knowledge or background on energy subject matter is limited or nonexistent. There is competition for their time, and we are often fighting for the public's attention.  Also, OER needs assistance in answering the question of "why?". The question is twofold, why should people pay attention to the proposed education and marketing campaigns we will be deploying and why should they care about participating. OER anticipates two deliverables from SCALE assistance:

- Deliverable 1 – a schedule of meetings with experts and facilitation assistance for a specific number of public meetings.
- Deliverable 2 – a playbook of lessons learned and action items that can be replicated in Rhode Island for OER to deploy in advance of deploying federal funding.

SEIN SCALE TASKS TO BE COMPLETED:

---

[9] https://www.nrel.gov/solar/market-research-analysis/solar-community-assistance.html

Some of the SEIN activities might intersect and overlap with public stakeholder meetings listed below, however specific topics, cadence of meetings, audience and other factors will be determined during future meetings with NREL.

1. OER will receive a Scope of Work from NREL
2. Schedule series of meetings between OER/NREL and other staff assigned to this project and determine which topics should be covered at each meeting.
3. Hold public education meetings referenced in deliverable one with NREL or other assigned professional facilitators.
4. Work with NREL staff to develop playbook referenced in deliverable 2 and determine whether it should be a public facing document or for internal OER use.
5. Finalize and/or publish playbook.

The Just and Clean Energy Future – State Implementation Accelerator Project

The Accelerator program is designed to support states that have been awarded IRA, BIL/IIJA and Justice 40 covered programs that incorporate equity analysis and implementation strategies specifically for LIDACs. The program is led by the Communities First Fund which helps transform how federal, state and local governments invest public dollars in Black, Indigenous, People of Color, and low wealth communities by implementing a relationships-first approach to community driven solutions that centers frontline communities' leadership, innovation and priorities. The project helped stack and leverage key federal programs that invest in a just and clean energy future across various sectors. Rhode Island was selected as part of the accelerator cohort on July 31, 2024.[10] This initiative has now concluded.

JUST AND CLEAN ENERGY FUTURE PROGRAM TASKS TO BE COMPLETED:

1. OER to attend kick off meeting in DC (September 16-17, 2024)
2. Develop a scope of work with the Communities First Fund for activities to be conducted during the project program period.
3. OER to attend regular meetings.
4. Host an in-state meeting with CBOs and program partners on implementation strategies.
5. Implement scope of work

**Community Based Organizations (CBOs):**

Inclusive and authentic community engagement is vital to creating trust with LIDACs and OER has dedicated a significant amount of time over the past several years to building a reliable network of CBOs including neighborhood associations, environmental advocacy groups, social service providers, and other charitable organizations. This network informs our policy and program work. OER is committed to a process where CBOs define and drive outcomes in order for benefits to flow to the community.

---

[10] https://communitiesfirst.us/accelerator1/

To expand this network, OER will leverage existing relationships with CBOs to introduce new CBOs to the CBO network. OER will also leverage working relationships with municipal sustainability offices, Rhode Island's philanthropic community, and other governmental partners to tap their CBO networks for introductions. This work will result in the development of a robust network of CBOs that can be called into action for their communities.

OER will implement multiple education and outreach methods when engaging with our CBO network including in-person and virtual meetings, mailings, and door-door contact. RI-EASE program partners will assist in these education and outreach efforts.

In addition to working with CBOs, other stakeholders will be consulted throughout the Solar for All program life. These include solar stakeholders. OER maintains a solar stakeholder email list with approximately 650 unique email addresses. Approximately three to four emails per month are sent to this list with various program and policy updates. Additionally, OER and the REF host between three to four solar stakeholder meetings per year. We anticipate the cadence of meetings to increase during Solar for All. OER will solicit industry feedback on program design during year 1 of SFA implementation.

For other stakeholders, in addition to the CBOs and solar industry, OER will attempt to reach a diverse set of stakeholders that include other state agencies, boards and councils, trade associations, workforce groups, colleges and universities, and energy efficiency groups.

OER will hold quarterly calls with CBOs to educate and provide opportunities for feedback and to ensure that program design prioritizes applicants within LIDACs. OER will work with CBOs to develop a framework for prioritization of LIDACs, while ensuring benefits to tenants and 20% bill savings. The low-commitment savings guarantee offered through community solar subscription models will be promoted via Rhode Island's community focused email listservs. RI Program partners will provide CBOs with appropriate translations for their listservs. Program partners will also distribute hard-copy outreach materials by mail to CEJST-identified census tracts with a return address that can be verified by residents. The inclusion of return addresses from state agencies will help to establish trust that the distributor of hard-copy materials is not a scam and can be verified by similar online material.

CBO TASKS TO BE CONDUCTED:

1. Expand upon OER's existing list of CBOs to develop new working relationships.
2. Expand upon OER's existing list of neighborhood associations to develop new working relationships with association staff.
3. Coordinate with environmental non-profits on solar, energy storage, community solar education.
4. Engage with municipal sustainability offices on solar, energy storage, community solar education.
5. Coordinate with environmental non-profits on scope of programmatic offerings and CBO engagement.
6. Engage with municipal sustainability offices on scope of programmatic offerings.

7. Engage with local neighborhood associations in eligible communities to coordinate educational presentations to community members.
8. Engage with local neighborhood associations in eligible communities to coordinate programmatic presentations to community members.
9. Scheduling a cadence of meetings with community-based organizations on programmatic and technical assistance offerings made available through SFA.
10. Creation of a list of digital content (e.g., webpages, videos, 1-pagers) to be distributed to various CBO and community-focused email listservs.
11. Creation of digital content (e.g., webpages, videos, 1-pagers) to be distributed to various CBO and community-focused email listservs.
12. Develop hard-copy outreach materials for distribution to CBOs, public libraries, and community centers.
13. Explore opportunities with local utilities to include inserts for Income Eligible customers in utility bills for programmatic offerings.
14. Engage with Rhode Island Foundation and present on programmatic offerings.
15. Explore feasibility to develop a SFA campaign strategy for canvassing eligible neighborhoods.
16. Community Action Agency engagement: Host events in eligible communities
17. Meet with DOE staff on low-income clean energy connector and explore eligibility to partner as a pilot state.
18. Conduct regular cadence of meetings with DHS to implement Clean Energy Connector partnership as a pilot state.
19. Engage with DOE connector staff to get a Clean Energy Connector Fellow placed at OER to assist with LIHEAP and DHS engagement to pilot Connector in Rhode Island
20. Onboarding DOE Connector Fellow
21. Engage and empower LIDAC communities to develop an understanding of the link between climate justice and economic justice.

**Multilingual Education and Workshops:**

OER will provide Solar 101 educational resources and workshops such as one-pagers, tri-fold flyers, educational videos about solar energy (that can be QR coded on one-pagers and distributed), or in-person workshops held after work hours that residents can attend and learn about the benefits of solar energy and how to get involved. Translation services will be offered at in-person workshops. Wrap-around services will be provided, recognizing childcare, transportation vouchers, and compensation for time spent at an event is equally as important. Program partners will work with CBOs and other RI agencies currently offering wrap-around services to determine adequate offerings for the communities that are being targeted through these initiatives.

Program partners will focus outreach and educational efforts in RI's most energy burdened census tracts. DAC-focused educational initiative is oriented around how solar can provide meaningful benefits while changing the energy landscape for underserved residents, from both a health and financial perspective. These materials will be made available in multiple languages using translation services.

30

MULTILINGUAL EDUCATION AND WORKSHOP TASKS:

1. Create Solar 101 educational resources that can be posted to OER's website, the RI Solar Marketplace, and hard copy. QR coded hard-copy materials to simplify access.
2. Creation of educational videos that can be used on OER website to broadly educate about the benefits solar and the nexus of solar with energy efficiency and electrification.
3. Work with translation services vendor to translate digital content for CBOs (see CBO section above) into culturally appropriate language for eligible communities.
4. Work with translation vendor to translate all materials for distribution into culturally appropriate language necessary to reach target audience.
5. Develop resource pages on OER website and RI Solar Marketplace for educational content.
6. Engage with CBOs to determine adequate offerings for wrap-around services.
7. Engage with CBOs to identify local community meetings that OER can attend and give educational presentations, which include Solar 101 written materials and videos.
8. Work with community libraries in eligible communities to disseminate educational materials.
9. Work with the members of the Rhode Island Community Action Association to disseminate educational materials.

**Community-Serving Solar Tours:**

Program Partners will hold solar siting conversations in tandem with education about the meaningful benefits of solar. Part of this outreach will include drawing attention to the availability of solar tours offered in the surrounding area. The RI Solar Marketplace website will also be updated to include information about where and when tours are available, with the potential to send email invites to subscribers to that specific project. Community solar tours will be a requirement for any projects funded through SFA.

Community Serving Solar Tour tasks to be completed:

1. Create community solar developer and project management company outreach plan aimed at identifying points of contact and establishing meaningful connections with installer industry to engage.
2. Work with communications team to create an event proposal for a series of solar tours, recognizing the speaking portion will vary based on audience.
3. Create outreach strategy for solar tours.
4. Engage with local school districts to assess opportunity for tours geared towards students, with emphasis on communities that may use CRNM program to install rooftop installations.
5. Engage with Project Green Schools.
6. Engage with Movement Education Outdoors.
7. Engage with environmental non-profits in RI who have experience conducting solar tours, exploring the opportunity to join efforts on prospective tours and learn best practices for administration.
8. Explore electronic tools and resources to provide translation services during solar tours (e.g., Headphones, AI, etc.)

31

9. Work with translation services providers ahead of solar tours to debrief on appropriate jargon, recognizing highly technical industry language can still pose barriers to understanding without proper preparation.
10. Identify rooftop sites suitable for visitation.

**Tribal engagement:**

Rhode Island is home to the Narragansett Tribe, the only federally recognized tribe in the state. Over the past few years, OER has made several attempts to contact and engage with the Narragansett Tribe, but the response has been tepid. OER will continue attempting to make meaningful connections with the Narragansett Tribe and ensure inclusivity on our educational and outreach plan if they show such interest. Our strategy will involve using our established networks with CBOs, non-profits, state agencies, and academic institutions to engage with the Narragansett Tribe on the programs available through the RI-EASE initiative. This strategy will be integrated into the outreach strategy throughout the duration of SFA implementation.

Tribal Engagement Activities:

1. Locate new points of contact with Tribal council using our existing network of CBOs.
2. Engage with known tribal representatives and Climate Jobs RI.
3. Engage with leadership at the University of Rhode Island to connect with students enrolled in the Narragansett Undergraduate Scholarship Program, which was established for members of the Narragansett Tribe. OER will seek to engage with students interested in environmental or energy-related fields.
4. Explore possibility of co-hosting public engagement event with the Tomaquag Museum, which is operated by a member of the Narragansett Tribe.

**Public Stakeholder Meetings:**

An engaged stakeholder community will be necessary for the long-term sustainability of the RI-EASE initiative. Stakeholder engagement and regular communication leads to committed community members who support the development of initiatives. OER will develop a robust public engagement strategy to provide opportunities for public comment to inform detailed program design and incorporate feedback on draft program plans.

A key element of OER's strategy will be to embark on a statewide road show where OER staff will hold meetings in public venues to educate and inform stakeholders about the RI-EASE initiative. OER's community engagement team will also leverage relationships with federal and state elected officials to cohost road show events.

Further, OER will take a holistic approach to public engagement collaborating with stakeholders by being inclusive, providing wraparound services such as childcare assistance and transportation vouchers.

STAKEHOLDER MEETING TASKS:

1. Expand upon OER's existing list of venues to conduct stakeholder meetings, recognizing conference rooms in buildings housed by state agencies is not effective at reaching target audience. OER staff will conduct in-person visits to potential sites while establishing stronger connections with building staff.
   a. Identify venues that are child-care friendly to hold public meetings.
2. Create list of neighborhood associations and points of contact for regular communication and scheduling
3. Develop a robust outreach plan for a SFA "Road Show" across RI, holding meetings at town halls, senior centers, and community centers.
4. Explore opportunities to partner with neighborhood associations, CBOs, and with elected officials from the RI General Assembly for Road Show tour.
5. Engage with the RI Lieutenant Governor on community outreach and engagement efforts, including:
   a. Monthly events in senior centers
   b. Spanish radio station segments – i.e., Poder FM111.0
6. WRAP AROUND SERVICES
   a. Explore possibilities for compensating community members for their time if they attend meetings, such as gift cards, vouchers, etc.
   b. Engage with Rhode Island Public Transportation Authority to buy bus vouchers in bulk.
   c. Go out to bid for childcare services vendor and/or Identify opportunities to partner with organizations that already offer childcare services.

**Participatory Governance in Regulatory Proceedings:**

R.I. Center for Justice (RICJ) is a non-profit public interest law center that partners with community groups to strengthen existing advocacy and service provision with legal representation and strategy. Through working with existing grassroots organizations as a trusted partner, RICJ will continue to advance the goals of the SFA coalition by representing low-income consumers directly in PUC proceedings and any directly relevant court proceedings. Their assistance will be needed during the CRNM regulatory process.

Participatory Governance tasks:

1. Set up kick-off call with Center for Justice
2. Identify stakeholders RICJ will represent during CRNM regulatory process and determine how and when to report out to represented stakeholders.
3. Set up regular cadence of calls with RICJ as OER prepares for CRNM regulatory filing.
4. Coordinate debriefing call with Public Utilities Commission on participatory governance efforts for CRNM filing.

**Community Solar Marketplace website:**

The RI Solar Marketplace website is Rhode Island's principal platform for community solar education and outreach and will also be used for communications on all initiatives undertaken by

RI on community solar and customer inclusion. This website already includes a "Low- and Moderate-Income Customer Inclusion in the CRNM Program Plan" page, which will be significantly expanded upon throughout the CRNM regulatory proceeding and year 1 of implementation. The website will also be the primary way community solar project details are available to the public, including low-income customers, to learn where projects are located, who the installers is, and if the project is actively seeking new subscribers. Customers can link directly to projects that may be looking to subscribe customers to learn more and sign up. Additional activities to be included are numerated in the Project Deployment Technical Assistance Strategy.

Community Solar Marketplace Tasks:

1. Train additional OER staff on backend of CS marketplace website
2. Create tutorial for program beneficiaries on how to use the Community Solar Marketplace Website.
3. Explore possibility of using translation services to translate webpage into other languages for non-English speakers.
4. Add definitions on marketplace website for different community solar programs.
5. Add a glossary of terms to the marketplace website.
6. Update the "what is community solar?" page.
7. Add educational "Solar 101" videos to RI Solar Marketplace website.
8. After the second program year, add additional community stories as projects are developed and interconnected.
9. Publish a community story on community solar consumer protection.
10. Publish the community solar consumer protection form on the marketplace website.
11. Once the plan for community serving solar tours is developed, create subpage on marketplace website to provide information about purpose of tours and opportunities to participate.

Consumer Protection:

OER and the REF have several consumer protection requirements in place including the REF's Minimum Technical Requirements (MTR) which identifies specific codes projects must be built to, safety parameters, and site requirements that projects must met to qualify for incentives. The MTR is periodically updated as Rhode Island updates electrical and building codes relevant to solar and energy storage as well as industry best practices related to installation. The MTR also includes a total solar resource fraction (TSRF) of .8 or greater in order for a project to receive funding. TSRF is a measure of the actual expected irradiance divided by the total irradiance available to a system with optimal siting characteristics (tilt, azimuth, etc.) Shading losses are incorporated into the TSRF and a low TRSF can be the result of shading, non-ideal orientation, or both. All REF Small and Commercial Scale projects that do not meet the MTR are not eligible to receive funding. The REF and OER will require all SFA funding projects, in association with the Small and Commercial Scale programs and adders, to adhere to the MTR.

The REF currently requires a 100% inspection with a third-party quality assurance vendor for all projects that receive funding. Most of these inspections are self-inspections and/or self-

verification of compliance, using photographs of each stage of install to verify proper installation and labeling of system components. New installers participating with the REF's programs for the first time, delinquent installers, or those not performing well are subject to field inspections. The inspection requirement will continue to be enforced for all REF programs included in SFA. The REF will provide inspection services for projects utilizing the adders funded through SFA.

OER plans on requiring inspections for all SFA funded projects as well as adherence to the MTRs.

The REF currently requires a minimum of a three-year workmanship warranty. In addition, the REF requires submission of the turnkey contract which provides detailed warranty information as well as the expected output of the project during the anticipated lifetime of the project. OER will work to develop warranty requirements for the CRNM and AHSSP programs in accordance with EPA's General Terms and Conditions.

For the past few years, the RI General Assembly has proposed legislation regarding PV recycling. One example is H5525 from 2021, which required developers to create a stewardship plan to recycle panels at the end of their expected life.[11] Since then, DEM and OER collaborated on the recently passed Solar Decommissioning law which was signed by the Governor on May 26, 2024. This law requires that developers of ground-mounted solar systems submit a plan for decommissioning to be held on file by the municipality and requires DEM, with OER, to make publicly available model decommissioning plans.[12] All ground mounted projects using SFA funds must adhere to the solar decommissioning law. in the law took effect January 1, 2025.

On August 7, 2024, Governor McKee signed the Solar Consumer Protection and Homeowners Bill of Rights Act, which will require solar retailers to register their business and have a roster of all representatives soliciting sales, conduct criminal background checks for all sales representatives, and follow municipal restrictions on door-to-door sales and telemarketing rules. It gives the Department of Business Regulation (DBR) the authority to investigate complaints and impose any administrative penalties. The law also requires OER to develop and implement solar consumer protection disclosure forms. While the REF and REG programs already require these forms, the new law ensures that all residential solar PV customers will use the new forms, regardless of which incentive program is utilized (net metering or REG). The law goes into effect on March 1, 2025.[13] All residential SFA projects will adhere to the new law and utilize the net metering consumer protection disclosure form.

On August 30, 2024, OER submitted a technical assistance application to the National Community Solar Partnership (NCSP) for assistance with developing consumer protections for community solar customers. The Solar Consumer Protection and Homeowners Bill of Rights Act does not cover community solar customers so it will be important to have a plan for consumer protection before OER makes its filing to the PUC to expand the CRNM program. The application to NCSP requested assistance for four specific deliverables:

---

[11] https://legiscan.com/RI/text/H5525/id/2291764/Rhode_Island-2021-H5525-Introduced.pdf
https://legiscan.com/RI/text/S2808/2024
[13] 2024-S 2801A

1. Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
2. Assistance with developing a community solar consumer protection form.
3. Leading a public comment process and facilitating one public meeting on the draft form

4. As a result of scoping conversations with NREL, deliverable 4 was removed from the scope of work.

OER commits to implementing a community solar consumer protection form for all CRNM customers that utilize SFA funding, whether technical assistance is awarded or not.

OER commits to working with the Attorney General's office and all program partners to track all customer complaints related to projects that are funded through SFA. This will include developing a new procedure for tracking customer complaints, including a shared drive accounting system of all customer complaints by program.

Consumer Protection Tasks:

1. Continue meeting with DBR and the AG's office on the implementation of the Solar Consumer Protection and Homeowners Bill of Rights Act
2. Develop the consumer protection disclosure forms.
3. Solicit stakeholder feedback on the draft disclosure forms.
4. If awarded, work with NCSP to complete the following deliverables:
    a. Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
    b. Assistance with developing a community solar consumer protection form.
    c. Leading a public comment process and facilitating one public meeting on the draft form

5. Work with DBR on the development of the solar business registration system and promulgating rules and regulations specific to the Solar Consumer Protection and Homeowners Bill of Rights Act

6. Develop a protocol with DBR and the REF to ensure that only solar companies in good standing can participate in REF programs.
7. OER and program partners will develop a process and procedure for tracking customer complaints.
8. OER will develop a solar consumer protections webpage including links to existing videos and resources about the importance of solar consumer protection.
9. OER will update the existing Rhode Island Residential Guide to Going Solar to include community solar, energy storage, the new consumer protection disclosure forms and other updates related to SFA.

**Section 3: Fiscal Stewardship Plan**

All Program Partners commits to reducing waste, fraud, and abuse both internally and among our agencies by creating plans for audits. This includes including audit fees in the budget which are

36

charged to each federal grant by the RI Office of Auditor General for the allocable costs of performing the State's single audit.

OER, REF and RIIB currently use SharePoint with a multifactor authentication requirement. SharePoint has been in place for all three agencies for the past few years. In fact, collaboration on SFA documents, including this workplan, have been done via SharePoint. Only designated users are allowed to share links to documents. This results in a targeted number of people to have access to documents or specific folders within SharePoint, rather than the entire database. Such measures and the use of SharePoint will continue to take place between OER and our subawardees for reporting. For those subawardees who do not utilize SharePoint themselves, OER will make a folder on our SharePoint site available for reporting with a limited number of authorized users.

Rhode Island also has a grants management software system which will be the platform used for management of subawards. Use of this system will ensure OER can maintain oversight of subawardees and ensure that funds will be used for authorized purposes only.

OER also attempts to limit staff access to personal identification information. When receiving confidential information from RIE, the information comes via email as a password protected, encrypted file.

All State employees are subject to the State's code of ethics.[14] Periodic mandatory training for State employees is required. Additionally, all State employees are subject to the Procurement Statutes and Regulations, which includes a Code of Ethics and Professional Behavior regulation (220-RICR-30-00-3)[15]. These regulations help manage conflicts of interest in the procurement process.

OER and the REF have several consumer protection requirements in place including the REF's Minimum Technical Requirements (MTR) which identifies specific codes projects must be built to, safety parameters, and site requirements that projects must met to qualify for incentives. The MTR is periodically updated as Rhode Island updates electrical and building codes relevant to solar and energy storage. All REF Small and Commercial Scale projects that do not meet the MTR are not eligible to receive funding. The REF/OER will require all SFA funding projects, in association with the Small and Commercial Scale programs and adders, to adhere to the MTR.

The REF currently requires a 100% inspection for all projects that receive funding. Most of these inspections are self-inspections and/or self-verification of compliance. New installers participating with the REF's programs for the first time, delinquent installers, or those not performing well are subject to field inspections. The inspection requirement will continue to be enforced for all REF programs included in SFA. The REF will provide inspection services for projects utilizing the adders funded through SFA.

---

[14] https://ethics.ri.gov/media/166/download?language=en
[15] https://rules.sos.ri.gov/regulations/part/220-30-00-3

On August 7, 2024, Governor McKee signed the Solar Consumer Protection and Homeowners Bill of Rights Act, which will require solar retailers to register their business and have a roster of all representatives soliciting sales, conduct criminal background checks for all sales representatives, and follow municipal restrictions on door-to-door sales and telemarketing rules. It gives the Department of Business Regulation (DBR) the authority to investigate complaints and impose any administrative penalties. The law also requires OER to develop and implement solar consumer protection disclosure forms. While the REF and REG programs already require these forms, the new law ensures that all residential solar PV customers will use the new forms, regardless of which incentive program is utilized (net metering or REG). The law goes into effect on March 1, 2025.[16] All residential SFA projects will adhere to the new law and utilize the net metering consumer protection disclosure form.

On August 30, 2024, OER submitted a technical assistance application to the National Community Solar Partnership (NCSP) for assistance with developing consumer protections for community solar customers. The Solar Consumer Protection and Homeowners Bill of Rights Act does not cover community solar customers so it will be important to have a plan for consumer protection before OER makes its filing to the PUC to expand the CRNM program. The application to NCSP requested assistance for our specific deliverables:

- Research on community solar disclosure form best practices and lessons learned on states that have implemented them.
- Assistance with developing a community solar consumer protection form.
- Leading a public comment process and facilitating one public meeting on the draft form
- OER commits to implementing a community solar consumer protection form for all CRNM customers that utilize SFA funding, whether technical assistance is awarded or not.

OER commits to working with the AG's office and all program partners to track all customer complaints related to projects that are funded through SFA. This will include developing a new procedure for tracking customer complaints, include a shared drive accounting system of all customer complaints by program.

**Section 4: Timeline and Milestones**

The detailed timeline for RI's 5-year workplan is included as an attachment, with start and end dates for over 200 tasks. Each of the activities and associated milestones are listed in their respective sections of this document; namely, the Meaningful Benefits Plan, the Financial Assistance Strategy, the Project-Deployment Technical Assistance Strategy, and the Equitable Access and Meaningful Involvement Plan. Duplicating all of those activities in this section of the document would make it increasingly challenging to edit future iterations of the timeline, as start and end dates for activities may be revised. OER remains committed to tracking the tasks listed in the detailed timeline and will continue to add tasks to this workplan as necessary.

---

[16] 2024-S 2801A

**Section 5: Reporting Requirements**

As the lead applicant, RI OER is dedicated to tracking and measuring progress towards achieving outputs and outcomes. All Program Partners are aware of reporting requirements and are committed to ensuring timely and accurate reporting. OER has experience with creating dashboards and infographics that intuitively and visually display program data. REF will ensure to report on all funding sources for all projects leveraging SFA and ensure that projects do not dip into multiple programs erroneously. Program Partners have ample experience in analyzing and publicizing program success, data, and evidence.

OER already provides metrics to the National Community Solar Partnership and will continue to update the number and capacity of community solar projects in the state, community solar off. takers, including breakout by rate code to track the low-income participants, and will include household savings in the future. OER will also include community solar and energy storage metrics in OER's Renewable Energy Portfolio, which reports on quarterly renewable interconnection data at the state-level.

Household Savings Plan:
The Rhode Island Coalition will implement a standardized household savings data collection protocol, utilizing both self-reported data from participants and financial transaction records where applicable. The protocol will be designed to capture key metrics required by EPA at the time of transaction, such as percentage and/or dollar savings amounts (including financial and non-financial benefits to be realized by program beneficiaries), and the total number of households benefitting from each incentive program.

To ensure the integrity and reliability of the savings data, the RI Coalition will implement a verification process which may include surveys, modeling, random audits, third-party reviews, and/or utility data if possible. Additionally, OER and its subawardees will establish a framework for ongoing evaluation of savings outcomes, including the use of key performance indicators to assess both program effectiveness and data accuracy. A comprehensive data management plan will be implemented to ensure accurate tracking, verification, and evaluation of household savings outcomes. This plan will include both qualitative and quantitative data collection methods and a clear evaluation framework to assess program impact.

OER meets regularly with the utility and REF on a number of topics. To ensure effective implementation of the Household Savings Plan, the workplan and timeline include several cadences of meetings with subawardees and the utility. These additional meetings will facilitate ongoing collaboration, alignment of program objectives and meaningful benefits, and troubleshooting of any issues that arise during implementation. Additionally, community outreach is a critical component of the workplan which enables community buy-in while demonstrating tangible examples of energy savings to program beneficiaries. Together, these efforts enable a well-rounded approach to a methodology that shall achieve the 20% savings requirement.

1. Performance Reports
Semi-Annual Report

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024. The semi-annual performance report should cover activities from the preceding two quarters.

Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions. and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters.

**Section 6: Budget Narrative**

**6.1 Project Budget**

**Personnel**

40

- 100%: 1 FTE for Office of Energy Resources, Programming Services Officer (PSO) = $389,931 (over five years)
  - The Full Time Employee supporting the OER RI Office of Energy Resources will support the Renewable Energy team to implement and administer the Rhode Island Solar for All Program. This position is for a five-year period. Some of these responsibilities include facilitation of weekly Solar for All (SFA) team meetings, ensuring the team meets all deliverable deadlines in the workplan, managing all SFA reporting requirements from the Environmental Protection Agency (EPA), including Davis-Bacon and Build America, Buy America. They are Responsible for OER's development of and compliance with EPA's Quality Management Plan for SFA.
  - Limited budget has been allocated for salary adjustments for this FTE. Any salary adjustments through increases with a salary step increase or non-union staff increases in excess of the budgeted amount will be paid by OER.

**Fringe Benefits**
- Office of Energy Resources FTE Fringe = $228,982
- Fringe Rates are calculated on direct salaries as follows:
  - Assessed Fringe Benefit - 3.95%,
  - Payroll Accrual - 0.4%,
  - Retirement - 29.54%,
  - Retiree Health Insurance - 3.94 %,
  - FICA - 7.65 %.
  - Medical, Dental and Vision weighted cost $18,073 per employee.

The fringe percentage for the OER SFA FTE is 63.43%. The fringe benefit rate is total for 5 years. The annual two week leave for the SFA PSO is included in the salary budget line item.

**Travel**
- Travel for 2 OER staff to attend SFA program-related workshops/conferences. These are expected to be out of state conferences which include airfare and hotel = $5,200
- OER SFA staff person mileage, 100 mi/mo @ .655/ mi x 12 mo = $3,930
  - this is ONLY for the OER SFA staff person in state travel to Rhode Island based meetings and does not include any other OER staff travel expenses or milage. Milage will only be used for SFA program-related events and meetings.

**Equipment** - N/A

**Supplies** -
- Laptop for OER FTE = $1,500 – Cooperative agreement with NASPO
  - **Type of procedure to be used to purchase supplies:** NASPO - National Association of State Procurement Officials - the cooperative purchasing division of the National Association of State Procurement Officials (NASPO), facilitating cooperative public procurement solicitations using a Lead State Model™. NASPO aggregates the demand of all 50 states, the District of Columbia, the US territories, their political subdivisions, and other eligible entities, spurring best value, innovation, and competition in the marketplace. NASPO delivers high-value, reliable, and

41

competitively sourced cooperative contracts - offering public entities outstanding prices, favorable terms and conditions, and value-added services.

- Printing for solar marketing material = $1,000 – Master Price Agreement (MPA) list or in-house (depending on volume)
  - **Type of procedure to be used to purchase supplies:** MPA is the acronym for Master Price Agreement. MPAs cover requirements for universal need for goods or services for a specified contract period on a state-wide basis. They are solicited as Requests for Proposals or Requests for Quotes and may have cap limits for pricing and cap limits for project cost. MPAs provide agencies with access to qualified vendors, expedited process, and opportunity for mini-bid. State and Quasi-Public Agencies order their requirements for these items individually, as the need arises. There are approximately 200 MPAs in the portfolio and they are diverse in the goods and services provided. For example, road salt, office supplies, milk, small appliance repairs, automotive parts and batteries, energy efficiency services and stenographic services are all contracted as MPAs.
- General office supplies = $500 – selected via competitive solicitation for MPA

The dollar amount for supplies is for the 5-year duration of the grant.


**Contractual** -

**No individual consultants will be procured with SFA funding. All consultants have or will be procured through a competitive process.**

- Energy Storage Analysis Vendor = $80,000
  Duration: June 2025-December 2026
  - OER will procure a consultant to perform an evaluation of the residential scale energy storage market to determine an appropriate incentive for a battery system paired with solar located on multifamily housing, community resiliency hubs, or public critical facility locations. SFA funds will be used to continue funding the small-scale energy storage incentive program.
  - OER has not gone out to bid for this vendor. The scope of work and hourly rate will be shared when known.


- REF Application Portal Updates vendor = $50,000
  Duration: Current-December 2029
  - The REF is currently designing its new software platform funded, in part, through DOE's Scaling up Solar Initiative. Phase I of the portal design is covered with a combination of REF and DOE funding, not utilizing SFA funds. This new software platform will significantly improve the efficiency of program management efficiencies, communication between solar installers and REF. It is not expected to be available for beta testing until early 2024. However, including new adders in the REF's current suite of programs will require portal design and functionality that is not included in the current portal design. Phase II of the portal design will specifically cover the cost of portal functionality, document management, and reporting for the REF adders (programs 2-4) that Phase I does not cover. Phase II of the portal will be funded

42

through SFA. The vendor will need to be under contract for the duration of the SFA program.

- OER Translation Services Vendor = $150,000
  Duration: November 2024-December 2029
  - OER is currently in the process to procure a vendor to assist with translation services for both written materials and for in-person meetings. This vendor will need to provide staff to provide verbal translation services for languages identified by the community for in-person meetings, which may include stakeholder meetings related to community solar, solar 101s and other educational meetings, public meetings and docket proceedings. The vendor will also need to be able to provide translation of written materials which may include content from the Community Solar Marketplace website, marketing material, sample contracts and disclosures, and other material as needed.
  - As of October 3rd (when the RFP was due), OER received nine proposals. A vendor has not yet been selected. The vendor and hourly rate will be shared when known.

- OER Updates to Community Solar Marketplace = $63,000
  Duration: Current –December 2029
  - OER maintains the RI Community Solar Marketplace website which serves as a critical forum for community solar education and stakeholder engagement. There are several updates that must be completed to prepare for the upcoming docket filing, additional stakeholder engagement, development of new FAQs, and updated metrics. Backend site design work will be needed as well as training for staff members to make edits such as code changes, layout and formatting as well as content updates. The vendor will need to be under contract for the duration of the SFA program or until the CRNM funds are expended in order to make updates to the backend software, as needed.

- RIIB Technical Services Consultant = $125,000
  Duration: Current-December 2027
  - OER and RIIB will procure a technical services consultant to help cities and public agencies meet their energy goals. RIIB will offer free consulting and energy audits to create action plans for each participant. They'll also provide affordable for energy efficiency and renewable energy projects, while OER will decide which projects get priority. This partnership will make it easier for participants to get the help and funding and "technical assistance" as needed.
  - OER/RIIB have not gone out to bid for this vendor. The scope of work and hourly rate will be shared when known.

- OER Solar for All Consultant = $58,412
  - OER currently does not have an FTE for the Programming Services Officer position available. Funding for the position was submitted to the Governor's office for the FY26 budget on September 27th. While it is anticipated that a FTE may be hired in 2025, OER hired a contract employee to fill this role until the FTE is approved and hired. Hiring of this contract employee was conducted utilizing MPA 569, Temporary Employment Services, Statewide. The dates associated with this MPA are Jun 19, 2019-September 8,

43

2026. OER posted a contract employee position at the Program Manager I rate of $59.91.[17]

- OER CRNM Grant Program - Program 6 = $30,100,004
  - The redesigned, low-income-focused CRNM program would meet the 20% household savings threshold by requiring and guaranteeing that community solar facilities structure their subscription models such that the annual direct bill savings resulting from a subscription are equal to or greater than 20% of the household's electric bill.
  - The CRNM program design will be subject to regulatory approval. SFA funds will be provided directly to community solar installers or subscriber management companies as a pass-through cost. Participation in DOE's Clean Energy Connector pilot program ensures necessary savings requirements and consumer protections will be met.

- OER Renewable Ready Technical Assistance Program = $450,000
  - In June 2024, the Rhode Island General Assembly passed SB-2293Aa which established the Renewable Ready Fund. The Fund, co-managed by OER and RIIB, will provide financial assistance to cover the costs of connecting a renewable energy generation project to the electric distribution system on eligible sites within LIDACs. This fund will provide financial assistance to reduce the site preparation and interconnection costs for renewable energy development projects on these locations.
  - The Renewable Ready Program has been designed. OER will review the recently passed legislation with RIIB and collaborate on program launch. SFA funding through this program will benefit projects, specifically community solar and on multifamily housing. By reducing the interconnection and other siting costs, all program participants will benefit as the project should cost less to build and interconnect.

**Construction (if applicable)** - N/A

**Other** -

**Participant Support Costs:**

- OER Community Engagement = $2,000,000
  - OER and its partners recognize how critical it is for the community to hear from the state regarding the design of programs designed to serve them. Their participation is critical to the success of the programs outlined in this application. The state needs to make it as easy as possible for community members and CBOs to participate in stakeholder meetings, either virtual or in person. To ensure maximum participation, OER plans to develop and deploy a robust plan which includes holding public meetings during evening hours with childcare and transportation assistance (gas reimbursement, bus fare, parking costs, etc.) included. Additionally, underserved communities and its

---

[17]https://webprocure.proactiscloud.com/maincontractboard/contractviewdoc.do?docid=17102&eboid=46&&mimeType=application/pdf&docName=RIMSP_Rate_Card%2001-22-24.pdf&docUniqueName=RIMSP_Rate_Card%2001-22-24.pdf&contract=9835

44

residents have a difficult time engaging in the regulatory process, where some rulings directly impact their electricity bills. OER has included the RI Center for Justice as a program partner to address this problem with the upcoming CRNM docket. The Center will represent low-income customers in the docket filing. Details on each of these initiatives are further elaborated upon in the Equitable Access and Meaningful Involvement Plan.

o   Wrap around services will be made available for community members attending public meetings. The cost per participant (including the amount of travel assistance) will be determined and refined throughout implementation and in tandem with the full scope of wrap around services offered at public meetings conducted by the RI Coalition. Some of the wrap around services that may be provided, depending on venue, include but are not limited to childcare and transportation/parking vouchers.

o   Participant benefits from wrap around services will go directly to the participant, following EPA/DOE guidelines regarding payment via gift card or other approved method. These may include stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants.

- OER Auditing fees (0.05% of the total awarded funds) = $24,462
  o   Single Audit fees are assessed at 0.05% for all federal funding. The Auditor General's Office charges the allocable cost to perform the State of Rhode Island's annual single audit. OER will comply with RI rules related to auditing fees.

**Subawards**

Descriptions and specific lists of activities to be supported via subawards are included in the Financial Assistance Strategy and Project Deployment Technical Assistance Strategy sections of this workplan and have been included in the detailed timeline.

REF: Rhode Island Commerce's Renewable Energy Fund (REF) is a quasi-state agency that provides grants for projects that generate sustainable electricity and stimulate job growth in green technology and energy sectors. Funded by the "system benefit charge" on electric bills alternative compliance payments from electricity suppliers, and RGGI. the REF supports Small Scale solar, Commercial Scale, and Community Renewables projects. Rhode Island Commerce has adequate systems in place to meet the requirements in the terms and conditions.

- Subgrant to the REF for the Low-Income Residential Direct Ownership Adder - Program 2 = $1,000,000
  REF Administrative Costs for Program 2 = $160,827
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- Subgrant to the REF for the Low-Income/DAC Roof and Electrical System Adder - Program 3 = $6,670,414
  REF Administrative Costs for Program 3 = $160,827

45

*Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*

- Subgrant to the REF for the Low-Income/DAC Residential Energy Storage Adder - Program 4 = $250,000
  REF Administrative Costs for Program 4 = $160,827
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- All subgrants will last for a duration of five years.

REF Income Verification Vendor = $75,000 – to be subawarded to the REF for this vendor
  Duration: March 2025-December 2029
  - The REF will procure a vendor to provide income verification services to ensure applicants meet the AMI requirements for eligibility and the geographical parameters for program participation. The REF does not, nor would they prefer to, receive confidential customer information including but not limited to social security numbers, employment records or medical program enrollment information. A third-party vendor, with comprehensive cybersecurity policies and procedures in place, would be better equipped to handle this type of documentation.
  - The REF has not gone out to bid for this vendor. The scope of work and hourly rate will be shared when known.

RIIB: Rhode Island Infrastructure Bank is a quasi-state agency that is a central hub for grants and financing of infrastructure projects in Rhode Island, serving municipalities, businesses, and homeowners. It offers innovative financing from a revolving fund for various projects that enhance infrastructure, create jobs, stimulate economic growth, and improve the environment.
- Subgrant to RIIB for Community Solar on Preferred Sites - Program 7 = $1,320,185
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- Subgrant to RIIB for Community Solar Technical Assistance = $500,000
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*
- All subgrants will last for a duration of five years.

Rhode Island Housing (RI Housing): RI Housing is a quasi-state agency dedicated to providing affordable housing options and financing solutions for residents of Rhode Island. It aims to ensure that all Rhode Islanders have access to safe, healthy, and affordable homes. The organization offers a variety of programs, including mortgage loans for homebuyers, rental assistance, and funding for the development and preservation of affordable housing. RI Housing works in collaboration with public and private partners to address the state's housing needs and support community development.
- Subgrant to RI Housing for the Affordable Housing Solar Supplemental Program (AHSSP) - Program 5 = $3,700,000
  RI Housing Administrative Costs for Program 5 = $200,000
  *Details: Activities related to program design and implementation are detailed in the Financial Assistance Strategy section.*

46

- All subgrants will last for a duration of five years.

DLT: The Department of Labor and Training (DLT) in Rhode Island is a state agency responsible for administering workforce development, labor market information, and unemployment insurance programs. It provides employment services, job training, and career development resources to residents, helping them gain the skills needed for employment. The DLT also enforces labor laws, ensuring fair labor practices and workplace safety. Additionally, it offers support to employers through recruitment assistance, labor market data, and various workforce programs aimed at enhancing the state's economic stability and growth.

- Subgrant to DLT for Workforce Development = $1,000,000
  *Details: Activities related to program design and implementation are detailed in the Technical Assistance Strategy and Meaningful Benefits Plan sections.*

**Additional Items**

**Indirect Charges - N/A**

**Conferences and Workshops:**

No additional workshop or conferences are planned at this time.

**Meals and Refreshments:**
The use of light refreshments/meals at public events as tools encourages increased attendance, ease the burden of participation for attendees, and to help foster a positive and diverse atmosphere will be determined during that process. The anticipated expenses would then be added to the plan and subject to EPA approval.

**Program Income – N/A**

**Other**
Does the grant involve or relate to geospatial information? Includes info identifying geographic location or application/tools associated with such information – GPS, mapping or statistical data.

- The definition of LIDAC communities as discussed on the first page of the workplan involves CEJST-identified census tracts, which technically utilizes geospatial information for categorical eligibility. The RI Coalition does not plan to develop applications or tools associated with such information, beyond eligibility criteria as defined in the NOFO.

# EXHIBIT J

Notifications

PageID #: 5553

| Status | Date/Time Sent | Notification Type | View Details |
|--------|----------------|-------------------|--------------|
| Read | 01/27/2025 08:04:09 | A RETURNED PAYMENT HAS BEEN CLASSIFIED | A returned payment has been classified to the following account: <br><br> The account balance for this account has been increased by the classified  amount.  You may view this transaction on the Agency Payment Report with TAS/BETC. Please contact your servicing RFC if you have questions. |

# EXHIBIT K

**From:**  ▮▮▮▮▮▮
**Sent:** Tuesday, January 28, 2025 4:56 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮
**Subject:** FW: Pause EPA Grants

Team,

This just came through during the RE Team meeting. Since ▮▮▮ and ▮▮▮ were not cc'd I'm sending to the team for awareness.

Thanks,
Shauna

**From:** EPA_Grants_Info <EPA_Grants_Info@epa.gov>
**Sent:** Tuesday, January 28, 2025 4:50 PM
**Subject:** Pause EPA Grants

---

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

---

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* [whitehouse.gov] Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

# EXHIBIT L

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 01/29/2025
Time: 11:09 AM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
█████████

**Recipient ID:**
██████

**Recipient Short Name:**
RISEO

### Inquiry Results:

| ACCOUNT DETAILS | |
|---|---|
| Requestor ID : | 4435626 |
| Account ID : | █████████ |
| Account Description : | RHODE ISLAND SOLAR FOR ALL |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | 1007 |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $48,930,000.00 |
| Create Date : | 07/16/2024 |
| Begin Date : | 05/01/2024 |
| Performance Period End Date : | 04/30/2029 |
| End Date : | 08/30/2029 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

| CUMULATIVE AUTHORIZATIONS | |
|---|---|
| Cumulative Authorized Amount : | $48,930,000.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

| GRANT DETAILS | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | █████████ |
| CFDA Number : | 66959.000 |
| Total Estimated Grant Amount : | $0.00 |

| AGENCY PAYMENT REVIEW | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

| DRAW AMOUNTS | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

| AUTOMATED AUTHORIZATION RENEWALS | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT M

**Notifications**

| Status | Date/Time Sent | Notification Type | View Details |
|--------|----------------|-------------------|--------------|
| Read | 01/28/2025 17:48:35 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:48:35 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:48:35 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:44:00 | FEDERAL AGENCY HAS MADE CHANGES TO AN ACCOUNT | Federal Agency 68128933/  has made changes to the following account:<br>Recipient ID          Account ID<br>4435626              ▮<br>You may use Account Profile Inquiry in the Inquiry menu to inquire on the account. |
| Read | 01/28/2025 17:36:29 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:32:41 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:26:19 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:26:19 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:26:19 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 17:26:19 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000104  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 16:40:11 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 8900000106  has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |
| Read | 01/28/2025 16:07:11 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 89000001    has set agency review parameters for the following account.<br>Recipient ID: 4435626<br>Account ID: ▮ |

**Notifications**

| | | | |
|---|---|---|---|
| Read | 01/28/2025 16:07:11 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 89000001    has set agency review parameters for the following account. Recipient ID: 4435626 Account ID: ▆▆▆▆ |
| Read | 01/28/2025 15:11:07 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 89000001    has set agency review parameters for the following account. Recipient ID: 4435626 Account ID: ▆▆▆▆ |
| Read | 01/28/2025 15:11:07 | FEDERAL AGENCY SET AGENCY REVIEW | Federal Agency 89000001    has set agency review parameters for the following account. Recipient ID: 4435626 Account ID: ▆▆▆▆ |

# EXHIBIT N

**Saturday, February 1, 2025 at 09:57:45 Central Standard Time**

**Subject:** FW: **Response Required** Credit Payment Inquiry $26,510.21 EPA Grant 5H84091001
**Date:** Thursday, January 30, 2025 at 3:37:40 PM Central Standard Time
**From:** ███████████
**To:** ███████████

**From:** ███████████
**Sent:** Thursday, January 30, 2025 8:46 AM
**To:** ███████████████████
**Subject:** RE: **Response Required** Credit Payment Inquiry $26,510.21 EPA Grant 5H84091001

Good morning,

I did not request a refund.  I received a notification from ASAP that the payment request had been returned.  An attempt to request the funds yesterday was unsuccessful as our account for this grant has been suspended in ASAP.

Please advise.

Thank you,

████████
*Assistant Director, Financial & Contract Management*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
██████████████████        www.energy.ri.gov

**From:** ███████████████████
**Sent:** Wednesday, January 29, 2025 4:19 PM
**To:** ███████████
**Subject:** **Response Required** Credit Payment Inquiry $26,510.21 EPA Grant 5H84091001

| **This Message Is From an External Sender** | Report Suspicious |
| --- | --- |
| This message came from outside your organization. | |

Greetings,

Your organization recently submitted a refund payment to the EPA for amount shown in subject line.
Our procedures require a follow-up to request the reason for the returned funds.
Federal regulations require funds to be drawn in a manner that minimizes time elapse between
transfer and disbursement of funds.  Therefore, ASAP allows same or next day payments to reduce
the excess draw of funds.

This is a routine request, a simple reply to this email within 3 business days will be sufficient.

Reference RAIN-2018-G06 https://www.epa.gov/grants/rain-2018-g06#footnotes [epa.gov]
Recipients may not retain more than 5% of the amount drawn down, or $1,000 whichever is less, 5
business days after drawdown to materially comply with policy.
If a recipient draws down funds more than the allowed amount, the recipient must contact EPA's
RTP Finance Office at RTPFC-grants@epa.gov for instructions on returning the funds to EPA.


*Respectfully sent,*

███████████████

*Financial Specialist*
*U.S. Environmental Protection Agency*
*RTP-Finance Division*
███████████████
*Org Email:* *rtpfc-grants@epa.gov*
██████████████████████
*RTP-FC Customer Service Survey [usepa.sharepoint.com]*

-

# EXHIBIT O



**Account Profile Inquiry**

Date: 02/05/2025
Time: 9:00 AM

| | | |
|---|---|---|
| **ALC/Region:** 68128933 | **Agency Short Name:** RTP-Grants | **Account ID:** ▮▮▮▮ |
| **Recipient ID:** 4435626 | **Recipient Short Name:** RISEO | |

**Inquiry Results:**

### ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID | : 4435626 |
| Account ID | : ▮▮▮▮ |
| Account Description | : RHODE ISLAND SOLAR FOR ALL |
| 1031/LOC Account | : No |
| Account Type | : Regular Account |
| Group ID | : 1007 |
| Control Account | : No |
| Account Status Indicator | : Suspended |
| Available Balance | : $48,930,000.00 |
| Create Date | : 07/16/2024 |
| Begin Date | : 05/01/2024 |
| Performance Period End Date | : 04/30/2029 |
| End Date | : 08/30/2029 |
| TAS Distribution Method | : Percentage by Account |
| Allow Book Entry Adjustment | : Yes |
| Allow Warehoused Payments | : Yes |
| CMIA Indicator | : No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount | : $48,930,000.00 |
| Cumulative Authorized Amount Reset Period | : |
| Annual Reset Month | : |

### GRANT DETAILS

| | |
|---|---|
| Grant | : Yes |
| Federal Award Identification Number (FAIN) | : 5H84091001 |
| CFDA Number | : 66959.000 |
| Total Estimated Grant Amount | : $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review | : No |
| Threshold Amount | : |
| Reason for Review | : |

### DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount | : |
| Max Daily Draw Amount | : |
| Max Monthly Draw Amount | : |
| Max Quarterly Draw Amount | : |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount | : $0.00 |
| Certified Date | : |
| Renewal Frequency | : |
| Pending Renewal Frequency | : |
| Pending Automated Renewal Amount | : $0.00 |
| Rollover Reset Quarter | : |
| Default Action | : |

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT P

 

**NATIONAL ENERGY TECHNOLOGY LABORATORY**
Albany, OR • Houston, TX • Morgantown, WV • Pittsburgh, PA

January 28, 2025

**MEMORANDUM FOR ALL DOE FUNDING AGREEMENTS OR AWARDS**

FROM:      ███████████

PROCUREMENT DIRECTOR
NATIONAL ENERGY TECHNOLOGY LABORATORY

SUBJECT:    Cease All Activities Associated with DEI and CBP

The President has issued 43 Executive Orders, Presidential Memoranda, and Proclamations, including an Executive Order entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing*. DOE is moving aggressively to implement this Executive Order by directing the suspension of the following activities in any loans, loan guarantees, grants, cost sharing agreements, contracts, contract awards, or any other source of DOE funding:

- diversity, equity, and inclusion (DEI) programs and activities involving or relating to DEI objectives and principles; and
- Community Benefits Plans (CBP); and
- Justice40 requirements, conditions, or principles.

Recipients and subrecipients must cease any activities, including contracted activities, and stop incurring costs associated with DEI and CBP activities effective as of the date of this letter for all DOE grants, cooperative agreements, loans, loan guarantees, cost sharing agreements, or other DOE funding of any kind. Recipients are responsible for communicating and enforcing this direction with all subrecipients and contractors. Costs incurred after the date of this letter will not be reimbursed. This letter will be incorporated into your award with the next modification.

Additional guidance will be forthcoming. Recipients who have DEI and CBP activities in their awards will be contacted by their Grants Officer to initiate award modifications consistent with this Order.

# EXHIBIT Q

**Tuesday, January 28, 2025 at 15:56:29 Central Standard Time**

**Subject:** RE: Rhode Island HER Award is Signed!
**Date:** Friday, January 24, 2025 at 11:13:50 AM Central Standard Time
**From:** ▮▮▮▮▮▮
**To:** ▮▮▮▮▮▮
**CC:** ▮▮▮▮▮▮
**Attachments:** image001.png, image002.png, image003.png, image004.png, image005.png, image006.png

▮▮▮▮

Unfortunately, I needed to cancel this call for now. I will get back to you as soon as I can reschedule.

Regards,

▮▮▮

**From:** ▮▮▮▮▮▮
**Sent:** Friday, January 24, 2025 12:04 PM
**To:** ▮▮▮▮▮▮

**Cc:** ▮▮▮▮▮▮
**Subject:** [EXTERNAL] RE: Rhode Island HER Award is Signed!

Hi ▮▮▮ –
I'm checking in re: a calendar invite from you folks for our kickoff call for 1/30, from 1-2.

All the best,



▮▮▮▮

**Thermal Decarbonization Manager**
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908

▮▮▮▮ | www.energy.ri.gov

[facebook.com]  [youtube.com]  (in)

[linkedin.com]  [twitter.com]

1 of 8

**From:** ████████████████████████
**Sent:** Friday, January 17, 2025 9:22 AM
**To:** ████████████████████████████████
████████████████████████████████████
**Cc:** ████████████████████████████████
████████████████████████████████
**Subject:** RE: Rhode Island HER Award is Signed!

Thanks ████ ! I'm staying on the Rebates/TREC team at DOE, but we've hired and onboarded additional POs (including ████ over the past few months, so our portfolios are changing a bit. I'm still working with several northeastern states and I'm sure our paths will cross again soon. 😊

**From:** ████████████████████████
**Sent:** Friday, January 17, 2025 9:05 AM
**To:** ████████████████████████████████
████████████████████████████
**Cc:** ████████████████████████████████
████████████████████████████
**Subject:** [EXTERNAL] RE: Rhode Island HER Award is Signed!

Great! We look forward to the invite.

We'll miss you as our PO. Hopefully, you're going somewhere new and exciting in DOE or elsewhere?

All the best,



████████████████
*Thermal Decarbonization Manager*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
████████████████████████ | www.energy.ri.gov

[facebook.com]    [youtube.com]    [linkedin.com]

[twitter.com]

**From:** ████████████████████████
**Sent:** Friday, January 17, 2025 8:15 AM
**To:** ████████████████████████████████
████████████████████████████

**Cc:** ██████ | ████████     ██ ; ████████

**Subject:** RE: Rhode Island HER Award is Signed!

Hi ████

It looks like that time will work for our team! I'm going to pass this over to ████ to get on the calendar as she is going to be the PO for these awards going forward.

Thanks,

████

---

**From:** ████████████████████████

**Sent:** Thursday, January 16, 2025 4:31 PM

**To:** ████████████████████████

████████████     ████████████████

**Cc:** ████████████████████████

**Subject:** [EXTERNAL] RE: Rhode Island HER Award is Signed!

HI ████ –

I'm still waiting for one team member's availability but as a hail Mary, <mark>does 1/30, from 1-2</mark> work for you? If not, I'll send along additional times tomorrow.

All the best,



████

***Thermal Decarbonization Manager***
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908

████████████████ | www.energy.ri.gov

[facebook.com]     [youtube.com]     [linkedin.com]

[twitter.com]

---

**From:** ████████████████████

**Sent:** Thursday, January 16, 2025 9:45 AM

**To:** ████████████████████████

████████████████████████

**Cc:** ████████████████████████

███████████████████████████████████

**Subject:** RE: Rhode Island HER Award is Signed!

A key member of our team is in training that day. If 1/24 or 1/27 don't work on your end, can you please share some times that work from 1/28-1/31?

---

**From:** ████████████████████████████████
**Sent:** Thursday, January 16, 2025 9:01 AM
**To:** ████████████████████████████████████████████
████████████████████         ██████████████████████
**Cc:** █████████████████████████████████████████
**Subject:** [EXTERNAL] RE: Rhode Island HER Award is Signed!

Hi ███████-
How does Thursday afternoon work?

All the best,




*Thermal Decarbonization Manager*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908

████████████████████    www.energy.ri.gov

[facebook.com]  [youtube.com]  [linkedin.com]

[twitter.com]

---

**From:** ███████████████████████████████
**Sent:** Wednesday, January 15, 2025 5:44 PM
**To:** ██████████████████████████████████████████████████
████████████████████████████████████████████████
**Cc:** ████████████████████████████████████
**Subject:** RE: Rhode Island HER Award is Signed!

Unfortunately, we're booked solid on that day. Can you share your availability on 1/24 or 1/27?

---

**From:** █████████████████████████████

**Sent:** Wednesday, January 15, 2025 10:31 AM
**To:** ███████████████████████████████████

**Cc:** ███████████████████████

**Subject:** [EXTERNAL] RE: Rhode Island HER Award is Signed!

Hi ████████

It looks like Tuesday afternoon would work for our team. Do any of the times below work for your team?

- 2:30
- 3:00
- 3:30

All the best,



***Thermal Decarbonization Manager***
Rhode Island Office of Energy Resources
1 Capitol Hill, 4ᵗʰ Floor, Providence, RI 02908

████████████████ | www.energy.ri.gov

[facebook.com]   [youtube.com]   [linkedin.com]

[twitter.com]

---

**From:** ████████████████████████████
**Sent:** Wednesday, January 15, 2025 8:47 AM
**To:** ██████████████████████████████████

**Cc:** ███████████████████████

**Subject:** RE: Rhode Island HER Award is Signed!

Good morning ███████

The award has been acknowledged in FedConnet.

████████

██████████████

*Assistant Director, Financial & Contract Management*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
████████████████████ | www.energy.ri.gov

---

**From:** ███████████████████████
**Sent:** Wednesday, January 15, 2025 8:41 AM
**To:** ████████████████████████████████
████████████████████████████████
**Cc:** ████████████████████████████
**Subject:** RE: Rhode Island HER Award is Signed!

Hi ████████
Great news!

All the best,



*Thermal Decarbonization Manager*
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
████████████████████  www.energy.ri.gov



[facebook.com]    [youtube.com]    [linkedin.com]

[twitter.com]

---

**From:** ██████████████████████
**Sent:** Wednesday, January 15, 2025 8:37 AM
**To:** ████████████████████████████████
████████████████████████
**Cc:** ████████████████████████████
**Subject:** Rhode Island HER Award is Signed!

Hello all,

I'm pleased to inform you that Rhode Island's Home Energy Rebates Award No. DE-SE0000062 has been signed! Congratulations on this exciting milestone.

This award corresponds to Rhode Island's full program application for section 50121 of the IRA Home Energy Rebates Program (Home Efficiency Rebates). The full allocation of IRA funds for this provision ($31,943,127.00) has been obligated under the award. **Please note that DOE must approve your State Implementation Blueprint before you can begin issuing rebates to consumers.**

Please formally acknowledge this award in FedConnect and confirm via email when you've done so. See the FedConnect tutorial to assist with any questions on locating and acknowledging your award there.

We would like to schedule a kick-off call with you to discuss the reporting requirements, terms and conditions, and other important items for this award. Please let us know when you're available within the next two weeks so we can get a meeting scheduled.

Thank you,



*Project Officer, Home Energy Rebate Programs*

Office of State and Community Energy Programs (SCEP)
Office of the Under Secretary for Infrastructure (S3)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT R

**Wednesday, February 5, 2025 at 09:19:24 Central Standard Time**

**Subject:** HEAR Program

**Date:** Monday, January 27, 2025 at 2:32:08 PM Central Standard Time

**From:** ███████████

**To:** ████████████████████████████████████████████

**CC:** ███████████████████████████████████████████

**Priority:** High

Good Afternoon,

Effective, today, January 27, 2025, the Rhode Island Office of Energy Resources (OER) is notifying all Rhode Island CAP Agencies to pause any new applications with the Rhode Island Home Energy Appliance Rebate (HEAR) program. This pause is due to the current uncertainty on federal funding with the Inflation Reduction Act and the Executive Order issued by the Trump Administration. OER will be in touch once we have any updates on the federal energy funding situation with the HEAR program.

Please reach out to me if you have any questions.

Thank you,

███

███████████
***Assistant Director, Financial & Contract Management***
Rhode Island Office of Energy Resources
1 Capitol Hill, 4th Floor, Providence, RI 02908
██████████████ | www.energy.ri.gov

1 of 1

# EXHIBIT S

MEMORANDUM OF UNDERSTANDING

By and Between

The RHODE ISLAND DEPARTMENT OF TRANSPORATION

and

The RHODE ISLAND OFFICE OF ENERGY RESOURCES

Regarding the Coordination of the National Electric Vehicle Infrastructure ("NEVI")
Formula Program in Rhode Island

This MOU is made and entered into this 15th day of December, 2022, by and between the State of
Rhode Island Department of Transportation (hereinafter "RIDOT") and the Rhode Island Office of
Energy Resources (hereinafter "RIOER"), collectively hereinafter referred to as the "Parties."

WHEREAS, on November 15, 2021, President Biden signed into law the Bipartisan
Infrastructure Law (hereinafter "BIL") creating a National Electric Vehicle Infrastructure
(hereinafter "NEVI") Formula Program to implement a nationwide network of 5,000,000 electric
vehicle ("EV") charging stations by 2030; and,

WHEREAS, on September 14, 2022, the Federal Highway Administration (hereinafter
"FHWA") approved RI EV Infrastructure Deployment Plan ("RI EV Plan") and provided
approximately $3.8 million in funding to RIDOT for Fiscal Year 2022, with additional funding
through 2026 of approximately $22.8 million; and,

WHEREAS, on June 27, 2022, the FY23 State Budget established administrative and
reporting requirements for the RI EV Plan, and provided that RIOER administer the program in
coordination with RIDOT and the Rhode Island Department of Environmental Management
(hereinafter "RIDEM"); and,

WHEREAS, the Parties are committed to working together to implement the terms of the BIL,
RI EV Plan, and achieving the policies and goals prescribed therein.

Page **1** of **5**

NOW THEREFORE, in accordance with R.I. Gen. Laws § 42-162-1 *et. seq.*, the BIL, RI EV
Plan, and in consideration of the promises and mutual obligations contained herein, the Parties
hereby agree as follows:

1.   RIOER shall serve as a sub-recipient to RIDOT for the purpose of administering the RI
     EV Plan. In conjunction with RIOER, RIDOT shall serve as State's oversight to
     ensure that delivery of the RI EV Plan meets federal purposes and requirements.

2.   The Parties shall, in consultation with the RIDEM, collaborate to ensure the proper
     implementation of the RI EV Plan.

3.   The Parties mutually agree to provide one another with the following assistance:

     a.  Technical assistance related to the deployment, operation, and maintenance of zero
         emission vehicle charging and infrastructure;

     b.  Data sharing of installation, maintenance, and utilization in order to ensure a
         network of zero emission vehicle charging and infrastructure;

4.   The Parties shall coordinate to update the RI EV Plan annually. The RI EV Plan shall
     describe the goals and objectives for infrastructure expansion in Rhode Island,
     including applicable references to federal guidance, State statutes, and the
     recommendations of the Executive Climate Change Coordinating Council. The RI EV
     Plan shall indicate the expected timing or sequencing of its implementation.

5.   Pursuant to R.I. Gen. Laws § 42-162-3, RIOER shall serve as the lead agency in the
     implementation of the RI EV Plan and to that end, shall be responsible for the
     following:

     a.  All project management activities including but not limited to:

         a.  Procurement of all related consultant services, studies, equipment, and other
             services necessary to carry out the RI EV Plan in accordance with federal
             guidance;

         b.  All stakeholder communication; including both governmental and non-
             governmental entities, the energy providers, the environmental community,
             and the business community. Communication shall include an online

presence for announcements related to the plan and all required public comment;

   c. Transmission of all RI EV Plan related expenditures to RIDOT for reimbursement upon request; including certification by RIOER that all expenditures were made pursuant to relevant federal guidance;

   d. Development of all necessary policies, procedures and regulations related to the deployment of the NEVI Plan in accordance with all programmatic guidance from the granting authority; including but not limited to the minimum standards and requirements for RI EV Plan projects:

      i. Installation, operation and maintenance of EV charging infrastructure

      ii. Traffic control and signage

      iii. Data collection and sharing

      iv. Network connectivity and payment

      v. Accessibility of information on station availability, pricing, and location

6. RIDOT shall support RIOER in the following capacity:

   a. Provide information reasonably related to RI EV Plan, generated by RIDOT and its consultants, including all contact lists and interested third parties;

   b. Offer advice and consultation to RIOER for all technical aspects of RI EV Plan delivery for the benefit of the State and public; provided however that, RIOER shall have final decision-making authority on all matters related to RI EV Plan delivery and execution.

   c. The staff from both parties will meet monthly or more regularly, as needed, to coordinate efforts relative to NEVI programs and funding. This will help ensure consistent communication with the Federal Joint Office of Energy and Transportation and the FHWA.

   d. Both parties agree to collaboratively update the plan annually, as required.

7. Pursuant to R.I. Gen. Laws § 42-162-4, the Parties shall provide a report to the governor and general assembly by December 31, 2023.

8.    This MOU is subject to, and will be carried out in compliance with, all applicable laws, regulations, and other legal requirements.

9.    This MOU shall remain in effect provided that the State of Rhode Island continues to receive funding from the federal government for the IIJA NEVI Formula and Discretionary Grant Programs (or any/all equivalent programs that success the IIJA). All activities conducted pursuant to this MOU are subject to the availability of funds.

10.   This MOU may not be altered or amended except by written agreement signed by all parties.

11.   Notices shall be sent to the following representative for the Parties:

RIOER:    ████████████
          Administrator, Clean Transportation Programs
          Rhode Island Office of Energy Resources
          One Capitol Hill, 4ᵗʰ Floor
          Providence, RI 02908

          ████████████████

RIDOT:    ████████████
          Chief Economic Policy Analyst
          Two Capitol Hill, Room 276
          Providence, RI 02908

          ████████████████


**(Remainder of Page Left Intentionally Blank)**

IN WITNESS WHEREOF, The Rhode Island Department of Transportation and the Rhode Island
Office of Energy Resources have caused this MOU to be executed by their duly authorized
officials on the ____15th____ day of ___December___ , 2022.

RHODE ISLAND DEPARTMENT                     RHODE ISLAND OFFICE OF

OF TRANSPORTATION                           ENERGY RESOURCES


Recommended For Approval:

████████████████████████████

Chief Financial Officer
Date: 12/21/2022

Approved As To Form:                        Approved As To Form:

████████████████████████████                ████████████████████████████

Assistant Director for Legal Services       Legal Counsel
Date: 12/20/22                              Date: 12.15.2022


Approved:                                    Approved:

████████████████████████████                ████████████████████████████

Director                                     Interim Commissioner
Date: 12/21/22                              Date: 12/15/22