Thomas-Jensen
Affirmation
(redacted)


Exhibit # 118

| | |
|---|---|
| STATE OF NEW YORK; et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00039-JJM-PAS |
| DONALD TRUMP, in his official capacity as President of the United States; et al., | **DECLARATION OF JOSEPH-THANH NGUYEN** |
| Defendants. | |

## Declaration Of Joseph-Thanh Nguyen

I, Joseph-Thanh (Joe) Nguyen, declare as follows:

1.     I am a resident of the State of Washington. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Director of the Washington State Department of Commerce (Commerce). I was appointed to this role by Governor Bob Ferguson in December 2024 and began my tenure as Director in January 2025. I previously served in the Washington State Senate from 2019 to 2024.

3.     The Department of Commerce is responsible for enhancing and promoting sustainable community and economic vitality in Washington. Our mission is to strengthen communities in Washington. With a biennial budget of $7.9 billion, we administer a diverse portfolio of more than 100 programs and several state boards and commissions, all focused on helping communities achieve positive growth.

4.     As Director, I oversee all aspects of Commerce's funding and budget.

5.     Commerce administers grant funds to a number of programs and serves as a pass-

through for hundreds of millions of dollars of federal funding, passing funding directly to the communities and local governments who need it most.

6. Washington State is dedicated to clean and renewable energy. Washington's Clean Energy Transformation Act commits Washington to an electricity supply free of greenhouse gas emissions by 2045. Clean electricity will allow Washington residents and businesses to power their buildings and homes, vehicles and appliances with carbon-free resources, such as wind and solar. Reducing fossil-fuel use will improve the health of communities, grow the economy, create family-sustaining jobs, and enable the State to achieve its long-term climate goals.

7. As outlined below, Commerce received a number of federal awards from the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"), the funding from which will help Washington meet its clean energy goals. Together, the IRA and the IIJA represent an unprecedented federal investment in clean and renewable energy, transportation electrification infrastructure, energy efficiency and building retrofits, and other activities nationwide to reduce greenhouse gas. These historic federal investment packages are intended to support and modernize infrastructure, create well-paying jobs, and spur economic growth. They also serve as a step forward in empowering vulnerable communities and addressing decades of historical disparities. Washington stands to benefit greatly from this investment.

8. Since taking office, the Trump Administration has issued several executive orders and directives intended to freeze funds appropriated by the IRA and IIJA.

9. On January 20, 2025, the Administration issued an Executive Order entitled "Unleashing American Energy" that directs federal agencies to, among other things, pause disbursement of IRA and IIJA funds related to clean energy.

10. On January 27, 2025, the Administration issued a broad memorandum, OMB Memorandum M-25-13 (OMB Memorandum), directing agencies to pause disbursement of most federal funding, including IRA and IIJA funds, until consistency with various executive orders could be evaluated.

11. On January 29, 2025, OMB issued a follow-up memorandum purporting to rescind

the OMB Memorandum. Simultaneously, however, White House Press Secretary Karoline Leavitt explained that the OMB Memorandum was rescinded to "to end any confusion" but stated that the executive orders "remain in full force and effect and will be rigorously implemented by all agencies and departments."

12. On January 31, 2025, this Court issued a temporary restraining order ("TRO") enjoining the Federal Defendants from pausing, freezing, impeding, blocking, canceling, terminating, or otherwise impeding access to awards and obligations to provide federal financial assistance to the Plaintiff States, "except on the basis of the applicable authorizing statutes, regulations, and terms."

13. Notwithstanding the TRO and supposed rescission of the OMB Memorandum, the Trump Administration has repeatedly paused or frozen funding that was duly appropriated by Congress, causing direct harm to Washington State.

**Solar for All Grant**

14. On October 11, 2023, Commerce applied for a Solar for All competitive grant under the IRA. A true and accurate copy of the grant application narrative is attached hereto as Exhibit A.

15. On July 8, 2024, Commerce received confirmation from the Environmental Protection Agency ("EPA") that it had been awarded a $156 million Solar for All grant. A true and accurate copy of the grant award document is attached hereto as Exhibit B. A true and accurate copy of the terms and conditions applicable to the grant award, as conveyed on June 21, 2024, is attached hereto as Exhibit C. On February 4, 2025, we received an amended award agreement, dated January 14, 2025. A true and accurate copy of the amended grant award document is attached hereto as Exhibit D.

16. The Solar for All grant is intended to support the deployment of solar to support low-income households and overburdened communities across the State. Commerce's implementation plan for Solar for All is designed to fill critical gaps in enabling solar energy to benefit households in Washington by focusing on single-family homes owned by low-income

residents; large scale community solar; affordable multifamily buildings; and tribal solar projects. We expect the Solar for All program to benefit up to 5,000 households in Washington through reduced energy bills and large-scale solar deployment.

17. The Solar for All grant is funded through reimbursement via the Automated Standard Application for Payments ("ASAP") system.

18. On January 28, 2025, Commerce received notice that EPA was "working diligently to implement President Trump's "Unleashing American Energy" Executive Order . . . in coordination with the Office of Management and Budget." A copy of this notice is attached hereto as Exhibit E. Indeed, between January 30, 2025, and February 4, 2025, our Solar for All account was suspended in ASAP, meaning we were unable to draw down funds or otherwise receive reimbursement for Solar for All funds spent. A copy of the suspension notice is attached hereto as Exhibits F.

19. Commerce's budget for the Solar for All program relies on this federal funding. Commerce has allocated staff, program administrators, other contractors, and resources based on the anticipated receipt of federal funding.

20. Any pause in the receipt of Solar for All funding would prevent Commerce from reaping the benefits of a statewide low-income solar program, as articulated in the award documents. Commerce may also be unable to proceed with hiring as planned or issue requests for proposals to support implementation as a result of a pause in funding.

**Climate Pollution Reduction Grant**

21. On April 26, 2023, Commerce applied for a Climate Pollution Reduction Grant ("CPRG") under the IRA.

22. On June 29, 2023, Commerce received confirmation from the EPA that it had been awarded an approximately $3 million CPRG. A true and accurate copy of the grant award document is attached hereto as Exhibit G.

23. The CPRG is a noncompetitive planning grant that will enable Washington to develop and implement plans for reducing greenhouse gas emissions and other harmful air

pollution.

24.     Like the Solar for All grant, the CPRG is funded through reimbursement via the ASAP system.

25.     On January 28, 2025, Commerce received notice that EPA was "working diligently to implement President Trump's "Unleashing American Energy" Executive Order . . . in coordination with the Office of Management and Budget." Indeed, between January 30, 2025, and February 4, 2025, our CPRG account was suspended in ASAP, meaning we were unable to draw down funds or otherwise receive reimbursement for CPRG funds spent. A copy of the February 4, 2025, suspension notice is attached hereto as Exhibits H.

26.     Commerce has relied on the promise of federal CPRG funding by hiring staff, developing energy modeling, engaging in extensive community and outreach, procuring communication contracts, including for website development and maintenance, and coordinating with our Tribal partners.

27.     Even a short pause in our receipt of federal funding would impact the staff assigned to this important work and could derail the extensive groundwork we've laid for community outreach and Tribal coordination.

**Additional IRA and IIJA Grant Funds**

28.     Commerce has secured a number of additional IRA and IIJA federal grant awards, including but not limited to:

a.      $165 million in Department of Energy ("DOE") grant funding for Home Energy Rebates, which will provide efficiency and electrification rebates for low- and moderate-income households across Washington State;

b.      $60 million in DOE grant funding for Preventing Outages and Enhancing the Resilience of the Electric Grid, which supports grid resilience upgrades for utilities;

c.      $47 million in DOE grant funding for the Weatherization Assistance Program, which will provide weatherization assistance for low-income households across Washington State;

d.      $19 million in DOE grant funding for Technical Assistance for the Adoption of Building Energy Codes, which will support workforce and local government training and development related to Washington's clean building standards and energy codes; and

e.      $8.4 million in DOE State Energy Program funding, which will support state energy strategy implementation at Commerce's Energy Office.

29.     Commerce's budget for this year relies on federal agencies such as EPA and DOE continuing to reimburse the Department for allowable expenditures, consistent with the IRA and IIJA grant awards. Commerce has relied extensively on the promise of federal funding by hiring full-time staff, procuring contracts, developing implementation plans, and more.

30.     Any pause in any of the IRA or IIJA funding streams could have massive impacts on the Department of Commerce and the people we serve. Even a temporary pause could require Commerce to furlough or terminate staff, shift resources, and interfere with Commerce's ability to accomplish its mission of strengthening communities in Washington. Washington's Office of Financial Management has already directed most state agencies—including Commerce—to identify spending reductions of at least six percent. Commerce simply does not have the funds to cover a pause or freeze in appropriated federal funding.

31.     Washington has already invested state money in clean energy partially funded by the IRA and IIJA. The 2023-25 Washington State budget funded $80 million for home electrification and appliance rebates to complement the IRA Home Energy Rebate program; $40 million for weatherization projects for low-income homes to complement the Weatherization Assistance Program; and $3.87 million in requisite matching funds for DOE's grid resilience program. A pause in federal IRA and IIJA funding would likely negatively impact Washington's own investment in its future.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of February 2025, at Olympia, Washington

_____
JOSEPH-THANH NGUYEN
Director of the Washington State
Department of Commerce

# Exhibit A

# WASHINGTON STATE SOLAR FOR ALL PROPOSAL
## Program Narrative

For the state of Washington, the Washington State Department of Commerce (Commerce) is excited to apply for the U.S. Environmental Protection Agency's (EPA) Solar for All competition, under the Greenhouse Gas Reduction Fund (GGRF), authorized under the Inflation Reduction Act (IRA). Commerce is the one state agency in Washington that touches every aspect of community and economic development: planning, infrastructure, energy, public facilities, housing, public safety, international trade, business services, and more. Commerce partners with local governments, tribes, businesses, nonprofits, and civic leaders throughout the state to strengthen communities so all residents may thrive and prosper. Commerce already administers a number of clean energy grant programs, and is eager to expand its reach through the Solar for All Program. We are requesting $250,000,000 of Solar for All funds to serve over 10,000 households across the state. With these funds, Commerce will design, develop, and implement the following:

1. **Washington Affordable Solar Homes (WASH)**: Provide income-qualified homeowners with no-cost rooftop solar installations, support enabling upgrades, and, for those who can benefit most from enhanced resiliency, paired energy storage. Through this program offering, Washington anticipates serving at least 3,000 households. (38.5% of budget)
2. **Expanded Shared Solar Access Program (ESSAP)**: Support larger community solar projects for income-qualified households through a new program that is complementary to existing state programs. Through this program offering, Washington anticipates serving at least 4,000 households. (30.3% of budget)
3. **Bridging Energy Affordability through Multifamily Solar (BEAMS)**: Pair funding for enabling upgrades with a low or no-interest revolving loan fund to allow multifamily affordable housing properties to access and leverage existing state and federal funding for solar. Through this program offering, Washington anticipates serving at least 1,200 households over the Solar for All period of performance, and providing for a sustainable source of future funding through a revolving loan fund. (5.2% of budget)
4. **Tribal Solar Program**: Formally consult with federally recognized tribal governments located in Washington to co-create a tribal solar offering. While the metrics of success for this program will be co-designed over at least the next year, Commerce hopes to serve at least 2,000 households with this offering. (26% of budget)

These programs will be supported by in-kind state community solar programs and technical assistance. Washington anticipates using over 96% of the proposed budget from federal Solar for All funds for direct financial assistance to households.

Commerce is committed to facilitating an equitable, open, and transparent process to design, develop, and implement its Solar for All program. This process was initiated through the application's development, in which Commerce staff held several public engagement opportunities and solicited feedback on our draft proposal, summarized in Section 1.6.

Commerce plans to use the full year of program design to continue focusing on equitable engagement and involvement, maximizing savings and long-term benefits to households, and leveraging other programs and investment to deepen the impact of Solar for All funds.

# 1. Program Strategy Narrative

## Overview of Washington's Proposed Solar for All Programs

Commerce's Solar for All proposal has been developed based on our understanding of the gaps and barriers for low-income households and frontline communities in accessing distributed and residential-serving solar. We propose four new programs to comprehensively serve these groups.

### For Homeowners: Supporting Solar Deployment and Enabling Upgrades

*Washington Affordable Solar Homes (WASH): Provide no cost rooftop solar installations, support enabling upgrades, and, for those who can benefit most from enhanced resiliency, paired energy storage. Through this program offering, Washington anticipates serving at least 3,000 households, with approximately one third receiving a no-cost energy storage installation.*

Behind the meter solar can provide significant electric bill savings by enabling customers to use what they generate in real time and receive credits for exported energy. Washington has not had an income-qualified rooftop solar program, so our Solar for All application proposes to create the Washington Affordable Solar Homes (WASH) program. This program will have the following key features, which will be reviewed and further defined during program planning and design:

- Grants to income-qualified homeowners to fully cover the cost of a solar installation and support enabling upgrades such as roof repair. A subset of participants will also receive no-cost battery energy storage installation, if the investment will substantially improve the household's resilience.
- Enable household bill savings of at least 20%, with a target of at least 50%.
- Be limited to income-qualified homeowners, with a specific focus on households that are located in environmental justice communities across the state.

To implement the program, Commerce will work with multiple vendors across the state, with a preference for those who are able to link robust outreach with installation of measures. In addition, there will be a requirement to integrate workforce development features into projects, described further in Section 1.2.5.

### For Renters and Others: Enhancing Access to Community Solar

*Expanded Shared Solar Access Program (ESSAP): Support community solar projects between 200 kW and 1 MW with a minimum of 20 income-qualified subscribers per 200 kW. Through this program offering, Washington anticipates serving at least 4,000 households*

Community solar programs can provide benefits to renters and other households without adequate rooftop space to support a distributed solar system. Active Washington state funding for low-income serving community solar has started to yield results. Commerce proposes to use Solar for All funds to catalyze this success and provide these benefits to even more households across the state. This new program, the Expanded Shared Solar Access Program (ESSAP), is anticipated to serve at least 4,000 households and would have the following key features, which will be reviewed and further defined during program planning and design:

- Allow for community solar projects between 200 kW to 1 MW; this approach complements an existing state program for smaller community solar projects. Projects will be required to have a minimum of 20 income-qualified subscribers per 200 kW.

- Subscribers will be required to meet EPA's income qualification criteria at the time of entering the program or be a member of a federally recognized tribe in Washington, and projects located in environmental justice communities will be prioritized.
- A set-aside of credits to supplement multifamily affordable housing properties that can only support small, onsite solar arrays that may not provide sufficient benefits to tenants.
- At least 85% of the value of solar energy generated must be passed on to income-qualified customers; shares of projects are to be sized so that each subscriber receives savings of at least 20% of the average residential electric bill in their applicable utility's service territory, with a target of a 50% bill credit. The remaining 15% of the value of solar energy generated may be used as an incentive for the host site or to support a common area meter on a multifamily building.

## For Multifamily Affordable Housing: Leveraging Other Funds to Unlock Solar

*Bridging Energy Affordability through Multifamily Solar (BEAMS): Create a new program that pairs funding for enabling upgrades with a low/no-interest revolving loan fund that allows multifamily affordable housing properties to access existing state and federal funding for solar.*

We have heard from affordable housing stakeholders that affordable housing properties are interested in having access to solar and storage due to the bill savings, resilience, and community benefits this technology can offer. For example, during outreach on this grant application, a stakeholder stated, "[f]or organizations that serve low-income individuals, like affordable housing developers and property owners, opportunities to invest in tools that reduce operating expenses can enable those organizations to increase spending on other important expenses, such as building maintenance and residential services."[1]

However, these kinds of properties have been unable to implement solar projects at scale. To overcome access to upfront capital issues that have slowed project deployment, Commerce proposes to use Solar for All funds to create a Bridging Energy Affordability through Multifamily Solar program (BEAMS). This program will have the following key features, which will be reviewed and further defined during program planning and design:
- Financing to catalyze access the state's existing community solar incentive program and to the federal investment tax credit (ITC).
- No-interest forgivable loans for enabling upgrades to support and catalyze projects.
- Open to both new and existing affordable housing buildings.
- At least 85 percent of the value of solar energy generated will benefit tenants.
- Leverages ESSAP to bridge any gap in minimum tenant bill savings.

## For Tribes: Prioritizing Tribes and Promoting Tribal Sovereignty

*Tribal Solar Program: Allocate 26% of the financial assistance budget and formally consult with federally recognized tribal governments to co-create a tribal solar program.*

Our application for Solar for All commits 26% of the financial assistance funding requested to develop a Tribal Solar Program through formal consultation with tribal governments. This program will use an allocation formula, co-developed with tribes, to provide direct support for tribal solar projects. The program will center principles of tribal sovereignty and self-

---

[1] Response to Commerce Request for Information. June 2023.
https://deptofcommerce.app.box.com/s/ytgqw11ik6kcncon32cbtour9wavrr2x

determination and will enable tribes to design and implement their own projects. Administrative funds will also be deployed to support specific needs such as travel funds, funds for contract negotiation or legal needs, and funds to hire staff and support professional development.

## 1.1 Impact Assessment

Washington has a population of approximately 7.78 million with an estimated 3.31 million housing units.[2] Interest in distributed solar has been growing in recent years, but past programs and investments have not sufficiently reached those in lower income homes. For example, data on solar adoption by income percentile in the state shows that those at the highest income brackets make up the plurality of solar users in the state.



FIGURE 1. WASHINGTON SOLAR ADOPTER INCOME DISTRIBUTIONS[3]

The barriers to solar access for income-qualified residential customers are well researched nationally, and help explain trends in adoption in Washington. These barriers include, but are not limited to: awareness of the benefits of solar, access to upfront capital and to financing, poor roof conditions, and lack of homeownership. While Washington has had programs that accelerated adoption of distributed solar, there has not been sufficient funding to address barriers faced by income-qualified households. Solar for All can expand access to solar to these households, with a specific focus on those communities that are most harmed by the impacts of climate change.

Throughout our application, we address the barriers to solar faced by target populations and describe the multi-prong approach that Washington intends to take to address historical gaps in these communities being able to access distributed solar. This section provides an overview of Washington's market and policy context for distributed solar deployment, our assessment of the expected impacts of Washington's Solar for All program, and potential outcome and output metrics to measure impact.

### 1.1.1 Current State of Electricity in Washington

Washington has a unique electric utility landscape with more than sixty electric utilities providing retail service to customers. Three of these utilities are investor-owned utilities (IOUs),

---

[2] U.S. Census Bureau. Quick Facts about Washington State, as of July 2022. https://www.census.gov/quickfacts/fact/table/WA/PST045222
[3] Lawrence Berkeley National Lab. Solar Demographics Tool. https://emp.lbl.gov/solar-demographics-tool

and the remainder are consumer-owned utilities (COUs), a mixture of public utility districts (PUDs), municipal utilities, and electric cooperatives. COUs serve about 56% of Washington residential electric utility customers, and IOUs serve the remaining 44%.[4] The federal Bonneville Power Administration (BPA) markets wholesale electrical power from 31 federal dams, one nonfederal nuclear facility, and a variety of nonfederal power plants. For most COUs in Washington, BPA is the main power supplier.

A majority of the generated power for Washingtonians comes from hydroelectric sources (52.99% of energy mix in 2021). Other primary energy sources include natural gas (12.98%), coal (9.2%), wind (6.03%), nuclear (4.36%), and unspecified power (12.95%), which is generally power that is bought through the market and does not have a clear generation source. Utility-scale solar only accounts for a very small percentage of the electricity that serves Washington's customers, at 0.56% of the state's electricity as of 2021.[5] The use of distributed solar is not included by utilities when reporting their electricity generation make-up; generally, for utilities, the use of distributed solar is considered a reduction in demand for a utility.

Washington has some of the lowest electricity rates in the United States. As of May 2023, Washington's average residential electric rate (11.18 cents/kWh) was far below the U.S. average (16.14 cents/kWh), and only higher than Utah and Idaho.[6] With more than 60 retail electric utilities, and with varying geography, weather, and housing types, there is a range of rates and final bills that residential customers pay for their electricity. However, electricity costs can still make up a significant portion of a household's energy use: over 57% of households in Washington use electricity for heating compared to the national average of 41%,[7] with energy inefficient electric resistance heating still being very common.[8]

Utilities report sales, revenues, and customers to the U.S. Energy Information Administration (EIA), but reporting for smaller utilities does not include a breakdown of residential versus other sales. In 2021, 61 individual electric utilities reported customer data to EIA for Washington, and 38 of these reported a breakdown in sales to customer types. These 38 utilities represent about 85% of the total electricity sales in Washington in 2021. For these utilities, in 2021:
- The average residential monthly bill was $110.66
- The median residential monthly bill was $109.13
- The weighted average based on residential customers was $99.16

Among electric utilities, there is a wide range of average monthly bills for residential customers, from $190.57 per month for a small electric cooperative that serves fewer than 100 customers in

---

[4] U.S. EIA. Annual Electric Power Industry Report.  https://www.eia.gov/electricity/data/eia861/

[5] Commerce. Fuel Mix Disclosure. https://www.commerce.wa.gov/growing-the-economy/energy/fuel-mix-disclosure

[6] U.S. EIA, Washington State Profile and Energy Estimates. https://www.eia.gov/state/data.php?sid=WA#Prices

[7] *Id.*

[8] Northwest Energy Efficiency Alliance. 2016-17 Residential Building Stock Assessment. Updated 2019. https://neea.org/img/uploads/Residential-Building-Stock-Assessment-II-Single-Family-Homes-Report-2016-2017.pdf

eastern Washington (and more in Idaho), to $59.19 per month for a PUD in the central part of the state, which serves more than 40,000 customers.[9]

**Washington's Solar for All Program**: We will use the weighted average ($99.16) for residential customers as the statewide average residential number and baseline and the minimum benefit that we would expect households to receive (20% of $99.16, or $19.83). However, we will aim with all of our programs to provide 50% benefit to households (50% of $99.16, or $49.58). Depending on the program offering, we expect that this benefit would be provided as a direct financial benefit or through a corresponding benefit.

## 1.1.2 Washington Policy Context

Washington has been a national leader in clean energy, as shown in Table 1. These laws will interact with our Solar for All program in a few key ways:

**Energy Assistance and Solar for All.** Beginning in 2021, CETA requires that electric utilities make energy assistance available to all households in Washington, prioritizing those with high energy burden. This law also provided a new definition of energy assistance that can include not only traditional energy assistance strategies like monetary assistance and weatherization, but also distributed energy resources that target energy burden reduction.

In Washington, high energy burden is defined as a household spending more than 6% of their income on energy. Over 250,000 low-income households (about 25% of low-income households) in Washington spend more than 6% of their household income on home energy bills.[10] Washington's Solar for All program provides an opportunity to help address energy burden as qualified energy assistance.

**Focus on Environmental Justice and Solar for All.** Washington has explicitly linked the success of its clean energy transition to the equitable distribution of benefits and lowering of environmental burdens for tribal communities, overburdened communities, and vulnerable populations.[11] This linkage is in alignment with EPA's Solar for All goals and the Justice40 initiative. We discuss further in Section 1.1.5 how the targeted populations for Washington's Solar for All proposal align with both federal and state goals.

---

[9] This data does not reflect any energy assistance provided to customers, which could dramatically impact a customer's final monthly bill. This data also does not capture weather impacts on bills. For example, in 2020, the weighted average residential utility bill was $95.46 and in 2019, it was $123.44, though overall electricity rates were lower in 2019 than in 2020. This is likely due to extreme winter weather in Feb. 2019 that drove electric bills up.

[10] Commerce. Low-Income Energy Assistance 2023 Legislative Report at 2 https://deptofcommerce.box.com/s/qazu3yweu5w6udvnvw97qk5dwzop56p5

[11] "Overburdened communities" means a geographic area where vulnerable populations face combined, multiple environmental harms and health impacts, and includes, but is not limited to, highly impacted communities as defined in RCW 19.405.020" and "Vulnerable populations" means population groups that are more likely to be at higher risk for poor health outcomes in response to environmental harms, due to (i) Adverse socioeconomic factors, such as unemployment, high housing and transportation costs relative to income, limited access to nutritious food and adequate health care, linguistic isolation, and other factors that negatively affect health outcomes and increase vulnerability to the effects of environmental harms; and (ii) sensitivity factors, such as low birth weight and higher rates of hospitalization. "Vulnerable populations" includes, but is not limited to Racial or ethnic minorities; Low-income populations; Populations disproportionately impacted by environmental harms; and Populations of workers experiencing environmental harms. https://app.leg.wa.gov/RCW/default.aspx?cite=70A.02.010

TABLE 1. KEY CLIMATE POLICIES IN WASHINGTON STATE

| Law | Impact |
| --- | --- |
| Energy Independence Act (2006, Voter Initiative) | • Establishes a Renewable Portfolio Standard and an energy efficiency resource standard for large electric utilities (>25,000 customers) |
| Clean Energy Transformation Act (CETA) (2019) | Requires electric utilities to: <br> • Remove coal-fired electricity from rates by 2025 <br> • Have GHG-emission neutral portfolio by 2030 <br> • Supply customers with 100% renewable or non-emitting electricity by 2045, with no provision for offsets. <br> • Ensure the equitable distribution of energy and non-energy benefits to vulnerable populations and highly impacted communities, including tribes, in their resource and clean energy planning <br> • Make energy assistance available to all households in Washington, prioritizing those with high energy burden |
| Climate Commitment Act (CCA) (2021) | • Requires achievement of the state's GHG emission targets (namely, 2050 net zero target and 45% emissions reduction by 2030) <br> • Establishes economic cap-and-invest program with focus on investing at least 35% (with a goal of 40%) of revenue in projects which benefit vulnerable populations and overburdened communities |
| Healthy Environment for All Act (HEAL) (2021) | • Establishes a statewide, coordinated approach to environmental justice. <br> • Requires that a number of state agencies, including Commerce, identify and address environmental health disparities in overburdened communities and for vulnerable populations. <br> • Establishes a statewide definition for environmental justice[12] that builds upon EPA's definition by adding the outcomes important to Washington. |
| Relevant regulations | • The current energy code for new commercial and large multifamily buildings requires rooftops be solar-ready with appropriate wiring (effect since 2021). <br> • The energy code that will go into effect in 2024 for new commercial and large multifamily buildings requires inclusion of a renewable energy generating system of at least 0.5 watt per square foot[13], with some exceptions. |

## 1.1.3  Current State of Distributed Solar

As of Q2 2023, the Washington Solar Energy Industries Association (WASEIA) reports that Washington has 627 MW of installed solar, including both utility-scale and distributed solar. Prior to 2022, almost all of this installed solar was small-scale, customer-sited photovoltaic systems. In 2022, there was a very large increase in the installation of utility-scale solar projects, driven by both policy and market forces (Figure 2).

---

[12]"Environmental justice" means the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, rules, and policies. Environmental justice includes addressing disproportionate environmental and health impacts in all laws, rules, and policies with environmental impacts by prioritizing vulnerable populations and overburdened communities, the equitable distribution of resources and benefits, and eliminating harm. (RCW 70A.02.010(8))

[13] 2021 Washington State Energy Code at Section C411.1 On-site Renewable Energy
https://sbcc.wa.gov/sites/default/files/2023-05/2021_WSEC_C_2ndPrint_0518023.pdf



FIGURE 2. ANNUAL SOLAR INSTALLATIONS IN WASHINGTON, SOLAR ENERGY INDUSTRIES ASSOCIATION[14]

As Figure 3 from the U.S. EIA shows, in Washington, the annual net generation from small-scale solar PV increased substantially, from just over 35,000 MWh in 2014 to almost 400,000 MWh in 2022, or a more than eleven-fold increase over eight years.



FIGURE 3. ANNUAL NET GENERATION FOR SMALL-SCALE SOLAR PHOTOVOLTAIC IN WASHINGTON, U.S. EIA[15]

Retail electric utilities are required to report quarterly on the number and capacity of systems installed under the state's net energy metering (NEM) law.[16] The estimated solar PV installed according to the most recent report in June 2023 was just under 400 MW alternating current.[17] Two utilities account for half of the NEM solar capacity: Seattle City Light with 48 MW and Puget Sound Energy (PSE) with over 155 MW. Since NEM is only required for systems up to 100 kW, there are additional distributed solar projects that are not accounted for in the reporting.

WASEIA provides the following data that help characterize the solar industry in Washington:
- Solar prices have fallen 43% over the past 10 years.[18]

---

[14] WASEIA. Washington Solar. https://www.seia.org/state-solar-policy/washington-solar
[15] EIA. Electricity Data Browser. https://www.eia.gov/electricity/data/browser/
[16] WSU Energy Program. Net Metering. https://www.energy.wsu.edu/RenewableEnergy/NetMetering.aspx
[17] WSU Energy Program. Net Metering Reporting.
https://www.energy.wsu.edu/documents/Net%20Metering%20Reporting_20230630.pdf
[18] WASEIA. Washington Solar. https://www.seia.org/state-solar-policy/washington-solar

- There have been 58,000 residential solar installations as of September 2023.[19]
- There are 151 solar companies operating in Washington and 4,107 solar jobs in the state.

According to EnergySage, an online marketplace funded by the U.S. Department of Energy (DOE), the average solar panel cost in Washington is $3.08 per watt, which is slightly below the average national cost. With a rooftop solar system size of 5 kW, installations can cost between $13,090 and $17,710.[20] Due to low electricity rates, the average solar payback time in Washington is estimated to be 16.31 years.[21]

## 1.1.4  Policy-supported Deployment of Distributed and Residential-serving Solar

Washington has a long history of supporting solar adoption by residential customers. In 2005, the state created a production incentive for homeowners and other eligible customers who install renewable energy, including solar PV. In 2017, the original program was replaced by the Renewable Energy System Incentive Program (RESIP).[22] RESIP pays participants up to 50% of the system price over eight years. As of 2021, RESIP incentives were fully subscribed and the program was closed to new entrants. RESIP supported over 7,000 residential solar installations, equating to over 60 MW of capacity.[23]

While this program was successful at deploying solar and increasing jobs, it largely did not broaden low-income participation in accessing rooftop solar.[24] From the legislative report: "No specific income data was collected on participants in the New Program. However, since the average Residential-scale system cost is nearly $30,000, and no specific subsidized funding was provided for low income participants, it is unlikely that the Residential scale incentive resulted in significant penetration into low to low-moderate income communities."[25]

There is also a long history of community solar projects in Washington. In fact, the City of Ellensburg, Washington is credited with installing the first community solar project in the country in 2006.[26] The original state solar production incentive program was modified in 2009 to include funding for community solar projects. Later, RESIP also provided incentives for both community solar projects that were less than or equal to 1 MW, as well as for commercial shared solar projects that were 1 to 5 MW.[27] In 2019, Commerce received funding that enabled it to support $3.7 million in grants for nine community solar energy projects across the state. The projects equal 2.8 MW of solar and result in a total $6.1 million reduction in the energy burden

[19] WASEIA. Updates to the House Environment and Energy Committee. September 21, 2023. https://app.leg.wa.gov/committeeschedules/Home/Documents/31381#
[20] EnergySage. Washington Solar Panel Cost. https://www.energysage.com/local-data/solar-panel-cost/wa/ Accessed September 11, 2023.
[21] Id.
[22] WSU. RESIP. https://www.energy.wsu.edu/RenewableEnergy/RenewableEnergySystemIncentiveProgram.aspx
[23] Id.
[24] WA JLARC. 21-06 Final Report: Credit for Renewable Energy Program Payments. https://leg.wa.gov/jlarc/taxReports/2021/renewable/f_3/default.html
[25] WSU Energy Program, RESIP Legislative Report: October 2019. https://www.energy.wsu.edu/documents/Renewable%20Energy%20System%20Incentive%20Program%20Report-Oct2019.pdf
[26] Stoel Rives. Community Solar Beginnings. https://www.stoel.com/legal-insights/special-reports/the-rise-of-community-solar/sections/the-rise-of-community-solar
[27] Renewable Energy System Incentive Program Report-Oct2019.pdf (wsu.edu)

of low-income households and nonprofits serving low-income communities over 25 years.[28] These grants helped explore new pathways for community solar to serve households.

Overall, from 2010 to 2020, 90 community solar projects were built in the state, equaling 6.5 MW and serving over 7,000 participants.[29] The community solar projects that were built through RESIP included many that were utility-owned and administered, as well as several projects at affordable housing properties. While there was no requirement to include income-qualified households in these projects, several of RESIP-supported community solar projects voluntarily provided some utility-administered bill credits or other benefits to income-qualified households. A legislative report on the program concluded, "The single-family market appears to have momentum beyond the incentives, but neither type of Community Solar does. There is a need for successful models for Community Solar that can develop in a post-incentive environment."[30]

In 2022, recognizing a need to serve more income-qualified residents through community solar, the State Legislature created a new low-income community solar program. As stated by the Legislature, "stimulating local investment in community solar projects continues to be an important part of a state energy strategy… The legislature finds that although previous community solar programs were successful in stimulating these benefits, the programs failed to provide an adequate framework for low-income participation and long-term market certainty."[31] In the first year of implementation, 7 projects have already been pre-certified by the program.[32]

**Tribal Deployment:** Tribes and tribal entities are eligible applicants for energy programs deployed by Commerce. Additionally, Commerce has been developing programs and other resources to increase the number and size of projects funded on tribal lands. For example, within state clean energy funds, there is a set-aside for tribal projects, and there are specific planning, pre-development, and technical assistance grants for tribes. While we do not have comprehensive data on tribal solar deployment, these projects are examples of Washington funding to tribes:

- $98,673 to the Lummi Nation to install 72 kW at the Lummi Tribal School
- $593,898 to the Lummi Nation for the installation of two solar PV systems on the Lummi Nation Administration Building and HeadStart Building, with a total capacity of 384 kW.
- $1,200,731 to Cowlitz Indian Tribe for a resilient energy and emergency power project.
- $500,000 to Yakama Power, for the design, purchase, and installation of an electricity grids control system, creating workforce training opportunities for the Yakama Nation.
- $20 million in the state's FY24-25 capital budget for the Yakama Nation to deploy solar over irrigation canals.

Throughout Washington, tribes are leading on clean energy deployment. For example, Spokane Housing Authorities' Children of the Sun Initiative Solar Initiative deployed 650 kW of solar for

---

[28] Clean Energy Fund Solar Deployment Grant Program. https://www.commerce.wa.gov/growing-the-economy/energy/clean-energy-fund/clean-energy-fund-solar-program/

[29] WSU Energy Program Presentation to House Energy and Environment Committee. September 21, 2023. https://app.leg.wa.gov/committeeschedules/Home/Documents/31381?/House/31642/09-18-2023/10-01-2023/Schedule///Bill/#

[30] *Id* at 6.

[31] SSHB 1814 (2022). https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bills/House%20Passed%20Legislature/1814-S2.PL.pdf?q=20220701103859

[32] WSU Community Solar Expansion Program. As of September 2023. https://www.energy.wsu.edu/RenewableEnergy/CommunitySolarProgram.aspx

the benefit of tribal members.[33] Commerce's proposed Tribal Solar Program will align with and bolster tribal leadership and innovation in harnessing clean energy for their communities.

## 1.1.5  Target Market for Washington's Solar for All

Washington's Solar for All application focuses on bringing the benefits of solar to low-income households and environmental justice communities in the state.

**Definition of Low Income**: In Washington, "low-income" for the purposes of energy policy is defined as a household with an income that does not exceed the higher of 80% of area median income (AMI) or 200% of federal poverty level (FPL), adjusted for household size.[34] This definition aligns well with EPA's definition of geographically dispersed low-income households. Our definition of "affordable housing" is also generally aligned with EPA's definition.

**Defining Environmental Justice Communities**: To assist with implementing our state's environmental justice requirements, Washington has developed a mapping tool, the Washington Environmental Health Disparities (EHD) Map[35], which provides nuanced information on different environmental health indicators across the state and identifies which communities are most impacted by environmental health disparities. State agencies are strongly encouraged to use the EHD map as a resource when implementing the HEAL Act, including making funding decisions and prioritizing outreach. The EHD map weighs environmental exposures such as diesel emissions and ozone with proximity to hazardous waste sites, and measures such as education levels, race, employment, poverty rates, birth weights, and cardiovascular disease deaths to develop an overall environmental health disparities score for each census tract in the state. Higher scores correspond to higher rates of environmental health disparities; a score of 9 or 10 indicates that a census tract is "highly impacted". Much of the environmental exposure data is sourced from EPA's EJScreen tool.[36]

While there is significant overlap between census tracts with high environmental health disparities scores and those that are marked as disadvantaged in the CEJST tool, there is not complete agreement. For example, CEJST marks all tribal lands as disadvantaged, while the EHD tool does not unless these lands also have other significant environmental health disparities. However, other Washington laws require that tribal lands be a focus of clean energy transition laws. A University of Washington researcher has compared these maps[37] and found that another example is that more census tracts in southern parts of Puget Sound are considered highly impacted by the EHD map but not disadvantaged by CEJST; the difference may be because of weighting for various environmental factors between the two tools, different datasets or weighting of datasets, or different metrics that go into one tool versus another (e.g. the EHD map

---

[33] Spokane Indian Housing Authority. Children of the Sun Initiative.
https://www.energy.gov/sites/prod/files/2020/12/f81/Abrahamson-Spokane-COSSI.pdf
[34] Washington State. RCW 19.405.020. https://app.leg.wa.gov/RCW/default.aspx?cite=19.405.020
[35] Washington State Department of Health. Washington Environmental Health Disparities Map.
https://doh.wa.gov/data-and-statistical-reports/washington-tracking-network-wtn/washington-environmental-health-disparities-map
[36] Washington State Department of Health. Washington Environmental Health Disparities Map, Technical Report.
Updated July 2022. https://deohs.washington.edu/sites/default/files/2022-08/311-011-EHD-Map-Tech-Report.pdf
[37] Min, Esther. Washington vs. Federal Environmental Justice Mapping Tools.
https://storymaps.arcgis.com/stories/2fa34bcc4a7443e380b0eccc0a41c2c9

weighs race as a factor because "[a]n individual's race/ethnicity is a primary social determinant of health and is strongly associated with exposure to environmental pollutants"[38]).

**Washington's Proposal for Solar for All Targeted Populations:**
- For WASH and BEAMS, participants and those who benefit from the funds must be identified as low-income, as defined by EPA
- For ESSAP, subscribers must be low-income, as defined by EPA, or be a member of a federally recognized tribe.
- The Tribal Solar Program will define eligibility as part of program design, but we anticipate that any household on tribal lands will qualify for this program.
- For WASH, BEAMS, and ESSAP, households located in environmental justice communities will be further prioritized:
  - Commerce will prioritize outreach and investment in communities that are facing higher environmental health burdens as identified by the EHD map and those who live on tribal lands and are members of federally recognized tribes.
  - Examples of how we may prioritize these communities include: funding set-asides in each program offering specific to these communities; targeted outreach to these communities; prioritizing implementation of these projects first, and providing support to assist these communities with process and substance questions.

In reporting to EPA, Commerce will explain the overlap between census tracts that benefit from projects under Washington's Solar for All program and those marked as disadvantaged through CEJST data and with EJScreen data. Because of the 26% set-aside for the tribal solar program and the substantial overlap between CEJST disadvantaged communities and highly impacted communities in Washington, Commerce is confident that our overall Solar for All approach will ensure that at least 40% of the overall benefits of this program will flow to disadvantaged communities as defined by CEJST and required by the Justice40 initiative, while also meeting the intent and direction of our state's climate and environmental justice laws.

## 1.1.6  Measuring Success
Washington's Solar for All program aims to achieve or contribute to three primary goals:
1. Ensure equitable access to the benefits of solar
2. Provide tangible climate benefits
3. Continue building a robust solar ecosystem.

Table 2 shows the metrics that Commerce plans to use to track overall success on these goals. In addition, Commerce will track output metrics, which will help measure progress and gaps for the programs. The tribal program will develop metrics of success as part of the co-design process with tribal governments. We look forward to working with EPA to refine metrics of success. Attachment E, in addition to the detailed budget, includes a tab that shows the math behind how some of these targets were calculated.

---

[38] Washington State Department of Health. Washington Environmental Health Disparities Map, Technical Report. Updated July 2022. https://deohs.washington.edu/sites/default/files/2022-08/311-011-EHD-Map-Tech-Report.pdf

TABLE 2. PROPOSED OUTCOMES AND OUTPUT METRICS

| | Ensure equitable access to the benefits of solar | Provide tangible climate benefits | Continue building a robust solar ecosystem |
|---|---|---|---|
| **Overarching outcomes** These are metrics we will track to understand our overall progress on meeting our goals. We are looking for directional progress on these to help inform our success. | • Progress on achieving energy burden reduction goals under CETA <br> • Qualified households benefiting from programs <br> • Number of solar jobs created | • Progress toward Washington climate goals <br> • Overall greenhouse gas emissions reduced as a result of Solar for All funding <br> • Overall new clean energy generation as a result of Solar for All funding | • Continued growth in number of solar jobs <br> • Broad investment in distributed solar |
| **WASH** | • Number of households participating in program *(At least 3,000)* <br> • Number of households receiving storage *(1,000)* <br> • Capacity of Storage deployed *(5,000 kW and 12,500 kWh)* <br> • Average amount of household utility bill savings by project and by geography *(At least 20%, goal of 50%)* | • Solar capacity installed *(15 MW)* <br> • Greenhouse gas emissions reduced *(By Year 5, 20,000 tons $CO_2$ annual reduction, with approximately 10% of this achieved in Y2, and adding approx. 30% more each subsequent year)* | • Number of job trainees working on program projects *(At least 1 per associated project)* <br> • Number of community-based organizations engaged by Solar for All *(At least 40)* |
| **ESSAP** | • Number of households receiving benefits *(4,000 minimum)* <br> • Average amount of household utility bill savings per household *(At least 20%, goal of 50%)* | • Solar capacity installed *(over 36 MW, at least 32 MW of which will support qualified subscribers)* <br> • Greenhouse gas emissions reduced *(By Year 5, 47,000 tons $CO_2$ annual reduction, with approximately 25% achieved in Y2, 50% in Y3, 75% in Y4)* | |
| **BEAMS** | • Number of households receiving benefits *(1,200 minimum)* <br> • Average amount of household utility bill savings or equivalent per household *(At least 20%, goal of 50%)* | • Solar capacity installed *(at least 6 MW)* <br> • Greenhouse gas emissions reduced *(By Year 5, 5,000 tons $CO_2$ annual reduction, with approximately 50% in Y3 and each RLF cycle taking 2 years)* | |
| **Tribal Solar Program** | To be developed / For budgeting purposes, assuming 2,000 households served, 10 MW of solar, and 12,500 kWh/5000 kW of storage | | |

Other metrics we are interested in tracking, but have not yet developed targets for include:

WASH outputs
- Number of households switching from fossil fuel appliances to efficient electric uses
- Number of households receiving enabling upgrades, by type of upgrade
- Energy avoided due to efficiency measures
- Average wage of Solar for All installers

ESSAP outputs:
- Number of projects created under this program by location
- Number of utilities voluntarily offering on bill crediting for tenants of affordable housing

BEAMS outputs:
- Number of properties participating in program
- Number of properties receiving enabling upgrades, by type of upgrade
- Number of properties receiving storage benefits
- Number of projects able to leverage federal ITC
- Types of benefits received by tenants (financial and in-kind)
- Energy avoided due to efficiency measures
- Amount of private financing contributed to Solar for All projects

Commerce anticipates reviewing progress on determined metrics at least quarterly.

## 1.2 Meaningful Benefits Plan

Washington's Solar for All program will ensure that benefits from this program flow to communities most in need and in alignment with Justice40 principles, Washington's laws related to environmental justice, and program guidance for Solar for All.

### 1.2.1 Financial and Equivalent Benefits of Washington Solar for All

Washington's Solar for All program will ensure financial benefits flow to targeted communities. We will target a goal of 50% bill savings for all households participating, with a minimum of 20% bills savings. More detail on average residential bills is found in Section 1.1.1.

#### Washington Affordable Solar Homes (WASH)

Through WASH, Commerce will offer grants that support enabling upgrades such as roof repair and will fully cover the cost of a rooftop solar installation for income-qualified homeowners. We plan to offer a standard 5 kW installation per household, but we will work with our vendors to support slightly larger system sizes in the unlikely event that this is necessary to achieve 20% bill savings. We will reserve 20% of the program budget for enabling upgrades. We anticipate serving at least 3,000 households with this funding. Based on our analysis, a 5 kW system should provide at least a 20% bill savings benefit for some households, but closer to 50% bill savings for most participants.

In addition, a subset of WASH participants who experience frequent, impactful outages would be eligible to receive a no-cost energy storage installation of 5 kW and 12.5 kWh. WASH vendors would be tasked with working with these participants to explain and enroll them in any available utility demand response programs that could result in greater bill savings by discharging their battery at times when it could benefit the grid.

To ensure Washington is providing benefits to income-qualified households in perpetuity, we will focus our WASH program on homes that are owned and occupied by income-qualified households. Our reasons for this program choice are threefold:

1. Washington has a sizable number of income-qualified households who own their own home: 36.7% of Washington households that are 80% AMI or below and 31.2% of Washington households that are 200% of FPL or below are owners of single family homes.[39]

2. Focusing this program offering on income-qualified homeowners avoids any need to pursue affordability covenants or other mechanisms to ensure renters are income-qualified and that the addition of solar does not result in a rent increase. The ESSAP offering supports solar benefits for renters.

3. If the homeowner eventually sells their home, this improvement would count as wealth accrual to the income-qualified seller as the value of the solar installation would be accounted for in the price of the home.[40] In addition, by reducing energy burden, we aim to support residents in maintaining housing security and stability.

In implementation, Commerce will prioritize homes that are located in communities that are identified as "highly impacted" on Washington's EHD map (see Section 1.1.5). During program design, we also plan to collaborate with nonprofit organizations that construct houses for income-qualified homeowners to ensure new homeowners can benefit from this program.

### Expanded Shared Solar Access Program (ESSAP)

As mentioned in Section 1.1.4, the 2022 Community Solar Expansion Program,[41] administered by the WSU Energy Program, provides up to $100 million in incentives through 2033 to fund solar and battery energy storage installations. Incentives are only paid after project completion, so participants must be able to finance the upfront solar and storage installation costs. To qualify for incentives, projects must have (1) at least two low-income subscribers or one low-income service provider subscriber, and (2) have a direct current nameplate capacity between 12 kW and 199 kW in size. In the first year since program launch, seven projects have been pre-certified for incentives, obligating about $1.7 million of the available $100 million.[42] Each project will support low-income service providers; to date, no projects have been pre-certified that provide bill credits to multiple, low-income residential customers.

Commerce proposes to use Solar for All funding to create an income-qualified community solar program, ESSAP, that will be complementary to but distinct from the Community Solar Expansion Program. Projects can be 200 kW to 1 MW and will be required to have a minimum of 20 income-qualified residential subscribers per 200 kW.

Subscribers will be required to meet EPA's income qualification criteria at the time of entering the program or be a member of a federally recognized tribe in Washington; through program design, Commerce will determine any further eligible entities that represent these groups. To

---

[39] Statistics derived from U.S. DOE's Low-Income Energy Affordability Data Tool.
https://www.energy.gov/scep/slsc/lead-tool
[40] LBNL. Team of Appraisers Across Six States Find Home Buyers Will Pay Premium for Solar Homes.
https://newscenter.lbl.gov/2015/11/12/premium-for-solar-homes/
[41] WSU Energy Program. Community Solar Program.
https://www.energy.wsu.edu/RenewableEnergy/CommunitySolarProgram.aspx
[42] From conversations with WSU Energy Program Staff. As of September 21, 2023.

maximize funding towards energy burden reduction, ESSAP will not fund battery storage installation, but may support enabling upgrades of up to $1 million. As with WASH, Commerce will prioritize projects sited in and benefiting residents of communities identified as "highly impacted" on Washington's EHD map (see Section 1.1.5).

Given the lack of virtual net metering (VNEM) policy in Washington, as discussed further in Section 1.3.5, it is unlikely that the Community Solar Expansion Program or ESSAP will enable third party ownership of projects by communities absent any legislative change. To enable tenants to directly benefit from solar at affordable multifamily properties, Commerce would require utilities to demonstrate progress in making on-bill crediting available to tenants of affordable multifamily housing properties with onsite solar in their service territory in order to access ESSAP. ESSAP funding should incentivize utilities to voluntarily provide a bill crediting mechanism for multiple residential meters at affordable multifamily housing with onsite solar. Commerce will work with utilities in the Program Planning Year to develop the billing principles, which will help address a key regulatory barrier, discussed further in Section 1.3.5. Finally, as further discussed with BEAMS, onsite solar installations at multifamily affordable housing may not result in sufficient bill savings for all tenants in a building, so a portion of ESSAP funding will be held to supplement these projects as needed.

Commerce intends to administer ESSAP as a grant program and reimburse project costs based on achievement of milestones. At least 85% of the value of solar energy generated must be passed on to income-qualified residential customers. The remaining 15% can be provided to a single host customer to incentivize site access or to a common area meter of a multifamily building.

During program implementation, Commerce will collaborate with each participating utility to determine their average residential electric bill and will work with community solar project administrators to ensure that each income-qualified residential subscriber receives a bill credit equal to at least 20% of that amount, with a target of a 50% bill credit to maximize energy burden reduction. Based on Commerce's calculations of various utilities' compensation rates for community solar, each subscriber will receive an approximately 8 kW share of solar.

### Bridging Energy Affordability through Multifamily Solar (BEAMS)
For affordable multifamily housing properties, BEAMS will develop two loan products:

- First will be a no-interest forgivable loan for enabling upgrades. We have heard from affordable housing stakeholders that this kind of product (versus a grant) allows for more flexible stacking of capital. Some properties may be able to address the issue of upfront capital to finance a solar installation, but lack funding for the necessary precursors such as roof repair. Through this forgivable loan product, Solar for All funds could be deployed to remove key barriers to accessing the state's existing community solar program.
- Second, for properties that are unable to finance the upfront cost of a solar and storage installation, BEAMS will provide a no or low-interest revolving loan that can provide bridge financing to support access to the WSU Community Solar Expansion program and the federal ITC. Through this program offering, Washington anticipates serving at least 1,200 households over the Solar for All period of performance, leveraging funding that may not have otherwise been accessed, and providing for a sustainable source of future funding through a revolving loan fund. This household assumption is based on at least

600 households being served in the first two years of implementation, and the funding cycling back into the revolving loan fund to be leveraged again in the next two years.

These financing products will be available to both new and existing multifamily affordable housing properties. We will align the definition of multifamily affordable housing with EPA's definition. To participate, projects would need to commit to passing on at least 85% of the value of solar energy generated to tenants, preferably as electric bill credits if the building is individually metered, or through a tangible benefit to tenants that is documented.

In addition, Commerce will leverage ESSAP in two unique ways:

1. As discussed in the section on ESSAP, electric utilities administering ESSAP projects will be required to make on-bill crediting available to tenants of affordable housing properties with onsite solar. This requirement will allow affordable multifamily housing properties whose electric utility is participating in ESSAP to have savings go directly on tenants' electric bills to reduce their energy burden.
2. One concern that was raised during public comment on Commerce's straw proposal was whether onsite solar installations at affordable housing properties could generate sufficient electricity to achieve 20% bill savings for all tenants. This question is valid especially for urban properties that may be particularly dense. Commerce is mindful of this situation and, as discussed in the previous section, will work to ensure ESSAP community solar shares can be reserved for affordable housing properties that appear unlikely to achieve the requisite level of 20% average bill savings for all tenants.

Implementation of BEAMS may be through a contracted vendor with experience with these financing products and with affordable housing; an agreement with another state entity with similar experience; or a Washington-based Green Bank that may form over the next year.

## Tribal Solar Program

Twenty-nine federally recognized tribes are located in Washington, and Washington's State Energy Strategy includes as an equitable policy design principle the need to "increase resilience and energy sovereignty for Tribes and energy independence for vulnerable communities."[43] Washington's Solar for All proposal commits a substantial part of its budget (26% of the total requested funding) to develop a Tribal Solar Program through formal consultation with tribal governments. This program will use an allocation formula, co-developed with tribes, to provide direct support for tribal solar projects. The program will center principles of tribal sovereignty and self-determination and will enable tribes to design and implement their own projects.

The allocation of funds will be based on conversations with federally recognized tribal governments and will build off work underway at Commerce and with tribal governments to develop a similar, innovative formula to administer a new state-funded Tribal Climate Resiliency Grant. The formula looks beyond metrics like land base and population and instead includes information on ceded lands. These design criteria have been directly informed by tribal coordination, and Commerce will continue to find ways to tailor the allocation formula for the new Tribal Solar Program.

---

[43] Washington 2021 State Energy Strategy. Page 27. https://www.commerce.wa.gov/wp-content/uploads/2020/12/Washington-2021-State-Energy-Strategy-December-2020.pdf

In addition to allocating funds for tribes, administrative and technical assistance funds for this program will support tribal specific needs, including:

- Travel funds to ensure in person conversations in Indian country
- Funds for a tribal mediation pool to support contract negotiation and other legal needs
- Hiring of staff with tribal expertise and funding for further professional development

While this program will be co-created with tribal governments, Commerce will ensure that the final program complies with other EPA guidance for the Solar for All program, including maximizing household savings and focusing the funds on solar deployment and benefits. As discussed in Section 1.1.5, tribal lands are considered to be "disadvantaged" under the CEJST tool, so we anticipate that the participant eligibility for these programs will comply with Solar for All principles and ensure progress on meeting both Justice40 principles and our state's environmental justice laws.

## 1.2.2 Ensuring Equitable Access to Solar

Washington's proposal provides the majority (96%) of the Solar for All funds as direct financial assistance to participants and utilizes state funds to support technical assistance like project planning and pre-development. The Solar for All funded financial assistance will be used to:

- Install energy efficiency measures and support other enabling upgrades on single family homes and multifamily properties
- Purchase solar PV that is installed directly on homes or multifamily buildings
- Purchase solar PV that is deployed as community solar projects either on multifamily buildings or in low-conflict siting areas (see Section 1.3.4)
- Other direct financial assistance as developed with tribal governments

More information on our approach is in Sections 1.4 and 1.5. By focusing the vast majority of funds on direct financial assistance, we can increase the number of households benefiting from solar. To address what we know about the barriers for income-qualified households in accessing solar, we have focused deployment of financial assistance to support upfront purchases of equipment and support financial products. By leveraging other state funds for technical assistance, we can broaden the reach of Solar for All dollars and reach more households.

## 1.2.3 Energy Resilience and Grid Benefits

Washington's clean energy laws and goals recognized that resiliency is a key part of the clean energy transition. For example, the CCA requires that investments from cap and invest proceeds must result in long-term environmental benefits and increased resilience to the impacts of climate change, and the Washington State Energy Strategy highlights the importance of energy resilience as part of energy policy and planning and recommends "[e]nhancing resilience in rural Washington by strengthening the electric grid to deliver clean energy."[44]

Commerce is a key agency in implementing clean energy resilience. The agency has an Energy Resilience and Emergency Management Office in its Energy Division, which supports capacity-building in the energy resilience space. Working with community, local and Tribal governments, and utility providers, this office focuses on community planning, addressing equity issues for vulnerable populations, and bringing needed resources and technical assistance to historically

---

[44] Commerce. Washington 2021 State Energy Strategy. Page 17. https://www.commerce.wa.gov/wp-content/uploads/2020/12/Washington-2021-State-Energy-Strategy-December-2020.pdf

disadvantaged communities in Washington. Commerce also receives $37 million in state funds annually to support our new Solar plus Storage for Resilient Communities Program which is focused on enabling community buildings to provide supportive services during electricity outages. As part of the state's Solar plus Storage program, we provide no cost planning assistance and feasibility studies which can be a model for our technical assistance programming under Solar for All.[45] In addition, Commerce received $23.4 million from the Grid Resilience Formula grants under the Infrastructure Investment and Jobs Act (IIJA). The funds will implement a program that includes meeting objectives and tracking metrics that support a resilient clean energy transition; several align well with our proposed outcomes for Solar for All.

In conjunction with this policy direction and ongoing programming, Washington's Solar for All program will also integrate resilience into its offerings:

- The WASH program will reduce the resiliency of a subset of participating income-qualified homeowners who experience frequent, impactful outages by allowing them to receive a no-cost energy storage installation. Commerce will work with stakeholders to determine the appropriate metric to be eligible for an energy storage installation. For example, eligibility could be homeowners who have experienced at least two outages a year in the past two years, with an outage defined as an event that was caused by something other than intentional acts by a non-utility entity. Some of our utilities have also expressed a desire for battery storage to be added to residential solar installations in locations on the grid where integration would otherwise require expensive upgrades. We are considering this suggestion and will continue to discuss and refine with stakeholders. Our initial estimates to develop the budget for this application are that one-third of participating households (approximately 1,000) would receive a 5 kW, 12.5 kWh energy storage installation, but this estimate will be refined.
- The BEAMS program will allow multifamily affordable housing properties to leverage existing incentives for solar and storage that may not have otherwise been accessible due to upfront capital constraints. We will use our state funds for community solar technical assistance to support affordable multifamily properties in designing paired solar and storage installations that can enhance resilience for all tenants.
- The Tribal Solar Program will be co-designed with tribal governments. We know energy resilience is important to many tribes, especially those located in rural and remote areas of the state. The benefits of resilience will be a key conversation in program design.

### 1.2.4 Long-Lasting Benefits for Households and Communities

In addition to the immediate bill savings that solar will provide households, Washington's Solar for All program will provide long-lasting benefits to ensure that wealth accrues to households:

- Income-qualified homeowners who participate in WASH will receive no-cost solar installations and in some cases, needed enabling upgrades and storage installations. This can help build equity in the home, as well as contribute to lowering energy burden and longer term financial stability for a household. As discussed in Section 1.3.2, we will pursue opportunities, such as third party ownership, to leverage the ITC for these households which may have little to no tax liability, but we will ensure that the systems convert to full ownership to the homeowner within 5 years.

---

[45] Commerce. Solar plus Storage for Resilient Communities. https://www.commerce.wa.gov/growing-the-economy/energy/solar-plus-storage/

- ESSAP and BEAMS will similarly provide benefits in lowering energy burden, which contributes to longer term housing stability and ability to support other important household needs. For multifamily affordable housing properties that participate, the new installations could also contribute to lower operating costs for these organizations.
- For tribal members, all programs in the Solar for All proposal will prioritize funding for tribes in keeping with the mandates from state climate, energy, and environmental justice laws. The program will center principles of tribal sovereignty and self-determination.

## 1.2.5  Job and Economic Benefits for Washington

Washington has been a national leader in incorporating workforce requirements into clean energy laws and programs, and Washington's Solar for All program will benefit from Washington's laws and programs that incentivize workforce development in the clean energy transition. In 2019, Washington passed CETA, which notably took the first national steps to support equitable workforce development in tandem with clean energy development and tax policy. Under this law, a purchaser, as well as the consumer, who have paid tax on machinery and equipment used to generate clean electricity are entitled to an exemption of state and local taxes between 50% and 100%, with higher amounts for projects developed under a community workforce agreement or project labor agreement.

State law further incentivizes labor and workforce provisions specific to solar. Through 2029, the purchaser of eligible equipment for solar energy systems can receive a tax exemption, if the project is certified to meet certain labor, procurement, and community workforce standards:
- 100% of the state/local sales and use tax for systems smaller than 100 kW; and
- 50% of the state/local sales and use tax for systems between 100 kW and 500 kW.[46]

These incentives were the first instance of the state tying tax policy, clean energy transition, and support for good paying jobs, and have since been used as a template in other state legislation.

These financial incentives support and enhance a growing clean energy workforce, but we know we have more to do to ensure we are taking tangible steps to get new people into clean energy careers. Initial responses to our Solar for All Request for Information provided some specific insight into the barriers facing those wanting to enter the solar workforce - for example, one respondent noted barriers beyond just the financial costs of training, such as transport and childcare, that make it hard to recruit prospective workers. As Washington further designs our Solar for All programs, we will discuss with our partners and stakeholders ways to ensure a growing workforce to support project deployment.

In tandem, the whole of Washington is taking a close look at clean energy workforce development. In 2023, Washington's legislature[47] directed the state's Workforce Training and Education Coordinating Board (Workforce Board) to support an equitable clean energy transition by identifying future industry occupations and skill needs, the existing transferrable skills to meet those needs, and the gaps that need to be addressed. The Workforce board must forecast these needs and make recommendations to the Governor and Legislature, with a first report due

---

[46] Washington State Department of Labor & Industries. Labor Standards Certification for Tax Incentives. https://lni.wa.gov/licensing-permits/electrical/electrical-installation-information/clean-energy-projects#tax-deferrals-solar-clean-tech
[47] Washington State Legislature. HB 1176. https://app.leg.wa.gov/billsummary?BillNumber=1176&Year=2023&Initiative=false

November 1, 2023, and every two years thereafter. These reports will be informed by a Clean Energy Technology Workforce Advisory Committee that is chaired by representatives of both the labor and the business community. This work will provide more understanding of ways to provide additional training opportunities for clean energy jobs and mitigate the impact to workers and business as climate change policies are enacted, and will inform programs like Washington's Solar for All and its Climate Pollution Reduction Grant Program.

We will also look to local and nonprofit initiatives on workforce for best practices and to leverage these programs. For example, King County, which is home to almost 1/3 of Washingtonians, is currently expanding its green jobs initiatives by supporting minority- and women-owned contractors and through work-based learning programs (Attachment K).

**Washington's Solar for All Program:** Commerce is highly motivated for these programs to create jobs and careers that are high quality and sustaining to support a diverse clean energy workforce in Washington.

For the WASH program, Commerce would competitively select multiple vendors to conduct outreach and support income-qualified homeowners throughout the solar installation process. Given the geographic diversity of the state, Commerce would seek to contract with multiple entities (estimating 5 vendors) with deep community relationships and with different regional foci. Solar installers, community based organizations, local government coalitions, weatherization providers, nonprofits, and others would all be eligible to be individual vendors or part of vendor teams. Commerce would prioritize applications that provide complete wraparound services that focus on educating and empowering participating homeowners while completing a quality solar installation with optional enabling upgrades and battery energy storage. Commerce is also eager to consider vendors who are able to leverage the ITC while ensuring robust consumer protections. Commerce has agency-wide contracting goals: 10% participation by minority-owned businesses, 6% by women-owned businesses, 5% by veteran-owned businesses, and 5% by small businesses.

In addition, for WASH, Commerce will require workforce development and training opportunities to be provided in every Solar for All funded single family home installation. Commerce proposes to require that every vendor or its subcontractor who performs installations through WASH hire at least one student or graduate of a job training organization for at least one full paid day of work on each installation performed or in a support role on the solar installation (e.g., project design, engineering, project coordination). To ensure that the program reaches income-qualified homeowners throughout the state, Commerce will assess during program design whether any exemptions to this workforce training requirement are warranted (e.g., in rural locations with no suitable job training program). Vendors will be encouraged to provide these job opportunities to low-income and frontline communities; many of the areas considered disadvantaged by CEJST or "highly impacted" by Washington's EHD Map are also historically underutilized business zones as defined by the U.S. Small Business Administration.

For ESSAP and BEAMS, Commerce will prioritize projects for funding that create workforce development opportunities, such as projects that hire individuals associated with job training organizations or that promote hiring in the areas mentioned above. Commerce is also eager to support workforce training opportunities through the Tribal Solar Program.

As Commerce implements Solar for All, we will continue to leverage existing partnerships with clean energy workforce entities in the state to support outreach and recruitment for workforce development initiatives. These partnerships include:

- Nonprofits that advocate for clean energy and equitable and just workforce development
- Entities that run training programs in the clean energy fields and have a pipeline of qualified jobseekers
- Labor unions with apprenticeship programs
- Colleges and Tribal colleges with clean energy workforce programs
- Associations and organizations representing the solar industry
- State agencies that intersect with workforce development, including the Employment Security Department, which helps connect jobseekers to new careers; the Department of Labor & Industries, which regulates and enforces labor standards; and the Workforce Board, mentioned above.

## 1.3 Distributed Solar Market Strategy

This section details Washington's policy and market structures and how our Solar for All proposal will address barriers to deploying distributed solar.

### 1.3.1 Working in the Ecosystem of Net Metering Policies

In Washington, our historically low electric rates have served Washingtonians well, but they also mean that it can take a long time for a homeowner to recoup investments in distributed solar. The average payback period for net metered solar in Washington is 16.31 years[48], compared to less than 6 years in California. Several PUDs in the state have such low electric rates that distributed generation customers may not break even on their investment within the 25 year system warranty. Importantly these estimates are for systems participating in full retail rate net energy metering (NEM), a regime which Washington utilities are beginning to transition away from.

Washington's NEM law was established in 1998 and has been revised a number of times. It applies to systems 100 kW and smaller. Since its inception, the law has included a threshold for full retail rate NEM, after which a utility may elect to propose an alternate compensation regime for the exported energy from distributed generation. The most recent change in 2019 modified the threshold to be June 30, 2029 or when a utility's cumulative generating capacity of NEM equals 4% of the utility's peak demand during 1996, whichever occurs first.[49] Utilities must report quarterly on their progress toward the NEM threshold.[50] As of the most recent reporting, five utilities had reached the NEM threshold[51] and two of the five had implemented alternate compensation rates that would provide less than full retail rate and in some cases, would not allow banking of credits month to month. Other utilities are nearing their NEM threshold, including regulated utilities PacifiCorp and PSE, and have signaled a desire to modify their NEM tariff, such as requiring customers with distributed generation to be on a time of use rate.[52] It is likely that, absent any legislative change, future distributed generation compensation will vary

---

[48] EnergySage. Washington Solar Panel Cost. https://www.energysage.com/local-data/solar-panel-cost/wa/ Accessed September 11, 2023.

[49] Net Metering of Electricity RCW 80.60. https://app.leg.wa.gov/RCW/default.aspx?cite=80.60

[50] WSU Energy Program. Net Metering. https://www.energy.wsu.edu/RenewableEnergy/NetMetering.aspx

[51] Id.

[52] Utilities and Transportation Commission. PacifiCorp General Rate Case: Direct Testimony of Robert M. Meredith at 41. https://apiproxy.utc.wa.gov/cases/GetDocument?docID=1606&year=2023&docketNumber=230172

significantly across the state. As demonstrated in the state's 2021 Fuel Mix Report, the generation mix between IOUs and COUs is fairly distinct, with IOUs currently more reliant on fossil fuel resources and COUs benefiting from greater access to federal hydropower resources.[53] This means that utilities see distinctly different clean energy value from distributed generation. In addition, for COUs, the local landscape and politics inform their electric rates and program offerings.

**Washington's Solar for All Program:** Washington's Solar for All Program will ensure that households see immediate benefits and savings on their electric bill. During the program planning year, we will work with as many electric utilities as possible to determine the average residential utility bill in their service territories and discuss how any pending changes to their NEM tariffs could impact energy burden reduction for customers participating in Solar for All.

WASH will fully cover the costs of rooftop solar installations so that income-qualified homeowners do not have to pay out of pocket and worry about financing. A household's bill saving under WASH will necessarily depend on their electric utility and the distributed generation tariffs available at the time of interconnection. To streamline program implementation, we plan to offer a standard 5 kW installation per household. EIA's Residential Energy Consumption Survey estimates the average Washington household uses 10,990 kWh annually. Using a conservative capacity factor for Washington of 14%, a 5 kW system is anticipated to produce 6,132 kWh per year. Our analysis of the two NEM successor tariffs currently approved in Washington indicates that a 5 kW rooftop system for the WASH Program will provide a residential household annual bill savings of at least 20%. For electric utilities still offering full retail rate NEM, customers could save closer to 50%.We will work with the vendors to support systems slightly larger than 5 kW in the unlikely event it is necessary to achieve the minimum 20% bill savings. In addition, energy efficiency measures can be implemented in households that need it, helping reduce overall household energy consumption and maximize the value of solar and its bill savings benefits.

Multifamily housing properties can participate in NEM as long as the solar system installed is less than or equal to 100 kW and it serves a single meter. To participate in ESSAP, we will require utilities to begin to enable all tenants of an affordable multifamily property with onsite solar to receive bill credits. While Commerce will work with partner utilities to encourage maximizing bill savings for these income-qualified tenants, the compensation rate provided will be determined by the utility's regulatory authority once the utility files an applicable tariff.

## 1.3.2  Third Party Ownership

There have been some examples of third-party ownership models in the state for other behind-the-meter technologies (e.g., a water heater rental program). However, there are not any currently operational third party ownership programs to Commerce's knowledge. Recently, PSE proposed a rooftop solar leasing program: PSE would have paid customers to lease their rooftop space but the electricity produced would be owned by the utility. Stakeholders expressed concern that this

---

[53] Commerce. Fuel Mix Disclosure and Greenhouse Gas Content Reports. https://www.commerce.wa.gov/growing-the-economy/energy/fuel-mix-disclosure/

program would not provide "a pathway for accumulation of wealth and increased property value."[54] PSE was directed to replace this proposed program with a rent to own offering.[55]

**Washington's Solar for All Program:** For the WASH program, part of Commerce's competitive procurement will include a desire to work with vendors that can leverage the ITC for households which may have little to no tax liability, so long as each vendor has a robust consumer protection plan in place that protects the homeowner first and foremost. This monetization of the ITC could occur through third party ownership of these rooftop systems, but Commerce would require the system to convert to full ownership by the homeowner within 5 years. Commerce is holding funding to fully fund rooftop solar installations, in case we are not presented with a proposal to monetize the ITC that meets our robust standards for consumer protection. If vendors can monetize the ITC while prioritizing the interest of income-qualified homeowners, we will be able to serve additional households through the WASH program.

### 1.3.3 Barriers to Interconnection

Interconnection rules and timelines vary by utility in Washington, meaning that different processes exist for similar projects based on where they are located. For IOUs, interconnection standards are overseen by the state's public utilities commission.[56] Interconnection rules for COUs are, however, overseen at the local level. The good news is that Washington's solar industry is adept at navigating these different frameworks as exemplified by the over 400 MW of small distributed solar already installed in Washington.

**Washington's Solar for All Program:** Commerce plans to tap into this existing expertise by working with multiple vendors to deploy single family solar under WASH. For ESSAP, under the current regulatory landscape, utilities will most likely own or contract with the vast majority of community solar projects, so interconnecting these projects should be fairly seamless. Since solar deployment is largely lacking in the affordable multifamily housing sector, this is where there may be the most challenges for interconnecting projects. For BEAMS, Commerce plans to use some of our state funding for low-income community solar as technical assistance to support projects from conception through interconnection. Commerce will seek to gather lessons learned on interconnecting solar on multifamily buildings to promote statewide process improvements.

Another interconnection barrier is for consumer-owned utilities who are customers of BPA, the federal agency that markets power from power facilities in the Northwest including 31 federal dams. Commerce's ESSAP has been designed to align with the proposed new long term contract rules between BPA and its customers. As proposed, BPA's new contract will allow COUs to develop distributed generating resources up to 1 MW without having to dedicate them in their contract.[57] We are planning on a 1 MW project size limit for ESSAP to ensure funding can be

---

[54] UTC Filing UE-210795. 10/10/2022 Testimony and Exhibits of Elaine Hart, Mariel Thuraisingham, Lauren McCloy, Roger Colton and Scott Reeves. SR-1T at 46: 17-18 and 46:23-
47:1.https://apiproxy.utc.wa.gov/cases/GetDocument?docID=513&year=2021&docketNumber=210795
[55] UTC Filing UE - 210795.6/6/2023. Final Order 08 Approving Clean Energy Implementation Plan Subject to Conditions. Appendix A.
https://apiproxy.utc.wa.gov/cases/GetDocument?docID=1015&year=2021&docketNumber=210795
[56] Washington Administrative Code Chapter 480-108 WAC: Electric Companies - Interconnection with Electric Generators. https://app.leg.wa.gov/WAC/default.aspx?cite=480-108
[57] "Bonneville will raise the minimum threshold required for a customer's non-federal resource to be included and tracked in the power sales contracts from a nameplate of 200 kilowatts to 1 MW. There will be no limit to the

used to support all income-qualified customers statewide, regardless of who their electric utility is. Commerce will use our state-funded technical assistance to support COUs who are interested in launching community solar projects to align with BPA's 2028 contract date. In addition, Commerce plans to allow transmission metering costs to be eligible for ESSAP funding since BPA will still require projects over 200 kW to have revenue grade meters.

## 1.3.4 Supporting Washington's RPS and 100% Clean Laws

Washington's state Energy Independence Act, passed by voter initiative in 2006, set the renewable portfolio standard (RPS) for the state, which is currently 15% for all electric utilities that serve more than 25,000 customers. CETA, passed in 2019, commits Washington to an electricity supply free of greenhouse gas emissions by 2045 (see Section 1.1.2). Under these laws, the market for renewable energy has grown tremendously, but there have also been some community concerns about where and how to site new projects, especially when there are competing land uses.

**Washington's Solar for All Program:** Our proposal will help utilities meet these standards by reducing utility electric load through behind the meter solar projects and supporting larger community solar projects. In addition, Solar for All directly aligns with the legislative intent in CETA to "demonstrate progress toward making energy assistance funds available to low-income households",[58] as further discussed in Section 1.1.2. To align with Washington policy direction around siting, Commerce will require that all ESSAP projects be located on structures, existing impervious surfaces, landfills, brownfields, previously developed sites, irrigation canals and ponds, stormwater collection ponds, industrial areas, Washington Department of Natural Resources (DNR) properties identified for solar development[59], and areas identified as least conflict in WSU's solar mapping process.[60]

## 1.3.5 Community Solar Regulatory Frameworks

Currently in Washington, there is no mechanism for enabling individually metered tenants of multifamily buildings to see electric bill reductions through onsite solar. The challenges this creates was demonstrated by one of the low-income community solar projects Commerce funded in 2019.[61] The project deployed rooftop solar at an affordable housing property in Western Washington that serves income eligible apartments which were originally all individually metered. To enable the property to benefit from NEM, the building was converted to a master-metered property in the process of installing solar. All bill credits are now allocated to a single meter. The housing provider pays the property's electric bill and uses an algorithm to charge each tenant for their estimated electricity costs based on the number of bedrooms in their apartment. While this project eliminated each tenant's basic charge and provided energy savings

---

number of non-federal resources a customer can add under 1 MW". Draft Bonneville Power Administration Provider of Choice Policy July 2023 at 12. https://www.bpa.gov/-/media/Aep/power/provider-of-choice/draft-provider-of-choice-policy.pdf

[58] RCW 19.405.120 Energy assistance for low-income households. https://app.leg.wa.gov/RCW/default.aspx?cite=19.405.120

[59] Washington State Department of Natural Resources. Clean Energy. https://www.dnr.wa.gov/programsservices/product-sales-and-leasing/energy

[60] WSU Energy Program. Least Conflict Solar Siting. https://www.energy.wsu.edu/RenewableEnergy/LeastConflictSolarSiting.aspx

[61] Commerce. Solar Deployment Grant Program. https://www.commerce.wa.gov/growing-the-economy/energy/clean-energy-fund/clean-energy-fund-solar-program/

that all tenants benefit from, it has tradeoffs since residents no longer have control over their own electric bill and cannot access opportunities to further reduce their energy costs through energy efficiency, time of use rates, demand response programs, and other conservation measures.

There is also no requirement in Washington that utilities enable households to participate in offsite solar projects through virtual net energy metering (VNEM). Most of the community solar projects in the state that have provided on-bill credits are operated by the applicable utility and these utilities' on-bill crediting system is not available to projects that are not directly managed by the relevant utility. In addition, the majority of these projects have been one-off efforts as a result of incentives - most utilities in Washington do not have ongoing community solar programs. Similar to NEM, utilities that do offer community solar options have different rate structures. Absent any legislative change, it is expected that utilities will largely administer the ESSAP projects to enable bill crediting to eligible customers. While Commerce will work with partner utilities to encourage maximizing bill savings for these households, the value of community solar bill credits will vary by utility.

**Washington's Solar for All Program:** Commerce will require all electric utilities participating in ESSAP to make on-bill crediting available to tenants of affordable housing properties with onsite solar, but the credit rate will be determined by the utility and their regulatory authority. In addition to making funding available for community solar projects, Commerce may allow utilities to access funding for enabling upgrades to support billing system updates directly tied to supporting Solar for All projects. Leveraging Solar for All funding and partnering with Washington's electric utilities, Commerce's proposal enables a new group of income qualified households to experience direct energy burden reduction through onsite solar.

In implementing ESSAP, we will need to navigate the different rates that utilities have adopted or will adopt for community solar projects. Using several electric utilities' community solar tariffs, we have determined that the community solar subscription size that an income-qualified household would need to receive in order to experience at least a 20% electric bill reduction is 8 kW. Commerce will work to right size the standard 8 kW subscription if needed to ensure that participating households receive at least a 20% bill reduction.

**Future Changes:** For the past several years, there have been legislative proposals to mandate that utilities create VNEM tariffs; a similar proposal is anticipated to be introduced in the 2024 legislative session.[62] Commerce's Solar for All proposal is grounded in the current regulatory landscape so we can ensure income-qualified households benefit from reduced energy burden absent any statutory changes. If a VNEM policy is enacted, the new policy would bolster Commerce's approach by enabling third party development and ownership of these projects.

## 1.3.6  Ensuring Broad Reach

Washington's utility landscape is complex with over 60 electric utilities and a mixture of COUs and IOUs. Only the IOUs are regulated centrally at the state level. As a result, all but three of Washington's electric utilities are regulated at the local level, which makes their rate structures, resource preferences, and approaches to equity informed by the local landscape and politics.

---

[62] Washington House Committee on Environment & Energy - 9/21/2023 Committee Meeting. Community Solar Policy Summary. https://app.leg.lihe.gov/committeeschedules/Home/Documents/31381?/House/31642/09-19-2023/09-21-2023/Schedule///Bill/#

**Washington's Solar for All Program:** We have developed our proposal to be nimble and flexible to ensure we can support income-qualified customers statewide. While the bill reductions that participants will experience will vary according to the rates of their applicable utility, we will ensure that every participant experiences a minimum bill reduction of 20% through continuous monitoring and improvement. We will also use our state funded technical assistance to reach portions of the state where participation and uptake in any of the program offerings may at first be delayed. We are proposing a program that includes four program offerings to address the different realities that limit access to solar based upon where people live.

## 1.4 Financial Assistance Strategy

Washington's Solar for All proposal focuses the vast majority of the requested funding on providing direct financial assistance to households. We heard during our initial outreach that it will be important that our Solar for All Program mitigate the burden of any upfront costs for low-income households and for developers and owners of affordable housing, and that we should provide an opportunity for renters to benefit from solar. Our Solar for All proposal proactively addresses these comments and provides meaningful direct financial assistance to participants.

**WASH**: Past incentive programs in Washington have paid incentives for solar after installation and often only partially.[63] To fully serve low-income households, we know we need to cover as much of the costs as possible. Our WASH program will fully cover the costs of a 5 kW onsite solar system and 20% of the budget for the program to support associated enabling upgrades. This direct financial assistance will result in a 20%-50% electric bill savings for households. However, we will work with our vendors to support slightly larger solar system sizes in the unlikely event that this is necessary to achieve 20% bill savings. Assumptions:

- Each homeowner receives a 5 kW solar installation; installation cost of $3.50 per watt.[64]
- At least 3,000 homes participate for a minimum solar deployment of 15 MW.
- Approximately one-third of participants (1,000) receive battery energy storage. Each of these homes receive a 5 kW, 12.5 kWh battery (Estimated cost: $19,000[65]).
- 20% of the budget is held for enabling upgrades, such as roof repair and efficiency measures not covered by other programs.

Washington's Solar for All program will not work in a silo – coordinating marketing, outreach, and implementation of this program with other related home energy programs is key to ensure that we are maximizing benefits to income qualified households. Commerce's Energy Division also operates the state's weatherization program, and will be implementing the IRA Home Energy Rebate programs, so we will be in discussions with teams at Commerce as program design commences to align implementation to ensure households are receiving as much benefit as possible through all of these programs. Commerce will also prioritize vendor applications that seek to leverage existing energy assistance support such as weatherization and LIHEAP as a pipeline for identifying income-qualified homeowners.

---

[63] Washington's previous solar program, RESIP, paid participants up to 50% of the system price over 8 years

[64] This installation price is at the high end of the average cost per watt estimated by EnergySage for Washington. It is also higher than NREL's conservative estimates for residential PV in the latest version of the Annual Technology Baseline. Our cost estimate also does not include leveraging the ITC so it should be a fairly conservative estimate.

[65] NREL estimates the cost of a 5 kW 12.5 kWh battery to be $18,791 in 2022.
https://atb.nrel.gov/electricity/2022/residential_battery_storage

**ESSAP**: Our ESSAP community solar program will serve renters and other households without access to sufficient rooftop space to benefit from onsite solar. At least 85% of the value of solar energy generated must be passed on to income-qualified residential customers. Commerce will work with community solar project administrators to ensure that each income-qualified residential subscriber receives a bill credit equal to at least 20% of the average electric bill in the applicable utility's service territory, with a target of a 50% bill credit to maximize energy burden reduction. Based on Commerce's calculations, each subscriber will receive an approximately 8 kW share of solar. Although we assume that many of these larger projects will not be installed on existing buildings, $1,000,000 of the budget for the program (approximately 1%) will be held to support associated enabling upgrades. Projects can be between 200 kW and 1 MW.
Assumptions:

- Targeting an installation cost of $2.00 per watt.[66]
- Each households receives a 8 kW subscription.
- At least 85% of value of solar energy generated must be passed on to income qualified customers.
- 4,000 households participate for an estimated solar deployment of over 36 MW, approximately 32 MW of which will serve income qualified households.

**BEAMS**: Solar for All funds will be used to provide financial benefit to tenants through solar deployment. To participate, projects would need to provide benefits from the solar energy generated to tenants, preferably as electric bill credits if the building is individually metered, or through a tangible benefit to tenants as agreed upon during contract award. We heard during outreach for this application that requiring 100% of the value of solar to be passed on to tenants as direct benefit could be a deterrent to some properties participating; Commerce or our vendor will encourage properties to share as much of the benefits with tenants as possible during contract negotiations, but at least 85%.

The financial mechanism for this program would be two loan funds: (1) a no-interest forgivable loan for enabling upgrades and (2) a revolving loan fund for solar investment. To administer these loan funds with proper safeguards in place, Commerce would seek to contract with a vendor with suitable financing expertise through a competitive procurement process, with a state agency with appropriate experience with financing, or with a Washington Green Bank, if one is established during the program planning year. The selected implementer would preferably also have familiarity with the financial structures of the affordable housing sector to be able to navigate the needs of both new and existing properties. Assumptions:

- Targeting an installation cost of $2.50 per watt.[67]
- Each household is allocated 5 kW for parity with the WASH program.
- 1,200 households participate for an estimated solar deployment of 6 MW over 4 years.

---

[66] The Washington state legislature has established this as the target price for projects greater than 200 kW. RCW 82.16.183 at 11(a) https://app.leg.wa.gov/RCW/default.aspx?cite=82.16.183
[67] $2.25 per watt is the target price for projects under 200 kW for the existing Community Solar Expansion program but we acknowledge that installations at affordable housing properties may have additional complexity. RCW 82.16.183 at 11(a) https://app.leg.wa.gov/RCW/default.aspx?cite=82.16.183

The other competitions through the GGRF may be complementary to Washington's approach. As the winners of those competitions are announced, Commerce will coordinate as appropriate to ensure alignment between Solar for All deployment and clean energy financing products.

**Tribal Solar Program**: The specific details of this program will be co-designed with tribal governments, but at least 75% of the overall budget for this program will be direct financial assistance, in compliance with the Solar for All grant requirements.

## 1.5 Project-Deployment Technical Assistance Strategy

Deploying direct financial assistance will be a key part of our Solar for All program, but technical assistance will be needed to amplify its reach and support implementation of the program. We largely anticipate using existing programs funded by the state and administered by Commerce to support technical assistance as in-kind match, such as the $19.5 million in annual funding that Commerce has to support low-income community solar projects. Technical assistance will likely include up-front project design including site identification for community solar deployment and solar system sizing and design as well as other activities described below.

**Technical Assistance for a Skilled Workforce:** As discussed in [Section 1.2.5](), Commerce anticipates robust partnerships with other state agencies, boards, and outside entities that focus on workforce development to align our investments in developing a skilled solar workforce. Washington's Solar for All proposal will invest in a skilled workforce in a few ways:

1. For WASH, Commerce will require workforce development and training opportunities to be provided in every Solar for All funded single family home solar installation as described in [Section 1.2.5](). We anticipate that vendors will fold these costs into project deployment costs, as trainees will participate in installations and associated activities.
2. For ESSAP and BEAMS, Commerce will prioritize projects for funding that create workforce development opportunities, for example hiring individuals associated with job training organizations or that promote hiring in the areas mentioned above. These costs are built into the estimated project costs.
3. Through the Tribal Solar Program, it is anticipated that workforce development will be a prime program component. For example, tribal consultation may lead to this program investing a portion of the funding into solar workforce training for tribal members.
4. Invest staff time in consulting with workforce agencies and partners to promote these workforce training opportunities and identify other ways to enhance the solar workforce to support this program and the overall market.

**Technical assistance for interconnection challenges:** As a state with many different electric utilities, most of which that are regulated at the local level, interconnection standards vary widely. However, the solar industry has been able to ably adapt to these standards; Commerce plans to tap into this existing expertise by working with multiple vendors to deploy single family solar under WASH. For ESSAP, under the current regulatory landscape, utilities will most likely own or contract with the vast majority of community solar projects, so interconnecting these projects should be fairly seamless. For BEAMS, since solar deployment is largely lacking in the multifamily affordable housing sector, this is where there may be the most challenges for interconnecting projects. Commerce plans to use state funding for low-income community solar as technical assistance to support these projects from conception through interconnection.

**Technical assistance for installation-specific issues:** With an intent of deploying projects statewide and in many different communities, Commerce wants to ensure that our programs do not run into issues regarding siting, land use, permitting, building codes, or other installation-specific issues. To support these projects, Commerce will lean on existing resources:

- Project siting: We do not anticipate that ESSAP projects will run into siting issues, as we will require that they be located on previously developed sites and other locations as noted in Section 1.3.4. Commerce will continue to engage with state efforts to identify appropriate sites for solar that do not conflict with other uses.
- Permitting and land use: We do not anticipate significant permitting-related barriers for WASH implementation, as we expect to work with vendors who are adept at navigating solar permitting for single family homes. However, multifamily affordable housing may need more support navigating these issues. Commerce has $19.5 million in annual funding that accelerates solar and battery storage community solar projects serving low-income communities. The appropriations language provides that funding may be used for "planning and predevelopment work with vulnerable, highly impacted, and rural communities."[68] This funding will be leveraged to support early planning and design for affordable housing properties. It can also be utilized to support affordable housing properties that are master-metered and are looking to identify models for providing benefits to tenants through mechanisms other than via direct energy bill savings.
- Building codes: Any new multifamily affordable housing properties that participate in BEAMS may need support navigating the new energy code, currently set to take effect in March 2024. This code will require that new properties have a renewable energy generating system of at least 0.5 watt per square foot[69], with some exceptions. Commerce anticipates that Washington will pursue separate funding under the IRA to support code implementation (e.g., additional training), and will align those efforts with this program.[70]
- Inspection and quality control: We anticipate serving at least 3,000 households through WASH; to ensure projects are installed properly, we anticipate performing quality inspections for a percentage of projects, as discussed in Section 2.2.2. We will also develop a plan for any needed quality control at other projects funded by Solar for All.

## 1.6 Equitable Access and Meaningful Involvement Plan

Commerce is committed to an open and continued dialogue with communities and stakeholders on this Solar for All program. This approach will continue what was initiated this summer as Commerce began work on this application:

- Prior to the Solar for All RFA opening, we posted a Request for Information to help inform our approach. This RFI was open June 9-30, 2023 and received 77 responses.
- On August 22, 2023 we held a public webinar with 154 participants to present our draft Solar for All proposal and receive feedback. We also offered an online comment form as an alternate method to collect feedback. Approximately twenty comments were collected, either through the form, the email address, or directly communicated to staff.

---

[68] Making 2023-2025 fiscal biennium operating appropriations. Page 94.
https://app.leg.wa.gov/billsummary?BillNumber=5187&Year=2023&Initiative=false
[69] 2021 Washington State Energy Code at Section C411.1 On-site Renewable Energy
https://sbcc.wa.gov/sites/default/files/2023-05/2021_WSEC_C_2ndPrint_0518023.pdf
[70] DOE. Technical Assistance for the Adoption of Building Energy Codes. https://www.energy.gov/scep/technical-assistance-adoption-building-energy-codes

- In September 2023, we presented at an annual meeting of the Affiliated Tribes of the Northwest Indians (ATNI) to share initial ideas and tee-up future tribal consultation.
- We held follow-up conversations with stakeholders to clarify comments.

While we have attempted to be broad in our outreach, we know that only a few months of engagement on a program this large and complex is not sufficient and we likely did not hear from all voices and communities. In addition, our 2021 State Energy Strategy acknowledges that equity is not in and of itself assured through public meetings. Historically excluded voices must be intentionally sought out, respected, empowered, and privileged.

We are also directed by state law to center environmental justice in our engagement. The HEAL Act directs certain state agencies, including Commerce, to:
- Adopt a community engagement plan that centers on environmental justice.
- Incorporate environmental justice into our strategic plan.
- Develop a Tribal consultation framework.
- Prioritize environmental justice in budget and funding decisions.
- Conduct environmental justice assessments for Significant Agency Actions – Washington's Solar for All programs will all count as Significant Agency Actions.[71]

**Washington's Solar for All Program.** We will make full use of the program planning year and will be informed by the best practices in meaningful engagement, such as is suggested by Front & Centered in their Accelerating a Just Transition in Washington State[72] report and Washington's Environmental Justice Council's recently released Community Engagement Values and Guidance document.[73] During this year, we plan to:
- Develop a clear website for the program, written in an accessible and clear way.
- Develop or leverage an existing email listserv for those interested in the program.
- Make clear through all communication when there are decision points about the program, how people can provide feedback, and how decisions will be made.
- Leverage Commerce-led statewide meetings on energy assistance to present on our Solar for All proposal and opportunities to engage on implementation (beginning now).
- Hold a kick-off meeting for the public to detail plans and ways to get involved.
- Hold quarterly meetings on progress in implementing the program and any key design questions. Schedule meetings that can work for most interested stakeholders, including evenings or weekends. Offer virtual meetings and comment sessions. For any in-person meetings, schedule in locations accessible to communities highly prioritized for outreach.
- Attend community events and other events to solicit feedback on program design questions, including in-person engagement and tabling. Provide translated materials in languages most commonly found in the state. Attend existing venues and workgroups with an interest in equitable deployment of solar in the state, such as the state's Environmental Justice Council.

---

[71] Commerce. Environmental Justice. https://www.commerce.wa.gov/program-index/environmentaljustice/
[72] Front and Centered. Accelerating and Just Transition in Washington State: Climate Justice Strategies from the Frontlines. https://frontandcentered.org/wp-content/uploads/2020/10/Front-and-Centered-Accelerating-Just-Transition-WAState.pdf
[73] Community Engagement Values and Guidance document. Adopted by the Environmental Justice Council on August 25, 2023. https://waportal.org/sites/default/files/2023-09/EJ%20Council/2023.08.25%20ADOPTED%20Community-%20Engagement%20Guidance.pdf

- Engage deeply with organizations that may interact with eligible households on similar projects to align programming, messaging, and share best practices for outreach.
- Toward the end of our program planning year, develop an environmental justice assessment and solicit public feedback on it, as required by our state processes.

Some specific program design questions we are particularly eager to receive community feedback on include best ways to conduct outreach to households that have traditionally not participated in clean energy programs, and how best to prioritize targeted communities to ensure we are meeting our environmental justice goals and the intent of Justice40. Initial ideas for attracting households to these programs include:

- Selecting vendors with deep community connections that can be trusted partners.
- Working with community action agencies across the state, who often implement weatherization programs and other assistance programs.
- Sharing information with community-based organizations; working with these organizations to identify potential households.
- Encouraging utilities to share information on the program with energy burdened customers or those who contact them with high bill complaints.
- Co-deployment with the IRA Home Energy Rebates and weatherization programs.
- Communicate about available solar programs with customers who are already participating in other income-qualified programs, such as LIHEAP and SNAP.

How we qualify customers for the program will be another aspect that we fully develop during the program planning year. We will plan to leverage existing programs that establish income-eligibility such as income-verified federal assistance programs and utility assistance programs. Given the overlap between the IRA Home Energy Rebates program definition of low-income and Solar for All's definitions, as well as the need to co-deploy these programs to maximize benefits to households, we anticipate aligning eligibility requirements and processes between these two programs. Self-attestation is allowable under the IRA Home Energy Rebates program, but only with 50% verification, so at this time, we do not anticipate allowing many, if any, households to self-verify into the WASH program. We will refine these requirements through the Solar for All program planning year and through the IRA Home Energy Rebates development, which is on a slightly faster timeline. Particularly for the ESSAP program, we will work during program design to find the balance between program rigor and ease of applying.

Once the program is fully underway after the program planning year, Commerce is committed to regular report-outs on implementation, soliciting feedback on possible program changes or additions. We will work with partners and vendors to ensure that program offerings under Solar for All are reaching households statewide and make iterative adjustments to improve accessibility of the program. To maintain a sustaining program after the grant period of performance, communities across Washington will need to understand the value of Solar for All, so engagement is a key piece of our program.

**Washington's Solar for All Tribal Consultation and Engagement:** We are proposing a specific Tribal Solar Program that will be co-designed with tribal governments; tribal engagement will be well informed by Commerce's existing tribal engagement and consultation policies. In addition, under the HEAL Act, Commerce is required to develop a tribal consultation framework, conduct consultation on actions that affect tribes' rights and interests in their tribal lands, and assess environmental benefits and harms of all program implementation activities.

To ensure that our engagement is aligned with statewide best practices, Commerce will work with our Office of Tribal Relations and with the Governor's Office of Indian Affairs, who are also supporting the development of other IRA programs, including the Climate Pollution Reduction grant. Commerce can also use existing tribal climate action plans to support objectives and outcomes, including the Columbia River Inter-Tribal Fish Commission's (CRITFC) Energy Vision[74], Spokane Tribe's Climate action plan[75], Makah Tribe's renewable energy plan[76] and climate resilience plan[77] and Quinault Indian Nation's climate resilience plan[78].

Commerce plans to coordinate with an expansive group of tribal entities and resource groups to support program design and marketing, including but not limited to:

- Commerce's Tribal Advisory Committee (COMTAC), a Commerce-convened committee
- Affiliated Tribes of Northwest Indians (ATNI) represents over 50 Northwest tribal governments. Commerce regularly attends ATNI events to engage with members.
- Upper Columbia United Tribes (UCUT), whose members include Confederated Tribes of the Colville Reservation, Spokane Tribe of Indians, and Kalispel Tribe of Indians.
- Northwest Indian College (NWIC) is a public tribal land-grant community college in Bellingham, WA and is the only accredited tribal college serving reservation communities of Washington, Oregon, and Idaho. NWIC has launched a solar energy training program to support growth of renewable energy workforce among tribes.
- Environmental Protection Agency Region 10 Thriving Communities Technical Assistance Center (TCTAC) Program at the University of Washington.[79]
- Tribal and Tribal-Serving Community Development Finance Institutions (CDFIs).
- Tribal planning groups and program implementers such as the South Puget Intertribal Planning Agency and Small Tribes Organization of Western Washington.

Commerce notes that five Washington-area tribes have submitted a Solar for All notice of intent: Nisqually Indian Tribe, Lummi Nation, Nez Perce Tribe[80], Makah Tribe, and Confederated Tribes and Bands of the Yakama Nation – as well as ATNI.[81] We are in the process of connecting with these tribes and tribal entities to hear more about their Solar for All proposals.

## 1.7 Program Planning Timeline and Workplan Narrative
As detailed in the above sections and in Attachment D, Commerce intends to make full use of the Program Planning Year (PPY) to design and refine details of the Solar for All program. The

---

[74] CRITFC. Energy Vision for the Columbia River Basin. https://critfc.org/energy-vision/

[75] Spokane Tribe of Indians. Sustainable Community Master Plan. https://spokanetribe.com/wp-content/uploads/2020/03/FINAL_2015_SCMP.pdf

[76] Makah Indian Tribe. Comprehensive Renewable Energy Feasibility Study for the Makah Indian Tribe. https://www.osti.gov/biblio/850362

[77] Makah Tribe's Resilience, Adaptation, and Mitigation Planning. https://www.energy.gov/indianenergy/makah-tribe-2017-project

[78] DOE. "DOE Assists Quinault Indian Nation with Plans for a Climate-Resilient Community" https://www.energy.gov/indianenergy/articles/doe-assists-quinault-indian-nation-plans-climate-resilient-community

[79] University of Washington Center for Environmental Health Equity. https://deohs.washington.edu/cehe/

[80] Nez Perce Tribe is federally recognized but is not currently located in Washington State. However, there are previously ceded lands in Washington, and the tribe has hunting rights within Washington.

[81] EPA. Solar for All Notices of Intent. https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all-notices-intent-tribal-governments#wa

focus of the PPY will be on: hiring staff, running competitive procurement for vendors, conducting stakeholder outreach to further define details of the program, including metrics; conducting formal consultation with tribal governments for our Tribal Solar Program; and substantial outreach and marketing to ensure that communities are aware of the programs as they launch. We will use the program planning year to make any adjustments to our approach based on any legislative changes that occur in early 2024 and to incorporate relevant guidance from EPA regarding Build America, Buy America and the Davis-Bacon Act. Throughout program rollout, Commerce will be nimble, adaptive, and responsive in our approach. As detailed in Attachment D, many of the PPY activities will inform a robust Program Plan that will be the implementation guidebook for our Solar for All program.

Beginning in budget year two, Washington will fully launch its Solar for All offerings. Keeping the public and interested stakeholders up to date will be a continuing key activity. For each of the program offerings, we plan to develop a program landing webpage that will be regularly updated with metrics and program information. For WASH, this will include contact information for selected vendors so that households who are interested in participating can be put in touch with the appropriate entity. For ESSAP, we will develop a dashboard indicating the status of allocated and available funds and how qualified customers can sign up for a community solar subscription. For BEAMS, we will leverage contacts developed through state-funded community solar technical assistance to connect multifamily affordable housing owners and operators with our chosen vendor to begin the process of accessing financial support. For the Tribal Solar Program, we will develop communication materials that are in alignment with program design decisions made in consultation with tribal governments. In addition, during the implementation period, we will hold regular report-out meetings. These events could include public workshops (approximately twice a year), attending solar industry events to provide updates, and tribal-specific outreach events.

As discussed more in Section 2.3, we intend to conduct a mid-point evaluation of our program to help inform any changes needed; we estimate the timeline for this evaluation would happen after the first full year of implementation.

## 2. Program Administration Narrative

The Washington State Department of Commerce would be the prime recipient for funds for Washington's Solar for All Program: its mission is to strengthen communities in Washington. Commerce is the lead state agency charged with enhancing and promoting sustainable community and economic vitality in Washington. Commerce houses the Energy Division, which is Washington's State Energy Office. The Energy Division oversees the state's energy policy development and implements many clean energy grant programs, including state-funded solar incentive programs. The Energy Division works closely with the other policy divisions of Commerce: the Office of Economic Development and Competitiveness, the Community Services Division, the Housing Division, and the Local Government Division, as well as other state agencies, and the Governor's office.

Commerce has strong policies and procedures to efficiently and responsibly manage a grant such as Solar for All, and has the capabilities and expertise to achieve the grant's goals.

## 2.1 Budget Narrative

As an agency with the mission to *strengthen communities*, Commerce has the statutory role of developing programs and passing through funds to entities throughout the state, including local governments, tribes, community based organizations, and utilities, among others. Commerce has deep expertise in implementing a wide variety of both state and federal grant programs, as discussed in Section 3. Currently, Commerce disperses billions of dollars annually over more than one hundred different programs. The agency has relationships within communities as well as regional expertise to help ensure statewide accessibility to programs.

The staffing assumptions for the Solar for All program are designed to provide cross functional support as well as core expertise for each program, which supports a community of practice for all clean energy programs, including existing solar grant programs. Reporting, monitoring, and verification activities will be supported in a cross functional way. As Commerce continues to build overall capacity for equitable and accessible clean energy programs, there will be continued work across the agency to streamline our program administration. Commerce assumes that the bulk of program design work will happen in the first three years of the program.

Commerce will periodically evaluate these budget allocations and may adjust funding between programs depending on community feedback, deployment success of programs, and other factors. Based on our evaluation and success, Commerce could pursue agency request legislation and budget requests to continue support of the programs established under this proposal. Table 3 summarizes the direct financial assistance and direct and indirect costs for each program. Full details are available in Attachment E.

TABLE 3. BUDGET SUMMARY

| Program | Direct Financial Assistance | Direct Costs | | | Indirect (Federal Indirect Rate) | % of budget |
|---|---|---|---|---|---|---|
| | | Salary and Benefits | Travel, Other Direct | Consultant and Legal Services | | |
| 1. Single family program (WASH) | $94,383,000 | $1,171,845 | $151,069 | $250,000 | $385,537 | 38.5% |
| 2. Low-income community solar program (ESSAP) | $73,460,000 | $1,421,972 | $151,069 | $250,000 | $467,829 | 30.3% |
| 3. Multifamily program (BEAMS) | $11,000,000 | $1,717,845 | $151,069 | $250,000 | $385,537 | 5.2% |
| 4. Tribal solar program | $62,000,000 | $1,882,855 | $196,912 | $250,000 | $619,459 | 26% |
| TOTAL | $240,783,000 | $5,648,517 | $650,120 | $1,000,000 | $1,858,362 | |
| % of budget | 96% | 3% | | | 1% | |

Commerce will pass through 96% of the total funds as direct financial assistance, implemented as subgrants (in the case of ESSAP and the Tribal Solar Program) or through contracts with vendors (in the case of WASH and BEAMS). Workforce training opportunities enabled through WASH, ESSAP, and BEAMS projects are included in the estimated installed cost of projects. Since we have built our budget to fully cover rooftop solar and community solar installations in advance of leveraging the ITC, there should be sufficient funding to support robust technical assistance for workforce development. Of the remaining funds, 3% will go to Commerce to support internal administration and staffing, consultants, travel, supplies, and other direct costs and 1% will be used to cover Commerce's federal indirect rate.

Commerce has set aside $1,000,000 for consultant fees and legal fees for: tribal mediation to support contract negotiation and state attorney general time; translation services; program evaluation; and other services and program needs identified during the PPY.

As discussed in Section 1.5, technical assistance for projects will be supported through in kind match, as we draw upon state funded resources provided in our operating budget. Commerce has $19.5 million annually to support planning, pre-development, and deployment of low income community solar projects; we plan to use a portion of these funds to support Solar for All.

## 2.2 Fiscal Stewardship Plan

As a state executive-level agency tasked with implementing programs across the state of Washington with both state and federal funds, the Commerce is well-suited to effectively administer the Solar for All grant from EPA and be a strong fiscal steward for these funds.

### 2.2.1 Grant Management Experience

For the 2023-2025 budget biennium, Commerce is administering a budget of $7.9 billion, including a $5.1 billion in capital funding, one of the largest capital budgets amongst Washington state agencies. Much of the funding is provided to Commerce from the state legislature to support direct and competitive grants to communities across the state.

Commerce is governed by a set of accounting and budget policies that ensure efficiency in how the money flows into the agency, how it is documented and accounted for, and how reporting is conducted. These policies include ones around risk management, the federal award process, and cost allocation to programs. All of these policies are in alignment with Washington's Office of Financial Management (OFM), which sets the grounding accounting and administrative policy for the state,[82] and following Commerce's financial management policy, which among other requirements, directs Commerce to design financial policies, procedures, and practices "to be compliant with federal and state laws and regulations."

Commerce also has strong policies and procedures governing how it distributes money. As an entity that manages more than 100 programs, Commerce has robust processes around competitive procurement, which are in alignment with federal requirements. These policies include requirements around record retention, disclosure of conflicts of interest, and clear documentation around contracting decisions. Commerce also has internal audit and control

---

[82] Washington OFM. State Administrative and Accounting Manual. https://ofm.wa.gov/sites/default/files/public/legacy/policy/SAAM_22A-05_2022_07_01.pdf

policies in place to effectively manage risk and prevent waste, fraud, and abuse of funds, and to respond to any findings of our state's Single Audit.

Commerce has wide experience in receiving, managing, and reporting on federal grants and complying with the Code of Federal Regulations' requirements for administering federal grants. In addition to the awards noted in Attachment F, recent federal awards have included those from EPA (e.g., Climate Pollution Reduction formula planning grant), DOE (e.g., formula Weatherization Assistance Program funds), and the U.S. Economic Development Administration (e.g., COVID Safe Start projects).

Washington's Solar for All application does not propose any named subrecipients or named contractors. If awarded, Commerce will use its standard procedures to fairly select vendors and transparently name subrecipients; these procedures will be in alignment with federal rules. We do anticipate Solar for All funds will be deployed through tribal governments located in Washington, but details will be determined through consultation and transparently with EPA and the public.

## 2.2.2 Consumer Protections

Washington's Solar for All program must not only provide consumer benefits, but also proactively protect households, and so our program will include robust protections.

For solar installations, we know that there are already instances of problematic advertising and some households being overpromised benefits, such as unrealistic payback periods. Currently, Commerce is pursuing agency request legislation to establish new consumer protection measures for solar installations. This legislation would specifically address contracts between property owners and solar installers to ensure that the costs and savings of installing solar energy are accurately described, so that households can make informed decisions about solar. We are working with stakeholders to demonstrate the immediate need of this bill, particularly before we launch offerings to make solar more accessible to income-qualified customers.

Regardless if this bill passes the legislature in the 2024 session, we plan to incorporate similar requirements for our Solar for All offerings. We will require that WASH vendors:
- Communicate in clear, understandable language, including providing needed translation.
- Provide documentation that explains the value of the project; any long-term maintenance costs; any impact on the household's ability to sell or refinance their home; their consumer rights; and the contact information for the vendor to address any complaints.
- Submit to Commerce documents relating to interactions with households, and submit for preapproval any sales and marketing materials and training materials.
- Develop or have a meaningful process for handling consumer complaints and detail what interaction is needed from Commerce in the process.

Commerce reserves the right to terminate a contract with any vendor for cause, such as unreasonable number of complaints. If subcontractors are used in the Tribal Solar Program, we anticipate there will be similar provisions, depending on the specific design of the program.

For the ESSAP program, community solar companies are required by law to register with our state's public utilities commission, which has a formal process to register complaints.[83]

---

[83] Washington RCW 80.28.375. https://app.leg.wa.gov/RCW/default.aspx?cite=80.28.375

The BEAMS program will work directly with multifamily affordable housing properties, rather than with households. We anticipate that the vendor or organization we work with will have robust experience with financing of these kinds of properties. Though we do not anticipate that the financing products under BEAMS will result in long-term debt for a property, there will be some short-term debt for those awaiting incentives to be paid back; we will work with the vendor to develop terms that ensure that no property is overleveraged. Part of the BEAMS program includes capitalizing a revolving loan program; we will work with the vendor to ensure that program income that comes back into the fund is properly accounted for and moved back into the fund for further use. Commerce works closely with WSU Energy Program staff, which will aid our ability to ensure incentives are accurately estimated and are paid out timely.

### 2.2.3 Ensuring Benefits to Households

We are committed to maximizing benefits to households - our programs aim to provide a minimum of 20% utility bill savings for households, but is targeting at least 50% bill savings for participants. To ensure that these benefits are reaching households:

- For a percentage of WASH projects, Commerce will perform spot checks and quality install inspections to ensure that these projects are meeting the expected household savings predicted and that measures were installed as reported. For example, we may require that a vendor have the first three projects and 5% thereafter be inspected. These requirements will be developed as part of contract negotiations.
- Under ESSAP, we will require reports on subscribers' electric bills, scrubbed of any personally identifiable information, to ensure expected benefits are reaching subscribers.
- For BEAMS, we will require affordable housing owners to report on the savings and how it has been passed onto customers. We may perform site visits to review installations and any non-financial benefits that are provided.
- As described in Section 1.6, to verify income qualifications, we will leverage other assistance programs, and will align with other utility and state procedures.

## 2.3 Reporting Plan

Commerce is confident that we are able to fulfill the reporting requirements of EPA's Solar for All Program. Commerce staff, and specifically the Energy Division, have managed a number of federal grants, and have successfully met the reporting requirements and achieved outputs, as further detailed in Section 3 and Attachment F. As an executive level agency in the State of Washington, Commerce also participates in the state of Washington's Single Audit, which ensures that the state and its agencies are using federal funds appropriately and is in compliance with all applicable requirements and regulations of each grant award.[84]

**Staffing for Reporting**: For Solar for All, our staffing proposal includes sufficient staff for each program offering we are developing to request, track, and manage data for the program, and to develop reports for both EPA and for the general public. Each program offering includes dedicated staff to focus on monitoring, reporting, and compliance.

Once agreed upon metrics are developed during grant award negotiations, Commerce intends to convene a kick-off meeting with staff and subsequently hold regular internal team meetings. The kick-off meeting will include a review of the key pieces of data and metrics of success that we

---

[84] Washington Office of Financial Management. Single Audit Report. https://ofm.wa.gov/accounting/financial-audit-reports/single-audit-report

are tracking, as preliminarily proposed in Section 1.1.6, and a discussion to inform our collective understanding of how the needed data will be collected, calculated, and reported.

**Contractors:** Any contracts, vendors, or subrecipients selected by Commerce to assist with implementation will also include reporting requirements as part of their scopes of work. For example, for the WASH program, any vendor will be required to report on the following: address of project, means of income-qualification, energy efficiency measures installed, size of solar PV system, storage measures installed, and expected household savings as a result of the project. Vendors will maintain strict confidentiality of any and all sensitive and personally identifiable information. For a percentage of projects, Commerce plans to do spot checks and quality installation inspections to ensure that these projects are meeting the expected household savings predicted and that measures were installed as reported, as discussed in Section 2.2.3.

**Evaluation of the Program**: We intend to conduct a mid-point evaluation of our program to help inform any changes and adaptive management needed. We will discuss the specifics of when this program evaluation might occur with stakeholders during program design and with EPA, but our preliminary estimate is that this would happen after the first full year of implementation, to help inform the following three years and ensure ultimate impact. A key part of this evaluation will be review of available quantifiable data, as well as interviews with relevant stakeholders, to help inform whether the program is on track to meet its expected outputs, outcomes, and goals. Evaluation results will be reviewed with Commerce program staff and with any vendors as appropriate, to determine any needed changes in outreach to households, installation of measures, and any directional shifts Washington's program should take to stay on track toward success. Commerce is committed to proactively discussing preliminary and final evaluation findings with both Washington stakeholders and with EPA.

## 3. Programmatic Capability & Environmental Results Past Performance

Commerce would be the prime recipient for funds for this project. Commerce has a long and successful history of receiving and managing federal grants, meeting reporting requirements, and achieving goals. We are confident that Commerce and specifically its Energy Division will be able to successfully achieve the objective of Solar for All with our proposal, as well as provide reporting as required in a timely and efficient manner.

The Energy Division is the recipient of newly awarded funds under the Investment Infrastructure and Jobs Act (IIJA) and will be administering and reporting on these grants: the Grid Resilience Funding ($23.4 million for FY24-25) and the Energy Efficiency Community Block Grant ($2.27 million), in addition to its new allotment of State Energy Program and Weatherization Assistance Program funds awarded through IIJA. Under the IRA, Commerce is managing the EPA Climate Pollution Reduction planning grant on behalf of Washington. We also anticipate receiving future formula funding and potentially some competitive funding under IIJA and IRA.

Commerce's Energy Division will assemble a capable and qualified team to design, implement, and report on this grant. We anticipate developing a new team in our Energy Programs in Communities (EPIC) unit to manage and implement the Solar for All grant. This team will include staff with expertise in contract management, solar programming, community outreach and engagement, tribal consultation, financing, and federal grant compliance. This team will intersect with our Energy Policy Office, our Office of Tribal Relations, our central contracting

and internal controls office, our budget team, and our federal funding coordination team. The key staff who will provide strategic guidance and oversight for this program include:

**Jennifer Grove, Managing Director for EPIC**, has over two decades of expertise in executing and spearheading clean energy initiatives. She leads a team of 50+ staff, partnering with communities to design and implement energy and environmental justice programs. Her team administers a grant portfolio worth $500 million that includes federal, state, and private sector funding; these programs aim to reduce the energy burden for low-income households, promote access to clean energy technologies, and advance environmental justice. She is responsible for negotiating and overseeing the execution of all contracting, including multimillion dollar state contracts and complex federal awards. Ms. Grove was previously Executive Director of a nonprofit, Spark NW. During this time, she provided strategic direction and led coalitions to expand solar in the Pacific Northwest. During her tenure, Spark NW launched the first community solar projects in the nation and introduced a unique solar group purchase program, which sparked replication efforts nationwide. Ms. Grove contributes her expertise in national forums and has co-authored DOE publications on solar.

**Larry Mattson, Renewable Energy Grants Section Supervisor in EPIC**, is currently responsible for overseeing more than $100 million in annual funding for renewable energy grant programs for the state. Mr. Mattson has extensive experience with energy facility siting, land use and capital facility planning, contracting, and grants management through various positions held at the city, county, regional, and state levels, and in private industry.

**Jill Eikenhorst, Solar Section Supervisor in EPIC,** oversees a portfolio of solar grant programs funded at over $100 million. In her time at Commerce, she has developed multiple new clean energy grant programs and piloted new technical assistance offerings. In her previous role at Spark Northwest, she developed and managed utility grant programs for solar and EVs and managed solar and heat pump group purchase campaigns, including a groundbreaking solar program for low-income homeowners in partnership with a community land trust. She has a decade of experience managing grant-funded programs, including federal grants.

**Nora Hawkins, Senior Energy Policy Specialist in Energy Policy Office**, works on renewable energy and energy storage policy at Commerce. She has developed clean energy policies in several states and with the federal government. At the California Public Utilities Commission, she oversaw the Self-Generation Incentive Program and three programs focused on expanding solar access to environmental justice communities. Ms. Hawkins helped launch Washington, DC's Solar for All program to reduce the energy burden of low income residents through solar deployment. She is passionate about expanding access to solar and storage and finding ways to bring the benefits of clean energy to communities through innovative policy and implementation.

**Michelle Gladstone-Wade, Tribal Liaison in the Office of Tribal Relations**, leads agency efforts to develop and strengthen government-to-government relationships and tending to developing working relationships with tribal governments. Previously, she worked with the Washington State Department of Revenue building relationships with Tribes in the area of compact administration. Before state service, she spent 10 years at a Tribal College with experience spanning tribal economic development, tribal governance, business administration, and Indigenous research. Ms. Gladstone-Wade grew up surrounded by traditions old and new, and the teachings from her Suquamish Tribe and Shxwhá:y Village lineages have molded her character and values and serve as the foundation of her approach to tribal relations.

# Exhibit B

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Grant Agreement** | **GRANT NUMBER (FAIN):** 84093001<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/08/2024 |
| | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/11/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>X0078 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| COMMERCE, WASHINGTON STATE DEPARTMENT OF<br>P. O. BOX 42525<br>OLYMPIA, WA 98504-2525<br>EIN: 91-0823820 | COMMERCE, WASHINGTON STATE DEPARTMENT OF<br>1011 Plum St SE<br>P.O. Box 42525<br>Olympia, WA 98504-2525 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Nora Hawkins<br>P.O. Box 42525<br>OLYMPIA, WA 98504-2525<br>**Email:** Nora.hawkins@commerce.wa.gov<br>**Phone:** 360-819-3739 | Christine Clark<br>77 West Jackson Boulevard<br>Chicago, IL 60604<br>**Email:** Clark.Christine@epa.gov<br>**Phone:** 312-886-9749 | Shana Etheridge<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Etheridge.Shana@epa.gov<br>**Phone:** 202-564-9777 |

**PROJECT TITLE AND DESCRIPTION**

Washington State Solar for All "Note: A Special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE**<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41063 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

*__The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:__*

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

   Progress towards objectives on key performance metrics over the entire period of performance,

   Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

   Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

   Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

   Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

## 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

## 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees <u>General Term and Condition</u>, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements.* The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

#### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Amy Wheeless (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

_The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:_

### 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# Exhibit C

**I. Definitions** ................................................................................................................................... 3

    Air Pollutant ................................................................................................................................. 3

    Apprentice.................................................................................................................................... 3

    Eligible Recipient ......................................................................................................................... 3

    Eligible Zero-Emissions Technology ............................................................................................ 4

    EPA Award Official ....................................................................................................................... 4

    EPA Project Officer ...................................................................................................................... 4

    Financial Assistance .................................................................................................................... 5

    Greenhouse Gas .......................................................................................................................... 5

    Low-Income and Disadvantaged Communities .......................................................................... 5

    Participant Support Costs ............................................................................................................ 6

    Program Administration Activities .............................................................................................. 6

    Program Beneficiary.................................................................................................................... 6

    Program Income .......................................................................................................................... 6

    Project-Deployment Technical Assistance .................................................................................. 7

    Subaward ..................................................................................................................................... 7

    Subrecipient ................................................................................................................................ 7

**II. National Programmatic Terms and Conditions** ........................................................................... 8

    A. Performance Reporting .......................................................................................................... 8

    B. Cybersecurity Condition........................................................................................................ 10

    C. Competency Policy ................................................................................................................ 12

    D. Signage Required .................................................................................................................. 12

    E. In-Kind Assistance ................................................................................................................. 13

    F. Geospatial Data Standards .................................................................................................... 13

    G. Leveraging and Fund Raising ................................................................................................ 13

    H. Quality Assurance ................................................................................................................. 14

    I. Equipment Disposition ........................................................................................................... 15

    J. Real Property .......................................................................................................................... 15

    K. Program Income..................................................................................................................... 16

    L. Use of Logos .......................................................................................................................... 16

**III. Additional Programmatic Terms and Conditions** ..................................................................... 17

    A. Conflicts Among Authorities ................................................................................................. 17

    B. Specific Condition on Completion of EPA-approved Solar for All Workplan ....................... 17

    C. Solar for All Workplan ........................................................................................................... 18

    D. Allowable and Unallowable Activities .................................................................................. 18

    E. Foreign Entity of Concern ...................................................................................................... 19

    F. Low-Income and Disadvantaged Communities Expenditure Requirement ......................... 19

    G. Revolving Loan Fund Characterization ................................................................................. 19

    H. Subawards to For-Profit Entities........................................................................................... 20

    I. Subawards as Part of Revolving Loan Funds .......................................................................... 20

    J. Participant Support Costs ....................................................................................................... 21

    K. Labor and Equitable Workforce Development Requirements............................................... 22

    L. Build America, Buy America Act ............................................................................................ 25

    M. Consumer Protection Requirements .................................................................................... 26

    N. Financial Risk Management Requirements ........................................................................... 26

O. Historic Preservation ........................................................................................................... 27

P. Uniform Relocation Assistance and Real Property Acquisition Policies Act ....................... 28

Q. Other Federal Requirements ............................................................................................... 28

R. Remedies for Non-Compliance ............................................................................................ 29

S. Clarifications to EPA General Terms and Conditions .......................................................... 29

T. Period of Performance ........................................................................................................ 31

U. Closeout Agreement ........................................................................................................... 31

V. Accounting Principles .......................................................................................................... 34

W. Internal Controls ................................................................................................................ 34

X. Audits ................................................................................................................................... 34

Y. Annual Workshop ................................................................................................................ 35

Z. EPA Project Officer Oversight and Monitoring ................................................................... 35

AA. Compliant URL Links .......................................................................................................... 36

AB. Flow-Down Requirements .................................................................................................. 36

AC. Financial Assistance in the Form of Credit Enhancements ............................................... 36

AD. Additional Requirements for Eligible Nonprofit Recipients ............................................. 37

**IV. Administrative Terms and Conditions** ................................................................................ 39

A. General Terms and Conditions ............................................................................................ 39

B. Correspondence Condition .................................................................................................. 39

C. Intergovernmental Review Period ...................................................................................... 39

D. Pre-Award Costs .................................................................................................................. 40

E. Pre-Award Administrative Capability .................................................................................. 40

F. New Recipient Training Requirement .................................................................................. 40

## I. Definitions

**Air Pollutant:** "Air pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** "Apprentice" means an individual working on a project receiving financial assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Eligible Recipient:** Eligible recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible recipients that are states are identified on the Notice of Award as a "state" recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
    d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

Eligible recipients that are eligible nonprofit recipients are identified on the Notice of Award as a not for profit recipient type, excluding recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: "EPA Project Officer" means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, financial assistance means assistance that non-Federal entities receive or administer in the form of debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Financial assistance that generates program income such as debt and credit enhancements are considered financial products.

**Greenhouse Gas:** "Greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.
- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.
- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.
- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and

Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

**Participant Support Costs**: 2 CFR 200.1 defines participant support costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of participant support costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, participant support costs are primarily a form of financial assistance to projects which enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries. Program administration costs include procuring services and tools that support the recipient in program design (e.g., technical assistance from the United States Department of Energy (DOE) National Laboratories to support the recipient directly for program design). Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of [EPA's Guidance on Selected Items of Cost for Recipients](#), and fund raising, as described in Item 4 of [EPA's Guidance on Selected Items of Cost for Recipients](#).

**Program Beneficiary:** "Program beneficiary" means an entity (either an individual or an organization) that receives financial assistance or technical assistance from the recipient or a subrecipient as an end-user. Expenditures for financial assistance or technical assistance to program beneficiaries are in the form of participant support costs, as defined in 2 CFR 1500.1. A program beneficiary is distinct from a subrecipient, as defined in 2 CFR 200.1.

**Program Income:** Consistent with 2 CFR 200.1, "program income" means gross income earned by the recipient that is directly generated by a supported activity or earned as a result of the award. Under this assistance agreement, program income includes but is not limited to loan and other origination fees, interest payments, principal repayments, interest on cash deposits, revenue from asset sales and other sources of program income. Additionally, under this assistance agreement, refunds from cash reserves, release of loan loss reserves, and similar transactions are treated as program income under 2 CFR 1500.8(b), and terms and conditions applicable to program income apply to such transactions. Costs incidental to the generation of program income may be deducted from gross income to determine

program income as authorized by 2 CFR 1500.8(b). EPA-specific rules on program income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients).

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "project-deployment technical assistance" and is services and tools provided by recipients to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, working capital lines of credit to small businesses, and other services and tools that enable low-income and disadvantaged communities to deploy or benefit from rooftop residential solar, and residential-serving community solar. Please note: financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as "project-deployment technical assistance" for the purposes of this program.

**Subaward:** 2 CFR 200.1 defines a subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity." Since subawards may come in other forms (i.e., loans), the term "subgrant" denotes a subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, "subrecipient" means an entity that receives a subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a program beneficiary of such an award. A subrecipient is distinct from a program beneficiary, which is referenced in 2 CFR 1500.1.

## II. National Programmatic Terms and Conditions

### A. Performance Reporting
In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*
The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**2. Transaction-Level and Project-Level Data**

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

**B. Cybersecurity Condition**

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**C. Competency Policy**
In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**D. Signage Required**

**1. Signage Requirements**
a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be

placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events
The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

### E. In-Kind Assistance
This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

### F. Geospatial Data Standards
All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

### G. Leveraging and Fund Raising

#### 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

#### 2. Fund Raising
2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

**H. Quality Assurance**
Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

**1. Quality Management Plan (QMP)**
a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:
i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,
ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,
iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,
iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**
a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:
i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,
iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.
• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**I. Equipment Disposition**

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

**J. Real Property**
In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

**Disposition**
When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring

replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

**Recordation**

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

**K. Program Income**

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

**L. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. Additional Programmatic Terms and Conditions

### A. Conflicts Among Authorities
Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

### B. Specific Condition on Completion of EPA-approved Solar for All Workplan
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

- Revised SF-424A, Budget Information for Non-Construction Programs
- Indirect Rate Proposal or Agreement, if applicable
- Revised Budget Narrative
- Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**
**1. EPA-approved Solar for All Workplan**
The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**
The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**D. Allowable and Unallowable Activities**
The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to

support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

### F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

**H. Subawards to For-Profit Entities**

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

**I. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**
**1. Participant Support Cost Requirements**
The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.
B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

**2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs**
When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

**K. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.  Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and

Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

    **a. Solicitation and Contract Requirements:**
        **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
        **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
    **b. After Award of Contract:**
        **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
        **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
    b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. **Solicitation and Contract Requirements:**
   i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
   ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
b. **After Award of Contract:**
   i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
   ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**2. Mega Construction Project Program**

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

**3. Compliance with Federal Statutes and Regulations**
The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Safety and Health Administration.

**4. Free and Fair Choice to Join a Union**
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**5. Disadvantaged Business Enterprises**
The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

**L. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**M. Consumer Protection Requirements**

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

**N. Financial Risk Management Requirements**

**1. Cash Management Requirements**

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**2. Climate-Related Financial Risks**

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to apply [EPA's Final Financial Assistance Conflict of Interest Policy](#) to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-

sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

**P. Uniform Relocation Assistance and Real Property Acquisition Policies Act**
The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**Q. Other Federal Requirements**
In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

- **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.
- **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*
- **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.
- **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

**R. Remedies for Non-Compliance**
The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

**S. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

**1. Access to Records**
In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

**2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**3. Establishing and Managing Subawards**

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate
The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress
The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination
EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste,

fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout

Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

**1. Allowable Activities**
The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

**2. Reporting Requirements**
The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

**3. Low-Income and Disadvantaged Communities Expenditure Requirements**
The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

**4. Cash Management Requirements**
The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

**5. Remedies for Non-Compliance**
The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

**6. Suspension and Debarment**
The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

**7. Non-Discrimination**
The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:
- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

- Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;
- Executive Order 11988 (Floodplain Management) and Executive Order 14030 (Climate-Related Financial Risk), as specified in the Financial Risk Management Programmatic Term and Condition;
- Endangered Species Act, as specified in 50 CFR Part 402;
- Federal Funding Accountability and Transparency Act;
- Farmland Protection Policy Act; and
- Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement
The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement
The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact
The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Accounting Principles
Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls
Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits
The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any

subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### Y. Annual Workshop
Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

### Z. EPA Project Officer Oversight and Monitoring
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;
3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;
6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links
The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements
As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements
If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds;

(2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

### AD. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

### 1. Incorporation and Control
The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition
The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and

make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

**B. Board Independence**

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

**3. Legal Counsel**

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

## IV. Administrative Terms and Conditions

**A. General Terms and Conditions**

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**B. Correspondence Condition**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and *[Insert GS or local email box (if local copy desired)]*
- MBE/WBE reports (EPA Form 5700-52A): *[Insert name and contact information of the appropriate DBE coordinator and Grants Specialist (optional)/or local email box.]*
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: *[Insert name and contact information of regional point of contact (the GS, PO, and/or local email box]*
- Payment requests (if applicable): *[Insert name and contact information of the GS and PO/or local email box]*
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: *[Insert name and contact information of the PO]*

**C. Intergovernmental Review Period**

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

**E. Pre-Award Administrative Capability**

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

**F. New Recipient Training Requirement**

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Exhibit D

| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Assistance Amendment** | **GRANT NUMBER (FAIN):** 84093001 **MODIFICATION NUMBER:** 1 **PROGRAM CODE:** 5H | **DATE OF AWARD** 01/14/2025 |
|---|---|---|---|
| | | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 01/14/2025 |
| | | **PAYMENT METHOD:** ASAP | **ACH#** X0078 |

| **RECIPIENT TYPE:** State | **Send Payment Request to:** Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| COMMERCE, WASHINGTON STATE DEPARTMENT OF P. O. BOX 42525 OLYMPIA, WA 98504-2525 EIN: 91-0823820 | COMMERCE, WASHINGTON STATE DEPARTMENT OF 1011 Plum St SE P.O. Box 42525 Olympia, WA 98504-2525 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Nora Hawkins P.O. Box 42525 Olympia , WA 98504-2525 Email: Nora.hawkins@commerce.wa.gov Phone: 360-819-3739 | Vineet Pandharpurkar 1200 Pennsylvania Ave., NW, 4410C Washington, DC 20460 Email: Pandharpurkar.Vineet@epa.gov Phone: 971-645-0444 | Caitlyn Chandler OGD - GMBOD, 3903R 1200 Pennsylvania Ave. NW Washington, DC 20460 Email: Chandler.Caitlyn@epa.gov Phone: 202-564-0592 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Washington State Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation

| **BUDGET PERIOD** 05/01/2024 - 04/30/2029 | **PROJECT PERIOD** 05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST** $ 156,120,000.00 | **TOTAL PROJECT PERIOD COST** $ 156,120,000.00 |
|---|---|---|---|

# NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund OA - Office of the Administrator 1200 Pennsylvania Ave. NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Phillip Schindel - Chief, Business Operations Branch | **DATE** 01/14/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,516,368 |
| 2. Fringe Benefits | $ 1,671,056 |
| 3. Travel | $ 82,870 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 36,000 |
| 6. Contractual | $ 96,705,243 |
| 7. Construction | $ 0 |
| 8. Other | $ 51,072,800 |
| 9. Total Direct Charges | $ 154,084,337 |
| 10. Indirect Costs: 32.90 % Base SW+FB | $ 2,035,663 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 7,400,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)**

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

• **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

      a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

      b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

      c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

      d. Being funded by public or charitable contributions; and

      e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

• **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

• **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

• **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's [Environmental Information Quality Policy](). Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's [Environmental Information Quality Policy](). Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well [SFA@epa.gov]() such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a)** the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity. Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

## Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## J. Program Income

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the [EPA Build America, Buy America General Term and Condition](), which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply [EPA's Final Financial Assistance Conflict of Interest Policy](#) to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

    1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

    2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

    3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

    4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

    5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# Exhibit E

Making sure you both received this.

**Nora Hawkins** (she/her)
Senior Energy Policy Specialist
Washington State Department of Commerce | Energy Office

**From:** EPA_Grants_Info <EPA_Grants_Info@epa.gov>
**Sent:** Tuesday, January 28, 2025 1:50 PM
**Subject:** Pause EPA Grants

<div style="border: 2px solid red;">

### External Email

</div>

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

Exhibit F



**Account Profile Inquiry**

Date: 02/04/2025
Time: 11:56 AM

| | | |
|---|---|---|
| **ALC/Region:** 68128933 | **Agency Short Name:** RTP-Grants | **Account ID:** |
| **Recipient ID:** | **Recipient Short Name:** DCTED | |

**Inquiry Results:**

## ACCOUNT DETAILS

Requestor ID : 5388821

Account ID :

Account Description : WASHINGTON STATE
SOLAR FOR ALL

1031/LOC Account : No

Account Type : Regular Account

Group ID :

Control Account : No

Account Status
Indicator : Suspended

Available Balance : $155,609,105.62

Create Date : 07/09/2024

Begin Date : 05/01/2024

Performance Period
End Date : 04/30/2029

End Date : 08/30/2029

TAS Distribution
Method : Percentage by Account

## GRANT DETAILS

Grant : Yes

Federal Award
Identification Number
(FAIN) : 5H84093001

CFDA Number : 66959.000

Total Estimated Grant
Amount : $0.00

## AGENCY PAYMENT REVIEW

Agency Review : No

Threshold Amount :

Reason for Review :

## DRAW AMOUNTS

Max Total Draw Amount :

Max Daily Draw Amount :

Max Monthly Draw Amount :

Max Quarterly Draw Amount :

# Exhibit G

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Grant Agreement | GRANT NUMBER (FAIN): 02J30901<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5D | DATE OF AWARD<br>06/29/2023 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>07/05/2023 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>X0078 |

| RECIPIENT TYPE:<br>State | Send Payment Request to:<br>RTPFC-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| Washington State Dept. of Commerce<br>P.O. Box 42525<br>Olympia, WA 98504-2525<br>EIN: 91-0823820 | Washington State Dept. of Commerce<br>PO Box 42525<br>Olympia, WA 98504-2525 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Anna Lising<br>PO Box 40002<br>Olympia, WA 98504-0002<br>**Email:** Anna.Lising@gov.wa.gov<br>**Phone:** 360-870-8671 | Jeffrey Hunt<br>1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101<br>**Email:** Hunt.Jeff@epa.gov<br>**Phone:** 206-553-0256 | Kwansu Ha<br>1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101<br>**Email:** ha.kwansu@epa.gov<br>**Phone:** 206-553-0837 |

**PROJECT TITLE AND DESCRIPTION**

Washington State Climate Pollution Reduction Plan

See Attachment 1 for project description.

| BUDGET PERIOD<br>07/01/2023 - 07/01/2027 | PROJECT PERIOD<br>07/01/2023 - 07/01/2027 | TOTAL BUDGET PERIOD COST<br>$2,999,691.00 | TOTAL PROJECT PERIOD COST<br>$2,999,691.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 04/26/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $2,999,691.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $2,999,691.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10 , EPA Region 10<br>Mail Code: 17-C04, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, Air and Radiation Division<br>R10 - Region 10<br>1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official    Alan Lee - Grants Management Officer | DATE<br>06/29/2023 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $0 | $2,999,691 | $2,999,691 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $2,999,691 | $2,999,691 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.046 - Climate Pollution Reduction Grants | Clean Air Act: Sec. 137 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Oganization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2310IRG007 | 2231 | E4SFX | 10B4 | 000ACGXJ1 | 4132 | - | - | $2,999,691 |
| | | | | | | | | | $2,999,691 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $548,076 |
| 2. Fringe Benefits | $202,788 |
| 3. Travel | $15,832 |
| 4. Equipment | $0 |
| 5. Supplies | $5,512 |
| 6. Contractual | $662,000 |
| 7. Construction | $0 |
| 8. Other | $1,318,447 |
| 9. Total Direct Charges | $2,752,655 |
| 10. Indirect Costs: 0.00 % Base | $247,036 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $2,999,691 |
| 12. Total Approved Assistance Amount | $2,999,691 |
| 13. Program Income | $0 |
| 14. Total EPA Amount Awarded This Action | $2,999,691 |
| 15. Total EPA Amount Awarded To Date | $2,999,691 |

# *Attachment 1 - Project Description*

The agreement provides funding under the Inflation Reduction Act (IRA) to the Washington State Department of Commerce (WSDC) to develop a comprehensive, economy-wide climate mitigation plan or update an existing plan in collaboration with air pollution control districts, large and small municipalities statewide, and tribal governments that will support actions to reduce greenhouse gases (GHG) and harmful air pollutants and to conduct meaningful engagement with low-income and disadvantaged communities. WSDC will draw from and compile existing state plans and strategies, which include sector-specific policies and programs. Planning activities will focus on immediate and near-term GHG emissions reduction opportunities to identify measures needed to achieve Washington's statutory emissions limit of net-zero by 2050. Sectors that will be covered are transportation, buildings, power, industrial, natural working lands, and other, including short-lived climate pollutants, with the primarily goal to reduce emissions at scale in those sectors. Consistent with Washington state's Healthy Environment for All (HEAL) Act, climate policies and programs will be designed with the intention of addressing harm and pollution in overburdened communities. In general, activities include the development, updating, and evaluation of plans to reduce climate pollution (i.e., to reduce GHG emissions and/or enhance carbon sinks). WSDC will identify sector-specific policies and programs with the largest potential for reducing the state's greenhouse gas emissions. Plans will be developed in alignment with the state's environmental justice and equity goals and requirements, as outlined in the HEAL Act and state agency-specific community engagement plans. A multi-pronged approach will be used to engage the public and stakeholder groups effectively, beginning with the formation of a stakeholder and public engagement team that will work collaboratively to design and start to implement a comprehensive engagement strategy. The team will include representatives from diverse stakeholder groups, including local community organizations, industry and business groups, environmental organizations, and, when possible, community members. To identify low-income and disadvantaged communities, WSDC will use demographic data analysis and community outreach, working closely with a communications consultant that is skilled in effective outreach to communities with high concentrations of low-income and disadvantaged residents. Three key deliverables will be produced and submitted over the course of the four-year program period, including: a Priority Climate Action Plan (PCAP), due March 1, 2024; a Comprehensive Climate Action Plan (CCAP), due two years from the date of the award; and a Status Report, due at the close of the grant period. The CCAP will serve as a gap analysis to identify sectors and policies that may not yet be prime for significant emissions reductions, but with state investment and resources, could deliver meaningful emissions reductions. Both the PCAP and CCAP will be developed in alignment with the state's environmental justice and equity goals and requirements.

Expected outcomes include a PCAP and CCAP that identifies: tons of pollution (GHGs and co-pollutants) reduced over the lifetime of the measures; tons of pollution (GHGs and co-pollutants) reduced annually; and tons of pollution (GHGs and co-pollutants) reduced with respect to low-income and disadvantaged communities. Other expected outcomes include: improved air and water quality; analysis of energy consumption data; increased air and

water quality; increased climate resilience; additional health benefits achieved; decreased energy burden; enhanced understanding of ways to provide additional training opportunities for clean energy jobs; and, increased public awareness of project and results.

The intended beneficiaries include all residents of and visitors to Washington. Priorities and concerns of low-income and disadvantaged communities will be incorporated into plans. State agencies will develop specific action items and strategies that reflect the needs and voices of these communities and will also monitor the progress in these communities and make necessary adjustments to ensure their continued engagement and participation.

WSDC will make a subaward to the Washington Department of Ecology to assess GHG research targets, quantify GHG reduction measures, conduct benefits analyses, review authorities to implement planned projects, and support stakeholder outreach.

# *Administrative Conditions*

**National Administrative Terms and Conditions**

**General Terms and Conditions**

**Use for All New Awards**

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2022-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**A. Correspondence Condition**

**Edit this condition in accordance with your Grant Management Office's processes and points of contact.**

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov

MBE/WBE reports (EPA Form 5700-52A): bennett.andrea@epa.gov

All other forms/certifications/assurances, Indirect Cost Rate Agreements, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: wasson.wendy@epa.gov

Requests for Extensions of the Budget and Project Period, Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables, Amendment Requests, Requests for other Prior Approvals: hunt.jeff@epa.gov

Administrative questions and issues: ha.kwansu@epa.gov

**B. Pre-Award Costs**

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from *07/01/2023* to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

**C. Expired Indirect Cost Rate Agreement (also listed in General Terms and Conditions)**

The indirect cost rate agreement on file with EPA expired **06/30/2023**. In order to charge for indirect costs beyond that date, we must have a copy of a current approved agreement in our files. If you have an approved rate agreement please provide a copy. If you have not yet received an approval of an indirect cost rate from your cognizant agency, please submit a copy within 30 days of approval to the EPA Region 10. **Note that you may not draw down funds for indirect costs without a current, approved rate in place.**

# *Programmatic Conditions*

**Climate Pollution Reduction Grants Specific Programmatic Terms and Conditions**

**A**. **PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT**

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas:  1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

**Performance Reports - Frequency**

Quarterly performance reports are required to be submitted electronically to the EPA Project Officer within 30 calendar days after the reporting period (every three-month period). Quarterly reports are due according to the following schedule. If a due date falls on a weekend or holiday, the report will be due on the next business day. If a project start date falls within a defined reporting period, the recipient must report for that period by the given due date unless otherwise noted. This quarterly reporting schedule shall be repeated for the duration of the award agreement.

July 1 – September 30 Reporting Period: report due date October 30 (note, in year 1, this reporting period should begin at the project start date)

October 1 – December 31 Reporting Period: report due date January 30

January 1 – March 31 Reporting Period: report due date April 30

April 1 – June 30 Reporting Period: report due date July 30

**The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.**

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

1. Summaries of results of reviews of financial and programmatic reports.

2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Environmental results the subrecipient achieved.

4. Summaries of audit findings and related pass-through entity management decisions.

5. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

**B.  DELIVERABLES AND REQUIREMENTS**

**States that accept an award are required to produce and electronically submit the following three deliverables by the date specified:**

1.) By March 1, 2024, a Priority Climate Action Plan (PCAP), which is a narrative report that includes a focused list of near-term, high-priority, implementation ready measures to reduce Greenhouse Gas (GHG) pollution and an analysis of GHG emissions reductions that would be achieved through implementation. These initial plans can focus on a specific sector or selected sectors, and do not need to comprehensively address all sources of GHG emissions and sinks in the jurisdiction. The PCAP must include: a GHG inventory; quantified GHG reduction measures; a low-income and disadvantaged communities benefits analysis; and a review of authority to implement.

2.) A Comprehensive Climate Action Plan (CCAP), due 2 years from the date of the award. The CCAP is a narrative report that should touch on all significant GHG sources/sinks and sectors present in a state or metropolitan area, establish near-term and long-term GHG emission reduction goals, and provide strategies and identify measures to achieve those goals. Each CCAP must include: a GHG inventory; GHG emissions projections; GHG reduction targets; quantified GHG reduction measures; a benefits analysis for the full geographic scope and population covered by the plan; a low-income and disadvantaged communities benefits analysis; a review of authority to implement; a plan to leverage other federal funding; and, a workforce planning analysis.

3.) A Status Report, due at the closeout of the 4-year grant period. This report should include the implementation status of the quantified GHG reduction measures included in the CCAP; any relevant updated analyses or projections supporting CCAP implementation; and, next steps and future budget/staffing needs to continue CCAP implementation.

States must coordinate with municipalities and air pollution control agencies within their state to include priority measures that are implementable by those entities. States are further encouraged to similarly coordinate with tribes. In all cases, the lead organization for a state or metropolitan area PCAP funded through the CPRG program must make the PCAP available to other entities by March 1, 2024 for their use in developing an implementation grant application.

State lead organizations must involve stakeholder groups and the public in the process for developing the PCAP and CCAP. Potential stakeholders include urban, rural, and underserved or disadvantaged communities as well as the general public, governmental entities, federally recognized tribes, Port Authorities, labor organizations, community and faith-based organizations, and private sector and industry representatives.

**C. Cybersecurity Condition**

**State Grant Cybersecurity**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and

used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## D.  Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, <u>Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,</u>

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable. Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## E.  Public or Media Events

The Recipient agrees to notify the EPA Project Officer listed in this award document of public or media events related to activities accomplished as a result of this agreement, and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

## F.  Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## G.  Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work using Ecology's QMP. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations, the recipient must:

i. Submit a previously EPA-approved and current QMP,

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

b. The recipient must submit the QMP within 90 days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP (for existing environmental information),

ii. Prepare QAPP in accordance with the current version of EPA QA/R-5: EPA Requirements for Quality Assurance Project Plans,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA QA/R-5: *EPA Requirements for Quality Assurance Project Plans*; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*, Appendix C provides a QAPP Checklist.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**H.  Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Washington State Department of Commerce and the Washington Department of Ecology received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**END OF DOCUMENT**

# Exhibit H



**Account Profile Inquiry**

Date: 02/04/2025
Time: 11:55 AM

| | | |
|---|---|---|
| **ALC/Region:** 68128933 | **Agency Short Name:** RTP-Grants | **Account ID:** ▮▮▮▮▮ |
| **Recipient ID:** ▮▮▮▮▮ | **Recipient Short Name:** DCTED | |

**Inquiry Results:**

## ACCOUNT DETAILS

**Requestor ID** : 5388821

**Account ID** : ▮▮▮▮▮

**Account Description** : CLIMATE POLLUTION REDUCTION PL

**1031/LOC Account** : No

**Account Type** : Regular Account

**Group ID** : ▮▮▮▮▮

**Control Account** : No

**Account Status Indicator** : Suspended

**Available Balance** : $2,320,507.94

**Create Date** : 07/03/2023

**Begin Date** : 07/01/2023

**Performance Period End Date** : 07/01/2027

**End Date** : 11/01/2027

**TAS Distribution Method** : Percentage by Account

## GRANT DETAILS

**Grant** : Yes

**Federal Award Identification Number (FAIN)** : 5D02J30901

**CFDA Number** : 66046.000

**Total Estimated Grant Amount** : $0.00

## AGENCY PAYMENT REVIEW

**Agency Review** : No

**Threshold Amount** :

**Reason for Review** :

## DRAW AMOUNTS

**Max Total Draw Amount** :

**Max Daily Draw Amount** :

**Max Monthly Draw Amount** :

**Max Quarterly Draw Amount** :