# Thomas-Jensen Affirmation (redacted)

# Exhibit # 123

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF NEW YORK, et al.,

      Plaintiffs,

      v.

DONALD TRUMP, et al.,

      Defendants.

C.A. No. 25-CV-39-JJM-PAS

**DECLARATION OF WILL TOOR IN SUPPORT OF**
**THE STATES' REQUEST FOR PRELIMINARY INJUNCTION**

I, Will Toor, hereby declare and state as follows:

1.      I am the current Director of the Colorado Energy Office for the State of Colorado,

which is organized within the Office of the Governor. I have served in this role since 2019.  As

Executive Director, I guide the Energy Office in meeting its statutory mission to "(a) Support

Colorado's transition to a more equitable, low-carbon, and clean energy economy and promote

resources that reduce air pollution and greenhouse gas [("GHG")] emissions, including pollution

and emissions from electricity generation, buildings, industry, agriculture, and transportation; (b)

Promote economic development and high quality jobs in Colorado through advancing clean

energy, transportation electrification, and other technologies that reduce air pollution and [GHG]

emissions, including helping to finance those investments; (c) Promote energy efficiency; (d)

Promote an equitable transition toward zero emission buildings; (e) Promote an equitable

transition to transportation electrification, zero emission vehicles, transportation systems, and

land use patterns that reduce energy use and [GHG] emissions; (f) Increase energy security; (g)

Support lower long-term consumer costs and support reduced energy cost burden for lower-income Coloradans; and (h) Protect the environment and public health."[1]

2.      I make this declaration as a representative of the Colorado Energy Office, in part based on the business records of the Colorado Energy Office and the State of Colorado, and in part based on my personal knowledge and experience.  In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

3.      I submit this declaration in support of Plaintiff States' Request for Preliminary Injunction in this matter, which challenges the federal funding freeze triggered by various Executive Orders issued by President Trump and federal agency actions that seek to implement aspects of those Orders. In particular, this declaration addresses the effects of federal agencies' attempt to pause disbursement of federal grant and loan funds appropriated by Congress under the Inflation Reduction Act of 2022 (IRA) and the Infrastructure Investment and Jobs Act (IIJA).

4.      The Colorado Energy Office has been awarded over $500 million in grants under the IRA and IIJA. This funding includes both formula funding and competitive grants. The largest grants that have been awarded and contracted include a $156 million Solar For All award from the Environmental Protection Agency (EPA), $132 million in Climate Pollution Reduction Grant funding from the EPA, $140 million in funding awarded by the Department of Energy (DOE) to support rebates for energy upgrades for low and moderate income homes, $50 million in weatherization funds awarded by DOE to support energy upgrades for low income homes, $37 million in energy code grants from the DOE, and $25 million in Grid Resilience and Innovation

---

[1] § 24-38.5-101, C.R.S.

Partnerships (GRIP) funds awarded by DOE to support grid security and resilience. The Energy

Office also administers National Electric Vehicle Infrastructure funds, allocated by USDOT, to

the Colorado DOT; Colorado has $44 million awarded in this program. Consistent with the

instructions of the IRA and IIJA, Colorado uses these funds to support a wide array of programs

designed to benefit Coloradans, reduce energy costs, prevent pollution, and grow the economy.

Details regarding several specific grants are set forth below.

5.     As of the date of this declaration, the Executive Orders, and federal agency

actions attempting to implement the Orders, have had crippling effects on the operations of the

Colorado Energy Office, including but not limited to interrupted and delayed disbursement of

funds that Colorado has been awarded, and uncertainty on whether and when these funds will be

disbursed. The interruption and uncertainty have led to clear harm in the following areas:

a.  The Colorado Energy Office has many subcontracts with private sector entities, nonprofits, and local governments. These subcontractors have been working in good faith on implementing these programs: hiring staff, buying and installing equipment, and other activities in which they both incur expenses and make financial commitments. Examples include local governments and utilities implementing grid resilience upgrades, local government projects funded by IIJA Energy Efficiency Community Block Grants that have been allocated by the Energy Office, EV charging stations being constructed under the National Electric Vehicle Infrastructure program, and weatherization upgrades across the state. The funding freeze has created uncertainty for the ability of the state to reimburse these subcontractors for work they have already done and expenses they have already incurred, as well as creating great uncertainty in continuing their work. If the funding freeze continues, the Energy Office will be forced to direct subcontractors to pause work, which will impact critical services for communities across the state.

b.  The Energy Office has had to delay signing contracts for work that has statutory deadlines, which we may now miss. As an example, the Energy Office was just finishing a long procurement process for a contractor to conduct an analysis of the potential of nuclear energy and other advanced energy technologies to provide jobs and tax base in communities with retiring coal plants when the freeze was initiated. This was to be paid for with EPA Climate Pollution Reduction Grant program funds that were subject to the funding freeze, so this study, which is important to the economic future of several rural communities in Colorado, is now on hold.

3

c.  The Colorado Energy Office's ability to hire talented staff in an extremely competitive hiring environment has been impacted. Specifically, the Energy Office has lost the top candidates for several new roles due to the uncertainty and delays related to the Orders.

d.  The Colorado Energy Office's ability to execute contracts for goods and services that rely on federal funding.

e.  The provision of services to Coloradans that rely on federal funds, including the weatherization of low income households and installation of energy saving appliances.

## COMMUNICATIONS FROM FEDERAL AGENCIES

6.      The Colorado Energy Office also received confusing communications from federal agencies regarding the status of federal grant funds, some of which appear to unilaterally change the terms and condition of existing grant agreements, or to direct the Energy Office to cease work which is required under existing grant agreements. For example, the Colorado Energy Office received a memorandum dated January 27, 2025, that was issued by the Acting Chief Financial Officer of the Environmental Protection Agency (EPA), attached hereto as Exhibit A. That memorandum indicates that all disbursements for unliquidated obligations funded by the IRA and the IIJA are paused to allow for review of the programs pursuant to section 7 of the Unleashing American Energy Executive Order. It is unclear how this review could impact Colorado's funding appropriated under the IRA and IIJA.

7.      The Colorado Energy Office received an email on January 28, 2025 that indicated EPA was pausing IRA and IIJA funding pursuant to the Executive Order. It stated, "Dear Grant Recipient, EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." A true and

4

accurate copy of the email is attached hereto as Exhibit B. The Colorado Energy Office has since

received an updated communication from EPA indicating that funding has resumed as a result of

a court directive. However, the Energy Office is still unable to access multiple online accounts

that are used to request disbursements, and it is unclear if or when funding will actually be

restored.

8.    The result of these communications has been to create confusion and uncertainty

regarding the status of the federal funds that the Colorado Energy Office relies on to implement

its statutory mission. In addition, because of this uncertainty, the Colorado Energy Office has

delayed executing award agreements with subgrantees and has delayed extending employment

offers for positions expected to be funded by grants already awarded by the federal government.

## STATUS OF FEDERAL FUNDING PORTALS

9.    Following issuance of the now rescinded OMB memorandum on January 27,

2025, all of the Colorado Energy Office's accounts on the federal government funding portals

ASAP and VIPERS became frozen, with the Office unable to draw funds pursuant to existing

grant agreements.

10.    Starting on February 4, 2025, the Office began receiving correspondence from

federal agencies indicating that grant funding for IRA and IIJA grants would resume. However,

as of the afternoon of February 5, 2025, the Office has still not been able to access most of its

grant accounts in the relevant federal portals. During the time the funds have been frozen and

inaccessible, the Colorado Energy Office has experienced the serious disruptions to its

operations described above. In light of the continued effect of the "Unleashing American

Energy" Executive Order, which directs all agencies to immediately pause disbursement of

certain funds appropriated through the IRA and IIJA, the Office expects its funding to continue to be in jeopardy absent court intervention.

**GRID RESILIENCE IIJA FORMULA FUNDS**

11.      Colorado has applied for and been approved for several grants to support grid resilience. On April 26, 2023, the Colorado Energy Office applied for approximately $17,200,000 over the first and second years of the Grid Resilience State and Tribal Formula Grant, which is a FORMULA program under the IIJA. Per the IIJA, section 40101(d), this program is to be a five year program.  A true and accurate copy of the grant application materials is attached hereto as Exhibit C. On August 30, 2023, the Colorado Energy Office received confirmation from the Department of Energy Grid Deployment Office that the Colorado Energy Office had been awarded the grant, with a total award of $17,249,786.  True and accurate copies of the grant award documents are attached hereto as Exhibit D.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on August 30, 2023 are attached hereto as Exhibit E.

12.      On April 12, 2024, the Colorado Energy Office applied for approximately $8,300,000 for the third year of the Grid Resilience State and Tribal Formula Grant. A true and accurate copy of the grant application materials is attached hereto as Exhibit F. On August 15, 2024, the Colorado Energy Office received confirmation from the Department of Energy Grid Deployment Office that the Colorado Energy Office had been awarded the third year of the grant, with an additional award of $8,359,178, for a total award of $25,608,964.  True and accurate copies of the grant award documents are attached hereto as Exhibit G.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on August 15, 2024 are attached hereto as Exhibit H.

13.     The funding mechanism is on a reimbursement basis. The distribution of this formula funding to the State of Colorado supports three separate competitive grant programs run by the Colorado Energy Office and the Colorado Department of Local Affairs.

14.     Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system

15.     This Grid Resilience grant in Colorado supports the Grid Hardening for Small and Rural Communities Program, the Advanced Grid Monitoring Program, and the Microgrids for Community Resilience Program. The beneficiary subrecipients are local retail electrical rural cooperative and municipal utilities. The selected projects, which are approved both by an interagency State selection committee and the U.S. Department of Energy, will enable utilities to reduce the duration and frequency, and impact of power outages, particularly in communities that experience a high prevalence of power outages. Thus far, seventeen projects have been awarded by the state, of which fifteen have been contracted and have initiated work. These projects are geographically dispersed throughout the State of Colorado, and the majority serve rural and small communities. The funded projects include undergrounding and reconductoring of critical and problematic distribution lines, vegetation management in remote and thickly forested areas, grid modelling with satellite and drone data collection to prioritize upgrades and future projects, and microgrids that will provide resiliency for fire departments, communications and resilience hubs, and communities in areas with high wildfire, avalanche, and flood risk.

16.     These projects are highly consequential for the communities they serve. The application, state selection, federal review, and contracting with the state took on average 13 months for these projects. The Order and the uncertainty it has caused has delayed the implementation of these programs, and further delay will result in increased likelihood of power outages, increased costs, and lack of information for grid operators to evaluate and prioritize future projects. Cancelling any of these projects would exacerbate these issues, as the subrecipients (rural electric cooperatives and municipal utilities) would have to seek funding elsewhere, most likely by raising electricity prices for their customers.

**WEATHERIZATION ASSISTANCE PROGRAM IIJA FORMULA FUNDS**

17.     On November 28, 2022, the Colorado Energy Office applied for DE-EE0009976, which is a FORMULA program under the IIJA.  A true and accurate copy of the grant application materials is attached hereto as Exhibit I.

18.     On January 20, 2023, the Colorado Energy Office received confirmation from the United States Department of Energy that Colorado Energy Office was awarded the grant, with a total award of $50,064,163.00.  True and accurate copies of the grant award documents are attached hereto as Exhibit J.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on January 20, 2023, are attached hereto as Exhibit K.

19.     The funding mechanism for these funds are reimbursement based and are awarded by a county-based allocation formula to five subrecipients across the state who applied competitively for the funds.

20.     The Colorado Weatherization Assistance Program's mission is to support low-income households through the installation of DOE approved energy efficiency and health and

8

safety measures. The following is a non-exhaustive sample of the approved energy efficiency measures: attic, wall, and/or floor insulation, high efficiency furnace, storm windows, air and duct sealing, LED lightbulbs. The following is a non-exhaustive sample of the approved health and safety measures: smoke and carbon monoxide detectors, water heater repairs or replacements, furnace replacements (if the prior water heater or furnace was leaking carbon monoxide). All installed measures are determined based on a whole-home audit using DOE approved audit software called Weatherization Assistant 10.0. Allowable energy efficiency measures must meet a savings to investment ratio of 1.0 or greater in order to be installed.

21.     Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system.

22.     The impact of the loss of IIJA/BIL funds to the Weatherization Assistance Program would be the loss of approximately $35 million in obligated funding that is dedicated to providing energy efficiency and in some cases life saving health and safety improvements to low income households. The primary objective of the program is to help residents to save money on their energy bills by protecting homes from the elements including cold, heat, water, and wind. This ultimately will reduce the ability of the program to deliver services to approximately 2,000 income-qualified households. The Weatherization Assistance Program serves residents in every county of Colorado. The Colorado Energy Office is currently contracted with four local non-profits and two county governments to provide services across the state. Work is underway and a pause in funding will impact their ability to pay their field staff who perform the work in homes

9

(i.e. home assessments, inspections, in-home work such as insulation, furnace replacements, health and safety work, and carry out other program elements.)

**SOLAR FOR ALL COMPETITIVE IRA FUNDS**

23.     On October 11, 2023, the Colorado Energy Office applied for the Environmental Protection Agency Solar for All grant program, which is a competitive program under the IRA. A true and accurate copy of the grant application materials is attached hereto as Exhibit L.

24.     On April 21, 2024, the Colorado Energy Office received confirmation from the Environmental Protection Agency that the Colorado Energy Office was awarded the grant, with a total award of $156,120,000.  True and accurate copies of the grant award documents including terms and conditions dated July 9, 2024 are attached hereto as Exhibit M.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on July 21, 2024 are attached hereto as Exhibit N. True and accurate copies of the grant amendment with revised terms and conditions as conveyed on December 4, 2024 are attached hereto as Exhibit O.

25.     The funding mechanism is on a reimbursement basis and will support competitive grants across Colorado.

26.     Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "No accounts found matching criteria." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system.

27.     Colorado Solar for All (COS4A) will expand access to solar power by focusing on targeted and contextualized technical assistance and heavily subsidized financing products while also looking to address any localized barriers. The program will subsidize single-family

rooftop solar, multifamily rooftop solar, and community solar to balance serving the highest

energy burdened residents, maximizing the resident cost savings and emissions reductions, and

the market transformation potential of such a large scale program. The COS4A program will

dedicate 75% of the awarded funds towards financial assistance to ensure income-qualified

households have access to residential rooftop and residential-serving community solar energy

across Colorado. The mechanism to deploy the funds will be through a combination of fully

subsidized grants, low-interest loans and production based incentives for entities that guarantee

the benefits to flow to participating Colorado residents. COS4A is positioned to deliver the

benefits of solar to more than 20,000 households across Colorado, saving them money on utility

bills. The program will do this by providing technical assistance, training, and financial

incentives to increase the options for financial ownership, governance oversight, and wealth

building opportunities for members. The EPA's Solar for All grant will complement the robust

solar market in Colorado by enabling the state to increase the number of communities that can

take advantage of distributed solar investments and provide access to affordable, resilient, and

clean solar energy as well as the related benefits of lower utility bills, improved public health

through reduced pollution from power generation, and creation of wealth and jobs for local

communities. In addition to the financial assistance to directly support solar installations, the

program will also subsidize workforce development and technical assistance offerings in support

of implementing the program.

     28.     On January 28, 2025, Colorado Energy Office Deputy Director Dominique

Gómez was notified that the EPA is working diligently to implement President Trump's

_Unleashing American Energy_ Executive Order issued on January 20 in coordination with the

Office of Management and Budget. The agency has paused all funding actions related to the

Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

29.     The current uncertainty is causing delays in program launch. For example, hiring of the Quality Program Manager  has been put on hold which is a critical position in order to fulfill the quality program requirements of the EPA, as has the hiring of the Solar Program Manager which affects financial assistance programming and oversight. Canceling the program would be detrimental and the deployment of solar to 20,000 low-income households would be forfeited, the economic benefits of these investments, including substantial monthly energy bill cost savings, would not be realized and critical workforce development would be lost.

**HOME ENERGY REBATES IRA FORMULA FUNDS**

30.     In June 2023, the Colorado Energy Office applied for the Home Energy Rebates Program, which is a FORMULA program under the IRA.

31.     On August 1, 2023, the Colorado Energy Office received confirmation from the U.S. Department of Energy that the Colorado Energy Office had been awarded Early Administrative funds for both grants, $1,759,883 for 50121 Home Efficiency Rebates and $1,749,647 for 50122 Home Electrification and Appliance Rebates, with a total award of $3,509,530. This represents advance planning funding for the implementation of the full awards that total $140,242,735.00.  A total of $70,256,845 is for the 50121 program and a total of $69,985,890 is for the 50122 program.  The full award for 50122 Home Electrification and Appliance Rebates was awarded on September 3, 2024. The full award for 50121 Home Efficiency Rebates was awarded on September 10, 2024.  True and accurate copies of the grant

award documents are attached hereto as Exhibit P. True and accurate copies of the terms and conditions applicable to those grant award documents, are attached hereto as Exhibit Q.

32.    The funding mechanism is on a reimbursement basis and supports formula grants in the form of rebates provided to primarily low-income households across Colorado. As funds are expended and rebates issued reimbursement draws are completed by the Colorado Energy Office.

33.    Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system

34.    Initial funds received are Early Administrative Funds, intended and utilized for hiring program staff, developing program design and strategy, develop program evaluation, selecting a vendor to assist with application and program administration, initiating program piloting, developing agreements supporting collaboration with community-based organizations, to conduct a strategic impact analysis as well as to consult with affordable housing professionals. As awarded in our Modification 1, current use of funds includes allowable administrative costs including state program staff (personnel, fringe, indirect, travel, supplies), and contractual. Upcoming use of funds includes allowable administrative costs including state program staff (personnel, fringe, indirect, travel, supplies), and contractual funds that include administrative, rebate delivery and rebate reimbursement funds. Allowable administrative costs include:

- program planning and design,
- state program staff,
- development of tools and systems, including websites, applications, rebate processing and reporting,

- program evaluation and customer satisfaction surveys,

- program monitoring and audits,

- consumer protection functions including resolution procedures, data review, contractor management, installation standards, continuous improvement,

- marketing, education, and outreach, including the funding of of local governments and place-based organizations to assist with these activities,

- implementation contract costs not including rebates and costs for activities directly related to delivery of rebates,

- Contractor training,

- Activities to improve access to rebates, facilitating leverage of private funds and financing mechanisms (e.g., loan loss reserves, interest rate reductions) where beneficial to efficiency and/or electrification projects,

- DAC (Disadvantaged Community) Incentive, and

- Technical assistance.

35.    Projects commenced include full use of Early Administrative Funds, and preparation for use of all Allowable Administrative Costs, Rebate Delivery Funds, and Rebate Reimbursement Funds. Rebate Delivery Funds include Equipment, tools, models, and procedures used to assess a building and estimate energy savings, Equipment, tools, models, and procedures used to verify installations and perform quality control (QC) including inspections and reporting, disadvantaged community delivery including targeted marketing and outreach, and disadvantaged community incentives.

36.    A January 23, 2025 e-mail communication received by Colorado Energy Office employee Raine Queenan from a DOE project officer noted that they were evaluating information from the new administration and would be pausing further communication. Also on January 23rd, Raine Queenan received phone communication from a DOE Project Officer providing the same context.

14

37.    On January 29th, Colorado Energy Office staff Annie Beall and Loren Ahonen received various communications via e-mail that a Technical Assistance program sponsored by DOE to aid rebate program delivery was being postponed.

38.    The current delays are impacting program launch activities including: vendor contract management, technical provider decision-making, staffing of five existing positions (and nine planned positions), and coordination with other internal and external programs. Without continued progress on these activities, the program will not reach its target launch date of June 2025. Further delaying and/or canceling these programs will result in wasteful spending of already completed activities.  Additionally, continued delay and/or canceling of these programs would forfeit needed improvements for residential homes and associated workforce benefits . Because rebate programs are delivered through contractors and other market entities that stimulate additional investment, delayed/and or cancelled funding eliminates that additional economic investment in the State of Colorado.


**SIGNED UNDER THE PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY, 2025.**

Will Toor

Will Toor
Director, Colorado Energy Office

# EXHIBIT A



## THE CHIEF FINANCIAL OFFICER
WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**   Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action
Pause

**FROM:**   Gregg Treml, Chief Financial Officer (Acting)

GREGG
TREML

Digitally signed by
GREGG TREML
Date: 2025.01.27
16:59:02 -05'00'

**TO:**   Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including
unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the
Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass
financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in
discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including
funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure
Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements
will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the
Order.

All related actions, including new contract, grant, rebate and interagency actions, to include
drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any
actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this
time and all upcoming travel funded from either should be cancelled.

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc:  Lek Kadeli
     Meshell Jones-Peeler
     Paige Hanson
     Senior Resource Officials
     Senior Budget Officers
     Regional Comptrollers
     Funds Control Officers

# Controlled by U.S. Environmental Protection Agency

# EXHIBIT B



STATE OF
COLORADO

**Gomez - CEO, Dominique <dominique.gomez@state.co.us>**

---

## Pause EPA Grants

**EPA_Grants_Info** <EPA_Grants_Info@epa.gov>                                          Tue, Jan 28, 2025 at 2:41 PM

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

# EXHIBIT C

# Bipartisan Infrastructure Law - Section 40101(d)

### Preventing Outages and Enhancing the Resilience of the Electric Grid

**State of Colorado**

**January 2023**

# Program Narrative

## Introduction and Overview

The Grid Resilience Grant Program, funded through Section 40101(d) of the Infrastructure Investment and Jobs Act (IIJA), will be administered through the Colorado Energy Office (CEO) and Colorado Department of Local Affairs (DOLA). The IIJA provides $2.5 billion in formula grants to states and tribes for the purpose of improving the all-hazards resilience of electric grids. Under this U.S. Department of Energy (DOE) formula program, Colorado is estimated to receive approximately $8.6 million annually for the next five years, or approximately $43 million over the next five years. This application is for years 1 and 2 of the program, for approximately $17.2 million.

The state's Greenhouse Gas Pollution Reduction Roadmap identified reducing emissions from electric utilities by at least 80% by 2030 (from a 2005 baseline) and reducing emissions from buildings as key strategies to meet Colorado's greenhouse gas emissions targets. Microgrids and the technologies that expand the use of smart appliances and grid interactive buildings will help meet both of these goals. In addition, the State of Colorado has experienced significant, recent climate related extreme weather events including wildfires (including Cameron Peak and East Troublesome fires in 2020, and the Marshall fire in 2021), extreme heat, winter storm Uri (2021), and flooding (2013) that have tested the resilience and reliability of the state's energy infrastructure. The State intends to use the Grid Resilience Grant Program federal funding, matched with state and utility funding to support the microgrids grant program created by House Bill 22-1013, invest in microgrids, grid hardening projects, advanced system monitoring, and the creation of a grid reliability and resilience study.

**Objectives and Metrics**

The State of Colorado has been designated to receive $8,635,068 for the first year of funding from IIJA 40101(d) formula funding, and approximately the same amount for the second year. The State of Colorado is pursuing this funding to work with eligible entities- including utilities, storage operators, and others- to support investments in solutions that can provide reliable energy through the climate related extreme impacts including potentially:

A. Microgrids for Community Resilience (restricted to small cooperative and municipal utilities): Construction of distributed energy resources for enhancing system adaptive capacity during disruptive events, including microgrids and battery-storage subcomponents
B. Microgrids for Community Resilience (open to all utilities): Construction of distributed energy resources for enhancing system adaptive capacity during disruptive events, including microgrids and battery-storage subcomponents
C. Development of grid hardening projects that advance the state's goal of an equitable transition to a low-carbon economy and meeting state energy needs with 100% renewable energy by 2040.
D. Implementation of advanced system monitoring for use in smart grids and microgrids.
E. Creation of a grid resiliency and reliability roadmap and technical assistance

The Colorado Energy Office and Department of Local Affairs  plan to use a competitive process to award grant funding, based on the criteria and metrics described in this document, with the planned allocation and matching funds following the budget below for the first two years of the program, 2023 and 2024.

New electric generation sources that are not part of a system for increasing adaptive capacity during disruptive events, such as a microgrid, are not allowed.

**Matching funds:**

The 15% state match requirements for year 1 and 2 of the IIJA 40101d funds is $2,587,467.90. This match will be met through funding from the Microgrids for Community Resilience Grant Program, which has a total appropriation of $3,520,713 from House Bill 22-1013, which was passed by the Colorado General Assembly in the 2022 legislative session.

The matching funds from the State of Colorado are particularly focused on the Microgrids for Community Resilience Program, which is intended for rural communities. Therefore, these $2,587,467.90 will be reserved for cooperative electric associations and municipal utilities from rural communities in Colorado that are interested in developing microgrids that increase electrical resilience.



## Proposed Objectives for Colorado's Grid Resilience

**Objective A: Microgrids for Community Resilience (cooperative/municipal utilities only), Proposed 2-year Budget: $5,174,935.80**

The State of Colorado has a large and diverse geography, with rural communities located in remote canyons and widely dispersed along the eastern plains. These rural communities are vulnerable to electric interruptions, as they are often located far along the electricity distribution lines from the generation sources and transmission lines. The Colorado Microgrids for Community Resilience Act (HB22-1013) states: "The use of microgrids can help increase a community's resilience regarding severe or natural disaster events that can affect the electric grid by providing the community with an alternative, reliable source of electricity that is not dependent on the electric grid". Therefore, the HB22-1013 funding will be tied to essential infrastructure and support strengthening community resilience. The funding for this program will be a total of $5,174,936, which comprises $2,587,468.90 of matching state funds for the 40101d formula grant, as well an equal amount of $2,587,468.90 of 40101d formula funds. This Objective A program is closely aligned with the Objective B program, with the exception that Objective A funding is reserved for cooperative and municipal utilities that serve rural areas. Rural is defined as being in a county that has less than 50,000 people **or** a town that has less than 25,000 residents.

3

**Metrics for Awarding Grants Under Objective A:**

1. Demonstrates the greatest community need, benefit, and collaboration
   a. The project realizes and outlines mutual community benefits as demonstrated by signed letters of support from community-based partners, including anchor institutions, local governments, and/or partner agencies.
2. Reduces vulnerabilities and increases grid reliability and resiliency
   a. Data and narrative is provided to support the degree of exposure to climate related severe weather or natural disaster events for a rural community or communities that are part of a proposed project
   b. Data is provided to show infrastructure vulnerability, including but not limited to utility-provided or FEMA data (e.g., standard Key Performance Indicators: MTBF (mean time before failure), MTTR (mean time to recovery, repair, respond, or resolve), MTTF (mean time to failure), and MTTA (mean time to acknowledge)
   c. Evidence of social vulnerability is demonstrated through the Justice40 and Colorado EnviroScreen mapping tools
3. Local commitment and readiness
   a. Applicant has a strong track record of actions and planning towards energy efficiency, demand-side management, incentive programs, or other initiatives that demonstrate commitment to local energy resiliency and reliability. For example:
      i. Proposed microgrid has a higher reliance on non-fossil-fuel-based generation
      ii. The utility has (or is proposing to) take the opportunity to promote energy efficiency and demand-side management programs
      iii. The utility has (or is proposing to develop) an incentive program that saves partners money when they use energy storage to reduce electricity use during peak electricity use periods
      iv. Other programs that demonstrate a commitment to local energy resiliency, reliability, and "microgrid readiness"
   b. Demonstrate readiness through financial resources being committed and aligned with risk mitigation and community goals
   c. Aligns with regional and/or local plans
   d. Timeline is feasible
   e. Demonstrates eligibility through local effort and match

**Objective B: Microgrids for Community Resilience (open award for all utilities)**
**Proposed 2-year Budget: $7,582,668**

Colorado is already experiencing the impacts of climate change including increased flooding and wildfires. The use of microgrids, including distributed generation and storage, can improve the resilience of the grid and improve the reliability of energy delivery by providing communities with reliable sources

4

of power.  This funding will support utility-led microgrid development in vulnerable communities. The objectives and metrics of this program will be the same as those from Objective A: Microgrids for Community Resilience, with the exception of that the applicant utility need not be restricted to small rural cooperatives and municipal utilities. If the utility is over the threshold of 4 million MWh per year, the match increases from 33% to 100%. The metrics for Objective B are the same as those for Objective A, with the exception that they are not reserved only for small and rural communities.

**Metrics for Awarding Grants Under Objective B:**

1. Demonstrates the greatest community need, benefit, and collaboration
   a. The project realizes and outlines mutual community benefits as demonstrated by signed letters of support from community-based partners, including anchor institutions, local governments, and/or partner agencies.
2. Reduces vulnerabilities and increases grid reliability and resiliency
   a. Data and narrative is provided to support the degree of exposure to climate severe weather or natural disaster events for a rural community or communities that are part of a proposed project.
   b. Data is provided to show infrastructure vulnerability, including but not limited to utility-provided or FEMA data (e.g., standard Key Performance Indicators: MTBF (mean time before failure), MTTR (mean time to recovery, repair, respond, or resolve), MTTF (mean time to failure), and MTTA (mean time to acknowledge)
   c. Evidence of social vulnerability is demonstrated through the Justice40 and Colorado EnviroScreen mapping tools.
3. Local commitment and readiness
   a. Applicant has a strong track record of actions and planning towards energy efficiency, demand-side management, incentive programs, or other initiatives that demonstrate commitment to local energy resiliency and reliability. For example:
      i. Proposed microgrid has a higher reliance on non-fossil-fuel-based generation
      ii. The utility has (or is proposing to) take the opportunity to promote energy efficiency and demand-side management programs
      iii. The utility has (or is proposing to develop) an incentive program that saves partners money when they use energy storage to reduce electricity use during peak electricity use periods.
      iv. Other programs that demonstrate a commitment to local energy resiliency, reliability, and "microgrid readiness"
   b. Demonstrate readiness through financial resources being committed and aligned with risk mitigation and community goals
   c. Aligns with regional and/or local plans
   d. Timeline is feasible
   e. Demonstrates eligibility through local effort and match

**Objective C: Grid Hardening in Small and Remote Communities**
**Proposed 2 year Budget: $4,236,494**

The Grid Hardening Act of 2021 defined grid hardening as " The ability to use technology, equipment, or hardening measures to enable the electric grid to better withstand the effects of extreme weather, a wildfire, or any other natural disaster." Grid hardening projects typically focus on and prioritize options to reduce the impact of these events, make the components of the system more resilient to the impacts, and often use innovative response approaches.[1] This funding will be reserved for rural electricity cooperatives and small municipally-owned utilities.

Some of the uses for this funding include:

- monitoring and control technologies
- the undergrounding of electrical equipment
- utility pole management
- the relocation of power lines or the reconductoring of power lines with low-sag, advanced conductors
- vegetation and fuel-load management
- the replacement of old overhead conductors and underground cables

**Metrics for Awarding Grants Under Objective C:**

1. Historic frequency and duration of power outages due to natural disasters and extreme weather events.
2. The ability of specific grid hardening activities to mitigate risks of power outages in specific communities.
3. The proportion of historically marginalized community members in the communities served, as measured by area median income (AMI), percentage below AMI, racial, and ethnic composition.
4. The focus of the applying organization on strong labor standards and protections, such as through project labor agreements, training practices, plans to partner with a training provider, and the use of appropriately credentialed workforce.
5. Demonstrated financial need of the cooperative or small municipal utility demonstrating that the identified projects could not be completed without outside grant funding.

**Objective D: Advanced system monitoring for use in smart grids and microgrids**
**Proposed 2-year Budget: $1,980,666.70**

---

[1] Richard, Jeffery. 2017. "The Keys to Grid Hardening." Leidos.com. retrieved 8/22/22 from: https://www.leidos.com/insights/keys-grid-hardening-how-implement-effective-solution

6

Per statutory requirements, Colorado's electrical utilities are rapidly transitioning from primarily depending on fossil fuels as generation sources to renewable energy sources, particularly wind and solar. Smart grids have a higher reliance on distributed generation resources, whereas microgrids have the ability to function independently of the wider grid ("island mode"). The use of wind, solar, and storage as energy sources for smart grids and microgrids requires a more precise understanding of weather conditions as relating to electricity generation, storage, and use. This funding would incentivize communities operating smart grids and microgrids to invest in technologies that would support this advanced system monitoring.

**Metrics for Awarding Grants Under Objective D:**

1. Share of electricity in impacted communities from renewable and distributed generation sources.
2. Innovative approaches to advanced system monitoring of smart grids and microgrids.
3. Justification of need: Demonstrated financial need of the applying entity to cover the costs of developing or updating an advanced monitoring system.
4. Projected equitable impacts: Degree to which application demonstrates process or projections by which at least 40% of funds will be invested in projects in disproportionately impacted communities, in alignment with the federal Justice40 initiative.
5. Impact on workforce/job creation: Degree to which application demonstrates that project is projected to create new jobs or workforce demand, and inclusion of planning for funding past initial funding as needed.
6. Long-term Community Impact Depth: Degree to which a project uses specific sources or examples to demonstrate projected long-term permanent impact to the health and safety of the community or region through outcomes impact, environmental impact, workforce impact, etc.
7. Shovel-ready status: Clearly defined project scope, partners, secured site, and timeline for project implementation.

**Objective E: Grid Resiliency Studies and Technical Support**
**Proposed 2-year Budget: $862,489.30**

In addition to investing in projects, Colorado intends to use some of the funding to help conduct a study or studies that will help assess outages, especially in communities of color and historically impacted communities. The State will develop a grid resiliency and microgrid roadmap that will address key questions such as what parts of Colorado may face the most severe risk; what locations should be identified as critical facilities; how can microgrids, especially microgrids capable of islanding help ensure resilience; and how can the development of microgrids and other grid resilience investments help reduce GHG emissions and create good paying jobs.

To advance resilience and reliability and to help harden the grid, especially in response to extreme weather events that are stressing the State's energy delivery system, and cyber security

threats, Colorado will use some of the resilience funding to prepare a microgrid roadmap that will identify and describe:

1. Communities that are at highest risk of power outages due to natural disasters or other grid interruptions
2. Assess how microgrids may be able to:
   a. Protect critical facilities and infrastructure
   b. Reduce negative effects of power outages
   c. Dynamically utilize demand-side resources
   d. Improve customer options for cost impacts and benefits
   e. Be included in DER planning
   f. Help customers reduce energy costs, especially in rural areas
   g. Help state meet GHG reduction targets.
3. ID barriers to developing and deploying microgrids
4. Opportunities to foster public-private partnerships

In developing this Roadmap, the State will work with the Public Utilities Commission, the Office of Utility Consumer Advocate, utilities, disproportionately impacted communities, large customers, local governments, labor interests, and other stakeholders.

The Roadmap will serve as a foundational document that local governments and others can use in determining how to implement microgrids and other resilience and reliability solutions at the local level.

In addition, pursuant to recent changes in Colorado statute, the state Public Utilities Commission is also implementing rules addressing environmental justice and equity that will directly impact utility distribution system planning, implementation of microgrid programs, and potentially other resilience investments.

The funding from this objective would largely be used to hire contractors, consultants, researchers, and public engagement experts to support the work of the Colorado Energy Office and the Department of Local Affairs to complete the projects as described in their associated scopes of work.

8

**Metrics for Awarding Grants Under Objective E:**

1. Ability and experience of independent contractors to carry out the grid resilience and reliability roadmap research and compile the study.
2. Demonstrated ability to conduct the appropriate projects as outlined in the scopes of work in a timely and professional manner.
3. Clear plan for stakeholder engagement on energy reliability and resiliency throughout the state of Colorado.
4. Working knowledge of issues of equity and ability to effectively communicate with and receive feedback from disadvantaged communities.

## Distributing Funds

The primary method for distributing funds to eligible sub-awardees will be through a competitive solicitation process that will result in grants to those awardees. An eligible entity that receives a subaward under this program is required to match 100 percent of the amount of the subaward as required by IIJA Section 40101(h)(1).  However, if the eligible entity sells not more than 4,000,000 megawatt hours of electricity per year, the required match will be one-third of the amount of the subaward as required by Section 40101(h)(2). "Cost matching" for the non-federal share is calculated as a percentage of the Federal funds only, rather than the Total Project Cost.

**Funding Distribution**

Colorado intends to fund projects from four broad programmatic areas or objectives including: Microgrids for Community Resilience, Microgrid (open award), Advanced system monitoring for use in smart grids and microgrids, and Grid Resiliency Studies and Technical Support. The Microgrid for Community Resilience will target awards to eligible entities (municipal or cooperative utilities) for projects that serve rural communities as defined by the Department of Local Affairs Microgrids for Community Resilience.

9

| Program Objective | Year 1 Funding Distribution | Year 2 Funding Distribution | Year 1 and Year 2 Combined |
|---|---|---|---|
| Objective A: Microgrids for community resilience (STATE match) | **$1,295,261** | **$1,292,206.90** | **$2,587,467.90** |
| Objective A: Microgrids for community resilience (DOE) | $1,295,261 | $1,292,207 | $2,587,467.90 |
| Objective B: Microgrid (open award) | $3,789,807 | $3,792,861 | $7,582,668 |
| Objective C: Grid Hardening in Small and Remote Communities | $2,118,247 | $2,118,247 | $4,236,494 |
| Objective D: Advanced Monitoring | $1,000,000 | $980,666.70 | $1,980,667 |
| Objective E: Grid Resiliency Studies and Technical Support | $431,753 | $430,736 | $862,489 |
| **DOE total** | **$8,635,068** | **$8,614,718** | **$17,249,786** |
| **Total (DOE Grant + State Match)** | **$9,930,329** | **$9,906,925** | **$19,837,254** |

**Equity Approach**

Colorado is committed to a just and equitable access to the benefits of clean, renewable energy including reduced air pollution and investing in Colorado's workforce. CEO and DOLA intend to include equity and employment as criteria in determining awards for each of the funding objectives including:

1. Projected equitable impacts: Degree to which application demonstrates process or projections by which at least 40% of funds will be invested in projects in disproportionately impacted communities, in alignment with the federal Justice40 initiative.
2. Impact on workforce/job creation: Degree to which application demonstrates that the project is projected to create new jobs or workforce demand, and inclusion of planning for funding past initial funding as needed.
3. Long-term Community Impact Depth: Degree to which a project uses specific sources or examples to demonstrate projected long-term permanent impact to the health and safety of the community or region through outcomes impact, environmental impact, workforce impact, etc.
4. Shovel-ready status: Clearly defined project scope, partners, secured site, and timeline for project implementation.

10

**Technical Assistance and Administration:**

Colorado's goal is to use the resilience funding to support investment in projects and technologies that increase grid resilience, improve reliability, advance equity goals, and create good-paying jobs all while reducing GHG emissions. To meet this goal, the focus of the state's investment through IIJA grants will be to fund projects that increase investment in renewable energy and microgrid technologies. Technical assistance will be provided to sub-grantees through contractors approved by the Department of Energy.

**Public Notice and Hearing:**

Colorado will post a draft of its application to its "Infrastructure, Investment and Jobs Act" (IIJA) website as well as to relevant agencies' IIJA websites or main site. The Colorado DOLA and CEO held an open informational meeting for Thursday, November 17, 2022, 4-6pm via Zoom, which was attended by over 100 interested parties, mostly representing Colorado's electric utilities. The designated State of Colorado staff reached out to parties that would be potentially interested in applying for this grant funding, including rural municipal and cooperative utilities, the Colorado Rural Electric Association (CREA), Ute and Southern Ute Tribes. These State staff are also making public announcements via:

- In person and virtual meetings with various utilities, NGOs, and interested groups
- Social media posts

Following the public hearing, a draft of this narrative and the Microgrids for Community Resilience Application Guidelines were posted on State of Colorado websites, including that of the Colorado Energy Office and the Department of Local Affairs. Contact information for the appropriate staff members was provided and the public were encouraged to submit comments on these documents and the proposed use of these funds. The initial deadline for commenting was set for December 5, but was later extended to December 12, 2022. A total of 10 parties submitted comments, which were subsequently posted, and commented on by Colorado state staff members. Additionally, key changes to this narrative were made by staff based on the comments provided by the public.

11



JARED POLIS
GOVERNOR

136 STATE CAPITOL
DENVER, COLORADO 80203

TEL 303-866-2471
FAX 303-866-2003

January 9, 2023

Dear Secretary Granholm and the Department of Energy Grid Deployment Office,

Thank you for this terrific opportunity to receive funding for electrical grid hardening in the State of Colorado. Please find attached our application for these funds for the first two years of the five year Grid Resilience Grant Program.

The intent of this letter is to inform you that the Colorado Energy Office will be the recipient of the funds for the Grid Resilience Grant Program, funded through Section 40101(d) of the Bilateral Infrastructure Legislation (BIL). The Energy Office will administer these funds in partnership with the Colorado Department of Local Affairs (DOLA). Under this formula program, Colorado is estimated to receive approximately $8.6 million annually for the next five years, or approximately $43 million total. This application is for years 1 and 2 of the program, for approximately $17.2 million.

The State intends to use the Grid Resilience Grant Program federal funding, matched with state and utility funding, to support the microgrids grant program created by House Bill 22-1013, "Microgrids for Community Resilience," and invest in microgrids, grid hardening projects, advanced system monitoring, and grid reliability and resilience research.

The state's Greenhouse Gas Pollution Reduction Roadmap identified reducing emissions from electric utilities by at least 80% by 2030 (from a 2005 baseline) and reducing emissions from buildings as key strategies to meet Colorado's greenhouse gas emissions targets. Microgrids and expanded use of smart appliances and grid interactive buildings technology will help meet both of these goals. In addition, the State of Colorado has recently experienced significant climate-related extreme weather events; including wildfires (Cameron Peak and East Troublesome fires in 2020, and Marshall fire in 2021), extreme heat, winter storms (Uri, 2021), and flooding (2013), that have tested the resilience and reliability of the state's energy infrastructure. Our attached proposal links these goals together into a comprehensive approach to deploy these formula funds to reduce emissions while simultaneously improving the reliability and resilience of electric utility systems across Colorado.

Our agencies have engaged with large and small, urban and rural communities throughout the state to develop and refine the attached program narrative to ensure that it meets the greatest needs for grid resiliency while advancing innovative approaches to renewable energy. This strategy aligns with the goals of the Biden Administration and BIL, including ensuring that at least 40% of benefits of these investments serve disadvantaged communities, consistent with Justice40. We appreciate the Department of Energy's continued partnership with Colorado on this initiative and other ambitious efforts.

Sincerely,

Governor Jared Polis

**COLORADO**
**Department of Local Affairs**
Division of Local Government

January 9th, 2023

To Whom It May Concern:

As part of the IIJA 40101(d) application, a state funding match of at least 15% is required. This letter serves as the Department of Local Affairs' commitment to meet the state match fund requirements for the IIJA 40101(d) Formula Funding as part of Colorado Energy Office's submission to the U.S. Department of Energy.

The 15% state match requirements for year 1 and 2 of the IIJA 40101(d) funds is estimated to be $2,587,467.90. This match will be met through funding from the Microgrids for Community Resilience Grant Program, which has a total appropriation of $3,520,713 from House Bill 22-1013, which was passed by the Colorado General Assembly in the 2022 legislative session.

These cash funds are available now.

The HB22-1013 matching funds are limited to rural electric cooperatives and municipally owned utilities. Therefore, these $2,587,467.90 will be reserved for cooperative electric associations and municipal utilities from rural communities in Colorado that are interested in developing microgrids that contribute to their communities' energy resilience.

Sincerely,

Chantal Unfug
Director, Division of Local Government, Department of Local Affairs



# DISCLOSURE OF LOBBYING ACTIVITIES

**Complete this form to disclose lobbying activities pursuant to 31 U.S.C.1352**

Approved by OMB
0348-0046

| 1. * Type of Federal Action: | 2. * Status of Federal Action: | 3. * Report Type: |
|---|---|---|
| ☐ a. contract | ☐ a. bid/offer/application | ☒ a. initial filing |
| ☒ b. grant | ☒ b. initial award | ☐ b. material change |
| ☐ c. cooperative agreement | ☐ c. post-award | |
| ☐ d. loan | | |
| ☐ e. loan guarantee | | |
| ☐ f.  loan insurance | | |

**4.   Name and Address of Reporting Entity:**

☒ Prime  ☐ SubAwardee

* Name

* Street 1                                Street  2

* City                        State                        Zip

Congressional District, if known:

**5. If Reporting Entity in No.4 is Subawardee, Enter  Name and Address of Prime:**

| 6. * Federal Department/Agency: | 7. * Federal Program Name/Description: |
|---|---|
| | |
| | CFDA Number, *if applicable:* |

**8. Federal Action Number,** *if known:*

**9. Award Amount,** *if known:*

$

**10. a. Name and Address of Lobbying Registrant:**

Prefix          * First Name          Middle Name

* Last Name                        Suffix

* Street 1                                Street 2

* City                        State                        Zip

**b. Individual Performing Services** (including address if different from No. 10a)

Prefix          * First Name          Middle Name

* Last Name                        Suffix

* Street 1                                Street 2

* City                        State                        Zip

**11.** Information requested through this form is authorized by title 31 U.S.C. section  1352.  This disclosure of lobbying activities is a material representation of fact  upon which reliance was placed by the tier above when the transaction was made or entered into.  This disclosure is required pursuant to 31 U.S.C.1352. This information will be reported to the Congress semi-annually and will be available for public inspection.  Any person who fails to file the required disclosure shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

* Signature:    Completed on submission to Grants.gov

*Name:     Prefix          * First Name          Middle Name

* Last Name                        Suffix

Title:                     Telephone No.:              Date:    Completed on submission to Grants.gov

**Federal Use Only:**

Authorized for Local Reproduction
Standard Form - LLL (Rev. 7-97)



Home | Help | My Profile | Company Profile | Take a tour of FedConnect

**COLORADO ENERGY OFFICE — Ida Mae Isaac**

**cover page**    **attachments**    **cost sensitive attachments**    **summary**    **confirmation**

[ Print ]

**Your response has been successfully submitted.**
**Keep a copy of this page for your records.**

Confirmation Number: 638181080074092683
Sent:                          4/26/2023 12:13:27 PM

Status:                       Received by agency.
Picked up by Agency:   4/26/2023 12:21:16 PM

**Offer good for 60 days.**

[ Return to Opportunity Summary ]

© 2023 Unison Software, Inc. All rights reserved.          Terms of Service and Use          About FedConnect

# EXHIBIT D

**ASSISTANCE AGREEMENT**

| 1. Award No. DE-GD0000006 | 2. Modification No. | 3. Effective Date 08/30/2023 | 4. CFDA No. 81.254 |
|---|---|---|---|

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Vanessa Dam<br>1580 LOGAN STREET, SUITE 100<br>DENVER CO 802031940 | Grid Deployment Office (GD)<br>U.S. Department of Energy<br>1000 Independence Avenue, SW<br>Forrestal Building , GD-1<br>Washington DC 20585 | 08/30/2023<br>through<br>04/30/2028 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | See page 2 | 23GD000170 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Vanessa Dam<br>1580 LOGAN STREET, SUITE 100<br>DENVER CO 802031940 | Govt. Share: $17,249,786.00<br><br>Cost Share : $2,587,467.00<br><br>Total    : $19,837,253.00 | This action:<br>$17,249,786.00<br><br>Total    :<br>$17,249,786.00 |

| 14. Principal Investigator | 15. Program Manager Lucas S. Greza Phone: 304-285-4663 | 16. Administrator U.S. DOE/NETL NATIONAL ENERGY TECH LAB 3610 Collins Ferry Road Morgantown WV 26505-2353 |
|---|---|---|

| 17. Submit Payment Requests To Payment - Direct Payment from U.S. Dept of Treasury | 18. Paying Office Payment - Direct Payment from U.S. Dept of Treasury | 19. Submit Reports To See Attachment 3 |
|---|---|---|

| 20. Accounting and Appropriation Data |
|---|
| See Schedule |

| 21. Research Title and/or Description of Project |
|---|
| Bipartisan Infrastructure Law (BIL) - PREVENTING OUTAGES AND ENHANCING THE RESILIENCE OF THE ELECTRIC GRID FORMULA GRANTS TO STATES AND INDIAN TRIBEs |

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer *Sheldon E. Funk* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer Sheldon E. Funk | 27. Date Signed 08/30/2023 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-GD0000006 | | | | PAGE<br>2 | OF<br>29 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | UEI:  JLVGQ4E7RD53<br>Block 9 Authority:<br>Infrastructure Investment and Jobs Act of 2021,<br>Section 40101(d), 42 U.S.C. . § 18711(d) (2023<br><br>Project Period: 08/30/2023 - 4/30/2028<br><br>(DOE) Adward Administrator / Contract Specialist:<br>Rachel L. Price<br>rachel.price@netl.doe.gov<br>(412)386-9474<br><br>(DOE) Program Manager:<br>Lucas S. Greza<br>lucas.greza@netl.doe.gov<br>(304)285-4663<br><br>Business Point-Of-Contact (BPOC):<br>Gregg Hefner<br>gregg.hefner@state.co.us<br>(303)866-2601<br><br>Principal Investigator (PI):<br>John Parks<br>john.m.parks@state.co.us<br>(970)631-6786<br><br><br>ASAP: YES Extent Competed: NOT COMPETED<br>Davis-Bacon Act: YES PI: John Parks<br>Delivery Location Code: 02605<br>U.S. DOE/NETL<br>NATIONAL ENERGY TECH LAB<br>3610 Collins Ferry Road<br>Morgantown WV 26505-2353 | | | | |

SPECIAL TERMS AND CONDITIONS FOR USE IN FORMULA GRANTS ISSUED UNDER THE GRID
DEPLOYMENT OFFICE (GDO) ADMINISTRATIVE AND LEGAL REQUIREMENTS DOCUMENT
(ALRD)...........................................................................................................................................6
LEGAL AUTHORITY AND EFFECT (JUNE 2015) ....................................................................6
RESOLUTION OF CONFLICTING CONDITIONS ......................................................................6
AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – MARCH 2023) ......6
FLOW DOWN REQUIREMENT ...................................................................................................6
CONFERENCE SPENDING (FEBRUARY 2015) .........................................................................7
PAYMENT PROCEDURES – REIMBURSEMENTS STANDARD APPLICATION FOR PAYMENTS
(ASAP) SYSTEM...........................................................................................................................7
COST MATCH..................................................................................................................................7
REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS
AND FRINGE BENEFITS..............................................................................................................8
USE OF PROGRAM INCOME - ADDITION ...............................................................................8
POST-AWARD DUE DILIGENCE REVIEWS (MARCH 2023) .................................................8
ANNUAL ALLOCATION REQUEST...........................................................................................8
RESILIENCE PROJECT AND SUBAWARD/SUBCONTRACT NOTIFICATION ...................8
REPORTING ..................................................................................................................................10
FOREIGN NATIONAL PARTICIPATION – APPROVAL REQUIRED (MARCH 2023) ..........10
STATEMENT OF FEDERAL STEWARDSHIP ..........................................................................10
SITE VISITS ..................................................................................................................................11
CATEGORICAL EXCLUSION (CX) – Initial Application.........................................................11
FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS .....................................................11
ELIGIBLE ENTITY PRIORITIZATION – 40101(d)(5) .............................................................11
SMALL UTILITIES SET ASIDE – 40101(d)(6)..........................................................................11
TECHNICAL ASSISTANCE AND ADMINISTRATIVE EXPENSES – 40101(d)(7) ...............11
NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS --
SENSE OF CONGRESS ...............................................................................................................11
INSURANCE COVERAGE (DECEMBER 2014) ........................................................................12
REAL PROPERTY – GRID RESILIENCE...................................................................................12
EQUIPMENT (DECEMBER 2014)...............................................................................................12
SUPPLIES (DECEMBER 2014)....................................................................................................12
CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022) .................12
PROPERTY TRUST RELATIONSHIP (DECEMBER 2014) ......................................................13
INSOLVENCY, BANKRUPTCY OR RECEIVERSHIP .............................................................13
PERFORMANCE OF WORK IN UNITED STATES ...................................................................14
REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION .......................................14
SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS............16
FINAL INCURRED COST AUDIT (DECEMBER 2014).............................................................17
INDEMNITY..................................................................................................................................17
LOBBYING RESTRICTIONS (MARCH 2012) ..........................................................................18
CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH
2014)..............................................................................................................................................18
NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)............18

DE-GD0000006/0000

REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE
(DECEMBER 2015)..................................................................................................................19
EXPORT CONTROL (MARCH 2023)......................................................................................20
PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES
OR EQUIPMENT (MARCH 2023) ...........................................................................................21
PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT
PROGRAMS (MARCH 2023)....................................................................................................21
IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS
LIBERTY (NOVEMBER 2020) .................................................................................................22
INTERIM CONFLICT OF INTEREST REQUIREMENTS FOR FINANCIAL ASSISTANCE (MARCH
2023)..........................................................................................................................................22
FRAUD, WASTE AND ABUSE (MARCH 2023)....................................................................22
TRANSPARENCY OF FOREIGN CONNECTIONS (MARCH 2023)....................................23
FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023)..................................23
BUY AMERICAN REQUIREMENTS FOR INFRASTRUCTURE PROJECTS (MARCH 2023) ...............24
REPORTING, TRACKING AND SEGREGATION OF INCURRED COSTS (MARCH 2023) ..................27
DAVIS-BACON REQUIREMENTS (MARCH 2023)................................................................27
AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (MARCH 2023).................28
POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023).......................................29

DE-GD0000006/0000

**SPECIAL TERMS AND CONDITIONS FOR USE IN FORMULA GRANTS ISSUED UNDER THE GRID DEPLOYMENT OFFICE (GDO) ADMINISTRATIVE AND LEGAL REQUIREMENTS DOCUMENT (ALRD)**

**LEGAL AUTHORITY AND EFFECT (JUNE 2015)**

(a) A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

(b) Recipients are free to accept or reject the award. A request to draw down DOE funds constitutes the Recipient's acceptance of the terms and conditions of this Award.

**RESOLUTION OF CONFLICTING CONDITIONS**

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this award must be referred to the DOE Award Administrator for guidance.

**AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – MARCH 2023)**

This award/agreement consists of the Assistance Agreement cover page, plus the following:
a.    Special terms and conditions.
b.    Attachments:

| Attachment No. | Title |
| --- | --- |
| 1 | Intellectual Property Provisions |
| 2 | Statement of Project Objectives |
| 3 | Federal Assistance Reporting Checklist |

c.    Applicable program regulations: NONE
d.    DOE Assistance Regulations, 2 CFR part 200 as amended by 2 CFR part 910 at http://www.eCFR.gov.
e.    Research Terms and Conditions and the DOE Agency Specific Requirements at http://www.nsf.gov/bfa/dias/policy/rtc/index.jsp (if the Award is for research and the Award is to a university or non-profit).
f.    Application/proposal as approved by DOE.
g.    National Policy Assurances to Be Incorporated as Award Terms in effect on date of award at https://www.nsf.gov/awards/managing/rtc.jsp.
h.    Public Law 117-58, also known as the Bipartisan Infrastructure Law (BIL)

**FLOW DOWN REQUIREMENT**

The Recipient agrees to apply the terms and conditions of this Award, as applicable, including the Intellectual Property Provisions, to all subrecipients (and subcontractors, as appropriate), as required by 2 CFR 200.101, and to require their strict compliance therewith. Further, the Recipient must apply the Award terms as required by 2 CFR 200.327 to all subrecipients (and subcontractors, as appropriate), and to require their strict compliance therewith.

6

DE-GD0000006/0000

**CONFERENCE SPENDING (FEBRUARY 2015)**

The recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive Branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

**PAYMENT PROCEDURES - REIMBURSEMENT THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM**

a. Method of Payment. Payment will be made by reimbursement through the Department of Treasury's ASAP system.

b. Requesting Reimbursement. Requests for reimbursements must be made through the ASAP system. Your requests for reimbursement should coincide with your normal billing pattern, but not more frequently than every two weeks. Each request must be limited to the amount of disbursements made for the federal share of direct project costs and the proportionate share of allowable indirect costs incurred during that billing period.

c. Adjusting payment requests for available cash. You must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from DOE/NNSA.

d. Payments. All payments are made by electronic funds transfer to the bank account identified on the ASAP Bank Information Form that you filed with the U.S. Department of Treasury.

**COST MATCH**

a. "Cost Matching" for the non-federal share is calculated as a percentage of the Federal funds only, rather than the Total Project Cost.  The Total Project Cost is the sum of the Government share and Recipient match.  The Recipient's cost match must come from non-Federal sources unless otherwise allowed by law.

Each Recipient is required to match 15 percent of their allocation.  In addition, eligible entities performing resilience projects are required to provide a 100 percent cost match, unless the eligible entity sells not more than 4,000,000 megawatt hours of electricity per year, then the eligible entity is required to provide a one-third cost match.

By accepting federal funds under this award, the Recipient is liable for the cost match percentage of total expenditures incurred, even if the project is terminated early or is not funded to its completion.

b. If the Recipient discovers that you may be unable to provide the required cost matching under this award, the Recipient should immediately provide written notification to the DOE Award Administrator indicating whether the Recipient will continue or phase out the project. If you plan to continue the project, the notification must describe how replacement cost matching will be secured.

c. The Recipient must maintain records of all project costs that you claim as cost match, including in-kind costs, as well as records of costs to be paid by DOE/NNSA. Such records are subject to audit.

d. Failure to provide the cost matching required by this term may result in the subsequent recovery by DOE of some or all the funds provided under the award.

**REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS**

a. If actual allowable indirect costs are less than those budgeted and funded under the award, you may use the difference to pay additional allowable direct costs during the project period. If at the completion of the award the Government's share of total allowable costs (i.e., direct and indirect), is less than the total costs reimbursed, you must refund the difference.

b. Recipients are expected to manage their indirect costs. DOE will not amend an award solely to provide additional funds for changes in indirect cost rates. DOE recognizes that the inability to obtain full reimbursement for indirect costs means the recipient must absorb the underrecovery. Such underrecovery may be allocated as part of the organization's required cost sharing.

**USE OF PROGRAM INCOME - ADDITION**

If you earn program income during the project period as a result of this award, you may add the program income to the funds committed to the award and use it to further eligible project objectives.

**POST-AWARD DUE DILIGENCE REVIEWS (MARCH 2023)**

During the life of the Award, DOE may conduct ongoing due diligence reviews, through Government resources, to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring an individual or entity not participate in the Award.

**ANNUAL ALLOCATION REQUEST**

The Recipient shall submit their annual allocation request in accordance with the instructions provided in the Reporting Requirements Checklist attached to this award.  The Annual Allocation Request must be submitted to the DOE Program Manager whose name is in Block 15 of the Award Agreement and the DOE Award Administrator whose name is identified on Page 2 of the Assistance Agreement cover page.

The Annual Allocation Request must include the following information:

- SF 424 reflecting the current year allocation and cost match amounts.

- Cost Match Information for current year allocation.

  - Cost Match Value
  - Identify the source/organization of the proposed cost match.
  - Type of Cost Match (cash or in-kind)
  - Provide a description of their proposed cost match.

- Program Narrative – copy of current Program Narrative if there are no changes or an updated Program Narrative to reflect any changes.   If changes have occurred, a Public Notice and Hearing must be documented in the updated Program Narrative.

**RESILIENCE PROJECT AND SUBAWARD/SUBCONTRACT NOTIFICATION**

**For all resilience project subawards** and any other subaward over $250,000, the Recipient must notify the DOE Contracting Officer and Project Officer in writing prior to the execution of new or modified subawards/subcontracts.  This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR 200, nor does it relieve the Recipient from its obligation to comply with applicable Federal statutes, regulations, and executive orders.

The Recipient is responsible for making a final determination to award or modify subawards/subcontracts under this agreement, but the Recipient may not proceed with the subaward/subcontract until the DOE determines, and provides the Recipient written notification, that the information provided is adequate.

In order to satisfy this notification requirement, Recipient documentation must, at a minimum, include the following:

DE-GD0000006/0000

(a) Recipient confirms that the subawardee:

    (i) is an eligible entity type identified in BIL section 40101(a)(2);

    (ii) is a domestic entity; to qualify as a domestic entity, the entity must be organized, chartered or incorporated (or otherwise formed) under the laws of a particular state or territory of the United States; have majority domestic ownership and control; and have a physical place of business in the United States;

    (iii) is not a debarred or a suspended entity; and

    (iv) will pay all of the laborers and mechanics performing construction, alteration, or repair work in excess of $2,000 on projects funded directly by or assisted in whole or in part by and through funding under the award, wages at rates not less than those prevailing on projects of a character similar in the locality as determined by subchapter IV of Chapter 1 of Title 40, United State Code commonly referred to as the "Davis-Bacon Act" (DBA).

(b) Recipient confirms that:

    (i) the process undertaken to solicit the subaward/subcontract complies with their written procurement procedures as outlined in 2 CFR 200.318;

    (ii) the proposed work to be done is an eligible activity identified in BIL Section 40101(e)(1);

    (iii) the proposed subaward effort is consistent with the Program Narrative being executed under the award;

    (iv) the primary purpose of the proposed project is not cyber security but that the implementation of the proposed project will adhere to any applicable cybersecurity requirements, and where possible, best practices in deploying technologies under their subaward;

    (v) no planned, actual or apparent conflict of interest exists between the Recipient and the selected subawardee/subcontractor and that the Recipient's written standards of conduct were followed;

    (vi) as applicable, subaward/subcontracts address the Small Utilities Set Aside requirement set forth in BIL Section 40101(d)(6); and

    (vii) all required award provisions will be flowed down in the resulting subaward/subcontract.

(c) Recipient provides:

    (i) SF-424A Budget Information form and Budget Justification form for all resilience project subawards; and any other subaward over $250,000;

    (ii) a completed Environmental Questionnaire covering the subaward activity;

    (iii) cost match commitment letter from the eligible entity committing to meet the cost matching as required in BIL Section 40101(h);

    (iv) the proposed metrics that will be collected and reported in the Quarterly Progress Report to measure and demonstrate the beneficial impact of the resilience project on the resilience of the grid and to the community served;

    (v) listing of Foreign Nationals for subrecipients/eligible entities and technical assistance contractors in accordance with the Foreign National Participation – Approval term;

    (vi) Performance of Work in the United States waiver (if applicable);

    (vii) Buy America for Infrastructure Projects waiver (if applicable);

    (viii) Domestic entity waiver for subrecipients (if applicable); and

    (ix) a summary/brief description of any application, similar in nature, submitted by the proposed subawardee to the DOE under BIL Section 40101(c), DE-FOA-0002740, Grid Resilience and Innovation Partnerships (GRIP).

DE-GD0000006/0000

If a State or Indian Tribe petitions the Secretary to be designated as an eligible entity for the purpose of executing a resilience project, it must provide both the 15% cost match for the entire allocation made by DOE to the State or Tribe (see BIL section 40101(d)(8)) and the project specific cost match requirement of 100% or 1/3 (see BIL section 40101(h)).

**REPORTING**

Reporting requirements are identified on the Federal Assistance Reporting Checklist and Instructions, DOE F 4600.2, attached to the award agreement. Additional reporting requirements apply to projects funded by BIL. As part of tracking progress toward key Departmental goals – ensuring justice and equity, creating jobs, boosting domestic manufacturing, reducing greenhouse gas emissions, and advancing a pathway to private sector – DOE may require specific data collection. Examples of data that may be collected include:

- project locations,
- measurable improvements of resilience,
- transmission capacity upgraded, expanded, or built,
- electricity storage capacity installed,
- funding leveraged,
- stakeholders engaged,
- technical assistance provided, and
- value of contracts or agreements with minority owned business for supplies, services, or equipment.

Recipients must maintain sufficient records to substantiate this information upon request.

**FOREIGN NATIONAL PARTICIPATION – APPROVAL REQUIRED (MARCH 2023)**

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of this award, the Recipient must provide DOE with specific information about each foreign national to ensure compliance with the requirements for foreign national participation and access approvals. The volume and type of information required may depend on various factors associated with the award.

Approval for foreign nationals in Principal Investigator/Co-Principal Investigator roles, from countries of risk (i.e., China, Iran, North Korea, and Russia), and from countries identified on the U.S. Department of State's list of State Sponsors of Terrorism (https://www.state.gov/state-sponsors-of-terrorism/) must be obtained from DOE before they can participate in the performance of any work under this award.

A "foreign national" is defined as any person who is not a United States citizen by birth or naturalization. DOE may elect to deny a foreign national's participation in the award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs, or personnel.

**The Recipient must include this term in any subaward and in any applicable contractual agreement(s) associated with this award.**

**STATEMENT OF FEDERAL STEWARDSHIP**

DOE/NNSA will exercise normal Federal stewardship in overseeing the project activities performed under this award. Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance or temporary intervention in unusual circumstances to correct deficiencies which develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the award objectives have been accomplished.

10

DE-GD0000006/0000

## SITE VISITS

DOE/NNSA's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required. You must provide, and must require your subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

## CATEGORICAL EXCLUSION (CX) – Initial Application

DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of federal funds.  Based on the initial information provided by the Recipient, DOE has made a NEPA determination by issuing a CX, thereby **authorizing use of funds for technical assistance and administrative project activities only.**

NEPA review and approval of proposed resilience project activities are required as per the Resilience Project and Subaward/Subcontract Notification Term. If any of the proposed projects are likely to require an Environmental Assessment (EA) or Environmental Impact Statement (EIS), the DOE NEPA Compliance Officer will provide further guidance.  Should the recipient elect to undertake activities prior to authorization from the DOE, the Recipient is doing so at risk and such costs may not be authorized and recognized as allowable cost.

## FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS

You must obtain any required permits and comply with applicable federal, state, and municipal laws, codes, and regulations for work performed under this award.

## ELIGIBLE ENTITY PRIORITIZATION – 40101(d)(5)

In making subawards to eligible entities using funds made available under the program, the Recipient shall give priority to projects that, in the determination of the Recipient, will generate the greatest community benefit (whether rural or urban) in reducing the likelihood and consequences of disruptive events.

## SMALL UTILITIES SET ASIDE – 40101(d)(6)

The Recipient shall ensure that, of the amounts made available to eligible entities, the percentage made available to eligible entities that sell not more than 4,000,000 megawatt hours of electricity per year is not less than the percentage of all customers in the Recipient State or Indian Tribe (as applicable) that are served by those eligible entities.

## TECHNICAL ASSISTANCE AND ADMINISTRATIVE EXPENSES – 40101(d)(7)

Of the amounts made available to the Recipient under the program each fiscal year, the Recipient may use not more than 5 percent for technical assistance (*see* BIL Section 40101(g)(1)(A)) and administrative expenses associated with the program.

## NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this award should be American-made.

DE-GD0000006/0000

**INSURANCE COVERAGE (DECEMBER 2014)**

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds.

**REAL PROPERTY – GRID RESILIENCE**

Acquisition of land or easements is not permitted under this grant program. Improvements to real property for the purpose of grid hardening or resilience is not considered acquisition of real property for the purpose of this grant program, and therefore may be permitted.

**EQUIPMENT (DECEMBER 2014)**

Subject to the conditions provided in 2 CFR Part 200.313, title to equipment (property) acquired under a Federal award will vest conditionally with the non-Federal entity.

The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR Part 200.313 before disposing of the property.

States must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by the Federal awarding agency in the priority order specified in 2 CFR Part 200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR Part 200.313(d).

When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from the Federal awarding agency or pass-through entity.

Disposition will be made as follows: (a) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency; (b) Non-Federal entity may retain title or sell the equipment after compensating the Federal awarding agency as described in 2 CFR Part 200.313(e)(2); or (c) transfer title to the Federal awarding agency or to an eligible third Party as specified in CFR Part 200.313(e)(3).

See 2 CFR Part 200.313 for additional requirements pertaining to equipment acquired under a Federal award. Also see 2 CFR Part 200.439 Equipment and other capital expenditures.

See 2 CFR Part 910.360 for amended requirements for Equipment for For-Profit recipients.

**SUPPLIES (DECEMBER 2014)**

See 2 CFR Part 200.314 for requirements pertaining to supplies acquired under a Federal award.

See also § 200.453 Materials and supplies costs, including costs of computing devices.

**CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022)**

12

Real property and equipment purchased with project funds (federal share and recipient cost share) under this Award are subject to the requirements at 2 CFR 200.311, 200.313, and 200.316 (non-Federal entities, except for-profit entities) and 2 CFR 910.360 (for-profit entities). The Recipient may continue to use the real property and equipment after the conclusion of the award period of performance so long as the Recipient:

a. Continues to use the property for the authorized project purposes;
b. Complies with the applicable reporting requirements and regulatory property standards;
c. As applicable to for-profit entities, UCC filing statements are maintained; and
d. Submits a written Request for Continued Use for DOE authorization, which is approved by the DOE Contracting Officer.

The Recipient must request authorization from the Contracting Officer to continue to use the property for the authorized project purposes beyond the award period of performance ("Request for Continued Use"). The Recipient's written Request for Continued Use must identify the property and include: a summary of how the property will be used (must align with the authorized project purposes); a proposed use period (e.g., perpetuity, until fully depreciated, or a calendar date where the Recipient expects to submit disposition instructions); acknowledgement that the recipient shall not sell or encumber the property or permit any encumbrance without prior written DOE approval; current fair market value of the property; and an Estimated Useful Life or depreciation schedule for equipment.

When the property is no longer needed for authorized project purposes, the Recipient must request disposition instructions from DOE. For-profit entity disposition requirements are set forth at 2 CFR 910.360. Property disposition requirements for other non-federal entities are set forth in 2 CFR 200.310-200.316.

## PROPERTY TRUST RELATIONSHIP (DECEMBER 2014)

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.

See 2 CFR Part 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

## INSOLVENCY, BANKRUPTCY OR RECEIVERSHIP

**The Recipient must include the insolvency, bankruptcy or receivership term in any for-profit/non-profit sub-award(s), at any tier.**

a. You shall immediately notify the DOE of the occurrence of any of the following events: (i) you or your parent's filing of a voluntary case seeking liquidation or reorganization under the Bankruptcy Act; (ii) your consent to the institution of an involuntary case under the Bankruptcy Act against you or your parent; (iii) the filing of any similar proceeding for or against you or your parent, or its consent to, the dissolution, winding-up or readjustment of your debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over you, under any other applicable state or federal law; or (iv) your insolvency due to your inability to pay your debts generally as they become due.

b. Such notification shall be in writing and shall: (i) specifically set out the details of the occurrence of an event referenced in paragraph a; (ii) provide the facts surrounding that event; and (iii) provide the impact such event will have on the project being funded by this award.

c. Upon the occurrence of any of the four events described in the first paragraph, DOE reserves the right to conduct a review of your award to determine your compliance with the required elements of the award (including such items as cost share, progress towards technical project objectives, and submission of required reports). If the DOE review determines

13

DE-GD0000006/0000

that there are significant deficiencies or concerns with your performance under the award, DOE reserves the right to impose additional requirements, as needed, including (i) change your payment method; or (ii) institute payment controls.

d. Failure of the Recipient to comply with this term may be considered a material noncompliance of this financial assistance award by the Contracting Officer.

## PERFORMANCE OF WORK IN UNITED STATES

The Recipient agrees that at least **100%** of the direct labor cost for the project (including subrecipient labor) shall be incurred in the United States, unless the Recipient can demonstrate to the satisfaction of the DOE that the United States economic interest will be better served through a greater percentage of the work being performed outside the United States.

## REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

a. Reporting of first-tier subawards.

1. Applicability. Unless you are exempt as provided in paragraph d. of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

2. Where and when to report.

   i. You must report each obligating action described in paragraph a.1. of this award term to http://www.fsrs.gov.

   ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

3. What to report. You must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov specify.

b. Reporting Total Compensation of Recipient Executives.

1. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if

   i. the total Federal funding authorized to date under this award is $30,000 or more;

   ii. in the preceding fiscal year, you received;

      (A) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      (B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

   iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

DE-GD0000006/0000

2. Where and when to report. You must report executive total compensation described in paragraph b.1. of this award term:

    i. As part of your registration profile at http://www.sam.gov.

    ii. By the end of the month following the month in which this award is made, and annually thereafter.

c. Reporting of Total Compensation of Subrecipient Executives.

1. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if;

    i. in the subrecipient's preceding fiscal year, the subrecipient received;

    (A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

    (B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

    ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm. )

2. Where and when to report. You must report subrecipient executive total compensation described in paragraph c.1. of this award term:

    i. To the recipient.

    ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year ( i.e., between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

d. Exemptions

If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    i. Subawards,

    and

    ii. The total compensation of the five most highly compensated executives of any subrecipient.

e. Definitions. For purposes of this award term:

1. Entity means all of the following, as defined in 2 CFR part 25:

    i. A Governmental organization, which is a State, local government, or Indian tribe;

DE-GD0000006/0000

ii. A foreign public entity;

iii. A domestic or foreign nonprofit organization;

iv. A domestic or foreign for-profit organization;

v. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

2. Executive means officers, managing partners, or any other employees in management positions.

3. Subaward:

i. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

ii. The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec. __ .210 of the attachment to OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations).

iii. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

4. Subrecipient means an entity that:

i. Receives a subaward from you (the recipient) under this award; and

ii. Is accountable to you for the use of the Federal funds provided by the subaward.

5. Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

i. Salary and bonus.

ii. Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

iii. Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

iv. Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

v. Above-market earnings on deferred compensation which is not tax-qualified.

vi. Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

**SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS**

A. Requirement for System for Award Management (SAM) Unless exempted from this requirement under 2 CFR 25.110, the prime recipient must remain registered and maintain current information in SAM for the entire period of performance

16

DE-GD0000006/0000

of the award. This includes providing information on the prime recipient's immediate and highest level owner and subsidiaries, as well as on all of its predecessors that have been awarded a Federal contract or Federal financial assistance agreements within the last three years, if applicable, until the prime recipient submits the final financial report required under this award or receives the final payment, whichever is later. This requires the prime recipient to review its information in SAM at least annually after the initial registration, and to update its information as soon as there are changes. Reviews and updates may be required more frequently due to changes in recipient information or as required by another award term.

B. Requirement for Unique Entity Identifier

If authorized to make subawards under this award, the prime recipient:

    1. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward until the entity has provided its unique entity identifier to the prime recipient.

    2. Must not make a subaward to an entity unless the entity has provided its unique entity identifier to the prime recipient. Subrecipients are not required to obtain an active SAM registration, but must obtain a unique entity identifier.

C. Definitions

For purposes of this term:

    1. System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

    2. Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

    3. Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following for purposes of this part:

        a. A foreign organization;

        b. A foreign public entity;

        c. A domestic for-profit organization; and

        d. A Federal agency.

    4. Subaward has the meaning given in 2 CFR 200.1.

    5. Subrecipient has the meaning given in 2 CFR 200.1.

**FINAL INCURRED COST AUDIT (DECEMBER 2014)**

In accordance with 2 CFR Part 200 as amended by 2 CFR Part 910, DOE reserves the right to initiate a final incurred cost audit on this award. If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

17

DE-GD0000006/0000

**INDEMNITY**

The Recipient must include the following indemnity provision in any sub-awards to eligible entities performing the resilience projects at any tier:

The **Colorado Energy Office** shall indemnify the Government and its officers, agents, or employees for any and all liability, including litigation expenses and attorneys' fees, arising from suits, actions, or claims of any character for death, bodily injury, or loss of or damage to property or to the environment, resulting from the project, except to the extent that such liability results from the direct fault or negligence of Government officers, agents or employees, or to the extent such liability may be covered by applicable allowable costs provisions.

**LOBBYING RESTRICTIONS (MARCH 2012)**

By accepting funds under this award, you agree that none of the funds obligated on the award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913. This restriction is in addition to those prescribed elsewhere in statute and regulation.

**CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH 2014)**

By entering into this agreement, the undersigned attests that Colorado Energy Office has not been convicted of a felony criminal violation under Federal law in the 24 months preceding the date of signature.

The undersigned further attests that Colorado Energy Office does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

For purposes of these assurances, the following definitions apply:

A Corporation includes any entity that has filed articles of incorporation in any of the 50 states, the District of Columbia, or the various territories of the United States [but not foreign corporations]. It includes both for-profit and non-profit organizations.

**NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)**

(1) By entering into this agreement, the undersigned attests that Colorado Energy Office does not and will not require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(2) The undersigned further attests that does not and will not use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

a. ''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and

18

DE-GD0000006/0000

liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''

   b. The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

   c. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

**REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015)**

a. General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

b. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

2. Reached its final disposition during the most recent five year period; and

3. Is one of the following:

   (A) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

   (B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

   (C) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

   (D) Any other criminal, civil, or administrative proceeding if:

DE-GD0000006/0000

(i) It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

(ii) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

(iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

c. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

d. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

e. Definitions

For purposes of this award term and condition:

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or A. Reporting of Matters Related to Recipient Integrity and Performance.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

(A) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

(B) The value of all expected funding increments under a Federal award and options, even if not yet

**EXPORT CONTROL (MARCH 2023)**

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade. There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls." The Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under the award, including subrecipient work.

DE-GD0000006/0000

The Recipient must immediately report to DOE any export control violations related to the project funded under this award, at the recipient or subrecipient level, and provide the corrective action(s) to prevent future violations.

**PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (MARCH 2023)**

As set forth in 2 CFR 200.216, recipients and subrecipients are prohibited from obligating or expending project funds (Federal and non-Federal funds) to:

(1) Procure or obtain;

(2) Extend or renew a contract to procure or obtain; or

(3) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

**PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT PROGRAMS (MARCH 2023)**

A.    **Prohibition**

Persons participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk* are prohibited from participating in this Award. The Recipient must exercise ongoing due diligence to reasonably ensure that no individuals participating on the DOE-funded project are participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. Consequences for violations of this prohibition will be determined according to applicable law, regulations, and policy. Further, the Recipient must notify DOE within five (5) business days upon learning that an owner of the Recipient or subrecipient or individual on the project team is or is believed to be participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. DOE may modify and add requirements related to this prohibition to the extent required by law.

21

B.    **Definitions**

1.    **Foreign Government-Sponsored Talent Recruitment Program**. An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government. Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose. Some programs allow for or encourage continued employment at United States research facilities or receipt of federal research funds while concurrently working at and/or receiving compensation from a foreign institution, and some direct participants not to disclose their participation to U.S. entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

2.    **Foreign Country of Risk**. DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.


## IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY (NOVEMBER 2020)

States, local governments, or other public entities may not condition sub-awards in a manner that would discriminate, or disadvantage sub-recipients based on their religious character.


## INTERIM CONFLICT OF INTEREST REQUIREMENTS FOR FINANCIAL ASSISTANCE (MARCH 2023)

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy.


## FRAUD, WASTE AND ABUSE (MARCH 2023)

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse and mismanagement. The OIG

DE-GD0000006/0000

accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to include grants, cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit https://www.energy.gov/ig/ig-hotline.

Additionally, the Recipient must be cognizant of the requirements of 2 CFR § 200.113 Mandatory disclosures, which states:

> The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Non-Federal entities that have received a Federal award including the term and condition outlined in appendix XII of 2 CFR Part 200 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in § 200.339. (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)

## TRANSPARENCY OF FOREIGN CONNECTIONS (MARCH 2023)

During the term of the Award, the Recipient must notify the DOE Contracting Officer within fifteen (15) business days of learning of the following circumstances in relation to the Recipient or subrecipients:

1. The existence of any joint venture or subsidiary that is based in, funded by, or has a foreign affiliation with any foreign country of risk;
2. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an enterprise owned by a country of risk or foreign entity based in a country of risk;
3. Any current or pending change in ownership structure of the Recipient or subrecipients that increases foreign ownership related to a country of risk;
4. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has a foreign affiliation with any foreign country of risk;
5. Any current or pending technology licensing or intellectual property sales to a foreign country of risk; and
6. Any current or pending foreign business entity, offshore entity, or entity outside the United States related to the Recipient or subrecipient.

## FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023)

A.    Consideration of new collaborations with foreign organizations and governments. The Recipient must provide DOE with advanced written notification of any potential collaboration with foreign entities, organizations or governments in connection with its DOE-funded award scope. The Recipient must await further guidance from DOE prior to contacting the proposed foreign entity, organization or government regarding the potential collaboration or negotiating the terms of any potential agreement.

B.    Existing collaborations with foreign entities, organizations and governments. The Recipient must provide DOE with a written list of all existing foreign collaborations in which has entered in connection with its DOE-funded award scope.

C.    Description of collaborations that should be reported: In general, a collaboration will involve some provision of a thing of value to, or from, the Recipient. A thing of value includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the Award, regardless of whether or not they

DE-GD0000006/0000

have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the Award but resulting in provision of a thing of value from or to the Award must also be reported. Collaborations do not include routine workshops, conferences, use of the Recipient's services and facilities by foreign investigators resulting from its standard published process for evaluating requests for access, or the routine use of foreign facilities by awardee staff in accordance with the Recipient's standard policies and procedures.

## BUY AMERICAN REQUIREMENTS FOR INFRASTRUCTURE PROJECTS (MARCH 2023)

A.    **Definitions**

**Components** are defined as the articles, materials, or supplies incorporated directly into the end manufactured product(s).

**Construction Materials** are an article, material, or supply—other than an item primarily of iron or steel; a manufactured product; cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives—that is used in an infrastructure project and is or consists primarily of non-ferrous metals, plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables), glass (including optic glass), lumber, drywall, coatings (paints and stains), optical fiber, clay brick; composite building materials; or engineered wood products.

**Domestic Content Procurement Preference Requirement**- means a requirement that no amounts made available through a program for federal financial assistance may be obligated for an infrastructure project unless—
>    (A) all iron and steel used in the project are produced in the United States;
>    (B) the manufactured products used in the project are produced in the United States; or
>    (C) the construction materials used in the project are produced in the United States.
>    Also referred to as the Buy America Requirement.

**Infrastructure** includes, at a minimum, the structures, facilities, and equipment located in the United States, for: roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and generation, transportation, and distribution of energy -including electric vehicle (EV) charging.

The term "infrastructure" should be interpreted broadly, and the definition provided above should be considered as illustrative and not exhaustive.

**Manufactured Products** are items used for an infrastructure project made up of components that are not primarily of iron or steel; construction materials; cement and cementitious materials' aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

**Primarily of iron or steel** means greater than 50% iron or steel, measured by cost.

**Project**- means the construction, alteration, maintenance, or repair of infrastructure in the United States.

**Public**- The Buy America Requirement does not apply to non-public infrastructure. For purposes of this guidance, infrastructure should be considered "public" if it is: (1) publicly owned or (2) privately owned but utilized primarily for a public purpose. Infrastructure should be considered to be "utilized primarily for a public purpose" if it is privately operated on behalf of the public or is a place of public accommodation.

**B.**    **Buy America Requirement**

None of the funds provided under this award (federal share or recipient cost-share) may be used for a project for infrastructure unless:

1. All iron and steel used in the project is produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

The Buy America Requirement only applies to articles, materials, and supplies that are consumed in, incorporated into, or permanently affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought into the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Requirement apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

Recipients are responsible for administering their award in accordance with the terms and conditions, including the Buy America Requirement.  The recipient must ensure that the Buy America Requirement flows down to all subawards and that the subawardees and subrecipients comply with the Buy America Requirement.  The Buy America Requirement term and condition must be included all sub-awards, contracts, subcontracts, and purchase orders for work performed under the infrastructure project.

**C.**    **Certification of Compliance**

The Recipient must certify or provide equivalent documentation for proof of compliance that a good faith effort was made to solicit bids for domestic products used in the infrastructure project under this Award.

The Recipient must also maintain certifications or equivalent documentation for proof of compliance that those articles, materials, and supplies that are consumed in, incorporated into, affixed to, or otherwise used in the infrastructure project, not covered by a waiver or exemption, are produced in the United States. The certification or proof of compliance must be provided by the suppliers or manufacturers of the iron, steel, manufactured products and construction materials and flow up from all subawardees, contractors and vendors to the Recipient. The Recipient must keep these certifications with the award/project files and be able to produce them upon request from DOE, auditors or Office of Inspector General.

**D.**    **Waivers**

When necessary, the Recipient may apply for, and DOE may grant, a waiver from the Buy America Requirement. Requests to waive the application of the Buy America Requirement must be in writing to the Contracting Officer.

DE-GD0000006/0000

Waiver requests are subject to review by DOE and the Office of Management and Budget, as well as a public comment period of no less than 15 calendar days.

Waivers must be based on one of the following justifications:

1. Public Interest- Applying the Buy America Requirement would be inconsistent with the public interest;

2. Non-Availability- The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. Unreasonable Cost- The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

Requests to waive the Buy America Requirement must include the following:

- Waiver type (Public Interest, Non-Availability, or Unreasonable Cost);
- Recipient name and Unique Entity Identifier (UEI);
- Award information (Federal Award Identification Number, Assistance Listing number);
- A brief description of the project, its location, and the specific infrastructure involved;
- Total estimated project cost, with estimated federal share and recipient cost share breakdowns;
- Total estimated infrastructure costs, with estimated federal share and recipient cost share breakdowns;
- List and description of iron or steel item(s), manufactured goods, and/or construction material(s) the recipient seeks to waive from the Buy America Preference, including name, cost, quantity(ies), country(ies) of origin, and relevant Product Service Codes (PSC) and North American Industry Classification System (NAICS) codes for each;
- A detailed justification as to how the non-domestic item(s) is/are essential the project;
- A certification that the recipient made a good faith effort to solicit bids for domestic products supported by terms included in requests for proposals, contracts, and non-proprietary communications with potential suppliers;
- A justification statement—based on one of the applicable justifications outlined above—as to why the listed items cannot be procured domestically, including the due diligence performed (e.g., market research, industry outreach, cost analysis, cost-benefit analysis) by the recipient to attempt to avoid the need for a waiver. This justification may cite, if applicable, the absence of any Buy America-compliant bids received for domestic products in response to a solicitation; and
- Anticipated impact to the project if no waiver is issued.

The Recipient should consider using the following principles as minimum requirements contained in their waiver request:

- Time-limited: Consider a waiver constrained principally by a length of time, rather than by the specific project/award to which it applies. Waivers of this type may be appropriate, for example, when an item that is "non-available" is widely used in the project. When requesting such a waiver, the Recipient should identify a reasonable, definite time frame (e.g., no more than one to two years) designed so that the waiver is reviewed to ensure the condition for the waiver ("non-availability") has not changed (e.g., domestic supplies have become more available).

- Targeted: Waiver requests should apply only to the item(s), product(s), or material(s) or category(ies) of item(s), product(s), or material(s) as necessary and justified. Waivers should not be overly broad as this will undermine domestic preference policies.

26

DE-GD0000006/0000

- Conditional: The Recipient may request a waiver with specific conditions that support the policies of IIJA/BABA and Executive Order 14017.

DOE may request, and the Recipient must provide, additional information for consideration of this wavier. DOE may reject or grant waivers in whole or in part depending on its review, analysis, and/or feedback from OMB or the public. DOEs final determination regarding approval or rejection of the waiver request may not be appealed. Waiver requests may take up to 90 calendar days to process.

**REPORTING, TRACKING AND SEGREGATION OF INCURRED COSTS (MARCH 2023)**

BIL funds can be used in conjunction with other funding, as necessary to complete projects, but tracking and reporting must be separate to meet the reporting requirements of the BIL and related Office of Management and Budget (OMB) Guidance.  The Recipient must keep separate records for BIL funds and must ensure those records comply with the requirements of the BIL.  Funding provided through the BIL that is supplemental to an existing grant or cooperative agreement is one-time funding.

**DAVIS-BACON REQUIREMENTS (MARCH 2023)**

This award is funded under Division D of the Bipartisan Infrastructure Law (BIL).  All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2000 on an award funded directly by or assisted in whole or in part by funds made available under this award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA).

Recipients shall provide written assurance acknowledging the DBA requirements for the award or project and confirming that all of the laborers and mechanics performing construction, alteration, or repair work in excess of $2000 on projects funded directly by or assisted in whole or in part by and through funding under the award  are paid or will be paid wages at rates not less than those prevailing on projects of a character similar in the locality as determined by Subchapter IV of Chapter 31 of Title 40, United States Code (Davis-Bacon Act).

The Recipient must comply with all of the Davis-Bacon Act requirements, including but not limited to:

(1) ensuring that the wage determination(s) and appropriate Davis-Bacon clauses and requirements are flowed down to and incorporated into any applicable subcontracts or subrecipient awards.

(2) being responsible for compliance by any subcontractor or subrecipient with the Davis-Bacon labor standards.

(3) receiving and reviewing certified weekly payrolls submitted by all subcontractors and subrecipients for accuracy and to identify potential compliance issues.

(4) maintaining original certified weekly payrolls for 3 years after the completion of the project and must make those payrolls available to the DOE or the Department of Labor upon request, as required by 29 CFR 5.6(a)(2).

(5) conducting payroll and job-site reviews for construction work, including interviews with employees, with such frequency as may be necessary to assure compliance by its subcontractors and subrecipients and as requested or directed by the DOE.

27

(6) cooperating with any authorized representative of the Department of Labor in their inspection of records, interviews with employees, and other actions undertaken as part of a Department of Labor investigation.

(7) posting in a prominent and accessible place the wage determination(s) and Department of Labor Publication: WH-1321, Notice to Employees Working on Federal or Federally Assisted Construction Projects.

(8) notifying the Contracting Officer of all labor standards issues, including all complaints regarding incorrect payment of prevailing wages and/or fringe benefits, received from the recipient, subrecipient, contractor, or subcontractor employees; significant labor standards violations, as defined in 29 CFR 5.7; disputes concerning labor standards pursuant to 29 CFR parts 4, 6, and 8 and as defined in FAR 52.222-14; disputed labor standards determinations; Department of Labor investigations; or legal or judicial proceedings related to the labor standards under this Contract, a subcontract, or subrecipient award.

(9) preparing and submitting to the Contracting Officer, the Office of Management and Budget Control Number 1910-5165, Davis Bacon Semi-Annual Labor Compliance Report, by April 21 and October 21 of each year. Form submittal will be administered through the iBenefits system (https://doeibenefits2.energy.gov) or its successor system.

The Recipient must undergo Davis-Bacon Act compliance training and must maintain competency in Davis-Bacon Act compliance. The Contracting Officer will notify the Recipient of any DOE sponsored Davis-Bacon Act compliance trainings. The Department of Labor offers free Prevailing Wage Seminars several times a year that meet this requirement, at https://www.dol.gov/agencies/whd/government-contracts/construction/seminars/events.

The Department of Energy has contracted with, a third-party DBA electronic payroll compliance software application. The Recipient must ensure the timely electronic submission of weekly certified payrolls as part of its compliance with the Davis-Bacon Act unless a waiver is granted to a particular contractor or subcontractor because they are unable or limited in their ability to use or access the software.

**Davis Bacon Act Electronic Certified Payroll Submission Waiver**
A waiver must be granted before the award starts. The applicant does not have the right to appeal DOE's decision concerning a waiver request.

For additional guidance on how to comply with the Davis-Bacon provisions and clauses, see
https://www.dol.gov/agencies/whd/government-contracts/construction and
https://www.dol.gov/agencies/whd/government-contracts/protections-for-workers-in-construction.


**AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (MARCH 2023)**

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246:

(1) Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.

(2) Recipients and Contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors and subcontractors.

DE-GD0000006/0000

(3) Recipients, subrecipients, contractors and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co-workers.

The Department of Labor's (DOL) Office of Federal Contractor Compliance Programs (OFCCP) uses a neutral process to schedule contractors for compliance evaluations. OFCCP's Technical Assistance Guide[1] should be consulted to gain an understanding of the requirements and possible actions the recipients, subrecipients, contractors and subcontractors must take.

For construction projects valued at $35 million or more and lasting more than one year, Recipients, contractors, or subcontractors may be selected by OFCCP as a mega construction project. If selected, DOE, under relevant legal authorities including Sections 205 and 303(a) of Executive Order 11246, will require participation as a condition of the award. This program offers extensive compliance assistance with EO 11246. For more information regarding this program, see https://www.dol.gov/agencies/ofccp/construction/mega-program.

**POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023)**

If the Recipient or subrecipients have or receive any other award of federal funds for activities that potentially overlap with the activities funded under this Award, the Recipient must promptly notify DOE in writing of the potential overlap and state whether project funds (i.e., recipient cost share and federal funds) from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under this Award. If there are identical cost items, the Recipient must promptly notify the DOE Contracting Officer in writing of the potential duplication and eliminate any inappropriate duplication of funding.

---

[1] See OFCCP's Technical Assistance Guide at:
https://www.dol.gov/sites/dolgov/files/ofccp/Construction/files/ConstructionTAG.pdf?msclkid=9e397d68c4b111ec9d8e6fecb6c710ec
. Also see the National Policy Assurances http://www.nsf.gov/awards/managing/rtc.jsp.

# EXHIBIT E

**Toor Declaration Exhibit E**

## Intellectual Property Provisions (NRD-821)
## Nonresearch and Development

Intellectual property rights are subject to 2 CFR 200.315 (e.g. institution of higher education or nonprofit organizations) or 2 CFR 910.362 (e.g. for-profit).

## ATTACHMENT 2 – STATEMENT OF PROJECT OBJECTIVES

## BIPARTISAN INFRASTRUCTURE LAW (BIL) - PREVENTING OUTAGES AND ENHANCING THE RESILIENCE OF THE ELECTRIC GRID

## PROJECT OBJECTIVES

This project is in direct support of Section 40101(d) of the Infrastructure Investment and Jobs Act (i.e., Bipartisan Infrastructure Law (BIL)). The objective of this project is to improve the resilience of the electric grid against disruptive events. Per BIL Section 40101(a)(1), a disruptive event is an event in which operations of the electric grid are disrupted, preventively shut off, or cannot operate safely due to extreme weather, wildfire, or a natural disaster.

## SCOPE OF WORK

To achieve the objectives of this project, a Recipient shall implement a wide range of resilience measures, as described in Appendix A.1, "Section 40101 Allowances and Requirements", of the SOPO, intended to mitigate the impact of disruptive events. The Recipient may execute resilience projects that in the determination of the Recipient, will generate the greatest community benefit in reducing the likelihood and consequences of disruptive events to the electricity grid serving its jurisdiction. Resilience projects under this project shall comply with limitations and requirements that are detailed in Appendix A.1 of the SOPO.

Each year, the Recipient shall provide a Program Narrative that describes the criteria and methods that will be used by the Recipient to make subawards to eligible entities; is adopted after notice and a public hearing; and describes the proposed funding distributions and recipients of the subawards to be provided by the Recipient. The requirements of the Program Narrative are described in the Appendix A.2, Section 40101(d) Program Narrative Template and Instructions, of the SOPO.

The Recipient shall not use more than 5 percent of the total Federal grant allocation amount to administer the grant and provide technical assistance in support of grant objectives.

## TASKS TO BE PERFORMED

### Task 1.0:  Project Management & Administration

The Recipient shall manage and administer activities in order to achieve project objectives. The activities will include tracking and disseminating information regarding the performance of the project, as well as administrative tasks associated with Government reporting.

An initial Project Management Plan (PMP) shall be provided within ninety (90) days after the initial award.  Revised PMPs shall be submitted when major project changes are proposed, with less significant changes documented in the submitted Quarterly Progress Report (QPR).

1

**Phase I – Planning**

**Task 2.0:  Technical Assistance and Planning**

The Recipient shall conform to all aspects of the Program Narrative approved at execution of the award.  If the Program Narrative is revised mid-year, the Recipient must provide the revised Program Narrative within 5 days following the Recipient's official adoption of the revised Program Narrative.   Program Narrative revisions must be subjected to a public notice and hearing prior to adoption.

**Task 3.0: Resilience Project Approval**

The Recipient shall prepare and submit to the DOE Program Manager Resilience Project Packages in accordance with the Resilience Project and Subaward/Subcontract Notification Term in the Assistance Agreement.

***The Recipient may not execute a proposed resilience project or issue subawards/subcontracts for resilience projects without DOE Program Manager review and written determination of adequacy of the Resilience Project Package.***

**Phase II – Project Execution**

**Task 4.0:  Resilience Project Execution**

Upon DOE's written determination of adequacy of the Resilience Project Package, the Recipient shall execute the approved resilience project and/or issue subawards to eligible entities to execute the resilience project.  For each resilience project and subaward/subcontract, the Recipient shall:

   A.  monitor the performance of the entity/awardee to assure adherence to the Terms and Conditions of the subaward
   B.  collect necessary information for the Recipient to provide measurable progress towards completion of the funded activity, and
   C.  collect necessary information for the Recipient to verify the extent to which its established objectives are being realized.

The Recipient shall monitor the execution and performance of the resilience projects and provide the implementation status, progress towards measurable performance targets, and verifiable progress towards resilience objectives, as part of its QPRs to the Department of Energy.

**DELIVERABLES**

Periodic and final reports will be submitted in accordance with the attached "Federal Assistance Reporting Checklist" and the instructions accompanying the checklist.  In addition to the reports specified in the "Federal Assistance Reporting Checklist", the Recipient will provide the following

DE-GD0000006 / 0000

| Task | Deliverable | Due Date | Instructions/ Template | Where to Submit |
|------|-------------|----------|------------------------|-----------------|
| 1.0 | Project Management Plan (PMP) | • Due 90 days after the effective date of the award.  • Revised PMPs due within grant years as a result of major project plan changes | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
| 2.0 | Program Narrative | If it is revised mid-year, Program Narrative must be submitted within 5 days following adoption | Appendix A.2 of the SOPO | Email to DOE Program Manager identified in Block 15 of Assistance Agreement |
| 3.0 | Resilience Project Package | Submitted prior to the execution of resilience projects and/or issuance of subawards for resilience projects | Award Document and Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov | Email to DOE Program Manager identified in Block 15 of Assistance Agreement |
| 4.0 | Subaward Monitoring Reports | Due quarterly with QPR | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov | https://www.eere-pmc.energy.gov/SubmitReports.aspx |

All reports noted in the Deliverables section must be high quality, verified for technical accuracy, and suitable for publishing in Federal records.  Other major products/materials developed shall be submitted to DOE as they are completed.


**BRIEFINGS AND TECHNICAL PRESENTATIONS**

Upon request by DOE, the Recipient will provide additional project metrics information and briefings for presentation to the DOE explaining the plans, progress, and results of the grant activities.

3

DE-GD0000006 / 0000

## APPENDIX A.1 - Section 40101 Allowances and Requirements

The Recipient may use Federal funds to make subawards to eligible entities for activities, technologies, equipment, and hardening measures to reduce the likelihood and consequences of disruptive events, including:

    A.  weatherization technologies and equipment

    B.  fire-resistant technologies and fire prevention systems

    C.  monitoring and control technologies

    D.  the undergrounding of electrical equipment

    E.  utility pole management

    F.  the relocation of power lines or the reconductoring of power lines with low-sag, advanced conductors

    G.  vegetation and fuel-load management

    H.  the use or construction of distributed energy resources for enhancing system adaptive capacity during disruptive events, including:

        a.  microgrids; and

        b.  battery-storage subcomponents

    I.  adaptive protection technologies

    J.  advanced modeling technologies

    K.  hardening of power lines, facilities, substations, of other systems; and

    L.  the replacement of old overhead conductors and underground cables, and

    M.  other measures as determined or approved by DOE.

A subaward to an eligible entity under this grant program may not be used for:

    A.  construction of a

        a.  new electric generating facility or

        b.  large-scale battery-storage facility that is not used for enhancing system adaptive capacity during disruptive events, or

    B.  cybersecurity.

4

DE-GD0000006 / 0000

Eligible entities are:

    A. an electric grid operator

    B. an electricity storage operator

    C. an electricity generator

    D. a transmission owner or operator

    E. a distribution provider

    F. a fuel supplier, and

    G. any other relevant entity as determined by the Secretary of Energy.

The Recipient shall ensure that, of the amounts made available to eligible entities from funds made available to the Recipient under the program, the percentage made available to eligible entities that sell not more than 4,000,000 megawatt hours of electricity per year is not less than the percentage of all customers in the State, Territory or Indian Tribe that are served by those eligible entities.

The Recipient may not use more than 5 percent of the Federal funding for:

    A. providing technical assistance and facilitating the distribution and sharing of information to reduce the likelihood and consequences of disruptive events; and

    B. administrative expenses associated with the program.

APPENDIX A.2 – Section 40101(d) Program Narrative Template and Instructions

[Delete instructions in *italics* when completing Program Narrative.]

Bipartisan Infrastructure Law - Sᴇᴄᴛɪᴏɴ 40101(d)

Pʀᴇᴠᴇɴᴛɪɴɢ Oᴜᴛᴀɢᴇs ᴀɴᴅ Eɴʜᴀɴᴄɪɴɢ ᴛʜᴇ Rᴇsɪʟɪᴇɴᴄᴇ ᴏғ ᴛʜᴇ Eʟᴇᴄᴛʀɪᴄ Gʀɪᴅ

[Name of Indian Tribe or State]

[Date]

# Program Narrative

**1. Objectives and Metrics:**

*List 3-5 objectives that the applicant intends to apply for guiding their resilience investment decisions. The intent of this section of the Program Narrative is to ultimately develop a planning framework for resilience to address all-hazards including future climate implications. The first year, DOE is seeking input on criteria for determining investment decisions. At a minimum, the objectives and metrics should address:*

a. *resilience and energy justice concerns, including reducing the frequency and duration of outages in disadvantaged communities,*

b. *how the project will use strong labor standards and protections (including for direct employees, contractors, and sub-contractors), such as through the use of project labor agreements, local hire agreements, and outline of a plan to attract, train, and retain an appropriately skilled workforce (i.e., through registered apprenticeships and other joint labor-management training programs that serve all workers, particularly those underrepresented or historically excluded); plans to partner with a training provider (labor, community college, etc.); and the use of an appropriately credentialed workforce (i.e., requirements for appropriate and relevant professional training, certification, and licensure).*

*Provide the metrics that will accompany the objectives to measure outcomes associated with improving resilience, creating good-paying jobs with the free and fair choice to join a union, and advancing energy justice.*

*Indicate whether the objectives and metrics are provisional pending further discussion and consideration by the State or Indian Tribe with its stakeholders. DOE expects that recipients will establish a formal set of objectives and metrics in order to receive Year 2 formula funding. Examples of objectives and metrics, in addition to reporting on any DOE required metrics, and approaches for establishing them are available at: Section 40101(d) Formula Grants to States & Indian Tribes | netl.doe.gov*

DE-GD0000006 / 0000

2. **Criteria:**

*Describe the criteria used for selecting and determining the awards to eligible entities. At a minimum, the criteria should address the following specific requirements set forth in Section 40101(d):*

> *Priority should be given to projects that will generate the greatest community benefit (whether rural or urban) in reducing the likelihood and consequences of disruptive events,*

> *The percentage made available to eligible entities that sell not more than 4,000,000 megawatt hours of electricity per year should not be less than the percentage of all customers in the State or Indian Tribe that are served by those eligible entities, and*

> *Awards should be provided to eligible entities for projects within the State or on the land of the Indian Tribe.*

3. **Methods:**

*Provide a description of the methods the applicant anticipates using for soliciting, awarding, and distributing funds. These might include several options, including the use of competitive solicitations, direct awards, and the use of financial instruments, such as Green Banks, to leverage the funds through 40101(d).*

*Provide also a description of the methods the applicant anticipates using to track and make public the metrics achieved by awardee uses of program funds to improve resilience by reducing the likelihood and consequences of disruptive events, to generate quality jobs, and to improve equity and community benefits.*

4. **Funding Distribution:**

*Provide a description of the proposed funding distributions and categories of recipients of the subgrants to be provided to eligible entities. Also, indicate preferences for eligible entities if they do not explicitly appear on the list of eligible entities provided in Section 40101.*

5. **Equity Approach:**

*To achieve the greatest impact for all Americans with this once-in-a-generation investment in infrastructure, it is critical that the BIL-funded projects not only contribute to the country's energy technology and climate goals, but also (1) support the BIL objectives to invest in America's workforce by including specific elements to accelerate job growth and job quality, including approaches to give workers a free and fair choice to join or form a union; and (2) advance DOE's equity, environmental and energy justice priorities, including DOE's commitment to the Justice40 Initiative. Accordingly, the*

DE-GD0000006 / 0000

*Program Narrative must describe how the State or Indian Tribe will ensure their proposed project will incorporate:*

a. *Quality Jobs: Strengthening prosperity by expanding good-paying, safe jobs accessible to all workers and supporting job growth through investments in domestic supply chains is a key goal set by President Biden, discussed in depth in his Executive Orders on Ensuring the Future Is Made in All of America by All of America's Workers (EO 14005), Tackling the Climate Crisis at Home and Abroad (EO 14008), Worker Organizing and Empowerment (EO 14025), Boosting Quality of Federal Construction Contracts (EO 14063), Promoting Competition in the American Economy (EO 14036), and Implementing the Infrastructure Investment and Jobs Act (EO 14052). Accordingly, this section of the Program Narrative should address efforts to achieve these goals, including*

   i. *efforts to attract, train, and retain a skilled workforce and*

   ii. *workforce opportunities in communities that have lost jobs due to the displacements of fossil energy jobs; and*

b. *Community Benefits:  Section 40101(d)(5) requires a State or Indian Tribe to give priority to projects that would generate the greatest community benefit (whether rural or urban) in reducing the likelihood and consequences of disruptive events.  The Program Narrative should include an explanation of how the State or Indian Tribe will make such a determination for the projects that will be receiving funding and should include information on how the projects go beyond measures that are already being undertaken through current resilience planning by the State or Indian Tribe.*

c. *Diversity, Equity, Inclusion and Accessibility:  DOE strongly encourages efforts to reach historically underserved populations, racial minorities, and women. These strategies should create the connectivity and conditions for growth where they may not exist, such as in rural and underserved communities. The Program Narrative should articulate the strategy the State or Indian Tribe will use for sharing and maximizing the project's benefits across disadvantaged communities and include a discussion of how resident, worker, and community leadership will be engaged throughout the project's duration.*

*Provide an explanation of how the State or Indian Tribe will make such a determination for the projects that will be receiving funding and should include information on how the projects go beyond measures that are already being undertaken through current resilience planning by the State or Indian Tribe.*

6. **Technical Assistance and Administration:**

*Provide a description of how the State or Indian Tribe intends to utilize up to 5 percent of Federal grant funds for project administration and technical assistance.*

DE-GD0000006 / 0000

**7. Public Notice and Hearing:**

*Section 40101(d)(2)(B)(ii) requires that eligible applicants give notice and undertake a public hearing to review the criteria and methods they anticipate using to grant awards to eligible entities and the proposed funding distributions and recipients of the grant awards to eligible entities. The applicant should use the public hearing to share the approach envisioned for setting objectives and metrics and the proposed funding distributions and recipients of the grant awards to eligible entities. Provide a brief description of the notice and public hearing process, including the number and types of organizations that attended. Also, report on the outcome of the public hearing such as approaches for engaging stakeholders for establishing formal objectives and metrics and for implementing strategic planning processes. Provide a copy of the notice as an attachment to the Program Narrative.*

***Note:*** *DOE anticipates that the Program Narrative will be between 5 and 15 pages, depending upon the grant amount and complexity of resilience activities. DOE may reject applications and require revisions, if it determines that the program narrative lacks sufficient detail or does not comply with stated requirements. Save the information in a single file named (APPLICANT NAME PROGRAM NARRATIVE.pdf).*



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

| 1. | Award Number: | 2. | Program/Project Title: |
| --- | --- | --- | --- |

| 1. Award Number:<br>DE-GD0000006 | 2. Program/Project Title:<br><br>BIL – Preventing Outages and Enhancing the Resilience of the Electric Grid, Formula Grants to States and Indian Tribes |
| --- | --- |
| 3. Recipient:<br>Colorado Energy Office | |

| 4. Reporting Requirements (see also the Special Instructions) | Frequency | Addresses | |
| --- | --- | --- | --- |
| **I.    PROJECT MANAGEMENT REPORTING** | | | |
| ☐ A.  Performance Report – Narrative | **Q** | A. | EERE PMC |
| ☐ B.  Performance Report – Quantitative | **Q** | B. | EERE PMC |
| ☒ C.  Financial Report (SF-425) | **F, Q** | C. | EERE PMC |
| ☐ D.  Scientific and Technical Reporting | | | |
| ☐ 1.   Accepted Manuscript of Journal Article(s) | **A5, P** | D.1. | OSTI E-Link |
| ☐ 2.   Conference Product(s) | **A5, P** | D.2. | OSTI E-Link |
| ☐ 3.   Technical Report(s) | **A5, P** | D.3. | OSTI E-Link |
| ☐ 4.   Software & Manual(s) | **A5, P** | D.4. | DOE CODE |
| ☐ 5.   Dataset(s) | **A5, P** | D.5. | OSTI E-Link Datasets |
| ☐ 6.   Other STI (Dissertation / Thesis, etc.) | **A5, P** | D.6. | OSTI E-Link |
| ☐ E.  Intellectual Property Reporting | | | |
| ☐ 1.   Intellectual Property Reporting | **A5, P** | E.1. | iEdison |
| ☐ 2.   Invention Utilization Report | **A5, P** | E.2. | iEdison |
| ☒ F.  Project Management Plan (PMP) | **A5** | F. | EERE PMC |
| ☒ G.  Special Status Report | **A5** | G. | EERE PMC |
| ☐ H.  Continuation Application | **A5** | H. | EERE PMC |
| ☒ I.  Other (see Special Instructions) | **A5** | I. | See Special Instructions |
| **II.    AWARD MANAGEMENT REPORTING** | | | |
| ☐ A.  Current and Pending Support | **A5** | A. | EERE PMC |
| ☒ B.  Demographic Reporting | **A5** | B. | EERE PMC |
| ☒ C.  Financial Conflict of Interest Report | **A5** | C. | EERE PMC |
| ☐ D.  Tangible Personal Property Report – Annual Property Report (SF-428 & SF-428A) | **Y** | D. | EERE PMC |
| ☒ E.  Tangible Personal Property Report – Disposition Request/Report (SF-428 & SF-428C) | **A5** | E. | EERE PMC |
| ☒ F.  Uniform Commercial Code (UCC) Financing Statements | **A5** | F. | See section II. F. for instructions and due dates |
| ☒ G.  Federal Subaward Reporting System (FSRS) | **A5** | G. | FSRS |
| ☐ H.  Annual Incurred Cost Proposal | **Y180** | H. | See section II. H. for instructions and due dates |
| ☐ I.  DOE For-Profit Compliance Audit | **O** | I. | See section II. I. for instructions and due dates |
| ☒ J.  Single Audit: States, Locals, Tribal Governments, and Non-Profits | **O** | J. | See section II. J. for instructions and due dates |
| ☒ K.  Other (see Special Instructions) | **A** | K. | See Special Instructions |
| **III.    CLOSEOUT REPORTING** | | | |
| ☐ A.  Final Scientific/Technical Report | | | |
| ☐ A.1.  Final Scientific/Technical Report – Unlimited | **F** | A.1. | OSTI E-Link |
| ☐ A.2.  Final Scientific/Technical Report – Data Protection | **F** | A.2. | OSTI E-Link |
| ☐ B.  Invention Certification (DOE F 2050.11) | **F** | B. | EERE PMC |
| ☒ C.  Tangible Personal Property Report – Final Report (SF-428 & SF-428B) | **F** | C. | EERE PMC |

*Template Version 04/01/23 (NETL 05/14/2023)*

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
### Attachment 3

| | | | |
|---|---|---|---|
| ☐ D. Verification of Receipt of Accepted Manuscripts | **F** | D. | See section III. D. for instructions and due dates |
| ☐ E. Other (see Special Instructions) | **F** | E. | See Special Instructions |
| | | | |
| **IV.    POST-PROJECT REPORTING** | | | |
| ☐ A. Scientific and Technical Reporting | **P** | A. | OSTI E-Link |
| ☐ B. Intellectual Property Reporting | **P** | B. | iEdison |

| 4. Reporting Requirements (see also the Special Instructions) | Frequency | Addresses |
|---|---|---|
| **V.    BIPARTISAN INFRASTRUCTURE LAW REPORTING** | | |
| ☒ A. Community Benefits Plan/Equity Plan | **A5, F** | A.    EERE PMC |
| ☐ B. Cybersecurity Plan | **A5** | B.    CR-IIJACybersecurityplans@hq.doe.gov |
| ☐ C. Boosting Domestic Manufacturing | **A5, Y, F** | C.    EERE PMC |
| ☒ D. Quality Job Creation | | |
|     ☒ 1.    Direct Jobs | **A5** | D.1.  See Section V. D. I for instructions and due dates. |
|     ☒ 2.    Training Outcomes | **Y, F** | D.2.  EERE PMC |
|     ☒ 3.    Good Jobs Outcomes | **Y, F** | D.3.  EERE PMC |
|     ☒ 4.    Permanent Jobs | **Y, F** | D.4.  EERE PMC |
| ☒ E. Equity and Justice | | |
|     ☒ 1.    Community Engagement Process | **Y, F** | E.1.  EERE PMC |
|     ☒ 2.    Engagement Events and Technical Assistance | **Y, F** | E.2.  EERE PMC |
|     ☐ 3.    Community Ownership | **Q** | E.3.  EERE PMC |
| ☐ F. Pathway to Net-Zero | | |
|     ☐ 1.    Infrastructure Supported | **A5, Y, F** | F.1.  EERE PMC |
|     ☐ 2.    Hydrogen Production | **A5, Y, F** | F.2.  EERE PMC |
|     ☐ 3.    Carbon Capture, Removal, and Storage | **A5, Y, F** | F.3.  EERE PMC |
|     ☐ 4.    Energy Saved | **A5, Y, F** | F.4.  EERE PMC |

**FREQUENCY CODES AND DUE DATES:**

**A5 – As Specified or within five (5) calendar days after the event.**

**F – Final; within 120 calendar days after expiration or termination of the award.**

**O – Other: See instructions for further details.**

**P – Post-project (after the period of performance); within five (5) calendar days after the event, or as specified.**

**Q – Quarterly; within 30 calendar days after the end of the federal fiscal year quarter.**

**S – Semiannually; within 30 days after end of the reporting period.**

**Y – Yearly; within 90 calendar days after the end of the federal fiscal year.**

**Y180 – Yearly; within 180 calendar days after the close of the recipient's fiscal year.**

**FULL URLS:**

**OSTI E-Link:** https://www.osti.gov/elink/2413-submission.jsp
**OSTI E-Link Datasets:** https://www.osti.gov/elink/2416-submission.jsp
**DOE CODE:** https://www.osti.gov/doecode/
**iEdison:** https://www.nist.gov/iedison
**EERE PMC:** https://www.eere-pmc.energy.gov/SubmitReports.aspx
**FSRS:** https://www.fsrs.gov



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

---

5.    **Special Instructions:**

I.    **Project Management Reporting:**

    I.    **Other**

    <u>SOPO Deliverables</u>

    All deliverables identified in the Statement of Project Objectives (SOPO) must be submitted to the address identified in the SOPO deliverables table.

    <u>Quarterly Progress Reports (QPR)</u>

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| First QPR Submission Deadline: | Due within 30 calendar days after the end of the first *full* quarterly reporting period following the issuance of the award. |
| Submission Deadline for Subsequent QPRs: | Within 30 calendar days after the end of the quarterly reporting period (January 30, April 30, July 30, October 30) |
| Template and Instructions | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov |

    The QPR template utilizes the same template document as the Project Management Plan (PMP). The Recipient Will use the QPR to report the progress made from the baseline information set forth in the PMP. The final QPR shall reflect any final close-out activities, costs, payments and reimbursements that occurred following the submission of the QPR for the last reporting period of the Period of Performance.

    <u>Annual Program Metrics and Impact Report</u>

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the annual reporting period (i.e., October 30). The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

    The Annual Program Metrics and Impact Report will capture benefits that communities realize through the program. Information collected will include communities affected by specific projects, avoided outages and Reduced restoration time because of projects, community and labor engagement; workforce and community agreements, collective bargaining agreements and project labor agreements, investments in job quality and skilled workforce; diversity, equity, inclusion and accessibility; and Justice40 benefits. The annual reporting template is available here Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov or is available upon request from the DOE Project Officer.



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

Annual Allocation Request

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx DOE Program Manager identified in Block 15 and the DOE Award Administrator identified on Page 2 of the Award Agreement |
|---|---|
| Submission deadline: | Within 90 calendar days after issuance of the ALRD DE-FOA-00002736 amendment publicizing the Annual Allocations. |
| Content and Information | See the "Annual Allocation Request" provision in the Special Terms and Conditions. |

**II.   Award Management Reporting:**

**F.   Uniform Commercial Code (UCC) Financing Statements:**

If a piece of equipment is planned to be purchased by a for-profit Recipient or a for-profit Subrecipient with either Federal and/or non-Federal funds, and when the DOE share of the award exceeds $1M, the for-profit Recipient or the for-profit Subrecipient must record Uniform Commercial Code (UCC) financing statement(s) before being reimbursed for the DOE share of the equipment.  See "Reporting Instructions" for specific guidance.



**Federal Assistance Reporting Checklist**

**Attachment 3**

Table of Contents

| I. | | 7 |
| | A. | 7 |
| | B. | 7 |
| | C. | 7 |
| | D. | 7 |
| | E. | 7 |
| | F. | 7 |
| | | 1. | 8 |
| | | 2. | 8 |
| | G. | 9 |
| | H. | 10 |
| | I. | 10 |
| II. | | 11 |
| | A. | 11 |
| | B. | 11 |
| | C. | 12 |
| | D. | 13 |
| | E. | 13 |
| | F. | 13 |
| | G. | 14 |
| | H. | 15 |
| | I. | 15 |
| | J. | 15 |
| III. | | 17 |
| | A. | 17 |
| | B. | 17 |
| | C. | 17 |
| | D. | 17 |
| | E. | 17 |
| IV. | | 17 |
| | A. | 17 |



**Federal Assistance Reporting Checklist**

**Attachment 3**

| | | |
|---|---|---|
| B. | 18 | |
| V. | 18 | |
| A. | 18 | |
| B. | 18 | |
| C. | 18 | |
| D. | 18 | |
| | 1. | 18 |
| | 2. | 19 |
| | 3. | 19 |
| | 4. | 20 |
| E. | 20 | |
| | 1. | 20 |
| | 2. | 20 |
| | 3. | 20 |
| F. | 20 | |
| VI. | 21 | |



**Federal Assistance Reporting Checklist**

**Attachment 3**

## Reporting Instructions (05/2023)

**\*\*\***    *Throughout the performance of the project, it is important that you mark Protected Data/Limited Rights Data as described in Appendix A.  It is equally important that you not submit Protected Personally Identifiable Information (Protected PII) to DOE.  See Appendix A for guidance on Protected PII.*    **\*\*\***

I. **Project Management Reporting**

A. **Performance Report Narrative (PRN) - Not Required**

B. **Performance Report Quantitative (PRQ) - Not Required**

C. **Financial Report SF-425 Federal Financial Report**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the quarterly reporting period (January 30, April 30, July 30, October 30) **and** within 120 calendar days after expiration or termination of the award |

Every quarter, the prime recipient is required to submit a completed SF-425 for the project to DOE, covering the entirety of work performed by the prime recipient, subrecipients, and contractors – to DOE. A fillable version of the SF-425 is available at https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html or https://www.netl.doe.gov/business/business-forms/financial-assistance.

D. **Scientific and Technical Reporting - Not Required**

E. **Intellectual Property Reporting - Not Required**

F. **Project Management Plan (PMP)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 90 days of the effective date of the DOE award |
| Template and Instructions | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov |

The recipient is required to develop, update, and adhere to a project management plan. The purpose of the plan is to establish cost, schedule, and technical performance baselines, and

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

to formalize the processes by which the project will be managed.  These processes include considerations such as risk management, change management, and communications management. While it is primarily the project recipient's responsibility to maintain the plan, federal staff may request changes. The plan is intended to be a living document, modified as necessary, and comprising the following iterations:

**1.  Revised Plan(s)**

During the life of the project the recipient must submit a revised project management plan based on the following circumstances:

**a.**  Developments that have a significant favorable impact on the project.

**b.**  Problems, delays, or adverse conditions which materially impair the recipient's ability to meet the objectives of the award or which may require the program office to respond to questions relating to such events from the public.  Specifically, the recipient must update the plan when any of the following incidents occur:

  i.    Any event which is anticipated to cause significant schedule or cost changes, such as changes to the funding and costing profile or changes to the project timeline.
  ii.   Any change to Technology Readiness Level.
  iii.  Any significant change to risk events (including both potential and realized events) or to risk management strategies.
  iv.   Failure to meet a milestone or milestones; any dependencies should be adjusted.
  v.    Any changes to partnerships.
  vi.   Any significant change to facilities or other project resources.
  vii.  Any other incident that has the potential for high visibility in the media.

**2.  Content of revised PMP**

All interim and draft PMP revisions can be exchanged via email with the NETL project officer.  However, all final versions of the PMP need to be uploaded to the EERE PMC website.  The revised PMP must stay consistent with the PMP instructions and template located at:

Section 40101(d) Formula Grants to States & Indian Tribes | netl.doe.gov

8





# Federal Assistance Reporting Checklist
**Attachment 3**

### G. Special Status Reports

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within five (5) calendar days after the event, or as specified |

Problems, delays, or adverse conditions which materially impair the recipient's ability to meet the objectives of the award or which may require DOE to respond to questions relating to such events from the public. The recipient must report any of the following incidents and include the anticipated impact and remedial action to be taken to correct or resolve the problem/condition.

The prime recipient is required to report the following events to DOE:

1. If the recipient or project team member receives any other award of federal funds for activities that potentially overlap with the activities funded under the DOE award, the recipient must promptly notify DOE in writing of the potential overlap and state whether project funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under the DOE award;

2. Any change in ownership or control of the recipient or project team member which increases the percentage of ownership or control by an entity that is based in, funded by, or has a foreign affiliation with a foreign country of risk;

3. If an individual on the project team is or is believed to be participating in a foreign government-sponsored talent recruitment program of a foreign country of risk.

4. If the recipient is considering new collaborations with foreign entities and governments, the recipient must provide written notification to DOE and await further guidance from DOE prior to contacting the proposed foreign entity or government regarding the potential collaboration or negotiating the terms of any potential agreement. In general, a collaboration will involve some provision of a thing of value to, or from, the recipient. A thing of value includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the DOE award, regardless of whether or not they have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the DOE award but resulting in provision of a thing of value from or to the DOE award must also be reported.

5. The existence of any joint venture or subsidiary that is based in, funded by, or has a foreign affiliation with any foreign country of risk;

6. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an enterprise owned by a country of risk or foreign entity based in a country of risk;

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

7. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has a foreign affiliation with any foreign country of risk;

8. Any current or pending technology licensing or intellectual property sales to a foreign country of risk; and

9. Any current or pending foreign business entity, offshore entity, or entity outside the United States related to the Recipient or subrecipient.

10. Any fatality or injuries requiring hospitalization arising out of or relating to work under the award;

11. Potential or actual violations of environmental, health, or safety laws and regulations, any significant environmental permit violation, and any incident which causes a significant process or hazard control system failure;

12. Any incident arising out of or relating to work under the award that has the potential for high visibility in the media;

13. Potential or actual violations of federal, state, and municipal laws arising out of or relating to work under the award;

14. Potential or actual noncompliance with DOE reporting requirements under the award;

15. Potential or actual bankruptcy/insolvency of the prime recipient or subrecipient;

16. Potential or actual violation of U.S. export control laws and regulations arising out of or relating to the work under the award;

17. Any notices or claims of patent or copyright infringement arising out of or relating to the performance of the DOE award;

18. Refusal of a subrecipient to accept flow down requirements in the Special Terms and Conditions and/or any Attachment to the DOE award;

19. Any improper claims or excess payments arising out of or relating to work under the award;

20. Potential or actual violations of the cost share requirements under the award;

21. Potential or actual violations of the lobbying restrictions in the award;

22. Any event which is anticipated to cause a significant schedule slippage or cost increase;

23. Any damage to Government-owned equipment in excess of $50,000; and,

24. Developments that have a significant favorable impact on the project.

## H. Continuation Application - Not Required

## I. Other (see Special Instructions)

| | |
|---|---|
| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
| Submission deadline: | Within five (5) calendar days after the event, or as specified |



**Federal Assistance Reporting Checklist**
**Attachment 3**

## II. Award Management Reporting

**A. Current and Pending Support - Not Required**

**B. Demographic Reporting**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 days after issuance of award |

DEMOGRAPHIC INFORMATION FOR SIGNIFICANT CONTRIBUTORS

Demographic data (i.e., gender, ethnicity, race, and disability status) should be provided directly by the Principal Investigator and Business Contact with the understanding that the submission of this report is mandatory for awards made after 03/01/2022. There are no adverse consequences for responding "Do not wish to provide" in any question. Principal Investigators and Business Contacts of awards made prior to 03/01/2022 are encouraged, but not required, to submit demographic reporting. Confidentiality of demographic data will be in accordance with agency's policy and practices for complying with the requirements of the Privacy Act. Demographic Reporting is submitted via a web-based form in the EERE PMC and includes the questions outlined below.

Gender:
- o Male
- o Female
- o Do not wish to provide

Ethnicity:
- o Hispanic or Latina/o
- o Not-Hispanic or not-Latina/o
- o Do not wish to provide

Race (select one or more):
- o American Indian or Alaska Native
- o Asian
- o Black or African American
- o Native Hawaiian or other Pacific Islander
- o White
- o Do not wish to provide

Disability Status:

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

     o  Yes (check yes if any of the following apply to you)
- ▪  Deaf or serious difficulty hearing
- ▪  Blind or serious difficulty seeing even when wearing glasses
- ▪  Serious difficulty walking or climbing stairs
- ▪  Other serious disability related to a physical, mental, or emotional condition.

     o  No
     o  Do not wish to provide

This measure is designed as a binary measure; it encompasses all self-reported disabilities. Please do not use it to report the number of individuals who have different types of disabilities (e.g., hearing impairments).

Note: This construct is not designed to be used at an individual-level (i.e., it should not be used for determining accommodation needs or disability status for particular individuals associated with the project).

## C. Financial Conflict of Interest Report

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 180 days of the date of the award and within thirty (30) calendar days only when there is a change |

**Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the** Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. Further, the recipient must submit updated reports within 30 days of a change.

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal

 **Federal Assistance Reporting Checklist**
**Attachment 3**

entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI reports.

**D.  Tangible Personal Property Report – Annual Property Report (SF-428 & SF-428A) - Not Required**

**E.  Tangible Personal Property Report – Disposition Request/Report (SF-428 & SF-428C)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 5 calendar days of the event or as specified |

The prime recipient must request disposition instructions for or report disposition of federally-owned property or equipment acquired with project funds, whether the property or equipment is/was in the possession of the prime recipient or subrecipient(s).  Recipients may also be required to provide compensation to the awarding agency when acquired equipment is sold or retained for use on activities not sponsored by the federal government. Any equipment with an acquisition cost above $5,000 must be included in the inventory.

If disposition occurs at any time other than award closeout (i.e., at any time throughout the life of the project or after project completion and closeout as long as the federal government retains an interest in the item), the prime recipient must complete an SF-428 and SF-428C, available at https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html or https://www.netl.doe.gov/business/business-forms/financial-assistance.

If disposition instructions are requested at the time of award closeout, the prime recipient must submit the SF-428 and SF-428B (see section III. C. Tangible Personal Property Report – Final Report).

Only the DOE Contracting Officer has authority to approve disposition requests and issue disposition instructions.

**F.  Uniform Commercial Code (UCC) Financing Statements**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within five (5) calendar days after the event, or as specified. |

If a for-profit recipient or subrecipient desires to purchase a piece of equipment for their project, and the per-unit dollar value of said equipment is $5,000 or more, and the federal share of the financial assistance agreement is more than $1M, the recipient or subrecipient



**Federal Assistance Reporting Checklist**

**Attachment 3**

must file a UCC financing statement. These financing statement(s) must be approved in writing by the Contracting Officer prior to the recording.

A UCC financing statement provides public notice that the federal government has an undivided reversionary interest in the equipment, and as such the equipment cannot be sold or used as collateral for a loan (encumbered).

The for-profit recipient or subrecipient must file the UCC financing statement(s) with the Secretary of State where the equipment will be physically located and must pay any associated costs for such filings.

The initial UCC financing statement may also be referred to as a UCC1. For additional pieces of equipment not specified in the award budget, TBD equipment, or equipment needed in future budget periods, the recipient can file an amendment to the original UCC1 financing statement, by submitting the UCC3 financing statement amendment.

Each UCC financing statement or amendment is to be filed with the appropriate Secretary of State office, where the equipment will be physically located.

Note: All costs associated with filing UCC financing statements, UCC financing statement amendments, and UCC financing statement terminations, are allowable and allocable costs which can be charged to the federal award.

At a minimum, the recipient must have stated in their UCC financing statement in block 4. (collateral) the following:

o "Title to all equipment (not real property) purchased with federal funds under this financial assistance agreement is conditional pursuant to the terms of 2 CFR 910.360, and the federal government retains an undivided reversionary interest in the equipment at the federal cost-share proportion specified in the award terms and conditions."

o Federal Award Identification Number (e.g., DE-EE000XXXX)

**G. Federal Subaward Reporting System (FSRS)**

| Submit to: | https://www.fsrs.gov/ |
|---|---|
| Submission deadline: | The prime recipient is required to file a FFATA sub-award report by the end of the month following the month in which the prime recipient awards any sub-grant greater than or equal to $30,000. |

The Federal Subaward Reporting System (FSRS) is the reporting tool prime recipients use to capture and report subaward and executive compensation data regarding their first-tier subrecipients to meet the FFATA reporting requirements. Prime recipients will report



**Federal Assistance Reporting Checklist**
**Attachment 3**

against subrecipients' awards. The subrecipient information entered in FSRS will then be displayed on USASpending.gov associated with the prime recipient's award furthering federal spending transparency.

The prime recipient is required to file a FFATA sub-award report by the end of the month following the month in which the prime recipient awards any sub-award greater than or equal to $30,000.

**H.  Annual Incurred Cost Proposals - Not Required**

**I.  DOE For-Profit Compliance Audit - Not Required**

**J.  Single Audit: States, Local Government, Tribal Governments, Institution of Higher Education (IHE), or Non-Profit Organization**

| Submit to: | Federal Audit Clearinghouse - https://harvester.census.gov/facweb/Default.aspx |
|---|---|
| Submission deadline: | Within the earlier of 30 days after receipt of the auditor's report(s) or 9 months after the end of the audit period (recipient's fiscal year-end)* *The end of the period of the performance, or closure of an award, does not dismiss this reporting requirement. |

As required by 2 CFR 200 Subpart F, non-federal entities that expend $750,000 or more during the non-federal entity's fiscal year in federal awards must have a single or program-specific audit conducted. The single audit must be conducted in accordance with §200.514 Scope of audit, except when it elects to have a program-specific audit conducted.

For most single audits, the requirement is for annual single audits.  However, there are occasions where a single audit is not required annually. Per 2 CFR 200.504 - Frequency of audits, a state, local government, or Indian tribe that is required by constitution or statute to undergo its audits less frequently than annually, is permitted to undergo its audits biennially. Also, any nonprofit organization that had biennial audits for all biennial periods ending between July 1, 1992, and January 1, 1995, is permitted to undergo its single audits biennially.

For a program-specific audit, when a recipient expends federal award funds under only one federal program (excluding R&D) and the federal program's statutes, regulations, or the terms and conditions of the federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program-specific audit conducted.  A program-specific audit may not be elected for R&D unless all of the federal awards expended were received from the same federal agency, or the same federal agency and the same pass-

 **Federal Assistance Reporting Checklist**

**Attachment 3**

through entity, and that federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

The single audit report shall include audited financial statements.

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

## III. Closeout Reporting

**A. Final Scientific/Technical Report - Not Required**

**B. Invention Certification (DOE F 2050.11) - Not Required**

**C. Tangible Personal Property Report – Final Report (SF-428 & SF-428B)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 120 calendar days after expiration or termination of the award |

The prime recipient must submit a final inventory of and request disposition instructions for any federally-owned property and/or property or equipment acquired with project funds with an acquisition cost above $5,000, whether the property is/was in the possession of the prime recipient or subrecipients.

The prime recipient must complete an SF-428 and SF-428B, available at
https://www.netl.doe.gov/business/business-forms or
https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html.

If disposition occurs at any time other than award closeout, the prime recipient must complete an SF-428 and SF-428C (see section II. E. Tangible Personal Property Report – Disposition Request/Report).

Only the DOE Contracting Officer has authority to approve disposition requests and issue disposition instructions.

**D. Verification of Receipt of Accepted Manuscripts - Not Required**

**E. Other (see Special Instructions)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 120 calendar days after expiration or termination of the award |

## IV. Post-Project Reporting

**A. Scientific and Technical Reporting - Not Required**

 **U.S. DEPARTMENT OF ENERGY**

**Federal Assistance Reporting Checklist**
**Attachment 3**

**B. Intellectual Property Reporting - Not Required**

**V. Bipartisan Infrastructure Law (BIL) Reporting**

**A. Community Benefits Plan**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | As Specified or within 30 calendar days after the end of the annual reporting period (i.e., October 30). The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

The Recipient must meet the stated objectives and milestones set forth in its Community Benefits Plan, which is incorporated into Recipient's Program Narrative. A report on the Recipient's progress towards meeting the objectives and milestones set forth will be included in the Annual Program Metrics and Impact Report.

**B. Cybersecurity Plan - Not Required**

**C. Boosting Domestic Manufacturing - Not Required**

**D. Quality Job Creation**

**1. Direct Jobs**

| Submit to: | Consult DOE Project Team for URL |
|---|---|
| Submission deadline: | Weekly |

This award is funded under Division D of the Bipartisan Infrastructure Law (BIL). All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2000 on an award funded directly by or assisted in whole or in part by funds made available under this award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA).

The Recipient must ensure the timely electronic submission of weekly certified payrolls to a third-party DBA electronic payroll compliance software application unless a waiver is granted to a particular contractor or subcontractor because they are unable or limited in their ability to use or access the software.



**Federal Assistance Reporting Checklist**
**Attachment 3**

### 2. Training Outcomes

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the annual reporting period (i.e., October 30).  The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

This report on training and training outcomes is required for all projects requiring DBA compliance, those that discuss workforce development or training in statute, as well as any projects where recipients utilize a portion of their BIL funding on workforce development. Only career-track training that focuses on skill development or pathways into career-track training such as pre-apprenticeship should be tracked for this metric. Career-track training leads to an appropriate industry-recognized credential, professional qualification, or license. It teaches broad occupational knowledge and skills that can be applied across a range of technologies, leading to several different career paths. Continuing education allowing incumbent workers to keep up with the latest technology and practices, and to advance in their careers, is another important element of career-track training. This report will also track the number of workforce partnerships involving employers, community-based organizations (CBOs), or labor unions, including partnerships specified in community benefits agreements and project labor agreements, or similar.

A report on the Recipient's progress towards meeting the training outcomes will be included in the Annual Program Metrics and Impact Report.

### 3. Good Jobs Outcomes

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the annual reporting period (i.e., October 30).  The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

This report is required of all recipients of BIL funding. To assess activities contributing to growing American jobs, improving the quality of energy jobs, and facilitating equitable access to good jobs and training opportunities, all BIL recipients must report annually on good jobs outcomes.

Good Jobs Outcomes reporting shall be included in the Annual Program Metrics and Impact Report.

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

### 4. Permanent Jobs

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the annual reporting period (i.e., October 30).  The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

All BIL funding recipients who are creating ongoing operations, maintenance, and production jobs should report the number of hires for each reporting period and associated demographic information.

Permanent Jobs reporting shall be included in the Annual Program Metrics and Impact Report.

## E. Equity and Justice

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the annual reporting period (i.e., October 30).  The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

Applicable Equity and Justice reporting shall be reported in the Annual Program Metrics and Impact Report.

### 1. Community Engagement Process

This report applies to all projects that include building, expanding, or retrofitting a facility. Recipients should report on engagement activities such as participatory research, citizen advisory committees, open planning forums, etc. and the outputs of those activities such as memorandums of understanding, letters of support, etc. Information in this tab should reflect the objectives outlined in the Program Narrative.

### 2. Engagement Events and Technical Assistance

This report applies to all projects that hold stakeholder engagement events as outlined in their Program Narrative. Recipients are required to report on stakeholders engaged and from what, if any, communities of interest.

### 3. Community Ownership – Not Required

## F. Pathways to Net Zero – Not Required



**Federal Assistance Reporting Checklist**
**Attachment 3**

VI. **Appendix A: Notice To Recipients (Prime Recipients And Subrecipients) Regarding Protected Data, Limited Rights Data And Protected Personally Identifiable Information**

**I. PROTECTED DATA AND LIMITED RIGHTS DATA**

The recipient is required to mark protected data and limited rights data in accordance with the IP clause set of the award agreement.  Failure to properly mark data may result in its public disclosure under the Freedom of Information Act (FOIA, 5 U.S.C. § 552) or otherwise.

**A. Protected Data - Technical Data or Commercial or Financial Data First Produced in the Performance of the Award**

The U.S. Government normally retains unlimited rights in any technical data or commercial or financial data produced in performance of Government financial assistance awards, including the right to distribute to the public.

However, under certain DOE awards, the recipient may mark certain categories of data produced under the award as protected from public disclosure for a period of time ("Protected Data").  If the award agreement provides for protected data and the recipient wants the data to be protected, the recipient must properly mark any documents containing Protected Data. The recipient should review  the IP clause set of the award agreement to determine the applicability of protected data, the maximum length of period of time for data protection and the required markings that must be used to invoke data protection for the award.

**B. Limited Rights Data - Data Produced Outside of the Award at Private Expense**

Limited Rights Data is data (other than computer software) developed at private expense outside any Government financial assistance award or contract that embody trade secrets or are commercial or financial and confidential or privileged.  Prior to including any Limited Rights Data in any documents to DOE, the recipient should review the award agreement.  In most DOE awards, the recipient should not deliver any limited rights data to DOE if the recipient wants to protect the Limited Rights Data.  If the DOE award does allow and require the delivery of limited rights data, then the recipient must properly mark any documents containing Limited Rights Data as set forth in the IP clause of the award agreement.

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

**II. PROTECTED PERSONALLY IDENTIFIABLE INFORMATION**

The recipient should not include any Protected Personally Identifiable Information (Protected PII) in their submissions to DOE.  Protected PII is defined as any data that, if compromised, could cause harm to an individual such as identify theft.  Protected PII includes, but is not limited to:

- Social Security Numbers in any form;
- Place of Birth associated with an individual;
- Date of Birth associated with an individual;
- Mother's maiden name associated with an individual;
- Biometric record associated with an individual;
- Fingerprint;
- Iris Scan;
- DNA;
- Medical history information associated with an individual;
- Medical conditions, including history of disease;
- Metric information, e.g., weight, height, blood pressure;
- Criminal history associated with an individual;
- Ratings;
- Disciplinary actions;
- Passport number;
- Educational transcripts;
- Financial information associated with an individual;
- Credit card numbers; and
- Security clearance history or related information (not including actual clearances held).

# EXHIBIT F

## Bipartisan Infrastructure Law - SECTION 40101(d)

### PREVENTING OUTAGES AND ENHANCING THE RESILIENCE OF THE ELECTRIC GRID

### State of Colorado

### April 2024

# Year 3-5 Revised Program Narrative

**Introduction and Overview**

The Grid Resilience Grant Program, funded through Section 40101(d) of the Infrastructure Investment and Jobs Act (IIJA), will be administered through the Colorado Energy Office (CEO) and Colorado Department of Local Affairs (DOLA). The IIJA provides $2.5 billion in formula grants to states and tribes for the purpose of improving the all-hazards resilience of electric grids. Under this U.S. Department of Energy (DOE) formula program, Colorado is estimated to be awarded approximately $8.3 million annually for the next five years, or approximately $42.5 million over the five year timeframe of 2022-2026. This application is for years 3-5 of the program, for approximately $8.3 million for each year, or a total of about $24.9 million.

The state of Colorado's Greenhouse Gas Pollution Reduction Roadmap identified reducing emissions from electric utilities by at least 80% by 2030 (from a 2005 baseline) and reducing emissions from buildings as key strategies to meet Colorado's greenhouse gas emissions targets. Microgrids and the technologies that expand the use of smart appliances and grid interactive buildings will help meet both of these goals. In addition, the state of Colorado has experienced significant, recent climate related extreme weather events including wildfires (including Cameron Peak and East Troublesome fires in 2020, and the Marshall fire in 2021), extreme heat, winter storm Uri (2021), and flooding (2013) that have tested the resilience and reliability of the state's energy infrastructure. The state intends to use the Grid Resilience Grant Program federal funding, matched with state matching funds from a program specifically set up for required state match for IIJA-funded programs, as well as utility funding to support investments in microgrids, grid hardening projects, advanced system monitoring, and technical and administrative assistance to support these programs.

1. **Objectives and Metrics**

The State of Colorado has been designated to receive $8,359,178 for the third year of funding (Federal FY 2024) from IIJA 40101(d) formula funding, and approximately the same amount for the fourth and fifth years. The State of Colorado is pursuing this funding to work with eligible entities- including utilities, storage operators, and others- to support investments in solutions

1

that can provide reliable energy through the climate related extreme impacts. The objectives of the programs that Colorado will be funding include:

1. Identifying the need for, design, and construct microgrids that serve communities in areas of high risk of power outages.
2. Implementing grid hardening projects of greatest need for cooperative and municipal utilities.
3. Deploying advanced grid monitoring systems to protect the grid against wildfires and other risks.
4. Ensuring that subgrantee utilities use strong labor standards and protections, including project labor agreements, local hire agreements, and a plan to attract, train, and retain an appropriately skilled workforce.

Each of these objectives have a focus on responding to resilience and energy justice concerns in Colorado. The end goal of each of these objectives is to reduce the frequency and duration of power outages, especially in disadvantaged communities that have historically had higher incidences of power outages and/or have less resources to address the problem of power outages.

The Colorado Energy Office (CEO), as the applicant for these funds, is partnering with the Colorado Department of Local Affairs (DOLA). Together, CEO and DOLA will implement the following five programs to meet the above objectives:

A. Microgrids for Community Resilience (restricted to rural electric cooperatives and municipal utilities): Construction of distributed energy resources for enhancing system adaptive capacity during disruptive events, including microgrids and battery-storage subcomponents
B. Microgrids for Community Resilience (open to all utilities): Construction of distributed energy resources for enhancing system adaptive capacity during disruptive events, including microgrids and battery-storage subcomponents
C. Development of grid hardening projects for small cooperative and municipal utilities that advance the state's goal of an equitable transition to a low-carbon economy through access to renewable energy (Colorado's goal is 100% renewable energy for the grid by 2040).
D. Implementation of advanced grid monitoring for use in smart grids and microgrids.
E. Technical assistance and administrative support as needed (5% of federal funding).

DOLA will administer programs A and B, while CEO will administer programs C, D, and E.

Objective 1 (microgrids) will be a primary focus of programs A, B, and E. The outcome metrics of these programs towards objective 1 will include:

2

    i.    Number of microgrid grants and funding amount awarded to communities that express the greatest risks and vulnerabilities including climate risks, socioeconomic risks, and infrastructure risks.

    ii.   Increases grid reliability and resiliency through avoided and/or reduced outages in benefit communities, as reported by subgrantees.

    iii.  Number of microgrid grants and amount of funding awarded to disproportionately impacted communities as defined by Justice40 and Colorado EnviroScreen.

    iv.  The Colorado Microgrid Roadmap will identify communities most at risk to power outages, communities that would most benefit from microgrids, and regulatory, statutory, and other changes that would facilitate the creation of microgrids in those communities.

Objective 2 (grid hardening projects for utilities/communities of greatest need) will be the primary focus of program C. The metrics used to measure outcomes of this program towards meeting objective 1 include:

    i.    The ability of specific grid hardening activities to mitigate risks of power outages in specific communities, including but not limited to outage frequency and duration, as measured by estimated impacts on SAIDI and SAIFI.

    ii.   The proportion of historically disadvantaged community members in the communities benefiting from the projects (as measured by percentage below area median income (AMI), ethnic composition, and other socioeconomic factors).

    iii.  Advances energy justice through a combination of metrics (i) and (ii).

    iv.  The demonstrated financial need of the cooperative or small municipal utility shows that the identified projects could not be completed without outside grant funding.

Objective 3 (advanced grid monitoring) is the primary focus of program D. The metrics used to measure outcomes of this program towards meeting objective 1 include:

    i.    Ability of the projects to increase grid reliability and resiliency through grid monitoring technologies, through SAIDI and SAIFI.

    ii.   Justification of need: Demonstrated financial need of the applying entity to cover the costs of developing or updating an advanced monitoring system.

    iii.  Share of electricity in impacted communities from renewable and distributed generation sources and the ability of the advanced grid monitoring systems to support the current and future deployment of higher percentages of renewable energy.

    iv.  Projected equitable impacts: Degree to which application demonstrates process or projections by which at least 40% of the benefits from the projects flow to disproportionately impacted communities, in alignment with the federal Justice40 initiative.

3

Objective 4 (strong labor standards) is an additional focus of each program (A, B, C, D, and E). The metrics used to measure the outcomes of these programs towards meeting objective 4 include:

    i.    Degree to which applicants demonstrate that the projects are projected to create or maintain jobs that will meet or exceed local prevailing wages and benefits, as determined by the Davis Bacon Act.

    ii.    Inclusion of workforce development opportunities for current and future employees as part of the projects, including training practices, and partnering with a training provider.

    iii.    Extent to which the workers employed by the projects have a free and fair choice to join a union.

    iv.    The proportion of workers employed that have appropriate and applicable credentials.

    v.    The extent to which the subgrantee uses labor agreements, such as project labor agreements and local hire agreements.

## 2. Criteria

CEO and DOLA plan to use a competitive process to award grant funding, based on the criteria below, with the planned allocation and matching funds following the budget below. Each program will have its own competitive subgrantee or vendor selection process, and the criteria are described in detail below.

*a. Priority to projects that will generate the greatest community benefit in reducing the likelihood and consequences of disruptive events*

Each of the proposed programs will have separate criteria for the selection of the subgrantees, with priority to projects that will generate the greatest community benefit in reducing the likelihood and consequences of disruptive outages and other impacts to the electrical grid. As DOLA and CEO are separate agencies both under the current Administration, they have developed slightly different, yet similar criteria.

**DOLA Criteria for Programs A and B:**

DOLA's scoring tool will be out of a maximum of 90 points.

    1.  a.  Project Description and Management - 20 points

        a.  The problem, opportunity, or challenge this project will address

        b.  Describe the ability to generate the greatest community benefit and how these funds will reduce the likelihood and consequences of disruptive events.

        c.  Demonstrated community support of the proposed activities described in 1.b

            i.  The project realizes and outlines mutual community benefits as demonstrated by signed letters of support from community-based

4

partners, including anchor institutions, local governments, organizations representing socially vulnerable areas, and/or partner agencies.

2. Project Readiness - 30 points
    a. Time frame for completion
    b. Steps taken in advance of this application
        i. Applicant has a strong track record of actions and planning towards energy efficiency, demand-side management, incentive programs, or other initiatives that demonstrate commitment to local energy resiliency and reliability. For example:
            1. Proposed microgrid has a higher reliance on non-fossil-fuel-based generation
            2. The utility has (or is proposing to) take the opportunity to promote energy efficiency and demand-side management programs
            3. The utility has (or is proposing to develop) an incentive program that saves partners money when they use energy storage to reduce electricity use during peak electricity use periods
            4. Other programs that demonstrate a commitment to local energy resiliency, reliability, and "microgrid readiness"
    c. Alignment of project with other local and regional plans
        i. Demonstrate readiness through financial resources being committed and aligned with risk mitigation and community goals
    d. How the utility has utilized and/or promoted energy efficiency or demand-side management programs

3. Measures of Risks and Vulnerability (Reduces vulnerabilities and increases grid reliability and resiliency) - 30 points
    a. Socioeconomic risks and vulnerabilities
        i. Evidence of social vulnerability is demonstrated through the Justice40 and Colorado EnviroScreen mapping tools
    b. Climate/extreme weather risks and vulnerabilities
        i. Data and narrative is provided to support the degree of exposure to climate related severe weather or natural disaster events for a rural community or communities that are part of a proposed project
    c. Infrastructure risk and vulnerabilities
        i. Data is provided to show infrastructure vulnerability, including but not limited to utility-provided or FEMA data (e.g., standard Key Performance Indicators: MTBF (mean time before failure), MTTR (mean time to recovery, repair, respond, or resolve), MTTF (mean time to failure), and MTTA (mean time to acknowledge)

4. Budget and timeline - 10 points
    a. Total budget, including match amount and source
        i. Demonstrates eligibility through local effort and match

5

      b. Cost estimates determination

      c. Timeline and deliverables

         i. Timeline is feasible

**CEO Criteria for Programs C and D:**

CEO's scoring tool will be out of 100%

1. Demonstrated need - 40%
   a. Historic frequency and duration of power outages
   b. Proportion of historically underserved populations in the target community or communities
   c. Demonstrated financial need of cooperative or municipal utility
2. Project Impact - 30%
   a. Climate and social vulnerability
   b. Ability of the project to mitigate risks of power outages to the community
3. Labor Impact - 10%
   a. The focus of the applying utility on strong labor standards and protections, such as through project labor agreements, training practices, plans to partner with a training provider, and the use of appropriately credentialed workforce
4. Project Readiness - 10%
   a. Demonstration of administrative, technical and operational preparedness
5. Cost Match - 10%
   a. Ability of the utility to meet or exceed the 33% minimum cost match

**CEO Criteria for Program E:**

Staff at CEO and DOLA will analyze the needs for additional technical assistance in grid resilience in the upcoming years to identify specific funding priorities and projects that are needed. Criteria for these programs will include:

1. Demonstrated need for the technical assistance from sub-recipients, potential subrecipients, utilities, local governments, and other organizations in Colorado concerned with grid resilience.
2. Alignment with state policies and goals relating to grid resiliency, decarbonization, worker safety, equity, and electrification.
3. Usefulness of other similar technical assistance programs and/or potential for replicability of this technical assistance in other states or jurisdictions.

6

4. Assurance that the cost of the program will not exceed the 5% cap for technical assistance and administration for the federal IIJA 40101(d) funding.

b. *Percentage made available to eligible entities that sell not more than 4,000,000 megawatt hours of electricity per year being not less than the percentage of all customers in the state that are served by those eligible entities*

Colorado has fifty-four retail electric utilities, and five wholesale electric utilities and only two of these retail utilities, Xcel Energy and Colorado Springs Utilities, sell more than 4,000,000 megawatt hours (MWh) of electricity per year.[1] The other retail utilities ("small utilities") provide electricity to the remaining 37% of Colorado electricity customers. Colorado is anticipated to receive $8,359,178 for program year three, with the state of Colorado providing a 15% match of $1,253,877, for a total state-federal allocation of $9,613,055. The percentage of this total funding that is equivalent to the same percentage of Colorado residents that receive funding from small utility companies (37%) is $3,556,830. To ensure that at least this amount of funding flows directly to Colorado's small utility companies, two of the five programs that will be created by this funding will be restricted to small utilities: Programs A and C. The combined total allocation to these two programs will be greater than the amount listed above.

c. *Awards should be provided to eligible entities for projects within the State or on the land of the Indian Tribe.*

Regardless of lead agency, each eligibility determination will start with the applicant being reviewed as eligible within the state of Colorado. CEO and DOLA will ensure that subawards are only selected from the "Eligible Entities for Subawards", as identified in the 40101d FOA (III.A.ii). In particular, CEO and DOLA are focused on electricity grid operators, although it is possible that sub-awardees include electricity storage operators, electricity generators, and/or transmission owners or operators.

Below are specific eligibility criteria for each of the specific programs.

Programs A and B led by DOLA

A - Eligibility for this program is meeting the definition of a small utility provider (note, this eligibility is representative of Section 40101(d) which includes that the eligible entity sell not more than 4,000,000 megawatt hours of electricity per year as not less than the percentage of all customers served by that entity.
B - Eligibility for DOLA program B is open to any utility provider.

Programs C, D, and E led by CEO

---

[1] Based on 2021 data from the U.S. Energy Information Administration.

C - Eligibility for this program is for GRID hardening for small and remote utility providers

D - Eligibility for this program is open to all Colorado electric utility providers

E-Eligibility for this program is for eligible and competent organizations/companies who are able to meet the requirements of the study required by statute. Eligibility and competency will be determined by the criteria described above.

## 3. Methods

CEO and DOLA will each use competitive methods for the solicitation, awarding, and distribution of funding. Even though these grants will be led by different agencies, there will be consistency in the reviewers by having staff representatives from CEO and DOLA reviewing each applicant through the five different opportunities. This will enable the review process to be consistent and have enough reviewers to create a balance in the overall scores.

Each agency has program managers dedicated to the programs this funding opportunity will help create. These program managers will work through all phases of the programs, including program and application development, application review, subgrantee selection and notification, grant implementation, reporting to DOE and the public, and grant closeout. Some of the tasks will include: distributing information pertaining to each program through various methods to the full body of potential applicants (via email, website, vendor self service platform, social media, etc.); holding stakeholder meetings to gain input on the application process; posting application directions, receiving applications, and leading selection committee review of applications; contacting applicants on award status and contracting subgrantees; establishing protocols and platforms for invoicing, reimbursements, and reporting; and maintaining websites that make public the metrics achieved by awardee uses of program funds to improve resilience by reducing the likelihood and consequences of disruptive events, generating and maintaining quality jobs, and improving equity and community benefits.

## 4. Funding Distribution

Distribution of the allocated formula funding from the IIJA section 40101(d) for Colorado will be allocated amongst these four programs based on need, interest, and the ability of the programs to best meet the needs of the most Coloradoans and meet the criteria as listed above. The first two years of funding allocated 59% of the funding to the DOLA-led Microgrid Programs, 24.6% to the Grid Hardening for Small and Rural Communities, 11.5% to the Advanced Grid Monitoring Program, and 5% to administration and technical assistance. As there was the highest number of applications and requested amounts for the Grid Hardening program, approximately 49% of the funding for year 3 will be allocated to that program, the remaining amount distributed among the other programs. The funding in years 4 and 5 will be allocated amongst these existing programs based on interest and applications received for the first three years to ensure that the

8

objectives of the IIJA 40101(d) and Colorado Grid Resiliency programs are met to the fullest extent possible.

**Program A:  Microgrids for Community Resilience (cooperative/municipal utilities only),**
The State of Colorado has a large and diverse geography, with rural communities located in remote canyons and widely dispersed along the eastern plains. These rural communities are vulnerable to electric interruptions, as they are often located far along the electricity distribution lines from the generation sources and transmission lines. The Colorado Microgrids for Community Resilience Act (HB22-1013) states: "The use of microgrids can help increase a community's resilience regarding severe or natural disaster events that can affect the electric grid by providing the community with an alternative, reliable source of electricity that is not dependent on the electric grid". Therefore, the HB22-1013 funding will be tied to essential infrastructure and support strengthening community resilience. This Objective A program is closely aligned with the Objective B program, with the exception that Objective A funding is reserved for cooperative and municipal utilities that serve rural areas. Rural is defined as being in a county that has less than 50,000 people **or** a town that has less than 25,000 residents.

**Program B: Microgrids for Community Resilience (open award for all utilities)**
Colorado is already experiencing the impacts of climate change including increased flooding and wildfires. The use of microgrids, including distributed generation and storage, can improve the resilience of the grid and improve the reliability of energy delivery by providing communities with reliable sources of power.  This funding will support microgrid development in vulnerable communities. The objectives and metrics of this program will be the same as those from Objective A: Microgrids for Community Resilience, with the exception of that the applicant need not be restricted to small rural cooperatives and municipal utilities. If the utility is over the threshold of 4 million MWh per year, the match increases from 1/3 to 100%. The metrics for Objective B are the same as those for Objective A, with the exception that they are not reserved only for small and rural communities.

**Program C: Grid Hardening in Small and Remote Communities**
The Grid Hardening Act of 2021 defined grid hardening as " The ability to use technology, equipment, or hardening measures to enable the electric grid to better withstand the effects of extreme weather, a wildfire, or any other natural disaster." Grid hardening projects typically focus on and prioritize options to reduce the impact of these events, make the components of the system more resilient to the impacts, and often use innovative response approaches.[2] This funding will be reserved for rural electricity cooperatives and small municipally-owned utilities.

Some of the uses for this funding include:

---

[2] Richard, Jeffery. 2017. "The Keys to Grid Hardening." Leidos.com. retrieved 8/22/22 from: https://www.leidos.com/insights/keys-grid-hardening-how-implement-effective-solution

9

- monitoring and control technologies
- the undergrounding of electrical equipment
- utility pole management
- the relocation of power lines or the reconductoring of power lines with low-sag, advanced conductors
- vegetation and fuel-load management
- the replacement of old overhead conductors and underground cables

**Objective D: Advanced system monitoring for use in smart grids and microgrids**

Per statutory requirements, Colorado's electrical utilities are rapidly transitioning from primarily depending on fossil fuels as generation sources to renewable energy sources, particularly wind and solar. Smart grids have a higher reliance on distributed generation resources, whereas microgrids have the ability to function independently of the wider grid ("island mode"). The use of wind, solar, and storage as energy sources for smart grids and microgrids requires a more precise understanding of weather conditions as relating to electricity generation, storage, and use. This funding would incentivize communities operating smart grids and microgrids to invest in technologies that would support this advanced system monitoring.

**Program E: Technical Assistance and Administration of Colorado Grid Resilience Programs**

In addition to investing in projects, Colorado intends to use some of the funding to support technical assistance and administration of these programs. During the first round of funding, CEO and DOLA utilized a portion of the 5% allowable Technical Assistance and Administrative funding to pay for stakeholder engagement and report research, writing, and review to create the Colorado Microgrid Roadmap. This project was required by Colorado Legislation HB22-1249, and will be published by January 1, 2025. While specific technical assistance programs for grid resilience in Colorado have not been specifically identified for years 3-5, the State plans to fund eligible technical assistance programs that have been identified as needed through the Microgrid Roadmap, administration of grid resiliency grants, or are State priorities. For example, in the development of the Colorado Microgrid Roadmap, stakeholders identified the need for a course or training on battery storage safety.

**Eligible Entities** - During the first two rounds of funding for the Microgrids for Community Resilience program, concern was raised by a number of potential applicants that the fact that funding was limited to electrical utilities restricted the widespread deployment of microgrids. The project managers have been working with the NETL Federal Program Officer to expand the list of eligible entities to include "electricity storage operators" and "electricity generators", even if they produce or maintain small scale storage or generation equipment. This will allow for more community anchor institutions, such as schools, public and non-profit hospitals or other health-care facilities, libraries, law enforcement, emergency medical service providers, other public safety agencies, government offices, community organizations that support marginalized

10

communities, or other critical community service facilities. DOLA and CEO will work closely with the NETL FPO to ensure that any entity selection will meet the requirements of the IIJA 40101(d).

## 5. Equity Approach

Colorado is committed to a just and equitable access to the benefits of clean, renewable energy including reduced air pollution and investing in Colorado's workforce. As described in the "criteria" section above, CEO and DOLA intend to include equity and employment as criteria in determining awards for each of the funding objectives including:

a. *Quality Jobs*
   i. Degree to which application demonstrates that the project is projected to create and maintain new jobs or workforce demand, and inclusion of planning for funding past initial grant funding as needed.
   ii. Demonstration of the utility's plans to pay wages that meet or exceed local prevailing wages, as determined by the Davis Bacon Act.
   iii. Just Transition: Workforce opportunities in communities that have lost jobs due to the displacements of fossil energy jobs

b. *Community Benefits*
   i. Historic frequency and duration of power outages, especially those due to natural disasters and extreme weather events
   ii. The project realizes and outlines mutual community benefits as demonstrated by official letters of support explicitly describing the community benefits from community-based partners, including anchor institutions, local governments, and/or partner agencies.
   iii. Demonstrated financial need of the cooperative or small municipal utility demonstrating that the identified projects could not be completed without outside grant funding.

c. *Diversity, Equity, Inclusion, and Accessibility:*
   i. Projected equitable impacts: Degree to which application demonstrates process or projections by which at least 40% of funds will be invested in projects in disproportionately impacted communities, in alignment with the federal Justice40 initiative.
   ii. Measures of Risks and Vulnerability (Reduces vulnerabilities and increases grid reliability and resiliency)
      1. Socioeconomic risks and vulnerabilities: Evidence of social vulnerability is demonstrated through the Justice40 and Colorado EnviroScreen mapping tools
      2. Climate/extreme weather risks and vulnerabilities: Data and narrative is provided to support the degree of exposure to climate related severe weather or natural disaster events for a

11

rural community or communities that are part of a proposed project

3. Infrastructure risk and vulnerabilities : Data is provided to show infrastructure vulnerability, including but not limited to utility-provided or FEMA data (e.g., standard Key Performance Indicators: MTBF (mean time before failure), MTTR (mean time to recovery, repair, respond, or resolve), MTTF (mean time to failure), and MTTA (mean time to acknowledge)

## 6. Technical Assistance and Administration:

**Administration of the five programs listed above by CEO, DOLA, and the Subgrantees**

CEO and DOLA are cognizant of the 5% administrative budget cap associated with the 40101d funding. This budget amount plus the Program E budget is equivalent to five percent of the total allocation to the state of Colorado for all the years of this program. Any funding that will be passed from CEO to DOLA will go through an interagency agreement with clear restrictions and reporting requirements.

Technical assistance will be provided to sub-grantees through contractors approved by the Department of Energy. Additionally, DOLA has already conducted a grant application, review and approval for planning grants for programs A and B, paid for out of state funding.

## 7. Public Notice and Hearing:

Colorado will post a draft of its application to its "Colorado Electric Grid Resilience Funds" website as well as to relevant agencies' IIJA websites or main site. The Colorado DOLA and CEO held an open informational meeting on Thursday, March 6, 2024, 2-3:30pm (MST) via Zoom, which was attended by over 50 interested parties, mostly representing Colorado's electric utilities. The designated State of Colorado staff reached out to parties that would be potentially interested in applying for this grant funding, including rural municipal and cooperative utilities, the Colorado Rural Electric Association (CREA), Ute and Southern Ute Tribes. These state staff are also making public announcements via:

- In person and virtual meetings with various utilities, NGOs, and interested groups.
- Social media posts.

This was the third such public meeting related to the allocation of the IIJA section 40101(d) funds in Colorado, with the first one being held on November 17, 2022. Following the initial

12

public hearing, a draft of the narrative and the Microgrids for Community Resilience Application Guidelines were posted on state of Colorado websites, including that of the Colorado Energy Office and the Department of Local Affairs. Contact information for the appropriate staff members was provided and the public were encouraged to submit comments on these documents and the proposed use of these funds. The initial deadline for commenting was set for December 5, but was later extended to December 12, 2022. A total of 10 parties submitted comments, which were subsequently posted, and commented on by Colorado State staff members. Additionally, key changes to the narrative were made by staff based on the comments provided by the public.

CEO and DOLA held an additional stakeholder meeting and October 10, 2023  after the award notification was made by DOE. The purpose of this meeting was  to provide updated information on the five programs Colorado's 40101d funding will support, and to receive additional input on the criteria, grant sizes and numbers, and other important programmatic updates and timelines. The state of Colorado is dedicated to ensuring that these funding opportunities are most effective at increasing grid resiliency and reliability in Colorado, increasing energy justice, and creating good jobs and lasting careers in the electric utility industry.

13

OMB Number: 4040-0004
Expiration Date: 11/30/2025

## Application for Federal Assistance SF-424

**\* 1. Type of Submission:**
☐ Preapplication
☒ Application
☐ Changed/Corrected Application

**\* 2. Type of Application:**
☐ New
☒ Continuation
☐ Revision

**\* If Revision, select appropriate letter(s):**
[ ]

**\* Other (Specify):**
[ ]

**\* 3. Date Received:**
08/30/2023

**4. Applicant Identifier:**
[ ]

**5a. Federal Entity Identifier:**
[ ]

**5b. Federal Award Identifier:**
DE-GD0000006

**State Use Only:**

**6. Date Received by State:** 08/30/2023

**7. State Application Identifier:**
[ ]

**8. APPLICANT INFORMATION:**

**\* a. Legal Name:** Colorado Energy Office

**\* b. Employer/Taxpayer Identification Number (EIN/TIN):**
84-0644739

**\* c. UEI:**
JLVGQ4E7RD53

**d. Address:**

**\* Street1:** 1600 Broadway

**Street2:** Suite 1960

**\* City:** Denver

**County/Parish:** [ ]

**\* State:** CO: Colorado

**Province:** [ ]

**\* Country:** USA: UNITED STATES

**\* Zip / Postal Code:** 80202-4955

**e. Organizational Unit:**

**Department Name:** [ ]

**Division Name:** [ ]

**f. Name and contact information of person to be contacted on matters involving this application:**

**Prefix:** Mr.

**\* First Name:** John

**Middle Name:** Michael

**\* Last Name:** Parks

**Suffix:** [ ]

**Title:** Elect. Markets and Transmission Policy Analys

**Organizational Affiliation:**
State Agency

**\* Telephone Number:** 970-631-6786

**Fax Number:** [ ]

**\* Email:** john.m.parks@state.co.us

**Application for Federal Assistance SF-424**

**\* 9. Type of Applicant 1: Select Applicant Type:**

A: State Government

Type of Applicant 2: Select Applicant Type:

Type of Applicant 3: Select Applicant Type:

**\* Other (specify):**

**\* 10. Name of Federal Agency:**

Department of Energy - Grid Deployment Office

**11. Catalog of Federal Domestic Assistance Number:**

81.254

CFDA Title:

Grid Infrastructure Deployment and Resilience

**\* 12. Funding Opportunity Number:**

DE-FOA-0002736

**\* Title:**

BIL - SECTION 40101(d) - PREVENTING OUTAGES AND ENHANCING THE RESILIENCE OF THE ELECTRIC GRID
FORMULA GRANTS TO STATES AND INDIAN TRIBES

**13. Competition Identification Number:**

Title:

**14. Areas Affected by Project (Cities, Counties, States, etc.):**

| | Add Attachment | Delete Attachment | View Attachment |

**\* 15. Descriptive Title of Applicant's Project:**

State of Colorado Grid Resilience sub-grant programs: Microgrids for Community Resilience, Grid
Hardening for Small and Rural Communities, Advanced Grid Monitoring, and technical assistance.

Attach supporting documents as specified in agency instructions.

| Add Attachments | Delete Attachments | View Attachments |

**Application for Federal Assistance SF-424**

**16. Congressional Districts Of:**

| | | | |
|---|---|---|---|
| * a. Applicant | 01 | * b. Program/Project | CO |

Attach an additional list of Program/Project Congressional Districts if needed.

| | | | |
|---|---|---|---|
| | Add Attachment | Delete Attachment | View Attachment |

**17. Proposed Project:**

| | | | |
|---|---|---|---|
| * a. Start Date: | N/A | * b. End Date: | N/A |

**18. Estimated Funding ($):**

| | |
|---|---|
| * a. Federal | 8,359,178.00 |
| * b. Applicant | 1,253,877.00 |
| * c. State | |
| * d. Local | |
| * e. Other | |
| * f. Program Income | |
| * g. TOTAL | 9,613,055.00 |

**\* 19. Is Application Subject to Review By State Under Executive Order 12372 Process?**

☐ a. This application was made available to the State under the Executive Order 12372 Process for review on _____

☐ b. Program is subject to E.O. 12372 but has not been selected by the State for review.

☒ c. Program is not covered by E.O. 12372.

**\* 20. Is the Applicant Delinquent On Any Federal Debt? (If "Yes," provide explanation in attachment.)**

☐ Yes    ☒ No

If "Yes", provide explanation and attach

| | | | |
|---|---|---|---|
| | Add Attachment | Delete Attachment | View Attachment |

**21. \*By signing this application, I certify (1) to the statements contained in the list of certifications\*\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances\*\* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)**

☒ \*\* I AGREE

\*\* The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**Authorized Representative:**

| | |
|---|---|
| Prefix: | * First Name: Gregg |
| Middle Name: | |
| * Last Name: Hefner | |
| Suffix: | |

| |
|---|
| * Title: Director of Finance & Operations |

| | |
|---|---|
| * Telephone Number: 303-866-2100 | Fax Number: |

| |
|---|
| * Email: gregg.hefner@state.co.us |

| | |
|---|---|
| * Signature of Authorized Representative: *Gregg Hefner* | * Date Signed: 04/12/2024 |



To: U.S. Department of Energy, Grid Deployment Office, % Lucas Greza, NETL FPO
From: John Parks, Colorado Energy Office
Date: April 12, 2024
RE: Colorado 2024 IIJA 40101(d) Cost Match Letter

As part of the IIJA 40101(d) Formula Funding application, a State funding match of at least 15% is required. The Colorado Energy Office will be using State matching funds through the Colorado Infrastructure Investment and Jobs Act Cash Fund. The Colorado General Assembly passed Senate Bill 22-215 and Senate Bill 23-283 (creating Colorado Revised Statute 24-75-232), the Infrastructure Investment and Jobs Act Cash Fund, which allocates approximately $164 million in state General Funds for local match support for state agencies and local governments for the non-federal match requirements included in the federal Infrastructure Investment and Jobs Act (IIJA.) From these bills, the Colorado Governor's Office, in collaboration with the Office of Economic Development and International Trade (OEDIT) has created the Infrastructure Investment and Jobs Act (IIJA) Match grant program to support non-federal match requirement when are applying directly to the federal government for an IIJA Program.

Cost Match Value:  $1,253,877 has been approved for Federal FY 2024 award (which is equal to 15% of the $8,359,178 IIJA 40101(d) grant for Colorado), and approximately the same amount has been requested for Federal Fiscal Years 2025 and 2026.

Organization of the cost match: Colorado Governor's Office

Type of Cost Match: Cash

Description:  This match will be met through the program specifically set up in the State of Colorado to meet state needs for matching funds for programs supported by the IIJA.  These cash funds are available now.  The matching funds from the State of Colorado will be allocated to the four Grid Resiliency programs in Colorado, which are managed by the Colorado Energy Office and the Colorado Department of Local Affairs. Therefore, these funds meet the 15% state match requirement, and will be further matched by the 33% or 100% match from the eligible entity (percentage based on type and size of entity), all of which will increase electrical grid resilience in Colorado.



**Colorado IIJA 40101(d) 2024 Public Notice Hearing Documentation**
April 17. 2024

The Grid Resiliency Team at the Colorado Energy Office (CEO) and Department of Local Affairs (DOLA) decided to keep the same four programs from the first funding cycle of the IIJA 40101(d) program, but to change the allocation amounts and percentages amongst the existing programs. This decision was based on the following factors:

1. In the program narrative that we submitted in the first round in January 2023 and updated in June 2023, the distribution between the programs was very explicit and the dollar amounts were provided.
2. The 2024 allocation to Colorado (and all states) is different from the first allocation, which included both 2022 and 2023.
3. There were some programs that were oversubscribed by sub-grant applicants and some that were undersubscribed. The reallocation was done in a way to address these differences and meet the needs of Coloradoans to increase grid resiliency most effectively.
4. We were advised that by removing the specific numerical and percentile allocation between each of these programs in the program narrative, the updated program narrative would apply for the remaining three years of the program (2024-2026), and we could make adjustments in each year's allocations depending on the solicitations received in the previous years.

We also recognize that Colorado is unique in that we are offering multiple sub-grant programs with our Grid Resiliency formula funding.

On March 6, 2024, John Parks from CEO and Julia Masters from DOLA held a virtual public notice and hearing via Zoom. Invitations to this event were emailed to a list of several hundred people who represent utilities, municipalities, NGOs, and interested people who have signed up for updates to our program over the past two years. Notice of the meeting was also posted on our website for three weeks. There were 66 registrants for this meeting, most of whom attended. The meeting included a Q&A session and discussion at the end. The whole meeting was recorded and posted on Youtube on the CEO channel, where it has received 33 viewings over the past month.

Below is a screenshot of the Colorado Grid Resiliency Website with a link to the recording and Power Point Presentation.
https://energyoffice.colorado.gov/federal-funding-incentives/colorado-electric-grid-resilience-funds



Below is a screenshot of the Youtube posting of this webinar at: https://www.youtube.com/watch?v=ouUhrh4B700



Below are the slides from the presentation that was presented at this public meeting.

# 2024 Update to Colorado's Grid Resilience 40101(d) Funding Allocation

### Funding under the Infrastructure Investment and Jobs Act (IIJA)





**John Parks**

Electricity Markets & Transmission Policy Analyst

**Julia Masters**

Microgrids for Community Resilience Program Manager

# Colorado 2024 Grid Resiliency Public Meeting Agenda

1. **First Round of Electric Grid Resilience Funding in Colorado**

2. **Proposed Allocation of Year 3 funding**

3. **Programs** within IIJA Grid Resilience Funding

   a. **Colorado Resilience Office**

      i. **Microgrids for Community Resilience (Plannin**

   b. Colorado Energy Office

      i. **Grid Hardening Grants for Small Utilities**

      ii. **Advanced Grid Monitoring Grant Program**

      iii. **Microgrid Roadmap**

4. **Discussion**

5. **Q&A**



# Background on Electric Grid Resilience in Colorado

Building on the State's GHG Pollution Reduction Roadmap 2.0, Energy Assurance Emergency Plan, and Colorado Resiliency Framework, Colorado will:

- Create a Microgrid Roadmap to guide investments (per HB22-1249)
- Support initial investments in solutions that make energy systems resilient while advancing an equitable transition to a low-carbon economy



# Initial 2 Year Budget - FY 2022 & FY 2023



# 40101d Funding So Far.







# Initial Grid Resilience Funding Timeline



All Projects selected by the State are currently pending U.S. DOE compliance review.

DOE review may take 2-6 months, depending on NEPA review time.



# Colorado's 2024 Year 3 40101(d) Funding

## Federal Funding
## $8,359,178

## State Match (15%)
## $1,253,877

## Total Funding Federal & State
## $9,613,055

# Year 3 Budget - 2024 Proposed Allocations



# Proposed Year 3 Funding





# Total 40101d Allocations To-Date





# Colorado 2024 Grid Resiliency Public Meeting Agenda

1. **Background on Electric Grid Resilience in Colorado**

2. **Proposed Allocation for Year 3 funding**

3. **Programs** within IIJA Grid Resilience Funding

   a. **Colorado Resilience Office**

      i. **Microgrids for Community Resilience (Planning & Construction)**

   b. **Colorado Energy Office**

      i. **Grid Hardening Grants for Small Utilities**

      ii. **Advanced Grid Monitoring Grant Program**

      iii. **Microgrid Roadmap**

4. **Discussion**

5. **Q&A**



# MCR Program Overview

*Microgrid: a group of interconnected electric loads and distributed energy resources that can be connected to or disconnected from the electric grid to enable it to operate either in "grid-connected mode" or in "island mode."*



**Program Purpose:**

Increase community-level climate resilience through:

- Funding (1) Planning grants (2) Implementation Grants
- Funding "multi-objective" plans and projects that integrate all three elements: mitigation, adaption, and advancing IDEA

# Classifications of Microgrids

Level 1 "Single Customer Microgrid":
Single distributed energy resource (DER) system that is serving one customer through a single meter.  This microgrid class is connected to and can island from the distribution grid.



# Classifications of Microgrids

Level 2 "Campus Microgrid": Single or multiple DER system connecting multiple buildings, controlled by one meter at the point of common coupling. This microgrid class is connected to and can island from the distribution grid





# Classifications of Microgrids

Level 3 "Community Microgrid":

Single or multiple DER system that serves several different buildings/customers that are not on the same meter or on the same site as the DER.  The individual buildings/customers may be independently connected to the larger distribution grid.





# Resilience Benefits of Microgrids



[See the full list of all 8 planning grants funded in February 2023](#)

## Communications Resilience

### San Miguel Power Association

Solar/storage microgrid dedicated to supporting the utility's critical communications equipment. Although this is NOT a community facility, the justification for community-serving communications offer strong resilience benefits.

## Economic Resilience

### Poudre Valley Rural Electric Association

Solar/storage/backup generation microgrid dedicated to supporting a fire station, retail store, restaurant, elementary school, post office, CDOT facility, church, gas station, and several homes.  System installed at Livermore Fire Station and supports a range of economic vitality within the area

## Grid Resilience

### City of Delta
Adding heat and Power (CHP) generation source to support community's grid in event of shortfall, prolonged outage, or EMP attack



# Existing Colorado Community Based Microgrids

## City of Fort Collins
- Solar/storage microgrid installed at Northside Aztlan Community Center, designed to provide backup power during the fire season to enable the center to host base operations for first responders
- Partially funded by DOLA

## Red Feather Lakes
- Resiliency and emergency response supported for remote community
- Developed through local, regional, and national partnership, and included funding from NREA, DOE, and others

## San Miguel Power Association
- Centered around mission-critical loads (building lighting, receptacles, communications and internet, control rooms, IT servers and radio rooms, and protective custody and lock systems)





# MCR March 2024 Funding Availability

| | Planning ([NOFA](#)) | Construction Generation ([NOFA](#)) | Construction Storage/Controller ([NOFA](#)) | Total |
|---|---|---|---|---|
| **Funding Available:** | $467,000 | $ 540,000 | $10,100,000 | **$11.1M** |
| **Eligible applicants:** | Rural electric cooperatives and municipal-utilities only | | All utilities, local governments, and public or non-profit community-based anchor institutions | |
| **Maximum Award** | $36,000 grant request | $94,000 grant request | $2,000,000 grant request | |
| **Match** | ⅓ match | ⅓ match | ⅓ match for coops/munis, 100% match for local gov/anchor institutions** or utilities who sell over 4M MWh per year  **If local gov own or operate existing solar/storage, DOLA will work with DOE to reduce match from 100% to 1/3 | |

*Funding demand from this round will inform future rounds, including Year 3 Funding



# Community Anchor Institutions

**Community anchor institutions** are schools; libraries; [public and non-profit] hospitals or other health-care facilities; law enforcement, emergency medical service providers, or other public safety agencies; government offices; community organizations that support marginalized communities; or other critical community service facilities (as defined by HB22-1013, pg 2-3).

Resilience Hubs: trusted community-serving facilities augmented to support residents and coordinate resource distribution and services before, during, or after a natural hazard event





# Example MCR Grant Projects

| Project Type | Planning | Construction/Implementation |
|---|---|---|
| **Examples uses** | Establish community's potential for microgrid projects, including scale, size, and cost<br><br>Evaluate existing infrastructure vulnerability through resiliency criteria<br><br>Develop recommendations to integrate resiliency criteria into forthcoming energy projects | New microgrid facilities, including shovel-ready projects. Priority will be given to projects leveraging pre-existing assets. Projects are technology agnostic, and can include funding* for:<br><br>• Energy storage (batteries, vehicle to grid battery storage, pumped hydro, geothermal)<br>• Microgrid controller<br>• Switchgears, inverters, and other electric system components<br>• Replacing old generation components with new components of the same type in order to ensure weatherization/resilience, such as wind turbine blade replacement or damaged solar cells within an existing solar farm.<br><br>For HB22-1013 funding, new generation is an eligible use of funds. |



# Application and Selection Criteria

**01** — Demonstrates the greatest community need, benefit, and collaboration

**02** — Reduces vulnerabilities and increases grid reliability and resiliency

**03** — Local commitment and readiness

For more details, please see MCR Guidelines



# MCR Webinars and Office Hours

- **March 6**, 10-11:30 a.m. - <u>Webinar 1: Public Health, Extreme Weather & Microgrids</u>: This session will include presentations from Collective Energy and Colorado Department of Public Health and Environment on the intersecting needs of healthcare centers, extreme weather, and grid resilience [recording will be available on website]
- **April 2**, 1-2 p.m. - <u>Webinar 2: Microgrids for Community Resilience Overview & Best Practices</u>: This session will include an overview of the project, eligible entities and projects, as well as best practices learned from previous awardees.
- **April 17**, 9-10 a.m. - <u>Webinar 3: Technical Assistance Offerings</u>: This session will include an overview of free technical assistance, COSSA's Solar In Your Community programming, and direct pay overview from the Colorado Energy Office.
- **May 30**, 1-2 p.m. - <u>Office Hours</u>. This session is offered as drop-in support ahead of the application deadline.



# Microgrids Technical Assistance Offerings

A compiled list of state and federal technical assistance is available, including support from DOE and NREL.  Reach out to Program Manager Julia Masters at julia.masters@state.co.us for more support





# Agenda

1. **Background on Electric Grid Resilience in Colorado**

2. **Proposed Allocation for Year 3 funding**

3. **Programs** within IIJA Grid Resilience Funding

   a. **Colorado Resilience Office**

      i. **Microgrids for Community Resilience (Planning & Construction)**

   b. **Colorado Energy Office**

      i. **Grid Hardening Grants for Small Utilities**

      ii. **Advanced Grid Monitoring Grant Program**

      iii. **Microgrid Roadmap**

4. **Discussion**

5. **Q&A**



# Colorado Energy Office Grid Resiliency Programs

1. **Grid Hardening Grants for Small and Remote Communities**

    a.  $4.7 million available

    b.  Up to $1,000,000 per grant

2. **Advanced Grid Monitoring Grant Program**

    a.  $2.1 million available

    b.  Up to $500,000 per grant

3. **Microgrid Roadmap**

    a.  Jan-Feb Stakeholder Engagement - Vulnerabilities

    b.  Draft late June, Regional meetings in July





# Rural and Small Community Grid Hardening – Uses

- Eligible entities: Colorado small and rural coop. and municipal utilities

- Eligible uses:



a) weatherization technologies and equipment;
b) fire-resistant technologies and fire prevention systems;
d) the undergrounding of electrical equipment;
e) utility pole management;
f) the relocation of power lines or the reconductoring of power lines with low-sag, advanced conductors;
g) vegetation and fuel-load management;
h) adaptive protection technologies;
j) hardening of power lines, facilities, substations, or other systems from weather events, fire, etc.
k) the replacement of old overhead conductors and underground cables.

COLORADO
Energy Office

# Grid Hardening Grants - *How much & When*

- Up to $1,000,000 per grant

- One third Match requirement
  - $333,333 minimum if requesting maximum grant award
  - $1.33 million total per grant

- Timeline:
  - Early Fall:  Round 2 Application window opens
  - Late Fall: Applications due
  - Winter : Applicants notified





# *Colorado Energy Office*
# Advanced Grid Monitoring Grants



- Communications systems that identify or allow a utility to respond to disruptions on the transmission or distribution system

- Technologies that allow real-time monitoring of power flow or power quality on the distribution system





# Advanced Grid Monitoring Grants - Uses

## Eligible entities: all Colorado utilities

## Eligible uses:

- Fire monitoring technologies and fire prevention systems
- Advanced Vegetation and fuel-load management, using LiDAR, satellites, AI, or other information technology
- Distribution pole sensors
- Smart meters (advanced metering infrastructure, or AMI)
- Grid modeling
- Studies to identify where best to strategically locate weather stations, HD cameras, and other grid monitoring technologies





**COLORADO**
Energy Office



# Advanced Grid Monitoring Grants

Up to $500,000 per grant (4 available at this level)

Match:
- ○ One third local match (2022 utility sales < 4 million MWh)
- ○ 100% cost match for Colorado's largest utilities
    (2022 sales > 4 million MWh)
- ○ Cost match can be cash, in-kind, or a combination of the two

Timeline:

- Early Fall: Grant window open
- Late Fall: Grants due
- Winter: Award announcements





# Grid Hardening & Advanced Monitoring Scoring Criteria



- **Demonstrated need - 40%**
  - Historic frequency and duration of power outages
  - Proportion of historically underserved populations in the target community or communities
  - Demonstrated financial need of utility
- **Project Impact - 30%**
  - Climate risk and social vulnerability of the target population and how the project will mitigate those risks and vulnerabilities
  - Ability of the project to mitigate risks of power outages to the community
- **Labor Impact - 10%**
  - The focus of the applying utility on strong labor standards and protections, such as through project labor agreements, training practices, plans to partner with a training provider, and the use of appropriately credentialed workforce
- **Project Readiness  - 20%**
  - demonstration of administrative, technical and operational preparedness

# Microgrid Roadmap - HB22-1249



## Electric Utility Service Territories



- Joint effort between the Colorado Energy Office and Colorado Resiliency Office
- Identify communities at highest risk of power outages due to natural disasters or grid interruptions
- Recommend processes for Microgrid development (site selection, tech support, financial, administrative, legislative, etc.)
- Regional Stakeholder meetings: July 2024
- Draft due 7/1/24, Final due 1/1/25





**COLORADO**
**Energy Office**

Climate & Energy ›    Transportation ›    Clean Energy Programs ›    Buildings ›    Weatherization Assistance›

Federal Funding & Incentives›    About Us ›

Home › Federal Funding & Incentives › Colorado Electric Grid Resilience Funds

# Colorado Electric Grid Resilience Funds

In September 2023, the U.S. Department of Energy formally awarded the Colorado Energy Office and Department of Local Affairs (DOLA) electric grid resilience formula funding (IIJA 40101(d)). This federal grant will support three grid resilience grant programs and one study. Click the links below to learn more about each:

- Microgrids for Community Resilience (managed by the Department of Local Affairs)
- Grid Hardening Grants for Small Communities
- Advanced Grid Monitoring
- Colorado Microgrid Roadmap (draft due July 2024, final due January 2025)

In January 2024, the U.S. Department of Energy announced the next round of funding for this program. Colorado is allocated $8,359,178, which we will distribute to Colorado's electric utilities and local governments to increase grid resiliency in the state through the grant programs listed above. You are invited to participate in a public meeting via Zoom on March 6, 2024, 2:00PM to 3:30PM MST to give feedback on the State's proposed approach to grid resilience funding.

**Visit our website to find out more.**



# Equity Approach

- Colorado will follow Justice40 principles, using its state built EnviroScreen tool to score proposals on how they serve disproportionately impacted communities
- Scoring criteria for all allowable uses will include a narrative on how applicant entities will prioritize equity in their program use
- Applicants will be asked to also provide proposed allocation of funding by zip code to determine how funding is being spent in DI/Justice40 communities



# IIJA Additional Grant Opportunities

**Grid Resiliency and Innovation Partnership (GRIP) Competitive Funding**

- 3 programs under IIJA
- $10.5 Billion over 5 years

**Building Energy Codes: Resilient and Efficient Codes Implementation Program**

- $225,000,000 available

**Rural Energy for America Program (REAP) Renewable Energy Systems & Energy Efficiency Improvement Guaranteed Loans & Grants**

- Guaranteed loan financing and grant funding to rural small businesses for renewable energy systems or to make energy efficiency improvements

**Long-Duration Energy Storage Demonstration Projects**

- $350 million available
- Aims to extend storage potential from 10 to 24 hours or longer, to support a low-cost, reliable, carbon-free electric grid

**Assistance to High Energy Cost Rural Communities**

- $9.7 million available
- Specifically for rural utilities to build clean energy assets

**_Subscribe_ to the Infrastructure (+IRA) Funding Tracker**



# Additional Microgrid-Related Funding

**DOLA:**
- **Climate Resilience Challenge**

**CDPHE:**
- **Clean Fleet Enterprise**

**DHSEM:**
- **Building Resilient Infrastructure and Communities (BRIC)**
- **Hazard Mitigation Grant Program (HMGP)**
  - Emergency Back-Up Power Mitigation Projects, including microgrids and generators

**CEO:**
- **Public Building Electrification Grant**



# Discussion

1. Thoughts on the allocation of funding?

2. Thoughts on selection criteria?

3. Any additional technical assistance or support needed by subapplicants that would support the implementation of grid resilience efforts?

4. What should we be considering that we aren't currently focused on in order to increase grid resilience against disruptive events in the State?



# Questions?

**Grid Hardening Grants for Small and Rural Communities**

**Advanced Grid Monitoring Grant Program**

**Microgrid Roadmap**

**Contact:**
john.m.parks@state.co.us
gridresiliency@state.co.us

**Microgrids for Community Resilience Construction and Planning**

**Contact:**
Julia.Masters@state.co.us

Sign up for Grid Resiliency Updates



# EXHIBIT G

**ASSISTANCE AGREEMENT**

| | | |
|---|---|---|
| 1. Award No.<br>DE-GD0000006 | 2. Modification No.<br>0001 | 3. Effective Date<br>08/15/2024 | 4. CFDA No.<br>81.254 |

| 5. Awarded To<br>COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 BROADWAY STE 1960<br>DENVER CO 802024955 | 6. Sponsoring Office<br>Grid Deployment Office (GD)<br>U.S. Department of Energy<br>1000 Independence Avenue, SW<br>Forrestal Building , GD-1<br>Washington DC 20585 | 7. Period of Performance<br>08/30/2023<br>through<br>04/30/2032 |

| 8. Type of Agreement<br>[X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | 9. Authority<br>See page 2 | 10. Purchase Request or Funding Document No.<br>24GD000354 |

| 11. Remittance Address<br>COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 Broadway<br>Suite 1960<br>Denver CO 802024955 | 12. Total Amount<br>Govt. Share: $25,608,964.00<br><br>Cost Share : $5,683,544.00<br><br>Total    : $31,292,508.00 | 13. Funds Obligated<br>This action: $8,359,178.00<br><br>Total    :<br>$25,608,964.00 |

| 14. Principal Investigator | 15. Program Manager<br>Lucas S. Greza<br>Phone: 304-285-4663 | 16. Administrator<br>U.S. DOE/NETL<br>NATIONAL ENERGY TECH LAB<br>3610 Collins Ferry Road<br>Morgantown WV 26505-2353 |

| 17. Submit Payment Requests To<br>Payment - Direct Payment<br>from U.S. Dept of Treasury | 18. Paying Office<br>Payment - Direct Payment<br>from U.S. Dept of Treasury | 19. Submit Reports To<br>See Attachment 3 |

20. Accounting and Appropriation Data

See Schedule

21. Research Title and/or Description of Project

Bipartisan Infrastructure Law (BIL) - PREVENTING OUTAGES AND ENHANCING THE RESILIENCE OF THE ELECTRIC GRID FORMULA GRANTS TO STATES AND INDIAN TRIBEs

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br>*Sheldon E. Funk* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Sheldon E. Funk | 27. Date Signed<br>08/15/2024 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-GD0000006/0001 | | PAGE<br>2 | OF<br>4 |

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | UEI: JLVGQ4E7RD53<br>Project Period: 08/30/2023 - 4/30/2032<br><br>Budget Period: 08/30/2023 - 4/30/2032<br><br>Block 9 Authority:<br>Infrastructure Investment and Jobs Act of 2021,<br>Section 40101(d), 42 U.S.C. . § 18711(d) (2023).<br><br>Block 14. Principal Investigator:<br>John Parks<br>john.m.parks@state.co.us<br>(970)631-6786<br><br>Recipient Business Point-Of-Contact:<br>Gregg Hefner<br>gregg.hefner@state.co.us<br>(303)866-2601<br><br>Block 15. DOE Program Manager:<br>Lucas S. Greza<br>lucas.greza@netl.doe.gov<br>(304)285-4663<br><br>DOE Adward Administrator:<br>Rachel L. Price<br>rachel.price@netl.doe.gov<br>(412)484-8479<br>ASAP: YES Extent Competed: NOT COMPETED<br>Davis-Bacon Act: YES PI: John Parks | | | | |

DE-GD00000006
Amendment 0001
Page 4 of 4

The purpose of this amendment is to authorize the Fiscal Year (FY) 2024 funding allocation, increase the Total Estimated Cost of the Award, incrementally fund the award, extend the Period of Performance and Budget Period, incorporate the revised Attachment 3 - Federal Assistance Reporting Checklist, and incorporate the revised Special Terms and Conditions.  Accordingly, the agreement is amended as follows:

1.  In accordance with the "Annual Allocation Request" award term and the Recipient's annual allocation application dated April 2024, the Recipient is hereby authorized Fiscal Year 2024 allocated funding.  The authorization results in no change to the Statement of Project Objectives.

2.  As reflected in Block 7, the Period of Performance end date is changed to 04/30/2032.

3.  As reflected in Block 12 of the Assistance Agreement, the Total Amount is increased by $11,455,255. This is inclusive of $8,359,178 FY2024 Funding Allocation and $3,096,077 Recipient Share (inclusive of the 15% Cost Match requirement and any approved resilience project cost match requirement at the time of this amendment).

4.  As reflected in Block 13, the DOE Funds Obligated is increased by $8,359,178 from $17,249,786 to $25,608,964. This is inclusive of the FY 24 funding allocation.

5.  As reflected on Page 2 of the Assistance Agreement, the Period of Performance and Budget Period end date is changed to 04/30/2032.

6.  Attachment 3 – Federal Assistance Reporting Checklist is deleted in its entirety and replaced with the attached Attachment 3 - Federal Assistance Reporting Checklist. Changes to the FARC are highlighted in yellow.

7.  The Special Terms and Conditions have been deleted in its entirety and replaced with the attached Special Terms and Conditions.  Changes to the Special Terms are highlighted in yellow.

8.  All other terms and conditions remain the same and in full force and effect.

- END OF AMENDMENT 0001 -

# EXHIBIT H

SPECIAL TERMS AND CONDITIONS FOR USE IN FORMULA GRANTS ISSUED UNDER THE GRID DEPLOYMENT OFFICE (GDO) ADMINISTRATIVE AND LEGAL REQUIREMENTS DOCUMENT (ALRD)     3
LEGAL AUTHORITY AND EFFECT (JUNE 2015)     3
RESOLUTION OF CONFLICTING CONDITIONS     3
AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – APRIL 2024)     3
FLOW DOWN REQUIREMENT     3
CONFERENCE SPENDING (FEBRUARY 2015)     4
PAYMENT PROCEDURES - ADVANCES THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM     4
COST MATCH     4
REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS     5
USE OF PROGRAM INCOME - ADDITION     5
ANNUAL ALLOCATION REQUEST     5
RESILIENCE PROJECT AND SUBAWARD/SUBCONTRACT NOTIFICATION     5
REPORTING     7
FOREIGN NATIONAL PARTICIPATION – APPROVAL REQUIRED (APRIL 2024)     7
STATEMENT OF FEDERAL STEWARDSHIP     7
SITE VISITS     7
CATEGORICAL EXCLUSION (CX) – Initial Application     8
FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS     8
ELIGIBLE ENTITY PRIORITIZATION – 40101(d)(5)     8
SMALL UTILITIES SET ASIDE – 40101(d)(6)     8
TECHNICAL ASSISTANCE AND ADMINISTRATIVE EXPENSES – 40101(d)(7)     8
NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS     8
INSURANCE COVERAGE (DECEMBER 2014)     8
REAL PROPERTY – GRID RESILIENCE     9
EQUIPMENT (DECEMBER 2014) (NETL - MAY 2024)     9
SUPPLIES (DECEMBER 2014)     9
CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022)     9
PROPERTY TRUST RELATIONSHIP (DECEMBER 2014)     10
INSOLVENCY, BANKRUPTCY OR RECEIVERSHIP     10
PERFORMANCE OF WORK IN UNITED STATES     11
REPORTING SUBAWARD AND EXECUTIVE COMPENSATION (SEPTEMBER 2023)     11
SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS     13
FINAL INCURRED COST AUDIT (DECEMBER 2014)     14
INDEMNITY     14
LOBBYING RESTRICTIONS (MARCH 2012)     14
CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH 2014)     14
NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)     15
REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015)     15

DE-GD0000006 / 0001

EXPORT CONTROL (JUNE 2024) .......................................................................... 17
PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES
OR EQUIPMENT (APRIL 2024) ........................................................................... 17
PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT
PROGRAMS (MARCH 2023) ............................................................................... 18
IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS
LIBERTY (NOVEMBER 2020) ............................................................................. 18
INTERIM CONFLICT OF INTEREST REQUIREMENTS FOR FINANCIAL ASSISTANCE (MARCH
2023) ........................................................................................................... 19
ORGANIZATIONAL CONFLICT OF INTEREST (APRIL 2024) ..................................... 19
FRAUD, WASTE AND ABUSE (MARCH 2023) ....................................................... 19
TRANSPARENCY OF FOREIGN CONNECTIONS (APRIL 2024) .................................. 20
FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023) .............................. 21
BUY AMERICAN REQUIREMENT FOR INFRASTRUCTURE PROJECTS (MAY 2024) ...... 21
REPORTING, TRACKING AND SEGREGATION OF INCURRED COSTS (MARCH 2023) .... 24
DAVIS-BACON REQUIREMENTS (NETL – JUNE 2024) ............................................ 25
AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (SEPTEMBER 2023) .. 27
POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023) ............................. 27
CONSTRUCTION SIGNAGE (MAY 2024) ............................................................. 27
POST AWARD DUE DILIGENCE REVIEWS (APRIL 2024) ........................................ 28

DE-GD0000006 / 0001

**SPECIAL TERMS AND CONDITIONS FOR USE IN FORMULA GRANTS ISSUED UNDER THE GRID DEPLOYMENT OFFICE (GDO) ADMINISTRATIVE AND LEGAL REQUIREMENTS DOCUMENT (ALRD)**

**LEGAL AUTHORITY AND EFFECT (JUNE 2015)**

(a) A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

(b) Recipients are free to accept or reject the award. A request to draw down DOE funds constitutes the Recipient's acceptance of the terms and conditions of this Award.

**RESOLUTION OF CONFLICTING CONDITIONS**

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this award must be referred to the DOE Award Administrator for guidance.

**AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – APRIL 2024)**

This assistance agreement consists of the Assistance Agreement Cover Page and Award Terms and Conditions, plus the following:
a.      Special terms and conditions.
b.      Attachments:

| Attachment No. | Title |
| --- | --- |
| 1 | Intellectual Property Provisions |
| 2 | Statement of Project Objectives |
| 3 | Federal Assistance Reporting Checklist |

c.      Applicable program regulations: NONE
d.      DOE Assistance Regulations, 2 CFR part 200 as amended by 2 CFR part 910 at http://www.eCFR.gov.
e.      Research Terms and Conditions and the DOE Agency Specific Requirements at http://www.nsf.gov/bfa/dias/policy/rtc/index.jsp (if the Award is for research and the Award is to a university or non-profit).
f.      Application/proposal as approved by DOE.
g.      National Policy Assurances to Be Incorporated as Award Terms in effect on date of award at https://www.nsf.gov/awards/managing/rtc.jsp.
h.      Public Law 117-58, also known as the Bipartisan Infrastructure Law (BIL)

**FLOW DOWN REQUIREMENT**

The Recipient agrees to apply the terms and conditions of this Award, as applicable, including the Intellectual Property Provisions, to all subrecipients (and subcontractors, as appropriate), as required by 2 CFR 200.101, and to require their strict compliance therewith.  Further, the Recipient must apply the Award terms as required by 2 CFR 200.327 to all subrecipients (and subcontractors, as appropriate), and to require their strict compliance therewith.

DE-GD0000006 / 0001

**CONFERENCE SPENDING (FEBRUARY 2015)**

The recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive Branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

**PAYMENT PROCEDURES - ADVANCES THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM**

a. Method of Payment. Payment will be made by advances through the Department of Treasury's ASAP system.

b. Requesting Advances. Requests for advances must be made through the ASAP system. You may submit requests as frequently as required to meet your needs to disburse funds for the Federal share of project costs. If feasible, you should time each request so that you receive payment on the same day that you disburse funds for direct project costs and the proportionate share of any allowable indirect costs. If same-day transfers are not feasible, advance payments must be as close as is administratively feasible to actual disbursements.

c. Adjusting payment requests for available cash. You must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from DOE/NNSA.

d. Payments. All payments are made by electronic funds transfer to the bank account identified on the ASAP Bank Information Form that you filed with the U.S. Department of Treasury.

**COST MATCH**

a. "Cost Matching" for the non-federal share is calculated as a percentage of the Federal funds only, rather than the Total Project Cost.  The Total Project Cost is the sum of the Government share and Recipient match.  The Recipient's cost match must come from non-Federal sources unless otherwise allowed by law.

Each Recipient is required to match 15 percent of their allocation.  In addition, eligible entities performing resilience projects are required to provide a 100 percent cost match, unless the eligible entity sells not more than 4,000,000 megawatt hours of electricity per year, then the eligible entity is required to provide a one-third cost match.

By accepting federal funds under this award, the Recipient is liable for the cost match percentage of total expenditures incurred, even if the project is terminated early or is not funded to its completion.

b. If the Recipient discovers that you may be unable to provide the required cost matching under this award, the Recipient should immediately provide written notification to the DOE Award Administrator indicating whether the Recipient will continue or phase out the project. If you plan to continue the project, the notification must describe how replacement cost matching will be secured.

c. The Recipient must maintain records of all project costs that you claim as cost match, including in-kind costs, as well as records of costs to be paid by DOE/NNSA. Such records are subject to audit.

d. Failure to provide the cost matching required by this term may result in the subsequent recovery by DOE of some or all the funds provided under the award.

DE-GD0000006 / 0001

**REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS**

a. If actual allowable indirect costs are less than those budgeted and funded under the award, you may use the difference to pay additional allowable direct costs during the project period. If at the completion of the award the Government's share of total allowable costs (i.e., direct and indirect), is less than the total costs reimbursed, you must refund the difference.

b. Recipients are expected to manage their indirect costs. DOE will not amend an award solely to provide additional funds for changes in indirect cost rates. DOE recognizes that the inability to obtain full reimbursement for indirect costs means the recipient must absorb the underrecovery. Such underrecovery may be allocated as part of the organization's required cost sharing.

**USE OF PROGRAM INCOME - ADDITION**

If you earn program income during the project period as a result of this award, you may add the program income to the funds committed to the award and use it to further eligible project objectives.

**ANNUAL ALLOCATION REQUEST**

The Recipient shall submit their annual allocation request in accordance with the instructions provided in the Reporting Requirements Checklist attached to this award.  The Annual Allocation Request must be submitted to the DOE Program Manager whose name is in Block 15 of the Award Agreement and the DOE Award Administrator whose name is identified on Page 2 of the Assistance Agreement cover page.

The Annual Allocation Request must include the following information:

- SF 424 reflecting the current year allocation and cost match amounts.

- Cost Match Information for current year allocation.

  - Cost Match Value
  - Identify the source/organization of the proposed cost match.
  - Type of Cost Match (cash or in-kind)
  - Provide a description of their proposed cost match.

- Program Narrative – copy of current Program Narrative if there are no changes or an updated Program Narrative to reflect any changes.   If changes have occurred, a Public Notice and Hearing must be documented in the updated Program Narrative.

**RESILIENCE PROJECT AND SUBAWARD/SUBCONTRACT NOTIFICATION**

**For all resilience project subawards** and any other subaward over $250,000, the Recipient must notify the DOE Contracting Officer and Project Officer in writing prior to the execution of new or modified subawards/subcontracts.  This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR 200, nor does it relieve the Recipient from its obligation to comply with applicable Federal statutes, regulations, and executive orders.

The Recipient is responsible for making a final determination to award or modify subawards/subcontracts under this agreement, but the Recipient may not proceed with the subaward/subcontract until the DOE determines, and provides the Recipient written notification, that the information provided is adequate.

In order to satisfy this notification requirement, Recipient documentation must, at a minimum, include the following:

(a)  Recipient confirms that the subawardee:

(i)  is an eligible entity type identified in BIL section 40101(a)(2);

(ii) is a domestic entity; to qualify as a domestic entity, the entity must be organized, chartered or incorporated (or otherwise formed) under the laws of a particular state or territory of the United

5

DE-GD0000006 / 0001

States; have majority domestic ownership and control; and have a physical place of business in the United States;

(iii) is not a debarred or a suspended entity; and

(iv) will pay all of the laborers and mechanics performing construction, alteration, or repair work in excess of $2,000 on projects funded directly by or assisted in whole or in part by and through funding under the award, wages at rates not less than those prevailing on projects of a character similar in the locality as determined by subchapter IV of Chapter 1 of Title 40, United State Code commonly referred to as the "Davis-Bacon Act" (DBA).

(b)  Recipient confirms that:

(i)  the process undertaken to solicit the subaward/subcontract complies with their written procurement procedures as outlined in 2 CFR 200.318;

(ii)  the proposed work to be done is an eligible activity identified in BIL Section 40101(e)(1);

(iii) the proposed subaward effort is consistent with the Program Narrative being executed under the award;

(iv) the primary purpose of the proposed project is not cyber security but that the implementation of the proposed project will adhere to any applicable cybersecurity requirements, and where possible, best practices in deploying technologies under their subaward;

(v)  no planned, actual or apparent conflict of interest exists between the Recipient and the selected subawardee/subcontractor and that the Recipient's written standards of conduct were followed;

(vi) as applicable, subaward/subcontracts address the Small Utilities Set Aside requirement set forth in BIL Section 40101(d)(6); and

(vii) all required award provisions will be flowed down in the resulting subaward/subcontract.

(c)  Recipient provides:

(i)  SF-424A Budget Information form and Budget Justification form for all resilience project subawards; and any other subaward over $250,000;

(ii)  a completed Environmental Questionnaire covering the subaward activity;

(iii) cost match commitment letter from the eligible entity committing to meet the cost matching as required in BIL Section 40101(h);

(iv) the proposed metrics that will be collected and reported in the Quarterly Progress Report to measure and demonstrate the beneficial impact of the resilience project on the resilience of the grid and to the community served;

(v)  listing of Foreign Nationals for subrecipients/eligible entities and technical assistance contractors in accordance with the Foreign National Participation – Approval term;

(vi) Performance of Work in the United States waiver (if applicable);

(vii) Buy America for Infrastructure Projects waiver (if applicable);

(viii) Domestic entity waiver for subrecipients (if applicable); and

(ix)  a summary/brief description of any application, similar in nature, submitted by the proposed subawardee to the DOE under BIL Section 40101(c), DE-FOA-0002740, Grid Resilience and Innovation Partnerships (GRIP).

If a State or Indian Tribe petitions the Secretary to be designated as an eligible entity for the purpose of executing a resilience project, it must provide both the 15% cost match for the entire allocation made by DOE to the State or Tribe (see BIL section 40101(d)(8)) and the project specific cost match requirement of 100% or 1/3 (see BIL section 40101(h)).

**REPORTING**

Reporting requirements are identified on the Federal Assistance Reporting Checklist and Instructions, DOE F 4600.2, attached to the award agreement. Additional reporting requirements apply to projects funded by BIL. As part of tracking progress toward key Departmental goals – ensuring justice and equity, creating jobs, boosting domestic manufacturing, reducing greenhouse gas emissions, and advancing a pathway to private sector – DOE may require specific data collection. Examples of data that may be collected include:

- project locations,
- measurable improvements of resilience,
- transmission capacity upgraded, expanded, or built,
- electricity storage capacity installed,
- funding leveraged,
- stakeholders engaged,
- technical assistance provided, and
- value of contracts or agreements with minority owned business for supplies, services, or equipment.

Recipients must maintain sufficient records to substantiate this information upon request.

**FOREIGN NATIONAL PARTICIPATION – APPROVAL REQUIRED (APRIL 2024)**

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of this award, the Recipient must provide DOE with specific information about each foreign national to ensure compliance with the requirements for foreign national participation and access approvals. The volume and type of information required may depend on various factors associated with the award.

Approval for foreign nationals in Principal Investigator/Co-Principal Investigator roles, from countries of risk (i.e., China, Iran, North Korea, and Russia), and from countries identified on the U.S. Department of State's list of State Sponsors of Terrorism (https://www.state.gov/state-sponsors-of-terrorism/) must be obtained from DOE before they can participate in the performance of any work under this award.

A "foreign national" is defined as a person without United States citizenship or nationality (may include a stateless person). DOE may elect to deny a foreign national's participation in the award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs, or personnel. DOE's determination to deny participation or access is not appealable.

**The Recipient must include this term in any subaward and in any applicable contractual agreement(s) associated with this award.**

**STATEMENT OF FEDERAL STEWARDSHIP**

DOE/NNSA will exercise normal Federal stewardship in overseeing the project activities performed under this award. Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to correct deficiencies which develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the award objectives have been accomplished.

**SITE VISITS**

DOE/NNSA's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required. You must provide, and

DE-GD0000006 / 0001

must require your subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

## CATEGORICAL EXCLUSION (CX) – Initial Application

DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of federal funds. Based on the initial information provided by the Recipient, DOE has made a NEPA determination by issuing a CX, thereby **authorizing use of funds for technical assistance and administrative project activities only.**

NEPA review and approval of proposed resilience project activities are required as per the Resilience Project and Subaward/Subcontract Notification Term. If any of the proposed projects are likely to require an Environmental Assessment (EA) or Environmental Impact Statement (EIS), the DOE NEPA Compliance Officer will provide further guidance.  Should the recipient elect to undertake activities prior to authorization from the DOE, the Recipient is doing so at risk and such costs may not be authorized and recognized as allowable cost.

## FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS

You must obtain any required permits and comply with applicable federal, state, and municipal laws, codes, and regulations for work performed under this award.

## ELIGIBLE ENTITY PRIORITIZATION – 40101(d)(5)

In making subawards to eligible entities using funds made available under the program, the Recipient shall give priority to projects that, in the determination of the Recipient, will generate the greatest community benefit (whether rural or urban) in reducing the likelihood and consequences of disruptive events.

## SMALL UTILITIES SET ASIDE – 40101(d)(6)

The Recipient shall ensure that, of the amounts made available to eligible entities, the percentage made available to eligible entities that sell not more than 4,000,000 megawatt hours of electricity per year is not less than the percentage of all customers in the Recipient State or Indian Tribe (as applicable) that are served by those eligible entities.

## TECHNICAL ASSISTANCE AND ADMINISTRATIVE EXPENSES – 40101(d)(7)

Of the amounts made available to the Recipient under the program each fiscal year, the Recipient may use not more than 5 percent for technical assistance (*see* BIL Section 40101(g)(1)(A)) and administrative expenses associated with the program.

## NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this award should be American-made.

## INSURANCE COVERAGE (DECEMBER 2014)

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds.

8

DE-GD0000006 / 0001

**REAL PROPERTY – GRID RESILIENCE**

Acquisition of land or easements is not permitted under this grant program. Improvements to real property for the purpose of grid hardening or resilience is not considered acquisition of real property for the purpose of this grant program, and therefore may be permitted.

**EQUIPMENT (DECEMBER 2014) (NETL - MAY 2024)**

Subject to the conditions provided in 2 CFR 200.313 and 2 CFR 910.360 (as applicable), title to equipment (property) acquired under a Federal award will vest conditionally with the non-Federal entity.

The non-Federal entity cannot encumber this property or permit encumbrance without prior written approval by the DOE Contracting Officer and must follow the requirements of 2 CFR 200.313 before disposing of the property.

States must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by the Federal awarding agency in the priority order specified in 2 CFR  200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR 200.313(d).

When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from the Federal awarding agency or pass-through entity.  However, pursuant to the FY23 Consolidated Appropriations Act (Pub. L. No. 117-328), Division D, Title III, Section 309, the Secretary, or a designee of the Secretary may, at their discretion, vest unconditional title or other property interests acquired under this project regardless of the fair market value of the property at the end of the award period.

Subject to the vesting of any property pursuant to Section 309 of the FY23 Consolidated Appropriations Act (Pub. L. No. 117-328), Division D, Title III, disposition will be made as follows: (a) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency; (b) non-Federal entity may retain title or sell the equipment after compensating the Federal awarding agency as described in 2 CFR 200.313(e)(2); or (c) transfer title to the Federal awarding agency or to an eligible third Party as specified in 2 CFR 200.313(e)(3).

See 2 CFR 200.313 for additional requirements pertaining to equipment acquired under a Federal award. Also see 2 CFR 200.439 Equipment and other capital expenditures.

See 2 CFR 910.360 for supplemental requirements for Equipment for for-profit Recipients.

**SUPPLIES (DECEMBER 2014)**

See 2 CFR Part 200.314 for requirements pertaining to supplies acquired under a Federal award.

See also § 200.453 Materials and supplies costs, including costs of computing devices.

**CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022)**

DE-GD0000006 / 0001

Real property and equipment purchased with project funds (federal share and recipient cost share) under this Award are subject to the requirements at 2 CFR 200.311, 200.313, and 200.316 (non-Federal entities, except for-profit entities) and 2 CFR 910.360 (for-profit entities).  The Recipient may continue to use the real property and equipment after the conclusion of the award period of performance so long as the Recipient:

a. Continues to use the property for the authorized project purposes;
b. Complies with the applicable reporting requirements and regulatory property standards;
c. As applicable to for-profit entities, UCC filing statements are maintained; and
d. Submits a written Request for Continued Use for DOE authorization, which is approved by the DOE Contracting Officer.

The Recipient must request authorization from the Contracting Officer to continue to use the property for the authorized project purposes beyond the award period of performance ("Request for Continued Use").  The Recipient's written Request for Continued Use must identify the property and include: a summary of how the property will be used (must align with the authorized project purposes); a proposed use period (e.g., perpetuity, until fully depreciated, or a calendar date where the Recipient expects to submit disposition instructions); acknowledgement that the recipient shall not sell or encumber the property or permit any encumbrance without prior written DOE approval; current fair market value of the property; and an Estimated Useful Life or depreciation schedule for equipment.

When the property is no longer needed for authorized project purposes, the Recipient must request disposition instructions from DOE.  For-profit entity disposition requirements are set forth at 2 CFR 910.360.  Property disposition requirements for other non-federal entities are set forth in 2 CFR 200.310-200.316.

**PROPERTY TRUST RELATIONSHIP (DECEMBER 2014)**

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.

See 2 CFR Part 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

**INSOLVENCY, BANKRUPTCY OR RECEIVERSHIP**

**The Recipient must include the insolvency, bankruptcy or receivership term in any for-profit/non-profit sub-award(s), at any tier.**

a. You shall immediately notify the DOE of the occurrence of any of the following events: (i) you or your parent's filing of a voluntary case seeking liquidation or reorganization under the Bankruptcy Act; (ii) your consent to the institution of an involuntary case under the Bankruptcy Act against you or your parent; (iii) the filing of any similar proceeding for or against you or your parent, or its consent to, the dissolution, winding-up or readjustment of your debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over you, under any other applicable state or federal law; or (iv) your insolvency due to your inability to pay your debts generally as they become due.

b. Such notification shall be in writing and shall: (i) specifically set out the details of the occurrence of an event referenced in paragraph a; (ii) provide the facts surrounding that event; and (iii) provide the impact such event will have on the project being funded by this award.

c. Upon the occurrence of any of the four events described in the first paragraph, DOE reserves the right to conduct a review of your award to determine your compliance with the required elements of the award (including such items as cost share, progress towards technical project objectives, and submission of required reports). If the DOE review determines

10

DE-GD0000006 / 0001

that there are significant deficiencies or concerns with your performance under the award, DOE reserves the right to impose additional requirements, as needed, including (i) change your payment method; or (ii) institute payment controls.

d. Failure of the Recipient to comply with this term may be considered a material noncompliance of this financial assistance award by the Contracting Officer.

**PERFORMANCE OF WORK IN UNITED STATES**

The Recipient agrees that at least **100%** of the direct labor cost for the project (including subrecipient labor) shall be incurred in the United States, unless the Recipient can demonstrate to the satisfaction of the DOE that the United States economic interest will be better served through a greater percentage of the work being performed outside the United States.

**REPORTING SUBAWARD AND EXECUTIVE COMPENSATION (SEPTEMBER 2023)**

a.   Reporting of first-tier subawards.

1.   Applicability.  Unless the Recipient is exempt as provided in paragraph d. of this award term, the Recipient must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph e. of this award term).

2.   Where and when to report.

   i.   The non-Federal entity or Federal agency must report each obligating action described in paragraph a.1. of this award term to http://www.fsrs.gov.
   ii.   For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

3.   What to report. The Recipient must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov specify.

b.   Reporting total compensation of recipient executives for non-Federal entities.

1.   Applicability and what to report. The Recipient must report total compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if

   i.   The total Federal funding authorized to date under this Federal award is $30,000 or more as defined in 2 CFR 170.320;
   ii.   In the preceding fiscal year, the Recipient received:

      a)   80 percent or more of the Recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and
      b)   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

   iii.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to

11

DE-GD0000006 / 0001

the compensation information, see the U.S. Security and Exchange Commission total compensation filings at https://www.sec.gov/answers/execomp.htm.)

2.  Where and when to report. The Recipient must report executive total compensation described in paragraph b.1. of this award term:

    i.    As part of the Recipients registration profile at https://www.sam.gov.
    ii.    By the end of the month following the month in which this award is made, and annually thereafter.

c.  Reporting of total compensation of subrecipient executives.

1.  Applicability and what to report. Unless the Recipient is exempt as provided in paragraph d. of this award term, for each first-tier non-Federal entity subrecipient under this award, the Recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

    i.    In the subrecipient's preceding fiscal year, the subrecipient received;

        a)    80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and
        b)    $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

    ii.    The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at https://www.sec.gov/answers/execomp.htm.)

2.  Where and when to report.  The Recipient must report subrecipient executive total compensation described in paragraph c.1. of this award term:

    i.    To the recipient
    ii.    By the end of the month following the month during which the Recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year ( i.e., between October 1 and 31), the Recipient must report any required compensation information of the subrecipient by November 30 of that year.

d.  Exemptions
If, in the previous tax year, the Recipient had gross income, from all sources, under $300,000, it is exempt from the requirements to report:

    i.    Subawards, and
    ii.    The total compensation of the five most highly compensated executives of any subrecipient.

e.  Definitions.  For purposes of this award term:

1.  *Federal Agency* means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).
2.  *Non-Federal entity* means all of the following, as defined in 2 CFR part 25:

  i.  A Governmental organization, which is a State, local government, or Indian tribe;
  ii.  A foreign public entity;
  iii.  A domestic or foreign nonprofit organization; and
  iv.  A domestic or foreign for-profit organization;

3. *Executive* means officers, managing partners, or any other employees in management positions.

4. *Subaward*:

  i.  This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this award and that the recipient awards to an eligible subrecipient.
  ii.  The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).
  iii.  A subaward may be provided through any legal agreement, including an agreement that the Recipient or a subrecipient considers a contract.

5. *Subrecipient* means a non-Federal entity or Federal agency that:

  i.  Receives a subaward from the Recipient under this award; and
  ii.  Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

6. *Total compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)).

**SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS**

A. Requirement for System for Award Management (SAM) Unless exempted from this requirement under 2 CFR 25.110, the prime recipient must remain registered and maintain current information in SAM for the entire period of performance of the award. This includes providing information on the prime recipient's immediate and highest-level owner and subsidiaries, as well as on all of its predecessors that have been awarded a Federal contract or Federal financial assistance agreements within the last three years, if applicable, until the prime recipient submits the final financial report required under this award or receives the final payment, whichever is later. This requires the prime recipient to review its information in SAM at least annually after the initial registration, and to update its information as soon as there are changes. Reviews and updates may be required more frequently due to changes in recipient information or as required by another award term.

B. Requirement for Unique Entity Identifier

If authorized to make subawards under this award, the prime recipient:

 1. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward until the entity has provided its unique entity identifier to the prime recipient.

 2. Must not make a subaward to an entity unless the entity has provided its unique entity identifier to the prime recipient. Subrecipients are not required to obtain an active SAM registration but must obtain a unique entity identifier.

C. Definitions

For purposes of this term:

DE-GD0000006 / 0001

1. System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2. Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

3. Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following for purposes of this part:

    a. A foreign organization;

    b. A foreign public entity;

    c. A domestic for-profit organization; and

    d. A Federal agency.

4. Subaward has the meaning given in 2 CFR 200.1.

5. Subrecipient has the meaning given in 2 CFR 200.1.

**FINAL INCURRED COST AUDIT (DECEMBER 2014)**

In accordance with 2 CFR Part 200 as amended by 2 CFR Part 910, DOE reserves the right to initiate a final incurred cost audit on this award. If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

**INDEMNITY**

The Recipient must include the following indemnity provision in any sub-awards to eligible entities performing the resilience projects at any tier:

The Recipient shall indemnify the Government and its officers, agents, or employees for any and all liability, including litigation expenses and attorneys' fees, arising from suits, actions, or claims of any character for death, bodily injury, or loss of or damage to property or to the environment, resulting from the project, except to the extent that such liability results from the direct fault or negligence of Government officers, agents or employees, or to the extent such liability may be covered by applicable allowable costs provisions.

**LOBBYING RESTRICTIONS (MARCH 2012)**

By accepting funds under this award, you agree that none of the funds obligated on the award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913. This restriction is in addition to those prescribed elsewhere in statute and regulation.

**CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH 2014)**

By entering into this agreement, the undersigned attests that Colorado Energy Office has not been convicted of a felony criminal violation under Federal law in the 24 months preceding the date of signature.

DE-GD0000006 / 0001

The undersigned further attests that Colorado Energy Office does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

For purposes of these assurances, the following definitions apply:

A Corporation includes any entity that has filed articles of incorporation in any of the 50 states, the District of Columbia, or the various territories of the United States [but not foreign corporations]. It includes both for-profit and non-profit organizations.

**NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)**

(1) By entering into this agreement, the undersigned attests that Colorado Energy Office does not and will not require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(2) The undersigned further attests that does not and will not use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

    a.''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''

    b. The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

    c. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

**REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015)**

a. General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872

15

DE-GD0000006 / 0001

of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

b. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

2. Reached its final disposition during the most recent five-year period; and

3. Is one of the following:

(A) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

(B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

(C) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

(D) Any other criminal, civil, or administrative proceeding if:

(i) It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

(ii) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

(iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

c. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

d. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

e. Definitions

For purposes of this award term and condition:

16

DE-GD0000006 / 0001

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or A. Reporting of Matters Related to Recipient Integrity and Performance.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

  (A) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

  (B) The value of all expected funding increments under a Federal award and options, even if not yet

**EXPORT CONTROL (JUNE 2024)**

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade. There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls." The Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under the award. The Recipient must immediately report to DOE any export control investigations, charges, convictions, and violations upon occurrence, at the recipient or subrecipient level, and for convictions/violations, provide the corrective action(s) to prevent future convictions/violations.

**PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (APRIL 2024)**

As set forth in 2 CFR 200.216, recipients and subrecipients are prohibited from obligating or expending project funds (Federal and non-Federal funds) to:

  (1) Procure or obtain;

  (2) Extend or renew a contract to procure or obtain;

  (3) Exercise an option to procure; or

  (4) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.  As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

    (i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

    (ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

17

DE-GD0000006 / 0001

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

**PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT PROGRAMS (MARCH 2023)**

A.    **Prohibition**

Persons participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk* are prohibited from participating in this Award. The Recipient must exercise ongoing due diligence to reasonably ensure that no individuals participating on the DOE-funded project are participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. Consequences for violations of this prohibition will be determined according to applicable law, regulations, and policy. Further, the Recipient must notify DOE within five (5) business days upon learning that an owner of the Recipient or subrecipient or individual on the project team is or is believed to be participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. DOE may modify and add requirements related to this prohibition to the extent required by law.

B.    **Definitions**

1.    **Foreign Government-Sponsored Talent Recruitment Program**. An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government. Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose. Some programs allow for or encourage continued employment at United States research facilities or receipt of federal research funds while concurrently working at and/or receiving compensation from a foreign institution, and some direct participants not to disclose their participation to U.S. entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

2.    **Foreign Country of Risk**. DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

**IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY (NOVEMBER 2020)**

States, local governments, or other public entities may not condition sub-awards in a manner that would discriminate, or disadvantage sub-recipients based on their religious character.

**INTERIM CONFLICT OF INTEREST REQUIREMENTS FOR FINANCIAL ASSISTANCE (MARCH 2023)**

DE-GD0000006 / 0001

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at
https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistanc
e. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial
assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the
implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the
project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless
of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or
proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any
subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify
all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI
reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant
financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a
management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and
unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the
other requirements set forth in DOE's interim COI Policy.

## ORGANIZATIONAL CONFLICT OF INTEREST (APRIL 2024)

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or
subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action
involving a related organization (2 CFR 200.318(c)(2)).

The Recipient must disclose in writing any potential or actual organizational conflict of interest to the DOE Contracting
Officer.  The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds
with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian Tribe. For a list of the
information that must be included the disclosure, see Section VI. of the DOE interim Conflict of Interest Policy for
Financial Assistance at
https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistanc
e.

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the
Recipient must procure goods and services from other sources when using project funds.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with
the exception of DOE National Laboratories. The Recipient is responsible for ensuring subrecipient compliance with this
term.

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian Tribe, the
Recipient must maintain written standards of conduct covering organizational conflicts of interest.

## FRAUD, WASTE AND ABUSE (MARCH 2023)

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of
DOE's programs and operations including deterring and detecting fraud, waste, abuse and mismanagement. The OIG
accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to
include grants, cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting allegations of
fraud, waste, abuse, or mismanagement. To report such allegations, please visit https://www.energy.gov/ig/ig-hotline.

DE-GD0000006 / 0001

Additionally, the Recipient must be cognizant of the requirements of 2 CFR § 200.113 Mandatory disclosures, which states:

> The non‑Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass‑through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Non‑Federal entities that have received a Federal award including the term and condition outlined in appendix XII of 2 CFR Part 200 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in § 200.339. (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)

**TRANSPARENCY OF FOREIGN CONNECTIONS (APRIL 2024)**

The Recipient must notify the DOE Contracting Officer within fifteen (15) business days of learning of the following circumstances in relation to the Recipient and subrecipients:

1. Any current or pending subsidiary, foreign business entity, or offshore entity that is based in or funded by any foreign country of risk or foreign entity based in a country of risk;
2. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an entity owned by a country of risk or foreign entity based in a country of risk;
3. Any current or pending change in ownership structure of the Recipient or subrecipients that increases foreign ownership related to a country of risk.  Each notification shall be accompanied by a complete and up-to-date capitalization table showing all equity interests held including limited liability company (LLC) and partnership interests, as well as derivative securities.  Include both the number of shares issued to each equity holder, as well as the percentage of that series and of all equity on fully diluted basis.  For each equity holder, provide the place of incorporation and the principal place of business, as applicable.  If the equity holder is a natural person, identify the citizenship(s);
4. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has a foreign affiliation with any foreign country of risk;
5. Any current or pending technology licensing or intellectual property sales to a foreign country of risk; and
6. Any changes to the Recipient or the subrecipients' board of directors, including additions to the number of directors, the identity of new directors, as well as each new director's citizenship, shareholder affiliation (if applicable); each notification shall include a complete up-to-date list of all directors (and board observers), including their full name, citizenship and shareholder affiliation, date of appointment, duration of term, as well as a description of observer rights as applicable.
7. Any proposed changes to the equipment used on the project that would result in:
   a. Equipment originally made or manufactured in a foreign country of risk (including relabeled or rebranded equipment).
   b. Coded equipment where the source code is written in a foreign country of risk.
   c. Equipment from a foreign country of risk that will be connected to the internet or other remote communication system.
   d. Any companies from a foreign country of risk that will have physical or remote access to any part of the equipment used on the project after delivery.

Should DOE determine the connection poses a risk to economic or national security, DOE will require measures to mitigate or eliminate the risk.

DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

20

DE-GD0000006 / 0001

Recognizing the disclosures may contain business confidential information, subrecipients may submit their disclosures directly to DOE.

**FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023)**

A.    Consideration of new collaborations with foreign organizations and governments. The Recipient must provide DOE with advanced written notification of any potential collaboration with foreign entities, organizations or governments in connection with its DOE-funded award scope. The Recipient must await further guidance from DOE prior to contacting the proposed foreign entity, organization or government regarding the potential collaboration or negotiating the terms of any potential agreement.

B.    Existing collaborations with foreign entities, organizations and governments. The Recipient must provide DOE with a written list of all existing foreign collaborations in which has entered in connection with its DOE-funded award scope.

C.    Description of collaborations that should be reported: In general, a collaboration will involve some provision of a thing of value to, or from, the Recipient. A thing of value includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the Award, regardless of whether or not they have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the Award but resulting in provision of a thing of value from or to the Award must also be reported. Collaborations do not include routine workshops, conferences, use of the Recipient's services and facilities by foreign investigators resulting from its standard published process for evaluating requests for access, or the routine use of foreign facilities by awardee staff in accordance with the Recipient's standard policies and procedures.

**BUY AMERICAN REQUIREMENT FOR INFRASTRUCTURE PROJECTS (MAY 2024)**

A.    ***Definitions***

**Components** See 2 CFR 184.3 "Definitions."

**Construction Materials** See 2 CFR 184.3 "Definitions."

**Buy America Preference, Buy America Requirement, or domestic content procurement preference"** means a requirement that no amount of funds made available through a program for federal financial assistance may be obligated for an infrastructure project unless—

(A) all iron and steel used in the project are produced in the United States;
(B) the manufactured products used in the project are produced in the United States; or
(C) the construction materials used in the project are produced in the United States.

**Infrastructure** See 2 CFR 184.4 (c) and (d).

**Manufactured Products** See 2 CFR 184.3 "Definitions."

**Predominantly of iron or steel** See 2 CFR 184.3 "Definitions."

**Infrastructure Project-** See 2 CFR 184.3 "Definitions."

DE-GD0000006 / 0001

**Public-** The Buy America Requirement does not apply to non-public infrastructure. For purposes of this guidance, infrastructure should be considered "public" if it is: (1) publicly owned or (2) privately owned but utilized primarily for a public purpose. Infrastructure should be considered to be "utilized primarily for a public purpose" if it is privately operated on behalf of the public or is a place of public accommodation.

**B.**     ***Buy America Requirement for Infrastructure Projects (Buy America Requirement)***
None of the funds provided under this award (federal share or recipient cost-share) may be used for a project for infrastructure unless:

1.  All iron and steel used in the project is produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2.  All manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation. See 2 CFR 184.5 for determining the cost of components for manufactured products; and

3.  All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. See 2 CFR 184.6 for construction material standards.

The Buy America Requirement only applies to those articles, materials, and supplies that are consumed in, incorporated into, or permanently affixed to the infrastructure in the project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought into the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Requirement apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

The Buy America Requirement only applies to an article, material, or supply classified into one of the following categories* based on its status at the time it is brought to the work site for incorporation into an infrastructure project:

(i) Iron or steel products;
(ii) Manufactured products; or
(iii) Construction materials;

The Buy America Requirement only applies to the iron or steel products, manufactured products, and construction materials used for the construction, alteration, maintenance, or repair of public infrastructure in the United States when those items are consumed in, incorporated into, or permanently affixed to the infrastructure. An article, material, or supply incorporated into an infrastructure project should not be considered to fall into

DE-GD0000006 / 0001

multiple categories, but rather must meet the Buy America Preference Requirement for only the single category in which it is classified.

All iron and steel, manufactured products, and construction materials used in the infrastructure project must be produced in the United States.

\* Section 70917(c) of the BABA states that "construction materials" do not include cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. Section 70917(c) materials are excluded from Construction materials. Asphalt concrete pavement mixes are typically composed of asphalt cement (a binding agent) and aggregates such as stone, sand, and gravel. Accordingly, asphalt is also excluded from the definition of Construction materials.

Section 70917(c) materials, on their own, are not manufactured products. Further, Section 70917(c) materials should not be considered manufactured products when they are used at or combined proximate to the work site—such as is the case with wet concrete or hot mix asphalt brought to the work site for incorporation. However, when certain Section 70917(c) materials (such as stone, sand, and gravel) are used to produce a manufactured product, such as is precast concrete processed into a specific shape or form, and is in such state when brought to the work site, then that product is subject to the BABA requirements.
Further clarification is provided in 2 CFR 184 on the circumstances under which a determination is made that Section 70917(c) materials should be treated as components of a manufactured product. That determination is based on consideration of: (i) the revised definition of the "manufactured products" at 2 CFR 184.3; (ii) a new definition of "section 70917(c) materials" at 2 CFR 184.3; (iii) new instructions at 2 CFR 184.4(e) on how and when to categorize articles, materials, and supplies; and (iv) new instructions at 2 CFR 184.4(f) on how to apply the Buy America preference by category.

Recipients are responsible for administering their award in accordance with the terms and conditions, including the Buy America Requirement.  The recipient must ensure that the Buy America Requirement flows down to all subawards and that the subawardees and subrecipients comply with the Buy America Requirement.  The Buy America Requirement term and condition must be included all sub-awards, contracts, subcontracts, and purchase orders for work performed under the infrastructure project.

**C.** *Certification of Compliance*

Recipients must certify or provide equivalent documentation for proof of compliance that a good faith effort was made to solicit bids for domestic products used in the infrastructure project under this award.
Recipients must also maintain certifications or equivalent documentation for proof of compliance that those articles, materials, and supplies that are consumed in, incorporated into, affixed to, or otherwise used in the infrastructure project, not covered by a waiver or exemption provided in 2 CFR 184.8, are produced in the United States. The certification or proof of compliance must be provided by the suppliers or manufacturers of the iron, steel, manufactured products and construction materials and flow up from all subawardees, contractors and vendors to the recipient. Recipients must keep these certifications with the award/project files and be able to produce them upon request from DOE, auditors or Office of Inspector General.

**D.** *Waivers*

When necessary, recipients may apply for, and DOE may grant, a waiver from the Buy America Requirement. Waiver requests are subject to review by DOE and the Office of Management and Budget, as well as a public comment period of no less than 15 calendar days.

DE-GD0000006 / 0001

1. Waivers must be based on one of the following justifications:

   a) Public Interest- Applying the Buy America Requirement would be inconsistent with the public interest;

   b) Non-Availability- The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

   c) Unreasonable Cost- The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

2. Requests to waive the Buy America Requirement must include the following:
   - Waiver type (Public Interest, Non-Availability, or Unreasonable Cost);
   - Recipient name and Unique Entity Identifier (UEI);
   - Award information (Federal Award Identification Number, Assistance Listing number);
   - A brief description of the project, its location, and the specific infrastructure involved;
   - Total estimated project cost, with estimated federal share and recipient cost share breakdowns;
   - Total estimated infrastructure costs, with estimated federal share and recipient cost share breakdowns;
   - List and description of iron or steel item(s), manufactured goods, and/or construction material(s) the recipient seeks to waive from the Buy America Preference, including name, cost, quantity(ies), country(ies) of origin, and relevant Product Service Codes (PSC) and North American Industry Classification System (NAICS) codes for each;
   - A detailed justification as to how the non-domestic item(s) is/are essential the project;
   - A certification that the recipient made a good faith effort to solicit bids for domestic products supported by terms included in requests for proposals, contracts, and non-proprietary communications with potential suppliers;
   - A justification statement—based on one of the applicable justifications outlined above—as to why the listed items cannot be procured domestically, including the due diligence performed (e.g., market research, industry outreach, cost analysis, cost-benefit analysis) by the recipient to attempt to avoid the need for a waiver. This justification may cite, if applicable, the absence of any Buy America-compliant bids received for domestic products in response to a solicitation;
   - A description of the market research conducted that includes who conducted the market research, when it was conducted, sources that were used, and the methods used to conduct the research; and
   - Anticipated impact to the project if no waiver is issued.

3. How to submit a waiver
   Requests to waive the application of the Buy America Requirement must be submitted in writing to your cognizant Contracting Officer or Grants Officer.

DOE may request, and the recipient must provide, additional information for consideration of this wavier. DOE may reject or grant waivers in whole or in part depending on its review, analysis, and/or feedback from OMB or the public. DOEs final determination regarding approval or rejection of the waiver request may not be appealed. Waiver requests may take up to 90 calendar days to process.

**REPORTING, TRACKING AND SEGREGATION OF INCURRED COSTS (MARCH 2023)**

DE-GD0000006 / 0001

BIL funds can be used in conjunction with other funding, as necessary to complete projects, but tracking and reporting must be separate to meet the reporting requirements of the BIL and related Office of Management and Budget (OMB) Guidance. The Recipient must keep separate records for BIL funds and must ensure those records comply with the requirements of the BIL. Funding provided through the BIL that is supplemental to an existing grant or cooperative agreement is one-time funding.

## DAVIS-BACON REQUIREMENTS (NETL – JUNE 2024)

This Award is funded under Division D of the Bipartisan Infrastructure Law (BIL). All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2,000 on a project assisted in whole or in part by funds made available under this Award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with Subchapter IV of Chapter 31 of Title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA) and its implementing regulations in 29 CFR parts 1, 3, and 5 (collectively the "Davis-Bacon Act Requirements").

Award recipients shall provide written acknowledgement and confirmation of compliance with the Davis-Bacon Act Requirements which include but are not limited to:

1. Ensuring that laborers and mechanics on BIL funded/assisted projects are paid at least the prevailing wage for their work classification on applicable projects.

2. Ensuring that laborers and mechanics on BIL funded/assisted projects are paid on a weekly basis.

3. Ensuring that the applicable wage determination(s) for construction work performed by laborers and mechanics employed by the recipient, subrecipients, contractors, or subcontractors are identified and obtained from the database at www.sam.gov, by 1) selecting "Wage Determinations," then, 2) selecting "Public Buildings and Public Works," then, 3) filtering search results by State (selecting the appropriate state from the drop-down menus), and by County or Independent City (selecting the appropriate County/Independent City from the drop-down menu) in which the work will take place, then, 4) selecting the appropriate construction type (e.g., Building, Residential, Heavy, or Highway). The appropriate wage determination number hyperlink should be selected from the result. If the wage determination which opens lists a "Last Revised Date" after the date of the contract award/start of construction, then scroll to the bottom of the document, and under History, click on the wage determination with the date closest to, but still before the date of contract award/start of construction.

4. Ensuring that applicable wage determination(s) are uploaded to LCPtracker (see below section on LCPtracker).

5. Ensuring that the applicable wage determination(s) and the required contract provisions per 29 CFR 5.5 are flowed down to and incorporated into any applicable contracts/subcontracts or subrecipient awards.

6. Preserving a copy of the applicable wage determination(s) identified and obtained from www.sam.gov, for a period of 3 years after the construction, alteration or repair work herein is completed.

7. Maintaining responsibility for compliance by any lower-tier subcontractors or subrecipients subject to the Davis-Bacon Act Requirements.

8. Receiving and reviewing certified weekly payrolls submitted by all subcontractors and subrecipients for accuracy as needed and identifying potential compliance issues.

9.  Maintaining original certified weekly payrolls for 3 years after the completion of the project and making those payrolls available to the Department of Energy or the Department of Labor upon request.

10. Conducting site-visit interviews with employees as needed to provide reasonable assurance of compliance with subcontractors and subrecipients.

11. Cooperating with authorized representatives of the Department of Energy or Department of Labor in the inspection of DBA-related records, on-site interviews of laborers and mechanics, and other reasonable requests related to a DBA investigation.

12. Posting in a prominent and accessible place the applicable wage determination(s) and Department of Labor Publication: WH-1321, Notice to Employees Working on Federal or Federally Assisted Construction Projects.

13. Notifying the Contracting Officer of Davis-Bacon Act Requirement issues, including complaints, violations (as defined in 29 CFR 5.7), disputes (pursuant to 29 CFR parts 4, 6, and 8 and as defined in FAR 52.222-14), disputed DBA-related determinations, Department of Labor investigations, or legal/judicial proceedings related to the Davis-Bacon Act Requirements under this contract, subcontract, or subrecipient award.

14. Preparing and submitting the Semi-Annual Labor Enforcement Report, by April 21 and October 21 of each year, in accordance with the reporting instructions in Attachment 2, Federal Assistance Reporting Checklist.

15. Maintain competency in complying with Davis-Bacon Act Requirements. The Contracting Officer will notify the recipient of any DOE-sponsored Davis-Bacon Act compliance trainings. The Department of Labor offers free Prevailing Wage Seminars several times a year that meet this requirement, at https://www.dol.gov/agencies/whd/government-contracts/construction/seminars/events.

To avoid voluminous attachments under this award, all applicable wage determination(s) included in the www.sam.gov database and uploaded to LCPtracker are incorporated by reference herein as if set forth and attached in full.  The applicable wage determination(s) are effective herein even if they have not been attached to the contract/subcontract(s) or subrecipient awards thereunder or have not been correctly identified and obtained from www.sam.gov and/or uploaded to LCPtracker.

The Department of Energy has contracted with LCPtracker, a third-party DBA electronic payroll compliance software application. A waiver for the use of LCPtracker may be granted to a particular contractor or subcontractor if they are unable or limited in their ability to use or access the software.

**Davis-Bacon Act Electronic Certified Payroll Submission Waiver**

A waiver must be granted before the start of work subject to Davis-Bacon Act requirements (e.g., construction, alteration, or repair work). The recipient does not have the right to appeal DOE's decision concerning a waiver request.

For additional guidance on how to comply with the Davis-Bacon provisions and clauses, see https://www.dol.gov/agencies/whd/government-contracts/construction and https://www.dol.gov/agencies/whd/government-contracts/protections-for-workers-in-construction.

DE-GD0000006 / 0001

**AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (SEPTEMBER 2023)**

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246:

(1) Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.

(2) Recipients and Contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors and subcontractors.

(3) Recipients, subrecipients, contractors and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co‑workers.

The Department of Labor's (DOL) Office of Federal Contractor Compliance Programs (OFCCP) uses a neutral process to schedule contractors for compliance evaluations. OFCCP's Technical Assistance Guide should be consulted to gain an understanding of the requirements and possible actions the recipients, subrecipients, contractors and subcontractors must take. See OFCCP's Technical Assistance Guide at: https://www.dol.gov/sites/dolgov/files/ofccp/Construction/files/ConstructionTAG.pdf?msclkid=9e397d68c4b11ec9d8e6fecb6c710ec.

Additionally, for construction projects valued at $35 million or more and lasting more than one year, Recipients, subrecipients, contractors, or subcontractors may be selected by OFCCP to participate in the Mega Construction Project Program. DOE, under relevant legal authorities including Sections 205 and 303(a) of Executive Order 11246, will require participation as a condition of the award.  This program offers extensive compliance assistance with EO 11246. For more information regarding this program, see https://www.dol.gov/agencies/ofccp/construction/mega-program.

**POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023)**

If the Recipient or subrecipients have or receive any other award of federal funds for activities that potentially overlap with the activities funded under this Award, the Recipient must promptly notify DOE in writing of the potential overlap and state whether project funds (i.e., recipient cost share and federal funds) from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under this Award. If there are identical cost items, the Recipient must promptly notify the DOE Contracting Officer in writing of the potential duplication and eliminate any inappropriate duplication of funding.

**CONSTRUCTION SIGNAGE (MAY 2024)**

The Recipient is encouraged to display DOE Investing in America signage during and after construction. Guidance can be found at: (https://www.energy.gov/design). Proposed signage costs that meet these specifications are an allowable cost and may be included in the proposed project budget.

DE-GD0000006 / 0001

**POST AWARD DUE DILIGENCE REVIEWS (APRIL 2024)**

During the period of performance of the Award, DOE may conduct ongoing due diligence reviews, through Government resources, to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring an individual or entity not participate in the Award. As part of the research, technology, and economic security risk review, DOE may contact the Recipient project team members for additional information to inform the review.



# Federal Assistance Reporting Checklist
**Attachment 3**

| 1. Award Number: | 2. Program/Project Title: |
|---|---|
| DE-GD0000006 / 0001 | BIL – Preventing Outages and Enhancing the Resilience of the Electric Grid, Formula Grants to States and Indian Tribes |
| 3. Recipient: Colorado Energy Office | |

| 4. Reporting Requirements (see also the Special Instructions) | Frequency | Addresses | |
|---|---|---|---|
| **I.    PROJECT MANAGEMENT REPORTING** | | | |
| ☐ A. Performance Report – Narrative | **Q** | A. | EERE PMC |
| ☐ B. Performance Report – Quantitative | **Q** | B. | EERE PMC |
| ☒ C. Financial Report (SF-425) | **F, S** | C. | EERE PMC |
| ☐ D. Scientific and Technical Reporting | | | |
| ☐ 1.  Accepted Manuscript of Journal Article(s) | **A5, P** | D.1. | OSTI E-Link |
| ☐ 2.  Conference Product(s) | **A5, P** | D.2. | OSTI E-Link |
| ☐ 3.  Technical Report(s) | **A5, P** | D.3. | OSTI E-Link |
| ☐ 4.  Software & Manual(s) | **A5, P** | D.4. | DOE CODE |
| ☐ 5.  Dataset(s) | **A5, P** | D.5. | OSTI E-Link Datasets |
| ☐ 6.  Other STI (Dissertation / Thesis, etc.) | **A5, P** | D.6. | OSTI E-Link |
| ☐ E. Intellectual Property Reporting | | | |
| ☐ 1.  Intellectual Property Reporting | **A5, P** | E.1. | iEdison |
| ☐ 2.  Invention Utilization Report | **A5, P** | E.2. | iEdison |
| ☒ F. Project Management Plan (PMP) | **A5** | F. | EERE PMC |
| ☒ G. Special Status Report | **A5** | G. | EERE PMC |
| ☐ H. Continuation Application | **A5** | H. | EERE PMC |
| ☒ I. Other Project Management Reporting (see Special Instructions) | **Q** | I. | See Special Instructions |
| | | | |
| **II.    AWARD MANAGEMENT REPORTING** | | | |
| ☒ A. Current and Pending Support | **A5** | A. | EERE PMC |
| ☒ B. Demographic Reporting | **A5** | B. | EERE PMC |
| ☒ C. Financial Conflict of Interest Report | **A5** | C. | EERE PMC |
| ☐ D. Tangible Personal Property Report – Annual Property Report (SF-428 & SF-428A) | **Y** | D. | EERE PMC |
| ☒ E. Tangible Personal Property Report – Disposition Request/Report (SF-428 & SF-428C) | **A5** | E. | EERE PMC |
| ☒ F. Uniform Commercial Code (UCC) Financing Statements | **A5** | F. | See section II. F. for instructions and due dates |
| ☒ G. Federal Subaward Reporting System (FSRS) | **A5** | G. | FSRS |
| ☐ H. Annual Incurred Cost Proposal | **Y180** | H. | See section II. H. for instructions and due dates |
| ☐ I. Fringe Reconciliation Form | **Y180** | I. | See section II. I. for instructions and due dates |
| ☐ J. DOE For-Profit Compliance Audit | **O** | J. | See section II. J. for instructions and due dates |
| ☒ K. Single Audit: States, Locals, Tribal Governments, and Non-Profits | **O** | K. | See section II. K. for instructions and due dates |
| ☒ L. Other Award Management Reporting (see Special Instructions) | **A5** | L. | See Special Instructions |
| | | | |
| **III.    CLOSEOUT REPORTING** | | | |
| ☐ A. Final Scientific/Technical Report | | | |
| ☐ A.1.  Final Scientific/Technical Report – Unlimited | **F** | A.1. | OSTI E-Link |
| ☐ A.2.  Final Scientific/Technical Report – Data Protection | **F** | A.2. | OSTI E-Link |
| ☐ B. Invention Certification (DOE F 2050.11) | **F** | B. | EERE PMC |
| ☒ C. Tangible Personal Property Report – Final Report (SF-428 & SF-428B) | **F, A5** | C. | EERE PMC |
| ☐ D. Verification of Receipt of Accepted Manuscripts | **F** | D. | See section III. D. for instructions and due dates |
| ☐ E. Other Closeout Reporting (see Special Instructions) | **F** | E. | See Special Instructions |



# Federal Assistance Reporting Checklist
**Attachment 3**

| | | | | |
|---|---|---|---|---|
| **IV.** | **POST-PROJECT REPORTING** | | | |
| ☐ A. | Scientific and Technical Reporting | **P** | A. | OSTI E-Link |
| ☐ B. | Intellectual Property Reporting | **P** | B. | iEdison |

| 4. Reporting Requirements (see also the Special Instructions) | Frequency | Addresses |
|---|---|---|
| **V.**   **BIPARTISAN INFRASTRUCTURE LAW/INFLATION REDUCTION ACT REPORTING** | | |
| ☒ A.   Community Benefits Report | **Y** | A.   EERE PMC |
| ☐ B.   Boosting Domestic Manufacturing | **A5, Y, F** | B.   EERE PMC |
| ☒ C.   Quality Job Creation | | |
|     ☒ 1.   Direct Jobs | **A5** | C.1.   See Section V. C. I for instructions and due dates. |
|     ☒ 2.   Training Outcomes | **A5, F** | C.2.   EERE PMC |
|     ☒ 3.   Good Jobs Outcomes | **A5, F** | C.3.   EERE PMC |
|     ☒ 4.   Permanent Jobs | **A5** | C.4.   EERE PMC |
| ☒ D.   Equity and Justice | | |
|     ☒ 1.   Community Engagement Process | **A5** | D.1.   EERE PMC |
|     ☒ 2.   Engagement Events and Technical Assistance | **A5** | D.2.   EERE PMC |
|     ☐ 3.   Community Ownership | **Q** | D.3.   EERE PMC |
| ☐ E.   Pathway to Net-Zero | | |
|     ☐ 1.   Infrastructure Supported | **A5, Y, F** | E.1.   EERE PMC |
|     ☐ 2.   Hydrogen Production | **A5, Y, F** | E.2.   EERE PMC |
|     ☐ 3.   Carbon Capture, Removal, and Storage | **A5, Y, F** | E.3.   EERE PMC |
|     ☐ 4.   Energy Saved | **A5, Y, F** | E.4.   EERE PMC |
| ☒ F.   Davis Bacon Act Semi-Annual Labor Compliance Report | **A5** | F.   EERE PMC |

**FREQUENCY CODES AND DUE DATES:**

**A5 – As Specified or within five (5) calendar days after the event.**

**F – Final; within 120 calendar days after expiration or termination of the award.**

**O – Other: See instructions for further details.**

**P – Post-project (after the period of performance); within five (5) calendar days after the event, or as specified.**

**Q – Quarterly; within 30 calendar days after the end of the federal fiscal year quarter.**

**S – Semiannually; within 30 days after end of the reporting period.**

**Y – Yearly; within 90 calendar days after the end of the federal fiscal year or termination of the award.**

**Y180 – Yearly; within 180 calendar days after the close of the recipient's fiscal year.**

**FULL URLS:**

**OSTI E-Link:** https://www.osti.gov/elink/2413-submission.jsp
**OSTI E-Link Datasets:** https://www.osti.gov/elink/2416-submission.jsp

**DOE CODE:** https://www.osti.gov/doecode/
**iEdison:** https://www.nist.gov/iedison
**EERE PMC:** https://www.eere-pmc.energy.gov/SubmitReports.aspx
**FSRS:** https://www.fsrs.gov

**5.   Special Instructions:**

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

---

**Recipient's fiscal year end date**: 06/30
- ☐ No indirect costs proposed
- ☐ De minimis rate used/No fringe proposed

**Project Management Reporting:**

**I.        Other Project Management Reporting**

All deliverables identified in the Statement of Project Objectives (SOPO), Award Attachment 2, must be submitted to the address identified in the SOPO deliverables table.

---

**5.    Special Instructions (Continued):**



# Federal Assistance Reporting Checklist
**Attachment 3**

**Quarterly Progress Report (QPR)**

| | |
|---|---|
| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
| First QPR Submission Deadline: | Due within 30 calendar days after the end of the first ***full*** quarterly reporting period following the issuance of the award. |
| Submission Deadline for Subsequent QPRs: | Within 30 calendar days after the end of the quarterly reporting period (January 30, April 30, July 30, October 30) |
| Template and Instructions | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov |

The QPR template utilizes the same template document as the Project Management Plan (PMP). The Recipient will use the QPR to report the progress made from the baseline information set forth in the PMP. The Final QPR shall reflect any final close-out activities, costs, payments, and reimbursements that occurred following the submission of the QPR for the last reporting period of the Period of Performance.

**II.     Award Management Reporting:**

**F.     Uniform Commercial Code (UCC) Financing Statements:**

If a piece of equipment is planned to be purchased by a for-profit Recipient or a for-profit Subrecipient with either Federal and/or non-Federal funds, and when the DOE share of the prime award exceeds $1M, the for-profit Recipient or the for-profit Subrecipient must record Uniform Commercial Code (UCC) financing statement(s) before being reimbursed for the DOE share of the equipment. See "Reporting Instructions" for specific guidance.

**L.     Other Award Management Reporting**
**Annual Allocation Request**

| | |
|---|---|
| Submit To: | Program Manager identified in Block 15 and the DOE Award Administrator identified on Page 2 of the Award Agreement |
| Submission Deadline: | Within the specified time after issuance of the ALRD DE-FOA-00002736 amendment publicizing the Annual Allocations. |
| Content and Information: | See the "Annual Allocation Request" provision in the Special Terms and Conditions. |



**Federal Assistance Reporting Checklist**

**Attachment 3**

Table of Contents

| | | |
|---|---|---|
| I. | Project Management Reporting | 6 |
| A. | Performance Report Narrative (PRN) - Not Required | 6 |
| B. | Performance Report Quantitative (PRQ) - Not Required | 6 |
| C. | Financial Report SF-425 Federal Financial Report | 6 |
| D. | Scientific and Technical Reporting - Not Required | 6 |
| E. | Intellectual Property Reporting - Not Required | 6 |
| F. | Project Management Plan (PMP) | 6 |
| 1. | Revised Plan(s) | 7 |
| 2. | Content of revised PMP | 7 |
| G. | Special Status Reports | 7 |
| H. | Continuation Application - Not Required | 10 |
| I. | Other Project Management Reporting (see Special Instructions) | 10 |
| II. | Award Management Reporting | 10 |
| A. | Current and Pending Support | 10 |
| B. | Demographic Reporting | 12 |
| C. | Financial Conflict of Interest Report | 13 |
| D. | Tangible Personal Property Report – Annual Property Report (SF-428 & SF-428A) - Not Required | 14 |
| E. | Tangible Personal Property Report – Disposition Request/Report (SF-428 & SF-428C) | 14 |
| F. | Uniform Commercial Code (UCC) Financing Statements | 15 |
| G. | Federal Subaward Reporting System (FSRS) | 16 |
| H. | Annual Incurred Cost Proposals- Not Required | 16 |
| I. | Fringe Reconciliation Form- Not Required | 16 |
| J. | DOE For-Profit Compliance Audit- Not Required | 16 |
| K. | Single Audit: States, Local Government, Tribal Governments, Institution of Higher Education (IHE), or Non-Profit Organization | 16 |
| L. | Other Award Management Reporting (see Special Instructions) | 17 |
| III. | Closeout Reporting | 17 |
| A. | Final Scientific/Technical Report - Not Required | 17 |
| B. | Invention Certification (DOE F 2050.11) - Not Required | 17 |



**Federal Assistance Reporting Checklist**

**Attachment 3**

|  |  |  |
|---|---|---|
| C. | Tangible Personal Property Report – Final Report (SF-428 & SF-428B) | 17 |
| D. | Verification of Receipt of Accepted Manuscripts - Not Required | 18 |
| E. | Other Closeout Reporting (see Special Instructions) | 18 |
| IV. | Post-Project Reporting | 18 |
| A. | Scientific and Technical Reporting - Not Required | 18 |
| B. | Intellectual Property Reporting - Not Required | 18 |
| V. | Bipartisan Infrastructure Law/Inflation Reduction Act Reporting | 18 |
| A. | Community Benefits Report (<mark>Annual Program Metrics and Impact Report</mark>) | 18 |
| B. | Boosting Domestic Manufacturing - Not Required | 18 |
| C. | Quality Job Creation | 19 |
| 1. | Direct Jobs | 19 |
| 2. | Training Outcomes | 19 |
| 3. | Good Jobs Outcomes | 19 |
| 4. | Permanent Jobs | 20 |
| D. | Equity and Justice | 20 |
| 1. | Community Engagement Process | 20 |
| 2. | Engagement Events and Technical Assistance | 20 |
| 3. | Community Ownership - Not Required | 20 |
| E. | Pathways to Net Zero - Not Required | 20 |
| F. | Davis Bacon Act Semi-Annual Labor Compliance Report | 20 |
| VI. | Appendix A: Notice To Recipients (Prime Recipients And Subrecipients) Regarding Protected Data, Limited Rights Data And Protected Personally Identifiable Information | 22 |



**Federal Assistance Reporting Checklist**

**Attachment 3**

# Reporting Instructions (02/2024)

✱✱✱ ***Throughout the performance of the project, it is important that you mark Protected Data/Limited Rights Data as described in Appendix A. It is equally important that you not submit Protected Personally Identifiable Information (Protected PII) to DOE. See Appendix A for guidance on Protected PII.*** ✱✱✱

I.    **Project Management Reporting**

A.  **Performance Report Narrative (PRN) - Not Required**

B.  **Performance Report Quantitative (PRQ) - Not Required**

C.  **Financial Report SF-425 Federal Financial Report**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 calendar days after the end of the semi-annual reporting period (, April 30, October 30) **and** within 120 calendar days after expiration or termination of the award |

The prime recipient is required to submit a completed SF-425 for the project to DOE, covering the entirety of work performed by the prime recipient, subrecipients, and contractors – to DOE. A fillable version of the SF-425 is available at https://www.grants.gov/forms/forms-repository/post-award-reporting-forms.

D.  **Scientific and Technical Reporting - Not Required**

E.  **Intellectual Property Reporting - Not Required**

F.  **Project Management Plan (PMP)**

| Submit To: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission Deadline: | Within 90 days of the effective date of the DOE award |
| Template and Instructions: | Section 40101(d) Formula Grants to States & Indian Tribes \| netl.doe.gov |

The recipient is required to develop, update, and adhere to a project management plan. The purpose of the plan is to establish cost, schedule, and technical performance baselines, and to formalize the processes by which the project will be managed. These processes include considerations such as risk management, change management, and communications

7



**Federal Assistance Reporting Checklist**
**Attachment 3**

management. While it is primarily the project recipient's responsibility to maintain the plan, federal staff may request changes. The plan is intended to be a living document, modified as necessary, and comprising the following iterations:

1. **Revised Plan(s)**
   During the life of the project the recipient must submit a revised project management plan based on the following circumstances:

   a. Developments that have a significant favorable impact on the project.

   b. Problems, delays, or adverse conditions which materially impair the recipient's ability to meet the objectives of the award or which may require the program office to respond to questions relating to such events from the public.  Specifically, the recipient must update the plan when any of the following incidents occur:

   i. Any event which is anticipated to cause significant schedule or cost changes, such as changes to the funding and costing profile or changes to the project timeline.
   ii. Any change to Technology Readiness Level.
   iii. Any significant change to risk events (including both potential and realized events) or to risk management strategies.
   iv. Failure to meet a milestone or milestones; any dependencies should be adjusted.
   v. Any changes to partnerships.
   vi. Any significant change to facilities or other project resources.
   vii. Any other incident that has the potential for high visibility in the media.

2. **Content of revised PMP**
All interim and draft PMP revisions can be exchanged via email with the NETL project officer. However, all final versions of the PMP need to be uploaded to the EERE PMC website.  The revised PMP must stay consistent with the PMP instructions and template located at:

   [Section 40101(d) Formula Grants to States & Indian Tribes | netl.doe.gov](Section 40101(d) Formula Grants to States & Indian Tribes | netl.doe.gov)

**G. Special Status Reports**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within five (5) calendar days after the event, or as specified |

Problems, delays, or adverse conditions which materially impair the recipient's ability to meet the objectives of the award or which may require DOE to respond to questions relating



**Federal Assistance Reporting Checklist**
**Attachment 3**

to such events from the public. The recipient must report any of the following incidents and include the anticipated impact and remedial action to be taken to correct or resolve the problem/condition.

**Within forty-eight (48) hours**, provide notification to the DOE Program/Project Manager by email, with a copy to the DOE Award Contracting Officer/Grants and Agreements Officer, the following events:

1. Any fatality, injury, or illness that results in loss of consciousness or requires medical treatment beyond first aid involving an employee, or member of the public.
2. An imminent or actual environmental contamination or the need for environmental cleanup (including, but not limited to, contamination or cleanup resulting from an accident connected to or arising from the presence, leakage or spill of hazardous materials) in accordance with National Environmental Policy Act 42 USC §§4321, et seq. Examples of due care may include, but are not limited to, visual site inspection of any portions of the property where environmental contamination is likely or suspected, or other reasonable measures. Such notice must be made to DOE following any immediate mitigation efforts, as appropriate, and contacts made to requisite agencies.
3. Actual physical property damage in excess of $50,000.

**Within 48 hours,** the recipient is responsible for reporting cybersecurity incident(s) as follows
4. The recipient is responsible for identifying a cybersecurity incident. In general, a cybersecurity incidents is identified as any incident that may cause financial harm or loss of intellectual property created or supported in performance of the award, including malware and ransomware attacks; affecting operations or the security of, or access to, data, including disruption of both physical operations and business operations for a duration greater than one (1) hour or any Cybersecurity incidents that have national security implications.

Once identified, the Recipient is responsible for reporting Cybersecurity incidents to the Cyber Incident mailbox within 48 hours of the incident. The recipient sends a password protected document via email attachment that includes the date and time of the incident, a high-level description of the incident, a summary of the known impacts, and current and planned mitigation activities. The recipient sends a second email to the Cyber Incident mailbox including the password to the protected document.

The prime recipient is required to report the following events to the DOE Program/Project Manager by email, with a copy to the DOE Award Contracting Officer/Grants and Agreements Officer, within 5 business days:



# Federal Assistance Reporting Checklist
**Attachment 3**

5. If the recipient or project team member receives any other award of federal funds for activities that potentially overlap with the activities funded under the DOE award, the recipient must promptly notify DOE in writing of the potential overlap and state whether project funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under the DOE award;

6. Any change in ownership or control of the recipient or project team member which increases the percentage of ownership or control by an entity that is based in, funded by, or has a foreign affiliation with a foreign country of risk;

7. If an individual on the project team is or is believed to be participating in a foreign government-sponsored talent recruitment program of a foreign country of risk.

8. If the recipient is considering new collaborations with foreign entities and governments, the recipient must provide written notification to DOE and await further guidance from DOE prior to contacting the proposed foreign entity or government regarding the potential collaboration or negotiating the terms of any potential agreement. In general, a collaboration will involve some provision of a thing of value to, or from, the recipient. A thing of value includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the DOE award, regardless of whether or not they have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the DOE award but resulting in provision of a thing of value from or to the DOE award must also be reported.

9. The existence of any joint venture or subsidiary that is based in, funded by, or has a foreign affiliation with any foreign country of risk;

10. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an enterprise owned by a country of risk or foreign entity based in a country of risk;

11. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has a foreign affiliation with any foreign country of risk;

12. Any current or pending technology licensing or intellectual property sales to a foreign country of risk; and

13. Any current or pending foreign business entity, offshore entity, or entity outside the United States related to the Recipient or subrecipient.

14. Potential or actual violations of environmental, health, or safety laws and regulations, any significant environmental permit violation, and any incident which causes a significant process or hazard control system failure;

15. Any incident arising out of or relating to work under the award that has the potential for high visibility in the media;

16. Potential or actual violations of federal, state, and municipal laws arising out of or relating to work under the award;



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

17. Potential or actual noncompliance with DOE reporting requirements under the award;
18. Potential or actual bankruptcy/insolvency of the prime recipient or subrecipient;
19. Potential or actual violation of U.S. export control laws and regulations arising out of or relating to the work under the award;
20. Any notices or claims of patent or copyright infringement arising out of or relating to the performance of the DOE award;
21. Refusal of a subrecipient to accept flow down requirements in the Special Terms and Conditions and/or any Attachment to the DOE award;
22. Any improper claims or excess payments arising out of or relating to work under the award;
23. Potential or actual violations of the cost share requirements under the award;
24. Potential or actual violations of the lobbying restrictions in the award;
25. Any event which is anticipated to cause a significant schedule slippage or cost increase; and
26. Developments that have a significant favorable impact on the project.

**H. Continuation Application - Not Required**

**I. Other Project Management Reporting (see Special Instructions)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within five (5) calendar days after the event, or as specified |

## II.    Award Management Reporting

**A. Current and Pending Support**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within thirty (30) calendar days only when there is a change to Current and Pending Support (i.e., new PI or senior/key personnel join the project or there are changes to previously submitted current and pending disclosures for this Award) |

Applicable for all awards issued after 10/01/2021. For awards issued prior to 10/01/21, refer to your award terms and conditions for applicability.

Prior to award, the Recipient was required to provide current and pending support disclosure statements for each principal investigator (PI) and senior/key personnel, at the recipient and subrecipient level, regardless of funding source. Throughout the life of the award, the Recipient must submit current and pending support disclosure statements and a



# Federal Assistance Reporting Checklist
**Attachment 3**

CV or Biosketch for any new PI and senior/key personnel at the recipient and subrecipient level, added to the project funded under this Award within thirty (30) days of the individual joining the project. In addition, if there are any changes to current and pending support disclosure statements previously submitted to DOE, the Recipient must submit updated current and pending disclosure statements within thirty (30) days of the change. The Recipient must ensure all PIs and senior/key personnel at the recipient and subrecipient level, are aware of the requirement to submit updated current and pending support disclosure statements to DOE.

If there has been a change that would prompt the submission of a new or updated current and pending support disclosure, the instructions to complete the new or updated disclosure is listed below.

Current and pending support is intended to allow the identification of potential duplication, overcommitment, potential conflicts of interest or commitment, and all other sources of support. All PIs and senior/key personnel at the recipient and subrecipient level must provide a list of all sponsored activities, awards, and appointments, whether paid or unpaid; provided as a gift with terms or conditions or provided as a gift without terms or conditions; full-time, part-time, or voluntary; faculty, visiting, adjunct, or honorary; cash or in-kind; foreign or domestic; governmental or private-sector; directly supporting the individual's research or indirectly supporting the individual by supporting students, research staff, space, equipment, or other research expenses. All foreign government-sponsored talent recruitment programs must be identified in current and pending support.

For every activity, list the following items:
- The sponsor of the activity or the source of funding.
- The award or other identifying number.
- The title of the award or activity. If the title of the award or activity is not descriptive, add a brief description of the research being performed that would identify any overlaps or synergies with the proposed research.
- The total cost or value of the award or activity, including direct and indirect costs and cost share. For pending proposals, provide the total amount of requested funding.
- The award period (start date – end date).
- The person-months of effort per year being dedicated to the award or activity.
- Identify any overlap, duplication of effort, or synergistic efforts, with a description of the other award or activity to the current and pending support.
- Details of any obligations, contractual or otherwise, to any program, entity, or organization sponsored by a foreign government must be provided to DOE.

All PIs and senior/key personnel must provide a separate disclosure statement listing the required information above regarding current and pending support. The individual must sign



# Federal Assistance Reporting Checklist
**Attachment 3**

and date their respective disclosure statement and include the following certification statement:

> I, [Full Name and Title], certify to the best of my knowledge and belief that the information contained in this Current and Pending Support Disclosure Statement is true, complete and accurate. I understand that any false, fictitious, or fraudulent information, misrepresentations, half-truths, or omissions of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (18 U.S.C. §§ 1001 and 287, and 31 U.S.C. 3729-3730 and 3801-3812). I further understand and agree that (1) the statements and representations made herein are material to DOE's funding decision, and (2) I have a responsibility to update the disclosures during the period of performance of the award should circumstances change which impact the responses provided above.

The information may be provided in the format approved by the National Science Foundation (NSF), which may be generated by the Science Experts Network Curriculum Vita (SciENcv), a cooperative venture maintained at https://www.ncbi.nlm.nih.gov/sciencv/, and is also available at https://www.nsf.gov/bfa/dias/policy/researchprotection/commonform_cps.pdf. The use of a format required by another agency is intended to reduce the administrative burden to researchers by promoting the use of common formats. If the NSF format is used, the individual must still include a signature, date, and a certification statement using the language included in the paragraph above.

## B. Demographic Reporting

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 30 days after issuance of award |

DEMOGRAPHIC INFORMATION FOR SIGNIFICANT CONTRIBUTORS

Demographic data (i.e., gender, ethnicity, race, and disability status) should be provided directly by the Principal Investigator and Business Contact with the understanding that the submission of this report is mandatory for awards made after 03/01/2022. There are no adverse consequences for responding "Do not wish to provide" in any question. Principal Investigators and Business Contacts of awards made prior to 03/01/2022 are encouraged, but not required, to submit demographic reporting. Confidentiality of demographic data will be in accordance with agency's policy and practices for complying with the requirements of the Privacy Act. Demographic Reporting is submitted via a web-based form in the EERE PMC and includes the questions outlined below.

Gender:

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

- o   Male
- o   Female
- o   Do not wish to provide

Ethnicity:
- o   Hispanic or Latina/o
- o   Not-Hispanic or not-Latina/o
- o   Do not wish to provide


Race (select one or more):
- o   American Indian or Alaska Native
- o   Asian
- o   Black or African American
- o   Native Hawaiian or other Pacific Islander
- o   White
- o   Do not wish to provide

Disability Status:

- o   Yes (check yes if any of the following apply to you)
  - ▪   Deaf or serious difficulty hearing
  - ▪   Blind or serious difficulty seeing even when wearing glasses
  - ▪   Serious difficulty walking or climbing stairs
  - ▪   Other serious disability related to a physical, mental, or emotional condition.
- o   No
- o   Do not wish to provide

This measure is designed as a binary measure; it encompasses all self-reported disabilities. Please do not use it to report the number of individuals who have different types of disabilities (e.g., hearing impairments).

Note: This construct is not designed to be used at an individual-level (i.e., it should not be used for determining accommodation needs or disability status for particular individuals associated with the project).

## C.  Financial Conflict of Interest Report

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 180 days of the date of the award and within thirty (30) calendar days only when there is a change |



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
### Attachment 3

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. Further, the recipient must submit updated reports within 30 days of a change.

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI reports.

**D. Tangible Personal Property Report – Annual Property Report (SF-428 & SF-428A) - Not Required**

**E. Tangible Personal Property Report – Disposition Request/Report (SF-428 & SF-428C)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 5 calendar days of the event or as specified |

The prime recipient must request disposition instructions for or report disposition of federally-owned property or equipment acquired with project funds, whether the property or equipment is/was in the possession of the prime recipient or subrecipient(s).  Recipients may also be required to provide compensation to the awarding agency when acquired equipment is sold or retained for use on activities not sponsored by the federal government. Any equipment with an acquisition cost above $5,000 must be included in the inventory.

If disposition occurs at any time other than award closeout (i.e., at any time throughout the life of the project or after project completion and closeout as long as the federal



**U.S. DEPARTMENT OF ENERGY**

**Federal Assistance Reporting Checklist**
**Attachment 3**

government retains an interest in the item), the prime recipient must complete an SF-428 and SF-428C, available at
https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html or
https://www.netl.doe.gov/business/business-forms/financial-assistance.

If disposition instructions are requested at the time of award closeout, the prime recipient must submit the SF-428 and SF-428B (see section III. C. Tangible Personal Property Report – Final Report).

Only the DOE Contracting Officer has authority to approve disposition requests and issue disposition instructions.

**F. Uniform Commercial Code (UCC) Financing Statements**

| | |
|---|---|
| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
| Submission deadline: | Within five (5) calendar days after the event, or as specified. |

If a for-profit recipient or subrecipient desires to purchase a piece of equipment for their project, and the per-unit dollar value of said equipment is $5,000 or more, and the federal share of the financial assistance agreement is more than $1M, the recipient or subrecipient must file a UCC financing statement.  These financing statement(s) must be approved in writing by the Contracting Officer prior to the recording.

A UCC financing statement provides public notice that the federal government has an undivided reversionary interest in the equipment, and as such the equipment cannot be sold or used as collateral for a loan (encumbered).

The for-profit recipient or subrecipient must file the UCC financing statement(s) with the Secretary of State where the equipment will be physically located and must pay any associated costs for such filings.

The initial UCC financing statement may also be referred to as a UCC1. For additional pieces of equipment not specified in the award budget, TBD equipment, or equipment needed in future budget periods, the recipient can file an amendment to the original UCC1 financing statement, by submitting the UCC3 financing statement amendment.

Each UCC financing statement or amendment is to be filed with the appropriate Secretary of State office, where the equipment will be physically located.



**Federal Assistance Reporting Checklist**
**Attachment 3**

Note: All costs associated with filing UCC financing statements, UCC financing statement amendments, and UCC financing statement terminations, are allowable and allocable costs which can be charged to the federal award.

At a minimum, the recipient must have stated in their UCC financing statement in block 4. (collateral) the following:

o   "Title to all equipment (not real property) purchased with federal funds under this financial assistance agreement is conditional pursuant to the terms of 2 CFR 910.360, and the federal government retains an undivided reversionary interest in the equipment at the federal cost-share proportion specified in the award terms and conditions."

o   Federal Award Identification Number (e.g., DE-EE0000006)

**G.  Federal Subaward Reporting System (FSRS)**

| Submit to: | https://www.fsrs.gov/ |
|---|---|
| Submission deadline: | The prime recipient is required to file a FFATA sub-award report by the end of the month following the month in which the prime recipient awards any sub-grant greater than or equal to $30,000. |

The Federal Subaward Reporting System (FSRS) is the reporting tool prime recipients use to capture and report subaward and executive compensation data regarding their first-tier subrecipients to meet the FFATA reporting requirements. Prime recipients will report against subrecipients' awards. The subrecipient information entered in FSRS will then be displayed on USASpending.gov associated with the prime recipient's award furthering federal spending transparency.

The prime recipient is required to file a FFATA sub-award report by the end of the month following the month in which the prime recipient awards any sub-award greater than or equal to $30,000.

**H.  Annual Incurred Cost Proposals- Not Required**

**I.   Fringe Reconciliation Form- Not Required**

**J.   DOE For-Profit Compliance Audit- Not Required**

**K.  Single Audit: States, Local Government, Tribal Governments, Institution of Higher Education (IHE), or Non-Profit Organization**

 **U.S. DEPARTMENT OF ENERGY**

**Federal Assistance Reporting Checklist**

**Attachment 3**

| Submit to: | Federal Audit Clearinghouse - https://harvester.census.gov/facweb/Default.aspx |
|---|---|
| Submission deadline: | Within the earlier of 30 days after receipt of the auditor's report(s) or 9 months after the end of the audit period (recipient's fiscal year-end)* *The end of the period of the performance, or closure of an award, does not dismiss this reporting requirement. |

As required by 2 CFR 200 Subpart F, non-federal entities that expend $750,000 or more during the non-federal entity's fiscal year in federal awards must have a single or program-specific audit conducted. The single audit must be conducted in accordance with §200.514 Scope of audit, except when it elects to have a program-specific audit conducted.

For most single audits, the requirement is for annual single audits. However, there are occasions where a single audit is not required annually. Per 2 CFR 200.504 - Frequency of audits, a state, local government, or Indian tribe that is required by constitution or statute to undergo its audits less frequently than annually, is permitted to undergo its audits biennially. Also, any nonprofit organization that had biennial audits for all biennial periods ending between July 1, 1992, and January 1, 1995, is permitted to undergo its single audits biennially.

For a program-specific audit, when a recipient expends federal award funds under only one federal program (excluding R&D) and the federal program's statutes, regulations, or the terms and conditions of the federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program-specific audit conducted. A program-specific audit may not be elected for R&D unless all of the federal awards expended were received from the same federal agency, or the same federal agency and the same pass-through entity, and that federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

The single audit report shall include audited financial statements.

**L.  Other Award Management Reporting (see Special Instructions)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within five (5) calendar days after the event, or as specified |

## III.    Closeout Reporting

**A. Final Scientific/Technical Report - Not Required**

**B. Invention Certification (DOE F 2050.11) - Not Required**

 **U.S. DEPARTMENT OF ENERGY**

**Federal Assistance Reporting Checklist**

**Attachment 3**

**C.  Tangible Personal Property Report – Final Report (SF-428 & SF-428B)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 120 calendar days after expiration or termination of the award |

The prime recipient must submit a final inventory of and request disposition instructions for any federally-owned property and/or property or equipment acquired with project funds with an acquisition cost above $5,000, whether the property is/was in the possession of the prime recipient or subrecipients.

The prime recipient must complete an SF-428 and SF-428B, available at https://www.netl.doe.gov/business/business-forms or https://www.grants.gov/web/grants/forms/post-award-reporting-forms.html.

If disposition occurs at any time other than award closeout, the prime recipient must complete an SF-428 and SF-428C (see section II. E. Tangible Personal Property Report – Disposition Request/Report).

Only the DOE Contracting Officer has authority to approve disposition requests and issue disposition instructions.

**D.  Verification of Receipt of Accepted Manuscripts - Not Required**

**E.  Other Closeout Reporting (see Special Instructions)**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 120 calendar days after expiration or termination of the award |

## IV.    Post-Project Reporting

**A.  Scientific and Technical Reporting - Not Required**

**B.   Intellectual Property Reporting - Not Required**

## V.    Bipartisan Infrastructure Law/Inflation Reduction Act Reporting

**A.**                                        **Community Benefits Report (Annual Program Metrics and Impact Report)**



**U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist

**Attachment 3**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission Deadline: | Within 90 calendar days after the end of the annual reporting period (i.e., October 30).  The reporting period is the Federal fiscal year (i.e., October 1 – September 30). |

The Recipient must meet the stated objectives and milestones set forth in its Program Narrative.  A report on the Recipient's progress towards meeting the objectives and milestones set forth will be included in the Annual Program Metrics and Impact Report. The annual reporting template is available here Section 40101(d) Formula Grants to States & Indian Tribes | netl.doe.gov or is available upon request from the DOE Project Officer.

**B.**          **Boosting Domestic Manufacturing - Not Required**

**C.**          **Quality Job Creation**

**1. Direct Jobs**

| Submit to: | https://www.lcptracker.com/ |
|---|---|
| Submission deadline: | Weekly |

This award is funded under Division D of the Bipartisan Infrastructure Law (BIL).  All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2000 on an award funded directly by or assisted in whole or in part by funds made available under this award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA).

The Recipient must ensure the timely electronic submission of weekly certified payrolls to LCPtracker unless a waiver is granted to a particular contractor or subcontractor because they are unable or limited in their ability to use or access the software.

**2. Training Outcomes**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 90 calendar days after the end of the federal fiscal year and **Final;** within 120 calendar days after expiration or termination of the award. |



**Federal Assistance Reporting Checklist**

**Attachment 3**

A report on the Recipient's progress towards meeting the training outcomes will be included in the Annual Program Metrics and Impact Report.

### 3. Good Jobs Outcomes

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 90 calendar days after the end of the federal fiscal year and **Final;** within 120 calendar days after expiration or termination of the award. |

This report is required of all recipients of BIL funding. To assess activities contributing to growing American jobs, improving the quality of energy jobs, and facilitating equitable access to good jobs and training opportunities, all BIL recipients must report annually on good jobs outcomes.

Good Jobs Outcomes reporting shall be included in the Annual Program Metrics and Impact Report.

### 4. Permanent Jobs

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 90 calendar days after the end of the federal fiscal year and **Final;** within 120 calendar days after expiration or termination of the award. |

All BIL funding recipients who are creating ongoing operations, maintenance, and production jobs should report the number of hires for each reporting period and associated demographic information.

Permanent Jobs reporting shall be included in the Annual Program Metrics and Impact Report.

### D.                                     Equity and Justice

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx |
|---|---|
| Submission deadline: | Within 90 calendar days after the end of the federal fiscal year and **Final;** within 120 calendar days after expiration or termination of the award. |

Applicable Equity and Justice reporting shall be reported in the Annual Program Metrics and Impact Report.

### 1. Community Engagement Process

 **U.S. DEPARTMENT OF ENERGY**

**Federal Assistance Reporting Checklist**
**Attachment 3**

This report applies to all projects that include building, expanding, or retrofitting a facility. Recipients should report on engagement activities such as participatory research, citizen advisory committees, open planning forums, etc. and the outputs of those activities such as memorandums of understanding, letters of support, etc. Information in this tab should reflect the objectives outlined in the Community Benefits Plan.

**2. Engagement Events and Technical Assistance**

This report applies to all projects that hold stakeholder engagement events as outlined in their Community Benefits Plan. Recipients are required to report on stakeholders engaged and from what, if any, communities of interest.

**3. Community Ownership - Not Required**

**E.** **Pathways to Net Zero - Not Required**

**F.** **Davis Bacon Act Semi-Annual Labor Compliance Report**

| Submit to: | https://www.eere-pmc.energy.gov/SubmitReports.aspx and email DBAenforcementreports@hq.doe.gov |
|---|---|
| Submission deadline: | **As Specified,** April 21 and October 21 |

This award is funded under Division D of the Bipartisan Infrastructure Law (BIL). All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work in excess of $2,000 on an award funded directly by or assisted in whole or in part by funds made available under this award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with Subchapter IV of Chapter 31 of Title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA).

Calendar year semi-annual reports are required on compliance with and enforcement of the labor standards provisions of the Davis-Bacon Act and its related acts covering the periods of October 1st through March 31st, and April 1st through September 30th, respectively. Please submit your semi-annual report to DOE three weeks after the end of semi-annual reporting period by April 21st and October 21st for the applicable performance period.

A template is available at: https://www.energy.gov/infrastructure/reporting-checklists.

 **Federal Assistance Reporting Checklist**

**Attachment 3**

VI.    **Appendix A: Notice To Recipients (Prime Recipients And Subrecipients) Regarding Protected Data, Limited Rights Data And Protected Personally Identifiable Information**

**I.  PROTECTED DATA AND LIMITED RIGHTS DATA**

The recipient is required to mark protected data and limited rights data in accordance with the IP clause set of the award agreement.  Failure to properly mark data may result in its public disclosure under the Freedom of Information Act (FOIA, 5 U.S.C. § 552) or otherwise.

**A.  Protected Data - Technical Data or Commercial or Financial Data First Produced in the Performance of the Award**

The U.S. Government normally retains unlimited rights in any technical data or commercial or financial data produced in performance of Government financial assistance awards, including the right to distribute to the public.

However, under certain DOE awards, the recipient may mark certain categories of data produced under the award as protected from public disclosure for a period of time ("Protected Data"). If the award agreement provides for protected data and the recipient wants the data to be protected, the recipient must properly mark any documents containing Protected Data. The recipient should review  the IP clause set of the award agreement to determine the applicability of protected data, the maximum length of period of time for data protection and the required markings that must be used to invoke data protection for the award.

**B.  Limited Rights Data - Data Produced Outside of the Award at Private Expense**

Limited Rights Data is data (other than computer software) developed at private expense outside any Government financial assistance award or contract that embody trade secrets or are commercial or financial and confidential or privileged.  Prior to including any Limited Rights Data in any documents to DOE, the recipient should review the award agreement.  In most DOE awards, the recipient should not deliver any limited rights data to DOE if the recipient wants to protect the Limited Rights Data.  If the DOE award does allow and require the delivery of limited rights data, then the recipient must properly mark any documents containing Limited Rights Data as set forth in the IP clause of the award agreement.

 **U.S. DEPARTMENT OF ENERGY**

# Federal Assistance Reporting Checklist
**Attachment 3**

**II. PROTECTED PERSONALLY IDENTIFIABLE INFORMATION**

The recipient should not include any Protected Personally Identifiable Information (Protected PII) in their submissions to DOE. Protected PII is defined as any data that, if compromised, could cause harm to an individual such as identify theft. Protected PII includes, but is not limited to:

- Social Security Numbers in any form;
- Place of Birth associated with an individual;
- Date of Birth associated with an individual;
- Mother's maiden name associated with an individual;
- Biometric record associated with an individual;
- Fingerprint;
- Iris Scan;
- DNA;
- Medical history information associated with an individual;
- Medical conditions, including history of disease;
- Metric information, e.g., weight, height, blood pressure;
- Criminal history associated with an individual;
- Ratings;
- Disciplinary actions;
- Passport number;
- Educational transcripts;
- Financial information associated with an individual;
- Credit card numbers; and
- Security clearance history or related information (not including actual clearances held).

# EXHIBIT I

**V. PY22-26 BIL Plan: Master File**

---

**V1. Eligibility**
**V.1.1 Approach to Determining Client Eligibility**
***Provide a description of the definition of income used to determine eligibility***

Per Weatherization Program Notice (WPN) 22-3, in which the Colorado Energy Office Weatherization Assistance Program (CEO WAP) will comply with annually approved income eligibility for the BIL Grant period of PY22-PY26. When determining client eligibility, income is defined as the gross income (all cash receipts) at or below 60% of the State Median Income (SMI) to align eligibility with Colorado Department of Human Services LEAP [LIHEAP] eligibility. For PY22, 60% SMI will be used to determine eligibility for households up to seven residents per household; households with eight or more residents will be qualified using 200% Federal Poverty Level (FPL).

Gross income is calculated before taxes, insurance, etc., are deducted from the total cash receipts. When Social Security is included in income, the gross income must be calculated after Medicare deductions. In the event that a legal dissolution of a family unit occurs, an individual may use their sole income since the dissolution, annualized, to determine eligibility in accordance with the proposed income limits. Application eligibility expires 12 months from subgrantee certification date if work on the dwelling unit (energy audit) has not been initiated.

Please see "Colorado FPL to SMI Comparison" for a comparison from a 1 to 8 person household.

---

**Describe what household eligibility basis will be used in the Program**

To be eligible for CEO WAP services under the BIL grant, clients must meet the income criteria outlined in 10 CFR 440.22, or meet a minimum of one of the following three criteria as outlined in WPN 22-3:

1. Have a gross household income (total annual cash receipts) at or below 60% SMI up to a seven person household
2. No greater than 200% of the FPL for households with eight or more residents
3. Receive cash assistance payments under Title IV or Title XVI of the Social Security Act, or in accordance with applicable State or local law, at any time during the past five years preceding the determination of eligibility. Acceptable programs include:
   a) Temporary Assistance for Needy Families (TANF)
   b) Aid to the Needy and Disabled (AND)
   c) Supplemental Security Income (SSI)
   d) Low-Income Home Energy Assistance Program (LEAP)
   e) Supplemental Nutrition Assistance Program (SNAP)
4. Currently enrolled for assistance under the Low Income Energy Assistance Act of 1981, provided that such a basis is at least 60% of the SMI as determined with the criteria established by the Director of the Office of Management and Budget.

---

**Describe the process for ensuring qualified aliens are eligible for weatherization benefits**

The process for ensuring that qualified immigrants are eligible for weatherization benefits is:

1. Completion of a Lawful Presence Affidavit, signed by the applicant. In the event that there is no lawfully present adult, but there is a lawfully present individual under the age of 18, proof of lawful presence is not required, however confirmation of lawful presence must be in writing and noted in the client file.

2. The Lawful Presence Affidavit must include a copy of a current picture identification of the applicant. Acceptable forms of identification include:
   a) A valid Colorado driver's license or a valid Colorado identification card
   b) A valid United States military card/Common Access Card
   c) A valid United States Coast Guard Merchant Mariner card
   d) A Indigenous American tribal document
   e) A valid United States passport
   f) If an applicant cannot provide one of the aforementioned documents, they must provide one of the forms of identification set forth in §24-76.5-103(4)(a) C.R.S. or in 1 CCR 204-30 Rule 5 from the Executive Director of the Colorado Department of Revenue.

3. If the applicant checks the "I am lawfully present in the United State pursuant to Federal Law" box, residency status is verified through the Systematic Alien Verification for Entitlements (SAVE) by WAP staff. Acceptable forms of identification for a SAVE verification are:
   a) Colorado license (expired less than 10 years, image on file)
   b) Colorado ID card (expired less than 10 years, image on file)
   c) US passport (expired less than 10 years, image on file)
   d) Out of State ID from LP state (expired less than one year)
   e) Foreign passport w/photo, US Visa, I-94
   f) Valid Military ID/Common Access Card
   g) Certificate of Naturalization with photo less than 20 years old
   h) Valid I-551
   i) Valid EAD/ Temporary Resident
   j) Refugee/Asylee I-94 w/photo less than 20 years old
   k) Social Security Card verified by SSOLV
   l) U.S. birth certificate
   m) Certificate of Citizenship from the Department of Interior
   n) U.S. adoption order with birth information
   o) BIA ID Card with photo less than 10 years expired
   p) VA card with photo less than 20 years old
   q) Parent/Guardian affidavit if under 21 years old
   r) Colorado Department of Corrections or Federal Bureau of Prisons ID card

---

**V.1.2 Approach to Determining Building Eligibility**
*Box 1: Procedures to determine that units weatherized have eligibility documentation*

---

All clients receiving services under WAP must first have their eligibility verified as outlined in V.1.1 of the BIL Plan by the local administrative subgrantee, and client eligibility must be documented in the client file. Single family, manufactured housing, and small multifamily buildings consisting of only 2-4 units are eligible building types for weatherization using BIL funding in the state of Colorado.

Per 10 CFR 440.22(b)(3)., subgrantees are required to establish procedures for dwellings which consist of a rental unit or rental units to ensure that:

2

a) The benefits of weatherization assistance associated with such rental units, including units where the tenants pay for their energy through their rent, will accrue primarily to the low-income tenants residing in such units
b) For a reasonable period after weatherization work has been completed on a dwelling containing a unit occupied by an eligible household, the tenants in that unit (including households paying for their energy through their rent) will not be subjected to rent increases unless those increases are demonstrably related to matters other than the weatherization work performed
c) The enforcement is provided through procedures established by the State by which tenants may file complaints, and owners, in response to such complaints, shall demonstrate that the rent increase concerned is related to matters other than the weatherization work performed
d) Subgrantees are expected to receive tenant complaints regarding rent increases and should refer them to organizations (legal aide, tenant landlord mediation organizations, etc.) which can offer assistance in resolving the complaint
e) No undue or excessive enhancement shall occur to the value of the dwelling units

In order to secure the federal investment and address the issues of eviction from and sale of property receiving weatherization materials, CEO WAP may seek landlord agreements for placement of a lien or other contractual restrictions. For buildings identified in the BIL Plan, CEO WAP will continue to be responsible for ensuring compliance with the remaining requirements of this section, and CEO WAP has established requirements and procedures to ensure such compliance in accordance with this section.

The weatherization of non-stationary campers and trailers that do not have a mailing address associated with the eligible applicants is not allowed. The use of a post office box for non-stationary campers or trailers does not meet this requirement. The intentional partial weatherization of units is not permitted.

**STATE HISTORICAL PRESERVATION PROCESS**
Per WAP Memorandum 066, the requirements for the weatherization of federally or locally registered historic properties within the State of Colorado are located within the Prototype Programmatic Agreement between DOE, CEO, and Colorado State Historic Preservation Office (SHPO) originally dated July 2011, amended July 2012, and then again in October 2020. The undertakings covered under this Programmatic Agreement (PA) are primarily smaller scale activities and routine projects, without the potential for adversely affecting historic properties, rather than complex undertakings with a greater potential to adversely affect historic properties, which would require completion of the typical Section 106 review process. All undertakings will be done in accordance with applicable local building codes or the International Building Code, where applicable.

**QUALIFIED PROFESSIONALS**
Subgrantees are required to use qualified professionals in conducting its Section 106 requirements. For the purposes of this PA, the term "qualified professionals" means an individual or group of individuals who fulfill one of the following:

1. Meet the Secretary of Interior Professional Qualification Standards for Archeology and Historic Preservation
2. Have at least a total of one year full time prior experience in, or primary responsibility for, Section 106 reviews or state/local historic preservation reviews

3

3. Are currently employed by, or have worked in historic preservation matters, for a designated certified local government
4. Have completed a formal training in the Section 106 review process conducted by the Advisory Council on Historic Preservation (ACHP), SHPO, or DOE
5. Are listed as a historic preservation consultant or contract resource on the Directory of Cultural Resource Management Agencies, Consultants, and Personnel for Colorado

Subgrantees may decide to utilize qualified professionals in the manner that is most appropriate given the scope and nature of their particular program and projects, including hiring qualified professionals on a full-time, part-time, project specific, employee, or contractual basis.

**NON-EXEMPT PROJECTS**
When a measure or unit does not fall within the agreed upon exempt undertakings, the following process will be used:

1. CEO WAP and/or the subgrantee will retain qualified professionals to act as its primary point of contact for Section 106 historic preservation matters and to assist CEO WAP or subgrantee in implementing their responsibilities under the PA throughout the Section 106 process (including, without limitation, initiating consultations, evaluating a property against the criteria of eligibility for the National Register, or evaluating the applicability of PA exemptions to particular projects).
2. If a qualified professional requires assistance in making a determination of eligibility of a property for inclusion on the National Register, then the qualified professional may submit a photograph of the property involved by email to oahp.isu@state.co.us in order to receive the SHPO's preliminary opinion on whether or not the property may be eligible for inclusion in the National Register (only a qualified professional may utilize this email process to gain SHPO's preliminary opinion on eligibility).
3. The qualified professional will also contact SHPO at joseph.saldibar@state.co.us to inform the office that an email has been forwarded. SHPO will respond within 10 business days of the email to the qualified professional. If SHPO responds that the property does not have the potential to be eligible, subgrantees or their contractors may proceed with the project without additional consultation. If SHPO responds that the property may have the potential to be eligible, the subgrantee will follow the procedures to reach a final determination of eligibility.

**RECORDS**
Records are to be maintained for a period of six years from the project completion and be made available for review if requested by the DOE or the ACHP.

**FILE DOCUMENTATION**
For all homes 50 years or older, client file documentation must include proof that the following measures were taken:
1. A recording of the year in which the unit was built
2. Verification that the unit addressed was searched against national and local historical registries
3. Confirmation of whether or not the unit is a Registered Historic Property
4. The date on which the unit was verified
5. The initials of the staff member who completed the verification

For all units that are within Registered Historic Properties, documentation must additionally include the following:
1. The Historical Register paperwork printed from the website of registry

4

2. The historical site identification number
3. A copy of the audit form with EA signature and date
4. Explanation of the auditor's evaluation of whether or not weatherization measures will alter or compromise the historical integrity of the building
5. A record of all communication with Colorado SHPO in regards to that property

**REPORTS**

Subgrantees are required to submit to CEO WAP an annual report due August 30th of each program year which is to include all of the following information:

1. Brief summary of undertakings (nonexempt projects if applicable)
2. Number of non-exempt undertakings
3. Number of exempt undertakings
4. Any reviews conducted by SHPO

CEO WAP will then submit this information to the DOE, ACHP (Advisory Council on Historic Preservation), and NCSHPO (National Conference of State Historical Preservation Officers) in an annual report.

**WAP UNDERTAKINGS EXEMPT FROM SECTION 106 REVIEW**

In accordance with 36 CFR 800.3(a)(1), the following undertakings have been determined to have no potential to compromise the historical integrity of the registered properties:

1. **EXTERIOR WORK ON BUILDINGS OR STRUCTURES**
   a) Air sealing of the building shell, including caulking, weather-stripping, and other air infiltration control measures on windows and doors and installing thresholds in a manner that does not harm or obscure historic windows or trim.
   b) Thermal insulation in walls, floors, ceilings, attics, and foundations in a manner that does not harm or damage historic fabric.
   c) Blown-in wall insulation where no holes are drilled through exterior siding, or where holes have no permanent visible alteration to the structure.
   d) Removable film on windows (if the film is transparent, solar screens, or window louvers, in a manner that does not harm or obscure historic windows or trim.
   e) Reflective roof coating in a manner that closely resembles the historic materials and form, or with materials that restore the original feature based on historic evidence, and in a manner that does not alter the roofline, or where not on a primary roof elevation or visible from the public right-of-way.
   f) Storm windows or doors, and wood screen doors in a manner that does not harm or obscure historic windows or trim.
   g) In-kind replacement or repair of primary windows, doors and door frames that closely resemble existing substrate and framing on buildings and structures built after 1950.
   h) Repair of minor roof and wall leaks prior to insulating attics or walls, provided repairs closely resemble existing surface composite.
   i) Interior spaces where the work will not be visible from the public right of way, no structural alterations are made, no demolition of walls, ceilings or floors occurs, no drop ceilings are added, or no walls are leveled with furring or moved, should be automatically excluded from SHPO review.

2. **INTERIOR WORK UNDERTAKINGS**
   a) Energy efficiency work within the building shell

5

b) Thermal insulation in floors, ceilings, attics, crawl spaces, ducts and foundations, wall insulation for buildings and structures built after 1950, and, for buildings and structures built in 1950 or before, wall insulation if performed by a contractor with experience with historic buildings in order to ensure there are no gaps in which condensation may form.

c) Blown-in wall insulation where no decorative plaster is damaged for buildings and structures built after 1950; for buildings and structures built in 1950 or before, if performed by a contractor with experience with historic buildings in order to ensure there are no gaps in which condensation may form.

d) Plumbing work, including installation of water heaters.

e) Electrical work, including improving lamp efficiency.

f) Sealing air leaks using weather stripping, door sweeps, and caulk and sealing major air leaks associated with bypasses, ducts, air conditioning units, etc.

g) Repair or replace water heaters.

h) Adding adjustable speed drives such as fans on air handling units, cooling tower fans, and pumps.

i) Install insulation on water heater tanks and water heating pipes

j) Installation of solar water heating systems provided the structure is not visible from the public right of way.

k) Install waste heat recovery devices, including desuperheater water heaters, condensing heat exchangers, heat pump and water heating heat recovery systems, and other energy recovery equipment.

l) Repair or replace electric motors and motor controls like variable speed drives.

m) Incorporate other lighting technologies such as dimmable ballasts, day lighting controls, and occupant controlled dimming.

**3. WORK ON HEATING AND COOLING SYSTEMS**

a) Clean, tune, repair or replace heating systems, including furnaces, oilers, heat pumps, vented space heaters, and wood stoves

b) Clean, tune, repair, or replace cooling systems, including central air conditioners, window air conditioners, heat pumps, and evaporative coolers

c) Install insulation on ducts and heating pipes

d) Conduct other efficiency improvements on heating and cooling systems, including replacing standing pilot lights with electronic ignition devices and installing vent dampers

e) Modify duct and pipe systems so heating and cooling systems operate efficiently and effectively, including adding return ducts, replace diffusers and registers, replacing air filters, and installing thermostatic radiator controls on steam and hot water heating systems.

f) Install programmable thermostats, outdoor reset controls, UL listed energy management systems or building automation systems and other HVAC control systems.

**4. ENERGY EFFICIENCY WORK AFFECTING THE ELECTRIC BASE LOAD OF THE PROPERTY**

a) Convert incandescent lighting to fluorescent.

b) Add reflectors, LED exit signs, efficient HID fixtures, and occupancy (motion) sensors.

c) Replace refrigerators.

**5. HEALTH AND SAFETY MEASURES**

a) Installing fire, smoke, or carbon monoxide alarms.
b) Repair or replace vent systems on fossil-fuel-fired heating systems and water heaters to ensure that combustion gasses draft safely to outside.
c) Install mechanical ventilation in a manner not visible from the public right of way.

### 6. ADDITIONAL MISCELLANEOUS EXEMPT ACTIVITIES

a) Replacement or installation of new storm windows where the finish on the new storm windows matches the finish of the existing windows in color.
b) Replacement of interior doors that meet incidental repair expenditure criteria where the size of the openings is not altered. If the interior door replacements exceed the incidental repair expenditure criteria, replacements will not be performed with BIL or leveraged funding.
c) Replacement or repair of door knobs and other door hardware.
d) Installation of furnace outdoor termination plates.
e) Installation of exterior furnace vents and caps

---

**V.1.2 Box 2:** *Describe Re-weatherization compliance*

---

Per 10 CFR 440.18, dwelling units are eligible for re-weatherization if it has been damaged by fire, flood, or force majeure and the repair of the weatherization materials is not covered by insurance.

Per Public Law 116-260, dwelling units are eligible for re-weatherization after a period of 15 years from when the previous weatherization job was completed. If a dwelling unit has been previously weatherized, under this program or under other Federal programs, they may receive further financial assistance for weatherization provided that:

a) The previous weatherization occurred more than 15 years before the date of application approval
b) The occupant reapplies for assistance under the program and is certified to be eligible,
c) The local subgrantee prioritizes the application with all others adhering to program priorities,
d) A new energy audit is performed which considers all previous energy conservation improvements to the dwelling.

The 15 year rolling date will be tracked within the CEO WAP database using a previously weatherized report and "closed date" field.

---

**V.1.2 Box 3: Describe what structures are eligible for Weatherization**

---

Structures eligible for weatherization with BIL funds include site-built homes, manufactured homes, rentals, duplexes, triplexes, and four-plexes, which meet the requirements of 10 CFR 440.22. CEO WAP exercises caution in dealing with non-traditional dwelling units such as apartments over businesses,etc. to ensure they meet program regulations on whether the unit is, in fact, eligible. Weatherizing these types of units is discussed with and approved by the DOE Project Officer prior to weatherization. The weatherization of non-stationary campers and trailers that do not have a mailing address associated with the eligible applicants is not allowed. The use of a post office box for non-stationary campers or trailers does not meet this requirement.

## V.1.2. Box 4: *Describe how Rental Units/Multifamily Buildings will be addressed*

Structures eligible for weatherization with BIL funds include: site-built homes, manufactured homes, duplexes, triplexes, and four-plexes, which meet the requirements of 10 CFR 440.22 (any of which may be rentals).The weatherization of non-stationary campers and trailers that do not have a mailing address associated with the eligible applicants is not allowed. The use of a post office box for non-stationary campers or trailers does not meet this requirement.

Per 10 CFR 440.22, WPN 16-5, and WPN 16-6, a subgrantee may weatherize a building containing rental dwelling units, provided that:

1. The subgrantee has obtained the written permission of the owner, landlord, or a duly authorized agent to perform the installation of all weatherization materials and provide energy saving services.

2. No fewer than:
    a. A total of 50% of dwelling units in **two to four** unit buildings are eligible dwelling units or will become eligible dwelling units within 180 days under either a Federal, State, or Local Government program for rehabilitating the building, or making similar improvements.

3. The subgrantee has ensured that:
    a. The benefits of weatherization assistance, including instances in which tenants pay for their energy through rent, will accrue primarily to the low-income tenants residing in such units.
    b. The landlord, owner, or authorized agent has signed a document agreeing that rent will not be increased for a reasonable amount of time following weatherization improvements unless rent increases can be demonstrably proven to be related to matters other than the weatherization work performed.

4. Subgrantees are expected to receive tenant complaints regarding rent increases and should refer them to organizations (legal aid, tenant-landlord mediation organizations, etc.) which can offer assistance in resolving this issue. CEO WAP will not intervene or render a decision on tenant complaints involving landlord rent increases.

## V.1.2 Box 5: *Describe the Deferral Process*

The following Deferral Process was developed by CEO WAP to assist subgrantee field staff in determining which situations are "beyond the scope" of the weatherization program and thus represent a unit that should not be served until the conditions change. Generally speaking, situations which constitute a threat to the health and safety of the subgrantees' staff should be avoided until such time as the conditions are remedied.

Situations which constitute a threat to the health and safety of subgrantee staff and/or WAP clients should be avoided until the unsafe conditions are remedied. Subgrantee staff who choose to work on a unit that could or should be a deferral, do so at their own risk; however, putting occupants at further risk as a result of doing the work is never allowable. CEO WAP does not require, expect, or encourage subgrantee crews to work in unsafe or unhealthy conditions. Subgrantees who wish to classify a unit as a deferral must include an audit form that includes the following information related to the deferral:

8

1. Date(s) of the audit/assessment.
2. A description of the issue(s) that caused the deferral.
3. Potential reasons for deferral.
4. A description of the conditions under which WAP work could continue, specifying how the home may be made weatherization-ready.
5. A clear description of the responsibilities of all parties involved.
6. The client's signature indicating that they have been informed of their rights/options, and that they understand the issues and their responsibilities.
7. How client eligibility and priority will be addressed for deferred dwellings, including defined time limit before requalifying clients for the program becomes necessary.
8. The date the client was informed of the deferral.
9. Appeal process of deferral for client.
10. The date the issue causing a deferral was resolved, if applicable.

All subgrantees are required to document the following information: client identification, job number, stated problem(s), the root cause of the situation, and potential resolution. Any substantiating evidence, such as photos, staff written comments, defective materials, additional costs, etc., must be included. All of this information should be recorded in the client file as well as provided to the client. CEO WAP requires that subgrantees also record this information in the CEO WAP database.

**DEFERRAL CONDITIONS**

1. Client/Access Issues:
   a. The client cannot be reached at telephone number on file due to the service being disconnected or due to client unavailability AND follow up mail goes unanswered.
   b. The client is uncooperative, abusive, hostile, or threatening to the crew, subcontractors, auditors, inspectors, or others who must work on or visit the home or who, based upon the judgment of the senior staff person in the field, makes the working conditions intolerable for workers.
   c. The client refuses to allow energy auditor(s) access to all areas of the home necessary to conduct the comprehensive energy audit.
   d. The presence of animals which pose a risk to the weatherization workers.
      i. The work may be deferred until such animals have been secured adequately so that they no longer pose a threat.
   e. The inability to gain access to the area to perform the work.
      i. The work may be deferred until the blocked access is cleared to allow the necessary access to perform the work.
   f. Refusal of ASHRAE 62.2 2016 ventilation or other required measures.
2. Human Health Issues:
   a. The client, or other household member, has known health conditions that prohibit the installation of insulation or other weatherization materials.
   b. The house has raw sewage, excessive animal feces, or other sanitation problems that would further endanger the client and weatherization crews if the weatherization work were performed.
   c. Dangerous conditions exist due to high carbon monoxide levels associated with combustion appliances which cannot be resolved under existing health and safety measures and guidance.

9

    d.   The extent and condition of lead-based paint in the house would potentially create increased health and safety hazards for both the occupants and crew members.

    e.   Volatile organic compounds (VOC) and other chemicals on the premises are poorly stored and represent a health risk (via breathing or skin contact) to the workers or client's safety.

    f.   In the judgment of the energy auditor, if there are any conditions which may endanger the health and/or safety of the work crew or subcontractor, the work should not proceed until the identified condition is satisfactorily corrected.

3.   Combustion Appliance Issues:

    a.   Open combustion heating systems situated in a bedroom, bathroom, or closet that cannot be replaced under CEO WAP Program Guidance.

        i.   This includes all rooms that are used or designed to be used as a bedroom or any enclosed space that has access only through such a room.

    b.   Combustion systems that are operating in an unsafe manner, that cannot be repaired or replaced within the scope of the program.

    c.   Furnaces that have no service access.

        i.   Examples include attic furnaces with access doors through which the crew cannot enter, or furnaces where the client has finished the room around the unit but did not allow enough room to get to the controls and vents.

        ii.   Such situations should be discussed with supervisory staff.

    d.   Mobile homes with non-mobile home type furnaces.

        i.   This includes all furnaces that are added to the unit.

    e.   Furnaces with no cold air return or hot air delivery system (ductwork).

        i.   Typically, this type of installation is in the middle of a room with limited ductwork.

        ii.   It is particularly important if it has a delivery or return but not both.

    f.   Any unvented heater.

        i.   This includes all types of unvented heaters, portable kerosene space heaters or freestanding gas and propane heaters.

        ii.   Work should only be done at the home if the portable heater can be permanently disabled or vented (with client/owner permission).

    g.   Any furnace that is installed in a dangerous manner or cannot be brought to code at a reasonable cost (under $400 cost to the program).

        i.   Examples: units installed in an area where it could easily be broken.

4.   Structural Issues:

    a.   The building structure or its mechanical systems, including electrical and plumbing, are in such a state of disrepair that failure is imminent and the conditions cannot be resolved cost effectively or within the scope of the Weatherization Assistance Program guidance.

    b.   If the house is structurally in a condition that is unsafe or beyond repair (the home needs significant rehabilitation work from another funding source) and presents a risk to the worker or client safety.

    c.   A foundation that is not sound and will not support one or more of the walls.

    d.   A unit that is under renovation or where original construction is incomplete and completion will require more than one sheet of drywall material.

        i.   There is the possibility of coordinating weatherization with renovation/rehabilitation work underway; this is a judgment call of the subgrantees, considering all relevant factors (timetable for work being

        done and likelihood of it occurring; option of waiting until work is done before weatherization, etc.).

    e. Structurally unsound walls

        i. Where a substantial part of a wall is unstable and that wall is involved in one or more of the desired energy conservation measures for the home; consult an approved computer audit, a supervisor, or State Staff.

        ii. The same is true for structurally unsound floors and ceilings.

    f. Drainage issues

        i. This would include any exterior drainage material or structure that does not function properly and may lead to internal leakage or flooding.

5. Electrical Issues:

    a. Major electrical problems where a major portion of the total electrical system appears to be questionable (consult an "expert"); also, consult an approved computer audit.

    b. There are major electrical problems and when the cost is included with measures it is not cost effective to repair.

6. Safety Issues:

    a. Moisture problems that are so severe they cannot be resolved under existing health and safety measures or as incidental minor repairs.

        i. This includes standing water in the crawl space or any other source that is beyond the scope of the program to resolve.

    b. Friable asbestos or vermiculite in the home or significant enough in various locations that it precludes performing most of the cost-effective energy conservation work.

    c. If a mold condition is discovered during the initial audit of the home by an energy auditor and it cannot be adequately addressed by the weatherization crew, the unit will be referred to the appropriate public or non-profit subgrantee for remedial action. Subgrantees shall defer work on the home until another funding source or the owner completes mold remediation.

        i. Colorado weatherization shall distribute the pamphlet from the U.S. Environmental Protection Subgrantee (EPA), Indoor Environment Division (IED), "A Brief Guide to Mold, Moisture, and Your Home" to clients whose homes have a moisture and/or mold problem. The pamphlet can be found at: https://www.epa.gov/mold/brief-guide-mold-moisture-and-your-home

    d. The area is slated to be redeveloped (highway development, economic development, flood area).

    e. The house has been condemned or electrical, heating, plumbing, or other equipment has been "red tagged" by local, county, or state building officials or utilities due to safety or code issues.

    f. The presence of any illegal activity.

**REMOVING DEFERRAL STATUS**

The status of deferral from a unit may be removed if the conditions which warranted the deferral are addressed and/or a client's appeal results in the removal of deferral status. If there were multiple issues causing a dwelling to be deferred, the resolution date will be the day on which the last issue has been ameliorated.

The client is responsible for remedying the conditions, as specified in the communication that client received from the subgrantee, and contacting the subgrantee once these conditions have

11

been addressed. Once the subgrantee verifies that the conditions have been remedied, they are required to return to the unit and complete all work.

Combustion appliance situations that threaten client safety are of great concern to WAP. Attempts should be made to remedy the situation, rather than deferring the unit.

**APPEAL PROCESS**

The following process should be used should a client request an appeal or second opinion on a deferral:

1. Clients should submit a written appeal to the direct supervisor of the subgrantee staff member who determined the unit should be deferred.
2. If the deferral is upheld by the direct supervisor, the client may submit a written appeal to a CEO WAP Manager.
3. If the deferral is upheld by a CEO WAP Manager, the client may submit a written appeal to the CEO WAP Director.
4. The decision rendered by the CEO WAP Director is considered final and no further appeals are allowed.

If at any point in this process, the original deferral is either not upheld or the conditions that caused the initial deferral are mediated, the subgrantee is required to return to the unit and complete all work.

| **V.1.3 Definition of Children** |
| --- |

Definition of children (below age): 6

| **V.1.4 Approach to Tribal Organizations** |
| --- |

In accordance with 10 CFR 400.16(f), CEO WAP requires all subgrantees to provide the same weatherization services to eligible Indigenous American households that eligible non-Indigenous American households receive. Indigenous Americans residing on either the Ute Mountain Ute or Southern Ute reservations are eligible for weatherization services via standard allocation provided to Housing Resources of Western Colorado (HRWC). Assistance to low-income Indigenous American populations and other low income persons is equal in all respects.

| **V.2 Selection of Areas to be Served** |
| --- |

Colorado is committed to providing services to eligible households throughout all 64 counties within the state. Currently, the state is divided into five single family regions which are managed by five weatherization subgrantees. In addition, there is one statewide subgrantee that provides service to centrally heated multifamily units in all 64 counties. However, BIL funds will not be utilized to weatherize multifamily units in Colorado. For PY22, the five regions served are:

Region 2 Southeast Plains - The counties included within this region are: Baca, Bent, Crowley, Custer, Huerfano, Kiowa, Las Animas, Otero, Prowers, and Pueblo.

Region 4 Southwest - The counties included within this region are: Archuleta, Delta, Dolores, Gunnison, Hinsdale, La Plata, Mesa, Montezuma, Montrose, Ouray, San Juan, and San Miguel.

Region 5 High Country - The counties included within this region are: Chaffee, Clear Creek, Eagle, Garfield, Grand, Jackson, Lake, Moffat, Park, Pitkin, Rio Blanco, Routt, and Summit.

Region 7 East Denver Metro Area - The counties included within this region are: Adams and Arapahoe.

Region 8 Front Range, Northeast Plains, and San Luis Valley - The counties included within this service territory are: Alamosa, Boulder, Broomfield, Cheyenne, Conejos, Costilla, Denver, Douglas, El Paso, Elbert, Fremont, Gilpin, Jefferson, Kit Carson, Larimer, Lincoln, Logan, Mineral, Morgan, Phillips, Rio Grande, Saguache, Sedgwick, Teller, Washington, Weld, and Yuma.

**FUNDING ALLOCATIONS**

The CEO WAP funding allocation ensures funding will be fully utilized according to the approved BIL Plan, that prior contractual funding obligations are able to be met, and that the distribution of remaining available funds are allocated on an equitable basis as much as possible (and in accordance with the requirements of the funding source) across all five program subgrantees.

| **V.3 Priorities for Service Delivery** |
| --- |

As defined in 10 CFR 440.16, priority is given to identifying and providing weatherization assistance to clients that fall into one or more of the priority categories below:

  a) Households with a high energy burden
  b) Elderly persons (aged 60 years and over)
  c) Persons with disabilities
  d) Families with children (children below age 40)

In addition, subgrantees are required to track and report the number of Indigenous American populations served.

Subgrantees will be monitored on their provision of service to high priority groups, as approved in the subgrantee's plan to ensure compliance. Once a subgrantee satisfies all prioritization requirements, they may develop region-specific service models that promote cost-effective delivery of services due to constraining factors such as weather, geography, or the need to fulfill other contractual obligations, such as serving specific utility customers so long as the prioritization of specific clients as previously identified is achieved. CEO WAP provides oversight of the subgrantee client selection criteria at monitoring visits to ensure that local procedures are in accordance with DOE and CEO WAP policies. CEO WAP will report the number of priority clients served by priority type, as well as the number of Indigenous Americans served on a quarterly basis, to the DOE.

The Colorado Weatherization Assistance Program automatically falls in line with the Justice 40 initiative as the entirety of the clients served are from low-income families, and/or are members of disadvantaged communities greatly impacted by climate change.

13

## V.4 Climatic Conditions

Climatic conditions within the State of Colorado vary significantly depending on the region of the State. Colorado is somewhat unique in that the climatic conditions range include the semiarid plains of eastern Colorado, to a high alpine mountain climate in the middle and western portions of the state. According to the 2009 International Energy Conservation Code, Colorado had four distinct climate zones, including Mixed Dry (4B), Cold (5B and 6B), and Very Cold (7B). Low-income residences in Colorado encounter a significant heating load in the winter months due to decreased temperatures across the state, especially within the mountain regions. Heating Degree Day (HDD) averages for the 64 counties vary from a low of 4,714 (Fremont County) to a high of 11,656 (Lake County). The more populated areas along the Front Range have HDD ranges from the low 6,000's to around 7,500. Due to the variance in climatic zones, use of site specific audits is necessary to capture this variety and properly apply measures.

HDD data from weather stations around the State of Colorado is used in the Colorado subgrantee allocation formula. Data is used from 6 weather stations operated at:

Denver: Lat = 39.57 / Long = -104.85, Elevation = 5,882.55
Colorado Springs: Lat = 38.83 / Long = -104.72, Elevation = 6,201.12
Pueblo: Lat = 38.29 / Long = -104.52, Elevation = 4,684.06
Grand Junction: Lat = 39.12 / Long = -108.53, Elevation = 4,839.9
Eagle: Lat = 39.66 / Long = -106.92, Elevation = 6,497.05
Leadville: Lat = 39.22 / Long = -106.32, Elevation = 9,927.82

## V.5 Type of Weatherization Work to be Done
## V.5.1 Technical Guides and Materials

All weatherization work completed is consistent with CEO WAP DOE approved energy audits per Appendix A of 10 CFR 440, and WPN 22-4. Per WPN 22-4, CEO WAP has developed and implemented the Colorado Standard Work Specifications (SWS) which provides the benchmarks and standards for home energy upgrades in accordance with the Standard Work Specification standards developed by the National Renewable Energy Laboratory (NREL) and the Department of Energy (DOE). The SWS does not prescribe specific actions, materials, or techniques that must be used by subgrantees or subcontractors in order to achieve energy conservation goals. Instead, the SWS provides subgrantees and subcontractors the minimum set of requirements necessary to achieve the desired energy efficiency outcomes. CEO WAP has language in subgrantee contracts that outlines the expectations for work quality and instructs subgrantees to include these expectations in any contracts entered into with contractors and vendors. All subgrantee agreements and vendor contracts contain language which clearly references the SWS for work quality outlined in WPN 22-4. All subgrantees and contractors are provided with the CEO WAP website where CEO policy and the Colorado Field Guide are located. They can be downloaded and viewed at any time during the program year. Subgrantees and contractors are required to acknowledge that they have received a copy of CEO policy and field guide or the link to the website when contracts are signed. In addition, CEO WAP staff requests subgrantee managers and staff review CEO WAP Policies and Colorado SWS in the first quarter of each program year.

Per CEO-WAP-501.2.1.2 "Subgrantees are responsible for ensuring that subcontractors are trained and in compliance with all relevant CEO WAP Policies and Procedures and the

14

Colorado Field Guide, also known as the SWS. This requirement will also be part of the signed contract between the subgrantee and the subcontractor."

| V.5.2 Energy Audit Procedures |
|---|
| *Audit Procedures and Dates Most Recently Approved by DOE* |

**SUBMITTAL OF AUDIT PROCEDURES**

Per WPN 22-1 and 10 CFR 440.21(i), CEO WAP Quality Management (QM) Team will resubmit their energy audit procedures, and priority list, as applicable, to DOE for approval every five years. If the CEO WAP energy audit procedures are found to be out of compliance with this requirement, a corrective action plan will be submitted with this grant application as designated by a DOE Project Officer. Per WPN 19-4, CEO WAP QM Team will submit energy audit approval requests at least six months in advance of the current expiration date.

As the DOE specifically requires energy audit procedures to be separately developed and approved for use on site built single-family homes and manufactured homes, CEO WAP uses the appropriate energy audit procedures further described below.

**STANDARD ENERGY AUDIT PROCEDURES**

Energy audits will be performed using Weatherization Assistant for both site-built and manufactured homes. In the event that a home is a combination of a site built or modular home and a manufactured home, subgrantees must contact CEO to determine which audit tool to use.

Subgrantees must assess for the following three components as a part of the standard audit:

1. Incidental Repair Measures – Per WPN 12-9, an Incidental Repair Measure (IRM) is a repair that is necessary for the effective performance or preservation of weatherization materials. IRMs require cost justification through the electronic energy audit, however, they are not to be included with the cost of an Energy Conservation Measure (ECM). Written justification and photos for the necessity of the repair must be in the client file and the repair must be associated with an ECM identified on the Recommended Measures Report.
    a) All incidental repairs must be completed according to SWS standards, if applicable. If an IRM has no associated SWS procedure, subgrantees and subcontractors are required to document the incidental repair measure and install the IRM per CEO WAP Program Guidance and SWS.
    b) If neither a SWS, nor a CEO WAP Program Guidance exists for the installation of the IRM, subgrantees and subcontractors must install the IRM using industry best practices.
2. Energy Conservation Measures – Per WPN 12-9, ECMs are a procedure, including weatherization materials installation, which are considered or performed for its anticipated energy savings.
    a) Per WPN 22-7 and Colorado WAP Policy & Program Guidance, all measures must be cost tested as energy conservation measures by the energy audit. If they do not rank and meet the criteria for "at-risk" clients, certain equipment replacements, such as furnaces and water heaters, may be replaced under the Health and Safety category.

15

b) All approved ECMs that achieve a Savings to Investment Ratio (SIR) of 1.0 or greater MUST appear on the Recommended Measures Report.

3. Health and Safety Measures – Per WPN 22-7, Health and Safety measures are those measures that are necessary to maintain the physical wellbeing of both the occupants and/or weatherization workers. The actions must be taken to effectively perform weatherization work or the actions are necessary as a result of the weatherization work. Subgrantees are required to:

   a) Identify all health and safety deficiencies as a part of the initial audit. These health and safety measures must be identified in the work order and completed prior to beginning the installation of any IRM or ECM.

   b) Document all hazards, concerns, questionable situations, etc. as part of the standard audit. Make sure digital images can be linked back to the job. WPN 22-7 defines the activities allowed as Health & Safety.

## HEALTH AND SAFETY

Per WPN 22-7, allowable energy related Health and Safety (H&S) actions are those actions necessary to maintain the physical well-being of both the occupants and weatherization workers where costs are reasonable, and the actions must be taken to effectively perform weatherization work; or the actions are necessary as a result of weatherization work. No H&S measure can be performed in a home unless ECMs are also part of the scope of work.

Subgrantees are required to adhere to the following SWS Health and Safety standards:

1. Subgrantee Responsibility
2. Safe Work Practices
3. Combustion Safety Testing
4. Moisture
5. Electrical
6. Warranty
7. Asbestos
8. Radon
9. Incidental Repairs
10. Lead
11. Pests/Unsanitary Conditions
12. Common Health and Safety Practices

## BUILDING SHELL & AIR SEALING

Building shell and air sealing of a unit creates a separation between the interior and exterior environments and slows air flow, increasing energy efficiency through heat loss reduction. In addition, this prevents particulate matter from the outside from entering the unit. Subgrantees and/or subcontractors are required to follow the SWS for the following building shell and air sealing measures that are within the scope of CEO WAP:

1. Attic Penetrations and Chases
2. Open Stairwells
3. Dropped Ceiling and Soffit
4. Windows and Doors
5. Basement and Crawlspace
6. Attached Garages
7. Ducts

16

**INSULATION**

Insulation is building material that slows heat flow to create a separation from interior and exterior environments. This aids in heat retention, which lowers the cost of home energy. Subgrantees and/or subcontractors are required to follow the SWS for the following Insulation measures that are within the scope of CEO WAP:

1. General Requirements
2. Attic Insulation General Preparation
3. Knee Walls
4. Attic Openings
5. Walls
6. Floors
7. Basements and Crawl Spaces
8. Duct Insulation

**HVAC**

HVAC is the technology of indoor environmental comfort. Its goal is to provide thermal comfort and acceptable indoor air quality. Subgrantees and/or subcontractors are required to follow the SWS for the following HVAC measures that are within the scope of CEO WAP:

1. General Requirements
2. Combustion Safety Requirements
3. Forced Air Furnace Replacements
4. Warranty

**VENTILATION**

Ventilation is the mechanical system or equipment used to circulate air or to replace stale air with fresh air. Subgrantees and/or subcontractors are required to follow the SWS for the following ventilation measures that are within the scope of CEO WAP:

1. Ventilation Assessment Requirements
2. ASHRAE 62.2.2016
3. Installation
4. Inspection
5. Client Education
6. Dryer Venting/Ducts
7. Supply
8. Whole Building

**BASELOAD**

Baseloads are the common appliance-related energy costs that are common to units. Subgrantees and/or subcontractors are required to follow the SWS for the following baseload measures that are within the scope of CEO WAP:

1. Refrigerator
2. Water Heating General Items
3. Water Heater Insulation
4. Water Pipe Insulation
5. Water Heater Replacement
6. Water Use Reduction
7. Lighting
8. Rooftop Photovoltaics

**INSPECTION REQUIREMENTS**

17

The following inspection requirements constitute the minimum standards by which all subgrantees and subcontractors should assess all previously listed policies:

1. Subgrantee Quality Control Inspection
2. Client File Documentation
2. Quality Complaints
3. State Monitoring General Requirements
4. State Monitoring Field Visit Requirements

**MISCELLANEOUS REQUIREMENTS**

Miscellaneous Requirements are managerial and programmatic requirements that are not necessarily related to the installation of measures. They include: general program requirements, state and technical waiver requirements, subgrantee subcontract requirements, and training and certification requirements:

1. Multifamily Requirements
2. Multifamily specific requirements for individually and centrally heated multifamily units

**SAVINGS TO INVESTMENT RATIO**

As detailed in 10 CFR 440.21(c), in order to provide cost effective service, all assessed energy efficiency measures must meet the conditions as outlined in 10 CFR 440, Appendix A, and achieve a savings to investment ratio (SIR) of at least 1.0 or greater. All mandatory assessment measures that meet the SIR of 1.0 or greater must be installed by subgrantees or subcontractors.

**COMMUNICATION OF GUIDELINES AND STANDARDS**

Communication of Colorado Standard Work Specifications Guidelines and Standards (SWS), including updates, training plans, implementation schedules, and all other associated training and technical documents is the responsibility of CEO WAP Quality Management Team.  The new or updated SWS will be communicated via email in the form of an electronic memorandum to each subgrantee's Executive Director or Program Manager, with all subgrantee trainers copied on the memorandum. This electronic memorandum will, at a minimum:

1. Identify the approved changes to the SWS
2. Identify the dates the changes will be effective
3. Identify any additional training for the new policies and procedures scheduled by CEO WAP Quality Management Team

CEO WAP staff will require that the Executive Director or a Program Manager of each subgrantee sign and return the electronic memorandum to CEO WAP Management, acknowledging receipt of the updated SWS. It is the responsibility of the Executive Director/Program Manager and/or trainers to distribute the updated SWS sections to their respective subgrantee personnel and crews. In the event that subcontractors are hired by the subgrantees to perform weatherization work, subgrantees are responsible for providing subcontractors with the SWS and to ensure that all work performed by subcontractors meets the specifications and standards identified within the SWS. A sample of subcontractor contracts will be reviewed during each Administrative Monitoring to ensure subgrantee compliance with this requirement.

In addition to the electronic memorandum, CEO WAP staff will update the controlled copy of the SWS that exists on the CEO WAP database within 10 business days of issuing the

18

electronic memorandum. This is done so that all subgrantees and subcontractors may reference the most current version of the SWS at all times.

If SWS requirements are changed in the future by the DOE, CEO WAP will send confirmation to the DOE Project Officer responsible for Colorado that CEO WAP acknowledges these changes in the SWS requirements, has issued an electronic memorandum to all subgrantees identifying the changes, and that the controlled copy of the SWS on the CEO WAP database has been updated to reflect these changes. CEO WAP will submit a variance request pertaining to any new SWS requirements, via the standard variance procedure, to the DOE Project Officer, if CEO WAP feels it is warranted.

**WORK QUALITY CONTRACT LANGUAGE**
Per WPN 22-4, CEO WAP is required to include language in all subgrantee contracts that identify the requirements for work quality. CEO WAP developed the following work quality language beginning in PY15-16 that will be included in all PY22-PY26 subgrantee contracts scopes of work:

1. CEO WAP Weatherization Field Standards in the SWS and CEO Weatherization Policies and Procedures shall apply to the grantee and their subcontractors providing weatherization services through CEO WAP in order to ensure consistency in work quality.
2. These regulatory documents are not intended to abridge safety, health, environmental, or local codes or other ordinances. In such circumstances where there are conflicts the more stringent of rules shall apply.
3. The health and safety of the clients, grantee staff, grantee subcontractors and the integrity of the building structure shall not be compromised by any work completed with CEO WAP funds.
4. The Grantee, CEO WAP Administrator, has overall responsibility for proper implementation of the procedures and for the quality control of all repair and energy conservation work.
5. All installed WAP materials shall meet the materials standards taken from Appendix A of 10CFR440, Title 10 Part 440 of the US Department of Energy's (DOE) WAP for low-income persons, and shall be of good quality, and shall be installed in a safe, cost-effective manner.
6. Work not meeting quality expectations may be subject to findings, re-inspections, go-backs, and disallowed costs, as determined by the CEO WAP with reference to 10CFR440 and CEO WAP Policies and Procedures."

**FLOW-DOWN REQUIREMENTS**
Per WPN 22-4, all subgrantee contracts signed with subcontractors will contain language which clearly states that subcontractors must meet all the requirements contained within the SWS, as well as CEO WAP policies and procedures.

**CONFIRMATION OF RECEIPT**
Per WPN 22-4, CEO WAP will use the signature on the contract as the method by which a subgrantee confirms receipt.

---

**V.5.3 Final Inspection**

---

CEO WAP has decided to utilize an independent Quality Control Inspector (QCI) model in which the subgrantee or subcontracted QCI is not permitted to have had any prior involvement

with the unit being inspected. CEO WAP complies with all final inspection requirements outlined in WPN 22-4.

## SUBGRANTEE QCI STAFFING LEVELS

Subgrantee QCI staffing levels should be commensurate with subgrantee needs based on a combination of size, funding, and unit production. Although CEO WAP does not require a subgrantee to have a specific number of QCI on staff, CEO WAP does require that all subgrantee employees who conduct Final Inspections of units be QCI certified. Subgrantees are required to have policies and procedures in place to address subgrantee shortages of QCI. All subgrantees have adequate capacity of QCI.

## SUBGRANTEE QCI FINAL INSPECTION

All units reported as completed by a subgrantee must receive a final inspection from a subgrantee QCI or third party QCI if needed. The QCI must ensure that all work meets the minimum specifications as outlined in the SWS and must meet the applicable standards as found in 10 CFR 440. Units are deemed to be completed by CEO WAP once a QCI has determined that all incidental repair measures, energy conservation materials, and any necessary health and safety repairs have been installed in compliance with SWS standards and all installations meet all DOE SWS standards, if applicable. QCI are responsible for ensuring all materials have been accurately reported on the Building Weatherization Reports (BWRs), and that all energy savings measures listed on the BWR reflect accurate cost estimation. Inspectors are required to ensure accurate reporting of all measure costs, materials, and fuel types for all jobs in either NEAT or MHEA or approved multifamily auditing software.

All client files must include a form, signed by a QCI for the unit, signifying that all weatherization work performed by the subgrantee has met all applicable SWS or NREL SWS Standards. A QCI Final Inspection Report must include an assessment of the original audit, confirmation that the measures called for on the work order were appropriate per the audit procedures and protocols approved by the DOE, a record of final diagnostic testing, and that all measures costs were reported accurately.

## SUBGRANTEE QCI CORRECTIVE ACTION PROCEDURES

Per Department of Energy (DOE), Weatherization Program Notice (WPN) 19-1, Program Year 2019 Weatherization Grant Guidance, Section 2.5, Quality Work Plan Implementation, and WPN 22-4 "Quality Work Plan Requirement Update," subgrantee QCI "who repeatedly fail to perform to program expectations must be disqualified from performing work in the future. Grantees must establish protocols to remove poor performers from their network." Also, subgrantees must establish internal protocols to remove poor performing QCI contractors from the network. When a subgrantee QCI fails to adequately inspect to the most recently approved SWS, they will be subject to the following corrective action procedures:

- Corrective Action-Removal Procedures are dictated by the number of Quality Assurance (QA) identified defects of similar nature requiring corrective action that can be directly tied back to a specific subgrantee QCI during a single QA visit over a two-year program period
    1. First QA identified corrective action defect of similar nature
        1. Subgrantees shall fix issues using non- DOE funds and conduct classroom training within the subgrantee for the inspector prior to them performing subsequent inspection work within the network.
    2. Second QA identified corrective action defect of similar nature

20

1. Subgrantees shall fix issues using non BIL funds, conduct classroom training outside of the subgrantee, and supervised on-the-job training for the inspector prior to them performing subsequent inspection work within the network. guidance

3. Third QA identified corrective action defect of similar nature
   1. Subgrantees shall fix issues using non-BIL funds, suspend the inspector from performing inspections for a six month period from the date of inspector notification, and have the inspector complete a QCI performance plan during the suspension period prior to them performing subsequent inspection work within the network.

4. Fourth QA identified corrective action defect of similar nature
   1. Subgrantees shall fix issues using their own funds (not from any Weatherization grant) and then permanently disqualify the applicable inspector from performing all future inspection work within the network.

- Corrective Action-Removal Procedures Tracking
  1. Subgrantees are responsible for tracking where each impacted inspector is within the process outlined above. If subgrantees suspend or permanently disqualify an inspector, they shall notify a CEO Manager responsible for Quality Assurance via email. Prior to hiring and providing subsequent QCI work to an inspector, subgrantees are responsible for checking with the Quality Manager to ensure that the inspector is not suspended or permanently disqualified.

The corrective action-removal procedures listed above are outlined in CEO WAP Policy 602, Corrective Action-Removal Procedures. Additionally, per WPN 11-3, if a DOE funded unit has received a final inspection, subgrantees cannot return and expend BIL funds for corrections.

**PROCESS FOR VALIDATING SUBGRANTEE CERTIFICATIONS**
In accordance with WPN 22-4, CEO WAP has developed a comprehensive process for ensuring that all subgrantees acquire and maintain Building Performance Institute (BPI) QCI certifications for all inspectors. All subgrantees are required to include a list of all QCI that are on staff, as well as the date that each Inspector's existing certification expires, as a part of their annual Training Plan. These Training Plans are to be submitted as a required component of each subgrantee's annual Competitive and/or Noncompetitive RFA Applications. CEO WAP staff review all Training Plans to ensure compliance with this requirement. Competitive or noncompetitive applications missing these requirements will not be accepted by CEO WAP staff.

In addition to checking subgrantee Training Plans, CEO WAP Quality Management Team  will use the BPI certification database to periodically check that each employee identified by a subgrantee as having a current QCI certification on their Training Plan is QCI certified at the time of the Training Plan submission. If the CEO WAP Quality Management Team  find that either an individual listed as an Inspector on the Training Plan does not have a current QCI certification, or that an existing certification has expired and has not been renewed, CEO WAP Quality Management Team  will issue an electronic memorandum to the subgrantee director or Program Manager, and copy all Trainers, that the employee needs either certification or recertification. A subgrantee representative (either the Executive Director, a Program Manager, or a Trainer) must respond within 30 business days with a plan to certify the individual. Subgrantees are prohibited from allowing Inspectors without a current QCI certification to conduct Final Inspections of any units. Subgrantees who fail to comply with this requirement are subject to the Policies to Address Subgrantee Noncompliance listed later within this section.

21

**SUBCONTRACTOR QCI STAFFING LEVELS**

Recognizing that subgrantees may encounter situations in which subgrantee QCI staffing levels are not adequate to meet production needs, CEO WAP will allow independent, third party subcontractors to perform QCI provided that the subcontractor has a current QCI certification.

**SUBCONTRACTOR QCI INSPECTIONS**

In the event that subgrantees utilize a contractor to perform final inspections, the subgrantee must ensure that those contractors possess a QCI certification and will inspect to the level required by the SWS as outlined in the SWS.

**PROCESS FOR VALIDATION OF SUBCONTRACTOR QCI CERTIFICATION**

Subgrantees are responsible for ensuring subcontractors have a current QCI certification at the time the work is performed. Subgrantees who allow non-QCI certified subcontractors to perform Final Inspections are subject to CEO WAP noncompliance procedures and may have all costs associated with that job disallowed.

**CEO WAP QCI STAFFING LEVELS**

CEO WAP currently operates under the Independent QCI Model, which requires CEO WAP Quality Management Team  to perform QCI Inspections of a minimum of 5% of units reported as completed using BIL funds across the State. Four CEO WAP Quality Management Team members have successfully received their QCI certifications, or recertifications, and were able to conduct inspections on all BIL funded units beginning July 1, 2022.

**CEO WAP STAFF QCI INSPECTIONS**

CEO WAP staff are required to conduct onsite examinations of subgrantee and subcontractor work on 5% of BIL funded units designated as complete by subgrantees. These onsite audits are inspected to ensure that all weatherization work has been done in accordance with SWS and CEO Policies, and to assess subgrantee inspector effectiveness and knowledge. QCI certified CEO WAP staff members will sign a Final Inspection Form indicating that the job has been inspected and has passed all QCI requirements. This document has been developed by CEO WAP and is available for DOE Project Officer review at their request.

**PROCESS FOR VALIDATION OF CEO WAP STAFF QCI CERTIFICATIONS**

CEO WAP Quality Management Team are required to be QCI certified at all times and are responsible for all certification and recertification. Proof of QCI Certification and recertification of all CEO WAP Quality Management Team  are available to the assigned DOE Project Officer as requested.

**POLICIES TO ADDRESS SUBGRANTEE NONCOMPLIANCE**

Per 2 CFR 200.338, if a subgrantee fails to comply with any term of an award as stated in Federal or CEO WAP policies and procedures, the subgrantee may be subject to one or more of the following actions:

1. Temporarily withhold cash payments pending correction of the deficiency.
2. Disallow all or part of the cost of the activity or action not in compliance.
3. Wholly or partly suspend or terminate the current award.
4. Withhold further awards.
5. Board notification and required response from the Board.
6. Take other remedies that may be legally available.

7. May result in reallocation of funding or production to another CEO WAP contracted entity.

If a subgrantee has a repeated history of poor performance, financial instability, mismanagement, violates the terms and conditions of the Cooperative Agreement (contract), or is irresponsible in administering the Weatherization program, CEO WAP may impose additional requirements needed in the following manner:

1. Subgrantees will be notified in writing (mail or electronically) as to the special conditions.
2. Reasons why the special conditions are being imposed.
3. Nature of required corrective action.
4. Time allowed for completion of the corrective action.

The standard CEO WAP grievance procedure can be requested by the subgrantee at any time. Once the special conditions have been corrected to the satisfaction of CEO WAP, they will be removed.

In addition to the above remedies, funding may be suspended in whole or in part by CEO WAP for frequent or repeated violations as well as financial mismanagement. In such a case written notification will be sent to the subgrantee and DOE stating the reasons for suspension, the effective date, and in the case of a partial termination the reduced or modified portion of the funding. Should termination of an subgrantee contract be determined the following steps will be taken:

1. Notification in writing and effective date of termination to the subgrantee.
2. Complete inventory of all tools, materials, equipment and capital equipment will be conducted.
3. All grant purchased items (capital equipment, computers, tools, inventory, etc.) will be removed from the premises.
4. Close out procedures will begin.
5. All other actions will be determined by the CEO WAP Director.

In addition to these noncompliance measures, standard contract language included in each subgrantee's contract further outlines the remedies available to the State of Colorado.

---

**V.6 Weatherization Analysis of Effectiveness**

---

CEO WAP utilizes a four-pronged approach to assess subgrantee effectiveness in relation to overall program administration and performance. This four-pronged approach allows CEO WAP staff to conduct multifaceted analysis of the program that allows CEO WAP to use historical performance and current program trends to identify and mediate any potential issues that might impact the program in the future. CEO WAP believes that this process leads to long-term program stability, effective and responsible utilization of taxpayer funds, and overall program health. The four methods used by CEO WAP staff to evaluate program effectiveness include:

1. Evaluating subgrantees in regards to specific performance indicators
2. Evaluating subgrantees' risk in relation to proper administration of grant funding through a Risk Management Assessment

23

3. Analyzing performance in relation to other subgrantees with similar subgrantee profiles
4. Fostering a welcoming and inclusive environment based on equity, diversity, and inclusion (EDI) at both the grantee and subgrantee levels.

The following sections provide greater detail as to how CEO WAP staff use each of these four methods to evaluate subgrantee and program effectiveness.

**PERFORMANCE INDICATORS**

Using previous program year data, CEO WAP has identified the following five performance indicators that generally can be used to assess subgrantee effectiveness and overall program success. These performance indicators are:

1. Efficient Spending of BIL Funds – Subgrantee effectiveness is largely determined by the full and efficient spending of all allocated BIL funds within a designated program year. Subgrantees that consistently bill to the grant show proper use of ASHRAE testing and installation requirements, proper allocation of subgrantee resources, effective use of funds, proper program administration, proper understanding of allowable and disallowable costs, and successful implementation of the program in general. From a top-level perspective, subgrantee spending of BIL funds in a responsible manner ensures program continuity in future funding cycles, which assists in the overall health of CEO WAP.

2. Per Unit Average (PUA) – Program effectiveness is also determined by how well subgrantees are able to meet or better their target PUA for BIL allocated funds. Subgrantees that meet or better their target PUA show proper financial and program administration, as well as a fundamental understanding of allowable and disallowable costs. Subgrantees are consistently compared to their historical PUA to identify trends around efficient unit production. Issues such as spikes in costs, or growth in labor charged to the grant are assessed to identify deficiencies or trends that may show that subgrantees are not conducting work effectively.

3. Unit Production – The third component that determines subgrantee effectiveness is how successful subgrantees are at providing high quality weatherization services to low income citizens of Colorado. This unit of effectiveness is measured by how many high quality, cost effective units a subgrantee is able to complete in a given program year. Subgrantees are allocated contractual targets based on a standard formula of the total BIL budget/ACPU and are assessed on their ability to meet these targets. Subgrantees that meet or exceed proposed production trends are deemed more effective and show greater program administration than those which lag in their proposed production targets.

4. Service in all 64 Colorado Counties – Due to the significant amount of leveraged funding that Colorado receives, it is increasingly important to ensure service to all 64 Colorado counties. CEO WAP requires that each county receive a minimum of one weatherized unit per program year. Service to all 64 counties in Colorado shows proper use of the prioritization requirements, proper administration of program dollars and ensures overall program health.

5. Quality Installation of Weatherization Materials – Subgrantees are also assessed on how effectively they utilize BIL funding to perform quality installation of weatherization materials. This performance indicator is assessed using the following four metrics as identified below.
   a. Site Visits: The site visit provides CEO WAP staff an opportunity to assess not only the quality of the work, it also allows CEO WAP staff to assess subgrantee compliance with SWS Field Standards and CEO WAP policies and procedures.

24

This provides CEO WAP staff an opportunity to provide real time training to subgrantee field staff in both the SWS and CEO WAP policies and procedures to enhance the program.

b. Utilization of the CEO WAP database: All installed measures on a home are collected through CEO WAP database and can be sorted, compared and evaluated in real time. This data provides insights regarding costs per unit, costs related to field functions or office functions, types of energy efficiency and health/safety measures being performed and their relative frequencies, and beginning and ending air leakage rates. CEO WAP monitors this data to determine if agencies are underperforming or lacking proficiency in any one area. This data, along with the site visit information, provides a starting point for empirical and qualitative assessment of the effectiveness of the work being performed.

c. Quality Assurance Reports: Following a site visit, CEO WAP staff examines past quality assurance monitoring reports to identify recurring quality deficiencies within specific measures and/or processes. This process allows for the identification of Specific Training needs for specific subgrantees and also allows CEO WAP staff to identify issues that may occur across the entire subgrantee network, which could lead to additional Specific subgrantee network training as needed. This allows the subgrantee network greater program knowledge and a path to continuous improvement.

d. Communication with Subgrantees: CEO WAP staff is in continuous communication with subgrantee staff on waiver requests, question and answers, T&TA calls and T&TA meetings. Frequently, the training needs of a subgrantee are best understood by themselves and are expressed accordingly. This interaction, and the information gathered from it, is vital to determining the training needs of agencies and their staff and to assess the overall health of the program..

**RISK MANAGEMENT ASSESSMENT**

Per CEO WAP policy, each subgrantee undergoes a Risk Management Assessment that classifies each subgrantee as either a low, medium, or high risk to CEO WAP, and by extension, all CEO WAP funding partners. This comprehensive Risk Management Assessment includes a detailed, six-step audit of all aspects of subgrantee organizational methods, financials, work quality, including the following risk factors as outlined in standard CEO WAP policy. These risk factors include:

1. Substantial financial or programmatic mismanagement is documented utilizing but not limited to the Administrative Monitoring Reports.
   a. "Substantial" is defined as disallowed costs of a large dollar amount (generally $1,000 or more, or of a repetitive nature).
2. Gross or deliberate neglect of generally accepted workmanship standards as evidenced by utilizing QA Monitoring Reports.
   a. "Gross neglect" is defined as frequently recurring corrective action  item deficiencies  that have not improved through additional training and guidance.
3. Production goals are not completed in a timely manner, according to the goals set forth in the current program year's contract and as documented in monthly production reports.
4. Substantial noncompliance with applicable rules and regulations as documented in Administrative Monitoring, Quality Assurance Monitoring, monthly production reports, or monthly fiscal reports.

CEO WAP implements subgrantee risk management assessment by applying a comprehensive six-step risk management plan that includes the following steps:

1. Identifying Standards for Subgrantee Success (can be considered low-risk)
2. Identifying and Evaluating Relevant Stakeholders (actively involved, impacted by performance, and exert influence)
3. Conducting Communication (inform and collaborate with stakeholders on risk management plan implementation)
4. Conduct Risk Assessment (outline risk status, identification, categorization, impact and probability, and prioritization)
5. Develop Avoidance, Mitigation, and Response (avoid and mitigate all risks, while implementing response plans for high priority risks)
6. Oversight (systematic monitoring and control reviews)

Once the avoidance, mitigation, and response step is successfully implemented at the subgrantee level and verified through oversight by CEO WAP, the subgrantee is then reassessed with the intent of decreasing their overall risk status. This process allows CEO WAP to identify specific subgrantee risks and, using a replicable process, enact comprehensive change to reduce risk to the Grant. This provides CEO WAP with greater overall information, allows CEO WAP to assess subgrantee compliance, and to increase overall program health.

**SUBGRANTEE PROFILE COMPARISON**
CEO WAP also assesses a subgrantee's effectiveness based on comparisons to other subgrantees with similar subgrantee profiles. These subgrantee profiles include elements that are not necessarily financial in scope, things such as heating degree days, population characteristics, size of territory served, region specific costs, budgets, subgrantee organizational structures, and many other elements that have a direct impact on how effective a subgrantee is in delivering service. By comparing subgrantees with similar subgrantee's profile, CEO WAP can better identify subgrantee deficiencies, long term program trends, evaluate cost effectiveness of service, innovative best practices, and track the true financial and administrative impact of changes to CEO WAP and DOE policies and procedures. This allows CEO WAP to identify potential issues in advance and allows CEO WAP to continuously update and tailor the program to preemptively address these issues. This process leads to long term program stability, effective and responsible utilization of taxpayer funds, and overall program health. This process also allows for the identification of training needs that exist within the subgrantee network which allows CEO WAP to customize Specific training needs to support both national comprehensive training and standards as well as CEO WAP and industry best practice standards.

**EQUITY, DIVERSITY AND INCLUSION (EDI)**
On the ground, WAP subgrantees are expected to prioritize underserved populations, primarily those who bear the highest energy burden, as well as approach working with members in the practice of EDI at all times. For the past two years, CEO WAP has provided contracted EDI training to the Colorado WAP network on a semiannual basis, encouraging the professional growth of grantee and subgrantee staff. Recent topics have dealt with Principles of Inclusion, Impact vs. Intent, Allyship, and Bias Awareness. Using an EDI lens to approach CEO WAP's work allows for conscientiously ensuring that Colorado residents and Colorado WAP Network Staff are being served with equity.

26

Multiple members of CEO WAP staff are involved in an office-wide EDI working group striving to improve the accessibility, hiring, and retention challenges that exist across the network. One member of the CEO WAP team sits on the Hiring subcommittee for the EDI working group which is working to foster a welcoming and inclusive environment through the editing of language on job descriptions, work location and accessibility, and in the thoughtful review of applications. CEO WAP staff additionally has a presence at the Colorado Equity Alliance as well as the NASCSP Racial Equity Working Group. The CEO WAP Engagement Manager is developing a statewide Workforce Advisory Group to further address EDI throughout Colorado WAP.

---

**V.7 Health and Safety**

Per WPN 22-7 and 10 CFR 440.16, subgrantees are required to develop and implement detailed Health and Safety plans to ensure the health and safety of both workers and clients at all times. Subgrantee Health and Safety Plans must comply with all Occupational Safety and Health Administration (OSHA) regulations, all Colorado (SWS) Field Guide Health and Safety standards, all CEO WAP Health and Safety standards, as well as any other applicable State or Federal health and safety regulations. Subcontractors hired to perform weatherization work for a subgrantee are required to follow all Health and Safety standards as listed within the subgrantee's Health and Safety Plans and the SWS.  CEO WAP complies with all health and safety requirements outlined in WPN 22-7.

Please reference "BIL Grantee Health and Safety Plan".

---

**V.8 Program Management**
**V.8.1 Overview and Organization**

CEO WAP operates within the Colorado Energy Office (CEO). CEO WAP staff consists of:

Deputy Director: Dominique Gomez
Director: Stephanie Insinna-Sahondo
Senior Program Manager: Amy Miller
Engagement Manager: Michelle Butler
Senior Quality Manager: Andy Cordova
Salesforce Administrator: Sarah Burns
Quality and Technical Manager: Zac Stewart
Quality Manager: Jacob Wolff
Program Manager: Elizabeth Jaenicke
Contract Manager: Randi Nusser
Program Associate: Elizabeth Lenox
Program Associate: Barbara Pazos Brown
Quality Specialist: Mick McHone
Communications Associate: Erin Edwards

Other CEO staff provide support to the Weatherization Assistance Program, such as CEO Executive Director Will Toor, Procurement Director Sara Graf, Director of Finance & Operations Gregg Hefner, Senior Budget Analyst Natalie Doerre, Accountant Alex Lopez, and Office Manager/HR Coordinator Susannah Blythe.

27

**ALLOCATION OF STAFF SALARY COLORADO PROGRAM YEAR 2021**
Deputy Director:  Admin 10%, T&TA 0%
Director:  Admin 23.35%, T&TA 35.00%
Senior Program Manager:  Admin 18.80%, T&TA 39.55%
Senior Program Manager:Admin 6.9%, T&TA 7.8%
Program Manager:  Admin 18.80%, T&TA 39.55%
Program Associate:  Admin 19.10%, T&TA 39.25%
Program Associate: Admin 12.28%, T&TA 36.82%
Program Associate: Admin 12.28%, T&TA 36.82%
Quality Manager:  Admin 14.25%, T&TA 44.10%
Senior Technical and Training Manager:  Admin 16.15%, T&TA 42.20%
Quality and Technical Manager:  Admin 18.30%, T&TA 51.70%

**ALLOCATION OF STAFF SALARY COLORADO PROGRAM YEARS 2022-2026**
Deputy Director: Admin 4%, T&TA 4.5%
Director: Admin 6.9%, T&TA 7.8%
Senior Program Manager:Admin 6.9%, T&TA 7.8%
Senior Quality Manager: Admin 6.9%, T&TA 7.8%
Program Manager: Admin 6.9%, T&TA 7.8%
Contract Manager: Admin 6.9%, T&TA 7.8%
Quality and Technical Manager:  6.9%, T&TA 7.8%
Quality Manager: Admin 6.9%, T&TA 7.8%
Salesforce Administrator: 6.9%, T&TA 7.8%
Program Associate: Admin 6.9%, T&TA 7.8%
Program Associate: Admin 6.9%, T&TA 7.8%
Engagement Manager: Admin 6.9%, T&TA 7.8%
Quality Specialist: Admin 6.9%, T&TA 7.8%
Program Associate (communications): Admin 6.9%, T&TA 7.8%

## SELECTION OF SUBGRANTEES

CEO WAP will utilize its request for applications (RFA) process for the commencement of Program Year 2024. The subgrantees selected until then are as follows:

    (1) Region 2: Pueblo County Department of Human Services
    (2) Region 4: Housing Resources of Western Colorado (HRWC)
    (3) Region 5: Northwest Colorado Council of Governments (NWCCOG)
    (4) Region 7: Arapahoe County Weatherization Division
    (5) Region 8: Energy Resource Center (ERC)

All aforementioned subgrantees were CEO WAP local administering agencies during PY21 and selected for PY22 based on the criteria outlined in 10 CFR 440.15.

Each subgrantee is a public or nonprofit entity, underwent the opportunity to be commented on via the public hearing, have the requisite experience and history of performance, have experience in assisting low-income persons in its areas to be served, and continue to demonstrate the capacity to undertake a timely and effective weatherization program.

| V.8.2 Administrative Expenditure Limits |
| --- |

The following budgetary caps are not to be exceeded by CEO WAP and by extension all subgrantees:

1. No more than 15% of the BIL grant may be used by the grantee and subgrantees for administrative purposes.
2. Not more than 7.5% may be used by CEO WAP for administrative purposes.
3. No less than 7.5% must be made available to subgrantees by CEO WAP.

### V.8.3 Monitoring Activities

Per WPN 20-4, CEO WAP is responsible for executing the activities identified in the BIL Plan as approved by DOE. This responsibility includes ensuring that grant funds are expended in accordance with applicable law, including the regulations contained in 10 CFR 440, Financial Assistance Rule 2 CFR 200, Weatherization Program Notices, and other procedures that DOE may issue. Specifically, CEO WAP is required to conduct monitoring and oversight of all subgrantees in the following areas:

1. Programmatic and Management Monitoring
   a) Subgrantee Review
   b) Financial/Administrative
   c) Equipment/Inventory/Materials
   d) Eligibility
   e) Rental
   f) Feedback and Reporting
   g) Energy Audits
   h) Field Work
   i) Health & Safety
   j) Quality Assurance Subgrantee Monitoring
   k) Training & Technical Assistance
   l) Staff or entity performing the monitoring
   m) How monitoring results are handled and required follow-up procedures
2. Subgrantee Monitoring
   a) Program Overview (Client File Review, Work Orders, etc.)
   b) Financial/Administration
   c) Inventory
   d) Energy Audits
   e) Qualifications & Training
   f) Weatherization of Units
   g) Health & Safety
   h) Final Inspections
   i) Staff or entity performing the monitoring
   j) How monitoring results are handled and required follow-up procedures
3. Financial Monitoring
   a) Financial Management/Accounting Systems and Operations
   b) Audits
   c) Payroll/Personnel
   d) Vehicles and Equipment
   e) Procurement
   f) Invoicing
   g) Records Retention
   h) Staff or entity performing the monitoring
   i) How monitoring results are handled and required follow-up procedures Sub-awards/Subgrantee Monitoring

Per 10 CFR 440.12(b)(6), CEO WAP accomplishes oversight and monitoring of subgrantees by conducting annual administrative and technical monitoring that allows CEO WAP staff with specialized knowledge in these specific areas to assess subgrantee compliance. Per DOE guidance, CEO WAP reserves the right to monitor more units than the baseline requirement for subgrantees who have significant deficiencies. CEO WAP monitoring staff is comprised of one FTE who is responsible for conducting administrative monitoring of subgrantees in relation to financial and administrative functions, one 0.8 FTE certified QCI/0.2 FTE Trainer, and two 0.4 FTE certified QCI/0.6 FTE Trainers, who are responsible for performing technical monitoring of subgrantees related to the installation of energy conservation measures and health and safety repairs in clients' homes. For the BIL grant period of PY22-PY26, the following individuals will conduct monitoring of the following subgrantees:

Stephanie Insinna-Sahondo will be supervising the Administrative Monitoring efforts. Elizabeth Jaenicke will be leading the efforts with support from Randi Nusser, Libby Lenox, and Barbara Pazos: Administrative/Financial Monitoring – Pueblo County Department of Human Services, Housing Resources of Western Colorado, Northwest Colorado Council of Governments, Arapahoe County Weatherization Division, and Energy Resource Center.

Jacob Wolff: (0.8) Technical Monitoring /(0.2) Training – Pueblo County Department of Human Services, Housing Resources of Western Colorado, Northwest Colorado Council of Governments, Arapahoe County Weatherization Division, and Energy Resource Center

Andy Cordova: (0.4) Technical Monitoring/(0.6) Training – Pueblo County Department of Human Services, Housing Resources of Western Colorado, Northwest Colorado Council of Governments, Arapahoe County Weatherization Division, and Energy Resource Center

Zac Stewart: (0.4) Technical Monitoring/(0.6) Training – Pueblo County Department of Human Services, Housing Resources of Western Colorado, Northwest Colorado Council of Governments, Arapahoe County Weatherization Division, and Energy Resource Center

Mick McHone: (0.8) Technical Monitoring/(0.2) Training – Pueblo County Department of Human Services, Housing Resources of Western Colorado, Northwest Colorado Council of Governments, Arapahoe County Weatherization Division, and Energy Resource Center

A total of 9.3% of Administrative and 9.3% of T&TA funds are allocated for monitoring activities.

**ADMINISTRATIVE MONITORING**
Administrative monitoring of all subgrantees is conducted by either a Senior Program Manager or Program Manager and Program Associates at a minimum of once per program year. During an administrative monitoring, each subgrantee's programmatic and financial management are reviewed for compliance with DOE and CEO WAP policies and procedures. Following the completion of an administrative monitoring, a Senior Program Manager or Program Manager is required to complete and submit to the subgrantees the standard CEO WAP Administrative Monitoring Report within 30 days of conducting the administrative monitoring.

Prior to the monitoring, subgrantees submit electronic versions of core policies, procedures, financial audits, insurance certificates, and key operational documents for review and archiving. Administrative monitoring is primarily concerned with addressing subgrantee performance in the following areas:

1.     Organizational Information

2.    Outreach and Production
3.    Personnel
4.    Documentation
5.    Procurement
6.    Inventory
7.    Financial Management
8.    Review of previous administrative monitoring outcomes

Administrative monitoring allows CEO WAP staff to disseminate efficiencies by identifying administrative best practices that can be shared with other subgrantees, thus, reducing functional program requirements where feasible, building in quality checks for administrative processes and procedures, and identifying ways of streamlining operations.

The Administrative Monitoring Report contains the following elements:

A.    Introduction
B.    Methodology
C.    Administrative Monitoring Review
D.    Client File Review
E.    Action Items
F.    Subgrantee Acknowledgment and Performance Statement

Upon receipt of the Administrative Monitoring Report, subgrantees have 30 days for an authorized representative to sign the Administrative Monitoring Report, archive internally for future reference, and provide corrective action plans back to CEO WAP addressing all deficiencies identified during monitoring, per WPN 20-4. The corrective action plans must identify a process and resolution to address a major deficiency and state a reasonable time period for resolution to occur.

**CLIENT FILE REVIEW**
As part of administrative monitoring, a minimum of 5% of all BIL funded client files are provided for review to ensure subgrantee compliance with DOE, BIL, and CEO WAP client file requirements. In order to ensure transparency and consistency across all client file reviews, CEO WAP uses the standard CEO WAP Pre-Interview & Client File Checklist. The checklist includes the following elements, as applicable:

1.    Unit Information (i.e. funding source, heating fuel, job number, own or rent, priorities, structure type, year built)
2.    Eligibility and Permission (i.e. application date, call-back and go-back documentation, client complaint and resolution documentation, client sign and date application, copy of valid ID, deferral information, lawful presence affidavit, permission form for client and landlord if renter, permission to photograph, prequalified or income qualified, subgrantee sign and date application)
3.    Field Requirements (i.e. ASHRAE 62.2 calculation form, audit form, BWR accurate to application, combustion appliance zone (CAZ)summary, chemical sensitivity form, cost records and invoices, date of final QCI inspection, deviation documentation, duct testing, final inspection form, final QCI sign and date, health and safety inspection/notification form, HVAC system efficiency testing, mold/moisture assessment form, NEAT or MHEA audit/work order, NEAT or MHEA economic analysis report, permits, photo documentation, pre and post blower door tests, radon informed consent language/form, radon pamphlet received by client and landlord if renter, refrigerator

31

replacement form, state waivers, subgrantee waivers, suspected asbestos material inspection form, utility data consent forms, ventilation calculation form)
4. Renovate Right Procedures (RRP) (i.e. certified renovator certificate, lead safe pamphlet
5. State Historic Preservation Office (SHPO) (i.e. historical documentation, historical property, required SHPO review)
6. Landlord Contribution (i.e. contribution amount, date of landlord payment)
7. Rooftop PV (i.e. cost records and invoices, DOE project officer approval email, rooftop PV final inspection form, rooftop PV owner agreement, solar assist grant form, solar site assessment, solar workbook printout)

Included in the Administrative Monitoring Report are details regarding deficient areas of client files. Subgrantees are required to develop action plans based on deficiencies and are required to regain compliance prior to the end of the program year. CEO WAP staff check to ensure that any issues that occur with client file documentation are corrected by the subgrantee in accordance with the severity of the violation.

**ANTICIPATED PY22-PY26 ADMINISTRATIVE MONITORING SCHEDULE**
Due to costs associated with administrative monitoring, CEO WAP typically conducts the administrative monitoring and client file review during the same visit, however, due to unit production schedules and when units are reported as closed, this can sometimes pose a challenge. As a result,CEO WAP may or may not be able to complete both portions of the review at the same time. The schedule, which is subject to change, for PY22-PY26 is:

R7: Arapahoe, December 2022
R2: Pueblo, January 2023
R8: ERC, February2023
R5: NWCCOG, March 2023
R4: HRWC, May 2023

Additionally, CEO WAP will perform an annual review of subgrantee Financial Audits.

**TECHNICAL MONITORING**
Technical monitoring of subgrantees allows CEO WAP Quality Management Team to assess subgrantee work in regards to the quality installation of weatherization materials, incidental repair measures and health and safety measures. The technical monitoring schedule typically begins in late August and runs through the end of June and is dependent upon when subgrantees report closed units for BIL jobs. When the subgrantee reports an adequate number of BIL jobs as being closed, members of CEO WAP Technical team inspect the work to ensure the work is being completed in accordance with BIL, CEO WAP, and SWS standards, policies, rules, and regulations.

The quality of the field work and client service is assessed by conducting onsite visits of homes served at various stages in the production process (during initial audits, while work is in progress, accompanying the subgrantee inspector, or after the home has been reported to the state as a completed unit). A minimum of 5% of completed units receive an onsite inspection by the CEO WAP Quality Management Team. This approach provides the greatest possible insights into the subgrantee's processes and how these processes might be affecting quality. Also, the opportunity to have a positive impact upon local performance is increased by interacting with the local field staff during the work, thus providing immediate feedback, rather than just communicating feedback to them indirectly via reports which are addressed to

management staff. This will allow both state and subgrantee staff to ascertain the overall quality of measures and to recognize trends, both within the subgrantees' organization and throughout the state. Statewide or region-wide problems will be addressed in group training and seminars. The specific needs of an individual subgrantee will be addressed through T&TA visits. Work quality is assessed and recorded via Technical Monitoring Reports that are issued to each subgrantee by CEO WAP staff within 30 days of the visit, following a QA monitoring. These reports are used to identify areas of strength and weakness found during the QA visits, and identify quality issues related to the installation of weatherization materials. CEO WAP Quality Management Team classify inspected work into one of the following categories:

1. No Corrective Action Deficiencies – No deficiencies constituting substantial noncompliance with CEO WAP Program Guidance or the SWS.
2. Corrective Action Deficiencies – Deficiencies constituting substantial noncompliance with CEO WAP Program Guidance or the SWS.
3. Recommendation – Conditions observed that do not constitute substantial noncompliance with CEO WAP Program Guidance or the SWS.
4. Best Practice – Work installed or weatherization processes completed that are exemplary in nature.

Once the QA report has been completed, CEO WAP Quality Management Team forward the report to the appropriate subgrantee's designated point of contact, and request a signature indicating that the subgrantee has read the QA report in its entirety. The subgrantee has 30 days from receipt of the report to return a signed copy indicating the subgrantee has read the report, and, in the case of corrective action deficiencies, have developed an action plan for remedying all corrective action deficiencies.

**VIRTUAL TECHNICAL MONITORING PLANS**
The virtual technical monitoring plan will only be used in the event of pandemic level shut downs as in the case of COVID-19.

**Technical Monitoring (Final Inspection by Grantee):**
Virtual Technical Monitoring would consist of receiving the contents of the client file before the virtual site visit. The file review would be completed, and any questions or comments noted so the grantee monitor could respond during the virtual site visit. For the actual site visit, we would have the subgrantee conduct a live streaming application so the grantee monitor could observe the completed work and all diagnostic testing. We would be using all the same forms, checklists, and procedures we do when on site. This virtual technical monitoring will be conducted to satisfy the grantee final inspection requirement (5%) of completed units.

Step Process:

1. A completed unit that needs a final inspection is selected and the client file is sent to grantee staff electronically.
2. The monitors view the contents of the file and view the home via Google Earth if available. Notes are made in preparation.
3. The subgrantee is present for the final inspection and will video call the grantee monitor from the vehicle when they arrive on site.
4. The subgrantee conducts the inspection, and holds the device for very clear and focused zooming on the inspection that is being done. The subgrantee may have more than one device on hand as a backup if the first one battery life is not long enough to

support the entire final inspection. The subgrantee describes each activity like they would during a proctored field exam.

5. Everything that the subgrantee would normally do is completed and video streamed with the grantee monitor. The grantee will ask the team of inspectors to slow down, stop, explain, or show a closer shot of certain measures as needed.

6. The diagnostic testing is highly important, and the camera must be angled to clearly see the meters, gauges, location of testing, and appliance operation. It is assumed this will take the most time of the inspection.

7. As the final inspection is ending, the grantee monitor gives the inspectors an opportunity to address anything they might have missed.

8. If it appears the home is being left in an unsafe manner, the grantee monitor alerts the inspectors so that it can be corrected, and notations are made for the monitoring letter. Observations are made about how the inspectors addressed problems with the work or missed opportunities.

9. The final inspection visit is compared to the client file, and is a technical tool for consistency as the final inspection procedures are concluded.

**Technical Monitoring (Work-In-Progress):**

The virtual Technical Monitoring for work-in-progress jobs would consist of subgrantee staff conducting a live streaming application where the grantee monitor could observe the work being performed and view any diagnostic testing. We would be using all the same forms, checklists, and procedures we do when on site.

Step Process:

1. A client is selected from homes that have been assessed with materials and supplies on hand. If possible, select a home with multiple measures being installed to gain a wide understanding of the subgrantee's overall field practices. The client name and address are sent to grantee staff prior to the virtual monitoring visit.

2. Once the subgrantee's staff has unloaded their equipment and started work, they will contact the grantee monitor for a group video call. This occurs from the vehicle to obtain street view.

3. The grantee monitor will observe the staff working from the street view and approach the person operating the device and tour the job site. The person operating the device should be familiar with that home's scope of work to know what areas of the home to view. It will be requested that the tour is slowed with closer zooms on areas the grantee monitors need to see with more detail.

4. Each worker starting with the crew leader is asked what they are working on and how they are doing it.

5. The grantee monitor views the condition of the vehicles and tools and views safety equipment, location of Personal Protective Equipment (PPE), and Field Guides.

6. Specific areas of work in progress are compared against the grantee Field Guides and general OSHA compliance and safety practices are observed.

7. Safety violations or concerns are immediately brought up and communicated to the crew leader.

8. If it appears something is being missed, or not addressed properly, the team is given a chance to explain the reasoning.

9. The notes and video are later reviewed and compared to the technical tool for conclusion of the work-in-progress monitoring.

**Client File Review:**

The grantee will review all client files and documents at the subgrantees' office. Documents will be scanned and sent to the grantee staff prior to the meeting. The grantee staff would review the documents before the site visit. The subgrantee will redact confidential client information and/or utilize a secure file transfer protocol (FTP) so confidential information can be safely shared between the local subgrantee and the grantee staff. The following steps will be followed:

Step Process:
1. Grantee staff will choose the required number of client files to review from the list of recently completed jobs. They will provide the request to the local subgrantee.
2. Grantee staff will review the files and note any questions or concerns.
3. The interview is scheduled with the subgrantee involving key staff.
4. When the interview is complete, the information will be organized with any issues noted for follow-up during the virtual field visits.
5. If there are major deficiencies based on the subgrantee's answers and provided information, that will also be documented in the monitoring report.

**BIL ONSITE MONITORING**
Per WPN 20-4, CEO WAP will provide all requested documents to the DOE Project Officer pertaining to the following areas during any BIL monitoring of CEO WAP or subgrantees:

Grantee Program Materials
1. Grantee and subgrantee most recent amended agreement
2. Completed subgrantee monitoring reports
3. Monitoring tool/instrument
4. Procedures manuals for program implementation (with technical reports)
5. Most recent grantee support contract/training entities or other contracted activities
6. Procurement documentation related to agreements
7. Inventory tracking and records

Subgrantee Program Materials
1. Current grantee State Plan & BIL Plan
2. Most recently amended award with the grantee
3. Grantee Weatherization Policies and Procedures
4. Copies of files of homes to be reviewed and/or visited
5. Inventory tracking materials (if applicable)
6. Subcontractor Contracts
7. Procurement documents to verify competition
8. Most recent documentation of grantee monitoring visit
9. Costs and fixed price list (materials, services, audits, inspections, etc.)
10. CEO WAP shall confirm receipt of these requests and shall provide all documentation within the time period designated by the DOE Project Officer in all instances.

Detailed monitoring schedules for Administrative, Fiscal, and Technical Monitorings for the span of the grant period can be found in the BIL Planning Workbook.

| V.8.4 Training and Technical Assistance (T&TA) Approach and Activities |
| --- |

CEO WAP places a high priority on training and technical assistance (T&TA) to ensure the delivery of high quality, safe, cost-effective, and consistent energy efficiency and health and safety services throughout the State of Colorado. To support this goal, CEO WAP training

programs focusing on providing specific training and technical assistance to all subgrantees while maintaining strong and consistent program administration of BIL funds. Comprehensive training is provided by IREC entities and are typically related to certifications. The following sections provide a detailed outline of the comprehensive and specific technical training, as well as the administrative training that all occur under the umbrella of the CEO WAP T&TA program. CEO WAP complies with all training and technical assistance requirements outlined in WPN 22-4.

**WORKFORCE EFFORTS**

The Workforce Advisory Group working to further address Equity, Diversity and Inclusion throughout Colorado WAP will also be working on growing administrative and technical trainings to fortify our current staff capacity and engage more with potential employees throughout the state. A collaboration with the National Association of State Energy Officials (NASEO) and Markle is underway, currently working to identify representatives from relevant unions, education or training institutions, and private sector employers specific to the clean energy workforce in Colorado.

**ADMINISTRATIVE TRAINING**

CEO WAP staff conduct administrative training up to three times a year. The first annual administrative training is the Winter Meeting in which CEO WAP staff and subgrantees meet for two days to discuss CEO WAP program guidance, regulatory issues, and other administrative topics and changes that will be applicable to subgrantees in the upcoming program year. The second administrative training performed by CEO WAP staff on a regular basis is the 2 CFR 200 training which all subgrantees are invited to attend. The 2 CFR 200 training is conducted by an outside contractor who provides CEO WAP staff and subgrantees with information regarding Federal fiscal policies, processes and changes that will be applicable for CEO WAP staff and subgrantees in the upcoming program year. The final administrative training occurs in the summer/fall, usually within a few months of the beginning of the new program year. This CEO WAP Summer Meeting provides subgrantees and CEO WAP staff the opportunity to discuss changes in CEO WAP policy, understand program goals, and provide greater information as to the structure and process of the new program year. Training occurs on CEO WAP processes and procedures, reporting dates, database training, allowable and unallowable costs, and other administrative-based information.

In addition to these planned training events, a CEO WAP Senior Program Manager conducts subgrantee specific administrative training as needed. Administrative training is focused on providing, single issue, short term training to subgrantees on CEO WAP policies, procedures, database, forms, fiscals, and other administrative elements as needed.

**COMPREHENSIVE TECHNICAL TRAINING**

Per WPN 22-4 CEO WAP has developed and implemented a comprehensive, statewide subgrantee Technical Training Plan for PY22-PY26 that meets the requirements for comprehensive training as found in the National Renewable Energy Laboratory (NREL) Job Task Analysis (JTA) for QCI, Crew Leaders, Retrofit Installers, and Energy Auditors.

Per DOE standards, all subgrantee Inspectors, retrofit installers, crew leaders, and Energy Auditors are required to receive comprehensive training from an Interstate Renewable Energy Council (IREC) accredited program whose curriculum is aligned with the Job Task Analysis (JTA) for that occupation as identified by NREL. In order to ease the training burden, each subgrantee may select the training delivery method (i.e. in person, via distance learning, or a hybrid approach) that best meets the needs and capabilities of each subgrantee.

36

In order to maintain program continuity from a production and certification standpoint, subgrantees will be required to use the following timeline for certification of all subgrantee and subcontractor employees whose primary and secondary responsibilities fall within each of the associated JTA's.

CEO maintains workforce credentials  through a partnership with the EnergySmart Academy (ESA) at Santa Fe Community College, which  is a nationally recognized weatherization and energy efficiency training center that  offers in-person and online training to its WAP subgrantees.

For the upcoming program year 2022, CEO will cover the cost of tuition for field and administrative staff that wish to take the following online courses offered by ESA as follows: Energy Auditor, Building Science Principles, Quality Control Inspector, Multifamily Quality Control Inspector, Retrofit Installer Technician, Crew Leader, Advanced Retrofits- Smart Thermostats, Energy Auditing Software, Cold-Climate Heat Pumps, Healthy Home Evaluator- The Essentials of Healthy Home, and other available classes offered.

The courses offered by ESA qualify for Continuing Education Units (CEU) from BPI,  and can therefore be applied to the required CEUs needed for recertification of existing credentials.

## SUBGRANTEE EMPLOYEES
### QUALITY CONTROL INSPECTORS:
CEO WAP subgrantees are required to have all individuals that are either full-time or part-time Inspectors complete comprehensive training and be certified as a BPI QCI. Inspectors that are hired must receive their QCI certification prior to conducting any final inspections for a subgrantee. In order to maintain program transparency, subgrantees are required to identify all Quality Control Inspectors on staff, as well as the date that each QCI certification expires, on the subgrantee Training Plan that is submitted annually to CEO WAP. Subgrantees will be responsible for ensuring certifications of all QCI are maintained and valid at all times and are responsible for recertification in all instances. In addition to QCI certifications, all inspectors must receive an OSHA 30 and Lead Safe Renovator certifications. Additionally, a minimum of one subgrantee employee, not necessarily an inspector, must be a Colorado Certified Asbestos Inspector. Subgrantee QCI are required to receive comprehensive training only when they are renewing existing certifications. Certifications will be renewed and updated prior to expiration.

### RETROFIT INSTALLERS, CREW LEADERS, AND ENERGY AUDITORS:
Subgrantee employees whose primary and secondary duties fall under the JTA's for Retrofit Installers, Crew Leaders, and Energy Auditors are required to undergo comprehensive training and certification after the employees' existing Building Performance Institute (BPI) certifications have expired.

In order to maintain program transparency, subgrantees are required to identify all retrofit installers, crew leaders, and Energy Auditors that are on staff, as well as the date that each certification expires on the Training Plan that is submitted annually to CEO WAP. Subgrantees will be responsible for ensuring certifications of all retrofit installers, crew leaders, and Energy Auditors are maintained and current at all times and are responsible for recertification in all instances. OSHA 30 or CPR/ First Aid certification is required for crew leaders. Additionally, a minimum of one subgrantee employee, must have a Colorado Department of Public Health and Environment (CDPHE) Certified Asbestos Building Inspector on staff.

37

**SUBCONTRACTORS**
**QUALITY CONTROL INSPECTORS:**
Subgrantees are allowed to hire subcontractors to perform final inspections of BIL funded units provided that the inspector is QCI certified. Subgrantees are required to verify that all subcontractors hired to conduct a final inspection are QCI certified at all times, and that the QCI has not had any prior contact with the unit per the independent QCI model that has been adapted for the program.

**SUBCONTRACTOR RETROFIT INSTALLERS, CREW LEADER, AND ENERGY AUDITOR**
Subcontractors hired by subgrantees are not required to have retrofit installers, crew leaders, and Energy Auditor certifications, however all work performed by subcontractors must meet the standards and practices found in the SWS and SWS. Subgrantees are responsible for distributing applicable SWS guidelines to all subcontractors and are also responsible for ensuring all work performed by subcontractors meets the standards as found in the SWS at all times. Work performed that does not have an associated SWS standard, must comply with all DOE SWS & Field Guide standards, if applicable. Work performed by subcontractors that do not have an associated SWS or DOE SWS must be compliant with CEO WAP Policies.

Agency Trainers may invite subcontractors to participate in local field training or provide on-the-job training to subcontractors on the job-site. Subcontractors are encouraged to enroll in subgrantee training courses, such as the BPI certification courses or field internships. T&TA funds may be used to train contractors, provided that the subcontractor is participating in the program during the program year. In making the determination for contractor participation in training with grant funds, subgrantees must secure a retention agreement in exchange for the training. The contract agreement must stipulate that contractors will work in the program, at a minimum, for a specific amount of time that aligns with the cost of the T&TA provided. Subgrantees must obtain approval to enter into such agreements by CEO prior to engaging with the contractor. After the approval process, proof of agreement in the form of a contract must be provided to CEO before contractors can receive scholarship compensation. CEO will only compensate for tuition costs. Travel, per diem, and other ancillary costs associated with training will not be approved.

**SPECIFIC TECHNICAL TRAINING**
Specific Trainings consist of single issue, short-term training designed to address acute deficiencies in the field or in day-to-day program management, or based on Quality Assurance Inspection deficiencies. The primary objective of Specific training is to review the work flow process, identify inefficiencies, and to discuss ways to improve the overall processes of subgrantees. Specific training is conducted by CEO WAP Quality Management Team and other approved training entities. All subgrantees will receive specific training during PY22-PY26. specific training consists of training in all elements of CEO WAP, and SWS Policies, including, but not limited to: combustion appliance testing, pressure diagnostics, NEAT/MHEA, work order development, SWS, ASHRAE 62.2.2016, manufactured homes, measures installation, and other trainings as requested. Training typically includes classroom training and hands-on training out in the field. In addition, a general review of the training objectives and an overview of the Weatherization Assistance Program from a national and state perspective will be conducted at each subgrantee training. Additionally, general work processes including job set up, safety, and good or best practices will be covered in the initial training review and throughout the training process.

38

Other, more specific Specific training needs are assessed by CEO WAP Quality Management Team via four methods, they are:

1. Site Visits provide an opportunity for the CEO WAP Quality Management Team to assess subgrantee work quality and compliance with the SWS and CEO WAP Policies and Procedures. Site visits consist of evaluating completed and in-progress work for adherence to the SWS standards, review of client files to ensure adherence to CEO WAP policies, and to identify subgrantee specific issues that require additional training. Onsite visits help the CEO WAP Quality Management Team to identify specific subgrantee training needs as well as best practices that one subgrantee may have developed that could be used by other subgrantees. All site visits performed by the CEO WAP Quality Management Team have an associated Quality Assurance (QA) Report for that visit that provides detailed analysis of the work performed by the subgrantee on completed BIL units. Once the QA Report for a subgrantee has been completed, the CEO WAP Quality Management Team meets to discuss the subgrantee's overall performance, outstanding issues and concerns to be aware of during future visits. During these meetings, subgrantee specific training needs are identified and discussed. If subgrantee specific training is deemed necessary, the technical team will create a training plan that will address these deficiencies. If corrective action item deficiencies are identified during the visit, specific action items are discussed and responses are required by the subgrantee. These reports, including their corrective action item deficiencies, are stored on the CEO WAP database and reviewed before the subgrantee's next QA visit to ensure the problem has been resolved and the subgrantee complies moving forward.

2. All information relating to installed measures are collected through the CEO WAP database, and can be sorted, compared and evaluated in real time. This data provides insights regarding costs per unit, costs related to field functions or office functions, types of energy efficiency and health/safety measures being performed and their relative frequencies, and beginning and ending air leakage rates. Each month, reports including subgrantee specific production analysis (including all installed measures and their costs) and fiscal analysis (including budget to actual reports) are completed and posted on the CEO WAP database. CEO WAP monitors this data to determine if agencies are underperforming or lacking proficiency in any one particular area. Outliers are determined and necessary Specific training activities are developed by the technical team. This data, along with the site visit information, provides a starting point for empirical and qualitative assessment of the effectiveness of the work being performed.

3. External QA reports that are reviewed include, but are not limited to: DOE Project Officer monitoring reports, internal state audits, and IG reports. CEO WAP examines ALL quality assurance monitoring reports to identify recurring quality deficiencies within specific measures and/or processes.

4. CEO WAP maintains copies of all standards and policies, including the SWS, CEO WAP Policies and Procedures, and all other technical requirements on the CEO WAP database, to which all subgrantees have access to. Upon updating the rules, regulations, or standards of any documents, CEO WAP emails a copy of the changed requirements to the Program Director of each subgrantee and requests that each Director send back an email stating that they have received the updated requirements. In addition, CEO WAP staff update the control copy on CEO WAP database with the updated information so that all subgrantees have access to the most recent standards.

## CLIENT EDUCATION

Per CEO WAP Policies and Procedures all clients are provided with education about the materials being used in their homes. Educational pamphlets are discussed and provided to the

39

clients about materials already present in the home that may be detrimental to the health of the client, such as asbestos, lead, and radon. Upon receipt of these documents all clients are required to sign and date that they have been notified of the potential dangers of having these substances in their home. Materials created and provided to clients for educational purposes also include, but are not limited to, information on solar photovoltaic systems, insulation, appliances in the home, thermostats, etc. All grantee and subgrantee staff assist in client education on an as-needed basis.

It is the responsibility of the Energy Auditor and crew lead, to review the measures to be completed in the home before work commences, as well as educate clients about the potentials for energy savings and operating any appliances which may be added or replaced.

**EO WAP Quality Management Team**
**TRAINING:**
CEO WAP Quality Management Team  maintains the highest levels of training in DOE and industry standards in order to ensure quality and consistency in reviewing subgrantee work. CEO WAP Quality Management Team are required to hold a QCI, Asbestos Building Inspector (ABI), and Renovation, Repair, and Painting (RRP) certification from the Environmental Protection Agency (EPA), and an OSHA 30 certification. In addition, CEO WAP Quality Management Team  may have other certifications that assist in their ability to perform QA inspections of subgrantee work.  CEO WAP Quality Management Team  members doing Quality Assurance inspections meet the certification requirements as outlined above.

**PERCENT OF OVERALL TRAININGS**
Comprehensive Trainings: 14%
Specific Trainings: 86%

**BREAKDOWN OF T&TA TRAINING BUDGET**
Percent of budget allocated to Auditor/QCI trainings: 16%
Percent of budget allocated to Crew/Installer trainings: 41%
Percent of budget allocated to Management/Financial trainings: 43%

---

| **V.9 Energy Crisis and Disaster Response Plan** |
|---|

The purpose of the CEO WAP Disaster Relief Plan is to provide weatherization emergency services to low-income individuals and families affected by a disaster as determined by a Presidential or Gubernatorial order declaring either a Federal or State Emergency. The disaster generally involves the following phases: the crisis itself, cleanup, and repair or rebuilding of the area. It is not uncommon for weatherization work to be suspended during the crisis and early cleanup period until such time as community services including electricity, water and other infrastructure can be restored. The plan will be in effect dependent upon the anticipated recovery period.

Disaster relief services are only available to qualified low-income residential households directly affected by the declared disaster. Local agencies are required to identify and provide weatherization assistance to elderly persons, persons with disabilities, and families with children five and under. However, in the case of a declared disaster, households located in the disaster area can take top priority as long as the households are income eligible and meet one of the priorities established in regulation and are free and clear of any insurance claim or other form of compensation resulting from damage incurred from the disaster. Local authorities must

40

deem the dwelling unit salvageable as well as habitable and if the damage to the materials is not covered by insurance or other form of compensation.For qualified households, the unit allowance will be a maximum of $6,500 as permitted by DOE WPN 19-5.

The use of BIL funds to pay for weatherization personnel to perform relief work in the community as a result of a disaster are not allowable. Allowable expenditures under WAP include:

1. The cost of incidental repairs to an eligible dwelling unit if such repairs are necessary to make the installation of weatherization materials effective.
2. The cost of eliminating health and safety hazards, elimination of which is necessary before the installation of weatherization materials. To the extent that services are in support of eligible weatherization (or permissible re-weatherization) work, such expenditure would be allowable. For example, debris removal at a dwelling unit so that the unit can be weatherized would be an allowable cost. Debris removal from a dwelling unit that is not to be weatherized would not be an allowable cost.
3. Guidance under WPN 22-7 will determine the allowability of installed Health and Safety Measures for affected homes in the disaster area.
4. Applications will be taken to determine and verify eligibility for potential.
5. Low-income individuals affected by the disaster. Reporting will be the same as normal requirements with notes indicating in the comment section that the unit was weatherized as a result of the disaster. All measures must be cost justified using the DOE approved energy audits, i.e. NEAT/MHEA with a SIR of 1.0 or greater. Incidental repairs can be made to preserve or protect a measure and should be cost justified within the measure(s) identified in the assessment per DOE guidance WPN 19-5. Any unusual circumstances will require the pre-approval of CEO WAP staff and possibly pre-approval of DOE.
6. Any low-income qualified home damaged by disaster such as flooding can be re-weatherized without regard to the date of weatherization, if the damage to materials is not covered by insurance.
7. All remaining measures are to be installed in order of priority in accordance with CEO WAP Policies and Procedures for managing the Low-Income Weatherization Assistance Program.
8. Local agencies may use Weatherization vehicles and/or equipment to help assist in disaster relief provided WAP is reimbursed according to 2 CFR 200 rules. Weatherization personnel can be paid from BIL funds to perform functions related to protecting the BIL investment. Such activities include: securing weatherization materials, tools, equipment, weatherization vehicles, or protection of local subgrantee weatherization files, records and the like during the initial phase of the disaster response.

# EXHIBIT J

## ASSISTANCE AGREEMENT

| 1. Award No. DE-EE0009976 | 2. Modification No. 0001 | 3. Effective Date 07/01/2022 | 4. CFDA No. 81.042 |
|---|---|---|---|

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Vanessa Dam<br>1580 LOGAN STREET, SUITE 100<br>DENVER CO 802031940 | Energy Effcy & Renewable Energy<br>EE-1<br>U.S. Department of Energy<br>1000 Independence Avenue, S.W.<br>Washington DC 20585 | 07/01/2022<br>through<br>06/30/2027 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | 117-58 Infrastructure Investment and Job<br>109-58 Energy Policy Act 2005 | 23EE000467 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Vanessa Dam<br>1580 LOGAN STREET, SUITE 100<br>DENVER CO 802031940 | Govt. Share: $50,064,163.00<br><br>Cost Share : $0.00<br><br>Total    : $50,064,163.00 | This action:<br>$17,522,457.00<br><br>Total    :<br>$25,032,081.00 |

| 14. Principal Investigator | 15. Program Manager | 16. Administrator |
|---|---|---|
| | Jonny M. Muckey<br>Phone: 202-287-1809 | Golden Field Office<br>U.S. Department of Energy<br>Golden Field Office<br>15013 Denver West Parkway<br>Golden CO 80401 |

| 17. Submit Payment Requests To | 18. Paying Office | 19. Submit Reports To |
|---|---|---|
| Payment - Direct Payment<br>from U.S. Dept of Treasury | Payment - Direct Payment<br>from U.S. Dept of Treasury | See Attachment 2 |

**20. Accounting and Appropriation Data**

██████████████████████████████

**21. Research Title and/or Description of Project**
BIL: WAP - Colorado

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br>*Nim Osny* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Nicholas C. Oscarsson | 27. Date Signed<br>01/20/2023 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-EE0009976/0001 | | | PAGE<br>2 | OF<br>3 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | DUNS Number:  Not Available<br>UEI:  JLVGQ4E7RD53<br>The purposes of this modification are to:<br><br>1) Approve the full Grantee Plan;<br><br>2) Provide incremental funding of 35% of total grantee allocation, as shown in Block 13;<br><br>3) Delete and replace Attachment 3, Budget Information; and<br><br>4) Add Attachment 4, Annual File; Attachment 5, Master File; and Attachment 5a, Health and Safety Plan.<br><br>The Project Period for this award is 07/01/2022 - 06/30/2027, consisting of the following Budget Period:<br><br>Project Period and Budget Period: 07/01/2022 to 06/30/2027.<br><br>In Block 7 of the Assistance Agreement, the Period of Performance reflects the beginning of the Project Period through the end of the current Budget Period.<br><br>All other terms and conditions remain unchanged.<br><br>DOE Award Administrator: Denise McCracken<br>Email: Denise.Mccracken@ee.doe.gov<br>Phone: 240-562-1485<br><br>DOE Project Officer: Jon Muckey<br>E-mail: Jon.Muckey@ee.doe.gov<br>Phone: 202-287-1809<br><br>Recipient Business Officer: Stephanie Insinna-Sahondo<br>E-mail: stephanie.insinnasahondo@state.co.us<br>Phone:  720-384-4220<br><br>Recipient Principal Investigator: Elizabeth Jaenicke<br>E-mail: elizabeth.jaenicke@state.co.us<br>Phone:  303-335-5119<br><br><br>Electronic signature or signatures as used in this document means a method of signing an<br>Continued ... | | | | |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-EE0009976/0001 | | | PAGE<br>3 | OF<br>3 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | electronic message that—<br><br>(A) Identifies and authenticates a particular person as the source of the electronic message;<br>(B) Indicates such person's approval of the information contained in the electronic message; and,<br>(C) Submission via FedConnect constitutes electronically signed documents.<br><br><br>ASAP: YES Extent Competed: NOT COMPETED Davis-Bacon Act: YES PI: Jaenicke, Elizabeth Fund: 05461 Appr Year: 2022 Allottee: 31 Report Entity: 200835 Object Class: 41020 Program: 1004759 Project: 0000000 WFO: 0000000 Local Use: 0000000 | | | | |

# EXHIBIT K



**Special Terms and Conditions (WAP)**
Colorado Energy Office Award No. DE-EE0009976.0000

# Bipartisan Infrastructure Law (BIL)
# Special Terms and Conditions

The Grantee ("Recipient"), which is identified in Block 5 of the Assistance Agreement, and the Office of Energy Efficiency and Renewable Energy ("EERE"), an office within the United States Department of Energy ("DOE"), enter into this Award, referenced above, to achieve the project objectives stated in this Award.

This Award consists of the following documents including all terms and conditions therein:

|  |  |
|---|---|
|  | Assistance Agreement Form |
|  | Special Terms and Conditions |
| Attachment 1 | Intellectual Property Provisions |
| Attachment 2 | Federal Assistance Reporting Checklist and Instructions |
| Attachment 3 | Budget Information SF-424A |
| Attachment 4 | Annual File |
| Attachment 5 | Master File |
| Attachment 5a | Health and Safety Plan |
| Attachment 6 | NEPA Determination |

The following are incorporated into this Award by reference:

- DOE Assistance Regulations, 2 CFR part 200 as amended by 2 CFR part 910 at http://www.eCFR.gov.
- Public Law 117-58 Bipartisan Infrastructure Law (BIL)
- National Policy Requirements (November 12, 2020) at http://www.nsf.gov/awards/managing/rtc.jsp.
- The Recipient's application/proposal as approved by EERE.
- Applicable program regulations at http://www.eCFR.gov, including 10 CFR Part 440 – Weatherization Assistance for Low-Income Persons.



# Table of Contents

**Subpart A.  General Provisions**                                                                                  **4**

Term 1.      Legal Authority and Effect                                                                     4
Term 2.      Flow Down Requirement                                                                          4
Term 3.      Compliance with Federal, State, and Municipal Law                                              4
Term 4.      Inconsistency with Federal Law                                                                 4
Term 5.      Federal Stewardship                                                                            4
Term 6.      Federal Involvement                                                                            4
Term 7.      NEPA Requirements                                                                              6
Term 8.      Historic Preservation                                                                          7
Term 9.      Performance of Work in United States                                                           8
Term 10.     Foreign National Involvement                                                                   9
Term 11.     Reporting Requirements                                                                         9
Term 12.     Lobbying                                                                                       9
Term 13.     Publications                                                                                  10
Term 14.     No-Cost Extension                                                                             10
Term 15.     Property Standards                                                                            10
Term 16.     Insurance Coverage                                                                            11
Term 17.     Real Property                                                                                 11
Term 18.     Equipment                                                                                     11
Term 19.     Supplies                                                                                      12
Term 20.     Property Trust Relationship                                                                   12
Term 21.     Record Retention                                                                              12
Term 22.     Audits                                                                                        12

**Subpart B.  Financial Provisions**                                                                               **13**

Term 23.     Maximum Obligation                                                                            13
Term 24.     Continuation Application and Funding                                                          14
Term 25.     Refund Obligation                                                                            14
Term 26.     Allowable Costs                                                                               15
Term 27.     Indirect Costs                                                                                15
Term 28.     Decontamination and/or Decommissioning (D&D) Costs                                            17
Term 29.     Use of Program Income                                                                         17
Term 30.     Payment Procedures                                                                            17
Term 31.     Budget Changes                                                                                18
Term 32.     Carryover of Unobligated Balances                                                             19

**Subpart C.  Miscellaneous Provisions**                                                                           **19**

Term 33.     Reporting Subawards and Executive Compensation                                                19
Term 34.     System for Award Management and Universal Identifier Requirements                             23
Term 35.     Nondisclosure and Confidentiality Agreements Assurances                                       25
Term 36.     Subrecipient Change Notification                                                              26
Term 37.     Minimum Privacy Protections Regarding Applicant Information                                   26
Term 38.     Conference Spending                                                                           27
Term 39.     Recipient Integrity and Performance Matters                                                   27
Term 40.     Export Control                                                                                29
Term 41.     Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment        30

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Special Terms and Conditions
Colorado Energy Office Award No. DE-EE0009976.0000

| Term 42. | Fraud, Waste and Abuse | 31 |
| Term 43. | Interim Conflict of Interest Policy for Financial Assistance Policy | 31 |

| **Subpart D.** | **Bipartisan Infrastructure Law (BIL)- specific requirements** | **32** |

| Term 44. | Recipient Notification of prospective BIL - specific requirements | 32 |
| Term 45. | Reporting Tracking and Segregation of Incurred Costs | 32 |
| Term 46. | Buy American Requirements for Infrastructure Projects | 32 |
| Term 47. | Davis Bacon Requirements | 35 |

3

## Subpart A.  General Provisions

### Term 1.    Legal Authority and Effect

A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

The Recipient may accept or reject the Award.  A request to draw down DOE funds or acknowledgement of award documents by the Recipient's authorized representative through electronic systems used by DOE, specifically FedConnect, constitutes the Recipient's acceptance of the terms and conditions of this Award.  Acknowledgement via FedConnect by the Recipient's authorized representative constitutes the Recipient's electronic signature.

### Term 2.    Flow Down Requirement

The Recipient agrees to apply the terms and conditions of this Award, as applicable, including the Intellectual Property Provisions, to all subrecipients (and subcontractors, as appropriate), as required by 2 CFR 200.101, and to require their strict compliance therewith.  Further, the Recipient must apply the Award terms as required by 2 CFR 200.327 to all subrecipients (and subcontractors, as appropriate), and to require their strict compliance therewith.

### Term 3.    Compliance with Federal, State, and Municipal Law

The Recipient is required to comply with applicable Federal, state, and local laws and regulations for all work performed under this Award.  The Recipient is required to obtain all necessary Federal, state, and local permits, authorizations, and approvals for all work performed under this Award.

### Term 4.    Inconsistency with Federal Law

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this Award must be referred to the DOE Award Administrator for guidance.

### Term 5.    Federal Stewardship

EERE will exercise normal Federal stewardship in overseeing the project activities performed under this Award.  Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to address deficiencies that develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the project objectives have been accomplished.

### Term 6.    Federal Involvement



A. **Review Meetings**

The Recipient, including but not limited to, the principal investigator (or, if applicable, co-principal investigators), is required to participate in periodic review meetings with EERE. Review meetings enable EERE to assess the work performed under this Award and determine whether the Recipient has timely achieved the program goals stated in Attachment 4 (Annual Plan) and deliverables stated in Attachment 2 (Federal Assistance Reporting Checklist) to this Award.

EERE shall determine the frequency of review meetings and select the day, time, and location of each review meeting and shall do so in a reasonable and good faith manner. EERE will provide the Recipient with reasonable notice of the review meetings.

For each review meeting, the Recipient is required to provide a comprehensive overview of the project, including:

● The Recipient's program progress compared to the Annual Plan stated in Attachment 4 to this Award.
● The Recipient's actual expenditures compared to the approved budget in Attachment 3 to this Award.
● Other subject matter specified by the DOE Technology Manager/Project Officer.

B. **Project Meetings**

The Recipient is required to notify EERE in advance of scheduled tests and internal project meetings that would entail discussion of topics that could result in major changes to the baseline project technical scope/approach, cost, or schedule. Upon request by EERE, the Recipient is required to provide EERE with reasonable access (by telephone, webinar, or otherwise) to the tests and project meetings. The Recipient is not expected to delay any work under this Award for the purpose of government insight.

C. **Site Visits**

EERE's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required. The Recipient must provide, and must require subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

D. **EERE Access**

The Recipient must provide any information, documents, site access, or other assistance requested by EERE for the purpose of its Federal stewardship or



Energy Efficiency &
Renewable Energy

substantial involvement.

## Term 7.    NEPA Requirements

**A. Authorization**

DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of Federal funds.

For Recipients with a DOE executed Historic Preservation Programmatic Agreement (PA), EERE has determined that the "Allowable" listed in the Weatherization Assistance Program (WAP) NEPA Determination (Attachment 6) are categorically excluded and require no further NEPA review, when the Recipient demonstrates the activities are compliant with the restrictions of the "Allowable Activities. The Recipient is thereby authorized to use Federal funds for the "Allowable Activities" listed in the WAP Bipartisan Infrastructure Law, Administrative and Legal Requirements Document (WAP-BIL-ALRD) and, NEPA Determination, subject to the Recipient's compliance with paragraphs B. "Conditions" and C. "Activities Not Listed As Allowable Activities," and the restrictions listed in Attachment 6.

**B. Conditions**

1. This NEPA Determination only applies to activities funded by the WAP-BIL-ALRD, Administrative and Legal Requirements Document .
2.  Activities not listed under "Allowable Activities" including ground disturbing activities and tree removal, are subject to additional NEPA review and approval by DOE. For activities requiring additional NEPA review, Recipients must complete the environmental questionnaire found at https: //www.eere-pmc.energy.gov/NEPA.aspx and receive notification from DOE that the NEPA review has been completed and approved by the Contracting Officer prior to initiating the project or activities.
3. This authorization does not include activities where the following elements exist: extraordinary circumstances; cumulative impacts or connected actions that may lead to significant effects on the human environment; or any inconsistency with the "integral elements" (as contained in 10 CFR Part 1021, Appendix B) as they relate to a particular project.
4. The Recipient must identify and promptly notify DOE of extraordinary circumstances, cumulative impacts or connected actions that may lead to significant effects on the human environment, or any inconsistency with the "integral elements" (as contained in 10 CFR Part 1021, Appendix B) as they relate to project activities.
5. Recipients must have a DOE executed Historic Preservation Programmatic Agreement and adhere to the terms and restrictions of its DOE executed



Historic Preservation Programmatic Agreement. DOE executed historic preservation programmatic agreements are available on the Weatherization and Intergovernmental Programs website:

https://www.energy.gov/eere/wipo/historic-preservation-executed-programmatic-agreements.

6. Most activities listed under "Allowable Activities" are more restrictive than the Categorical Exclusion. The restrictions listed in the "Allowable Activities" must be followed.

7. Recipients are responsible for completing the online NEPA and Historic preservation training at www.energy.gov/node/4816816 and contacting NEPA with any questions at GONEPA@ee.doe.gov.

8. This authorization excludes any activities that are otherwise subject to a restriction set forth elsewhere in the Award.

**C. Activities Not Listed As "Allowable Activities"**

If the Recipient seeks to fund activities that do not qualify as "Allowable Activities" as defined in Attachment 6, those activities are subject to additional NEPA review which requires submission of an environmental questionnaire found at https://www.eere-pmc.energy.gov/NEPA.aspx and those activities are not authorized for Federal funding unless and until the DOE Contracting Officer provides written authorization for those activities. Should the Recipient elect to undertake activities prior to written authorization from the Contracting Officer, the Recipient does so at risk of not receiving Federal funding for those activities, and such costs may not be recognized as allowable cost share.

## Term 8.    Historic Preservation

**A. Authorization**

DOE must comply with the requirements of Section 106 of the National Historic Preservation Act (NHPA) prior to authorizing the use of Federal funds.  Section 106 applies to historic properties that are listed in or eligible for listing in the National Register of Historic Places.  Recipients with a DOE-executed Programmatic Agreement (PA) must comply with the requirements identified in paragraph B. Conditions below.

**B. Conditions**

**Recipients with a DOE executed PA for Historic Preservation**

**(AL, AK, AS, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MP, MS, MO, MT, ND, NE, NV, NH, NJ, NM, NY, NC, OH, OK, OR, PA, RI, PR, SC, SD, TN, TX, UT, VI, VT,  VA, WA, WI, WV, WY)**

Recipients with a DOE executed historic preservation Programmatic Agreement (PA) must adhere to all the Stipulations of their PA.  All DOE executed PAs are available on the Weatherization and Intergovernmental Programs website:



Special Terms and Conditions
Colorado Energy Office Award No. DE-EE0009976.0000

https://www.energy.gov/eere/wipo/historic-preservation-executed-programmatic-agreements

In addition to the Stipulations in their PAs, Recipients must notify EERE via GONEPA@ee.doe.gov whenever:

- Either the Recipient or the State Historic Preservation Office (SHPO)/Tribal Historic Preservation Office (THPO) believes that the Criteria of Adverse Effect pursuant to 36 CFR § 800.5, apply to the proposal under consideration by EERE;
- There is a disagreement between an Applicant, or it authorized representative, and the SHPO/THPO about the scope of the area of potential effects, identification, and evaluation of historic properties and/or the assessment of effects;
- There is an objection from a consulting party or the public regarding their involvement in the review process established by 36 CFR Part 800, Section 106 findings and determinations, or implementation of agreed upon measures; or

There is the potential for a foreclosure situation or anticipatory demolition as defined under 36 CFR §800.9 (b) and 36 CFR § 800.9 (c).

## Term 9.    Performance of Work in United States

### A. Requirement
All work performed under this Award must be performed in the United States unless the Contracting Officer provides a waiver.  This requirement does not apply to the purchase of supplies and equipment; however, the Recipient should make every effort to purchase supplies and equipment within the United States.  The Recipient must flow down this requirement to its subrecipients.

### B. Failure to Comply
If the Recipient fails to comply with the Performance of Work in the United States requirement, the Contracting Officer may deny reimbursement for the work conducted outside the United States and such costs may not be recognized as allowable Recipient cost share regardless if the work is performed by the Recipient, subrecipients, vendors or other project partners.

### C. Waiver for Work Outside the U.S.
All work performed under this Award must be performed in the United States. However, the Contracting Officer may approve the Recipient to perform a portion of the work outside the United States under limited circumstances. The Recipient must obtain a waiver from the Contracting Officer prior to conducting any work outside the U.S.  To request a waiver, the Recipient must submit a written waiver request to the Contracting Officer, which includes the following information:
- The rationale for performing the work outside the U.S.;
- A description of the work proposed to be performed outside the U.S.;

- Proposed budget of work to be performed; and
- The countries in which the work is proposed to be performed.

For the rationale, the Recipient must demonstrate to the satisfaction of the Contracting Officer that the performance of work outside the United States would further the purposes of the FOA or Program that the Award was selected under and is in the economic interests of the United States.  The Contracting Officer may require additional information before considering such request.

## Term 10.      Foreign National Involvement

The Recipient and project participants (including subrecipients and contractors) who anticipate involving foreign nationals in the performance of an award, may be required to provide DOE with specific information about each foreign national to satisfy requirements for foreign national participation.  A foreign national is defined as any person who is not a U.S. citizen by birth or naturalization. The volume and type of information collected may depend on various factors associated with the award.

## Term 11.      Reporting Requirements

### A. Requirements
The reporting requirements for this Award are identified on the Federal Assistance Reporting Checklist, attached to this Award.  Failure to comply with these reporting requirements is considered a material noncompliance with the terms of the Award. Noncompliance may result in withholding of future payments, suspension, or termination of the current award, and withholding of future awards.  A willful failure to perform, a history of failure to perform, or unsatisfactory performance of this and/or other financial assistance awards, may also result in a debarment action to preclude future awards by Federal agencies.

### B. Dissemination of Scientific and Technical Information
Scientific and Technical Information (STI) generated under this Award will be submitted to DOE via the Office of Scientific and Technical Information's Energy Link (E-Link) system.  STI submitted under this Award will be disseminated via DOE's OSTI.gov website subject to approved access limitations. Citations for journal articles produced under the Award will appear on the DOE PAGES website.

### C. Restrictions
Scientific and Technical Information submitted to E-Link must not contain any Protected Personal Identifiable Information (PII), limited rights data (proprietary data), classified information, information subject to export control classification, or other information not subject to release.

## Term 12.      Lobbying



By accepting funds under this Award, the Recipient agrees that none of the funds obligated on the Award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. § 1913.  This restriction is in addition to those prescribed elsewhere in statute and regulation.

## Term 13.    Publications

The Recipient is required to include the following acknowledgement in publications arising out of, or relating to, work performed under this Award, whether copyrighted or not:

- *Acknowledgment:*  "This material is based upon work supported by the U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy (EERE) under the Weatherization Assistance Program Award Number DE-_____."

- *Full Legal Disclaimer:*  "This report was prepared as an account of work sponsored by an agency of the United States Government.  Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.  Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof.  The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

  *Abridged Legal Disclaimer:* "The views expressed herein do not necessarily represent the views of the U.S. Department of Energy or the United States Government."

  Recipients should make every effort to include the full Legal Disclaimer.  However, in the event that recipients are constrained by formatting and/or page limitations set by the publisher, the abridged Legal Disclaimer is an acceptable alternative.

## Term 14.    No-Cost Extension

As provided in 2 CFR 200.308, the Recipient must provide the Contracting Officer with notice in advance if it intends to utilize a one-time, no-cost extension of this Award.  The notification must include the supporting reasons and the revised period of performance.  The Recipient must submit this notification in writing to the Contracting Officer and DOE Technology Manager/ Project Officer at least 30 days before the end of the current budget period.

Any no-cost extension will not alter the project scope, milestones, deliverables, or budget of this Award. Extensions require explicit prior Federal awarding agency approval when carrying forward unobligated balances to subsequent budget periods.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

## Term 15.    Property Standards

The complete text of the Property Standards can be found at 2 CFR 200.310 through 200.316.

Also see 2 CFR 910.360 for additional requirements for real property and equipment for For-Profit recipients.

## Term 16.    Insurance Coverage

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds.  Also see 2 CFR 910.360(d) for additional requirements for real property and equipment for For-Profit recipients.

## Term 17.    Real Property

Subject to the conditions set forth in 2 CFR 200.311, title to real property acquired or improved under a Federal award will conditionally vest upon acquisition in the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.311 before disposing of the property.

Except as otherwise provided by Federal statutes or by the Federal awarding agency, real property will be used for the originally authorized purpose as long as needed for that purpose. When real property is no longer needed for the originally authorized purpose, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.  The instructions must provide for one of the following alternatives: (1) retain title after compensating DOE as described in 2 CFR 200.311(c)(1); (2) Sell the property and compensate DOE as specified in 2 CFR 200.311(c)(2); or (3) transfer title to DOE or to a third party designated/approved by DOE as specified in 2 CFR 200.311(c)(3).

See 2 CFR 200.311 for additional requirements pertaining to real property acquired or improved under a Federal award.  Also see 2 CFR 910.360 for additional requirements for real property for For-Profit recipients.

## Term 18.    Equipment

Subject to the conditions provided in 2 CFR 200.313, title to equipment (property) acquired under a Federal award will conditionally vest upon acquisition with the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.313 before disposing of the property.

A state must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award.  When no longer needed for the originally authorized purpose,

11

the equipment may be used by programs supported by DOE in the priority order specified in 2 CFR 200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR 200.313(d).

When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.

Disposition will be made as follows: (1) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to DOE; (2) Non-Federal entity may retain title or sell the equipment after compensating DOE as described in 2 CFR 200.313(e)(2); or (3) transfer title to DOE or to an eligible third party as specified in 2 CFR 200.313(e)(3).

See 2 CFR 200.313 for additional requirements pertaining to equipment acquired under a Federal award.  Also see 2 CFR 910.360 for additional requirements for equipment for For-Profit recipients.  See also 2 CFR 200.439 Equipment and other capital expenditures.

## Term 19.    Supplies

See 2 CFR 200.314 for requirements pertaining to supplies acquired under a Federal award.  See also 2 CFR 200.453 Materials and supplies costs, including costs of computing devices.

## Term 20.    Property Trust Relationship

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.  See 2 CFR  200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

## Term 21.    Record Retention

Consistent with 2 CFR 200.334 through 200.338, the Recipient is required to retain records relating to this Award.

## Term 22.    Audits

A. **Government-Initiated Audits**
The Recipient must provide any information, documents, site access, or other assistance requested by EERE, DOE or Federal auditing agencies (e.g., DOE Inspector General, Government Accountability Office) for the purpose of audits and investigations.  Such assistance may include, but is not limited to, reasonable access to the Recipient's records relating to this Award.

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

Consistent with 2 CFR part 200 as amended by 2 CFR part 910, DOE may audit the Recipient's financial records or administrative records relating to this Award at any time.  Government-initiated audits are generally paid for by DOE.

DOE may conduct a final audit at the end of the project period (or the termination of the Award, if applicable).  Upon completion of the audit, the Recipient is required to refund to DOE any payments for costs that were determined to be unallowable.  If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

DOE will provide reasonable advance notice of audits and will minimize interference with ongoing work, to the maximum extent practicable.

**B. Annual Independent Audits (Single Audit or Compliance Audit)**
The Recipient must comply with the annual independent audit requirements in 2 CFR 200.500 through .521 for institutions of higher education, nonprofit organizations, and state and local governments (Single audit), and 2 CFR 910.500 through .521 for for-profit entities (Compliance audit).

The annual independent audits are separate from Government-initiated audits discussed in part A. of this Term, and must be paid for by the Recipient.  To minimize expense, the Recipient may have a Compliance audit in conjunction with its annual audit of financial statements.  The financial statement audit is **not** a substitute for the Compliance audit.  If the audit (Single audit or Compliance audit, depending  on Recipient entity type) has not been performed or completed prior to the closeout of the award, DOE may impose one or more of the actions outlined in 2 CFR 200.338, Remedies for Noncompliance.

## Subpart B.  Financial Provisions

## Term 23.    Maximum Obligation

The maximum obligation of DOE for this Award is the total "Funds Obligated" as stated in Block 13 of the Assistance Agreement to this Award. "Funds Obligated" is equivalent to 15% of the total allocation for this award. DOE will evaluate project performance, project schedule adherence, the extent milestone objectives are met, compliance with reporting requirements, and overall contribution to the program goals and objectives. Additional
funding will be released at the following negotiation and project milestones:
- 35% of the total allocation - Upon DOE approval of the Grantee Plan that identifies the quarterly milestones over the 5-year period of performance. (due October 1, 2022)
- Balance of total allocation (50%) is based on the Grantee demonstrating progress in meeting expenditures goals, production targets and reporting

requirement compliance. Demonstrated progress is defined as:
  1. 30% of all units estimated to be weatherized in approved Weatherization Plans are weatherized.

  2. Each Grantee has been fulfilling its monitoring and inspection protocol as part of its approved annual Grantee plan.
  3. Each Grantee is monitoring local agencies at least once each year to determine compliance with administrative, fiscal, and Grantee field policies and guidelines.
  4. Local quality control efforts are in place.
  5. At least 5% of the completed units are inspected by the Grantee Quality Control Inspection (QCI) staff during the course of the year.
  6. Grantees progress reports are acceptable, submitted in accordance with grant requirements, including being on time and accurate.
  7. Monitoring reviews by DOE confirm acceptable performance. If DOE's review reveals deficiencies, such as funds not disbursed, insufficient technical monitoring, or failure to meet reporting requirements, DOE reserves the right to place a hold on current balances and withhold funding until deficiencies are corrected.

Additional Federal funding is contingent upon: (1) Recipient's demonstrated substantial progress towards meeting the objectives of the Award; (2) availability of Federal funds appropriated by Congress for the purpose of this program; and (3) the availability of future-year budget authority.

## Term 24.    Continuation Application and Funding

A.  **Continuation Application**
A continuation application is a non-competitive application for an additional budget period and extended project period.  The continuation application shall be submitted to EERE in accordance with the annual Announcement/Grant Guidance that is issued.

B.  **Continuation Funding**
Continuation funding is contingent on (1) the availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) Recipient's satisfactory progress towards meeting the objectives of the Weatherization Assistance Program; (4) Recipient's submittal of required reports; (5) Recipient's compliance with the terms and conditions of the Award; (6) the Recipient's submission of a continuation application; and (7) written approval of the continuation application by the Contracting Officer.

## Term 25.    Refund Obligation

The Recipient must refund any excess payments received from EERE, including any costs determined unallowable by the Contracting Officer.  Upon the end of the project period (or the

termination of the Award, if applicable), the Recipient must refund to EERE the difference between (1) the total payments received from EERE, and (2) the Federal share of the costs incurred.  Refund obligations under this Term do not supersede the annual reconciliation or true

up process if specified under the Indirect Cost Term.

## Term 26.    Allowable Costs

EERE determines the allowability of costs through reference to 2 CFR part 200 as amended by 2 CFR part 910.  All project costs must be allowable, allocable, and reasonable.  The Recipient must document and maintain records of all project costs, including, but not limited to, the costs paid by Federal funds, costs claimed by its subrecipients and project costs that the Recipient claims as cost sharing, including in-kind contributions.  The Recipient is responsible for maintaining records adequate to demonstrate that costs claimed have been incurred, are reasonable, allowable and allocable, and comply with the cost principles.  Upon request, the Recipient is required to provide such records to EERE.  Such records are subject to audit. Failure to provide EERE adequate supporting documentation may result in a determination by the Contracting Officer that those costs are unallowable.

The Recipient is required to obtain the prior written approval of the Contracting Officer for any foreign travel costs.

## Term 27.    Indirect Costs

A.  **Indirect Cost Allocation:**
The Recipient has a Federally approved provisional Negotiated Indirect Cost Rate Agreement (NICRA) with a current effective period identified for billing and estimation purposes and it applies uniformly across all Federal awards.  These costs shall be reconciled or trued up (actual incurred costs) on an annual basis with the Recipient's cognizant agency.  An updated rate proposal or NICRA is required if the Recipient requests to bill the DOE higher billing rates than those listed in the current NICRA.

B.  **Fringe Cost Allocation:**
Fringe benefit costs have been allocated to this award under a segregated fringe billing rate.  The fringe costs were found to be reasonable, allocable, and allowable as reflected in the budget.  Fringe elements apply to both direct and indirect labor. Under a segregated cost pool, the fringe billing rate shall be treated as an indirect cost expenditure and must be reconciled annually.

C.  **Subrecipient Indirect Costs (If Applicable):**
The Recipient must ensure its subrecipient's indirect costs are appropriately managed, have been found to be allowable, and comply with the requirements of this Award and 2 CFR Part 200 as amended by 2 CFR Part 910.

D.  **Indirect Cost Stipulations:**

    **i.**    **Modification to Indirect Cost Billing Rates**
        EERE will not modify this Award solely to provide additional funds to cover
increases in the Recipient's indirect cost billing rate(s).  Adjustments to the
indirect cost billing rates must be approved by the Recipient's Cognizant
Agency or Cognizant Federal Agency Official.

The Recipient must provide a copy of an updated NICRA or indirect rate
proposal to the DOE Award Administrator in order to increase indirect cost
billing rates.  If the Contracting Officer provides prior written approval, the
Recipient may incur an increase in the indirect cost billing rates.
Reimbursement will be limited by the budgeted dollar amount for indirect
costs for each budget period as shown in Attachment 3 to this Award.

    **ii.**    **Annual Cost Reconciliation**
In accordance with Appendices III-VII of 2 CFR Part 200 or 48 CFR Part
42.7, governing for-profit organizations, the indirect cost billing rates
shall be reconciled or trued up (actual incurred costs) on an annual
basis via the annual incurred cost proposal within six months after the
Recipient's fiscal year end.

    **iii.**    **Adjustments to Indirect Cost Billing Rates**
Following an official audit or adequacy review of the incurred cost
proposal, one of the following shall apply:

        1.  If the Recipient's actual and final annual indirect cost billing rate(s)
reflect that Recipient invoiced at higher billing rates than actually
incurred, the Recipient must refund the Government the
over-recovered amounts.

        2.  If the Recipient's actual and final annual indirect cost billing rate(s)
reflect that the Recipient invoiced at lower billing rates than actually
incurred, the Recipient may not be reimbursed for increases in its
indirect cost rate, which resulted in an under-recovery.  Increased
indirect cost billing rates cannot be retroactively applied to the DOE
award.

    **iv.**    **Award Closeout**
The closeout of the DOE award does not affect (1) the right of the DOE
to disallow costs and recover funds on the basis of a later audit or other
review; (2) the requirement for the Recipient to return any funds due as
a result of later refunds, corrections or other transactions including final
indirect cost billing rate adjustments; and (3) the ability of the DOE to
make financial adjustments to a previously closed award resolving

16

indirect cost payments and making final payments.

## Term 28.    Decontamination and/or Decommissioning (D&D) Costs

Notwithstanding any other provisions of this Award, the Government shall not be responsible for or have any obligation to the Recipient for (1) Decontamination and/or Decommissioning (D&D) of any of the Recipient's facilities, or (2) any costs which may be incurred by the Recipient in connection with the D&D of any of its facilities due to the performance of the work under this Award, whether said work was performed prior to or subsequent to the effective date of the Award.

## Term 29.    Use of Program Income

If the Recipient earns program income during the project period as a result of this Award, the Recipient must add the program income to the funds committed to the Award and used to further eligible project objectives.

## Term 30.    Payment Procedures

**A. Method of Payment**
Payment will be made by advances through the Department of Treasury's ASAP system.

**B. Requesting Advances**
Requests for advances must be made through the ASAP system.  The Recipient may submit requests as frequently as required to meet its needs to disburse funds for the Federal share of project costs.   If feasible, the Recipient should time each request so that the Recipient receives payment on the same day that the Recipient disburses funds for direct project costs and the proportionate share of any allowable indirect costs.   If same-day transfers are not feasible, advance payments must be as close to actual disbursements as administratively feasible.

**C. Adjusting Payment Requests for Available Cash**
The Recipient must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from EERE.

**D. Payments**
All payments are made by electronic funds transfer to the bank account identified on the Bank Information Form that the Recipient filed with the U.S. Department of Treasury.

E. **Unauthorized Drawdown of Federal Funds**
For each budget period, the Recipient may not spend more than the Federal share

authorized to that particular budget period, without specific written approval from the Contracting Officer. The Recipient must immediately refund EERE any amounts spent or drawn down in excess of the authorized amount for a budget period. The Recipient and subrecipients shall promptly, but at least quarterly, remit to DOE interest earned on advances drawn in excess of disbursement needs, and shall comply with the procedure for remitting interest earned to the Federal government per 2 CFR 200.305, as applicable.

## Term 31.    Budget Changes

A. **Budget Changes Generally**
The Contracting Officer has reviewed and approved the SF-424A in Attachment 3 to this Award.

Any increase in the total project cost, whether DOE share or Cost Share, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award, must be approved in advance and in writing by the Contracting Officer.

Any change that alters the project scope, milestones or deliverables requires prior written approval of the Contracting Officer.  EERE may deny reimbursement for any failure to comply with the requirements in this term.

B. **Transfers of Funds Among Direct Cost Categories**.
The Recipient is required to submit written notification via email (not in PAGE) to the Project Officer identified in the Assistance Agreement of any transfer of funds among direct cost categories and/or functions where the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award.

Upon receipt of adequate notification documentation by the Project Officer, the recipient is hereby authorized to transfer funds among direct cost categories for program activities consistent with their approved State/Annual Plan, without prior approval by the awarding agency.

Limitations in existing rules and guidance, including Administration and Training and Technical Assistance (T&TA), along with prior approval of equipment as detailed in the respective year's WAP Grant Guidance and in the regulations still apply.

C. **Transfer of Funds Between Direct and Indirect Cost Categories**
The Recipient is required to obtain the prior written approval of the Contracting Officer for any transfer of funds between direct and indirect cost categories.  If the Recipient's actual allowable indirect costs are less than those budgeted in Attachment 3 to this Award, the Recipient may use the difference to pay additional allowable direct costs during the project period so long as the total difference is less

than 10% of total project costs and the difference is reflected in actual requests for reimbursement to DOE.

## Term 32.    Carryover of Unobligated Balances

The Recipient is hereby authorized to carry over unobligated balances of Federal and non-Federal funds from one budget period to a subsequent budget period, for program activities consistent with their approved State/Annual Plan, without prior approval by the Contracting Officer.  Should the Recipient wish to use carryover funds for activities that are not consistent with the approved State/Annual Plan, a budget revision application must be submitted for approval by DOE.

For purposes of this Award, an unobligated balance is the portion of the funds authorized by DOE that have not been obligated by the Recipient at the end of a budget period.  The Recipient is advised to carefully manage grant funds to minimize unobligated balances each year, but especially at the end of the grant project period.

## Subpart C.  Miscellaneous Provisions

### Term 33.    Reporting Subawards and Executive Compensation

**A.  Reporting of first-tier subawards**

i.    *Applicability*.   Unless the Recipient is exempt as provided in paragraph D. of this award term, the Recipient must report each action that equals or exceeds $30,000 in Federal funds for a subaward to an entity (see definitions in paragraph E. of this award term).

ii.   *Where and when to report*.

1.  The Recipient must report each obligating action described in paragraph A.i. of this award term to https://www.fsrs.gov.

2.  For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported no later than December 31, 2010.)

iii.  *What to report*. The Recipient must report the information about each obligating action that the submission instructions posted at https://www.fsrs.gov specify.

**B.  Reporting Total Compensation of Recipient Executives**

i.    *Applicability and what to report*. The Recipient must report total

19

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 285 of 556
PageID #: 6215

U.S. DEPARTMENT OF
**ENERGY**    Energy Efficiency &
Renewable Energy

**Special Terms and Conditions**
**Colorado Energy Office Award No. DE-EE0009976.0000**

compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if:

1. The total Federal funding authorized to date under this Award equals or exceeds $30,000 as defined in 2 CFR 170.320;

2. In the preceding fiscal year, the Recipient received;

   a. 80 percent or more of the Recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

   b. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards)

3. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

ii. *Where and when to report*. The Recipient must report executive total compensation described in paragraph B.i. of this award term:

1. As part of the Recipient's registration profile at https://www.sam.gov.

2. By the end of the month following the month in which this award is made, and annually thereafter.

**C. Reporting of Total Compensation of Subrecipient Executives**

i. *Applicability and what to report*. Unless the Recipient is exempt as provided in paragraph D. of this award term, for each first-tier subrecipient under this award, the Recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

1. In the subrecipient's preceding fiscal year, the subrecipient received:

    a.   80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

    b.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards)

2.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

ii.   *Where and when to report*. The Recipient must report subrecipient executive total compensation described in paragraph C.i. of this award term:

1.   To the recipient.

2.   By the end of the month following the month during which the Recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.*, between October 1 and 31), the Recipient must report any required compensation information of the subrecipient by November 30 of that year.

**D.  Exemptions**
If, in the previous tax year, the Recipient had gross income, from all sources, under $300,000, it is exempt from the requirements to report:

i.   Subawards; and

ii.   The total compensation of the five most highly compensated executives of any subrecipient.

**E.  Definitions**
For purposes of this Award term:

i.   Entity means all of the following, as defined in 2 CFR Part 25:

1. A Governmental organization, which is a State, local government, or Indian tribe.
2. A foreign public entity.

3. A domestic or foreign nonprofit organization.
4. A domestic or foreign for-profit organization.
5. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

ii.  Executive means officers, managing partners, or any other employees in management positions.

iii.  Subaward:

1. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this award and that the recipient awards to an eligible subrecipient.

2. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

3. A subaward may be provided through any legal agreement, including an agreement that the Recipient or a subrecipient considers a contract.

iv.  Subrecipient means an entity that:

1. Receives a subaward from the Recipient under this award; and

2. Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

v.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

1. Salary and bonus.

2. Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of

22

**U.S. DEPARTMENT OF ENERGY**  Energy Efficiency & Renewable Energy

Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

3. Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

4. Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

5. Above-market earnings on deferred compensation which is not tax-qualified.

6. Other compensation, if the aggregate value of all such other compensation (*e.g.* severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

**Term 34.**    **System for Award Management and Universal Identifier Requirements**

**A. Requirement for Registration in the System for Award Management (SAM)**
Unless the Recipient is exempted from this requirement under 2 CFR 25.110, the Recipient must maintain the currency of its information in SAM until the Recipient submits the final financial report required under this Award or receive the final payment, whichever is later. This requires that the Recipient reviews and updates the information at least annually after the initial registration, and more frequently if required by changes in its information or another award term.

**B. Unique Entity Identifier (UEI)**
SAM automatically assigns a UEI to all active SAM.gov registered entities. Entities no longer have to go to a third-party website to obtain their identifier. This information is displayed on SAM.gov.

If the Recipient is authorized to make subawards under this Award, the Recipient:

i. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward from the Recipient unless the entity has provided its UEI number to the Recipient.

ii. May not make a subaward to an entity unless the entity has provided its UEI number to the Recipient.

23

## C. Definitions

For purposes of this award term:

i.    System for Award Management (SAM) means the Federal repository into which an entity must provide information required for the conduct of business as a recipient.  Additional information about registration procedures may be found at the SAM Internet site (currently at https://www.sam.gov).

ii.   Unique Entity Identifier (UEI) is the 12-character, alpha-numeric identifier that will be assigned by SAM.gov upon registration.

iii.  Entity, as it is used in this award term, means all of the following, as defined at 2 CFR Part 25, subpart C:

1. A Governmental organization, which is a State, local government, or Indian Tribe.
2. A foreign public entity.
3. A domestic or foreign nonprofit organization.
4. A domestic or foreign for-profit organization.
5. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

iv.   Subaward:

1. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this Award and that the Recipient awards to an eligible subrecipient.

2. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

3. A subaward may be provided through any legal agreement, including an agreement that the Recipient considers a contract.

v.    Subrecipient means an entity that:

1. Receives a subaward from the Recipient under this Award; and

24



2.  Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

## Term 35.    Nondisclosure and Confidentiality Agreements Assurances

A.  By entering into this agreement, the Recipient attests that it **does not and will not** require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

B.  The Recipient further attests that it **does not and will not** use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

   i.   *''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''*

   ii.  The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

   iii. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Special Terms and Conditions
Colorado Energy Office Award No. DE-EE0009976.0000

## Term 36.    Subrecipient Change Notification

Except for subrecipients specifically proposed as part of the Recipient's Application for award, the Recipient must notify the Contracting Officer and Project Manager in writing 30 days prior to the execution of new or modified subrecipient agreements, including naming any To Be Determined subrecipients.  This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR part 200 as amended by 2 CFR part 910, nor does it relieve the Recipient from its obligation to comply with applicable Federal statutes, regulations, and executive orders.

In order to satisfy this notification requirement, the Recipient documentation must, as a minimum, include the following:

- A description of the research to be performed, the service to be provided, or the equipment to be purchased.
- Cost share commitment letter if the subrecipient is providing cost share to the Award.
- An assurance that the process undertaken by the Recipient to solicit the subrecipient complies with their written procurement procedures as outlined in 2 CFR 200.317 through 200.329.
- An assurance that no planned, actual or apparent conflict of interest exists between the Recipient and the selected subrecipient and that the Recipient's written standards of conduct were followed.[1]
- A completed Environmental Questionnaire, if applicable.
- An assurance that the subrecipient is not a debarred or suspended entity.
- An assurance that all required award provisions will be flowed down in the resulting subrecipient agreement.

The Recipient is responsible for making a final determination to award or modify subrecipient agreements under this Award, but the Recipient may not proceed with the subrecipient agreement until the Contracting Officer determines, and provides the Recipient written notification, that the information provided is adequate.

Should the Recipient not receive a written notification of adequacy from the Contracting Officer within 30 days of the submission of the subrecipient documentation stipulated above, the

---

[1] It is DOE's position that the existence of a "covered relationship" as defined in 5 CFR 2635.502(a)&(b) between a member of the Recipient's owners or senior management and a member of a subrecipient's owners or senior management creates at a minimum an apparent conflict of interest that would require the Recipient to notify the Contracting Officer and provide detailed information and justification (including, for example,  mitigation measures) as to why the subrecipient agreement does not create an actual conflict of interest.  The Recipient must also notify the Contracting Officer of any new subrecipient agreement with:  (1) an entity that is owned or otherwise controlled by the Recipient; or (2) an entity that is owned or otherwise controlled by another entity that also owns or otherwise controls the Recipient, as it is DOE's position that these situations also create at a minimum an apparent conflict of interest.

Recipient may proceed to award or modify the proposed subrecipient agreement.

## Term 37.    Minimum Privacy Protections Regarding Applicant Information

A. States, Tribes and their subawardees, including, but not limited to subrecipients, subgrantees, contractors and subcontractors that participate in the Weatherization Assistance Program (WAP) are required to treat all requests for information concerning applicants and recipients of WAP funds in a manner consistent with the federal government's treatment of information requested under the Freedom of Information Act (FOIA), 5 U.S.C. 552, including the privacy protections contained in Exemption (b)(6) of the FOIA, 5 U.S.C. 552(b)(6). Under 5 U.S.C. 552(b)(6), information relating to an individual's eligibility application or the individual's participation in the program, such as name, address, or income information, are generally exempt from disclosure.

B. A balancing test must be used in applying Exemption (b)(6) in order to determine:

    i. whether a significant privacy interest would be invaded;

    ii. whether the release of the information would further the public interest by shedding light on the operations or activities of the Government; and

    iii. whether in balancing the privacy interests against the public interest, disclosure would constitute a clearly unwarranted invasion of privacy.

C. A request for personal information including but not limited to the names, addresses, or income information of WAP applicants or recipients would require the state or other service provider to balance a clearly defined public interest in obtaining this information against the individuals' legitimate expectation of privacy.

D. Given a legitimate, articulated public interest in the disclosure, States and other service providers may release information regarding recipients in the aggregate that does not identify specific individuals.  However, a State or service provider must apply a FOIA Exemption (b)(6) balancing test to any request for information that cannot be satisfied by such less-intrusive methods.

## Term 38.    Conference Spending

The Recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

the date, location, and number of employees attending such conference.

## Term 39.    Recipient Integrity and Performance Matters

**A. General Reporting Requirement**

If the total value of the Recipient's currently active Financial Assistance awards, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this term.  This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313).  As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

**B. Proceedings About Which You Must Report**

Submit the information required about each proceeding that:

    i.    Is in connection with the award or performance of a Financial Assistance, cooperative agreement, or procurement contract from the Federal Government;

    ii.    Reached its final disposition during the most recent five-year period; and

    iii.    Is one of the following:

        1.    A criminal proceeding that resulted in a conviction, as defined in paragraph E of this award term and condition;

        2.    A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

        3.    An administrative proceeding, as defined in paragraph E of this term, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

        4.    Any other criminal, civil, or administrative proceeding if:

            a.    It could have led to an outcome described in paragraph B.iii.1, 2, or 3 of this term;

            b.    It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

            c.    The requirement in this term to disclose information about the proceeding does not conflict with applicable laws and regulations.

**C.  Reporting Procedures**

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph B of this term.  You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

**D.  Reporting Frequency**

During any period of time when you are subject to the requirement in paragraph A of this term, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report.  Recipients that have Federal contract, Financial Assistance awards, (including cooperative agreement awards) with a cumulative total value greater than $10,000,000, must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**E.  Definitions**

For purposes of this term:

i.  Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings).  This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or Financial Assistance awards.  It does not include audits, site visits, corrective plans, or inspection of deliverables.

ii.  Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of *nolo contendere*.

iii.  Total value of currently active Financial Assistance awards, cooperative agreements and procurement contracts includes—

1.  Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

2.  The value of all expected funding increments under a Federal award and options, even if not yet exercised.

# Term 40.    Export Control

The U.S. government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade.  There is a network of Federal agencies and regulations that govern exports



that are collectively referred to as "Export Controls."  To ensure compliance with Export Controls, it is the Recipient's responsibility to determine when its project activities trigger Export Controls and to ensure compliance.

Certain information, technology or material under an award may be considered export-controlled items that cannot be released to any foreign entity (organization, company, or person) without a license.  The Recipient, and any subrecipients, must take the appropriate steps to obtain any required licenses, monitor and control access to restricted information and material, and safeguard all controlled items to ensure compliance with Export Controls.  Under no circumstances may any foreign entity (organizations, companies, or persons) receive access to an export-controlled item unless proper export procedures have been satisfied and such access is authorized pursuant to law or regulation.

The Recipient must immediately report to DOE any export control violations related to the project funded under this Award, at the recipient or subrecipient level, and provide the corrective action(s) to prevent future violations.

## Term 41.        Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment

As set forth in 2 CFR 200.116, recipients and subrecipients are prohibited from obligating or expending project funds (federal funds and recipient cost share) to:

(1) Procure or obtain;

(2) Extend or renew a contract to procure or obtain; or

(3) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.  As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

> (i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

> (ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation,

reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

## Term 42.    Fraud, Waste and Abuse

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to include grants, cooperative agreements, loans, and contracts.

The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit https://www.energy.gov/ig/ig-hotline.

Additionally, the Recipient must be cognizant of the requirements of 2 CFR § 200.113 Mandatory disclosures:, which states:

> *The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Non-Federal entities that have received a Federal award including the term and condition outlined in appendix XII to this part are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in § 200.339. (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)    [85 FR 49539, Aug. 13, 2020]*

## Term 43.    Interim Conflict of Interest Policy for Financial Assistance Policy

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at https://www.energy.gov/management/pf-2022-17-department-energy-interim-conflict-interest-policy-requirements-financial. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under the DOE financial assistance award.

Recipients must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities.

31

It is understood that non-Federal entities and individuals receiving DOE financial assistance awards will need sufficient time to come into full compliance with DOE's interim COI Policy. To provide some flexibility, EERE allows for a staggered implementation. Specifically, prior to award, the Recipient must ensure all Investigators complete their significant financial disclosures; review the disclosures; determine whether a FCOI exists; develop and implement a management plan for FCOIs; and provide DOE with an initial FCOI report that includes any unmanaged/ unmanageable FCOIs.

To further ease the administrative burden, EERE established a model conflict of interest policy that WIPO Recipients may adopt and implement. The Recipients has 180 days from the date of this Award to either adopt and implement the WIPO model conflict of interest policy or ensure its existing conflict of interest policy aligns with the requirements of the WIPO model COI policy. The WIPO model COI Policy is available upon request from the Contracting Officer.

# Subpart D.  Bipartisan Infrastructure Law (BIL)- specific requirements

### Term 44.    Recipient Notification of prospective BIL - specific requirements
The funding for this Award is made available under the BIL and is subject to the applicable requirements included in the BIL. Requirements for this Award are listed in the subsequent award terms, however the Recipient should be aware that additional terms and modifications may be included when the Award is modified with the incororation of the Full Application. Additional terms that may be incorporated include, but are not limited to:
1. Publication of Information on the Internet
2. Certification and Registration
3. Whistleblowers and False Claims

### Term 45.    Reporting Tracking and Segregation of Incurred Costs
BIL funds may be used in conjunction with other funding, as necessary to complete projects, but tracking and reporting must be separate.  The Recipient must keep separate records for BIL funds and must ensure those records comply with the requirements of the BIL.

### Term 46.    Buy American Requirements for Infrastructure Projects
A.  _Definitions_

**Infrastructure** includes, at a minimum, the structures, facilities, and equipment for, in the United States:
- Roads, highways, and bridges;
- Public transportation;
- Dams, ports, harbors, and other maritime facilities;
- Intercity passenger and freight railroads;
- Freight and intermodal facilities;


- Airports;
- Water systems, including drinking water and wastewater systems;
- Electrical transmission facilities and systems;
- Utilities;
- Broadband infrastructure;
- Buildings and real property; and
- Facilities that generate, transport, and distribute energy.

Further, the "infrastructure" in question must either be publicly owned or serve a public function; privately owned infrastructure that is not open to the public, such as a personal residence, is not considered "infrastructure" for purposes of this requirement. In cases where the "public" nature of the infrastructure is unclear, the recipient is required to consult with the DOE Grants Officer who will render a determination.

**Project** means the construction, alteration, maintenance, or repair of infrastructure in the United States.

**Construction Materials** includes an article, material, or supply—other than an item of primarily iron or steel; a manufactured product; cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives—that is, or consists primarily of:
- Non-ferrous metals;
- Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
- Glass (including optic glass);
- Lumber; or
- Drywall.

**Domestic content procurement preference** means and refers to the same thing as "Buy America Preference."

B.   *Buy America Preference*

None of the funds provided under this award may be used for a project for infrastructure unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all

Case 1:25-cv-00039-JJM-PAS   Document 68-123   Filed 02/07/25   Page 299 of 556
PageID #: 6229

U.S. DEPARTMENT OF
ENERGY   Energy Efficiency &
Renewable Energy

Special Terms and Conditions
Colorado Energy Office Award No. DE-EE0009976.0000

components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought into the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

C.  *Waivers*

When necessary, recipients may apply for, and DOE may grant, a waiver from the Buy America Preference requirements. Requests to waive the application of the Buy America Preference must be in writing. Waiver requests are subject to public comment periods of no less than 15 days, as well as review by the Office of Management and Budget.
Waivers must be based on one of the following justifications:
1. Applying the Buy America Preference would be inconsistent with the public interest (Public Interest);
2. The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality (Nonavailability); or
3. The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent (Unreasonable Cost).

Requests to waive the Buy America Preference must include the following:
● Waiver type (Public Interest, Nonavailability, or Unreasonable Cost);
● Recipient name and Unique Entity Identifier (UEI);
● A detailed justification as to how the non-domestic item(s) is/are essential the project;
● A certification that the recipient made a good faith effort to solicit bids for domestic products supported by terms included in requests for proposals, contracts, and non-proprietary communications with potential suppliers;
● Total estimated project cost, with estimated Federal share and recipient cost share breakdowns;
● Total estimated infrastructure costs, with estimated Federal share and recipient cost share breakdowns;
● A brief description of the project, its location, and the specific infrastructure involved;



- List and description of iron or steel item(s), manufactured goods, and/or construction material(s) the recipient seeks to waive from the Buy America Preference, including name, cost, country(ies) of origin, and relevant PSC and NAICS codes for each;

- A justification statement—based on one of the applicable justifications outlined above—as to why the items in question cannot be procured domestically, including the due diligence performed (e.g., market research, industry outreach) by the recipient to attempt to avoid the need for a waiver. This justification may cite, if applicable, the absence of any Buy America-compliant bids received for domestic products in response to a solicitation; and
- Anticipated impact to the project if no waiver is issued.

DOE may request, and the recipient must provide, additional information for consideration of this wavier. The Agency's final determination regarding approval or rejection of the waiver request may not be appealed.

## Term 47.    Davis Bacon Requirements

This Award is funded under Division D of the Bipartisan Infrastructure Law (BIL). All laborers and mechanics employed by the recipient, subrecipients, contractors or subcontractors in the performance of construction, alteration, or repair work on multifamily buildings with five (5) or more units which has been assisted in whole or in part by funds made available under this Award shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code commonly referred to as the "Davis-Bacon Act" (DBA).

With respect to work funded under the Weatherization Assistance Program, this requirement only applies to work performed on multifamily buildings with 5 or more units. Single family homes or multifamily buildings with 4 or less units are not required to include this requirement.

By accepting this award, the Recipient acknowledges the DBA requirements for the Award and confirms that all of the laborers and mechanics performing construction, alteration, or repair work on applicable projects are paid or will be paid wages at rates not less than those prevailing on projects of a character similar in the locality as determined by Subchapter IV of Chapter 31 of Title 40, United States Code (Davis-Bacon Act).

The Recipient must comply with all of the Davis-Bacon Act requirements, including but not limited to:

(1) ensuring that the wage determination(s) and appropriate Davis-Bacon clauses and requirements are flowed down to and incorporated into any applicable subcontracts or subrecipient awards.

(2) being responsible for compliance by any subcontractor or subrecipient with the Davis-Bacon labor standards.

35



(3) receiving and reviewing certified weekly payrolls submitted by all subcontractors and subrecipients for accuracy and to identify potential compliance issues.

(4) maintaining original certified weekly payrolls for 3 years after the completion of the project and must make those payrolls available to the DOE or the Department of Labor upon request, as required by 29 CFR 5.6(a)(2).

(5) conducting payroll and job-site reviews for construction work, including interviews with employees, with such frequency as may be necessary to assure compliance by its subcontractors and subrecipients and as requested or directed by the DOE.

(6) cooperating with any authorized representative of the Department of Labor in their inspection of records, interviews with employees, and other actions undertaken as part of a Department of Labor investigation.

(7) posting in a prominent and accessible place the wage determination(s) and Department of Labor Publication: WH-1321, Notice to Employees Working on Federal or Federally Assisted Construction Projects.

(8) notifying the Contracting Officer of all labor standards issues, including all complaints regarding incorrect payment of prevailing wages and/or fringe benefits, received from the recipient, subrecipient, contractor, or subcontractor employees; significant labor standards violations, as defined in 29 CFR 5.7; disputes concerning labor standards pursuant to 29 CFR parts 4, 6, and 8 and as defined in FAR 52.222-14; disputed labor standards determinations; Department of Labor investigations; or legal or judicial proceedings related to the labor standards under this Contract, a subcontract, or subrecipient award.

(9) preparing and submitting to the Contracting Officer, the Office of Management and Budget Control Number 1910-5165, Davis Bacon Semi-Annual Labor Compliance Report, by April 21 and October 21 of each year. Form submittal will be administered through the iBenefits system (https://doeibenefits2.energy.gov) or its successor system.

The Recipient must undergo Davis-Bacon Act compliance training and must maintain competency in Davis-Bacon Act compliance.  The Contracting Officer will notify the Recipient of any DOE sponsored Davis-Bacon Act compliance trainings. The U.S. Department of Labor ("DOL") offers free Prevailing Wage Seminars several times a year that meet this requirement, at https://www.dol.gov/agencies/whd/government-contracts/construction/seminars/events.

For additional guidance on how to comply with the Davis-Bacon provisions and clauses, see https://www.dol.gov/agencies/whd/government-contracts/construction  and https://www.dol.gov/agencies/whd/government-contracts/protections-for-workers-in-construction.

# EXHIBIT L

Colorado Solar For All:  Program Narrative                                                  October 2023

# Colorado Solar for All Program Narrative

**Colorado Solar for All Program Narrative**                                                              **1**
**1. Program Strategy Narrative**                                                                          **2**
    **1. Impact Assessment**                                                          **2**
    **2. Meaningful Benefits Plan**                                                    **8**
    **3. Distributed Market Strategy**                                                 **13**
    **4. Financial Assistance Strategy**                                               **19**
    **5. Project-Deployment Technical Assistance Strategy**                            **25**
    **6. Equitable Access and Meaningful Involvement Plan**                            **30**
    **7. Program Planning Timeline and Workplan Narrative**                            **36**
**2. Program Administration Narrative**                                                                    **37**
    **1. Budget Narrative**                                                            **37**
    **2. Fiscal Stewardship Plan**                                                     **39**
    **3. Reporting Plan**                                                              **40**
**3. Programmatic Capability and Environmental Results Past Performance**                                   **40**

# 1. Program Strategy Narrative

The Colorado Solar for All (COS4A) program will provide all three installation types described in the EPA's Request for Application of single-family rooftop solar, multifamily rooftop solar, and community solar to balance serving the highest energy burdened residents, maximizing the resident cost savings and emissions reductions, and the market transformation potential of such a large scale program. Colorado is seeking $250M under the medium program award tier which aligns with the total population of the census tracts identified by CEJST as disadvantaged in Colorado of 1,060,921. COS4A program represents a diverse array of stakeholders with the Colorado Energy Office (CEO) as the lead applicant. This application was prepared with input from entities representing a cross section of affordable housing advocates, nonprofits, financial institutions, local government, solar industry experts and interested parties in Colorado. With varying expertise and capacity across our stakeholder network, COS4A is positioned to deliver the benefits of solar to more than 40,000 households living in low-income or disadvantaged communities (LIDC) across the entire state of Colorado. The EPA's Solar for All grant will complement the robust solar market in Colorado by enabling the state to increase the number of low-income and disadvantaged communities that can take advantage of distributed solar investments and providing access to affordable, resilient, and clean solar energy and the related benefits including lower utility bills. These efforts are critical to achieving the Governor's objective of 100% carbon-free electricity for Colorado by 2040 while protecting Colorado consumers from the high and unpredictable costs of natural gas and other fossil fuels.

# 1. Impact Assessment

To understand the potential scope of COS4A programming, it is necessary to consider the current state of the solar industry in Colorado by examining the deployed capacity of solar in Colorado, what proportion of the existing capacity serves LIDC populations, the available industry and workforce, the enabling policy (and subsequent limitations), and the estimated serviceable customer base for the COS4A program. The Impact Assessment section defines the expected programmatic targets for installed capacity, households served and annual CO2 emissions avoided through assessment of the state's existing solar market and future potential to serve low-income and disadvantaged households.

### 1.1 Existing Solar Market & Industry Baseline
Nationally, the residential solar market has grown continuously since the year 2000. According to the Lawrence Berkeley Laboratory (LBL) *Tracking the Sun* report, as of 2022 the median installed system size for residential applications is 7.2 kW.[1] While the system size in the residential market has grown there have been fluctuations in the ownership mechanisms for residential solar installations.

LBL *Tracking the Sun* reports that over time, third-party ownership (TPO) of residential assets has declined since 2012 in the national market. However, TPO continues to be steady in non-residential segments and is generally higher in states that offer deep incentive/subsidy

---

[1] Galen Barbose, Naim Darbhouth, Eric O'Shaughnessy, Sydney Forrester. "Tracking the Sun" Lawrence Berkeley Laboratories. https://emp.lbl.gov/tracking-the-sun

Colorado Solar For All:  Program Narrative                                    October 2023

programs..[2] The broad trends in ownership structure have market-based implications for the balance of project deployment in the COS4A program. As a state, Colorado has both policy (see *Section 3. Distributed Market Strategy*) and financing (see *Section 4. Financial Assistance Strategy*) conditions that make TPO residential projects a viable Solar For All pathway.

The growth in the national solar market is reflected in the deployed market in Colorado. Across the entire solar sector, Colorado has a robust market. Solar Energy Industries Association (SEIA) reports that Colorado has a total installed capacity of 2,671 MW of solar as of 2022 which could serve an estimated 515,688 homes and is approximately 6.45% of Colorado's total electricity.[3] Nationally, this puts Colorado 13th in total installed capacity. In addition, adopted electric resource plans by Colorado utilities include vast increases in renewable energy deployment throughout the decade. For example, the plan currently under consideration by the Colorado Public Utility Commission (PUC) for the state's largest utility, Public Service Company of Colorado, will lead to approximately 83% renewable electricity generation by 2030, including 3,406 MW of wind, 1,969 MW of solar, and 1,170 MW of storage.

**1.2 Colorado Deployed Market Share in Low and Moderate Income (LMI) Populations**
According to data from Lawrence Berkeley Lab, in Colorado a projected 15.5% of distributed solar adopters are LMI households.[4] As an early adopter of regulated TPO solar, the first community solar project installed in Colorado dates to 2009. Similar to the goals of Solar For All, Colorado's Community Solar Gardens have long had an emphasis on serving LMI communities. Since then, another 92 community solar projects have been installed in the state of Colorado as of July 2023 with a total of 158.68 MW-AC of installed capacity.[5] While not all of this capacity serves LMI populations, 17.66 MW-AC of statewide community solar is devoted to serving this population.[6] On average, 11% (or 1,900 kW-AC) of existing community solar capacity in Colorado serves LMI populations. This existing capacity supports 1,860 LMI subscriber households. Colorado was also the first state in the nation to receive approval from the U.S. Department of Energy (DOE) to integrate rooftop PV into the Weatherization Assistance Program and is enthusiastic about partnering with this program to leverage weatherized homes.

While discrete data of solar installations in LMI single-family households in Colorado is not available, a snapshot of the market is available through the Colorado Energy Office's Weatherization Assistance Program (WAP). Data from the last two fiscal years of WAP provides a baseline for the rate of LMI single-family solar installations. In Fiscal Year 22/23 WAP installed 147 solar arrays at qualifying households for a total of 724 kW. In Fiscal Year 21/22 WAP installed 155 arrays at qualifying households for a total of 652 kW. Across both program years the average installed cost was $3.18/W-DC at an average of 4.65 kW per system.[7]

---

[2] Ibid.
[3] SEIA/Wood Mackenzie Power & Renewables. "Solar Market Insight." State Summaries. https://www.seia.org/sites/default/files/2023-07/Colorado.pdf
[4] Lawrence Berkeley Labs. "Equity and Income Trends of Residential PV Adopters in Colorado." Contracted Analysis.
[5] Gabriel Chan, Jenny Heeter,, and Kaifeng Xu. 2022. "Sharing the Sun Community Solar Project Data (June 2022)." NREL Data Catalog. Golden, CO: National Renewable Energy Laboratory. https://data.nrel.gov/submissions/203
[6] Ibid.
[7] Colorado Energy Office. Weatherization Assistance Program. Program Data.

Available data on LMI multifamily solar installations in Colorado is even more sparse. As a result, that is not included in the baseline analysis here. While distinguishing the amount of deployed solar in multifamily contexts is challenging, Colorado has approximately 69,388 federally assisted units of housing in Colorado according to the National Housing Preservation Database.[8] Not every multifamily unit would be a candidate for Solar for All programming. As merely a subset of the multifamily landscape, this shows the scale of opportunity for multifamily solar in Colorado.

## 1.3 Solar Market Costs in Colorado

Current market costs in Colorado are dependent on the type of installation and size. Generally, SEIA reports that prices have dropped 54% in Colorado over the past decade.[9] LBL *Tracking the Sun* disaggregates costs by residential and non-residential installations. According to LBL, the median installed cost for residential systems (1-12 kW) in Colorado was $4.60/W-DC.[10] This is higher than the national median installed cost of $3.80/W-DC. However, it should be noted that both the CEO WAP program and non-profit installer GRID Alternatives report installed costs closer to $3.50/W-DC. *Tracking the Sun* identifies a median installed cost of $2.4/W-DC in non-residential systems (1-100 kW) in Colorado. This is substantially lower than the national median installed cost of $3.0/W-DC.[11] More granular estimates of expected deployment costs for various types of COS4A programming can be found in the *Section 4: Financial Assistance Strategy*. We also hypothesize that the COS4A initiative will help drive down the costs of solar installations in Colorado by creating additional demand-pull and competition for solar projects within the relevant guidelines described in this application and as prescribed by EPA.

## 1.4 Colorado Solar Industry and Workforce

Consistent with its high-levels of installed solar capacity, Colorado also has a substantial solar industry workforce. The most recent Interstate Renewable Energy Council (IREC) report indicates a robust, and growing, solar workforce in Colorado. As of 2022, Colorado has the 8th largest per capita solar workforce in the country at roughly 7,600 people employed.[12] Supporting these workers in Colorado are at least 388 distinct solar companies - of which 186 are installers/developers.[13]

From 2017-2022 Colorado experienced a five-year solar workforce growth rate of more than 12%. In 2023, projected growth is 6.4%.[14] Despite the naturally occurring growth in the industry, National Renewable Energy Lab (NREL) modeling suggests a significant need for growth in solar energy jobs to support the trends and targets of the national market. In Colorado alone the

[8] National Affordable Housing Preservation Database. Colorado. https://reports.mysidewalk.com/335c0f64f5
[9] SEIA/Wood Mackenzie Power & Renewables. "Solar Market Insight." State Summaries. https://www.seia.org/sites/default/files/2023-07/Colorado.pdf
[10] Galen Barbose, Naim Darbhouth, Eric O'Shaughnessy, Sydney Forrester. "Tracking the Sun: Pricing and Design for Distributed Photovoltaic Systems in the United States 2023 Edition" Lawrence Berkeley Laboratories. https://emp.lbl.gov/tracking-the-sun
[11] Ibid.
[12] Interstate Renewable Energy Council (IREC). National Solar Jobs Census 2022. https://irecusa.org/programs/solar-jobs-census/
[13] SEIA/Wood McKenzie.
[14]  Interstate Renewable Energy Council (IREC). National Solar Jobs Census 2022.

Colorado Solar For All:  Program Narrative                                                    October 2023

projected market growth calls for a need to double the existing workforce by 2030.[15] We believe COS4A is well-positioned to support additional workforce growth to meet demand in Colorado and ensure the solar industry offers good-paying, family-sustaining jobs in the sector.

## 1.5 COS4A Serviceable Target Market Characteristics

In determining the success of a COS4A program, it is valuable to consider the potential scale of the serviceable target market. Using a maximum of 80% statewide AMI, 43% of Colorado households are income-eligible for Solar for All low-income programs estimated at 925,750 total households.[16]

Across Colorado, 64% of all renter-occupied households are income-eligible and 32% of all owner-occupied households are income-eligible.[17] Based on income alone, there is a disproportionate need to provide service to Colorado renter households. CEO recognizes that serving this population is inherently complex but the goals of Solar for All offer a significant opportunity to close the gap. A majority of renter households live in apartments of 10 or more units and could be functionally served by community solar applications or rooftop systems. Proprietary data from BlocPower indicates that there are 76,116 majority low-moderate-income multifamily rental buildings in Colorado.[18] In addition, 25% of Colorado renters live in single-family detached units that could be served with behind-the-meter initiatives.[19]

Of the population under the 80% AMI threshold statewide, an estimated 549,000 Colorado households are cost burdened by housing. In Colorado, housing burden transcends geographic boundaries as rural, rural resort, and urban communities all face significant impacts from housing affordability.[20] While housing burden is widely distributed, Colorado households facing the highest energy costs are disproportionately rural. When considering households at or below 80% AMI in Colorado, 50 (out of 64) counties have LI households who on average pay between 6-13% of their gross income to energy costs.[21] All but two of these counties are rural or rural resort in state classification systems utilized by the Colorado Division of Housing. An analysis of statewide energy burden commissioned by the Colorado Energy Office highlights that many of these high-burden, rural communities would benefit greatly from community solar opportunities to help reduce cost.[22] The same analysis also highlights that black, indigenous, and people of color (BIPOC) in Colorado are also disproportionately impacted by energy burden and have historically lacked effective access to renewable energy generation programs. COS4A plans to directly address this through our program deployment strategies addressed in Sections 2 and 3 of this application.

---

[15] Sarah Truitt, James Elsworth, Juliana Williams, David Keyser, Allison MOe, Julia Sullivan, Kevin Wu. State-Level Employment Projections for Four Clean Energy Technologies in 2025 and 2030. https://www.nrel.gov/docs/fy22osti/81486.pdf
[16] Comprehensive Housing Affordability Strategy (CHAS) Data Based on 2015-2019 American Community Survey. 2022. https://www.huduser.gov/portal/datasets/cp.html
[17] Ibid
[18] Proprietary Data. BlocPower. Personal Communication.
[19] Ibid.
[20] Energy Burden. DOE LEAD Tool. https://www.energy.gov/scep/slsc/lead-tool
[21] Energy Burden. DOE LEAD Tool. https://www.energy.gov/scep/slsc/lead-tool
[22] Colorado Energy Office. "Pathways to Energy Affordability in Colorado". Prepared by Physicians, Scientists, and Engineers for Healthy Energy and the Institute for Energy and Environmental Research.https://drive.google.com/file/d/1oTnkG1oiDrLrtoU9Ay7Se7bBbvG0KNcp/view

Colorado Solar For All:  Program Narrative                                          October 2023

## 1.6 Applying Historic Data to Contemporary Context

With the context of the existing socio-economic conditions and the market dynamics summarized previously, CEO recognizes the need to maximize efficacy in Colorado's highly-enabling policy environment.  In the absence of an existing Solar for All program in Colorado, COS4A will expand access to low-income, historically underserved and disadvantaged communities by focusing on targeted and contextualized technical assistance and heavily subsidized financing products while also looking to address any localized barriers (reference *Section 2 Meaningful Benefits Plan* for cultural and financial barriers and *Section 3 Distributed Market Strategy* for market barriers).

Given the context of the solar market in Colorado and the existing rates of deployment in LIDC, CEO believes the metrics and outcomes highlighted in the next section are attainable within the five-year period of the award.

## 1.7 COS4A Metrics of Success: Outputs and Outcomes

While the following outcomes are based on reasonable (vetted with solar developers and industry professionals) and ambitious (maximizing households served and household savings) modeling assumptions, COS4A recognizes that on-going performance evaluation of programmatic offerings may result in reallocation of resources across programs, which could mean improved performance over current estimates. The values below represent an estimation of anticipated funding allocations, however market conditions and actual uptake will ultimately inform final program results, and Colorado remains committed to offering real-world data to EPA on the efficacy of the program in the spirit of continuous improvement. Colorado expects the final deployment numbers to change throughout the program and reserves the right to reallocate dollars appropriately to serve the market, but for the purposes of this application, finite allocations have been carefully estimated in order to project possible outcomes. After thorough coordination with industry stakeholders and careful modeling based on the best available market data and appropriate estimation, COS4A is projecting the following outputs and outcomes for households served, megawatts (MW) of solar deployed, and GHG emissions (short tons) reduced across these three primary categories of solar deployment.

| Type of Installation | Total Households Served | Total Installed Capacity (MW) | Program Period (4 yrs) GHG Reductions* (CO2e) | System Life (20 yrs) GHG Reductions* (CO2e) | Program Period (4 yrs) Savings ($) | System Life (20 yrs) Savings ($) |
|---|---|---|---|---|---|---|
| Residential | 3400 | 17 | 107,040 | 535,200 | $12,606,912 | $63,034,560 |
| Multifamily | 14,000 | 20.5 | 129,040 | 645,200 | $15,200,776 | $76,003,880 |
| Community Solar Low | 25,166 | 93 | 693,920 | 3,469,600 | $81,896,064 | $409,480,320 |
| Community Solar High | 25,166 | 125.83 | 939,280 | 4,696,400 | $110,807,264 | $554,036,320 |

Table 1.7:  Colorado Solar for All summary table of projected outcomes and outputs

6

<u>Residential Rooftop</u>
Total Households Served: 3,400

Total Installed Capacity: 17 MW *(Assumes a 5 kW average installed system size)*

4-Year Program Period Avoided GHG*: 107,040 short tons $CO_2e$

20-Year System Life Avoided GHG*: 535,200 short tons of $CO_2e$

Projected Annual Household Savings: Savings are modeled at 95% per household while systems will be designed to provide 75% to 120% of household electricity use. *(Based on financial modeling assumptions)*

<u>Multifamily Rooftop</u>
Total Households Served: 14,000

Total Installed Capacity: 20.5 MW *(Assumes 410 installations/buildings, 50 kW each, @$3/W)*

4-Year Program Period Avoided GHG*: 129,040 short tons $CO_2e$

20-Year System Life Avoided GHG*: 645,200 short tons of $CO_2e$

Projected Annual Household Savings: 30% *(Based on financial modeling assumptions)*

<u>Community Solar</u>
Total Households Served: 25,166

Total Installed Capacity: 93 MW- 125.83 MW *(Range contingent upon varying subscription size from 3.7-5 kW)*

4-Year Program Period Avoided GHG*: 693,920 - 939,280 short tons $CO_2e$ *(Range contingent upon variation in total MW deployed across 4 years of production)*

20-Year System Life Avoided GHG*: 3,469,600 - 4,696,400 short tons $CO_2e$ *(Range contingent upon variation in total MW deployed across 20 years of production)*

Projected Annual Household Savings: 50% *(Based on financial modeling assumptions)*

<u>COS4A Totals</u>
Households Served: 42,566

Total Installed Capacity:  130.5 - 163.33 MW *(Range contingent upon installed community solar capacity)*

4-Year Program Life Avoided GHG*: 930,000-1,175,360 short tons $CO_2e$ *(Range contingent upon total installed MW capacity across 4 years of production)*

20-Year System Life Avoided GHG*: 4,650,000 - 5,876,800 short tons  $CO_2e$ *(Range contingent upon total installed MW capacity across 20 years of production)*

Colorado Solar For All:  Program Narrative                                    October 2023

*All avoided emissions calculations were conducted utilizing the EPA AVERT web edition.*

<u>Estimated Annual Average Savings per Household</u>: Blended average across deployment structures yields an average estimate of 47% savings.

<u>Ratio of Dollars Requested to Installed Capacity</u>: Based on total dollars requested, COS4A anticipates a cost of between $1,519,018 - $1,897,533 per installed megawatt.

<u>Ratio of Dollars Requested to Households Served</u>: Based on total dollars requested, COS4A anticipates a cost of $5,873 per household served.

<u>Ratio of Dollars Requested to $CO_2$ Emissions Avoided**</u>: Based on total dollars requested, COS4A anticipates a cost between $213-269 per short ton of $CO_2e$ mitigated across the period of performance (4 years). Across the lifetime of the installed capacity (assumed conservatively at 20 years) the estimated cost is between $43-54 per short ton of $CO_2e$ mitigated.

<u>Ratio of Dollars Requested per Dollars of Household Savings**</u>: Based on total dollars requested, COS4A anticipates that the ratio of dollars of household savings will vary across the three implementation strategies, particularly given the variation in potential subscription size for community solar arrays. So in this calculation an average savings across the three deployment mechanisms was calculated.

COS4A anticipates that every dollar of savings generated by SFA funds during the period of performance (4 years) will cost between $1.80-$2.28 of requested dollars. Extending this cost to the life of the system reduces the cost to $0.36-$0.43.

***These estimates were generated utilizing estimated output from PVWatts for the City of Denver and the statewide average cost of electricity per the EIA.[23]*

# 2. Meaningful Benefits Plan

## 2.1 A Minimum of 20% Household Savings

The Colorado Solar for All (COS4A) program will include single-family rooftop solar, multifamily rooftop solar and community solar. Single-family rooftop systems will be designed to provide 75% to 120% of household electricity use where solar access and roof space is available. Achieving greater than the minimum of 20% recognizes the high mobilization cost of installing a single-family rooftop system– the relatively marginal overall cost of adding additional panels– as well as the benefit to future housing affordability as Colorado homes transition to electric heat pumps for heating and to add cooling, especially in low-income and disadvantaged communities that are experiencing heat events due to climate change and may have increased demand due to electric vehicle charging and other electric loads. Multifamily properties participating in the program will be required to demonstrate that tenants are receiving at least a 30% reduction in average electricity bills or that they are receiving an equivalent benefit. Proposed "equivalent benefits" will be reviewed through a competitive selection process and affordable housing owners will be required to demonstrate protections against increased

---

[23] U.S. Energy Information Administration. US Electricity Profile 2021. State Electricity Profiles. Colorado.
https://www.eia.gov/electricity/state/

rents or supplanting of already existing benefits. Community solar projects will be required to provide a reduction of at least 50% of the average household electricity bill when compared to the average bill in the utility territory. As funding for community solar will be a competitive process, projects that cost-effectively reduce bills by more than 50% will be prioritized.

## 2.2 Equitable Access to Solar

As described in *Section 6: Equitable Access and Meaningful Involvement*, COS4A will include four pathways for program entry to diversify our approach and ensure that we are reaching historically underserved communities with products that address their needs. These pathways include: 1) integrating solar with state programs; 2) integrating solar with and/or expanding partner programs; 3) integrating solar with affordable housing; and 4) community-designed, community-led programs. Our education and engagement strategies will be designed to address lack of trust, cultural barriers and financial barriers that have resulted in inequitable solar adoption in Colorado. These include developing culturally competent messaging and educational materials; working through partners that have demonstrated long-term trusted relationships with historically underserved and disadvantaged communities; incubating community-based and Tribal partnerships with technical assistance; incorporating and promoting strong consumer protections; offering both rooftop and community solar options; and designing financial options that make solar for low-income households financially attractive and low-risk (see *Section 4: Financial Assistance Strategy*).

To improve equitable access, COS4A will implement low-barrier household qualification mechanisms including:

- Categorical qualification through other state programs including WAP, SNAP, TANF and LIHEAP. CEO will work with the Colorado Department of Human Services to identify other income qualified programs that meet COS4A criteria and to develop processes for validating client eligibility through those programs.
- Combined application through programs including single-family owner-occupied housing rehabilitation programs and the IRA Home Rebate programs.
- Geographic qualification with income self-attestation in CEJST-identified disadvantaged communities.
- Income qualification through affordable housing partners operating under federal income qualification guidelines.
- Income qualification through other approved partner programs.

Addressing historic disinvestment is also essential to equitable access to solar. Wherever possible, we will leverage existing programs to accomplish enabling upgrades for energy efficiency, structural deficiencies or electrical upgrades (e.g. WAP, housing rehabilitation programs, IRA home rebate programs) but we recognize this as a significant barrier to participation for households living in naturally occurring affordable housing, and single-family owner-occupied housing in rural and urban disadvantaged communities. The COS4A budget estimates 40% of the single-family rooftop systems will need electrical panel upgrades based on historical data from the Colorado WAP (this amounts to less than 3% of the total financial assistance package or nearly 8% of the single-family rooftop solar investment). Other eligible upgrades may include roof repairs and new roofing, minor structural repairs, and energy

Colorado Solar For All:  Program Narrative                                    October 2023

efficiency improvements. Households will be prioritized for enabling upgrades based on unavailability of other program offerings within a reasonable timeframe (i.e. outside of WAP territory; no emergency repair or home rehab program in the jurisdiction; program backlog of more than 12 months), lack of access to services, financial need, and reasonableness of expense that will facilitate rooftop solar. Grid infrastructure also poses a barrier to participation for both rooftop and community solar in rural Colorado. While we recognize that addressing grid infrastructure may be prohibitively expensive in many cases, we will explore the possibilities of leveraging Solar for All enabling upgrades funds with other sources to address this barrier and also explore policy (legislative and regulatory) solutions. During the planning phase, with input from impacted communities, partner programs, and rural utilities, we will further define the terms and use cases for access to funding for enabling upgrades; however, it is our intent to remove these barriers to participation in disadvantaged communities.

To protect renters from displacement, COS4A will implement protections against rent increases resulting from solar installed on rental housing by focusing renter benefits from community solar and partnerships with deed restricted affordable housing property owners. Participation from owners of naturally occurring affordable housing properties will require program payback terms when affordability is not maintained.  On the homeownership side, solar panels are exempt from Colorado property tax. We will work with the State Division of Property Taxation to educate county assessors to ensure that this exemption is being properly considered to prevent increased property taxes due to solar.

## 2.3 Resilience Benefits

COS4A recognizes the benefits of pairing solar with battery storage, but also that storage technology remains a costly investment that, particularly in areas with reliable service, is rarely put into use. Given that Colorado already invests state and federal dollars into microgrids and storage, COS4A will not include explicit funding for storage. Colorado's existing program, Microgrids for Community Resilience, already allows for $13M to be directed towards the development of microgrids (including storage) in Colorado's communities at highest risk for power outages. This funding comes from state sources as well as the federal Grid Resilience formula funding from BIL section 40101(d). Additionally, the State is working on a Microgrid Roadmap, which will identify grid vulnerabilities, how microgrids can improve resiliency, and financial, administrative, regulatory, and legislative pathways to facilitate wider microgrid adoption.

## 2.4 Community Ownership

COS4A will include community ownership opportunities through both rooftop solar and community solar. Our single-family rooftop solar opportunities will provide low-income households with the opportunity for ownership through grants and a path to ownership through third-party solar leases. These systems will provide customer benefits by reducing utility bills and increase the value of the home at sale.[24]

---

[24] Ben Hoen, Sandra Adomatis, Thomas Jackson, Joshua Graff-Zivin, Mark A Thayer, Geoffrey T Klise, Ryan H Wiser, "Selling into the Sun: Price Premium Analysis of a Multi-State Dataset of Solar Homes", Lawrence Berkeley National Laboratory, 2015. https://eta-publications.lbl.gov/sites/default/files/lbnl-6942e.pdf

For community solar, COS4A will provide technical assistance, training, and financial incentives to increase the options for financial ownership, governance oversight, wealth building opportunities for members, and community benefits agreements. During the COS4A planning phase, CEO will research best practices and develop a training toolkit to help communities consider the benefits, costs and levels of involvement of these models. Throughout the project period, CEO will offer trainings targeted to non-profits, resident coops, community organizations, housing authorities and other entities interested in exploring community-owned community solar projects,  on these ownership and benefit models. Community solar projects will be evaluated for funding with consideration for additional benefits gained through community ownership such as wealth building, energy sovereignty, resilience, and community co-benefits. For example, Colorado's rural communities have expressed a strong interest in agrivoltaics as a way to preserve agricultural farmland while addressing energy burden. It is our intent to pilot innovative replicable models of community solar with community ownership or partnerships.

Ongoing operations and maintenance expenses will be considered in our financial support of all community-owned systems. The third party owned systems will require project owners to provide O&M service to the systems and ensure that systems are performing through the life of the lease term - multifamily, single-family and community solar.

## 2.5 Workforce Development and Entrepreneurship
Commitment to High Quality Jobs
COS4A is committed to ensuring that the projects it finances support high quality, middle-class jobs. This commitment includes requiring preference:

- to contractors that agree to the U.S. Department of Labor and Commerce's eight Good Jobs Principles
- contractors providing services to COS4A to pay prevailing wages
- contractors providing services to COS4A to agree to a collective bargaining and union neutrality clause
- contractors that leverage registered apprenticeship programs.

COS4A will build systems and policies that focus the opportunities for these high quality jobs in the low-income and disadvantaged communities where solar energy is being deployed through targeted job training, entrepreneurship and business development support, and local hiring preferences.

Multi-sector Partnership
The state of Colorado has a robust solar workforce with more than 7,600 jobs across the sector. Collectively, this is the 8th largest per capita solar workforce in the country.[25] Despite this established workforce, Colorado will need to continue to grow its solar industry workforce, and do so rapidly, to account for anticipated COS4A programming. Data models from NREL suggest that by 2030 the solar workforce statewide will need to double to support market trends and national renewable energy deployment targets. Fortunately, Colorado will be able to build upon a strong ecosystem of solar workforce development programming and expects to partner with

---

[25]  Interstate Renewable Energy Council (IREC). National Solar Jobs Census 2022.

Colorado Solar For All: Program Narrative                                    October 2023

training and workforce organizations through a competitive process (see attached letters of support in Attachments I and K from some of the strong workforce organizations in Colorado). Colorado's solar workforce ecosystem includes:

- State-sponsored programs through the Colorado Department of Labor and Employment (CDLE) and the Colorado Workforce Development Council (CWDC), including My Colorado Journey, a web-based tool identifying the pathways to specific careers, including those in energy and renewables.
- Local workforce programs which partner with employers, trade organizations, training providers, and community organizations to provide paid training opportunities and career pathways in renewable energy.
- Labor union registered apprenticeship programs.
- Nonprofits that provide in-depth training and certification for solar installers or workforce training and on-the-job experience to workers in the areas of their installs. (See attached letters of support from Solar Energy International and GRID Alternatives in Attachments I and K)
- Higher education programs that specialize in workforce development for solar careers. One example is the Colorado Community College System Strengthening Photovoltaic and Renewable Careers (SPARC) workforce development program which operates through Aurora, Arapahoe County, Northeastern (Sterling), and Pueblo Community Colleges.
- High school programs which connect secondary students to careers in the renewable energy industry in conjunction with local nonprofits. Denver Public Schools has a Summer Renewable Energy Program.

Despite this strong ecosystem of solar workforce capacity, numerous barriers to participation for residents of historically underserved and disadvantaged communities have been identified including:

- English-only trainings
- Cost of trainings
- Unpaid time or low-paid time required for trainings
- Lack of geographic diversity of training opportunities
- Lack of wrap around services available during training
- Uncertainty of the career path forward for students

We will invite the breadth of workforce development partners to participate in and collaborate with our Advisory Council (See *Section 6: Equitable Access and Meaningful Involvement*) and other stakeholders during the project planning phase.

<u>Centering on Delivering Meaningful Benefits to Low-income and Disadvantaged Communities</u>
COS4A will devote approximately 8% of the total Solar for All funding to workforce development in order to leverage existing program capacity while seeking innovative ways to address gaps and barriers to participation by residents of low-income and disadvantaged communities. Broadly, COS4A workforce programming will take an industry wide approach that considers the entire value and supply chain of the solar industry for engaging stakeholders for

12

Colorado Solar For All:  Program Narrative                                    October 2023

workforce development including manufacturers, installers, sales representatives, skilled-trades and non-profit employees. Our vision for delivering meaningful benefits to the low-income and disadvantaged communities served by COS4A includes increasing and diversifying the baseline workforce, upskilling the existing workforce including small contractors located in low-income communities, and supporting local business incubation and development.

COS4A program elements to achieve this vision include:

- Encouraging participation from women-owned, minority-owned businesses in all competitive bidding through education and outreach on the state procurement process.
- Implementing application scoring criteria that values local hiring commitments, local training commitments, community workforce agreements and project labor agreements.
- Providing enhanced financial incentives for qualified entities such as disadvantaged business enterprises, small business enterprises, non-profit organizations and tribal entities.
- Consider providing enhanced financial incentives for systems located in and serving disadvantaged communities as defined by CEJST.
- In conjunction with unions, COS4A will consider ways to aggregate resulting projects to ensure more opportunity for Project Labor Agreements (PLA) that support prevailing wages and 'high road' labor practices.
- Using innovative ways to address the geographic limitations of existing workforce training opportunities, such as 'mobile labs'.
- Partnering with Colorado's Hispanic Serving Institutions (HSI) and our singular Native American/American Indian Serving Institution (NA/AIS) to catalyze business development in underserved communities.
- Incubate entrepreneurship through localized micro-financing and assistance to build and grow clean energy businesses in disadvantaged communities.
- Providing contracted consultancy options for business development strategies within the solar industry.
- Supporting solar business development and incubation.
- Improving trainee retention by improving soft-skills and cultural competency amongst trainers/certificate providers to ensure students finish apprenticeships and other certification programs.
- Expanding and deepening recruitment for workforce development in low-income and disadvantaged communities by partnering with community based organizations
- Partnering with community based organizations to provide thorough and effective wrap-around services where they are absent or inadequate in existing programs.
- Hiring culturally competent recruitment specialists.

The planning phase in collaboration with stakeholders and our workforce ecosystem will solidify the COS4A strategies and program planning to achieve our vision of meaningful workforce benefits for residents of low-income and disadvantaged communities served by COS4A.

13

Colorado Solar For All:  Program Narrative                                                          October 2023

# 3. Distributed Market Strategy

Colorado has immense solar potential given its sunny climate and nation-leading enabling legislation, and is already planning additional work (outside of the COS4A application and funds) to ensure continued progress on reducing barriers to solar adoption, particularly for low-income and disadvantaged communities. Nationally, Colorado is ranked 13th for total installed solar capacity with a $5.6B solar market value[26] and according to the National Renewable Laboratory's *2023 Sharing the Sun Database* released in July of 2023, Colorado ranks 8th in community solar capacity across the nation. Policy plays an important role in Colorado's ability to execute solar at scale and reach communities historically underserved. The Distributed Market Strategy section describes the existing policies, statutes and rules in support of solar development for Colorado.

**3.1 Net Metering Policies in Colorado**
Colorado law requires all electric utilities – except municipalities with fewer than 5,000 customers – to offer net metering.[27] State policies in Colorado also determine how credit for excess generation gets carried forward and compensated, as well as how large a rooftop solar system can be.  Given these policies, for many Coloradans, net metering rates are favorable to residential distributed solar deployment, but additional incentives are needed in smaller, municipal utilities and for LIDC populations.

Colorado enacted legislation in 2008 (House Bill (HB) 08-1160) requiring municipal utilities with more than 5,000 customers and all electric cooperatives to offer net metering for residential systems up to 10 kW. Electric cooperatives and municipal utilities are provided discretion to exceed these minimum size standards. Any customer's net excess generation (NEG) in a given month is applied as a kWh credit to the customer's next bill, with each kWh credit of NEG off-setting 1 kWh of electricity consumption in a future month. Electric cooperatives and municipal utilities are required to pay for any remaining NEG at the end of an annual period based on a "rate deemed appropriate" by the electric cooperative or municipal utility.

In IOU service territories, systems that generate electricity using qualifying renewable energy resources are eligible for net metering up to 200% of the customer's annual average consumption. In 2018, Senate Bill (SB) 18-009 expanded eligible qualifying equipment to include solar-plus-storage systems for net metering. In 2021, SB21-261 established that all renewable energy storage systems are eligible for net metering and allowed master meter operators, like multifamily housing unit owners, to supply distributed generation electricity to customers. The Public Utilities Commission (PUC) is currently forming rules to regulate how master meter multifamily housing operators and their tenants can participate in net metering.

Finally, Colorado state law (40-2-127, CRS) establishes economic compensation for community solar garden (CSG) customers as net metering "minus a reasonable charge" for transmission, integration, and administration by a utility and as determined by the PUC. The benefits of Colorado's net metering programs have helped drive participation in Colorado's largest utility (Public Service Company of Colorado). They recently reported that of the customers that sought

---

[26] Davis, Michelle. "US Solar Market Insight." *Wood Mackenzie Power & Renewables*, June 2023. https://www.seia.org/sites/default/files/2023-07/Colorado.pdf
[27] 40-2-124 and 40-9.5-118, CRS, which codified Amendment 37 in 2004

14

Colorado Solar For All:  Program Narrative                                      October 2023

to install solar, 99% applied for solar with net energy metering (NEM) credits only (i.e., they did not seek additional incentives such as renewable energy credits).

However, NEM alone is often not enough incentive for income-qualified and disproportionately impacted communities to install on-site solar. Barriers include upfront costs, condition of house/roof, not owning the house, shading/solar orientation and understanding of the logistics and process. To address this, Public Service Company of Colorado has invested $583,000 in incentives provided for 98 systems (291.65 kWac) and offers an up-front incentive of $1 per watt.

### 3.2 Third-Party Ownership Policy in Colorado

Third-party ownership is permitted for distributed solar generation in Colorado, and both leasing and financing are common models of rooftop solar acquisition. Third-party ownership also facilitates CSGs for customers who cannot install distributed generation directly on their home or premise for a variety of reasons. Colorado was the first state to adopt a traditional third-party community solar program in 2010, which allows customers to subscribe to a portion of a shared solar project and receive credits on their electricity bill for the power generated by their share without having to directly host a distributed generation system. In addition, Colorado has implemented several initiatives to expand access and affordability of community solar for low-income and disadvantaged communities and households.

One example is a low-income community solar demonstration project CEO launched  in 2015 with GRID Alternatives to build six community solar models with different utilities, financing structures, and siting options. The purpose of the project was twofold: 1) to demonstrate the feasibility of building 100% low-income community solar models, and 2) to reduce household energy burden. As of October 2017, 380 households were benefiting from 1,485 kW of community solar, surpassing the original project goals of 300 impacted households with most projects offsetting up to 100% of the subscribers' electricity usage.[28] Another example is the City and County of Denver's program that uses community solar gardens to own and operate projects through which they can generate and donate bill credits to low-income residential households. The City of Denver has collaborated with Denver Public Schools (DPS) and the non-profit, Energy Outreach Colorado, to donate bill credits to DPS families in need. The portfolio of projects will support more than 250 DPS families through discounted utility bills. The projects also provide paid training opportunities for clean energy jobs, student internships, and hands-on classroom activities. These are just two examples of successful community solar projects in Colorado that demonstrate how the benefits can flow directly to Colorado residents.

Colorado utilities are also playing a role in community solar. Xcel Energy Inc.'s (the parent company of Public Service Company of Colorado) *2022-2025 Renewable Standard Energy Plan* commits to provide 300 MW[29] of community solar, more than half of which will be dedicated to significant bill reduction for low-income subscribers. Participants will receive between 50% and 100% of their electricity usage credited by their community solar subscription.

---

[28] Dobos, Hillary and Artale, Emily.  (2017) *Insights from the Colorado Energy Office Low-Income Community Solar Demonstration Project*.  Colorado Energy Office.

[29] Verified Application of Public Service Company of Colorado for approval of its 2022–2025 Renewable Energy Compliance Plan.  December 20, 2021.
https://www.xcelenergy.com/staticfiles/xe-responsive/Company/Rates%20&%20Regulations/21A-0625EG-HE_100-Public_Service_2022-25_RE_Plan_Application.pdf

15

Colorado Solar For All:  Program Narrative                                    October 2023

Despite the increase of community solar across the state, low-income renters are still disproportionately underrepresented in solar in Colorado. While 43% of Colorado's households are low- to moderate-income, only 11% of community solar in Colorado is serving these households.[30] EPA's Solar for All funds will help Colorado bring clean energy parity to the state's residents that are experiencing the greatest energy burden while also reducing emissions of greenhouse gas emissions from alternative heating sources.

### 3.3 Interconnection Policy in Colorado

Slow interconnection timelines and high fees create barriers that can discourage customers from installing solar or increase their payback period. A lack of clear and timely information from utilities about their interconnection processes, requirements, and status to customers and developers can create uncertainty, confusion, and frustration for solar applicants, and delay or even stop projects. Colorado has worked to mitigate these challenges through PUC interconnection rules and legislation. In 2021, SB21-261 clarified interconnection rules, making it easier for solar projects to qualify for fast-track processing and hold utilities accountable for sticking to interconnection deadlines. Recent PUC rulemaking determined that interconnection fees must be demonstrated as cost-based.

Current state policy has made Colorado a leader in addressing interconnection barriers, however CEO recognizes interconnection costs, delays, and process can still hinder COS4A success. Currently the PUC has an open proceeding that is assessing the potential for policy changes, including the development of a bi-directional performance incentive (an incentive and a penalty) to encourage more efficient interconnection of distributed energy resources like solar and community solar gardens. As Colorado updates its Greenhouse Gas Roadmap, the state is also considering recommending additional policy changes that would improve transparency in the distribution system planning process by better identifying locations where there is capacity to interconnect without the need for significant upgrades and locations where upgrades would be required.

### 3.4 Plan to Maximize and Leverage Relevant Enabling Renewable Portfolio Standard

Colorado became the first state to pass a voter adopted Renewable Portfolio Standard (RPS) by ballot initiative through Amendment 37 in 2004. This RPS required qualified utilities to generate a certain proportion of electricity from eligible energy resources.[31] While utilities have all met that standard, the state continues to adopt climate and clean energy targets. In 2019, Colorado adopted science-based greenhouse gas emissions reduction targets of 26% below 2005 levels by 2025, 50% by 2030 and 90% by 2050.[32] In 2023, the state updated the targets requiring a 65% reduction by 2035, a 75% reduction by 2040, a 90% reduction by 2045, and achieving net zero emissions by 2050. In 2019 the state passed SB19-236 , and followed with HB21-1266, that

---

[30]% of households earning <=80% AMI from:  "Comprehensive Housing Affordability Strategy (CHAS) Data Based on 2015-2019 American Community Survey" 2022. https://www.huduser.gov/portal/datasets/cp.html. % of MW community solar serving low- and moderate-income households from "2023 Sharing the Sun Database Final Release" National Renewable Energy Laboratory.

[31] https://programs.dsireusa.org/system/program/co
[32] Colorado House Bill 19-1261.

16

together require utilities in the state to adopt clean energy plans (or in the case of Generating and Transmission Cooperatives, electric resource plans) that achieve at least 80% emissions reduction below 2005 levels by 2030. To date, utilities representing 99% of fossil generation in the state have approved plans that achieve, collectively, 84-87% emission reduction by 2030. In addition, many of the coal plant retirements included in these plans (which retire all coal generation in the state by the end of 2030), have been included in the state implementation plan for regional haze, making them federally enforceable. Our largest utility has submitted a plan, currently under review by the PUC, that would exceed 80% of total generation from renewables by 2030. These policies demonstrate how our state continues to serve as a clean energy leader and continues to develop policy to support solar deployment

## 3.5 Enabling Regulatory Frameworks that Support Solar Deployment

Colorado has a 20-year history of enabling legislation that will support the execution of a Colorado Solar for All grant program. The last five years have been primarily focused on supporting system transparency, community solar garden implementation, allowance of net metering, participation by low-income communities and reductions in greenhouse emissions through clean energy.  In 2019, SB19-236 required the PUC to adopt distribution system planning rules, which included the creation of hosting capacity maps to help create transparency on grid capacity on a utility's distribution system. Also in 2019, HB19-1003 expanded the maximum size of a CSG (now up to 10 MW for investor owned utilities) and removed geographic restrictions within a utility's service territory making siting and developing CSGs easier.

In 2021, HB21-1284 capped permitting costs for rooftop solar while SB21-261 increased the deployment of rooftop solar to meet Colorado's energy needs, raised the allowable capacity of customer-sited renewable energy generation facilities, permitted virtual net metering and use of a meter collar to avoid more expensive electrical upgrades and allowed residents in IOU territory to earn net metering credits indefinitely. Also in 2021, SB21-272 required a minimum percentage of utility renewable energy funding go towards vulnerable customers to support greater solar adoption.  In 2022, the legislature adopted HB22-1362, which created new minimum energy code requirements that include solar-ready, electric-ready and EV-ready requirements for residential and commercial construction. Most recently, 2023 legislation provides funding for permitting jurisdictions to adopt the SolarAPP software (HB23-1234), which can instantly process up to 80% of typical solar permits, leading to decreased administrative and cost burdens on permitting entities, reduced install times, better compliance with codes and regulations, and fewer project cancellations. Additional legislation provides an alternative bill methodology for CSGs that provides greater price stability (HB23-1137) and supports the development of agrivoltaics (SB23-092).  In April of 2023, the state air quality commission adopted building performance standards (BPS) for buildings over 50,000 square feet, including multifamily residential, requiring the sector to reduce emissions 20% below 2020 levels by 2030, allowing the use of a combination of energy efficiency, building electrification, and solar generation to achieve these targets. This BPS will drive significant interest from multifamily properties in solar generation; and as the program is administered by the Colorado Energy Office, the Colorado Solar for All program will be well situated to engage with the properties.

Colorado Solar For All:  Program Narrative                                      October 2023

Electricity generation is Colorado's second largest contributor to statewide greenhouse gas emissions.[33] Replacing coal generation with solar and other no- and low-emissions energy resources will be essential in meeting these greenhouse gas reductions for the electric grid. Colorado is a national leader in climate action strategies and funding a COS4A program will support further progress to reduce greenhouse gas emissions through clean energy investments.

### 3.6 Describe a plan to ensure the program will maximize deployment breadth and diversity across the geography, despite jurisdictional differences between different utility territories and/or regulatory jurisdictions in the geography the application proposes to serve.

The Colorado Solar for All program will maximize deployment breadth and diversity across Colorado, through a statewide plan that will ensure communities that have been historically underserved in the solar market have the opportunity to participate in rooftop or community solar. Colorado has 53 electric utilities: two IOUs, 29 municipal utilities, and 22 rural electric cooperative utilities and electric rates vary for each utility, but the Colorado Energy Office has experience working directly with IOUs, municipal utilities, electric cooperatives, and the state associations for both municipal and cooperative utilities. As a result, the state is well poised to work collaboratively with the various electric utilities statewide to understand how to determine, calculate, and deliver the benefits of Colorado Solar for All for customers of all utilities. As described above, the state has adopted substantial legislation to support the growth of distributed generation in Colorado, and key policies– such as net metering– which apply to all utilities in the state.

In order to identify any major variation in adoption rates between utility territories, we will start our program development with a statewide assessment of solar adoption to date, based on the current and projected solar capacity, policy landscape, customer demand, and utility participation The program will establish clear goals and metrics to measure the success of the program in terms of increasing the number and capacity of community solar projects; expanding access and affordability of community solar for low-income customers and customers in disadvantaged communities; reducing energy burden and greenhouse gas emissions; creating local jobs and economic opportunities; improving health and environmental quality; enhancing social cohesion and empowerment; and advancing equity and justice in the energy sector. This data will demonstrate the progress and impact of the program on the deployment breadth and diversity of community solar across the geography despite jurisdictional differences between different utility territories and/or regulatory jurisdictions.

### Summary

Colorado is fortunate to have long invested in the support for solar adoption, and has nation leading enabling policies already in place. That being said, there are still clear additional barriers for low-income and disadvantaged communities that Colorado is working to address. In addition to the community engagement and technical assistance discussed below, Colorado's plan is to work with community based organizations that serve rural and disadvantaged communities that tend to have particularly high energy burden. In addition, we will partner with other state agencies including our Department of Local Affairs and others that have a statewide network of contacts with local governments, nonprofits, and other organizations that can help promote this program.

---

[33] Colorado Greenhouse Gas Pollution Reduction Roadmap.  January 14, 2021.

Colorado Solar For All:  Program Narrative                                    October 2023



Figure 3.1 shows a map of Colorado with colored shading to represent different utility territories.

# 4. Financial Assistance Strategy

## 4.1 Introduction

*Financial Assistance Overview*:

Single-family Rooftop (Lease & 100% Subsidy):   $61,340,483

Multifamily On-Site and Rooftop:                $61,446,517

Community Solar:                                 $64,713,000

***Total Financial Assistance***:              ***$187,500,000***

The financial assistance strategies in this application have been identified and designed to advance and maximize the three overarching objectives of the Greenhouse Gas Reduction Fund (GGRF) program 1) maximize solar deployment with financial assistance to reduce overall GHG emissions in affected communities, 2) finance and incentivize distributed solar to directly deliver benefits to America's low-income and disadvantaged communities, 3) mobilize private capital and building financing mechanisms to support market transformation towards a clean energy economy for all Coloradans. This financial assistance package will complement, and not

duplicate, existing subsidies, tax credits, and other sources of financing to support deployment that would not have occurred otherwise.

The strategies outlined below deliver a balanced approach to achieve the Solar for All goals outlined in the Request for Application, including enabling the rapid deployment of distributed solar, increasing equitable access to solar, facilitating ownership models that allow LIDCs to access the economic benefits of asset ownership, and catalyzing public/private participation that leverage additional capital and lead to market transformation beyond the Solar for All program period. Subsidies are proposed values which came from case studies in Colorado and other states and will be refined and finalized with industry partners and current market conditions during the program planning period should an award be made. CEO recognizes the benefit to provide all three of the solar installation types of single-family rooftop, multifamily rooftop and community solar. While allocations have been proposed based on  potential serviceable markets, enabling legislation and discussions with industry partners, there remains considerable uncertainty. CEO plans to use the planning period to refine the methodology and expects to adjust the program annually based on market conditions, participant demand, and benefits realized.

## 4.2 Single-Family Residential Rooftop Solar and Enabling Upgrades
The subsidy provided in the single-family sector is a per-home calculation depending on whether the participating home requires enabling upgrades. CEO projects serving 40% of households with a main electrical service panel upgrade at an average cost of $3,500. The market in Colorado for solar installation costs (across rural and urban) ranges from: $2.65/watt-$3.80/watt. A fully subsidized model will cover the entire cost for qualified households, and a low cost partially subsidized leasing model will serve other households. These models utilize current market and historical data for projecting an average solar system size of 5kW per household and an approximate cost of $3.50/watt, for an average system cost of $17,500. When including the electrical upgrade package for 40% of the homes, the average cost across the portfolio is $17,900 per household.

Single-Family Immediate Solar Ownership Model (100% Subsidy)
Colorado's Weatherization Assistance Program (WAP) has been serving LIDCs in Colorado for more than 45 years. In 2017 Colorado's WAP sought and gained approval from the Department of Energy to utilize WAP funds for rooftop solar installations for qualified households, increasing access to clean energy and pairing with energy conservation solutions for eligible income qualified Coloradans. This was the first time in the nation that DOE allowed WAP funds to be used for solar. This program has driven changes in energy production and the built environment that counteracts a history of racist and discriminatory policy by providing benefits to disproportionately impacted communities and underserved populations.

Through Solar for All, Colorado will create a solar ownership model by leveraging the long-standing and successful infrastructure of the WAP program. CEO has a pipeline of these weatherized and solar ready homes - over 10,000 single-family homes have been serviced by WAP over the last decade  - and will install solar on the homes best situated for rooftop solar. CEO will grant funds to implement these installations at no cost to the homeowners (i.e., 100% subsidy). In addition to direct ownership, CEO will work with nonprofit solar developers and relevant third-party project owners who are eligible to monetize the federal investment tax credits (ITC) through direct pay on behalf of these households.  These entities receiving these tax credits will be required through this program to utilize funds to provide ongoing operations and

maintenance associated with the long term performance of the solar asset (20+ years in most cases) and when applicable reduce the system's installation price accordingly.

These projects will deliver nearly 100% electricity savings for Colorado's most vulnerable and energy burdened households. Leveraging WAP, CEO will ensure solar is installed on homes that have already received weatherization improvements and enabling upgrades, extending the impact of Colorado's Solar for All allocation (i.e., by enabling more households to benefit from this funding and ensuring funding leads to an optimized solar system). The solar system can also offset any additional electric load resulting from electrification measures. CEO will direct approximately $29.53M through this fully subsidized model and anticipates installing approximately 1,650 households with rooftop solar photovoltaic systems of which roughly 660 homes would receive main electrical service panel upgrades.

<u>Single-Family Third-Party Owned Solar Lease Ownership Model</u>
Colorado will work with entities who will deliver a solar ownership model, based on a third-party owned solar lease that will lead to solar asset ownership over time. Households in Colorado with eligible income criteria and lease terms with appropriate financial protections will be determined during the program planning period. Third-party owned solar lease models are an effective tool to expand access to solar for low-income single-family homeowners and renters. CEO will allocate $31.74M towards this model, and will use approximately $2M in the form of a $0.30 - $0.650/watt subsidy for participating households. The remaining approximately $29M will be used to provide two different forms of financing to third-party solar lease providers. First, CEO will capitalize a revolving bridge loan fund with approximately $4.4M that will be used for bridge financing of third-party lease providers to bridge the time between when a project is installed and when the tax credits are captured, including state and local rebates and incentives. The timing between when a lease provider funds installation and receives the relevant tax credits can create cash flow issues which is mitigated with low-cost bridge loans (i.e., priced at a 4% interest rate). Paired with a long-term revolving loan product, CEO will offer this directly to selected third-party lease providers. This low-cost loan product (i.e., priced at a 1% interest rate) will be blended with the existing capital base of lease providers, allowing the selected lease providers to offer reduced cost lease rates (1-2%) to participating households, with the option for the household to assume ownership at the completion of the lease term.

This lease program allows eligible households without tax liability (or otherwise unable to realize tax credits) a pathway to monetize and receive these benefits via lease providers creating a reduced lease. Homeownership is lower in America's CEJST communities relative to higher income communities, and this solution will also be designed to allow single-family renters access to the solar lease model. This third-party owned solar lease allows households to enjoy the benefits of solar without assuming the burden of operating and maintaining the system - this responsibility remains with the lease providers throughout the lease term. Households that wish to take ownership of the solar asset will have the option to purchase at "fair market value" after all tax incentives, including the ITC and depreciation, have been realized and the recapture period has passed.

This lease model is designed to support the development of long term market transformation, and reduce the barriers for solar lease providers to enter underserved markets statewide.  Posi Gen's work in Louisiana in the aftermath of Hurricane Katrina is a case study CEO may use to replicate through this program design, utilizing public funds to support growth and market development to

Colorado Solar For All:  Program Narrative                                                    October 2023

ultimately attract private, non-public capital including philanthropic funds to deploy solar in underserved markets across the state.  Prudent financial practices by the CEO will ensure this capital in the long term revolving loan fund continues to circulate after the five-year performance period has ended, and also allows solar lease provider's to blend their existing capital base with Solar for All funds.  This model unlocks potential funding sources that currently don't exist for the LIDC market in Colorado.

<u>Single-Family Rooftop Solar Program Outcomes</u>
The single-family residential financial assistance package is projected to serve approximately 3,400 households and produce significant energy utility bill savings since systems are required to be designed to support 75-120% of participating households' energy usage. CEO's financial model determined that the 100% subsidy model will serve 1,650 households and the leasing structure (i.e., subsidy, short term bridge and long term revolving loan fund package), with the total capitalization referenced above, is projected to support a minimum of approximately 1,750 households, with an additional approximately  95 households served from  lease repayments being recycled to the principal in the revolving loan fund. The number of households served in this leasing program may, more than likely, be higher depending on the amount of private capital leveraged from solar lease providers and will be determined during the rollout of Colorado's Solar for All lease program. The lease projection is conservative, with Solar for All funding being the only assumption of capital for the lease program. During the program planning period, CEO will be engaging with a stakeholder network of non-profit solar lease providers and additional interested private capital providers who will be supporting this lease program. Funds may be reallocated between the two models depending on actual uptake and current market conditions.

**4.3 Multi-Family Residential Rooftop Solar**
The financial assistance strategy for multifamily residential rooftop creates two deployment models that rely on financing as opposed to subsidies: 1) a long-term loan product that immediately transfers solar ownership to the building owner, and 2) a third-party owned solar lease model that eventually leads to solar ownership for the building owner. CEO will direct approximately $61.5M towards solar for both public housing and privately owned multifamily and affordable housing developments. The multifamily affordable housing solar financing, will seek matching funds from other GGRF funds from the National Clean Investment Fund and Clean Communities Investment Accelerator when possible. CEO's multifamily housing solar financing program, will complement and expand funding capacity for existing financing solar products in the multifamily marketplace. CEO's allocation of capital in the multifamily housing sector creates efficiency and provides greater service coverage to eligible households. The following describes the financing tools, program goals and households that can be reached through the multifamily housing sector.

<u>Multifamily and Affordable Housing - Solar Loan and Revolving Loan Fund</u>
CEO will use Solar for All funding to support and complement the expansion and growth of existing affordable multifamily loan programs managed by specialty lenders experienced in underwriting and financing energy efficient affordable housing developments. This model will provide low-cost bridge financing (i.e., priced at a 4% interest rate) to secure rebates, incentives and tax credits, associated with solar and pair this with long-term financing (i.e., priced at a 1% interest rate) to affordable multifamily housing building owners that agree to pass-through at

Colorado Solar For All:  Program Narrative                                    October 2023

least 30% electricity savings to tenants. The financing terms of this program will be paired with a $0.25 - $0.40/watt subsidy directed at solar developers and/or project owners that will produce the desired electricity savings for building owners and tenants.

Multifamily and Affordable Housing Solar Lease
In addition, a third-party owned solar lease product will be available for multifamily developments. This allows the project owner to monetize the federal IRA investment tax credit and require that O&M costs and responsibilities are borne by the third-party lease provider rather than the building owner, and provides a flexible approach for the state's multifamily housing sector. This flexible approach allows multi-family housing owners to access a third-party ownership and solar lease financing arrangement to provide solar benefits to their tenants without increasing debt and ensuring long term system performance is managed by the solar project owner.

Similar to the single-family third party owned solar lease product described above, this will pair a subsidy approximately $0.25 - $0.45/watt with two different forms of financing available for the third-party lease provider - a low cost revolving bridge loan (i.e., 3%) and long-term revolving loan (i.e., 1%). The long-term loan may be blended with the lease provider's existing capital base (philanthropic, and/or other public and private sources), reducing the lease rate to ensure an affordable low cost solar lease to the multifamily housing owner and tenants. This model recycles the capital available and doesn't require the building owner to assume ownership or a debt liability but delivers solar benefits to tenants.

Multifamily and Affordable Housing Rooftop Solar Program Outcomes
The total multifamily program  consisting of the revolving loan fund and third-party owned solar lease option will serve approximately  14,000 household units. This figure is based on the assumption that an average project size approximately 50 kW and that an average installed solar cost will be approximately $3 per watt. These two models rely on different subsidy amounts, as referenced above, and thus the number of households served by each model will depend on the financing model that the building owner selects.

In addition to producing efficiencies in capital deployment, these models enable CEO to support equitable access to solar for low-income renters. Colorado has a pipeline of eligible multifamily renters. Colorado has approximately 69,388 federally assisted units of multi-family housing in Colorado according to the National Housing Preservation Database.[34] Although not every multifamily unit would be a candidate for Solar for All programming this inventory far exceeds the 14,000 multifamily unit target. Additionally, Colorado WAP has a database of over 9,000 units that have been weatherized that are renter occupied units between manufactured homes, 2/3/4 plex and multi-family properties and there are over 30,000 eligible participants identified through the Colorado LIHEAP ("LEAP"). There are also independent statewide nonprofits that raise funds to help low-income Coloradans afford their home energy that CEO will partner with that have relationships and access to additional eligible households. As described in a previous section, CEO will also administer the state's BPS (building performance standards) program, which strongly incentivizes large multifamily properties to pursue improvements including energy efficiency, building electrification, and solar generation. CEO will make sure that eligible multifamily properties that are required to comply with the BPS are aware of Solar for All

---

[34] National Affordable Housing Preservation Database. Colorado. https://reports.mysidewalk.com/335c0f64f5

23

opportunities. The existing pipeline of multifamily affordable housing developments will enable CEO to complement and support existing programs, including projects that lack solar financing.

## 4.4 Community Solar

Colorado is well positioned to deploy Solar for All funding to support community solar gardens, including supporting existing projects delayed due to financing constraints in both IOU and non-IOU territory immediately on receipt of the COS4A package. Community solar helps provide the benefits of solar to homeowners and renters, including single-family and multifamily residences, as well as other customers who are not able to install solar on a property. Community solar also scales at a faster rate compared to rooftop installations because the barriers to deployment are lower, and all development risks are borne by development firms as opposed to low-income individuals. Installation barriers inherent with single-family rooftop solar due to shading, solar orientation, or inadequate structural or electrical capacity are non-existent for community solar. The number of households served per dollar invested is greater for community solar than residential rooftop through economies of scale and will contribute to the program's overall solar market transformation. CEO will direct approximately $64.71M towards community solar. Colorado's financial assistance strategy for community solar will focus on one deployment model - an upfront incentive that will be used to buy down the cost of the community solar subscriptions for the household. In order to deliver the most efficient capital for large scale solar development in eligible communities, developers and owners will be allowed to pool incentives at the project level  to pass through subsidized subscription rates to participating households.

In this incentive model, the community solar project owner or developer will be required to manage their project finance and capital requirements; they will be responsible to build a business model and secure long term financing that delivers approximately 50% electric utility bill savings to their enrolled subscribers.  The project finance will come from financial partners including state "greenbanks" and/or any awardees of NCIF and CCIA and other applicable community lenders.   This incentive model payable to the project owner allows for maximum flexibility for community solar project owners to capture relevant tax credits (solar ITC, energy communities, domestic content and other state and local credits). These additional tax credits and rebate benefits will be transferred to the community solar subscribers, via any mechanism the project owner may choose. Both direct pay and transferability are encouraged in this program design and can be in the form of bill credits or reduced project cost for subscribers. Community solar developers, project owners, utilities and project originators will utilize CEO's incentives for any of the following: project design including development of project models that allocate adequate benefits to an environmental justice (EJ) community, project development process, equipment purchasing, other development costs necessary for solar deployment, and for securing necessary long term project finance.

<u>Community Solar Investor Owned Utility Territory</u>
In IOU territory, CEO will leverage existing frameworks for pipeline and project development. The proposed incentive amount available to solar developers, utilities or other project owners will range from $0.40-$0.60/watt based on current market data and the corresponding utility territory, recognizing electric costs in IOU territories are lower compared to cooperative distribution utility territories. This incentive range will create the desired electric savings and increased level of solar deployment in IOU territories as compared to a larger incentive needed

Colorado Solar For All:  Program Narrative                                                    October 2023

for cooperative utility territories. CEO will maximize rapid solar deployment in this model by leveraging the economies of scale for community solar projects and working to adapt and align eligible projects in established programs from Public Service Company of Colorado and Black Hills Electric servicing eligible communities.

Community Solar Non - Investor Owned Utility Territory
The incentive amount will be larger for projects in non-IOU utilities and co-op territories. This will allow community solar project owners to complete projects in harder to access rural communities and when possible bundle solar projects across rural territories, to build a portfolio of projects and achieve economies of scale. This approach supports the state's goals of providing a geographically dispersed financial assistance package while incentivizing solar developers to ensure projects are successful.

Community Solar Outcomes
Assuming a 3.7 - 5 kW average size subscription for households, and an average installed cost of $1.80/watt, and an average upfront incentive of $0.50/watt CEO anticipates serving approximately 25,166 households and producing approximately 50% electricity bill savings to those households. This funding amount of $64.71M will be split between IOU and non-IOU community solar development.

**4.5 Conclusion**
Goals, Outcomes and Performance Criteria Financial Assistance COS4A
This financial assistance package will accomplish the intended goals from EPA to service Colorado's communities through: 1) maximizing solar deployment and reducing GHG emissions across all housing sectors and community types through mobilizing public and private capital, 2) supporting market transformation for distributed solar with financing and incentive structures to directly deliver benefits to America's low-income and disadvantaged communities, 3) ensuring fiscal stewardship of funding is managed effectively and according to all applicable regulations 4) and providing a geographically dispersed statewide financial assistance package. During this five year award period CEO expects to serve over 40,000 eligible households with a long term plan to continue this work after the award period ends by recycling this capital to support future market transformation statewide.

# 5. Project-Deployment Technical Assistance Strategy

Colorado is home to roughly 5.8M people (67% white, 22% Hispanic, 4% black or African American, 3% Asian American[35] and less than 2% of American Indian descent. Colorado's population increased by 74,000 on average each year between 2010-2020 with similar growth in the preceding decade. Growth in the last decade has led to increased housing costs across our 2.5M housing units.[36] According to the American Community Survey, more than 800,000 households, largely along our most populated "front range corridor" earn 80% average median income or lower and roughly half of those households are rentals.[37]

---

[35] "SDO Crosstabs Page." *Colorado Department of Local Affairs: State Demography Office*, demography.dola.colorado.gov/assets/html/crosstabs.html.
[36] United States Census Bureau.  https://www.census.gov/quickfacts/fact/table/CO/PST045222
[37] Comprehensive Housing Affordability Strategy (CHAS) Data. based on 2015-2019 American Community Survey 2022,  https://www.huduser.gov/portal/datasets/cp.html

Colorado Solar For All:  Program Narrative                                    October 2023



Figure 5.1:  Number of households in Colorado counties at 80% or lower AMI based on the Low-income Energy Affordability Data Tool. *U.S. Dept. of Energy*, https://www.energy.gov/scep/slsc/lead-tool. Counties in yellow represent less than  5K households, light green less than 19K households, light aqua less than 48K households, dark aqua less than 75K households, blue less than 123K households (Denver = 122,905 households at lower than 80% AMI).

Colorado households are spread across 103,000 square miles. While the front range corridor continues to house large population centers (Pueblo, Colorado Springs, Denver, Fort Collins), recent Census data points to population growth trajectories that are eastward and more rural,[38] largely due to the availability and affordability of housing.

Colorado continues to build back better from the 2021 Marshall fire through high-performance homes that are more resilient to future climate crises[39] in response to the impacts of climate change (worsened air quality, more frequent natural disasters, limited recreation opportunities and jeopardized food production)[40] but we also face a crisis of affordable housing, especially in rural areas which has impacted not only solar deployment but also the ability for communities to overcome barriers to the creation of housing that meets the needs of disadvantaged communities, low-income residents and our workforce.[41]

An analysis of the socio-economic factors around Colorado solar adoption follows national trends:

---

[38]Wenzler, Elliott and Fish, Sandra.  "Census: Colorado's smaller communities are growing while large cities level off" The Colorado Sun. May 18, 2023.

[39] https://rebuildingbetter.org/

[40] https://conservationco.org/2020/05/13/blog-four-ways-climate-change-impacts-colorado/

[41] "[L]ocal small housing agencies are unable to develop in areas of the state that are in fact the areas most in need of development, especially for economic purposes. As the agency is unable to develop real estate its capacity diminishes, further reducing the potential for community development. Both the agency capacity and the access to capital are paramount hurdles to overcome in addressing housing needs." Affordable Housing Policy Recommendations Colorado Strategic Housing Working Group, 2021.

Colorado Solar For All:  Program Narrative                                                    October 2023

- Only 5-15% of Colorado solar (PV) adopters have a household income less than 200% of the federal poverty level and 15-20% of Colorado solar (PV) adopters have a household income less than 80% of the average median household income.[42]
- Areas of highest adoption by low and moderate income households follow the front range corridor with greater participation in some rural areas including Teller, Mesa, Weld, Adams, Arapahoe, and Clear Creek counties.



Figure 5.2:  Maps of Colorado which highlight counties of solar (PV) adoption below 200% of the federal poverty level in shades of green and below 80% in shades of purple for Public Service Company of Colorado, Black Hills and other utilities.

## 5.1 Incubating Localized Workforce through Turnkey Project Assistance

As described in Section 2.5, Colorado has a robust solar workforce with more than 7,600 jobs across the sector and a strong ecosystem of solar workforce development programming. However, high demand and low participation continues to stretch Colorado's energy workforce. Gaps in workforce availability affect installation quality, increase cost, and lengthen disruption–all impacts that impede the development of projects for low-income households and in communities that have been historically underserved already.

In response to these workforce shortages and our commitment to delivering meaningful benefits to disadvantaged and historically underserved communities, Colorado will develop capacity by removing barriers to access workforce training, improving trainee retention by improving soft-skills and cultural competency among trainers, incentivizing local hiring, and fostering local business development and entrepreneurship. We will pursue partnerships with high schools, community colleges, trade schools, unions and universities to expand workforce training capacity, and recruit and retain individuals from disadvantaged and historically underserved communities. Further, we will incubate entrepreneurship through localized micro-financing and assistance to build and grow clean energy businesses in disadvantaged communities.

---

[42] Equity and Income Trends of Residential PV Adopters in Colorado by Naïm Darghouth and Sydney Forrester, from the Lawrence Berkeley National Laboratory Solar Demographics Tool, provided to Colorado in February 2022.

Colorado Solar For All:  Program Narrative                                October 2023

In support of Colorado's existing contractor network, we will continue active engagement through the Energy Efficient Business Coalition, Beneficial Electrification League of Colorado and will convene a series of listening sessions to better understand how to help minimize overhead, support better margins and increase the appetite for projects in low and moderate income communities. Technical assistance to contractors will include the development of a statewide portal to consolidate resources, offset subscription costs and provide one point of interface for access to many resources including training programs, business support, funding, financing, technical assistance and incentives.

Colorado will build workforce in the community while deploying technical assistance through hands-on projects and field work that delivers holistic real-world training centered around solar installation and development with a complimentary understanding of energy efficiency, weatherization and electrification. We will provide "boots on the ground" experts who will train the trainers and, in turn, create local, sustainable pipelines of expertise and skill.[43] We will replicate and expand existing workforce programs which are designed to attract people from communities with clean energy deployment opportunities and provide an entry point to the clean energy sector. These programs provide industry newcomers with a good understanding of electrical and solar basics, construction and field installation experience on actual projects, safety and workplace etiquette.  We will pay all trainees a stipend, travel assistance, wrap around services and finish with a hiring event where we invite local employers to come and meet trainees.

Colorado will align related programs (IRA Home Rebate programs, state-funded tax credits, grants and weatherization assistance) and equip a cohort of traineded Regional Coordinators with holistic resources, including funding packages and project templates, to provide directly to households and developers to make it easy for households to participate. Packages and templates will be designed based on differing needs and barriers for urban vs. rural, single-family vs. multifamily, and community vs. rooftop solar. We will emphasize pathways to asset ownership as well as pathways to take qualifying households off-grid to enable energy sovereignty and independence, specifically for Tribes and urban/rural off reservation tribal communities. This turnkey package-based regional technical assistance approach is essential to ensure that upgrades do not increase the cost of ownership, to ease the burden and streamline access to resources at any one step along the way.

### 5.2 An All-of-Industry Approach to Technical Assistance for Siting and Interconnection
We know that solar project deployment in Colorado LIDCs will require a whole industry approach. In 2015, Colorado conducted seven low-income community solar demonstration projects[44] across the state. These projects were widely studied for impact and replication opportunities.[45] Programmatic benefits included reduced energy burden and ease of access for low-income households, specifically the ability to access environmental and economic benefits despite potential split-incentive barriers for renters. Since demonstrating these examples,

---

[43] For example, fostering programs like Remote Energy's Technical Training for Native Americans and creating an environment for more Colorado-based companies that replicate Seneca Solar.
[44]  Dobos, Hillary and Artale, Emily.  (2017) *Insights from the Colorado Energy Office Low-Income Community Solar Demonstration Project.*  Colorado Energy Office.
[45] Cook, Jeffrey J. and Monisha Shah. 2018. Reducing Energy Burden with Solar: Colorado's Strategy and Roadmap for States. Golden, CO: National Renewable Energy Laboratory. NREL/ TP-6A20-70965. https://www.nrel.gov/docs/fy18osti/70965.pdf.

28

Colorado Solar For All:  Program Narrative                                          October 2023

Colorado has continued to open doors for solar in low-income households, including through the adoption of explicit policies to connect multifamily tenants with distributed generation through offsite (virtual) net metering and the adoption and deployment of statewide solar-ready codes (the Colorado General Assembly passed the Building Energy Codes law HB22-1362: Building Greenhouse Gas Emissions) in May of 2022 to improve energy use and efficiency in buildings.

Moving forward, Colorado proposes to provide dedicated local experts (Regional Coordinators) to provide holistic technical and deployment assistance to help overcome existing and emerging barriers to community and rooftop solar projects.

Proposed Technical Assistance for Community Solar Siting & Interconnection
- Identification, support and connections for siting,
- Design assistance for project feasibility, to prioritize dual land-use practices on working lands, and to optimize output,
- Development and implementation of community ownership models with Special Purpose Entities,
- Robust funding and expanded access, similar to the equity initiatives and clean energy access program underway in California, to support participation by rural communities, minority groups and Tribes in siting and regulatory decision making,
- Peer sharing, model policies and direct assistance to help local jurisdictions find large groups of subscribers, to streamline land use approvals and siting policies and to enable expedited environmental review and permitting for IQ/DAC projects,
- Evaluation of utility plans and capacity to reduce interconnection costs.

Proposed Technical Assistance for Rooftop Solar Siting & Interconnection
- Support and technical assistance to get through utility approval processes for metering and infrastructure requirements and to leverage demand side management, existing rebates and other related funding streams,
- Understanding and utilizing utility maps and information regarding utility capacity to reduce interconnection costs,
- Expedited or preference for low-income and disadvantaged community project permitting and interconnection approvals at the local level.

Additionally, the Colorado Department of Agriculture's long-standing ACRE3 Program which provides project feasibility studies, technical assistance to coordinated permitting, financing, and contractor services, and grant funding for on-farm solar and other renewable energy projects can be leveraged. With Solar for All funds, the state proposes to continue and expand technical and financial assistance through this program as part of the state's focus on developing community solar projects hosted by farms and ranches. Technical services will include developing and implementing models for community ownership of community solar projects that also prioritize dual land-use practices, such as agrivoltaics. By providing these technical assistance services, the state will ensure that larger, ground-mount, community solar projects are designed to preserve the existing ecosystem services, agricultural enterprises and other land-based values whenever possible.

Colorado is well situated to rapidly expand solar deployment in low and moderate income communities but we still face evolving engagement, awareness and policy barriers. Given existing relationships with existing income qualified programs including LIHEAP (called

"LEAP" in Colorado) and WAP, and relationships with the affordable housing community, COS4A will have a ready made eligible population it can serve. That being said, it will also conduct culturally appropriate and responsive communications, marketing and outreach. We intend to facilitate targeted work with regional representatives at the Colorado Division of Housing and the Colorado Division of Local Affairs, to collaborate with cooperative and municipal utilities and to ensure that we have touchpoints and materials designed for a multitude of related services including engineering providers, permitting offices, insurance agents, tax assessors and realtors.

Additionally, Colorado will provide funding for community-led, community-designed programs and projects as well as innovative replicable models of community solar with community ownership. These pilot projects will demonstrate best practices and innovation and will showcase and streamline models for community-ownership, demonstrate best practices for engaging hard to reach populations and geographies, identify and rapidly solve emerging barriers to solar, and foster relationships to expand workforce development programs targeted at discrete workforce gaps.  Working with rural cooperatives, unions such as the Rocky Mountain Farmers Union, and other agricultural groups, Colorado will support innovative projects that produce multiple meaningful benefits for rural communities, including, where feasible, integrating community solar projects with working farms and ranches. As a leader in dual land-use solar practices, Colorado believes that agrivoltaics can reduce siting conflicts, while increasing renewable energy for rural communities and support the state's agricultural economy.

Finally, Colorado will continue to lead on energy policy adoption through the analysis, evaluation and development of best practices and templates for cost-sharing, expedited permitting and siting approvals in cooperative and municipal utilities. These studies will inform rule and policymaking before regulatory bodies in order to equitably distribute costs and accelerate the adoption of beneficial regulation to support low-income solar developments.  This funding would support stakeholder engagement and data collection to produce a template that could be used to enable clustering of interconnection infrastructure.

Municipal and cooperative utilities can be flexible, nimble and progressive. By design, they serve members and represent communities but may be limited by long term contracts.  Colorado will conduct analysis of local and national cooperative and municipal utility models to better understand how to incent these under resourced entities to enable and support broader solar deployments, especially community solar.

# 6. Equitable Access and Meaningful Involvement Plan

### 6.1 Identifying and Engaging Historically Underserved Households Customers

Equitable access to solar requires an intentional focus on households and communities that have been historically underserved. Approximately 926,000 households in Colorado – 51% renter households and 49% owner households – qualify by income under the Solar for All guidelines by earning 80% AMI or below[46] and 1,060,921 people reside in Colorado's disadvantaged

---

[46] "Comprehensive Housing Affordability Strategy (CHAS) Data Based on 2015-2019 American Community Survey" 2022. https://www.huduser.gov/portal/datasets/cp.html

Colorado Solar For All:  Program Narrative                                      October 2023

communities per data from the EPA's CEJST Tool. Low-income households are disproportionately underserved in both rooftop solar and community solar in Colorado. While



Figure 6.1: Low-income Households Historically Underserved by Solar in Colorado

43% of Colorado households earn 80% AMI or below, only 17% of rooftop solar and 11% of community solar in Colorado serves these households (Figure 6.1).

National studies have shown that Latino and Black households are underrepresented in rooftop solar adoption relative to the general population in each state[47] and that, even after accounting for differences in household income and homeownership, PV adoption rates are significantly lower in Black- and Hispanic-majority census tracts.[48] As community solar development has increased in Colorado since 2009, solar opportunities for renters have increased; however, low-income renters are still significantly disproportionately underrepresented in solar in Colorado.

Many of Colorado's historically underrepresented and disadvantaged communities (as per the CEJST mapping tool) are those that would benefit most from solar. Almost 274,000 households in Colorado pay more than 50% of their income for housing expenses, including utilities. About 63% of these are very low-income, earning less than 30% AMI.[49] Our rural disadvantaged communities and the Ute Mountain Ute Tribe have the highest energy burdens in the state. When considering households at or below 80% AMI in Colorado, 48 out of 50 of our most energy burdened counties in Colorado are rural.[50] Residents of mobile homes have a higher energy

[47] Sydney Forrester, Galen Barbose, Eric O'Shaughnessy, Naïm Darghouth, and Cristina Crespo Montañés. Residential Solar-Adopter Income and Demographic Trends: November 2022 Update, Lawrence Berkeley Laboratory, November 2022.

[48] Sunter, Deborah A., Sergio Castellanos, and Daniel M. Kammen. 2019. "Disparities in Rooftop Photovoltaics Deployment in the United States by Race and Ethnicity." Nature Sustainability 2 (1): 71–76. https://doi.org/10.1038/s41893-018-0204-z.

[49] Comprehensive Housing Affordability Strategy (CHAS) Data Based on 2015-2019 American Community Survey" 2022. https://www.huduser.gov/portal/datasets/cp.html

[50] Ma, Ookie, Krystal Laymon, Megan Day, Ricardo Oliveira, Jon Weers, and Aaron Vimont. 2019. Low-Income Energy Affordability Data (LEAD) Tool Methodology. Golden, CO: National Renewable Energy Laboratory. NREL/TP-6A20-74249. https://www.nrel.gov/docs/fy19osti/74249.pdf

Colorado Solar For All:  Program Narrative                                      October 2023

burden on average than residents of other types of housing in Colorado.[51] Nationally, 52% of Black and American Indian households reported household energy insecurity in 2020 more than twice the rate of white, not Hispanic households (20%).[52]

**6.2 Describe how your customer acquisition strategy will maximize solar deployment across Colorado, ensuring equitable access to and participation in the program.**
Colorado will undertake a multi-pathway approach to customer acquisition, utilizing the efficiency of integrating solar with existing state and partner programs, while also providing the opportunity for historically underserved and disadvantaged communities to design and lead projects to reach their own communities in a culturally competent, community-driven model.

Pathway 1: Integration with existing state programs
The state of Colorado operates or funds several programs that provide services to income-qualified households that will be candidates for COS4A by meeting the Solar for All income guidelines or categorical eligibility allowances. We will integrate the opportunity to participate in COS4A with these programs, utilizing a shared application and qualification process to reduce barriers to participation. These programs include, but are not limited to:

- low-income Weatherization Assistance Program (WAP)

- low-income Home Energy Assistance Program (LIHEAP/LEAP)

- IRA home rebate programs

- Single-family owner-occupied housing rehabilitation programs

- Affordable housing development grants and loans

CEO does or will manage several of these programs directly (WAP and IRA home rebate programs) and will work with other state agencies to integrate COS4A client acquisition and/or solar implementation wherever possible.

Pathway 2: Integration with partner programs
Colorado has a strong ecosystem of non-profit organizations, local governments, and utility companies that serve income-qualified households with energy efficiency, renewable energy and/or housing rehabilitation programs. For example, Energy Outreach Colorado serves 25,000 households per year with energy bill payment assistance through a partner network of over 100 community-based organizations throughout the state, and manages over 2,500 income-qualified community solar subscriptions. Grid Alternatives Colorado has installed over 560 solar systems totaling more than 13MW throughout Colorado, providing solar access to over 2,700 families and 26 community organizations/centers. CEO will competitively bid partnership opportunities

---

[51] Ma, Ookie, Krystal Laymon, Megan Day, Ricardo Oliveira, Jon Weers, and Aaron Vimont. 2019. Low-Income Energy Affordability Data (LEAD) Tool Methodology. Golden, CO: National Renewable Energy Laboratory. NREL/TP-6A20-74249. https://www.nrel.gov/docs/fy19osti/74249.pdf

[52] 2020 Residential Energy Consumption Survey HC11.1, Energy Information Administration.
Energy Insecurity is defined as reporting one or more of the following: Reducing or forgoing food or medicine to pay energy costs; Leaving home at unhealthy temperature; Receiving disconnect or delivery stop notice; or Unable to use heating or cooling equipment.

Colorado Solar For All:  Program Narrative                                    October 2023

with the intent of partnering with existing successful programs to expand their reach and increase the number of households served.  Partners will be selected through a process that values the ability of the organization to reach historically underserved and disadvantaged communities, and all partners will be required to meet the COS4A guidelines for income qualifications and consumer protections.

Pathway 3: Integration with affordable housing providers
Colorado has a severe shortage of affordable housing. Almost 68% of low-income renter households and 50% of owner households are housing cost burdened, paying more than 30% of their income for housing costs. When looking at very low-income households (<50% AMI) 80% of renters and 63% of owners are housing cost burdened. Colorado has only 105,000 federally subsidized affordable rental housing units (both vouchers and project subsidies) and 477,000 low-income renter households. The state has committed substantial funds for the development of additional affordable housing units, including $300M per year from Proposition 123 and $650M from the American Rescue Plan Act (ARPA), providing the opportunity to integrate solar in new construction. CEO will partner with affordable rental and homeownership housing providers and developers to integrate solar as a mechanism for creating affordable units and maintaining housing affordability.

Pathway 4: Targeted, community-led, community-designed programs and projects
We recognize that our state's current programs, while reaching income eligible households, do not reach all communities equitably. Our fourth pathway for client acquisition will provide opportunities for historically underserved and disadvantaged communities to design and lead projects to reach their own communities in a culturally competent, community-driven model. Through a competitive process, communities will be selected and provided with funding, program tools, and technical assistance to implement client acquisition and program implementation strategies. $2M has been budgeted over the life of the program for this community based approach. During the planning phase, we will work with community leaders to design the selection criteria, goals and technical support needed for this pathway.

**6.3 Explain how you will educate and engage communities on the benefits of solar energy.**
Our education and engagement strategy will be designed to address lack of trust, cultural barriers and financial barriers that have resulted in inequitable solar adoption in Colorado.  Our education and engagement strategy will include the following:

- Developing culturally competent messaging and educational materials, including accessible documents translated into commonly spoken languages, particularly Spanish.

- Working through partners that have demonstrated long-term trusted relationships with historically underserved and disadvantaged communities. Providing these trusted partners with the training and administrative support to reach households directly.

- Incorporating and promoting strong consumer protections to address barriers around fear of predatory lending.

- Developing messaging and tools that directly address the financial barriers for low-income and low-wealth households.

Colorado Solar For All:  Program Narrative                                    October 2023

- Providing opportunities and resources for communities to develop their own education and engagement strategy (Pathway 4 described above).

- Implementing local hiring incentives, and focusing workforce development and business development resources to historically underserved communities.

We will incorporate an ongoing evaluation of our program to ensure that our education and engagement is reaching and resulting in solar implementation in our historically underserved and disadvantaged communities. If not, we will adjust our strategies to improve our equity outcomes.

**6.4 Describe how your outreach and marketing strategies are culturally appropriate and responsive to the needs of the communities you are proposing to serve. You should consider how you may need to employ different engagement strategies to reach different types of communities, including urban, rural, and suburban communities; communities with limited English proficiency; and different types of residential buildings, including single-family, multi-family, and manufactured homes.**
We recognize the need for substantial and targeted resources to build relationships with historically underserved communities in order to deploy solar, including those living in mobile home parks and naturally occurring affordable housing. We will partner with trusted community organizations and community leaders, and dedicate funding to build and implement the communication strategies needed to be successful with these communities.

Our strategy will include working with existing programs including LIHEAP/LEAP, WAP and utility assistance programs to let households who are likely eligible know about the program, the value of solar, and benefits of participation. We will also work directly with the affordable housing community to educate building owners, managers, and developers about the program. When providing information to households directly, we will ensure materials have culturally competent messaging, are accessible and translated into Spanish and (where relevant) other languages. Community partners participating in Pathway 2 will be asked to utilize our common messaging and branding, but will be encouraged to implement community-based outreach methods such as employing trusted messengers (e.g. faith-based leaders, neighborhood associations, community-based organizations) and integration with other community services (e.g. food banks, schools). Organizations, local governments, or Tribes selected as subgrantees in Pathway 4 will have the opportunity to design the outreach strategy that they believe will best reach their community. Pathway 2 and 4 partners will be supported by the program marketing team in development of program materials.

**6.5 Describe how low-income and disadvantaged communities will be involved in program design and operations.**
We are proposing a six month planning phase for COS4A, during which time we will work closely with stakeholders from Colorado's disadvantaged and historically underserved communities to identify barriers to solar and further develop the program design and operations to address those barriers. This stakeholder work will entail a multi-tiered approach including:

- <u>Community leader and program participant interviews:</u> During the planning phase we will conduct interviews with community leaders including representatives of community based organizations, as well as current program participants and potential clients for COS4A such as previous WAP solar customers, participants in existing income qualified community solar

Colorado Solar For All:  Program Narrative                                  October 2023

programs, and applicants to these programs who did not successfully access solar. These interviews will gather input on barriers to participation and inform solutions to address those barriers; financial models; program offerings; and education and outreach materials and messaging. This information will be used to hone our program design and operations before sharing it more broadly with community stakeholders. We will conduct interviews or focus groups across the state, focused in historically underrepresented communities. The interview phase will include education and training for community leaders who can help ensure successful implementation. Participants will be compensated for their time if they are not participating as part of a full-time paid position.

- Community meetings: CEO will host regional in-person and virtual meetings in disadvantaged communities across the state to share its proposed program design. Meetings will also be offered to each federally recognized Tribe in Colorado. Whenever possible, the meetings will be coordinated with other activities that engage eligible COS4A customers (such as engagement on other income qualified programs). CEO will ensure meetings are held in accordance with the state's Environmental Justice Action Taskforce Recommendations on Best Practices for Community Engagement, including offering translation/interpretation, holding meetings in safe, accessible locations, and offering compensation where appropriate.[53] Additionally, CEO will host meetings with existing stakeholder organizations such as the Rocky Mountain Farmers Union; and the Colorado Chapter of National Association of Housing and Redevelopment Officials.

- Development and support of an Advisory Council: CEO will support a COS4A Advisory Council made up of stakeholders who represent historically underserved and disadvantaged communities, workforce and labor, local governments and utilities, affordable housing, service providers, financing and lenders, and others key to the successful implementation of this program. Council participation will be financially compensated for members who are not participating as part of a paid full time role, and members will be provided with a series of training opportunities and facilitated conversations to develop a shared vision of best practices for COS4A.

**6.6 Describe how communities can participate in program and project design, in formal input and feedback structures. These formal structures should include participatory governance and regular, meaningful engagement with community-based organizations and residents of low-income and disadvantaged communities.**
The Advisory Council will be financially and administratively supported through the five-year project timeline, with responsibilities including reviewing evaluation results and recommending programmatic and operational changes as needed; providing input on subgrant evaluation criteria; reviewing and providing feedback on messaging and educational materials; and representing the program to and gathering feedback from their communities. The Advisory Council and CEO will create by-laws and governance documents, including definition of the governance structure and accountability for integrating Advisory Council feedback into the program design and operations.

---

[53]Colorado Environmental Justice Action Task Force.  November 14, 2022.
https://drive.google.com/file/d/1l4rN-o3h3OJg8TciUzh-qxytULvyD_NE/view

CEO will conduct quarterly program evaluation, tracking measures including: household income or income-qualified program participation; household demographics; geographic location (county); location in disadvantaged community (y/n); rural/urban/suburban location; and occupant tenancy (renter/homeowner). Program outcomes such as electricity generated (kWh); greenhouse gas emissions reductions (tons $CO_2e$ reduced); and installed capacity (kW) will also be gathered. This information will be publicly available for program transparency.

Annually, CEO and the Advisory Council will host program evaluation and input meetings to present results and receive program feedback and recommendations for programmatic and operational changes from program partners and community stakeholders. Recommendations and changes implemented based on these recommendations will be publicly available.

**6.7 If there are American Indian and Native Alaska communities in your geography, you should describe how the program will serve these communities and meaningfully involve these communities in program planning and operations.**

Two federally recognized Tribes – the Ute Mountain Ute and the Southern Ute – are located in Colorado. Colorado law requires that any programs and benefits available to local governments also must be available to the Tribes. We will work through the Colorado Commission of Indian Affairs to convene government-to-government meetings to share information and invite the Tribes to participate in COS4A. For the last year and a half CEO has been building relationships and trust with the Tribes and getting a better understanding of their needs and interests. CEO has been exploring ways to collaborate, share funding opportunities and remove application burden when possible since that is a barrier they have expressed based on their capacity. If the Tribe government chooses to participate, we will suggest participation in stakeholder engagement, leader interviews, and the Advisory Council.  We will welcome applications from the Tribes for the Pathway 3 approach to community led, community-designed program participation. We also recognize that many American Indians residing in Colorado, outside of the Ute Mountain Ute and Southern Ute reservations, will be income-eligible for COS4A. As a historically underserved, and heavily energy- and housing-cost burdened community, we will seek to partner with organizations and community leaders to reach these households to participate in COS4A.

# 7. Program Planning Timeline and Workplan Narrative

Phase I Planning:  If awarded funds, the first 6 months of the program will be dedicated to hiring staff, planning and program development.  While the overall objectives of the COS4A program will remain the same - to deliver single-family rooftop solar, multifamily rooftop solar and community solar - the execution strategies and reporting methods need to be developed and finalized. This will include confirming the model assumptions and estimates to calculate household savings; finalizing and integrating the program design with existing state programs, partner programs and affordable housing developers through competitive solicitations as needed; researching best practices for community ownership models and the creation of a workforce development program.  The policy and regulatory framework will be reviewed annually for changes to legislation and any recommendations for new policy that would facilitate solar deployment. The proposed incentives of the financing model will need to be aligned with current market conditions and parameters of when enabling upgrades will be allowed need to be fully defined. The technical assistance strategy for (1) workforce development needs to be coordinated

Colorado Solar For All:  Program Narrative                                              October 2023

with existing programs as well as proposed for integration into the solar development solicitations/contracts; (2) interconnections need to be vetted with the utilities and (3) any barriers associated with project siting, land-use, permitting or building codes need to be evaluated.  The Advisory Council will need to be recruited which will in-turn help inform program design as well educational outreach and community involvement.

Phase II Execution:  After the program specifics have been determined, COS4A will transition to execution mode through the procurement and solicitation process.  Single-family rooftop solar is expected to deploy first while outreach to multi-family owners will commence and planning for community solar developments will begin.  Program milestones will be established during the planning period and the first year will help determine market uptake and inform program projections and any necessary adjustments. With community solar projects averaging 9-12 months to acquire land, obtain zoning approvals, receive utility approvals, construct, connect and activate the solar garden, it could be half way through the program's five-year program period before systems come online and meaningful data can be obtained for all the installation types. Programs will be implemented using a continuous improvement approach, which may require modifying program design and incentives over time, to maximize program impact and stay responsive to changes in the market.

Phase III Closeout: The final phase of the program will be to commence closeout.  This will include submitting the final financial and programmatic reports. In accordance with OMB Uniform Grants Guidance §200.343, CEO will submit all financial, performance, and other reports required under the grant within 90 days after the grant award expires or is terminated. This will require a phase-down approach to ensure that projects are planned with completion deadlines in advance of the program end date.

# 2. Program Administration Narrative

## 1. Budget Narrative

CEO, as part of the state of Colorado infrastructure, has detailed procedures in place to distribute and deploy funds. A major aspect of this infrastructure is built and maintained in the state of Colorado's Office of the State Controller (OSC). Colorado Revised Statutes created the OSC. Part 2, Title 24, Article 30, C.R.S., lists the powers and duties of the State Controller and is incorporated as a reference into each of these Fiscal Rules. Section 24-30-202(13), C.R.S. provides the authority of the State Controller to issue binding Fiscal Rules and is specifically incorporated into each of these State Fiscal Rules as statutory authority. The purpose of the Fiscal Rules is to implement statutory provisions, set forth principles concerning internal controls, accounting policies, and financial reporting for the state of Colorado, and assist the State Controller in managing the finances and financial affairs of the state. This includes controller policies and procedures for general operations such as running a competitive bid process for subrecipients, travel guidance, and contract policies. CEO already has experience in operating federal funds under these guidelines and with that experience comes efficiency.

In accordance with the Request for Application guidance, Colorado will be dedicating 75% of the awarded funds towards financial assistance (including subgrants, subsidies and loans). The current financial model estimates approximately 40% of the single family homes will require

Colorado Solar For All:  Program Narrative                                    October 2023

main electrical panel upgrades.  This equates to approximately 8% of the single-family rooftop solar investment or less than 3% of the total financial assistance package. Existing programs such as WAP, IRA Home Rebate programs and other funding sources will be leveraged to provide the enabling upgrades for weatherization and energy efficiency before Solar for All funds are deployed. The primary objective of the funding is solar deployment and while the extent of enabling upgrades is unknown, some of the funds may be diverted to support enabling upgrades if necessary. The financial assistance will be issued through a competitive bid process to financial institutions, solar developers or third-party operators that can take advantage of federal tax credits which will ultimately be transferred to the residents.  The distribution of funds through the financial assistance strategy is the mechanism to deliver the benefits of affordable, resilient, and clean solar energy which will result in lower utility bills to LIDC residents of Colorado.

The remaining 25% of the funds will support technical assistance, workforce development and program administration. The technical assistance and workforce development will be issued through a competitive bid process to entities like community based organizations, non-profit organizations and workforce development programs. Other entities may be contracted to help with community engagement strategies, including education, outreach, and dissemination of information to the public; customer acquisition support; management and verification requirements and cross-program coordination specific to project deployment. The strategies and specifics of this deployment will be determined in the planning period.  The remaining funds will be distributed through direct costs for personnel.  A new program team will be hired including a senior program director as well as dedicated staff to provide program management, fiscal stewardship, procurement, reporting and monitoring, quality control and outreach services. Additionally, localized regional coordinators will be hired to help with outreach, education and coordination of workforce development opportunities. Furthermore, an Advisory Council is proposed, made up of stakeholders who represent historically underserved and disadvantaged communities, workforce and labor, local governments, utilities, affordable housing, service providers, financing and lenders, and others key to the successful implementation of this program. Council participation will be financially compensated and members will be provided with a series of training opportunities and facilitated conversations to develop a shared vision of best practices for COS4A. The Advisory Council will be supported through the five-year project timeline, with responsibilities including recommending programmatic and operational changes as needed; providing input on subgrant evaluation criteria; reviewing and providing feedback on messaging and educational materials; and representing the program to and gathering feedback from their communities. By-laws and governance documents will be created, including definition of the governance structure and accountability for integrating Advisory Council feedback into the program design and operations. Dedicated funding will also support community-based pilot projects, language services, consultant services to ensure tax credits are maximized and travel around the state to facilitate outreach.

CEO will adhere to and abide by the allowable and unallowable costs in Section III.D: Allowable and Unallowable Costs. Lastly, CEO has a negotiated indirect rate from the Department of Health and Human Services of 44.5% applied to the base of salaries and fringe expenses.

Colorado Solar For All:  Program Narrative                                          October 2023

## 2. Fiscal Stewardship Plan

As an existing state agency, CEO has robust internal controls in place that align with §200.303. In February 2016 the Office of State Controller issued a policy entitled "Internal Control System." The policy makes it mandatory that State agencies adopt and follow the U.S. Government Accountability Office's (USGAO) Standards for Internal Control in the Federal Government (commonly referred to as the Green Book). As part of this, there is segregation of duties in the submission and approval process as well as procurement and accounting. The current structure is set up so that each expense is reviewed by multiple staff for compliance in alignment with federal statutes, regulations, and terms of the award. CEO utilizes Salesforce for approval of purchases. If a staff member wants to make a purchase, a request is logged into the system and reviewed for approval. After approval, the expense is processed with full backup by the accounting team. When processing requests for reimbursement from DOE, the operations team reviews a summary of expenses, to ensure compliance and accurate chart of account elements. If an instance of noncompliance is identified, the issue is resolved promptly. CEO expects a similar level of internal controls from subrecipients.

CEO requires a risk assessment form be completed during the contracting phase of the award. The risk assessment is a framework that was developed by the Colorado Office of the State Controller to assesses risk based on a number of factors including: previous experience with similar subawards, previous audit findings/provide a copy of the lastest audit, reporting of new personnel or systems in place at the agency and details of their accounting system to ensure they can maintain segregated accounts to manage the funds.  This is documented in the OSC Guide for Monitoring Subrecipients. These procedures are consistent with §200.332(b).

After award, in alignment with §200.332(d) CEO conducts monitoring based on assessed risk level, high risk grantees receive more comprehensive frequent monitoring and lower risk level grantees receive sampling style monitoring. This process ensures that all subrecipient spending is evaluated for compliance with the terms and conditions of the award. For both CEO and any subrecipient, waste, fraud, and abuse will not be tolerated and will be identified. CEO mitigates the risk of fraud, waste, and abuse by ensuring all expenditures are allowable via all of the reconciliations and approval processes as described above with the Salesforce process.  This approval process is mapped and documented through the Salesforce Active Approval Matrix.

CEO will ensure comprehensive consumer protections throughout the COS4A program to ensure that contracted savings are actually achieved and to reduce participant risk. These include:

- A contractor vetting and approval process for all COS4A projects.
- Standard disclosure forms written in clear and concise language and available in all common languages across Colorado.
- Warranties and guarantees of workmanship for all COS4A projects.
- Multi-lingual customer service to answer questions, explain program requirements, disclosures and warranties.
- Standard branding to clarify projects that are and are not connected to COS4A.
- Financial protections: no securing solar loans against single-family properties; seek to avoid placing liens on properties to secure loans, unless the size and risk profile of the project necessitates a lien on the real estate; full disclosure of grant opportunities prior to

39

loans; exploring opportunities for replacement reserve funds for malfunctioning systems post warranty but pre-20 year.
- No upfront costs and no penalties for termination of community solar subscriptions. Clear multi-lingual communications around costs, savings, and risks.
  - 5% physical inspection rate rooftop systems
  - 5% client follow up on single-family rooftop systems
- Data collection on all systems; annual data analysis and audit of projected vs actual savings by installer to ensure installation integrity.

## 3. Reporting Plan

CEO intends to hire two data analysts dedicated to developing and executing a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. These individuals will be responsible for developing the underlying methodologies, identifying technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. They will also be responsible for submitting annual reports within 30 days of the end of each reporting period, as well as a final program report, within 120 days after the end of the project period.

CEO will conduct quarterly program evaluation, tracking measures including: household income or income-qualified program participation; household demographics; geographic location (county); location in disadvantaged community (y/n); rural/urban/suburban location; and occupant tenancy (renter/homeowner). Program outcomes such as electricity generated; greenhouse gas emissions reductions and installed capacity (MW) will also be gathered. All avoided emissions calculations will be calculated utilizing the EPA AVERT web edition unless determined otherwise during the planning period. This information will be publically available for program transparency. Evaluations will be conducted in adherence with EPA Order 1000.33, U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings.

## 3. Programmatic Capability and Environmental Results Past Performance

See Attachment F

# EXHIBIT M

5H - 84090401 - 0    Page 1

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br>Grant Agreement | **GRANT NUMBER (FAIN):** 84090401<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/09/2024 |
| | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/12/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>80568 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| COLORADO ENERGY OFFICE<br>1600 BROADWAY STE 1960<br>DENVER, CO 80202-4955<br>EIN:  84-0644739 | COLORADO ENERGY OFFICE<br>1600 BROADWAY STE 1960<br>DENVER, CO 80202-4955 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Ida Mae Isaac<br>1600 Broadway<br>STE 1960<br>DENVER, CO 80202-4955<br>**Email:** idamae.isaac@state.co.us<br>**Phone:** 303-866-2100 | Cynthia Gonzales<br>1595 Wynkoop Street, 5103<br>Denver, CO 80202<br>**Email:** Gonzales.Cynthia@epa.gov<br>**Phone:** 303-312-6569 | Matthew Forte<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Forte.Matthew@epa.gov<br>**Phone:** 202-564-2245 |

**PROJECT TITLE AND DESCRIPTION**

State of Colorado - Solar For All "Note: A Special payment condition applies to this award".

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>09/01/2024 - 08/31/2029 | **PROJECT PERIOD**<br>09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | **DATE**<br>07/09/2024 |

5H - 84090401 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41055 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84090401 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

5H - 84090401 - 0     Page 4

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

5H - 84090401 - 0    Page 5

## Administrative Conditions

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## I. Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

#### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

  Progress towards objectives on key performance metrics over the entire period of performance,

  Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

  Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

  Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

  Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service

Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the***

*Notice of Award:*

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

D. Signage Required

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must

identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

## 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

*__The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:__*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this

5H - 84090401 - 0    Page 15

agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the

conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor,

whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic

requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal

Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

#### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

5H - 84090401 - 0    Page 23

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall

include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**2. Mega Construction Project Program**

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

**The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the** Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** EPA's Final Financial Assistance Conflict of Interest Policy **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332 (e).

### O. Historic Preservation
#### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

#### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above.

The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistoric, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

• **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

• **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, Reporting Subaward and Executive Compensation.

• **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

• **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. **Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).**

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business

information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

Endangered Species Act, as specified in 50 CFR Part 402;

Federal Funding Accountability and Transparency Act;

Farmland Protection Policy Act; and

Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA

5H - 84090401 - 0    Page 36

has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award

or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

5H - 84090401 - 0    Page 38

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT N

## Solar For All (SFA) Terms and Conditions (June 21, 2024)

**I. Definitions** ......................................................................................................................... 3

    Air Pollutant ....................................................................................................................... 3

    Apprentice .......................................................................................................................... 3

    Eligible Recipient ............................................................................................................... 3

    Eligible Zero-Emissions Technology .................................................................................. 4

    EPA Award Official ............................................................................................................ 4

    EPA Project Officer ............................................................................................................ 4

    Financial Assistance .......................................................................................................... 5

    Greenhouse Gas ................................................................................................................ 5

    Low-Income and Disadvantaged Communities ................................................................. 5

    Participant Support Costs .................................................................................................. 6

    Program Administration Activities .................................................................................... 6

    Program Beneficiary .......................................................................................................... 6

    Program Income ................................................................................................................ 6

    Project-Deployment Technical Assistance ........................................................................ 7

    Subaward ........................................................................................................................... 7

    Subrecipient ...................................................................................................................... 7

**II. National Programmatic Terms and Conditions** .................................................................. 8

    A. Performance Reporting ................................................................................................ 8

    B. Cybersecurity Condition .............................................................................................. 10

    C. Competency Policy ...................................................................................................... 12

    D. Signage Required ........................................................................................................ 12

    E. In-Kind Assistance ....................................................................................................... 13

    F. Geospatial Data Standards .......................................................................................... 13

    G. Leveraging and Fund Raising ...................................................................................... 13

    H. Quality Assurance ...................................................................................................... 14

    I. Equipment Disposition ................................................................................................. 15

    J. Real Property ............................................................................................................... 15

    K. Program Income .......................................................................................................... 16

    L. Use of Logos ................................................................................................................ 16

**III. Additional Programmatic Terms and Conditions** ........................................................... 17

    A. Conflicts Among Authorities ....................................................................................... 17

    B. Specific Condition on Completion of EPA-approved Solar for All Workplan ................. 17

    C. Solar for All Workplan ................................................................................................. 18

    D. Allowable and Unallowable Activities ......................................................................... 18

    E. Foreign Entity of Concern ............................................................................................ 19

    F. Low-Income and Disadvantaged Communities Expenditure Requirement ................. 19

    G. Revolving Loan Fund Characterization ........................................................................ 19

    H. Subawards to For-Profit Entities ................................................................................. 20

    I. Subawards as Part of Revolving Loan Funds ................................................................ 20

    J. Participant Support Costs ............................................................................................. 21

    K. Labor and Equitable Workforce Development Requirements ...................................... 22

    L. Build America, Buy America Act ................................................................................... 25

    M. Consumer Protection Requirements .......................................................................... 26

    N. Financial Risk Management Requirements .................................................................. 26

1

O. Historic Preservation ................................................................................................ 27

P. Uniform Relocation Assistance and Real Property Acquisition Policies Act ............ 28

Q. Other Federal Requirements .................................................................................... 28

R. Remedies for Non-Compliance ................................................................................ 29

S. Clarifications to EPA General Terms and Conditions ............................................... 29

T. Period of Performance ............................................................................................. 31

U. Closeout Agreement ................................................................................................ 31

V. Accounting Principles ............................................................................................... 34

W. Internal Controls ..................................................................................................... 34

X. Audits ....................................................................................................................... 34

Y. Annual Workshop ..................................................................................................... 35

Z. EPA Project Officer Oversight and Monitoring ........................................................ 35

AA. Compliant URL Links .............................................................................................. 36

AB. Flow-Down Requirements ...................................................................................... 36

AC. Financial Assistance in the Form of Credit Enhancements .................................... 36

AD. Additional Requirements for Eligible Nonprofit Recipients .................................. 37

**IV. Administrative Terms and Conditions** ...................................................................... 39

A. General Terms and Conditions ................................................................................. 39

B. Correspondence Condition ...................................................................................... 39

C. Intergovernmental Review Period ........................................................................... 39

D. Pre-Award Costs ....................................................................................................... 40

E. Pre-Award Administrative Capability ....................................................................... 40

F. New Recipient Training Requirement ....................................................................... 40

## I. Definitions

**Air Pollutant:** "Air pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** "Apprentice" means an individual working on a project receiving financial assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Eligible Recipient:** Eligible recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible recipients that are states are identified on the Notice of Award as a "state" recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible recipients that are Tribal governments are identified on the Notice of Award as an Indian Tribe recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the recipient type as an Intertribal Consortia.
- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;
    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
    d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

Eligible recipients that are eligible nonprofit recipients are identified on the Notice of Award as a not for profit recipient type, excluding recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW$_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: "EPA Project Officer" means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, financial assistance means assistance that non-Federal entities receive or administer in the form of debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Financial assistance that generates program income such as debt and credit enhancements are considered financial products.

**Greenhouse Gas:** "Greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.
- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.
- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.
- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and

Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or (4) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

**Participant Support Costs**: 2 CFR 200.1 defines participant support costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of participant support costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, participant support costs are primarily a form of financial assistance to projects which enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries. Program administration costs include procuring services and tools that support the recipient in program design (e.g., technical assistance from the United States Department of Energy (DOE) National Laboratories to support the recipient directly for program design). Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** "Program beneficiary" means an entity (either an individual or an organization) that receives financial assistance or technical assistance from the recipient or a subrecipient as an end-user. Expenditures for financial assistance or technical assistance to program beneficiaries are in the form of participant support costs, as defined in 2 CFR 1500.1. A program beneficiary is distinct from a subrecipient, as defined in 2 CFR 200.1.

**Program Income:** Consistent with 2 CFR 200.1, "program income" means gross income earned by the recipient that is directly generated by a supported activity or earned as a result of the award. Under this assistance agreement, program income includes but is not limited to loan and other origination fees, interest payments, principal repayments, interest on cash deposits, revenue from asset sales and other sources of program income. Additionally, under this assistance agreement, refunds from cash reserves, release of loan loss reserves, and similar transactions are treated as program income under 2 CFR 1500.8(b), and terms and conditions applicable to program income apply to such transactions. Costs incidental to the generation of program income may be deducted from gross income to determine

program income as authorized by 2 CFR 1500.8(b). EPA-specific rules on program income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients).

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "project-deployment technical assistance" and is services and tools provided by recipients to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, working capital lines of credit to small businesses, and other services and tools that enable low-income and disadvantaged communities to deploy or benefit from rooftop residential solar, and residential-serving community solar. Please note: financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as "project-deployment technical assistance" for the purposes of this program.

**Subaward:** 2 CFR 200.1 defines a subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity." Since subawards may come in other forms (i.e., loans), the term "subgrant" denotes a subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, "subrecipient" means an entity that receives a subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a program beneficiary of such an award. A subrecipient is distinct from a program beneficiary, which is referenced in 2 CFR 1500.1.

## II. National Programmatic Terms and Conditions

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

### 1. Performance Reports

*Semi-Annual Report*
The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once,

and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

*Final Report*
The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**2. Transaction-Level and Project-Level Data**

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

**B. Cybersecurity Condition**

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**C. Competency Policy**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**D. Signage Required**

**1. Signage Requirements**

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be

placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events
The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days notice.

### E. In-Kind Assistance
This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

### F. Geospatial Data Standards
All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

### G. Leveraging and Fund Raising

## 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising
2 CFR 200.442 provides coverage on allowable fund raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund raising costs charged to the award will be treated as program income.

**H. Quality Assurance**
Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

**1. Quality Management Plan (QMP)**
a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:
i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,
ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,
iii. Submit the QMP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,
iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**
a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:
i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 calendar days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:
• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.
• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.
• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.
• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**I. Equipment Disposition**

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

**J. Real Property**

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

**Disposition**

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring

15

replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

**Recordation**

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

**K. Program Income**

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from gross income to determine program income comply with regulatory requirements.

**L. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must not be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

### III. Additional Programmatic Terms and Conditions

**A. Conflicts Among Authorities**

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

**B. Specific Condition on Completion of EPA-approved Solar for All Workplan**

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 calendar days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

- Revised SF-424A, Budget Information for Non-Construction Programs
- Indirect Rate Proposal or Agreement, if applicable
- Revised Budget Narrative
- Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as required by 2 CFR 200.208(e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

**C. Solar for All Workplan**

**1. EPA-approved Solar for All Workplan**

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

**2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period**

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

**D. Allowable and Unallowable Activities**

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to

18

support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

### E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

### F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

### G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

**H. Subawards to For-Profit Entities**

The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

**I. Subawards as Part of Revolving Loan Funds**

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

**J. Participant Support Costs**
**1. Participant Support Cost Requirements**
The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.
B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

**2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs**
When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](EPA Guidance on Participant Support Costs)

**K. Labor and Equitable Workforce Development Requirements**

**1. Davis-Bacon and Related Acts (DBRA)**
**A.   Program Applicability**
As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon and Related Act requirements and the requirements of these Terms and Conditions The recipient must ensure that these requirements apply to all construction projects assisted by such financial assistance without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the Davis-Bacon and

Related Act, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

**B. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

    **a. Solicitation and Contract Requirements:**
        **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
        **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
    **b. After Award of Contract:**
        **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
        **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

    a. **Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
    b. **Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

c. **Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries**

Any financial assistance provided in the form of a participant support cost to a program beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

a. **Solicitation and Contract Requirements:**
   i. **Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
   ii. **Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
b. **After Award of Contract**:
   i. **Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
   ii. **Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**F. DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

**2. Mega Construction Project Program**

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

### 3. Compliance with Federal Statutes and Regulations
The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Safety and Health Administration.

### 4. Free and Fair Choice to Join a Union
In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

### 5. Disadvantaged Business Enterprises
The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

**L. Build America, Buy America Act**
The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

**M. Consumer Protection Requirements**

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;
2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;
3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;
4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and
5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

**N. Financial Risk Management Requirements**

**1. Cash Management Requirements**

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**2. Climate-Related Financial Risks**

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 3. Additional Requirements

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all subawards and participant support costs made to entities receiving financial assistance or project-deployment technical assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

### O. Historic Preservation

#### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

#### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-

sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

**P. Uniform Relocation Assistance and Real Property Acquisition Policies Act**

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

**Q. Other Federal Requirements**

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

- **Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.
- **Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*
- **Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.
- **Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

**R. Remedies for Non-Compliance**
The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

**S. Clarifications to EPA General Terms and Conditions**
EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

**1. Access to Records**
In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

**2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

**3. Establishing and Managing Subawards**

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate
The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress
The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination
EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.339 and 2 CFR 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste,

fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout

Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

**1. Allowable Activities**
The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

**2. Reporting Requirements**
The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

**3. Low-Income and Disadvantaged Communities Expenditure Requirements**
The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

**4. Cash Management Requirements**
The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

**5. Remedies for Non-Compliance**
The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

**6. Suspension and Debarment**
The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

**7. Non-Discrimination**
The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

33

- Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;
- Executive Order 11988 (Floodplain Management) and Executive Order 14030 (Climate-Related Financial Risk), as specified in the Financial Risk Management Programmatic Term and Condition;
- Endangered Species Act, as specified in 50 CFR Part 402;
- Federal Funding Accountability and Transparency Act;
- Farmland Protection Policy Act; and
- Coastal Zone Management Act.

**10. Amendments to the Closeout Agreement**
The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

**11. Termination of the Closeout Agreement**
The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

**12. Points of Contact**
The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Authorized Representative (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

**V. Accounting Principles**
Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

**W. Internal Controls**
Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

**X. Audits**
The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 calendar days of the submission of any

subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipient) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

### Y. Annual Workshop
Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

### Z. EPA Project Officer Oversight and Monitoring
Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;
2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;
3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;
4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;
5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;
6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7.  Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8.  Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9.  Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration*. If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

### AA. Compliant URL Links
The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

### AB. Flow-Down Requirements
As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### AC. Financial Assistance in the Form of Credit Enhancements
If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as cash reserves. "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds;

(2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

**AD. Additional Requirements for Eligible Nonprofit Recipients**

***The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

**1. Incorporation and Control**
The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

**2. Governance Requirements**

**A. Board Size and Composition**
The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and

make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

**B. Board Independence**

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

**C. Board Policies and Procedures**

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

**3. Legal Counsel**

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

## IV. Administrative Terms and Conditions

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and *[Insert GS or local email box (if local copy desired)]*
- MBE/WBE reports (EPA Form 5700-52A): *[Insert name and contact information of the appropriate DBE coordinator and Grants Specialist (optional)/or local email box.]*
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: *[Insert name and contact information of regional point of contact (the GS, PO, and/or local email box]*
- Payment requests (if applicable): *[Insert name and contact information of the GS and PO/or local email box]*
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: *[Insert name and contact information of the PO]*

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

**D. Pre-Award Costs**

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

**E. Pre-Award Administrative Capability**

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

**F. New Recipient Training Requirement**

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# EXHIBIT O

5H - 84090401 - 1    Page 1

| | | |
|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Assistance Amendment | **GRANT NUMBER (FAIN):** 84090401<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5H | **DATE OF AWARD** 12/04/2024 |
| | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/04/2024 |
| | **PAYMENT METHOD:** ASAP | **ACH#** 80568 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| State | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| COLORADO ENERGY OFFICE<br>1600 Broadway<br>STE 1960<br>Denver, CO 80202-4955<br>EIN:  84-0644739 | COLORADO ENERGY OFFICE<br>1600 Broadway<br>STE 1960<br>Denver, CO 80202-4955 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Ida Mae Isaac<br>1600 Broadway<br>STE 1960<br>Denver, CO 80202-4955<br>**Email:** idamae.isaac@state.co.us<br>**Phone:** 303-866-2100 | Melissa Hopkinson<br>1200 Pennsylvania Ave. NW, 1101R<br>Washington, DC 20460<br>**Email:**  hopkinson.melissa@epa.gov<br>**Phone:** 202-566-0810 | Matthew Forte<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:**  Forte.Matthew@epa.gov<br>**Phone:** 202-564-2245 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

State of Colorado - Solar For All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation.

| **BUDGET PERIOD** 09/01/2024 - 08/31/2029 | **PROJECT PERIOD** 09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST** $ 156,120,000.00 | **TOTAL PROJECT PERIOD COST** $ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, The Office of Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** ||
|---|---|
| **Digital signature applied by EPA Award Official** LaShaun Phillips - Associate Award Official | **DATE** 12/04/2024 |

5H - 84090401 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 155,720,000 | $ 0 | $ 155,720,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84090401 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 5,344,497 |
| 2. Fringe Benefits | $ 1,929,363 |
| 3. Travel | $ 243,749 |
| 4. Equipment | $ 45,000 |
| 5. Supplies | $ 60,550 |
| 6. Contractual | $ 2,100,000 |
| 7. Construction | $ 0 |
| 8. Other | $ 143,225,438 |
| 9. Total Direct Charges | $ 152,948,597 |
| 10. Indirect Costs: 43.60 % Base SW + FB | $ 3,171,403 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 2,500,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

5H - 84090401 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/032024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition:*

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

<u>2 CFR 200 Procurement Standards</u>

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at <u>Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements</u>.

## J. Labor and Equitable Workforce Development Requirements

<u>1. Davis-Bacon and Related Acts (DBRA)</u>

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

5H - 84090401 - 1    Page 35

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as c**ash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

EXHBIT P

## ASSISTANCE AGREEMENT

| | | | |
|---|---|---|---|
| 1. Award No.<br>DE-SE0000081 | 2. Modification No.<br>0001 | 3. Effective Date<br>08/01/2023 | 4. CFDA No.<br>81.041 |

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 BROADWAY STE 1960<br>DENVER CO 802024955 | State and Community Energy Programs<br>U.S. Department of Energy<br>1000 Independence Ave, SW<br>washington DC 20585 | 08/01/2023<br>through<br>07/31/2025 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | 117-169 IRA 2022<br>109-58 Energy Policy Act 2005 | 24SE000975 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 Broadway<br>Suite 1960<br>Denver CO 802024955 | Govt. Share: $69,985,890.00<br><br>Cost Share : $0.00<br><br>Total    : $69,985,890.00 | This action:<br>$68,236,243.00<br><br>Total    :<br>$69,985,890.00 |

| 14. Principal Investigator | 15. Program Manager | 16. Administrator |
|---|---|---|
| | Daniel J. Kelley<br>Phone: 240-982-0050 | Golden Field Office<br>U.S. Department of Energy<br>Golden Field Office<br>15013 Denver West Parkway<br>Golden CO 80401 |

| 17. Submit Payment Requests To | 18. Paying Office | 19. Submit Reports To |
|---|---|---|
| Payment - Direct Payment<br>from U.S. Dept of Treasury | Payment - Direct Payment<br>from U.S. Dept of Treasury | See Attachment 2 |

**20. Accounting and Appropriation Data**

███████████████████████████████████

**21. Research Title and/or Description of Project**
IRA SECTION 50122 – HIGH-EFFICIENCY ELECTRIC HOME REBATE PROGRAM

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br>*[signature: Stephanie Sites]* |
| 23. Name and Title \| 24. Date Signed | 26. Name of Officer<br>Stephanie D. Sites \| 27. Date Signed<br>08/30/2024 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0000081/0001 | | | PAGE 2 | OF 4 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | UEI: JLVGQ4E7RD53 The purposes of this modification are to: | | | | |

UEI: JLVGQ4E7RD53
The purposes of this modification are to:

1) Provide incremental funding, as shown in Block 13;

2) Update the DOE Award Administrator, the DOE Project Officer and the Recipient Principal Investigator, as shown below;

3)  Delete and replace Attachments
        Attachment 1, Narrative File;
        Attachment 2, Reporting Checklist;
        Attachment 3, Budget Information SF424A;
        Attachment 5, NEPA and;

4)  Delete and replace the Special Terms and Conditions.

The current Project Period for this award is 08/01/2023 through 07/31/2028, consisting of the following Tranches:

Tranche 1: 08/01/2023 through 07/31/2025
Tranches 2-4: TBD through TBD

In Block 7 of the Assistance Agreement, the Period of Performance reflects the beginning of the Project Period through the end of the current Budget Period.

In addition to this Assistance Agreement, this award consists of the items listed on the Cover Page of the Special Terms and Conditions.

Recipient acknowledges the activities approved by this award are listed in the NEPA determination, Attachment 5 of this Award. If new activities, or activities that do not fit within the restrictions listed in the NEPA determination are proposed, additional NEPA review and Contracting Officer approval are required. Contact your DOE Project Officer, as shown below.

This award is subject to the Financial Assistance regulations contained in 2 CFR 200 as amended by 2 CFR Part 910.

Funding for all awards and future budget periods is contingent upon the availability of funds appropriated by Congress for the purpose of this
Continued ...

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0000081/0001 | | PAGE 3 | OF 4 |
|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | program and the availability of future-year budget authority. | | | | |

The Special Terms and Conditions for this award
contain specific funding restrictions. Please
review the applicable terms for procedures
required to lift the restrictions. Specifically,
Term 7 which restricts access to funding outside
of your current tranche. This Administrative and
Legal Requirements Document (ALRD) for this Award
establishes funding tranches. The Recipient's
approved use of funds is only for the tranche
that DOE has approved the recipient for. The
Recipient is not approved to use funds in other
tranches beyond those it is approved for. If the
Recipient uses funds beyond what it has been
approved to use, SCEP reserves the right to
disallow associated funds as well as take other
actions as listed in Term 7 of the Special Terms
and Conditions.

All other Terms and Conditions remain unchanged.

DOE Award Administrator: Jarrod Reeson
Email: jarrod.reeson@ee.doe.gov
Phone: 720-916-4822

DOE Project Officer: Daniel Kelley
E-mail: daniel.kelley@hq.doe.gov
Phone: 240-982-0050

Recipient Business Officer: Gregg Hefner
E-mail: Gregg.hefner@state.co.us
Phone:  303-866-2601

Recipient Principal Investigator: Raine Queenan
E-mail: raine.queenan@state.co.us
Phone:  720-315-9216

Electronic signature or signatures as used in
this document means a method of signing an
electronic message that—
(A) Identifies and authenticates a particular
person as the source of the electronic message;
(B) Indicates such person's approval of the
information contained in the electronic message;
and,
(C) Submission via FedConnect constitutes
electronically signed documents.
ASAP: YES Extent Competed: NOT AVAIL FOR COMP

Davis-Bacon Act: NO PI: Queenan, Raine
Continued ...

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-SE0000081/0001 | | | PAGE<br>4 | OF<br>4 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | Fund: 05479 Appr Year: 2022 Allottee: 31 Report<br>Entity: 200835 Object Class: 41020 Program:<br>1800008 Project: 0000000 WFO: 0000000 Local Use:<br>0000000 | | | | |

JULY 2004

**ASSISTANCE AGREEMENT**

| 1. Award No. DE-SE0000025 | 2. Modification No. 0001 | 3. Effective Date 09/01/2023 | 4. CFDA No. 81.041 |
|---|---|---|---|

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 BROADWAY STE 1960<br>DENVER CO 802024955 | State and Community Energy Programs<br>U.S. Department of Energy<br>1000 Independence Ave, SW<br>washington DC 20585 | 09/01/2023<br>through<br>08/31/2025 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | 117-169 IRA 2022<br>109-58 Energy Policy Act 2005 | 24SE001004 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| COLORADO ENERGY OFFICE<br>Attn: Jonathon Bray<br>1600 Broadway<br>Suite 1960<br>Denver CO 802024955 | Govt. Share: $70,256,845.00<br><br>Cost Share : $0.00<br><br>Total    : $70,256,845.00 | This action:<br>$68,496,962.00<br><br>Total    :<br>$70,256,845.00 |

| 14. Principal Investigator | 15. Program Manager | 16. Administrator |
|---|---|---|
| | Daniel J. Kelley<br>Phone: 240-982-0050 | Golden Field Office<br>U.S. Department of Energy<br>Golden Field Office<br>15013 Denver West Parkway<br>Golden CO 80401 |

| 17. Submit Payment Requests To | 18. Paying Office | 19. Submit Reports To |
|---|---|---|
| Payment - Direct Payment<br>from U.S. Dept of Treasury | Payment - Direct Payment<br>from U.S. Dept of Treasury | See Attachment 2 |

20. Accounting and Appropriation Data

████████████████████████████████████

21. Research Title and/or Description of Project
IRA SECTION 50121 - HOME EFFICIENCY REBATES PROGRAM

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br>*Stephanie Sites* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Stephanie D. Sites | 27. Date Signed<br>09/10/2024 |

NSO

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0000025/0001 | | | PAGE 2 | OF 4 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | UEI:  JLVGQ4E7RD53 | | | | |

UEI:  JLVGQ4E7RD53
The purposes of this modification are to:

1) Provide incremental funding, as shown in Block 13;

2) Update the DOE Award Administrator, the DOE Project Officer and the Recipient Principal Investigator, as shown below;

3) Delete and replace Attachments
        Attachment 1, Narrative
        Attachment 2, Reporting Checklist
        Attachment 3, Budget Information SF424A
        Attachment 5, NEPA and;

4) Delete and replace the Special Terms and Conditions.

The current Project Period for this award is 09/01/2023 through 08/31/2028, consisting of the following Tranches:

Tranche 1: 09/01/2023 through 08/31/2025.
Tranches 2-4: TBD through TBD

In Block 7 of the Assistance Agreement, the Period of Performance reflects the beginning of the Project Period through the end of the current Budget Period.

In addition to this Assistance Agreement, this award consists of the items listed on the Cover Page of the Special Terms and Conditions.

Recipient acknowledges the activities approved by this award are listed in the NEPA determination, Attachment 5 of this Award. If new activities, or activities that do not fit within the restrictions listed in the NEPA determination are proposed, additional NEPA review and Contracting Officer approval are required. Contact your DOE Project Officer, as shown below.

This award is subject to the Financial Assistance regulations contained in 2 CFR 200 as amended by 2 CFR Part 910.

Funding for all awards and future budget periods is contingent upon the availability of funds appropriated by Congress for the purpose of this
Continued ...

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-SE0000025/0001 | | | PAGE 3 | OF 4 |

NAME OF OFFEROR OR CONTRACTOR
COLORADO ENERGY OFFICE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | program and the availability of future-year budget authority.<br><br>The Special Terms and Conditions for this award contain specific funding restrictions. Please review the applicable terms for procedures required to lift the restrictions. Specifically, Term 7 which restricts access to funding outside of your current tranche. This Administrative and Legal Requirements Document (ALRD) for this Award establishes funding tranches. The Recipient's approved use of funds is only for the tranche that DOE has approved the recipient for. The Recipient is not approved to use funds in other tranches beyond those it is approved for. If the Recipient uses funds beyond what it has been approved to use, SCEP reserves the right to disallow associated funds as well as take other actions as listed in Term 7 of the Special Terms and Conditions.<br><br>All other Terms and Conditions remain unchanged.<br><br>DOE Award Administrator: Jarrod Reeson<br>Email: jarrod.reeson@ee.doe.gov<br>Phone: 240-562-1854<br><br>DOE Project Officer: Daniel Kelley<br>E-mail: daniel.kelley@hq.doe.gov<br>Phone: 240-982-0050<br><br>Recipient Business Officer: Gregg Hefner<br>E-mail: Gregg.hefner@state.co.us<br>Phone:  720-672-2839<br><br>Recipient Principal Investigator: Annie Beall<br>E-mail: annie.beall@state.co.us<br>Phone:  720-315-9216<br><br>Electronic signature or signatures as used in this document means a method of signing an electronic message that—<br><br>(A) Identifies and authenticates a particular person as the source of the electronic message;<br>(B) Indicates such person's approval of the information contained in the electronic message; and,<br>(C) Submission via FedConnect constitutes electronically signed documents.<br><br>ASAP: YES Extent Competed: NOT AVAIL FOR COMP<br>Continued ... | | | | |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>DE-SE0000025/0001 | | | PAGE<br>4 | OF<br>4 |

**NAME OF OFFEROR OR CONTRACTOR**
COLORADO ENERGY OFFICE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | Davis-Bacon Act: NO PI: Beall, Annie<br>Fund: 05478 Appr Year: 2022 Allottee: 31 Report<br>Entity: 200835 Object Class: 41020 Program:<br>1800007 Project: 0000000 WFO: 0000000 Local Use:<br>0000000 | | | | |

# EXHIBIT Q



# Inflation Reduction Act (IRA)
# Special Terms and Conditions

The Grantee ("Recipient"), which is identified in Block 5 of the Assistance Agreement, and the Office of State and Community Energy Programs ("SCEP") an office within the United States Department of Energy ("DOE"), enter into this Award, referenced above, to achieve the project objectives and the technical milestones and deliverables stated in Attachment 1 to this Award.

This Award consists of the following documents, including all terms and conditions therein:

|  | Assistance Agreement |
|---|---|
|  | Special Terms and Conditions |
| Attachment 1 | Narrative |
| Attachment 2 | Federal Assistance Reporting Checklist and Instructions |
| Attachment 3 | Budget Information SF-424A |
| Attachment 5 | NEPA Determination |

The following are incorporated into this Award by reference:
- DOE Assistance Regulations, 2 CFR part 200 as supplemented by 2 CFR part 910 at http://www.eCFR.gov.
- National Policy Requirements (November 12, 2020) at http://www.nsf.gov/awards/managing/rtc.jsp.
- Public Law 117-169, also known as the Inflation Reduction Act (IRA).
- The Recipient's application/proposal as approved by SCEP.

Case 1:25-cv-00039-JJM-PAS   Document 68-123   Filed 02/07/25   Page 484 of 556
PageID #: 6414

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
**Special Terms and Conditions**

# Table of Contents

**Subpart A.   General Provisions** ..................................................................................................1

**Term 1.**   Legal Authority and Effect ............................................................................................1
**Term 2.**   Reserved ......................................................................................................................1
**Term 3.**   Flow Down Requirement ..............................................................................................1
**Term 4.**   Compliance with Federal, State, and Municipal Law ....................................................1
**Term 5.**   Inconsistency with Federal Law ....................................................................................1
**Term 6.**   Federal Stewardship ....................................................................................................1
**Term 7.**   Federal Involvement ....................................................................................................2
**Term 8.**   NEPA Requirements .....................................................................................................3
**Term 9.**   Historic Preservation ...................................................................................................4
**Term 10.**  Performance of Work in United States ..........................................................................4
**Term 11.**  Foreign National Involvement .....................................................................................5
**Term 12.**  Foreign National Participation .....................................................................................5
**Term 13.**  Post-Award Due Diligence Reviews ..............................................................................5
**Term 14.**  Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress ...6
**Term 15.**  Reporting Requirements ..............................................................................................6
**Term 16.**  Lobbying ......................................................................................................................6
**Term 17.**  Publications .................................................................................................................7
**Term 18.**  No-Cost Extension .......................................................................................................7
**Term 19.**  Property Standards ......................................................................................................7
**Term 20.**  Insurance Coverage .....................................................................................................8
**Term 21.**  Real Property ...............................................................................................................8
**Term 22.**  Equipment ...................................................................................................................8
**Term 23.**  Supplies .......................................................................................................................9
**Term 24.**  Property Trust Relationship ..........................................................................................9
**Term 25.**  Record Retention .........................................................................................................9
**Term 26.**  Audits ..........................................................................................................................9
**Term 27.**  Site Visits and Recipient Administrative Organizational Reviews ..................................10
**Term 28.**  Indemnity ....................................................................................................................10

**Subpart B.   Financial Provisions**.................................................................................................11

**Term 29.**  Maximum Obligation ..................................................................................................11
**Term 30.**  Funding of Tranches ....................................................................................................11
**Term 31.**  Continuation Application and Funding .........................................................................11
**Term 32.**  Refund Obligation .......................................................................................................12
**Term 33.**  Allowable Costs ..........................................................................................................12
**Term 34.**  Indirect Costs ..............................................................................................................12
**Term 35.**  Decontamination and/or Decommissioning (D&D) Costs .............................................14
**Term 36.**  Use of Program Income ...............................................................................................14
**Term 37.**  Payment Procedures ...................................................................................................14
**Term 38.**  Budget Changes ..........................................................................................................16

**Subpart C.   Miscellaneous Provisions** ........................................................................................17

**Term 39.**  Insolvency, Bankruptcy or Receivership ......................................................................17
**Term 40.**  Reporting Subawards and Executive Compensation .....................................................17
**Term 41.**  System for Award Management and Universal Identifier Requirements .........................21
**Term 42.**  Nondisclosure and Confidentiality Agreements Assurances .........................................23
**Term 43.**  Subrecipient and Contractor Approvals .......................................................................24
**Term 44.**  Subrecipient and Subcontractor Change Notification ...................................................25
**Term 45.**  Conference Spending...................................................................................................26

**U.S. DEPARTMENT OF**
**ENERGY** | Energy Efficiency &
Renewable Energy

Term 46.    **Recipient Integrity and Performance Matters**..................................................26
Term 47.    **Export Control**..............................................................................................28
Term 48.    **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**...........28
Term 49.    **Fraud, Waste and Abuse**................................................................................29
Term 50.    **Interim Conflict of Interest Policy for Financial Assistance Policy** ....................29
Term 51.    **Organizational Conflict of Interest**................................................................30
Term 52.    **Participants and Other Collaborating Organizations**........................................31
Term 53.    **Community Benefits Outcomes and Objectives** .............................................31
Term 54.    **Human Subjects Research** .............................................................................31
Term 55.    **Affirmative Action and Pay Transparency Requirements** ..............................32
Term 56.    **Potentially Duplicative Funding Notice** ........................................................33

**Subpart D.  Inflation Reduction Act (IRA) Specific Requirements .......................................... 33**

Term 57.    **Program Launch Approval**.............................................................................33
Term 58.    **Implementation Blueprint Submission** ..........................................................33
Term 59.    **Reporting Tracking and Segregation of Incurred Costs** ................................34

# Subpart A.    General Provisions

## Term 1.    Legal Authority and Effect

A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

The Recipient may accept or reject the Award. A request to draw down DOE funds or acknowledgement of award documents by the Recipient's authorized representative through electronic systems used by DOE, specifically FedConnect, constitutes the Recipient's acceptance of the terms and conditions of this Award.  Acknowledgement via FedConnect by the Recipient's authorized representative constitutes the Recipient's electronic signature.

## Term 2.    Reserved

## Term 3.    Flow Down Requirement

The Recipient agrees to apply the terms and conditions of this Award, as applicable, including the Intellectual Property Provisions, to all subrecipients (and subcontractors, as appropriate), as required by 2 CFR 200.101, and to require their strict compliance therewith.  Further, the Recipient must apply the Award terms as required by 2 CFR 200.327 to all subrecipients (and subcontractors, as appropriate), and to require their strict compliance therewith.

## Term 4.    Compliance with Federal, State, and Municipal Law

The Recipient is required to comply with applicable Federal, state, and local laws and regulations for all work performed under this Award.  The Recipient is required to obtain all necessary Federal, state, and local permits, authorizations, and approvals for all work performed under this Award.

## Term 5.    Inconsistency with Federal Law

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this Award must be referred to the DOE Award Administrator for guidance.

## Term 6.    Federal Stewardship

SCEP will exercise normal Federal stewardship in overseeing the project activities performed under this Award.  Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to address deficiencies that develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the project objectives have been accomplished.

## Term 7.    Federal Involvement

**A. Review Meetings**

The Recipient, including but not limited to, the principal investigator (or, if applicable, co-principal investigators), is required to participate in periodic review meetings with SCEP.  Review meetings enable SCEP to assess the work performed under this Award and determine whether the Recipient has timely achieved the milestones and deliverables stated in Attachment 1 to this Award.

SCEP shall determine the frequency of review meetings and select the day, time, and location of each review meeting and shall do so in a reasonable and good faith manner. SCEP will provide the Recipient with reasonable notice of the review meetings.

For each review meeting, the Recipient is required to provide a comprehensive overview of the project, including:
- The Recipient's progress compared to the Narrative Document in Attachment 1 to this Award.
- The Recipient's actual expenditures compared to the approved budget in Attachment 3 to this Award.
- Other subject matter specified by the DOE Project Officer.

**B. Project Meetings**

The Recipient is required to notify SCEP in advance of scheduled tests and internal project meetings that would entail discussion of topics that could result in major changes to the baseline project scope/approach, cost, or schedule.  Upon request by SCEP, the Recipient is required to provide SCEP with reasonable access (by telephone, webinar, or otherwise) to the tests and project meetings.  The Recipient is not expected to delay any work under this Award for the purpose of government insight.

**C. Site Visits**

SCEP's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required.  The Recipient must provide, and must require subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties.  All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

**D. Tranche Continuation Decisions**

The Administrative and Legal Requirements Document (ALRD) for this Award establishes funding tranches. The Recipient's approved use of funds is only for the

tranche that DOE has approved the recipient for. The Recipient is not approved to use funds in other tranches beyond those it is approved for. If the Recipient uses

funds beyond what it has been approved to use, SCEP reserves the right to take appropriate action up to and including those listed below.

For each funding tranche, SCEP must determine whether the Recipient has fully and satisfactorily completed the work described in the ALRD, Program Requirements, award attachments, award terms and conditions as well as DOE approved plans for this Award. The holistic performance of the award is taken into consideration during the continuation review. As a result of the continuation review, in its discretion, SCEP may take one of the following actions:
- Continue to fund the project, contingent upon the availability of funds appropriated by Congress for the purpose of this program;
- Place a hold on additional federal funding for the project, pending sufficient progress against performance targets, milestones and deliverables, further supporting data or funding; or
- Discontinue funding the project because of insufficient progress, change in strategic direction, or lack of funding.

If routine data reviews demonstrate the Recipient is not meeting Plan terms, DOE reserves the right to put a hold on the funds the Recipient can draw down under the Automated Standard Application for Payments (ASAP) System.

**E. Performance Targets, Milestones, and Deliverables**
The Administrative and Legal Requirements Document (ALRD) and Program Requirements for this Award establishes performance targets, milestones, and deliverables required to continue into a new tranche of funding.  If the Recipient fails to meet the established performance targets, milestones and/or deliverables, the Recipient must provide an improvement plan in its continuation application for how it will improve program performance to meet the next tranche's targets. DOE approval is required in order to move to the next tranche and for funds to be released.

**F. SCEP Access**
The Recipient must provide any information, documents, site access, or other assistance requested by SCEP for the purpose of its Federal stewardship or substantial involvement.

## Term 8.    NEPA Requirements
DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of federal funds. Based on all information provided by the Recipient, SCEP has made a NEPA determination by issuing a categorical exclusion (CX) for all activities listed in the Statement of

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

Project Objectives (SOPO) approved by the Contracting Officer and the DOE NEPA Determination. The Recipient is thereby authorized to use federal funds for the defined project activities, except where such activity is subject to a restriction set forth elsewhere in this Award.

This authorization is specific to the project activities and locations as described in the SOPO approved by the Contracting Officer and the DOE NEPA Determination.

***If the Recipient later intends to add to or modify the activities or locations*** as described in the approved SOPO and the DOE NEPA Determination, those new activities/locations or modified activities/locations are subject to additional NEPA review and are not authorized for federal funding until the Contracting Officer provides written authorization on those additions or modifications. Should the Recipient elect to undertake activities or change locations prior to written authorization from the Contracting Officer, the Recipient does so at risk of not receiving federal funding for those activities, and such costs may not be recognized as allowable cost share.

## Term 9.    Historic Preservation

### A.  Authorization

DOE must comply with the requirements of Section 106 of the National Historic Preservation Act (NHPA) prior to authorizing the use of Federal funds.  Section 106 applies to historic properties that are listed in or eligible for listing in the National Register of Historic Places.  DOE does not anticipate any impacts to resources of concern.

## Term 10.    Performance of Work in United States

### A.  Requirement
All work performed under this Award must be performed in the United States unless the Contracting Officer provides a waiver. This requirement does not apply to the purchase of supplies and equipment; however, the Recipient should make every effort to purchase supplies and equipment within the United States. The Recipient must flow down this requirement to its subrecipients and subcontractors.

### B.  Failure to Comply
If the Recipient fails to comply with the Performance of Work in the United States requirement, the Contracting Officer may deny reimbursement for the work conducted outside the United States and such costs may not be recognized as allowable Recipient cost share regardless if the work is performed by the Recipient, subrecipients, vendors or other project partners.

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency &
Renewable Energy

**Award No. DE-SE0000081.0001**
**Special Terms and Conditions**

C. **Waiver for Work Outside the U.S.**

All work performed under this Award must be performed in the United States. However, the Contracting Officer may approve the Recipient to perform a portion of the work outside the United States under limited circumstances. The Recipient must obtain a waiver from the Contracting Officer prior to conducting any work outside the U.S.  To request a waiver, the Recipient must submit a written waiver request to the Contracting Officer, which includes the following information:

- The rationale for performing the work outside the U.S.;
- A description of the work proposed to be performed outside the U.S.;
- Proposed budget of work to be performed; and
- The countries in which the work is proposed to be performed.

For the rationale, the Recipient must demonstrate to the satisfaction of the Contracting Officer that the performance of work outside the United States would further the purposes of the ALRD or Program that the Award was selected under and is in the economic interests of the United States.  The Contracting Officer may require additional information before considering such request.

## Term 11.    Foreign National Involvement

The Recipient and project participants (including subrecipients and contractors) who anticipate involving foreign nationals in the performance of an award, may be required to provide DOE with specific information about each foreign national to satisfy requirements for foreign national participation.  A foreign national is defined as any person who is not a U.S. citizen by birth or naturalization. The volume and type of information collected may depend on various factors associated with the award.

## Term 12.    Foreign National Participation

A "foreign national" is defined as any person who is not a U.S. citizen by birth or naturalization.

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of the Award, the Recipient must, upon DOE's request, provide DOE with specific information about each foreign national to ensure compliance with the requirements for participation and access approval. The volume and type of information required may depend on various factors associated with the Award. The DOE Contracting Officer will notify the Recipient if this information is required.

DOE may elect to deny a foreign national's participation in the Award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs, or personnel. DOE's determination to deny participation or access is not appealable.

## Term 13.    Post-Award Due Diligence Reviews

During the period of performance of the Award, DOE may conduct ongoing due diligence

reviews, through Government resources, to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring an individual or entity not participate in the Award.

## Term 14.    Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this Award should be American-made.

## Term 15.    Reporting Requirements

### A.    Requirements
The reporting requirements for this Award are identified on the Federal Assistance Reporting Checklist, attached to this Award.  Failure to comply with these reporting requirements is considered a material noncompliance with the terms of the Award. Noncompliance may result in withholding of future payments, suspension, or termination of the current award, and withholding of future awards.  A willful failure to perform, a history of failure to perform, or unsatisfactory performance of this and/or other financial assistance awards, may also result in a debarment action to preclude future awards by Federal agencies.

### B.    Dissemination of Scientific and Technical Information
Scientific and Technical Information (STI) generated under this Award will be submitted to DOE via the Office of Scientific and Technical Information's Energy Link (E-Link) system.  STI submitted under this Award will be disseminated via DOE's OSTI.gov website subject to approved access limitations. Citations for journal articles produced under the Award will appear on the DOE PAGES website.

### C.    Restrictions
Scientific and Technical Information submitted to E-Link must not contain any Protected Personal Identifiable Information (PII), limited rights data (proprietary data), classified information, information subject to export control classification, or other information not subject to release.

## Term 16.    Lobbying

By accepting funds under this Award, the Recipient agrees that none of the funds obligated on the Award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913.  This restriction is in addition to those prescribed elsewhere in statute and regulation.

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

## Term 17. Publications

The Recipient is required to include the following acknowledgement in publications arising out of, or relating to, work performed under this Award, whether copyrighted or not:

- *Acknowledgment:* "This material is based upon work supported by the U.S. Department of Energy's Office of State and Community Energy Programs (SCEP) under the IRA Home Energy Rebates Award Number SE-0000081."

- *Full Legal Disclaimer:* "This report was prepared as an account of work sponsored by an agency of the United States Government.  Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.  Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

  *Abridged Legal Disclaimer:* "The views expressed herein do not necessarily represent the views of the U.S. Department of Energy or the United States Government."

  Recipients should make every effort to include the full Legal Disclaimer. However, in the event that recipients are constrained by formatting and/or page limitations set by the publisher, the abridged Legal Disclaimer is an acceptable alternative.

## Term 18. No-Cost Extension

As provided in 2 CFR 200.308, the Recipient must provide the Contracting Officer with notice in advance if it intends to utilize a one-time, no-cost extension of this Award. The notification must include the supporting reasons and the revised period of performance. The Recipient must submit this notification in writing to the Contracting Officer and DOE Technology Manager/ Project Officer at least 30 days before the end of the current budget period.

Any no-cost extension will not alter the project scope, milestones, deliverables, or budget of this Award.

## Term 19. Property Standards

The complete text of the Property Standards can be found at 2 CFR 200.310 through 200.316. Also see 2 CFR 910.360 for additional requirements for real property and equipment for For-Profit recipients.

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

## Term 20.    Insurance Coverage

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds. Also see 2 CFR 910.360(d) for additional requirements for real property and equipment for For-Profit recipients.

## Term 21.    Real Property

Subject to the conditions set forth in 2 CFR 200.311, title to real property acquired or improved under a Federal award will conditionally vest upon acquisition in the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.311 before disposing of the property.

Except as otherwise provided by Federal statutes or by the Federal awarding agency, real property will be used for the originally authorized purpose as long as needed for that purpose. When real property is no longer needed for the originally authorized purpose, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.  The instructions must provide for one of the following alternatives: (1) retain title after compensating DOE as described in 2 CFR 200.311(c)(1); (2) Sell the property and compensate DOE as specified in 2 CFR  200.311(c)(2); or (3) transfer title to DOE or to a third party designated/approved by DOE as specified in 2 CFR 200.311(c)(3).

See 2 CFR  200.311 for additional requirements pertaining to real property acquired or improved under a Federal award.  Also see 2 CFR 910.360 for additional requirements for real property for For-Profit recipients.

## Term 22.    Equipment

Subject to the conditions provided in 2 CFR 200.313, title to equipment (property) acquired under a Federal award will conditionally vest upon acquisition with the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.313 before disposing of the property.

A state must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by DOE in the priority order specified in 2 CFR 200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR 200.313(d).
When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.

Disposition will be made as follows: (1) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to DOE; (2) Non-Federal entity may retain title or sell the equipment after compensating DOE as described in 2 CFR 200.313(e)(2); or (3) transfer title to DOE or to an eligible third party as specified in 2 CFR 200.313(e)(3).

See 2 CFR 200.313 for additional requirements pertaining to equipment acquired under a Federal award.  Also see 2 CFR 910.360 for additional requirements for equipment for For-Profit recipients. See also 2 CFR 200.439 Equipment and other capital expenditures.

## Term 23.    Supplies

See 2 CFR 200.314 for requirements pertaining to supplies acquired under a Federal award.  See also 2 CFR 200.453 Materials and supplies costs, including costs of computing devices.

## Term 24.    Property Trust Relationship

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.  See 2 CFR 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

## Term 25.    Record Retention

Consistent with 2 CFR 200.334 through 200.338, the Recipient is required to retain records relating to this Award.

## Term 26.    Audits

### A.  Government-Initiated Audits

The Recipient must provide any information, documents, site access, or other assistance requested by SCEP, DOE or Federal auditing agencies (e.g., DOE Inspector General, Government Accountability Office) for the purpose of audits and investigations.  Such assistance may include, but is not limited to, reasonable access to the Recipient's records relating to this Award.

Consistent with 2 CFR part 200 as amended by 2 CFR part 910, DOE may audit the Recipient's financial records or administrative records relating to this Award at any time. Audits or reviews may be performed to determine if the Recipient has an adequate financial management system to estimate, bill, and record federal government expenditures in accordance with the criteria in 2 CFR 200.302, Generally Accepted Accounting Principles (GAAP), Generally Accepted Government Accounting Standards (GAGAS), and Standard Form 1408.Government-initiated audits are generally paid for by DOE.

DOE may conduct a final audit at the end of the project period (or the termination of the Award, if applicable).  Upon completion of the audit, the Recipient is required to refund to DOE any payments for costs that were determined to be unallowable.  If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

DOE will provide reasonable advance notice of audits and will minimize interference with ongoing work, to the maximum extent practicable.

**B. Annual Independent Audits (Single Audit or Compliance Audit)**
The Recipient must comply with the annual independent audit requirements in 2 CFR 200.500 through .521 for institutions of higher education, nonprofit organizations, and state and local governments (Single audit), and 2 CFR 910.500 through .521 for for-profit entities (Compliance audit).

The annual independent audits are separate from Government-initiated audits discussed in part A. of this Term, and must be paid for by the Recipient. To minimize expense, the Recipient may have a Compliance audit in conjunction with its annual audit of financial statements.  The financial statement audit is **not** a substitute for the Compliance audit.  If the audit (Single audit or Compliance audit, depending  on Recipient entity type) has not been performed or completed prior to the closeout of the award, DOE may impose one or more of the actions outlined in 2 CFR 200.339, Remedies for Noncompliance.

## Term 27.    Site Visits and Recipient Administrative Organizational Reviews

SCEP's authorized representatives have the right to make site visits and conduct Recipient Administrative Organizational Reviews to review the project and management control systems and to provide technical assistance, as appropriate. The Recipient must provide, and must require its subrecipients and contractors to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. SCEP will make reasonable efforts to ensure these site visits do not interfere with or unduly delay project work.

## Term 28.    Indemnity

The Recipient shall indemnify DOE and its officers, agents, or employees for any and all liability, including litigation expenses and attorneys' fees, arising from suits, actions, or claims of any character for death, bodily injury, or loss of or damage to property or to the environment, resulting from the project, except to the extent that such liability results from the direct fault or negligence of DOE officers, agents or employees, or to the extent such liability may be covered by applicable allowable costs provisions.

## Subpart B.    Financial Provisions

### Term 29.    Maximum Obligation

The maximum obligation of DOE for this Award is the total "Funds Obligated" stated in Block 13 of the Assistance Agreement to this Award.

### Term 30.    Funding of Tranches

SCEP has obligated funding as shown in Block 13 of the Assistance Agreement for completion of the Project. However, only the federal share of costs associated with the current funding tranche is available for work performed by the Recipient. Tranches are associated with specific project milestones, which are outlined in the Administrative and Legal Requirements Document (ALRD), associated with this program. The federal share of costs is shown on Attachment 3.

The remainder of funding is contingent upon: (1) the availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) Recipient's satisfactory progress towards meeting the objectives of the Home Energy Rebates Program; (4) Recipient's submittal of required reports; (5) Recipient's compliance with the terms and conditions of the Award; (6) the Recipient's submission of a continuation application; and (7) written approval of the continuation application by the Contracting Officer.

In the event that the Recipient does not submit a continuation application for subsequent tranches, or SCEP disapproves a continuation application for subsequent tranches, the maximum SCEP liability to the Recipient is the funds that are available for the current approved tranche. In such event, SCEP reserves the right to deobligate any remaining federal funds.

### Term 31.    Continuation Application and Funding

**A. Continuation Application**
A continuation application is a non-competitive application to enter into a new funding tranche.  The continuation application shall be submitted to SCEP in accordance with the tranche table in the ALRD that is issued.

**B. Continuation Funding**
Continuation funding is contingent on (1) the availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) Recipient's satisfactory progress towards meeting the objectives of the Home Energy Rebates Program; (4) Recipient's submittal of required reports; (5) Recipient's compliance with the terms and conditions of the Award; (6) the Recipient's submission of a continuation application; and (7) written approval of the continuation application by the Contracting Officer. The holistic performance of the award is taken into consideration during the continuation review.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

### C. Continuation Review

The Administrative and Legal Requirements Document (ALRD) outlines expected performance targets and deliverables required to continue into a new tranche of funding. In addition, DOE will take the full performance of the award into consideration when making a continuation decision. If a Recipient's overall performance is assessed by DOE to be inadequate, DOE reserves the right to disapprove a continuation into a new tranche of funding.

## Term 32.    Refund Obligation

The Recipient must refund any excess payments received from SCEP, including any costs determined unallowable by the Contracting Officer.  Upon the end of the project period (or the termination of the Award, if applicable), the Recipient must refund to SCEP the difference between (1) the total payments received from SCEP, and (2) the Federal share of the costs incurred. Refund obligations under this Term do not supersede the annual reconciliation or true up process if specified under the Indirect Cost Term.

## Term 33.    Allowable Costs

DOE determines the allowability of costs through reference to 2 CFR part 200 as amended by 2 CFR part 910.  All project costs must be allowable, allocable, and reasonable. The Recipient must document and maintain records of all project costs, including, but not limited to, the costs paid by Federal funds, costs claimed by its subrecipients and project costs that the Recipient claims as cost sharing, including in-kind contributions.  The Recipient is responsible for maintaining records adequate to demonstrate that costs claimed have been incurred, are reasonable, allowable and allocable, and comply with the cost principles.  Upon request, the Recipient is required to provide such records to DOE.  Such records are subject to audit. Failure to provide DOE adequate supporting documentation may result in a determination by the Contracting Officer that those costs are unallowable.

The Recipient is required to obtain the prior written approval of the Contracting Officer for any foreign travel costs.

## Term 34.    Indirect Costs

### A. Indirect Cost Allocation:

The Recipient has a federally approved provisional Negotiated Indirect Cost Rate Agreement (NICRA) with a current effective period identified for billing and estimation purposes and it applies uniformly across all federal awards. These costs shall be reconciled or trued up (actual incurred costs) on an annual basis with the Recipient's cognizant agency. An updated rate proposal or NICRA is required if the Recipient requests to bill the DOE higher billing rates than those listed in the current NICRA.

**B. Fringe Cost Allocation:**
Fringe benefit costs have been allocated to this award under a segregated fringe billing rate. The fringe costs were found to be reasonable, allocable, and allowable as reflected in the budget. Fringe elements apply to both direct and indirect labor. Under a segregated cost pool, the fringe billing rate shall be treated as an indirect cost expenditure and must be reconciled annually.

**C. Subrecipient Indirect Costs (If Applicable):**
The Recipient must ensure its subrecipient's indirect costs are appropriately managed, have been found to be allowable, and comply with the requirements of this Award and 2 CFR Part 200 as amended by 2 CFR Part 910.

**D. Indirect Cost Stipulations:**

    **i. Modification to Indirect Cost Billing Rates**
SCEP will not modify this Award solely to provide additional funds to cover increases in the Recipient's indirect cost billing rate(s). Adjustments to the indirect cost billing rates must be approved by the Recipient's Cognizant Agency or Cognizant Federal Agency Official.

The Recipient must provide a copy of an updated NICRA or indirect rate proposal to the DOE Award Administrator in order to increase indirect cost billing rates. If the Contracting Officer provides prior written approval, the Recipient may incur an increase in the indirect cost billing rates. Reimbursement will be limited by the budgeted dollar amount for indirect costs for each budget period as shown in Attachment 3 to this Award.

    **ii. Annual Cost Reconciliation**
In accordance with Appendices III-VII of 2 CFR Part 200 or 48 CFR 42.7, governing for-profit organizations, the indirect cost billing rates shall be reconciled or trued up (actual incurred costs) on an annual basis via the annual incurred cost proposal within six months after the Recipient's fiscal year end.

    **iii. Adjustments to Indirect Cost Billing Rates**
Following an official audit or adequacy review of the incurred cost proposal, one of the following shall apply:

        1. If the Recipient's actual and final annual indirect cost billing rate(s) reflect that Recipient invoiced at higher billing rates than actually incurred, the Recipient must refund the Government the over-recovered amounts.

2.  If the Recipient's actual and final annual indirect cost billing rate(s) reflect that the Recipient invoiced at lower billing rates than actually incurred, the Recipient may not be reimbursed for increases in its indirect cost rate, which resulted in an under-recovery. Increased indirect cost billing rates cannot be retroactively applied to the DOE award.

iv.  **Award Closeout**
The closeout of the DOE award does not affect (1) the right of the DOE to disallow costs and recover funds on the basis of a later audit or other review; (2) the requirement for the Recipient to return any funds due as a result of later refunds, corrections or other transactions including final indirect cost billing rate adjustments; and (3) the ability of the DOE to make financial adjustments to a previously closed award resolving indirect cost payments and making final payments.

## Term 35.    Decontamination and/or Decommissioning (D&D) Costs

Notwithstanding any other provisions of this Award, the Government shall not be responsible for or have any obligation to the Recipient for (1) Decontamination and/or Decommissioning (D&D) of any of the Recipient's facilities, or (2) any costs which may be incurred by the Recipient in connection with the D&D of any of its facilities due to the performance of the work under this Award, whether said work was performed prior to or subsequent to the effective date of the Award.

## Term 36.    Use of Program Income

If the Recipient earns program income during the project period as a result of this Award, the Recipient must add the program income to the funds committed to the Award and used to further eligible project objectives.

## Term 37.    Payment Procedures

A.  **Method of Payment**
Payment will be made by advances through the Department of Treasury's ASAP system.

B.  **Requesting Advances**
Requests for advances must be made through the ASAP system.  The Recipient may submit requests as frequently as required to meet its needs to disburse funds for the Federal share of project costs.   If feasible, the Recipient should time each request so that the Recipient receives payment on the same day that the Recipient disburses funds for direct project costs and the proportionate share of any allowable indirect costs.   If same-day transfers are not feasible, advance payments must be as close to actual disbursements as administratively feasible.

C. **Adjusting Payment Requests for Available Cash**
The Recipient must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from SCEP.

D. **Payments**
All payments are made by electronic funds transfer to the bank account identified on the Bank Information Form that the Recipient filed with the U.S. Department of Treasury.

E. **Unauthorized Drawdown of Federal Funds**
For each budget period, the Recipient may not spend more than the Federal share authorized to that particular budget period, without specific written approval from the Contracting Officer. The Recipient must immediately refund SCEP any amounts spent or drawn down in excess of the authorized amount for a budget period. The Recipient and subrecipients shall promptly, but at least quarterly, remit to DOE interest earned on advances drawn in excess of disbursement needs, and shall comply with the procedure for remitting interest earned to the Federal government per 2 CFR 200.305, as applicable.

F. **Supporting Documents for Agency Approval of Payments**
DOE may require Agency pre-approval of payments.  If the Agency approval requirement is in effect for the Recipient's Award, the ASAP system will indicate that Agency approval is required when the Recipient submits a request for payment.

The Recipient must notify the DOE Technical Project Officer and DOE Award Administrator identified on the Assistance Agreement that a payment request has been submitted.

The following items are required to be submitted to the DOE Technical Project Officer and DOE Award Administrator identified on the Assistance Agreement:
- Summary cost data, for the billing period and cumulative cost data, showing all categories listed in the SF-424A and identifying Federal, non-Federal, and total amounts.
- SF-270.
- If there are unauthorized phases and/or tasks for the current budget period in the NEPA Requirements term in these Special Terms and Conditions, a statement affirming that no invoiced costs are related to tasks or activities prohibited by the NEPA Requirements term.

- *Applicable to for-profit recipients and subrecipients* UCC filing proof for all equipment acquired with project funds (i.e., Federal share or Recipient share)

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

and equipment offered as cost share.

The DOE payment authorizing official may request additional information from the Recipient to support the payment requests prior to release of funds, as deemed necessary. The Recipient is required to comply with these requests. Supporting documents include invoices, copies of contracts, vendor quotes, and other expenditure explanations that justify the payment requests.

## Term 38. Budget Changes

### A. Budget Changes Generally
The Contracting Officer has reviewed and approved the SF-424A in Attachment 3 to this Award.

Any increase in the total project cost, whether DOE share or Cost Share, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award, must be approved in advance and in writing by the Contracting Officer.

Any change that alters the program design, project scope, milestones or deliverables requires prior written approval of the Contracting Officer. SCEP may deny reimbursement for any failure to comply with the requirements in this term.

### B. Transfers of Funds Among Direct Cost Categories
The Recipient is required to obtain the prior written approval of the Contracting Officer for any transfer of funds among direct cost categories where the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award.

The Recipient is required to <u>notify</u> the DOE /Project Officer of any transfer of funds among direct cost categories where the cumulative amount of such transfers is equal to or below 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award.

### C. Transfer of Funds Between Direct and Indirect Cost Categories
The Recipient is required to obtain the prior written approval of the Contracting Officer for any transfer of funds between direct and indirect cost categories. If the Recipient's actual allowable indirect costs are less than those budgeted in Attachment 3 to this Award, the Recipient may use the difference to pay additional allowable direct costs during the project period so long as the total difference is less than 10% of total project costs and the difference is reflected in actual requests for reimbursement to DOE.

## Subpart C.    Miscellaneous Provisions

### Term 39.    Insolvency, Bankruptcy or Receivership

The Recipient shall immediately, but no later than five days, notify SCEP of the occurrence of any of the following events: (1) the Recipient or the Recipient's parent's filing of a voluntary case seeking liquidation or reorganization under the Bankruptcy Act; (2) the Recipient's consent to the institution of an involuntary case under the Bankruptcy Act against the Recipient or the Recipient's parent; (3) the filing of any similar proceeding for or against the Recipient or the Recipient's parent, or the Recipient's consent to the dissolution, winding-up or readjustment of its debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over the Recipient, under any other applicable state or federal law; or (4) the Recipient's insolvency due to its inability to pay debts generally as they become due.

Such notification shall be in writing and shall: (1) specifically set out the details of the occurrence of an event referenced in paragraph A; (2) provide the facts surrounding that event; and (3) provide the impact such event will have on the project being funded by this Award.

Upon the occurrence of any of the four events described in paragraph A. of this term, SCEP reserves the right to conduct a review of the Recipient's Award to determine the Recipient's compliance with the required elements of the Award (including such items as cost share, progress towards technical project objectives, and submission of required reports).  If the SCEP review determines that there are significant deficiencies or concerns with the Recipient's performance under the Award, SCEP reserves the right to impose additional requirements, as needed, including (1) change of payment method; or (2) institute payment controls.

Failure of the Recipient to comply with this term may be considered a material noncompliance of this Award by the Contracting Officer.

### Term 40.    Reporting Subawards and Executive Compensation

A.  **Reporting of first-tier subawards**

  i.  *Applicability*.  Unless the Recipient is exempt as provided in paragraph D. of this award term, the Recipient must report each action that equals or exceeds $30,000 in Federal funds for a subaward to an entity (see definitions in paragraph E. of this award term).

  ii.  *Where and when to report*.

    1.  The Recipient must report each obligating action described in paragraph A.i. of this award term to https://www.fsrs.gov.

    2.  For subaward information, report no later than the end of the month

following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported no later than December 31, 2010.)

    iii.   *What to report*. The Recipient must report the information about each obligating action that the submission instructions posted at https://www.fsrs.gov specify.

**B.  Reporting Total Compensation of Recipient Executives**

    i.   *Applicability and what to report*. The Recipient must report total compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if:

      1.  The total Federal funding authorized to date under this Award equals or exceeds $30,000 as defined in 2 CFR 170.320;

      2.  In the preceding fiscal year, the Recipient received;

        a.  80 percent or more of the Recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        b.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards)

      3.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

    ii.   *Where and when to report*. The Recipient must report executive total compensation described in paragraph B.i. of this award term:

      1.  As part of the Recipient's registration profile at https://www.sam.gov.

      2.  By the end of the month following the month in which this award is

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
**Special Terms and Conditions**

made, and annually thereafter.

**C. Reporting of Total Compensation of Subrecipient Executives**

i.   *Applicability and what to report.* Unless the Recipient is exempt as provided in paragraph D. of this award term, for each first-tier subrecipient under this award, the Recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

   1.   In the subrecipient's preceding fiscal year, the subrecipient received:

      a.   80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      b.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards)

   2.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

ii.   *Where and when to report.* The Recipient must report subrecipient executive total compensation described in paragraph C.i. of this award term:

   1.   To the recipient.

   2.   By the end of the month following the month during which the Recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.*, between October 1 and 31), the Recipient must report any required compensation information of the subrecipient by November 30 of that year.

**D. Exemptions**

If, in the previous tax year, the Recipient had gross income, from all sources, under $300,000, it is exempt from the requirements to report:

    i.    Subawards; and

    ii.    The total compensation of the five most highly compensated executives of any subrecipient.

**E. Definitions**

For purposes of this Award term:

    i.    Entity means all of the following, as defined in 2 CFR Part 25:

        1. A Governmental organization, which is a State, local government, or Indian tribe.
        2. A foreign public entity.
        3. A domestic or foreign nonprofit organization.
        4. A domestic or foreign for-profit organization.
        5. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

    ii.    Executive means officers, managing partners, or any other employees in management positions.

    iii.    Subaward:

        1. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this award and that the recipient awards to an eligible subrecipient.

        2. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

        3. A subaward may be provided through any legal agreement, including an agreement that the Recipient or a subrecipient considers a contract.

    iv.    Subrecipient means an entity that:

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

1.  Receives a subaward from the Recipient under this award; and

2.  Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

v.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

1.  Salary and bonus.

2.  Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

3.  Earnings for services under non-equity incentive plans.  This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

4.  Change in pension value.  This is the change in present value of defined benefit and actuarial pension plans.

5.  Above-market earnings on deferred compensation which is not tax-qualified.

6.  Other compensation, if the aggregate value of all such other compensation (*e.g.* severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

## Term 41.    System for Award Management and Universal Identifier Requirements

**A.  Requirement for Registration in the System for Award Management (SAM)**
Unless the Recipient is exempted from this requirement under 2 CFR 25.110, the Recipient must maintain the currency of its information in SAM until the Recipient submits the final financial report required under this Award or receive the final payment, whichever is later.  This requires that the Recipient reviews and updates the information at least annually after the initial registration, and more frequently if required by changes in its information or another award term.

**B. Unique Entity Identifier (UEI)**

SAM automatically assigns a UEI to all active SAM.gov registered entities. Entities no longer have to go to a third-party website to obtain their identifier. This information is displayed on SAM.gov.

If the Recipient is authorized to make subawards under this Award, the Recipient:

i. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward from the Recipient unless the entity has provided its UEI number to the Recipient.

ii. May not make a subaward to an entity unless the entity has provided its UEI number to the Recipient.

**C. Definitions**

For purposes of this award term:

i. System for Award Management (SAM) means the Federal repository into which an entity must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM Internet site (currently at https://www.sam.gov).

ii. Unique Entity Identifier (UEI) is the 12-character, alpha-numeric identifier that will be assigned by SAM.gov upon registration.

iii. Entity, as it is used in this award term, means all of the following, as defined at 2 CFR Part 25, subpart C:

1. A Governmental organization, which is a State, local government, or Indian Tribe.
2. A foreign public entity.
3. A domestic or foreign nonprofit organization.
4. A domestic or foreign for-profit organization.
5. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

iv. Subaward:

1. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this Award and that the Recipient awards to an eligible subrecipient.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
**Special Terms and Conditions**

2. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

3. A subaward may be provided through any legal agreement, including an agreement that the Recipient considers a contract.

v.    Subrecipient means an entity that:

1. Receives a subaward from the Recipient under this Award; and
2. Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

## Term 42.    Nondisclosure and Confidentiality Agreements Assurances

A. By entering into this agreement, the Recipient attests that it **does not and will not** require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

B. The Recipient further attests that it **does not and will not** use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

i.    *''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''*

ii.    The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 509 of 556
PageID #: 6439

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

iii.   Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms  shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

## Term 43.    Subrecipient and Contractor Approvals

A.   *At Risk Notice.*  The Recipient must obtain written approval by the Grants Officer for reimbursement of costs associated with subrecipients/activities/contractor listed in paragraph B. below.   If the contractor cost is for $250,000 or more, the Recipient must submit quote and purpose/need.  The Recipient is restricted from expending project funds (i.e., federal share and Recipient share) on the subrecipients' and/or contractors' supporting the tasks identified in paragraph B. below unless and until the Grants Officer provides written approval.  At its discretion, SCEP may not reimburse costs incurred prior to the date of any such written approval by the Grants Officer.

B.   Grants Officer approval as set out above is required for the following:

| Activity and Subrecipients / Contractor | Total Amount ($) |
|---|---|
| Administrative, Pilot | $      507,488.85 |
| Administrative, Contractor Training | $      600,000.00 |
| Administrative, Policy Consultant | $        25,000.00 |
| Administrative, Strategic Analysis | $        50,000.00 |
| Administrative, Implementation Vendor | $   8,578,754.35 |
| Rebate Funds: Reimbursement, Implementation Vendor | $ 45,559,792.87 |
| Rebate Funds: Reimbursement, Contractor Incentive | $      287,041.00 |
| Administrative, Implementation Vendor | $      220,000.00 |
| Rebate Funds: Rebate Delivery, Implementation Vendor | $      678,300.00 |
| Administrative, Vendor | $      400,000.00 |
| Rebate Funds: Rebate Delivery, Subgrants to CBOs | $   1,800,000.00 |
| TOTAL | $ 58,706,377.07 |

The Grants Officer may require additional information concerning these tasks prior to providing written approval.



C. Upon written approval by the Grants Officer, the Recipient may then receive payment for the tasks identified in paragraph B. above for allowable costs incurred, or SCEP will recognize costs incurred toward cost share requirements, if any, in accordance with the payment provisions contained in the Special Terms and Conditions of this agreement.

## Term 44.    Subrecipient and Subcontractor Change Notification

Except for subrecipients and/or subcontractors specifically proposed as part of the Recipient's Application for award, the Recipient must notify the Contracting Officer and Project Officer in writing 30 days prior to the execution of new or modified subrecipient and/or subcontractor agreements, including naming any To Be Determined subrecipients and/or subcontractors. This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR part 200 as amended by 2 CFR part 910, nor does it relieve the Recipient from its obligation to comply with applicable Federal statutes, regulations, and executive orders.

In order to satisfy this notification requirement, the Recipient documentation must, as a minimum, include the following:

- A description of the research to be performed, the service to be provided, or the equipment to be purchased.
- Cost share commitment letter if the subrecipient and/or subcontractor is providing cost share to the Award.
- An assurance that the process undertaken by the Recipient to solicit the subrecipient and/or subcontractor complies with their written procurement procedures as outlined in 2 CFR 200.317 through 200.327.
- An assurance that no planned, actual or apparent conflict of interest exists between the Recipient and the selected subrecipient and/or subcontractor and that the Recipient's written standards of conduct were followed.[1]
- A completed Environmental Questionnaire, if applicable.
- An assurance that the subrecipient and/or subcontractor is not a debarred or suspended entity.
- An assurance that all required award provisions will be flowed down in the resulting subrecipient and/or subcontractor agreement.

The Recipient is responsible for making a final determination to award or modify subrecipient and/or subcontractor agreements under this agreement, but the Recipient may not proceed with the subrecipient and/or subcontractor agreement until the Contracting Officer

---

[1] It is DOE's position that the existence of a "covered relationship" as defined in 5 CFR 2635.502(a)&(b) between a member of the Recipient's owners or senior management and a member of a subrecipient's owners or senior management creates at a minimum an apparent conflict of interest that would require the Recipient to notify the Contracting Officer and provide detailed information and justification (including, for example, mitigation measures) as to why the subrecipient agreement does not create an actual conflict of interest. The Recipient must also notify the Contracting Officer of any new subrecipient agreement with: (1) an entity that is owned or otherwise controlled by the Recipient; or (2) an entity that is owned or otherwise controlled by another entity that also owns or otherwise controls the Recipient, as it is DOE's position that these situations also create at a minimum an apparent conflict of interest.

determines, and provides the Recipient written notification, that the information provided is adequate.

Should the Recipient not receive a written notification of adequacy from the Contracting Officer within 30 days of the submission of the subrecipient and/or subcontractor documentation stipulated above, the Recipient may proceed to award or modify the proposed subrecipient agreement.

## Term 45.    Conference Spending

The Recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

## Term 46.    Recipient Integrity and Performance Matters

### A. General Reporting Requirement

If the total value of the Recipient's currently active Financial Assistance awards, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this term. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

### B. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

i.     Is in connection with the award or performance of a Financial Assistance, cooperative agreement, or procurement contract from the Federal Government;

ii.    Reached its final disposition during the most recent five-year period; and

iii.   Is one of the following:

1. A criminal proceeding that resulted in a conviction, as defined in

paragraph E of this award term and condition;

2. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

3. An administrative proceeding, as defined in paragraph E of this term, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

4. Any other criminal, civil, or administrative proceeding if:

    a. It could have led to an outcome described in paragraph B.iii.1, 2, or 3 of this term;

    b. It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

    c. The requirement in this term to disclose information about the proceeding does not conflict with applicable laws and regulations.

**C. Reporting Procedures**

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph B of this term. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

**D. Reporting Frequency**

During any period of time when you are subject to the requirement in paragraph A of this term, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, Financial Assistance awards, (including cooperative agreement awards) with a cumulative total value greater than $10,000,000, must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**E. Definitions**

For purposes of this term:

i.   Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

Financial Assistance awards. It does not include audits, site visits, corrective plans, or inspection of deliverables.

ii.   Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of *nolo contendere*.

iii.  Total value of currently active Financial Assistance awards, cooperative agreements and procurement contracts includes—

1. Only the Federal share of the funding under any Federal award with a recipient cost share or match; and
2. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## Term 47.    Export Control

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade.  There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls."  The Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under a resulting award.

The Recipient must immediately report to DOE any export control violations related to the project funded under this award, at the recipient or subrecipient level, and provide the corrective action(s) to prevent future violations.

## Term 48.    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment

As set forth in 2 CFR 200.116, recipients and subrecipients are prohibited from obligating or expending project funds (Federal funds and recipient cost share) to:

(1) Procure or obtain;

(2) Extend or renew a contract to procure or obtain; or

(3) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.  As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video

surveillance and telecommunications equipment produced by Hytera
Communications Corporation, Hangzhou Hikvision Digital Technology Company, or
Dahua Technology Company (or any subsidiary or affiliate of such entities).

(ii) Telecommunications or video surveillance services provided by such entities or
using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or
provided by an entity that the Secretary of Defense, in consultation with the Director
of the National Intelligence or the Director of the Federal Bureau of Investigation,
reasonably believes to be an entity owned or controlled by, or otherwise connected
to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

## Term 49.    Fraud, Waste and Abuse

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity,
economy and efficiency of DOE's programs and operations including deterring and detecting
fraud, waste, abuse, and mismanagement. The OIG accomplishes this mission primarily through
investigations, audits, and inspections of Department of Energy activities to include grants,
cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting
allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit
https://www.energy.gov/ig/ig-hotline.

Additionally, the Recipient must be cognizant of the requirements of 2 CFR 200.113 Mandatory
disclosures, which states:

> The non-Federal entity or applicant for a Federal award must disclose, in a timely
> manner, in writing to the Federal awarding agency or pass-through entity all
> violations of Federal criminal law involving fraud, bribery, or gratuity violations
> potentially affecting the Federal award. Non-Federal entities that have received
> a Federal award including the term and condition outlined in appendix XII of 2
> CFR Part 200 are required to report certain civil, criminal, or administrative
> proceedings to SAM (currently FAPIIS). Failure to make required disclosures can
> result in any of the remedies described in 200.339. (See also 2 CFR part 180, 31
> U.S.C. § 3321, and 41 U.S.C. § 2313.)

## Term 50.    Interim Conflict of Interest Policy for Financial Assistance Policy

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at
https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-
requirements-financial-assistance. This policy is applicable to all non-Federal entities applying
for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant,
cooperative agreement, or technology investment agreement) and, through the



**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy.

## Term 51.    Organizational Conflict of Interest

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization (2 CFR 200.318(c)(2)).

The Recipient must disclose in writing any potential or actual organizational conflict of interest to the DOE Contracting Officer. The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe. For a list of the information that must be included the disclosure, see Section VI. of the DOE interim Conflict of Interest Policy for Financial Assistance at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance.

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the Recipient must procure goods and services from other sources when using project funds. Otherwise, DOE may terminate the Award in accordance with 2 CFR 200.340 unless continued performance is determined to be in the best interest of the federal government.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-federal entities, with the exception of DOE National Laboratories. The Recipient is responsible for ensuring subrecipient compliance with this term.

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe, the Recipient must maintain written standards of conduct covering organizational conflicts of interest.

## Term 52.    Participants and Other Collaborating Organizations

Prior to award, the Recipient was required to provide the following information on participants and other collaborating organizations. If there are any changes to Participants and Collaborating Organizations information previously submitted to DOE, the Recipient must submit updated information within thirty (30) calendar days after the end of the quarterly reporting period in which the change occurred:

**A. What individuals have worked on the project**
Provide the following information for individuals at the prime recipient and subrecipient level: (1) all senior and key personnel; and (2) each person who has worked or is expected to work at least one person month per year on the project regardless of the source of compensation (a person month equals approximately 160 hours of effort).

   i.   Name
   ii.   Organization
   iii.  Job Title
   iv.   Role in the project
   v.    Start and end date (month and year) working on the project
   vi.   State, U.S. territory, and/or country of residence
   vii.  Whether this person collaborated with an individual or entity located in a foreign country in connection with the scope of this Award, and
   viii. If yes to vii, whether the person traveled to the foreign country as part of that collaboration, and, if so, where and what the duration of stay was.

**B. Organizations**
Identify all subrecipients, contractors, U.S. National Laboratories, partners, and collaborating organizations. Recipients must also include all foreign collaborators as outlined in the Foreign Collaboration Considerations term of the award Terms and Conditions. For each, provide name, UEI, zip code or latitude/longitude, role in the project, contribution to the project, and start and end date.

## Term 53.    Community Benefits Outcomes and Objectives

The recipient must meet the stated objectives and milestones set forth in its Community Benefits Outcomes and Objectives, which is incorporated into the Award per Term 56. A report on the recipient's progress toward meeting the objectives and milestones set forth in the Community Benefits Outcomes and Objectives must be included in the continuation application.

## Term 54.    Human Subjects Research

Research involving human subjects, biospecimens, or identifiable private information conducted with Department of Energy (DOE) funding is subject to the requirements of DOE Order 443.1C, *Protection of Human Research Subjects*, 45 CFR Part 46, *Protection of Human*

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

Subjects (*subpart A which is referred to as the "Common Rule"),* and 10 CFR Part 745, *Protection of Human Subjects.*

Federal regulation and the DOE Order require review by an Institutional Review Board (IRB) of all proposed human subjects research projects. The IRB is an interdisciplinary ethics board responsible for ensuring that the proposed research is sound and justifies the use of human subjects or their data; the potential risks to human subjects have been minimized; participation is voluntary; and clear and accurate information about the study, the benefits and risks of participating, and how individuals' data/specimens will be protected/used, is provided to potential participants for their use in determining whether or not to participate.

The Recipient shall provide the Federal Wide Assurance number identified in item 1 below and the certification identified in item 2 below to DOE prior to initiation of any project that will involve interactions with humans in some way (e.g., through surveys); analysis of their identifiable data (e.g., demographic data and energy use over time); asking individuals to test devices, products, or materials developed through research; and/or testing of commercially available devices in buildings/homes in which humans will be present. *Note:* This list of examples is illustrative and not all inclusive.

No DOE funded research activity involving human subjects, biospecimens, or identifiable private information shall be conducted without:

1) A registration and a Federal Wide Assurance of compliance accepted by the Office of Human Research Protection (OHRP) in the Department of Health and Human Services; and
2) Certification that the research has been reviewed and approved by an Institutional Review Board (IRB) provided for in the assurance.  IRB review may be accomplished by the awardee's institutional IRB; by the Central DOE IRB; or if collaborating with one of the DOE national laboratories, by the DOE national laboratory IRB.

The Recipient is responsible for ensuring all subrecipients comply and for reporting information on the project annually to the DOE Human Subjects Research Database (HSRD) at https://science.osti.gov/HumanSubjects/Human-Subjects-Database/home. *Note:*  If a DOE IRB is used, no end of year reporting will be needed.

Additional information on the DOE Human Subjects Research Program can be found at: https://science.osti.gov/ber/human-subjects.

## Term 55.    Affirmative Action and Pay Transparency Requirements

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246:

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

(1)     Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.

(2)     Recipients and Contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors and subcontractors.

(3)     Recipients, subrecipients, contractors and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co-workers.

The Department of Labor's (DOL) Office of Federal Contractor Compliance Programs (OFCCP) uses a neutral process to schedule contractors for compliance evaluations. OFCCP's Technical Assistance Guide should be consulted to gain an understanding of the requirements and possible actions the recipients, subrecipients, contractors, and subcontractors must take. See OFCCP's Technical Assistance Guide at: https://www.dol.gov/sites/dolgov/files/ofccp/Construction/files/ConstructionTAG.pdf?msclkid=9e397d68c4b111ec9d8e6fecb6c710ec.

## Term 56.     Potentially Duplicative Funding Notice

If the Recipient or subrecipients have or receive any other award of federal funds for activities that potentially overlap with the activities funded under this Award, the Recipient must promptly notify DOE in writing of the potential overlap and state whether project funds (i.e., recipient cost share and federal funds) from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under this Award. If there are identical cost items, the Recipient must promptly notify the DOE Contracting Officer in writing of the potential duplication and eliminate any inappropriate duplication of funding.

# Subpart D.  Inflation Reduction Act (IRA) Specific Requirements

## Term 57.     Program Launch Approval

The Recipient must not disburse rebate funds nor accept rebate claims until it receives DOE approval to proceed with program launch. The Recipient must address and comply with all program requirements to receive Federal funding and to launch State programs. If the Recipient launches the rebate program(s) or disburses rebate funds prior to DOE approval, DOE reserves the right to take appropriate action.

## Term 58.     Implementation Blueprint Submission

The Recipient must submit a complete State Implementation Blueprint and related plans within a minimum of 60 days prior to planned program launch. Any application requirements that

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000081.0001
Special Terms and Conditions

were deferred to the State Implementation Blueprint must also be addressed. States must receive DOE approval on the State Implementation Blueprint and related plans before launching their program. Once DOE approval is received, the State Implementation Blueprint and supporting plans become immediately binding to the award and will be enforceable. The State Implementation Blueprint and supporting plans will be incorporated into the award Terms & Conditions by reference and will be incorporated formally in the next award modification, following approval by DOE.

## Term 59.    Reporting Tracking and Segregation of Incurred Costs

IRA funds may be used in conjunction with other funding, as necessary to complete projects, but tracking and reporting must be separate.  The Recipient must keep separate records for IRA funds and must ensure those records comply with the requirements of the IRA.

SCEP
STATE & COMMUNITY ENERGY PROGRAMS

# Inflation Reduction Act (IRA)
# Special Terms and Conditions

The Grantee ("Recipient"), which is identified in Block 5 of the Assistance Agreement, and the Office of State and Community Energy Programs ("SCEP") an office within the United States Department of Energy ("DOE"), enter into this Award, referenced above, to achieve the project objectives and the technical milestones and deliverables stated in Attachment 1 to this Award.

This Award consists of the following documents, including all terms and conditions therein:

|  |  |
|---|---|
|  | Assistance Agreement |
|  | Special Terms and Conditions |
| Attachment 1 | Narrative |
| Attachment 2 | Federal Assistance Reporting Checklist and Instructions |
| Attachment 3 | Budget Information SF-424A |
| Attachment 5 | NEPA Determination |

The following are incorporated into this Award by reference:

- DOE Assistance Regulations, 2 CFR part 200 as supplemented by 2 CFR part 910 at http://www.eCFR.gov.
- National Policy Requirements (November 12, 2020) at http://www.nsf.gov/awards/managing/rtc.jsp.
- Public Law 117-169, also known as the Inflation Reduction Act (IRA).
- The Recipient's application/proposal as approved by SCEP.

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

# Table of Contents

Subpart A.    General Provisions ..............................................................................................................1

Term 1.    Legal Authority and Effect.................................................................................................1
Term 2.    Reserved ...........................................................................................................................1
Term 3.    Flow Down Requirement...................................................................................................1
Term 4.    Compliance with Federal, State, and Municipal Law ........................................................1
Term 5.    Inconsistency with Federal Law ........................................................................................1
Term 6.    Federal Stewardship .........................................................................................................1
Term 7.    Federal Involvement.........................................................................................................2
Term 8.    NEPA Requirements..........................................................................................................3
Term 9.    Historic Preservation ........................................................................................................4
Term 10.    Performance of Work in United States.............................................................................4
Term 11.    Foreign National Involvement ..........................................................................................5
Term 12.    Foreign National Participation ..........................................................................................5
Term 13.    Post-Award Due Diligence Reviews ..................................................................................5
Term 14.    Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress ...6
Term 15.    Reporting Requirements ...................................................................................................6
Term 16.    Lobbying............................................................................................................................6
Term 17.    Publications ......................................................................................................................7
Term 18.    No-Cost Extension ............................................................................................................7
Term 19.    Property Standards...........................................................................................................7
Term 20.    Insurance Coverage ..........................................................................................................7
Term 21.    Real Property ....................................................................................................................8
Term 22.    Equipment ........................................................................................................................8
Term 23.    Supplies.............................................................................................................................9
Term 24.    Property Trust Relationship ..............................................................................................9
Term 25.    Record Retention..............................................................................................................9
Term 26.    Audits................................................................................................................................9
Term 27.    Site Visits and Recipient Administrative Organizational Reviews ....................................10
Term 28.    Indemnity .......................................................................................................................10

Subpart B.    Financial Provisions.........................................................................................................11

Term 29.    Maximum Obligation.......................................................................................................11
Term 30.    Funding of Tranches .......................................................................................................11
Term 31.    Continuation Application and Funding ............................................................................11
Term 32.    Refund Obligation...........................................................................................................12
Term 33.    Allowable Costs ..............................................................................................................12
Term 34.    Indirect Costs ..................................................................................................................12
Term 35.    Decontamination and/or Decommissioning (D&D) Costs ...............................................14
Term 36.    Use of Program Income ..................................................................................................14
Term 37.    Payment Procedures .......................................................................................................14
Term 38.    Budget Changes ..............................................................................................................16

Subpart C.    Miscellaneous Provisions ................................................................................................16

Term 39.    Insolvency, Bankruptcy or Receivership .........................................................................16
Term 40.    Reporting Subawards and Executive Compensation.......................................................17
Term 41.    System for Award Management and Universal Identifier Requirements ..........................21
Term 42.    Nondisclosure and Confidentiality Agreements Assurances ...........................................23
Term 43.    Subrecipient and Contractor Approvals ..........................................................................24
Term 44.    Subrecipient and Subcontractor Change Notification .....................................................25
Term 45.    Conference Spending......................................................................................................26

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

**Award No. DE-SE0000025.0001**
**Special Terms and Conditions**

**Term 46.  Recipient Integrity and Performance Matters**..........................................................26

**Term 47.  Export Control**.........................................................................................................28

**Term 48.  Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**...........28

**Term 49.  Fraud, Waste and Abuse**..........................................................................................29

**Term 50.  Interim Conflict of Interest Policy for Financial Assistance Policy** ...........................29

**Term 51.  Organizational Conflict of Interest**.........................................................................30

**Term 52.  Participants and Other Collaborating Organizations**................................................31

**Term 53.  Community Benefits Outcomes and Objectives** ......................................................31

**Term 54.  Human Subjects Research** .......................................................................................31

**Term 55.  Affirmative Action and Pay Transparency Requirements** ........................................32

**Term 56.  Potentially Duplicative Funding Notice** ...................................................................33

**Subpart D.  Inflation Reduction Act (IRA) Specific Requirements** ........................................................ **33**

**Term 57.  Program Launch Approval** ........................................................................................33

**Term 58.  Implementation Blueprint Submission** .....................................................................33

**Term 59.  Reporting Tracking and Segregation of Incurred Costs** ...........................................34

## Subpart A.    General Provisions

### Term 1.    Legal Authority and Effect
A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

The Recipient may accept or reject the Award. A request to draw down DOE funds or acknowledgement of award documents by the Recipient's authorized representative through electronic systems used by DOE, specifically FedConnect, constitutes the Recipient's acceptance of the terms and conditions of this Award.  Acknowledgement via FedConnect by the Recipient's authorized representative constitutes the Recipient's electronic signature.

### Term 2.    Reserved

### Term 3.    Flow Down Requirement
The Recipient agrees to apply the terms and conditions of this Award, as applicable, including the Intellectual Property Provisions, to all subrecipients (and subcontractors, as appropriate), as required by 2 CFR 200.101, and to require their strict compliance therewith.  Further, the Recipient must apply the Award terms as required by 2 CFR 200.327 to all subrecipients (and subcontractors, as appropriate), and to require their strict compliance therewith.

### Term 4.    Compliance with Federal, State, and Municipal Law
The Recipient is required to comply with applicable Federal, state, and local laws and regulations for all work performed under this Award.  The Recipient is required to obtain all necessary Federal, state, and local permits, authorizations, and approvals for all work performed under this Award.

### Term 5.    Inconsistency with Federal Law
Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this Award must be referred to the DOE Award Administrator for guidance.

### Term 6.    Federal Stewardship
SCEP will exercise normal Federal stewardship in overseeing the project activities performed under this Award.  Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to address deficiencies that develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the project objectives have been accomplished.

## Term 7.    Federal Involvement

### A.  Review Meetings

The Recipient, including but not limited to, the principal investigator (or, if applicable, co-principal investigators), is required to participate in periodic review meetings with SCEP.  Review meetings enable SCEP to assess the work performed under this Award and determine whether the Recipient has timely achieved the milestones and deliverables stated in Attachment 1 to this Award.

SCEP shall determine the frequency of review meetings and select the day, time, and location of each review meeting and shall do so in a reasonable and good faith manner. SCEP will provide the Recipient with reasonable notice of the review meetings.

For each review meeting, the Recipient is required to provide a comprehensive overview of the project, including:

- The Recipient's progress compared to the Narrative Document in Attachment 1 to this Award.
- The Recipient's actual expenditures compared to the approved budget in Attachment 3 to this Award.
- Other subject matter specified by the DOE Project Officer.

### B.  Project Meetings

The Recipient is required to notify SCEP in advance of scheduled tests and internal project meetings that would entail discussion of topics that could result in major changes to the baseline project scope/approach, cost, or schedule.  Upon request by SCEP, the Recipient is required to provide SCEP with reasonable access (by telephone, webinar, or otherwise) to the tests and project meetings.  The Recipient is not expected to delay any work under this Award for the purpose of government insight.

### C.  Site Visits

SCEP's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required.  The Recipient must provide, and must require subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties.  All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

### D.  Tranche Continuation Decisions

The Administrative and Legal Requirements Document (ALRD) for this Award establishes funding tranches. The Recipient's approved use of funds is only for the tranche that DOE has approved the recipient for. The Recipient is not approved to use funds in other tranches beyond those it is approved for. If the Recipient uses funds beyond what it has been approved to use, SCEP reserves the right to take appropriate action up to and including those listed below.

For each funding tranche, SCEP must determine whether the Recipient has fully and satisfactorily completed the work described in the ALRD, Program Requirements, award attachments, award terms and conditions as well as DOE approved plans for this Award. The holistic performance of the award is taken into consideration during the continuation review. As a result of the continuation review, in its discretion, SCEP may take one of the following actions:

- Continue to fund the project, contingent upon the availability of funds appropriated by Congress for the purpose of this program;
- Place a hold on additional federal funding for the project, pending sufficient progress against performance targets, milestones and deliverables, further supporting data or funding; or
- Discontinue funding the project because of insufficient progress, change in strategic direction, or lack of funding.

If routine data reviews demonstrate the Recipient is not meeting Plan terms, DOE reserves the right to put a hold on the funds the Recipient can draw down under the Automated Standard Application for Payments (ASAP) System.

**E. Performance Targets, Milestones, and Deliverables**
The Administrative and Legal Requirements Document (ALRD) and Program Requirements for this Award establishes performance targets, milestones, and deliverables required to continue into a new tranche of funding.  If the Recipient fails to meet the established performance targets, milestones and/or deliverables, the Recipient must provide an improvement plan in its continuation application for how it will improve program performance to meet the next tranche's targets. DOE approval is required in order to move to the next tranche and for funds to be released.

**F. SCEP Access**
The Recipient must provide any information, documents, site access, or other assistance requested by SCEP for the purpose of its Federal stewardship or substantial involvement.

## Term 8.    NEPA Requirements

DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of federal funds. Based on all information provided by the Recipient, SCEP has made a NEPA

determination by issuing a categorical exclusion (CX) for all activities listed in the Statement of Project Objectives (SOPO) approved by the Contracting Officer and the DOE NEPA Determination. The Recipient is thereby authorized to use federal funds for the defined project activities, except where such activity is subject to a restriction set forth elsewhere in this Award.

This authorization is specific to the project activities and locations as described in the SOPO approved by the Contracting Officer and the DOE NEPA Determination.

***If the Recipient later intends to add to or modify the activities or locations*** as described in the approved SOPO and the DOE NEPA Determination, those new activities/locations or modified activities/locations are subject to additional NEPA review and are not authorized for federal funding until the Contracting Officer provides written authorization on those additions or modifications. Should the Recipient elect to undertake activities or change locations prior to written authorization from the Contracting Officer, the Recipient does so at risk of not receiving federal funding for those activities, and such costs may not be recognized as allowable cost share.

## Term 9.    Historic Preservation

### A.  Authorization

DOE must comply with the requirements of Section 106 of the National Historic Preservation Act (NHPA) prior to authorizing the use of Federal funds.  Section 106 applies to historic properties that are listed in or eligible for listing in the National Register of Historic Places.  DOE does not anticipate any impacts to resources of concern.

## Term 10.    Performance of Work in United States

### A.  Requirement
All work performed under this Award must be performed in the United States unless the Contracting Officer provides a waiver. This requirement does not apply to the purchase of supplies and equipment; however, the Recipient should make every effort to purchase supplies and equipment within the United States. The Recipient must flow down this requirement to its subrecipients and subcontractors.

### B.  Failure to Comply
If the Recipient fails to comply with the Performance of Work in the United States requirement, the Contracting Officer may deny reimbursement for the work conducted outside the United States and such costs may not be recognized as allowable Recipient cost share regardless if the work is performed by the Recipient, subrecipients, vendors or other project partners.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

### C. Waiver for Work Outside the U.S.

All work performed under this Award must be performed in the United States. However, the Contracting Officer may approve the Recipient to perform a portion of the work outside the United States under limited circumstances. The Recipient must obtain a waiver from the Contracting Officer prior to conducting any work outside the U.S.  To request a waiver, the Recipient must submit a written waiver request to the Contracting Officer, which includes the following information:

- The rationale for performing the work outside the U.S.;
- A description of the work proposed to be performed outside the U.S.;
- Proposed budget of work to be performed; and
- The countries in which the work is proposed to be performed.

For the rationale, the Recipient must demonstrate to the satisfaction of the Contracting Officer that the performance of work outside the United States would further the purposes of the ALRD or Program that the Award was selected under and is in the economic interests of the United States.  The Contracting Officer may require additional information before considering such request.

## Term 11.    Foreign National Involvement

The Recipient and project participants (including subrecipients and contractors) who anticipate involving foreign nationals in the performance of an award, may be required to provide DOE with specific information about each foreign national to satisfy requirements for foreign national participation.  A foreign national is defined as any person who is not a U.S. citizen by birth or naturalization. The volume and type of information collected may depend on various factors associated with the award.

## Term 12.    Foreign National Participation

A "foreign national" is defined as any person who is not a U.S. citizen by birth or naturalization.

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of the Award, the Recipient must, upon DOE's request, provide DOE with specific information about each foreign national to ensure compliance with the requirements for participation and access approval. The volume and type of information required may depend on various factors associated with the Award. The DOE Contracting Officer will notify the Recipient if this information is required.

DOE may elect to deny a foreign national's participation in the Award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs, or personnel. DOE's determination to deny participation or access is not appealable.

## Term 13.    Post-Award Due Diligence Reviews

During the period of performance of the Award, DOE may conduct ongoing due diligence

Case 1:25-cv-00039-JJM-PAS     Document 68-123     Filed 02/07/25     Page 528 of 556
PageID #: 6458

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

reviews, through Government resources, to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring an individual or entity not participate in the Award.

## Term 14.      Notice Regarding the Purchase of American-Made Equipment and Products – Sense of Congress

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this Award should be American-made.

## Term 15.      Reporting Requirements

### A.  Requirements

The reporting requirements for this Award are identified on the Federal Assistance Reporting Checklist, attached to this Award.  Failure to comply with these reporting requirements is considered a material noncompliance with the terms of the Award. Noncompliance may result in withholding of future payments, suspension, or termination of the current award, and withholding of future awards.  A willful failure to perform, a history of failure to perform, or unsatisfactory performance of this and/or other financial assistance awards, may also result in a debarment action to preclude future awards by Federal agencies.

### B.  Dissemination of Scientific and Technical Information

Scientific and Technical Information (STI) generated under this Award will be submitted to DOE via the Office of Scientific and Technical Information's Energy Link (E-Link) system.  STI submitted under this Award will be disseminated via DOE's OSTI.gov website subject to approved access limitations. Citations for journal articles produced under the Award will appear on the DOE PAGES website.

### C.  Restrictions

Scientific and Technical Information submitted to E-Link must not contain any Protected Personal Identifiable Information (PII), limited rights data (proprietary data), classified information, information subject to export control classification, or other information not subject to release.

## Term 16.      Lobbying

By accepting funds under this Award, the Recipient agrees that none of the funds obligated on the Award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913.  This restriction is in addition to those prescribed elsewhere in statute and regulation.

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

**Award No. DE-SE0000025.0001**
**Special Terms and Conditions**

## Term 17.    Publications

The Recipient is required to include the following acknowledgement in publications arising out of, or relating to, work performed under this Award, whether copyrighted or not:

- *Acknowledgment:* "This material is based upon work supported by the U.S. Department of Energy's Office of State and Community Energy Programs (SCEP) under the IRA Home Energy Rebates Award Number SE-0000025."

- *Full Legal Disclaimer:* "This report was prepared as an account of work sponsored by an agency of the United States Government.  Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.  Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

    *Abridged Legal Disclaimer:* "The views expressed herein do not necessarily represent the views of the U.S. Department of Energy or the United States Government."

    Recipients should make every effort to include the full Legal Disclaimer. However, in the event that recipients are constrained by formatting and/or page limitations set by the publisher, the abridged Legal Disclaimer is an acceptable alternative.

## Term 18.    No-Cost Extension

As provided in 2 CFR 200.308, the Recipient must provide the Contracting Officer with notice in advance if it intends to utilize a one-time, no-cost extension of this Award. The notification must include the supporting reasons and the revised period of performance. The Recipient must submit this notification in writing to the Contracting Officer and DOE Technology Manager/ Project Officer at least 30 days before the end of the current budget period.

Any no-cost extension will not alter the project scope, milestones, deliverables, or budget of this Award.

## Term 19.    Property Standards

The complete text of the Property Standards can be found at 2 CFR 200.310 through 200.316. Also see 2 CFR 910.360 for additional requirements for real property and equipment for For-Profit recipients.

## Term 20.    Insurance Coverage



See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds. Also see 2 CFR 910.360(d) for additional requirements for real property and equipment for For-Profit recipients.

## Term 21.    Real Property

Subject to the conditions set forth in 2 CFR 200.311, title to real property acquired or improved under a Federal award will conditionally vest upon acquisition in the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.311 before disposing of the property.

Except as otherwise provided by Federal statutes or by the Federal awarding agency, real property will be used for the originally authorized purpose as long as needed for that purpose. When real property is no longer needed for the originally authorized purpose, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.  The instructions must provide for one of the following alternatives: (1) retain title after compensating DOE as described in 2 CFR 200.311(c)(1); (2) Sell the property and compensate DOE as specified in 2 CFR  200.311(c)(2); or (3) transfer title to DOE or to a third party designated/approved by DOE as specified in 2 CFR 200.311(c)(3).

See 2 CFR  200.311 for additional requirements pertaining to real property acquired or improved under a Federal award.  Also see 2 CFR 910.360 for additional requirements for real property for For-Profit recipients.

## Term 22.    Equipment

Subject to the conditions provided in 2 CFR 200.313, title to equipment (property) acquired under a Federal award will conditionally vest upon acquisition with the non-Federal entity.  The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR 200.313 before disposing of the property.

A state must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by DOE in the priority order specified in 2 CFR 200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR 200.313(d).
When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from DOE or pass-through entity.



Disposition will be made as follows: (1) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to DOE; (2) Non-Federal entity may retain title or sell the equipment after compensating DOE as described in 2 CFR 200.313(e)(2); or (3) transfer title to DOE or to an eligible third party as specified in 2 CFR 200.313(e)(3).

See 2 CFR 200.313 for additional requirements pertaining to equipment acquired under a Federal award.  Also see 2 CFR 910.360 for additional requirements for equipment for For-Profit recipients. See also 2 CFR 200.439 Equipment and other capital expenditures.

## Term 23.    Supplies
See 2 CFR 200.314 for requirements pertaining to supplies acquired under a Federal award.  See also 2 CFR 200.453 Materials and supplies costs, including costs of computing devices.

## Term 24.    Property Trust Relationship
Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.  See 2 CFR 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

## Term 25.    Record Retention
Consistent with 2 CFR 200.334 through 200.338, the Recipient is required to retain records relating to this Award.

## Term 26.    Audits

### A. Government-Initiated Audits
The Recipient must provide any information, documents, site access, or other assistance requested by SCEP, DOE or Federal auditing agencies (e.g., DOE Inspector General, Government Accountability Office) for the purpose of audits and investigations.  Such assistance may include, but is not limited to, reasonable access to the Recipient's records relating to this Award.

Consistent with 2 CFR part 200 as amended by 2 CFR part 910, DOE may audit the Recipient's financial records or administrative records relating to this Award at any time. Audits or reviews may be performed to determine if the Recipient has an adequate financial management system to estimate, bill, and record federal government expenditures in accordance with the criteria in 2 CFR 200.302, Generally Accepted Accounting Principles (GAAP), Generally Accepted Government Accounting Standards (GAGAS), and Standard Form 1408.Government-initiated audits are generally paid for by DOE.

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 532 of 556
PageID #: 6462

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

DOE may conduct a final audit at the end of the project period (or the termination of the Award, if applicable). Upon completion of the audit, the Recipient is required to refund to DOE any payments for costs that were determined to be unallowable. If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

DOE will provide reasonable advance notice of audits and will minimize interference with ongoing work, to the maximum extent practicable.

**B. Annual Independent Audits (Single Audit or Compliance Audit)**
The Recipient must comply with the annual independent audit requirements in 2 CFR 200.500 through .521 for institutions of higher education, nonprofit organizations, and state and local governments (Single audit), and 2 CFR 910.500 through .521 for for-profit entities (Compliance audit).

The annual independent audits are separate from Government-initiated audits discussed in part A. of this Term, and must be paid for by the Recipient. To minimize expense, the Recipient may have a Compliance audit in conjunction with its annual audit of financial statements. The financial statement audit is **not** a substitute for the Compliance audit. If the audit (Single audit or Compliance audit, depending on Recipient entity type) has not been performed or completed prior to the closeout of the award, DOE may impose one or more of the actions outlined in 2 CFR 200.339, Remedies for Noncompliance.

## Term 27.    Site Visits and Recipient Administrative Organizational Reviews

SCEP's authorized representatives have the right to make site visits and conduct Recipient Administrative Organizational Reviews to review the project and management control systems and to provide technical assistance, as appropriate. The Recipient must provide, and must require its subrecipients and contractors to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. SCEP will make reasonable efforts to ensure these site visits do not interfere with or unduly delay project work.

## Term 28.    Indemnity

The Recipient shall indemnify DOE and its officers, agents, or employees for any and all liability, including litigation expenses and attorneys' fees, arising from suits, actions, or claims of any character for death, bodily injury, or loss of or damage to property or to the environment, resulting from the project, except to the extent that such liability results from the direct fault or negligence of DOE officers, agents or employees, or to the extent such liability may be covered by applicable allowable costs provisions.

## Subpart B.    Financial Provisions

## Term 29.    Maximum Obligation

The maximum obligation of DOE for this Award is the total "Funds Obligated" stated in Block 13 of the Assistance Agreement to this Award.

## Term 30.    Funding of Tranches

SCEP has obligated funding as shown in Block 13 of the Assistance Agreement for completion of the Project. However, only the federal share of costs associated with the current funding tranche is available for work performed by the Recipient. Tranches are associated with specific project milestones, which are outlined in the Administrative and Legal Requirements Document (ALRD), associated with this program. The federal share of costs is shown on Attachment 3. The remainder of funding is contingent upon: (1) the availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) Recipient's satisfactory progress towards meeting the objectives of the Home Energy Rebates Program; (4) Recipient's submittal of required reports; (5) Recipient's compliance with the terms and conditions of the Award; (6) the Recipient's submission of a continuation application; and (7) written approval of the continuation application by the Contracting Officer.

In the event that the Recipient does not submit a continuation application for subsequent tranches, or SCEP disapproves a continuation application for subsequent tranches, the maximum SCEP liability to the Recipient is the funds that are available for the current approved tranche. In such event, SCEP reserves the right to deobligate any remaining federal funds.

## Term 31.    Continuation Application and Funding

### A.    Continuation Application
A continuation application is a non-competitive application to enter into a new funding tranche.  The continuation application shall be submitted to SCEP in accordance with the tranche table in the ALRD that is issued.

### B.    Continuation Funding
Continuation funding is contingent on (1) the availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) Recipient's satisfactory progress towards meeting the objectives of the Home Energy Rebates Program; (4) Recipient's submittal of required reports; (5) Recipient's compliance with the terms and conditions of the Award; (6) the Recipient's submission of a continuation application; and (7) written approval of the continuation application by the Contracting Officer. The holistic performance of the award is taken into consideration during the continuation review.

### C.    Continuation Review

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

The Administrative and Legal Requirements Document (ALRD) outlines expected performance targets and deliverables required to continue into a new tranche of funding. In addition, DOE will take the full performance of the award into consideration when making a continuation decision. If a Recipient's overall performance is assessed by DOE to be inadequate, DOE reserves the right to disapprove a continuation into a new tranche of funding.

## Term 32.    Refund Obligation

The Recipient must refund any excess payments received from SCEP, including any costs determined unallowable by the Contracting Officer.  Upon the end of the project period (or the termination of the Award, if applicable), the Recipient must refund to SCEP the difference between (1) the total payments received from SCEP, and (2) the Federal share of the costs incurred. Refund obligations under this Term do not supersede the annual reconciliation or true up process if specified under the Indirect Cost Term.

## Term 33.    Allowable Costs

DOE determines the allowability of costs through reference to 2 CFR part 200 as amended by 2 CFR part 910.  All project costs must be allowable, allocable, and reasonable. The Recipient must document and maintain records of all project costs, including, but not limited to, the costs paid by Federal funds, costs claimed by its subrecipients and project costs that the Recipient claims as cost sharing, including in-kind contributions.  The Recipient is responsible for maintaining records adequate to demonstrate that costs claimed have been incurred, are reasonable, allowable and allocable, and comply with the cost principles.  Upon request, the Recipient is required to provide such records to DOE.  Such records are subject to audit. Failure to provide DOE adequate supporting documentation may result in a determination by the Contracting Officer that those costs are unallowable.

The Recipient is required to obtain the prior written approval of the Contracting Officer for any foreign travel costs.

## Term 34.    Indirect Costs

**A. Indirect Cost Allocation:**
The Recipient has a federally approved provisional Negotiated Indirect Cost Rate Agreement (NICRA) with a current effective period identified for billing and estimation purposes and it applies uniformly across all federal awards. These costs shall be reconciled or trued up (actual incurred costs) on an annual basis with the Recipient's cognizant agency. An updated rate proposal or NICRA is required if the Recipient requests to bill the DOE higher billing rates than those listed in the current NICRA.

**B. Fringe Cost Allocation:**
Fringe benefit costs have been allocated to this award under a segregated fringe billing rate. The fringe costs were found to be reasonable, allocable, and allowable

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
**Special Terms and Conditions**

as reflected in the budget. Fringe elements apply to both direct and indirect labor. Under a segregated cost pool, the fringe billing rate shall be treated as an indirect cost expenditure and must be reconciled annually.

### C.  Subrecipient Indirect Costs (If Applicable):

The Recipient must ensure its subrecipient's indirect costs are appropriately managed, have been found to be allowable, and comply with the requirements of this Award and 2 CFR Part 200 as amended by 2 CFR Part 910.

### D.  Indirect Cost Stipulations:

#### i.  Modification to Indirect Cost Billing Rates

SCEP will not modify this Award solely to provide additional funds to cover increases in the Recipient's indirect cost billing rate(s). Adjustments to the indirect cost billing rates must be approved by the Recipient's Cognizant Agency or Cognizant Federal Agency Official.

The Recipient must provide a copy of an updated NICRA or indirect rate proposal to the DOE Award Administrator in order to increase indirect cost billing rates. If the Contracting Officer provides prior written approval, the Recipient may incur an increase in the indirect cost billing rates. Reimbursement will be limited by the budgeted dollar amount for indirect costs for each budget period as shown in Attachment 3 to this Award.

#### ii.  Annual Cost Reconciliation

In accordance with Appendices III-VII of 2 CFR Part 200 or 48 CFR 42.7, governing for-profit organizations, the indirect cost billing rates shall be reconciled or trued up (actual incurred costs) on an annual basis via the annual incurred cost proposal within six months after the Recipient's fiscal year end.

#### iii.  Adjustments to Indirect Cost Billing Rates

Following an official audit or adequacy review of the incurred cost proposal, one of the following shall apply:

1. If the Recipient's actual and final annual indirect cost billing rate(s) reflect that Recipient invoiced at higher billing rates than actually incurred, the Recipient must refund the Government the over-recovered amounts.

2. If the Recipient's actual and final annual indirect cost billing rate(s) reflect that the Recipient invoiced at lower billing rates than actually incurred, the Recipient may not be reimbursed for increases in its indirect cost rate, which resulted in an under-recovery. Increased

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency &
Renewable Energy

indirect cost billing rates cannot be retroactively applied to the DOE
award.

    **iv.**   **Award Closeout**
The closeout of the DOE award does not affect (1) the right of the DOE to
disallow costs and recover funds on the basis of a later audit or other review;
(2) the requirement for the Recipient to return any funds due as a result of
later refunds, corrections or other transactions including final indirect cost
billing rate adjustments; and (3) the ability of the DOE to make financial
adjustments to a previously closed award resolving indirect cost payments
and making final payments.

## Term 35.  Decontamination and/or Decommissioning (D&D) Costs

Notwithstanding any other provisions of this Award, the Government shall not be responsible
for or have any obligation to the Recipient for (1) Decontamination and/or Decommissioning
(D&D) of any of the Recipient's facilities, or (2) any costs which may be incurred by the
Recipient in connection with the D&D of any of its facilities due to the performance of the work
under this Award, whether said work was performed prior to or subsequent to the effective
date of the Award.

## Term 36.  Use of Program Income

If the Recipient earns program income during the project period as a result of this Award, the
Recipient must add the program income to the funds committed to the Award and used to
further eligible project objectives.

## Term 37.  Payment Procedures

**A. Method of Payment**
Payment will be made by advances through the Department of Treasury's ASAP
system.

**B. Requesting Advances**
Requests for advances must be made through the ASAP system.  The Recipient may
submit requests as frequently as required to meet its needs to disburse funds for the
Federal share of project costs.   If feasible, the Recipient should time each request so
that the Recipient receives payment on the same day that the Recipient disburses
funds for direct project costs and the proportionate share of any allowable indirect
costs.   If same-day transfers are not feasible, advance payments must be as close to
actual disbursements as administratively feasible.

**C. Adjusting Payment Requests for Available Cash**
The Recipient must disburse any funds that are available from repayments to and
interest earned on a revolving fund, program income, rebates, refunds, contract

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from SCEP.

**D. Payments**

All payments are made by electronic funds transfer to the bank account identified on the Bank Information Form that the Recipient filed with the U.S. Department of Treasury.

**E. Unauthorized Drawdown of Federal Funds**

For each budget period, the Recipient may not spend more than the Federal share authorized to that particular budget period, without specific written approval from the Contracting Officer. The Recipient must immediately refund SCEP any amounts spent or drawn down in excess of the authorized amount for a budget period. The Recipient and subrecipients shall promptly, but at least quarterly, remit to DOE interest earned on advances drawn in excess of disbursement needs, and shall comply with the procedure for remitting interest earned to the Federal government per 2 CFR 200.305, as applicable.

**F. Supporting Documents for Agency Approval of Payments**

DOE may require Agency pre-approval of payments. If the Agency approval requirement is in effect for the Recipient's Award, the ASAP system will indicate that Agency approval is required when the Recipient submits a request for payment.

The Recipient must notify the DOE Technical Project Officer and DOE Award Administrator identified on the Assistance Agreement that a payment request has been submitted.

The following items are required to be submitted to the DOE Technical Project Officer and DOE Award Administrator identified on the Assistance Agreement:
- Summary cost data, for the billing period and cumulative cost data, showing all categories listed in the SF-424A and identifying Federal, non-Federal, and total amounts.
- SF-270.
- If there are unauthorized phases and/or tasks for the current budget period in the NEPA Requirements term in these Special Terms and Conditions, a statement affirming that no invoiced costs are related to tasks or activities prohibited by the NEPA Requirements term.

- *Applicable to for-profit recipients and subrecipients* UCC filing proof for all equipment acquired with project funds (i.e., Federal share or Recipient share) and equipment offered as cost share.

The DOE payment authorizing official may request additional information from the

15

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 538 of 556
PageID #: 6468

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

Recipient to support the payment requests prior to release of funds, as deemed necessary.  The Recipient is required to comply with these requests.  Supporting documents include invoices, copies of contracts, vendor quotes, and other expenditure explanations that justify the payment requests.

## Term 38.    Budget Changes

### A.  Budget Changes Generally
The Contracting Officer has reviewed and approved the SF-424A in Attachment 3 to this Award.

Any increase in the total project cost, whether DOE share or Cost Share, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award, must be approved in advance and in writing by the Contracting Officer.

Any change that alters the program design, project scope, milestones or deliverables requires prior written approval of the Contracting Officer.  SCEP may deny reimbursement for any failure to comply with the requirements in this term.

### B.  Transfers of Funds Among Direct Cost Categories
The Recipient is required to obtain the prior written approval of the Contracting Officer for any transfer of funds among direct cost categories where the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award.

The Recipient is required to <u>notify</u> the DOE /Project Officer of any transfer of funds among direct cost categories where the cumulative amount of such transfers is equal to or below 10 percent of the total project cost, which is stated as "Total" in Block 12 to the Assistance Agreement of this Award.

### C.  Transfer of Funds Between Direct and Indirect Cost Categories
The Recipient is required to obtain the prior written approval of the Contracting Officer for any transfer of funds between direct and indirect cost categories.  If the Recipient's actual allowable indirect costs are less than those budgeted in Attachment 3 to this Award, the Recipient may use the difference to pay additional allowable direct costs during the project period so long as the total difference is less than 10% of total project costs and the difference is reflected in actual requests for reimbursement to DOE.

## Subpart C.    Miscellaneous Provisions

## Term 39.    Insolvency, Bankruptcy or Receivership



The Recipient shall immediately, but no later than five days, notify SCEP of the occurrence of any of the following events: (1) the Recipient or the Recipient's parent's filing of a voluntary case seeking liquidation or reorganization under the Bankruptcy Act; (2) the Recipient's consent to the institution of an involuntary case under the Bankruptcy Act against the Recipient or the Recipient's parent; (3) the filing of any similar proceeding for or against the Recipient or the Recipient's parent, or the Recipient's consent to the dissolution, winding-up or readjustment of its debts, appointment of a receiver, conservator, trustee, or other officer with similar powers over the Recipient, under any other applicable state or federal law; or (4) the Recipient's insolvency due to its inability to pay debts generally as they become due.

Such notification shall be in writing and shall: (1) specifically set out the details of the occurrence of an event referenced in paragraph A; (2) provide the facts surrounding that event; and (3) provide the impact such event will have on the project being funded by this Award.

Upon the occurrence of any of the four events described in paragraph A. of this term, SCEP reserves the right to conduct a review of the Recipient's Award to determine the Recipient's compliance with the required elements of the Award (including such items as cost share, progress towards technical project objectives, and submission of required reports). If the SCEP review determines that there are significant deficiencies or concerns with the Recipient's performance under the Award, SCEP reserves the right to impose additional requirements, as needed, including (1) change of payment method; or (2) institute payment controls.

Failure of the Recipient to comply with this term may be considered a material noncompliance of this Award by the Contracting Officer.

## Term 40.    Reporting Subawards and Executive Compensation

### A.  Reporting of first-tier subawards

    i.    *Applicability.*   Unless the Recipient is exempt as provided in paragraph D. of this award term, the Recipient must report each action that equals or exceeds $30,000 in Federal funds for a subaward to an entity (see definitions in paragraph E. of this award term).

    ii.    *Where and when to report.*

        1.  The Recipient must report each obligating action described in paragraph A.i. of this award term to https://www.fsrs.gov.

        2.  For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported no later than December 31, 2010.)

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

    iii.    *What to report*. The Recipient must report the information about each obligating action that the submission instructions posted at https://www.fsrs.gov specify.

**B.  Reporting Total Compensation of Recipient Executives**

    i.    *Applicability and what to report*. The Recipient must report total compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if:

        1.  The total Federal funding authorized to date under this Award equals or exceeds $30,000 as defined in 2 CFR 170.320;

        2.  In the preceding fiscal year, the Recipient received;

            a.  80 percent or more of the Recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            b.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards)

        3.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

    ii.    *Where and when to report*. The Recipient must report executive total compensation described in paragraph B.i. of this award term:

        1.  As part of the Recipient's registration profile at https://www.sam.gov.

        2.  By the end of the month following the month in which this award is made, and annually thereafter.

**C.  Reporting of Total Compensation of Subrecipient Executives**

    i.    *Applicability and what to report*. Unless the Recipient is exempt as provided in paragraph D. of this award term, for each first-tier subrecipient under this award, the Recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

        1.    In the subrecipient's preceding fiscal year, the subrecipient received:

            a.    80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            b.    $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards)

        2.    The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

    ii.    *Where and when to report*. The Recipient must report subrecipient executive total compensation described in paragraph C.i. of this award term:

        1.    To the recipient.

        2.    By the end of the month following the month during which the Recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.*, between October 1 and 31), the Recipient must report any required compensation information of the subrecipient by November 30 of that year.

**D.  Exemptions**
If, in the previous tax year, the Recipient had gross income, from all sources, under $300,000, it is exempt from the requirements to report:

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 542 of 556
PageID #: 6472

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
**Special Terms and Conditions**

    i.    Subawards; and

    ii.    The total compensation of the five most highly compensated executives of any subrecipient.

**E.  Definitions**

For purposes of this Award term:

    i.    Entity means all of the following, as defined in 2 CFR Part 25:

    1.    A Governmental organization, which is a State, local government, or Indian tribe.
    2.    A foreign public entity.
    3.    A domestic or foreign nonprofit organization.
    4.    A domestic or foreign for-profit organization.
    5.    A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

    ii.    Executive means officers, managing partners, or any other employees in management positions.

    iii.    Subaward:

    1.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this award and that the recipient awards to an eligible subrecipient.

    2.    The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

    3.    A subaward may be provided through any legal agreement, including an agreement that the Recipient or a subrecipient considers a contract.

    iv.    Subrecipient means an entity that:

    1.    Receives a subaward from the Recipient under this award; and

    2.    Is accountable to the Recipient for the use of the Federal funds

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

provided by the subaward.

    v.   Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

       1.   Salary and bonus.

       2.   Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

       3.   Earnings for services under non-equity incentive plans.  This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

       4.   Change in pension value.  This is the change in present value of defined benefit and actuarial pension plans.

       5.   Above-market earnings on deferred compensation which is not tax-qualified.

       6.   Other compensation, if the aggregate value of all such other compensation (*e.g.* severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

## Term 41.   System for Award Management and Universal Identifier Requirements

   **A.  Requirement for Registration in the System for Award Management (SAM)**
Unless the Recipient is exempted from this requirement under 2 CFR 25.110, the Recipient must maintain the currency of its information in SAM until the Recipient submits the final financial report required under this Award or receive the final payment, whichever is later.  This requires that the Recipient reviews and updates the information at least annually after the initial registration, and more frequently if required by changes in its information or another award term.

   **B.  Unique Entity Identifier (UEI)**
SAM automatically assigns a UEI to all active SAM.gov registered entities. Entities no

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 544 of 556
PageID #: 6474

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

longer have to go to a third-party website to obtain their identifier. This information is displayed on SAM.gov.

If the Recipient is authorized to make subawards under this Award, the Recipient:

i. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward from the Recipient unless the entity has provided its UEI number to the Recipient.

ii. May not make a subaward to an entity unless the entity has provided its UEI number to the Recipient.

**C. Definitions**

For purposes of this award term:

i. System for Award Management (SAM) means the Federal repository into which an entity must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM Internet site (currently at https://www.sam.gov).

ii. Unique Entity Identifier (UEI) is the 12-character, alpha-numeric identifier that will be assigned by SAM.gov upon registration.

iii. Entity, as it is used in this award term, means all of the following, as defined at 2 CFR Part 25, subpart C:

1. A Governmental organization, which is a State, local government, or Indian Tribe.
2. A foreign public entity.
3. A domestic or foreign nonprofit organization.
4. A domestic or foreign for-profit organization.
5. A Federal agency, but only as a subrecipient under an award or subaward to a non-Federal entity.

iv. Subaward:

1. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this Award and that the Recipient awards to an eligible subrecipient.

2. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 545 of 556
PageID #: 6475

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

explanation, see 2 CFR 200.501 Audit requirements, (f) *Subrecipients and Contractors* and/or 2 CFR 910.501 Audit requirements, (f) *Subrecipients and Contractors*).

3. A subaward may be provided through any legal agreement, including an agreement that the Recipient considers a contract.

v. Subrecipient means an entity that:

1. Receives a subaward from the Recipient under this Award; and
2. Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

## Term 42.    Nondisclosure and Confidentiality Agreements Assurances

A. By entering into this agreement, the Recipient attests that it **does not and will not** require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

B. The Recipient further attests that it **does not and will not** use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

i. *''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''*

ii. The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

iii. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person

connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms  shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

## Term 43.    Subrecipient and Contractor Approvals

A.  *At Risk Notice.*  The Recipient must obtain written approval by the Grants Officer for reimbursement of costs associated with subrecipients/activities/contractor listed in paragraph B. below.   If the contractor cost is for $250,000 or more, the Recipient must submit quote and purpose/need.  The Recipient is restricted from expending project funds (i.e., federal share and Recipient share) on the subrecipients' and/or contractors' supporting the tasks identified in paragraph B. below unless and until the Grants Officer provides written approval.  At its discretion, SCEP may not reimburse costs incurred prior to the date of any such written approval by the Grants Officer.

B.  Grants Officer approval as set out above is required for the following:

| Activity and Subrecipients / Contractor | Total Amount ($) |
|---|---|
| Administrative, Implementation Vendor | $     543,117.00 |
| Administrative, Agreements Supporting Collaboration w/Community Based Organizations and Organized Labor | $     424,608.00 |
| Administrative, Implementation Vendor – Strat. Analysis | $     154,100.00 |
| Administrative, Implementation Vendor | $     9,002,564.40 |
| Rebate Funds: Reimbursement, Implementation Vendor | $     52,785,152.78 |
| Rebate Funds: Rebate Delivery, Implementation Vendor | $     1,000,000.00 |
| Rebate Funds: Rebate Delivery, Implementation Vendor | $     550,000.00 |
| Rebate Funds: Rebate Delivery, Implementation Vendor | $     1,874,513.40 |
| Administrative, Implementation Vendor | $     325,486.60 |
| TOTAL | $     66,659,542.18 |

The Grants Officer may require additional information concerning these tasks prior to providing written approval.

C.  Upon written approval by the Grants Officer, the Recipient may then receive payment for the tasks identified in paragraph B. above for allowable costs incurred, or SCEP will

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

recognize costs incurred toward cost share requirements, if any, in accordance with the
payment provisions contained in the Special Terms and Conditions of this agreement.

## Term 44.    Subrecipient and Subcontractor Change Notification

Except for subrecipients and/or subcontractors specifically proposed as part of the Recipient's
Application for award, the Recipient must notify the Contracting Officer and Project Officer in
writing 30 days prior to the execution of new or modified subrecipient and/or subcontractor
agreements, including naming any To Be Determined subrecipients and/or subcontractors.  This
notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR
part 200 as amended by 2 CFR part 910, nor does it relieve the Recipient from its obligation to
comply with applicable Federal statutes, regulations, and executive orders.

In order to satisfy this notification requirement, the Recipient documentation must, as a
minimum, include the following:

- A description of the research to be performed, the service to be provided, or the
  equipment to be purchased.
- Cost share commitment letter if the subrecipient and/or subcontractor is providing cost
  share to the Award.
- An assurance that the process undertaken by the Recipient to solicit the subrecipient
  and/or subcontractor complies with their written procurement procedures as outlined
  in 2 CFR 200.317 through 200.327.
- An assurance that no planned, actual or apparent conflict of interest exists between the
  Recipient and the selected subrecipient and/or subcontractor and that the Recipient's
  written standards of conduct were followed.[1]
- A completed Environmental Questionnaire, if applicable.
- An assurance that the subrecipient and/or subcontractor is not a debarred or suspended
  entity.
- An assurance that all required award provisions will be flowed down in the resulting
  subrecipient and/or subcontractor agreement.

The Recipient is responsible for making a final determination to award or modify subrecipient
and/or subcontractor agreements under this agreement, but the Recipient may not proceed
with the subrecipient and/or subcontractor agreement until the Contracting Officer
determines, and provides the Recipient written notification, that the information provided is
adequate.

---

[1] It is DOE's position that the existence of a "covered relationship" as defined in 5 CFR 2635.502(a)&(b) between a member of
the Recipient's owners or senior management and a member of a subrecipient's owners or senior management creates at a
minimum an apparent conflict of interest that would require the Recipient to notify the Contracting Officer and provide
detailed information and justification (including, for example,  mitigation measures) as to why the subrecipient agreement does
not create an actual conflict of interest.  The Recipient must also notify the Contracting Officer of any new subrecipient
agreement with:  (1) an entity that is owned or otherwise controlled by the Recipient; or (2) an entity that is owned or
otherwise controlled by another entity that also owns or otherwise controls the Recipient, as it is DOE's position that these
situations also create at a minimum an apparent conflict of interest.

U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency &
Renewable Energy

**Award No. DE-SE0000025.0001**
**Special Terms and Conditions**

Should the Recipient not receive a written notification of adequacy from the Contracting Officer within 30 days of the submission of the subrecipient and/or subcontractor documentation stipulated above, the Recipient may proceed to award or modify the proposed subrecipient agreement.

## Term 45.    Conference Spending

The Recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

## Term 46.    Recipient Integrity and Performance Matters

### A.  General Reporting Requirement

If the total value of the Recipient's currently active Financial Assistance awards, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this term. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

### B.  Proceedings About Which You Must Report

Submit the information required about each proceeding that:

   i.  Is in connection with the award or performance of a Financial Assistance, cooperative agreement, or procurement contract from the Federal Government;

   ii.  Reached its final disposition during the most recent five-year period; and

   iii.  Is one of the following:

      1.  A criminal proceeding that resulted in a conviction, as defined in paragraph E of this award term and condition;

      2.  A civil proceeding that resulted in a finding of fault and liability and

payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

3. An administrative proceeding, as defined in paragraph E of this term, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

4. Any other criminal, civil, or administrative proceeding if:

   a. It could have led to an outcome described in paragraph B.iii.1, 2, or 3 of this term;

   b. It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

   c. The requirement in this term to disclose information about the proceeding does not conflict with applicable laws and regulations.

## C. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph B of this term. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

## D. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph A of this term, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, Financial Assistance awards, (including cooperative agreement awards) with a cumulative total value greater than $10,000,000, must disclose semiannually any information about the criminal, civil, and administrative proceedings.

## E. Definitions

For purposes of this term:

i. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

Financial Assistance awards. It does not include audits, site visits, corrective plans, or inspection of deliverables.

ii. Conviction means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of *nolo contendere*.

iii. Total value of currently active Financial Assistance awards, cooperative agreements and procurement contracts includes—

1. Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

2. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## Term 47.    Export Control

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade.  There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls."  The Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under a resulting award.

The Recipient must immediately report to DOE any export control violations related to the project funded under this award, at the recipient or subrecipient level, and provide the corrective action(s) to prevent future violations.

## Term 48.    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment

As set forth in 2 CFR 200.116, recipients and subrecipients are prohibited from obligating or expending project funds (Federal funds and recipient cost share) to:

(1) Procure or obtain;

(2) Extend or renew a contract to procure or obtain; or

(3) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.  As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

## Term 49.    Fraud, Waste and Abuse

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse, and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to include grants, cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit https://www.energy.gov/ig/ig-hotline.

Additionally, the Recipient must be cognizant of the requirements of 2 CFR 200.113 Mandatory disclosures, which states:

> The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Non-Federal entities that have received a Federal award including the term and condition outlined in appendix XII of 2 CFR Part 200 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in 200.339. (See also 2 CFR part 180, 31 U.S.C. § 3321, and 41 U.S.C. § 2313.)

## Term 50.    Interim Conflict of Interest Policy for Financial Assistance Policy

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant,

cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy.

## Term 51.    Organizational Conflict of Interest

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization (2 CFR 200.318(c)(2)).

The Recipient must disclose in writing any potential or actual organizational conflict of interest to the DOE Contracting Officer. The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe. For a list of the information that must be included the disclosure, see Section VI. of the DOE interim Conflict of Interest Policy for Financial Assistance at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance.

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the Recipient must procure goods and services from other sources when using project funds. Otherwise, DOE may terminate the Award in accordance with 2 CFR 200.340 unless continued performance is determined to be in the best interest of the federal government.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-federal entities, with the exception of DOE National Laboratories. The Recipient is responsible for ensuring subrecipient compliance with this term.

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe, the Recipient must maintain written standards of conduct covering organizational conflicts of interest.

## Term 52.    Participants and Other Collaborating Organizations

Prior to award, the Recipient was required to provide the following information on participants and other collaborating organizations. If there are any changes to Participants and Collaborating Organizations information previously submitted to DOE, the Recipient must submit updated information within thirty (30) calendar days after the end of the quarterly reporting period in which the change occurred:

**A. What individuals have worked on the project**

Provide the following information for individuals at the prime recipient and subrecipient level: (1) all senior and key personnel; and (2) each person who has worked or is expected to work at least one person month per year on the project regardless of the source of compensation (a person month equals approximately 160 hours of effort).

  i.    Name
  ii.   Organization
  iii.  Job Title
  iv.   Role in the project
  v.    Start and end date (month and year) working on the project
  vi.   State, U.S. territory, and/or country of residence
  vii.  Whether this person collaborated with an individual or entity located in a foreign country in connection with the scope of this Award, and
  viii. If yes to vii, whether the person traveled to the foreign country as part of that collaboration, and, if so, where and what the duration of stay was.

**B. Organizations**

Identify all subrecipients, contractors, U.S. National Laboratories, partners, and collaborating organizations. Recipients must also include all foreign collaborators as outlined in the Foreign Collaboration Considerations term of the award Terms and Conditions. For each, provide name, UEI, zip code or latitude/longitude, role in the project, contribution to the project, and start and end date.

## Term 53.    Community Benefits Outcomes and Objectives

The recipient must meet the stated objectives and milestones set forth in its Community Benefits Outcomes and Objectives, which is incorporated into the Award per Term 56. A report on the recipient's progress toward meeting the objectives and milestones set forth in the Community Benefits Outcomes and Objectives must be included in the continuation application.

## Term 54.    Human Subjects Research

Research involving human subjects, biospecimens, or identifiable private information conducted with Department of Energy (DOE) funding is subject to the requirements of DOE Order 443.1C, *Protection of Human Research Subjects*, 45 CFR Part 46, *Protection of Human Subjects* (*subpart A which is referred to as the "Common Rule")*, and 10 CFR Part 745, *Protection of Human Subjects*.



U.S. DEPARTMENT OF **ENERGY** | Energy Efficiency & Renewable Energy

Award No. DE-SE0000025.0001
Special Terms and Conditions

Federal regulation and the DOE Order require review by an Institutional Review Board (IRB) of all proposed human subjects research projects. The IRB is an interdisciplinary ethics board responsible for ensuring that the proposed research is sound and justifies the use of human subjects or their data; the potential risks to human subjects have been minimized; participation is voluntary; and clear and accurate information about the study, the benefits and risks of participating, and how individuals' data/specimens will be protected/used, is provided to potential participants for their use in determining whether or not to participate.

The Recipient shall provide the Federal Wide Assurance number identified in item 1 below and the certification identified in item 2 below to DOE <u>prior to</u> initiation of any project that will involve interactions with humans in some way (e.g., through surveys); analysis of their identifiable data (e.g., demographic data and energy use over time); asking individuals to test devices, products, or materials developed through research; and/or testing of commercially available devices in buildings/homes in which humans will be present. *Note:* This list of examples is illustrative and not all inclusive.

No DOE funded research activity involving human subjects, biospecimens, or identifiable private information shall be conducted without:

1) A registration and a Federal Wide Assurance of compliance accepted by the Office of Human Research Protection (OHRP) in the Department of Health and Human Services; and
2) Certification that the research has been reviewed and approved by an Institutional Review Board (IRB) provided for in the assurance.  IRB review may be accomplished by the awardee's institutional IRB; by the Central DOE IRB; or if collaborating with one of the DOE national laboratories, by the DOE national laboratory IRB.

The Recipient is responsible for ensuring all subrecipients comply and for reporting information on the project annually to the DOE Human Subjects Research Database (HSRD) at https://science.osti.gov/HumanSubjects/Human-Subjects-Database/home. *Note:*  If a DOE IRB is used, no end of year reporting will be needed.

Additional information on the DOE Human Subjects Research Program can be found at: https://science.osti.gov/ber/human-subjects.

## Term 55.    Affirmative Action and Pay Transparency Requirements

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246:

(1)     Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.

Case 1:25-cv-00039-JJM-PAS    Document 68-123    Filed 02/07/25    Page 555 of 556
PageID #: 6485

U.S. DEPARTMENT OF
**ENERGY** | Energy Efficiency &
Renewable Energy

Award No. DE-SE0000025.0001
**Special Terms and Conditions**

(2)      Recipients and Contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors and subcontractors.

(3)      Recipients, subrecipients, contractors and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co-workers.

The Department of Labor's (DOL) Office of Federal Contractor Compliance Programs (OFCCP) uses a neutral process to schedule contractors for compliance evaluations. OFCCP's Technical Assistance Guide should be consulted to gain an understanding of the requirements and possible actions the recipients, subrecipients, contractors, and subcontractors must take. See OFCCP's Technical Assistance Guide at:
https://www.dol.gov/sites/dolgov/files/ofccp/Construction/files/ConstructionTAG.pdf?msclkid=9e397d68c4b111ec9d8e6fecb6c710ec.

## Term 56.    Potentially Duplicative Funding Notice

If the Recipient or subrecipients have or receive any other award of federal funds for activities that potentially overlap with the activities funded under this Award, the Recipient must promptly notify DOE in writing of the potential overlap and state whether project funds (i.e., recipient cost share and federal funds) from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under this Award. If there are identical cost items, the Recipient must promptly notify the DOE Contracting Officer in writing of the potential duplication and eliminate any inappropriate duplication of funding.

# Subpart D.  Inflation Reduction Act (IRA) Specific Requirements

## Term 57.    Program Launch Approval

The Recipient must not disburse rebate funds nor accept rebate claims until it receives DOE approval to proceed with program launch. The Recipient must address and comply with all program requirements to receive Federal funding and to launch State programs. If the Recipient launches the rebate program(s) or disburses rebate funds prior to DOE approval, DOE reserves the right to take appropriate action.

## Term 58.    Implementation Blueprint Submission

The Recipient must submit a complete State Implementation Blueprint and related plans within a minimum of 60 days prior to planned program launch. Any application requirements that were deferred to the State Implementation Blueprint must also be addressed. States must receive DOE approval on the State Implementation Blueprint and related plans before



launching their program. Once DOE approval is received, the State Implementation Blueprint and supporting plans become immediately binding to the award and will be enforceable. The State Implementation Blueprint and supporting plans will be incorporated into the award Terms & Conditions by reference and will be incorporated formally in the next award modification, following approval by DOE.

## Term 59.    Reporting Tracking and Segregation of Incurred Costs

IRA funds may be used in conjunction with other funding, as necessary to complete projects, but tracking and reporting must be separate.  The Recipient must keep separate records for IRA funds and must ensure those records comply with the requirements of the IRA.