## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | C.A. No. 1:25-cv-00039-JJM-PAS |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; PATRICIA COLLINS, in her official capacity as Treasurer of the United States; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY A. FINK, M.D., in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as Acting Secretary of Education; U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; VINCE MICONE, in his official capacity as Acting Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, | |

in his official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General of the U.S. Department of Justice; THE NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in his capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT; MARCO RUBIO, in his official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; U.S. DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, in his official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; JEREMY PELTER, in his official capacity as Acting Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO in her official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; and EVERETT WOODEL, in his official capacity as Acting Administrator of U.S. Small Business Administration,

Defendants.

## INTRODUCTION

1.      This action seeks declaratory and injunctive relief against the federal government's categorical, immediate, and indefinite freeze on trillions of dollars of Congressionally authorized and appropriated federal funding (Federal Funding Freeze). Defendants' actions—beginning with certain Executive Orders (EOs) issued on or after January 20, 2025, followed by the EOs' implementation at federal agencies, and continuing through and beyond the issuance of a directive by the Office of Management and Budget (OMB) to pause virtually all federal disbursements to federal funding recipients—froze critical federal funding, including billions of dollars committed to Plaintiff States and benefitting their residents.

2.      The Federal Funding Freeze began with a January 20 EO entitled *Unleashing American Energy*, in which the President directed that all federal agencies impose a categorical, immediate, and indefinite pause on federal funds under the Infrastructure Improvement and Jobs Act (IIJA) (commonly known as the Bipartisan Infrastructure Law) and the Inflation Reduction Act of 2022 (IRA) pending review by those agencies of all such funding against the President's energy policy priorities. Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025) (*Unleashing* EO). The day after that EO, OMB issued a directive stating that agencies must "immediately pause disbursement of funds appropriated under the [IRA] or the [IIJA]." Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-11, *Guidance Regarding Section 7 of the Executive Order* Unleashing American Energy (Jan. 21, 2025) (*Unleashing* Directive).

3.      The Federal Funding Freeze continued through the following week when, on January 27, OMB issued a directive implementing an across-the-board Federal Funding Freeze—extending to nearly all federal funding streams nationwide—citing the *Unleashing* EO as well as several other EOs issued by the President in the previous week. Specifically, OMB ordered the

3

head of every executive branch department and agency to "**temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance," as well as any "other relevant agency activities" that "may be implicated by" recent executive orders, "including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-13, *Temporary Pause of Agency Grant, Loan, & Other Financial Assistance Programs* 2 (Jan. 27, 2025) (OMB Directive) (emphasis in original).[1]

4.      OMB purported to rescind that across-the-board OMB Directive shortly after Plaintiff States filed this lawsuit, and just before a hearing on Plaintiff States' motion for a temporary restraining order in this action. But that rescission was in name only. Defendants continued to implement the Federal Funding Freeze across myriad federal funding programs, as demonstrated through their repeated actions and communications, resulting in substantial disruptions across State agencies—both before and after OMB purported to rescind its Directive. These disruptions only stopped (and even then, only partially) following a temporary restraining order from this Court.

5.      The Federal Funding Freeze, effectuated through EOs, the *Unleashing* Directive, the OMB Directive, and other agency actions implementing them as detailed herein, is unconstitutional and exceeds statutory authority, and those agency actions violate the Administrative Procedure Act (APA).

6.      Defendants' actions to unlawfully withhold funds have caused substantial confusion and resulted in—and will continue to result in—immediate and devastating harm to Plaintiff States and their residents. The Federal Funding Freeze purports to allow federal agencies

---

[1] A copy of the OMB Directive is appended to this Complaint as Exhibit A.

to rescind hundreds of millions of dollars they have committed to pay, and on which Plaintiff States' budgets rely—monies that are necessary for the Plaintiff States to ensure that their residents have access to childcare, quality healthcare, a clean and safe environment, the protections of law enforcement, the benefit of safe roads, access to workforce development, and assistance in the aftermath of natural disasters, among many other key services. Indeed, the confusion caused by the Federal Funding Freeze itself constitutes immediate harm by impeding planning, wasting resources to mitigate potential impacts, and unnecessarily stopping work. Without the timely disbursement of this funding, the Plaintiff States will be unable to provide these essential services for residents, pay public employees, satisfy obligations, and carry on the important business of government.

7.      The Plaintiff States accordingly seek declaratory and injunctive relief to put an end to the Federal Funding Freeze and ensure that access to critical funds by the Plaintiff States and their residents continues, under the applicable statutes, regulations, and terms governing such disbursements.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. § 702.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### A.  Plaintiffs

10.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

11.     The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

12.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

13.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

14.     The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

15.     The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

16.     The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

17.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who acts as the chief legal representative of the state.

18.     The State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

19.     The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathleen Jennings, who is the chief law enforcement officer of Delaware.

20.     The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb.

21.     The State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne Lopez who is the chief law enforcement officer of Hawai'i.

22.     Plaintiff Office of the Governor ex rel. Andy Beshear brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. *Id.* § 228. The

Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. St. § 11.060; Ky. Rev. St. § 11.065; Ky. Rev. St. § 12.255; Ky. Rev. St. § 12.270.

23.    The State of Maine is a sovereign state of the United States of America. Maine is represented by Attorney General Aaron Frey who is the chief law enforcement officer of Maine.

24.    The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief law enforcement officer of Maryland.

25.    The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel who is the chief law enforcement officer of Michigan.

26.    The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison who is the chief law enforcement officer of Minnesota.

27.    The State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

28.    The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

29.    The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

30.    The State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield who is the chief law enforcement officer of Oregon.

8

31.     The State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark who is the chief law enforcement officer of Vermont.

32.     The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

33.     The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul who is the chief law enforcement officer of Wisconsin.

34.     The Plaintiff States each receive billions of dollars annually from the federal government for services that range from providing essential healthcare and free or low-cost school meals to low-income children, to supporting law enforcement efforts to combat violence against children, elders and other vulnerable groups, to maintaining highways and roads, to pollution reduction efforts and critical infrastructure improvements. The Federal Funding Freeze jeopardizes all of this funding—funding that Congress designated and appropriated for the Plaintiff States.

**B.  Defendants**

35.     Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity.

36.     Defendant the United States OMB is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. §§ 501–07.

37.    Defendant Russell Vought is the Director of the OMB and that agency's highest ranking official. In that capacity, he oversees OMB and provides direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements. The OMB Director authored the OMB Directive and other OMB directives detailed herein and is responsible for ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity. 31 U.S.C. §§ 502, 503.

38.    Defendant the United States Department of the Treasury is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301(a). The Department of the Treasury is responsible for ensuring the financial security of the United States.

39.    Defendant Scott Bessent is the Secretary of the Department of the Treasury, responsible for the operations of the Department of the Treasury and management of the finances of the United States. 31 U.S.C. § 301(b). He is sued in his official capacity.

40.    Defendant Patricia Collins is the Treasurer of the United States, responsible for the management of the finances of the United States. 31 U.S.C. § 301(d). She is sued in her official capacity.

41.    Defendant the United States Department of Health and Human Services (HHS) is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 3501. The National Institutes of Health is an agency of the United States within the HHS. 42 U.S.C. § 281(a).

42.    Defendant Dorothy A. Fink, M.D., is the Acting Secretary of HHS and that agency's highest ranking official. Exec. Off. of the President, *President Trump Announces Acting Cabinet and Cabinet-Level Positions* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-

actions/2025/01/designation-of-acting-leaders/ (Acting Designations Directive). She is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 3501. She is sued in her official capacity.

43.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.

44.    Defendant Denise Carter is the Acting Secretary of the United States Department of Education and that agency's highest ranking official. Acting Designations Directive. She is charged with the supervision and management of all decisions and actions of that agency. 20 U.S.C. § 3412. She is sued in her official capacity.

45.    Defendant United States Department of Transportation is a cabinet agency within the executive branch of the United States government. 49 U.S.C. § 102.

46.    Defendant Sean Duffy is the Secretary of the United States Department of Transportation and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 49 U.S.C. § 102. He is sued in his official capacity.

47.    Defendant United States Department of Labor (DOL) is a cabinet agency within the executive branch of the United States government. 29 U.S.C. § 551.

48.    Defendant Vincent Micone is the Acting Secretary of DOL and that agency's highest ranking official. Acting Designations Directive. He is charged with the supervision and management of all decisions and actions of that agency. 29 U.S.C. § 551. He is sued in his official capacity.

49.    Defendant United States Department of Energy (DOE) is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 7131.

50.     Defendant Chris Wright is the Secretary of the DOE and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 7131. He is sued in his official capacity.

51.     Defendant United States Environmental Protection Agency (EPA) is an independent agency within the executive branch of the United States government. 42 U.S.C. § 4321.

52.     Defendant Lee Zeldin is the Administrator of the EPA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 4321. He is sued in his official capacity.

53.     Defendant United States Department of the Interior is a cabinet agency within the executive branch of the United States government. 43 U.S.C. § 1451. The United States Geological Survey (USGS) is an agency within the United States Department of the Interior. 43 U.S.C. § 31.

54.     Defendant Doug Burgum is the Secretary of the Department of the Interior, and that agency's highest-ranking official. 43 U.S.C. § 1451. He is sued in his official capacity.

55.     Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111. The United States Federal Emergency Management Agency (FEMA) is an agency within the Department of Homeland Security. 6 U.S.C. § 313.

56.     Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. 6 U.S.C. § 112. She is sued in her official capacity.

57.     Defendant United States Department of Justice is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501.

58.     Defendant Pamela Bondi is the Attorney General for the United States Department of Justice and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. 28 U.S.C. § 503. She is sued in her official capacity.

59.     Defendant the National Science Foundation is an independent agency within the executive branch of the United States government. 42 U.S.C. § 1861.

60.     Defendant Dr. Sethuraman Panchanathan is the Director of the National Science Foundation and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 1864. He is sued in his official capacity.

61.     Defendant United States Department of Agriculture (USDA) is a cabinet agency within the executive branch of the United States government. 7 U.S.C. § 2201. The United States Forest Service is an agency within the United States Department of Agriculture. 16 U.S.C. § 553. The Natural Resources Conservation Service is an agency within the United States Department of Agriculture. 7 U.S.C. § 6936.

62.     Defendant Gary Washington is the Acting Secretary of USDA and that agency's highest-ranking official. 7 U.S.C. § 2202; Acting Designations Directive. He is sued in his official capacity.

63.     Defendant United States Department of Housing and Urban Development (HUD) is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 3532(a).

64.     Defendant Scott Turner is the Secretary of HUD and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 3532(a)–(b). He is sued in his official capacity.

65.     Defendant United States Department of State is a cabinet agency within the executive branch of the United States government. 22 U.S.C. § 2651.

66.     Defendant United States Agency for International Development is an independent agency within the executive branch of the United States government. 22 U.S.C. § 6563(a).

67.     Defendant Marco Rubio is Secretary of the United States Department of State, and that agency's highest-ranking official. He is charged with supervision and management of all decisions and actions of that agency, 22 U.S.C. § 2651, and is sued in his official capacity. Defendant Marco Rubio is also the acting Administrator of the United States Agency for International Development and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

68.     Defendant United States Department of Defense is a cabinet agency within the executive branch of the United States government. 10 U.S.C. § 111.

69.     Defendant Peter Hegseth is the Secretary of the United States Department of Defense and that agency's highest-ranking civilian official. He is charged with the supervision and management of all decisions and actions of that agency. *Id.* He is sued in his official capacity.

70.     Defendant United States Department of Veterans Affairs is a cabinet agency within the executive branch of the United States government. 38 U.S.C. § 301.

71.     Defendant Doug Collins is the Secretary of the United States Department of Veterans Affairs. He is charged with the supervision and management of all decisions and actions of that agency. *Id.* He is sued in his official capacity.

72.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States government. 40 U.S.C. § 1501. The National Oceanic and Atmospheric Administration is a bureau within the United States Department of Commerce. 42 U.S.C. § 1511(1).

73.     Defendant Jeremy Pelter is Acting Secretary of the United States Department of Commerce, and that agency's highest-ranking official. Acting Designations Directive. He is charged with the supervision and management of all decisions and actions of that agency. 40 U.S.C. § 1501. He is sued in his official capacity.

74.     Defendant National Aeronautics and Space Administration is an independent agency within the United States government. 51 U.S.C. § 20111(a).

75.     Defendant Janet Petro is Acting Administrator of the National Aeronautics and Space Administration and that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. 51 U.S.C. § 20111(a). She is sued in her official capacity.

76.     Defendant Corporation for National and Community Service, operating as AmeriCorps, is an independent agency within the United States government. 42 U.S.C. § 12651.

77.     Defendant Jennifer Bastress Tahmasebi is Interim Head of the Corporation for National and Community Service, operating as AmeriCorps, and that agency's highest-ranking official. She is sued in her official capacity.

78.     Defendant United States Social Security Administration is an independent agency within the United States government. 42 U.S.C. § 901.

79.     Defendant Michelle King is the Acting Commissioner of the United States Social Security Administration and that agency's highest-ranking official. Acting Designations Directive. She is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 902. She is sued in her official capacity.

80.     Defendant United States Small Business Administration is an independent agency within the United States government. 15 U.S.C. § 633.

81.     Defendant Everett Woodel is the Acting Administrator of United States Small Business Administration and that agency's highest-ranking official. Acting Designations Directive. He is charged with the supervision and management of all decisions and actions of that agency. 15 U.S.C. § 633(a)(1). He is sued in his official capacity.

## LEGAL BACKGROUND

### Constitutional and Statutory Provisions Governing Federal Funding

82.     The Constitution gives the "power of the purse" to Congress. Specifically, the Constitution grants to Congress the authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."); art. I, § 8, cl. 1 (Congress has authority "[t]o lay and collect Taxes, Duties, Imposts and Excises; to pay the Debts and provide for the common Defence and general Welfare of the United States . . . .").

83.    The Constitution also vests in Congress all legislative powers and prescribes a specific procedure by which laws may be enacted, which include the requirements of bicameralism and presentment. U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."); U.S. Const. art. I, § 7, cls. 2, 3. Bicameralism requires that both Houses of Congress pass an identical bill, and presentment requires that the proposed law be presented to the President for signature or veto. U.S. Const. art. I, § 7, cls. 2, 3.

84.    The President may recommend laws for Congress's consideration, including those related to spending. U.S. Const. art. II, § 3. Upon presentment with a bill, the President may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. Once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

**Appropriations Law**

85.    Congress authorizes federal spending not through one single piece of legislation but through many. To finance federal programs and activities, Congress authorizes an agency to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i).

86.    One such authorization is an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations. *See* 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., *A Glossary*

17

*of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

87.    Congress has enacted multiple overarching framework statutes that affirm congressional control over federal spending. First, the so-called "purpose statute" states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—that is, funds can only be used for the purposes that Congress has designated.

88.    Second, the Antideficiency Act, prevents agencies from obligating or spending funds absent congressional appropriation. 31 U.S.C. § 1341.

89.    Finally, the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.* (Impoundment Control Act), permits the Executive Branch to "impound" (or decline to spend) federal funds under a small set of highly circumscribed conditions.

90.    Under the Impoundment Control Act, the President must indicate his intention either to defer (delay) or rescind (cancel) a congressional appropriation by transmitting a "special message" to both Houses of Congress and the Comptroller General, which also must be published in the Federal Register. 2 U.S.C. §§ 681, 683 (rescissions), 684 (deferrals), 685 (transmission of messages; publication). The special message must justify the deferral or rescission, including its amount and likely fiscal consequences. *Id.* §§ 683(a) (rescissions), 684(a) (deferrals).

91.    Under the Impoundment Control Act, deferrals are required to be consistent with "legislative policy." 2 U.S.C. § 684(b). They are permissible only "to provide for contingencies"; "to achieve savings made possible" through "changes in requirements or greater efficiency of operations"; or "as specifically provided by law." 2 U.S.C. § 684(b). Deferrals for any other purpose are prohibited. 2 U.S.C. § 684(b).

92.      In the case of a proposed rescission, once the President transmits the requisite special message, Congress has 45 days to consider the President's proposal and approve it by passing a "rescission bill," which rescinds the agency's authorization to incur financial obligations, in whole or in part. 2 U.S.C. § 682(3). If Congress does not act within 45 days to approve the President's proposal, the funds are not rescinded and "shall" be made available for obligation. 2 U.S.C. § 683(b).

**Laws Governing Federal Funding to States**

93.      Many of the most significant funding streams to the Plaintiff States are so-called categorical or "formula" grants, which Congress has through specific statutory provisions instructed the federal agencies or officials to provide to States on the basis of enumerated statutory factors, such as population or the expenditure of qualifying state funds. *See, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 935 (9th Cir. 2019). Congress authorized and appropriated other significant funding streams for specific purposes, or using specific statutory commands. For example:

94.      **Medicaid Funding.** Congress has directed the Secretary of Health and Human Services to "pay to each State" a fixed portion of their annual Medicaid expenditures, 42 U.S.C. § 1396b(a)—an amount totaling over $800 billion annually, and amounting to one of the Plaintiff States' most significant sources of federal funds.

95.      **Highway Funding.** Congress established a statutory formula by which the Secretary of Transportation is required to distribute federal highway funds to States, *see* 23 U.S.C. § 104(a)(1), (b), (c), totaling hundreds of millions of dollars annually in the coming two fiscal years, 23 U.S.C. §§ 104(a)–(e). The distribution methodology is mandatory and does not permit the Secretary to deviate from the formula. *Id.* §§ 104(b) ("The Secretary *shall* distribute the amount

of the base apportionment . . . ."), 104(c)(1) ("[T]he amount for each State *shall* be determined as follows . . . .") (emphases added).

96.    **Special Education Services.** Congress also instructed federal agencies to give States the funds they need to support the health and safety of children in their jurisdictions. The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, for instance, states that "[t]he Secretary [of Education] shall make grants to States . . . to assist them to provide special education and related services to children with disabilities" according to a statutory formula, *id.* § 1411(a)(1); *see id.* § 1411(d) (setting amounts of grants based on prior funding levels and population data).

97.    **Mental Health and Substance Abuse Treatment.** In another example, Congress has directed the Secretary of HHS to provide nondiscretionary block grants to states for mental health and substance abuse treatment and appropriates over $2 billion annually to fund those grants. The Secretary "shall make" or "shall determine the amount of" grants according to fixed statutory formulas, 42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a), and lacks the discretion to unilaterally withhold funds absent compliance with statutory procedures that afford the states notice and an opportunity to be heard, *see, e.g.*, *id.* §§ 300x-26(b)(1), 300x-55(e).

98.    **Power and Heating for Low-Income Residents.** Congress also established the Low-Income Home Energy Assistance Program (LIHEAP), likewise administered by the HHS Secretary, to support the Plaintiff States in their efforts to ensure low-income residents are able to obtain electricity and heat in the winter. 42 U.S.C. § 8621(a). Congress has appropriated billions of dollars for LIHEAP, which established a set formula by which the Secretary must provide funding to the states, *id.* §§ 8623(a), 8626(a)(1); and sharply limited the Secretary's discretion to

withhold those funds (again, by requiring notice to the state and an opportunity for a hearing), *id.* § 8627.

99.     **The IIJA and IRA.** More recently, Congress enacted two federal statutes that authorize and direct federal agencies to make significant investments in, among other things, energy and infrastructure projects across the Nation—the IIJA, Pub. L. No. 117-58, 135 Stat. 429 (2021), and the IRA, Pub. L. No. 117-169, 136 Stat. 1818 (2022). Collectively, the IIJA and IRA directed over $2 trillion in spending on projects ranging from highways, to broadband access, to pollution reduction, to increasing the reliability of the electric grid.

100.    For example, section 50210 of the IIJA appropriated $14.65 billion in grants for States' Clean Water revolving funds for 2022 to 2026. IIJA § 50210, 135 Stat. at 1169. These funds were originally created through a separate statute, the Federal Clean Water Act, which directs that EPA "shall make capitalization grants to each State" to establish and support those States' water pollution control revolving funds for wastewater and sewage treatment, stormwater management and treatment, and water conservation and recycling projects using formula grants. 33 U.S.C. §§ 1381(a), (b); 1383(c); 1384(a), (c)(2) (mandating reallocation of any unallotted funds to State programs). Several of the Plaintiff States received Clean Water revolving fund awards under the IIJA appropriation that are subject to final, binding grant agreements.

101.    The IIJA also reauthorized and appropriated an additional $14.65 billion from 2022 to 2026 for Drinking Water State revolving funds. IIJA § 50102, 135 Stat. at 1136. Congress created these revolving funds in the Federal Safe Drinking Water Act, which provides that EPA "shall offer to enter into agreements with eligible States to make capitalization grants" via formula grants. 42 U.S.C. § 300j-12(a)(1)(A), (D); *see also id.* § 300j-12(a)(1)(E) (mandating reallocation of any unallotted funds to state programs). These funds provide loans and other financial assistance

to public water systems, including for the replacement or rehabilitation of aging treatment, storage, and distribution facilities. 42 U.S.C. § 300j-12(a)(2)(B). Multiple Plaintiff States have received Safe Drinking Water revolving fund awards obligated through final, binding grant agreements.

102.    As another example, the IRA also appropriated $117.5 million to EPA to award grants under an existing air monitoring program established in the 1963 Clean Air Act, 42 U.S.C. §§ 7401(a)(4), 7403(a)–(c), 7405. EPA "shall," Congress instructed, "provide financial assistance to air pollution control agencies" in conducting their activities, *id.* § 7403(a)(2), including the mandatory establishment of a national air monitoring network and research program, *id.* § 7403(c). EPA has awarded such grants to multiple Plaintiff States that are obligated under final, binding grant agreements with EPA.

103.    The IRA also created the Climate Pollution Reduction Grant (CPRG) program, in which Congress appropriated $5 billion to EPA and directed that EPA "shall competitively award grants to eligible entities to implement" greenhouse gas pollution reduction plans and "shall make funds available" to grantees. 42 U.S.C. §§ 7437(a)(1), (a)(2), (b), (c)(1), (c)(3). EPA awarded grants to multiple Plaintiff States which are obligated under final, binding grant agreements with EPA.

104.    The IRA also appropriated to EPA $7 billion to make grants to states and other eligible recipients "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies," including rooftop solar panels and storage systems. 42 U.S.C. § 7434(a)(1). EPA awarded these $7 billion through the "Solar for All" program to 60 grantees, including many Plaintiff States, all of which are also obligated under final, binding agreements with EPA.

105.    Another section of the IRA, entitled the High-Efficiency Electric Home Rebate Act, provides that the Secretary of Energy "shall award grants to State energy offices . . . to establish a high-efficiency electric home rebate program under which rebates shall be provided" for heat pump heating and cooling and other electrification projects for low- and moderate-income households and appropriated $4.5 billion through 2031 for a home rebate program. 42 U.S.C. § 18795a(a)(1), (c), (d)(1), (d)(6); § 18795a(a)(2)(A)(i). DOE awarded several Plaintiff States grants under this formula grant program which are subject to final, binding grant agreements.

## FACTUAL ALLEGATIONS

### Executive Orders

106.    Between January 20 and 28, 2025, the President issued a series of executive orders directing federal agencies to review funding recipients in connection with widespread policy changes. Two of the EOs also direct agencies to withhold funds pending that review, in certain circumstances.

107.    **Unleashing EO.** On January 20, 2025, the President issued the *Unleashing* EO. Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025). The *Unleashing* EO announces a categorical, immediate, and indefinite pause on federal funds under the IIJA and IRA. *See id.* Section 7(a) of the *Unleashing* EO, entitled "Terminating the Green New Deal," orders all federal agencies to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." *Id.* at 8357.

108.    Section 7(a) of the *Unleashing* EO further directs all agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and policy outlined in section 2 of this order," *id.*, which in turn articulates the President's energy policy priorities. Those

priorities include encouraging fossil fuel and minerals exploration and production, eliminating "the electric vehicle (EV) mandate," and protecting the "freedom to choose from a variety of goods and appliances." *Id.* at 8353 (internal quotations omitted). The *Unleashing* EO orders agency heads to submit a report detailing this review and resulting recommendations to OMB and the National Economic Council ("NEC") within 90 days of the order and directs that: "[N]o funds [appropriated under the IRA or IIJA] shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt." *Id.* at 8357.

109. **Invasion EO.** On January 20, 2025, the President issued an executive order entitled "Protecting the American People Against Invasion" (*Invasion* EO). Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025). This EO asserts that an "unprecedented flood of illegal immigration" over the last four years resulted in the entry of people who "present significant threats to national security and public safety," "are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," or have "abused the generosity of the American people." *Id.* at 8443. To achieve a policy of "total and efficient enforcement" of the nation's immigration laws, *id.*, the *Invasion* EO calls for a "Funding Review" in which the Attorney General and Secretary of Homeland Security are to review "all contracts, grants or other agreements providing federal funding to non-governmental organizations" that support or provide services, "directly or indirectly," to "removable or illegal aliens" and "[p]ause distribution of all further funds pursuant to such agreements pending the results of" this review. *Id.* at 8447. The *Invasion* EO also directs the Attorney General and the Secretary of Homeland Security to ensure that "so-called 'sanctuary' jurisdictions" do not receive federal funds. *Id.* at 8446.

110.    **DEI EO.** On January 20, 2025, the President issued an executive order, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (*DEI* EO). Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025). This EO declares an intention to "terminat[e] . . . all . . . 'diversity, equity, inclusion, and accessibility' (DEIA) . . . programs." *Id.* at 8339. In addition, the *DEI* EO orders federal agencies to provide the OMB Director with a list of all federal grantees who received federal funding "to provide or advance DEI, DEIA, or 'environmental justice'" programs since January 20, 2021. *Id.* at 8339–40.

111.    **Gender EO.** On January 20, 2025, the President issued an executive order, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (*Gender* EO). Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025). This EO defines federal policy to recognize "two sexes, male and female" determined only by "an individual's immutable biological classification . . . ." *Id.* The *Gender* EO requires that federal agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* at 8616.

112.    **Gender-Affirming Care EO.** On January 28, 2025, the President issued an executive order, entitled "Protecting Children from Chemical and Surgical Mutilation" (*Gender-Affirming Care* EO). Exec. Order 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025). This EO asserts as the "policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Id.* Section 4 of the *Gender-Affirming Care* EO directs agencies that provide research or education grants to medical institutions to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* at 8772.

25

113.    **Foreign Aid EO.** On January 20, 2025, the President also issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid" (*Foreign Aid* EO). Exec. Order 14169, 90 Fed. Reg. 8619 (Jan. 30, 2025). This EO asserts that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values," and announces that it is "the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." The EO orders a 90-day pause in all U.S. foreign development assistance "for assessment of programmatic efficiencies and consistency with United States foreign policy," further specifying that "[a]ll department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors," pending review of those programs. *Id.* The *Foreign Aid* EO further instructs department and agency heads, the Secretary of State, and the Director of OMB to participate in a review of the programs, which is to culminate in a decision as to whether each program should be continued, modified, or ended. *Id.*

114.    **Other EOs.** The President issued two other Executive Orders between January 20 and 28, 2025, that declare changes in policies that relate to federal funding decisions but did not by themselves pause funding or expressly refer to federal grants. *See* "Putting America First in International Environmental Agreements," Exec. Order 14162, 90 Fed. Reg. 8455 (Jan. 30, 2025); "Enforcing the Hyde Amendment," Exec. Order 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025).

**Initial Funding Disruptions Following the Executive Orders**

115.    Following these Executive Orders, major funding disruptions ensued, as the following non-exhaustive examples illustrate.

116.    For example, on January 20—the same day as the *Unleashing* EO—DOE issued a memorandum ordering that, "effective immediately and until further notice," "[a]ll funding and financial assistance . . . shall not be announced, approved, finalized, modified, or provided" until reviewed "to ensure compliance with Congressional authorization and Administration policy." *See* Memorandum from Ingrid C. Kolb, Acting Secretary, Agency-wide Review of Program and Administrative Activities (Jan. 20, 2025).[2]  On January 23, DOE informed the Colorado Energy Office that it was pausing further communication while it evaluated information from the new administration.

117.    That same day, USDA advised grantees that payments would continue to be processed under existing awards, "provided that they are not funded using IIJA and IRA funding sources."

118.    On January 21, 2025, OMB Acting Director Matthew J. Vaeth and Kevin Hassett, Assistant to the President for Economic Policy and Director of the NEC, issued the *Unleashing* Directive, titled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." OMB Mem. M-25-11.[3] This Directive reiterates the terms in *Unleashing* EO itself, directing that "section 7 of the [*Unleashing* EO] requires agencies to immediately pause disbursement of funds appropriated under the [IRA] or the [IIJA]." *Id.* It goes on to specify that the "pause" applies to "funds supporting the 'Green New Deal,'" meaning, "any appropriations for objectives that contravene the policies established in section 2" and that agencies may disburse funds only after consulting with OMB. *Id.*

---

[2] A copy of this DOE memorandum is appended to this Complaint as Exhibit B.
[3] A copy of the *Unleashing* Directive is appended to this Complaint as Exhibit C.

119.    On January 24, the Federal Highway Administration cancelled contract negotiations with the Massachusetts Department of Transportation for an awarded Low-Carbon Transportation Materials grant, citing a funding freeze; as recently as February 5, the grant remained on hold.

120.    On January 26, USAID issued stop work orders that appeared to unilaterally suspend grant awards, citing the Executive Order titled, "Reevaluating and Realigning U.S. Foreign Aid." Among the recipients who received this order was the State of Washington Water Research Center, which is administered through the Washington State University Office of Research. Other suspensions followed, affecting many research universities in Plaintiff States. Subsequently, a Declaration filed by the Deputy Assistant Commissioner for Federal Disbursement Services at the Bureau of Fiscal Services in the U.S. Department of Treasury revealed that, on January 26, Treasury leadership directed the Bureau to "identify" and "flag" "all USAID payment files" within the Bureau's payment system before they could be paid, apparently because they were "potentially implicated by the President's foreign aid Executive Order." By January 27, Treasury leadership "informed [the Bureau] that State Department had decided to intercept the USAID files prior to the initial submission."

121.    On the morning of January 27, Rhode Island's Office of Energy Resources received notification that a drawdown of $26,510.21 from Rhode Island's Solar for All grant had been rejected.

122.    And in the late afternoon of January 27, the acting Chief Financial Officer of the EPA issued a memorandum, entitled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." *See* Mem. from Gregg Treml, Acting Chief Financial Officer, to Deputy Administrators, re: Inflation Reduction Act and Infrastructure Investment and Jobs

Funding Action Pause (Jan. 27, 2025) (Jan. 27 EPA Memo).[4] Stating that it is "based on instruction from OMB," the Jan. 27 EPA Memo explains: (i) "[i]n accordance with the [*Unleashing* EO], unobligated funds (including unobligated commitments) appropriated by" the IIJA and IRA "are paused"; (ii) "all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by" the IIJA and IRA likewise "are paused"; and (iii) "[a]ll related actions, including new contract, grant, rebate, and interagency actions, to include drawdowns, for IIJA and IRA are paused." *Id.*

**Issuance and Purported Rescission of the OMB Directive**

123.    On January 27, OMB Acting Director Vaeth issued the OMB Directive (M-25-13). Ex. A. The OMB Directive targeted a broader swath of federal fund disbursements for a near-immediate freeze. OMB Directive. This directive stated that all federal agencies "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2. While this analysis is ongoing, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* (emphasis original). The OMB Directive ordered that the temporary pause take effect the following day, on January 28, 2025, at 5:00 PM. *Id.*

124.    The OMB Directive appeared to suspend all federal financial assistance, with few exceptions—by its terms, it was not limited to funds that may be related to "foreign aid,

---

[4] A copy of the Jan. 27 EPA Memo is appended to this Complaint as Exhibit D.

nongovernmental organizations, DEI, woke gender ideology, and the green new deal," but rather applied to "all activities related to obligation or disbursement of all Federal financial assistance." *Id.* at 2.[5] And it expressly stated that its list of "other relevant agency activities" that may be implicated by the EOs was merely illustrative and not exhaustive. *Id.*

125.    The blanket freeze required by the OMB Directive was also unambiguously indefinite. The OMB Directive stated that agencies must "submit to OMB detailed information on any programs, projects or activities subject to this pause"by February 10, 2025. *Id.* But it did not specify when OMB had to or planned to complete its review of the agencies' submissions or release funding pursuant to its findings. *Id.*

126.    Following the transmittal of the OMB Directive to federal agencies, OMB circulated a document labeled "Instructions for Federal Financial Assistance Program Analysis in Support of M-25-13."[6] This document contains a chart listing federal funding lines, with columns that ask whether the funding line "promote[s] gender ideology," "provide[s] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens," or "relate[s] to 'environmental justice' programs or 'equity-related' grants," among other inquiries. *Id.* The OMB Spreadsheet also asks whether the funding, "[i]f not covered in the preceding columns," supports "any activities that must not be supported based on executive orders issued on or after January 20, 2025 (including executive orders released following the dissemination of this spreadsheet)." *Id.*

---

[5] The OMB Directive relied upon a potentially broad definition of affected federal funds. *See id.* at 1 n.1 ("For the purposes of this Memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients *of any type* except for assistance received directly by individuals." (emphasis added)).

[6] A copy of this document is appended to this Complaint as Exhibit E.

127.    On January 28, the U.S. District Court for the District of Columbia ordered an administrative stay of the OMB Directive pending a hearing on a motion for a temporary restraining order. Order of Administrative Stay (ECF No. 13), *Nat'l Council of Nonprofits, et al. v. Trump, et al.*, No. 1:25-cv-00239-LLA (D.D.C. filed Jan. 28, 2025). At approximately 1:00 PM Eastern Time on January 29, OMB issued M-25-14, a memorandum purportedly rescinding the OMB Directive in two sentences: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel."[7]

128.    Shortly after OMB purported to rescind the OMB Directive, however, White House Press Secretary Karoline Leavitt stated that the Federal Funding Freeze remained in place, notwithstanding the rescission of the OMB Memorandum. Leavitt announced on social media: "This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented."

129.    At a press conference that same day, Leavitt stated: "So, what does this pause mean? It means no more funding for illegal DEI programs. It means no more funding for the Green New Scam that has . . . cost American taxpayers tens of billions of dollars. It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies. No more funding for Green New Deal social engineering policies."

**Continued Implementation of the Federal Funding Freeze**

130.    Following the issuance of the OMB Directive but even before it was slated to go into effect, many Plaintiff States were unable to draw down vast swaths of appropriated and

---

[7] A copy of OMB Memorandum M-25-14 is appended to this Complaint as Exhibit F.

awarded funding using federal funding portals, like the Payment Management Services (PMS) portal used by HHS and DOL, and the EPA's payment portal, the Automatic Standard Application for Payments (ASAP).

131.    For example, Oregon was unable to access its Medicaid federal funding system on Tuesday, January 28, even before the OMB Directive was set to take effect at 5:00 pm, causing the Oregon Health Authority to lose a day of work.

132.    As another example, New Mexico's Early Childhood Education and Care Department found PMS not operational at approximately 8:00 am on January 28, 2025.

133.    And from January 27 to January 28, New York's Office of the State Comptroller was not able to draw any of over $70 million in obligated funds needed across state agencies.

134.    Similarly, after Arizona's Department of Homeland Security (AZDHS) submitted draw requests to FEMA's Payment and Reporting System (PARS) on January 28, 2025, for "critical homeland security needs," the Deputy Director of AZDHS contacted FEMA to inquire about the OMB Directive and received an email indicating that, "FEMA is actively reviewing President Trump's memo directing agencies to pause grants and other types of federal assistance issued Monday, January 27. We are working quickly to understand the exact implications across the full range of FEMA equities. We will provide additional guidance to stakeholders as soon as possible."

135.    On January 28, 2025, Oregon's Department of Emergency Management, which depends heavily on federal emergency management grants for disaster preparedness, response, mitigation, and recovery, was unable to withdraw federal funds for payroll because the federal payment system in use was offline. As a result, the Oregon Department of Emergency Management was unable to cover payroll with federal funds that day.

136.    On January 28, 2025, California's Employment Development Department (EDD) requested $1.8 million in Workforce Innovation and Opportunity Act (WIOA) funds, which EDD distributes to 45 regional Local Workforce Development Areas to support job search assistance, career services, and training opportunities. EDD had to stop sub-granting WIOA funds to the Local Workforce Development Areas for these programs as its payment request remained pending throughout the day.

137.    On January 28, 2025, Maryland's Department of Education attempted to submit a $31 million reimbursement request for Child Care Scholarship funds, which help low-income families pay for high-quality child care and early education programs. The PMS portal, however, was not initially accessible. Instead, the webpage included a banner stating: "Due to Executive Orders regarding potentially unallowable grant payments, PMS is taking additional measures to process payments. Reviews of applicable programs and payments will result in delays and/or rejections of payments."

138.    Even after the purported rescission of the OMB Directive on January 28, the Federal Funding Freeze has continued to manifest through chaotic actions, including frozen grant funding, by federal agency defendants (Agency Defendants), resulting in widespread and significant disruptions of funding and related activities across the Plaintiff States' agencies—in many instances continuing to the present—and interfering with the Plaintiff States' ability to plan for provision of and provide essential services to their residents.

139.    For example, on both January 27 and 29, 2025, Massachusetts's Department of Environmental Protection attempted to draw down grants funded by IIJA and IRA, but no reimbursements were issued.

140.   As another example, Illinois's available funds in EPA's payment portal, ASAP, decreased from $1 billion on January 28 to $52 million on January 29, with entire accounts, like CPRG, deleted and still inaccessible as of February 5.

141.   And as another example, Rhode Island has received a Specialty Crop Block Grant to improve competitiveness of specialty crops from the USDA for each of the past four years, but USDA froze those funds on January 30 and as of February 12 had still not released them, pending "further guidance."

142.   Salem State University in Massachusetts attempted to draw down grant funding from the National Science Foundation on January 28 and received a notice via email on the same day that while that agency "perform[ed] a comprehensive review of the award portfolio to ensure compliance with recent Executive Orders, pursuant to" the OMB Directive, "all payments under active awards will be paused."

143.   Beginning on January 27, various Plaintiff States found that grants they had been awarded pursuant to the IRA's Solar for All program were suspended in the federal payment portal. Solar for All grants remained suspended for other states on January 30.

144.   Then, following this Court's January 31 restraining order, Temporary Restraining Order, *New York v. Trump* (1:25-cv-00039-JJM-PAS) (Jan. 31, 2025), on or about February 4, EPA issued an "Update" on the IIJA and IRA funding pause, explaining that, "pursuant to the recent Court directive," the agency would now "enable the obligation of financial assistance" including some, but not all, "programs within the [IIJA] and [IRA]," to be specified on a forthcoming "detailed list." Mem. from Gregg Treml, Acting Chief Financial Officer, to Deputy Administrators, re: Update on Inflation Reduction Act and Infrastructure Investment and Jobs Funding Action

Pause (Feb. 4, 2025) (Feb. 4 EPA Memo).[8] But the referenced list included only twenty-eight IIJA grant programs—many of them small grant programs targeted at specific localities—and only one IRA program. U.S. Env't Prot. Agency, List of EPA IIJA and IRA Grants Referenced in Feb. 4 EPA Memo.[9]

145.    But only two days later, on February 6, EPA Acting Deputy Administrator Chad McIntosh tried a different approach to freeze funding, ordering a review of all "issued grants" including "payments on all grant programs and awards where Agency personnel suspect that the grant is unlawful *or* contrary to Agency policy priorities," or "fraudulent, abusive, duplicative, *or implemented in a way that failed to safeguard Agency dollars*." Mem. from Chad McIntosh, Acting Deputy Administrator, "Review of Financial Assistance Programs" (Feb. 6, 2025) (Feb. 6 EPA Memo) (emphasis added).[10] The Feb. 6 EPA Memo purported to instruct that disbursements paused by the OMB Directive and any EOs it implemented "shall continue to be immediately released." *Id.* at 2.

146.    Despite that caveat, the very next day, EPA's Office of Budget and Planning announced by email to EPA staff that, "pending a review for compliance with applicable administrative rules and policies," twenty-eight IIJA and IRA programs—including CPRG and air monitoring grants—"are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions." Email from Budget & Planning re: Additional Information on IIJA and IRA – program review pause (Feb. 7, 2025).

---

[8] A copy of the Feb. 4 EPA Memo is appended to this Complaint as Exhibit G.
[9] A copy of this document is appended to this Complaint as Exhibit H.
[10] A copy of the Feb. 6 EPA Memo is appended to this Complaint as Exhibit I.

147.    On February 4, 2025, the California State University received a phone call from the U.S. Economic Development Administration (a bureau within Defendant the Department of Commerce), in which it was informed that the Administration would receive reimbursement requests but had been directed not to process and pay reimbursements for a program relating to the Monterey Bay Small Business Assistance and Resilience Program.

148.    Further, Los Angeles County attempted to draw down $25.7 million in federal funds from the Payment Management System on January 28, as reimbursements for crucial services related to HIV programs, which was initially denied. Upon resubmission, the request was designated to be under "pending review," and the requested funds had not been reflected in Los Angeles County's accounts as of February 5.

149.    On February 10 and 11, 2025, accounts for many programs continued to be suspended or were re-suspended, including, just to name a few examples: EPA Clean Air Act air sensors and air monitoring grants to the Massachusetts Department of Environmental Protection, the Rhode Island Department of Environmental Management, the Michigan Department of Environment, Great Lakes, and Energy, and the Kentucky Energy and Environment Cabinet; wildlife prevention and response funding from USDA, FEMA, the U.S. Forest Service, and the USGS, to the Washington Department of Natural Resources; Home Efficiency Rebates and Home Electrification and Appliance Rebates Program grants from DOE to the New York State Energy Research and Development Authority and the Kentucky Energy and Environment Cabinet; and DOI Abandoned Mine Land Reclamation Fund Grants to the Maryland Department of the Environment and the Kentucky Energy and Environment Cabinet. As of February 11, the Kentucky Department for Local Government, which is attached to the Office of the Governor, still was unable to access $733,256.19 in appropriated and obligated funds from the U.S. Department of

Commerce for the Economic Development Administration Partnership Planning Grant. And though Solar for All grant accounts were reopened in the payment portal for many Plaintiff States by February 7, they were suspended once again for many Plaintiff States on the afternoon of February 10.

**Harms to the Plaintiff States from the Federal Funding Freeze**

150.    The Federal Funding Freeze has already harmed and will continue to harm the Plaintiff States and their residents in myriad ways. While a full account of the impacts of the countless interrupted federal grant programs (surpassing $1 trillion in fiscal year (FY) 2024[11]) that benefit the Plaintiff States is impossible here, the following examples demonstrate the Federal Funding Freeze's alarming toll.

151.    The impact of the Federal Funding Freeze on the State of Washington is one example. For the most recent fiscal year—FY2024, running from July 1, 2023, to June 30, 2024—Washington received over $27 billion in federal funding. This comprised approximately 32% of Washington's total budget for FY2024.

152.    More than $14 billion of these funds are threatened by the Federal Funding Freeze, including such critically important programs as: highway planning and construction funds (over $952 million in FY2024 state expenditures); Child Care and Development Block Grants (over $393 million in FY2024 state expenditures); National School Lunch Program (over $361 million in FY2024 state expenditures); Title I education grants ($310 million in FY2024 state expenditures); Special Education grants (over $275 million in FY2024 state expenditures); child

---

[11] Rebecca Thiess, Kate Watkins & Justin Theal, "Record Federal Grants to States Keep Federal Share of State Budgets High," Pew Charitable Trust (Sept. 10, 2024), https://www.pewtrusts.org/en/research-and-analysis/articles/2024/09/10/record-federal-grants-to-states-keep-federal-share-of-state-budgets-high.

support enforcement (over $134 million in FY2024 state expenditures); allergy and infectious disease research (over $121 million in FY2024 state expenditures); LIHEAP (over $96 million in FY2024 state expenditures); substance abuse treatment block grants (over $65 million in FY2024 state expenditures); veterans nursing care funding (over $59 million in FY2024 state expenditures); and hundreds or thousands of other programs, covering everything from immunizations to clean water to adoption assistance to transit to childcare to global AIDS prevention to National Guard operations to crime victim assistance to immigration and refugee assistance to wildlife restoration, and on and on.

153.    Washington simply does not have funds to cover all of these necessary programs that are currently funded through federal dollars. Nor does it have the funds to backfill federal dollars while continuing to pay for the many state-funded programs on which its residents rely. Thus, pausing or terminating federal funds necessarily entails cuts—likely drastic cuts—to key services provided by state agencies on which Washington residents depend. This threat to federal funding comes at a precarious time for Washington. Due to factors like inflation, higher projected caseloads in several safety net programs, and revenue declines, Washington is facing a forecasted budget deficit of over $12 billion over the next four years.

154.    Washington's Legislature is currently in session trying to address this budget shortfall and pass a budget for the FY2025–2027 biennium. Many Washington state agencies are facing budget cuts of between three and six percent to account for the lack of funding.

155.    As in Washington, the Federal Funding Freeze interferes with critical programs in all of the Plaintiff States and makes it nearly impossible for state agencies intelligently to prioritize budgeting needs.

156.    For example, state health systems rely on federal grant programs to provide essential health services to millions of residents. State Departments of Health alone receive billions in federal grant funding. HHS grants support hospital facilities, community health centers, lab testing, addiction treatment centers, services for people living with disabilities, and facilities for aging people. The New York Department of Health alone has nearly $40 billion in federal funding obligated for FY2025. For California's fiscal year ending June 30, 2025, the state's federal Medicaid funding is $107.5 billion, and California's Department of Health Care Services receives more than $125 million in other federal funds annually for other health care services. Hundreds of millions of dollars from these federal funds support the facilities that provide community healthcare, including in rural and other under-resourced areas. The Federal Funding Freeze impedes the Plaintiff States from providing critical healthcare—from lifesaving measures to Medicaid and basic health care services for low-income, elderly, pregnant, and disabled individuals. The Federal Funding Freeze thus harms the health and safety of the Plaintiff States' residents and requires the Plaintiff States to incur significant expenses to attempt to cover the most pressing gaps in healthcare coverage.

157.    Plaintiff States also rely on federal funds for disaster relief and management. For example, California is relying heavily on FEMA's assistance to recover from recent devasting fires. Funds authorized by President Biden's declaration of a major disaster pursuant to the Stafford Act are critical to helping the state recover from a disaster whose economic losses are estimated at upwards of $150 billion. Similarly, North Carolina is still reeling from the catastrophic damages sustained during Hurricane Helene in September 2024, and needs federal assistance to rebuild homes, businesses, roads, bridges, and other critical infrastructure. Indeed, both President Biden and President Trump authorized expenditures of FEMA funding to assist North Carolina's

recovery. Kentucky currently has 14 presidentially declared disasters for which it is relying on FEMA for assistance and reimbursement. The Federal Funding Freeze impedes these critical disbursements and will continue to harm disaster relief, management, and recovery.

158.    Federal infrastructure funding often provides emergency augmentation of state budgeted and planned funds when disaster strikes. For example, Rhode Island experienced the unexpected failure of a bridge span carrying a major interstate highway, the Washington Bridge, that has a daily traffic volume of 90,000 vehicles and has been closed since December 2023. Rhode Island's Congressional Delegation wrote to Acting Director Vaeth on January 27, 2025, inquiring after the $220 million in competitive grant funding allocated for the bridge and the balance of the $600 million in competitive grant funding for other critical infrastructure, including bridges along I-95, currently awarded to Rhode Island. As of February 12, there has been no response to clarify that this money would not be impacted.

159.    The Plaintiff States' ability to provide for public safety and law enforcement are also hindered by the Federal Funding Freeze. In FY2024, the Federal Edward Byrne JAG grant program gave over $180 million in funding to the states to fund essential law enforcement and criminal justice programs, including programs that prevent and prosecute hate crimes, address the opioid crisis, and support mental health treatment services. Other grant programs administered by the U.S. Department of Justice fund initiatives to combat violence against women and internet crimes against children, support community policing, and provide services to victims of crimes. The High Intensity Drug Trafficking Areas program provides assistance to federal, state, local, and Tribal law enforcement agencies operating in areas determined to be critical drug-trafficking regions of the United States. The Federal Funding Freeze significantly impedes state and local government efforts to address violent crime and the proliferation of illegal drugs.

160.    State education systems also suffer due to the Federal Funding Freeze. The Department of Education has $2.1 billion obligated for FY2025 public education in New York alone. Included in that funding are formula grants for local education agencies to improve teaching and learning in high-poverty schools for children failing, or most at-risk of failing, to meet academic standards. Because this is a formula grant, the allocation is to be made automatically based on a statutory formula. Such grants serve millions of children nationwide.

161.    School districts nationwide receive billions of dollars in special education funding from the federal government to support critical services for millions of students with disabilities nationwide. For the school year 2024–25, for example, California is receiving $1.5 billion. Because this is also a formula grant, the allocation is to be made automatically. Without these funds, there would be disruption to educational services provided to students with disabilities, loss of related services (such as physical therapy, speech therapy, occupational therapy, and services for deaf or blind students), and delayed or reduced payments to staff and potential layoffs.

162.    The Plaintiff States also rely on federal funding to provide free and low-cost meals to low-income children, professional development for teachers, academic interventions such as tutoring, after-school programs and early childhood education, and anti-bullying programming, among many other critical services. California draws approximately $40 to $50 million in federal funds per week for school nutrition services. The Federal Funding Freeze thus has catastrophic impacts on student learning in the Plaintiff States.

163.    State institutions of higher education also receive billions of dollars in grants from Defendants—including the Department of Health and Human Services, the Department of Education, the National Science Foundation, the National Aeronautics and Space Administration, and USAID—not including direct student aid, that fund essential research in every conceivable

area of study. For instance, the University of California has multiple active USAID grants totaling millions of dollars. The Federal Funding Freeze chills research and undermines the Plaintiff States' ability to provide higher education, especially to students who cannot independently afford the costs of private colleges.

164.    The Plaintiff States' job training and workforce development programs also suffer due to the Federal Funding Freeze. For example, the New Mexico Department of Workforce Solutions receives approximately 89% of its funding from the federal government, including funding for all personnel and operations for the State's Unemployment Insurance program. Without this funding, New Mexico can neither provide the benefits to newly unemployed workers to which they are entitled, nor provide job training to returning veterans who lack critical workplace skills.

165.    The Federal Funding Freeze hampers the Plaintiff States' ability to provide services to older Americans and adults with disabilities. Federal funding currently supports services that help older Americans remaining in their homes and communities, rather than in nursing homes and similar facilities. The Federal Funding Freeze jeopardizes these services, including meal delivery and transportation to medical appointments, for the Plaintiff States' residents.

166.    The Federal Funding Freeze also would prevent the Plaintiff States from completing much needed transportation infrastructure projects, including repairs and upgrades. For example, the Maryland Transportation Authority is awaiting $60 million in promised reimbursement in the coming months for the costs of removal and salvage of debris from the collapsed Francis Scott Key Bridge. Plaintiff States may be unable to complete necessary repair projects without federal assistance, leaving old infrastructure in place and increasing the risk of catastrophic events.

167.     The Federal Funding Freeze, including the *Unleashing* EO and agency actions implementing it, impede the Plaintiff States' ability to provide essential services to protect the health, safety, and welfare of their residents through critical IIJA- and IRA-funded programs.

168.     For example, IRA funding provides significant resources to the Plaintiff States to remediate contamination and pollution, including the cleanup of sites contaminated with hazardous waste and plugging orphaned oil and gas wells. The Federal Funding Freeze also jeopardizes initiatives to develop clean energy resources and realize associated reliability, bill savings, job creation, and other benefits for the Plaintiff States and their residents. It similarly impedes Plaintiff States' efforts to ensure clean air and water for their residents, by interfering with projects that help states monitor air quality, improve water quality, and ensure availability of clean drinking water. Further, the Federal Funding Freeze thwarts the Plaintiff States' plans to implement waste management, reduction, and recycling plans. And the freeze also causes the loss of workforce training programs, career opportunities, and community education opportunities within the Plaintiff States.

169.     The Federal Funding Freeze also has caused significant budgetary confusion, uncertainty, and risk among agencies of the Plaintiff States that administer IIJA- and IRA-funded programs and services. Dozens, if not hundreds, of Plaintiff States' agencies have experienced confusion and budgetary uncertainty as they have been cut off from access to funds to which they are entitled. These agencies' inability to access these funds and fear of non-reimbursement are already interfering with their ability to budget and plan, including with respect to planned hiring. The Federal Funding Freeze has harmed their ability to work with and reimburse subgrantees, potentially risking cancellation or modification of contracts with state vendors and subgrantees,

and it will continue to harm their goodwill and reputation among project partners and participants, making it more difficult to recruit project partners in the future.

170.    The lack of notice for the Federal Funding Freeze compounds these injuries. The Plaintiff States were unable to prepare for or mitigate the pause in federal funding, creating chaos and confusion. For example, given the less than 24-hours notice before the OMB Directive took effect, Plaintiff States were unable to set aside funding for the anticipated shortfall in response, work with their legislatures to appropriate funds, or take other similar measures to lessen the blow. And both the breadth of the Federal Funding Freeze and the speed with which the Defendants imposed it renders implausible any claim, in any of the EOs or any subsequent agency actions, that funding is halted only "to the extent permissible by law" or any allowance, as in the OMB Directive, for exceptions on a case-by-case basis.

171.    The Federal Funding Freeze has sown chaos and confusion around whether Plaintiff States can continue to receive disbursements of funding already obligated to them. And this uncertainty surrounds all grant programs, without regard to the specific statutes that authorize particular grant programs or what regulations or terms govern their award and use. For example, the OMB Directive references categories of funding with no clear reference to federal law, including categories like "woke gender ideology," terms not appearing in any statute governing the grant of federal financial assistance, and "green new deal social engineering policies," an apparent reference to proposed legislation that was never enacted.

172.    State agencies also administer numerous federal grants and direct grant programs of their own—some of which pass through federal funding. State agencies in the Plaintiff States do not know when or if disbursements and obligations may resume, complicating the important work they do to ensure that state residents have access to healthcare services, education support,

appropriate law enforcement, reliable infrastructure, among many other missions. They are also now unable to evaluate whether they need to take action under their own sub-agreements or contracts to mitigate any downstream effects of the pause.

173.    Thousands of nongovernmental and nonprofit organizations operating within the Plaintiff States also rely on federal funding to provide services to the Plaintiff States' residents, to the benefit of the Plaintiff States. Such organizations are engaged in federally funded projects such as improving heat resilience in cities disproportionately impacted by heat and poor air quality, promoting local sourcing of food, improving food accessibility and sustainability, and subgranting to public health and environmental projects. For such organizations, the Federal Funding Freeze could result in laid off workers as well as significant harms to the communities they serve, including at-risk populations. And such harms would have ripple effects within the Plaintiff States, increasing health care costs and regulatory burdens to make up for the loss of the pollution reduction, food security, and other benefits attributable to these organizations' reliance on federal funding.

174.    In sum, across all Plaintiff States, the Federal Funding Freeze has caused severe harm across a range of programs and services, and will continue to cause such harm if it remains in effect.

## CAUSES OF ACTION

### COUNT I

**Substantive Violation of the Administrative Procedure Act—Contrary to Law, Ultra Vires (Against Agency Defendants)**

175.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

176.    Agency Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

177.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

178.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

179.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

180.    No constitutional or statutory authority authorizes OMB to order federal agencies to refrain from fulfilling their statutory duties, or to violate federal law.

181.    No constitutional or statutory authority authorizes federal agencies to refrain from fulfilling their statutory duties, or to violate federal law.

182.    The Agency Defendants lack authority to impose and maintain the Federal Funding Freeze, which is an across-the-board pause on disbursement of categories of federal funds without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream. This Freeze is unauthorized, unprecedented, and not entitled to deference by this Court.

183.    As a general matter, the "purpose statute" requires that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a), meaning that funds can only be used for the purposes that Congress has designated. Federal agencies therefore lack authority to freeze funds immediately, categorically, and indefinitely, particularly where the stated purpose of that freeze is to pause, cancel, or reallocate funding to sources which do not align with the purpose for which those funds were appropriated by Congress.

184.    Moreover, in implementing the Federal Funding Freeze, the Agency Defendants have acted contrary to the statutes and regulations governing the disbursement of federal funds for the impacted programs.

185.    For example, in the IIJA and IRA, Congress appropriated billions of dollars to federal programs that support critical energy and infrastructure projects, among other legislative priorities, and used mandatory language to describe many of the most significant funding decisions that it made. For instance, the IIJA appropriated almost $30 billion for use in constructing and rehabilitating state water, wastewater, and sewage facilities, and directed that EPA "shall make capitalization grants to each State" for water pollution control pursuant to a statutory formula. 33 U.S.C. §§ 1381(a), 1384(a), (c)(2); *see also* 42 U.S.C. § 300j-12(a)(1)(A), (D) (similar for drinking water grant).

186.    Similarly, the IRA established a program to subsidize low- and moderate-income households' purchase of heat pump systems—and directed the Secretary of Energy to "reserve funds . . . for each State energy office" based on an allotment formula, 42 U.S.C. § 18795a(a)(2)(A)(i), that does not give the Secretary the power to decline to expend funds.

47

187.     Congress has elsewhere appropriated mandatory funds to the Plaintiff States to fund programs for their residents ranging from special education to mental health and substance abuse treatment to power and heat for low-income individuals, and imposed specific limits on the relevant agencies' power to withhold such funds (generally requiring notice and a hearing). *See* 20 U.S.C. §§ 1411, 1412, 1416 (Individuals with Disabilities Education Act); 42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a) (mental health and substance abuse treatment); 42 U.S.C. §§ 8621, 8623, 8626, 8627 (LIHEAP).

188.     Federal agencies lack the authority to immediately, categorically, and indefinitely pause obligated grant funding in a purported effort to root out waste and fraud, as EPA claimed to do in its Feb. 7 EPA Memo.

189.     Moreover, the Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq.*, circumscribes the Agency Defendants' authority to immediately, categorically, and indefinitely pause obligated grant funding. The Impoundment Control Act permits the Executive Branch to impound (i.e., decline to spend) federal funds only under a very narrow set of specific circumstances. The Impoundment Control Act does not permit the Executive Branch to defer appropriated funds based on policy disagreement with Congressional priorities, nor rescind them without Congressional approval. Nor does the Impoundment Control Act permit agencies to unilaterally, categorically, immediately, and indefinitely freeze disbursement of federal funds.

190.     The Federal Funding Freeze thus violates the express terms and purpose of appropriations law, authorizing and appropriating statutes, governing regulations, and terms and conditions of operative grant agreements obligated pursuant to those authorities.

191.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants lack legal authority to categorically pause or freeze the

disbursement of federal funds contrary to congressional directive and intent, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

192.     Plaintiff States are also entitled to vacatur of the OMB *Unleashing* Directive, the OMB Directive, and Agency Defendants' other actions implementing and maintaining the Federal Funding Freeze pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing the Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through implementation of EOs, such as the *Unleashing* EO, and agency actions implementing them.

## COUNT II

### Substantive Violation of the Administrative Procedure Act—Arbitrary & Capricious (Against Agency Defendants)

193.     Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

194.     Defendants include "agenc[ies]" under the APA 5 U.S.C. § 551(1).

195.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

196.     An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

197.     That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be

scrutinized by courts and the interested public." *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

198.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

199.    Because the Agency Defendants provided no reasoned basis for pausing the disbursement and obligation of trillions of federal dollars and failed to consider the consequences of those actions, those actions were arbitrary and capricious. Neither the OMB *Unleashing* Directive, the OMB Directive, nor Agency Defendants' other directives implementing and maintaining the Federal Funding Freeze contain any reasoning regarding their immediate, categorical, and indefinite scope or regarding the impact and chaos they have caused, including as to the Plaintiff States and their residents, who rely on federal funding for key programs and services.

200.    Moreover, neither the OMB *Unleashing* Directive, the OMB Directive, nor Agency Defendants' other directives implementing and maintaining the Federal Funding Freeze provide any reasoned basis for refusing to disburse funds authorized and appropriated by Congress contrary to congressional intent and directive. Agency Defendants' actions in implementing the Federal Funding Freeze are thus arbitrary and capricious.

201.    Defendants have recently characterized the freezing of some funding streams for compliance reasons or for reasons related to budget periods, which is implausible given the timing of the immediate, categorical, and indefinite nature of the Federal Funding Freeze, and the massive number of funding streams affected.

202.    Agency Defendants' recent efforts to immediately, categorically, and indefinitely pause obligated grant funding purportedly to root out waste and fraud, as EPA claimed to do in its Feb. 7 EPA Memo, is a pretextual effort to achieve the Federal Funding Freeze, and is thus also arbitrary and capricious.

203.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the OMB *Unleashing* Directive, the OMB Directive, and Agency Defendants' other actions implementing and maintaining the Federal Funding Freeze violate the APA because they are arbitrary and capricious.

204.    Plaintiff States are also entitled to vacatur of the OMB *Unleashing* Directive, the OMB Directive, and Agency Defendants' other actions implementing and maintaining the Federal Funding Freeze pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through implementation of EOs, such as the *Unleashing* EO, and agency actions implementing them.

### COUNT III

### Equitable *Ultra Vires*—Conduct Outside the Scope of Statutory Authority Conferred on the Executive (Against All Defendants)

205.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

206.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

207.    Defendants' conduct in initiating and maintaining the Federal Funding Freeze without regard to the individual authorizing statutes, regulations and terms that govern each funding stream is contrary to law and outside of Defendants' authority. *See also* ¶¶ 182–90, *supra*. For example, implementation of the categorical, immediate, and indefinite pause on federal funds under the IRA and IIJA announced in the *Unleashing* EO exceeded Defendants' authority.

208.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Federal Funding Freeze—including as implemented through the *Unleashing* EO—is contrary to law and outside of Defendants' authority.

209.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through implementation of EOs, such as the *Unleashing* EO, and agency actions implementing them.

## COUNT IV

### Violation of the Separation of Powers—Usurping the Legislative Function
### (Against All Defendants)

210.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

211.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992) (citations omitted). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

212.    The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

213.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

214.    Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

215.    The Federal Funding Freeze violates the separation of powers because the executive branch has overridden the careful judgments of Congress by refusing to disburse funding for innumerable federal grant programs. *See also* ¶¶ 182–90, *supra*. For example, implementation of the categorical, immediate, and indefinite pause on federal funds under the IIJA and IRA announced in the *Unleashing* EO is a clear violation of the separation of powers.

216.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Federal Funding Freeze—including through the EOs, including the *Unleashing* EO, and agency actions implementing them—violates the constitutional separation of powers doctrine, and impermissibly arrogates to the executive power that is reserved to Congress.

217.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze,

including through implementation of EOs, such as the *Unleashing* EO, and agency actions implementing them.

## COUNT V

### Violation of the Spending Clause and Tenth Amendment
### (Against All Defendants)

218.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

219.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

220.    The Spending Clause of the U.S. Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

221.    The Tenth Amendment of the U.S. Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

222.    When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

223.    States must also have fair notice of the terms that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012).

224.    The Federal Funding Freeze has altered the terms upon which grants were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the myriad grants affected.

225.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Federal Funding Freeze—including through the EOs, such as the *Unleashing* EO, and agency actions implementing them—violates the Spending Clause.

226.    Plaintiff States are also entitled to a preliminary and permanent injunction barring the Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through the EOs, such as the *Unleashing* EO, and agency actions implementing them.

### COUNT VI

**Violation of the Presentment Clauses
(Against All Defendants)**

227.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

228.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

229.    The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see* U.S. Const. art. I, § 7, cls. 2, 3.

230.    This procedure is an exclusive one. Therefore, the President's attempt to unilaterally decline to expend funds violates the Presentment Clauses by attempting to repeal federal laws that the President dislikes without following the "finely wrought" procedures for doing so. *Chadha*, 462 U.S. at 951

231.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Federal Funding Freeze—including through the EOs, including the *Unleashing* EO, and agency actions implementing them—violates the Presentment Clauses of the U.S. Constitution.

232.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through the EOs, such as the *Unleashing* EO, and agency actions implementing them.

### COUNT VII

### Violation of the Appropriations Clause
### (Against All Defendants)

233.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

234.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable

56

jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

235.    The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

236.    Defendants' unilateral executive action to decline to expend appropriated funds, *see supra* at ¶¶ 109–49 (describing Federal Funding Freeze), therefore infringes on Congress's appropriations power and is unconstitutional.

237.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Federal Funding Freeze—including through implementation of EOs, including the *Unleashing* EO, and agency actions implementing them—violates the Appropriation Clause of the U.S. Constitution.

238.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through the EOs, such as the *Unleashing* EO, and agency actions implementing them.

## COUNT VIII

### Violation of the Take Care Clause
### (Against All Defendants)

239.    The Plaintiff States reallege and reincorporate the foregoing allegations.

240.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

241.    The Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

242.    The Executive violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

243.    Defendants' conduct in initiating and maintaining the Federal Funding Freeze without regard to the individual authorizing statutes, regulations and terms that govern each funding stream was contrary to the Executive's duty to faithfully execute the laws enacted by Congress.

244.    For example, implementation of the categorical, immediate, and indefinite pause on federal funds under the IRA and IIJA announced in the *Unleashing* EO violated the Take Care Clause.

245.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Federal Funding Freeze—including through the EOs, such as the *Unleashing* EO, and agency actions implementing them—violates the Take Care Clause of the U.S. Constitution.

246.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through the EOs, such as the *Unleashing* EO, and agency actions implementing them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

i.  Issue a judicial declaration that the Federal Funding Freeze, effected through the Executive Orders, agency actions implementing them, and OMB directives, is unconstitutional and/or unlawful because it violates the APA and the United States Constitution;

ii.  Pursuant to 5 U.S.C. § 706, vacate Agency Defendants' actions implementing the Federal Funding Freeze;

iii.  Preliminarily and permanently enjoin the Agency Defendants from implementing the Federal Funding Freeze;

iv.  Issue a writ of mandamus compelling the Agency Defendants to immediately cease implementing the Federal Funding Freeze without further delay and to release funds withheld under the Federal Funding Freeze;

v.  Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi.  Grant other such relief as this Court may deem proper.

Respectfully submitted,

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Kathryn M. Sabatini*
Kathryn M. Sabatini (RI Bar No. 8486)
Civil Division Chief
Special Assistant Attorney General
Sarah W. Rice (RI Bar No. 10465)
Deputy Chief, Public Protection Bureau
Assistant Attorney General
Leonard Giarrano IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Michael J. Myers*
Senior Counsel
Molly Thomas-Jensen*
Special Counsel
Colleen Faherty*
Special Trial Counsel
Zoe Levine*
Special Counsel for Immigrant Justice
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
michael.myers@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
colleen.Faherty@ag.ny.gov
zoe.Levine@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Laura L. Faer*
Laura L. Faer*
Supervising Deputy Attorney General
Christine Chuang*
Supervising Deputy Attorney General
Nicholas Green*
Carly Munson*
Kenneth Sugarman*
Theodore McCombs*
Marie Logan*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Christine.Chuang@doj.ca.gov
Nicholas.Green@doj.ca.gov
Carly.Munson@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov
Theodore.McCombs@doj.ca.gov
Marie.Logan@doj.ca.gov

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
Deputy Solicitor General
R. Henry Weaver*
Assistant Attorney General
115 S. LaSalle St.
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov
Robert.Weaver@ilag.gov

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
Deputy Chief, Government Bureau
Turner H. Smith*
Deputy Chief, Energy and Environment Bureau
Anna Lumelsky*
Deputy State Solicitor
Vanessa Arslanian**
Julia Jones-Day**
Nathaniel Hyman**
Chris Pappavaselio**
Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
turner.smith@mass.gov

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Angela Cai*
Angela Cai*
Executive Assistant Attorney General
Jeremy M. Feigenbaum*
Solicitor General
Shankar Duraiswamy*
Deputy Solicitor General
25 Market St.
Trenton, NJ 08625
(609) 376-3377
Angela.Cai@njoag.gov
Jeremy.Feigenbaum@njoag.gov
Shankar.Duraiswamy@njoag.gov

61

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Nathan Arrowsmith*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Nathan.Arroswmith@azag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
Jill Lacedonia*
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.Skold@ct.gov
Jill.Lacedonia@ct.gov

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
Solicitor General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
shannon.stevenson@coag.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726
Andrew.Mendrala@dc.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
in his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo**
General Counsel
Taylor Payne**
Chief Deputy General Counsel
Laura C. Tipton**
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jason Anton*
Jason Anton*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6424
AKirschner@oag.state.md.us

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Linus Banghart-Linn*
Linus Banghart-Linn*
Chief Legal Counsel
Neil Giovanatti*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
GiovanattiN@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
Deputy Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 270-4332
asamant@nmdoj.gov

**JEFF JACKSON**
Attorney General for the State of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
(919) 716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Christina Beatty-Walters*
Christina Beatty-Walters*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
Leah Brown*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Andrew.Hughes@atg.wa.gov
Leah.Brown@atg.wa.gov

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Aaron J. Bibb*
Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
BibbAJ@doj.state.wi.us

*Admitted *Pro Hac Vice*
**Pro Hac Vice* Motion forthcoming