## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00039 |

## PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.     Defendants Mischaracterize Their Own Actions and Plaintiff States' Claims. ................. 2

II.    Savings Clauses Cannot Salvage the Defendants' Actions. ................................................. 8

III.   The Case Is Not Moot. ...................................................................................................... 10

IV.    Plaintiff States Are Highly Likely to Prevail on The Merits............................................. 15

   A.   Plaintiff States Will Succeed on Their Constitutional and *Ultra Vires* Claims................. 15

      1. Defendants Violated the Constitution. ......................................................................... 15

      2. Defendants Exceeded Their Statutory Authority ......................................................... 18

   B.   Plaintiff States Will Succeed on Their APA Claims.......................................................... 23

      1. Plaintiff States Are Challenging Discrete and Final Agency Action ........................... 23

      2. Defendants Violated the APA....................................................................................... 28

V.     Plaintiff States Are Entitled to the Proposed Injunction. .................................................. 30

   A.   Plaintiff States Have Established Irreparable Harm. .......................................................... 30

   B.   The Balance of Equities and Public Interest Support Plaintiff States.............................. 32

   C.   The Requested Injunction Is Appropriate in Scope. .......................................................... 33

CONCLUSION.................................................................................................................... 35

i

## <u>INTRODUCTION</u>

Defendants' Opposition to Plaintiff States' motion for a preliminary injunction does not advance any serious defense of the Funding Freeze, which has manifested through numerous actions and resulted in widespread chaos across Plaintiff States. Indeed, Defendants do not identify a single federal statute that could plausibly justify the categorical, indefinite, and immediate withholding of funds that they have implemented. Instead, Defendants attempt to re-write the facts of this case, ECF 113, ("PI Opp.") at 13, to obscure the breadth of their actions. They claim that "a broader 'Funding Freeze'" simply does not exist. *Id.* at 13; ECF 114 Am. Compl. ¶ 3 & Ex. A. But that is Defendants' term, not Plaintiffs States'. As the White House has made clear, the Funding Freeze in all of its forms is a very real policy, and the purported "rescission" of the OMB Directive was "NOT a rescission of *the federal funding freeze*." ECF 68 (Thomas-Jensen Aff.) Ex. 126 (emphasis added). "The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented." *Id.*

As Plaintiff States' motion demonstrates in painstaking detail, the Executive has fulfilled that promise, with dire impacts on Plaintiff States and their residents. This record is entirely unrebutted. And Defendants have not shown that the freeze "cannot 'reasonably be expected to recur'" if they are not enjoined from carrying it out. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 189 (2000)).

To this day, Plaintiff States are experiencing the effects of this generalized Funding Freeze, despite two of this Court's Orders. This fact resolves Defendants' arguments in opposition to the preliminary injunction motion, essentially all of which rest on the notion that there is no policy to enjoin. The Court should grant Plaintiff States' motion for a preliminary injunction.

1

## ARGUMENT

### I.    Defendants Mischaracterize Their Own Actions and Plaintiff States' Claims.

Defendants' opposition is premised on blatant mischaracterizations. There is nothing to see here, they claim: "[i]n reality, this case is about" the Executive's ability to "temporarily pause discrete categories of funding, to the extent doing so is consistent with their underlying statutory authorities." PI Opp. at 1. But the freezes Defendants have implemented are neither temporary nor discrete; they are inescapably indefinite and categorical. Moreover, these actions were (and still are) undertaken irrespective of any statutory, regulatory, or other authority applicable to any particular funding stream. Defendants thus have it backward in claiming that Plaintiff States cannot challenge "a 'pause' in funding in the abstract—without reference to any of the underlying legal frameworks, appropriations measures, or grant conditions." PI Opp. at 27. On the contrary, it is Defendants who cannot categorically pause funding without reference to such authorities. And it is that sweeping unlawful "'Funding Freeze,' untethered to any specific decisions in the context of individual grant programs," *id.* at 30, that Defendants have implemented and that State Plaintiffs now seek to stop.[1]

---

[1] Plaintiffs have now filed an amended complaint in order to conform their pleading to the scope of the present facts, as Defendants' actions have moved the goal posts on multiple occasions, and the Court can consider the amended complaint as the operative pleading notwithstanding that it was filed after the preliminary injunction motion. Indeed, courts must consider facts outside the complaint in ruling on a preliminary injunction motion. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 14 (1st Cir. 2020) (considering both "the facts as alleged in the complaint" and "the evidence at the preliminary injunction hearing"). And complaints need not plead legal theories. *See Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014). Plaintiff States were thus not limited to the four corners of their original complaint, either as to facts or law, when they moved for a preliminary injunction. The First Circuit has considered evidence as long as it was "before the court at the time of the preliminary injunction hearing," regardless of whether it had yet been "added to the complaint." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 604 (1st Cir. 1988). Indeed, "a preliminary injunction may be granted upon a motion made before a formal complaint is presented." 11A Fed. Prac. &

*First*, the Funding Freeze is not "temporary" because Defendants have never—to this day—declared its end date. The Day 1 Executive Order *Unleashing American Energy*, for example, identifies neither a date certain nor a general timeline by which the categorical pause it imposes will be lifted. Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025) (ECF 68, Ex. 1). Similarly, Funding Freeze memoranda and directives from OMB, the U.S. Department of Energy (DOE), and the U.S. Environmental Protection Agency (EPA), to name a few, lack any indication of their duration or end date. *See* DOE's January 20 memorandum (ECF 68, Ex. 124) ("funding . . . shall not be . . . provided until a review of such takes place"; no timeline); Off. of Mgmt. & Budget, Exec. Off. of the President, M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* 2 (Jan. 21, 2025) (ECF 68, Ex. 13) (agencies only "may disburse funds as they deem necessary after consulting with OMB"; no timeline); Mem. from Gregg Treml, Acting Chief Financial Officer, to Deputy Administrators, re: Inflation Reduction Act and Infrastructure Investment and Jobs Funding Action Pause (Jan. 27, 2025) (Jan. 27 EPA Memo) (ECF 68, Ex. 14) (funds "paused"; no end date); *see generally* ECF 67 ("PI Mot.") at 16–19; ECF 114, Am. Compl. ¶¶ 116–20 & Exs. A–D; *accord* OMB Directive (funds "temporarily pause[d]"; no end date).

That some of these directives use the word "temporarily" does not make it so; a period is temporary only when its span is delimited. *See* Merriam-Webster Dictionary (defining "temporary" as "lasting for a limited time"). Where no such limits are set, the period is, by definition, indefinite. *See id.* (defining "indefinite" as "having no exact limits"). Defendants have set no limits here, and

---

Proc. Civ. § 2949. Still, to avoid any possible issue, Plaintiff States have conformed the operative pleading to the motion.

that fact has upended Plaintiff States' ability to provide essential services to their residents and instilled fear and anxiety.

*Second*, the notion that Defendants have frozen only "narrow" categories of funding is at odds with the well-documented reality. *See* PI Opp. at 5–6. Plaintiffs have demonstrated freezes affecting virtually every part of government, ranging from FEMA payments to highway funding to pollution reduction grants to services for children. *See* PI Mot. at 17–24; *see also, e.g.*, ECF 68, Ex. 56 (Roche Dec. ¶¶ 10–13) (Illinois's Climate Pollution Reduction Grant account deleted from EPA's payment portal); Ex. 93 (Clayton Dec. ¶ 6) (New York's Office of the State Comptroller unable to draw any of over $70 million in obligated funds needed across state agencies); Ex. 86 (Groginsky Dec. ¶ 16) (New Mexico's Early Childhood Education and Care Department found Payment Management System (PMS) not operational on morning of January 28); Ex. 106 (Cahoon-Horvath Dec. ¶¶ 6–17) (U.S. Department of Agriculture froze Rhode Island's Specialty Crop Block Grant); Ex. 58 (Colucci Dec. ¶ 4) (National Science Foundation (NSF) notified Salem State University that its NSF grant funding was paused).

Defendants offer no evidence whatsoever to counter that extensive evidentiary record or to support their assertion that "[m]ost funds that Plaintiffs discuss were never paused." PI Opp. at 19. Defendants' criticism of the "broad-ranging nature of Plaintiffs' claims" (PI Opp. at 31)—rather than "isolated grant decisions" (*id.* at 43)—is the result of their own decision to implement a categorical freeze touching every corner of Plaintiff States and every aspect of their residents' lives.

*Third*, Defendants' suggestion that this case involves only "funding pauses that agencies have concluded are lawful," PI Opp. at 36, is likewise divorced from reality. Defendants have indiscriminately frozen funds in huge swaths, and in unpredictable patterns. *See* PI Mot. at 21-24;

ECF 68, Ex. 34 (CA—Kitchell Dec. ¶ 19) & Ex. 29 (CA—Womack Dec. ¶ 17) (after rescission of OMB Directive, payment portals only available on reduced hours); Ex. 28 (Buffington Dec. ¶ 18) (five of California's Inflation Reduction Act (IRA) grants missing from EPA payment website); Ex. 56 (Roche Dec. ¶¶ 10–13) (Illinois's available funds in EPA's payment portal decreased from $1 billion on January 28 to $52 million on January 29, with entire accounts deleted and still inaccessible as of February 5). Before this Court issued the TRO, the Defendants had paused nearly all federal funding streams. PI Mot. at 17–21. Since this Court's TRO, some funding streams have been unfrozen only to mysteriously become frozen again. *See* PI Mot. at 22; *see, e.g.*, ECF 68, Ex. 61 (MA—Mohler Dec. ¶¶ 8–9); Ex. 35 (CA—Lau Dec. ¶¶ 17–23); Ex. 95 (NY—Poisson Dec. ¶ 55); Ex. 23 (AZ—Sprunger Dec. ¶¶ 11–12); Ex. 49 (HI—Laramee Dec. ¶ 13, 19); Ex. 60 (Herron Dec. ¶¶ 13–14); Ex. 51 (HI—Tanaka Dec. ¶¶ 9–15); Ex. 48 (HI—Kimura Dec. ¶ 24). And Plaintiff States learn of new grants becoming frozen nearly every day, without the federal agencies providing any purported statutory, regulatory, or grant-term authority to do so—despite this Court's TRO. *E.g.*, B. Johnston, HillHeat, *Trump EPA Again Freezes All Biden-Era Programs* (Feb. 10, 2025), https://hillheat.com/2025/02/10/trump-epa-again-freezes-all-biden-era-programs. Defendants do not—indeed, they cannot—support their depiction of agencies carefully considering the lawfulness of pausing each individual funding stream in accordance with applicable authorities.

*Fourth*, Defendants also distort and disregard the harm wrought by their Funding Freeze. They assert that Plaintiff States' harms are purely "speculative," PI Opp. at 17–18, and go so far as to question Plaintiff States' standing—despite the billions of dollars State Plaintiffs have on the line, PI Opp. at 18–22. Here, again, Defendants altogether fail to rebut Plaintiff States' robust evidentiary showing that the Funding Freeze would harm virtually every aspect of American life.

Among other services and programs, the Freeze would impair law enforcement and public safety, by interfering with grant programs that support state and local law enforcement agencies. ECF 68, Ex. 102 (OR—Sanchagrin Dec. ¶¶ 4–6); Ex. 18 (AZ—Dzbanko Dec. ¶ 17). The Freeze would also hinder emergency management and preparedness, potentially leading to loss of life and injury. *See, e.g.*, *id.* Ex. 99 (OR—McMahon Dec. ¶ 13); *see also id*. Ex. 18 (AZ—Dzbanko Dec. ¶ 19). State childcare services, like Head Start and grants to childcare providers, as well as child welfare services, like summer food assistance to low-income children, would be hampered. *See, e.g.*, *id.* Ex. 76 (MI—Walker-Griffea Dec. ¶¶ 7, 13); Ex. 86 (NM—Groginsky Dec. ¶¶ 9–10); *see also id.* Ex. 116 (WA—Heddin Dec. ¶¶ 15–16, 21); Ex. 36 (CA—Lee Dec. ¶ 19).

The Freeze also would impair State education services, like academic interventions and services for children with disabilities. *See id.* Ex. 89 (NM—Padilla Dec. ¶ 5); Ex. 76 (MI—Walker-Griffea Dec. ¶ 5); Ex. 75 (MI—Rice Dec. ¶¶ 6–8); Ex. 43 (CA—Thurmond Dec. ¶¶ 14–33); Ex. 116 (WA—Heddin Dec. ¶ 10). States' university research and financial aid likewise would be hobbled, *see, e.g.*, *id.* Ex. 34 (CA—Kitchell Dec. ¶¶ 6–7); *see also id.* Ex. 107 (Hirth Dec. ¶¶ 12–17); Ex. 50 (Hawaii—Syrmos Dec. ¶¶ 9-10); Ex. 121 (WI—Smith Dec. ¶¶ 7–8), as would health care services and support for Americans with disabilities and those who are elderly, *see, e.g.*, *id.* Ex. 31 (CA—Halterman Dec. ¶¶ 6, 7); Ex. 32 (CA—Harrington Dec. ¶ 13); Ex. 87 (NM—Kaltenbach Dec. ¶¶ 3–7); Ex. 39 (CA—Matthews Dec. ¶ 9). The Freeze would interfere with States' programs for job training and workforce development. *See, e.g.*, *id.* Ex. 94 (NY—Melvin Dec. ¶ 16, 30); *see also id.* Ex. 101 (OR—Riel Dec. ¶ 9); Ex. 70 (MD—Wu Dec. ¶¶ 6, 12); Ex. 25 (AZ—Ward Dec. ¶ 16.d). It also would harm critical transportation infrastructure—for example, the $60 million owed to the Maryland Transportation Authority for removal and salvage from the Francis Scott Key Bridge accident. *See, e.g.*, *id.* Ex. 66 (MD—Gartner Dec. ¶¶ 5–7); *see also id.*

Ex. 77 (MI—Wieferich Dec. ¶¶ 9–13). It would hamper Plaintiff States' efforts to ensure a safe environment for their residents, by interfering with contamination remediation (*see, e.g.*, *id.* Ex. 113 (WA—Bartlett Dec.) ¶¶ 45, 60–61 (funding freeze threatens to pause important contamination remediation efforts; contracted-for brownfield cleanup work being "held up" by funding freeze); *see also* Ex. 59 (MA—Heiple Dec. ¶ 11.c.)), clean energy development (*e.g.*, *id.* Ex. 95 (NY—Poisson Dec. ¶¶ 8–13); *see also id.* Ex. 123 (CO—Toor Dec. ¶¶ 5, 29)), pollution reduction and monitoring efforts (ECF 68, Ex. 28 (Buffington Dec. ¶¶ 7–8, 13) (California Air Resource Board unable to access granted federal funding aimed at monitoring air toxins); *see also id.* Ex. 123 (CO—Toor Dec. ¶¶ 5, 29)), and waste management (*e.g.*, *id.* Ex. 33 (CA—Hunt Dec. ¶¶ 20, 26); *see also id.* Ex. 123 (CO—Toor Dec. ¶¶ 5, 29)). Plaintiff States' standing is firmly established on this compelling—and uncontested—evidence. *See Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019) (loss of federal funds is sufficiently concrete and imminent injury to satisfy standing requirements).

Ultimately, Defendants' goal has been clear from the outset: to freeze all funding that contravenes the President's policy priorities, regardless of whether any statute, regulation, or grant agreement stands in the way. And rather than follow well-worn procedures available to them under "the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program," PI Opp. at 25, Defendants did just the opposite.[2] They implemented blanket freezes and asserted authority to make some "exceptions" on a "case-by-case" basis at some later date.

---

[2] Of course, the President also has the option of advancing his priorities by proposing legislation to the United States Congress, a step notably disregarded here.

And now, remarkably, Defendants ask this Court to simply assume they have this authority—or for Plaintiff States to disprove it. This, they cannot do.

## II.    Savings Clauses Cannot Salvage the Defendants' Actions.

Defendants cannot rely on generic "savings clauses"—*see, e.g.*, OMB Directive ("to the extent permissible under applicable law")—to rescue their unlawful Funding Freeze. First, such clauses are wholly inconsistent with the substance of the directives. Second, and in any event, the Agency Defendants implemented categorical freezes that plainly were not permissible under applicable law; to the contrary, the freezes were (and continue to be) untethered to and in contravention of the statutory, regulatory, and grant-term authority applicable to the funding streams.

"The Supreme Court has long instructed that acts 'cannot be held to destroy [themselves]' through saving clauses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) (citation omitted)). Savings clauses "are read in their context," and "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018); *see also Shomberg v. United State*s, 348 U.S. 540, 547–48, (1955) (declining to "nullify" "clear legislative purpose" based on savings clause). In *HIAS, Inc. v. Trump*, for example, the Fourth Circuit rejected the government's "attempt to immunize" an Executive Order from review "through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order." 985 F.3d 309, 325 (4th Cir. 2021) (quoting *San Francisco*, 897 F.3d at 1239). The Court found that plaintiffs were likely to succeed in establishing that the Executive Order was inconsistent with federal law, and concluded that the "purely theoretical" savings clause "does not and cannot override [the Order's] meaning." *HIAS*, 985 F.3d at 325 (quoting *San Francisco*, 897 F.3d at 1240).

8

The same principle applies here: a sweeping and indefinite freeze on congressionally appropriated funds cannot be immunized by a generic savings clause. The incongruity between such clauses and the Defendants' freezes is especially obvious in the *Unleashing* EO, which *explicitly* refers to governing law and orders agencies not to follow it. *See Unleashing* EO, Section 7(a) ("All agencies shall immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]."); *see also* OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025) (clarifying that *Unleashing* EO provides for immediate pause on disbursements for "any appropriations for objectives that contravene the policies established in section 2" of the EO). No savings clause can negate the plain import of such unlawful directives.

In any event, Defendants' saving clause argument also defies reality because the Agency Defendants plainly instituted a categorical Funding Freeze that was not permissible under applicable law and instead disregarded any applicable statutory and regulatory requirements. The unrebutted record shows that Defendants have frozen funding in direct contravention of governing law, notwithstanding any savings clauses. *See, e.g.*, *Water Grants under IIJA*: 33 U.S.C. §§ 1381(a), 1384(a) (EPA "*shall* make capitalization grants to each State" for Clean Water State Revolving Funds (CWSRF) pursuant to statutory formula) (emphasis added); 42 U.S.C. § 300j-12(a)(1)(A), (C) (similar for Drinking Water State Revolving Funds (DWSRF)); *compare with* ECF 68, Ex. 35 (Lau Dec. ¶ 20) (Water Resources Control Board staff unable to draw down funds for reimbursement of permitted expenses under existing CWSRF and DWSRF grant agreements on January 31); *Climate Pollution Reduction Grants under IRA*: 42 U.S.C. § 7437(b) ("EPA "*shall* make a grant to at least one eligible entity in each State for the costs of developing a [climate action] plan") (emphasis added); *compare with* ECF 68, Ex. 73 (Boeskool Dec. ¶ 8) (as of Feb. 5,

Michigan unable to access two Climate Pollution Reduction grants); Ex. 123 (Toor Dec. ¶¶ 4, 9) (following OMB Directive, Colorado unable to draw funds for Climate Pollution Reduction grant); *Jobs for Veterans Act*: 38 U.S.C. § 4102A(c)(2)(B)(i) ("The Secretary *shall* make available to each State with an application approved by the Secretary an amount of funding in proportion to the number of veterans seeking employment…") (emphasis added); *compare with* ECF 68, Ex. 54 (Coultas Dec. ¶¶ 18, 34) (on January 28, Illinois Department of Employment Security was unable to draw funds for Jobs for Veterans grant).

This Court should reject Defendants' invitation to ignore these unlawful actions on the ground that savings clauses insulate them from review. As the Ninth Circuit has recognized, "[i]f 'consistent with law' precludes a court from examining whether [an] Executive Order is consistent with law, judicial review is a meaningless exercise." *San Francisco*, 897 F.3d at 1240.[3]

## III.    The Case Is Not Moot.

Defendants have failed to meet their burden of establishing that Plaintiff States' claims are moot. As the Court correctly concluded in its Order Granting Plaintiff States' Motion for Enforcement of the TRO, the categorical Funding Freeze implemented by the OMB Directive and Defendants' other actions is still in place because Defendants "have continued to improperly freeze federal funds and refused to resume disbursement of appropriated federal funds." ECF 96 at 3. As

---

[3] Defendants' reliance on *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, is misplaced because the Court found that the Executive Order at issue there was not "self-executing." 295 F.3d 28, 33 (D.C. Cir. 2002). Because the Order was "above suspicion in the ordinary course of administration," the Court would not invalidate it based on the "mere possibility that some agency might make a legally suspect decision." *Id.* Here, by contrast, Defendants' directives "unambiguously command action," and there is thus "more than a 'mere possibility'" of unlawful action by an agency. *San Francisco*, 897 F.3d at 1240 (quoting and distinguishing *Allbaugh*). Another case Defendants cite, *Common Cause v. Trump*, 506 F.Supp.3d 39 (D.D.C. 2020), is also distinguishable. *See id.* at 53 (while executive orders "'cannot be held to destroy themselves through savings clauses,'" order at issue did not "not command any action that a savings clause purports to negate") (citation omitted).

the Court explained, the OMB Directive amounted to a "broad, categorical, all-encompassing directive freezing federal funding" and, as a consequence, "the freezes in effect now were a result of the broad categorical order" set out in the OMB Directive. *Id*. In support of this motion, Plaintiff States have provided extensive evidence that Defendants have continued freezing multiple funding streams, causing ongoing and substantial harms including severe disruptions in vital life-saving, health, mental health, education, and supportive services of every kind. *See generally* PI Mot. pages 16-34. Defendants have failed to contest that evidentiary record or provide even a single declaration in support of their claims.

For the same reasons the Court granted the TRO and subsequently had to enforce it, the Court can—and should—provide Plaintiff States with "effectual relief" from the Defendants' continued unlawful withholding of federal funding upon which they and their residents rely. *See Horizon Bank & Trust Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004).

Defendants' cramped view of Plaintiffs' claims should be rejected. They claim that because OMB rescinded the OMB Directive, Plaintiff States' entire action is moot. PI Opp. at 11. Defendants also argue that Plaintiff States must pursue "separate litigation" to challenge Agency Defendants' categorical funding pause—even where the federal agencies' actions to withhold federal funds continue from the initial policy underlying the OMB Directive. *See id.* at 12.

In any event, Plaintiff States' claims and the relief they seek are *not* limited to the OMB Directive but extend to the Funding Freeze as a whole. That fact is indisputably clear in Plaintiff States' amended complaint, ECF 114, though the scope of this litigation has been evident from the beginning. The evidence set forth in support of this motion unambiguously shows that Defendants have refused to disburse funds appropriated by Congress—contrary not only to congressional intent but also to statutory, regulatory, and grant-term provisions that govern those funds. *See, e.g.*,

11

ECF 1 at ¶¶ 105, 106. Plaintiff States' claims challenging the ongoing funding freeze are not moot simply because the OMB Directive document itself has purportedly been rescinded.

Defendants have submitted no evidence with their opposition and do not even dispute that they are, in fact, pausing (or will pause absent preliminary injunctive relief) the distribution of federal funds that Congress has already appropriated and, in many cases, specifically instructed be distributed through statutory formulas. They assert instead—with no support—that some of those pauses *might* be based on other causes. Notably, one alternative source they cite is OMB Memo M-25-11, OMB's guidance document regarding the *Unleashing* EO. But that guidance document actually *demonstrates* the categorical and unlawful Funding Freeze, *see* PI Mot. at 20, 39; Am. Compl. at 3–4, because it explicitly instructs agencies to pause disbursements mandated by Congress, *see* Ex. 68, Ex. 13. In light of the 125 declarations that Plaintiff States submitted as support for their motion—which set forth compelling evidence of on-going funding disruptions— it is clear that Defendants have made no meaningful effort to meet their "heavy burden" to show mootness with "specific evidence[.]" *See Scaer v. City of Nashua*, 2024 WL 5205155, at *9 (D.N.H. Dec. 16, 2024) (internal quotation marks omitted).

Defendants also suggest that the undisputed pauses in funding are the result of "independent agency actions" that are beyond the scope of this lawsuit. *See* PI Opp. at 13–14. But Defendants again offer no evidence at all to support that assertion, nor could they.

Moreover, even if Defendants had actually ceased the categorical funding freezes challenged here (which they have not), the voluntary cessation doctrine applies. A defendant's voluntary change in conduct moots a case only if a defendant establishes that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 47 (1st Cir. 2022) (quotation marks omitted). The voluntary

cessation doctrine is comprised of two tests: (1) whether the cessation was intended to try to moot the case or was unrelated to the litigation; and (2) whether the conduct will likely be repeated absent judicial relief. *See Lowe v. Gagné-Holmes*, 126 F.4th 747, 756 (1st Cir. 2025). The doctrine is intended to ensure that a defendant is not "free to return to [its] old ways" absent judicial relief. *Friends of the Earth, Inc.*, 528 U.S. at 189. Here, the unrebutted evidence establishes that recission of the OMB Directive was meant to "evade judicial review," i.e., to allow the Funding Freeze to continue without court interference, *Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013), and that defendants intend to repeat and continue the blanket funding freezes if the court does not enter a preliminary injunction.

*First*, defendants offer no plausible explanation for the rescission, instead relying exclusively on a conclusory OMB memorandum that states: "OMB Memorandum M-25-13 is rescinded." ECF No. 43-1. But the evidence establishes that the purported rescission was plainly to try to evade the courts' jurisdiction while continuing to impose blanket funding freezes. Specifically, shortly after OMB issued the "rescission," the White House Press Secretary released a public statement explaining that

> This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.

ECF 68, Ex. 126 (capitalization in original). As another district court considering a similar challenge correctly found, the purported rescission "appears to be nothing more than a thinly veiled attempt to prevent" judicial relief. *National Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *7 (D.D.C. Feb. 3, 2025). Defendants have offered no evidence to the contrary, *see Lowe*, 126 F.4th at 756, and their claim that the statement reflects "a

noble attempt to end confusion" simply "strains credulity," *National Council of Nonprofits*, 2025 WL 368852, at *7 (quotation and alteration marks omitted).

*Second*, defendants have failed to offer any assurances that the challenged conduct—i.e., blanket funding freezes without regard to applicable statutory, regulatory, or contract terms governing the funding—will not be repeated. To the contrary, the White House Press Secretary's statement makes clear that the rescission was in name only and that the conduct will be repeated absent a preliminary injunction. Under these circumstances, Plaintiff States thus face more than "a fear of repetition"; in fact, it is likely that the challenged conduct will continue unabated. *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010); *see Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 157–58 (1st Cir. 2021).

Lastly, Defendants err in claiming that "at a minimum Plaintiffs' request for preliminary relief is moot" because the OMB Memo has been rescinded, and therefore "'defendants have [voluntarily] provided or promised to provide all the relief that plaintiffs sought.'" PI Opp. at 17 (citation omitted). That assertion is wholly contradicted by the unrebutted record before this Court, as laid out in the PI motion and its exhibits, and it should be rejected.

Defendants' extra-circuit authorities are readily distinguishable. *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306 (6th Cir. 2020), for example, is about the mootness of an *appeal* from an order denying a preliminary injunction. *See id.* at 309. And the Sixth Circuit's decision in that case concluded that the appeal was moot because "as a practical matter the Agencies have already provided the States with [the] relief" they sought by way of injunction. *Id.* at 308. Here, as noted above, the (uncontroverted) record shows that the Executive continued to implement its funding freeze even after this Court entered a TRO, and that implementation continues to this date. *Brooks v. Gant*, 2012 WL 871262 (D.S.D. Mar. 14, 2012), an unpublished district court decision from

South Dakota, is similarly inapposite. In that case, the defendant had "voluntarily granted" "all the relief that plaintiffs requested in their motion" for preliminary relief. *See id.* at *2. That is not the case here, where Defendants *concede* that the Funding Freeze remained in effect after the purported rescission of the OMB Directive, and, even now, they continue to withhold federal funds.

## IV.    Plaintiff States Are Highly Likely to Prevail on The Merits.

Plaintiff States are highly likely to succeed on the merits. PI Mot. at 41–57. Defendants initiated and enforced a categorical and indefinite pause on disbursement of federal funding without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream, and in doing so, violated multiple constitutional provisions, federal funding laws, and the Administrative Procedures Act. Defendants' counterarguments lack merit.

### A.    Plaintiff States Will Succeed on Their Constitutional and *Ultra Vires* Claims.

Plaintiff States showed that they are likely to succeed on their constitutional and *ultra vires* claims. PI Mot. at 43–52. Nothing in Defendants' opposition calls that conclusion into question.

#### 1.    Defendants Violated the Constitution.

As Plaintiff States showed, Defendants violated "bedrock principles of constitutional law," *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013), in initiating and enforcing a categorical and indefinite freeze on disbursing federal funds. Defendants are wrong that these legal principles are merely "recycled statutory claims." PI Opp. at 47. To the contrary, federal courts have consistently held that the federal government exceeds its constitutional bounds in attempting to withhold funds that Congress has appropriated. *See, e.g.*, *San Francisco*, 897 F.3d at 1231; *Aiken Cnty.*, 725 F.3d at 259. That is exactly what Plaintiffs have established here.

Defendants say that *Dalton v. Specter*, 511 U.S. 462 (1994), "rejected the proposition that 'whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine.'" PI Opp. at 47 (quoting *Dalton*, 511 U.S. at 471). But *Dalton* holds

15

only that the federal government does not "*necessarily* violate[] the Constitution" when it exceeds the bounds of its statutory authority. 511 U.S. at 473. That does not mean that action outside the scope of statutory authority can *never* give rise to a constitutional violation. *Accord Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020) ("*Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not."), *vacated and remanded as moot sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). Here, Plaintiff States showed that Defendants' funding freeze violates separation-of-powers principles and multiple constitutional provisions, as follows:

*Separation of powers.* Defendants lack the constitutional authority to "refuse to disburse" federal funds "without congressional authorization." *San Francisco*, 897 F.3d at 1231; PI Mot. at 43–50. Defendants appear to agree, conceding that they are not "rely[ing] on" "[t]he Constitution" as the "authority" for their decision to suspend federal funds (or, at minimum, as "[t]he only" basis of their authority to do so). PI Opp. at 48. Instead, Defendants' only defense against Plaintiff States' separation-of-powers claim is their insistence that (a) Plaintiff States have challenged only the OMB Directive and the President's Executive Orders, (b) those documents amount to no more than "guid[ance]" to federal officials "in their implementation of existing law," and (c) the President and OMB have the constitutional power to provide such guidance. PI Opp. at 49–50. But that argument proceeds from multiple mistaken premises, as discussed, *supra* pp. 2–7: this is not a case about "guidance" the President offered to Agency Defendants, but about a categorical and indefinite funding freeze that Defendants deliberately initiated and implemented. Defendants offer *no* defense as to why such an action would be constitutionally permissible because none exists.

*Appropriations Clause and Presentment Clause.* Defendants also assert that Plaintiff States "do not allege a distinct violation of the Appropriations Clause," PI Opp. at 50, or Presentment

Clause, *id.* at 53, but those arguments rest solely on the view that, under *Dalton*, statutory and constitutional claims are necessarily coterminous, *supra* pp. 15–16. As the Ninth Circuit explained in *Sierra Club*, that is incorrect: *Dalton* "suggests that a constitutional violation may occur when an officer violates an express prohibition of the Constitution," and the Appropriations Clause and the Presentment Clause each contains "such a constitutional prohibition." *Sierra Club*, 963 F.3d at 889–90. Plaintiff States have established that Defendants violated the Appropriations Clause by failing to expend funds that Congress duly appropriated; and violated the Presentment Clause by declining to carry out statutes that Congress enacted, thereby attempting to amend or repeal federal laws without following the required procedures for doing so. PI Mot. at 46–47. Defendants have no other response to that basic point.

*Take Care Clause.* Defendants' Take Care Clause arguments fare no better. Defendants say that there is "no precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies." PI Opp. at 52. But the Supreme Court has long understood the Take Care Clause to impose independent limitations on the Executive Branch. Over 150 years ago, the Court explained that the obligation imposed by the Clause "to see the laws faithfully executed" does not "impl[y] a power to forbid their execution." *Kendall v. United States*, 37 U.S. 524, 613 (1838); *see also, e.g.*, *United States v. Texas*, 599 U.S. 670, 689 (2023) (Gorsuch, J.) (observing that litigants had pressed "a claim under the Take Care Clause"). Here, Defendants have asserted exactly that: a power to "forbid the execution," *Kendall*, 37 U.S. at 613, of federal funding laws.

*Spending Clause.* Finally, Defendants assert that Plaintiff States' Spending Clause claim fails because they have imposed no "new conditions . . . on [the States'] receipt of federal funds." PI Opp. at 53. But that blinks reality: Defendants have identified no statutory, regulatory, or

contractual terms that would permit them to categorically and indefinitely withhold the disbursement of federal funds, and so by extension can be understood to impose a "new condition[]," *id.*, on federal grants permitting them to do so. That would plainly violate the Spending Clause. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012) (Congress cannot "surpris[e] participating States with post-acceptance or 'retroactive' conditions") (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)). Put another way, Defendants have pointed to no provision of any grant, regulation, or statute that provided any notice to the Plaintiff States—let alone the clear notice required under the Spending Clause—that Defendants had any authority to implement sudden, categorical funding freezes.

## 2. Defendants Exceeded Their Statutory Authority.

Plaintiff States have also showed that Defendants exceeded their statutory authority in initiating and enforcing the Funding Freeze. PI Mot. at 50–51. Defendants do not appear to dispute that Plaintiff States can obtain an injunction prohibiting them from engaging in *ultra vires* action— that is, action that exceeds their statutory power. *See* PI Opp. at 38.[4] That makes sense, as "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to

---

[4] Defendants dispute that Plaintiff States can obtain an injunction against the President. PI Opp. at 23–24. But courts routinely enjoin the enforcement of executive orders. *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) (enjoining enforcement of executive order mandating vaccination of certain individuals); *State v. Nelson*, 576 F. Supp. 3d 1017, 1040 (M.D. Fla. 2021) (similar). And when an injury cannot be "redressed fully" by enjoining other federal defendants, an injunction against the President can also be appropriate. *Hawai'i v. Trump*, 859 859 F.3d 741, 788 (9th Cir. 2017); *Missouri v. Biden*, 738 F. Supp. 3d 1113, 1145 (E.D. Mo. 2024). Regardless, here Plaintiff States do not seek to enjoin the President from issuing executive orders, as defendants appear to suggest, PI Opp. at 24, they simply seek to enjoin defendants from implementing a funding freeze policy set out in multiple executive orders and enforced by Agency Defendants.

England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Plaintiff States' equitable *ultra vires* claims fall easily within this tradition, as Defendants do not dispute.[5]

Defendants likewise do not genuinely argue that their categorical and indefinite funding freeze was authorized by any federal statute, rule, or contractual term. Instead, Defendants appear to contend mainly that Plaintiff States are not entitled to relief on their *ultra vires* claims because (a) those claims attack a wide range of conduct across a wide range of programs, and thus are not "ripe," PI Opp. at 24–27, or (b) they are "facial" in nature, and so fail because, in theory, Defendants might possess some authority in some context to pause federal funds for some reason, even if they did not identify any such reasons in acting, *id.* at 24–27, 38–43. Those arguments are incorrect.

*First*, Plaintiff States' equitable claims are ripe, notwithstanding that they target a federal funding freeze carried out by multiple Defendants in multiple agencies and spanning a wide range of federal programs. Courts frequently review equitable claims targeting multiple federal officials as long as those officials engaged in a common core of conduct, as here. "Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring). In *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), for instance, "the plaintiffs were entitled to invoke the equitable jurisdiction to restrain enforcement" of two executive orders and multiple sets of regulations, *id.* at 414. Similarly, in *Youngstown Sheet & Tube Co. v. Sawyer*, the Supreme Court upheld injunctive relief against an executive order and a series of "possessory

---

[5] Defendants briefly assert that Plaintiff States are entitled to obtain equitable relief only to the extent that the APA does not afford them a remedy. PI Opp. at 66. But even if that were so, that means only that the Court should evaluate their APA contrary-to-law claim first and then turn to their equitable *ultra vires* claim, which would be available absent an APA claim even under defendants' understanding of the available remedies.

orders" by the Secretary of Commerce. 343 U.S. 579, 583, 588–89 (1952). The question is simply whether "the things of which [this] complaint was made"—namely, the full sweep of actions alleged—violate the Constitution in the same manner. *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912). If so, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). To the extent plaintiffs' claims attack a wide range of federal agencies, that is because a wide range of federal agencies initiated and maintained the categorical Funding Freeze. Defendants cannot, at bottom, complain about a broad problem that they created.[6]

*Second*, Defendants' argument that Plaintiff States' *ultra vires* claim fails because they cannot show that Defendants' funding freeze could "*never*" be "lawful[]," PI Opp. at 38 (emphasis in original), is, for its part, badly flawed. The premise of Defendants' argument is mistaken. Defendants appear to believe that Plaintiff States are required to show that that "no set of circumstances exist" under which they are permitted to freeze federal funds. *See* PI Opp. at 38; *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is not correct, for multiple reasons. For

---

[6] Traditional ripeness doctrine, which defendants do not genuinely invoke, requires the same result. "[T]he doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential considerations." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003). Plaintiff States have shown Article III injuries. PI Mot. at 35-37. And the "prudential component[]" looks for "fitness," meaning whether "delay may see the dissipation of the legal dispute without need for decision," and "hardship," meaning "whether the challenged action creates a direct and immediate dilemma for the parties." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 8–9 (1st Cir. 2012) (quotations omitted). Defendants do not even cite these basic elements, PI Opp. at 26–27, which are plainly satisfied. Instead, they quote out-of-context language from two cases with no resemblance to the sweeping and injurious actions of the federal officials here. *Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017), was a "pre-enforcement challenge to a New Hampshire statute that has not been activated or enforced since its enactment," *id.* at 495. *Labor Relations Division v. Healey*, 844 F.3d 318 (1st Cir. 2016), centered on the idiosyncrasies of the "claim-specific preemption inquiry" under the Labor-Management Relations Act, *id.* at 327. Here, Plaintiff States face immediate, devastating harm from the sudden removal of billions of dollars of funding, and this dispute is not going to dissipate until Defendants are obliged to stop freezing funds. Plaintiff States' suit is ripe.

one, this *Salerno* standard applies to claims challenging legislative enactments, not unlawful directives and actions by federal officials to exceed the scope of their statutory authority. Defendants cite no case relying on the *Salerno* standard to limit a court's equitable power to enjoin unlawful behavior. For another, even in a so-called "facial" claim, courts measure unlawful conduct by reference to "the universe of applications contemplated by plaintiffs' claim, not to all conceivable applications." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016); *accord Showtime Ent., LLC v. Town of Mendon*, 769 F.3d 61, 71 (1st Cir. 2014) (analysis begins with plaintiffs' "claim and the relief that would follow," and must consider the "standards for a facial challenge *to the extent of that reach*" (emphasis added)). Here, Plaintiff States challenge Defendants' categorical and indefinite funding freeze—a funding freeze made "without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream." ECF 114 ¶ 182. That some hypothetical statutes or regulations might have permitted Defendants to make *particularized* decisions as to federal funding is "irrelevant," *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015), given that Defendants made no such particularized decisions. The conduct challenged here is "one-size-fits-all, for all comers," *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016), and should be evaluated on that basis. The Court need not consider the "hypothetical situation[s]" Defendants "conjure up" to invent different conduct, not at issue here, such as freezes based on actual statutory, regulatory, grant-term authority. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012).

Regardless, Plaintiff States satisfy the facial standard, because the funding freeze has no "legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). Defendants identify exactly two examples that they say exemplify the discretion agencies retain to pause funds. PI Opp. at 41–43. But *neither* example provides Defendants the

power to unilaterally and indefinitely suspend funding. OMB's uniform grant regulations, 2 C.F.R. pt. 200, allow unilateral grant termination only under certain enumerated circumstances, *id.* § 200.340(a), and even then, only after providing grantees "written notice" and "an opportunity to object," *id.* §§ 200.341–.342. Defendants here provided neither before implementing the funding freeze. Defendants also cite an NSF grant agreement, but that grant agreement affirmatively requires NSF officers to comply with these regulations before terminating funding: "Any suspension or termination action taken by NSF must be issued by a cognizant NSF Grants and Agreements Officer and will be in accordance with this article [and] 2 CFR §200.340." NSF, *Research Terms & Conditions: Agency Specific Requirements*, at § 41(a) (Jan. 30, 2023), https://perma.cc/438V-6H7N. Defendants' failure to identify even *one* statutory, regulatory, or contractual term that might authorize their funding freeze simply illustrates that the freeze lacks any legitimate basis.

Finally, and contrary to Defendants' view, the Court can and should consider the Impoundment Control Act ("ICA") when evaluating whether Defendants acted *ultra vires*. *See* PI Opp. at 43–47. Plaintiff States did not need to "plead a claim under the Impoundment Control Act," *id.* at 43, because they pled a claim that Defendants acted *ultra vires*, i.e., that Defendants acted in excess of the statutory authority afforded to them by the ICA and other statutes. In contrast to Defendants' assertions, the ICA does indeed have something "to say about the present circumstances." *id.* at 44. As Plaintiff States explained, PI Mot. at 44–45, the Act *specifically bars* federal agencies from declining to spend funds for policy reasons, regardless of how they characterize that action. *See* 2 U.S.C. § 684(b) (limiting agencies' authority to "defer" expenditure of funds). Defendants claim that they only "temporarily" paused payments in order to "efficiently and equitably" implement federal programs, PI Opp. at 44-45, just as (for instance) President

Obama put in place a 30-day pause on certain infrastructure funds in 2009 in order to ensure that funds were expended consistent with congressional priorities, *see* PI Opp. at 46 (citing this example); *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12,531 (Mar. 20, 2009), § 2(d)(i) (directing agencies to pause the funding of certain projects for 30 days to ensure that funds were being spent consistent with Congress's directives in separate statutory provision).[7] The record here belies that characterization, *supra* pp. 2–7. Defendants have frozen funding for the express purpose of advancing the Administration's policy priorities (regardless of whether those priorities are consistent with Congress's), and thereby exceeded their authority, warranting equitable relief.[8]

### B.    Plaintiff States Will Succeed on Their APA Claims.

#### 1.    Plaintiff States Are Challenging Discrete and Final Agency Action.

As described above, Defendants' response to Plaintiffs' PI Motion is to mischaracterize the facts of this case. Their argument that there is no final agency action here is more of the same. Contrary to their representations, the challenged agency actions are discrete and final, not the

---

[7] Defendants likewise point to an executive order signed by President Biden in 2021, Opp. 45-46, but that EO directed federal agencies only to pause "the obligation of funds," *id.*, not disbursements of previously obligated funds. That action is thus different in kind from Defendants' funding freezes.

[8] Defendants assert that "temporary pauses in obligations or payments of appropriations are quite common."  PI Opp. at 44 (citing *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987)).  They fail to mention that the *New Haven* case, in discussing the legislative history of the ICA, explained that Congress's description of certain funding pauses as part of the "'normal and orderly operation of the government'" "plainly speaks to 'trivial,' everyday *programmatic* deferrals," and that "Congress most certainly did not mean to suggest that impoundments designed to negate congressional budgetary *policies* would be 'presumptively valid.'" *Id.* at 908 (emphasis in original; quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 42).  The funding "pauses" at issue in this case are by their own terms "designed to negate congressional budgetary *policies*," *id.* (emphasis in original), and *New Haven*'s emphatic distinction between "programmatic" and "policy" pauses in funding therefore supports the Plaintiffs, not the Defendants.

"high-level, ongoing operation of an overall funding program." PI Opp. at 27. Plaintiff States need not proceed on "a program-by-program, grant-by-grant basis," *id.* at 31, precisely because *Defendants* have taken reviewable actions that span "our federal bureaucracy and agencies," ECF 68 Ex. 127 at 11.

First, Plaintiffs have shown that the actions making up the Funding Freeze are "agency actions" under the APA, and thus "discrete" under *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). *Norton* (like *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), also cited by defendants) considered whether certain conduct qualified as "agency action" under the text of the Administrative Procedure Act, 5 U.S.C. § 551. *See Norton*, 542 U.S. at 62; *Lujan*, 497 U.S. at 890.

Here, the actions that comprise the funding freeze are "agency actions" for the APA's purposes. The OMB Directive, for instance, is plainly reviewable under the APA as either a "rule" or an "order." *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); *N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 2 F.4th 989, 992 (D.C. Cir. 2021) (an "order" is "virtually any authoritative agency action other than a rule"). And the funding freezes implemented by Agency Defendants are likewise reviewable as, at minimum, the "denial" of "relief"—another form of agency action reviewable under the APA, 5 U.S.C. § 551(13), defined to include the denial of "the whole or part of an agency . . . grant of money," *id.* § 551(11). In sum, "the relevant directive of [OMB] and subsequent determinations of agency heads" to implement funding freezes "have immediate effect and constitute" agency action for purposes of APA review. *AIDS Vaccine Advocacy Coalition v. U.S. Dep't of Health*, No. 25-cv-400, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025) (blanket freeze of foreign-aid funding constituted agency action by

Department of State and implementing agencies); *see also Doctors for Am. v. Office of Personnel Mgmt*., No. 25-cv-322, 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025) ("[R]emoval of webpages and datasets is likely such a circumscribed and discrete action that is an agency action" (quotation marks omitted)). Defendants are thus wrong to suggest that *Norton* or *Lujan* (which, again, do no more than interpret the APA's text) pose any barrier to review of the funding freeze.

Plaintiffs likewise have satisfied their burden in demonstrating that the agency actions making up the Funding Freeze are final because they: (1) "mark the consummation" of agency decision-making and (2) determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

*First*, the OMB Directive marks the consummation of the decisionmaking process notwithstanding the fact that it contemplates further review by Agency Defendants of federal funding to determine its compliance with various sources of law. So too with any action by the Agency Defendants imposing categorical freezes pending such a review. The requirement that an action mark the consummation of the decisionmaking process does not preclude relief from determinations with final effect pending further review and agency action. While an agency action that begins a review process "that could culminate in no change to the rule" fails the *Bennett* test, the imposition of a stay pending that review "is an entirely different matter" and such a step can constitute final agency action. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). In *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, for example, the D.C. Circuit concluded that interim relief from a safety standard pending reconsideration of that standard constituted final agency action because the relief was granted "for the entire period of time that the petition is pending," and there was no indication that "the Secretary intends to reconsider this decision or to vacate the grant of interim relief." 823 F.2d 608,

614–15 & n.5 (D.C. Cir. 1987). This case is markedly different from cases cited by Defendants, PI Opp. at 28–31—*Berkshire Env't Action Team, Inc. v. Tennessee Gas Pipeline Co., LLC*, 851 F.3d 105, 111 (1st Cir. 2017)—where the plaintiff was in the process of going through a very specialized administrative process, and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990), where plaintiffs pointed to no discrete actions at all.

To be sure, OMB's Directive to conduct a review of federal funding by itself might not constitute a final agency action, just as an agency's decision to merely reconsider a rule does not typically constitute final agency action. *See Clean Air Council*, 862 F.3d at 6. But the imposition of a freeze of trillions of dollars of federal spending pending that review, with no clear end date, "is an entirely different matter." *Id.* The determination to categorically freeze funding represents the final agency position on whether to categorically freeze funds until the undefined review period is completed (if ever). *See AIDS Vaccine Advocacy Coalition*, 2025 WL 485324, at *5 (stated purpose of reviewing foreign-aid funding for "efficiency and consistency with priorities" did not explain "why a blanket suspension of all congressionally appropriated foreign aid . . . was a rational precursor to reviewing programs"); *see also Doctors for America*, 2025 WL 452707, at *6 ("[T]hat an agency may restore the removed webpages in the future does not mean that the agency's prior removal decision was not the consummation of an agency's decisionmaking process.").

*Second*, the OMB Directive and the Agency Defendants' implementation of it determines rights and obligations from which legal consequences flow. The Supreme Court has noted that this element of the *Bennett* test is a pragmatic one. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016). The immediate and direct effect of the OMB Directive and the actions of the Agency Defendants on the parties is amply demonstrated in the unrebutted factual record.

Defendants attempt to obfuscate the source of the Funding Freeze, claiming that review is unavailable because the harms arise from separately issued Executive Orders, OMB's *Unleashing* Directive, and various independent agency actions, PI Opp. at 31, but that obfuscation is insufficient to defeat APA review. As initial matter, the voluntary cessation doctrine (*see supra* at 12–13) precludes Defendants' claim that the "recission" of the OMB Directive bars APA review of that action. And Plaintiff States have now amended their complaint to more fulsomely address OMB's *Unleashing* Directive and the Agency Defendants' imposition of categorical funding freezes. *See* ECF 114. To the extent that Defendants claim that they made independent determinations to pause funding based on actual statutory, regulatory, or grant terms, that argument is implausible and contradicted by the record. *See* PI Opp. at 28. As the court explained in *National Council of Nonprofits*, "it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." 2025 WL 368852, at *8. Moreover, Agency Defendants' implementation of the "pause" by shutting down payment portals wholesale further confirms that the agencies' actions do not reflect individualized assessments of statutory authorities and grant terms. *See id.* at *4, 13. Ultimately, although "the exact course of the decisionmaking process is unclear" on this record in light of defendants' failure to provide any evidence, the categorical funding freezes implemented by the Agency Defendants were "the consummation of each agency's decisionmaking process to comply with the President's executive order[s], the [OMB Directive], or both." *Doctors for America*, 2025 WL 452707, at *5.

Finally, "legal consequences will flow" where an agency action "withdraws some of the discretion" that lower-level officials "previously held." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016); *accord NRDC v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 809 (D.C. Cir. 2006).

The OMB Directive does precisely that, requiring all federal agencies to subordinate discretion they may have to implement categorical freezes instead, from which agencies need to obtain "exceptions . . . on a case-by-case basis." Am. Compl. Ex. A at 2. The Department of Homeland Security, in order to implement the Funding Freeze, has demanded that subordinate officials start obtaining "express written consent of the General Counsel" for all their funding decisions. ECF 102-2 at 1.

### 2. Defendants Violated The APA.

Plaintiff States have extensively documented how the Funding Freeze applied across a massive array of funding without any regard to the relevant statutes, regulations, and terms. As a result, the Funding Freeze violates the APA because it is contrary to law and *ultra vires*. For the same reasons, combined with the immense harms threatened, the Funding Freeze is also arbitrary and capricious. The Defendants' arguments to the contrary are flawed.

*First*, Defendants again attempt to evade the legal standards applicable to this case by mischaracterizing the Funding Freeze as a "temporary pause" which seeks to ensure "spending aligns with statutory provisions and presidential priorities." PI Opp. at 57. The Funding Freeze is nothing of the sort. Rather, the unrebutted facts show a categorical policy executed through federal agencies to suspend funding across the majority of the Government with no statutory authority. That reality is contrary to law and arbitrary and capricious. Agencies cannot implement priorities—Presidential or otherwise—via means that are contrary to Congressional dictates.

Defendants argue that because the ICA may not provide Plaintiff States a cause of action, they cannot point to it as evidence that agency action is contrary to law or arbitrary and capricious. PI Op. at 44. But "not in accordance with law," 5 U.S.C. § 706(2)(A), "means, of course, *any* law." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). The APA itself provides a cause of action.

28

*Second*, Defendants make the remarkable claim that agencies do not need to articulate rational reasons for their actions "beyond simple compliance with the President's directives" since he himself is not subject to the APA, citing a district court ruling. PI Opp. at 57 (citing *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011)). But the D.C. Circuit has considered and rejected this argument at least twice, allowing APA review unless "the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (same). Defendants' argument would revolutionize administrative law, allowing "the President [to] indemnify every agency action by issuing an executive order telling the agency how to use its discretion." William Powell, *Policing Executive Teamwork: Rescuing the APA from Presidential Administration*, 85 Mo. L. Rev. 71, 109 (2020). Regardless, there is no such exception in the standard for determining whether agency action is appropriately explained. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, as described *supra* at 8–10, the fact that certain directives referred to actions "consistent with the law" cannot salvage the Funding Freeze.

*Third*, the idea that the Agency Defendants attempted to mitigate the harms of the Funding Freeze, PI Opp. at 58, is belied by the facts. At every step of the way, the Agency Defendants directed and carried out immensely harmful funding suspensions without regard to the particular statutes, regulations, and terms that govern each Congressional appropriation and without any consideration of the impacts.

## V.    Plaintiff States Are Entitled to the Proposed Injunction.

### A.    Plaintiff States Have Established Irreparable Harm.

Defendants remarkably suggest that the Court may deny Plaintiff States' motion for a preliminary injunction "solely on the basis that they have failed to demonstrate irreparable harm." PI Opp. at 58. This assertion ignores the Court's previous finding that Plaintiff States "will likely suffer severe and irreparable harm" in the absence of injunctive relief and that "an overarching pause on federal funding that Congress allocated" to the Plaintiff States would cause "severe disruption in their ability to administer . . . vital services—even if it is for a brief time." ECF 50 at 7, 8; *see also* ECF 111 at 7 (quoting ECF 50 at 7, 8).

As previously explained (PI Mot. at 24–34, 57–65), Plaintiff States have already suffered, and continue to suffer, irreparable harm in two distinct respects. First, Defendants' freezes are depriving the States of funding that is essential to the health, safety, and wellbeing of state residents, as well as state budgets. *Id.* at 24–34, 58–61. Second, the budgetary uncertainty Defendants' conduct has created has hampered States' ability to responsibly plan for the provision of essential public services. *Id.* at 61–63. Defendants' opposition does not disturb these key points.

As explained above, Defendants cannot seriously dispute that they have deprived Plaintiff States of access to a number of different federal funding streams. Instead, Defendants argue that these harms are not traceable to the OMB Directive, but rather "pertain to other alleged pauses in funding." PI Opp. at 60. This is little more than a repackaging of Defendants' mootness argument, which fails for the reasons discussed above. *See supra* at 10–13. The evidence shows that Defendants have instituted wide-ranging pauses of funding across many different programs— pauses that began around the time the OMB Directive was issued. As the Court has noted, "the evidence shows that the OMB Directive rescission was 'in name-only' and that the 'substantive effect of the directive carries on.'" ECF 111 at 4. Under these circumstances, Plaintiff States have

established that the harms they are suffering are a result of the OMB Directive and related "categorical" funding pauses that are the subject of this litigation, *id.* at 5, not Defendants' "actual authority in the applicable statutory, regulatory, or grant terms," *id.* at 7 (emphasis omitted).

It is clear that the funding freezes at issue are causing real, immediate harm to Plaintiff States and their residents. As Plaintiff States explained, *see* PI Mot. at 24–34, 58–61, the freezes are impairing States' ability to provide many different kinds of services to their residents—in areas as varied as childcare, K-12 education, healthcare, emergency preparedness, law enforcement, transportation infrastructure, and more. To take just a few examples, the funding freezes threaten to force Head Start providers to lay off staff and reduce services, ECF 68, Ex. 69 (MA—Wright Dec. ¶¶ 7–8); Ex. 76, (MI – Walker-Griffea Dec. ¶¶ 7–19); Ex. 55 (IL – Mueller Dec. ¶ 24), to deprive state emergency management offices of the resources needed to respond to natural disasters, ECF 68, Ex. 18 (AZ – Dzbanko Dec. ¶¶ 17, 19); Ex. 99 (OR – McMahon Dec. ¶ 11), to prevent HIV-positive individuals from accessing life-saving medication, ECF 68 Ex. 122 (CO – Scheminske Dec. ¶ 14), and to curtail mental health services and suicide-prevention programs for veterans, ECF 68 Ex. 22 (AZ – Scott Dec. ¶¶ 12, 16–17). Defendants make no attempt to dispute that these harms, or the many others detailed in Plaintiff States' motion and supporting declarations, are occurring. *See* PI Opp. at 59–63.

Similarly, Defendants argue that Plaintiff States' second (alternative) ground for irreparable injury—the budgetary uncertainty caused by the funding freezes—is invalid because the OMB Directive has been rescinded. PI Mot. at 61–63; *see* PI Opp. at 60–62. This too is simply a repackaged version of Defendants' mootness argument. Plaintiff States must now take steps to consider, and attempt to redress, the consequences of both that directive and the Funding Freeze as a whole, which has continued even after this Court issued a TRO. Budgetary uncertainty is thus

31

not something Plaintiff States are merely "imagining," *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004), but rather an entirely rational and prudent response to Defendants' conduct.

**B.    The Balance of Equities and Public Interest Support Plaintiff States.**

The balance of equities and public interest factors also favor issuance of the requested preliminary injunction. PI Mot. at 65–69; *see Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). The public interest would be served by "preserv[ing] the status quo," *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009)—under which Plaintiff States receive funding pursuant to congressional appropriations for education, healthcare, energy development, and more—pending the resolution of this litigation on the merits. Moreover, "[c]ontinuation of [that] status quo will not work an irreparable harm" on Defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers).

Defendants offer two responses, but neither is persuasive. First, they cite *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), for the proposition that any time the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." PI Opp. at 64. Here, however, what is being enjoined is not a statute enacted by Congress or a state legislature, but agency action that Plaintiff States contend *violates* statutory appropriations and directives. *See* PI Mot. at 69. *King* does not suggest that the federal government suffers irreparable harm any time agency action is enjoined. Nor have Defendants pointed to the kind of "ongoing and concrete" harm to "law enforcement[,] public safety," or similar government interests that the Chief Justice highlighted as irreparable harm in *King*, where a lower court decision threatened to prohibit the State of Maryland from collecting DNA samples from "individuals arrested for violent felonies." 567 U.S. at 1303.

Second, Defendants argue that a preliminary injunction would prevent the Executive Branch from "mak[ing] decisions about the disbursement or allocation of federal funds" in situations where they are "legally entitled" to do so. PI Opp. at 64; *see id.* at 64–65. That is not correct; a preliminary injunction, like the TRO, would not preclude Defendants from restricting funding pursuant to their "actual authority in the applicable statutory, regulatory, or grant terms." ECF 111 at 7 (emphasis deleted).

### C. The Requested Injunction Is Appropriate in Scope.

As Plaintiff States have explained, *see* PI Mot. at 69–70, the requested injunction is appropriate in its scope. Preliminary injunctive relief should prohibit Defendants from reinstituting the now-rescinded OMB Directive, either explicitly or under another name or through another means where the "substantive effect of the directive carries on." ECF 111 at 4. Thus, while Plaintiff States agree that the injunctive relief should "permit lawful agency activity," PI Opp. at 65 (capitalization omitted), it should nonetheless prohibit categorical funding freezes like the Funding Freeze at issue here.[9]

Defendants argue that relief should "apply only to Plaintiffs." PI Opp. at 66. While Plaintiff States have not sought nationwide relief, the Court should issue an injunction that applies both to Plaintiff States and to other, non-governmental recipients of federal funds that operate or expend funds within Plaintiff States. While injunctions should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano*, 442 U.S. at 702), under the circumstances here, an injunction that allows Defendants to categorically freeze funding to non-governmental recipients

---

[9] The fact that Plaintiff States seek to prohibit categorical freezes refutes Defendants' suggestion that the Court would become the "ongoing superintendent" of federal agency funding decisions if relief were granted here. PI Opp. at 1.

within Plaintiff States would not provide complete relief to Plaintiff States. For example, Plaintiffs rely on federally funded programs run by non-state entities to meet various obligations under federal statutes, such as attainment of standards under the Clean Air Act and Clean Water Act. ECF 68, Ex. 28 (CA – Buffington Dec. ¶ 23); Ex. 42 (CA – Rees Dec. ¶ 23-24); Ex. 35 (CA – Lau Dec. ¶ 13, 24-26). Interruption of these programs caused by Defendants' illegal actions would not only result in dirtier air and more polluted water. *Id.* Ex. 56 ¶ 14 (IL – Roche); Ex. 42 ¶ 12 (CA – Rees); Ex. 80 ¶¶ 9-10 (MN – Minge). It would also imperil Plaintiffs' sovereign and proprietary interests in complying with federal laws. *Id.*, Ex. 56 (IL – Roche Dec. ¶ 14); Ex. 42 (CA – Rees Dec. ¶ 12); Ex. 80 (MN – Minge Dec. ¶¶ 9-10); Ex. 87 (NM – Kaltenbach Dec. ¶¶ 8a., 10c.); Ex. 89 (NM – Padilla Dec. ¶ 5ai.); Ex. 35 (CA – Lau Dec. ¶ 28).

Moreover, relief to Plaintiffs cannot be separated from relief to entities within Plaintiff States, as the two necessarily interact. Indeed, Plaintiffs more generally suffer injury when non-state entities that operate or expend funds within their borders are improperly denied federal funding because those entities often must scale back services to Plaintiffs' citizens in response. ECF 68, Ex. 76 (MI – Walker Grieffea Dec. ¶¶ 1, 7-19); Ex. 80 (MN – Minge Dec. ¶¶ 9-10); Ex. 26 (AZ – Witt Dec. ¶ 8); Ex. 87 (NM – Kaltenbach Dec. ¶¶ 8a., 10c.); Ex. 32 (CA – Harrington Dec. ¶ 11); Ex. 38 (CA – Mangia Dec. ¶ 12) (California non-profit healthcare provider). Curtailing funding to non-state recipients will increase states' costs and could require state entities to either provide additional services or abandon their efforts altogether if state budgets cannot make up the difference. *Id.,* Ex. 28 (CA – Buffington Dec. ¶ 23); Ex. 35 (CA – Lau Dec. ¶ 13); Ex. 32 (CA – Harrington Dec. ¶ 11-12); Ex. 97 (OR – Davis Dec. ¶¶ 16–18).

Defendants also contend that injunctive relief should not preclude "agencies from implementing the President's priorities as expressed through Executive Orders." PI Opp. at 68.

That is true as far as it goes; in making funding decisions pursuant to their statutory and regulatory authority, agencies certainly may take into consideration the President's policy priorities reflected in Executive Orders. What agencies may *not* do, however, is institute categorical funding pauses untethered to their "actual authority in the applicable statutory, regulatory, or grant terms." ECF 111 at 7 (emphasis omitted). For instance, Section 7(a) of Executive Order 14154, *Unleashing American Energy*, orders agencies to "immediately pause the disbursement of funds appropriated through" the IRA and IIJA, without any regard to whether such pauses are within their authority. 90 Fed. Reg. 8353 (Jan. 29, 2025) (ECF 68, Ex. 1). That kind of order is unlawful and should be enjoined. And agencies may not institute similar categorical funding freezes to effectuate other Executive Orders, though they may restrict funds in accordance with their statutory and regulatory authority and the grant terms.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff States' motion for a preliminary injunction.

Respectfully submitted,

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Kathryn M. Sabatini*
Kathryn M. Sabatini (RI Bar No. 8486)
Civil Division Chief
Special Assistant Attorney General
Sarah W. Rice (RI Bar No. 10465)
Deputy Chief, Public Protection Bureau
Assistant Attorney General
Leonard Giarrano IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Michael J. Myers*
Senior Counsel
Molly Thomas-Jensen*
Special Counsel
Colleen Faherty*
Special Trial Counsel
Zoe Levine*
Special Counsel for Immigrant Justice
28 Liberty St.

35

ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
michael.myers@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
colleen.Faherty@ag.ny.gov
zoe.Levine@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Laura L. Faer*
Laura L. Faer*
Supervising Deputy Attorney General
Christine Chuang*
Supervising Deputy Attorney General
Nicholas Green*
Carly Munson*
Kenneth Sugarman*
Theodore McCombs*
Marie Logan*
Deputy Attorneys General
California Attorney General's Office
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov
Christine.Chuang@doj.ca.gov
Nicholas.Green@doj.ca.gov
Carly.Munson@doj.ca.gov
Kenneth.Sugarman@doj.ca.gov
Theodore.McCombs@doj.ca.gov
Marie.Logan@doj.ca.gov

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
Deputy Solicitor General
R. Henry Weaver*
Assistant Attorney General
115 S. LaSalle St.
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov
Robert.Weaver@ilag.gov

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
Deputy Chief, Government Bureau
Turner H. Smith*
Deputy Chief, Energy and Environment
Bureau
Anna Lumelsky*
Deputy State Solicitor
Vanessa Arslanian**

**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Angela Cai*
Angela Cai*
Executive Assistant Attorney General
Jeremy M. Feigenbaum*
Solicitor General
Shankar Duraiswamy*
Deputy Solicitor General
25 Market St.
Trenton, NJ 08625

Julia Jones-Day**
Nathaniel Hyman**
Chris Pappavaselio**
Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
turner.smith@mass.gov

(609) 376-3377
Angela.Cai@njoag.gov
Jeremy.Feigenbaum@njoag.gov
Shankar.Duraiswamy@njoag.gov


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Nathan Arrowsmith*
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Nathan.Arroswmith@azag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
Jill Lacedonia*
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.Skold@ct.gov
Jill.Lacedonia@ct.gov


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
Solicitor General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
shannon.stevenson@coag.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov


**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General

37

of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726
Andrew.Mendrala@dc.gov

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo**
General Counsel
Taylor Payne**
Chief Deputy General Counsel
Laura C. Tipton**
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6424
AKirschner@oag.state.md.us

425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jason Anton*
Jason Anton*
Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Linus Banghart-Linn*
Linus Banghart-Linn*
Chief Legal Counsel
Neil Giovanatti*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
GiovanattiN@michigan.gov

38

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
Deputy Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 270-4332
asamant@nmdoj.gov

**JEFF JACKSON**
Attorney General for the State of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
(919) 716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Christina Beatty-Walters*
Christina Beatty-Walters*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
Leah Brown*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Andrew.Hughes@atg.wa.gov
Leah.Brown@atg.wa.gov


*Admitted *Pro Hac Vice*
***Pro Hac Vice* Motion forthcoming

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Aaron J. Bibb*
Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
BibbAJ@doj.state.wi.us