# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

---

| | |
|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAII; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>C.A. No. 25-cv-39-JJM-PAS |
| Plaintiffs, | ) |
| v. | )<br>) |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; PATRICIA COLLINS, in her official capacity as Treasurer of the United States; U.S. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

DEPARTMENT OF HEALTH AND                )
HUMAN SERVICES; ROBERT F.               )
KENNEDY, JR., in his official           )
capacity as Secretary of Health and     )
Human Services; U.S.                     )
DEPARTMENT OF EDUCATION;                 )
LINDA MCMAHON, in her official          )
capacity as Secretary of Education;      )
U.S. DEPARTMENT OF                       )
TRANSPORTATION; SEAN DUFFY,              )
in his official capacity as Secretary of )
Transportation; U.S. DEPARTMENT          )
OF LABOR; VINCE MICONE, in his          )
official capacity as Acting Secretary    )
of Labor; U.S. DEPARTMENT OF             )
ENERGY; CHRIS WRIGHT, in his            )
official capacity as Secretary of        )
Energy; U.S. ENVIRONMENTAL               )
PROTECTION AGENCY; LEE                   )
ZELDIN, in his official capacity as      )
Administrator of the U.S.                )
Environmental Protection Agency;         )
U.S. DEPARTMENT OF THE                   )
INTERIOR; DOUG BURGUM, in his           )
official capacity as Secretary of the    )
Interior; U.S. DEPARTMENT OF             )
HOMELAND SECURITY; KRISTI                )
NOEM, in her capacity as Secretary      )
of Homeland Security; U.S.               )
DEPARTMENT OF JUSTICE;                   )
PAMELA BONDI, in her official           )
capacity as Attorney General of the      )
U.S. Department of Justice; THE          )
NATIONAL SCIENCE                         )
FOUNDATION; DR. SETHURAMAN               )
PANCHANATHAN, in his capacity            )
as Director of the National Science      )
Foundation; U.S. DEPARTMENT OF          )
AGRICULTURE; BROOKE                      )
ROLLINS, in her official capacity as     )
Secretary of Agriculture; U.S.           )
DEPARTMENT OF HOUSING AND                )
URBAN DEVELOPMENT; SCOTT                 )
TURNER, in his official capacity as      )

Secretary of Housing and Urban
Development; U.S. DEPARTMENT
OF STATE; U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT; MARCO RUBIO,
in his official capacities as Secretary
of State and Acting Administrator of
the United States Agency for
International Development; U.S.
DEPARTMENT OF DEFENSE;
PETER HEGSETH, in his official
capacity as Secretary of Defense; U.S.
DEPARTMENT OF VETERANS
AFFAIRS; DOUG COLLINS, in his
official capacity as Secretary of
Veterans Affairs; U.S.
DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;
NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION; JANET
PETRO in her official capacity as
Acting Administrator of National
Aeronautics and Space
Administration; CORPORATION
FOR NATIONAL AND
COMMUNITY SERVICE;
JENNIFER BASTRESS
TAHMASEBI, in her official capacity
as Interim Head of the Corporation
for National and Community Service;
U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND
DUDEK, in his official capacity as
Acting Commissioner of United
States Social Security
Administration; U.S. SMALL
BUSINESS ADMINISTRATION; and
KELLY LOEFFLER, in her official
capacity as Administrator of U.S.
Small Business Administration,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

The Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct constitutional roles of each branch of our government.  The interaction of the three co-equal branches of government is an intricate, delicate, and sophisticated balance—but it is crucial to our form of constitutional governance.  Here, the Executive put itself above Congress.  It imposed a categorical mandate on the spending of congressionally appropriated and obligated funds without regard to Congress's authority to control spending. Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them–they have no other spending power.  The Executive has not pointed to any constitutional or statutory authority that would allow them to impose this type of categorical freeze.  The Court is not limiting the Executive's discretion or micromanaging the administration of federal funds.  Rather, consistent with the Constitution, statutes, and caselaw, the Court is simply holding that the Executive's discretion to impose its own policy preferences on appropriated funds can be exercised only if it is authorized by the congressionally approved appropriations statutes.  Accordingly, based on these principles and the reasons stated below, the Court grants the States' Motion for Preliminary Injunction.  ECF No. 67.

## I.    BACKGROUND

We begin by restating the American government principles learned during critical civics education lessons in our youth.[1]  Our founders, after enduring an eight-year war against a monarch's cruel reign from an ocean away, understood too well the importance of a more balanced approach to governance.  They constructed three co-equal branches of government, each tasked with their own unique duties, but with responsibilities over the other branches as a check in order to ensure that no branch overstepped their powers, upsetting the balance of the fledgling constitutional republic.  *See Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880).  These concepts of "checks and balances" and "separation of powers" have been the lifeblood of our government, hallmarks of fairness, cooperation, and representation that made the orderly operation of a society made up of a culturally, racially, and socioeconomically diverse people possible.

The three branches of our government—Legislative, Executive, and Judicial—derive their power from the United States Constitution; they function together, and one branch's power does not supersede that of another.  "To the legislative department has been committed the duty of making laws; to the executive the duty

---

[1] "This is what it all comes down to: we may choose to survive as a country by respecting our Constitution, the laws and norms of political and civic behavior, and by educating our children on civics, the rule of law, and what it really means to be an American, and what America means. Or, we may ignore these things at our . . . peril." *A.C. v. Raimondo*, 494 F. Supp. 3d 170, 181 (D.R.I. 2020), aff'd sub nom. *A.C. by Waithe v. McKee*, 23 F.4th 37 (1st Cir. 2022).

of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.) ("[T]he legislature makes, the executive executes, and the judiciary construes the law"). Importantly, James Madison wrote that this system prevents "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands." The Federalist No. 47, at 301 (C. Rossiter ed. 1961). Such an accumulation and concentration of power would pose an inherent "threat to liberty." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

The Legislative branch, consisting of two Houses of Congress elected by the citizens of the states, has the power to levy taxes, finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, §§ 8, 9. Congress also makes laws, and the Constitution prescribes a specific procedure for it to follow involving the agreement of both the House of Representatives and the Senate and presentment of the final bill to the President for signature or veto. U.S. Const. art. I, §§ 1, 7. The President, as head of the Executive Branch, may recommend laws for Congress's consideration, including those related to spending. U.S. Const. art. II, §§ 1, 3. Once the bill becomes the law, U.S. Const. art. I, § 7, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And Article III empowers the Judiciary with the "province and duty ... to say what the law is" in

particular cases and controversies. *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177 (1803); U.S. Const. art. III, § 2.

Important to this case is how Congress uses its power to authorize spending to support federal programs and activities. One way is through an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations. *See* 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

Congress has enacted multiple statutes that affirm its control over federal spending. First, the "purpose statute," 31 U.S.C. § 1301(a), states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law,"—that is, funds can be used only for the purposes that Congress has designated. Second, the Antideficiency Act prevents agencies from obligating or spending funds absent congressional appropriation. 31 U.S.C. § 1341. Finally, the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 et seq. ("ICA"), permits the Executive Branch to "impound" (or

7

decline to spend) federal funds only under a very small set of highly circumscribed conditions.

This case also involves the actions of agencies in receipt of statutorily appropriated federal funding. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "It is no exaggeration to say that 'an agency literally has no power to act ... unless and until Congress confers power upon it.'" *City of Providence*, 954 F.3d at 31 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). In this case, there are specific statutory provisions instructing federal agencies to provide the States with categorical or formula grants where money is allocated on the basis of enumerated statutory factors such as population or the expenditure of qualifying state funds. ECF No. 114 ¶ 93. Several examples of these formula grants involve funding for Medicaid (42 U.S.C. § 1396(a), highway (23 U.S.C. § 104(a)(1), (b), (c)), special education services (the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.), for mental health and substance abuse treatment (42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a)), power and heating for low-income residents, (the Low-Income Home Energy Assistance Program ("LIHEAP"), 42 U.S.C. § 8621(a)), the Infrastructure Improvement and Jobs Act ("IIJA") (Pub. L. No. 117-58, 135 Stat. 429 (2021)) and Inflation Reduction Act ("IRA") (Pub. L. No. 117-169, 136 Stat. 1818 (2022)) for projects ranging from highways, to broadband access, to pollution reduction, to increasing the reliability of the electric

grid, and clean water. These statutes direct the agencies to make grants to states for enumerated purposes in accordance with congressional policies.

With this backdrop, the Court moves to the Executive actions that spurred this lawsuit.

### A. The President's Executive Orders and OMB Memorandum M-25-13

The President issued a series of Executive Orders ("EOs") in his first eight days of office, directing federal agencies to pause and review funding in connection with his policy priorities—specifically relating to:

- "terminating the Green New Deal" and requiring an immediate pause on disbursement of funds appropriated under the IRA or IIJA ("*Unleashing* EO"), ECF No. 68-1;
- pausing funding programs relating to "removable or illegal aliens" ("*Invasion* EO"), ECF No. 68-3;
- identifying "diversity, equity, inclusion, accessibility" programs, in an effort to "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("*DEI* EO"), ECF No. 68-2;
- ending federal funding of gender ideology ("*Gender* EO"), to ensure that research or educational grants to medical institutions do not include federal funds for transgender medical care ("*Gender-Affirming Care* EO"), ECF Nos. 68-5, 65-8; and
- pausing federal foreign aid that is not in line "with the foreign policy of the President of the United States" ("*Foreign Aid* EO"). ECF No. 68-6.

On January 27, 2025, the Office of Management and Budget's (OMB) Acting Director, Matthew J. Vaeth issued OMB Memorandum M-25-13 ("OMB Directive"), entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" to executive departments and agencies' heads. *See* ECF No. 68-9. The OMB Directive instructed federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." *Id.* at 2.

Then, the OMB Directive mandated that, in the interim of the comprehensive analyses, "Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the Executive Orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI [diversity, equality, and inclusion], woke gender ideology, and the green new deal." *Id.* Agencies had until February 10, 2025 to submit to the OMB "detailed information on any programs, projects, or activities subject to this pause." *Id.* The OMB Directive further noted that the pause would continue "until OMB has reviewed and provided guidance" to the agencies in relation to the information submitted to the OMB. *Id.* The pause was set to "become effective on January 28, 2025, at 5:00 PM." *Id.*

## B. The States' Suit, the OMB Directive's Rescission, and the TRO

On January 28, the "States"—comprising twenty-two states and the District of Columbia—brought suit against the President and the heads of numerous federal executive departments and agencies, arguing that their actions to implement the OMB Directive violated: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (Counts I, II); (2) the Separation of Powers (Count III); and the Spending, Presentment, Appropriations, and Take Care Clauses of the U.S. Constitution (Counts IV, V).  ECF No. 1.  Additionally, the States immediately moved for a temporary restraining order ("TRO") to "restrain the Defendants from enforcing the OMB Directive's directive to 'pause all activities related to obligation or disbursement of all Federal financial assistance.'" ECF No. 3 at 3 (citing OMB Directive at 2).  That

same day, the U.S. District Court for the District of Columbia issued an administrative stay on the OMB Directive until it could hold a hearing on a separate motion for a TRO from coalitions of nonprofit organizations. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 314433 (D.D.C. Jan. 28, 2025).

The next day, a hearing for the TRO motion was set for 3:00 p.m. (Hearing Notice Jan. 29, 2025) and the Defendants entered an appearance. ECF No. 39. But shortly before the hearing, the Defendants filed a notice stating that the OMB rescinded the OMB Directive and that the Plaintiffs' claims and request for prospective relief were now moot. ECF No. 43. Nonetheless, the Court preceded with the TRO hearing at the States' request. During the hearing the States argued against mootness, presenting White House Press Secretary Karoline Leavitt's post-rescission announcement on X (formerly Twitter) stating that the federal funding freeze was not rescinded and that the President's EOs remained in full force and effect. *See* Minute Entry Jan. 29, 2025; ECF No. 44; *see also* ECF No. 68-126 (screenshot of the Press Secretary's X announcement). Feeling inclined to grant a TRO based on the evidence before it, the Court requested that the States submit, and the Defendants respond, to a proposed TRO order (Minute Entry Jan. 29, 2025)—a request the parties promptly complied with, *see* ECF Nos. 46, 49.

Based on the Press Secretary's announcement—along with supplemental evidence showing continued enforcement of the OMB Directive—the Court determined that the OMB Directive's rescission was "in name only" and that the

"substantive effect of the directive carries on."  ECF No. 50 at 10.  Thus, the Court found that the OMB Directive's rescission did not moot the States' claims and ultimately issued a TRO on January 31.  *See id.* at 11-12.  The TRO provided that the Defendants: "shall not pause, freeze, impede, block, cancel, or terminate [their] compliance with awards and obligations . . . to the States . . . except on the basis of the applicable authorizing statutes, regulations, and terms"  and shall be enjoined from "from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive . . .." *Id.*[2]

## C. TRO Enforcement Order, The Defendants' Appeal, And The  Preliminary Injunction Hearing

A few days after the Court issued the TRO, it set an expedited briefing schedule on the States' Motion for a Preliminary Injunction.  *See* Text Order, Feb. 3, 2025. Then, on February 6, the Court extended the TRO's duration, for good cause, until it could rule on the preliminary injunction motion.  *See* Text Order, Feb. 6, 2025.  A day later, the States filed an emergency motion to enforce the TRO, pointing to evidence that their access to federal funds was still being denied.[3]  *See* ECF No. 66.  Based on the evidence, the Court determined that there were "pauses in funding [that] violate[d] the plain text of the TRO" and granted the States' Motion, ordering the

---

[2]  The Court later issued an order on February 10, making clear that the TRO also applied to funds paused under the *Unleashing* EO and the *Unleashing* Guidance. *See* ECF No. 96.

[3]  The States filed another motion to enforce the TRO on February 28, 2025 relating to FEMA funds that continue to be frozen despite the Court's TRO and subsequent clarifying orders.  ECF No. 160.  The Court will address that motion later in this Order.

Defendants to end any federal funding pauses and take steps to carry out the TRO during its pendency.  ECF No. 96 at 3-4.

Soon after the Court granted the States' emergency enforcement motion, the Defendants appealed to the First Circuit the Court's: (1) TRO; (2) order extending the TRO's duration, and: (3) order enforcing the TRO.  ECF No. 98 at 1.  The Defendants sought a stay of the Court's orders from the First Circuit, including an immediate administrative stay.  *Id.*  The Defendants also filed a motion to stay, requesting the Court to stay its orders pending appeal.  ECF No. 100.  Ultimately, the First Circuit denied the Defendants' motion for an administrative stay (ECF No. 106 at 2), the Court denied the Defendants' motion to stay (ECF No. 111), and the Defendants then voluntarily dismissed their appeal.  ECF Nos. 121, 122.  In the meantime, the States amended their complaint.  ECF No. 114.

Eventually, after an expedited briefing period, the Court held a hearing on the preliminary injunction motion where the States presented evidence of the categorical pause in funding and the harms resulting.  The Defendants did not rebut any of that evidence or introduce any evidence of their own but instead simply argued against the States' Motion on other grounds.  At the close of the arguments, the Court reiterated that the TRO was in full force and effect and took the States' Motion for Preliminary Injunction under advisement.

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022).  "To secure a preliminary

injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).  In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)).  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## III.    DISCUSSION

### A.    Jurisdiction

The Defendants assert that the Court lacks jurisdiction to enter preliminary relief in this case because: (1) the OMB Directive's rescission renders the States' claims—or at least their request for preliminary relief—moot; and (2) the States have

not established standing to challenge the OMB Directive. *See* ECF No. 113 at 11-22. The Court will address each argument in turn.

        1.    **Mootness**

The Defendants contend that the States' claims here are directed only against the OMB Directive, and thus the rescission of the OMB Directive renders the States' claims moot. *Id.* at 11. They assert that the States' allegations of ongoing harms, such as continued funding freezes, do not stem from the challenged OMB Directive but from actions that are not challenged in the States' Complaint. *Id.* at 13. Those purportedly unchallenged actions that the Defendants suggest are the true basis for the States' ongoing harms are: (1) independent agency decisions not based on the OMB Directive; and (2) the issuance of OBM Memorandum M-25-11 (the "*Unleashing* Guidance")—which directed agencies to immediately pause certain disbursement of funds appropriated under the IRA and the IIJA.[4] *Id.* at 14-15.

The OMB Directive's rescission does not render the States' claims moot. The voluntary cessation doctrine precludes a finding of mootness in this case. The voluntary cessation doctrine gives rise to a mootness exception when the following two-part test is met: (1) the defendant voluntarily ceased the challenged conduct to moot the plaintiff's case; and (2) there is a reasonable expectation that the defendant will repeat the challenged conduct after the lawsuit's dismissal. *Lowe v. Gagné-*

---

[4] After the Defendants responded to the States' preliminary injunction motion, the States filed an Amended Complaint to explicitly include challenges to the *Unleashing* Guidance, the related *Unleashing* EO, and the general implementation of funding freezes based on the President's EO. *See* ECF No. 114 ¶¶ 192, 203-04, 208-09, 215-17, 225-26, 231-32, 237-38, 244-46.

*Holmes*, 126 F.4th 747, 756 (1st Cir. 2025) (citing *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021)).  Here, there was a rescission of the challenged OMB Directive, *see* ECF No. 68-12, but as the Court has previously found, the evidence suggests that the OMB Directive's rescission was in name only and "may have been issued simply to defeat the jurisdiction of the courts."  ECF No. 50 at 10.  The Court made this finding, in part, based on a statement from the White House Press Secretary after the OMB Directive's rescission, stating:

> This is NOT a rescission of the federal funding freeze.  It is simply a rescission of the OMB memo.  Why?  To end any confusion created by the court's injunction.  The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.[5]

ECF No. 68-126; ECF No. 50 at 10-11.  The Defendants' contentions that the sole goal of that statement was "ending confusion" and "focusing agencies on the legal effect of the President's recent Executive Orders" are unavailing.  ECF No. 113 at 16.  The Press Secretary's statement reflects that the OMB Directive's rescission was a direct response to a court-issued stay against the OMB Directive so that the challenged federal funding freeze could continue without any judicially-imposed impediment.  Therefore, the Defendants' voluntary rescission of the OMB Directive was a clear effort to moot legal challenges to the federal funding freeze announced in the OMB Directive.

---

[5] The injunction referenced in the Press Secretary's statement is the administrative stay another federal court issued against the OMB Directive's instructions to agencies to "pause ... disbursement of Federal funds under all open awards."  *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025).

Nor have the Defendants met their heavy burden of illustrating that it is "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  The Defendants purport that a reinstatement of the challenged OMB Directive, absent an injunction, is a fear that is "wholly speculative given the existence of the President's Executive Orders which separately address the President's priorities."  ECF No. 113 at 16.  But nothing suggests that the OMB voluntarily abandoned the OMB Directive because they believed that: (1) the President's EOs, alone, sufficiently instructed agencies on how to implement the President's priorities; or (2) the OMB Directive was deficient or exceeded the Defendants' constitutional or statutory authority.  *See* ECF No. 68-12 (recission without explanation).  Rather, as explained above, the Press Secretary's statement reflects that the OMB Directive's rescission was in direct response to litigation that impeded the execution of a federal funding freeze.  Thus, the rationale underlying the OMB Directive's rescission makes it unreasonable to conclude that the Defendants will not reinstate the challenged funding freeze absent an injunction from this Court. Accordingly, the States' challenges are not moot based on the OMB Directive's rescission.

Next, the Defendants claim that the States' request for preliminary relief is moot because, by rescinding the OMB Directive, the Defendants have "voluntarily provided the prospective injunctive relief that the States sought in their Complaint."

ECF No. 113 at 17.  Since the Defendants' submission of their Opposition to the States' Motion for Preliminary Injunction, the States have filed an Amended Complaint that clarifies the scope of their claims and requests for relief.  *See* ECF No. 114.  The States request that the Court preliminarily enjoin the Agency Defendants from implementing "the Federal Funding Freeze" "effectuated through EOs, the *Unleashing* [Guidance], the OMB Directive, and other agency actions . . .."  *Id.* ¶ 246.  The States' request for a preliminary injunction makes clear that they are challenging a pause on federal funding that was implemented under not only the OMB Directive, but also to the EOs incorporated therein and other agency actions such as the OMB's issuance of the *Unleashing* Guidance.  Thus, the rescission of the OMB Directive does not provide the States with *all* the prospective relief they have requested.[6]  Accordingly, the States' preliminary injunction request is not moot.

## 2.    Standing

The Defendants assert that the States lack standing to challenge the OMB Directive, particularly with respect to claims based on funding streams that "(1) are not within the scope of the OMB Memo; (2) are not managed by any of the Defendant agencies; or (3) benefit other States or third parties that are not plaintiffs in this case."  ECF No. 113 at 18-19.  "To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the

---

[6] Additionally, various funding disruptions that occurred after the Court's TRO—and that continue to the present day—underscore how the Directive's rescission does not suffice as "voluntarily" providing the States all the prospective relief they request.  *See* ECF No. 96 at 3.

defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). The Defendants contend that the States seek to bring five claims against "thousands of various agency funding streams," and thus must demonstrate standing for each claim against each funding stream. ECF No. 113 at 18. But the States' claims are not against funding streams.[7] Rather, the States' claims focus on the Defendants' actions, which seek to inhibit access to obligated funds indefinitely and indiscriminately—without reference to statute, regulations, or grant terms.

The States have introduced dozens of uncontested declarations illustrating the effects of the indiscriminate and unpredictable freezing of federal funds, which implicate nearly all aspects of the States' governmental operations and inhibit their ability to administer vital services to their residents.[8] These declarations reflect at least one particularized, concrete, and imminent harm that flows from the federal funding pause—a significant, indefinite loss of obligated federal funding. And such

---

[7] Even if the States' claims were targeted at these "thousands" of funding streams, their inability to feasibly take a program-by-program, grant-by-grant approach to raising their challenges is the consequence of the Defendants' broad, sweeping efforts to indefinitely stop nearly all faucets of federal funding from flowing to carry out the President's policy priorities, without regard to Congressional authorizations. One cannot set one's house on fire and then complain that the firefighters smashed all the windows and put a hole in the roof trying to put it out.

[8] *See* e.g., ECF Nos. 68-99 ¶ 11, 12; 68-18 ¶¶ 17-19; 68-102 ¶¶ 4-6 (effects on public safety and emergency management services); 68-31 ¶¶ 6, 7; 68-32 ¶ 13 (effects on health care services); 68-75 ¶¶ 6-8; 68-76 ¶ 5; 68-89 ¶ 5 (effects on State education services); 68-113 ¶¶ 45, 60-61; 68-95 ¶¶ 8-13; 66-123 ¶¶ 5, 29 (effects on environmental safety and energy development); 68-76 ¶¶ 7-19; 68-86 ¶¶ 9-10; 68-116 ¶¶ 15-16, 21 (effects on childcare services and child welfare).

a harm is fairly traceable to the Defendants' conduct via their acts to implement a widespread federal funding pause under the OMB Directive, the EOs incorporated therein, and the *Unleashing* Guidance.  Granting this Motion in the States' favor will more than likely redress their injuries because it would inhibit the abrupt, indefinite pause of obligated federal funds on which the States rely to administer vital services to their residents.  Accordingly, the States have the requisite standing to challenge the federal funding freeze.

Now that the Court has jumped over these initial hurdles, it moves to resolution of the States' preliminary injunction motion.

### B.    Likelihood of Success on the Merits

#### 1.    Administrative Procedure Act Claims

The States assert that the Agency Defendants'[9] implementation of the federal funding freeze, without regard to relevant authorizing statutes and regulations, violates the Administrative Procedure Act ("APA") because such actions violate the law, are ultra vires, and arbitrary and capricious.  ECF No. 67 at 52 (citing 5 U.S.C. § 706(2)(A)).  To begin, the Court must address the Defendants' arguments that the States' APA claims do not fall within the Court's subject matter jurisdiction.

#### a.    Final Agency Action

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  An agency action is "final" if: (1)

---

[9] "Agency Defendants" refers to the federal executive agencies *and* departments that are parties in this suit.

it marks the "'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)).

The States identify: (1) the OMB Directive itself; and (2) the Agency Defendants' implementation of a categorical federal funding freeze, under the OMB Directive and Section 7(a) of the *Unleashing* EO, as final agency actions. ECF No. 67 at 53. The Defendants contend that the OMB Directive and other "guidance" about implementing the President's priorities are not final agency actions because the OMB Directive did not determine which funds or grants should be paused but required agencies to make such a determination under their respective authorities. ECF No. 113 at 28.

To suggest that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the *Unleashing* Guidance is disingenuous. Recall that the OMB Directive informed agencies that they "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." ECF No. 68-9 at 2. The OMB Directive mandated that "[i]n the interim" of these comprehensive analyses, "Federal agencies **must temporarily pause** all activities related to obligation or disbursement of *all* Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders . . .." *Id.* (second emphasis added). Elsewhere, the

OMB Directive emphasized that "[e]ach agency must pause . . . disbursement of Federal funds under all open awards." *Id.*

The record makes clear that following the OMB Directive's issuance—and even before it was set to take effect—many of the States found themselves unable to draw down appropriated and awarded funding because they were completely shut out from accessing federal funding payment portals such as the Payment Management Services ("PMS").[10] As the States highlight, such a wholesale shutdown does not suggest that agencies made individualized assessments of their statutory authorities and relevant grant terms before making the determination to blanketly pause access to obligated funds.[11] And how could these agencies make such assessments? The OMB Directive explicitly stated that the "temporary funding pause will become effective on January 28, 2025, at 5:00 PM"—a mere day after the Directive was

---

[10] *See* e.g., ECF Nos. 68-100 ¶ 8 (Oregon unable to access Medicaid federal funding system for entire day on January 28); 68-93 ¶ 6 (New York State Comptroller Office unable to draw over $70 million in obligated federal funds); 68-118 ¶ 18 (Washington's DCYF unable to draw down funds on morning of January 28—faced with message from federal payment system stating, "Temporary Pause on Disbursement of Federal Financial Assistance"); 68-55 ¶¶ 27-28 (New York's DCFS unable to draw down funds from PMS on morning January 28—faced with message stating: "Due to [EOs] regarding potentially unallowable grant payments, PMS is taking additional measures to process payments. Reviews of applicable programs and payments will result in delays and/or rejections of payments.").

[11] While the Defendants claim that the Directive and the EOs required the agencies to pause funding and impose restriction on obligated funds consistent with the law, the undisputed evidence before the Court is that adding the "consistent with the law" caveat was nothing more than window dressing on an unconstitutional directive by the Executive. This is clear because when the Court clarified its TRO, when faced with evidence that the Defendants continued to freeze obligated funding, the money flowed once again.

issued. *Id.* As another court faced with a similar challenge to the OMB Directive underscored "it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 368852, at *8 (D.D.C. Feb. 3, 2025). Overall, the OMB Directive amounted to a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze to align funding decisions with the President's priorities. Such a command, along with the Agency Defendants swift actions to execute the categorical funding freeze, marked the "consummation of each agency's decisionmaking process to comply with the President's executive order, the OBM [Directive], or both." *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025).

The same analysis applies to the Agency Defendants' acts implementing funding pauses under Section 7(a) of the *Unleashing* EO and the OMB's *Unleashing* Guidance. The *Unleashing* Guidance largely reiterates the *Unleashing* EO's instruction that agencies immediately pause disbursements of funds under the IRA or IIJA and does not even attempt to allow for agency discretion.[12] *See* ECF No. 68-13 at 2. And agencies, such as the Department of Energy (DOE) and the U.S. Department of Agriculture acted quickly to implement the pause of appropriated IIJA

---

[12] The most that the *Unleashing* Guidance advances is an attempt to limit the pause of IRA/IIRA to only to "funds supporting programs, projects, or activities that may be implicated by the policy established in section 2 of the [*Unleashing*] order." *See* ECF No. 68-13.

and IRA funds. *See* ECF Nos. 68-123 ¶¶ 33, 36, 37; 68-92 ¶¶ 14-15. Thus, the implementation of those IIJA and IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both, not to exercise its discretion.

As to the second finality factor, the evidentiary record sufficiently shows that the abrupt, categorical, and indefinite pause of obligated federal funds is the direct, appreciable legal consequence that States have suffered from the Agency Defendants' actions implementing the funding pauses commanded in the OMB Directive and the *Unleashing* EO. Accordingly, the Agency Defendants' actions suffice as "final agency action" as to permit the Court's judicial review of such actions under the APA.

Returning to the merits, the Court must decide whether the States are likely to succeed on their claim that the Defendants' implementation of the federal funding freeze was contrary to law, ultra vires, and arbitrary and capricious. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because this standard is "quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). Therefore, a reviewing court must uphold an agency's decision if it is: (1) devoid of legal errors; and (2) "supported by any rational review of the record." *Mahoney v. Del Toro*, 99 F.4th 25, 34 (1st Cir. 2024) (quoting *Atieh*, 797 F.3d at 138). The Court will

first discuss whether the Defendants' actions were contrary to law and then turn to whether such acts were arbitrary and capricious.

### b. Contrary to Law and Ultra Vires Actions

The States assert that the Defendants acted contrary to law and exceeded their statutory authority when imposing the challenged federal funding freeze. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Therefore, "an agency literally has no power to act ... unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, (1986)). Any action an agency takes that is beyond the limits of its statutory authority is ultra vires and violates the APA. *Id.*

The statutory scheme governing federal appropriations are at the forefront of the States' ultra vires and "contrary to law" claims against the Agency Defendants. The States contend that the ICA[13] permits the Executive to defer or decline the expenditure of appropriated federal funds only under certain limited conditions that are not present here. *See* ECF No. 67 at 45, 54-55. They highlight that such an expenditure deferral cannot be made based on policy reasons but only on the

---

[13] The Defendants assert that because the ICA does not provide for a private right of action, the statute is "generally not enforceable through an APA suit." ECF No. 113 at 44 (citing *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024)). The Court declines to adopt such a narrow view of what it may consider when determining whether an agency has acted "not in accordance with law" under the APA. In the Court's view, "not in accordance with law," refers to "*any* law." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).

permissible bases listed under the ICA. *See id.* at 54 (citing 2 U.S.C. § 684(b)); Mem. of Gen. Accountability Off., *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2. The States also note that the ICA requires the Executive to send a "special message" to Congress explaining proposed deferrals. *Id.* at 55 (2 U.S.C. § 684(a)). Thus, the States argue that the federal funding freeze exceeded the Defendants' authority and contravened the ICA because: (1) the freeze, or deferral, was impermissibly based on "policy disagreement with Congressional priorities;" and (2) the Executive failed to send the required "special message" to Congress detailing the numerous proposed deferrals.

The ICA provides that "[w]henever the President, the Director of the [OMB], [or] the head of any [U.S.] department or agency . . . proposes to defer any budget authority provided for a specific purpose or project," the President must send a "special message" to Congress detailing the proposed deferrals. 2 U.S.C. § 684(a). A "deferral of budget authority" includes: (1) "withholding or delaying the obligation or expenditure of budget authority . . . provided for projects or activities;" or (2) "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority . . .." *Id.* § 682(1)(A), (B). Further, the ICA enumerates only three bases in which a deferral is permissible: (1) "to provide for contingencies;" (2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations;" or (3) "as specifically provided by

law." *Id.* § 684(b). "**No officer or employee of the United States may defer any budget authority for any other purpose.**" *Id.* (emphasis added).

Here, the OMB Directive and Section 7(a) of the *Unleashing* EO, constituted a budget authority deferral because it commanded—and prompted—an indefinite withholding or delay of obligated funds. 2 U.S.C. § 682(1)(A). Thus, under the law, the President was required to send a special message to Congress detailing the proposed deferrals, such as the amounts deferred, the proposed deferral period, and the programs involved. *See id.* § 684(a). There is no evidence that such a special message detailing the indefinite, widespan deferrals of obligated funding was ever communicated to Congress. Accordingly, the States have substantiated a likelihood of success in proving that the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires.

The States also raise that "the Funding Freeze violates the specific statutes in which Congress mandated that funding be used in a specific manner according to specific terms." ECF No. 67 at 55. They assert that many federal funding streams are so-called "categorical" or "formula" grants that Congress directed the Executive to provide to the States based on "enumerated statutory factors, such as population or the expenditure of qualifying State funds." *Id.* (citing *City of Los Angeles v. Barr*, 941 F.3d 931, 934-35 (9th Cir. 2019)). Thus, the States contend that Congress's specific directives in the statutory and regulatory schemes that govern such "formula"

funding streams are inconsistent with the sweeping authority the Defendants have asserted in carrying out the federal funding freeze. *Id.* at 48, 55-56.

The States have underscored clear examples in which Congress has appropriated funds to federal programs and has strictly prescribed how those funds must be expended. For example, the IIJA appropriated over $14 billion in grants for the States' Clean Water revolving funds from 2022 to 2026. IIJA, Pub. L. No. 117-58, § 50210, 135 Stat. 429, 1169 (2021). Those funds are a creature of a separate statute—the Federal Clean Water Act—which instructs the Environmental Protection Agency ("EPA") that it "shall make capitalization grants to each State," via formula grants, to establish and support water pollution control revolving funds for certain enumerated objectives and policy goals. 33 U.S.C. §§ 1381(a), (b); 1383(c); 1384(a), (c)(2).

Additionally, the IRA established a program to subsidize heat pump systems purchases, instructing the DOE Secretary that they "*shall* reserve funds . . . for each State energy office" based on an allotment formula. 42 U.S.C. § 18795a(a)(2)(A)(i) (emphasis added). Further, a climate pollution reduction grant under the IRA directed that the EPA "*shall* make a grant to at least one eligible entity in each State for the costs of developing a plan for the reduction of greenhouse gas air pollution . . .." 42 U.S.C. § 7437(b). Congress has instructed other agencies to provide the States with federal funding using a mandatory fixed formula. *See e.g.*, 23 U.S.C. § 104(a)(1), (b), (c) (instructing that the Transportation Secretary "*shall*" distribute federal highway funds based on mandatory apportionment formulas); 42 U.S.C. §§ 300x(a),

300x-7(a), 300x-21(a), 300x-33(a) (directing that the Health and Human Services Secretary "shall make" or "shall determine the amount of" grants to States for mental health and substance abuse treatment based on fixed statutory formulas).

These are a few examples of funding streams where Congress has mandated that the Executive spend appropriated funds according to a prescribed statutory formula, thus leaving agency Secretaries with no discretion to deviate from such formula. *See* ECF No. 67 at 6-11, 48-50; *see also* ECF No. 147 at 9-10. Yet the Agency Defendants halted the disbursement of these formula grants when freezing appropriated funds to ensure spending conformed with the President's policy priorities. *See e.g.*, ECF Nos. 68-35 ¶ 20 (California's Water Resources Control Board unable to draw down funds under existing Clear Water State Revolving Funds grant agreements on January 31); 68-123 ¶ 4, 9 (Colorado unable to draw down funds for the IRA climate pollution reduction grant); *see also* ECF No. 68-124 at 2 (DOE memorandum announcing that "[a]ll funding and financial assistance . . . shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with . . . Administration policy.").

But "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). There is sufficient evidence that, in implementing the funding freeze, the Agency Defendants withheld funding that Congress did *not* tie to compliance with the President's policy priorities in the OMB Directive and the *Unleashing* EO.

29

Accordingly, the States have substantiated a likelihood of success on the merits that the Agency Defendants acted "not in accordance with the law"—in violation of the APA—when exceeding their statutory authority to carry out a categorical federal funding freeze.  5 U.S.C. § 706(2)(A).

### c.  Arbitrary and Capricious

Next, the States argue that the challenged federal funding freeze is arbitrary and capricious because it is not "reasonable or reasonably explained."  ECF No. 67 at 56 (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  The States assert that the Agency Defendants did not provide a satisfactory explanation for the funding freeze and explained only that the freeze was aimed at helping the President achieve his policy priorities.  ECF No. 67 at 56.  The States contend that achieving such priorities "cannot come in the form of an across-the-board directive that contravenes numerous statutory provisions without explanation of how that action comports with applicable statutory or regulatory commands or factors relevant under those authorities."  *Id.*  Further, the States allege that the Defendants disregarded the harmful consequences of the funding freeze, particularly the danger to "critical services [upon which] millions of Americans rely."  *Id.* at 56-57.  Lastly, the States argue that the freezing of all funds appropriated under the IRA and the IIJA was substantively unreasonable because it lacks support in law and contravenes statutory text.  *Id.* at 57.

The Defendants counter that the OMB Directive adequately explained the goals of the funding freeze, which was "to effectuate the President's Executive Orders

and 'safeguard valuable taxpayer resources.'" ECF No. 113 at 57 (citing OMB Directive at 1). Further, the Defendants assert that the OMB Directive rationally connected the temporary pause to those stated objectives when explaining that the pause was needed to give "the Administration time to review agency programs and determine the best [funding uses] consistent with the law and the President's priorities." *Id.* at 57-58 (citing OMB Directive at 2). They highlight that the OMB Directive explicitly orders agencies to act "consistent with the law" six times and thus agencies were not directed to contravene their statutory authorities. *Id.* at 58.

Moreover, the Defendants argue they did consider important aspects of the problem because the OMB Directive highlighted the problem—the "significant amount of money" spent each year on financial assistance—and merely directed agencies to assess the problem by reviewing which assistance may be impacted by the President's order. *Id.* Additionally, they assert that they considered the practical consequences that would flow and took steps to mitigate them because the OMB Directive: (1) exempted assistance provided directly to individuals from the pause; (2) noted that the OMB could grant exceptions on a case-by-case basis; (3) directed only a temporary pause; and (4) provided a delayed effective date. *Id.* at 58-59.

A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Melone v. Coit*, 100 F.4th 21,

29 (1st Cir. 2024) (*Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013)).  The Court finds that the Defendants have not provided a rational reason that the need to "safeguard valuable taxpayer resources" is justified by such a sweeping pause of nearly all federal financial assistance with such short notice.  Rather than taking a deliberate, thoughtful approach to finding these alleged unsubstantiated "wasteful or fraudulent expenditures," the Defendants abruptly froze billions of dollars of federal funding for an indefinite period.  It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences—when these funding pauses endanger the States' ability to provide vital services, including but not limited to public safety, health care, education, childcare, and transportation infrastructure. *See* ECF No. 67 at 24-34, 58-61.

Further, the mere twenty-four hours that the OMB gave agencies to discern which of thousands of funding freezes must or must not be paused flouts the Defendants' arguments that either the "delayed" effective date or the "consistent with the law" instruction mitigated the harm that the pause caused.  The OMB Directive essentially ordered agencies to effectuate the blanket pause and then decide later which funding streams they actually had lawful authority to withhold.  *See e.g.*, ECF No. 68-55 ¶¶ 27-28 (New York's Office of Children and Family Services unable to draw down funds from PMS on morning January 28—faced with message stating: "Due to [EOs] regarding potentially unallowable grant payments, PMS is taking added measures to process payments.  Reviews of applicable programs and payments will result in delays and/or rejections of payments.").  Again, the Defendants have not

proffered a rational reason for how their alleged goal of safeguarding taxpayer funds justified a de facto suspension of nearly all federal funding. Thus, the States have substantiated a likelihood of success of proving that the Agency Defendants' implementation of the funding freeze was arbitrary and capricious.

Further, the Agency Defendants' categorical freeze of funding appropriated under the IRA and IIJA is also likely substantively unreasonable in violation of the APA. Generally, substantive unreasonableness may arise when an agency "exercise[s] its discretion unreasonably." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.). As discussed above, the IRA and IIJA appropriated funds to certain programs and funding streams that mandated expenditures based on fixed formulas—*not* the contravening policies of the President. Based on the record, the Agency Defendants implemented sweeping pauses of IRA/IIJA appropriated funds—under the OMB Directive and *Unleashing* EO—despite various fundings streams being governed by statutory commands that did not give discretion to withhold funds based on the policy initiatives the Executive sought to further. *See e.g.*, ECF Nos. 48-1 ¶¶ 4-5 , 68-124 at 2; 68-123 ¶¶ 6-10, 26; 68-123 ¶ 36; 68-92 ¶ 15. Thus, the States have substantiated a likelihood of success on illustrating that the Agency Defendants unreasonably exercised its discretion, in violation of the APA, when broadly freezing IRA/IIJA appropriated funds in contravention of the underlying statutory funding commands.

In sum, the Agency Defendants have failed to offer rational reasons for finding that the policy objectives stated in the OMB Directive and Section 2 of *Unleashing*

EO justified the indefinite pause on nearly all federal funding. The breadth and immediacy of the funding freeze and the catastrophic consequences that flowed reflects the Agency Defendants' failure to: (1) meaningfully consider the "important aspect[s] of the problem[s]"—namely the plain implications of withholding trillions of dollars of federal financial assistance; and (2) reflect if the freeze fell within the bounds of their statutory authority. Accordingly, the States have shown a likelihood of success on their APA claims (Counts I and II). The Court "need go no further."[14] It turns now to whether the States satisfy the other requirements for injunctive relief.[15]

### C.    Irreparable Harm

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). There are "relevant guideposts" to guide that discretion—"the plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19

---

[14] The Honorable Bruce M. Selya's body of over 1800 written opinions, *passim*.

[15] Under the constitutional avoidance doctrine, "federal courts are not to reach constitutional issues where alternative grounds for resolution are available." *Vaquería Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) (quoting *Am. Civil Liberties Union v. U.S. Conference of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013)). Thus, because the Court finds the challenged agency actions violate the APA, the Court will not decide the States' constitutional claims (Counts IV-VIII), although the Court has noted in its introduction to this decision that the constitutional balance of powers issues that arise from the Executive's actions in this case are serious.

(1st Cir. 1996) (citations omitted).  The Court found at the TRO stage that the States would suffer irreparable harm if the Defendants' blanket freeze of appropriated and obligated funds, which currently has no end date, were not enjoined.  After a full briefing and hearing on the merits where the Defendants presented no answer, no evidence, and no counter to the States' extensive evidence of still frozen funds and the harm resulting, the Court finds that the unrefuted evidence shows irreparable and continuing harm.

In their Complaint, preliminary injunction motion, and during the argument thereon, the States laid out scores of examples of obligated funding and the harm that withholding such funding has caused.  It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended.  And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

Defendants concede that there is no date written into the EOs or the OMB Directive or instructions when the freeze will end but argues that the funding recipients can be assured that it will end eventually, presumably when the agencies have reviewed all of the funding and made decisions about whether any or all or some align with how the President wants that money spent.  The States are not reassured by this vague promise, and neither is the Court.  This is particularly true where the

States had no notice of a potential freeze so they could plan, States appear to have little to no information about how any funding review is being conducted and by whom, and even though the frozen funds were obligated and owed, States had no chance to justify and protect the funding that they were granted by statute, regulation, or grant contract. *See, e.g.*, ECF Nos. 68-28 (receiving no response from EPA officials to inquiry about grants missing from ASAP); 68-33 (same). As the Court observed, these arbitrary and capricious actions violate the APA, with consequences that harm not only to our orderly system of government but also inflict direct pecuniary harm to the States and their residents.

The States have presented unrebutted evidence of the harm they are suffering and will continue to suffer due to this categorical funding freeze. The Court will not recount each instance but will summarize the "highlights" and note that while the States are the plaintiffs in this Court, it is their citizens, often our most vulnerable citizens, who are enduring much of the harm resulting from these arbitrary and capricious acts. The Court makes the following factual findings based on the record evidence.

Head Start and other childcare programs have been impacted. As of February 5, 2025, many Head Start providers were still having difficulties accessing federal funds and are considering layoffs, reductions in service, and even closures. *See* ECF Nos. 68-76; 68-41. Some States would have to pay more in provider subsidies if federally-funded Head Start childcare does not resume. ECF No. 68-111.

Other federally-funded childcare, child welfare services, and early childhood services are impacted. *See* ECF Nos. 68-76; 68-36; 68-86; 68-116; 68-55; 68-68; 69-39; 68-43.

A freeze in federal funding for education "would catastrophically disrupt student instruction[,]" including for low-income students and children with disabilities. ECF No. 68-89 ¶ 8; *see also* ECF Nos. 68-75; 68-43; 68-116. A freeze impacts state universities who receive federal funding who may be forced to stop vital research projects. "Even a temporary pause in funding could require the University to shutter or reduce programs, including mission-critical research activities, instruction, and public service activities and to furlough and/or lay off employees." ECF Nos. 68-112 ¶ 7; 68-121 ¶ 7 ("Research projects that require daily activities and meticulous record-keeping may be ruined, setting back the research enterprise and wasting the federal investment.").

This funding freeze affects critical healthcare provided through federally-funded Medicaid programs, the Children's Health Insurance Program ("CHIP"), and other health care programs. ECF Nos. 68-31, 68-32; 68-74; 68-105; 68-24. Loss of Medicaid funding would "significantly impede the delivery of basic health care services to . . . low-income, elderly, and pregnant individuals, as well as individuals with disabilities." ECF No. 68-32 ¶ 13.

The funding freeze also impacts law enforcement and public safety agencies who also rely on federal funding. Federal grant programs support state and local law enforcement agencies, community violence, and crisis interruption programs, and programs addressing sexual violence, among many other crucial services. ECF

Nos. 68-102, 68-18.  In an evident and acute harm, with floods and fires wreaking havoc across the country, federal funding for emergency management and preparedness would be impacted.  ECF Nos. 68-111; 68-39.  To be sure "[i]f a major disaster were to occur while federal emergency management funds . . . are frozen. . . [p]ending preparedness training and mitigation work may come to a stop and the incapacitation of federally-funded emergency management programs and services that would result from a federal funding freeze could very well lead to increased loss of life and injury …, slowed emergency response times, greater risks to first responders, greater property damage, and delays to community recovery and rebuilding." ECF No. 68-99 ¶ 13.

The freeze affects job training, workforce development, and unemployment programs and the ripple effect of cutting off this funding is felt throughout the States. ECF Nos. 68-94; 68-54; 68-70; 68-104; 68-39; 68-88; *see* ECF No. 68-29 ¶ 27 (harms to veterans seeking to acquire job skills and employment, and others seeking career and employment training services, reduced level of service in processing and approving unemployment insurance claims and paying out unemployment insurance benefits);  ECF No. 68-30 ¶ 13 (harms to workers seeking to participate in job apprenticeship programs).

The freeze also affects federal funds for critical transportation infrastructure, such as the $60 million in promised reimbursement for the costs of removal and salvage of debris from the Francis Scott Key Bridge for which Maryland is awaiting. ECF No. 68-66 ¶¶ 5-7 .  Other States have likewise entered into contracts for projects

to be paid for with obligated funds. ECF Nos. 68-77; 68-31; 68-66; 68-80; 68-39. Without these funds, States may have to suspend, delay, or cancel projects. ECF No. 68-77.

IIJA and IRA funding programs are subject to the freeze and threaten the loss of essential services to protect the health, safety, and welfare of the States' residents. *See, e.g.*, ECF No. 68-28 (California Air Resource Board unable to access granted federal funding aimed at monitoring air toxins); ECF No. 68-42 (frozen funds include those awarded to South Coast Air Quality Management District for programs reducing air pollution from freight corridors and warehousing hubs); ECF No. 68-113 (funding freeze threatens to pause important contamination remediation efforts; contracted-for brownfield cleanup work being "held up" by funding freeze); ECF No. 68-106 (frozen funds designated for monitoring of air pollution); ECF No. 68-92 (New York State Department of Environmental Conservation denied funding reimbursement for plugging of orphaned oil and gas wells due to alleged inconsistency with OMB's *Unleashing* Guidance).

Congress enacted these statutes and appropriated these funds for legitimate reasons, and the Defendants' categorical freeze, untethered to any statute, regulation, or grant term, frustrates those reasons, and causes significant and irreparable harms to the States. *See, e.g.*, ECF No. 68-118 (pause in funding streams would have "massive impact," require resource shifts, and interfere with mission); ECF No. 68-59 (without grant funding, "small public water systems … will continue to rely on drinking water polluted by PFAs and/or other emerging contaminants,"

cleanup of oil and hazardous materials contamination in post-industrial communities would likely be abandoned, and state efforts to monitor and mitigate air pollution would be hampered); ECF No. 68-83 ("North Carolina will lose the benefits of over $117 million in conservation projects" if the freeze is not lifted, leaving its residents "more vulnerable to flooding and wildfires."); ECF No. 68-40 (state would have to regain trust of contractors and homeowners after reimbursement delays); ECF No. 68-122 (funding freeze causes uncertainty, harming Colorado's ability to provide services to Coloradans relying on federal funds for installation of energy-saving appliances; continued delay will cause homeowners to forfeit improvements to homes that would cut energy bills); ECF No. 68-95 (freezing of IIJA Grid Resilience Innovations Partnerships funding in New York will delay electric grid resilience improvements, "potentially increasing the risk of damage to the grid in a severe weather event and causing additional harm to small municipal electric utilities."); ECF No. 68-59 (pause in Long Island Sound Program Grant would impede remediation of nitrogen and other pollution); ECF No. 68-79 (frozen $25 million grant funds for replacing lead service lines to residential homes "put[s] the safety of Minnesotans' drinking water at risk"); ECF No. 68-31 (health care, emergency relief, highway safety, and billions of dollars in water infrastructure, transportation, and broadband infrastructure projects); ECF No. 68-30 (federal funding pause could render California government entities unable to deliver numerous services to increase workplace health and safety); ECF No. 68-35 (interruption in funding threatens California Water Board's ability to come into compliance with federal safe

drinking water standards, including ongoing work to remove lead from water service lines).

Even though some funding has begun to flow again after the TRO entered, the States have presented evidence of harm resulting from the chaos and uncertainty that the Defendants' arbitrary decision to categorically freeze billions of dollars in federal funding. *See, e.g.*, ECF Nos. 68-40; 68-44 (Connecticut's Department of Energy and Environmental Protection "unable to recruit and hire future staff" to support Solar for All Program due to "budgetary uncertainty"); 68-107 (uncertainty has led Brown University's research community to suspend orders of large research equipment, which over time will negatively impact the ability of researchers to conduct their studies); 68-85 (uncertainty surrounding funding forcing New Jersey Board of Public Utilities to decide between delaying Solar for All Program or risking no reimbursement); 68-27 (uncertainty over grants has disrupted California agency's "ability to budget, plan… and carry out its mission"); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) ("While funds have resumed flowing to some recipients, that does not erase the imminence or irreparability of what another pause would entail.").

Even with the Court's TRO in place, state agencies continue to experience interruptions to access and inconsistent ability to draw down funds from grants funded by IIJA and IRA appropriations. Some funding has been restored in federal funding portals, but others appear to have been removed. *See*, *e.g.*, ECF Nos. 68-28; 68-35; 68-33; 68-59. And nothing in the Defendants' briefing or oral presentation

reassures the States that federal agencies, under the Executive's directives, will fulfill their funding obligations in the future. *See e.g.*, ECF Nos. 68-20 (Arizona has incurred obligations over $16 million in reliance on Home Electrification and Appliance Rebate award, of which over $15 million has yet to be reimbursed); 68-49 (University of Hawaii has been paying five employees out of pocket, without reimbursement to which they are entitled); 68-106 (elimination of $3 million Climate Pollution Reduction Grants ("CPRG") would make statutory compliance more costly); 68-61 (if not reimbursed through CPRG, Massachusetts may be forced to cancel vendor contract); 68-42 (California's South Coast Air Quality Management District and its subgrantees face risks that EPA would refuse to reimburse incurred work and costs). This litany of struggles experienced in the last seven weeks unquestionably constitute irreparable harm to the States.

### D.    Balance of the Equities and Public Interest

The Court need not say much more on the final two factors than it did when it granted the TRO as the more developed evidentiary record continues to overwhelmingly show that the balance of equities weighs heavily in favor of granting the States' preliminary injunction motion and the public interest is supported by "preserv[ing] the status quo." *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009).

The Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to the States and that they have obligated. The Court's order does not prevent the Defendants from making funding decisions in

situations under the Executive's "actual authority in the applicable statutory, regulatory, or grant terms," ECF No. 111 at 7; rather it enjoins agency action that violates statutory appropriations and obligations. An agency is not harmed by an order prohibiting it from violating the law.

On the other hand, without injunctive relief to pause the categorical freeze, the funding that the States are due and owed creates an indefinite limbo. Without the injunction, Congressional control of spending will have been usurped by the Executive without constitutional or statutory authority. While some of the funding has begun to flow, and some only after the Court issued an order to enforce the TRO, the States continue to face substantial uncertainty about whether Defendants will meet their contractual obligations under several statutorily appropriated programs, including those under the IIJA and IRA. ECF Nos. 68-93; 68-105; 68-34; 68-101; 68-100; 68-114; 68-39; 68-80; 68-28; 68-40; 68-35; 68-61; 68-95; 68-23; 68-49; 68-60; 68-51; 68-48; 68-106; 68-108; 68-52; 68-83; 68-72; 68-59; 68-42; 68-85; 68-56.

In light of the unrebutted evidence that the States and their citizens are currently facing and will continue to face a significant disruption in health, education, and other public services that are integral to their daily lives due to this overly broad pause in federal funding, the Court finds that the public interest lies in maintaining the status quo and enjoining any categorical funding freeze.

## IV.    PRELIMINARY INJUNCTION

A preliminary injunction is appropriate, and the Court ORDERS as follows:

1.   The Agency Defendants[16] are enjoined from reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 (the "OMB Directive") with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.

2.   The Agency Defendants are enjoined from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress. This includes, but is by no means not limited to, Section 7(a) of Executive Order 14154, Unleashing American Energy.

3.   The Defendants must provide written notice of this Order to all federal departments and agencies to which the OMB Directive was addressed.  The written notice shall instruct those departments and agencies that they may not take any steps to implement, give effect to, or reinstate under a different name or through other means the directives in the OMB Directive with respect to the disbursement or

---

[16] "Agency Defendants" refers to the federal executive Agencies and Departments that are parties in this suit.

transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.

4.      The foregoing written notice shall also instruct those agencies to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued before the rescission of the OMB Directive.

5.      In light of the States' second motion to enforce the TRO, ECF No. 160, Defendant Federal Emergency Management Agency ("FEMA") shall file a status report on or before March 14, 2025, informing the Court of the status of their compliance with this order.

Additionally, based on its findings that the States: (1) are entitled to a preliminary injunction; and (2) will be irreparably harmed without this Order, the Court DENIES the Defendants' request to stay this Order pending appeal to the First Circuit.  *See* ECF No. 113 at 65-66.  Further, the Court DENIES as moot the Plaintiffs' motion to enforce the TRO because this Order's issuance renders the TRO expired.  ECF No. 160.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

March 6, 2025