# NOTICE OF COURT ORDER

You are hereby advised that a temporary restraining order has been entered in the case of *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025). You are receiving this Notice pursuant to the Court's directive that notice of the order be provided "to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." A copy of the Court's Order is attached for reference.

This case challenges an alleged "pause" of certain Federal financial assistance, related to OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo"). Although that OMB Memo was rescinded on January 29, 2025, the plaintiffs in the above-referenced case allege that the funding pause directed by the OMB Memo is still in effect, including because of recently issued Executive Orders by the President.

In response, the Court has entered a temporary restraining order prohibiting certain actions by the Defendants in the case, which is effective immediately. All Defendants—including their employees, contractors, and grantees—must immediately comply with the Court's Order. For complete details and terms of the Court's Order, please refer to pages 11 and 12 of the enclosed Order.

To assist in your compliance, here is a summary of the key terms:

1. **Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders.**

2. **This prohibition applies to all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations).**

3. **Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders—and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such a pause.**

    a. On pages 11 and 12 of the Order, the Court prohibits agencies from pausing funding "except on the basis of the applicable authorizing statutes, regulations, and terms." Thus, agencies remain free to exercise their own discretion under their "authorizing statutes, regulations, and terms," including any exercise of discretion to pause certain funding. Additionally, agencies remain free to take action pursuant to the terms of the relevant award or obligation, such as in cases of grantee noncompliance.

    b. Any exercise of agency discretion, however, cannot be based on the OMB Memo or the President's Executive Orders, given that the Court has prohibited agencies from "implementing or giving effect to the OMB [Memo] under any other name

      or title[.]" (Order, pg.12).  Additionally, any decision to pause, stop, delay, or otherwise withhold federal financial assistance programs must comply with all notice and procedural requirements in the award, agreement, or other instrument setting forth the terms of the award or obligation.

4. **Out of an abundance of caution, all federal agencies (even those not named as defendants in the case) should comply with the above-referenced terms.**

As the Court's Order reflects, the above terms are temporary as litigation in the case is ongoing. At present, however, the Court's Order is in effect and must be complied with.

If you have any questions about the scope or effect of the Court's Order, please contact your agency's Office of General Counsel or your grant officer, as appropriate.  Thank you for your attention to this matter.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF )
CALIFORNIA; STATE OF ILLINOIS; )
STATE OF RHODE ISLAND; STATE OF )
NEW JERSEY; COMMONWEALTH OF )
MASSACHUSETTS; STATE OF )
ARIZONA; STATE OF COLORADO; )
STATE OF CONNECTICUT; STATE OF )
DELAWARE; THE DISTRICT OF )
COLUMBIA; STATE OF HAWAI'I; )
STATE OF MAINE; STATE OF )
MARYLAND; STATE OF MICHIGAN; )
STATE OF MINNESOTA; STATE OF )
NEVADA; STATE OF NORTH )
CAROLINA; STATE OF NEW MEXICO; )
STATE OF OREGON; STATE OF )
VERMONT; STATE OF WASHINGTON; )
and STATE OF WISCONSIN, )
)
    Plaintiffs, )
)
v. )   C.A. No. 25-cv-39-JJM-PAS
)
DONALD TRUMP, *in his Official* )
*Capacity as President of the United* )
*States*; U.S. OFFICE OF )
MANAGEMENT AND BUDGET; )
MATTHEW J. VAETH, *in his Official* )
*Capacity as Acting Director of the U.S.* )
*Office of Management and Budget*; U.S. )
DEPARTMENT OF THE TREASURY; )
SCOTT BESSENT, *in his Official* )
*Capacity as Secretary of the Treasury*; )
PATRICIA COLLINS, *in her Official* )
*Capacity as Treasurer of the U.S.*; U.S. )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; DOROTHY A. )
FINK, M.D., *in her Official Capacity As* )
*Acting Secretary Of Health And Human* )
*Services*; U.S. DEPARTMENT OF )
EDUCATION; DENISE CARTER, *in her* )
*Official Capacity as Acting Secretary of* )
*Education*; U.S. FEDERAL )
EMERGENCY MANAGEMENT )
AGENCY; CAMERON HAMILTON, *in* )

| | |
|---|---|
| *his Official Capacity as Acting Administrator of the U.S. Federal Emergency Management Agency*; U.S. DEPARTMENT OF TRANSPORTATION; JUDITH KALETA, *in her Official Capacity as Acting Secretary of Transportation*; U.S. DEPARTMENT OF LABOR; VINCE MICONE, *in his Official Capacity as Acting Secretary of Labor*; U.S. DEPARTMENT OF ENERGY; INGRID KOLB*, in her Official Capacity as Acting Secretary of the U.S. Department of Energy*; U.S. ENVIRONMENTAL PROTECTION AGENCY; JAMES PAYNE, *in his Official Capacity as Acting Administrator of the U.S. Environmental Protection Agency*; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, i*n her Capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF JUSTICE; JAMES R. McHENRY III, *in his Official Capacity as Acting Attorney General of the U.S. Department of Justice*; THE NATIONAL SCIENCE FOUNDATION; and DR. SETHURAMAN PANCHANATHAN, *in his Capacity as Director of the National Science Foundation*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## TEMPORARY RESTRAINING ORDER

The legal standard for a Temporary Restraining Order ("TRO") mirrors that of a preliminary injunction. The Plaintiff States must show that weighing these four factors favors granting a TRO:

> 1. likelihood of success on the merits;
> 2. potential for irreparable injury;
> 3. balance of the relevant equities; and

      4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

### Likelihood of Success on the Merits

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In **Count I**, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In **Count II**, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

In <u>Count III</u>, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In <u>Count IV</u>, the States allege a violation of the Spending Clause of the U.S. Constitution. U.S. Const. art. I, § 8, cl. law 1.

And in <u>Count V</u>, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover. Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take? The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not. The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims. The reasons are as follows:

4

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

> When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

6

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

> Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill. *See* 2 U.S.C. § 683; *see also Train v. City of New York,* 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary,* 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.,* 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

### Irreparable Harm

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

7

- will cause severe disruption in their ability to administer such vital services–even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause on funding that Congress has allocated will harm them and their citizens. These programs range from highway planning and construction, childcare, veteran nursing care funding, special education grants, and state health departments, who receive billions of dollars to run programs that maintain functional health systems. *See, e.g.*, ECF No. 3-1 at 56 (highway construction programs in Delaware), at 73 (childcare programs in Michigan), at 113 (veterans nursing care funding in Washington state), at 77 (special education programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts. The States assert that the pause applies to federal actions directing federal financial assistance to North Carolina to address the damage inflicted by Hurricane Helene and to any Federal Emergency Management Agency grant money not yet disbursed, including key support for California's ongoing response to the fires. ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law enforcement in high drug-trafficking areas, shows that payments to state-based HIDTA programs have been paused, putting the public's safety at risk. *Id.* ¶ 83.

8

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens. Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here. As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

### Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.
- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.
- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest. Moreover, the

9

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect." ECF No. 44.

## Mootness

The Defendants now claim that this matter is moot because it rescinded the OMB Directive. But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts. The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point. At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')." ECF No. 43. Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented." ECF No. 44. And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

10

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum." ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

## Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025. ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m. Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court. A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____

John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025

13