# United States Court of Appeals
## For the First Circuit

---

No. 25-1236

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE
OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE
OF HAWAI'I; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his
official capacity as Governor of the COMMONWEALTH OF KENTUCKY;
STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH
CAROLINA; STATE OF OREGON; STATE OF VERMONT; STATE OF
WASHINGTON; and STATE OF WISCONSIN,

Plaintiffs, Appellees,

v.

DONALD TRUMP, in his official capacity as President of the
United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL
VOUGHT, in his official capacity as Director of the U.S. Office
of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT
BESSENT, in his official capacity as Secretary of the Treasury;
PATRICIA COLLINS, in her official capacity as Treasurer of the
United States; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his official capacity as Secretary of
Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA
MCMAHON, in her official capacity as Secretary of Education;
U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official
capacity as Secretary of Transportation; U.S. DEPARTMENT OF
LABOR; LORI CHAVEZ-DEREMER, in her official capacity as
Secretary of Labor*; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER
WRIGHT, in his official capacity as Secretary of Energy; U.S.
ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official
capacity as Administrator of the U.S. Environmental Protection
Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in his
official capacity as Secretary of the Interior; U.S. DEPARTMENT

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Secretary of Labor Lori Chavez-DeRemer is automatically
substituted for former Acting Secretary of Labor Vince Micone as
Respondent.

OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General; THE NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in his official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; ERIC SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT; MARCO RUBIO, in his official capacities as Secretary of State and Acting Administrator of the U.S. Agency for International Development; U.S. DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, in his official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO in her official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in his official capacity as Acting Commissioner of U.S. Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in her official capacity as Administrator of U.S. Small Business Administration; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; and CAMERON HAMILTON, in his official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency,

Defendants, Appellants.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

———————

Before

Barron, Chief Judge,
Montecalvo and Rikelman, Circuit Judges.

———————

Yaakov M. Roth, Acting Assistant Attorney General, Sara Miron

Bloom, Acting United States Attorney, Eric D. McArthur, Deputy Assistant Attorney General, Daniel Tenny, Sean R. Janda, Brian J. Springer, Attorneys, Appellate Staff Civil Division, U.S. Department of Justice, on brief for appellants.

Russell Coleman, Attorney General, and Matthew F. Kuhn, Solicitor General, on brief for Commonwealth of Kentucky, amicus curiae.

Nathan J. Moelker and Olivia F. Summers, on brief for American Center for Law and Justice, amicus curiae.

Letitia James, Attorney General of New York, Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, Mark S. Grube, Senior Assistant Solicitor General, Rabia Muqaddam, Special Counsel for Federal Initiatives, Michael J. Myers, Senior Counsel, Molly Thomas-Jensen, Special Counsel, Colleen Faherty, Special Trial Counsel, Zoe Levine, Special Counsel for Immigrant Justice, Rob Bonta, Attorney General of California, Laura L. Faer, Christine Chuang, Supervising Deputy Attorneys General, Joshua Patashnik, Deputy Solicitor General, Nicholas Green, Carly Munson, Kenneth Sugarman, Marie Logan, Theodore McCombs, Deputy Attorneys General, Kwame Raoul, Attorney General of Illinois, Jane Elinor Notz, Solicitor General, Alex Hemmer, Deputy Solicitor General, Peter F. Neronha, Attorney General of Rhode Island, Kathryn M. Sabatini, Civil Division Chief, Special Assistant Attorney General, Sarah W. Rice, Deputy Chief, Public Protection Bureau, Assistant Attorney General, Leonard Giarrano IV, Special Assistant Attorney General, Matthew J. Platkin, Attorney General of New Jersey, Jeremy M. Feigenbaum, Solicitor General, Andrea Joy Campbell, Attorney General of Massachusetts, Katherine B. Dirks, Deputy Chief, Government Bureau, Turner Smith, Deputy Chief, Energy and Environment Bureau, David C. Kravitz, State Solicitor, Anna Lumelsky, Deputy State Solicitor, Kristen K. Mayes, Attorney General of Arizona, Joshua D. Bendor, Solicitor General, Philip J. Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, William Tong, Attorney General of Connecticut, Michael K. Skold, Solicitor General, Kathleen Jennings, Attorney General of Delaware, Vanessa L. Kassab, Deputy Attorney General, Brian L. Schwalb, Attorney General of the District of Columbia, Andrew Mendrala, Assistant Attorney General, Public Advocacy Division, Anne E. Lopez, Attorney General of Hawai'i, David D. Day, Special Assistant to the Attorney General, Kaliko'onālani D. Fernandes, Solicitor General, Andy Beshear, Governor of Kentucky, S. Travis Mayo, General Counsel, Taylor Payne, Chief Deputy General Counsel, Laura C. Tipton, Deputy General Counsel, Aaron M. Frey, Attorney General of Maine, Jason Anton, Assistant Attorney General, Anthony G. Brown, Attorney General of Maryland, Adam D. Kirschner, Senior Assistant Attorney General, Dana Nessel, Attorney General of

Michigan, <u>Linus Banghart-Linn</u>, Chief Legal Counsel, <u>Neil Giovanatti</u>, Assistant Attorney General, <u>Keith Ellison</u>, Attorney General of Minnesota, <u>Liz Kramer</u>, Solicitor General, <u>Aaron D. Ford</u>, Attorney General of Nevada, <u>Heidi Parry Stern</u>, Solicitor General, <u>Raúl Torrez</u>, Attorney General of New Mexico, <u>Anjana Samant</u>, Deputy Counsel, <u>Jeff Jackson</u>, Attorney General of North Carolina, <u>Daniel P. Mosteller</u>, Associate Deputy Attorney General, <u>Dan Rayfield</u>, Attorney General of Oregon, <u>Christina Beatty-Walters</u>, Senior Assistant Attorney General, <u>Charity R. Clark</u>, Attorney General of Vermont, <u>Jonathan T. Rose</u>, Solicitor General, <u>Nicholas W. Brown</u>, Attorney General of Washington, <u>Andrew Hughes</u>, Assistant Attorney General, <u>Leah Brown</u>, Assistant Attorney General, <u>Joshua L. Kaul</u>, Attorney General of Wisconsin, and <u>Aaron J. Bibb</u>, Assistant Attorney General, on brief for appellees.

  <u>Elizabeth B. Wydra</u>, <u>Brianne J. Gorod</u>, <u>Miriam Becker-Cohen</u>, and <u>Nina G. Henry</u>, on brief for <u>Constitutional Accountability Center</u>, amicus curiae.

---

March 26, 2025

---

BARRON, **Chief Judge**.  The heads of various federal agencies as well as the agencies themselves -- collectively, the Agency Defendants[1] -- move for a stay pending appeal.  They seek to block temporarily a preliminary injunction that the United States District Court for the District of Rhode Island issued against them on March 6, 2025.[2]  The Plaintiffs are twenty-two states, including Rhode Island, as well as the District of Columbia and the Governor of Kentucky ("Plaintiff-States").

The suit challenges the Office of Management and Budget ("OMB") Memorandum M-25-13 ("OMB Directive"), issued on January 27, 2025.  It also challenges alleged funding freezes under the OMB Directive and Executive Orders that the President issued in his first week in office to which the OMB Directive referred.

The Plaintiff-States filed their initial complaint on January 28, 2025.  The next day, OMB rescinded the OMB Directive.  The operative complaint alleges that the funding freezes took place prior to that rescission and continued thereafter.

---

[1] The Appellants before us -- and thus those bringing the stay motion at issue -- also include the President, who is named as a defendant in this suit, but to whom the preliminary injunction does not apply.  We thus use the term Agency Defendants except where we mean to refer to all Defendants, the President included, in which case we use the term Defendants.

[2] In our discretion, we have accepted the proposed amicus briefs.  We have considered them only insofar as they concern legal issues and positions raised by the parties.  See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020).

The preliminary injunction, among other things, bars the Agency Defendants from:

> reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in [the OMB Directive] with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations.[3]

It further prohibits the Agency Defendants from:

> pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding

---

[3] An "obligation" is defined in federal appropriations law as "a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received." 2 U.S. Gov't Accountability Off., Principles of Federal Appropriations Law, at 7-3 (3d ed. 2006) (citations omitted) [hereinafter GAO Redbook]. Obligated federal funds may be payable immediately or at a later point, and the "fact that an unmatured liability may be subject to a right of cancellation does not negate the obligation." Id. at 7-4 to -5. Funds available under awarded grants, executed contracts, or other executed financial obligations are obligated federal funds. See 31 U.S.C. § 1501(a)(1), (5) (including, within the scope of the obligation-reporting requirement, funds payable under grant awards, whether fixed by law or under an agreement, and other binding agreements); see also GAO Redbook at 7-40 to -42 (explaining that a grant becomes obligated once it is awarded and its terms are communicated to the grantee).

appropriated by Congress. This includes, but
is by no means [] limited to, Section 7(a) of
Executive Order 14154, Unleashing American
Energy.[4]

In addition, the preliminary injunction requires the

Agency Defendants to provide written notice "to all federal

departments and agencies to which the OMB Directive was addressed"

that shall:

> [(1)] instruct [them] that they may not take
> any steps to implement, give effect to, or
> reinstate under a different name or through
> other means the directives in the OMB
> Directive with respect to the disbursement or
> transmission of appropriated federal funds to
> the States under awarded grants, executed
> contracts, or other executed financial
> obligations[;] [and] [(2)] instruct [them] to
> release and transmit any disbursements to the
> States on awarded grants, executed contracts,
> or other executed financial obligations that
> were paused on the grounds of the OMB
> Directive and Executive Orders included by
> reference therein or issued before the
> rescission of the OMB Directive.

The stay motion is denied.

---

[4] The preliminary injunction states that it is "by no means
not limited to, Section 7(a) of Executive Order 14154, Unleashing
American Energy." We understand the inclusion of "not" to be a
typographical error, and neither party contends otherwise.

**I.**

This case already has an unusually involved procedural history.  A detailed review of that history is necessary to set the stage for the substantive analysis that follows.

**A.**

On January 27, 2025, Matthew Vaeth, Acting Director of OMB, issued the OMB Directive, which is titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," to all heads of executive departments and agencies.  The OMB Directive stated that it "requires Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," (footnotes omitted), and it noted both the definition of "financial assistance" set forth in 2 C.F.R. § 200.1 and that "[n]othing in this memo should be construed to impact Medicare or Social Security benefits."

The OMB Directive identified a series of Executive Orders the President issued in his first week in office.  It then provided that, "[t]o implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."  It further provided that:

> [i]n the interim, to the extent permissible
> under applicable law, Federal agencies <u>must
> temporarily pause</u> all activities related to
> obligation or disbursement of all Federal
> financial assistance, and other relevant
> agency activities that may be implicated by
> the executive orders, including, but not
> limited to, financial assistance for foreign
> aid, nongovernmental organizations, DEI, woke
> gender ideology, and the green new deal.

The OMB Directive explained that "[t]his temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities."  It further stated that "[t]he temporary pause will become effective" the next day -- January 28 -- at 5:00 PM and that "[e]ven before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect" and "report this information to OMB along with an analysis of the requirement."

The OMB Directive went on to provide that: "[n]o later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause."  It added that:

> [e]ach agency must pause: (i) issuance of new
> awards; (ii) disbursement of Federal funds
> under all open awards; and (iii) other
> relevant agency actions that may be implicated
> by the executive orders, to the extent
> permissible by law, until OMB has reviewed and

> provided guidance to your agency with respect
> to the information submitted.

It provided as well that "OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis."

The OMB Directive explicitly identified the following Executive Orders: Protecting the American People Against Invasion, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Reevaluating and Realigning United States Foreign Aid, Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025); Putting America First in International Environmental Agreements, Exec. Order No. 14,162, 90 Fed. Reg. 8455 (Jan. 20, 2025); Unleashing American Energy, Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025) [hereinafter Unleashing EO]; Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025); and Enforcing the Hyde Amendment, Exec. Order No. 14,182, 90 Fed. Reg. 8751 (Jan. 24, 2025).  The "Unleashing American Energy" Executive Order ("Unleashing EO") is particularly relevant for reasons that will become clear below.

The Unleashing EO provides in Section 2 a list of "polic[ies]" that it states are "the policy of the United States." It further provides in Section 7(a):

> All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order. . . . No funds identified in this subsection . . . shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

Unleashing EO, 90 Fed. Reg. 8357.

OMB issued guidance concerning the Unleashing EO on January 21, 2025 ("Unleashing Guidance"). The guidance states that "[t]his pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." It further provides that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." Id.

On January 28, OMB also issued a separate document about the scope of the OMB Directive ("OMB Q&A"). The document stated in bold type: "Any program not implicated by the President's Executive Orders is not subject to the pause," and then listed the

seven Executive Orders discussed above.  It explained that "the pause does not apply across-the-board.  It is expressly limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest."  Additionally, however, OMB circulated a document to federal agencies entitled "Instructions for Federal Financial Assistance Program Analysis in Support of M-25-13" ("OMB Spreadsheet").  It "required" "[a]ll Federal agencies that provide Federal financial assistance . . . to complete the attached spreadsheet and submit it to OMB" by February 7, 2025.  The spreadsheet listed over 2,500 federal funding lines, including for programs that the OMB Q&A explicitly stated were excluded from the pause, the Head Start program being one example.

**B.**

The Plaintiff-States filed their suit in the District of Rhode Island on January 28, 2025, naming as defendants the President, the OMB and its head, and eleven separate agencies and their heads.  The complaint alleged that the OMB Directive, which the complaint asserted was "set to take effect at [5:00 PM] today but [was] actually being implemented even earlier," was unconstitutional on various grounds.  The complaint also alleged that the OMB Directive violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., because it constituted "final

agency action" that was "contrary to law" and "arbitrary and capricious." As to the action being contrary to law, the complaint alleged, among other things, that the "Defendants have no authority to impose a government-wide pause on federal awards without regard to the individual authorizing statutes, regulations, and terms that govern each funding stream." As to the action being "arbitrary and capricious," the complaint alleged, also among other things, that "the OMB Directive provides no reasoned basis for pausing the disbursement and obligation of trillions of federal dollars and fails to consider the consequences of that action."

To support their claims, the Plaintiff-States alleged that they receive significant amounts of federal funds to provide essential services to their residents. They further alleged that the Agency Defendants' implementation of the OMB Directive, by resulting in the withholding of these funds and providing them with less than twenty-four hours' notice of doing so, would interfere with their ability to provide such services. They alleged, too, that the tight time frame for the OMB Directive's implementation and the last-minute notice of it "compounded the[ir] injuries" because they could neither "prepare for or mitigate" the fiscal impact nor effectively plan for any future or downstream fiscal effects.

The Plaintiff-States sought a declaratory judgment and an injunction, as well as to vacate the OMB Directive under § 706

of the APA.  See 5 U.S.C. § 706.  They also moved for a temporary restraining order ("TRO") to "restrain the Defendants from enforcing the OMB Directive's directive to 'pause all activities related to obligation or disbursement of all Federal financial assistance.'"

The same day the Plaintiff-States filed their complaint, the U.S. District Court for the District of Columbia issued an administrative stay of the OMB Directive pending that court's hearing on a separate request for a temporary restraining order. See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 1:25-cv-00239, 2025 WL 314433, at *1 (D.D.C. Jan. 28, 2025). In that case, non-profit organizations brought their own suit challenging the OMB Directive.[5]  See id.

On January 29, 2025, prior to the scheduled 3:00 PM hearing on the Plaintiff-States' TRO motion in the District of Rhode Island, the Defendants filed a notice with the District Court.  The notice stated that OMB had rescinded the OMB Directive and that the Plaintiff-States' claims and request for injunctive relief were moot.  The Defendants nevertheless indicated that they would appear at the 3:00 PM hearing.  The District Court proceeded

---

[5] The district court subsequently issued a preliminary injunction in that case.  See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 1:25-cv-00239, 2025 WL 597959, at *19-20 (D.D.C. Feb. 25, 2025).

with the hearing and, on January 31, 2025, granted a TRO as to the Agency Defendants.

With respect to whether the OMB Directive's rescission mooted the case, the District Court determined that the rescission of the OMB Directive was in name only, relying in part on a statement that the White House Press Secretary made on the social media platform "X" on the day of the rescission. She stated: "This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's EO[]s on federal funding remain in full force and effect, and will be rigorously implemented." The District Court also relied on evidence submitted by the Plaintiff-States regarding emails that the Environmental Protection Agency ("EPA") sent federal grant recipients one day "after the so-called rescission." One email stated that the agency is working "diligently to implement the [OMB Directive], Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities." The email also explained that "[t]he agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time" and that "EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum."

"Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies," the District Court determined that the case was not moot. It explained that "the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts." It also explained that, based on the record, "the policies in the OMB Directive" were "still in full force and effect," such that the "substantive effect of the directive carries on."

### c.

One week later, on February 7, 2025, the Plaintiff-States filed a motion to enforce the TRO as to certain federal funds that they contended were due to them but remained paused. That same day, the Plaintiff-States also filed a motion for a preliminary injunction against the Agency Defendants.

That motion described the Plaintiff-States' requested relief in terms that approximate the preliminary injunction that the District Court ultimately entered. To support the motion, the Plaintiff-States introduced a large body of evidence to show that the Agency Defendants had implemented, within a matter of hours or days, categorical freezes of obligated federal funds, without regard to whether the relevant statute or grant award permitted the funding freezes.

This evidence included 127 exhibits, which included more than 100 declarations, as well as grant documents and communications with the relevant agencies. The communications concerned the named agencies' decisions to freeze funds in implementation of the OMB Directive and the President's Executive Orders. The declarations, most of which were submitted by public officials from the Plaintiff-States, described these states' inability to access their federal funding in the immediate aftermath of the issuance of the OMB Directive and the President's Executive Orders. The declarations also discussed the harm that the funding freezes and attendant uncertainty were causing and would continue to cause the Plaintiff-States.

Based on this evidence, the Plaintiff-States argued that they had standing and that the case was not moot. As to the elements of the established test for securing preliminary injunctive relief, see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008), the Plaintiff-States contended that they had established a likelihood of success on the merits based on their claims that the Defendants' actions violated the APA and the Constitution, and exceeded the Executive's statutory authority.[6] They further contended that the remaining elements of the Winter

---

[6] As discussed below, the Plaintiff-States subsequently amended their complaint to expressly include this statutory ultra vires claim as a separate count.

test favored their request for preliminary injunctive relief due
to the impact of the funding freezes on their ability to reliably
provide essential services to their residents, and the absence of
harm that the relief they sought would cause the Defendants.

The APA claims are the only ones that we address in
resolving the stay motion before us here.  The Plaintiff-States
contended that they were likely to succeed in showing that the
challenged agency actions -- which their preliminary injunction
motion collectively termed the "Federal Funding
Freeze"[7] -- violated the APA because those actions were contrary
to law and ultra vires, 5 U.S.C. § 706(2)(B)-(C), as well as
arbitrary and capricious, id. § 706(2)(A).

With respect to the agency actions being "contrary to
law," the Plaintiff-States pointed to the Impoundment Control Act
("ICA"), 2 U.S.C. § 681 et seq.  They also pointed to various
statutory schemes governing the disbursement of federal funds
under specific programs, including the Inflation Reduction Act
("IRA"), Pub. L. No. 117-169, 136 Stat. 1818 (2022), and the
Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No.
117-58, 135 Stat. 429 (2021).  They contended that these measures

---

[7] The term "Federal Funding Freeze" appears to be drawn from
the White House Press Secretary's statement that the rescission of
the OMB Directive "is NOT a rescission of the federal funding
freeze."

establish mandatory funding directives based on allocation
formulas and enumerated factors.

    With respect to the challenged agency actions being
"arbitrary and capricious," the Plaintiff-States asserted that the
"only explanation provided" for the "Funding Freeze" was its
"inten[t] to help the Executive achieve his policy priorities."
They also argued that the Agency Defendants had neither identified
statutory authority for the actions making up the "Funding Freeze"
nor "attempted to explain their utter disregard for the [resulting]
harms."  And they argued that "freezing all funds under the IRA
and the IIJA" was "substantively unreasonable" because doing so
conflicted with applicable statutory directives.

    The Plaintiff-States separately made arguments about the
existence of "final agency action."  See 5 U.S.C. § 704.  They
contended that the OMB Directive itself constituted final agency
action.  They also contended that the Agency Defendants' "actions
to implement the Funding Freeze by unilaterally suspending
funding" separately constituted final agency actions because
"[e]ach of th[o]se actions . . . marked 'the consummation' of
agency decision making and determined 'rights or
obligations . . . from which legal consequences' flowed." (Second

alteration in original) (quoting <u>Bennett</u> v. <u>Spear</u>, 520 U.S. 154, 177-78 (1997)).[8]

### D.

Two days later, on February 9, 2025, the Defendants responded to the Plaintiff-States' pending motion to enforce the TRO. The District Court granted the motion the next day.

On February 10, 2025, the Defendants appealed the TRO (as well as the District Court's order granting its extension) and the District Court's order granting the motion to enforce the TRO. They also asked us to stay these orders pending appeal and to administratively stay them pending resolution of their motion for a stay pending appeal.[9] In seeking the administrative stay, the Defendants argued, among other things, that the order granting the motion to enforce effectively required them to go to the District Court for "preclearance" before exercising their lawful authority to withhold funds "across [a] multitude of [federal] programs."

On February 11, 2025, we denied the motion for an administrative stay without prejudice. We also noted the

---

[8] The Plaintiff-States also argued that "the funding freezes implemented by Agency Defendants are likewise reviewable as, at minimum, the 'denial' of 'relief' -- another form of agency action reviewable under the APA, 5 U.S.C. § 551(13), defined to include the denial of 'the whole or part of agency . . . grant of money,' <u>id.</u> § 555(11)."

[9] The Defendants simultaneously sought a stay pending appeal of those same orders from the District Court.

Plaintiff-States' position that the District Court's order granting the motion to enforce the TRO "does not stop [D]efendants from limiting access to funds without any preclearance from the [D]istrict [C]ourt on the basis of the applicable authorizing statutes, regulations, and terms" (internal quotation marks omitted), as well as our confidence that the District Court would provide any clarification necessary as to that issue.  The next day, the District Court issued an order clarifying that: (1) the TRO "permits the Defendants to limit access to federal funds on the basis of the applicable authorizing statutes, regulations, and terms" (internal quotation marks omitted); (2) the order granting Plaintiff-States' motion to enforce "does not bar[] both the President and much of the Federal Government from exercising their own lawful authorities to withhold funding without the prior approval of the [D]istrict [C]ourt" (internal quotation marks omitted); and (3) neither order "require[s] the Defendants to seek 'preclearance' from the Court before acting to terminate funding when that decision is based on <u>actual authority in the applicable statutory, regulatory, or grant terms</u>."[10]

---

[10] In a separate order issued the same day, the District Court denied the Defendants' motion to stay the TRO, the order extending the TRO, and the order granting the Plaintiff-States' motion to enforce the TRO pending appeal to this Court.  On February 13, 2025, the Defendants voluntarily dismissed their appeal.

**E.**

On February 12, 2025, the Defendants filed their opposition to the Plaintiff-States' motion for a preliminary injunction. Their primary argument was that the "Plaintiffs' Complaint challenges one action -- the OMB [Directive] -- which has now been rescinded," and they asserted that the rescission of the OMB Directive rendered the case moot. They did not attempt to dispute the Plaintiff-States' evidence or introduce any contrary evidence of their own.

As to the merits of the APA claims, the Defendants contended, among other things, that the Plaintiff-States had not identified any final agency action other than the rescinded OMB Directive. They also argued that the Plaintiff-States' attempt to invoke the ICA was unavailing, because that statute did not apply here and, in any event, was not enforceable under the APA. They further argued that the Plaintiff-States' claims "rest on a . . . flawed premise" because the OMB Directive and Executive Orders "expressly instruct[] agencies to implement a pause only to the extent permissible by law," and thus do not direct a "categorical[]" pause "without consideration of whether [such] a pause is consistent with the underlying legal framework governing that funding."

At the end of their response in opposition, the Defendants included the statement: "[p]articularly in light of the

extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized." They did not thereafter file a motion for such a stay with the District Court or at any point in the proceedings below mention or address the established test for securing one set forth in Nken v. Holder, 556 U.S. 418 (2009). See Fed. R. App. P. 8(a)(1)(A) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").

## F.

On February 13, 2025, the day after the Defendants filed their opposition, the Plaintiff-States filed an Amended Complaint. It alleged that the challenged "Federal Funding Freeze" violated the APA, the Constitution, and exceeded the Executive's statutory authority. It also alleged that the "Federal Funding Freeze [was] effectuated through EOs, the Unleashing [Guidance], the OMB Directive, and other agency actions implementing [those orders and directives] as detailed [in the Amended Complaint]."

The Amended Complaint named eleven additional agencies and their heads as defendants. It also included additional factual

allegations regarding "major funding disruptions" that followed the issuance of certain Executive Orders that "direct[ed] federal agencies to review funding recipients in connection with widespread policy changes" but predated the issuance of the OMB Directive.  Among other things, the Amended Complaint sought as relief an "injunction preventing the Agency Defendants from maintaining or reinstating the Federal Funding Freeze, including through implementation of EOs, such as the Unleashing EO, and agency actions implementing them."

The Plaintiff-States filed a reply to the Defendants' opposition to their motion for preliminary injunction the next day.  The Defendants did not request an opportunity to respond to the Amended Complaint, either in a sur-reply or by filing a new opposition.  That was so even though their opposition to the motion for the preliminary injunction focused on the Plaintiff-States' initial complaint and asserted that it targeted only the OMB Directive itself, which had been rescinded.

On February 21, 2025, the District Court held a hearing on the preliminary injunction motion.  Both parties addressed the Amended Complaint, but the Defendants did not seek to make any additional filing or suggest it would be improper for the District Court to focus on the Amended Complaint in resolving the preliminary injunction motion.

G.

On March 6, 2025, the District Court issued its ruling on the motion for the preliminary injunction. It granted the motion.

The District Court reasoned that the OMB Directive's rescission did not moot the case. The District Court concluded that, under the "voluntary cessation" doctrine, Lowe v. Gagné-Holmes, 126 F.4th 747, 756 (1st Cir. 2025), the rescission "was a clear effort to moot legal challenges to the federal funding freeze" and that it was "unreasonable to conclude that the Defendants will not reinstate [the OMB Directive] absent an injunction." The District Court also reasoned that the Plaintiff-States' claims were not moot because the challenged funding freezes continued and because of the additional claims in the Amended Complaint relating to "the Unleashing Guidance, the related Unleashing [Executive Order], and the general implementation of funding freezes based on the President's EO[s]."[11] Winding up its jurisdictional analysis, the District

_____

[11] Although the District Court referred to a singular "EO," it later explained -- correctly -- that the Amended Complaint seeks to "enjoin the Agency Defendants from implementing 'the Federal Funding Freeze' 'effectuated through EOs, the Unleashing [Guidance], the OMB Directive, and other agency actions.'" (Emphasis added) (alteration in original). It further explained that the Plaintiff-States' challenge is to "a pause on federal funding that was implemented under not only the OMB Directive, but also . . . the EOs incorporated therein and other agency actions

Court determined that the Plaintiff-States had met their burden with respect to their Article III standing to sue.

The District Court then addressed the Plaintiff-States' contention that they were likely to succeed on the merits as to their APA claims.  The District Court identified the OMB Directive and the Agency Defendants' "swift actions to execute the categorical funding freeze" under the OMB Directive, Unleashing EO, and Unleashing Guidance as final agency actions.  It explained that those actions "marked the 'consummation of each agency's decisionmaking process'" (quoting <u>Drs. for Am.</u> v. <u>Off. of Pers. Mgmt.</u>, No. CV 25-322, 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025)), and that the "abrupt, categorical, and indefinite pause of obligated federal funds is the direct, appreciable legal consequence" of those actions.

The District Court also determined that the Plaintiff-States had demonstrated that they were likely to succeed in showing that the challenged final agency actions were contrary to law and arbitrary and capricious.  The District Court concluded that there was sufficient evidence to establish that the Agency Defendants' funding freezes were categorical in nature,[12] and not

---

such as the OMB's issuance of the Unleashing Guidance." (Emphasis added).

[12] The District Court treated the Unleashing EO and Guidance interchangeably at points.

individualized assessments of their authority to pause individual funding streams.  In doing so, the District Court referred to the evidence that the Plaintiff-States had submitted along with their motion for a preliminary injunction discussing their inability to access funds in the immediate aftermath of the issuance of the OMB Directive and the Unleashing EO, as well as communications received from Agency Defendants regarding the freezing of such funds.  Based on the unrebutted evidence before it, the District Court observed that any "suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions" was "disingenuous."

As to the Plaintiff-States' "contrary to law" showing, the District Court determined that the challenged actions of the Agency Defendants involved categorical funding determinations that were likely barred by both the ICA and specific directives in individual statutes mandating that funds be spent in specific ways. As to the Plaintiff-States' "arbitrary and capricious" showing, the District Court determined that the challenged agency actions, given their breadth and immediacy, were likely not supported by rational reasons and that the Defendants had failed to consider meaningfully important aspects of the problem that they sought to address in taking those actions.

Finally, the District Court concluded both that the Plaintiff-States had presented "unrebutted evidence" of

irreparable harm and that the balance of equities, as well as the public interest, weighed heavily in favor of the Court granting preliminary relief.    Accordingly, the District Court issued a preliminary injunction against the Agency Defendants, which contained the elements described at the outset of this opinion.[13] The District Court also denied "Defendants' request to stay this Order pending appeal to the First Circuit."

### H.

The Defendants appealed the District Court's order granting the preliminary injunction on March 10, 2025.    They then moved for a stay pending appeal, which is the sole motion that we address here.

### II.

Because only the stay motion is before us, we address only the narrow question of whether the Defendants have met their burden to show that they are entitled to judicial intervention that is "not a matter of right," as a stay pending appeal is "an 'intrusion into the ordinary processes of administration and

---

[13] In response to a second motion to enforce the TRO filed by the Plaintiff-States on February 28, 2025, in connection with certain Federal Emergency Management Agency ("FEMA") funds, the District Court in the preliminary injunction also directed Defendant FEMA to "file a status report on or before March 14, 2025, informing the Court of the status of [its] compliance with th[e] [preliminary injunction]."    The District Court further denied as moot Plaintiff-States' motion to enforce the TRO because the issuance of the preliminary injunction "renders the TRO expired."

judicial review.'" Nken, 556 U.S. at 427 (first quoting Virginian R. Co. v. United States, 272 U.S. 658, 672 (1926); and then quoting Va. Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)). To obtain the stay, the Defendants bear the burden of satisfying a most familiar test. They must: (1) make a "strong showing that [they are] likely to succeed on the merits" in their appeal; (2) show that they "will be irreparably injured absent a stay"; (3) show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) show that the stay would serve "the public interest." Id. at 434 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).

In evaluating whether this burden has been met, we are mindful that the "first two factors" -- likelihood of success and irreparable injury -- "are the most critical." Id. We also emphasize that addressing interlocutory motions on a "tight timeline" is "not always optimal for orderly judicial decisionmaking," Labrador v. Poe, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring in the grant of stay), and that, especially in those circumstances, we "rely on the parties to frame the issues for decision," Greenlaw v. United States, 554 U.S. 237, 243 (2008). We note, too, that a district court's decision to grant a preliminary injunction is reviewed for abuse of discretion. Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020).

Finally, we make two clarifying observations about the analysis that follows. First, we proceed on the understanding that the Defendants seek to stay the injunction in its entirety, notwithstanding their expressed choice to develop no argument in their stay motion that they are likely to succeed in showing that the District Court's analysis of the OMB Directive was mistaken. Second, after considering the parties' positions, we understand the scope of the District Court's preliminary injunction to operate on freezes that were implemented: (1) pursuant to the Unleashing EO and Guidance, the OMB Directive itself, or the other EOs referenced in the OMB Directive; and (2) regardless of whether the freezes began before the OMB Directive's issuance on January 27, 2025.

**A.**

We begin with the Defendants' arguments regarding the first Nken factor -- which requires that they make a "strong showing" that they are likely to succeed on the merits in their appeal. Nken, 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776). We conclude that the Defendants have not made that showing.

**1.**

A central line of the Defendants' challenge is that the preliminary injunction appears "[i]n the guise of litigation under the" APA but is in fact "unmoored from any specific agency

action."[14]  They assert that the Plaintiff-States have "leveraged their challenge to" the rescinded OMB Directive into "broad-based relief against innumerable funding decisions at twenty-three federal agencies" and that "such broad-based APA challenges" are impermissible.  As support, the Defendants cite to the Supreme Court's decision in <u>Norton</u> v. <u>Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004), and contend that "[i]t is black-letter law that cases under the APA must challenge discrete agency actions and may not level a 'broad programmatic attack,'" (quoting <u>Norton</u>, 542 U.S. at 64).  The thrust of this line of argument thus appears to be that the preliminary injunction rests on a broad programmatic attack rather than on challenges to discrete final agency actions.

    <u>Norton</u> does make clear that the APA permits review of only discrete final agency actions and "precludes the kind of broad programmatic attack [the Supreme Court] rejected in <u>Lujan</u> v.

_____

    [14] As to the merits of the APA claims themselves, the Defendants only argue that the District Court erred in relying on the Impoundment Control Act ("ICA"), 2 U.S.C. §§ 681-692.  The District Court, however, separately determined that the Agency Defendants' actions violated the APA by virtue of having been arbitrary and capricious -- a determination that does not in any part rely on the ICA.  The Defendants fail to challenge that determination in their stay motion, thus leaving that independent ground for issuing the preliminary injunction unchallenged before us.  <u>See</u> <u>Wadsworth</u> v. <u>Nguyen</u>, 129 F.4th 38, 52 (1st Cir. 2025) (concluding that an appellate claim must fail where only one part of a two-part test was challenged on appeal); <u>cf.</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Accordingly, we need not address the Defendants' contentions regarding the ICA.

National Wildlife Federation, 497 U.S. 871 (1990)."  542 U.S. at 64.  Norton explains, however, that the "broad programmatic attack" at issue in Lujan was an attempt to seek "wholesale" "programmatic improvements" "by court decree" by "couch[ing]" "[the Bureau of Land Management's] land withdrawal review program" as an "unlawful agency 'action'" that should be "'set aside' under § 706(2)" of the APA.  Id. (emphasis omitted) (quoting Lujan, 497 U.S. at 891, 879).  Because "the program was not [itself] an 'agency action,'" Norton explained, the Court in Lujan rejected the plaintiff's challenge to it.  Id. (quoting 5 U.S.C. § 706(2)).

Indeed, Lujan concluded that the "program" challenged there was "simply the name by which [the government] ha[d] occasionally referred to the continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required" under federal law.  497 U.S. at 890 (emphasis added). Lujan observed that, in styling the challenge as against the "program," the plaintiff there was in fact challenging a variety of programmatic deficiencies that it claimed were unlawful for varied reasons.  Id. at 891.  But the APA, Lujan explained, does not "permit[] a generic challenge to all aspects of" a program, "as though that itself constituted a final agency action."  Id. at 890 n.2.

The District Court determined here, by contrast, that the Plaintiff-States' APA claims do challenge discrete final agency actions. To be sure, those claims, like the motion for the preliminary injunction, describe those actions, collectively, as the "Federal Funding Freeze." The District Court at points uses that nomenclature as well. But the claims themselves, like the motion, assert that the discrete final agency actions are the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds.

It is also clear that the District Court determined that the discrete challenged agency actions were "final." The District Court did so based on its assessment that these actions satisfied the test set forth in Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (holding that agency actions will be deemed final where the challenged action (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow'" (first quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); and then quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970))).

The stay motion does not address those findings by the District Court or, for that matter, Lujan itself. That is so even though Lujan recognized that "[i]f . . . in fact some specific

order or regulation[] appl[ied] some particular measure across the board to all individual classification terminations and withdrawal revocations, and . . . that order or regulation is final . . . it can of course be challenged under the APA."  497 U.S. at 890 n.2; see also Hisp. Affs. Project v. Acosta, 901 F.3d 378, 388 (D.C. Cir. 2018) (applying that statement in Lujan and holding that the plaintiffs' APA challenge to the Department of Homeland Security's administration of the H-2A visa program was not impermissibly programmatic in nature because the plaintiffs were challenging an across-the-board agency practice in violation of a statutory command).  The stay motion instead makes the conclusory, implicit assertion, based on a passage in Norton concerning a holding in Lujan, that no such discrete final agency actions were identified to support the preliminary injunction.  And the Defendants do not develop any independent argument as to why the challenged agency actions, if discrete, do not satisfy the Bennett test for finality. We therefore do not see how the Defendants have met their burden of making a "strong showing," Nken, 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776), that the injunction was based on a "broad programmatic attack" of the type Norton had in mind, 542 U.S. at 64.

Elsewhere in their stay motion, and more clearly in their reply, the Defendants offer a variation on the same theme.  They assert that the Plaintiff-States challenge "unidentified past

funding decisions across thousands of programs and an untold number of hypothetical future funding decisions." They contend that such a challenge "runs squarely into the APA's limitation on leveling a 'broad programmatic attack' rather than seeking review of discrete agency actions."

To the extent that this argument is distinct from the one discussed above, we are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once. Nor do the movants identify any such precedent.

The Defendants do assert in their reply that the Plaintiff-States' opposition to their motion for a stay does not identify "specific agency actions other than the rescinded OMB [Directive]" and that "most of the agencies that are now subject to the injunction are not mentioned in [Plaintiff-States'] opposition at all." The Defendants are the movants, however. Their contention about deficiencies in an opposition to their motion thus cannot itself constitute a strong showing that they are likely to succeed in challenging the preliminary injunction itself. See Nken, 556 U.S. at 433-34 (burden to show that "the circumstances justify" a stay is on the party seeking such relief).

In any event, the Plaintiff-States' opposition does identify specific agency actions. The Plaintiff-States make clear that they challenge the Agency Defendants' "actions -- following

the executive orders and [OMB] Directive -- to implement categorical funding freezes without regard and contrary to legal authority." The Defendants' contention about the deficiencies in the Plaintiff-States' opposition to the stay motion also must be considered in light of the fact that, as we have already explained, the stay motion does not address the District Court's findings regarding the final agency actions that undergird the preliminary injunctive relief.

Indeed, the record before the District Court included numerous notices and emails authored by Agency Defendants that support the finding that their funding freezes were categorical in nature, rather than being based on "individualized assessments of their statutory authorities and relevant grant terms." The Plaintiff-States also attached numerous declarations describing pauses, freezes, and sudden terminations of obligated funds that suggested that these actions were taken pursuant to such categorical decisions. And we note as well the familiar proposition that, in reviewing the record, a court is "not required to exhibit a naiveté from which ordinary citizens are free." Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)); see also, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 1:25-cv-00239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting the contention that "countless federal

agencies . . . suddenly began exercising their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

For these reasons, we see no basis for concluding that the Defendants have made a strong showing as to their likelihood of success on appeal insofar as they aim to demonstrate that there is no final agency action to support the entirety of the injunction.  This ground for satisfying the first <u>Nken</u> factor therefore fails.

**2.**

The Defendants separately argue that because the District Court "fail[ed] to limit its injunction to the few statutory schemes that it concluded were nondiscretionary," it "enjoin[ed] broad swaths of lawful conduct."[15]  The Defendants emphasize that "many federal funding programs and instruments provide the Executive with discretion to suspend or terminate funding that the Executive determines is inconsistent with the national interest."  They also observe that the District Court found that the OMB Directive was implemented in a way that violated

---

[15] In the stay motion, the Defendants argue that the District Court's TRO "essentially acknowledged as much."  We note, however, that the TRO merely questioned whether there "might be" "some aspects" of implementations of the OMB Directive that could be "legal and appropriate constitutionally for the Executive to take."

statutes that require the disbursement of funding in only "a handful of cases." Because the District Court did not limit its injunction to the implementation of the OMB Directive to funding streams under those statutes, they contend, the District Court enjoined lawful behavior. As the Defendants at one point put it, the District Court erred in "enter[ing] a sweeping injunction that was not tethered to the supposed flaws in the OMB [Directive], but instead broadly and unjustifiably prohibited actions based on other Executive Orders or directives."

The District Court found, however, that the "suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the Unleashing Guidance . . . [was] disingenuous." (Emphasis omitted). And the District Court explicitly rejected the Defendants' "claim that the [OMB] Directive and the [Executive Orders] required the agencies to pause funding and impose restriction[s] on obligated funds consistent with the law." The District Court did so, moreover, because it found that the "undisputed evidence before [it] [wa]s that adding the 'consistent with the law' caveat was nothing more than window dressing on an unconstitutional directive by the Executive."

The District Court further found that "[t]he OMB Directive essentially ordered agencies to effectuate the blanket pause and then decide later which funding streams they actually

had lawful authority to withhold," given "the mere twenty-four hours" that the OMB Directive gave agencies to "discern" which funding streams must be paused. It found, too, that the Unleashing EO and Unleashing Guidance, in particular, "instruct[ed] that agencies immediately pause disbursements of funds under the IRA or IIJA and d[id] not even attempt to allow for agency discretion."

The stay motion does not meaningfully engage with this aspect of the District Court's analysis. That is so even though the analysis rests on the District Court's view of the record considered as a whole and resulted in its conclusion that the final agency actions at issue -- the funding freezes by each of the Agency Defendants -- violated the APA because they were either contrary to law or arbitrary and capricious or both.

Moreover, the record contains evidence that the Plaintiff-States submitted to show that categorical freezes were undertaken pursuant to directives in Executive Orders referenced in the OMB Directive other than the Unleashing EO. Yet, despite bearing a "strong showing" burden under Nken's first factor, the Defendants make no clear or developed argument to us that the District Court abused its discretion in relying on that record to apply the preliminary injunction to such freezes. We thus conclude that, as to this aspect of their motion for the stay, the Defendants also have failed to make a strong showing of their

likelihood of success.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Accordingly, the Defendants' repeated assertions that the OMB Directive and Executive Orders solely directed agencies to pause funding "to the extent permitted by law" fail to show that the movants have a strong likelihood of success on appeal as to the merits of the Plaintiff-States' APA claims.  So, this ground for satisfying the first Nken factor also is without merit.[16]

**3.**

The Defendants' final argument as to the first Nken factor is that "the preliminary injunction . . . operates to interfere with the President's authority to supervise federal agencies by providing policy direction in the exercise of each agency's authorities" because it "appears to demand that, in exercising their discretionary authority, agencies should not take policy direction from the President."  The contention is that this

---

[16] The Defendants also argue that the preliminary injunction is "unclear" as to whether it permits agencies to make funding decisions based on Executive priorities when they have legal authority to do so.  But the preliminary injunction clearly refers to a "categorical pause or freeze of funding," which, by its terms, could not apply to a pause or freeze based on an individualized determination under an agency's actual authority to pause such funds.  Consistent with this understanding, the District Court explained in its opinion that the preliminary injunction "does not prevent the [Government] from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms." (Internal quotation marks omitted).

feature of the preliminary injunction "cannot be squared with Article II" of the Constitution, which grants the President "authority to exercise 'general administrative control of those executing the laws, throughout the Executive Branch of government, of which he is the head.'" (Quoting Bldg. & Constr. Trades Dep't., AFL-CIO v. Allbaugh, 295 F.3d 28, 32 (D.C. Cir. 2002)).

To be clear, the argument is not that the President has Article II authority to order a funding pause in contravention of a statutory directive precluding such a pause. We understand the argument to be only that the District Court has interfered with the Agency Defendants' ability to lawfully carry out the President's directives.[17] Indeed, the stay motion argues that the preliminary injunction interferes with the Executive's authority because the "President's Executive Orders are plainly lawful." And the stay motion rests this argument on the view that the "Executive Orders . . . simply direct federal agencies to pause or terminate federal funding programs that may not accord with the President's priorities where such action is consistent with applicable law."

---

[17] The Defendants also note, without further argument, that "the President's directions to subordinates" are not "themselves reviewable under the APA" because the "President is not an 'agency' within the meaning of th[at] statute." (Quoting Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992)). But the District Court did not review the President's actions for consistency with the APA. Rather, it reviewed -- and ultimately enjoined -- the Agency Defendants' actions under the Executive Orders.

As we have already noted, however, the stay motion does not meaningfully address the District Court's findings as to the Agency Defendants having adopted categorical funding freezes. Therefore, the Defendants have not demonstrated that they have a likelihood of success in demonstrating that the injunction reaches lawful conduct. It follows that they have not made a strong showing that they are likely to succeed in defending what on their own account is a necessary premise of their Article II-based argument. We therefore conclude that the Defendants cannot rely on their Article II-based argument to satisfy their burden with respect to the first Nken factor.

### B.

The remaining three Nken factors require the movants to show that they "will be irreparably injured absent a stay," that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding," and that the stay would be in "the public interest." 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776). The movants have not done so.

### 1.

The Defendants advance two arguments as to the second Nken factor, which concerns their irreparable harm absent a stay. As we noted at the outset of our substantive analysis, this factor, along with the likelihood of success factor, is one of the two "most critical" factors under the Nken test. Id.

The first contention is that the preliminary injunction "interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives." It further asserts that the preliminary injunction "undermines the President's unquestioned Article II authority to direct subordinate agencies how to exercise their own authorities, giving rise to an intolerable intrusion on the prerogatives of the Executive Branch."

The District Court's order granting the preliminary injunction does not bar all freezes in funding, however. It instead enjoins the discrete final agency actions to adopt the broad, categorical freezes challenged here. This argument thus suffers from the same flaw as the Article II-based argument as to the first Nken factor, as it rests on the same undefended premise about the lawfulness of the enjoined agency actions as that argument does.

Relatedly, the Defendants assert that the injunction includes "multiple vague instructions" and so "invites the [D]istrict [C]ourt to engage in precisely the sort of 'preclearance' regime that led the government to appeal the [District Court's TRO], and which the [D]istrict [C]ourt purported to disclaim." This type of separation-of-powers harm, the argument goes, "itself reflects irreparable injury."

For starters, no "preclearance" language appears in the preliminary injunction itself, a fact that the Defendants appear to acknowledge in their reply. The Defendants also acknowledge that the District Court has previously clarified that it had imposed no such requirement in enjoining the Agency Defendants, via its TRO or order granting the Plaintiff-States' motion to enforce, from taking specific funding actions.

We also cannot agree that the Defendants have made the case that the preliminary injunction is vague as to the OMB Directive or funding freezes pursuant to it. The Defendants take issue with the District Court's injunction against their "'implementing' or 'giving effect to' the OMB [Directive] 'under a different name,'" contending that this lacks the detail necessary for compliance. But Rule 65 requires injunctions to "describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added). It does not "require that an order list the components of a term whose boundaries are understood by common parlance." United States v. Pro. Air Traffic Controllers Org. (PATCO), PATCO Local 202, 678 F.2d 1, 3 (1st Cir. 1982). And the Defendants do not identify any particular action with respect to which they are unclear about the reach of this portion of the injunction.

Insofar as the Defendants contend that the injunction is vague because it enjoins them from "pausing funds as 'described' or 'implied by' the President's Executive Orders," we also do not agree.  The order granting the preliminary injunction plainly enjoins the Agency Defendants from maintaining categorical "funding freezes" based on the identified Executive Orders.  And, as we have explained, "funding freezes" are "categorical" freezes on obligated funds.  Given that the Defendants are in the best position to know the basis for any freezing decisions, we do not see -- nor do the Defendants explain -- why this instruction does not provide them with "reasonable detail" of the "acts restrained." Fed. R. Civ. P. 65(d)(1)(C); see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2955 (3d ed. 2024) ("[T]he issuance of a nonspecific injunction or restraining order may be justified. . . . when the information needed to make the order specific in form is known only to the party to be enjoined." (footnotes omitted)); see also M.G. ex rel. Garcia v. Armijo, 117 F.4th 1230, 1249-51 (10th Cir. 2024) (explaining how an injunction's form may depend on "information[al] asymmetr[ies]").

That leaves, as to the second Nken factor, only the argument that the Defendants face irreparable pecuniary harm absent a stay.  Here, they argue that "[i]f the government's position is later vindicated at the conclusion of the litigation,

there would be no guarantee that funds that the government obligated or disbursed pursuant to the [preliminary injunction] would be retrievable from the States or their subgrantees after the fact."

The Defendants devote only the single sentence mentioned above to making this argument in their stay motion, and they identify no authority and offer no reasoning suggesting that this would be the case here. Because the Defendants bear the burden of demonstrating that they "will be irreparably injured absent a stay," Nken, 556 U.S. at 434 (emphasis added) (quoting Hilton, 481 U.S. at 776), we cannot see how their speculative and conclusory statement suffices.

We note that the Defendants rely entirely on these same contentions to satisfy the fourth Nken factor -- whether a stay would be in the public interest.  Id.  So, they have failed to satisfy their burden as to that factor as well.  That leaves to address the Defendants' arguments about the third Nken factor -- whether the "issuance of the stay will substantially injure the other parties interested in the proceeding."  Id.

**2.**

As to the third Nken factor, the Defendants first contend that the Plaintiff-States "have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled."  This contention,

however, just repackages the arguments as to the first Nken factor that we rejected above.  And while the Defendants cite Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), for the proposition that "reviewing courts owe agency actions a 'presumption of regularity,'" Overton Park did not hold that a court addressing a motion for a stay pending appeal of a lower court's injunction should presume the lawfulness of the enjoined conduct in assessing the harm to "the other parties interested in the proceeding" under the third Nken factor.  Nken, 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776).  Indeed, Overton Park affirmatively stated that the "presumption [of regularity] is not to shield [agency] action from a thorough, probing, in-depth review."  401 U.S. at 415.

The Defendants separately urge us to disregard the harms that the Plaintiff-States' residents would suffer, because "States cannot invoke harms on behalf of their citizens in actions against the federal government."  The Defendants cite Haaland v. Brackeen, 599 U.S. 255, 294-95 (2023), as support for that proposition.

Brackeen did not hold, however, that residents of a state may not be counted among "the other parties interested in this proceeding" under the third Nken factor when that state obtained the injunction that is sought to be stayed.  It held only that "[a] State does not have [Article III] standing as parens patriae to bring an action against the Federal Government."  Id. at 295

(quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 610 n.16 (1982)).

Even if we were to set aside the harms to the Plaintiff-States' residents, the District Court still found a number of harms that the Plaintiff-States themselves would irreparably suffer. These harms included the obligation of new debt; the inability to pay existing debt; impediments to planning, hiring, and operations; and disruptions to research projects by state universities. And the Defendants do not contend that these harms are not "substantial" or "irreparable," except by asserting that "[the Plaintiff-States] will receive any funds that agencies are legally obligated to disburse." But without supporting explanations for how and when the Plaintiff-States could recoup those funds, the movants have not met their burden to show that the third Nken factor weighs in favor of a stay.

### III.

For the foregoing reasons, we **deny** the motion for a stay pending appeal of the District Court's preliminary injunction.